1          IN THE UNITED STATES BANKRUPTCY COURT
             NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3
   In the Matter of:          )   No. 19 B 10562
4                             )
   BCAUSE MINING LLC, a       )
5  Virginia limited liability )
   company,                   )   April 18, 2019
6                             )   9:35 A.M.
           Debtor.           )   Chicago, Illinois
7  ---------------------------)
   In the Matter of:          )
8                             )
   BCAUSE LLC, a Virginia     )   No. 19 B 10731
9  limited liability company, )
                              )
10         Debtor.           )

11
                TRANSCRIPT OF PROCEEDINGS
12        BEFORE THE HONORABLE JANET S. BAER

13
   APPEARANCES:
14
   MR. SCOTT R. CLAR
15 MR. JEFFREY C. DAN
   on behalf of the debtors;
16
   MR. DAVID A. AGAY
17 on behalf of Westco Distribution, Inc.;

18 MS. HEATHER L. MALY
   on behalf of Virginia Electric and Power Company,
19 d/b/a Dominion Energy Virginia;

20 MR. HA NGUYEN
   on behalf of the U.S. Trustee;
21
   MR. DENNIS T. LEWANDOWSKI, (telephonically)
22 on behalf of Hoffman Properties.

23 Court Reporter:  Carol Raber, CSR
                    219 S. Dearborn St.
24                  #661
                    Chicago, Illinois 60604
25

1                      I N D E X

2

3    WITNESS:                          PAGE:

4    GEORGE SLADOJE

5      Direct Examination by Mr. Clar     33

6      Cross-Examination by Mr. Agay      51

7      Redirect Examination by Mr. Clar   87

8      Cross-Examination by Mr. Agay      93

9

10

11   EXHIBITS:                         MARKED:

12   Exhibit A                            41

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  BCause Mining LLC, six

2    matters.

3          THE COURT:  Let's have appearances

4    starting over here at the left.

5          MS. MALY:  Good morning, your Honor.

6    Heather Maly, on behalf of Virginia Electric, doing

7    business as Dominion Energy Virginia.

8          THE COURT:  Good morning.

9          MR. NGUYEN:  Good morning, your Honor.

10   Ha Nguyen for the United States Trustee.

11         MR. AGAY:  Good morning, your Honor.

12   David Agay, on behalf of Westco.

13         MR. CLAR:  Good morning, your Honor.

14   Scott Clar and Jeffrey Dan on behalf of BCause LLC

15   and BCause Mining LLC.

16         THE COURT:  Good morning.

17         And it looks like we have on the phone

18   Dennis Lewandowski, on behalf of creditor Hoffman

19   Properties.

20         Okay, you may proceed.

21         MR. CLAR:  Thank you, your Honor.

22         Taking it from the top, we have a motion

23   to use cash collateral in the LLC cases.  And I

24   should probably at the outset explain BCause Mining

25   LLC (sic) is a holding company.  It owns 100

1    percent of the membership interest in Mining --

2              THE COURT:  Hold on.  You said BCause

3    Mining is a holding company.  Did you --

4              MR. CLAR:  No, I'm sorry.  BCause LLC.

5              THE COURT:  BCause LLC is a holding

6    company.

7              MR. CLAR:  I'm sorry.

8              And BCause, it owns one hundred percent

9    of the entities including Mining.  The only

10   operating entity -- it's all set forth in the

11   motion, but the only operating entity is Mining.

12             So we have a motion to use cash

13   collateral on the Mining case, also one on the LLC

14   case -- I will try to keep these straight for

15   you -- also, a motion to provide adequate assurance

16   with respect to payment of the utilities to

17   Dominion.  And Mr. Dan can address that first.

18             THE COURT:  Well, I think we should

19   probably start with cash collateral.  If you don't

20   have any money to spend --

21             MR. CLAR:  Well, except that...

22             MR. DAN:  What we were going to do, your

23   Honor, is actually set over the utility motion on

24   the Mining case to next week.  We've already been

25   in discussions with Dominion trying to work out any

1   issues with them.  And as far as the Mining case

2   there is only one other utility and that one -- and

3   we've heard nothing from them.

4           But what we'd like to do is just set

5   that motion over to next week so that we have an

6   opportunity to hopefully work things out as to what

7   kind of adequate assurance would satisfy them, as

8   well as us, and which I will hold off on setting

9   exactly when next week until we get through the

10  other stuff.  But we're not planning on going

11  forward with the utility motion today.

12          THE COURT:  All right.

13          MR. CLAR:  Okay.  With respect to cash

14  collateral, Mr. Agay has a motion that we can deal

15  with, his emergency motion.

16          You should tell the Court about that.

17          MR. AGAY:  Sure.

18          Your Honor, we filed an emergency motion

19  to file one of our exhibits under seal.  I received

20  an e-mail from the U.S. Trustee this morning just

21  asking for authority.  We believe debtors' counsel

22  consents to our filing of that under seal.

23          MR. CLAR:  We do.  We do.

24          MR. AGAY:  It's basic financial

25  information that was provided to us pursuant to an

1   NDA.  And it's their balance sheets, P&Ls, and

2   things like that, so we think that is confidential

3   business information that's appropriate under 107.

4            MR. CLAR:  I agree.  I don't know that

5   it's relevant, but I agree.

6            MR. NGUYEN:  Judge, the issue is under

7   107.  107 sets forth the -- the rule be public.

8   That's strong public policy.  Again, sealing

9   documents, we're very careful when we seal

10  documents.

11           And these fall within the exception to

12  the general rule.  Just because they are basic

13  financial documents that the parties agreed to seal

14  doesn't meet the exception.  It needs to be, you

15  know, trade secrets, scandalous materials.  And,

16  you know, this goes all the way up to the public's

17  first amendment right to access papers that are

18  filed with the court.  They have the right to know

19  how justice is being dispensed in this court.  And

20  by invoking 107 just because the parties say that

21  we should invoke 107 is not proper under the Code

22  and it's contrary to public policy of keeping court

23  documents available for the public.

24           I don't see any reason why basic

25  financial information, if -- we're in a bankruptcy

1    case.

2              THE COURT:  Well, issue number one would

3    have been the confidentiality agreement.  But I can

4    kind of overrule that.

5              So issue number two, what is this stuff

6    and why is it sensitive?

7              MR. CLAR:  Before Mr. Agay answers, I

8    think we can probably short circuit this because

9    they can -- Westco can use it as an exhibit, it

10   doesn't have to be filed.  I'm not admitting that

11   it should be admitted, but they can use it as an

12   exhibit without it being filed.  So if that takes

13   care of Mr. Nguyen's concerns --

14             THE COURT:  No, not at all.  His concern

15   is he thinks the public has a right to see it.

16             I don't know what we're talking about.

17   I haven't looked at the exhibits.

18             MR. AGAY:  I can tender them to your

19   Honor.  I have them with me.

20             THE COURT:  Well, when and if it's

21   relevant.

22             For now what's relevant is what it is

23   and why it is sensitive.

24             MR. AGAY:  Sure.  Your Honor, they are

25   balance sheets, they're P&L statements and other

1   financial information of the debtors.  They were

2   provided to us, as I indicated, pursuant to a

3   confidentiality agreement.  I think under 107(a)

4   they would qualify as both a trade secret and as

5   commercial information that the debtor is

6   interested in continuing to protect.  We believe

7   this information supports certain of the arguments

8   we made in our cash collateral motion.  This

9   information may or may not be relevant today.  For

10  purposes of a contested cash collateral hearing, it

11  depends on how -- to the extent they present

12  evidence how that evidence unfolds.

13          So we think both -- we need to be able

14  to use it today, if necessary.  And it should be

15  filed at a minimum so that we can preserve the

16  record in these cases.

17          THE COURT:  Nobody has still told me why

18  P&Ls and balance sheets are trade secrets or --

19  actually, probably not trade secrets, it is

20  probably more of a competitive issue.  So, again,

21  this is a weird business.  But tell me why.

22          MR. CLAR:  I'm not arguing it, your

23  Honor.

24          THE COURT:  Well, you are, Mr. Clar,

25  because you're saying they shouldn't be able to

1   file it on the public record.  So tell me why it

2   shouldn't be filed on the public record.

3            MR. CLAR:  I'd like to tell you that

4   except the way this came about is a little weird,

5   okay.  Counsel for Westco sent me an e-mail saying

6   we intend to introduce these documents at trial, we

7   intend to file them under seal.

8            I'm not sure that -- honestly, I'm not

9   sure that I care if they're filed under seal or not

10  because at some point --

11           THE COURT:  Well, we need to know.

12           MR. CLAR:  Well, I'm getting there.  I'm

13  sorry.

14           -- because at some point these documents

15  are certainly discoverable.  And unless -- unless

16  my client tells me some competitive reason why they

17  should be...

18           I don't want to get hung up on this.  I

19  would like to get moving on cash collateral.

20           THE COURT:  I agree with you.

21           Mr. Agay did the prudent thing.  He

22  doesn't want to disclose --

23           MR. CLAR:  He did.

24           THE COURT:  -- and put on public record

25  documents that are subject to a confidentiality

1    agreement.

2            If I have the debtor saying we don't

3    care, we'll waive the confidentiality, you can file

4    on the record, that solves the problem.

5            MR. CLAR:  We're saying that.

6            THE COURT:  Okay.

7            MR. AGAY:  Good.

8            MR. DAN:  Your Honor, obviously we just

9    want to make sure that anything is redacted from

10   those regarding tax ID numbers or any bank account.

11   I haven't seen the documents.  As long as they are

12   redacted in accordance with the Bankruptcy Rules.

13   They must be redacted --

14           MR. AGAY:  We'll redact tax ID

15   information and bank account information.

16           MR. DAN:  That's fine, your Honor.

17           THE COURT:  Okay, that's fine.  Then I

18   think I can deny this motion as unnecessary.

19           MR. CLAR:  Thank you, your Honor.

20           THE COURT:  Okay, next.

21           MR. CLAR:  Moving on to cash collateral,

22   a little bit about the structure.

23           Mr. Agay and his client are objecting to

24   use of cash collateral.  They filed an objection

25   yesterday.  I read it, and I can address it briefly

1    before we have a contested hearing.

2              But before we do that, a little bit

3    about the business, okay.  BCause LLC is a holding

4    company that owns a hundred percent of Mining.

5    Mining is an entity that provides hosting services.

6              And please don't ask me what bitcoin

7    mining is, but...

8              THE COURT:  Just so you know, my

9    knowledge of bitcoin and the like is a couple of,

10   you know, bitcoin For Dummy articles.  I'm not any

11   further.

12             MR. CLAR:  I am, but I'm not sure that

13   it's helped.

14             So Mining provides hosting services

15   pursuant to hosting agreements with, for lack of a

16   better word, miners.  There are literally -- and so

17   it provides a building in Virginia Beach, Virginia,

18   and it provides utility services -- which, as you

19   can see, are huge -- for these very large servers,

20   thousands of them, so that miners can mine bitcoin.

21             THE COURT:  And does the company own the

22   servers?

23             MR. CLAR:  No.  The servers are owned by

24   the miners themselves.

25             THE COURT:  Oh.  Well, what does this

1    company own?

2            MR. CLAR:  This company owns the

3    racking, which is huge.

4            Well, when you say "this company," we

5    know what the LLC owns.

6            THE COURT:  LLC is a holding company --

7            MR. CLAR:  Right.

8            THE COURT:  -- it has no hard assets.

9            What does Mining own?

10           MR. CLAR:  Mining owns, for lack of a

11   better word again, machinery and equipment.  It

12   owns the racking, it owns the --

13           MR. SLADOJE:  Transformers.

14           MR. CLAR:  -- the transformers.  There

15   is machinery and equipment in association with

16   providing the mining -- the hosting services.

17           THE COURT:  Okay.

18           MR. CLAR:  And which, by the way, has a

19   book value along with leasehold improvements, which

20   we don't need to get into today, of over $15

21   million.

22           But Mining has agreements with

23   individual entity miners.  And under those

24   agreements revenue comes in every month of

25   approximately $1,021,000.

1            Mining has its own expenses.  Its

2    expenses would be the rent, the utilities.  The

3    payroll is all handled by the holding company.  And

4    the holding company employees provide services for

5    both the holding company and Mining.

6            I think that's all I wanted to say about

7    the operation of the business.

8            The case was filed because Westco froze

9    the BCause LLC bank account, out of which there is

10    a waterfall of expenses paid, and garnished it.

11    And in order to not lose $911,000, the case was

12    filed.

13            In addition, because -- I'm sorry, I'm

14    trying not to use that word.

15            THE COURT:  You might want to use the

16    debtor, lower case because.

17            MR. CLAR:  Lower case because, right.

18    Because the utility payment to Dominion Energy was

19    returned because of the freezing of the account,

20    that caused a problem, an urgent problem as well,

21    because they were going to turn off the power last

22    Friday.  So that's why the case was filed.

23            I have with me today, Ann Cresce, who is

24    general counsel and corporate secretary, and George

25    Sladoje, S-l-a-d-o-j-e, Cresce is C-r-e-s-c-e -- to

1    testify.  At this point, only Mr. Sladoje would be

2    testifying in support of the use of cash

3    collateral.

4              We submitted two motions.  We submitted

5    budgets.  I do have an updated budget that I will

6    circulate to all parties and the Court of course.

7              But a couple of things about the

8    objection first.  First of all, we believe -- and

9    this is not for today, but we believe that Westco

10   -- even though they claim to be a secured creditor

11   of Mining and LLC, we believe that their security

12   interest really only attaches to Mining and not

13   LLC.  And since LLC holds the account -- and I know

14   they make the argument that the only cash flowing

15   to the account is Mining services -- except that

16   the account is in the name of LLC.

17             So I am not certain that they have a

18   perfected security interest in the cash.  Whether

19   they have a perfected security interest in Mining's

20   assets, they may.  But as to a perfected security

21   interest with respect to LLC, if they're relying

22   upon a lien that was created within 90 days of the

23   filing, that may be subject to litigation later on.

24             To the specifics of their objections, it

25   seems to me that part of what Westco is arguing is

1    that because we haven't articulated a plan in the

2    first week of the case that we shouldn't be able to

3    use cash collateral and I don't think that is

4    right.

