IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


BCause Mining, LLC,                    )  19 B 10562
BCause, LLC,                           )  19 B 10731
                                       )  Chicago, Illinois
                                       )  10:00 a.m.
                        Debtor.        )  May 8, 2019



TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE JANET S. BAER


APPEARANCES:

For the Debtors:              Mr. Scott Clar;

For Wesco Distribution,
Inc.:                         Mr. David Agay;

For Hoffland Properties:      Mr. Mark Fisher;
                              Ms. Sarah Angelino;

For Dominion Energy
Virginia:                     Mr. Russell Johnson;

For the U.S. Trustee:         Mr. Ha Nguyen;
                              Ms. Katy Gleason;

For BMG Operations, Ltd.:     Mr. Brian Shaw;
                              Ms. Christina Sanfelippo;

For Official Committee
of Unsecured Creditors:       Ms. Elizabeth Janczak;

                              Jerri Estelle, CSR, RPR
                              U.S. Courthouse
                              219 South Dearborn
                              Room 661
                              Chicago, IL  60604.

1            THE CLERK:  BCause Mining, LLC, and

2    BCause, LLC.

3            UNIDENTIFIED SPEAKER:  They're out in

4    the hallway, Judge.

5            THE COURT:  And I just want to kind of

6    see where things are at, and then we'll take a little

7    break before we start anything big, but we'll --

8            UNIDENTIFIED SPEAKER:  Sure.

9            THE COURT:  -- see where things are

10   at.

11            Okay.  Let's just get everybody's

12   appearance on file and see what we're going to do

13   today.

14            MR. CLAR:  Fair enough.

15            THE COURT:  And I'm going to apologize

16   right now.  I'll give you as much as I got.  I've got

17   this crazy cold, and I'm sneezing and coughing like

18   crazy.  But I've got water, I've got kleenex, so

19   we'll go on.

20            MR. FISHER:  Do you have drugs?

21            THE COURT:  Yeah, I have cough drops,

22   no drugs.

23            MR. AGAY:  Good morning, Your Honor.

24   David Agay on behalf of Wesco.

25            MR. JOHNSON:  Good morning, Your

3

1   Honor.  Russell Johnson on behalf of Dominion Energy

2   Virginia.

3                    MR. NGUYEN:  Good morning, Your Honor.

4   Ha Nguyen for the U.S. Trustee.

5                    MR. FISHER:  Good morning, Your Honor.

6   Mark Fisher for Hoffland Properties, the landlord.

7                    MS. ANGELINO:  Sarah Angelino for

8   Hoffland Properties.

9                    MR. CLAR:  Good morning, Your Honor.

10  Scott Clar and John Redfield on -- and soon to be

11  Jeff Dan, I think, on behalf of the debtors.

12                    Also with me are several of the

13  debtors' representatives.  I won't get into that.

14                    MS. JANCZAK:  Good morning, Your

15  Honor.  Elizabeth Janczak, proposed counsel to the

16  official committee of unsecured creditors.

17                    MR. SHAW:  Good morning, Your Honor.

18  Brian Shaw on behalf of BMG Operations, Limited.

19                    MS. SANFELIPPO:  Good morning, Your

20  Honor.  Christina Sanfelippo also on behalf of BMG

21  Operations, Limited.

22                    THE COURT:  A new party.  Who's BMG?

23                    MR. CLAR:  The largest creditor.

24                    MR. SHAW:  Yeah, we've got about 3.2

25  million in a claim.

4

1          THE COURT:  Okay.  I appreciate that.

2          And then I have on line Jennifer

3   McLemore on behalf of BMG.  And Dennis Lewandowski on

4   behalf of Hoffland Properties.

5          Okay.  Mr. Clar, where are we at?

6          MR. CLAR:  Well, there is a long

7   answer to that, but -- and I have in my brief case --

8   I have Your Honor's call and all the motions.

9          Where are we?  Mr. Agay and I spoke,

10  so I think the most important thing that I can answer

11  in that regard would be where are we with agreed use

12  of cash collateral.  And we do not have an agreement

13  as to use of cash collateral.

14          THE COURT:  Okay.

15          MR. CLAR:  But just as importantly, we

16  do have an agreement with Dominion Energy of

17  Virginia, I believe they're called, going forward

18  that under certain circumstances they will withdraw

19  their joinder to the motion to dismiss.

20          Getting to the motion to dismiss or

21  the alternative relief from automatic stay, we don't

22  have an agreement on that.  There are other parties

23  who wish to be heard, most notably the committee and

24  BMG on that.  And we would like time to respond as

25  well.

1            We -- I wrestled with the idea of

2    filing a response, but since I've not had a chance to

3    really discuss it with Mr. Shaw or Ms. Janczak, we

4    did not.

5            So, where are we?  We've got some what

6    I consider ministerial motions to employ.  I don't

7    know if they are ministerial or not, but we've got

8    motions to jointly administer these cases.  We

9    have -- what am I missing?  Ms. Janczak's and

10   Freeborn & Peter's motions to employ -- thank you --

11   their counsel.  Mr. Fisher's motion --

12            MR. FISHER:  On the rent.

13            MR. CLAR:  -- to compel, which I

14   believe we have resolution of that as well.  And I

15   think maybe some motions that Mr. Agay filed, motion

16   to exceed the page limit.  I don't know if that's

17   been dealt with or not.

18            THE COURT:  Yeah, that's --

19            MR. CLAR:  But the most important

20   motion, obviously, is cash collateral.

21            THE COURT:  Cash collateral, right.

22            MR. CLAR:  Yes.  And I am prepared to

23   put Mr. Thomas Flake on the stand to testify as to

24   Your Honor's concerns the last two hearings.

25            First of all, that the budget showed a

1  small, but a -- but a surplus.  We've now -- and Your

2  Honor hasn't seen it -- we've now circulated a new

3  budget which shows at the end of the day -- this

4  budget goes through -- it's the 13-week budget that

5  the court and Mr. Agay and I thought was appropriate.

6  And it shows a surplus of cash.  Mr. Flake is

7  prepared to testify as to the expenditures under that

8  budget.

9            I should also point out that the last

10 time we were here, we conditioned cash collateral

11 usage on collection of receivables and verification,

12 and the not unreasonably withheld consent of Wesco.

13 They did not unreasonably withhold their consent.

14 The receivables were collected.  We've paid Dominion

15 the six-sixty, and we paid some of the other holding

16 company bills that were required to be paid.

17            So we did what we were supposed to do.

18 And now we're before Your Honor to not only address

19 that and address the expenditures going forward, but

20 also to address what we might do to increase revenue,

21 what we might do additionally to cut costs to

22 hopefully increase the surplus that exists as of

23 August 2nd of, I think -- I don't have it in front of

24 me.  It's in my briefcase.  But that's not the one --

25 well, actually, here -- increase -- thanks --

1          MS. JANCZAK:  I do what I can.

2          MR. CLAR:  -- to increase the cash

3     collateral.  So we started out with $911,000 in the

4     account.  And Mr. Agay has made the point that we

5     don't want to be cutting into that.  We're not.  That

6     stays the same or increases.  And that, by the way, I

7     would point out is with -- that is with paying four

8     months rental payment in three months, which won't

9     happen again.  So there are some -- there are some

10    factors here that resulted in increased costs.

11         THE COURT:  Okay.

12         MR. CLAR:  So I would like to put on

13    testimony again.

14         THE COURT:  All right.  Well --

15         MR. CLAR:  But I think we can take

16    care of the other motions, perhaps, first.

17         THE COURT:  We can probably do that.

18         Let me ask a basic question before we

19    begin.  I don't have any schedules.

20         MR. CLAR:  No.

21         THE COURT:  I don't know who the

22    creditors are, and it's very frustrating, which is

23    why I said who are you guys?  I didn't know there was

24    a $3 million creditor.

25         MR. SHAW:  I'm Brian, Judge.

1          THE COURT:  I know who you are, Brian,

2    but I don't know who your client is, and how he fits

3    into this picture.

4          MR. SHAW:  And, Judge, that's a -- let

5    me -- I'm going to -- I'd like to speak up now since

6    you brought up the point.  That is a problem that the

7    attorneys and my clients have on our side, which is

8    we've got Mr. Agay's stay motion, which is before the

9    court today.  And, ultimately, we've got more money

10   than anybody in the estate here, other than probably

11   the debtor itself.

12          THE COURT:  Are you secured?

13          MR. SHAW:  We are -- we are not

14   secured, but we are the biggest, I believe -- and

15   Mr. Flake can probably answer -- I believe we were

16   their biggest customer.

17          THE COURT:  Okay.

18          MR. SHAW:  And we are owed a lot of

19   money.  And the effective way that arrangement was

20   made previously is that we are secured by the right

21   of setoff.  So we are secured in the sense that as

22   payments come due, they can be set off, but we're not

23   secured with traditional collateral.  And we do

24   have -- if the company tanks, there's a $3.2 million

25   of a claim that is not going to get --

1    THE COURT:  That's one of my concerns.

2  And it was raised by -- it was raised by Mr. Agay,

3  and it was raised by the debtor.  I'm seeing people

4  flying around here with comments that there is X

5  amount in value in this company.  I've heard zero.  I

6  have no schedules, and I know nothing.

7    MR. SHAW:  And, Judge, at least with

8  regard to the stay motion, and to a lesser extent

9  with regard to the dismissal motion, neither of those

10  really can be looked at or responded to until we, at

11  a minimum, see the schedules.  I did talk to Mr. Clar

12  outside in the hallway.  He believes the schedules

13  will be filed sometime next week before the scheduled

14  341 meeting.

15    My concern is that everybody be given

16  some -- I realize it's going to be short -- but some

17  reasonable amount of time to digest that information

18  before they have to respond to the motion for stay,

19  and, similarly, the motion to dismiss.  But the

20  motion to dismiss hasn't even been brought before the

21  court on proper notice.  So that may be a different

22  issue entirely.

23    MR. CLAR:  May I address the schedules

24  issue, because I'm painfully aware of that, and I've

25  been trying to impress upon the client.  But the

10

1    problem is the client is shorthanded with respect to

2    financial -- and they've been working on the other

3    aspects of this case.  It's not an excuse, but -- or

4    maybe it is, but --

5                    THE COURT:  No, it's really not an

6    excuse.  I mean --

7                    MR. CLAR:  But --

8                    THE COURT:  -- what Chapter 11 debtor

9    isn't in that position?

10                   MR. CLAR:  But let me -- let me just

11   point out, though, that last time we were in court we

12   continued -- and I should have addressed this before

13   we ended -- but we continued our motions to extend

14   time to file schedules to today, whereas the motions

15   to extend time to file schedules requested through

16   today to file schedules, not knowing at that time

17   when we filed the motion when the next hearing would

18   be.

19                   So all I'm saying is that we're not

20   technically -- I understand the practical part of

21   this, but we're not technically late.

22                   THE COURT:  I'm not saying you're

23   late.  I'm saying you haven't filed them yet.  It

24   doesn't --

25                   MR. CLAR:  And I --

1          THE COURT:  There's a big difference

2   between that.  You may have gotten an extension, but

3   the fact of the matter is we're all working in the

4   dark.  Are they going to be filed today?

5          MR. CLAR:  No, because we're in court.

6          THE COURT:  Oh, then you are going to

7   be late.

8          MR. CLAR:  If you grant the motion.

9   Or unless -- unless we ask for an additional couple

10   of days, and I'll talk to Mr. Nguyen about that.

11          MR. SHAW:  My comments weren't meant

12   to be critical of the company.  It was just pointing

13   out that --

14          MR. CLAR:  So --

15          MR. SHAW:  -- that comment is

16   applicable to several motions before the court.

17          THE COURT:  Okay.  We need to figure

18   out today, if everybody's going to have time to see

19   these schedules and figure out what to do, what if

20   any use of cash collateral there has to be, what if

21   any use of cash collateral I'm going to give.

22          So you've got to tell me how we're not

23   going to -- how we're going to maintain the status

24   quo.  How do we maintain the status quo?  And I need

25   to hear testimony about that.  I need to be

1   comfortable that Mr. Agay's client is not going to be

2   in worse shape; the unsecured creditors committee

3   aren't going to be sitting here with no hope of ever

4   getting paid; Mr. Shaw's client's not going to be

5   sitting here with no hope of ever getting paid, and

6   your law firm is in the same position.

7           I mean, that's what my concern is,

8   it's been from the beginning, which is it's really

9   tight.  And I really don't like administratively

10   insolvent cases.  And then when I see a motion to

11   employ unsecured creditor committee counsel, it makes

12   me even more cringe because now I've got two

13   professionals that have to be paid and nothing in the

14   budget for them.

15           MR. CLAR:  That's not -- that's not --

16   oh, you haven't seen it.

17           THE COURT:  Right.  I haven't seen

18   anything yet.

19           So, again, you're going to have to

20   convince me that we have to go beyond today and we

21   can maintain the status quo while we all get a little

22   bit smarter here about what's going on, who the

23   creditors are, what's owed, and where the money is

24   going to come from.

25           MR. CLAR:  I think Mr. Johnson and I

13

1   can address a proposal with respect to use of cash

2   collateral, obviously, subject to testimony and

3   Mr. Agay's cross-examination, if he wishes to do so,

4   but --

5              THE COURT:  And what I'm going to do

6   is I'm going to ask you to hold on that.

7              MR. CLAR:  Okay.

8              THE COURT:  I want to take a break --

9              MR. CLAR:  Okay.

10             THE COURT:  -- blow my nose a couple

11  more times.

12             MR. CLAR:  Fair enough.

13             THE COURT:  -- sneeze a few more times

14  and come back.  And also I want to give you an

15  opportunity, because I know I pulled you out of the

16  hallway, just to see where things are at.  I want to

17  give you an opportunity to talk and discuss what can

18  be worked out.

19             I am unlikely to dismiss a case

20  without even having seen the schedules.  I'm unlikely

21  to dismiss a case knowing I've now, for the first

22  time, been informed I've got a $3 million creditor

23  here.  He's even bigger than you are.  So I think it

24  makes sense for you all to talk about how we get from

25  here to the next day.

1          MR. SHAW:  We would love that, Your

2    Honor.

3          THE COURT:  Okay.  Take as much time

4    as you need.

5          MR. CLAR:  Right.  So we're --

6          MR. FISHER:  The only thing that I

7    would say about preserving the status quo is the

8    landlord, which is the one where the only operating

9    business is operated, we haven't been paid any rent

10   yet.  The Code says we're entitled to get our

11   post-petition rent.

12          We have, I think, an agreement that we

13   would accept a payment the end of this week for the

14   rent, plus account for our stub rent in three

15   installments over the next period of time.  The

16   number isn't quite right, but it's within a couple

17   thousand bucks on the stub rent.

18          And, you know, that's where we are.

19   But we think to preserve the status quo, our client

20   is not forced to keep providing services to this

21   debtor without being paid as the Code requires it.

22          MR. CLAR:  Well, Your Honor wanted to

23   take a break.  Is that -- that's where I was going.

24   But if Your Honor wants to take a break, we can come

25   back.

15

1               THE COURT:  Take a break.  Okay, let

2    me know --

3               MR. CLAR:  Can you give us 15 minutes?

4               THE COURT:  You can have as much time

5    as you want.  I'm not going anywhere.  So let me know

6    when you're ready.

7               MR. CLAR:  Thank you.

8               MR. SHAW:  Thank you, Judge.

9               MR. FISHER:  Thank you, Your Honor.

10                   (Brief recess.)

11               THE CLERK:  Continuing with this

12   court's 10:00 matters, BCause Mining, LLC, and

13   BCause, LLC.

14               MR. CLAR:  Mr. Agay asked if he could

15   have a few minutes, so he'll be -- there he is.

16   Okay.  Okay.

17               THE COURT:  Okay.  We're here on the

18   debtors' continued motion for use of cash collateral.

19               MR. CLAR:  Correct.  We do not have an

20   agreement, Your Honor.  I'd like to --

21               THE COURT:  Okay.

22               MR. CLAR:  -- put on testimony.

23   Mr. Thomas Flake, who is in the courtroom, came in

24   from Virginia Beach.  He is the -- one of the

25   founders.  He is the president of mining and a few

1   other things.

2              THE COURT:  Okay.  Before we begin,

3   does anybody want to make any preliminary remarks?

4              Mr. Agay?

5              Mr. Shaw?  Where is he?

6              MR. SHAW:  Sure.

7              THE COURT:  There he is.

8              MR. SHAW:  Your Honor, the only

9   comment I would like to make is, again, as the

10  largest creditor in this case, we're sitting here

11  with a paucity of information.  And it's -- I've

12  also -- just so the court knows, I've also spoken to

13  Mr. Agay because I looked -- you know, I've got

14  limited documents, including what was attached to

15  Mr. Agay's motion.

16             And at the same time that I have lots

17  of questions about what's going on with the debtor,

18  my client has questions about some of the underlying

19  paperwork that we assume, but have not seen, is

20  behind Mr. Agay's claim.  And I think I'll get that

21  information from him, but it just puts my client,

22  and, obviously, us here today in an odd position

23  because we really, really don't have a lot of

24  information.  And it's information underlying the

25  lien claims that are being at least preliminarily

1  dealt with in a cash collateral motion, and it's

2  information about the finances.

3          So what I would hope happens is that

4  we can all after this hearing hopefully get to a

5  place where we don't just kill a case or kill it

6  defacto by not letting it have cash in a situation

7  when there's a lot of questions about the respective

8  rights of the various major constituents.

9          THE COURT:  I understand that, but

10  I'll make this comment, which is I think we've been

11  in this case for three weeks.  And from day one there

12  have been threats that Mr. Agay's liens aren't any

13  good.  From day one there have been documentation.

14  I've seen the confession of judgment and all this

15  sort of stuff, so there's no mystery here.

16          MR. SHAW:  Well, Judge, there is a

17  mystery when it's all relying, at least according to

18  the motion, on a single application for credit.

19  There's dots, and the dots don't connect in my

20  opinion.  And I would like -- obviously, I would like

21  to have my client and their counsel be able to look

22  at those documents.  I assume that if I ask Mr. Agay

23  for them, and I will later today, we'll be able to

24  get them.

