### Lease

This Lease ("**Lease**") is entered into on the Effective Date by and between Landlord and Tenant.

1.    <u>BASIC TERMS AND DEFINITIONS</u>.

    1.1    "**Landlord**": **W-R2 Jefferson Owner VIII, L.L.C.**, a Delaware limited liability company.

    1.2    "**Tenant**": bcause, LLC, a Virginia limited liability company.

    1.3    "**Effective Date**": November __, 2017.

    1.4    "**Property**": the property located at 130 South Jefferson, Chicago, Illinois legally described on Exhibit B attached hereto.

    1.5    "**Building**": the building on the Property, which is deemed and agreed to be **71,558** rentable square feet.

    1.6    "**Premises**": the space in the Building that is depicted in <u>Exhibit A</u> attached hereto, which space is commonly known as Suite 101 and deemed and agreed to be 3,600 rentable square feet.

    1.7    "**Commencement Date**": The **60th** day after the date of Substantial Completion of the Landlord's Work (as such terms are defined in Rider 1, attached hereto).

    1.8    "**Expiration Date**":  The last day of the **3rd** Lease Year after the Commencement Date.

    1.9    "**Term**": the period beginning on the Commencement Date and ending on the Expiration Date, together with all renewals and extensions thereof.

    1.10    "**Lease Year**": 1st Lease Year: the period between the Commencement Date and the day before the 1st anniversary of the Commencement Date.  The 2nd Lease Year, and all subsequent Lease Years, shall be the successive 1-year periods thereafter, except that if the Commencement Date is not the 1st day of a calendar month, then the final Lease Year shall include the entire calendar month in which the Commencement Date occurred, making the final Lease Year longer than 1 year.

    1.11    "**Base Rent**": the amounts written below.

| Lease Year | Rate/R.S.F. | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| 1st | $33.00 | $118,800.00 | $9,900.00 |
| 2nd | $33.99 | $122,364.00 | $10,197.00 |
| 3rd | $35.01 | $126,034.92 | $10,502.91 |

    1.12    "**Use**": general office use.

    1.13    "**Security Deposit**": $29,700.00.

    1.14    "**Brokers**": Landlord: an affiliate of Landlord.  Tenant: Jameson Real Estate.

    1.15    "**Landlord's Address**":  c/o R2 Companies, 1130 W. Monroe Street, Chicago, Illinois 60607, Attention: Matthew G. Garrison, Email: mg@r2.me, Facsimile: (312) 278-0161, with copy to Landlord, c/o Walton Street Capital, 900 North Michigan Avenue, Suite 1900, Chicago, Illinois 60611, Attention: Angela Lang, Douglas J. Welker and James Odenbach, Facsimile: (312) 915-2881.



EXHIBIT

A

**1.16**    "**Tenant's Address**": the Premises, email address: ann.cresce@bcause.com.

2.    <u>LEASE</u>.

**2.1**    <u>LEASE</u>. Landlord leases to Tenant, and Tenant leases from Landlord, the Premises for the Term. As long as Tenant fully and timely performs all of its obligations under this Lease, Tenant shall have, hold and enjoy the Premises during the Term subject to the terms of this Lease without hindrance or disturbance from or by Landlord subject, however, to all mortgages, encumbrances, easements and underlying leases and matters of record to which this Lease may be or become subject and subordinate, from time to time. Should Tenant enter the Premises prior to the Commencement Date, such entry shall be subject to all the terms and conditions of this Lease other than those requiring payment of Base Rent, Taxes and Operating Expenses.

**2.2**    <u>USE</u>.

(a)    The Premises shall be used and occupied for only the Use. Tenant shall procure and maintain all licenses and permits that are necessary for the operation of Tenant's business at the Premises. Tenant shall comply, and shall cause its agents, contractors and invitees to comply with (i) all laws, regulations, rules, orders, permits, statutes and ordinances that apply to the Property or its use or occupancy ("**Laws**"), (ii) all applicable insurance underwriters' regulations and other requirements, (iii) all notices from any mortgagee or ground lessor of the Property, and (iv) all of Landlord's current and future rules and regulations for the Property or Premises including those attached hereto as <u>Rider 2</u>. Tenant shall not use (or allow the use of) the Premises in any way that constitutes a public or private nuisance or waste, increases the cost or insurance risk, or renders void or causes the termination of any insurance on the Premises, Building, or Property.

(b)    Except in quantities that are customary and appropriate for the Use and in compliance with Environmental Laws, Tenant shall not install, use, locate, store, process, release or discharge any Hazardous Materials at or from the Premises. "**Environmental Laws**" shall mean all federal, state, and local laws, statutes, ordinances, codes, rules, regulations, licenses, authorizations, decisions, orders, and injunctions that pertain to health, safety, any Hazardous Materials or the environment (including ground, air, water or noise pollution or contamination, and underground or above-ground storage tanks), as any of the foregoing exist now or may be changed or amended or come into effect in the future. "**Hazardous Materials**" shall mean all substances, whether solid, liquid or gaseous, that are listed, defined or regulated as "hazardous materials," "hazardous wastes," or "solid wastes," or are otherwise classified as pollutants or contaminants or any other similar substances or materials that are now or may hereafter be included under or regulated by any Environmental Law, or that are or contain asbestos, radon, any polychlorinated biphenyls, urea formaldehyde foam insulation, explosive or radioactive materials, or motor fuels or other petroleum hydrocarbons, or that cause or pose a threat to cause contamination or a nuisance on the Property or any adjacent property or are a hazard to the environment or to the health or safety of persons.

(c)    Tenant shall be responsible for complying with all requirements of Title III of the Americans With Disabilities Act of 1990 (42 U.S.C. §12101 et seq.) with respect to the Premises and all regulations and guidelines promulgated thereunder, as same may be amended from time to time, and any and all state and local laws, regulations and ordinances regarding disabilities and access within the Premises.

**2.3**    <u>ACCESS</u>. Tenant shall have 24-hour, 7-day per week access to the Premises, subject to the terms and conditions in this Lease. Landlord and its employees, agents, representatives and contractors shall have the right to enter the Premises to inspect or show the Premises, clean the Premises if necessary, make repairs, alterations, modifications or additions to the Premises, and/or make or facilitate repairs, alterations, modifications or additions to any portion of the Property, including other tenants' premises. Except in emergencies, Landlord shall notify Tenant at least 24 hours before entering the Premises. Landlord's exercise of its rights under this §2.3 shall not constitute a constructive eviction or entitle Tenant to any abatement or reduction of Rent.

**2.4**    <u>RESERVED RIGHTS</u>. Landlord reserves to itself (a) all rights to the roof(s) and exterior of the

Premises and Property, (b) all rights to the Property excluding the Premises (including the land and all air and subterranean rights), and (c) the right to temporarily close all or a portion of the Premises, Building, or Property and/or suspend services to or the use of any facilities at the Premises, Building, or Property in connection with Landlord's performance of any repairs, alterations, modifications or additions thereto, provided that Landlord shall not close or suspend any of the foregoing during normal business hours except in the event of an emergency or to the extent that such repairs, alterations, modifications, or additions cannot reasonably be performed during non-business hours. Landlord's exercise of its rights under this §2.4 shall not constitute a constructive eviction or entitle Tenant to any abatement or reduction of Rent.

3.    <u>CONDITION OF PREMISES</u>.  Except for Landlord's Work, the Premises are leased to Tenant on an **"AS-IS" and "WHERE-IS"** condition and basis.  Except as expressly stated in this Lease, neither Landlord nor anyone who has rights by, through, or under Landlord has (a) made any representation or warranty on the condition of the Premises, Building, or Property (including any implied warranty of habitability, merchantability, or fitness for a specific purpose), or (b) promised to repair, improve, or otherwise perform any work on the Premises, Building, or Property.

4.    <u>RENT</u>.

4.1    <u>BASE RENT</u>.

(a)    Tenant shall pay Base Rent to Landlord in the amounts set forth in the Basic Terms, in equal monthly installments (but prorated for any partial period), in advance, and on or before the 1st day of each calendar month.  Simultaneously with executing and delivering this Lease to Landlord, Tenant shall pay the 1st monthly installment of Base Rent to Landlord.

(b)    Notwithstanding §4.1(a), Monthly Base Rent shall be abated for the 13th, 14th and 25th calendar months after the Commencement Date; provided, however, that if (i) a Default (defined in §12.1) occurs and (ii) Landlord terminates this Lease or Tenant's right to possess the Premises, then the preceding abatement shall become void, and all Base Rent that has been abated and is unamortized at such time shall become immediately due and payable to Landlord.

(c)    Upon notice to Tenant, Landlord shall have the right to purchase the Abatement Amount at any time during the Term, by paying to Tenant an amount equal to the "Abatement Amount Purchase Price", as that term is defined below.  As used herein, "Abatement Amount Purchase Price" shall mean the Abatement Amount remaining during the Term, as of the date of payment of the Abatement Amount Purchase Price by Landlord.  Upon such payment of the Abatement Amount Purchase Price, the provisions of §4.1(b), above, shall be deemed deleted and without any further force or effect.

