**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BCause Mining LLC, *et al.* | ) | Case No. 19-10562 |
| | ) | |
| Debtors. | ) | Honorable Janet S. Baer |
| | ) | |

**WESCO DISTRIBUTION'S REPLY IN SUPPORT OF MOTION (I) TO DISMISS THE**
**DEBTORS' BANKRUPTCY CASES, OR, IN THE ALTERNATIVE,**
**(II) FOR RELIEF FROM THE AUTOMATIC STAY**

WESCO Distribution, Inc. ("WESCO") hereby files this reply in support of its Motion
(i) to Dismiss the Debtors' Bankruptcy Cases, or, in the Alternative, (ii) for Relief from the
Automatic Stay [D.I. 35] (the "Motion"), and in response to the objections filed by BMG
Operations, Inc. ("BMG") [D.I. 102], the above-captioned debtors and debtors in possession,
BCause Mining LLC ("BCause Mining") and BCause LLC ("BCause LLC" and collectively
with BCause Mining, the "Debtors") [D.I. 105], and the Official Committee of Unsecured
Creditors (the "Committee") [D.I. 103].[1]

I.    **Introduction**

Since the outset of these cases, WESCO has advanced its secured claims against the
Debtors for $1,915,137.77 and actively advocated in these bankruptcy cases. WESCO (and the
Court) have invited the Debtors, the Committee, and any other party in these cases to investigate
and challenge WESCO's liens. As of the date hereof, more than two months into these cases,
notwithstanding WESCO's Motion and the filing of WESCO's proofs of claim, not one party has
objected to, sought to avoid, or otherwise challenged WESCO's claims. To be clear, WESCO's

---

[1] Capitalized terms not otherwise defined herein will have the meanings assigned to them in the Motion.

{8136137:10 }

claims are prima facie valid, and the burden lies with the Debtors, the Committee, or another party to prove otherwise. No party has attempted to carry this burden.

In light of its position, WESCO's arguments for dismissal or lifting of the stay are straightforward. The Debtors have no likelihood of rehabilitation, the estates are suffering continuing loss and diminution, the Debtors cannot confirm a chapter 11 plan, and at this point, the only purpose for continuing these bankruptcy cases is to forestall WESCO from foreclosing on its collateral. Nothing in the objections points to a different outcome, and the Debtors cannot prove any "unusual circumstances" exist for continuing these cases. Even if the Debtors, the Committee, or another party successfully challenged WESCO's liens in whole or in part, the evidence at trial will show that the Debtors still could not implement a turnaround and could not confirm a chapter 11 plan without WESCO's consent. In the meantime, as the evidence at trial also will demonstrate, and as discussed below, the estates (and hence WESCO's position) are deteriorating by the day. For these reasons, the Court should dismiss the bankruptcy cases or, in the alternative, lift the automatic stay so WESCO can proceed against its collateral.

## II.      The Debtors' Business and Restructuring Plan Is Not Realistic or Permissible, and the Debtors' Valuation Has No Basis in Fact

The Debtors' current, yet ever-evolving, business plan is attached hereto as Exhibit A. Notably, this business plan differs from the Debtors' business plan currently filed with the Court [D.I. 105-1], and has twice changed substantially since the Debtors filed their objection to the Motion on May 28. The Debtors' multiple changes to the business plan, as highlighted herein, do not reflect improvements, however; instead, the changes show decreased revenue, diminishing cash balances, and increased (but likely still insufficient) payroll expenses, with only a slight offset from reduced electricity costs. The transcript from WESCO's Rule 30(b)(6) deposition of Thomas Flake, the principal author of the business plan, is also attached hereto as

Exhibit B.  WESCO anticipates presenting Mr. Flake as a witness at the June 21, 2019 hearing

on the Motion.   WESCO also anticipates presenting Fred Grede, the Debtors' former CEO, as a

witness and Carl Lane as an expert witness during the hearing on the Motion. Mr. Grede's

deposition transcript is attached hereto as Exhibit C, and Mr. Lane's expert affidavit  (referred to

herein as the "Lane Aff.") regarding the Debtors' valuation and business plan is attached hereto

as Exhibit D.

A.    The Debtors' Business Plan for BCause Mining Is Unrealistic

As part of the business plan, there are two budgets for each Debtor: one for each Debtor

currently on file with the Court as part of the cash collateral orders (and going through August 2,

2019), and one for each Debtor that the Debtors are proposing in connection with the go-forward

business plan (and going through September 6, 2019).  Under the August 2 budgets, the Debtors

state they have reduced expenses by approximately $40,000.00 per month, realizing an alleged

net cash increase of $72,898.00 through August 2, albeit that alleged cash increase just returns

the Debtors to a projected cash balance ($916,947.00) commensurate with their cash balance at

the commencement of these cases (approximately $914,000.00).  Under the September 6

budgets, the Debtors contend they will further reduce expenses (albeit not by enough to offset

reduced revenues from "storm damage"), in part by "shifting" certain expenses to a non-debtor

subsidiary, and end with cash balances of $855,843 for the week of August 2 and $888,625.00

for the week of September 6, in both instances nearly $200,000.00 less than the balances

predicted two weeks ago.  *See* Flake Deposition Transcript, attached hereto Exhibit B (referred to

herein as "Flake Dep. Tr."), 125:20-23.  Payroll expenses also have increased – likely because

the Debtors currently are seeking to hire a chief financial officer and general counsel.  The

incremental payroll and benefits costs for these positions (which are not currently reflected in the

budgets) would likely range from $100,000 to over $400,000.  Lane Aff. ¶ 18.  Essentially, since

the Debtors' budgets assume no new revenues, the Debtors propose to reorganize BCause

Mining by cutting costs – but not by enough to offset declining revenues – and by otherwise

maintaining the status quo.

