# EXHIBIT B

Page 1

1               IN THE UNITED STATES BANKRUPTCY COURT

2                  NORTHERN DISTRICT OF ILLINOIS

3                       EASTERN DIVISION

4

5    IN RE:                    )  Chapter 11

6                              )

7    BCAUSE MINING, LLC, et al.,  )  No. 19-10562

8               Debtors.        )

9                              )

10

11         The deposition of THOMAS FLAKE, called for

12   examination pursuant to the Rules of Civil

13   Procedure for the United States Bankruptcy Courts

14   pertaining to the taking of depositions, taken

15   before Raelene Stamm, a Certified Shorthand

16   Reporter licensed by the State of Illinois, at

17   300 North LaSalle Street, Suite 1400, Chicago,

18   Illinois, on the 3rd day of June, 2019, at the hour

19   of 1:00 p.m.

20

21

22

23   Reported by:  RAELENE STAMM, CSR

24   License No.:  084-004445

Page 2

```
 1      APPEARANCES:
 2          MCDONALD HOPKINS, LLC
            BY:  MR. DAVID A. AGAY
 3          300 North LaSalle Street
            Suite 1400
 4          Chicago, Illinois  60654
            (312) 642-2217
 5          dagay@mcdonaldhopkins.com
                On behalf of WESCO Distribution;
 6
            CRANE SIMON CLAR & DAN
 7          BY:  MR. SCOTT R. CLAR
            135 South LaSalle Street
 8          Suite 3705
            Chicago, Illinois  60603
 9          (312) 641-6777
            sclar@craneheyman.com
10              On behalf of BCause, LLC;
11          FREEBORN & PETERS, LLP
            BY:  MS. ELIZABETH L. JANCZAK
12          311 South Wacker Drive
            Suite 3000
13          Chicago, Illinois  60606
            (312) 360-6000
14          ejanczak@freeborn.com
                On behalf of the Official Committee
15              of Unsecured Creditors of BCause
                Mining, LLC, and BCause, LLC;
16
            FOX ROTHSCHILD, LLP
17          BY:  MS. CHRISTINA M. SANFELIPPO
            321 North Clark Street
18          Suite 800
            (312) 541-0151
19          csanfelippo@foxrothschild.com
                On behalf of BMG Operations, Ltd.
20
21
22
23
24
```

1                          I N D E X

2    WITNESS                          EXAMINATION

3    THOMAS FLAKE

4        By Mr. Agay                      4

5        By Ms. Janczak                   228

6

7

8

9                      E X H I B I T S

10   NUMBER                           IDENTIFICATION

11   Flake Deposition

12   Exhibit 1  Business plan                    6

13   Exhibit 2  BCause balance sheet unaudited   25

14   Exhibit 3  SBI Hosting Service Agreement    43

15   Exhibit 4  BMG Hosting Service Agreement    48

16   Exhibit 5  St. Bitts Hosting Service        53

17              Agreement

18   Exhibit 6  St. Bitts amended Hosting        53

19              Service Agreement

20   Exhibit 7  Letter from James Smith          92

21   Exhibit 8  May 7, 2019 article              147

22

23            (Exhibits retained by reporter.)

24

Page 4

1              (WHEREUPON, the witness was

2              duly sworn.)

3                   THOMAS FLAKE,

4    called as a witness herein, having been first duly

5    sworn, was examined and testified as follows:

6                   EXAMINATION

7    BY MR. AGAY:

8         Q.   Please state your name for the record.

9         A.   Thomas Flake.

10        Q.   Tom, have you ever been deposed?

11        A.   I think yes, but it was quite a while ago.

12        Q.   Okay.  Was it a setting like this?

13        A.   No.  I sat as an expert witness on a

14   completely unrelated matter.

15        Q.   I would like to go over some ground rules

16   so that we all understand where we're going and so

17   on and so forth.  So I'm going to ask you a number

18   of questions.  If you don't understand the

19   question, please say so.  If I'm speaking too fast,

20   ask me to slow down.  If you answer, I'm going to

21   assume that you understood the question; is that

22   fair?

23        A.   Fair.

24        Q.   Okay.  When answering, please make audible

Page 5

1    responses for the court reporter rather than

2    shaking your head yes or no.

3         A.    I understand.

4         Q.    You will notice the court reporter here

5    recording everything we say.  For a clear record it

6    is important we do not talk over each other.

7    Accordingly, if you would please wait to finish my

8    questions before speaking, and I will do my best to

9    provide the same courtesy when you are speaking.

10        A.    Sounds fair.

11        Q.    All right.  Lastly, this is a marathon,

12   not a sprint.  So please let me know if you need a

13   break.  Our bathrooms are under construction, so

14   you got to go up to 20, unfortunately.  That said,

15   we will not take breaks while a question is

16   pending, okay?

17        A.    Sounds good.

18        Q.    Did you meet with your counsel to prepare

19   for the deposition?