5           They also, on page 4, Westco claims that

6    the debtors acknowledge these interests, Westco's

7    interest, in our motions.  That's not true.  We do

8    not for the time being acknowledge their liens.

9    It's likely there is going to be a committee in

10   this case.  And if there is, they will have time to

11   challenge the liens as well.  But we do not

12   acknowledge their liens yet.  Mr. Agay and I can

13   speak about that later.

14          It's interesting, each case they cited

15   is a case that I was involved in.  But that's an

16   aside.

17          Mining has accounts receivable each

18   month of 1,021,000 which are 100 percent

19   collectible.  So those receivables are evergreen so

20   to speak.  They continually come into the BCause

21   LLC account from which the waterfall flows to pay

22   expenses.

23          Westco claims that we don't explain what

24   the post-petition liens are, and I think Mr. Agay

25   knows -- I'm sure he does -- they're post-petition

1    liens that attach to the extent of their

2    pre-petition liens.  So whatever they had

3    pre-petition, if it was cash, if it was

4    receivables, that extends to their -- for the time

5    being -- to their post-petition liens as well.

6         As far as generating new income or new

7    collateral, as I said, the receivables are

8    continuing to be collected.

9         The next argument that's made has to do

10   with why the debtors collectively can't live on the

11   1,021,000 that continually comes in.  With

12   $997,354 of expenditures, why we can't live off of

13   the continuing income?  The answer is simple.  For

14   one thing, use of cash collateral is use of all

15   cash collateral.  Whether the Court conditions it

16   or not -- and I think that the Court should not

17   because our expenses are ongoing, whereas the

18   revenue comes in later on in the month or the

19   beginning of the next month, so we need to use cash

20   collateral now.

21        THE COURT:  By the way, who owns the

22   contracts for the hosting services?

23        MR. CLAR:  Mining.

24        THE COURT:  Mining?

25        MR. CLAR:  Mining.

1          THE COURT:  Okay.

2          MR. CLAR:  And we need to pay the

3    expense -- we need to pay the employees we need of

4    Holding.  We need to pay utilities.  And as Mr. Dan

5    told the Court, we are working on a resolution with

6    Dominion.  We need to pay insurance.  We need to

7    pay rent in Virginia Beach and Chicago.

8          THE COURT:  Well, who do you owe the

9    rent to?  Don't you owe the rent to LLC?

10          MR. CLAR:  No.

11          THE COURT:  Oh, you don't own the

12    premises?

13          MR. CLAR:  No, we do not.  The premises

14    -- the Hoffman -- whoever is on the phone for

15    Hoffman Properties, I believe that's Chicago.

16          MR. SLADOJE:  No.

17          MR. CLAR:  No?  Okay, I'm wrong.  That's

18    Virginia Beach.

19          There is a Chicago landlord, and that I

20    think is in LLC's name, is it not?

21          MR. SLADOJE:  Yes.

22          MR. CLAR:  And so Mining itself has a

23    lease in Virginia Beach, the Hoffman property.  No,

24    we do not own the real estate.

25          THE COURT:  Okay.

1     MR. CLAR:  So as for why we have to pay

2   Dominion Energy, I think Section 366(b) explains

3   that.  But we are working on a deal with Dominion

4   Energy.

5          The next issue that was raised by

6   Westco's objection is compensation to Westco.  My

7   constant understanding after all these years is

8   that cash collateral -- among other issues, but

9   basically comes down to adequate protection.  Are

10  they adequately protected for the use of the cash

11  collateral?  And sometimes creditors are entitled

12  to compensation if in fact their collateral is

13  deteriorating.  Well, it's not because every month

14  the same receivables are collected.  And although

15  there is a minor downturn in cash only because of a

16  one-time payment, the payroll motion mentions an

17  $86,000 payment to Paychex, which is a pre-petition

18  debt.  Paychex paid our pre-petition payroll, but

19  they didn't get paid because the account was

20  frozen.  I recognize that there might be an issue

21  with that, but in the interest of caution put it in

22  there.  If we take out the $86,000 to Paychex,

23  Paychex will not process the payroll, that will be

24  a problem for the debtor.  And if you take it out,

25  though, the cash flow is decidedly positive.  Right

1   now it's a little bit negative, but in terms of

2   deterioration of collateral the receivables aren't

3   going anywhere, the machinery and equipment --

4   which is not cash collateral, but it is part of

5   their collateral package -- is not going anywhere.

6           And unless and until the Court decides

7   pursuant to a hearing that is not going to take

8   place today, that Westco's position is either

9   totally secured, oversecured or undersecured, they

10  are not entitled to payment.

11          That is not to say that Mr. Agay and I

12  can't at some point later in the case discuss

13  that --

14          THE COURT:  Let me stop you and ask you

15  about Westco.

16          MR. CLAR:  Yes.

17          THE COURT:  Did Westco lend money to the

18  debtor?

19          MR. CLAR:  No.  Westco is an equipment

20  provider.

21          THE COURT:  Okay.

22          MR. CLAR:  I'm not totally certain what

23  equipment, but...

24          THE COURT:  So money was purchased from

25  Westco?  I'm sorry, the equipment was purchased

1   from Westco?

2          MR. CLAR:  And what you just said is

3   interesting because when Mr. Simon and I were

4   looking at this, we decided that perhaps this is a

5   purchase money security interest, which changes

6   everything.  But, yes, that is exactly where I was

7   going.

8          THE COURT:  And prior to the judgment

9   that they got, were you paying them on a monthly

10  basis?

11         MR. CLAR:  Yes, we were.

12         THE COURT:  When did that stop?

13         MR. CLAR:  I'm not certain, your Honor.

14  But there is only one --

15         MR. SLADOJE:  The last payment made to

16  them was in January.

17         MR. CLAR:  January, your Honor.

18         MR. SLADOJE:  And it wasn't -- it wasn't

19  the whole amount.  It was --

20         THE COURT:  We'll get to that.

21         Why did the payment stop?

22         MR. CLAR:  I believe because there was a

23  revenue issue.

24         THE COURT:  A revenue issue?  Is that a

25  fancy way of saying you didn't have the money?

1      MR. CLAR:  We couldn't -- we didn't have

2  the money, right.

3      THE COURT:  Okay, I just wanted to make

4  sure.

5      MR. CLAR:  And there were settlement

6  negotiations, and there was a payment plan, and

7  there were ongoing conversations between I believe

8  Ms. Cresce and Mr. Robbins, who is Virginia counsel

9  for Westco, about resolving this.

10     THE COURT:  And why was there a revenue

11  problem?

12     MR. DAN:  I can answer that, your Honor.

13  There have been issues with Dominion Energy that --

14  a lot of that changed in January with a revised

15  contract with Dominion.  The utilities used to be a

16  lot higher.  They have actually come down

17  considerably since January.  January was about a

18  million dollars.  February I think was about 750-.

19  March was about 650-.

20     There was a new deal entered into

21  between the debtor and Dominion essentially

22  regarding the usage and the time of usage that

23  changed the rates and has actually brought the

24  bills down considerably.  Prior to that, they were

25  considerably higher which caused some cash issues.

1    But that has actually already been worked on and

2    we've seen a large resolution thus far.

3              MR. CLAR:  Meaning a downturn in

4    expenditures which will cause a positive cash flow.

5              THE COURT:  Although I don't see a

6    budget showing that necessarily.

7              MR. DAN:  Well, the budget only shows --

8    the budget showed that the payment to Dominion

9    would be 600,000.  I think the revised one is

10   actually 660-.

11             THE COURT:  Yes.  And you're barely

12   making it with that.  So where is the extra cash

13   you said you have been saving?

14             MR. DAN:  Well, no, your Honor.  What

15   I'm saying, the downward cash flow issue, is that

16   the utilities used to be a million dollars.

17             THE COURT:  Well, no, I understand that.

18   But I'm looking at your budget right now, and

19   you're saying you have this steady cash flow every

20   single month, it hasn't changed.  You're saying

21   that you used to have to pay more in utilities,

22   that's why you got into cash trouble.  Now you're

23   paying less in utilities.  And I'm looking at your

24   budget that shows with lesser payment to utilities,

25   you're barely making it.

1          MR. CLAR:  Right.  But it will

2    transition further as the case goes on.  There will

3    be --

4          THE COURT:  How?

5          MR. CLAR:  Well, the utilities will go

6    down --

7          THE COURT:  More?

8          MR. CLAR:  The expenditures for payroll

9    are going to go down, we're going to have less

10   employees.

11         THE COURT:  Okay, now you're going

12   beyond.  We're obviously going to have to have

13   testimony.

14         MR. CLAR:  Right, but --

15         THE COURT:  I'm just trying to get the

16   simple facts so far.

17         MR. CLAR:  That's fair.

18         I would point out, though, is that all

19   we have to show is that the collateral position is

20   not deteriorating, not that we're operating at a

21   huge profit.

22         THE COURT:  Okay.

23         MR. CLAR:  I recognize the problem.

24         But for today, to keep people -- to keep

25   the business open, I think we've met our burden.

1          Again, we don't have to articulate the

2   plan of reorganization right now.  I don't think

3   that's a condition of use of cash collateral.

4          As far as the payroll motion is

5   concerned, there are -- there are insiders, but

6   they are members who have one percent or less

7   interest who are being paid.  Mr. Boyk, Mr. Pollack

8   and Mr. Shen, each of whom have less -- one percent

9   or less -- they are being paid and they are

10  providing services.

11          THE COURT:  Okay.

12          MR. CLAR:  That's all I have.

13          THE COURT:  Mr. Agay.

14          MR. AGAY:  Thank you.

15          David Agay on behalf of Westco.  Thank

16  you, your Honor, good morning.

17          I don't say this to celebrate, but as

18  presented in the papers and to the Court this

19  morning, we believe this case is dead on arrival.

20          Mr. Clar said that they don't have to

21  file a Chapter 11 plan at the beginning of the

22  case.  That is true.  And the purpose in part of

23  Chapter 11 is to give the debtor breathing room in

24  order to ultimately accomplish a reorganization.

25  But Mr. Clar clearly stated that the purpose for

1    the filing was to fend off our garnishment.

2              And he has not articulated any purpose

3    for these cases other than that.  Whether it be a

4    sale of the company, whether it be to deleverage

5    the balance sheet, whatever the case may be,

6    typically with a Chapter 11 filing, whether it be

7    big or small, the debtor's articulating some

8    purpose for keeping this case out of a Chapter 7.

9    And we haven't heard that.

10             And to continue to burn through our cash

11   collateral solely so they can keep this business

12   alive to fight another day isn't good enough,

13   respectfully, your Honor.  And obviously we're

14   going to hear more in evidence from the debtor

15   about what they want to accomplish.  Presumably.

16             Your Honor, Mr. Clar argues that we

17   don't have a lien, or whatever the theory is, over

18   the bank account held at LLC.  But they haven't

19   filed anything challenging the lien.  Respectfully,

20   we've submitted papers, your Honor, which we think

21   makes the prima facie case that we do have a valid

22   lien over that bank account.  Shortly, we'll be

23   filing a proof of claim in this case to further

24   buttress that case.

25             But Mr. Clar does acknowledge that we

1   have a lien over the Mining assets so that money

2   that Mining is generating should be our cash

3   collateral, at a very minimum, and concerningly --

4   if that's even a word -- they're moving that money

5   during the case into a LLC bank account where he

6   says we don't have a lien.  So he's undercutting

7   our adequate protection at the outset.

8              THE COURT:  Do you have a security

9   interest in all of Mining's assets including the --

10             MR. AGAY:  Yes.  Yes, we do.  We believe

11   we do, your Honor, and we believe they are

12   unavoidable.

13             In the face of all of that, your Honor,

14   Mr. Clar said that they have over -- that Mining

15   has over a million dollars a month in revenues that

16   are evergreen, guaranteed.  So they don't explain

17   why they need to access the 900,000 sitting in the

18   LLC bank account to cover the cost of these cases.

19             And Mr. Clar is further stating to you

20   that they're going to submit a budget which shows

21   that their expenses are continuing to go down, the

22   company is going to get healthier.  So if they are

23   showing in a budget that they're just scraping by,

24   and that situation -- that cushion is only going to

25   improve, why do they need to access the $900,000 in

1    the bank account?  And they want to do that while

2    they're using the revenues that are coming in which

3    are our cash collateral at Mining.  So I'm not

4    following the logic of their position that they

5    should be able to use what we view as our property

6    to finance cases which may at the outset be

7    administratively insolvent, as we state in our

8    pleadings, at least if you're to believe the papers

9    that are filed by Dominion.

10           At a minimum, your Honor, I don't see --

11   pending resolution of the Dominion issues -- how

12   your Honor can approve cash collateral today

13   because you don't know how much they're going to

14   have to give to Dominion, which is their biggest

15   expenditure in their budget.  So at a minimum I

16   don't see how the cash collateral motion doesn't

17   get adjourned to next week along with the Dominion

18   motion.  We believe that it should be denied

19   outright, at least based on what's been presented

20   to your Honor today.  At least based on their

21   budget, they don't really have any expenditures

22   over the next week.

23           So I just don't know how there's enough

24   in front of your Honor today in order to make an

25   informed decision that would allow them to move

1   forward with cash collateral.

2          I heard them whisper, just as I was

3   saying, that they have payroll in the next week.

4   Well, okay, they want to use our security to pay

5   these pre-petition claims for what purpose we don't

6   know.  The company, unfortunately, could be out of

7   business a week, two weeks, three weeks, even four

8   weeks from now.

9          So it is always unpleasant when

10  employees don't get paid.  Terrible.  That should

11  not happen.  But that's not our fault, your Honor.

12  And we think it's also terrible that we don't get

13  paid.  And we don't think it's appropriate for our

14  collateral to go pay those employees -- some of

15  whom, as Mr. Clar just pointed out, are insiders,

16  which -- and I would think the U.S. Trustee would

17  have an issue with this -- could potentially be an

18  end run around 503(c) if what they're saying is in

19  order to retain those insiders we have to pay them.

20         So there is just a whole lot of problems

21  with what's been put in front of your Honor.  And

22  we think that the debtors have, unfortunately,

23  erected a pretty high barrier for themselves for

24  your Honor to approve use of cash collateral today.