25          But, again, realizing he's filed a

18

1  document, he has a confession to judgment, but all of

2  that goes back to ultimately also an alleged

3  financing statement and a UCC-1 filed back in 2017.

4  I believe if you look at the motion and the

5  attachments, there's still some dots missing.  I

6  assume those documents exist, but we have not been

7  able to review them.

8              THE COURT:  And I understand that.  My

9  only point, because I see you all jumping up getting

10  excited here.  I'm not ruling on anything.  My point

11  is the case has been pending for three weeks.  From

12  day one the debtor has alleged that there are issues

13  with Mr. Agay's lien.

14              The other parties who are new to the

15  party, who have just come into my courtroom for the

16  first time, I'm not going to give a lot of time here

17  because the information is there.  It's been there

18  since day one.  The debtor should be up to speed on

19  this, and the debtor hasn't jumped on it.  There's

20  just so much time we can hold off on this.

21              If there's a problem with the lien,

22  then file the adversary.  Let's get to it, and let's

23  get to it quickly.

24              MR. SHAW:  Well --

25              THE COURT:  All right.  With that, go

1    ahead.

2                    MR. CLAR:  Well, I've already -- I've

3    already --

4                    THE COURT:  Mr. Clar --

5                    MR. CLAR:  I think --

6                    THE COURT:  -- I mean, sorry,

7    Mr. Agay.

8                    MR. CLAR:  Yeah.

9                    MR. AGAY:  So let's take what's

10   actually before the court.  In terms of our motion to

11   dismiss or lift the automatic stay, what I would

12   suggest doing, Your Honor, is let's set a deadline

13   for the debtors to file their schedules and SOFAs.

14   Let's set a deadline for them to respond thereafter.

15   We would like a limited period to conduct limited,

16   very limited discovery thereafter.  And then a

17   deadline for us to file a reply.  And then a

18   deadline -- and then a date for a hearing.  So that's

19   how I think this should unfold.  And I think that's

20   consistent with the concerns Mr. Shaw has raised,

21   okay?

22                    THE COURT:  Yeah.  And what that tells

23   you is that the case isn't going to be dismissed or

24   the stay isn't going to be lifted today.

25                    MR. AGAY:  Right.

1          THE COURT:  Which you all could have

2   figured out anyway.

3          MR. AGAY:  And I didn't come into

4   court --

5          THE COURT:  Right.

6          MR. AGAY:  -- telling my client that,

7   you know, they can take out the guns today.

8          THE COURT:  Right.  Again, the issue

9   is whether or not, and how much use of cash

10  collateral there is going to be until we get there.

11         MR. AGAY:  Right.  So I think that --

12  I mean, in terms of those actual dates, I think you

13  can table that until the end of the hearing until we

14  hear --

15         THE COURT:  Right.

16         MR. AGAY:  Now, in terms of cash

17  collateral, Your Honor is correct, we've been here

18  since the beginning of the case.  And since then, you

19  know, the crowd has -- the lawyers have proliferated

20  like weeds.  And we're saying nothing different today

21  than what we've been saying since the beginning of

22  the case.

23         We filed a proof of claim with all the

24  documentation attached.  We filed a motion to

25  dismiss.  It's been out there.  There's been no

1    inconsistency.  We haven't held anything back.  And

2    if somebody has a basis to attack our claims, then

3    okay, we've got to deal with that.  That's

4    bankruptcy.

5               And Mr. Shaw -- we -- we're talking --

6    he may or may not take us up on that, and the

7    committee may or may not take us up on that.  I

8    understand all they're looking for is information.

9               In terms of today's hearing, I think,

10   unfortunately, we have to put them through their

11   paces because you haven't seen a budget.

12               THE COURT:  Right.

13               MR. AGAY:  And you -- Mr. Clar

14   circulated that all -- to us all last night.  And I

15   think it bears some examination because all of this

16   is building on prior hearings and prior evidence.  So

17   I think, unfortunately, we have to put his client up

18   on the witness stand to walk through the budget and

19   to pressure test it, and to understood how reliable

20   it is, and what makes the most sense in terms of go

21   forward cash collateral usage.

22               THE COURT:  Okay.  Ms. Janczak.

23               MS. JANCZAK:  Your Honor,

24   understanding that the core issue before Your Honor

25   today is the extent to which the debtors will be able

1   to use cash collateral, I think that the evidence

2   that Mr. Clar is going to put on will be helpful to

3   the court in understanding what's necessary to get

4   everybody to a point where Mr. Shaw's client and my

5   constituents, who, incidentally, include Mr. Shaw,

6   can understand what's going to happen in this case,

7   what Wesco's rights are going to be in this case, and

8   where it can go.  And we need that runaway to figure

9   those things out.  We need the schedules.  We need

10  the time to digest those schedules and to understand

11  the debtors' true financial position.

12            As far as Wesco goes, they're getting

13  adequate protection payments, which are built into

14  the budget before Your Honor.  And I know we

15  discussed at prior hearings, they're getting $24,000

16  or so a month.  So they are adequately protected.

17  There's been no evidence that they're not.

18            So today, the committee is just asking

19  Your Honor to afford the debtors that leeway, allow

20  them to use cash collateral as provided for in this

21  budget for a period of time to allow all the parties

22  in interest to evaluate Wesco's claims, to look at

23  the debtors' financial position and make an informed

24  decision about what's in the best interests of the

25  estate.

1          MR. FISHER:  Your Honor, on behalf of

2    Hoffland Properties, we would support the use of cash

3    collateral because it's the only way we're going to

4    get our rent paid.

5          THE COURT:  Of course.

6          MR. FISHER:  The statute says we're

7    supposed to get our rent paid.  We're happy with the

8    proposal that they've made in the budget.  The

9    numbers are a little bit off, but not materially in

10   terms of the stub rent payments, but we would

11   certainly like to get our rent or we don't think we

12   ought to be held hostage here.

13         MR. JOHNSON:  Your Honor, Russell

14   Johnson for Dominion Energy of Virginia.  The

15   agreement Mr. Clar mentioned earlier with respect to

16   my client is all contingent on the use of cash

17   collateral.  If they don't get cash collateral, our

18   motion before the court today is the motion for

19   adequate assurance of payment.  And we've reached a

20   30-day agreement with them because they've come up

21   with some information that we weren't previously

22   aware of on some software that they claim will reduce

23   usage by 14 percent.

24         You haven't seen our bills.  We put

25   some stuff in the joinder and objections, but they

24

1    can range from 700,000 to $1400 a month.  It's a big

2    number, but it's all based on some software that they

3    have and whether they can curtail and all this other

4    stuff.

5              So our only position on cash

6    collateral is, you know, we're paid -- they made a

7    payment for the first 30 days of the case --

8              THE COURT:  Right.

9              MR. JOHNSON:  -- we're paid through

10   this Saturday.  And we reached an agreement, subject

11   to the approval of cash collateral, for the next 30

12   days.  And so we can test the numbers and the usage

13   and be back before you, if Your Honor would permit,

14   on the adequate assurance, the 30-day agreement, if

15   they get cash collateral.

16             THE COURT:  All right.

17             Mr. Shaw, you're jumping up and down a

18   little bit.

19             MR. SHAW:  No, I'm just -- I'm just --

20             THE COURT:  You just do that.

21             MR. SHAW:  -- trying to keep my feet

22   from falling -- I'm fidgety.

23             But no, no, I mean, it's pretty

24   simple.  Obviously, we believe that Mr. Agay's client

25   in the interim is adequately protected pursuant to

1  the payments that have been provided in the interim.

2  And ultimately what this is about from a creditor

3  perspective is if Mr. Agay wins, the biggest losers

4  are Mr. Johnson's and my clients because they're the

5  ones who are stuck with empty claims.

6              MR. CLAR:  One other point, though, to

7  add to what Mr. Johnson said, I thought that if those

8  conditions he mentioned are met, that his client is

9  willing to withdraw their joinder today.

10             MR. JOHNSON:  Correct.  The other

11 conditions being that that $700,000 payment is made

12 May 20th; that the debtor curtails usage during peak

13 A days during this next 30 days; and that if they

14 don't make a payment, there's a five-business-day

15 cure.  Those would be the other conditions for the

16 joinder, yes, that is correct.

17             THE COURT:  All right.

18             Mr. Clar, you can proceed.

19             MR. CLAR:  Thank you, Your Honor.

20             Your Honor, I'd like to -- I did

21 submit Exhibits A, B, and C to Your Honor.  Exhibit A

22 is the -- Exhibit A is the holding budget.  B is the

23 mining budget.  And Exhibit C is a list of machinery

24 and equipment on site in Virginia.

25             THE COURT:  Okay.

1          MR. CLAR:  I'd like to call Thomas

2     Flake to the stand, Your Honor.

3          THE COURT:  Mr. Flake, you can come up

4     here, and raise your right hand.

5               (Witness sworn.)

6          THE CLERK:  Please state your name and

7     spell it for the record.

8          THE WITNESS:  Thomas G. Flake.

9     T-H-O-M-A-S, G, F-L-A-K-E.

10         THE COURT:  Mr. Flake, you can have a

11    seat here.  You will note that the court reporter is

12    sitting in front of you with her back to you, so you

13    need to answer all questions verbally.

14         THE WITNESS:  Yes, ma'am.

15         THE COURT:  Nods, she can't see.

16         MR. CLAR:  Your Honor, I've tried to

17    circulate Exhibits A, B, and C to all parties.  If

18    I've missed somebody, let me know.

19         THOMAS G. FLAKE, WITNESS, SWORN

20              DIRECT EXAMINATION

21    BY MR. CLAR:

22    Q    Mr. Flake, do you have Exhibits --

23    A    I do.

24    Q    -- A, B, and C in front of you?

25              All right.  Would you state your name

1    for the record -- well, I guess you've already done

2    that.

3         A     Thomas G. Flake.

4         Q     What's your address, Mr. Flake?

5         A     709 Roosevelt Avenue, Virginia Beach,

6    Virginia, 23452.

7         Q     And what is your connection to the debtor,

8    BCause, LLC?

9         A     I'm founder of the company, treasurer on

10   the board, and I serve as the president of the mining

11   operation.

12        Q     So, I was going to say what is your

13   relationship to mining.  You are the president?

14        A     I am.

15        Q     And you are on site, correct?

16        A     I am.

17        Q     Can you describe the business of BCause

18   Holdings, or BCause, LLC, which is a holding company?

19        A     BCause Holdings has ownership of all of the

20   subsidiaries, which include BCause Mining, BCause

21   Spot, BCause Derivatives, BCause Clearing, and BCause

22   Secure.

23        Q     And which of those entities operates?

24        A     BCause Mining.

25        Q     And BCause, LLC, correct?

1        A     Yes.

2        Q     And when did BCause, LLC, open for

3    business, so to speak?

4        A     We filed as a corporate entity about six

5    years ago.  However, we received a Series A in

6    financing in November of 2017.  And we commenced

7    actual operations in January of 2018.

8        Q     What about mining?

9        A     That is mining.  Because the holding

10   company, I suppose, has also been in existence that

11   same period of time, it was -- the founders were

12   essentially working without compensation at that

13   time.

14       Q     Can you tell us your background going back

15   to -- well, let's try after college?

16       A     So I did college after leaving the Navy,

17   worked for NASA for about 13 years.  During that

18   time, I was a project manager and responsible for IT

19   security at NASA's line in the research center.

20   After I left Jacobs Engineering, which was a

21   subcontractor to NASA, I ran the Peninsula Technology

22   Incubator in southeastern Virginia.  And subsequent

23   to leaving the Peninsula Technology Incubator is when

24   I founded BCause.

25       Q     And what is your role with respect to

29

1  BCause, LLC, on a day-to-day basis?

2      A    On a day-to-day basis, I'm responsible for

3  the operations of the mining, the interface with the

4  clients, the interface with the vendors, raising

5  capital, pretty much anything that needs doing.

6      Q    Is there a board of managers for BCause,

7  LLC?

8      A    There is.

9      Q    And can you name the board of managers?

10     A    Michael Adolphi is the chairman.  Karan

11  Rai, who's a banker in New York, is a member of the

12  committee -- or the board.  Myself.  A gentleman

13  named John Ashby.  Another gentleman named Chris

14  Sikes.  And, finally, Jonathan Tanemori, who's an

15  officer of SBI, which is an investment company in

16  Japan.

17     Q    Are any of the board of managers

18  compensated for their services?

19     A    They're not.

20     Q    By the debtors?

21     A    By the -- I didn't understand the --

22     Q    By the debtors.  Are they compensated by

23  the debtors?

24     A    They are not compensated at all.

25     Q    Are you compensated by the debtors for your

30

1    services?

2         A    As an employee of the company, rather than

3    as a board member, I draw an $1800 a month stipend.

4         Q    Briefly, what caused the debtors to seek

5    Chapter 11 relief?

6         A    The proximal cause was that Wesco received

7    a -- or obtained a garnishment order against our bank

8    account, which prevented us from making payroll or

9    paying --

10        Q    Is there a secured creditor in this case, a

11   purported secured creditor?  And I'm not making any

12   comment on the liens, but is there --

13        A    My understanding is that CSC or Wesco claim

14   that they're secured.

15        Q    Do you know how much Wesco claims to be

16   owed?

17        A    I believe it's somewhat north of

18   $1.8 million at this point.

19        Q    And do you believe that Wesco claims a

20   security interest in all of the assets of BCause --

21   excuse me -- BCause, LLC, and BCause Mining?

22        A    I believe they do claim that, yes.

23        Q    What type of assets does BCause, LLC, have?

24   Anything other than the bank account?

25        A    I believe all the physical and tangible

1  assets are assets of BCause Mining.  And, no, I don't

2  believe that BCause, the parent company, has any

3  assets, though there might be some software that are

4  assets of the parent company.

5       Q    Well, in whose name is the bank account

6  that we're going to talk about in a few minutes?

7       A    It's in BCause, LLC's name.

8       Q    Okay.  I'm going to show you what's marked

9  as Exhibit -- Exhibits A and B for identification.  I

10 seem to have an extra here.

11            Mr. Flake, do you recognize Exhibits A

12 and B?

13      A    I do.

14      Q    And what do they purport to be?

15      A    They're a 13-week budget that we understood

16 was requested by the court and Wesco's counsel.

17      Q    And who prepared Exhibits A and B?

18      A    I did with the assistance of our CFO,

19 George Sladoje, and our controller, Christy Vawson

20 (phonetic).

21      Q    What experience do you have in preparing

22 cash flow projections?

23      A    Academically, I have an undergraduate

24 degree in applied mathematics.  I have an MBA from

25 the College of William & Mary.  I ran the Peninsula

1  Technology Incubator, and I provided -- or helped

2  about 50 different companies prepare such documents.

3       Q    For what time period are the cash flow

4  projections?

5       A    They cover this week and for the next 13

6  weeks.

7       Q    What information did you use to prepare

8  cash flow projections?

9       A    We used contracts with our clients,

10  historical payments from those clients.  We've used a

11  model that we've developed that models Dominion's

12  Schedule 10 rate and its behavior in our operating

13  environment.  We used historical bills from clients

14  or vendors and agreements with those vendors.

15       Q    Referring to the Dominion Schedule 10, can

16  you elaborate on that because it's an important

17  factor in this case.  There's an -- is there an

18  expenditure in the budget -- are their expenditures

19  in the budget for Dominion?

20       A    There are.  There's a plan -- that was

21  several questions.  I'll do those in reverse order.

22            So there's a payment that was just

23  made in the last couple days for 660,000.  There's a

24  budgeted payment for the week of May 24th of

25  700,000, and then subsequent payments in June and

1   July.

2              With regard to your question about

3   Schedule 10, in the state of Virginia, Dominion Power

4   is a regulated monopoly, and they have filed tariffs.

5   The schedule that we were on, GS-4, and the schedule

6   that we're currently on, Schedule 10, are two of

7   those tariffs that are available to customers.  We

8   moved to that new tariff on January 19th.

9       Q     How did you compute the numbers in the

10  budget for Dominion?

11      A     So our load is very consistent.  We have

12  what in the electricity industry is called a very

13  consistent power factor.  Because we typically come

14  up to power, we run, and the only times we shut down

15  is when a -- a machine is when a machine fails.  And

16  currently we're operating somewhere in the

17  neighborhood of 14,500 to 15,000 machines as of,

18  like, this moment.  And so no individual machine

19  comprises a significant amount of that load.  And so

20  the load is very consistent over time.

21              We used our load since the

22  January 19th conversion to Schedule 10.  And we used

23  the power factor since that point because it differed

24  materially from what had been prior to December.

25  There was a software release from the vendor called

1   AsicBoost.  And AsicBoost reduced our electricity

2   usage somewhere in the neighborhood of about 15 to

3   17 percent.

4        Q    In computing the numbers that you have

5   proposed -- projected to pay Dominion --

6        A    Yes.

7        Q    -- are there peak days and non-peak days?

8   Is there a term that I'm -- that you can tell the

9   court for these days?

10       A    Yeah.  Schedule 10 is divided into three

11  categories of A days, B days, and C days.  And

12  then --

13       Q    What are A days?

14       A    And then A days and B days -- I'm sorry,

15  those days are then further subdivided into on-peak

16  and off-peak hours.  So there's actually six

17  categories that could apply to any period of time.

18            An A day is statutorily limited to 28

19  days during the calendar period.  And Dominion has

20  the authority within the context of their tariff to

21  declare any day an A day, a B day, or a C day without

22  consulting any of the clients, which is fine.  We

23  just build that into our model.

24            It tends to be that the on-peak power

25  or on-peak period of ten hours during an A day, power

1  is extremely expensive, about ten times what we would

2  typically pay on a B day, and 13 or 14 times what we

3  would pay on a C day.  So it's very important that

4  our operations recognize when on-peak A periods

5  are -- or on-peak A days are, because it's our

6  intention from an operational standpoint to shut down

7  during those periods.  And we shut down because it's

8  just not economic for us to operate.