4.2    <u>ADDITIONAL RENT</u>.  Tenant shall pay all other costs, expenses and charges that are expressly set forth in this Lease (collectively, "**Additional Rent**").  Base Rent and Additional Rent are collectively referred to as "**Rent**."  All Rent shall be paid (i) without deduction, set off, discount, or abatement, (ii) in lawful money of the United States, (iii) at Landlord's Address, and (iv) to the order of Landlord or any other entity as directed by Landlord by notice to Tenant.  Tenant's obligation to pay Rent is a separate, independent and absolute covenant, and is not conditioned upon the performance by Landlord of any of its obligations under this Lease or any other matter.  Every installment of Rent which shall not be paid within 5 days of the due date shall (i) bear interest at the lesser of 18% per annum and the maximum rate permitted under applicable law (the "**Default Rate**") from the due date until paid and (ii) incur a late fee of 5% of such installment, which late fee shall be due upon demand as additional Rent.  With respect to any check that is dishonored, Tenant shall pay an administrative fee of $50 to Landlord.  If 2 or more checks are dishonored, then Landlord may require all subsequent checks from Tenant to be certified or cashier's checks.  Landlord may apply payments received from Tenant pursuant to this Lease to satisfy any obligations of Tenant hereunder in any order and amount that Landlord chooses in its sole and absolute discretion regardless of Tenant's designation of such payments.

**4.3**     OPERATING EXPENSES AND TAXES.

(a)     PAYMENT. During each calendar year beginning on January 1, 2018, Tenant shall pay to Landlord **5.03%** ("**Tenant's Pro Rata Share**") of the amount by which the Operating Expenses (defined below) and Taxes (defined below) that are due and payable in such calendar year exceed the Operating Expenses and Taxes that are due and payable in the Base Year. "**Base Year**" shall mean calendar year **2018**. On the 1st day of each and every month of the Term, beginning on January 1, 2018, Tenant shall deposit monthly with Landlord a sum equal to 1/12th of the last ascertainable amount (or at Landlord's election, a sum equal to 1/12th of Landlord's reasonable estimate of the current amount) of Tenant's obligations under this §4.3 for the then-current calendar year. Tenant shall not be entitled to interest on any such monthly deposits. The payment of such monthly deposits shall not limit or "cap" Tenant's obligations under this §4.3.

(b)     ALLOCATIONS AND GROSS-UP.

(A)     If at any time or from time to time (a) the Property is physically or legally altered or (b) any portion of the Property is used for non-office purposes, then Landlord may (i) re-determine, in accordance with sound accounting and management practices, the rentable square footage of the Property and/or Building (each of the foregoing is a "**Component**") and re-define the "Property" and/or "Building" accordingly (e.g., limiting same to the balance of Property and/or Building in which the Premises are located); (ii) reasonably and equitably allocate Operating Expenses and/or Taxes among the Components; and (iii) re-compute Tenant's Pro Rata Share accordingly.

(B)     If the Building is not fully occupied by tenants during all or a portion of any calendar year, then with respect to only the components of Operating Expenses that vary with occupancy, Tenant's Pro Rata Share shall be multiplied by **100%** divided by the overall occupancy rate of the Building during such calendar year (or such portion of such calendar year, as applicable). If (i) Landlord provides a service to Tenant that is a component of Operating Expenses (e.g., trash removal), and (ii) Landlord does not provide such service to all other tenants of the Building, then with respect to the cost of such service, Tenant's Pro Rata Share shall be multiplied by **100%** divided by the percentage of tenants of the Building who received such service during such calendar year (or the relevant portion of such calendar year, as applicable).

(C)     Tenant shall not be obligated to pay any increase in Controllable Operating Expenses exceeding **5.0%** of the Controllable Operating Expenses due for any calendar year under this Lease for the previous calendar year, such cap to be determined on a per square foot compounded and cumulative basis. "**Controllable Operating Expenses**" shall mean all Operating Expenses other than union labor costs, insurance costs, all governmentally mandated costs and expenses (including all taxes of any kind, to the extent such taxes are included in Operating Expenses hereunder), utility costs, weather related costs, replacement landscaping, management fees, maintenance and repairs, and other costs not within Landlord's control.

*In no event* shall Landlord double count any component of Tenant's Pro Rata Share of Operating Expenses or Taxes.

(c)     DEFINITIONS.

(A)     "**Operating Expenses**" shall mean all expenses that Landlord incurs in operating, maintaining, repairing and replacing the Building, any component of the Building that is shared by the buildings on the Property, or any portion thereof. "Operating Expenses" shall include, without limitation, all insurance premiums and deductible amounts under any insurance policy; maintenance and repair costs; steam, electricity, water, sewer, gas and other utility charges and the costs of providing such utilities to the Building; lighting; window washing; janitorial services; trash and rubbish removal; pest control and exterminating the common area; installing, maintaining and repairing common signage; property association fees; wages payable to persons at the level of manager and below whose duties are connected with maintaining and operating the Building (but only for the portion of such persons' time allocable to the Building); amounts paid to contractors or

subcontractors for work or services performed in connection with maintaining and operating the Building; all costs of supplies and materials used in connection with maintaining, repairing and operating the Building; costs of complying with any Laws; and such other expenses as may ordinarily be incurred in connection with maintaining and operating a building that is similar to the Building. "Operating Expenses" shall also include expenses that Landlord incurs in connection with public sidewalks adjacent to the Property (including snow and ice removal and sanding and salting) and any other public area that Landlord is required (whether directly or by an absence of performance by the applicable governmental authority) to maintain in connection with operating the Property. "Operating Expenses" shall not include (i) capital expenditures except as amortized over their useful life and with reasonable interest on the cost thereof; (ii) the cost of repairs, restoration or other work occasioned by fire, windstorm or other insured casualty other than the amount of any deductible under any insurance policy (regardless whether the deductible is payable by Landlord in connection with a capital expenditure); (iii) expenses Landlord incurs in connection with leasing or procuring tenants or renovating space for new or existing tenants; (iv) legal expenses incident to Landlord's enforcement of any lease; (v) interest or principal payments on any mortgage or other indebtedness of Landlord; (vi) allowance or expense for depreciation or amortization; (vii) fees or costs in excess of the comparable market value thereof for services rendered by vendors affiliated with Landlord; (viii) Landlord's reimbursable expenditures, which for purposes of this Lease shall be any expense for which Landlord is reimbursed by a tenant of the Property or other third party; (ix) the cost of repairing or replacing any item covered by a warranty; or (x) costs and expenses of utilities directly metered to tenants of the Property and payable separately by such tenants.

(B)      "**Taxes**" shall mean all general real property taxes, assessments, special assessments, reassessments, levies, charges, penalties, and similar impositions imposed upon the Property or any portion thereof, together with any and all legal fees and costs incurred in successfully appealing, contesting, or reducing any of the preceding items. "Taxes" shall not include Landlord's state or federal income, franchise, estate or inheritance taxes, or any fine, penalty or cost attributable to delinquent payment thereof.

5.      SECURITY DEPOSIT. Simultaneously with executing and delivering this Lease to Landlord, Tenant shall deposit the Security Deposit with Landlord to secure Tenant's obligations under this Lease. The Security Deposit is security for the payment and performance of Tenant's obligations, covenants, conditions and agreements under this Lease. The Security Deposit is not an advance payment of any amounts owed by Tenant under this Lease or the measure of damages to which Landlord is entitled if Tenant defaults under this Lease. Except as required by applicable Laws, Landlord shall not be obligated to hold the Security Deposit in a separate account or pay any interest thereon to Tenant. Without limitation of any other remedy, Landlord may use the Security Deposit to the extent necessary to remedy any default in the payment of Rent or to satisfy any other obligation of Tenant hereunder, and in such event, Tenant shall upon demand restore the Security Deposit to its original amount. If Tenant faithfully performs all of its obligations under this Lease, then the portion of the Security Deposit not previously used by Landlord under this §5 shall be returned by Landlord to Tenant within 30 days after the expiration of the Term. Within **10** business days after Landlord's request from time to time but not more than one (1) time per calendar year, other than in connection with a sale, financing, refinancing or recapitalization of the Property, Tenant shall provide Landlord with its current financial statements prepared in accordance with generally accepted accounting principles that are consistently applied.

6.      UTILITIES AND SERVICES.

6.1      WATER. Landlord shall provide water to the Premises for use by Tenant, its employees and invitees, in quantities that are consistent with the Use.

6.2      ALL OTHER UTILITIES.

(a)      Electricity shall be distributed to the Premises either by the electric utility company serving the Building or Property or, at Landlord's option, by Landlord. All electricity shall be used by Tenant, at its sole cost and expense, in quantities that are consistent with the Use. If electricity is separately metered and provided by an electrical utility company, then Tenant shall make all necessary arrangements with the electric

utility company to pay for electric current furnished to the Premises at Tenant's sole cost and expense, and shall pay all separately metered charges directly to such company. If electricity is not separately metered and provided by an electrical utility company, then Tenant shall pay all metered, sub-metered, or reasonably estimated charges (as applicable) to Landlord within **10** business days after receiving a statement therefor from Landlord.

(b)    All other utilities, including telecommunications, shall be used by Tenant at its sole cost and expense, and shall be used in quantities that are consistent with the Use. If any such utility is separately metered and provided by a utility company, then Tenant shall make all necessary arrangements with the utility company to pay for such use at Tenant's sole cost and expense, and shall pay all metered charges directly to such company. If any such utility is not separately metered and provided by a utility company, then Tenant shall pay all metered, sub-metered or reasonably estimated charges (as applicable) to Landlord within **10** business days after receiving a statement therefor from Landlord. Without Landlord's prior approval, Tenant shall not make any alterations or additions to any equipment or utility system in the Premises, Building, or Property.