However, even if the Debtors could realize the contemplated cost savings, the Debtors'

budgets do not incorporate at least $213,750.00, and perhaps $3 to $4 million more, in capital

expenditures the Debtors admit are essential to effectuate their business plan.  Lane Aff. ¶ 18;

Fred Grede Deposition Transcript (referred to herein as "Grede Dep. Tr.")151:13-22 (noting that

roofing, ventilation, humidity, fire suppression, and electricity prices are issues that would need

to be addressed through capital expenditures).  These expenses arise from at least $213,750.00

the Debtors must pay in July, August, and September 2019 ($71,250.00 per month) for a new fire

suppression system at their hosting facility.[2]  In addition, in their most recent business plan, the

Debtors neglected to account for payment of at least $800,000 to Nasdaq to ensure Nasdaq's

continued support of the BCause Spot exchange platform.  Flake Dep. Tr. 84:6-19; Grede Dep.

Tr. 83:23-24, 84:1-12**.**  Together with the other expenses highlighted by Mr. Lane, these

expenses more than eliminate any benefit from cost savings.  According to the Debtors' revised

projections, these expenses would reduce the Debtors' cash balance to at least $642,093.00 and

$674,875.00 (or perhaps to zero) for the weeks of August 2 and September 6, respectively, which

represent deficits of approximately $272,000.00 and $240,000.00, respectively, relative to

Debtors' cash position at the beginning of the case.[3]

---

[2] While the Debtors claim that they will be able to obtain separate financing to complete this project, it "appears
unlikely as there is no distinct value to an investor of paying for a fire suppression system, and lenders do not lend
against leasehold improvements, especially not for distressed companies."  Lane Aff. ¶ 18.
[3] In addition, the cash balance for the week of September 6 likely is ephemeral and overstated, since the Debtors did
not include September expenses in the budget.

Moreover, the Debtors set forth no long-term projections that would accompany a traditional chapter 11 feasibility analysis.  In fact, any such projections would amount to nothing more than pure conjecture, since the Debtors' three biggest customer hosting agreements terminate at the end of 2019, eliminating approximately $970,000.00 (or approximately 95%) of the Debtors' monthly revenues.  One of these customers, SBI — the Debtors' the biggest customer, and  responsible for approximately $519,000.00 in monthly revenues, and also an equity holder — has indicated that it will not renew its agreement, and another (St. Bitts, responsible for approximately $208,000.00 in monthly revenues) already tried to terminate its agreement by invoking a bankruptcy default provision.  Flake Dep. Tr. 46:4-14, 54:5-19; Grede Dep. Tr. 109:16-20, 62:2-11.  The third customer (BMG, responsible for approximately $244,000.00 in monthly revenues) has not indicated that it would renew its contract.  Grede Dep. Tr. 194:13-24, 195:1-2; Flake Dep. Tr. 62:12-22.  The Debtors have not presented projections demonstrating they could continue to operate if one or more of these key customers fails to extend its contract.  *See* Lane Aff. ¶ 17.

> B.     BCause Spot Likely Will Never Commence Operations

According to Mr. Flake, the second leg (and critical portion) of the Debtors' business plan is commencing operation of BCause Spot, which the Debtors say will operate as a crypto-currency exchange platform.  However, through October 4, 2019, the Debtors had previously projected BCause Spot will generate approximately $4,400.00 in revenues and $1,119,023.00 in losses.  Flake Dep. Tr. 153:2-3.  Prior to going live and operating through August 31, 2019 (assuming there are no further technical or regulatory delays), the Debtors plan to raise $750,000.00[4] from existing investors in June 2019.  Of that amount, the Debtors have only

---

[4] The Debtors' revised business plan claims that $503,000, instead of $750,000, in funding is required for Spot to commence operations.

obtained $350,000.00 in "verbal" commitments, although the Debtors have not received any

written commitments.  Flake Dep. Tr. 37:1-4; Lane Aff. ¶ 19.   According to the Debtors, these

investors have orally pledged this money even though the Debtors thereafter will have to raise

another $2,000,000.00[5] by August 31, 2019, for BCause Spot to continue to operate until Spot

can break even,[6] and even though the Debtors will remain mired in bankruptcy during this

period.  Flake Dep. Tr. 153:7-14; Lane Aff. ¶ 19.  In addition, the evidence will show the

Debtors have not obtained (and cannot obtain) the regulatory approvals and licenses necessary to

launch BCause Spot operations while still in bankruptcy.  Grede Dep. Tr. 65:17-20, 83:21-23.

On account of the foregoing challenges, Mr. Grede testified at this deposition that he does

not think BCause Spot will ever launch.  Grede Dep. Tr. 83:11-14.  Mr. Grede does not believe

the Debtors can raise the necessary capital or obtain regulatory approvals while in bankruptcy

and, in fact, that the Debtors are not seriously pursuing the launch of BCause Spot.  Grede Dep.

Tr. 83:11-14, 84:1-5.  Even if the Debtors somehow could commence operations at BCause Spot,

Mr. Lane will testify that the Debtors' long-term projections for BCause Spot defy reality.

C.      The Bankruptcy Code Does Not Permit the Debtors' Proposed Chapter 11 Plan

To effectuate their business plan, the Debtors propose to treat certain prepetition

unsecured creditors (including BFPE and perhaps Nasdaq, BMG, and Dominion, who would

each receive a 100% recovery) more favorably than other unsecured creditors.  For unsecured

creditors receiving the less favored treatment, the Debtors will reduce the par value of their

claims by one-third, exchange another one-third of their debt for approximately 20% of the

equity in the reorganized Debtors, and issue a 12% note for the remaining one-third.  The

Debtors propose to classify WESCO with these disfavored unsecured creditors —

---

[5] Investors would likely be hesitant to provide capital if such capital would inure for the benefit of others.  Lane Aff.
¶ 19.
[6] Equity investors likely would demand the vast majority of this value. Lane Aff. ¶ 25.

notwithstanding WESCO's liens — and propose that existing shareholders retain approximately 80% of the equity in the reorganized Debtors.