20        A.    I did.

21        Q.    And who is that?

22        A.    Scott Clar.

23        Q.    Is he the only person you met with?

24        A.    He is the only person I met with.

Page 6

1    Q.   Okay.  When did you meet with him?

2    A.   This morning after my flight arrived.

3    Q.   Okay.  How long did those meetings take?

4    A.   Roughly an hour and a half.

5    Q.   And you said you only met with him once?

6    A.   Yes.

7    Q.   Nobody else is present at those meetings?

8    A.   No.

9    Q.   Do you understand that you are represented

10   today?

11   A.   I do.

12   Q.   By?

13   A.   Scott Clar.

14   Q.   Okay.

15   MR. AGAY:  I'm going to mark as Exhibit 1 what

16   I understand to be the most current version of your

17   business plan.

18                   (WHEREUPON, Flake Deposition

19                    Exhibit No. 1 was marked for

20                    identification.)

21   MR. AGAY:  I just handed the witness a copy of

22   the business plan as I understand it to be.

23        Do you guys need copies?

24   MR. CLAR:  Yeah.

Page 7

1  BY MR. AGAY:

2      Q.   Mr. Flake, could you tell me what I just

3  handed you?

4      A.   A copy of a slide deck that represents our

5  business plan.

6      Q.   Okay.  Did you prepare it?

7      A.   I did prepare it, yes.

8      Q.   Okay.  Just you or did anybody assist?

9      A.   I had some assistance from the controller

10  of our company and some of the other personnel at

11  the company in setting some of the facts straight.

12      Q.   All right.  When did you prepare it?

13      A.   Over the course of the last three weeks.

14      Q.   Okay.  Why did you prepare it?

15      A.   It's my understanding that at some point

16  to exit the bankruptcy, one of the things we're

17  required to do within 120 days is to submit a

18  business plan.

19      Q.   Okay.  You're aware that my client, WESCO,

20  filed a motion to dismiss the bankruptcy case?

21      A.   I am aware.

22      Q.   Did you prepare this before or after we

23  filed the motion to dismiss?

24      A.   You'd have to tell me what date you filed.

Page 8

1      MR. CLAR:  Yeah.  I don't really understand the

2   question.  You have to put it in a time frame.

3   BY MR. AGAY:

4      Q.   All right.  Let me put -- when did you

5   guys first start the process of preparing a

6   business plan?

7      A.   We have maintained a business plan

8   throughout the course of the business.  It's a

9   living document in our mind.  So the question from

10  my perspective that you just asked, I need to know

11  the date, but it's been sort of an ongoing process.

12     Q.   So this document is not a new document?

13     A.   In its current form it is a new document,

14  but its constituent parts are not necessarily new.

15     Q.   Okay.  So a prior version of this existed

16  prior to the bankruptcy case?

17     A.   Absolutely.

18     Q.   Okay.  And how many versions of this have

19  you produced since the filing of the bankruptcy

20  case?

21     MR. CLAR:  Produced or --

22     THE WITNESS:  I think this is Version 9.

23     MR. AGAY:  Produced meaning generated.

24     THE WITNESS:  I think this is Version 9, but

Page 9

1   it's an iterative process.  So, for instance, if I

2   prepare something and I send it to my controller

3   for purposes of configuration management, we would

4   number the next version if she made some changes to

5   it, substantive or not, as version -- the next

6   verse, you know, the next increment.  So if I sent

7   it to her as eight, I would get it back as nine, as

8   an example.

9   BY MR. AGAY:

10      Q.    Are you aware of the version that is

11   currently on file with the bankruptcy court?

12      A.    I am.

13      Q.    Is this the version currently on file in

14   the bankruptcy court?

15      A.    There are parts of it that are.  So if,

16   for instance, you were to look at the plan, Part 1,

17   the first 30 days, the subsequent two spreadsheets

18   in there you will find are the same as what I

19   believe were Exhibit 1 and 2 when we testified

20   three weeks ago.

21      Q.    Okay.  But it's not completely the same?

22      A.    I don't believe that anything other than

23   Exhibit 1 and 2 were submitted to the court.

24      Q.    Okay.  Have all of the versions of the

Page 10

1   business plan that you have generated since the

2   beginning of the case either been filed with the

3   court or are in front of you?  Are there any we

4   haven't seen?

5       A.   There are a number of versions you haven't

6   seen as we've sort of iterated on the process, yes.

7       Q.   Since the filing of the bankruptcy case?

8       A.   Yes.

9       MR. AGAY:  Can I get copies of those?

10      MR. CLAR:  I don't know what we're talking

11  about, but can you get -- can you get -- no,

12  probably not.  You can get what we're using.

13      MR. AGAY:  Okay.

14  BY MR. AGAY:

15      Q.   In preparing either this version or any

16  prior versions of your business plan, did you

17  consult with counsel?

18      A.   We have an ongoing phone conversation

19  because I reside in Virginia Beach, and that's

20  where most of this work is going on, but I can't

21  tell you specifically what had to do with the

22  business plan.