25         THE COURT:  Okay, thank you.

1          MR. NGUYEN:  Judge, my comments on the

2     payroll.  Mr. Agay is correct, we're hearing for

3     the first time that there are insiders being paid

4     as part of the payroll motion.  We need to know a

5     little bit more about them and whether these

6     payments are appropriate.

7          I'm a big proponent of making sure

8     employees get paid.  But when there's insiders,

9     then there's Section 503 which prohibits payments

10    to insiders unless you meet the requirements of the

11    Code.  And the second problem with the payroll

12    motion is the payment with Paychex, which is a

13    pre-petition debt, they are not afforded a priority

14    as a wage claimant.

15          There's a proper way to do it, and I

16    think that Mr. Agay's objection makes that point.

17          THE COURT:  He did.

18          MR. NGUYEN:  You come in and you show

19    that Paychex is a critical vendor, and you can't

20    lump it in with a pre-petition wage motion.  Those

21    are my two comments.

22          THE COURT:  Does Dominion want to say

23    anything?

24          MS. MALY:  No, your Honor.  Our motion

25    will be dealt with next week.

1          MR. AGAY:  Your Honor, the last thing I

2    would like to add is -- we point this out in our

3    objection -- they have in their budget 600,000

4    going out to Dominion next week or the week after.

5    At least according to Dominion's objection, that

6    would be on account of pre-petition services.  So I

7    think one of the things that they need to clarify

8    is -- for their budget in its entirety, but

9    particularly with respect to Dominion, are they

10   using our cash collateral to pay pre-petition debt?

11   And that's a huge concern to us for all the obvious

12   reasons.

13          THE COURT:  Understood.

14          What I'd like to do is I'd like to

15   adjourn this here, take the stuff at 10:00 o'clock,

16   and then as soon as we're done with our 10:00

17   o'clock stuff, I would like to hear some evidence.

18          Mr. Clar, your motions were very light,

19   your budget is very light.  I need to know a lot

20   more about what the debtor is up to, what they're

21   planning on doing, how they see the numbers coming

22   out and, as you have identified, what kind of

23   adequate protection is being given to Westco.

24          So you guys have a seat or go out in the

25   hall for a few minutes and we'll take the 10:00

1   o'clock call, we'll take a very short break, and

2   then come back and have a hearing.

3                    MR. CLAR:  Thank you, your Honor.

4                              (Other matters heard

5                              by the Court.)

6                    THE CLERK:  Recalling lines 4 through 9,

7   BCause Mining LLC and BCause LLC.

8                    THE COURT:  All right, let me just make

9   sure that we've Mr. Lewandowski back on the

10  telephone.

11                   MR. LEWANDOWSKI:  Yes, your Honor.

12                   THE COURT:  Just wanted to make sure

13  because I know you hung up earlier.

14                   Okay, Mr. Clar.

15                   MR. CLAR:  Once again good morning, your

16  Honor.  Scott Clar and Jeffrey Dan on behalf of

17  BCause LLC and BCause Mining LLC.  With me are Ann

18  Cresce and George Sladoje, for which we now have

19  spellings.  Mr. Sladoje will be testifying in

20  support of use of cash collateral.

21                   But before we do that, I wanted to

22  address a couple of points that the Court raised.

23  As far as the insiders, although they comprise less

24  than one percent of the membership, each -- the

25  debtors will agree to remove the insiders from the

1    budget from being paid, which will result in a

2    savings of $36,400.

3              THE COURT:  Okay.

4              MR. CLAR:  In addition, so that we can

5    further show that the budget is a positive, the

6    Paychex payment which we believe is justified but

7    the debtor could do payroll itself, there aren't

8    that many employees, we'll take out the $86,000.

9    So now there's another -- what is that -- $122,000

10   in the budget.

11             THE COURT:  Okay.

12             MR. CLAR:  With that, I would like to

13   call to the stand George Sladoje, your Honor.

14             THE COURT:  Mr. Sladoje, if you would

15   please come up, over here.  And while you're still

16   standing, raise your right hand and we'll swear you

17   in.

18                  (Witness sworn.)

19        GEORGE SLADOJE, WITNESS, DULY SWORN:

20             THE COURT:  Mr. Sladoje, you may have a

21   seat and would you state your name and spell it for

22   the court reporter.

23             THE WITNESS:  Yes, your Honor, George

24   Sladoje, S, as in Sam, l-a-d-o-j-e.

25             THE COURT:  Mr. Sladoje, you will notice

1    this is a strange setup because the court

2    reporter's back is to you.  So whenever you answer,

3    if you can just please answer audibly because she

4    can't see your nods.

5              THE WITNESS:  Yes, your Honor.

6              THE COURT:  Thank you.

7              Mr. Clar.

8              MR. CLAR:  Your Honor, if you would give

9    me a moment, I had my notes, but -- anyway...

10             Also, I would like to submit to the

11   court and to the parties the revised budget.  It

12   does not have removal of the Paychex or the removal

13   of the insiders.

14             THE COURT:  Understood.

15             MR. CLAR:  I will submit a copy to the

16   witness as well.

17             THE COURT:  All right.

18                  DIRECT EXAMINATION

19   BY MR. CLAR:

20       Q.    Mr. Sladoje, would you state your name

21   for the record, please.

22       A.    George Sladoje.

23       Q.    And, Mr. Sladoje, what is your current

24   address?

25       A.    1842 North Halsted Street, Apartment

1  number 1, Chicago, Illinois, 60614.

2      Q.    And what is your position with respect

3  to BCause LLC?

4      A.    I am a consultant to BCause LLC and I am

5  the acting chief financial officer.

6      Q.    And as a consultant and acting chief

7  financial officer, are you compensated by BCause

8  LLC?

9      A.    I am compensated by BCause LLC.

10     Q.    And what is your position with respect

11 to -- we'll get to the compensation in a minute,

12 but with respect to BCause Mining, what is your

13 position?

14     A.    I am the acting CFO for BCause Mining as

15 well.

16     Q.    And who compensates you?  Which of the

17 entities compensates you?

18     A.    BCause LLC, the holding company.

19     Q.    And what is the yearly amount of your

20 compensation?

21     A.    If it was full time, it would be

22 $120,000 a year.

23     Q.    Is it not full time?

24     A.    I submit hours every two weeks and get

25 paid with the regular payroll.

1    Q.    And, Mr. Sladoje, what is your

2  background?

3    A.    In the last six years I've been a

4  consultant mainly in the financial area and

5  financial services, and I've been a member of the

6  board of directors of a public company.  And among

7  my clients have been E-Trade, NASDAQ, and now

8  BCause.  Prior to that time, I worked for NASDAQ

9  and I was head of a subsidiary of NASDAQ.  And

10 prior to that time I started a company in Chicago

11 that cleared, physically delivered, electricity and

12 natural gas and ultimately it became a part of

13 NASDAQ.  This takes us back to 2004.  I don't know

14 how far back you would like to go.  But prior to

15 that time I was in California, I was the CEO of the

16 California Power Exchange, which was an exchange

17 for electricity during their deregulation attempt.

18    Q.    If I might interrupt you for a second,

19 I'm sorry.

20    A.    Sure.

21    Q.    Are you trained as a certified public

22 accountant?

23    A.    I am.  I'm a -- I earned my CPA here in

24 Illinois and I was a public accountant at one time.

25    Q.    Do you currently have a CPA license?

1    A.    I do not have a current, up-to-date

2    license.

3    Q.    How many hours a week do you devote to

4    BCause LLC and BCause Mining?

5    A.    Since I came onboard in December, I've

6    been I would say full time, 40 hours a week.

7    THE COURT:  Did you come onboard in

8    December of 2018?

9    THE WITNESS:  That's correct.

10    THE COURT:  Thank you.

11    BY MR. CLAR:

12    Q.    Okay, I'm going to talk about the

13    businesses.  Can you tell me what is the business

14    of BCause LLC?

15    A.    BCause LLC is a holding company.  It's

16    the sole member in BCause LLC Mining and the other

17    subsidiaries.

18    Q.    What are the other subsidiaries?

19    A.    The other subsidiaries are BCause LLC,

20    Secure, Derivatives, Clearing, Trust.  I think

21    that's it.

22    Q.    Do the other subsidiaries other than

23    Mining, do they operate currently?

24    A.    No, they're not in operation.

25    Q.    When did BCause LLC open?

1          A.     BCause LLC began business in 2013.

2          Q.     And at that time what business was it

3     engaged in?

4          A.     At that time it actually was in the

5     business of mining for bitcoin.  That was its

6     business.

7          Q.     And I'm not asking you what that is.

8                 Did its business change at any time?

9          A.     The business changed.  And in 2017 is

10    when it took its emphasis onto mining, hosting of

11    mining and not mining itself.

12         Q.     And when did BCause Mining begin to do

13    business?

14         A.     2017.

15         Q.     And what is the business of BCause

16    Mining?

17         A.     BCause Mining has a facility which is

18    called a hosting service for companies or

19    enterprises that want and do mining for bitcoin and

20    other crypto currencies.

21         Q.     And specifically where is Mining

22    located?

23         A.     Virginia Beach, Virginia.

24         Q.     And what is located in Virginia Beach,

25    Virginia?

1    A.    BCause LLC Mining's facility is located

2    there.  It's a large -- it's a former Budweiser

3    warehouse.  And it has racks, air-conditioning

4    equipment, cooling equipment, heating equipment,

5    electrical equipment and so on, and it supplies

6    these for its customers to use in their mining.

7    Q.    How many customers are there, would you

8    estimate?

9    A.    I would say nine or ten.

10   Q.    And what do these customers place with

11   Mining?  What physical assets do they place with

12   Mining?

13   A.    They actually bring in and have

14   installed their computers that they utilize for

15   mining which -- which are called machines, but

16   they're computers.

17   Q.    Who are the managers of LLC and Mining?

18   Well, who are the managers of LLC, first of all?

19   A.    There's currently six Mining.  Mike

20   Adolphi, Tom Flake, Chris Sikes, Jonathan Tanemori,

21   Karan Rai.  Where am I, five?

22   Q.    I think --

23   A.    And John Ashby, six.

24   Q.    Six, okay.

25        Just as an aside, are any of those board

1   members sought to be --

2           THE COURT:  Well, you said managers.

3   What are they?

4           MR. CLAR:  Well, they're...

5   BY MR. CLAR:

6       Q.     The people you named, is that the board

7   of managers?

8       A.     The board of managers.

9       Q.     Thank you.

10          So those managers, are any of them

11  compensated in the payroll motion -- sought to be

12  compensated?

13      A.     No, they're not.

14      Q.     What caused BCause LLC and BCause Mining

15  to file a Chapter 11?

16      A.     The most immediate cause was the

17  garnishment and freezing of our bank account which

18  was then going to be followed up, as a result of

19  that, by a cutoff of electricity a few days later.

20      Q.     Now you were in court and you heard the

21  comments with respect to pre-petition revenue and

22  post-petition revenue.  Just in general the

23  comments with respect to the close -- closeness of

24  the surplus, if any, of income over expenses in the

25  budget, were there any other factors that caused

1    the downturn in cash prior to the filing?

2        A.    As opposed to?  I'm not sure what

3    you're...

4        Q.    All right.  We talked about the

5    garnishment.  Is there a price of any commodity

6    that would affect the debtor's revenue?

7        A.    The price of bitcoin because it had sunk

8    so low caused the chance to have our current

9    customers add additional machines and, therefore,

10   provide additional revenue kind of went away.  And

11   so everything kind of held steady after we got to

12   January.

13       Q.    Who is Westco?

14       A.    Westco was a -- is a supplier who

15   supplies a lot of the electrical equipment which is

16   utilized in Virginia Beach.

17       Q.    Do you know if -- as you're sitting

18   here, do you know if Westco claims a security

19   interest in the assets of both LLC and Mining?

20            MR. CLAR:  And I use the word claims,

21   because, your Honor, one, I don't think the Court

22   would accept Mr. Agay's word for it, but we're not

23   acknowledging.  Disagreeing.

24            THE COURT:  I understand.

25   BY MR. CLAR:

1      Q.    So do you understand that Westco asserts

2   a security interest in the assets of both the

3   debtors?

4      A.    Yes, I do.

5      Q.    I'm going to show you what is marked as

6   Exhibit A, which I have circulated.  This is a

7   revised budget.

8           THE COURT:  Is this supposed to be

9   Exhibit A?

10          MR. CLAR:  It is.

11          THE COURT:  I will mark it as such.

12          MR. CLAR:  Thank you, your Honor.  It

13  was supposed to be marked as Exhibit A.

14  BY MR. CLAR:

15     Q.    Who prepared Exhibit A, Mr. Sladoje?

16     A.    I was in charge of the preparation of

17  these projections.

18     Q.    Did you have any assistance in preparing

19  these projections?

20     A.    I did.

21     Q.    From whom?

22     A.    The controller of the company.

23     Q.    Who is that?

24     A.    Christy Bossen (phonetic).

25     Q.    Where is she?

1        A.      She's in Virginia Beach.

2        Q.      What experience do you have in preparing

3    cash flow projections?

4        A.      I have decades of experience with

5    preparing cash flow projections.

6                MR. AGAY:  Your Honor, may I interrupt

7    for a second?  I apologize.  Can I just clarify, is

8    Mr. Clar submitting these budgets as evidence?

9                MR. CLAR:  At the end of the --

10               MR. AGAY:  I don't think he's --

11               THE COURT:  Exhibit A has been marked

12   for identification.  Are you asking that he not go

13   forward and get testimony until he sets more

14   foundation?

15               MR. AGAY:  I think so, your Honor.

16               THE COURT:  Okay.

17               MR. CLAR:  Well, wasn't that where I was

18   going?

19               MR. AGAY:  I don't know.

20               THE COURT:  It has not yet been

21   admitted.

22   BY MR. CLAR:

23       Q.      What experience do you have in preparing

24   cash flow projections?

25       A.      As I said, I have decades of experience

1    preparing cash flow projections.

2        Q.    For what period are the cash flow

3    projections provided?

4        A.    These projections go from the filing

5    date of April 10th through -- for 30 days, to May

6    10th.

7        Q.    Upon what information were the cash flow

8    projections prepared?

9        A.    Our historical records, our ledgers, our

10    knowledge of the business operations, and our

11    understanding of what the final accounts are that

12    need to be satisfied in order to keep operating.

13        Q.    Is this a business record that you would

14    customarily prepare from time to time?