9       Q    Okay.  Have you built into your projections

10  Schedule A days?

11      A    We have.  In fact, what we did was we

12  looked at the historical record that's widely

13  available on Dominion's website, and we felt that the

14  average number of A days in a particular month was

15  most representative.  A case could be made that you

16  could use the entire day to set.  But a similar case

17  may be made that the more recent years are more

18  relevant.  And so we used an average of the number of

19  A days in any billing period from the last two years.

20      Q    And do you have a plan for reducing usage

21  during A days in the future?

22      A    Not just in the future, but in the past.

23  In January there was one A day declared, and we just

24  simply shut down during the A day period, the on-peak

25  period of the A day.

36

1          The off-peak period of the A day, the

2    cost is consistent with a B day on peak, and it's

3    economic for us to operate.  We would continue that

4    practice moving forward into May and June, and July

5    and August.  The maximum number of A days

6    historically has been in July and August when the

7    hottest days of the summer are.

8      Q    Turning back to the budget as a whole, do

9    you believe that the -- the budget, the cash

10   projections of cash income and necessary expenditures

11   is accurately portrayed in the budgets?

12     A    It is accurately portrayed given our

13   current agreements.  It's my understanding that

14   through a bankruptcy process that we can ask the

15   court for relief from certain agreements.

16          And one of our landlords in Virginia

17   Beach is for office space that we don't terribly

18   need, and that would save about $3500 per month.  And

19   there's an agreement with CenturyLink that includes a

20   circuit that we don't use, and that circuit costs

21   about $5,000.  So I would argue that this budget is

22   about $8,000 per month over billed in the favor of

23   creditors.

24     Q    Is there anything else about this budget

25   that would be unusual going forward with respect to

1  expenditures?

2      A    Well, I think it's worth pointing out that

3  because of the way the bankruptcy worked, and the

4  fact that we moved from postpaid on our debts to

5  prepaid that, in fact, this is a 90-day budget, but

6  it covers about 120 days of expenditures.  So what

7  you'll see is that there's four payments to Dominion.

8  There's four payments to Hoffland.  And there's prep

9  payments to other telecommunications providers and

10  other utilities providers.  In those cases it's our

11  estimate there's about three quarters of a million

12  dollars in one-time expenses that occurred four times

13  instead of three times, and so the expenses are

14  artificially inflated in this budget.

15     Q    Can you categorize and identify the

16  expenditures in both budgets, please.

17     A    Well, Exhibit A --

18     Q    Yes.

19     A    -- pertains to holding, but I'll start with

20  Exhibit B because there's some material at the bottom

21  of Exhibit A that applies to both.

22              So Exhibit B is the mining operation,

23  and it embodies revenue and expenses that are solely

24  attributable to the mining operation.

25              Exhibit A has no revenue, and it has

38

1  expenses that can be characterized as shared between

2  both entities, personnel, utilities, that type of

3  thing.  And then at the bottom it is essentially a

4  pro forma cash flow statement that indicates what the

5  beginning cash flow, the ending -- or the expenses

6  and revenue earned each period is, and then the

7  ending cash flow for each period.

8      Q    Turning to what we call accounts

9  receivable, does the -- does mining have accounts

10 receivable?

11     A    We typically bill our customers on the

12 first of the month, and receive payment by the end of

13 that month.  It's a net-30 agreement, and our

14 customers are generally well-funded.  And we don't

15 have any -- I suppose if the question is do we have

16 any long-term bad debt, the answer to that would be

17 no.

18     Q    Well, I didn't ask that, but -- but thank

19 you.

20     A    Sure.

21     Q    How many customers do you have?

22     A    Approximately seven.

23     Q    Can you name them?

24     A    SBI, BMG, Horizon Kinetics.  I'm probably

25 forgetting one or two in there, but I think that's

39

1    five or six of them.

2        Q    Since the bankruptcy was filed -- and if I

3    tell you it was filed on April 11th or 12th -- one

4    was filed on the 11th, one was the 12th; I believe

5    mining was the 12th -- have the receivable -- well,

6    how often do you -- strike that.

7                 How often do you collect receivables?

8        A    Well, technically seven times a month, but

9    generally within three days at the beginning of each

10   month.

11       Q    Each of the customers pays within three

12   days of the beginning of the month?

13       A    Typically, yes.

14       Q    And so for the month of April --

15       A    Yes.

16       Q    -- were the hosting fees collected?

17       A    They were.

18       Q    In full?

19       A    I believe we committed to the court to

20   collect 1,021,000 -- this is from memory -- and I

21   believe we collected within $300 of that amount.

22       Q    Do you anticipate collecting the same

23   amount in June?

24       A    I have no reason to suspect otherwise.

25       Q    In July?

1      A     Yes.

2      Q     And in August?

3      A     We believe so.

4      Q     Tell me a little bit about these

5    agreements.  What are you required to provide, and

6    what -- what is required of the miners, so to speak?

7      A     So, our typical customer is a large

8    institutional entity.  We mentioned BMG.  One other

9    that I forgot was Fidelity.  They're large.  BMG is

10   probably the largest mining operation in our

11   industry.  SBI is one of the largest.  VC is in

12   Japan.  Fidelity is well-known as a bank in the

13   United States.  Horizon Kinetics, from my

14   understanding, they're about a $4.3 billion hedge

15   fund, so our clients are very well-funded and

16   typically don't have any problem paying their bills.

17                 They send us a number of computers.  I

18   think our smallest customer has approximately 200

19   machines with us.  And our largest customer has about

20   7,000 machines with us.

21                 We receive those machines, shipped to

22   us typically on pallets.  We unbox them and put them

23   in shelves.  We provide internet connectivity, air

24   flow for cooling, and electricity.  Our data center

25   monitors their operation.  And when they have

1   mechanical problems, we repair them.

2              It's important to note that that what

3   we call Smart Hands Service, is not in the flat rate

4   price that they pay us, but is a variable revenue.

5   And we've included, I think, $9,000 per month in

6   revenue for that service, but we typically and on

7   average have collected more than that.  It was a very

8   conservative number that we put in there.

9       Q    Getting back to the expenditures on

10  Exhibits A and B, and I asked you about categories,

11  can you tell us what categories of expenditures are

12  in there for mining first?

13      A    So, if you look at Exhibit B, in mining

14  you'll see that there's costs associated with power,

15  which would be Dominion Energy, and what we termed AA

16  customer curtailment credits.

17             In our intent to cease operations

18  during on-peak A days, we have agreed -- reached

19  agreement with our customers to compensate them a

20  dollar per machine per A day that we experience

21  during the given billing period.  That's credited in

22  arrears, so you only see the occurrence of that once

23  on the 2nd of August, but that would have -- that

24  would have -- that would have applied to the June

25  billing period.  You also see in here G Hogan

42

1   Commercial Cleaning, Hoffland Properties, Jack Frost,

2   and those have to do with the physical plant.

3        Q    Well, what is Hoffland Properties?  I think

4   that's Mr. Fisher's client, but what is Hoffland

5   Properties?

6        A    Mr. Fisher's client is -- it was a beer

7   warehouse that we turned into a data center.  It's

8   110,000 square feet -- square foot facility.  And we

9   use the main building, which is about 86,000 square

10  feet.

11       Q    Any other categories of expenditures in

12  this budget?

13       A    Outside of that, you see Silbar and The

14  Water H2ole, which are essentially personnel related.

15  Silbar provides security during after hours and

16  weekends.  Water H2ole is providing bottled water,

17  which is an OSHA requirement for our workers in our

18  plant.  And then Verizon provides internet

19  connectivity that's solely used at the data center in

20  Virginia.  You'll see when we come to holding that

21  there's another bandwidth provider, but that's a

22  shared expense.

23       Q    Okay.  Let's move to Exhibit A --

24       A    Um-hum.

25       Q    -- which is the holding budget.  What

1   categories of expenditures are represented in that

2   budget?

3       A    So at the top you'll see the costs and

4   expenditures associated with the bankruptcy itself.

5   And then after that you'll see costs associated with

6   other operations.

7               CCA Financial is the ongoing lease of

8   servers.  CenturyLink is the bandwidth that I

9   mentioned.  Comcast is, I believe, for phone and

10  Internet.  ComEd are the utilities here in Illinois

11  for the Chicago office.  Cox Communication, again,

12  more shared facilities in terms of cable and

13  Internet.  Fonality, the same way.  Google is the web

14  hosting.  And Greenwich Center is the office that I

15  mentioned we would ask the court for some relief

16  from.  That would be an adder to the budget of about

17  $3700 a month.  And then insurance of various types,

18  software and hosting from Microsoft.

19              We included a miscellaneous expense

20  because there's just day-to-day operations, paper

21  towels, toilet paper, that kind of stuff that we

22  needed for personnel.  Payroll of personnel, it's our

23  intent to reduce our headcount going into the May

24  31st payroll period, which will also provide some

25  additional benefit to the creditors.  Pinnacle Group,

1  travel expenses, just -- we anticipate having

2  management have to fly here for court hearings, and

3  back and forth Chicago and Virginia Beach.  And then

4  finally, W-R2 is our office space here in Chicago.

5       Q    With respect to the -- excuse me, the top

6  lines of the holding budget, you mentioned bankruptcy

7  expenses, did you not?

8       A    I did.

9       Q    And is there a provision in this budget,

10 which goes through August 2nd, for payment to the

11 creditors committee's attorney?

12      A    There is.

13      Q    And what is that payment, and how often are

14 you --

15      A    It's $10,000 per month.

16      Q    Is that pursuant to an agreement?

17      A    It is.

18      Q    Okay.  And then is there a provision for

19 United States Trustee's fees --

20      A    There is.

21      Q    -- quarterly fees in here?

22              And how much is -- how much and when?

23      A    It's 28,927, and it's our understanding

24 that 1 percent of the expenditures during a

25 particular quarter.  And so those are the -- that's

45

1  the 1 percent of the expenditures requested of the

2  court during this period.

3        Q    Is there a provision for attorney's fees

4  for my firm in this budget?

5        A    In the budget, yes.  In this frame, no,

6  because my understanding is that your firm will ask

7  for payment in 120 days, and that doesn't fit within

8  this frame.

9        Q    Were we paid a retainer?

10       A    You were.

11       Q    And how much for each case?

12       A    We paid you $25,000 for each company.

13       Q    What would happen if the debtors were not

14  allowed to make the expenditures in these budgets?

15       A    I assume, and we've heard from counsel,

16  that Hoffland would want to kick us out, and Dominion

17  would want to turn us off, which would put us out of

18  business.

19       Q    Okay.  Now, turning to the budgets again,

20  Exhibits A and B, what is the beginning cash balance,

21  and where is that cash?

22       A    The beginning cash balance is at the bottom

23  left-hand corner, $44,050.

24       Q    Okay.  Now, that's less than what was in

25  the bank at the time of the filing, correct?

1        A       I believe that was pursuant to original

2   orders from the court to make some expenditures

3   during the month of April, but, yes, you're right.

4        Q       Right.  Well, I was going to get to that,

5   actually.  The week of May 10th there's some

6   highlighted items.  Why are they highlighted?

7        A       In the week of May 10th, those are

8   expenditures that were already approved by the court.

9        Q       And paid?

10       A       I don't believe that they've been paid.  I

11  think they're being paid today, actually.

12               You also see on Exhibit B that there's

13  a highlighted item.  That's been paid to Dominion as

14  well.

15       Q       The 660,000?

16       A       It has as of yesterday.

17       Q       What is the -- is there any difference

18  between the opening figure for what I've called

19  accounts receivable, meaning the revenue from the

20  hosting agreements and closing accounts receivable?

21       A       Are you talking about the -- on the week of

22  August 2nd, the 916,000?

23       Q       Throughout the budget --

24       A       Let me make sure I understand the question.

25       Q       Throughout the budget, is there any

47

1    difference in the accounts receivable?

2         A    As far as the billed amount, you'll see

3    that it goes from $118,000 to $114,000.  That's just

4    a recognition of some minor changes along the way.

5    But, no, essentially, there's no -- there's no

6    anticipation that we'll lose any customers.  There's

7    no anticipation that those customers will reduce

8    their hosting in any meaningful way.

9         Q    Well, that's -- that's going to beg certain

10   questions that I anticipate.  So what is the -- the

11   term of your hosting agreements?

12        A    They vary in lengths from two years to four

13   years, with most of them being two years in duration.

14   The -- I suppose the most imminent end of a client's

15   customer -- or a client's contract, we anticipate

16   being the very end of December, the very beginning of

17   January.  Call it December 31st --

18        Q    Which customer is that?

19        A    That's SBI.

20        Q    Okay.  And is that a significant percentage

21   of the revenue?

22        A    It is.  They represent about 45, 50 percent

23   of our business.

24        Q    And have you taken steps to replace that

25   revenue?

1      A      Yeah.  We believe that -- well, this belief

2   requires a little bit more explanation.  During the

3   fourth quarter of last year, it's been widely

4   reported that the exchange rate between

5   cryptocurrency and dollars had deteriorated

6   significantly.  It got to a bottom of about $3200 per

7   Bitcoin.

8               Since that time, since December 13th,

9   I think was the bottom of the market, the exchange

10  rate of cryptocurrency has appreciated significantly.

11  As of this morning when I checked, it was about

12  $5800.  So it's almost doubled since December 13th.

13              We don't have any direct exposure to

14  Bitcoin or cryptocurrency.  As I mentioned earlier,

15  our customers are billed a flat rate, and all of our

16  customers are well-funded.  However, our customers

17  have direct exposure to cryptocurrency.  And our

18  prospective customers have exposure to

19  cryptocurrency.

20              So during the period that I mentioned,

21  the end of last year, we received little or no

22  inquiries for new business.  In the last six weeks,

23  though, we were receiving a considerable amount of

24  increase in interest.  I think I received two last

25  night.  And I think we've received four so far this

49

1   week, as far as interest from new customers.

2              I don't know that SBI would change

3   their mind about extending their contract, but I

4   think we'll be able to replace them in one of a

5   variety of ways.

6       Q    Given the relatively static nature of your

7   income, are there any other measures that you either

8   have employed or plan to employ to increase revenue?

9       A    So, yes, we've got -- I would categorize

10  this four different ways to increase revenue.  The

11  first one is through -- I've already mentioned

12  receiving inquiries through our website for new

13  business.

14      Q    Let me stop you there.

15      A    Yeah, sure.

16      Q    Since the bankruptcy, have you received

17  inquiries?

18      A    Absolutely.

19      Q    How many?  You said two last night?

20      A    Two last night.  How many since April 11th?

21  Probably six or seven, most of those coming in the

22  last couple of weeks.  So I'd say that we are

23  reasonably optimistic about replacing SBI as a

24  customer, if that need arises.  But I also believe

25  it's not crazy speculation to say that if, for

1  instance, Bitcoin continues on the trajectory that

2  it's on, that at 7, 8, $9,000 a Bitcoin, that SBI

3  might reconsider their current stance.

4           Beyond that, I would say that we have

5  had ongoing conversations with a company called

6  Bitmain, which is the largest manufacturer of mining

7  equipment in our industry.  These discussions began

8  about four or five weeks ago.  And I continue to

9  correspond with a gentleman named Peng Lee

10  (phonetic), who is their representative here in the

11  United States.  Their interest is in co-locating

12  their equipment with us and operating it on a

13  shared-revenue/shared-expenses basis, until such time

14  as they were to sell that equipment to a customer,

15  and then they would encourage that customer to

16  continue to host with us so there would be no down

17  time.

18           In addition, on Friday of last week, I

19  traveled to Boston, and I talked to two of Bitmain's

20  competitors, MicroBT and Innosilicon, about crafting

21  a similar arrangement with them.  They're both open

22  to that idea.  The next step would be for them to

23  visit our data center, and I would anticipate that

24  being sometime in the next couple of weeks.

25           Thirdly, I'd say that we received a

51

1  recommendation from our largest client, which is SBI,

2  to entertain the creation of a new product that would

3  be a revenue share between somebody who would host

4  with us based upon the -- the revenue produced by

5  those machines.  We have finished modeling that and

6  building the executive summary and narrative that

7  would go with that product.  We've not launched it on

8  the website yet.

9         And then, finally, I would say that as

10 recently as -- well, we're also considering mining on

11 our own account.  That would require us to raise

12 external capital.  We estimate about $3 million.  And

13 you can understand that investors would like some

14 surety coming out of this bankruptcy before they

15 would make such capital available.  But we have

16 ongoing dialogue with potential investors.  It's a

17 really long answer, I'm sorry.

18    Q    Don't apologize.

19         So getting to the self-mining part of

20 this, are there any machines on hand that are

21 currently unused that you could use to mine for

22 yourselves?

23    A    No.  Historically, our -- our approach has

24 been to mine exclusively on behalf of our customers

25 for a couple of reasons.  It's important to

52

1   understand that the computers that we use for mining

2   have similar constraints to the computers you use on

3   your desktop, which is, historically, the computer

4   that you buy next month is going to be more powerful

5   than the computer you bought last month.

6            This is measured in a technical term

7   called nanometers.  It has to do with the size of the

8   wires.  I don't want to go into that.  But it is true

9   that the state of the art of those miners has

10  improved approximately every 18 months for the last

11  five years.  And so we've gone through five or six

12  different generations of miners during that period,

13  which meant that people that were investing in miners

14  were, in our estimation, taking a significant amount

15  of risk.

16            We made a conscious decision not to go

17  into mining-for-ourselves business because of our

18  familiarity with that effect, and the fact that you

19  had to make your -- a return on your investment that

20  much more quickly.

21            However, the new generation of miners

22  are as efficient as humans know how to make now.  And

23  so it's foreseeable that this generation of miners

24  will have a longer life expectancy than previous

25  generations of miners.  So that was one of the

53

1    reasons that we think going into mining makes more

2    sense.

3              The other thing is with the emergence

4    of derivatives, even though -- and if you can believe

5    it, Bitcoin going from 3200 to 5800 in five months

6    seems volatile, and it is, it's far less volatile

7    than it was historically.  And so the emergence of

8    those two things, the technology and the derivatives,

9    make self-mining more attractive to us than it was.

10       Q    Is there any -- let's leave out machines.

11   Is there any other equipment that you currently are

12   not using that could be used for self-mining?

13       A    So we -- when constructing the data center,

14   we broke it up into three phases, phase one, phase

15   two, and phase three, because we're really creative

16   that way.