**6.3    SERVICES.**  Landlord shall have no obligation to provide any services to Tenant, including security, telecommunications or data services to or for the benefit of Tenant. Tenant shall obtain all such services to the extent reasonably necessary in connection with the Use at its sole cost and expense. Notwithstanding the foregoing, to the extent Landlord elects to provide any such service to Tenant, Tenant shall pay the commercially reasonable costs thereof to Landlord as Additional Rent.

**6.4    CONDITIONS.**  Tenant shall not use or occupy the Premises in any manner that exceeds the design loads for the Premises or Building or the exhaust, heating, cooling, ventilation, electrical, life safety, water, or sewer systems of the Premises or Building, or that adversely affects the Premises or Building or the operation of the systems in the Premises or Building. If, at Tenant's request, Landlord provides services that are extra or in addition to the services described in §§6.1 or 6.2 or elsewhere in this Lease, then Tenant shall pay all costs therefor at Landlord's then present rates. If there is any failure, delay, interruption or diminution in any service required to be provided by Landlord, then Landlord shall not be liable for any damage or injury to any person, property or business, loss or interruption of business, or any other matter. No such failure, delay, interruption or diminution shall constitute an eviction or disturbance of Tenant's use or possession of the Premises (whether in whole or part or actual or constructive), entitle Tenant to any claim for a set-off, abatement, or reduction of Rent, render Landlord liable for damages, or relieve Tenant from performing any of its obligations under this Lease.

**7.    SIGNAGE.**  Landlord, at its sole cost and expense, shall provide Building-standard lobby and suite entrance signage for Tenant. Tenant shall not have any right to install and/or maintain any other signage, including any signage that is visible from outside the Premises or Building, except (i) with Landlord's prior approval (which may be withheld in Landlord's sole and absolute discretion), (ii) in compliance with all applicable Laws, and (iii) at Tenant's sole cost and expense.

**8.    REPAIRS AND MAINTENANCE.**

**8.1    BY TENANT.**  Tenant, at its sole cost and expense, shall (a) maintain the Premises in good order, condition and repair and in a neat and sanitary condition, including regularly cleaning the interior of all windows and doors of the Premises and the interior walls of the Premises, and maintaining all of Tenant's signage in good working order, and (b) pay for the repair of any damages to the Premises or Building that is caused by Tenant or any of its agents, employees, contractors, licensees, subtenants or invitees.

**8.2    BY LANDLORD.**  Landlord shall maintain and repair the heating, ventilating, and air conditioning equipment and systems which serve the Premises, all of which shall be in good working order on the Commencement Date. The cost of such maintenance and repairs shall not be billed directly to Tenant but may be included, together with the costs of all similar maintenance and repairs in other tenants' spaces, as part of Operating Expenses. Notwithstanding the foregoing, Tenant shall solely pay for any damage or repairs to the heating, ventilating, and air conditioning equipment and systems which serve the Premises that are caused by the negligence, recklessness, intentional misconduct, or intentional disregard by Tenant or any of its agents,

employees, contractors, licensees, subtenants or invitees. Landlord shall also keep the common areas of the Building and the Property in good order, condition and repair and in a neat and sanitary condition.

9. **ALTERATIONS**. Without Landlord's prior consent in each instance, Tenant shall not make any alterations, installations, modifications, improvements or additions to the Premises (collectively, "Alterations"). Landlord may impose any conditions with respect to Alterations as Landlord in its sole discretion deems appropriate, including requiring Tenant to use Landlord's contractors for the performance thereof. Landlord's consent to alterations shall not be required if such improvements (a) are nonstructural in nature, (b) do not affect the building systems outside of the Premises, and (c) cannot be seen outside of the Premises, provided that Tenant gives prior written notice to Landlord of such work. Tenant shall pay to Landlord, whether the Alterations are performed by Landlord, Landlord's contractors, Tenant or Tenant's contractors, all actual and out-of-pocket costs incurred by Landlord for reviewing any drawings, plans, and/or specifications for any Alterations proposed by Tenant together with a supervisory fee of 10% on the total cost of the Alterations (collectively, "Review Costs"). Promptly after completing an Alteration, Tenant shall deliver to Landlord evidence of the full payment of all contractors and subcontractors and a copy of full and final waivers of all liens for labor, services, and materials provided in connection with such Alteration. All Alterations shall be performed in a first-class and workmanlike manner, using only high-quality grades of materials and in compliance with all applicable Laws. All Alterations, whether temporary or permanent in character, shall (a) at Landlord's option and without compensating Tenant, become Landlord's property at the expiration or earlier termination of this Lease or of Tenant's right to possession of the Premises, and (b) unless Landlord requests their removal prior to such expiration or earlier termination, be relinquished to Landlord in good condition, order and repair (excluding ordinary wear and tear); provided that Tenant may remove all movable furniture, trade fixtures, equipment, telephone and computer systems and any other items of Tenant's personal property that are removable without damaging the Premises or the Property ("Tenant's Movable Property").

10. **LIENS**. Tenant shall not place or permit to be placed any lien or encumbrance upon Landlord's title or interest in the Property, any portion thereof, or Tenant's leasehold interest in the Premises. Tenant shall cause any such lien or encumbrance to be released and removed of record within **20** days after the date on which such lien is filed or asserted. The failure of Tenant to timely fulfill its obligations under this §10 shall constitute an immediate and incurable Default, and, in addition to all other remedies, Landlord may take any and all actions to cause such lien or encumbrance to be released and removed. In such event, Tenant shall immediately reimburse Landlord for all costs and expenses relating thereto.

11. **INSURANCE, WAIVERS AND INDEMNITIES**.

11.1 **INSURANCE**.

(a) **BY TENANT**. Tenant, at its sole cost and expense, shall maintain the following insurance during the Term: (a) "all risk" property insurance for all of Tenant's improvements, alterations, equipment, furniture, fixtures, machinery and personal property in the Premises at full replacement cost, and for loss of income and business interruption covering a **12**-month period and with an extended period of indemnity of **180** days, (b) commercial general liability insurance for claims of bodily injury, personal injury, advertising injury and property damage arising out of Tenant's operations, assumed liabilities or use of the Property, including contractual liability coverage for the performance by Tenant of the indemnities by Tenant in this Lease, coverage for non-owned automobile liability, all with a combined single limit of **$1,000,000** and with other coverages, limits and sub-limits reasonably required or acceptable to Landlord, (c) worker's compensation insurance and employer's liability insurance at the minimum required by the laws of the State of Illinois, (d) if Tenant intends to serve, is serving, or will serve any form of liquor at or from the Premises, then host liquor liability insurance with a combined single limit of **$2,000,000**, with coverage at least as broad as the underlying coverages under (b) above, and (e) excess or umbrella liability insurance with a **$2,000,000** combined single limit, with coverage at least as broad as the underlying coverages specified in (b) above. All such insurance shall (i) have commercially reasonable deductibles and (ii) be maintained with insurers that have an A.M. Best Insurer Financial Strength rating of "A-" or better, have a Financial Size Category of "VII" or better, and are licensed to do business in the State of Illinois. Tenant shall cause Landlord, its lenders and managers to be named as additional insureds under all of such

insurance policies (other than worker's compensation and employer's liability). Each of Tenant's insurance policies shall be primary with respect to all claims and matters that are covered under such insurance policy. On or before the Commencement Date and at least **30** days prior to the expiration of such policies, Tenant shall provide to Landlord a copy of a certificate evidencing the policies specified in this §11.1(a) and all required endorsements thereto and providing that such policies will not be terminated or modified without at least **30** days prior written notice to Landlord. During the Term, Tenant shall provide Landlord with certificates of insurance or other written evidence that the insurance required under this Lease is in full force and effect at all times.

(b)     BY LANDLORD.  Landlord shall maintain the following insurance during the Term: (i) "all risk" property insurance on the Property (excluding the property that Tenant is required to insure under this Lease and any property that any other tenant of the Property is required to insure under its lease) at **95%** or more of replacement cost value; and (ii) commercial general liability insurance in an aggregate amount of at least **$1,000,000.**

**11.2**   **WAIVER OF CLAIMS/SUBROGATION**.  Each of Landlord and Tenant hereby waives all claims for recovery from the other party and the other's respective agents, members, partners, shareholders, officers, directors and employees (collectively, the "**Released Parties**") for any loss, damage or destruction to any of its property (including the Premises, the Building, and their contents, and whether or not such loss, damage, or destruction is caused by negligence of the other party and notwithstanding any provision or provisions obtained in this Lease to the contrary), the elements of which are insured against or which would have been insured against had such party suffering such loss, damage or destruction maintained the property or physical damage insurance policies required under §11.1 hereof.  In no event shall this clause be deemed, construed, or asserted to (a) affect or limit any claims or rights against any Released Parties other than the right to recover damages for loss, damage or destruction to property, or (b) benefit any third party other than the Released Parties. Every policy of property insurance obtained by Landlord or Tenant with respect to the Property shall contain a waiver of subrogation by the insurer with respect to claims against the other party.