In short, the Debtors' proposed reorganization plan would violate, among other things, the fundamental pillars of the Bankruptcy Code: the absolute priority rule (§§ 506, 1111(b), & 1129(b)), the best interests test (§ 1129(a)(7)), classification and treatment of similarly situated claims (§§ 1122 & 1123(a)(4)), and the feasibility test (§ 1129(a)(11)).  Moreover, secured creditors would expect to be treated more favorably than unsecured creditors, who in turn would expect more favorable treatment than equity holders.  Thus, even if the Debtors, the Committee, or another party could successfully challenge WESCO's liens and claims (which they cannot), WESCO (as a hypothetical unsecured creditor, along with many other creditors receiving disfavored treatment) still would have to consent for the Debtors to confirm a chapter 11 plan; and WESCO will not consent.  In the face of opposition from WESCO and likely other creditors, the Debtors have not budgeted for the costs of soliciting and confirming a chapter 11 plan (contested or uncontested) or the costs of litigating WESCO's or any other creditor's claims. Grede Dep. Tr. 29:14-24, 30:1-19.  Moreover, Mr. Flake testified at his Rule 30(b)(6) deposition that the foregoing constitutes the *only* option for the Debtors to continue as a going concern. Flake Dep. Tr. 226:4-9.  It follows therefore that the Debtors *cannot* continue as a going concern with this unrealistic and unfeasible plan.   Stated in the context of the standards for dismissal of a bankruptcy case, the Debtors have not shown that "unusual circumstances" exist that justify maintaining these cases in chapter 11.  Rather, the Debtors' plan, and hence these bankruptcy cases, simply do not work.

In the face of all the foregoing challenges, the Debtors no doubt will argue the price of bitcoin could increase substantially, or they may realize any number of other potentialities, that

supposedly would propel the Debtors' success and create value of creditors. In other words, the

Debtors are attempting to cram-down WESCO and other creditors with nothing more than a

long-shot bet on the price of bitcoin, and also a bet they can renew their existing customer

hosting agreements and/or win new customers. Notwithstanding these uncertainties, the Debtors

have not prepared any sensitivity or other analyses to project alternative outcomes in the event

the Debtors' best-case scenario does not materialize. Even if they had prepared such analyses,

the Debtors cannot overcome WESCO's opposition to their theoretical plan.

      D.      <u>The Debtors' Valuation Has No Basis in Fact</u>

      It is difficult to gauge WESCO's or any other creditor's recovery under the Debtors'

going-concern scheme. Mr. Flake testified at his deposition that he estimates recoveries at 80%

or higher, with "hundreds of millions" in value in BCause Spot. Flake Dep. Tr. 189:10-12.

After accounting for the proposed notes issued to unsecured creditors under the Debtors' plan

(with a 33% recovery value, assuming the Debtors can service and repay the notes) the majority

of that alleged 80% recovery will have to come from equity value. Obviously, the going-concern

value of BCause Spot is completely speculative at this point, and arguably should be viewed as

zero,[7] although the Debtors are valuing BCause Spot at $2,000,000.00 in "replacement value."

Flake Dep. Tr. 40:4-11. According to Mr. Lane, the Debtors' use of "replacement value" for

BCause Spot is without foundation. Replacement value "is used primarily in valuing inventory

and equipment of performing companies where the inventory and equipment is being utilized for

profitable operations." Lane Aff. ¶ 25.

---

[7] It is reasonable to conclude that the valuation of Spot is "zero or close to zero, as it currently is not operating and
its prospects for success are highly uncertain." Lane Aff. ¶ 25.

Further, the Debtors are valuing BCause Mining as a multiple of top-line revenue[8] (not net income, EBITDA, or other cash flow or profitability measures) equal to $10,800,000.00 (or 11 months of revenue), for an aggregate alleged equity value of $12,800,000.00 for BCause Mining and BCause Spot, albeit creditors will receive only 20% of that equity value.  Flake Dep. Tr. 40:12-24.  Even though valuations are not commonly determined  based on a multiple of revenue, the Debtors essentially utilized a revenue multiple of .9 times annual revenues with no reasonable basis or explanation.  Lane Aff. ¶ 22.  While Mr. Flake attempted to compare this methodology with multiples used to measure equity valuations in the markets for publicly traded stocks and other equities like Uber or Lyft, this comparison is not reasonable or even relevant, as metrics to compare the performance of publicly traded stocks are not relevant to the valuation of private companies.  *See* Lane Aff. ¶ 22, Flake Dep. Tr. 34:1-19.

The Court will hear testimony that the Debtors' valuation methodologies and recovery estimates are completely inappropriate and detached from reality.  The going-concern enterprise value of BCause Mining is more likely between zero and approximately $1.7 million, and the equity value of Spot is likely zero or close to zero.  Lane Aff. ¶ 27-28 (explaining detailed methodology for calculating this valuation).  The Debtors' assertion that the value of BCause Spot will increase by $2 million when the exchange launches is irrelevant, because the current value reflects the reality that the business currently is not operating, has no cash flow, needs $2.75 million in capital investment merely to break even, and may or may not launch successfully this year. Lane Aff. ¶ 28.

---

[8] The Debtors provided no reasonable basis for using a revenue multiple valuation methodology. This method of valuation is not useful here because it "basically presumes that the growth of the subject company and the comparable companies are substantially similar."  Lane Aff. ¶ 23.  The Debtors also failed to justify their exclusion of other market multiple valuation methodologies that may be more applicable to operating companies, such as EBIDTA multiple and EBIDTA minus capital expenditures multiple.  Lane Aff. ¶ 24.

While the Debtors are pursuing their dream and continuing to languish in the bankruptcy

cases, they will be burning through WESCO's cash collateral (as already discussed), and

furthermore, the Debtors' non-cash assets will be depreciating on a daily basis (at a book value

rate of at least $125,000.00 per month).  The Debtors' non-cash assets have depreciated by

$250,000.00 in book value since the beginning of the cases, and will experience another

$500,000.00 in depreciation if the Debtors are allowed to run the cases for another four months.

Flake Dep. Tr. 31:19-24.  While the fair market value of that depreciation is unclear, the Debtors

believe the current liquidation value of their assets may be $900,000.00 or less.  Flake Dep. Tr.

68:15-17.  If correct, that means the WESCO will experience significant harm and impairment to

its recovery from continuation of these cases and diminution in its collateral, resulting from

depreciation of the non-cash assets during these cases coupled with the over $250,000.00 in

WESCO's cash collateral the Debtors want to spend.  The Bankruptcy Code does not permit this

outcome, and the Court should intercede to prevent it.