23      Q.   Okay.  Did your counsel review this before

24  sending it to us?

Page 11

1       A.    Yes, I believe so.

2       Q.    Did you get feedback from counsel?

3       A.    Yes, I believe so.

4       Q.    Okay.  Have you consulted with counsel to

5  the Creditors Committee or any other counsel other

6  than your own in connection with this business

7  plan?

8       A.    No, I have not.

9       Q.    You've only consulted with your own

10  counsel?

11      A.    Yes, sir.

12      Q.    And that's Scott Clar?

13      A.    Yes, sir.

14      Q.    Okay.  Why did you -- strike that.

15            Why did you amend the business plan again

16  after the last filing you made with the bankruptcy

17  court?

18      A.    Well, because when we made the last filing

19  with the bankruptcy court, the business plan was

20  not current with reference to everything that we

21  understood to be the case up to that point.  So as

22  I said, this is a living document, and we edited

23  it.  We amended it as facts on the ground changed.

24            As an example, what you'll find in here

Page 12

1   where we say the next 90 days, we believe that the

2   chairman of our company is in the process of

3   raising an external round of funding.  And that

4   wasn't the case three weeks ago, and so it required

5   an amendment to that to reflect that, just as an

6   example.

7      Q.   Okay.  And we're going to walk through all

8   of the slides, so we'll talk about whether there

9   are any other differences between that and those

10   you filed with the court.

11     A.   Sure.

12     Q.   Before I jump into the substance of the

13  slides themselves, I want to talk a little bit

14  about your bank account.

15         Where does -- where do the debtors

16  currently deposit their money?

17     A.   Lakeside Bank here in Chicago.

18     Q.   Is that your only bank account?

19     A.   It is our only bank account.

20     Q.   What's the current balance on that bank

21  account?

22     A.   I don't know.

23     Q.   Approximately?

24     A.   Well --

Page 13

1      MR. CLAR:  If you know --

2      THE WITNESS:  -- we just had accounts --

3      MR. CLAR:  If you don't know, you don't know.

4      THE WITNESS:  Well, approximately, I know

5   approximately because we had receipts yesterday.

6   It's probably in excess of $1,000,000 at this

7   moment.

8      MR. AGAY:  Off the record.

9                    (WHEREUPON, a discussion was had

10                    off the record.)

11  BY MR. AGAY:

12     Q.    You think there's approximately $1,000,000

13  in the bank?

14     A.    I would estimate slightly more than that

15  at this moment.

16     Q.    All right.  Fair enough.

17           When did you open that bank account?

18     A.    Approximately 10 months ago.

19     Q.    Did you have another bankruptcy bank

20  account prior that?

21     A.    We did.

22     Q.    Where was that?

23     A.    Town Bank in Virginia Beach.

24     Q.    Was that your only bank account at that

Page 14

1  point?

2      A.    It was.

3      Q.    Okay.  And how long had you been

4  depositing money in that bank account?

5      A.    Probability for five years.

6      Q.    Why did you move bank accounts?

7      A.    Because they along with other banks

8  recognized that cryptocurrency is a threat to their

9  business model, and they have chosen not to do

10  business with companies that engage with

11  cryptocurrency.

12      Q.    So the bank informed you that they could

13  no longer take your deposits?

14      A.    That is true.

15      Q.    Okay.  And thereafter you moved it to

16  Lakeside Bank?

17      A.    Yes.

18      Q.    And did you have to go through a process

19  of understanding whether Lakeside Bank would accept

20  your money?

21      A.    Yes, we did.

22      Q.    Are they the only bank out there that

23  would accept your money?

24      A.    They're not the only one.  But because

Page 15

1   they're in Chicago and we have offices here,

2   they're in proximity so there's some advantage to

3   that.

4        Q.    What's the advantage?

5        A.    Having proximity and a relationship with

6   your banker, I think that's obvious.

7        Q.    And then why not another bank in Virginia?

8        A.    Because the offices here in Chicago were

9   close and because our CEO was here and because our

10  CFO was here.  There were just a lot of good

11  reasons.

12       Q.    Okay.

13       A.    Personnel at BCause had relationship with

14  the people at Lakeside.  They knew them.

15       Q.    Explain to me the function of the Chicago

16  office versus what occurs down in Virginia Beach.

17       A.    So the folks in Chicago were responsible

18  for operation of an anticipated derivatives market,

19  the creation of the software necessary to interface

20  for anti-money laundering, KYC, which is know your

21  customer, money transmitter, and our relationship

22  with NASDAQ was with personnel here, as well as

23  generating relationships with people in the market

24  making and liquidity provider businesses.

Page 16

1      Q.    Okay.  And then what do the folks do down

2   in Virginia Beach?

3      A.    Administrative functions in terms of human

4   resources and financial controls, as well as the

5   operation of the mining portion of the company.