15        A.    Yes.  We prepare cash flow projections

16    on a regular basis.

17        Q.    Do you believe that the projections

18    accurately portray the cash, the income, and the

19    necessary expenditures for both entities for the

20    period described?

21        A.    Yes, I do.

22        Q.    Can you describe how revenue comes into

23    BCause LLC and how it goes out of LLC to pay

24    Mining's creditors and LLC's creditors?

25        A.    Yes.  The customers of BCause Mining pay

1    us on a monthly basis typically at the end of the

2    month.  They're all on -- mostly on two-year

3    contracts.  And the money comes into the bank

4    account, and then BCause LLC, the holding company

5    has -- and then the LLC will then take care to make

6    payments to the various vendors of both Holding and

7    Mining.

8         Q.    Now, what expenditures does LLC have?

9    You're looking at the budget.

10        A.    The major expenditure of the holding

11   company is the payroll by far.  It is the most

12   significant.  It's like 70 percent of this.  The

13   other ones are communications stuff and ongoing

14   office-related charges.

15        Q.    In Exhibit A there are payroll charges

16   that -- do the charges on the budget, the expenses,

17   do those include the insiders that you heard me

18   speak of a few minutes ago?

19        A.    The ones that are there right now, they

20   do.

21             THE COURT:  Well, just to clarify.  When

22   you're talking about Mining versus BCause, as I see

23   it, the first page of Exhibit A is Mining's cash

24   flow, the second page is the holding company's cash

25   flow.

1          MR. CLAR:  Correct.

2          THE COURT:  Okay.  Because I've been

3    flipping them back and forth a little bit.  I just

4    want to be sure.

5          MR. CLAR:  Thank you.

6    BY MR. CLAR:

7     Q.     So if the insiders -- let's talk about

8    them for a minute.  Who are we removing from the

9    payroll motion, from the budget?  Who specifically

10   are we removing?

11    A.     We would remove Bruce Pollack, Mike

12   Shen, Bill Boyk, Sean Ristau.

13    Q.     Okay.

14    A.     And I think that's it.  I think that's

15   it.

16    Q.     Just so we're clear, do all of those --

17   are they all members of one or the other of the

18   LLCs?

19    A.     They are -- they are members of BCause

20   LLC, the holding company.

21    Q.     And as a result of removing their

22   salaries or their compensation from the budget, how

23   much revenue is gained?

24    A.     Off the top of my head, I'm going to

25   estimate it at about seventeen thousand a pay

1    period.  In other words, 34,00 a month.

2         Q.    And you see that in that budget we also

3    asked to pay Paychex, did we not?

4         A.    We did.

5         Q.    And are we now paying Paychex?

6         A.    No.

7         Q.    Will that also result in a reduction of

8    expenditures?

9         A.    It will if we remove that first Paychex

10   amount, yes.

11        Q.    According to Exhibit A --

12             MR. CLAR:  And, your Honor, I apologize,

13   it might be a little bit difficult to tell.

14   BY MR. CLAR:

15        Q.    -- but what is the beginning cash for

16   BCause LLC?

17        A.    $911,000.

18        Q.    And at this point removing the $86,000

19   and the approximately $34,000 in payroll to the

20   insiders, what will the cash be at the end of the

21   period which I believe is May 10th?

22        A.    Off the top of my head, it will be 960-,

23   970-, in that range.

24        Q.    So it will increase, correct?

25        A.    Yes.

1    Q.    And the receivables, are they constant?

2    A.    At this point they are constant.

3    Q.    Well, let's talk about the receivables.

4  You mentioned that there are hosting agreements.

5  How many hosting agreements does Mining have with

6  miners?

7    A.    It's the number of customers we

8  mentioned a while ago.  Nine or ten, I don't know

9  the exact...

10    Q.    And they're all under contract?

11    A.    They are.

12    Q.    And the total amount of revenue combined

13  is how much?

14    A.    It's generally about 1,021,000.

15    Q.    And what is the collectability of the

16  hosting, Mining payments?

17    A.    Pretty much guaranteed.  There's never

18  been a bad debt in that area.

19    Q.    Okay.  Taking a look at Exhibit A -- to

20  each motion it should be clear.  Let's first take

21  up Mining.  Can you explain the expenditures which

22  are described in the projections, why they need to

23  be paid.

24    A.    The -- of course, the biggest

25  expenditure there is our estimated payment to

1    Dominion Energy.  That is historically and always

2    has been the biggest expense of the company and

3    particularly of BCause Mining.  The other major

4    expense that you see there is the building rent

5    which is due the first day of every month.

6              The other costs, most of the other

7    costs --

8              THE COURT:  Which line item is the rent?

9              THE WITNESS:  It's the one that is

10   called Hoffman Properties, it's the $58,570.

11             THE COURT:  Okay.

12   BY THE WITNESS:

13        A.    I don't know how detailed you want to go

14   into this.  But, for instance, Silbar for 80,640 is

15   security services 24 hours a day.  And then Verizon

16   is, of course, communications.  So those are the

17   major ones.  Lyons (phonetic) is a forklift.  I

18   don't know if you want to go through this to that

19   extent.  But --

20   By MR. CLAR:

21        Q.    Let me amend my question.  Just

22   categories is what I'm looking at.

23        A.    Okay.

24        Q.    Any other categories of expenditures for

25   Mining?

1       A.      No, this is it.

2       Q.      What about LLC?

3       A.      So the LLC, some of the expenses that

4    the LLC is paying is actually also utilized by

5    Mining.  But the biggest -- and of course the

6    biggest of these is that payroll for -- as you can

7    see now, is going to be reduced from 259,500.  But

8    that -- that's the biggest item.

9       Q.      And what would happen if Mining and LLC

10   were not allowed to make the expenditures on the

11   budget?

12      A.      The company would cease operations.

13   People would leave.  The company would cease

14   operations.  There would be no revenue.

15      Q.      I've asked you about the opening and

16   closing cash.  As a result of the expenditures

17   listed in the budget, will receivables go up or

18   down?

19      A.      No, receivables stay pretty constant.

20      Q.      Does Mining have any other assets such

21   as machinery and equipment?

22      A.      They have -- yes, they have.  They have

23   -- they have electrical equipment, transformers,

24   etc., as well as leasehold improvements to a large

25   degree.

1        Q.      Well, I'm only asking about machinery

2    and equipment.  On the company's books and records,

3    is there a dollar amount?

4        A.      Yes.  It's about -- machinery and

5    equipment would be about $7 million.  That's the

6    cost.  And of course it's being depreciated

7    regularly, so I'm not sure what the accumulated

8    depreciation is, but the cost is over $7 million.

9        Q.      Are the debtors insured?

10       A.      Yes.  We have a general liability

11   policy.

12       Q.      With whom?

13       A.      It's with Evanston Insurance and

14   Hartford.

15       Q.      Do you know the amount of coverage?

16       A.      The total -- the big number is

17   $3 million.

18       Q.      And for what term?

19       A.      It's on an annual basis.

20               MR. CLAR:  If I could have a minute,

21   your Honor.

22                         (Brief pause.)

23   BY MR. CLAR:

24       Q.      You heard the discussion about Dominion,

25   and you heard the objection of Westco that the

1    company Mining, I guess, is paying for pre-petition

2    services.  Is that true?

3        A.    This budget is established for

4    post-petition payment, for post-petition services.

5        Q.    So the amount in the budget, the 660- as

6    it now stands for Dominican, that is for

7    post-petition services?

8        A.    That is the intention.

9            MR. CLAR:  I have nothing further, your

10   Honor.

11           THE COURT:  All right, Mr. Agay.

12                CROSS-EXAMINATION

13   BY MR. AGAY:

14       Q.    Good morning, Mr. Sladoje.

15       A.    Good morning.

16       Q.    I'm David Agay.  I'm representing

17   Westco.

18           I apologize that you are in the position

19   that you are right now.  I don't envy you.  I would

20   like to ask you a few questions.  For the most part

21   I'm going to go in the order that Mr. Clar filed,

22   but I apologize if I jump around a little bit.

23   It's a little bit impromptu.

24           Mr. Sladoje -- am I pronouncing that

25   right?

1          A.     Yes, you are.

2          Q.     Thank you.

3                 You said you are a consultant and you're

4     currently the CFO of both LLC and Mining.  Do you

5     work for a separate firm in your consulting

6     capacity?

7          A.     I have my own LLC, although -- although

8     this -- in this case, I'm just working as an

9     individual.

10         Q.     Okay.  So you're not an independent

11    contractor?

12         A.     Yes, I think I would be considered an

13    independent contractor, yes.

14         Q.     And your firm -- does your consulting

15    firm specialize in any type of -- specific type of

16    consulting?

17         A.     My consulting firm is just me, okay.

18    So --

19         Q.     Do you specialize in --

20         A.     Yes, generally in financial services,

21    yes.

22         Q.     General financial services?

23         A.     Yes, generally in financial service.

24         Q.     Do you as part of your practice

25    represent, I'll call them, distressed companies?

1          A.     No.

2          Q.     And you said that once upon a time you

3     were the CEO of the California Power Exchange.

4          A.     That's correct.

5          Q.     If I recall correctly, that went through

6     its own financial difficulties.  Were you at the

7     helm?

8          A.     I was a CEO.

9          Q.     At that time?

10         A.     Let me correct one thing.  We went

11    through financial difficulties.  It wasn't that we

12    ran out of money, it was that we were holding over

13    a billion dollars in collateral.

14         Q.     I understand.  I'm not pointing fingers.

15    I'm not pointing fingers, Mr. Sladoje.

16         A.     All right.

17         Q.     I'm trying to gauge your experience in

18    distressed situations and I'm asking if during your

19    tenure as CEO of California Power Exchange you --

20    well, let me ask it this way.  I apologize.

21              Did California Power Exchange file for

22    bankruptcy while you were CEO?

23         A.     We did, March of 2001.

24         Q.     And you were the CEO during the

25    bankruptcy case?

1          A.     I was.

2          Q.     So you have experience in these types of

3     situations?

4          A.     I've seen some of this before, yes.

5          Q.     Okay, good.  Well, not good depending on

6     how you look at it.

7                 You said you started full-time in

8     December of 2018.  Were you working part time for

9     the companies before that?

10         A.     No, I had no connection to the company

11    prior to that time.

12         Q.     Okay.  And what caused you -- what

13    caused the company to bring you in?

14         A.     Two of the board members spoke to me

15    about -- about going to work for the company and

16    helping -- helping get the company on its feet.

17         Q.     So the company was struggling at that

18    point?

19         A.     Yes.

20         Q.     And when I say the company, are we

21    talking about LLC or Mining, or -- Mining is really

22    the business here?

23         A.     Yes.

24         Q.     And eventually you became the CFO of

25    both LLC and Mining, correct?

1      A.    Yes.  I would say acting though.  I'm

2   not an employee, so...

3      Q.    Sure.  What happened to the prior CFO?

4      A.    The only one that I know that they had

5   was a gentleman named Mike Adolphi.  He was one of

6   the members.  But he stepped away and stepped out

7   of the daily role many months before that.  So they

8   were operating without a CFO for a period of time.

9      Q.    Do you know why he left?

10     A.    I only know what he told me and that is

11  that he was involved with his wife's business.  And

12  I take his word for it.

13     Q.    Okay.  You said that the company used to

14  be in the business of mining, but then in 2017 it

15  switched over to hosting mining operations; is that

16  correct?

17     A.    Yes.

18     Q.    Why did it make that switch?

19     A.    I -- I don't know.  I wasn't there.  As

20  I said, the company's history goes all the way back

21  to 2013.  I just -- I don't think I could

22  accurately portray what went on over those four

23  years.

24     Q.    Was the company making money mining?

25     A.    I don't know.  I don't know how

1    successful they were when they were miners.  I

2    don't know.

3         Q.    Okay.  Since 2017, has -- let me back

4    up, I apologize.

5              Since 2017, has Mining been the only

6    active business of the group?

7         A.    Yes.

8         Q.    And has Mining ever generated any

9    positive income since 2017?

10        A.    It depends how you measure it.

11        Q.    Sure.  I love that answer.

12        A.    You could make a case that some months

13   under generally accepted accounting principles it

14   has broken even or even made a small profit.  You

15   could make that case.

16              But when you are -- when you have

17   payables that you're not keeping up with and when

18   you -- and when the depreciation of your equipment

19   and the leasehold improvements is over ten years

20   and so the depreciation amounts are small compared

21   to what is going on, it's -- it's very hard to say

22   that things are going well, okay.  You just can't.

23        Q.    So to be clear, on an annual basis

24   Mining has never generated positive income?

25        A.    That's correct.

1       Q.      But there are some months where Mining

2    has broken even, you said?

3       A.      Under generally accepted accounting

4    principles, I would say yes.

5       Q.      What about on a pro forma basis?

6       A.      Again, if you do nothing with the

7    liabilities, then you could make a case that some

8    months they have.

9       Q.      Okay.  You said that currently Mining,

10   which is the only of the -- which is the only

11   entity with any business right now, has nine or ten

12   customers; is that correct?

13      A.      Yes, yes.

14      Q.      And each of those customers is on a

15   contract with Mining?

16      A.      Yes.

17      Q.      When do those contracts expire?

18      A.      At different times.  The bulk of them

19   expire towards the end of 2019.

20      Q.      The end of 2019?

21      A.      This year, yes.

22      Q.      Do those customers know that LLC and

23   Mining have filed for bankruptcy?

24      A.      Yes.

25      Q.      And that's because you told them or they

1    got notice?

2        A.    Yes, plus our largest customers are on

3    our board of managers and are aware.

4        Q.    Are those customers individuals or

5    businesses?

6        A.    No, they are -- they are entities at

7    some point in time or another, yes.

8        Q.    And what type of feedback have you

9    gotten from those customers since you filed for

10   bankruptcy?

11       A.    I'm not aware of any feedback because

12   things are continuing.  So I'm not aware that we've

13   had any feedback.

14       Q.    None of those customers have told you

15   that they're going to go find another place for

16   hosting?

17       A.    No.

18       Q.    Okay.  Do you have competitors?

19       A.    There are -- there are hosting

20   operations in a lot of places, yes.

21       Q.    So if those customers decided to no

22   longer host with you, they would have alternatives,

23   correct?