17             Phase one was complete in March and

18   has been operating since then.

19             Phase two was kicked off in April and

20   is only partially complete.  These phases are each

21   five rows, except for phase three, which was planned

22   to be four rows because we reached the capacity of

23   the facility.

24             But it's important to note that of the

25   five rows planned for phase two, row six and row

54

1   seven are operational.  Row eight is fully built out,

2   but it would require the activation of another -- of

3   a 25 megawatt fee with Dominion, and there's a

4   required deposit associated with that.  So we've

5   never turned on row eight, nine, or ten because

6   they're all fed off of that second feed.  Now, the

7   feeds have been installed and paid for with Dominion.

8   It's just never been energized.

9               So, in answer to your question, there

10  is some spare capacity in rows one through seven that

11  we can potentially employ.  I would estimate that at

12  about 1500 machines.  That's the difference between

13  the 14,500 I mentioned earlier, and the 16,128 that

14  the facility is built out for.

15              And in addition, if we got some

16  investment capital to pay the required deposit with

17  Dominion, we can turn on row eight almost

18  immediately.  Row nine and row ten would require some

19  additional build out.

20      Q    I may have asked you this before, but if I

21  have, forgive me, but what is -- what was opening

22  cash at the time of the filing?

23      A    I believe you said it was nine eleven.

24      Q    I didn't say anything.

25              What do you think -- what do you

1  think --

2      A    I think it was 911,000.  I think that there

3  was some expenditures authorized by the court that on

4  this documentation, Exhibit B shows that is eight

5  forty-four.  So depending on your frame, it's either

6  nine eleven or eight forty-four.

7      Q    Well, okay.  What is beginning cash

8  according to -- on both of these budgets, beginning

9  cash for the period on which the budgets start,

10  what's the beginning cash?

11      A    The beginning budget was eight forty-four

12  on Exhibit A.

13      Q    And where will we find the ending cash on

14  the budget?

15      A    In the lower, right-hand corner it's

16  916,000.

17      Q    Which exhibit are we talking about?

18      A    Exhibit A.

19      Q    And we've already talked about the

20  receivables.

21              Is there any -- is there any machinery

22  and equipment associated with the debtor?  That would

23  be mining, correct?

24      A    There is, yeah.

25      Q    Well, I'll direct your attention to Exhibit

56

1    C.

2         A    Yes.

3         Q    And can you tell me, have you seen this

4    before?

5         A    I have.

6         Q    What is -- what is Exhibit C?

7         A    It's a list of all of the tangible and

8    appreciable assets associated with the mining

9    operation.  Actually, I think it's all of our

10   tangible and appreciable assets.

11        Q    Did you prepare this list?

12        A    I didn't prepare it.  Shawn Dailey and

13   Christy Vawson prepared it, but I did review it.

14        Q    But you're familiar with it?

15        A    I am familiar with it.

16        Q    Is this something that you -- your company

17   ordinarily prepares?

18        A    Not in this framework.  In fact, the way in

19   which we received invoices from our vendors made it

20   easier -- easier is not the right word -- more

21   correct from a GAAP standpoint to group things on

22   our -- on our balance sheet.  And this required a bit

23   more granularity than we were accustomed to, so it

24   required us to go through and actually physically

25   conduct an inventory of what was on hand.

1      Q    But I don't see values for the machinery

2  and equipment.  Is there a book value associated with

3  this list on the -- on mining's books and records?

4      A    There is.  We currently carry about

5  $16.8 million in assets on our -- on our balance

6  sheet.

7      Q    What's the basis for that valuation?

8      A    It was the cost charged to us from the

9  customers, and that then is depreciated over 10, 20,

10  or 30 years, depending on what's appropriate.

11      Q    Do you -- are you a familiar with the

12  machinery and equipment on this list?

13      A    I am.

14      Q    And do you have an opinion of its

15  liquidation value?

16      A    I believe its value is about 20 cents on

17  the dollar of what was paid.  Keeping in my mind that

18  what we carry on our balance sheet included labor and

19  things like fixed assets, such as drywall and

20  plumbing that would never be liquidated because they

21  would be I think Hoffland's claim.  These are the

22  things that we think are liquidatable and are

23  physical assets, not including things like labor.

24           My estimation of that is about 20

25  cents on the dollar of what we paid for it.  We

58

1    talked to AlphaCraft, which is one of our creditors.

2    They put us in touch with a -- a company that is in

3    the professional liquidation business.  And they

4    estimated that it might be closer to 25 cents per

5    dollar, but it's somewhere in that range.

6        Q    Twenty-five cents per dollar based on the

7    book value of 16 million?

8        A    No, because that includes fixed assets and

9    labor that wouldn't be depreciable.  On an all-in

10   basis, our estimate is that the proceeds of

11   liquidation of these assets would be less than a

12   million dollars.

13             MR. CLAR:  Okay.  Just a few final

14   questions, Your Honor.

15   BY MR. CLAR:

16       Q    You mentioned cost-cutting measures.  Are

17   there plans to reject a -- a lease for a physical

18   premises?

19       A    There are.  I mentioned earlier on Exhibit

20   A, you'll see Greenwich Center listed.  And we would

21   like the court's help in rejecting that lease.

22             In addition, there's an agreement with

23   CenturyLink.  We pay, currently, for three circuits,

24   one of which we don't use, and that's the most

25   expensive of which.  It comprises about 5,000 and

1    some odd amount of money each month.  We'd like the

2    court's assistance in rejecting that agreement as

3    well.

4         Q    Are the debtors insured?

5         A    We are.  In fact, you'll see that in

6    several lines on Exhibit A, where it says insurance,

7    group and liability insurance.  Because there's

8    things like workman's comp and unemployment and so on

9    that they have to pay, those were just lumped

10   together.

11        Q    Does the company have any direct exposure

12   to the price of Bitcoin?

13        A    We don't have any direct exposure to the

14   price of Bitcoin.  Our customers sometimes pay us in

15   cryptocurrency, but we liquidate it within minutes

16   usually.  And our customers themselves mine Bitcoin,

17   but our contracts are all denominated in dollars.

18                  MR. CLAR:  If I could have a minute,

19   Your Honor?

20                  THE COURT:  Sure.

21                      (Brief pause.)

22                  MR. CLAR:  Thank you, Your Honor.

23   BY MR. CLAR:

24        Q    I don't know if I asked you this, but is

25   there -- and if I did, again, I apologize.  I'm just

1    trying to be thorough.

2              But is there a -- is there an adequate

3    protection payment in the budget for Wesco?

4        A    There is.  It's on Exhibit A, labeled

5    adequate protection payment.  It's just shy of

6    $25,000 a month.

7        Q    Have the debtors made any reductions in

8    payroll?

9        A    We haven't to this point, but it is our

10   intention to do that in the payroll ends in the week

11   of -- the 31st of May.  So you'll see the number

12   drops from 86,500 to 70,000.

13       Q    And I don't know that I -- excuse me, Your

14   Honor.

15              Well, Mr. Flake, how many times per

16   month do you -- is payroll paid?

17       A    We have payroll twice a month.

18       Q    So what is the total reduction per month?

19       A    I've got to do some math here.

20              About $33,000 a month.

21       Q    Okay.  And then you mentioned before, you

22   touched on it, but I want to flesh it out a little

23   bit.  The abnormality of some of the payments that

24   are in this budget for rent, for example, could you

25   elaborate on that?

1       A     So let me find it here real quick.

2       Q     Which exhibit are you looking?

3       A     I'm not sure yet.

4             All right.  So if we go to Exhibit B

5       and look at Hoffland Properties, you'll see that in

6       that frame there's four payments of $58,570.  This is

7       a 12 -- this is a 13-week budget.  It's unusual to

8       have rent four times in three months.  It's also

9       unusual in that we didn't have permission from the

10      court to make the payment in April.

11            We subsequently, I believe, are asking

12      for that permission and so there's a Hoffland

13      Properties April stub payment of 12,365.  So, in

14      fact, we're making four and a half -- four and --

15      four and two-thirds payments during a three-month

16      period.  That's one example of where there's an

17      extraordinary amount of expenditure that the

18      companies incurred during this frame.

19      Q     How much do the -- does the extra rental --

20      do the extra rental payments mean in terms of

21      dollars?

22      A     If you include four payments in a

23      three-payment period -- or four payments to Dominion

24      in a three-month period --

25      Q     Well, that's not a rental payment, but --

1      A     I agree.

2           But if you include all of those

3    together as sort of these extraordinary payments,

4    it's about three quarters of a million dollars.  If

5    you exclude Dominion, it's about a hundred and some

6    thousand dollars.

7           MR. CLAR:  I have nothing further,

8    Your Honor.

9           THE COURT:  Okay.  Thank you.

10           Mr. Agay.

11           MR. AGAY:  Again, David Agay from

12    McDonald Hopkins on behalf of Wesco.

13                    CROSS-EXAMINATION

14    BY MR. AGAY:

15      Q     Good morning, Mr. Flake.  We met before,

16    earlier, in the courtroom.

17      A     We did.  Thank you.

18      Q     Thanks for making the trip in.

19           I'd like to start from the latter half

20    of your testimony where you discussed potential

21    future revenue sources.  Just sort of unfolding the

22    story from the beginning.

23           BCause has been in business for six

24    years you said?

25      A     Yes.

1      Q      But BCause Mining has been in business for

2  a year?

3      A      Well, the company was formed I think

4  earlier than that, but operationally, we started

5  operations in January of last year.

6      Q      Okay.  So what did the company do before

7  January of last year?

8      A      We had raised some seed money, an angel

9  investment of about a million dollars from investors,

10  and we were using that to write software and to do

11  the research necessary to start the business.

12      Q      Okay.  So why --

13      A      So there was a five-year period in there

14  where we were what we would consider to be

15  pre-revenue.

16      Q      Okay.  So why did you stop that business?

17  Why did you stop writing software?

18      A      We didn't.  The software is complete,

19  though.  So, as an example, we use very sophisticated

20  monitoring software for the miners.  We have a

21  website.  There's a number of different things that

22  we do with software.  And that's all built at this

23  point.

24      Q      I see.  So it's like a five-year incubation

25  period where you were getting ready to set up the

64

1  mining business?

2      A    Not just mining, but we mentioned earlier

3  there were six different subsidiaries.  We were

4  looking at sort of -- as an example, we filed an

5  application with the Commodities Futures Trading

6  Commission.  We filed with FinCEN for registration.

7  We filed in, I think about 35 states at this point,

8  as a money transmitter.  So there's an enormous

9  amount of bureaucratic administrivia that you have to

10  go through in order to start a business of our type.

11      Q    So why didn't you pursue -- why did you

12  pursue the mining business lines versus those other

13  business lines?

14      A    So we had mined early on in our existence

15  to a small degree.  And the economics on that changed

16  about four years ago where it became no longer

17  profitable to mine, and we exited the business.

18              In July of 2017, we -- I had continued

19  to do an analysis of the profitability or not of

20  cryptocurrency mining.  And some folks may remember,

21  but if you don't, I'll tell you, the profit -- the

22  exchange rate of cryptocurrency ran up substantially

23  during 2017.  By July, it was profitable again.  And

24  we were internally discussing the idea of starting

25  our mining operation again.

1          Concurrent with those discussions, we

2    were also out in the market talking to people about

3    investing in the company through a Series A that we

4    were doing at the time for $5 million.  It turns out

5    that we negotiated and closed that Series A

6    financing, the lead investor of which was SBI.  They

7    made us a $4 million investment, and then we filled

8    out the rest of that $5 million with other folks.

9          Concurrent with closing that deal,

10   they also gave us a contract valued at about $18

11   million over two years to host at a maximum number,

12   35,000 machines with their company.  They also made

13   an introduction to BMG.  And within 30 days, BMG had

14   given us a contract to host about 45,000 machines

15   with their company.  So we found ourselves -- you

16   know, sometime in sales you catch a tiger by the

17   tail.  This was the case there.

18          Subsequent to that, we approached BMG

19   and explained to them that in building out the data

20   center, we hadn't budgeted in that $5 million to

21   build out for the number of machines that they wanted

22   to host with us, and they subsequently loaned us

23   about $7 million.

24   Q    Okay.  So is it accurate to say that the

25   future of this company is in Bitcoin mining, or

1  it's -- or there's not a future of the company?

2       A    Well, opinions vary on that.  I think

3  that's why we're here.  From our perspective, mining

4  is one of several very viable business alternatives

5  that we're exploring that we think have different

6  operating characteristics.

7                 So as an example, the mining business

8  is very capital intensive, and fairly thin margined,

9  but you do that at an industrial scale.  So for me to

10  tell you that we're hosting 16,000 machines, and have

11  the capacity for 32,000 machines, you'd have to see

12  it to understand it, because if I just tell you

13  that -- I mean, people don't have a frame of

14  reference, but it's more computers than would fill

15  this room.

16                 Similarly, though, we've looked at the

17  spot and derivatives markets.  Those businesses

18  aren't nearly as capital intensive, and they have

19  more attractive margins.  But there weren't contracts

20  available to us immediately to host 75,000 machines.

21       Q    Okay.

22       A    So different operating equipment.

23       Q    I understand.  But from your testimony on

24  potential future revenue sources, you only talked

25  about the mining business.

1     A     I did.

2     Q     Okay.  So as of today, are you or are you

3  not actively exploring other potential revenue

4  sources outside the mining business?

5     A     We are actively exploring other revenue

6  sources.

7     Q     Okay.  What are you doing towards that end

8  specifically?

9     A     So we continue to look at how we would

10  raise capital to launch the spot market successfully.

11  We believe currently it would take us another

12  $350,000 to successfully launch the spot market.

13            But, again, I mentioned this earlier,

14  and it's true, this $350,000, investors are, I think,

15  reluctant to put money at risk unless they have some

16  clarity with how the bankruptcy is going to come out.

17  But our inside members have indicated that they would

18  be willing to invest that kind of money to see the

19  spot market launched.

20            In addition, the DCM, that's the

21  Designated Contracts Market, and Designated Clearing

22  Organization under BCause Derivatives, and BCause

23  Clear, I believe the filings with the CFTC are

24  currently on hold.  But once this situation is

25  cleared up, it would be our intention to also launch

68

1  those businesses.

2      Q    So you can't launch those businesses until

3  you're out of bankruptcy is what you're saying?

4      A    I'm saying that to launch those businesses

5  will be challenging, and that raising the capital

6  will be challenging, but we believe we've identified

7  sources for that capital.

8      Q    Okay.  But, again, it's challenging so long

9  as you continue in bankruptcy?

10     A    Absolutely.

11     Q    Okay.  Turning to the -- to the mining side

12  of the business, your revenues are based all --

13  strike that.

14              Right now you have -- was it your

15  testimony you have one, two, three, four, five, six,

16  seven -- seven customers?

17     A    Yes.

18     Q    Okay.  And I'm looking at -- I'm not

19  introducing this as an exhibit.  I'm looking at the

20  list that Mr. Clar had provided me earlier.

21  Actually, last week.

22              Are all seven of those customers

23  subject to existing contracts?

24     A    They are.

25     Q    Okay.  You mentioned SBI as your biggest

1    customer.  Does it sound accurate to say that they're

2    responsible for over a half a million dollars a month

3    in revenue?

4         A     Yeah, I believe it's in that ballpark.  I

5    can't --

6         Q     Five hundred and --

7         A     -- off the top of my head.

8         Q     -- twenty thousand, something like that?

9         A     I'll believe your number.

10        Q     Okay.

11        A     I'd have to check it myself.

12        Q     Okay.  But you already testified it's

13   substantial?

14        A     It is.

15        Q     Okay.  And their contract expires, you

16   said, on December 31st?

17        A     Yes.

18        Q     Okay.  And you had said something along the

19   lines of -- and I don't want to misquote you -- that

20   you're reasonably optimistic that you can replace the

21   SBI revenue stream with new customers if SBI does not

22   reconsider its current stance; am I getting that?

23        A     I think that's -- yes.

24        Q     What is SBI's current stance?

25        A     Their current stance is that they're

1  exiting the mining business entirely.

2      Q    Okay.  So SBI is going away at the end of

3  December?

4      A    That's our current best understanding, yes.

5      Q    So at the end of December, over 50 percent

6  of your revenues is going to expire?

7      A    I'd say roughly 50 percent.

8      Q    Roughly 50 percent?

9      A    Yeah.

10      Q    Okay.  And your testimony, furthermore, was

11  that you are reasonably optimistic that you can

12  replace that 50 percent of revenues, correct?

13      A    Yes.

14      Q    And that is based on your incoming calls

15  over the last few weeks?

16      A    It's based on incoming calls, which is

17  future forward looking, and it's also based

18  historically.  So as cryptocurrency has gone up in

19  price, there is some historical comparables to 2017

20  and 2018.  During the period from December of 2017 to

21  March of 2018, I mentioned the contracts we accepted.

22  We turned away contracts for over 250,000 miners.

23  Finding new customers has not typically been our

24  problem.

25      Q    Okay.  Is finding new customers more

1  challenging when you're in bankruptcy?

2     A    That hasn't been the case.

3     Q    Well, have you signed up any new customers

4  since you've been in bankruptcy?

5     A    We have not, but I explained earlier that

6  inquiries through our website have increased

7  substantially in the last six weeks, and there's a

8  sale cycle to what we're doing.

9     Q    Okay.  Would you say that that level of

10  interest from customers is, at least to a significant

11  extent, dependent upon the price of Bitcoin?

12     A    Absolutely.  In fact, I mentioned in the

13  fourth quarter of last year inquiries had dropped to

14  virtually zero, and that was when cryptocurrency

15  reached a bottom of 3200.  Inquiries seem to have

16  increased in the last six weeks as we crossed over

17  4,000.  And now we're at, like, 5800.  So not only

18  have the numbers increased, but the tempo has

19  increased.

20     Q    So what happens if the price of Bitcoin

21  goes back down?

22     A    If it goes back down, I would expect that

23  inquiries will go down.

24     Q    Okay.  Can you predict what's going to

25  happen with the price of Bitcoin?

1        A     Not with any clarity.

2        Q     Okay.  So is it fair to say that everybody

3   in this room is betting on the price of Bitcoin right

4   now?