**11.3**   **INDEMNITY**.  Tenant shall indemnify, defend and save harmless Landlord and its contractors, agents, employees, representatives and invitees from and against any and all claims, suits, actions, proceedings, liabilities, damages, obligations, liens, costs and expenses, including court costs and reasonable attorneys' fees and expenses, by or on behalf of any person or entity, arising from (i) any breach or default on the part of Tenant in the performance of any covenant or agreement under this Lease, (ii) any act, omission or negligence on the part of Tenant or its agents, contractors, servants, employees, invitees or licensees, (iii) Tenant's use of the Premises, or any activity or work permitted or permitted, by Tenant or its agents, contractors, servants, employees, invitees or licensees, (iv) any accident, injury or damage to any person or entity occurring in or about the Premises. Notwithstanding anything to the contrary in this §11.3, but subject to the limitations in §20.5, neither Landlord nor its contractors, agents, employees, representatives, and invitees shall be indemnified to the extent it incurs liability due to its gross negligence or intentional misconduct.

**12.**   **DEFAULTS; REMEDIES**.

**12.1**   **GENERAL**.  If (a) Tenant fails to pay any amount of Rent within **5** business days after same is due, (b) Tenant takes or fails to take any other action which in this Lease is deemed an immediate and incurable "Default" (including under §15.1), (c) excluding actions and failures that fall within clause (b) above, Tenant fails to perform any other covenant or agreement under this Lease and such failure continues for **30** days after receiving a notice thereof, (d) Tenant (y) files, or has filed against it, a petition (i) in any bankruptcy or other insolvency proceeding, (ii) seeking any relief under any state or federal debtor relief law; (iii) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease; (iv) for the reorganization or modification of Tenant's capital structure; or (z) makes an assignment for the benefit of creditors (e) as long as Landlord has notified Tenant if and as required above, Tenant shall more than twice during any Lease Year fail to keep, observe, or perform any covenant or agreement in this Lease, whether or not Tenant timely cures same, or (f) the "Tenant" under any other lease between Landlord and Tenant or their respective affiliates commits a "Default" thereunder (each, a "**Default**"), then Landlord—at any time thereafter, and with or

without demand or notice—may exercise any or all of the following remedies: (i) terminate this Lease; (ii) terminate Tenant's right to possess the Premises without terminating this Lease; (iii) exercise any legal or equitable remedy that is available to Landlord under applicable Laws; or (iv) perform such covenant or agreement at Tenant's expense, in which event Tenant shall immediately reimburse or pay (as applicable) all expenses that Landlord incurs in connection therewith together with an administrative fee of **15%**. Tenant hereby waives the requirement of any notice, demand, or service that is not expressly set forth in this Lease, including any and all statutory demands or notices that might otherwise be a prerequisite to commencing eviction proceedings (including the demands and notices specified in 735 ILCS §§5/9-209 and 5/9-210).

**12.2   TERMINATION OF LEASE**. If Landlord exercises its remedies under §12.1 to terminate this Lease, then (a) Tenant shall immediately vacate and surrender possession of the Premises to Landlord, and (b) Landlord may recover from Tenant all damages and other sums that Landlord is entitled to recover under any provision of this Lease, at law, in equity or otherwise, including (i) all delinquent or unpaid Rent, and (ii) the then present value (using a discount rate of **5%**) of the difference (if any) between the Rent that is payable for the remainder of the Term and the fair market rental value of the Premises for the remainder of the Term, which shall be determined as of the date on which this Lease is terminated and after deducting all reasonable and anticipated expenses of reletting the Premises (including tenant inducements, brokerage commissions, legal fees, and expenses of preparing the Premises for reletting such as changing the locks or other entry devices, making repairs, alterations, and additions in or to the Premises, and redecorating the Premises all to the extent determined necessary or desirable by Landlord) (collectively, "**Reletting Expenses**").

**12.3   TERMINATION OF POSSESSION**. If Landlord exercises its remedies under §12.1 to terminate Tenant's right to possession without terminating this Lease, then (a) Tenant shall immediately vacate and surrender possession of the Premises to Landlord, and (b) Tenant shall not be released, in whole or in part, from Tenant's obligation to pay the Rent that is due and owing or that will or would have become due and owing during the remainder of the Term, and Tenant shall pay all such amounts as and when they become due; provided, however, that if Landlord relets the Premises, then the rent that Landlord receives for the period covered by the remainder of the Term shall be reduced from the amounts that Tenant is obligated to pay after deducting all Reletting Expenses.

**12.4   ATTORNEYS' FEES**. Tenant shall pay and discharge all reasonable costs, attorneys' fees, and expenses incurred by Landlord in enforcing the covenants and agreements in this Lease. In any dispute, claim, or action by Landlord pertaining to this Lease in which Landlord is the substantially prevailing party, Landlord may recover from Tenant its reasonable attorneys' fees and costs.

**12.5   CUMULATIVE RIGHTS**. All rights and remedies of both parties under this Lease shall be cumulative, and neither the existence of such right nor the exercise thereof shall exclude any other rights and remedies allowed by applicable Laws.

**12.6   NO WAIVER**. Any waiver by Landlord of any breach of any covenant of Tenant under this Lease shall not be a waiver of a breach of any other covenant of Tenant or of any subsequent breach of the same covenant. No receipt of monies by Landlord from Tenant after the termination of this Lease shall in any way alter the length of the Term or Tenant's right of possession hereunder, reinstate, continue or extend the Term, create a new tenancy or affect any notice given Tenant prior to the receipt of such monies. Acceptance by Landlord of less than the entire amount then due and owing by Tenant shall not constitute an accord, satisfaction or waiver by Landlord of its rights to further collection.

**13.   TRANSFERS**. Without Landlord's prior consent in each instance, which consent: (a) with respect to any assignment of all of Tenant's right, title and interest in and to this Lease or any sublease of the Premises, shall not be unreasonably withheld or delayed; and (b) with respect to any other Transfer (hereinafter defined), may be granted or withheld in Landlord's sole and absolute discretion, Tenant shall not (i) assign, convey, pledge or mortgage this Lease or any interest hereunder; (ii) permit or suffer to exist any assignment of this Lease, or any lien upon Tenant's interest, voluntarily or by operation of applicable Law; (iii) sublet the Premises or any part

thereof; or (iv) permit the use of the Premises by any parties other than Tenant and its employees (each, a "Transfer"). Any Transfer without Landlord's consent shall be void and of no effect and, at Landlord's option, shall constitute a Default. If Tenant is an entity, then any transaction or series of transactions that results in the transfer of control of Tenant shall be deemed to be Transfer. Tenant shall have no right to make any claim for money damages or to offset any claim for damages against any sums due under this Lease based upon allegations that Landlord has improperly withheld or delayed its consent to a proposed Transfer, and Tenant's sole remedy therefor shall be to seek equitable relief or a declaratory judgment. No consent by Landlord to Transfer shall release Tenant from its obligations hereunder and, in the event of any Transfer, Tenant shall remain fully liable as a principal and not as a guarantor or surety for the performance of all of the obligations of the Tenant under this Lease. If Landlord consents to a Transfer, then Tenant shall pay to Landlord all of its actual and out-of-pocket costs and expenses pertaining thereto (e.g., legal expenses), capped at $3,000. Landlord shall provide its consent or disapproval (including the reasons therefor), within 10 days after receipt of notice from Tenant of the requested Transfer. In the event that the

Landlord shall be deemed to have not unreasonably withheld, conditioned or delayed its consent to a proposed Transfer if Landlord's consent is withheld, conditioned or delayed because (a) Tenant is then in Default hereunder; (b) either the portion of the Premises which Tenant proposes to sublease, or the remaining portion of the Premises, or the means of ingress or egress to either the portion of the Premises which Tenant proposes to sublease or the remaining portion of the Premises is of such nature that it will violate any applicable Law, is of such accessibility, size or irregular shape so as not to be suitable for normal renting purposes as space on a multi-tenant floor within the Building; (c) the proposed use of the Premises by the proposed transferee does not conform with the Use, will increase Landlord's obligations under or cost of compliance with any Laws, or will violate any exclusive right Landlord has granted to any tenant of any part of the Property; (d) in the reasonable judgment of Landlord, the proposed transferee is of a character or is engaged in a business which would be deleterious to the reputation of the Property, Landlord, or any of Landlord's members or managers; (e) in the reasonable judgment of Landlord, the proposed transferee is not sufficiently financially responsible to perform its obligations under the proposed Transfer; (f) the proposed transferee is a government or quasi-government (or a subdivision or an agency thereof); or (g) the proposed transferee is an occupant of the Property or a person or entity with whom Landlord is then dealing regarding leasing space in the Property. The preceding are merely examples and not limitations on the factors that Landlord may consider in determining whether to give or withhold its consent to a proposed Transfer.

Notwithstanding anything contained in this §13 to the contrary, provided Tenant is not in Default hereunder, and provided further that such assignment would not violate any other lease or agreement affecting the Property, without the consent of Landlord, this Lease may be assigned to (i) an entity created by merger, reorganization or recapitalization of or with Tenant or (ii) a purchaser of all or substantially all of Tenant's assets; provided, in the case of (i) and (ii) above, that (A) Landlord shall have received a notice of such assignment from Tenant a minimum of 30 days prior to the effective date of the transfer, including any documentation necessary to evidence compliance with this paragraph, as reasonably requested by Landlord, (B) the assignee assumes by written instrument in form and substance satisfactory to Landlord all of Tenant's obligations and liability under this Lease, (C) the proposed transferee has a net worth greater than or equal to that of Tenant as of the Effective Date of this Lease, and (D) such assignment is for a valid business purpose and not to avoid any obligations or liability under this Lease. Concurrently with Tenant's notice of any assignment pursuant to this paragraph, Tenant shall pay to Landlord a fee of $1,000 to defray Landlord's expenses in reviewing such assignment.