**III.    Legal Arguments**

     A.    None of the Objections Directly Address WESCO's Motion or Set Forth
            <u>Justifications for Continuing the Bankruptcy Cases</u>

When distilled, the Debtors, BMG, and the Committee basically raise two objections

against dismissal or lifting of the stay.  First, they say the Motion is premature, and the

Bankruptcy Court should give the Debtors more time for a turnaround and to confirm a chapter

11 plan.  Second, in its objection, the Committee makes several attempts to challenge the validity

of WESCO's claims and interests.

Each of the objections misses the point.  Any creditor may move to dismiss a bankruptcy

case for cause at any time pursuant to section 1112(b) of the Bankruptcy Code, and the Court

must dismiss the case if the movant meets its burden of proof.  *In re Draiman*, 450 B.R. 777, 826

(Bankr. N.D. Ill. 2011); *In re Dovetail, Inc.*, No. 07 B 72820, 2008 WL 5644889 at *3 (Bankr.

N.D. Ill. Dec. 31, 2008).  The objections do not attempt to address WESCO's arguments, much

less articulate how WESCO has not met its burden of proof.  As discussed in the Motion and also

above, and as WESCO will demonstrate at trial, continuation of these bankruptcy cases makes no

sense, and the Court should dismiss under section 1112(b) or lift the automatic stay.  This is true

irrespective of whether WESCO's claims are secured or unsecured.

Even if the nature of WESCO's claims and interests is relevant (which it's not), the

Committee cannot challenge WESCO's claims and interests merely by objecting to the Motion.

The presumptions and burdens that follow from WESCO's position and its proofs of claim are

black-letter law.

WESCO filed its proofs of claim early in the case (Claim Nos. 1 and 2 in the Debtors'

bankruptcy cases, collectively, the "Proofs of Claim").   WESCO's filed Proofs of Claim are

prima facie evidence of the validity and extent of its claims against the Debtors.[9]  Fed. R. Bankr.

P. 3001(f); *see In re Mary Ann Hood,* 449 Fed. Appx. 507, 509 (7th Cir. 2011) ("A properly

executed and filed proof of claim is prima facie evidence that a claim is valid."); *In re Airadigm*

*Communications, Inc.*, 616 F.3d 642, 659 (7th Cir. 2010); *Matter of Carlson*, 126 F.3d 915, 921-

22 (7th Cir. 1997).  A proof of claim is sufficient if it conforms substantially to the federal proof

of claim form and "gives specific notice of the creditor's intent to hold the bankruptcy estate

liable for a debt or other right to payment." *Mary Ann Hood*, 449 Fed. Appx. at 509, citing *Gens*

*v. Resolution Trust Corp.,* 112 F.3d 569, 575 (1st Cir. 1997); *In re Chataguay Corp.*, 94 F.3d

772, 777 (2d Cir. 1996); *In re marchFirst, Inc.* 431 B.R. 436, 443 (Bankr. N.D. Ill. 2010).  A

bankruptcy court must allow a properly filed proof of claim unless "a party in interest objects

---

[9] WESCO's Proofs of Claim supersede any scheduled claims by the Debtors.   *See* Fed. R. Bank. P. 3003(c)(4) (a
proof of claim executed and filed in accordance with this subdivision shall supersede any scheduling of that claim or
interest."); s*ee also In re Marino,* 201 B.R. 234 (Bankr. N.D. Ill. 1996).

and produces evidence sufficient to rebut the claim." *Mary Ann Hood,* 449 Fed. Appx. at 510*,*

11 U.S.C. § 502(b); *Matter of Carlson,* 126 F.3d at 921-22.  Moreover, the Debtors, or the

Committee if it seeks and obtains standing, must seek to avoid WESCO's liens by way of an

adversary proceeding.  *In re Dennis*, 286 B.R. 793, 796 (Bankr. W.D. Okla. 2002) ("contest[s]

take place in the context of an adversary proceeding.  The reason for this requirement is obvious.

The lien holder is entitled to have specific notice of the challenge to the validity, priority or

extent of its lien, as well as the opportunity to adequately defend the validity of its lien claim").

To date, no party has objected to WESCO's Proofs of Claims or brought an adversary

proceeding to avoid or otherwise contest WESCO's liens.

> B.     The Debtors' Unrealistic Business Plan Shows that the Debtors' Bankruptcy
> Cases are Futile, and Dismissal is the Best Interests of the Debtors' Estates

The Debtors filed their bankruptcy cases two months ago and have not made meaningful

progress.  Without a realistic path forward, the Debtors cannot continue to exploit the protections

of the Bankruptcy Code indefinitely while diminishing WESCO's cash and other collateral.

To defeat the Motion, the Debtors must show they have a reasonable likelihood of

rehabilitation and the ability to "restore the viability of [their] business." 11 U.S.C.

§ 1112(b)(4)(A); *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004).  The issue of

"rehabilitation" looks at not only whether a debtor can confirm a plan, but whether there is a

substantial and continuing loss to the estate, and whether "the debtor's business prospects justify

continuance of the reorganization efforts."  *In re Rey,* Nos. 04-B-35040, 04-B-22548, 06-B-4487,

2006 WL 2457435, at *6 (Bankr. N.D. Ill. 2006).  Here, the Debtors' unrealistic plan just

demonstrates the futility of these chapter 11 cases.  Even if the Court believes it should take into

account the Debtors' relatively short time in chapter 11, and therefore employ a less stringent

standard, the Debtors' exit from bankruptcy cannot be based on mere "speculation," "visionary

projections," or "hope against hope." *In re Aurora Memory Care, LLC*, 589 B.R. 631, 642

(Bankr. N.D. Ill. 2018) (a plan "will not be confirmed based on a debtor's 'hope against hope'

that financing or other goals will materialize"), citing *In re Repurchase Corp.,* 332 B.R. 336, 343

(Bankr. N.D. Ill. 2005). As already discussed, and as WESCO will show at trial, it is precisely a

"hope against hope" in which the Debtors anchor their prospects. Therefore, dismissal of the

Debtors' bankruptcy cases is warranted for good cause and is in the best interest of creditors.