6      Q.    So your hosting facility is down in

7   Virginia Beach?

8      A.    It is.

9      Q.    Okay.  If we could turn back to Exhibit 1

10  which I have in front of you and turn to Slide 2,

11  please?

12     A.    Yes.

13     Q.    Are there any differences between this

14  slide and the slide that you have on file with the

15  bankruptcy court?

16     A.    I don't believe we have any replica of

17  this slide on file with the court.

18     Q.    Okay.  You do, but that's okay.

19     A.    Okay.  It was unbeknownst to me.

20     Q.    Okay.  Do you plan on filing this with the

21  bankruptcy court?

22     MR. CLAR:  What's this?

23     MR. AGAY:  Exhibit 1.

24     THE WITNESS:  I believe so or at least some

Page 17

1    facsimile of it.  I don't know that it's in its

2    current or its final form yet.  I would say its

3    final form will be determined by, for instance,

4    negotiations with your client.

5    BY MR. AGAY:

6        Q.   Okay.  But are you aware that this

7    business plan is gonna be the subject of the

8    hearing on the 21st?

9        A.   I am.

10       Q.   Okay.  So do you plan to use this business

11   plan to support your presentation on the 21st?

12       A.   This or something very close to it, yes.

13       Q.   All right.  At the top you say, our

14   objective for entering into Chapter 11

15   reorganization is to mitigate the effect of several

16   errors by management.  What were those errors?

17       A.   I believe that we underappreciated the

18   cost that it would take to accommodate the mining

19   contracts that we have won, and I believe that we

20   were overly optimistic in the amount of time it

21   would take to launch a spot market.  In both of

22   those cases, they led to excessive costs.  I think

23   that we also underappreciated the fact that in

24   the -- from the middle of last year to the end of

Page 18

1    last year, the deterioration that would occur an

2    the exchange value of Bitcoin.

3        Q.    Okay.  Who are the individuals on the

4    current management team?

5        A.    In a day-to-day management role, Christy

6    Vausen is the controller.  Dawn Chapman is the head

7    of human resources.  Sean Daily is the head of

8    mining operations.  Bruce Pollack is head of spot

9    exchange operations.  And I'm acting as CEO right

10   now.

11       Q.    Okay.  Any other officers or --

12       A.    Not currently.

13       Q.    -- other individuals involved in

14   management?

15       A.    Not currently.

16       Q.    Of the individuals you just listed, who

17   were on the prior management team?

18       A.    All of them.

19       Q.    All of them?

20       A.    Yes.

21       Q.    Okay.  So the same -- the same individuals

22   that made the errors before are on the existing

23   management team?

24       A.    No.  I would say that prior to that there

Page 19

1   was a level of management above them, and they were

2   gotten rid of in the last head count reduction.

3       Q.   Who was that?

4       A.   Fred Grede, Kevin Fallen, Patrick

5   Childress.

6       Q.   What positions did they hold?

7       A.   CEO, and I couldn't tell you exactly off

8   the top of my head what Kevin and Pat's titles

9   were, but I could find it out for you.

10      Q.   Okay.  Did you ever have a CFO?

11      A.   We had a CFO, George Sladoji, and he has

12  left for a different opportunity.  He was not asked

13  to leave.

14      Q.   Okay.  And why did your CEO leave?

15      A.   He was asked to leave by the board.

16      Q.   Okay.  And are you stating -- is your

17  testimony today that the former CEO, Mr. Grede, is

18  responsible for the prior management errors?

19      A.   It is my testimony today that he was the

20  CEO, and he no longer is.

21      Q.   Okay.  Well, then who was responsible for

22  those prior errors?

23      A.   I would say that in a management team it's

24  the team's responsibility.

Page 20

1      Q.    Have those individuals been replaced?

2      A.    They have not, but there is an active

3   search for a CFO and an inside counsel.

4      Q.    Have you lost your inside counsel?

5      A.    We have.

6      Q.    Who is that?

7      A.    Ann Creshe.

8      Q.    So she's no longer with the company?

9      A.    She is not.

10     Q.    As of when?

11     A.    A week ago last Friday.  So, yeah, a week

12  ago last Friday.

13     Q.    Was she asked to leave?

14     A.    She was not.

15     Q.    Why did she quit?

16     A.    You have to ask Miss Creshe.

17     Q.    She didn't give you a reason?

18     A.    She did not.

19     Q.    Okay.  So since the beginning of the case,

20  you've lost your CEO, CFO and general counsel,

21  correct?

22     A.    Yes.

23     Q.    Okay.

24     A.    But the CFO and internal counsel were not

Page 21

1   asked to leave whereas the CEO and others were.

2       Q.   Okay.  As of right now you have an active

3   search for a new CFO?

4       A.   We do.

5       Q.   Okay.  But not to replace anybody else?

6       A.   And internal counsel.

7       Q.   I'm sorry.  You did say that.

8            Okay.  How are the past management errors

9   now being fixed?