24       A.    They would, although they would have to

25   dismantle what they put together here.

1    Q.    I understand.  Now that you mention that

2    they would have to dismantle, you said that they

3    have their computer -- they set up their computers

4    in your warehouse?

5    A.    Yes.

6    Q.    So how difficult is it to move that

7    equipment out of there?

8    A.    I don't -- I've been told that it would

9    take a month.

10   Q.    It would take a month for them to --

11   A.    To move it out and set it up somewhere

12   else, yes.  They'd lose considerable time.

13   Q.    You said you told those nine or ten

14   customers that the company filed for bankruptcy.

15   Does the market -- I'm using "the market" in an

16   amorphous way -- know that you filed for

17   bankruptcy?

18   A.    I don't know.  I mean, I can't answer

19   that, I don't know.

20   Q.    I noticed also that you were in some

21   sort of a joint venture with NASDAQ prior to the

22   case.  You were going to be co-hosting with them;

23   is that correct?

24   A.    No, that has to do with -- nothing to do

25   with this.  Nothing.

1    Q.    Okay.  So any sort of business with

2    NASDAQ is not included in your go-forward plans?

3    A.    At this time, no.

4    Q.    So what -- so we've talked about that

5    the company has never made money.  You're not going

6    to be doing business with NASDAQ on a go-forward

7    basis.  You've told your existing customers that

8    you're in bankruptcy.  What is the go-forward plan

9    for the business?  How are you going to start

10   making money?

11   A.    Just step back for just one second.

12   NASDAQ -- nothing to do with the hosting and mining

13   operation, okay.  That is a separate -- a separate

14   project, and so it's not -- it's not in the -- it

15   has nothing to do with what we're doing at this

16   time with the mining operation.

17   Q.    Okay.

18   A.    So the question is how do we make money

19   going forward?

20   Q.    Yes.

21   A.    You saw the budget.  You've seen the

22   budget and you saw the proposals that counsel has

23   made.  In addition, I've made some recommendations

24   to the CEO about some other personnel issues, so --

25   reducing them.  So I see the -- I see the

1    opportunity to proceed on a positive cash basis

2    with the company funds.

3         Q.    Okay.  So let's break that down a little

4    bit.  The plan is to reduce expenses; is that what

5    you said?

6         A.    Yes.  Yes.

7         Q.    What's the plan to grow top-line

8    revenue?

9         A.    The plan to grow top-line revenue is to

10   increase -- is to do the marketing and to talk it

11   out and talk with people and move it.  And perhaps

12   the bitcoin market will change.  So we'll see.

13   There's an opportunity there.

14        Q.    Okay.  And again I'm not disparaging

15   your efforts here, sir.  I'm trying to get to the

16   bottom of things.

17              You mentioned that in addition to the

18   garnishment issue, the price of bitcoin is low, so

19   you were not adding customers.  Am I correctly

20   characterizing your testimony?

21        A.    That's correct.  We haven't added

22   customers for a while, right.

23        Q.    So for how long have you been at nine or

24   ten customers?

25        A.    I mean we've added -- we've added one or

1    two small customers which has not made a

2    significant impact on the revenues.  So as far as

3    major customers, the ones that we really, you know,

4    live off of so to speak, we haven't added a big --

5    a big, major one for a while.

6         Q.    Has the price of bitcoin gone up?

7         A.    It's started to go up in the last three

8    or four weeks.

9         Q.    Okay.  Has that created any new customer

10   opportunities?

11        A.    We think it has, yes.

12        Q.    Okay.  Have any of those new customers

13   materialized?

14        A.    Not yet.

15        Q.    But you cannot say with certainty what's

16   going to happen with the price of bitcoin, correct?

17        A.    Correct.

18        Q.    I know I'm stating the obvious.

19        A.    Yes.

20        Q.    So it could go back down?

21        A.    Yes.

22        Q.    And just to be clear, adding customers

23   is going to be entirely dependent on what happens

24   to the price of bitcoin, correct?

25        A.    That will be a big, big factor.  I don't

1    know if it's the only factor.  But it will be a big

2    factor, yes.

3        Q.    So just to distill that out, the

4    company's success or failure is going to hinge on

5    what happens in your view with the price of

6    bitcoin, correct?

7        A.    Very likely it will have a major effect

8    on the mining operation.

9        Q.    And again you can't predict that as you

10   sit here today?

11       A.    That's right.

12       Q.    Bear with me for a moment here.

13       A.    Sure.

14       Q.    Have you made any efforts to try to sell

15   the business?

16       A.    I personally have not.  Our CEO has been

17   the investor and has attempted -- has been the one

18   who's involved with the fundraising and would also

19   entertain thoughts about selling the business.

20   But, no, I personally am not.

21       Q.    So is the CEO running a formal process?

22       A.    Well, to be specific, the formal process

23   of what?

24       Q.    Sure.  I apologize.

25            Is the CEO out marketing the business

```
 1    for sale?

 2         A.    For sale?

 3         Q.    Yes.

 4         A.    Not as much as looking for investors to

 5    put money in.  That's been most of his effort,

 6    yeah.

 7         Q.    Is anybody else out marketing the

 8    business for sale?

 9         A.    We have agreements with several

10    financial areas or financial entities, but they're

11    mainly for fundraising.  I don't think they're for

12    selling the business.  We are -- we've talked to a

13    couple of knowledgeable places about possibly

14    selling.  We've had conversations.

15         Q.    Okay.  But nothing in writing?

16         A.    Well, nothing that has materialized, no.

17         Q.    Let's talk about the fundraising.  Is

18    the CEO leading that effort?

19         A.    He is.

20         Q.    Is anybody else engaged in a fundraising

21    effort?

22         A.    Well, he calls people in from time to

23    time to assist him.

24         Q.    But everything goes through him?

25         A.    It does.
```

1    Q.    Okay.  Generally speaking, where does

2  that process stand?

3    A.    I don't know.  He was -- he was pretty

4  optimistic two days before the garnishment

5  occurred.

6    Q.    Okay.

7    A.    So like I said, he was very -- pretty

8  optimistic.  And then the garnishment occurred, so

9  that's dead now.

10    Q.    All right.  So you're saying garnishment

11  harmed the ability of the company to raise money?

12    A.    Yes.

13    Q.    What has the bankruptcy done to the

14  company's ability to raise money?

15    A.    Probably maybe added a little

16  complication to it.  But --

17    Q.    A little?

18    A.    Yeah.

19    Q.    Not a lot?

20    A.    Well, I mean the garnishment created the

21  situation.  So I mean I don't -- I know what you

22  want me to say.  But, yeah, bankruptcy doesn't

23  help, let me -- I'll put it that way.

24    Q.    Fine.

25        Do you have -- as you sit here today,

1    are you aware of any written commitment to infuse

2    money into the company?

3          A.    No, I'm not.

4          Q.    Are you aware of any soft commitments to

5    infuse money into the company?

6          A.    Yes.

7          Q.    Okay.  Are those in writing or are those

8    oral?

9          A.    No, oral.

10         Q.    Okay.  And how many?

11         A.    I don't know where those soft

12   commitments stand today.  But there were -- there

13   were several.

14         Q.    And how much are we talking about?

15         A.    We're talking about a quarter of a

16   million dollars in total.

17         Q.    A quarter of a million dollars?

18         A.    Yeah.

19         Q.    250,000?

20         A.    Right.

21         Q.    So let's say in a best-case scenario you

22   received that $250,000 and you were able to

23   stabilize the business, the best-case scenario,

24   would that be enough to repay my client, Westco,

25   what it's owed today?

1          MR. CLAR:  Your Honor, I'm going to

2    object on the grounds of relevance.  We're getting

3    into plan confirmation issues.

4          THE COURT:  Overruled.

5          You may answer.

6    BY THE WITNESS:

7          A.    There is no best-case scenario, okay.

8    The best-case scenario was that we got our

9    $250,000, we paid our Dominion bill as agreed upon,

10   and we don't have a garnishment on our bank

11   account, and we continue to go and raise money.

12   That's the best-case scenario.  There is no

13   best-case scenario right now under -- under getting

14   the $250,000 soft money right now.

15   BY MR. AGAY:

16         Q.    Are you aware that my client, Westco, is

17   owed 1.9 million?

18         A.    I'm aware that they are owed.  I didn't

19   know the amount was 1.9.

20         Q.    But are you aware it's above --

21         A.    Oh, it's substantial, yes, I'm aware.

22         Q.    And I'm not asking you to offer a legal

23   opinion.  But let's just say theoretically as part

24   of this bankruptcy process my client, in fact, is

25   secured -- I know that you're going to dispute that

1    -- and that my client has to be paid either in full

2    or through installments that amount that it's owed,

3    okay.  Is the business's current trajectory in

4    growth plus that 250,000 going to suffice to repay

5    my client?

6         A.    Well, I can't speculate now on what is

7    going to take place now.

8              THE COURT:  Well, let me ask you a

9    question.

10             THE WITNESS:  Yes?

11             THE COURT:  You can't speculate what

12   might take place in the future.  But if you were

13   ordered tomorrow to pay a certain amount of money

14   to Westco as adequate protection -- pick a number,

15   $10,000.  Do you have an extra $10,000 in the

16   budget?

17             THE WITNESS:  Your Honor, we made offers

18   to Westco to pay them.  And they turned it down.

19             THE COURT:  I am not asking you that,

20   sir.  I don't want to hear about what you may have

21   negotiated.  I'm just asking you based on your

22   numbers.  I'm looking at your numbers and I'm

23   trying to figure out if we determined that they

24   need to be paid something --

25             THE WITNESS:  Yes?

1    THE COURT:  -- do you have enough room

2    in the budget to pay them?

3    THE WITNESS:  Yes.  And you mentioned

4    $10,000, yes.

5    BY MR. AGAY:

6    Q.    Can you pay my client a hundred thousand

7    dollars?

8    A.    I couldn't say that today.

9    Q.    Fifty?

10    A.    I could not say that today.  But we can

11    pay something.

12    Q.    Okay.  Bear with me.  I would like to

13    turn to the budgets.

14    So I'm just looking at the new budgets

15    that your counsel passed out right before your

16    testimony versus the budgets that were filed with

17    the cash collateral motions.  Just generally

18    speaking, what changes were made?

19    A.    The most significant was the Dominion

20    Energy.  I think the original one you saw was for

21    600,000, and it's now at 660-.

22    Q.    So it's gone up?

23    A.    I think that was the biggest.  There

24    were other changes, but I think that was the major

25    one.

1        Q.    So that's gone up?

2        A.    Yes.

3        Q.    So the cushion has gone down?

4        A.    I don't -- no, I wouldn't classify it

5    that way.  I mean, our last bill from them was

6    665-.  So I mean I wouldn't --

7        Q.    No, I apologize, I wasn't being clear.

8              In the budget you filed, there was a

9    surplus after payment of expenses of 349,000 and

10   change.  In the new budget the surplus is 287- --

11       A.    Yes, most of it is Dominion.

12       Q.    So that's going back is my point.

13       A.    Oh, yeah, you're right.  You're right,

14   yes.

15       Q.    Okay.  Now the budget shows receipts at

16   Mining -- and when I say Mining, just to be clear

17   I'm saying BCause Mining LLC --

18       A.    Right.

19       Q.    -- and no receipts at BCause LLC -- I

20   will call it Holding; is that accurate?

21       A.    That's accurate.

22       Q.    And it shows expenditures at both Mining

23   and Holding, correct?

24       A.    Yes.

25       Q.    Okay.  Are any of the expenditures at

1    Holding on account of Holding business activities,

2    or are those all on account of Mining business

3    activities?

4         A.    Most of these are -- or a number of

5    these are kind of shared for both.

6         Q.    Okay.

7         A.    But the Holding company is the legal

8    obligor or legal payor.

9         Q.    But --

10        A.    So take, for instance, the group

11   insurance and then the payroll.  Those are both

12   Holding company and Mining related.

13        Q.    Okay.  But those are for services being

14   provided through Mining, correct?

15        A.    No, I --

16              Say that again?

17        Q.    What business activities is Holding

18   conducting today?

19        A.    They are -- like myself, we're

20   overseeing the finances of Mining and any other

21   activities that are going on.

22        Q.    Okay.  So they own -- so my question is

23   those only relate to the operations of Mining,

24   correct?

25        A.    Yes.

1          Q.     Okay.

2          A.     Yes, that's the only operations now.

3          Q.     Does Mining have its own bank account?

4          A.     No.

5          Q.     Okay.  So the million dollars and change

6     that you expect to receive on May 3rd, where is

7     that money going to go?

8          A.     It's going to go into the LLC or Holding

9     company bank account.

10         Q.     Okay.  Is there an intercompany loan

11    agreement between LLC and Mining?

12         A.     No.

13         Q.     So how do you account for that?  How is

14    that accounted for on your books?

15         A.     I'm not sure --

16                What are you seeking here?

17         Q.     Is there a note made in either balance

18    here, on your --

19         A.     No.

20         Q.     Okay.  And have you discussed setting up

21    a bank account, a Mining specific bank account, for

22    these cases?

23         A.     No.

24         Q.     Looking at the Dominion payment that is

25    slotted for April 26th -- the week of April 26th.

1        A.      Yes.

2        Q.      To what period does that payment relate?

3        A.      That is an attempt at estimating the

4   monthly -- monthly bill.

5        Q.      So for what month?

6        A.      It would encompass part of April and the

7   ending date in March.

8        Q.      So that 660- would be for the end of

9   March and part of April?

10       A.      That's correct.

11       Q.      Okay.  Do you recall the date that you

12   filed these cases, these bankruptcy cases?

13       A.      April 10.

14       Q.      April 10?

15       A.      Yeah.

16       Q.      So what you're saying is at least in

17   part that 660,000 would go towards services

18   provided prior to the bankruptcy cases?

19       A.      You are in an area where I am not really

20   comfortable getting real specific.  We have an

21   arrangement with Dominion in which they have a

22   rather large deposit.  And to what -- I'm not sure

23   how that offsets against pre-petition.  And I --

24   okay, I just -- that's -- that's...

25       Q.      I apologize.

1    A.    I'm not a bankruptcy expert here.  And

2    I'm not sure what --

3    Q.    I'm not asking you a bankruptcy

4    question, sir.

5    A.    Okay.

6    Q.    And I apologize, but we do have to get

7    specific because it is important.