5        A     I would say more broadly than Bitcoin

6   cryptocurrency, but most of the cryptocurrencies are

7   in some way correlated to Bitcoin.  So by extension,

8   yeah.  But I wouldn't say betting, but I would say

9   there's some exposure to currency risk that we all

10  share.

11       Q     Is it fair to say that the success or

12  failure of this bankruptcy case depends on what

13  happens with the price of Bitcoin?

14       A     No, I don't -- well, so, it depends.  And

15  it depends on a lot of variables.  We're having

16  ongoing discussions with the creditors.  And it would

17  be our plan and intent to exit the credit -- the

18  bankruptcy as quickly as possible.  As recently as

19  last week I think we had meetings with your client.

20       Q     We did.

21       A     So -- so these are ongoing.  And I think

22  you mentioned earlier, like the attorneys had

23  proliferated.  Either directly or indirectly we're

24  paying for all those.  And it shouldn't be lost on

25  your client that -- that we're not able to pay them

1  with that money because we're paying other people

2  with that money.

3      Q    Yeah, no, that's very fair.

4          Real quickly running out, so is it

5  fair to say that your second biggest customer is BMG?

6      A    BMG is our largest creditor and our second

7  largest customer, yes.

8      Q    Okay.  And would the dollar amount 250,000

9  plus or minus in monthly revenues make sense to you?

10     A    Yeah, I think that's right.

11     Q    Okay.  When does their contract expire?

12     A    Their contract is, I believe, four years,

13 and we're about a year and a half into that.

14     Q    Okay.  So there's some tail on that?

15     A    Oh, away, yeah.

16     Q    Okay.  And would the third biggest customer

17 be Saint Bits?

18     A    Saint Bits and S -- Horizon Kinetics, and

19 their affiliates I think are roughly the same size,

20 but Saint Bits or Horizon Kinetics are the next

21 largest, yes.

22     Q    Okay.  So is that dollar amount around

23 $200,000 --

24     A    That sounds about right.

25     Q    -- plus or minus?

74

1          And the Saint Bits customer contract

2   goes through when?

3      A    I believe May of next year.

4      Q    May of next year.

5      A    Um-hum.

6      Q    Do you have any other customer contracts

7   that are expiring in 2019?

8      A    In 2019, no.

9      Q    What about 2020?

10     A    2020, all of the them except BMG would

11  expire.

12     Q    Okay.  But going back to SBI, SBI seems to

13  be an issue in terms of replacing that revenue

14  stream?

15     A    I can't give you any certainty with regard

16  to SBI --

17     Q    I understand.

18     A    -- at this point, but I think we've already

19  asked that -- answered that.

20     Q    Yes, you have.

21          And just to make sure you answered

22  this, I'm not sure if you did, you haven't officially

23  signed any new contracts with any new customers to

24  date, have you, since the outset of the bankruptcy

25  case?

1    A    Not since April 11th, if that's your

2  question.

3    Q    Yes.

4          When was the last time before

5  April 11th you signed a new customer contract?

6    A    I believe Fidelity is our most recent

7  contract, and that was toward the end of last year,

8  but I can't give you an exact date off the top of my

9  head.

10    Q    So in 2019 have you signed any new customer

11  contracts?

12    A    Not to date.

13    Q    Okay.  And Fidelity Labs, that was for

14  about $2,000 a month?  Does that sound right?

15    A    Something in that neighborhood.

16    Q    Okay.  You testified that the business has

17  no direct exposure to the price of Bitcoin.  Does the

18  company have indirect exposure to the price of

19  Bitcoin?

20    A    We do.  I mean, if you think about when

21  Bitcoin went to 3200, we were still getting paid, but

22  our customers were feeling a great deal of pressure

23  at that point because their income was not what they

24  had projected.

25    Q    Right.

1      A    And so while it's true that Fidelity or SBI

2  can afford to pay their bills, it doesn't mean

3  they're happy about it when they're not making money

4  from their investment.

5      Q    I understand.

6            Have you engaged in any efforts to try

7  and sell the business?

8      A    When you offer stock in an equity, say a

9  Series A or Series B, you're selling portions of the

10  business.  But in whole, I think we've had some

11  discussions where we've been approached by people

12  that might have an interest.  But I don't know that

13  they've ever progressed beyond a preliminary stage

14  I'd sort of classify it as.

15      Q    Is there any formal process ongoing, other

16  than in these informal discussions you've talked

17  about, to either raise capital, sell the business,

18  get a loan?

19      A    Yeah, we're formally talking to parties

20  right now.

21      Q    When I say formally, what -- how do you

22  construe that?

23      A    Well, I understand that to mean that

24  parties sit down with the express intention to make

25  an investment or not.  And, yes, we've had ongoing

1    discussions to that effect over the last four or five

2    months.

3        Q    When you say we, is that you?

4        A    Myself, Fred Grede, our CEO.

5        Q    Okay.

6        A    Or, I'm sorry --

7        Q    So you haven't hired an outside

8    professional to help you with that process?

9        A    We hired Castle last year and asked Asgard

10   Partners, but that was right into the sort of teeth

11   of the downturn in crypto, and so that didn't go

12   anywhere.  You can understand why investors would be

13   more interested as crypto improves in price rather

14   than decreases in price.

15       Q    And have you had a discussion -- have you

16   reengaged in any discussions with those advisors

17   about interest in the bankruptcy?

18       A    We have not, but the intention is to do

19   that once we receive some clarity here.

20       Q    Okay.  I'd like to turn to the budget --

21   actually, before I turn to the budget, could we go to

22   Exhibit C --

23       A    Yes.

24       Q    -- the asset list.

25                 I understood your testimony to be that

78

1   the book value of the company's assets as of today

2   are 16.8 million --

3        A    Yes.

4        Q    -- is that correct?

5             And that's just basically a balance

6   sheet analysis, correct?

7        A    That is.

8        Q    Okay.

9        A    That's, in fact, the amount we carry on our

10  balance sheet as assets.

11       Q    Okay.

12       A    Yeah.

13       Q    So it's actually more than just what's

14  listed here.  It's, you know, labor, goodwill, you

15  know --

16       A    That's exactly right.

17       Q    Right.

18       A    So there's certain intangibles, or -- yeah,

19  absolutely.

20       Q    And those intangibles don't have a

21  liquidation value?

22       A    They do not.

23       Q    Okay.  So --

24       A    In fact, it would be our analysis that

25  these are primarily the assets that have a

1   liquidation value.

2        Q    And you testified that the liquidation

3   value of these assets is probably less than a million

4   dollars?

5        A    Our --

6        Q    That's your belief?

7        A    Our estimate was roughly a million.  And I

8   mentioned that we had asked AlphaCraft, one of our

9   other vendors, and they said probably in the $900,000

10  range, so that's why I testified the way I did.

11       Q    And is AlphaCraft a professional

12  liquidator?

13       A    They're not, but they're very similar to

14  the business your customers or your client is in.

15  And so they have familiarity with it.  And, in fact,

16  they know somebody who is a particular liquidator

17  that they sort of talk to before they gave us that

18  number.

19       Q    That hasn't been market tested, has it?

20       A    It has not been market tested.

21       Q    Okay.  So you don't have a sense of the

22  fair market value of these assets?

23       A    I do not, but I think places like eBay

24  provide some clarity that maybe didn't exist in prior

25  decades where you could get a pretty good estimate of

80

1  what the market would bear.  We have not done that,

2  but I think it would be relatively easy to obtain.

3       Q    So they would have to liquidate the assets

4  on eBay?

5       A    No, but typically that's the most efficient

6  marketplace, and anything less efficient than that

7  would give you a sub off on the price.

8       Q    I see, okay.  Can I turn to Exhibit B?

9            Mr. Flake, can we focus on the line

10 item for Dominion Energy?

11      A    Yes.

12      Q    Okay.  So, May 10th, 660.  May 24th, 700.

13 June 21st, six-sixty.  July 19th, six-sixty, okay.

14 And you gave fairly detailed testimony on how you

15 came to those amounts?

16      A    Yes.

17      Q    Are you aware that Dominion filed a joinder

18 to my client's motion to dismiss the bankruptcy case?

19      A    I am.

20      Q    Okay.  Did you read that?

21      A    I did not.

22      Q    Okay.  Are you aware that attached to that

23 joinder were two exhibits where Dominion provided its

24 own estimate based on no usage of A days and minimal

25 usage of A days?

81

 1              (Simultaneous colloquy.)

 2              MR. CLAR:  Just interpose an

 3    objection.  He said he didn't read it.  How could he

 4    be aware of anything that's in there?

 5              THE COURT:  I'm sorry, I was blowing

 6    my nose.  Can you ask the question again.

 7              MR. AGAY:  Sure.

 8    BY MR. AGAY:

 9        Q    Are you aware of the exhibits attached to

10    the joinder where Dominion --

11        A    I have no direct knowledge of those

12    attachments.  I am aware that Dominion did model our

13    usage.  They sent us an analysis via e-mail.  I

14    assume, but I'm not sure, that that same analysis is

15    what's attached to your joinder.

16        Q    Okay.  What was Dominion's analysis?

17        A    Their analysis was that our costs would be

18    higher than what we've represented.

19        Q    Okay.  How much higher?

20        A    Depends on which model you're looking at,

21    but anywhere from $400,000 per month higher to

22    $200,000 a month higher.

23        Q    Okay.  So as we sit here today, Dominion

24    believes that there's an extra 200 to $400,000 in

25    expenses that are not represented in this budget?

1      A      I think that was the belief when they

2  created the model.  We had a meeting with them this

3  morning and explained some of the reasons we believed

4  that their model was wrong, and I believe they

5  accepted that discussion.  You'd have to talk to

6  them.

7      Q      Okay.  And, I'm sorry, my question was 200

8  to $400,000 per month --

9      A      Yes.

10      Q      -- that is not in this model?

11      A      Yes.

12      Q      Okay.  Are there any other line items in --

13  on Exhibit B where there's a disagreement between you

14  and the vendor on how much it's going to cost?

15      A      On Exhibit B?  No, I don't believe so.

16      Q      Okay.  Did you build any cushion into these

17  costs?

18      A      We did.  The maintenance and repairs line

19  is based upon a rule of thumb used in the industrial

20  industry where you assume 2 percent of your capex is

21  going to be your maintenance budget for ensuing

22  years.  So there is a little bit of, perhaps, margin.

23  It depends on the actual realized failure rate.

24              There's some reason to suspect that

25  with the implementation of the new software, our

1  machines are operating at cooler temperatures that

2  our failure rate may drop.  But that was our best

3  guess as to what that maintenance is likely to be

4  without new data.  Outside of that, no, there isn't

5  any other type of cushion built into Exhibit B.

6      Q    You also talked about on peak A days

7  basically shutting down the facility, if I understood

8  you correctly.

9      A    That's correct.

10     Q    And how does that impact on your receipts

11  if that --

12     A    So it doesn't impact on our receipts in

13  terms of what we invoice the customer, but it does

14  impact our net.

15     Q    Okay.

16     A    And our net is impacted in that we've

17  agreed with our customers to give them a dollar per

18  machine that's turned off on those days.  Currently

19  we run about 14,000 machines.  And so built into the

20  budget is a $14,000 per A day.  And the number of A

21  days was estimated using historical data.

22     Q    So that's all incorporated into your

23  revenue line here on Exhibit B?

24     A    It's incorporated actually into the expense

25  line on the first line where it says A day customer

84

1    curtailment costs or credits.

2        Q    Oh, I see.  But there is -- oh, I'm sorry,

3    so there -- and that is the 56,000 as of August 2nd?

4        A    That's correct.

5        Q    That's where that shows up?

6        A    Yep.

7        Q    I see, okay.

8                 Turning to Exhibit A.  Let's talk

9    about expenses.  So there's a line item for your

10   bankruptcy attorneys --

11       A    There is.

12       Q    -- Mr. Clar and his firm, but there's

13   nothing in it.  So when do they get paid?

14       A    In mid August.

15       Q    Okay.

16       A    This is a 13-week frame that you and the

17   Judge requested.  And if we carried it out another

18   two weeks, it be would reflected.

19       Q    Okay.  And how much would be in there

20   for --

21       A    I believe $40,000.

22       Q    $40,000 for the entire case?

23       A    Well, we've already paid --

24                 MR. CLAR:  Objection.  That's not what

25   he said, but go ahead.

85

1              THE COURT:  Why don't you let him

2    finish.

3              THE WITNESS:  I believe we've already

4    paid them $50,000.  And I don't know what usual and

5    customary is, but that would sum to $90,000.

6    BY MR. AGAY:

7        Q    So your understanding is you paid them in

8    advance for up to $50,000 of the cost of the

9    bankruptcy case?

10       A    I suppose so.

11       Q    Okay.  And then in addition to that,

12   there's going to be another $40,000?

13       A    That's what we're budgeting right now.  I

14   suppose it's a time-and-material engagement, so we'll

15   know better when we get to August.

16       Q    Okay.

17       A    I mean, I believe it's -- my understanding

18   of the law is that the bank -- or our

19   representation --

20       Q    I understand you're not a lawyer.

21       A    -- can't -- can't invoice us for 120 days,

22   and so that's why that happened.

23       Q    I understand you're not a lawyer.

24              So your understanding --

25       A    Yeah.

1       Q     -- as a nonlawyer is through call it the

2  end of August, there's going to be $90,000 in

3  bankruptcy costs on account of your attorneys?

4       A     Yes.

5       Q     Okay.  But that's not reflected in here

6  right now?

7       A     The $50,000 is because it reflects in the

8  beginning cash balance.

9       Q     I thought that that $50,000 came from

10  outside money; it didn't come from the debtors.

11       A     That -- that's probably true, but so then I

12  guess they'd be liabilities, so I may have misspoken.

13       Q     Okay.  The -- and I'd like to come back to

14  that in a second.

15              The -- and you have $10,000 a month in

16  here for the creditors committee --

17       A     Yes.

18       Q     -- is that correct?

19              And how did you arrive at that number?

20       A     I wasn't privy to those negotiations, but

21  my understanding is there's an agreement in place.

22  And counsel is present, so I think you can ask her.

23       Q     So is -- you don't know whether that's a

24  written agreement?

25       A     I believe it is a written agreement.

1      Q    Have they agreement to cap their fees at

2  that for the entire bankruptcy case?

3      A    I believe so.  But, again, she's present.

4  You can ask her.

5      Q    Okay.  And has Mr. Clar's firm agreed to

6  cap his fees at $90,000 for the entire case?

7      A    I don't believe so.

8      Q    Okay.  So it could be much higher?

9      A    It could be.

10     Q    Okay.  Has he given you a --

11     A    I think that's why it's in your best

12  interest and our best interest to come to an

13  agreement and exit the bankruptcy as quickly as

14  possible.

15     Q    That would be wonderful.

16          Have they given you an estimate of the

17  costs of the bankruptcy case, Mr. Clar's firm?

18     A    None to my knowledge.

19     Q    Not -- they haven't -- okay.

20          So are you aware that Mr. Clar's firm

21  has filed an application to be retained in the case?

22     A    I have not, but I don't even know what that

23  means, so...

24     Q    Fine.

25          Would it -- so you said that they had

1    been paid $50,000 in retainer money --

2        A    Yes.

3        Q    -- prior to the case, 25 for each debtor;

4    is that correct?

5        A    Yes.

6        Q    Was it exactly 25,000?

7        A    I believe it was.

8        Q    Okay.  Were they paid that -- when were

9    they paid that amount?

10       A    I believe it was approximately April 11th.

11       Q    April 11th.  So the day they filed the --

12       A    It may have been a couple of days before,

13   it may have been a couple days after.

14       Q    Okay.

15       A    I believe it was around April 11th.

16       Q    Had the company paid anything to Mr. Clar's

17   firm prior to that point?

18       A    Not to my knowledge.

19       Q    Okay.  If we can go down to the bottom of

20   the Exhibit A, where we're looking at the ending cash

21   balance.  So the ending cash balance as of May 3rd

22   and the beginning cash balance as of May 10th is

23   1.8 million and change; is that correct?

24       A    Yes.

25       Q    Okay.  And that's because you received

89

1    significant revenues, and you haven't paid out the

2    expenses that you've been committed to pay?

3        A    That's correct.

4        Q    Okay.  And then by the end of that period

5    it goes down to 955,000, correct?

6        A    Yes.

7        Q    Okay.  And then you do not receive another

8    cash infusion until the week of June 7th; is that

9    correct?

10       A    I think May 31st.

11       Q    So the end of the week of May 31st?

12       A    Yeah, that's right.

13       Q    Okay.  So between the week of May 10th and

14   the end of the week of May 31st, what happens to

15   your cash balance?

16       A    It's spent on expenditures throughout the

17   month.

18       Q    And ultimately it goes down to what?

19       A    115,500 --

20       Q    And then it goes back up?

21       A    Yes.

22       Q    Okay.  Now, going over to June, you

23   really -- you have that same pattern; is that

24   correct?

25       A    Yes.

1     Q    Okay.  And then the ending cash balance as

2   of the week of July 5th is 962,000 and change; is

3   that correct?

4     A    Yes.

5     Q    Okay.  Which is less than the ending cash

6   balance of a million and change as of May 31st,

7   correct?

8     A    It is.

9     Q    Okay.  And then for the month of July and

10   in August it's the same pattern.  And you actually

11   get down to $54,000 and change?

12     A    You're correct.

13     Q    Okay.  And then at the end of the week of

14   August 2nd you get down to 916,000; is that correct?

15     A    Yes.

16     Q    Which is right at that $911,000 number,

17   correct?

18     A    It's very close.

19     Q    Where you started?

20     A    Yep.

21     Q    That's remarkable.

22           Now, let's say that the Dominion bill

23   comes in at 2 to $400,000 per month more than what

24   you expected, what happens to your cash balances?

25     A    If that were to happen, and I -- we can

1    have a long discussion on why I disagree that it will

2    happen, then the cash balance would be less.

3         Q    Okay.  At points would it go negative?

4         A    It's conceivable.

5         Q    Okay.  Now, after the week of August 2nd

6    when you have to start paying attorney fees, is that

7    going to significantly reduce your cash balance?