Notwithstanding anything contained in this §13 to the contrary, without the consent of Landlord, Tenant may assign this Lease or sublet the entire Premises to an Affiliate (defined herein) of Tenant, provided, that: (i) Landlord shall have received a notice of such assignment or sublease from Tenant a minimum of 10 business days prior to the effective date of the transfer, including any documentation necessary to evidence compliance with this paragraph, as reasonably requested by Landlord; (ii) the assignee or sublessee has a net worth greater than or equal to that of Tenant as of the Effective Date of this Lease; (iii) Landlord shall have received a copy of the fully executed assignment or sublease from Tenant; (iv) in the case of any such sublease, the fully executed sublease must require subtenant to comply with all of the insurance and indemnity obligations written in this Lease as if

such subtenant were the "Tenant" hereunder, including, without limitation, maintaining the insurance policies required by §11.1, and naming Landlord, Landlord's property manager, and Landlord's asset manager as additional insureds thereon, and indemnifying Landlord as required by §11.3); and (v) in the case of any such assignment, (A) the assignment is for a valid business purpose and not to avoid any obligations or liability under this Lease, and (B) the assignee assumes by written instrument satisfactory in form and substance to Landlord all of Tenant's obligations and liability under this Lease. "Affiliate" means, as to any designated person or entity, any other person or entity which controls, is controlled by, or is under common control with, such designated person or entity. "Control" (and with correlative meaning, "controlled by" and "under common control with") means ownership or voting control, directly or indirectly, of 50% or more of the voting stock, partnership interests or other beneficial ownership interests of the entity in question. Concurrently with Tenant's notice of any assignment pursuant to this paragraph, Tenant shall pay to Landlord a fee of $1,000 to defray Landlord's expenses in reviewing such assignment or sublease.

If Landlord consents to a sublease, Tenant shall pay to Landlord fifty percent (50%) of any Transfer Premium derived by Tenant from such sublease. "**Transfer Premium**" shall mean all rent, additional rent or other consideration paid by the sublessee in excess of the Rent payable by Tenant under this Lease (on a monthly basis during the Term, and on a per rentable square foot basis, if less than all of the Premises is transferred), after deducting therefrom (on a monthly basis) the reasonable expenses incurred by Tenant, amortized over the balance of the Term, for any changes, alterations and improvements to the Premises, any other economic concessions or services provided to the sublessee, and any customary brokerage commissions paid in connection with the sublease if acceptable written evidence of such expenditures is provided in advance to Landlord. The percentage of the Transfer Premium due Landlord hereunder shall be paid within **10** days after Tenant receives any Transfer Premium from the transferee.

14. <u>SUBORDINATION AND ATTORNMENT; ESTOPPEL CERTIFICATES</u>.

14.1   <u>SUBORDINATION AND ATTORNMENT</u>. This Lease and the rights of Tenant under this Lease are and shall be subject and subordinate to all of the following, whether existing on the Effective Date or first existing after the Effective Date: (i) all liens and similar rights held by any mortgagee of the Property or any portion thereof; and (ii) all rights of any lessor under any ground or improvements lease of the Property or any portion thereof. In connection therewith, Landlord's rights under this Lease are or may be assigned from time to time as collateral. If any such mortgagee or lessor succeeds to Landlord's interest in the Property or Premises (or the applicable portion thereof) by a foreclosure, deed in lieu of foreclosure, termination of lease or otherwise (each, a "**Succession Event**"), then Tenant shall attorn to such person or entity and perform all of its obligations under this Lease for such person or entity. If requested by any mortgagee or ground lessor, Tenant shall execute and deliver a subordination and attornment agreement in a customary form used by such mortgagee or ground lessor. The failure of Tenant to enter into any such subordination and attornment agreement shall not in any way affect or reduce Tenant's obligations and the rights of any mortgagee or ground lessor under this §14.1.

14.2   <u>SUCCESSOR RIGHTS AND LIABILITY</u>. Until a Succession Event occurs, no mortgagee or ground lessor shall be liable for failing to perform any of Landlord's obligations under this Lease. Any such mortgagee or ground lessor shall be liable only for obligations that accrue from and after the date that the Succession Event occurs, provided such mortgagee or ground lessor shall (i) have no liability for any previous act or omission of Landlord under this Lease; (ii) not be subject to any credit, demand, claim, counterclaim, offset or defense that has accrued to Tenant against Landlord; (iii) unless consented to by such mortgagee or ground lessor, not be bound by any previous amendment or modification of this Lease or any previous prepayment of more than one installment of Base Rent; (iv) have no liability for the Security Deposit or any other security provided or deposited by Tenant except to the extent actually received by such mortgagee or ground lessor; (v) not be bound by any obligation to make any payment to Tenant or grant any credits except for services, repairs, maintenance, and restoration that the "Landlord" is required to perform after the date of such attornment; and (vi) shall have no liability for any monies then owing to Tenant by Landlord. The agreements in this Lease with respect to the rights and powers of a mortgagee and/or ground lessor constitute a continuing offer to any presently existing or future mortgagee or ground lessor, which may be accepted by being or becoming a mortgagee or ground lessor of the

Property or Premises (or a portion thereof).

**14.3** <u>ESTOPPEL CERTIFICATES</u>.  Tenant shall execute and deliver to Landlord, within **10** days after Landlord's request from time to time, in a form that is acceptable to Landlord, a written statement certifying (i) that Tenant has accepted the Premises, (ii) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), (iii) that Landlord is not in default hereunder, (iv) that Tenant has not prepaid any Rent in advance (other than the then current monthly installment of Rent), and (v) any other matters required by Landlord.  Any prospective purchaser, mortgagee or ground lessor of the Premises, Building, and/or Property may rely on such written statement.

## 15.    <u>SURRENDER; HOLDOVERS</u>.

**15.1** <u>SURRENDER</u>.  Upon the termination of this Lease or the termination of Tenant's right to possess the Premises, Tenant shall immediately (a) surrender the Premises to Landlord in the same condition that existed on the Commencement Date and otherwise in broom-clean, good order, repair and condition, ordinary wear and tear excepted, (b) remove all of Tenant's signage, all of Tenant's Movable Property, and all Alterations that Tenant is required to remove under §9, (c) deliver to Landlord all keys and combinations to all locks, vaults, cabinets, and safes remaining in the Premises, and (d) repair any damage to the Premises and any other portions of the Building that Tenant has used or maintained, whether or not caused by Tenant.  If Tenant does not timely perform any of its obligations under this §15.1, then same shall be deemed an immediate and incurable "Default." Further, Landlord may (i) perform such obligations at Tenant's sole cost and expense, (ii) take title to any items left in the Premises free and clear of all claims by Tenant and at no cost to Landlord, (iii) dispose of any or all items left in the Premises, and/or (iv) exercise any other rights or remedies that Landlord may have under this Lease, at law or in equity.  Tenant's obligations under this §15.1 shall survive the expiration or termination of this Lease.

**15.2** <u>HOLDOVERS</u>.  If Tenant does not surrender possession of the Premises in accordance with §15.1, then (i) such failure shall constitute a holdover; (ii) on a daily basis, Tenant shall pay to Landlord Rent at **2** times the then present daily rate for Rent for each day after such date that Tenant does not surrender possession of the Premises; and (iii) Tenant shall pay all damages sustained by Landlord, whether direct or consequential, that arise from such hold over.  Nothing in this §15.2 shall limit or waive any other rights or remedies of Landlord at law, in equity or as provided in this Lease.

## 16.    <u>CASUALTY</u>.

If the Premises or Property are damaged by a fire or other casualty, and such damage does not render the Premises untenantable, then none of Tenant's obligations under this Lease shall be affected, and Tenant shall continue to pay Rent as provided in this Lease.  If the Premises or Property are damaged by a fire or other casualty, and such damage renders the Premises untenantable, then (i) Rent for the Premises shall be abated from the date of such fire or casualty until the earlier of the date on which this Lease is terminated under this §16 and the date on which the Premises (or the affected portion thereof) becomes tenantable, and (ii) this Lease shall remain in full force and effect and Landlord shall use commercially reasonable efforts to repair and restore such damage; provided, that Tenant shall be obligated to repair and restore all improvements to the Premises that have been made by or for the benefit of Tenant, all Alterations and all of Tenant's Movable Property.  Notwithstanding anything herein to the contrary, if the Premises or Property are damaged by fire or other casualty, then Landlord may terminate this Lease by notifying Tenant thereof.  Landlord shall have the sole right to all proceeds of any insurance for damage to items that Landlord is obligated to repair or restore under this §16, whether or not Landlord elects to repair and restore the Premises.