     C.    <u>WESCO Claims and Liens are Completely Valid</u>

     Even if the Debtors or the Committee have appropriately challenged WESCO's claims

and liens (which they haven't), and even if the Court believes it should scrutinize WESCO's

claims and liens under the circumstances (which it shouldn't), the arguments raised to date

against WESCO's claims and liens are unavailing

     Initially, the Committee complains that WESCO does not have a valid security interest in

the cash in the Lakeside bank account, because BCause Mining (not BCause LLC) was the

applicant on the Application (as defined below). However, the Committee overlooks the

Virginia Promissory and Confessed Judgment Note executed by both of the Debtors on

December 5, 2018, and entry of the Confession of Judgment thereafter on March 1, 2019, both of

which, as set forth and evidenced in the Motion and WESCO's Proofs of Claim, create a lien in

favor of WESCO. *See* VA St. §§ 8.01-431, 8.01-434. Moreover, as the Committee

acknowledges, WESCO executed a garnishment in both Virginia and Illinois against the

Lakeside account.

     The Committee could find only alleged one flaw with the Garnishment – i.e., that

WESCO supposedly garnished the wrong entity (Lakeside Bank Community Development

versus Lakeside Bank). In fact, WESCO issued two garnishments in both Virginia and Illinois –

one to Lakeside Bank and one to Lakeside Bank Community Development. Copies of the

garnishment summons and service affidavits issued to Lakeside Bank in Illinois and Virginia are attached hereto as <u>Exhibit E</u> and <u>Exhibit F</u>.[10]

Even if WESCO had not properly executed the Garnishment (which is not the case), WESCO still would have a lien in the Lakeside Bank account cash for three reasons.  First, BCause Mining owns the cash in the Lakeside Account, as proceeds of accounts receivable generated by BCause Mining.  All the materials submitted to date in these cases reflect, and the Court will hear evidence at trial, that BCause LLC does not have any operational functions other than as a cost center, licensee for the Nasdaq agreement, and custodian for the Lakeside Account. Flake Dep. Tr. 120:1-2, 141:10-11, and 160:17-23.   WESCO has not seen any documents or other evidence showing that cash has moved from BCause Mining to BCause LLC's books, by way of intercompany transfers or otherwise.  Even if such evidence exists (which it doesn't), Mr. Flake's testimony around the consolidated nature of the BCause enterprise suggests that with respect to the Lakeside Bank account, any distinction between BCause Mining and BCause LLC is a mere fiction, and that to the extent the separation has been respected to date, WESCO would challenge it in enforcing its claims and interests.  *See* Flake Dep Tr. 12:15-19, 161:15-18 (stating that "we only had one bank account, and we only had one lump sum of payroll").

The Committee also seems to argue that notwithstanding the plain language of the lien granting language in WESCO's document granting WESCO a lien on proceeds, the transfer of cash between the Debtors undercuts WESCO's position.  However, as already discussed, the Debtors have not produced any evidence that such a transfer has occurred, or that BCause LLC

---

[10] Illinois case law provides that while a garnishment must contain the correct name of the garnishee, "the garnishee becomes liable to hold the property subject to the process where he has actual knowledge of the identity of the principal defendant, though the latter's name is not correctly given, or has reason to suppose the proceedings are intended to be against his creditor." *Hantman, for use of Larson v. West Side Trust & Sav. Bank*, 249 Ill. App. 372, 380 (Ill. App. 1928).  Lakeside Bank accepted service of the garnishments for both Lakeside Bank and Lakeside Bank Community Development LLC, and neither Lakeside Bank, the Debtors, nor any other party (other than the Committee in its objection) has attempted to contest the validity of the garnishment.

holds the cash in the Lakeside account in anything other than a custodial capacity.  As Mr. Flake

has testified, "we've only got one bank account for the entire company."  *See* Flake Dep. Tr.

12:15-19, 161:15-18.  Even if the Debtors could produce evidence of appropriate bookkeeping

and intercompany transfers (which they can't), BCause LLC hardly constitutes an innocent, good

faith transferee that would take the BCause Mining cash free and clear of WESCO's lien on

proceeds.  *See* VA St. § 8.9A-332(a); *Keybank Nat. Ass'n v. Ruiz Food Prods., Inc.,* No. CV-04-

296-MHW, 2005 WL 2218441, at *5 (D. Idaho Sept. 9, 2005).

The Committee also seems to argue that the Court should treat WESCO's Confession of

Judgment and Garnishment as preferences under section 547 of the Bankruptcy Code.  The first

significant flaw with the Committee's argument arises from the fact that no one has yet brought a

preference action against WESCO, much less sought to carry the burden of proving all the

elements of a preference under section 547(b).[11]  Even if the Committee or another party could

bring such an action that would survive a Rule 12(b)(6) dismissal motion (which they can't), the

Committee suggests that the Confession of Judgment and Garnishment allegedly arising during

the 90 days prior to the bankruptcy filings amounts to the only relevant fact the Court should

consider.  As already mentioned, the Committee would have to prove (assuming it could gain

standing to bring such an action) all five elements of a preference action, including that the

relevant transfer dates occurred within 90 days of the bankruptcy filing, versus at dates prior to

the 90-day window (i.e., upon granting of the lien in the Application for Business Credit, filing

---

[11] Both of the cases the Committee cited in its objection addressed Illinois state citation liens to discover assets, not
liens resulting from confessed judgments and garnishments like those at issue in these cases.  Also, the Committee
alleges that the ability to pursue avoidance claims is only available in the Debtors' bankruptcy cases, but does not
mention that certain state laws include certain variations of avoidance actions.  Section 17 of WESCO's terms and
conditions (which are integrated into the Application) provides that Pennsylvania law governs any disputes relating
to the Application.  In the event of dismissal, the Debtors and creditors could pursue avoidance claims under both
Pennsylvania and Virginia state law.  Both Pennsylvania and Virginia have enacted statutes for setting aside
fraudulent conveyance and other transfers.  *See* 12 Pa. C.S.A. § 5105; *In re Wettach,* 811 F.3d 99, 104 (3d Cir.
2016) (considering constructively fraudulent claim); VA St. §§ 55-80, 55-81, 55-82, 55-82.2.

of the UCC-1, entry into the Judgement Note, or otherwise). *See, e.g., In re Aspen Data Graphics, Inc.,* 109 B.R. 677, 691 (Bankr. E.D. Pa. 1990) (where "the lien is obtained before the preference period commenced, no preferential transfer is thereby created"); *In re Schwinn Bicycle Co.,* 200 B.R. 980, 988 (Bankr. N.D. Ill. 1996) ("a creditor that receives payment attributable to a secured claim is not usually preferred because secured creditors generally receive 100% of the value of their collateral upon distribution in a chapter 7 case"); *Knopfler v. Schraiber*, Nos. 87 B 17144, 88 A 877, 1992 WL 280801, at *17 (Bankr. N.D. Ill. 1992); *Golfview Developmental Center, Inc. v. All-Tech Decorating Company,* 309 B.R. 758, 766-767 (Bankr. N.D. Ill. 2004) (transfers to fully secured creditors "are not preferential unless they exceed the value of the creditor's security interest").