10      A.   Well, I would say there's a variety of

11  strategies that are in place, cost reductions that

12  we both executed and we plan to execute, more

13  intensive communication strategy between offices,

14  and a more formal planning process as far as the

15  path of the company moving forward.

16      Q.   Okay.  Any specific actions that you can

17  cite to that have occurred since the beginning of

18  the case?

19      A.   As far as from a cost savings perspective?

20      Q.   Yes.

21      A.   Yeah.  So we've reduced our head count.

22  We've laid off seven people.  That reduced our

23  head -- our payroll expenses by approximately

24  $16,000 every two weeks, so about 33, $34,000 a

Page 22

1   month.  We intend to reject an agreement with

2   Century Link which will save another roughly $5,000

3   a month.  We plan to reject the lease associated

4   with the administrative offices in Virginia Beach

5   in favor of getting smaller, less costly offices.

6   That'll save about $1,500 a month.  And we plan to

7   reject the lease here in Chicago in favor of

8   getting smaller offices which should save about

9   $5,000 a month.

10       Q.   Have you actually found space to replace

11   the Virginia Beach space that you intend to reject?

12       A.   We have not yet.  But the plan for that is

13   August 1, and the people in Virginia Beach

14   recognize there's a deadline of that by July 1.

15       Q.   Okay.  Is the cost of that space built

16   into your budget currently?

17       A.   The cost of the Chicago office is

18   appropriately represented in the next 90-day plan.

19   But the cost associated with the savings in the

20   Virginia Beach would be accretive to that plan.  In

21   other words, it would -- we would perform better

22   than the plan as presented.

23       Q.   And does that take into account any

24   deposit you'll have to make?

Page 23

1      A.    We believe it does because there's

2  currently a very large deposit on the offices here

3  in Chicago, about $37,000 if memory serves.  And we

4  don't believe that upcoming offices would require

5  quite such a large department.

6      Q.    So you're assume that you'll get that

7  entire deposit back from your current landlord?

8      A.    Some fraction of it.

9      Q.    What fraction?

10      A.    About two thirds.

11      Q.    And how did you come up with that?

12      A.    It's notional for planning purposes, but

13  we recognize that most landlords would find some

14  reason not to give the entire deposit back.

15      Q.    Okay.  If we could go down to the first

16  bullet on the second slide, it says, we believe

17  there is significant value in the company we have

18  built both intrinsic, and then you have a

19  parenthetical, and operational, another

20  parenthetical.

21          What do you mean by intrinsic value?

22      A.    Intrinsic value would be something that

23  has worth in and of itself.  That's the definition

24  of the word intrinsic.  And in and of itself would

Page 24

1    mean that, as an example, there is the opportunity

2    in terms of those assets to depreciate them over

3    time, and any company that had net profits would

4    see value in being able to write off some fraction

5    of that.  So there's a market value in that.

6       Q.    Okay.  Let's unpackage that a little bit.

7       A.    Sure.

8       Q.    You have a parenthetical right after the

9    word intrinsic stating over $16.8 million in

10   assets.

11      A.    Uh-huh.

12      Q.    I take it that's what you mean by asset

13   value?

14      A.    Yeah.  In the typical GAP recognized term

15   of assets, it sits on our balance sheet.

16      Q.    So that's book value?

17      A.    Book value is a term of art.  I would say

18   that assets on the -- assets on our balance sheet

19   are 16 -- in excess of $16.8 million.

20      Q.    And you haven't taken any depreciation on

21   those assets to date?

22      A.    We've taken the depreciation that's

23   appropriate under GAP.

24      Q.    And so under GAP, what are those assets

Page 25

1   currently worth on your balance sheet?

2       A.   I'd have to look, but there's an

3   accumulated depreciation line on the balance sheet.

4   I just don't know off the top of my head what it is

5   in terms of the quantity of that.  I would

6   estimate, though, that it's about $1.2 million

7   because it's a 10-year amortization, and most of

8   these assets were put in place after May of last

9   year, roughly May of last year, so . . .

10       Q.   Bear with me for a second.

11       A.   Sure.

12       MR. AGAY:  I'm going to mark Exhibit 2.  It is

13   entitled the BCause balance sheet unaudited.

14                       (WHEREUPON, Flake Deposition

15                       Exhibit No. 2 was marked for

16                       identification.)

17   BY MR. AGAY:

18       Q.   All right.  Mr. Flake, could you describe

19   what I just handed to you?

20       A.   It says, BCause balance sheet unaudited,

21   dated March 31 of 2019.

22       Q.   Okay.  Is this your most recent balance

23   sheet?

24       A.   It is.

Page 26

1   Q.   And under total assets, what amount is

2   that?

3   A.   $16.8 million.

4   Q.   Approximately?

5   A.   $16,867,526.

6   Q.   And that's the 16.8 million you refer to

7   in this slide?

8   A.   It is.

9   Q.   Okay.  And is that net of depreciation?

10  A.   It is.  You can see accumulated

11  depreciated on Line 16 fixed assets.