8    That 660,000 relates to pre-April 10

9    services, correct?

10    A.    No, let me put it this way.  We base

11    that payment on the experiences that we have with

12    Dominion and the daily back and forth, the daily

13    usage and the categories of A, B and C depending

14    upon.  So whether it's pre-petition or

15    post-petition, I can't answer that.  It's a monthly

16    -- it's a monthly payment.

17    Q.    But you said that it's for the end of

18    March and part of April.

19    A.    We based it on those dates, the -- we

20    based it on the usage of those days, okay.  It gave

21    us a guideline.  Because we don't know what the

22    bill is going to be, but we tried our best to come

23    up with this accurately.  And so we based it on

24    those days.

25    THE COURT:  I'm going to ask a real

1   simple question because I'm a simple person.  When

2   I get my electric bill, it tells me what days are

3   covered.

4              THE WITNESS:  Right.

5              THE COURT:  When you get your next

6   electric bill from Dominion, what days is it going

7   to cover?

8              THE WITNESS:  When we get our next bill,

9   which will probably be coming towards the end of

10  the month I guess --

11             THE COURT:  Okay.

12             THE WITNESS:  Yeah -- it would be like

13  from the 19th of the previous month to the 19th of

14  the next month.  The 19th or 20th, or what have

15  you, that is generally what it is.

16             THE COURT:  Okay, thank you.

17             MR. AGAY:  Thank you.

18  BY MR. AGAY:

19      Q.    Using that same framework that the judge

20  just used --

21      A.    Yes?

22      Q.    -- are any of the other expenditures in

23  this budget going to be on account of bills

24  received for dates prior to the bankruptcy case?

25      A.    No.

1      Q.     They will be for post-bankruptcy

2   services?

3      A.     Yes.  After April 10, yes.

4      Q.     The 1,021,000 in hosting fees, you had

5   said that's guaranteed.  I think those were your

6   words, but I don't want to put words in your mouth.

7   Is that correct?

8      A.     Yes, pretty much.

9      Q.     It's guaranteed why?

10      A.     As long as we're operating and providing

11   the facility that the customers can utilize for

12   their mining.

13      Q.     Okay.  But what if that customer just

14   decides not to pay you?

15      A.     Well, that's not happened yet.

16      Q.     Okay.  But you hadn't been in bankruptcy

17   yet?

18      A.     No.

19      Q.     And how do those fees -- do you send out

20   monthly invoices for those fees?

21      A.     We do.

22      Q.     Okay.  And those fees come in through

23   checks?

24      A.     No, they come in through wire transfers,

25   they come in through bitcoin.  They send bitcoin

1    and we have to convert it.  It comes in different

2    ways.

3        Q.    Okay.  So let's just take the dollar

4    wire transfers.  Do those go directly into the

5    Lakeside bank account?

6        A.    They do.

7        Q.    Okay, let's take the bitcoin.  Explain

8    to me how those come in.

9        A.    They send bitcoin, and we have to go and

10   convert that into cash.

11       Q.    Okay.  And that conversion is subject to

12   the price of bitcoin, correct?

13       A.    Yes.

14       Q.    Okay.  So how can you be sure that the

15   number is going to be a million twenty-one if

16   bitcoin is fluctuating day to day?

17       A.    Because they send the bitcoin in an

18   amount that comes very close to the actual dollar

19   amount.  Yeah, we've not -- we've not had a big

20   problem there.

21       Q.    So to the extent that the price of

22   bitcoin goes down, you say they're going to send

23   more bitcoin to get up to the dollar amount?

24       A.    Yes.

25       Q.    Are your contracts in dollars or

1    bitcoin?

2         A.    Dollars.

3         Q.    So this million twenty-one -- I'm sorry,

4    one million twenty-one thousand two hundred

5    fifty-two thousand, which is guaranteed, why can't

6    you use that to fund your operations?  Why do you

7    need access to the 900,000 now in the Lakeside bank

8    account?

9         A.    Because our bank account is frozen.  We

10   don't have any other means of paying bills since

11   April 10th.  We have -- we have bills to pay.  And

12   it's two weeks until we actually start -- are going

13   to be receiving a million twenty-one.  So we have

14   nothing.

15        Q.    So the issue is your access to a bank

16   account?

17        A.    Yeah, access to the bank account.

18        Q.    It's not about access to 911,000?

19        A.    That is the $911,000.

20        Q.    No.  What I'm saying is when the million

21   twenty-one comes in, at least according to your

22   budget you're going to have enough money to cover

23   your expenditures, correct?

24        A.    Yes.

25        Q.    So if you had the use of that million

1    twenty-one, you wouldn't need to use the 911,000

2    that's currently sitting in the bank?

3         A.    No, we've got three weeks of expenses to

4    cover because we get the -- before we get the

5    million twenty-one.

6         Q.    Okay.

7         A.    We can't pay anybody anything today.

8    So...

9         Q.    So let's get to that.  The next week

10   coming up is the week of April 19th, correct?

11        A.    No, that's this week.  Tomorrow is the

12   19th.

13        Q.    I see.

14        A.    These are week ending.

15        Q.    So that's $4,300 that you need to spend

16   this week; is that what you're saying?

17        A.    That's on the LLC budget, yes.

18        Q.    That's on the Mining budget.

19        A.    That is on the Mining budget, right.

20        Q.    And I see that there are significant

21   expenditures the week of April 26th.  But the

22   lion's share of that is Dominion?

23        A.    That's correct.

24        Q.    And you have -- and it's also correct

25   that you're in discussions with Dominion right now?

1    A.    I believe counsel has started

2  discussions with them, yes.

3    Q.    Okay.  And have you discussed pushing

4  that payment back to the week of May 3rd?

5    A.    I have no idea what they're talking

6  about.

7    Q.    Why would you push it back to the week

8  of May 3rd if that's when your revenues are coming

9  in?

10    A.    I have no idea.  I don't know.  I'm not

11  part of those negotiations.

12    Q.    Okay, but you're in bankruptcy now.  So

13  presumably you should have some leverage in those

14  discussions.

15    A.    I hope so.

16    Q.    Now, let's just move back to the 911,000

17  that's currently in the bank account.  Assuming

18  that -- well, let's just say theoretically the

19  Court permitted you to use that 911,000.  Once the

20  million came in, presumably you would have no

21  problem replenishing that fund from my client to

22  sit there; is that correct?

23    A.    Under the proposed budget, that's

24  correct.

25    Q.    Okay.

1      A.    I don't know about for your client,

2  but...

3           MR. CLAR:  Your Honor -- I'm not sure of

4  the nature of the objection.  But to sit there for

5  his client?  I don't know what that means.  Is he

6  asking whether Mr. Sladoje knows as he sits there

7  as a legal conclusion frozen, then I would object.

8           THE COURT:  Well, Mr. Sladoje kind of

9  half answered already, so I think he knows --

10          But, Mr. Agay, why don't you ask

11 Mr. Sladoje?

12          MR. AGAY:  Sure.

13 BY MR. AGAY:

14      Q.    I'm not asking you for a legal

15 conclusion.  I'm saying that if the Court required

16 there to be a fund from my client of $911,000,

17 theoretically, presumably you could -- if you had

18 to spend some of that money today, you can

19 replenish that fund once that million dollars came

20 in May 3rd as a financial matter; is that correct?

21      A.    Under the budget that is laid out here

22 and adjusted a few minutes ago, yes.  Yes.

23      Q.    All right.  One of things you said --

24 I'm going to jump around a little bit, so I

25 apologize for that.  One of the things that you

1    said was the garnishment was the most immediate

2    cause of the Chapter 11.  Leading up to that, had

3    your client been on a payment plan with my client?

4    I'm sorry, had BCause been on a payment plan with

5    Westco, my client?

6         A.    There was a -- there was an agreement

7    that was done back in...

8         Q.    What was that?

9         A.    I'm not sure when.

10        Q.    What was that agreement?  What was the

11   substance?

12        A.    There was an agreement to pay a certain

13   amount at certain times.

14        Q.    Okay.  And what were those amounts and

15   what were those periods?

16        A.    I don't recall now because -- I know we

17   did make a payment in January after I came onboard.

18   It wasn't for the exact amount that was stated, and

19   we didn't make a payment after that time.

20        Q.    Why?

21        A.    Lack of funds.

22              THE COURT:  How much did you pay in

23   January?

24              THE WITNESS:  You know, your Honor, I

25   don't remember now.

1          THE COURT:  Ballpark, are we talking a

2     thousand dollars?

3          THE WITNESS:  Oh, no, no, no, no.  It

4     was more than that.  It was 20,000, 30,000.  I

5     don't know.  But we did.  We wanted to pay

6     something, okay.  That was my -- it was my attempt

7     was to at least pay something.

8     BY MR. AGAY:

9          Q.    Okay.  Do you recall when you made an

10    agreement with Westco to go on a payment plan?

11         A.    Firstly, I didn't make the agreement.

12    It was done by the CEO and general counsel.

13         Q.    Do you recall when that was?

14         A.    It would have been late 2018.

15         Q.    Okay.

16         A.    Or November, in that ballpark.

17         Q.    And you don't know -- was it a monthly

18    payment plan?

19         A.    Yes, it was.

20         Q.    And do you recall what those monthly

21    payments should have been?

22         A.    No.  I recall that they started lighter

23    and then they got heavier as time went by, so I

24    don't remember the buildup of that.

25         Q.    So at the time that the company made

1    that agreement with my client, the company believed

2    that it could make those payments?

3         A.    I think it did.

4         Q.    So what happened in January that

5    hindered the company's ability to continue with

6    those payments?

7         A.    I -- first of all, as I said, I was not

8    party to the agreement.  I don't know what the

9    expectations were in terms of fundraising.  There

10   may have been an expectation that we were going to

11   get an infusion of cash at the time.  So I don't

12   know.

13            I came onboard in December.  And we

14   almost had a cutoff on December 28th, we almost had

15   the power cut off, and we had to scramble around.

16   And we did go ahead and make a payment to Westco of

17   $20,000 or something in January, but after that the

18   financial condition just deteriorated.

19        Q.    Okay.  When you say the financial

20   condition has deteriorated, is that because your

21   expenditures had gone up or your revenues had gone

22   down?

23        A.    I would say probably a combination of

24   both.  If I take the monthly revenues in 2018,

25   we're slightly -- we're under what those revenues

1    were in 2018, and so that was part of the problem.

2         Q.    Is that because you have fewer

3    customers?

4         A.    No.  Because one or two of the contracts

5    were renewed -- were adjusted or renegotiated.

6         Q.    They were renegotiated so that those

7    customers are paying less in hosting fees?

8         A.    Yes.

9         Q.    Okay.  So as part of this bankruptcy

10   case, do you anticipate that you are going to be

11   able to negotiate higher hosting fees with

12   customers?

13        A.    I have no idea whether -- when these

14   things come up for renewal, I have no idea what

15   will transpire.

16        Q.    Okay.  I want to talk about the value of

17   the collateral at Mining.  But before I do that,

18   Mr. Clar asked you about the general liability

19   policy with 3 million in coverage; do you recall

20   that?

21        A.    Yes.

22        Q.    When does that policy expire?

23        A.    I don't know.

24        Q.    Do you know when the premium payment was

25   made on that policy?

1    A.    No.  Not paid while I was here, since

2   December.  I know what's paid since December.

3    Q.    Okay.  So then the policy has to come up

4   for renewal between now and December if it's on an

5   annual basis?

6    A.    Yes, I would assume.  Yes.

7    Q.    And what is the cost of that premium?

8    A.    I don't know.

9    Q.    You have no idea?

10   A.    I don't know.

11   Q.    Okay.  How is the company going to renew

12   that insurance coverage?

13   A.    I don't know.

14   Q.    Mr. Clar asked you about the value of

15  the machinery and equipment.  I will call it M&E.

16  You said it cost over $7 million?

17   A.    Yes.

18   Q.    Do you have any sense of the value of

19  that machinery and equipment today?

20   A.    No.

21   Q.    Have you done an appraisal of that

22  equipment?

23   A.    No.

24   Q.    Have you hired anybody, a liquidator, to

25  value that equipment?

1        A.    No.

2        Q.    So you have no idea what the market

3    value of that equipment is?

4        A.    That's right.

5        Q.    Other than the machinery and equipment

6    and other than the cash and account receivables in

7    the business, are there any other assets at either

8    Mining or Holding?

9        A.    There are $7 million of leasehold

10   improvements, but I don't know that that can be

11   utilized for any purposes because they're literally

12   attached to the building.  We have one big deposit

13   amount that would be a receivable of over 300,000

14   that we've been trying to collect on.

15       Q.    How many days outstanding of a

16   receivable?

17       A.    A year at least.

18       Q.    Collectability is probably not great?

19       A.    It doesn't look good.

20            MR. AGAY:  I don't think I have any

21   other questions.

22            THE COURT:  All right.  Thank you.

23            Mr. Clar.

24            MR. CLAR:  Thank you, your Honor.

25

1        REDIRECT EXAMINATION

2   BY MR. CLAR:

3        Q.    Mr. Sladoje, you've testified that the

4   cash flow previously prior to filing had not always

5   been positive, correct?

6        A.    Correct.

7        Q.    You testified that you made changes to

8   help turn that around?

9            MR. AGAY:  I'm sorry, I apologize.

10  There are a few more questions, I just ask to be

11  able to ask them after Mr. Clar is done.

12            THE COURT:  No problem.

13            MR. CLAR:  Sure.

14  BY MR. CLAR:

15       Q.    Did you make changes to help turn the

16  cash flow around?  Have you made changes?

17       A.    Yes.

18       Q.    Can you tell me what some of those

19  changes are?  We talked about Dominion at some

20  point.

21       A.    We signed a new contract with Dominion

22  on January the 23rd in order to get the rate that

23  we were paying lowered.  That's probably the

24  biggest.  We reviewed the personnel and some

25  personnel stopped taking salary and things like

1    that.  But the biggest one was the Dominion change.

2         Q.    Can you quantify in dollars what the

3    Dominion change means?

4         A.    We don't have enough history yet because

5    we need to get into the other months.  But for

6    right now it appears as though we're saving in the

7    ballpark of at least 200,000 a month compared to

8    where we were at one time.