8         A    If this model -- if this model is followed

9    as written, yes.  I don't believe that that's the

10   case if the court gives us the relief that I talked

11   about earlier.

12        Q    Okay.  So let's talk about that.  You want

13   to reject the CenturyLink and the Greenwich Center

14   contracts, right?

15        A    Yes.  Or at least portions of the

16   CenturyLink.  You'll see it drops from sixty-eight

17   fifty on May -- our current one thirty-three

18   twenty-eight to sixteen sixty-four.  That's a savings

19   of several thousand dollars a month.  And in terms of

20   Greenwich, that's also a savings of in excess of

21   $3,000 a month.  Combined, I believe the savings

22   anticipated is over $5,000 a month.  Over three

23   months that would be an additional $15,000 and sort

24   of --

25        Q    So it's $15,000 a month in savings.  Are

1  you trying to accomplish any other savings through

2  the case?

3      A    We also mentioned earlier that we're

4  planning to reduce headcount at the company.

5      Q    And that's reflected in this budget?

6      A    It is.

7      Q    Okay.  So coming back to my question then,

8  even with all that taken into account, if Dominion

9  ends up being higher, the attorney fees costs come

10 in, this $916,000 balance goes down significantly,

11 correct?

12     A    To some degree.  I don't know if I'd

13 classify it as significantly.  It would depend upon

14 sort of a lot of variables you left in your question.

15     Q    Well, everybody else can do the math.  I

16 mean, it's not difficult.

17              There are points in time based on your

18 monthly cycle where you could be in a negative cash

19 position; is that correct?

20     A    That's a possibility.

21     Q    Okay.  Just bear with me for a moment.

22     A    Sure.

23     Q    Have you had any discussions with your

24 counsel about confirming a Chapter 11 plan?

25     A    I have not.

1            MR. CLAR:  To the extent -- I object

2   to the extent that that calls for a violation of the

3   attorney/client privilege.  I object to the question.

4            MR. AGAY:  I'm just asking if he had

5   the discussion.

6            MR. CLAR:  That's fine.

7            THE COURT:  Sustained as to the actual

8   advice.

9            You can ask if he did.

10            THE WITNESS:  I have not personally,

11   but I believe others at our company may have, our

12   internal counsel, our CEO or CFO.

13   BY MR. AGAY:

14      Q    Okay.  And what's your understanding of how

15   this case has to conclude successfully?

16            MR. CLAR:  Objection, Your Honor.  It

17   calls for a legal conclusion.

18            THE COURT:  Overruled.  To the extent

19   that you as a layperson have an understanding of what

20   needs to happen here, you can testify as to that.  If

21   the only testimony you could give is on the advice of

22   counsel, then you do not and should not say so.

23            THE WITNESS:  Sure.

24            So, as a layperson my understanding is

25   that we would need to have some -- reach some

1  agreement with the various creditors.  And that if

2  the creditors were satisfied that they would be in

3  some way made whole, that the court would likely

4  approve that plan, and we would execute on.

5  BY MR. AGAY:

6      Q    Do you understand that as part of that

7  you're also going to have to come up with a business

8  plan?

9      A    Yeah, sure.

10     Q    Okay.  Is it fair to say, based on these

11  budgets, that if the company just continues on as it

12  is today, the value of the business goes down during

13  the bankruptcy case or at least during this 13-week

14  period?

15     A    So absent and injection of additional

16  capital from investors to start this, absent to

17  signing any new contracts with potential customers,

18  absent any of the other business building

19  opportunities that we discussed, so all other things

20  being equal, then yes, your premise is probably

21  correct.

22             MR. AGAY:  I don't have any other

23  questions, Your Honor.

24             THE COURT:  Thank you.

25             Any redirect?

1              MR. JOHNSON:  Your Honor, I'd like

2     to -- Russell Johnson -- one question just for

3     clarification of a statement the witness gave.

4              THE COURT:  Okay.

5                  CROSS-EXAMINATION

6     BY MR. JOHNSON:

7         Q    Good afternoon, Mr. Flake.

8         A    Good afternoon.

9         Q    Russell Johnson here for Dominion Energy

10    Virginia.

11             Just one question.  You made a

12    statement in response to Mr. Agay's question that

13    Dominion agreed to the debtors' numbers in this

14    document referred to as Exhibit B, but would have to

15    ask Dominion.

16             Is it your testimony that Dominion has

17    agreed to the numbers in Exhibit B or that we need to

18    ask Dominion?

19        A    Well, I don't know that I was privy to the

20    hallway conversations, so my last recollection was

21    that you were talking to our counsel about an

22    agreement.  I'm not sure if an agreement was reached.

23        Q    Okay.  So you're not certain if Dominion

24    has agreed to those numbers or not?

25        A    I am not certain.

1        Q     Okay.

2                    THE COURT:  Anything else?

3                    MR. JOHNSON:  What's that?

4                    THE COURT:  Did you have any other

5        questions?

6                    MR. JOHNSON:  No, that's the only

7        question.

8                    THE COURT:  Ms. Janczak?

9                    MS. JANCZAK:  Just a few questions.

10                   CROSS-EXAMINATION

11       BY MS. JANCZAK:

12       Q     Mr. Flake, you testified about some of the

13       other companies that I believe were subsidiaries of

14       BCause, LLC, that are not in bankruptcy, do you

15       recall that?

16       A     Yes, ma'am.

17       Q     Do those companies own any assets?

18       A     So, BCause Secure is a -- the company would

19       hold customer assets, and has in 50 states or so

20       applied as a money transmitter.  And I believe that

21       to the extent that we've been granted money

22       transmitter status, that those licenses would have

23       value.

24                   BCause, the parent company, the

25       holding company, has developed some software, and I

1  believe that that software would have some value.

2  Outside of that, no, I don't believe that that's the

3  case.

4       Q    So the licenses for one of the subsidiaries

5  you believe has some value; is that right?

6       A    Yes, ma'am.

7       Q    Does that subsidiary have any debt or

8  creditors?

9       A    It does not.

10       Q    Do you have a ballpark idea of what those

11  licenses might be worth?

12       A    I have no idea.  What I can tell you is

13  that in developing the spot market, we've probably

14  invested about a million-and-a-half to $2 million in

15  terms of labor, administrative filings, et cetera.

16  In fact, one of the law firms that's listed as a

17  creditor, Katten, for half a million dollars, those

18  efforts were largely geared toward the administrative

19  filings with the CFTC.  And so if any company wanted

20  to try and go into that business and wanted to

21  shorten the process, shorten the time frame that it

22  would take because it could be lengthy, buying our

23  assets might be a viable strategy for them.  And in

24  that case they'd have some value.  But that market's

25  very illiquid, and it would be dependent upon finding

1   a suitable buyer.

2        Q    Okay.  So those licenses may have some

3   value, but it's hard to put a number on it; is that

4   fair?

5        A    Very hard, yes.

6        Q    And then you mentioned LLC also has some

7   software.

8        A    Yes, ma'am.

9        Q    Do you have an idea of how much that

10  software might be worth?

11       A    No, ma'am.  It was internally developed,

12  and I just really -- I mean, as an example, I was at

13  a conference in Boston on Friday and there was a

14  company there trying to market a product very similar

15  to what we already developed.  I don't know what

16  they're selling it for, but that would be a good

17  market comp, but I didn't bother to ask.

18       Q    Okay.  With respect to your customers, you

19  said that they're billed at the beginning of the

20  month, and they typically pay at the end of the

21  month; is that right?

22       A    Yes, ma'am.  It's in that 30 billing.

23       Q    Okay.  When you bill them, let's say you

24  send them the bill on April 1st, for what period are

25  you billing them?

1      A      We're typically billing them two months in

2  advance so that would typically be for the period of

3  July performance.

4      Q      So if you bill them April 1st, this is for

5  future --

6      A      It's for June service.

7      Q      Got it.  You testified regarding Exhibit C,

8  which are the -- which is the list of equipment.

9      A      Yes.

10     Q      And you testified that, you estimated, has

11  a liquidation value, a forced liquidation value of

12  approximately 900,000 to a million dollars; is that

13  right?

14     A      Yes, ma'am.

15     Q      Do you believe those assets would be valued

16  differently if you were to, perhaps, sell the

17  business as a going concern?

18     A      Well, typically businesses are valued on a

19  multiple of revenue, which is not terribly dependent

20  upon the assets in the balance sheet.  I think most

21  folks value on the discounted cash flow, not based on

22  the liquidation value of the assets.  So maybe is the

23  answer to the question.

24     Q      Okay.

25              MS. JANCZAK:  That's all I have.

1                    THE COURT:  All right.  Any other

2     creditors?

3                    Mr. Shaw?

4                    Anybody?

5                    MR. SHAW:  No, Your Honor.

6                    THE COURT:  Okay.  Do you have

7     redirect?

8                    MR. CLAR:  No, Your Honor, I don't.

9                    THE COURT:  Okay.  Is that it with

10    this witness?

11                        (No response.)

12                   THE COURT:  Okay.  Mr. Flake, you may

13    step down.

14                   THE WITNESS:  Thank you.

15                       (Witness excused.)

16                   THE COURT:  All right.  I think this

17    is a good time to take a break.  We made it this far.

18                   You have other witnesses?

19                   MR. CLAR:  I do not, Your Honor.

20                   THE COURT:  Oh, you do not, okay.

21                   Do we have other witness?

22                       (No response.)

23                   THE COURT:  All right.  Why don't we

24    take -- is half hour enough?

25                   MR. CLAR:  Sure.

1                    THE COURT:  Okay.  Let's take a half

2     hour lunch break, break, break, and then come back,

3     and I'll hear arguments.

4                    MR. CLAR:  Okay.  Thank you, Your

5     Honor.

6               (Court is in recess until 1:30.)

7                    THE CLERK:  Continuing with this

8     court's 10:00 o'clock matters, BCause Mining, LLC,

9     and BCause, LLC.

10                    THE COURT:  Mr. Clar, it's your motion

11    for use of cash collateral.

12                    MR. CLAR:  Yes, it is.

13                    THE COURT:  So I will hear from you

14    first.

15                    MR. CLAR:  I hope the Court feels

16    better after lunch.

17                    Your Honor, I'll be brief because

18    we've already made -- we've already made the

19    arguments before.  We've heard the court's -- I've

20    heard the court's problems.  I've heard Mr. Agay's

21    problems.  I want to come back to what cash

22    collateral is all about, and what the problem was the

23    first two times.

24                    Cash collateral is about adequate

25    protection.  At no point did I hear Mr. Agay say his

1 client, for the period that we're asking to use cash

2 collateral which, incidentally, at this point is now

3 30 days, because we have this deal with -- with

4 Dominion -- well, we think we do, and we'd like to

5 see the results of -- to see if their coming peak --

6 Schedule A days or class -- whatever they are.

7 So, at no time during that period did

8 I hear Mr. Agay prove, try to prove, or attack the

9 fact that -- that the secured -- purported secured

10 creditor -- and, again, that's not a statement as to

11 the secured claim because I have my own opinion that

12 I won't share at this point because it's not

13 relevant -- are they -- is their collateral,

14 consisting of the cash or the accounts receivable, is

15 that deteriorating?  Plus, when you add in something

16 for the machinery and equipment, and we've now heard

17 testimony about they're -- they're oversecured

18 anyway.  And we are offering them adequate

19 protection.

20 It is true that this business sees ups

21 and downs during the month.  That's a function of

22 timing, and it's a function of when the receivables

23 come in all at the same time, and the payments are

24 spread out over a certain period of time.  You've

25 heard testimony that the payments that are in this

1  budget will not necessarily be recuring payments

2  because there's timing issues with respect to rental

3  payments that are currently bumping up against each

4  other that won't.

5            You've heard testimony that -- let me

6  go back to the court's comments, which I heard loud

7  and clear the last time and the time before, which is

8  where are we going?  What's the purpose?  Well, the

9  purpose is to reorganize.  The purpose is to preserve

10 the value for not just Wesco, but for other

11 creditors.  And what are we doing about it?  We --

12 you heard Mr. Flake's testimony that there are

13 efforts ongoing, even after the bankruptcy, to find

14 new sources of revenue.

15           Another problem that I recognize is

16 the Dominion problem.  Mr. Flake testified as to why

17 we think that we will not be at -- at the levels that

18 Dominion thinks we will be.  And by the way, I think

19 we're talking about a difference of 40 to $60,000 per

20 month in the peak months.  We believe that the

21 software we've instituted, and we believe that the

22 policies we've implemented in terms of shutting down

23 during those peak days will result in the -- the

24 amount of usage that we say it will result in.  And

25 if it doesn't, we've got -- we've now -- we've now

1  engaged in cost savings as well that will allow us to

2  generate -- not generate more revenue, but have more

3  surplus revenue on a going-forward basis.

4              The bottom line is between now and

5  let's say a 30-day period, there is no harm, nor has

6  any harm been alleged or proven, to the secured

7  creditor in allowing this business to continue.

8              I have admonished the client that we

9  do need to get the schedules on file within the next

10  couple of days in advance of the meeting.  And I

11  think that in order to preserve this business,

12  there's no harm in allowing us to proceed to pay the

13  expenses they've been wanting to pay.  The landlords

14  are being held up.  Some of the utilities are being

15  held up as well.

16              In making these payments for the next

17  30 days, and we'll come back and see what the usage

18  has been with Dominion, and we'll see if the

19  receivables collect again.  And we can see if there

20  has been any more progress towards new revenue or

21  some of the methods of producing new revenues

22  Mr. Flake testified to.  Again, I don't see the harm

23  in continuing.

24              THE COURT:  Thank you.

25              Mr. Agay.

```
 1              MR. AGAY:  Thank you, Your Honor.

 2              David Agay from McDonald Hopkins on

 3   behalf of Wesco.

 4              As I've said to Mr. Clar, and I've

 5   said to his clients, we're not doing this for sport.

 6   We didn't -- we're not -- we didn't set out to put a

 7   spear in the company.  We're doing this because we

 8   are legitimately concerned about our collateral

 9   position and that the company is continuing to exist

10   at our expense.

11              We've been here since the first day of

12   the case, and we have been saying the same thing, and

13   we haven't really learned anything new.  The profile

14   hasn't changed since the beginning of the case,

15   except in one important respect that we learned

16   today, which is 50 percent of their revenues are

17   going to be gone by the end of the year.  So they're

18   going to have to replace between now and the end of

19   the year 50 percent of their revenues, and that only

20   occurs if the price of Bitcoin goes up, at least

21   that's the testimony I heard.

22              To me, that's not a legitimate reason

23   to continue a case, and certainly calls into serious

24   question, if not renders it impossible, to confirm a

25   Chapter 11 plan.
```

1            Now, Mr. Clar and the committee are

2    correct that they don't have to come in on the first

3    day of the case and confirm a plan.  They don't even

4    have to do it in the first 30 days of the case.

5    However, where they are attempting to use our

6    collateral to see if they can ultimately accomplish

7    that goal, then it's incumbent upon the court not

8    only to adequately protect our position, but decide

9    if this is a case worth continuing very early on.

10           The -- the budget that they have

11   submitted is on the razor's edge, to say the least.

12   And, actually, according to their budget, we are only

13   adequately protected two out of the four weeks of the

14   month.  According to the revenue cycle, the cash

15   balance is dropped before the initial bank account

16   balance of the case two out of the four weeks of

17   every month.

18           And the balance, the ending balance,

19   continues to go down so that at the end of this

20   period, the ending cash balance of $916,000 and

21   change is less than where we started at 1.8 million,

22   or if you want to use 955,000 at the end of this

23   month.  And during that period they get very close to

24   a zero cash balance.  And that doesn't even take into

25   account the two to $400,000 that -- more that

1   Dominion says they could be owed per month based on

2   utility usage or attorney's fees.  And we've already

3   heard that as soon as this period ends, attorneys

4   start getting paid.

5                   So the -- I mean, the crowd has

6   expanded in this courtroom.  Mr. Shaw has talked

7   about how they want to subvert our liens, no doubt

8   the committee is going to be doing -- that all costs

9   money.  I am willing to bet you that the committee is

10  not going to sue us --

11                  THE COURT:  Mr. Shaw, you'll have your

12  chance.

13                  MR. SHAW:  Yeah, I just --

14                  THE COURT:  Sit down.

15                  MR. SHAW:  It was not said.  I need to

16  make sure the record is clear because I have people

17  on the phone that are listening on behalf of my

18  client, but that's not what --

19                  MR. AGAY:  I'm sure he'll clarify the

20  record.  He's good at that.

21                  THE COURT:  You'll have your

22  opportunity.

23                  MR. AGAY:  I am willing to bet that if

24  they're going to attack our liens -- and by they, I

25  mean the committee -- it's going to cost more than

1   30,000, a lot more.  And it's going to cost the

2   debtors a lot more than 40,000 or 90,000, whatever

3   their estimate is.

4            So this budget has flaws in it, I

5   believe, and at a minimum should be signaling to the

6   court that unless there's a significant turnaround

7   very quickly, this bankruptcy case will only serve to

8   destroy value for the estates.  And that's why

9   there's such urgency to decide whether to continue

10  this case and continue to allow them to use cash

11  collateral.

12           We have done -- and the reason that

13  our position is adequately protected today is because

14  we stood up at the very beginning of this case and

15  said, Judge, hold on a second, you have to put them

16  on a short leash because there's a lot of unanswered

17  questions.  They filled in some of the answers to

18  those questions, not all of them.  And the answers

19  they've given have not been great in terms of the

20  outlook here.

21           So, unfortunately -- and I truly mean

22  this -- unfortunately, this case seems to be a bridge

23  to nowhere.  And when the cost of building that

24  bridge is being paid by -- by my client, we have to

25  continue to object to use of cash collateral, we have

1 to continue to insist that if Your Honor is not ready

2 yet to dismiss the case for the reasons we already

3 discussed, then you've got to -- we've got to

4 continue on a week-to-week basis until we get further

5 clarity on what the future holds.