## 17.    <u>CONDEMNATION</u>.

If the Premises or Property are taken, condemned or purchased under the threat of condemnation or exercise of the right of eminent domain by any competent authority for any public or quasi-public use or purpose (any such taking, condemnation, purchase or exercise of eminent domain is referred to as a "**condemnation**"), and such condemnation does not render the Premises untenantable, then none of Tenant's obligations under this Lease shall be affected, and Tenant shall continue to pay Rent as provided in this Lease.  If a condemnation occurs, and such condemnation renders the Premises reasonably untenantable, then (i) Rent for the Premises shall be abated from the date of such condemnation until the earlier of the date on which this Lease

is terminated under this §17 and the date on which the Premises becomes tenantable, and (ii) this Lease shall remain in full force and effect, and Landlord shall use commercially reasonable efforts to remedy the portion of the Property that is affected by such condemnation; provided that Tenant shall be obligated to repair and restore all improvements to the Premises that have been made by or for the benefit of Tenant, all Alterations, and all of Tenant's Movable Property.  Notwithstanding anything herein to the contrary, if a condemnation occurs with respect to the Premises or Property, then Landlord may terminate this Lease by notifying Tenant thereof.  Landlord shall have the sole right to all condemnation awards and judgments for damages or losses due to any condemnation, whether or not Landlord elects to repair and restore the Premises; provided, however, that Tenant shall have the right to make a separate claim for the unamortized value of all improvements to the Premises that Tenant has made, all Alterations, and all of Tenant's Movable Property.

**18.**   **BROKERS.**   Each of Landlord and Tenant represents and warrants that it has not had any dealings with any broker or agent in connection with this Lease except for the Brokers.  Excluding the Brokers, (a) Tenant shall hold harmless, indemnify, and defend Landlord from and against any and all costs, expenses, and liabilities for any compensation, commissions, or charges claimed by, through, or under Tenant by any broker or agent with respect to this Lease or the negotiation thereof, and (b) Landlord shall hold harmless, indemnify, and defend Tenant from and against any and all costs, expenses, and liabilities for any compensation, commissions, or charges claimed by, through, or under Landlord by any broker or agent with respect to this Lease or the negotiation thereof.

**19.**   **NOTICES.**   All notices, requests, consents, approvals, demands and other communications required or allowed under this Lease (y) must be (i) in writing, (ii) delivered to the address/addresses written in the Basic Terms and Definitions (or to such other address/addresses as either party may from time to time specify in a written notice to the other in accordance with this §19), and (iii) delivered by email, personal delivery, or a national overnight courier; and (z) shall be effective when delivered or delivery is refused (whether affirmatively or due to the recipient failing to maintain a current address for receiving notices with the sender).

**20.**   **MISCELLANY.**

**20.1**   **CONSTRUCTION.**   Each of Landlord and Tenant has reviewed and approved this Lease. Accordingly, rules of construction that resolve ambiguities against the drafting party shall not be used in interpreting this Lease.  Headings and titles in this Lease are for convenience only.  All instances of "include," "including," and other derivations of "include" shall mean "including, but not limited to," or "including, without limitation," *unless specifically written to the contrary*.  All instances of "may" shall mean "may, but is not obligated to" *unless specifically written to the contrary*.  The invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provisions of this Lease.  The submission of this document for examination and negotiation shall not constitute an offer to lease, or a reservation of or option for, the Premises, and this Lease shall become effective and binding only when it has been signed by all parties hereto.  Nothing in this Lease shall create any relationship of principal and agent, partnership, joint venture, or other association between Landlord and Tenant except for that of landlord and tenant.  Except if and as specifically written in this Lease, (i) each of Landlord and Tenant do not intend to confer—and neither this Lease nor any of its contents shall confer—any right, remedy, or benefit upon any third party (whether express or implied); and (ii) no third party may enforce or otherwise acquire any right, remedy, or benefit by reason of this Lease or its contents.

**20.2**   **GOVERNING LAW.**   This Lease shall be governed by, construed, and enforced in accordance with the laws of the State of Illinois.  The exclusive venue and jurisdiction for any suit relating or pertaining to this Lease shall be any state or federal court located in Cook County, Illinois.  Each of Landlord and Tenant waives trial by jury in any action, proceeding, or claim brought by or against it in connection with this Lease.

**20.3**   **BINDING EFFECT.**   Subject to §13, each provision of this Lease shall extend to, bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors and assigns.

**20.4**   **FORCE MAJEURE.**   Neither Landlord nor Tenant shall be deemed in default with respect to any of the terms, covenants and conditions of this Lease on such party's part to be performed (other than the obligation

to pay money under this Lease) if the failure to timely perform same is due in whole or in part to any strike, lockout, labor trouble (whether legal or illegal), civil disorder, failure of power, restrictive Laws, riots, insurrections, war, shortages, accidents, casualties, acts of God, acts caused directly by the other party or its agents, employees and invitees, or any other cause beyond the reasonable control of such party.

**20.5**   **LIMITATION OF LIABILITY**.  The liability of Landlord under this Lease, any amendment to this Lease, and any instrument or document that is executed in connection with this Lease shall be limited to and enforceable solely against Landlord's ownership interest in the Property and not any other assets of Landlord.  No directors, officers, employees, agents, managers, members, or shareholders of Landlord, any entity affiliated with Landlord, or Landlord's property manager or asset manager (if any) shall have any personal liability under or in connection with this Lease, any amendment to this Lease, or any instrument or document that is executed in connection with this Lease.  Without limiting anything in this §20.5, if Landlord is a partnership or limited liability company, then none of the following shall be considered to be assets of Landlord: (a) the assets of the partners or members of Landlord; (b) any negative capital account of a partner or member of Landlord; and (c) any obligation of a partner or member of Landlord to contribute capital to Landlord.  In connection with this Lease, in no event shall Landlord or Tenant be liable for any consequential (except as expressly written in §15.2), punitive, special, treble, incidental, or indirect damages.

**20.6**   **CONFIDENTIALITY**.  Tenant shall keep this Lease and its contents confidential and not disclose any information thereon to any third parties, except to the extent required by applicable Law or court order.  Tenant shall not record this Lease or any memorandum or notice thereof.

**20.7**   **TIME OF ESSENCE**.  Time is of the essence in this Lease, except that if any deadline or similar date herein falls on a Saturday, Sunday, or a holiday observed by the U.S.A., State of Illinois, or City of Chicago, then such deadline shall be extended to the next business day.

**20.8**   **ENTIRE AGREEMENT**.  This Lease, together with all exhibits, riders, schedules, and other attachments, if any, attached hereto, is the complete and entire agreement between Landlord and Tenant and supersedes all prior discussions, understandings, and agreements (whether oral or written, and including all letters of intent) between the parties hereto.  No modification or amendment of, or waiver under, this Lease shall be binding on Landlord or Tenant unless it is in writing (and with respect to any modification or amendment, signed by both Landlord and Tenant).

**20.9**   **COUNTERPARTS**.  This Lease may be executed in counterparts, each of which shall be considered an original and all of which together shall constitute the same instrument.  Counterparts to this Lease may be delivered by email or facsimile, each of which shall be as effective as originals for all purposes.

**20.10**   **OFAC/MONEY LAUNDERING**.  Tenant represents to Landlord that: (i) neither Tenant nor any person or entity that directly owns a 10% or greater equity interest in it nor any of its officers, directors or managing members is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury, including those parties names on the OFAC's Specially Designated and Blocked Persons List and those covered pursuant to Executive Order 13224 signed on September 24, 2001, entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action; and (ii) that Tenant's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or USA Patriot Act, or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Acts").  Any breach of the representation and/or warranty contained in this Section 20.10 shall constitute a non-curable default and is grounds for immediate termination of this Lease by Landlord.  Any such exercise by Landlord of its remedies under this Section 20.10 shall not constitute a waiver by Landlord to recover (a) any Rent due under this Lease and (b) any damages arising from such breach by Tenant.

**20.11**   **TEMPORARY SPACE**.  During Landlord's performance of the Landlord's Work (as defined in Rider 1 attached hereto), Landlord shall make available to Tenant Suite 290 in the Building (the "**Temporary Space**"), commencing on the date of full execution of this Lease and expiring on the Commencement Date.  The

Temporary Space shall be delivered to Tenant "as is." Tenant's use of the Temporary Space shall be subject to all the terms and conditions of the Lease as if such space were part of the Premises except Tenant shall not be required to pay Base Rent, Taxes, or Operating Expenses for the Temporary Space (provided that Landlord may bill Tenant for Landlord's customary janitorial costs), Tenant shall not make any alterations to the Temporary Space without first obtaining Landlord's prior written approval, if any, Landlord reserves the right to require Tenant to remove and restore any alterations made by Tenant before Tenant vacates the Temporary Space, and Tenant may not sublet the Temporary Space. Without limitation of the preceding sentence, Tenant shall be responsible for the cost of utilities for the Temporary Space, all overtime HVAC charges for the Temporary Space, and other work orders requested by Tenant for the Temporary Space. Tenant shall be entitled to and responsible for moving Tenant's property to and from the Temporary Space and for any damage to the Temporary Space or Building caused by its use of the Temporary Space. Tenant shall vacate and surrender the Temporary Space no later than the Commencement Date. Tenant shall be considered a holdover Tenant with holdover rent payable at 150% of the Base Rent payable in the last month of this Lease in the event that Tenant fails timely to vacate the Temporary Space, plus consequential damages, if any, suffered by Landlord. No brokerage commission shall be payable with respect to the Temporary Space and Tenant shall indemnify Landlord for any claim made by Tenant's broker with respect to a commission for same. No allowance, incentive, or inducement shall be applicable or payable with respect to the Temporary Space.