Finally, the Committee alleges the Debtors only owe WESCO $745,756.08, and they allegedly owe $626,305.84 to CSC, a WESCO subsidiary, per the Debtors' schedules.  First, as already discussed, WESCO's Proofs of Claim supersede the Debtors' schedules and proves otherwise.  Second, WESCO's Application for Business Credit (attached to the Proofs of Claim and the Motion as Exhibit A) explicitly contemplates both WESCO and WESCO subsidiaries and affiliates selling to the Debtors, and the Application includes WESCO within the definition of the secured parties, along with "any and all of its subsidiaries, affiliates, and unincorporated divisions" of WESCO.  Nothing about the Debtors' internal bookkeeping (assuming it indicates otherwise) can alter this.  *See* VA. St. § 8.9A-503(d) ("[f]ailure to indicate the representative capacity of a secured party or representative of a secured party does not affect the sufficiency of a financing statement").[12]

---

[12] For example, most commercial lending relationships with multiple lenders have an agent, and only that agent needs to file a financing statement and otherwise act on behalf of the lending group. *See* W. Crews Lott, *et al.*, *Multiple Lender Transactions: Current Issues*, 112 Banking L.J. 846, 847 (1995).

## IV.    Alternatively, WESCO is Entitled to Relief from the Automatic Stay

In opposition to WESCO's arguments for lifting the stay, the Debtors and BMG claim that WESCO has an equity cushion.  However, that simply is not true.  WESCO's uncontested Proofs of Claim evidence claims of $1,915,137.77.  As the Court knows, the Debtors' monthly bank balances swing from approximately $900,000.00-$1,000,000.00 at their peak, to less than $100,000.00 at their lowest point.  Moreover, as already discussed, the Court will hear evidence of an additional $213,750.00, and perhaps three to four million more, in capital and other expenditures the Debtors must make to reorganize and exit chapter 11.  Mr. Flake has testified that he believes the non-cash collateral is worth less than $900,000.00 and is depreciating by the day.  Flake Dep. Tr. 68:16-20.  By itself, the depreciation supports cause to lift the stay the under section 362(d)(1) of the Bankruptcy Code.  *See In re Carson,* 30 B.R. 637, 642 (Bankr. D. Kansas 1983) (granting creditor relief from the automatic stay where creditor's collateral was subject to "continuous depreciation and risk of its collateral").  Also, under section 362(d)(2) of the Bankruptcy Code, since the Debtors have not demonstrated the prospect of a reorganization (as already discussed), WESCO's collateral is not "necessary for an effective reorganization." *In re Mayslake Village-Plainfield Campus, Inc.,* 441 B.R. 309, 324 (Bankr. N.D. Ill. 2010) (it is the debtor's burden to show that property is actually necessary for effective reorganization and there is "a reasonable possibility of a successful reorganization within a reasonable time"), citing *United Sav. Ass'n v. of Tex. v. Timbers of Inwood Forest Assoc., Ltd*., 484 U.S. 365, 375 (1988).

## V.    Conclusion

Therefore, for the foregoing reasons, as well as the reasons set forth in the Motion, WESCO respectfully requests that the Court overrule each of the objections, and enter an order (a) (i) dismissing each of the Chapter 11 Cases, or, in the alternative, (ii) granting WESCO relief

from the automatic stay of section 362 of the Bankruptcy Code to proceed with the garnishment

and other methods to enforce its interests; (b) waiving the 14-day stay imposed by Bankruptcy

Rule 4001(a)(3); and (c) granting such other and further relief as is just and proper.


Dated: June 18, 2019                     /s/  David A. Agay
                                         David A. Agay (ARDC No. 6244314)
                                         Shara Cornell (ARDC No. 6319099)
                                         McDONALD HOPKINS LLC
                                         300 North LaSalle Street, Suite 1400
                                         Chicago, Illinois 60654
                                         Telephone:  (312) 280-0111
                                         Facsimile:  (312) 280-8232
                                         dagay@mcdonaldhopkins.com
                                         scornell@mcdonaldhopkins.com

                                         -and-

                                         Maria G. Carr (OH 0092412) (admitted *pro hac vice*)
                                         McDONALD HOPKINS LLC
                                         600 Superior Avenue, E., Suite 2100
                                         Cleveland, OH 44114
                                         Telephone:  (216) 348-5400
                                         Facsimile:   (216) 348-5474
                                         mcarr@mcdonaldhopkins.com

## <u>CERTIFICATE OF SERVICE</u>

I, David A. Agay, hereby certify that, on June 18, 2019, I caused a copy of the foregoing WESCO Distribution's Reply in Support of Motion (i) to Dismiss the Debtors' Bankruptcy Cases; or, in the Alternative, (ii) For Relief from the Automatic Stay to be electronically filed with the Clerk of Court using the Electronic Case Filing System, and be served via the CM/ECF system or U.S. mail on the following interested parties:

**Via ECF:**

David A Agay on behalf of Creditor Wesco Distribution, Inc.
dagay@mcdonaldhopkins.com,
mbrady@mcdonaldhopkins.com;bkfilings@mcdonaldhopkins.com

Sarah K Angelino on behalf of Creditor Hoffland Properties, Inc.
sangelino@schiffhardin.com, edocket@schiffhardin.com