12  Q.   Okay.  What is the liquidation value of

13  these assets are today?

14  A.   We estimate that the hard assets that

15  could be liquidated are valued slightly less than a

16  million dollars, maybe $900,000.

17  Q.   Okay.  So I guess I come back to my

18  question.  If the liquidation value of these assets

19  are less than a million dollars, what do you mean

20  here by the intrinsic value of the assets of the

21  16.8 million?

22  A.   So it's our view that the company is worth

23  far more operating than it is liquidated.

24  Q.   Okay.  Do you think it's worth

Page 27

1   16.8 million?

2      A.   We think it's worth probably about

3   $12 million, yes.

4      Q.   And we're gonna come back to that, but is

5   that based on the value of the assets on your

6   balance sheet?

7      A.   No.   It's based on the value of the

8   company in its operational status.

9      Q.   Okay.   You mentioned taking the

10  depreciation.   By that do you mean as a tax

11  attribute?

12     A.   Yes.   So, again, these assets get

13  depreciated over 10 years.

14     Q.   Yeah.

15     A.   And only one year of that depreciation has

16  been taken.   So over the next -- over the next

17  nine years, there'd be about $9 million in tax

18  advantage to some entity that was looking to write

19  off other profits they had in other areas of their

20  business.

21     Q.   Okay.   Has this business ever generated

22  profits?

23     A.   On what period?   On a monthly period, yes.

24  On a quarterly basis, yes.   On an annual basis, no.

Page 28

1     Q.   Okay. So are you saying that you've never

2 had profits against which you can use that

3 depreciation?

4     A.   So I got to understand your question

5 because -- so now we're in my field of expertise,

6 and you're not using the terms of art properly.

7     Q.   Okay. Answer the question as you

8 understood it.

9     A.   So the company has never showed a net

10 profit, but that's the difference between EBITDA

11 and net profit is that you can show an EBITDA

12 profit that is positive cash flow that is offset by

13 depreciation or amortization before you get to net

14 profit.

15     Q.   Okay. In terms of your tax returns at the

16 end of the year, do you show profits?

17     A.   We do not.

18     Q.   Okay. So if you're not showing profits on

19 your tax returns, are your -- is your depreciation

20 write-off worth anything?

21     A.   Absolutely.

22     Q.   How?

23     A.   Well, it's an LLC, and so the depreciation

24 losses are a passthrough to the owners of the LLC,

Page 29

1  not -- it's not a schedule -- it's not a C Corp.,

2  and so the losses or gains are attributable to the

3  members, not to the corporate entity.

4      Q.   Oh, okay.  So they're only -- they only

5  have value to the members of the LLC, correct?

6      A.   Under the law, an LLC can attribute those

7  losses under the operating agreement in any way

8  they see fit.  Currently they ascribe on a

9  proportional basis to our members, but that doesn't

10 have to be the way it would be in the future.

11     Q.   Do you know whether those losses are going

12 to survive the bankruptcy case?

13     A.   I would anticipate that if we continue to

14 operate, they will.

15     Q.   Okay.  But do you know that?

16     A.   There's no certainty with that.

17     Q.   All right.  If we can come back to the

18 slides.  Oh, before we move on, the one million or

19 less than one million in liquidation value, have

20 you done a formal valuation of that?

21     A.   We have not.

22     Q.   All right.

23     A.   But your client was given access to the

24 facility about 10 days ago, and I assume that

Page 30

1    they're doing that.  And, frankly, they have more

2    expertise in the field than I do.

3        Q.    You haven't hired an appraiser?

4        A.    We have not.

5        Q.    Have you hired a liquidation company?

6        A.    We have not.  But that would not be in

7    accordance with the budget we submitted to the

8    court.

9        Q.    Okay.  If we keep reading in that bullet,

10   it says, and operational.  And then there's a

11   parens, greater than one million per month in

12   revenue and over $110,000 -- actually, strike that

13   question.  I'm sorry.  I moved on too quickly.

14            I believe you testified that the debtor's

15   assets are currently depreciating, correct?

16       A.    Yes.

17       Q.    Okay.  At what rate are they depreciating?

18       A.    It varies depending upon the nature of the

19   asset.  They're all being depreciated in accordance

20   with GAP, but some depreciate on double declining

21   balance, some on straight line method.  There's a

22   variety of ways that a company can choose to

23   depreciate an asset.

24       Q.    How are you depreciating it?

Page 31

1    A.    I believe they're being depreciated

2    straight line method.

3    Q.    Okay.  So you don't know what the

4    depreciated value of the assets are as of today; is

5    that correct?

6    A.    Well, I do as of March 31.  They would be

7    what's book value less the accumulated

8    depreciation.

9    Q.    Okay.  What about after March 31?

10   A.    The accounting associated with bankruptcy

11   particularly since the April 11 date fell right in

12   the middle of the month is a little bit wonky.  I'd

13   be able to give you a better date here in early

14   June after we're able to close May books.  But I

15   would assume that the depreciation will continue

16   apace unaffected by that April 11 date which would

17   be about $200,000 per month.