9         Q.    That is 200,000.  And what about the

10   personnel changes?  What will that yield in dollars

11   in terms of savings?

12        A.    Now are you talking about proposed

13   personnel changes or --

14        Q.    Yes.

15        A.    Well, the ones that we've talked about

16   before here were thirty -- what, 34,000?  And

17   there's a couple of others though that I've

18   suggested, which I don't know if they will take

19   place.  But if they did, it would be another 15,000

20   and change.

21        Q.    What are the suggestions and how much in

22   dollars?

23        A.    That would be about 15,000 in pay or

24   30,000 a month.

25        Q.    To be clear, will either of the debtors,

1    for the sake of clarity, be paying any pre-petition

2    dollars to Dominion?

3         A.    No.

4         Q.    So no matter what the dollar amount is,

5    it will be for post-petition services?

6         A.    That's correct.

7              THE COURT:  Well, wait a minute.  The

8    Dominion motion is up next week.  How are you so

9    confident that's the case?

10             THE WITNESS:  At least that's the plan.

11   That's what we've set out here.

12             THE COURT:  A very different answer.

13             THE WITNESS:  That's what I got.

14             MR. CLAR:  Your Honor, I guess the point

15   is we will have to determine before next Tuesday, I

16   guess, what is pre and what is post, and that's

17   what we will pay.

18             THE COURT:  Assuming that Dominion is

19   okay with that.

20             MR. CLAR:  Assuming that Dominion is

21   okay with that.  And that is part of the

22   negotiation we're having.

23             THE COURT:  Just want to make it clear.

24   We have no definites here vis-a-vis Dominion.

25             MR. CLAR:  Correct.  But I want to make

1    it clear that we cannot and will not pay any

2    pre-petition services.  Whether or not that flies

3    with Dominion is a different issue.

4                THE COURT:  Understood.

5    BY MR. CLAR:

6        Q.     Okay, getting to Mr. Agay's questions.

7    I believe you testified that -- you did not testify

8    that there has never been a positive cash flow,

9    correct?  I know that's a triple negative, but

10   there have been --

11       A.     Yes, there have been some positive --

12   there's been months in which that has occurred.

13       Q.     The machines that we're talking about,

14   the nine or ten customers located in Virginia Beach

15   at the Mining facility, how many machines does each

16   customer have; do you have an idea?

17       A.     There are 14,200 machines, okay.  So

18   they have various -- they have various amounts.  I

19   think up to 5,000 for the biggest customer.

20       Q.     So I don't necessarily think this is a

21   major point, but moving these machines would take

22   quite a while, would it not?

23       A.     Yes.  Moving them and then relocating

24   them, yes.

25       Q.     In response to both Mr. Agay and the

1    Court's questions with respect to the ability to

2    pay Westco going forward, if there was a need to do

3    so -- although I don't think there is, but if there

4    was -- out of the surplus that you now have, would

5    there be an ability to pay Westco something and not

6    just $10,000?

7         A.    Under -- under the alterations that we

8    talked about today and proposed, yes.

9         Q.    In response to Mr. Agay's questions

10   about the necessity of using the bank account, the

11   $911,000, will there be expenditures that need to

12   be made between now and May 3rd when the revenue is

13   expected to come in?

14        A.    Yes.

15        Q.    It's an ongoing business, isn't it?

16        A.    It's an ongoing business.  Bills,

17   regular bills, yes.

18        Q.    Isn't -- isn't --

19             MR. CLAR:  I suppose that is a legal

20   argument.  Strike that, your Honor.

21   BY MR. CLAR:

22        Q.    So to be clear, the surplus in the

23   budget is now higher presumably.  Although we don't

24   know what is going to be paid to Dominion, but

25   we've got 660- in here, we don't know what is going

1    to be pre and post.  But the surplus is now higher

2    due to the reduction in expenses, correct?

3        A.    Yes.

4             MR. CLAR:  I have nothing further, your

5    Honor.

6             MR. AGAY:  I would ask that your Honor

7    treat this as a cross rather than redirect, and I

8    apologize for not asking these questions before

9    this.

10            THE COURT:  Yes.

11                 CROSS-EXAMINATION

12   BY MR. AGAY:

13       Q.    Sir, your budget only goes through May

14   10th, are you aware of that?

15       A.    That's correct.

16       Q.    Why does it only go through May 10th?

17       A.    I was informed by counsel that we needed

18   to prepare a budget that goes 30 days from the

19   filing date.

20       Q.    So you were not told -- you were told by

21   counsel that you only had to provide a 30-day

22   budget?

23       A.    Right now that's correct.

24       Q.    Have you been asked to provide a budget

25   for anything beyond 30 days?

1      A.    No.

2      Q.    Okay.  What would a budget for 60 days

3  look like?

4           MR. CLAR:  Objection, your Honor.  Pure

5  speculation.  I mean we don't have anything in

6  front of us.

7           MR. AGAY:  Strike it.  It's not a big

8  deal anyway.

9           THE COURT:  Okay.

10  BY MR. AGAY:

11      Q.    So in terms of the long-term plans for

12  the company, is it your intent to continue to

13  operate in bankruptcy based on your receipts and

14  expenditures for the near future?

15      A.    I would hope we would emerge from

16  bankruptcy, if that's your question.  I'm not sure

17  whether you're implying --

18      Q.    Do you know when?  You don't know when

19  you're --

20      A.    No, no idea.

21      Q.    But in the meantime your intent is to

22  operate on receipts and expenditures, correct?

23      A.    Right now that's the case.

24      Q.    Okay.  I would like to turn to the

25  payroll motion.  Mr. Clar mentioned that you took

1    five individuals off of the payroll motion because

2    they were insiders; is that correct?

3          A.    Was it four or five?  I...

4          Q.    I thought it was five.

5                MR. DAN:  Four.

6                MR. CLAR:  Four.

7    BY MR. AGAY:

8          Q.    Okay.  Four individuals because they

9    were quote, unquote, insiders?

10         A.    Yes, right.

11         Q.    And you determined they were insiders

12   based on them being members?

13         A.    Members of the LLC, right.

14         Q.    Are any of the individuals left on

15   payroll officers of the company?

16         A.    Yes, general counsel.

17         Q.    General counsel.  Anybody else?

18         A.    No.

19         Q.    Are you still on payroll?

20         A.    I am.

21         Q.    You're the CFO?

22         A.    I am the CFO, but I'm not an employee,

23   so I'm not sure whether you would classify me as a

24   genuine officer or not.

25         Q.    Actually, let's stick on that.  Do you

1    have a contract with the company?

2         A.    No.

3         Q.    Okay.  Has the company sought to

4    formally retain you in the bankruptcy case?

5         A.    No.

6         Q.    So then let's go back.  So you're the

7    CFO, you're going to continue to be paid, the

8    general counsel is going to continue to be paid

9    under -- and also paid what you and the general

10   counsel are owed for pre-bankruptcy services,

11   correct?

12        A.    I -- I don't know if we get paid for any

13   pre-bankruptcy services.  Let me just mention one

14   other thing.  It's not sure that I'm going to

15   continue on.  I may be one of the cuts that is

16   going to take place.

17        Q.    I'm sorry.

18        A.    Okay.

19        Q.    Are there any other officers that are

20   still in the payroll motion?

21        A.    The CEO is not getting -- I don't

22   believe so.  I believe other than the general

23   counsel, I think that's it.

24        Q.    Do you have any vice presidents?

25        A.    No.

1        MR. AGAY:  I have no other questions.

2        THE COURT:  Mr. Clar, anything further?

3        MR. CLAR:  May I have a minute, your

4    Honor?

5                    (Brief pause.)

6        MR. CLAR:  No, your Honor.

7        THE COURT:  Okay.  Do you have any other

8    witnesses?

9        MR. CLAR:  I do not.

10       THE COURT:  Mr. Agay, do you have any

11   witnesses?

12       MR. AGAY:  No, your Honor.  But if

13   Mr. Clar is going to make any argument, I would

14   like to make one --

15       THE COURT:  Not a problem at all.  I

16   will take a break until noon and then we'll come

17   back for summations and ruling.

18       MR. CLAR:  Thank you, your Honor.

19       THE CLERK:  All rise.  Court is in

20   recess until noon.

21                    (Recess taken.)

22       THE COURT:  Mr. Clar.

23       MR. CLAR:  Thank you, I will be brief.

24   We've been here long enough.  I do appreciate the

25   Court extending the time to us.

1          As I said at the outset of the hearing,

2     I believe that the issue is adequate protection

3     and I believe that we have met our burden by

4     showing, one, that the cash will be increasing.

5          By the way, Mr. Agay made a point of not

6     having a longer budget.  Well, as I read the Code

7     and the Rules, we need to have a preliminary

8     hearing before we have a final cash collateral

9     order.  So we routinely tell our clients to give us

10    a 30-day budget.  If Mr. Agay wants a longer

11    budget, we will be happy to give him one.

12          In any event, we believe we have the

13    burden of showing that the cash collateral, if

14    there is cash collateral, of Westco has increased,

15    that they also have other collateral.  The

16    collateral is not deteriorating.  We need the cash

17    in the account to pay ongoing bills.  We can't wait

18    until May 3rd.

19          And by the way, I thought that cash

20    collateral was an all encompassing thing, either

21    we're authorized to use cash collateral or we're

22    not.

23          As far as what the plan is going

24    forward, I recognize that that is a concern except

25    that we're not required to set forth what the plan

1    is going to be now.  Now having said that, the plan

2    could be ongoing operations, the plan could be a

3    363 sale, the plan could be any of the things that

4    we ordinarily seek in Chapter 11 cases.  But we're

5    not -- that is not to be litigated right now in my

6    opinion.

7              So I guess in short I believe that we

8    should be authorized to use cash collateral under

9    the budget we have submitted for the time period we

10   have asked for.

11             THE COURT:  Thank you.

12             MR. AGAY:  David Agay on behalf of

13   Westco.

14             Mr. Clar has said that cash collateral

15   is an either/or thing.  That's just not right.

16   Your Honor can condition the use of cash

17   collateral, limit the use of cash collateral as

18   your Honor deems appropriate to protect my client's

19   interest obviously.  That's the meaning of secured

20   in Timbers -- in the Timbers Association ruling.

21   So that's just not true.

22             And unfortunately, I think as it has

23   been presented this is a do-over.  The budget was

24   literally changing as we were in court today and as

25   we were examining witnesses.  So as I sit here

1    today, I don't know what's in this budget.

2         And furthermore you heard that other

3    insiders are being paid as part of the payroll

4    motion, so they have to adjust that; otherwise, you

5    run up against the U.S. Trustee and the 503(c)

6    concerns.

7         The other thing I would note, your

8    Honor, is they redid the budget but they didn't

9    extend it past May 10th.  They don't have to extend

10   it beyond May 10th, but in light of the concerns

11   that we raise in our objection, I would think they

12   would want to show some path here that gets them

13   beyond the beginning of May.

14        And the other thing that's a glaring

15   omission in these budgets, there's no legal fees in

16   these budgets, there's no U.S. Trustee fees baked

17   into these budgets.  So that's great that they're

18   creating more cushion, but I'm assuming that

19   Mr. Clar's firm is not doing this pro bono, and I

20   know that the U.S. Trustee's office is not doing it

21   pro bono.  So we don't have a fully baked budget

22   here even for this interim period.

23        In terms of the long-term prospects,

24   they couldn't -- as we sit here today, they

25   couldn't confirm that.  They couldn't cram down my

1    client based on the dollar amounts that are owed.

2    And they haven't shown you a path to getting there.

3           Now, it may be that there is a path and

4    that the company can cut expenses and continue to

5    build cash with its existing customer base so that

6    we ultimately get to a confirmable plan, but my

7    client is not willing to take that risk.  And it's

8    certainly true that they haven't come to us with

9    any sort of proposal.  There was no discussions, no

10   approach pre-bankruptcy of give us this rope so

11   that we can ultimately get there and pay them.

12   That's just not an appropriate way to go about

13   this, particularly given the company's straits at

14   this point.  So it's just not right and it's not

15   what the Bankruptcy Code intends, that we should

16   take the risk in light of our current interest on

17   whether the company is going to succeed.

18           At a minimum they should have

19   established separate bank accounts for Mining and

20   for LLC.  There is money moving in and between

21   them.  And you heard Mr. Clar, they are going to

22   try to avoid our security interest at LLC.  Great,

23   they're going to take all the money and put it into

24   LLC and then say they don't have a security

25   interest.  How did that make any sense?  How is

1    that fair to us?  How does that maintain the status

2    quo?

3              He says that our interests are not being

4    harmed.  By definition they are being harmed

5    because they are going to use all of our cash and

6    then they're going to put it in a bank account that

7    they say we can't reach.  There is just no

8    protection baked into this entire process.

9              And then they come back and they say,

10   well, there is more cushion now.  Okay, well, then

11   you don't need to use our money that's in the bank

12   account.  So there is a lot of, you know, in this

13   pocket, in this pocket over here.

14              And as I see it, your Honor,

15   respectfully, I just don't see how your Honor can

16   approve this cash collateral budget as it's been

17   presented and as counsel has presented in court

18   today and given particularly how many moving pieces

19   there are.  I mean, the Dominion Energy thing makes

20   or breaks this case, and they have continued that

21   until next week.  You heard the witness say that

22   when they get a bill, it's going to be for

23   pre-petition periods.  Then Mr. Clar gets up and

24   says, well, we're not going to pay for any

25   pre-petition.  But then we don't know what the

1   budget looks like.

2          So as we sit here today, there is zero

3   adequate protection for my client.  They are just

4   going to continue to burn through their cash.  We

5   don't know what the budget is.  They don't know

6   what the value of the nonliquid assets are.  And

7   we're not being given any other protection.

8          It may be the case that the company to

9   continue and operate makes sense for my client, but

10  not under these circumstances.  So we have to

11  continue to sustain our objection, and we would ask

12  your Honor to sustain it also.

13          THE COURT:  Thank you.

14          There's no reply to a conclusionary

15  statement, Mr. Clar.  But I will ask you a

16  question.

17          MR. CLAR:  Yes?

18          THE COURT:  I think that your client or

19  the CFO testified that the one insider that was in

20  the budget was the general counsel.  How much is

21  that?

22          MR. CLAR:  It's unclear to me why that

23  would be an insider.