6                THE COURT:  Thank you.

7                Dominion.

8                MR. JOHNSON:  Thank you, Your Honor.

9 Russell Johnson for Dominion Energy Virginia.

10                Just real brief, Dominion has raised a

11 deal.  We're willing to give the debtors another 30

12 days to figure out what usage will be so that this

13 question about what will Dominion bills be can be

14 answered.  And we're willing to work with the debtors

15 on that.

16                They -- we met with them this morning.

17 They've explained to us that they installed some

18 software that's to represent 14 percentage usage

19 reduction.  We're going to look at the months that

20 they talked about that the software was installed,

21 run it through our rate department, and ascertain if

22 that's correct.  So we don't know.

23                Because we don't know, we reached a

24 one-month deal with them.  If they can make a

25 $700,000 payment to us on May 20th, during the week

1  of May 20th, then we'll agree to have us come back

2  to this court, if the court will entertain that, in

3  early June.

4              But if there is no cash collateral,

5  we've got the adequate assurance motion, and I've got

6  my witness here to testify as to that.  As I said, so

7  we don't know, all right.  I just want to make it

8  clear for the testimony that's why we reached the

9  one-month deal with them, subject, obviously, to the

10  court's approval.

11              THE COURT:  If we come back a month

12  from now, where will the billing cycle be with

13  Dominion?

14              MR. JOHNSON:  So the account bills

15  around the 20th of the month.  So the first bill

16  went out for April 11th to April 22nd, and I have

17  that as an exhibit if I were to put on my -- Chris

18  Russell here from Dominion Energy Virginia.  It was

19  $238,000 for 11 days, April 11th to April 22nd.  It

20  averages about $21,000 a day.  You extrapolate that

21  over a 30-day period, it's about $651,000.

22              So we need to look at that -- the data

23  from the reduced usage of this new software program,

24  and what the days are, these A, B, and C days that

25  they talked about, because there's a significant

1   difference in the pricing.  So we'll know.  We'll

2   have another bill that will issue on May 20th --

3                   THE COURT:  Okay.

4                   MR. JOHNSON:  -- that will cover

5   April 23rd to May 20th, May 21st, somewhere in that.

6   It's not an exact science.  It depends on weekends.

7   They don't read meters on weekends.

8                   THE COURT:  Right.

9                   MR. JOHNSON:  So we'll have another

10  full month of charges, post-petition charges.  And

11  I've asked the client if they can do a meter read for

12  the following week to see if that continues.

13                  So we'll have that additional data,

14  and we should have a good idea of whether the

15  debtors' proposed numbers are accurate or not.  And

16  that's why we agreed to a 30-day adequate assurance

17  agreement with the debtors to get that information.

18                  THE COURT:  Okay.

19                  MR. JOHNSON:  All right.  Thank you,

20  Your Honor.

21                  THE COURT:  Thank you.

22                  Mr. Shaw.

23                  MR. SHAW:  Your Honor, obviously, our

24  client supports the request of the debtor today.  But

25  I think a couple of things.

1          First of all, just so the record is

2    clear, I earlier requested that Mr. Agay ask his

3    client to provide us with some documents that I

4    believe if this court looks at his stay motion, the

5    court will realize that they're missing, or something

6    doesn't make sense.  I asked for a clarification.  If

7    he wants to take that defensively and assume that

8    that means my client wants to subvert his claim,

9    that's fine.  But really it's a significant creditor

10   who would like to know what's going on and doesn't

11   believe that the documents before the court support

12   his claim for relief, at least as to the documents

13   that were attached to the stay motion.

14          But, more importantly, at least with

15   regard to the request before the court today, this is

16   all about whether or not the debtor can show they can

17   adequately present -- protect the interest of this

18   alleged secured creditor.  They've done that for the

19   next 30 days.  They've done that for the next 37

20   days.

21          Is this perfect?  No.  If it was

22   perfect, we wouldn't be here.  But there's absolutely

23   no basis for the secured creditor to say today

24   they're not being adequately protected.  And somewhat

25   ironically with a very tight budget that while this

1   adequate protector, presumably on a provisional

2   basis, is getting $25,000 a month, it seems -- or

3   $25,000 twice a month, according to Mr. Agay.

4              Once a month?  Once a month.

5              THE COURT:  Once a month.

6              MR. SHAW:  Then, you know, it seems

7   like we should move beyond this and see what happens

8   in 35 days.  But, you know, there should be no

9   question.  When Mr. Agay's client says we don't want

10  to kill the debtor, we don't want to kill the debtor,

11  they're before you today taking a position that would

12  kill the debtor.

13             So we would respectively request that

14  the debtor be allowed to use cash collateral.  As the

15  largest creditor in the case, we don't think that ask

16  is unrealistically or inappropriately asking some

17  other creditor to take a risk.  That creditor is

18  being compensated.  That creditor is not going to

19  lose its position based on the testimony today in the

20  next 30 to 35 days.

21             THE COURT:  Thank you.

22             Mr. Fisher.

23             MR. FISHER:  Good afternoon, Your

24  Honor.

25             On behalf of Hoffland Properties, we

1   ask that we receive current payment and something on

2   our stub rent, and the debtor has been responsive to

3   that.  In fact, they've been responsive all along.  I

4   believe that the testimony that the debtors'

5   principal gave was credible.  He didn't really gild

6   the lily, this is a tight budget.  But there are

7   other assets.  There are receivables that aren't on

8   this budget.  There is equipment that's not on this

9   budget.

10              We're not in the business of leasing

11  to deadbeats, but I think we would support the 30-day

12  extension of the use of cash collateral per this

13  budget because it does pay as they go with the rent.

14  And I think that the diminution in the cash is

15  basically the one shot that every debtor faces when

16  they have to provide adequate assurance.  They have

17  to cure these stub periods, and they have to catch up

18  often, as they have here, with the payroll payment

19  that's been late.  As they get down to their steady

20  state, they're pretty close to breakeven, maybe do

21  better.  We'll see based on these other improvements

22  that they've alluded to.

23              I think the concern everybody wants to

24  know that there's a way out, that there are ways out

25  that -- whether there's a sale, whether there's an

1  investment of additional capital, whether there are

2  other developments.  But I think it's too soon to

3  kill this company when it's obvious that the

4  $1.8 million claim of this alleged secured party

5  seems to be covered by the collateral.

6            THE COURT:  Okay.

7            Ms. Janczak.

8            MS. JANCZAK:  Your Honor, at this

9  point I believe what the debtors is asking for is not

10  approval of the 13-week budget, but for 30 days of

11  cash collateral use.  If I'm hearing it correctly,

12  what Mr. Agay is suggesting is this needs to be a

13  week-to-week approval.  That makes very little sense

14  to me because coming back and going through this

15  exercise week to week is only going to increase

16  administrative costs.  And if you look at the budget,

17  this -- their expenses and their revenues are on a

18  month-to-month basis.  Nothing is really going to

19  change between now and next Wednesday or really even

20  now and two Wednesdays from now.

21            This debtor needs to be evaluated,

22  perhaps month to month, ideally longer than that.

23  But at this point, there's an agreement with Dominion

24  for 30 days.  The debtors need to get their schedules

25  on file and go through the 341 meeting.  And that 30

1   days will allow all the parties in interest to look

2   at those schedules, find out what the debtors' actual

3   energy consumption is going to be, and then evaluate

4   how realistic and how accurate these projections are.

5   But if we come back next week or keep coming back

6   week to week, that's not going to happen.  It's just

7   going to make this case more expensive.

8               The debtors made efforts to reduce

9   expenses by curtailing energy use during peak hours

10  and has committed to reducing headcount and rejecting

11  some leases to save some additional cash.  Its

12  customers are financially secure, so there's very

13  little risk of nonpayment.  In fact, one of its

14  customers is also the biggest creditor in the case.

15  So they, obviously, have an incentive to keep this

16  case going.  As Mr. Shaw has indicated, his client

17  wants to see what happens over the next 30 days.

18              Mr. Agay importantly admitted that as

19  we stand here today, his client is adequately

20  protected.  And that's what we're here talking about

21  is whether or not Wesco is adequately protected.  And

22  I've heard no argument or evidence that they're not

23  today or that they won't be in 30 days.

24              Since the bills go out on the 20th of

25  the month, I think it makes the most sense to

1   continue cash collateral beyond that point, see where

2   we're at, and then everybody can make an informed

3   decision based on the operations and the assets about

4   where this case can go.

5               MR. AGAY:  Can I make one point, Your

6   Honor?

7               THE COURT:  Sure.

8               MR. AGAY:  Thank you.

9               They're all right.  This is about

10  adequate protection, both short term and long term.

11  And we're very focused on preventing waste of estate

12  assets.  But if you focus on the short term, and the

13  ending cash balance after everything is paid out at

14  the end of the week of May 10th, you're at $955,000

15  and change, Your Honor, okay?  And there is no

16  accrual in there for attorney's fees.  That's outside

17  of this budget, okay, which is disingenuous because

18  of course if the court shut down the case tomorrow,

19  Mr. Clar and Freeborn would be in here arguing that

20  they should be paid their attorney's fees, okay?

21              So, it's actually something less than

22  955,000 when you take into account the administrative

23  costs.  And if it's anything less, I mean, and if the

24  attorney fees are anything more than $40,000, then

25  we're not adequately protected because then you're

118

1   below where the cash balance started at the beginning

2   of this case.

3              So whether we're adequate --

4   adequately protected in the short term and the long

5   term I believe is seriously in question.  I don't

6   think we're adequately protected in the long term.

7   And we get back to that same question of why are we

8   continuing with this exercise if you're destroying

9   value in the meantime?

10             THE COURT:  Thank you.

11             Mr. Clar, anything else?

12             MR. CLAR:  Thank you.  Just a couple

13  points, Your Honor.

14             As to the attorney's fees, I just want

15  to clarify something for Mr. Agay and for the court.

16  We were paid a $50,000 retainer.  Our rates are

17  reasonable, okay?  I haven't looked at the time.  I

18  would also point out that the more we end up in

19  court, the higher it's going to be, but that's life.

20             But I don't think we've spent $50,000

21  since April 11th and 12th.  The $40,000 figure

22  that's going to be put in there is, again, put in

23  there because we can only apply every 120 days.  It's

24  simply not right to say that fees are accruing that

25  have to be paid because we're billing against a

1   retainer.  So -- and we don't -- we don't bill that

2   way, okay.  So we try to do as best we can with what

3   we have.

4                   And as far as the creditors committee

5   is concerned, they've committed to $10,000 a month.

6   That's what's in the budget.

7                   And one more point, as you heard

8   Mr. Johnson say, to the extent that -- and this is in

9   the proposed order, it may be in the order that's

10  already been entered.  I've lost track of it,

11  frankly.  But in the event that the usage is less

12  than what we have paid -- and Mr. Johnson can correct

13  me if I'm wrong -- we get a credit.  So -- and we

14  think Mr. Flake's testimony is that our methods, our

15  software, our usage is going to result in less than

16  what is budgeted.  So, in fact, the secured creditor

17  is even more adequately protected.

18                   Thank you.

19                   THE COURT:  I do believe right now,

20  Mr. Agay, that your client is adequately protected.

21  But I am very concerned about where we go from here.

22  The testimony, frankly, suggested that, as Mr. Agay

23  said, the profile really hasn't changed that much in

24  the last three weeks.  And, in fact, I'm afraid it

25  might be getting worse.

1              When I hear that the largest

2     customer's contract is expiring at the end of the

3     year, and, frankly, the debtor doesn't think they're

4     going to renew -- I appreciate the debtor being very

5     honest and forthright, but if the debtor doesn't

6     think they're going to renew, then we've got to see

7     some replacements.  And we're a little bit on a

8     ticking time bomb because that's 50 percent of the

9     money.

10             Then I hear today, after the debtor

11    has filed documentation about, oh, don't worry, don't

12    worry, we've got $13.5 million in assets, that we all

13    know the hard assets are worth less than a million

14    dollars by the debtors' own testimony.  So this is a

15    very tight case.  And it doesn't necessarily look

16    like it's going in the right direction.

17             But I've got a creditors committee who

18    has just been appointed.  I have the largest creditor

19    appearing before me for the first time that I didn't

20    even know existed.  I don't have schedules.  We don't

21    know who else is out there.  I heard testimony about

22    one other customer who has also owed a significant

23    amount of money.  This is not a pretty picture.  But

24    with everybody just getting involved and getting up

25    to speed, and given that I do believe for the short

1  term, for the next 30 days, Mr. Agay's client is

2  adequately protected, I'm going to let it go 30 days.

3           But I haven't seen a lot of positive

4  progress in the last three weeks.  If I don't see

5  some positive progress toward a better result than

6  where we are now after this 30 days, I'm not sure

7  what the point is.

8           It's rather strange, and maybe I

9  shouldn't say this, but the one thing I do see is

10  that if we shut it down today and liquidate it, it's

11  an absolute disaster.  The chance for creditors to

12  get paid here is probably better if it continues to

13  operate, assuming it doesn't crash and burn 120 days

14  from now.  If it crashes and burns 120 days from now,

15  then everybody is even worse off then they are today,

16  and that's the tension we've got here.  So I'm going

17  to give the parties that are just getting involved 30

18  days to figure this out.

19           On the administrative expenses, I

20  agree at the end of the day, the administrative

21  expenses are going to have to be dealt with.  I

22  appreciate the unsecured creditors committee taking a

23  reasonable amount over the next couple of months.  If

24  Mr. Agay's client is really secured, you're going to

25  get paid before the administrative claimants.  So,

1   again, you're adequately protected, but the rest of

2   the folks are in deep trouble, and that does concern

3   me.

4                I also think in this next 30 days you

5   have got to examine Wesco's security interest and

6   documentation.  And if you don't think they have a

7   valid security interest, you've got to get something

8   on file, because right now they're leading the charge

9   here.  And if they're not truly a secured creditor,

10  they shouldn't be leading the charge.

11               MR. SHAW:  Your Honor, on that note, I

12  know it was mentioned earlier in the context of the

13  stay motion, I assume that the parties here, if they

14  enter into that -- if we have a scheduling order

15  which sets out a short time for both on the 30 days,

16  we're all going to be willing to engage in some

17  informal document exchanges because that's --

18               THE COURT:  I think Mr. Agay has

19  indicated that on the record already.  And if he

20  hasn't, I'll direct that he do so.

21               MR. SHAW:  Yeah, of course.

22               THE COURT:  It is to everybody's

23  advantage to get this information out there, reviewed

24  upon.  And if you think there's a problem, get

25  something on file, and then we won't have to be, you

1   know, wondering anymore.

2            So I think what we need to do is I'm

3   going to enter a cash collateral order giving the

4   debtor the 30 days that they've asked for.  We'll

5   have to figure out the exact dates.  And then I want

6   to set a briefing schedule on the motion to lift the

7   automatic stay or dismiss the case.  And then we've

8   got all the other motions we should deal with right

9   now.

10            MR. AGAY:  Your Honor, before we move

11   off of the cash collateral --

12            THE COURT:  Okay.

13            MR. AGAY:  -- can I -- so in term --

14   and Mr. Clar and I can work on an agreed order, as we

15   have been doing.

16            MR. CLAR:  Yes, we have.

17            MR. AGAY:  I would ask that that order

18   provide that they have to, obviously, adhere to the

19   budget --

20            THE COURT:  Right.

21            MR. AGAY:  -- that they have --

22            MR. CLAR:  Plus 10 percent.  That's

23   what we've said in our --

24            THE COURT:  That's what everybody

25   says.

1             MR. AGAY:  Okay.

2             MR. CLAR:  Right.

3             THE COURT:  That's not unreasonable.

4             MR. AGAY:  Okay.

5             MR. CLAR:  Thank you.

6             MR. AGAY:  And these budgets will be

7    attached to that order.

8                  In addition, Your Honor, I would ask

9    that within the next 30 days the debtor presents us

10   with a business plan of some sort, something that,

11   you know, addresses -- I mean, Your Honor has

12   addressed the concern now.  This isn't the first time

13   Your Honor is saying this, and it's obviously not the

14   first -- I believe that unless we put some concrete

15   milestones in the ground, we're going to be looking

16   at the same situation.

17             THE COURT:  Well, we're going to have

18   a trial on a motion to lift stay or dismiss the case.

19   In order for the debtor to convince me this case

20   should go forward, they're going to have to convince

21   me that they have a plan.

22             MR. AGAY:  Okay.

23             THE COURT:  That there's a reasonable

24   prospect of reorganization within a reasonable amount

25   of time.  Right now, I haven't heard it.

125

1          MR. AGAY:  Okay.

2          THE COURT:  And the burden is going to

3    be on the debtor to prove that.  So in that context,

4    the debtor needs to do whatever the debtor needs to

5    do to convince me, because I have serious doubts

6    right now.

7          MR. CLAR:  And I hear you.  Once

8    again, but that's not what Mr. Agay was saying.  I

9    don't want anything in the cash collateral order.  I

10   mean, there's already a motion for relief from stay

11   on file.

12         THE COURT:  Right.

13         Okay, so let's figure out a schedule.

14   Oh, with respect to cash collateral also, I'm going

15   to ask that the parties work together to figure out

16   if there are things on this budget that don't have to

17   be paid.

18         For example, if you've got a couple of

19   leases you want to reject -- CenturyLink and

20   Greenwich Center were the two that were mentioned --

21   if there's an opportunity to not pay that expense

22   given where you're going on this one, I would suggest

23   you not pay that expense.

24         MR. CLAR:  Fair enough.

25         THE COURT:  And I'd ask you to look at

1   every line item and really think about what you have

2   to pay versus what's on the line item.  And I'll just

3   trust the parties to use their best efforts in good

4   faith to work through that.

5                  MR. CLAR:  Thank you.

6                  THE COURT:  So I'll mark draft order

7   to follow on the use of cash collateral.  Today is

8   May 8th.  This budget -- we certainly want to get in

9   the May 31st payments, which I guess come in the --

10                  MR. CLAR:  The first week of the

11  month.

12                  THE COURT:  -- the first week of the

13  month, so we probably want to come back here in early

14  June.  And I've got June 5th and June 6th, which

15  would both be available.  I would prefer June 5th

16  because June 7th is Geneva and it makes my June 6th a

17  nightmare.