**IN WITNESS WHEREOF**, Landlord and Tenant execute this Lease on the Effective Date.

**LANDLORD**

**W-R2 Jefferson Owner VIII, L.L.C.,**
a Delaware limited liability company

By:   W-R2 Loft Holdings VIII, L.L.C.,
a Delaware limited liability company,
its Sole Member

    By:   W Loft Investors VIII, L.L.C.,
    a Delaware limited liability company,
    its Authorized Member

        By:   Walton Acquisitions Holding VIII, L.L.C.,
        a Delaware limited liability company,
        its Sole Member

            By:   Walton Street Real Estate Fund VIII, L.P.,
            a Delaware limited partnership,
            its Managing Member

                By:   Walton Street Managers VIII, L.P.,
                a Delaware limited partnership,
                its General Partner

                    By:   WSC Managers VIII, Inc.,
                    a Delaware corporation,
                    its General Partner

                    By: _____
                    Name: James Odenbach
                    Title: Authorized Signatory

**TENANT**

**bcause, LLC**, a Virginia limited liability company

By: _____
Name: FREDERICK J. GREDE
Title: CEC

EXHIBIT A

DEPICTION OF PREMISES

See Rider 1-A

EXHIBIT B

LEGAL DESCRIPTION OF PROPERTY

LOT 5 IN BLOCK 26 IN SCHOOL SECTION ADDITION TO CHICAGO, A SUBDIVISION IN THE WEST
1/2 OF THE NORTHWEST 1/4 OF SECTION 16, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE
THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

## RIDER 1

### LANDLORD'S WORK

1. **DEFINITIONS**.

    a.    "**Landlord's Work**" shall mean the work to the Premises that is described in <u>Rider 1-A</u> attached hereto.

    b.    "**Substantially Complete**" and similar phrases shall mean that Landlord's Work is complete except for minor or non-substantive items, none of which prevents the Premises from being used for the Use. Notwithstanding the immediately preceding sentence:

    i.    if a Tenant Delay (defined below) occurs, then Substantial Completion shall be deemed to have occurred when Landlord's Work would have been Substantially Complete but for the Tenant Delay; and

    ii.    if (y) Tenant requests Landlord to allow Tenant, before Landlord's Work is Substantially Complete, to be in the Premises to conduct business therefrom, and (z) Landlord, in its sole discretion, permits same, then at Landlord's election either

    1.    Substantial Completion shall be deemed to have occurred when such use begins, or

    2.    Substantial Completion shall not be deemed to have occurred, and until the Commencement Date, Tenant shall pay a monthly fee equal to one-half of the initial rate of Monthly Base Rent, prorated for partial periods.

    In either event, Landlord and Tenant shall enter into Landlord's standard form of occupancy and indemnity agreement.

    c.    "**Tenant Delay**" shall mean a delay in Landlord's Work that arises, directly or indirectly, from any of the following events:

    i.    the performance of any work or activity in the Premises by Tenant;

    ii.    any default by Tenant under this Lease; or

    iii.    Tenant's failure to timely (a) provide information, *if any*, that is reasonably necessary and requested by Landlord to perform Landlord's Work, or (b) fund excess costs, *if any*, relating to any allowance.

2. **PERFORMANCE**.

    a.    Landlord shall cause Landlord's Work to be performed. Landlord's Work shall be performed at Landlord's sole cost and expense except for any allowances specified therein, as to each of which (i) Landlord shall be responsible for only the cost of the allowance, and (ii) Tenant shall be responsible for any and all excess costs and pay same before Landlord commences the work covered by the allowance. Except if and to the extent specified in <u>Rider 1-A</u> attached hereto, Landlord's Work shall be performed using Building-standard means, methods, and materials (which shall be new or reclaimed). Landlord's Work shall be performed in a good and workmanlike manner and in accordance with all applicable Laws.

    b.    If minor work or construction items remain incomplete on the Commencement Date, then Landlord and Tenant, within **15** days after the Commencement Date and each in good faith, shall jointly prepare a written list (the "**Punch List**") of such incomplete items. Thereafter, (i) Landlord shall complete all Punch List items within **30** days, and (ii) Tenant shall reasonably cooperate therewith.

**RIDER 1-A**

- Build to the attached space plan (dated 11/16/17).
- Tenant responsible for providing and installing all fixtures, furniture, or equipment, unless specifically mentioned below.
- Assumes space will be fully vacated for the duration of Construction.
- Interior demolition, as needed.
- Existing suite entry doors.
- Horizontal security bar removed from rear double doors. Doors and frames repainted.
- Existing Offices and Storage Room
- Kitchen, per attached Lease plan.
    - Base cabinets: IKEA Sektion base cabinets with adjustable shelves, white frame, Häggeby white laminate flat panel doors.
    - IKEA Blankett aluminum, 2" handles
    - Countertop: Quartz, "frost white"
    - Faucet: Chrome finish faucet
    - Sink: Stainless steel undermount single basin sink, ADA compliant
    - Refrigerator: 36" W stainless steel front refrigerator with ice maker
    - Dishwasher: 24" W stainless steel front, ADA compliant
    - Grease interceptor for kitchen sink
    - Countertop GFCI power outlets
- No work to ceiling
- Flooring:
    - Throughout (excluding Kitchenette Area): Broadloom carpet – Penmtz Commercial Flooring, Quicksilver 20 / 3040B. Color selected by Tenant.
    - Kitchenette Area: LVT – Mannington Commercial LVT, Insight Plus. Color selected by Tenant.
- Paint all drywall walls throughout. Tenant color selection from Landlord provided options.
- Existing window blinds to be repaired or replaced as-needed.
- Existing HVAC and ductwork
- Existing power and data to remain, as-is.
- Lighting Allowance for new building standard linear and downlight fixtures, per plan.
- Exit signs and emergency lights throughout, per code.



Any measurements and dimensions are approximate.  Any furniture in the space plan is illustrative only.  Tenant is responsible for all furniture in the Premises.

**RIDER 2**

**RULES AND REGULATIONS**

1.    ACCESS TO BUILDING.  On Saturdays (except from 8:00 a.m. to 1:00 p.m.), Sundays and holidays, and on other days between the hours of 6:00 p.m. and 8:00 a.m. the following day, access to the Building and the Property or to the halls, corridors, elevators and stairways in the Building and the Property may be restricted and access shall be gained only by exhibiting an appropriate security pass or by otherwise complying with the established Building security regulations.  Landlord may from time to time establish security controls and regulations for the purpose of regulating or restricting access to the Building and the Property. Landlord may restrict access to washrooms by key combination or other security device.  Tenant shall abide by all such security controls and regulations so established.

2.    LOADING DOCK; LARGE ARTICLES.  Furniture, freight and other large or heavy articles may be brought into the Building only at time and in the manner (including use of freight elevators and the loading area) approved by Landlord, and always at Tenant's sole responsibility.  All damage done to the Building or the Property by moving or maintaining such furniture, freight or articles shall be repaired at the expense of Tenant. All furniture, equipment, cartons and similar articles desired to be removed from the Premises or the Building shall be listed in writing by Tenant with Landlord and a removal permit therefor shall first be obtained from Landlord.  No vehicles or material shall be permitted to block sidewalks or driveways.  All vehicles using the loading dock shall unload in an expedient manner and Tenant shall not store materials in the dock or common hallway nor delay, in the course of delivery, the removal of material from the dock and common hallway.

3.    ROOFTOP DECK/PATIO.  During business hours only, Tenant may use the rooftop deck/patio in common with other tenants.  Tenant shall use such area respectfully—e.g., no liquor may be consumed in such area, and no loud noises or obnoxious behavior is permitted.  A maximum of **10** people are permitted on the rooftop deck/patio.

4.    TERRACES.  Tenant shall not place any furniture, office equipment, or any other article of personal property on any outdoor terrace adjoining the Premises without prior written consent of the Landlord in each instance.

5.    DEFACING AND ALTERING PREMISES AND OVERLOADING.  Tenant shall not place anything or allow anything to be placed in the Premises near the glass of any door, partition, wall or window which may be unsightly from outside the Premises, and Tenant shall not place or permit to be placed any article of any kind on any window ledge or on the outside of the exterior walls of the Premises or the Building.  Blinds, shades, awnings or other forms of outside window ventilators or similar devices, shall not be placed in or about the outside windows in the Premises.  No blinds, shades, draperies or other forms of inside window covering other than those provided by Landlord may be installed in the Premises.  Tenant shall not overload any floor or part thereof in the Premises in excess of the live load therefor, or any facility in the Building or any public corridors or elevators therein while bringing in or removing any large or heavy articles.  Landlord may direct and control the location of safes of all other heavy articles and, if considered necessary by Landlord, require supplementary supports at the expense of Tenant of such material and dimensions as Landlord may deem necessary to properly distribute the weight.

6.    OBSTRUCTION OF PUBLIC AREAS.  Tenant shall not take or permit to be taken in or out of other entrances of the Building or the Property, or take or permit on other elevators, any item normally or required by Landlord to be taken in or out through service doors or in or on freight elevators.  Tenant shall not, whether temporarily, accidentally or otherwise, allow anything to remain in, place or store anything, in, or obstruct in any way, any sidewalk, court, passageway, entrance, exit, loading or shipping area or hall, corridor, elevator or stairway.  Tenant shall lend its full cooperation to keep such areas free from all obstruction and in a clean and sightly condition, shall move all supplies, furniture and equipment as soon as received directly to the Premises, and shall move all such items and waste (other than waste customarily removed by Property employees) that are at any time being taken from the Premises directly to the areas designated for disposal.  All courts, passageways, entrances, exits, loading or shipping areas, elevators, stairways, corridors, halls and roofs are not for the use of

the general public and Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence in the judgment of Landlord shall be prejudicial to the safety or security of the Property or its occupants. No tenant and no employee, agent, licensee, invitee or contractor of Tenant shall enter into areas reserved for the exclusive use of Landlord or its agents, employees, licensees or invitees.