Jamie L Burns on behalf of Creditor W-R2 Jefferson Owner VIII, LLC
jburns@lplegal.com, rwilliamson@lplegal.com;ikropiewnicka@lplegal.com

Maria G Carr on behalf of Creditor Wesco Distribution, Inc.
mcarr@mcdonaldhopkins.com, bkfilings@mcdonaldhopkins.com

Scott R Clar on behalf of Debtor 1 BCause LLC and BCause Mining LLC a Virginia limited liability company
sclar@cranesimon.com, mjoberhausen@cranesimon.com;asimon@cranesimon.com

Shara C Cornell on behalf of Creditor Wesco Distribution, Inc.
scornell@mcdonaldhopkins.com,
mbrady@mcdonaldhopkins.com;lburrell@mcdonaldhopkins.com

Jeffrey C Dan on behalf of Debtor 1 BCause LLC and BCause Mining LLC, a Virginia limited liability company
jdan@cranesimon.com, sclar@cranesimon.com;mjoberhausen@cranesimon.com

Shelly A. DeRousse on behalf of Creditor Committee Official Committee Of Unsecured Creditors
sderousse@freeborn.com, bkdocketing@freeborn.com;jhazdra@ecf.inforuptcy.com

Devon J. Eggert on behalf of Creditor Committee Official Committee Of Unsecured Creditors
deggert@freeborn.com, bkdocketing@freeborn.com;jhazdra@ecf.inforuptcy.com

Elizabeth L. Janczak on behalf of Creditor Committee Official Committee Of Unsecured Creditors
ejanczak@freeborn.com, bkdocketing@freeborn.com;jhazdra@ecf.inforuptcy.com

Marc Ira Fenton on behalf of Creditor W-R2 Jefferson Owner VIII, LLC
mfenton@lplegal.com, skiolbasa@lplegal.com;ikropiewnicka@lplegal.com

J Mark Fisher on behalf of Creditor Hoffland Properties, Inc.
mfisher@schiffhardin.com, edocket@schiffhardin.com;sricciardi@schiffhardin.com

Jennifer M McLemore on behalf of Creditor BMG Operations Ltd.
jmclemore@williamsmullen.com, avaughn@williamsmullen.com

Christina Sanfelippo on behalf of Creditor BMG Operations Ltd.
csanfelippo@foxrothschild.com, orafalovsky@foxrothschild.com

Brian L Shaw on behalf of Creditor BMG Operations Ltd.
bshaw@foxrothschild.com, cknez@foxrothschild.com

Arthur G Simon on behalf of Debtor 1 BCause LLC and BCause Mining LLC, a Virginia limited
liability company
asimon@cranesimon.com, sclar@cranesimon.com;slydon@cranesimon.com

Jason M Torf on behalf of Creditor Virginia Electric and Power Company d/b/a Dominion
Energy Virginia
jason.torf@icemiller.com

Patrick S Layng
USTPRegion11.ES.ECF@usdoj.gov

**Via Regular Mail**

Paul Bozych
Nielsen, Zehe & Antas, P.C.
Wesco Distribution, Inc.
55 W. Monroe St., Ste. 1800
Chicago, IL 60603

Seth A. Robbins
Robbins Law Group
1100 N. Glebe Rd., Ste. 1010
Arlington, VA 22201

AlphaCraft Technologies, LLC
601 Railroad Ave.
South Boston, VA 24592

Matthew B. Kirsner
Eckert Seamans
919 East Main St., Ste. 1300
Richmond, VA 23219

Abacus Solutions, LLC
1190 Kennestone Circle NW, #120
Newborn, GA 30056

Amazon Web Services, Inc.
410 Terry Avenue North
Seattle, WA 98109-5210

Brian Sayler
48 Bensam Place
Haledon, NJ 07508

Alison Zizzo
Midget-Pret-Olansen
2901 S. Lynnhaven Rd., Ste. 120
Virginia Beach, VA 23452

Gaylene Watson
Dominion Energy Virginia
2700 Cromwell Drive
Norfolk, VA. 23509

Kristopher C. Russell
Key Account Manager
Customer Service and Strategic Partnerships
Dominion Energy Virginia
2700 Cromwell Drive
Norfolk, VA 23509

BMG Operations Ltd.
44 Church Street
St. John's, Antigua

Amazon Web Services, Inc.
410 Terry Avenue North
Seattle, WA 98109-5210

EF Fallon, Kevin
2800 252nd Ave.
Salem, WI 53168

Silbar Security Corporation
1508 Technology Drive, #101
Chesapeake, VA 23320

Solutrix
5469 Greenwich Road
Virginia Beach, VA 23462

Inate One LLC
1083 Independence Blvd., #206
Virginia Beach, VA 23455

Zhouyang (Mason) Song
2930 Barnard Street, #7204
San Diego, CA 92110

Tradehelm, Inc.
27 N. Wacker Dr., 103
Chicago, IL 60606

Endurance IT Services, LLC
295 Bendix Road, #300
Virginia Beach, VA 23452

Russell R Johnson, III and John M. Craig,
on behalf of Creditor Virginia Electric and
Power Company
d/b/a Dominion Energy Virginia
Law Firm of Russell R Johnson III, PLC
2258 Wheatlands Drive
Manakin Sabot, VA 23103

Capital Counsel, L.L.C.
700 13th Street, NW, 2nd Floor
Washington, DC 20005

Century Link
1025 Eldorado Blvd.
Broomfield, CO 80021

Ciniva, LLC
251 Granby Street
Norfolk, VA 23510

Crystal Clear Communications
3180 N. Lake Shore Drive, #20C Chicago,
IL 60657

FIS Systems International LLC 601
Riverside Ave.
Jacksonville, FL 32204

Jones, Madden & Council, PLC
5029 Corporate Woods Drive, #190
Virginia Beach, VA 23462

Katten Munchin Rosenman LLP
525 W. Monroe St.
Chicago, IL 60661

LeClairRyan
4405 Cox Road, #200
Glen Allen, VA 23060

Nasdaq
One Liberty Plaza, 50th Floor
New York, NY 10006

Paychex of New York LLC 8215 Forest
Point Blvd., #150
 Charlotte, NC 28273
Adam.bleifeld@softvision.com