18   Q.    200 a month?

19   A.    Well, it was $1.4 million last year out of

20   12 months.  So it's actually more like $125,000 a

21   month.

22   Q.    Okay.  Is it fair to say that the assets

23   are depreciating on a daily basis?

24   A.    It is fair to say.

Page 32

1    Q.   Okay.  Can you tell me what you mean by

2    operational value?

3    A.   Oft times companies are valued on a

4    multiple of revenue or a multiple of profit.  And

5    because we have ongoing revenue, if we value a

6    company at some fair market base multiple of that

7    operational revenue, the company has value.

8    Q.   Okay.  Are you valuing BCause as a

9    multiple of your revenue?

10    A.   In the case of the mining side of the

11    business, the answer to that is yes.  In terms of

12    talking to potential investors, we're valuing the

13    company at about 11 months revenue.

14    Q.   So just to unpackage that, basically you

15    take your top line receipts?

16    A.   Yes.

17    Q.   And you multiply them by 12?

18    A.   11 actually.

19    Q.   By 11?

20    A.   Yes.

21    Q.   Why by 11?

22    A.   Because 11 months revenue was less

23    aggressive, and it's a recognition of the fact that

24    in our business at our current stage the margins

Page 33

1    are relatively thin or comparatively thin.

2        Q.    Okay.

3        A.    And the nature of being in a bankruptcy is

4    such that we couldn't command in the marketplace a

5    multiple commensurate with a high growth company

6    which might be three or four times revenue.

7        Q.    Okay.  So you're not valuing this company

8    as a multiple of EBITDA, correct?

9        A.    We are not.

10       Q.    And you're not valuing it as multiple of

11   net income, correct?

12       A.    We are not.

13       Q.    Okay.

14       A.    We're discounted cash flow or four, five

15   other methods I could give you.  We're using

16   multiple of revenue.

17       Q.    Are you aware of other businesses that

18   value themselves as a multiple of revenue?

19       A.    Absolutely.

20       Q.    Could you give me some examples?

21       A.    The entire stock market.

22       Q.    The entire stock market?

23       A.    Yeah, price earnings or price revenue.

24       Q.    Explain that to me.

Page 34

1    A.    So it's very typical in the market for

2  companies right now to be valued as a multiple of

3  earnings, maybe 18 times earnings, but it's equally

4  true that those same companies are valued at about

5  three to four to five times revenue.

6    Q.    What do you mean by that, they're valued

7  at three to four times revenue?

8    A.    If you take their annual revenue and you

9  multiply by three, four or five, you'll generally

10 find that there is a corresponding value in the

11 stock market.

12    Q.    And your view is that those companies that

13 are listed on the stock market have their stock

14 prices set as a multiple of their revenues?

15    A.    Absolutely.  As an example, Lyft and Uber

16 have no profits.  They're valued on a multiple of

17 their revenue, and they're -- on a discounted cash

18 flow basis, they're valued on a discount of their

19 perceived or prospective growth.

20    Q.    Would you view Lyft or Uber as high growth

21 companies?

22    A.    Opinions vary.

23    Q.    Okay.

24    A.    They were, certainly.  There's some

1  evidence to suggest that some of that growth has

2  topped out.  I'll give you another example.  Amazon

3  had no profits for over 20 years.  They were always

4  valued as a multiple of revenue.

5      Q.   So the companies that you just mentioned,

6  Lyft, Uber, Amazon, were they ever in bankruptcy?

7      A.   I couldn't speak to that.

8      Q.   Okay.  Do you know?

9      A.   I don't.

10     Q.   Okay.  And do you believe that BCause

11  should be valued by the same methodology as Amazon,

12  Lyft and Uber?

13     A.   The methodology is appropriate.  The

14  discount is also appropriate.  Where they're valued

15  at three, four or five times annual revenue, we're

16  valuing the company at about 0.9 annual revenue.

17  And it's specifically because of the bankruptcy.

18     Q.   So the bankruptcy has only discounted the

19  value of the company to one times revenue

20  effectively?

21     A.   Slightly less than that.

22     Q.   Okay.  And your belief of that is based on

23  what?

24     A.   Just market experience and the fact that

Page 36

1   we were out raising money at a higher multiple

2   prior to the bankruptcy.  We're having ongoing

3   discussions with folks, and the valuation of the

4   company was -- that we were discussing at the time

5   was significantly higher.

6       Q.   Okay.  What about now in terms of your

7   discussions you're having with people now, how --

8       A.   The valuations that we presented here are

9   the discussions that we're having with folks.

10      Q.   Okay.  And have those folks indicated back

11  to you that they share your view of the value of

12  the company?

13      A.   Yes.

14      Q.   So they view the value of the company as a

15  multiple of revenue?

16      A.   I don't know what they view.  But I can

17  tell you that that's what we presented, and they've

18  accepted our ascribed value.  How they arrived at

19  that I couldn't speak to.