24          THE COURT:  Let's get the answer and

25  then I will ask you the question.

1           MR. CLAR:  Okay.

2           3,000 a paycheck.

3           THE COURT:  Is the general counsel a

4    member?

5           MS. CRESCE:  No.

6           MR. CLAR:  No, she is not.

7           MS. CRESCE:  No.

8           MR. CLAR:  She is not.

9           THE COURT:  So you're just an employee?

10          MS. CRESCE:  Correct.

11          MR. CLAR:  So I don't believe that she

12   is an insider.

13          THE COURT:  Understood.

14          All right.  I am not in the habit of

15   shutting down businesses the minute they file

16   Chapter 11, and I don't want to do that as long as

17   I know that creditors are adequately protected and

18   I won't cause them to be in a worse position.

19          In looking at this budget, I completely

20   agree with Mr. Agay that the energy company is the

21   big Kahuna here that can make or break this company

22   and that put a small risk into a very large risk,

23   so I'm not going to authorize the use of adequate

24   protection through May 10th.  What I will do --

25          MR. CLAR:  You mean cash collateral?

1              THE COURT:  I'm sorry, cash collateral.

2              What I will do is authorize the use of

3       adequate protection through April 26th, which means

4       this week and next week.  And that means you can

5       pay the payroll.

6              As I see it, the total expenditures for

7       the two entities the week of April 19th was -- and

8       I had added it here somewhere, let's see if I can

9       find it.  It was your 198- that became 140-.  It's

10      140-.  I'm sorry, the payroll became 140- instead

11      of 174-.  So that's 198-.  You have to back out the

12      34-.

13             MR. CLAR:  As well as the --

14             THE COURT:  I'm sorry, what?  I'm just

15      talking about April 19, okay.  And then you add in

16      the $4370 that the Mining company has.

17             So I'm going to authorize that cash

18      collateral to use this week, the week of April

19      19th.  I think that number is $169,008 when I

20      backed out and then added up.

21             The week of April 26th there are minimal

22      expenses other than the energy company, and I'm not

23      allowing any payment on that right now.  What I

24      think makes sense to do is just come back here next

25      week when we're back here with the energy company.

1          So I will authorize you to pay the

2     expenses this week which includes the payroll.  I

3     think it is a total of 169,008.  And then we'll

4     come back next week and see where you are on the

5     energy company, what you're really asking for.

6          I also note that I received another

7     motion to pay the other utility company which is

8     set up for Wednesday.  But it has no numbers in it,

9     so I have no idea what it is.  All it is is just a

10    list of utility companies.  What was printed out

11    for me has no numbers, no amounts, just names.

12          MR. CLAR:  I will see to it that --

13          MR. DAN:  Your Honor, the -- just

14    generally don't put -- all we've added in there is

15    what we would propose for adequate protection --

16    adequate assurance to the utility.  The number on

17    that one I can tell you is -- I think what we

18    proposed is actually I believe less than $10,000.

19    So it's not like that one because it's basically

20    for an office here in Chicago.  So it's not -- not

21    a hosting facility like the other one, and so we're

22    talking a normal utility bill from a case that

23    doesn't have a giant --

24          THE COURT:  Okay, we'll take that up

25    next Wednesday.

1           So just to make it perfectly clear,

2    Mr. Agay, I believe that under all the

3    circumstances given the amount of money that is due

4    to come in in May, even if it doesn't all come in

5    in May, I think you're okay with respect to the

6    165,000 or whatever it is, $169,000, and that is

7    all that I am authorizing be paid out of that bank

8    account.

9           You can figure out the mechanics of how

10   to release enough money to pay those bills.

11          MR. CLAR:  Right.

12          THE COURT:  But that is all I'm

13   authorizing.  The rest stays where it is, frozen.

14          MR. AGAY:  May I ask some clarifying

15   questions, your Honor?

16          THE COURT:  Yes, you may.

17          MR. AGAY:  The 169,000 that your Honor

18   is permitting to go out -- maybe this is a question

19   for Mr. Clar -- does that include the Paychex?

20          THE COURT:  No.

21          MR. CLAR:  No.

22          THE COURT:  No.  If you look at the line

23   item on the budgets for April 19th, it's a total of

24   198,638.

25          MR. AGAY:  Yes, right.

1          THE COURT:  You back out 34,000 for

2     insiders.

3          MR. AGAY:  Uh-huh.

4          THE COURT:  Then you look at the budget

5     for Mining and there's only $4,370.  So if you add

6     those two together, I believe I came up with --

7     it's 164,638 for the LLC.  It's 4,370 for the

8     Holding company.  That's 169,008.  That's April

9     19th.  That's all the bills that are being paid,

10    and that's all that I'm authorizing being spent.

11         MR. AGAY:  So the budget, though -- the

12    new budget for Holding says payroll for April 19th,

13    in parens, Paychex, 174,500.

14         THE COURT:  No.  No, it doesn't.  I'm

15    looking at it right here.  The new budget for LLC

16    shows total expenditures April 19th, 198,638.

17         MR. AGAY:  Oh...

18         THE COURT:  The payroll, Paychex, is not

19    paid until May 3rd, the $85,000, and taken out.

20         MR. AGAY:  All right, fine.

21         MR. DAN:  Your Honor, there is one thing

22    that I need to clarify to that.  The testimony --

23    and I just confirmed with Mr. Sladoje -- is that

24    it's 34,000 a month.  It's 17- per pay period.

25    You've taken the 34- out of one of the two pay

1    periods, as opposed to 17- and 17-.

2          THE COURT:  There are no more pay

3    periods on this --

4          MR. DAN:  Isn't May 3rd -- isn't the

5    week of May 3rd also a pay period on this?

6          MR. SLADOJE:  Yes.

7          THE COURT:  But that's just got the

8    $85,000 that I thought was going to Paychex.

9          MR. SLADOJE:  No, no. The Paychex is

10   174,000.

11         THE COURT:  Holy cow.

12         MR. CLAR:  Okay.

13         THE COURT:  Okay, how much is the

14   payroll without Paychex?

15         You are absolutely right, Mr. Agay.

16   That was not clear at all.

17         MR. SLADOJE:  The regular payroll -- the

18   regular payroll is 85-, 86,000.

19         THE COURT:  That's all I'm authorizing.

20   You're not paying a penny to Paychex.

21         MR. SLADOJE:  Right.

22         MR. CLAR:  That's fine.  Thank you for

23   the clarification.

24         THE COURT:  Then let's make it very --

25   perfectly clear.

1     MR. AGAY:  Thank you, your Honor.

2     THE COURT:  What we're going to allow

3 them on payroll is the regular payroll minus the

4 insiders.  So what is that number?

5     MR. SLADOJE:  That will be 85,000 minus

6 17-.  The insiders were 17-.

7     MR. DAN:  It's rough.

8     MR. SLADOJE:  It's roughly, yes.

9     MR. DAN:  We don't have an exact number

10 as we sit here.  It's approximately 17,000.

11     MR. SLADOJE:  Yeah.

12     MR. DAN:  So 85- minus the 17- would be

13 roughly 68-.  Could it be 69-?  You know, we're

14 talking right in that range.

15     THE COURT:  Okay.

16     So I'm authorizing -- the total amount

17 we had here was 198,638 plus 4,370 for Mining,

18 okay.  We're going to back out of that the

19 insiders, which is 17,000, and we're going to back

20 out of that the Paychex.  Which was how much?

21     MR. CLAR:  86-.

22     THE COURT:  86,000.  Okay, I don't have

23 my calculator with me.  You can figure it out.

24 That's all I am authorizing get paid.

25     MR. CLAR:  That's fine.

1          THE COURT:  All right.

2          MR. CLAR:  Until?

3          THE COURT:  And then we'll be back here

4     next Wednesday.

5          MR. CLAR:  For the Dominion --

6          THE COURT:  For Dominion and for the

7     other motion that Mr. Dan has filed.

8          At that time I would suggest you figure

9     out what you're going to do next because you're in

10    freefall here.  And while you don't have to file a

11    plan, you do have to tell me that there is a

12    reasonable possibility of reorganization in a

13    reasonable amount of time, or I am going to be

14    lifting the stay in a couple of weeks would be my

15    guess.  I mean, that's just where this goes.

16         MR. CLAR:  Well --

17         THE COURT:  I need to know there is a

18    plan.  I need to know that you're not just going to

19    burn through all the cash and then say, oh, well, I

20    guess we're not going to make it.  There has got to

21    be something that convinces me that you're not just

22    going to burn through the cash and then not pay

23    anybody.

24         And Mr. Agay makes another good point,

25    there are no attorney fees in here, there is no

1    U.S. Trustee fees.

2                MR. CLAR:  May I address the attorney

3    fees?  I appreciate Mr. Agay's concern for

4    attorneys' fees.  We were paid a pre-petition

5    retainer.  We can only go in every 120 days.  The

6    budget only goes for a month.  The attorneys' fees

7    do need to be in there.

8                THE COURT:  Well, we don't even know

9    that you got a pre-petition retainer.  We don't

10   have --

11               MR. CLAR:  We got a pre-petition

12   retainer of $25,000 for each company, okay.  And

13   that's -- that's simply not right to raise that

14   issue.  The U.S. Trustee fees, yes, we'll put that

15   in the budget.  But --

16               THE COURT:  Mr. Clar, you're getting

17   bent out of shape about something when we're

18   looking at a simple situation here.  This company

19   has expenses.  They have to show me that they can

20   pay their expenses.  And we all know that maybe

21   you're not doing anything this month, but we know

22   that you're working and we know you're going to be

23   entitled to be paid, and we have an allegation that

24   this might be an administratively insolvent estate.

25   I don't like administratively insolvent.

1    MR. CLAR:  Neither do we.

2    THE COURT:  Okay.  So we're all on the

3    same page.  So while you can say, oh, our budget is

4    fine, it's not there.  We all know you're not

5    working for free.  And it's going to make a

6    significant impact.  And the chances are you're

7    going to blow through that 25- in a Chapter 11 case

8    with a contested confirmation hearing, a collateral

9    hearing with --

10   MR. CLAR:  Well, I hope so.

11   THE COURT: -- collateral hearings like

12   this are going to blow through it pretty quickly.

13   MR. CLAR:  Well, that's true.  But there

14   is a requirement that we only come in every 120

15   days.

16   Look, your Honor, we're not looking to

17   work for free, that's for sure.  But I just think

18   it's a little early to raise that as an issue.

19   And as far as blowing through the

20   cash --

21   THE COURT:  Mr. Clar, I just ruled.  We

22   don't need argument here.  It's done.  We're done.

23   I've ruled.  It's over.  I've ruled.

24   I will see you next Wednesday.

25   MR. NGUYEN:  Judge, before -- can I make

1    a recommendation that we meet on Thursday?  There

2    is a committee formation on Wednesday.  We might

3    have a secured creditors committee formed on the

4    24th.  Could we do the 25th?  There might be

5    committee counsel who represents the unsecured

6    creditors.

7              MR. CLAR:  Well, we can't -- we would

8    have to re-notice the motion.

9              THE COURT:  Or we can call it on

10   Wednesday and continue it until Thursday.

11             Any objections?

12             MR. AGAY:  No.

13             THE COURT:  It won't change what's going

14   to be paid out of the amounts.

15             MR. AGAY:  Right.

16             Could I just clarify --

17             THE COURT:  Oh, wait a minute.  Next

18   Thursday?  Okay --

19             MR. AGAY:  The 25th.

20             THE COURT:  The problem with the 25th is

21   I cannot have a contested confirmation hearing.  I

22   have to be in a car and on my way to St. Louis by

23   no later than 11:00 o'clock.

24             So realistically, we could come -- what

25   time is the meeting?

1          MR. NGUYEN:  It's at 1:30, your Honor,

2     on the 24th.

3          THE COURT:  Right, understood.  I mean,

4     you could come in 9:00 o'clock on the 25th, but I

5     can't have testimony.  I mean, it just can't

6     happen.  We'd have to do it --

7          MR. CLAR:  Can we address that briefly?

8     What testimony would that be?

9          THE COURT:  I don't know what you're

10     going to do with the utility company.

11          So you're going to have to convince me,

12     Mr. Clar, that I'm going to let you pay you

13     whatever they want to get paid out of his cash

14     collateral, alledgedly.

15          MR. CLAR:  I get that.  I just -- I'm

16     just not sure that we need a contested hearing.

17          THE COURT:  Well, I'm not going to

18     advise you what to do.  You're the lawyer.  You

19     figure out what you think you need to do to

20     convince me to let you go further.

21          Mr. Agay, did you have another question?

22          MR. AGAY:  Yes.  So our cash collateral

23     is being diminished by 68,000 and change --

24          MR. CLAR:  I thought we were done.

25          THE COURT:  We're not arguing.

1           I thought you had a question?

2           MR. AGAY:  I do.

3           I assume that we still get our adequate

4   protection for that amount.  We'll get a

5   replacement lien for example.

6           THE COURT:  Well, I thought that was

7   part of the offer anyway.

8           MR. CLAR:  It was.

9           THE COURT:  I don't think that's an

10  issue.  So, yes --

11          MR. CLAR:  That's true.

12          MR. AGAY:  Okay.  And we'll get a

13  replacement lien on the cash and accounts

14  receivable that are in Mining today?

15          MR. CLAR:  Correct.

16          THE COURT:  Yes.

17          MR. CLAR:  Whatever you had before.  If

18  you had it before.

19          THE COURT:  Why don't you put together

20  an order between the two of you and submit it to

21  me.  And that way there won't be any questions.

22  We'll know exactly what you've got and exactly

23  where we are for the next week.

24          MR. AGAY:  Okay.

25          THE COURT:  4/24, at 10:00 o'clock.

1    Don't come in at 9:30.

2              MR. DAN:  So it will just be the utility

3    motion?

4              THE COURT:  Yes.

5              MR. DAN:  Thank you.

6                   (Which were all the proceedings

7                    had in the above-entitled cause,

8                    April 18th, 2019.)

9

10

11   I, CAROL RABER, C.S.R., DO HEREBY CERTIFY
     THE FOREGOING IS A TRUE AND ACCURATE
12   TRANSCRIPT OF PROCEEDINGS HAD IN THE
     ABOVE-ENTITLED CAUSE.
13

14

15

16

17

18

19

20

21

22

23

24

25