18                  MR. CLAR:  Traverse or Geneva?

19                  THE COURT:  That's Geneva.

20                  MR. CLAR:  Oh.

21                  THE COURT:  Traverse is the following

22  weekend.

23                  MR. CLAR:  The following -- yeah, that

24  was my fear.

25                  THE COURT:  Yeah, no, Traverse City is

127

1   the 13th and 14th.  We figured that out earlier

2   today.  So, no, I'm in Geneva on the 7th of June,

3   which is why June 5th would be a good time.

4                    MR. CLAR:  June 5th is fine.

5                    MR. AGAY:  Fine by me.

6                    THE COURT:  Okay.  So make your cash

7   collateral go out through June 5.  We'll come back or

8   pick --

9                    MR. CLAR:  Right.

10                   THE COURT:  -- June -- maybe the end

11  of that week then, June 7th, and we'll come back on

12  June 5 at 10:00 on the next use of cash collateral.

13                   MR. CLAR:  Thank you.

14                   THE COURT:  All right.  So I'll mark

15  that draft order to follow and expect to get one from

16  you that will be by agreement.

17                   All right.  Now, let's take a look at

18  everything else we have.

19                   MR. CLAR:  Right.

20                   THE COURT:  All right.

21                   MR. CLAR:  I'm just looking at the

22  court's calendar.

23                   THE COURT:  Yeah, that's a good way to

24  do it.  That will help Alex too.

25                   MR. CLAR:  The first entry is

1    Mr. Agay's motion for relief from stay from the

2    mining company.  So we need --

3                    THE COURT:  You need a briefing

4    schedule --

5                    MR. CLAR:  Right.

6                    THE COURT:  -- on the lift stays.

7                    MR. AGAY:  I think, Your Honor, this

8    starts with the filing of the schedules.  I think

9    we've got --

10                    THE COURT:  Yeah.  When's the 341

11    meeting?

12                    MR. CLAR:  The 15th.

13                    THE COURT:  Okay.  So -- there she is.

14    Ms. Gleason, you're still here.  That's your last

15    day.

16                    MS. GLEASON:  Well, no, I'm not.

17                    THE COURT:  When does the U.S. Trustee

18    need the schedules to hold a good 341 meeting?

19                    MS. GLEASON:  At least three days

20    before.

21                    THE COURT:  At least three days

22    before, okay.  So be ready at the 8th.  Can we get

23    them on file by the 10th?

24                    MR. CLAR:  I talked to Mr. Nguyen

25    about this, and I asked him if it was okay if we got

1  them done by Monday, and he said that was okay with

2  him.

3              MS. GLEASON:  I -- well, it is his

4  case.  I'll defer to him.

5              THE COURT:  Okay.  Then the schedules

6  will be due on --

7              MR. CLAR:  I think he said that.

8  That's what I --

9              MS. GLEASON:  I think Monday is --

10             THE COURT:  Okay.

11             MS. GLEASON:  -- it would be fine.

12             THE COURT:  So the schedules are due

13  on the 13th.  The 341 is on the 15th.

14             MR. CLAR:  Right.

15             THE COURT:  Okay.  Now, we need a

16  response on the lift stay and motion to dismiss.

17             MR. CLAR:  On both cases, actually.

18             THE COURT:  On both cases.

19             MR. AGAY:  So I would propose, Your

20  Honor, to give them seven days after they file the

21  schedules.

22             THE COURT:  After the 341.  I'll give

23  them seven days after the 341 meeting.

24             MR. CLAR:  Question that Ms. Janczak

25  just asked me that was a very good question is that

1   do we need to do two separate responses if the cases

2   are going to be jointly administered?

3               THE COURT:  No, the cases are going to

4   be jointly administered.  I'll enter that order right

5   now.  I do not -- please, I do not want two separate

6   responses.  And I do not want the rote first how many

7   paragraphs about what this case is about.  I know

8   what it's about.  I've read it several times.  All

9   right?  So just go to the points.

10              MR. SHAW:  And those dates would be

11   for any party in interest to respond?

12              THE COURT:  Any parties in interest.

13   Okay.  So, they will be due on the 22nd of May.

14              MS. JANCZAK:  To be clear, Your Honor,

15   the committee filed a preliminary objection and

16   request to file something --

17              THE COURT:  You'll have time to file a

18   more substantive objection.

19              MS. JANCZAK:  Perfect.  Thank you.

20              THE COURT:  Okay.  So they'll all be

21   due on 5/22.

22              Mr. Agay, you want to reply?

23              MR. AGAY:  Yes.  So what did we -- we

24   said June 5th as the --

25              THE COURT:  June 5 is the cash

1   collateral date, which I think should also be the

2   hearing on this.

3                    MR. AGAY:  Right.  So what if we file

4   our reply June 3rd?

5                    THE COURT:  Where am I -- where am I

6   June 2nd and 3rd?

7                    (Discussion off the record.)

8                    THE COURT:  Oh, that's right.  Okay.

9   Yeah, June 3rd is fine.

10                    MR. AGAY:  Okay.  And, Your Honor,

11  we're not looking to engage in scorched earth

12  discovery, but between May 2nd and June 3rd I'd like

13  to have an opportunity to take a deposition, if

14  necessary, issue interrogatories, admissions,

15  whatever.  But we'd do it very quickly.  And I'll try

16  to work out a schedule with Mr. Clar.

17                    THE COURT:  Yeah.  I will ask -- I

18  know you all well.  You're all reasonable people.

19  Try to work something out.  Again, I think it would

20  be minimum discovery.  Get what you need to have done

21  so we can have a full-fledged hearing on all this

22  stuff on the 5th.

23                    MR. AGAY:  Yeah.

24                    MR. CLAR:  I think Mr. Agay and I have

25  shown that we can cooperate with each other.

1          MR. AGAY:  Sure.

2          THE COURT:  Yeah, you have.

3          All right.  What else do we have

4   before me?

5          MR. CLAR:  Well, the next motion is

6   cash collateral.  We've dealt with that.

7          THE COURT:  Okay.  That will be up

8   again on the 5th.

9          MR. CLAR:  Then there's adequate

10   assurance of future performance in mining, and I

11   think -- I thought there was an order entered

12   already, wasn't there?

13          MR. JOHNSON:  No.

14          MR. CLAR:  Okay.  Well --

15          THE COURT:  Now, wait a minute, is

16   this one -- this is Dominion.

17          MR. CLAR:  This is just Dominion,

18   correct.

19          THE COURT:  This is just Dominion,

20   right.  Do we have an agreed order with Dominion?

21          MR. CLAR:  I think we can probably

22   craft one.

23          MR. JOHNSON:  Yes, Your Honor, we can

24   craft one.

25          THE COURT:  Okay.  I want an agreed

1  order with Dominion.  I understand that's going to

2  go, again, 30 days.  It's the same 30 days.  Get your

3  700,000.  We really want to see your bills.  When we

4  come back on June 5th, that will be a key because if

5  it's way higher, I think the writing is on the wall.

6  I don't see how --

7                    MR. CLAR:  And then what?

8                    THE COURT:  The writing may be on the

9  wall if it's way higher because there's not a whole

10  lot of room in this budget.

11                    MR. JOHNSON:  All right.  So we're

12  going to -- the 30-day agreement on adequate

13  assurance, and we'll come back June 5th --

14                    THE COURT:  Right.

15                    MR. JOHNSON:  -- on that as well.

16  Thank you.

17                    MR. CLAR:  And we'll -- I'll work with

18  Mr. Johnson, or whoever for a draft order to follow,

19  okay.

20                    THE COURT:  Okay.  Motion to extend

21  time to file schedules has been granted.  They're due

22  on the 13th of May.

23                    Motion for joint administration is

24  granted.

25                    MR. AGAY:  Your Honor, with respect to

1   joint administration, can there be a clarification in

2   the order that it's not granting substantive

3   consolidation?

4                THE COURT:  I think that's very clear

5   in their request, but --

6                MR. CLAR:  Yeah.

7                THE COURT:  -- it's now very clear to

8   me too.

9                MR. AGAY:  Thank you.

10               THE COURT:  It's not substantive.

11               MR. CLAR:  Well, right, but it doesn't

12  have to be in the order.  It was never asked for.

13  Why should that be in the order?  I'm still not --

14  hold on one second.

15               THE COURT:  It's not necessary to be

16  in the order.

17               MR. CLAR:  Thank you.

18               THE COURT:  We don't need to argue

19  about something.  It's not substantive consolidation.

20  It's joint administration only.

21               MR. AGAY:  Okay.

22               MR. CLAR:  Thank you.

23               THE COURT:  Okay.  Application to

24  employ Mr. Clar.

25               MS. GLEASON:  Your Honor, the U.S.

135

1  Trustee does has some questions.  There are retainers

2  that are paid by the insiders who have a loan.  We

3  talked about it.  We're trying to work out the

4  issues.  And in addition, I believe your disclosure

5  was just filed today as well.

6              MR. CLAR:  Correct.

7              MS. GLEASON:  So, Your Honor, I'd

8  either continue it or we would ask for a draft order

9  to follow with hopes that we would get it resolved.

10  If not, we would bring any issues in front of Your

11  Honor.

12              THE COURT:  Yeah, I'll grant it draft

13  order to follow.

14              MR. CLAR:  Fine.

15              THE COURT:  It was a little unclear to

16  me about the retainer.  I didn't understand how much

17  it was.  Now I understand.  It was confusing --

18              MS. GLEASON:  We are requesting a

19  waiver of any loans or claims by the insiders, Your

20  Honor.

21              THE COURT:  I'll let you talk among

22  yourselves.

23              MS. GLEASON:  Thank you.

24              So can we have a date for the draft

25  order to follow to the extent that we don't get an

1  agreement?  How about the -- well, I would imagine

2  you want to come back before June 5th if there's any

3  issues?

4          MR. CLAR:  I'm trying to think that

5  through.  Yes, I would.  I'm not sure that I have to,

6  but I would.

7          MS. GLEASON:  Well, Your Honor,

8  there's -- it's a draft order to follow.  Typically

9  you give a date.

10          THE COURT:  I typically give 14 days,

11  and --

12          MR. CLAR:  That would be fine.

13          MS. GLEASON:  Okay.

14          THE COURT:  Fourteen days.

15          MS. GLEASON:  And then there will be a

16  hearing on 14 days if we don't have a --

17          THE COURT:  There won't be a hearing.

18  If you need a hearing, you need to call us and let us

19  know.

20          MS. GLEASON:  Okay.

21          MR. CLAR:  Similarly, the draft order

22  to follow on the adequate assurance, 14 days?

23          THE COURT:  Yes.

24          MR. CLAR:  And on the cash collateral

25  as well?

1                   THE COURT:  I think you want that one

2     right away.

3                   MR. CLAR:  I definitely do, but I just

4     need to know that there's a --

5                   THE COURT:  On cash collateral, I will

6     be out of town the rest of the week, but I will be in

7     contact with my staff.  So when it comes, if it's

8     agreed to, it will not be a problem.

9                   MR. CLAR:  We've typically done this

10    fairly quickly.

11                  THE COURT:  Yeah, you have.

12                  Okay.  Motion to exceed page limit,

13    I'll grant that.

14                  Motion to compel debtor to pay

15    post-petition rent, this is the landlord's motion.

16    That will be granted.

17                  MR. FISHER:  Thank you, Your Honor.

18                  THE COURT:  Application to employ

19    Freeborn & Peters, any objection?

20                  MS. GLEASON:  No objection, Your

21    Honor.

22                  MR. CLAR:  I'm sorry, Your Honor, wait

23    one second.

24                  Ms. Janczak.

25                  MR. FISHER:  Your Honor, on the

138

1  landlord's motion, we probably ought to tailor it and

2  submit it because they had -- I said paid forthwith,

3  and they have a schedule.  So we'll work out

4  something.

5              THE COURT:  Okay.  We'll mark it draft

6  order to follow.

7              Application to employ Freeborn, any

8  issues?

9              MS. GLEASON:  No objection, Your

10 Honor.

11             MR. AGAY:  Your Honor, we don't have

12 an objection to the application, but, you know, the

13 testimony has been they're getting paid 10,000 a

14 month.  Is that part of the terms of their retention?

15             THE COURT:  Nothing was in there.

16 There wasn't a word in the motion about that.

17             MS. JANCZAK:  I don't know that

18 there's a written agreement.  That's just -- we asked

19 for a line item in the cash collateral budget for

20 10,000 a month.  And we are trying our very best to

21 keep our fees down as much as we can.

22             THE COURT:  Oh, so there's no written

23 agreement, and there's no cap.

24             MS. JANCZAK:  There might be an

25 e-mail.  I don't know.

1                    MR. CLAR:  There is --

2                    MS. JANCZAK:  Ms. DeRousse may have

3    e-mailed --

4                    MR. CLAR:  Let me --

5                    MS. JANCZAK:  -- I was not on it.

6                    MR. CLAR:  -- let me tell you what

7    there is.  There was an e-mail from Ms. DeRousse

8    saying does $10,000 a month work for you, and I said

9    yes.

10                    THE COURT:  Does that mean it's a cap,

11   or does that mean what you're putting as a line item

12   in the budget?  That's a pretty big distinction.

13                    MS. JANCZAK:  We did not agree to cap

14   our fees.  This is just a cash collateral line item.

15                    MR. CLAR:  We'll see what follows.

16                    THE COURT:  We'll see what follows at

17   the next hearing too, won't we.

18                    MR. CLAR:  Well, yeah, that's what I

19   mean, Your Honor.  Look, that's all I have.  That's

20   all I have right now.

21                    THE COURT:  Well, Mr. Clar, nobody

22   challenged the testimony today.

23                    Ms. Janczak, you didn't challenge the

24   testimony today.

25                    MS. JANCZAK:  I believe he said he

1   didn't know.

2               THE COURT:  Where the heck did that

3   come from?

4               MS. JANCZAK:  I believe he said he

5   didn't know if it was a cap.  And I believe he

6   directed Mr. Agay to ask me.

7               MR. SHAW:  Actually, that would be

8   cash accrual in the budget, which is for some of the

9   attorney's fees.

10              MS. JANCZAK:  In any event, Your

11   Honor, I don't think it bears on whether or not we're

12   retained.

13              THE COURT:  It doesn't bear on whether

14   or not you're retained.  It's duly noted for purposes

15   of the budgeting.

16              MR. CLAR:  Something to take up next

17   time.

18              THE COURT:  Application to employ,

19   okay, I've got both of them on Freeborn.  Freeborn

20   will be employed.

21              And there's another motion to exceed

22   page limit.  That's granted.

23              Application to employ debtors'

24   counsel, it must be the other case.

25              MS. GLEASON:  Your Honor, I still want

1  to go back to the motion to employ Mr. Clar's firm.

2  I mean, we do have a concern.  We think we can work

3  it out.  So I'm a little concerned when you say that

4  you granted it subject to draft order to follow if

5  we're not able to get affidavits and information that

6  we need, Your Honor.

7                  THE COURT:  You want me to set a

8  hearing?

9                  MS. GLEASON:  Well, you know, Mr. Clar

10 was fully aware that we had these concerns, and we're

11 trying to work this out.

12                 MR. CLAR:  Actually, not until this

13 morning, but --

14                 MS. GLEASON:  Well, and you only did

15 your disclosure this morning, Your Honor.  If you

16 want to set a briefing schedule, we'd be happy to do

17 that.  I think we can avoid that.  But I would ask

18 that you not grant it and allow us to work this out.

19 And if we have to come back, maybe next week --

20                 MR. CLAR:  That's fine.

21                 MS. GLEASON:  -- and actually argue

22 it, I think would be a better way.

23                 THE COURT:  All right.  Then let's

24 continue the motion.

25                 MS. GLEASON:  Thank you, Judge.

142

1          MR. CLAR:  As long as Ms. Gleason is

2   still here.

3          MS. GLEASON:  Well, then it'd have to

4   be before the 15th.

5          THE COURT:  One second, I'm going to

6   sneeze.

7          Okay.  Let's come back on the 14th.

8          MS. GLEASON:  Thank you, Judge.

9          MR. CLAR:  That's fine.

10          THE COURT:  All right.  The 14th at

11   10:00 on the application to employ Mr. Clar's firm.

12   There are two of them.

13          MR. CLAR:  That's fine.  Bless you.

14          THE COURT:  Okay.  Motion to file

15   schedules has been granted in both cases.

16          Cash collateral, we have a schedule

17   on.

18          Motion to authorize debtor to pay

19   pre-petition payroll.

20          MR. CLAR:  That was already granted --

21          THE COURT:  It was really granted

22   subject to the interim cash collateral --

23          MR. CLAR:  Right.

24          THE COURT:  -- order.  So I think we

25   can adjourn that as being resolved.

1          MR. CLAR:  We've paid it, so right.

2          THE COURT:  Motion to provide adequate

3    assurance.  This is the --

4          MR. CLAR:  This one I'd like you to

5    grant, Your Honor, because these are utilities that

6    are much smaller than Dominion --

7          THE COURT:  Yeah.

8          MR. CLAR:  -- that are threatening

9    shutoff right now, so we'd ask that since you're

10    granting the use of cash collateral for the 30-day

11    period, we would ask that you enter these orders.

12          THE COURT:  Yeah, these are very

13    minor.  There was really nothing that was being paid.

14          MR. CLAR:  Correct.

15          THE COURT:  So I will grant that.

16          Motion for relief from stay, I've set

17    the briefing schedule, so it's on both cases.  So

18    from now on going forward, you file one thing, not

19    two.

20          MR. CLAR:  Fine.

21          THE COURT:  Okay.  Did I take care of

22    everything?

23          MR. CLAR:  I think you did.

24          THE COURT:  All right.  We know where

25    we're going.

1            MR. CLAR:  Feel better.

2            MR. SHAW:  Yeah, feel better, Your

3    Honor.

4            MR. FISHER:  Get better.

5            (Which were all the proceedings had in

6            the above-entitled cause, May 8, 2019,

7            10:00 a.m.)

8    I, JERRI ESTELLE, CSR, RPR, DO HEREBY CERTIFY
     THAT THE FOREGOING IS A TRUE AND ACCURATE
9    TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
     ENTITLED CAUSE.  /S/

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25