7.    KEYS AND ADDITIONAL LOCKS.  Tenant shall not attach or permit to be attached additional locks or similar devices to any door, window, change existing locks or the mechanisms thereof, or make or permit to be made any keys for any door other than those provided by Landlord. If more than two keys for one lock are desired, Landlord will provide them to Tenant upon payment therefor by Tenant.

8.    TOILET ROOMS.  The toilet rooms, urinals, wash bowls and other bathroom apparatus shall not be used for any purpose other than that for which they were constructed, and no foreign substance of any kind whatsoever shall be thrown therein.

9.    VENDING MACHINES.  No vending machines of any description shall be installed, maintained or operated in the Premises or the Property without the prior written consent of Landlord.

10.    NUISANCES AND CERTAIN OTHER PROHIBITED USES.  Tenant shall not (i) conduct itself or permit its employees, agents, licensees, invitees, or contractors to conduct themselves in a manner inconsistent with the comfort or convenience of other tenants or the first-class character of the Property; (ii) install or operate any internal combustion engine, boiler, machinery, refrigerating, heating or air-conditioning apparatus or space heater in or about the Premises; (iii) use the Premises for housing, lodging, or sleeping purposes; (iv) place any radio or television antennae on the roof or on or in any part of the inside or outside of the Property other than the inside of the Premises; (v) operate or permit to be operated any radio, television, record player, stereo, tape player, musical instrument or other sound producing instrument or device inside or outside the Premises which may be heard outside the Premises; (vi) use any illumination or power for the operation of any equipment or device other than electricity; (vii) operate any electric device from which may emanate electrical waves which may interfere with or impair radio or television broadcasting or reception from or in the Property or elsewhere; (viii) bring or permit to be in the Property any dog (except in the company of a blind or deaf person) or other animal or bird; (ix) make or permit any objectionable noise or odor to emanate from the Premises; (x) disturb, solicit or canvass any occupant of the Property; (xiii) do anything in or about the Premises tending to create or maintain a nuisance or do any act tending to injure the reputation of the Property; or (xi) throw or drop or permit to be thrown or dropped any article from any terrace, window or other opening in the Property.

11.    ADVERTISING.  Tenant shall not in any manner use the name of the Property for any purpose or use any picture or likeness of the Property in any letterheads, envelopes, circulars, notices, advertisements, containers or wrapping material.

12.    ROOM-TO-ROOM CANVASS.  Tenant shall not make any room-to-room canvass to solicit business from other tenants or occupants of the Property or for any other person and shall not exhibit, sell or offer to sell, rent or exchange any products or services in or from the Premises.

13.    FLOOR COVERINGS.  Tenant shall provide and maintain hard surface protective mats under all desk chairs which are equipped with casters to avoid excessive wear and tear to carpeting. If Tenant fails to provide such mats, the cost of carpet repair or replacement made necessary by such excessive wear and tear shall be paid by Tenant.

### RIDER 3

### EXTENSION OPTION

Tenant is hereby granted the option ("Extension Option") to extend the term of the Lease for **1** period of **3** Lease Years (the "Extension Term"). The Extension Option may be exercised only by giving Landlord irrevocable and unconditional written notice thereof no earlier than **18** months and no later than **12** months prior to the commencement of the Extension Term. Tenant may not exercise the Extension Option if Tenant is in default under the Lease beyond the expiration of any applicable cure period either at the date of said notice or at any time thereafter prior to commencement of the Extension Term. Upon exercise of the Extension Option, all references in the Lease to the Term shall be deemed to be references to the Term as extended pursuant to the Extension Option.

The Extension Term shall be on the same terms, covenants and conditions as are contained in the Lease, except that (i) no additional extension option shall be conferred by the exercise of the Extension Option, (ii) Base Rent applicable to the Premises for the Extension Term shall be determined as provided below, and (iii) any initial rent abatement, concession or allowance which are in the nature of economic concessions or inducements shall not be applicable to any Extension Term. In addition to Base Rent, Tenant shall pay Additional Rent, and other Rent during the Extension Term as provided in this Lease.

Base Rent per annum per rentable square foot of the Premises for the Extension Term shall be **100%** of the Current Market Rate for lease terms commencing on or about the date of commencement of the Extension Term. The term "Current Market Rate" means the prevailing net rental rate per rentable square foot under office leases recently executed for comparable space in the Building. The determination of Current Market Rate shall take into consideration net or gross lease (and differing base years, if applicable); any differences in the size of space being leased, the location of space in the building and the length of lease terms; any differences in definitions of rentable square feet or rentable area with respect to which rental rates are computed; the value of rent abatements, allowances (for demolition, space planning, architectural and engineering fees, construction, moving expenses or other purposes), the creditworthiness of Tenant; and other pertinent factors. The Current Market Rate may include an escalation of a fixed net rental rate (based on a fixed step or index) then prevailing in the market.

Within **30** days after receipt of Tenant's notice to extend Landlord shall deliver to Tenant written notice of the Current Market Rate and shall advise Tenant of the required adjustment to Base Rent, if any.

Tenant shall, within **15** days after receipt of Landlord's notice, notify Landlord in writing whether Tenant (a) accepts Landlord's determination of the Current Market Rate; (b) rejects Landlord's determination of the Current Market Rate, or (c) requests that the Current Market Rate be determined by an appraiser ("Arbitration Request"). If Tenant rejects Landlord's determination, Tenant's exercise of the Extension Option granted herein shall be deemed revoked and of no further force of effect. If Tenant requests that the Current Market Rate be determined by an appraiser, Landlord and Tenant, within **10** days after the date of the Arbitration Request, shall each simultaneously submit to the other, in a sealed envelope, its good faith estimate of the Current Market Rate (collectively referred to as the "Estimates"). If the higher of such Estimates is not more than **105%** of the lower of such Estimates, then Current Market Rate shall be the average of the two Estimates. If the Current Market Rate is not resolved by the exchange of Estimates, Landlord and Tenant, within **7** days after the exchange of Estimates, shall each select an appraiser to determine which of the two Estimates most closely reflects the Current Market Rate. Each appraiser so selected shall be certified as an MAI appraiser and shall have had at least **5** years' experience within the previous **10** years as a real estate appraiser working in the same submarket in which the Building is located, with working knowledge of current office rental rates and practices. For purposes of this Lease, an "MAI" appraiser means an individual who holds an MAI designation conferred by, and is an independent member of, the Appraisal Institute (or its successor organization, or in the event there is no successor organization, the organization and designation most similar). Upon selection, Landlord's and Tenant's appraisers shall work together in good faith to agree upon which of the two Estimates most closely reflects the Current Market Rate. The Estimate chosen by such appraisers shall be binding on both Landlord and Tenant as the Current Market Rate. If either Landlord or Tenant fails to appoint an appraiser within the seven day period referred to above, the appraiser appointed by the other party shall be the sole appraiser for the purposes hereof. If the two appraisers cannot agree upon which of the two Estimates most closely reflects the Current Market Rate within the

20 days after their appointment, then, within 10 days after the expiration of such 20 day period, the 2 appraisers shall select a third appraiser meeting the aforementioned criteria. Once the third appraiser has been selected as provided for above, then, as soon thereafter as practicable but in any case within 14 days, the appraiser shall make his determination of which of the two Estimates most closely reflects the Current Market Rate and such Estimate shall be binding on both Landlord and Tenant as the Current Market Rate. The parties shall share equally in the costs of the third appraiser. Any fees of any appraiser, counsel or experts engaged directly by Landlord or Tenant, however, shall be borne by the party retaining such appraiser, counsel or expert. In the event that the Current Market Rate has not been determined by the commencement date of the Extension Term at issue, Tenant shall pay the most recent Base Rent set forth in the Lease until such time as the Current Market Rate has been determined. Upon such determination, Base Rent shall be retroactively adjusted. If such adjustment results in an underpayment of Base Rent by Tenant, Tenant shall pay Landlord the amount of such underpayment within 30 days after the determination thereof. If such adjustment results in an overpayment of Base Rent by Tenant, Landlord shall credit such overpayment against the next installment of Base Rent due under the Lease and, to the extent necessary, any subsequent installments until the entire amount of such overpayment has been credited against Base Rent.

Tenant must timely exercise the Extension Option or the Extension Option shall terminate. Tenant may not exercise the Extension Option if Tenant is not occupying and conducting business in the Premises. Tenant's exercise of the Extension Option shall not operate to cure any default by Tenant of any of the terms or provisions in the Lease, nor to extinguish or impair any rights or remedies of Landlord arising by virtue of such default. If the Lease or Tenant's right to possession of the Premises shall terminate in any manner whatsoever before Tenant shall exercise the Extension Option, or if Tenant shall have subleased or assigned all or any portion of the Premises, then immediately upon such termination, sublease or assignment, the Extension Option shall simultaneously terminate and become null and void. The Extension Option is personal to Tenant.