Endurance IT Services, LLC
295 Bendix Road, #300
Virginia Beach, VA 23452

BitGo, Inc.
2443 Ash Street
Palo Alto, CA 94306

HK Cryptocurrency Mining LLC
470 Park Avenue South
New York, NY 10016

US Customs & Border Protection
6650 Telecom Drive, #100
6650 Telecom Drive, #100
Indianapolis, IN 46278

CSC
3462 Solution Center
Chicago, IL 60677-3004

AlphaCraft Technologies, LLC
601 Railroad Ave.
South Boston, VA 24592

Pro Window, Inc.
Attn: Justice White, Mgr.
1604 Virginia Beach Blvd.
Virginia Beach, VA 23452

Matthew B. Kirsner
Eckert Seamans
919 East Main St., Ste. 1300
Richmond, VA 23219

BFPE International
PO Box 791045
Baltimore, MD 21279-1045

Bay Technologies
4501 Bainbridge Blvd., #200
Chesapeake, VA 23320

CB Critical Systems
Attn: Gregory Crone
11816 Mason Park Way
Glen Allen, VA 23059

Professional Heating & Cooling, Inc.
3306 Arizona Avenue
Norfolk, VA 23513

United HealthCare
PO Box 94107
Palatine, IL 60094

Andrew Cohen
3750 Jefferson Blvd.
Virginia Beach, VA 23455

Aon Risk Services Northeast, Inc.
PO Box 7247-73676
Philadelphia, PA 19170-7376

Asgard Partners & Co, LLC
12 East 49th St.
New York, NY 10017

Boyk, William
982 Dakota Circle
Naperville, IL 60563

Chaman, Dawn
2324 Treesong Trail
Virginia Beach, VA 23456

Childress, Patrick
701 S. Wells St., #2001
Chicago, IL 60607

Chris Sikes
1332 Creekview Drive
Chesapeake, VA 23321

Chuck Mackie
4827 N. Hamilton
Chicago, IL 60625

Comcast
PO Box 70219
Philadelphia, PA 19176-0219

ComEd
P.O. Box 6111
Carol Stream, IL 60197-6111

Cox Business
Dept 781121
PO Box 78000
Detroit, MI 48278-1121

Cresce, Ann
5731 Hampton Dr. Long
Grove, IL 60047

FIA
2001 Pennsylvania Ave. NW, #600
Washington, DC 20006

Frederick J. Grede
500 N. Lake Shore Drive, Unit 3314
Chicago, IL 60611

GA Secretary of State - Corp. Div.
2 Martin Luther King Jr Drive SE
Suite 313 West Tower
Atlanta, GA 30334

Greenhouse Software, Inc.
PO Box 392683
Pittsburgh, PA 15251-9683

Greenwich Centre Investors, L.C.
c/o Robinson Development Group
150 W. Main St., #1100
Norfolk, VA 23510

Health Equity, Inc.
15 W. Scenic Pointe Drive, #100
Draper, UT 84020

HireRight, LLC
PO Box 847891
Dallas, TX 75284-7891

Jeff Brandt
601 Tradewind Circle
Newport News, VA 23602-6324

John Ashby
1440 W. Little Neck Road
Virginia Beach, VA 23452

Justin Taylor
7507 S. Morgan St.
Chicago, IL 60620

K&L Gates LLP
PO Box 844255
Boston, MA 02284-4255

Karen Rai
921 Atlantic Ave., #1401
Virginia Beach, VA  23451

Legal Resources
2877 Guardian Lane, #101
Virginia Beach, VA 23452

MA Commonwealth
William Francis Galvin
One Ashburton Place, Room 1717
Boston, MA 02108-1512

Marc Nagel
680 N. Lake Shore Drive, #419
Chicago, IL 60611

Mayo Insurance Agency Inc.
1917 Laskin Road, #101
Virginia Beach, VA 23450

Meltwater News US Inc.
Dept LA 2372
Pasadena, CA 91185-3721

Patrick S. Childress
701 S. Wells St., #2001
Chicago, IL 60607

Paul Wong
4020 Church Point Road
Virginia Beach, VA 23455

Pinnacle Group
208 Golden Oak Court, #121
Virginia Beach, VA 23452

RI Department of State
Division of Business Services
148 W. River St.
Providence, RI 02904-2615

{8136137;10 }                    23

Sayler, Brian
48 Bensam Place
Glencoe, IL 60022

SoftVision Consulting LLC
Two Midtown Plaza
1349 W. Peachtree St., N.E., #1375
Atlanta, GA 30309

Sun Life Financial
PO Box 7247-0381
Philadelphia, PA 19170-0381

Tradehelm, Inc.
27 N. Wacker Dr., #103
Chicago, IL 60606

UNUM – Dental
PO Box 406990
Atlanta, GA  30384

UNUM – LTD/B Life
PO Box 406990
Atlanta, GA  30384

UNUM – STD
PO Box 406990
Virginia Beach, VA  23455

UNUM – Vision
PO Box 406990
Eaton Park, FL  33840

Alliance Material Handling
PO Box 62050
Baltimore, MD  21264-2050

Bruce Pollack
167 Park Ave
Glencoe, IL  60022

EF Flake, Thomas
709 Roosevelt Avenue
Virginia Beach, VA  23452

Fidelity Labs LLC
200 Seaport Boulevard
Boston, MA 02210

FRMO Corporation
One North Lexington Ave., #12-C
White Plains, NY  10601

G Hogan Commercial Cleaning
645 Estates Way
Chesapeake, VA  23320

Horizon Kinetics LLC
470 Park Avenue South
New York, NY 10016

Image 360
118 Pennsylvania Ave.
Virginia Beach, VA 23462
Jack Frost Enterprises
3168 Holland Road
Virginia Beach, VA  23453

Johns Brothers Security
310 E. Street
Hampton, VA 23661

Joseph LaMontagne
582 Lynnhaven Parkway
Virginia Beach, VA 23452

Michael Adolphi
4404 Muddy Creek Road
Virginia Beach, VA 23457

The Water H2Ole, Inc
1444 Southern Blvd., #C2-A
Virginia Beach, VA  23454

Verizon
PO Box 15043
Albany, NY  12212-5043

/s/ David A. Agay