20      Q.   For those individuals with whom you've

21  been having those discussions, have any of them

22  committed money to the company?

23      A.   Yes.

24      Q.   Okay.  Can we talk about how much that is?

Page 37

1      A.    We believe currently it's about $350,000

2  with two other parties both being discussed with

3  about $250,000 each.  So we're trying to raise

4  $750,000 for this part of Phase 2.  And we think

5  actually by the 20th we'll have some good news for

6  you, but I can't say that for sure.  We're having

7  ongoing discussions.

8      Q.    Are those in the forms of LOIs?

9      A.    No, not yet.  They're sort of what we call

10  penciled in at this point.

11      Q.    Nothing in writing?

12      A.    No.

13      Q.    So they've made oral indications that they

14  would invest?

15      A.    Yes.

16      Q.    Any strings attached to those investments?

17      A.    Define strings for me.

18      Q.    What are the conditions for those

19  individuals making those investments?

20      A.    That they'd receive equity in exchange for

21  their investment.

22      Q.    That's it?

23      A.    Yes.

24      Q.    No other conditions attached?

1     A.    Not that I'm aware of, no.

2     Q.    Okay.  And when do you expect to receive

3  written commitments?

4     A.    We're ongoing work as discussions are

5  being had.  I couldn't tell you.

6     Q.    So you said that you're aiming to raise

7  750K?

8     A.    In an initial tranche, yes.

9     Q.    And you believe that 750K will allow the

10  company to emerge from bankruptcy?

11     A.    I don't know the technicalities of that,

12  but I believe that it will allow us to execute our

13  plan.

14     Q.    Okay.  Of that 750K, how much will go into

15  spot and how much will go into mining?

16     A.    It would go exclusively to spot, and then

17  mining has enough positive cash flow.  Because

18  along with the money going into spot, all of the

19  associated expenses associated with spot would go

20  into that corporate subsidiary.  And that would

21  offload, in our estimation, another roughly $70,000

22  a month that would be for the benefit of the

23  creditors.

24     Q.    Okay.  So as of right now you're not

Page 39

1   planning on raising any new money for mining?

2       A.   Not within the context of the bankruptcy,

3   but we do plan to raise money as soon as we've got

4   some clarity with regard to the bankruptcy, about

5   $3 million to engage in our own self-mining.

6       Q.   Okay.  So you had stated that you are

7   valuing mining as a multiple of your top line

8   revenues, correct?

9       A.   Yes.

10      Q.   Okay.  And based on that, you've raised

11  $750,000 to date or you have it penciled in?

12      A.   No.  I said $350,000 with another $250,000

13  with two other parties.

14      Q.   Fair enough.  Fair enough.

15      A.   Yeah.

16      Q.   But you also said that you don't

17  contemplate that money going into mining.  You've

18  contemplate it going into spot, correct?

19      A.   Yes.

20      Q.   And those individuals, they understand

21  that that money will go into spot and not mining,

22  correct?

23      A.   Yes.

24      Q.   Okay.  But isn't it also true that spot

Page 40

1    doesn't have any revenues today?

2        A.    Spot does not have any revenues today.

3        Q.    So what's spot worth?

4        A.    We believe spot's worth about $2 million.

5        Q.    Why is that?

6        A.    Because that's the replacement value of

7    the work that would be necessary to replace the

8    money transmitter, licenses, the FinCEN

9    registration and the software that's been developed

10   for the execution of the business, plus the

11   relationship with NASDAQ.

12       Q.    So why are you valuing mining based on a

13   multiple of top line revenues, but you're valuing

14   spot based on --

15       A.    Replacement value.

16       Q.    -- replacement value?

17       A.    Because those are appropriate

18   methodologies in those individual cases.

19       Q.    Why?

20       A.    Well, if you were to multi -- if you were

21   to value mining at replacement value, you'd come

22   out at very close to about $12 million.  So it's --

23   it works out about the same number either way.  If

24   you were to value spot as a multiple of revenue,

Page 41

1   you would get a very small number because it has no

2   revenue.  But it clearly has value, and so

3   replacement seems to be the appropriate value for a

4   transaction of that nature.

5       Q.   Okay.  Did you say that your hope is to

6   have written commitments for 750,000 by June 20?

7       A.   Yes.

8       Q.   Okay.  But you can't provide any

9   guarantees of that obviously?

10      A.   Of course not.

11      Q.   Where does the revenue of mining come

12  from?

13      A.   We have about seven customers that pay us

14  on a monthly basis.

15      Q.   Can we list those customers along with the

16  revenue stream, the monthly revenue stream?

17      A.   Can I do that from memory?  I can get

18  close.

19      Q.   Okay.  Go for it.

20      A.   SBI is our largest customer, and we get

21  approximately $400,000 a month from them.  BMG is

22  our second largest company, and we get

23  approximately $200,000 a month from them.

24  St. Bitts is our next largest customer, and we get