# EXHIBIT B

Page 42

1   approximately $200,000 a month from them.  And then

2   Inate One and Solutrix are two smaller customers

3   from which we get, I don't know, several tens of

4   thousands of dollars a month, but I couldn't give

5   you the exact number.  And I'm forgetting one or

6   two, but I'm doing this from memory.

7        Q.   No, you're doing good.  Would it surprise

8   you --

9        A.   Oh, and Fidelity is also a customer.  We

10   get a couple thousand dollars a month from them.

11        Q.   Would it surprise you that you get over

12   $500,000 a month from SBI?

13        A.   No, it doesn't surprise me.

14        Q.   Okay.  So your top three customers are

15   SBI, BMG and St. Bitts, correct?

16        A.   I think so, yes.

17        Q.   Is it fair to say that those customers

18   account for approximately $950,000 in revenue?

19        A.   That sounds about right.

20        Q.   Out of approximately a million dollars a

21   month?

22        A.   Yes.

23        MR. AGAY:  Okay.  I'm going to mark these

24   Exhibit 3.

1              (WHEREUPON, Flake Deposition

2              Exhibit No. 3 was marked for

3              identification.)

4    BY MR. AGAY:

5         Q.    Mr. Flake, what did I just hand you?

6         A.    It's a document titled, Hosting Service

7    Agreement.  That is our agreement between BCause

8    Mining and SBI Crypto.

9         Q.    Is this your current hosting agreement

10   with SBI?

11        A.    I believe so.  But there was an appendix

12   that may not be reflected here, a sub agreement

13   that may not be reflected here, a subsequent

14   agreement that was reached with them.  But it's

15   unclear that that agreement is in force, so this

16   is, I think, the current agreement.

17        Q.    Okay.  This hasn't been amended to your

18   knowledge?

19        A.    To my knowledge, no.

20        Q.    What's the effective date of this

21   agreement?

22        A.    30 November 2017.

23        Q.    Could you turn to Article 91, please?

24   It's on Page 6.

Page 44

1      A.    Yes.

2      Q.    Do you see where it says, term?

3      A.    Yes.

4      Q.    Does this state that this agreement has a

5 two-year term?

6      A.    It does.

7      Q.    Okay.  And is that your understanding of

8 the agreement?

9      A.    It is.

10      Q.    So your understanding is that this

11 agreement will expire on November 30, 2019?

12      A.    Well, the effective date, I think, is such

13 that we entered -- we began providing service to

14 them in January.  So my understanding is the

15 effective date ends or the term of the agreement

16 ends at the end of December.

17      Q.    Okay.  But that's not what the agreement

18 says, correct?

19      A.    I would say that the effective date is

20 poorly defined in this agreement.

21      Q.    Okay.  So your understanding of the

22 expiration date is different from what the

23 agreement says?

24      A.    My understanding of the agreement is

Page 45

 1  different from the way you're interpreting the

 2  effective date.

 3      Q.   Let's just agree that this agreement

 4  terminates at the end of this year, correct?  Of

 5  2019?

 6      A.   I would agree with that, yes.

 7      Q.   Okay.  And that hasn't changed, has it?

 8      A.   It has not.

 9      Q.   Okay.  Now, you see that if you go to

10  Page 6 --

11      A.   Yes.

12      Q.   -- Article 91, it says, the agreement

13  shall be automatically renewed and continued on a

14  year-to-year basis unless either party expresses

15  its intention not to renew --

16      A.   Yes.

17      Q.   -- and continue this agreement by written

18  notice to the other party two months in advance?

19      A.   Yes.

20      Q.   Have you received that notice from SBI?

21      A.   We have received at least verbal intention

22  of their desire not to continue service.  I don't

23  know if we've received written notice at this

24  point, but I would anticipate it.  I testified to

Page 46

1   that three weeks ago.

2       Q.   I think you testified that SBI is the only

3   agreement terminating this year, correct?

4       A.   I believe so.  I would add this, though,

5   since you and I spoke last, Bitcoin's gone from

6   $5800 to $8600.  At the time I expressed that I

7   thought it cryptocurrency went up in value, that it

8   was likely that SBI might change their mind.  As

9   recently as this morning, I had correspondence with

10  SBI about 3500 machines that they store with us and

11  placing those in production, and we're discussing

12  that.  For us, if that agreement were to come to

13  fruit, it would mean an additional $40,000 a month

14  on out bottom line.

15      Q.   Okay.  But they haven't to your knowledge

16  changed their view that they're going to terminate

17  this agreement at the end of this year?

18      A.   To my knowledge they have not changed

19  their view with regard to this agreement.  That's

20  correct.

21      Q.   Okay.  And they haven't indicated that

22  they're going to continue to use your facility past

23  the end of this year, correct?

24      A.   Those two things go hand in glove, yes.

Page 47

1     Q.    All right.  If you look at Article 92, it

2   says, do you see where it says, termination for

3   convenience?

4     A.    Yes.

5     Q.    Okay.  Are you aware that either party may

6   terminate this agreement without cause on at least

7   60 days prior notice?

8     A.    I am aware.

9     Q.    So you're aware that as of right now SBI

10   can terminate this agreement?

11     A.    I am aware.

12     Q.    For no cause whatsoever?

13     A.    I am aware of that.

14     Q.    Okay.  Do you see --

15     A.    Can I point something out to you though?

16     Q.    Sure.

17     A.    In order to terminate without cause,

18   they'd have to pay us the -- an amortized amount of

19   their buildout.  It would be financially disastrous

20   for them to do that.

21     Q.    So you don't expect them ever to do

22   anything like that?

23     A.    I would expect that it is cheaper for them

24   to continue service than to terminate service.

Page 48

1      Q.    Through the end of this year?

2      A.    Through the end of this year.

3      Q.    Got it.  Article 94, do you see where it

4   says, termination for insolvency or bankruptcy?

5      A.    Yes.

6      Q.    And without opining on the legal effect of

7   this --

8      MR. CLAR:  I'm not sure how you can get past

9   that, but go ahead.

10  BY MR. AGAY:

11     Q.    Do you see where it seas that either party

12  may terminate upon the liquidation or insolvency of

13  the other party?

14     A.    I do see that.

15     Q.    Were you aware of this provision?

16     A.    I was.

17                          (WHEREUPON, Flake Deposition

18                          Exhibit No. 4 was marked for

19                          identification.)

20  BY MR. AGAY:

21     Q.    I'm handing you what I've marked as

22  Exhibit 4.  Mr. Flake, what did I just hand you as

23  Exhibit 4?

24     A.    A hosting services agreement or a document

1    titled, Hosting Services Agreement between BCause

2    Mining, LLC, and BMG Operations, Limited.

3        Q.    Okay.   To your knowledge, is this the

4    current hosting agreement with BMG?

5        A.    I don't think it is.   And the reason I say

6    I don't think it is, is I believe that the middle

7    of last year we arrived at an agreement to amortize

8    some debt that they had provided us to complete our

9    buildout that extended this agreement, and I don't

10   believe that extension is reflected in this

11   agreement.

12       Q.    Okay.   So this is the only agreement

13   that's been provided to us.

14       MR. CLAR:   It's the only one I have.

15       THE WITNESS:   It's the only one I think I have

16   as well.   And I'll tell you that I believe the

17   renegotiated agreement was in the possession of

18   Fred Greed, and I can tell you that we've been

19   operating under the basis and assumption that the

20   agreement that he told us had been renegotiated had

21   been.   We've been amortizing that debt

22   appropriately.   And so we've been acting, and I

23   believe you'd have to ask BMG, but I believe

24   they've been acting as if this agreement's been

Page 50

1  extended.

2  BY MR. AGAY:

3     Q.   Okay.  But as of right now under this

4  agreement, when does this agreement terminate?

5     A.   I believe this is a two-year agreement,

6  but I can't find the term -- oh, two-year

7  agreement.

8     Q.   So when does it terminate?

9     A.   Again, it depends on the effective date.

10  I don't believe that their service went into -- I

11  don't believe that their service began to be

12  provided until March of '18, and so I believe it

13  would be March of '18.

14     Q.   Okay.  But if you look at the top of this,

15  it says the effective date is defined as

16  November 30, 2013 -- 2017, correct?

17     A.   I guess it is, yeah.

18     Q.   Okay.  And then it says, if you turn to

19  Article 9(1) under term, it says, this agreement

20  commences on the effective date, defined term, and

21  continues thereafter for a period of two years,

22  correct?

23     A.   Uh-huh, that is what it says.  Yes.

24     Q.   Okay.  So based on those words, this

Page 51

1    agreement terminates on November 30, 2019, correct?

2    A.    That would not be my understanding, but it

3    is what the words say.

4    Q.    Okay.  Do you also see under Article 9(2)

5    where it talks about termination for convenience?

6    A.    Yes.

7    Q.    Okay.  And just as with SBI, this says

8    that either party can terminate without cause on

9    60 days notice, right?  Actually, I'm sorry.

10    A.    I don't believe it does say that.

11    Q.    Okay.  What does it say then?

12    A.    I believe it says that if the value of the

13    cryptocurrency mined for two consecutive months is

14    less than the cost of hosting, then they have a

15    right to terminate the agreement.

16    Q.    Okay.  On how many days notice?

17    A.    30 days.

18    I would point out to you that that was the

19    case from October to December of last year, and

20    they did not terminate their agreement.  And today

21    that is no longer the case.  It is profitable for

22    them to mine significantly so.

23    Q.    So you don't expect them to terminate for

24    convenience?

Page 52

1      A.    I don't believe that they will.

2      Q.    All right.  Has BMG indicated whether they

3    are going to renew their hosting agreement with

4    you?

5      A.    Again, I believe our agreement is for four

6    years, and so the conversation hasn't even come up.

7    But in every case where we've discussed this

8    bankruptcy and our continued amortization of their

9    loan to us, they have expressed support for our

10   company.

11     Q.    But they haven't indicated that they're

12   going to renew?

13     A.    They have not.

14     Q.    Okay.  And as we sit here today, you don't

15   have a written agreement in your possession that

16   states this is going to extend beyond this year,

17   correct?

18     A.    I do not.

19     Q.    Okay.  And have you received formal notice

20   from BMG that they're not going to renew --

21     A.    I have not, no.

22     Q.    -- this year?

23     A.    Though I think somewhere in there there's

24   a double negative.

Page 53

1    Q.   Sure.

2    MR. AGAY:   Let's call this 5 and 6.

3              (WHEREUPON, Flake Deposition

4              Exhibit Nos. 5 and 6 were marked

5              for identification.)

6    BY MR. AGAY:

7    Q.   Okay.  Mr. Flake, what did I just hand you

8    labeled Exhibits 5 and 6?

9    A.   Exhibit 5 is a hosting services agreement

10   between BCause Mining, LLC, and St. Bitts.  And

11   hosting services -- Exhibit 6 is a hosting services

12   agreement between BCause -- also between BCause

13   Mining and St. Bitts.

14   Q.   Okay.  Is Exhibit 6 an amendment of the

15   original agreement?

16   A.   Yes.

17   Q.   Okay.  If you can turn back to Exhibit 5,

18   please?

19   A.   Yes.

20   Q.   What is the effective date of this

21   agreement?

22   A.   30 December 2017.

23   Q.   And if you turn to Article 91 on Page 7?

24   A.   Okay.

Page 54

1      Q.    When does this agreement terminate?

2      A.    It's a two-year agreement.

3      Q.    From when?

4      A.    From the effective date.

5      Q.    Okay.  So under this original hosting

6  agreement with St. Bitts, their hosting arrangement

7  expires on December 30, 2019; is that correct?

8      A.    I don't believe so.  We've had this

9  discussion on previous agreements.  Their service

10  did not begin until May of 2020, so I don't believe

11  their effective date was until May of 2020.  But we

12  can agree to disagree how effective date is

13  determined.

14      Q.    But that isn't what this says, is it?

15      A.    It is not what it says.

16      Q.    Okay.  Can you show me where in this

17  agreement it supports your interpretation of the

18  effective date?

19      A.    No.

20      Q.    Okay.  Have you received any feedback from

21  St. Bitts or BMG which support your interpretation

22  of the effective date?

23      A.    So from BMG, yes.  I was present at the

24  negotiations when we renegotiated the debt to be a

Page 55

1    four-year amortization, and that was the verbal

2    agreement we reached.  I don't have a written

3    agreement to that effect as I previously stated.

4         With regard to St. Bitts, I believe the

5    hosting services agreement amendment probably

6    supercedes this.

7         Q.   Okay.

8         A.   I guess.

9         Q.   Let's look at the amendment then.  So if

10   you look at the amendment on the whereas clause on

11   the first page, do you see where it says B?

12        A.   Yes.

13        Q.   Okay.  Could you read that for me?

14        A.   Customer desires to continue to utilize

15   BCause's services and intends to collocate certain

16   units at BCause's datacenter in Virginia Beach.

17   Such service to be covered under the terms of this

18   agreement and to begin 1 February 2019 and continue

19   until 31 December 2019.

20        Q.   Okay.  And then if you turn to Page 3 of

21   this under Article 9(1), term?

22        A.   Uh-huh.

23        Q.   Could you read that first sentence for me?

24        A.   This agreement commences on the effective

Page 56

1    date and continues thereafter until December 31,

2    2019.

3       Q.   Okay.   So was your understanding of the

4    St. Bitts hosting agreement that it terminates as

5    of December approximate 31, 2019?

6       A.   I think that's right.

7       Q.   Okay.   And have you received notice from

8    St. Bitts that they either are or are not going to

9    renew this agreement?

10      A.   We received notice upon their receiving

11   notice of our filing for bankruptcy that they

12   wanted to exercise their rights under the clause to

13   discontinue service under the bankruptcy.

14   Subsequently there was some back and forth between

15   our attorney and theirs, and to my knowledge they

16   have decided not to discontinue service.

17      Q.   Probably because your attorney told them

18   that the bankruptcy provision was not enforceable?

19      A.   I wasn't part of that conversation.

20      MR. CLAR:   Yes.   That's what we told them.

21      MR. AGAY:   That's good advice.

22

23   BY MR. AGAY:

24      Q.   Okay.   If you turn to the next page, I'm

Page 57

1   sorry, Page 4 of the amendment, is this an executed

2   version?

3       A.    This is not an executed version.

4       Q.    Was this amendment ever executed?

5       A.    I don't know.  I can tell you that I was

6   present when the amendment was negotiated, but I

7   don't know that Fred and Roger ever signed or

8   executed the agreement.

9       Q.    Okay.  So whether it's under the original

10  hosting agreement or the amendment, at least

11  according to the agreement, the hosting services

12  terminate as of December 2019?

13      A.    So I would argue that it's clear in the

14  amendment that that's the case.  I would argue it's

15  less clear under the agreement as to the effective

16  date.

17      Q.    Okay.  Why did you negotiate an amendment

18  with St. Bitts?

19      A.    Their service was impacted or their

20  startup service was impacted significantly by a

21  couple of different occurrences.  One was that we

22  were late in raising money and, therefore, being

23  able to accommodate their miners, first.  Second,

24  once that money was raised and the construction was

1    complete, it took an enormous amount of time for

2    the city inspectors to come out and approve the

3    construction.  When I say an enormous amount of

4    time, it was about two months.  Which in any other

5    business may not be but an enormous amount of time,

6    but in our business it's a considerable amount.  It

7    seemed fair to us to give them some consideration

8    for that.

9        Q.   Okay.  And what consideration did you give

10   them?

11       A.   I believe this is for fewer machines than

12   they originally contracted for.  I believe this is

13   for 3170 units, and I believe their original

14   contracted amount was 7500 as I recall.

15       Q.   Okay.  Did you reduce the rate of the

16   hosting services under the amendment?

17       A.   We did.

18       Q.   Okay.  And was that another accomodation

19   that you provided to them?

20       A.   It was.

21       Q.   Okay.  Did they demand that from you?

22       A.   Demand is a bit strong.  It was a

23   negotiated thing.

24       Q.   Okay.  So when you filed the -- I'm sorry.

Page 59

1    Strike that.

2            Once St. Bitts received notice of the

3    bankruptcy case, they called you and told you they

4    want to terminate the hosting agreement, correct?

5        A.    They did.

6        Q.    Have they since indicated to you that they

7    desire to continue that hosting agreement beyond

8    the end of this year?

9        A.    I've received no notice from them

10   regarding an intent to continue beyond the end of

11   this year.  But, again, your question presupposes

12   that the end of this year is the termination date.

13       Q.    It does.

14           Have you engaged in any discussions with

15   St. Bitts?

16       A.    I have not spoken to any personnel from

17   St. Bitts since the original call expressing a

18   desire about the bankruptcy.  Since our attorney

19   engaged with them, I haven't spoken with them at

20   all.  And they paid their bill on time this month.

21   I've got no reason to believe they're dissatisfied.

22       Q.    Okay.  Oh, could you -- on Exhibit 5,

23   could you turn to Page 7, Article 9(2), termination

24   for convenience?

Page 60

1      A.    Uh-huh.

2      Q.    Can you confirm for me that this agreement

3  on its face also allows St. Bitts to terminate

4  without cause on 60 days notice?

5      A.    It does.

6      Q.    Okay.

7      A.    But in Appendix B, similarly and

8  documented remaining amortization on improvements,

9  it would make it financially disastrous for them to

10  do that.

11      Q.    Okay.  Can you confirm -- you stated this,

12  but I'd just like to confirm it, that St. Bitts

13  received notice of the bankruptcy case?

14      A.    Well, I know they're aware of it.  I don't

15  know that they received notice.  And so if I said

16  that earlier, I don't have any firsthand knowledge

17  of that.  What I do know is they called and said,

18  we understand you're in bankruptcy.  How they came

19  to that knowledge, I don't know.

20      Q.    All right.  Can you confirm that SBI has

21  received notice of the bankruptcy case?

22      A.    Jonathan Tamnomore serves on our board,

23  and he is clearly aware.

24      MR. CLAR:  Excuse me, if you don't mind.  Yes,

Page 61

1  they have notice.

2  BY MR. AGAY:

3      Q.   And BMG has notice?

4      A.   Absolutely.

5      MR. CLAR:  Sitting here.

6  BY MR. AGAY:

7      Q.   Okay.  Part of your business plan includes

8  moving your hosting site from Virginia to North

9  Carolina, correct?

10     A.   That's one contingency, yes.

11     Q.   Have you analyzed under these contracts

12 whether you can change the hosting site without the

13 consent of the customer?

14     A.   It is our assumption that if we speak to

15 any of our clients and tell them that we can give

16 them a lower price than we currently charge them,

17 that they would gladly take that opportunity.

18     Q.   Okay.  But have you --

19     A.   But we have not -- we have not had those

20 discussions with them.

21     Q.   My question was, have you analyzed the

22 contracts to determine whether you're permitted to

23 move the hosting site without consent of the

24 customer.

Page 62

1      A.    I think it varies from contract to

2   contract.  I think there are some that say we have

3   the opportunity or we have the ability to host at

4   multiple sites and some contracts that are silent

5   on that issue.

6      Q.    Okay.  Is that belief based on your review

7   of the contracts?

8      A.    Not a recent review.  So a lot of what

9   I've testified today is from memory.

10     Q.    Okay.  You don't need to review them right

11  now.

12     A.    All right.

13     Q.    So it's fair to say that you haven't done

14  a formal analysis recently about whether you need

15  consent of the customers to move the hosting site?

16     A.    It's fair to say that that's true.  It's

17  equally fair to say that our agreement with

18  GPC Green would not require any kind of movement,

19  and we would also see improved margins.

20     Q.    Okay.  Now, when you say GPC Green, and

21  we'll get to that, you're referring to your new

22  provider of electricity?  Potential?

23     A.    They're a new potential provider.  In the

24  state of Virginia, we are -- because we have a

Page 63

1    demand that's over five megawatts, we're entitled

2    to compete our source of electricity.  GPC Green

3    approached us about six months ago with the idea of

4    generating that electricity on site.  In February

5    we met with Virginia Natural Gas to see if there

6    would be sufficient pipeline capacity, and there

7    was not.  In fact, at the time we were notified by

8    Virginia Natural Gas that it would take them

9    between 12 and 18 months to provide sufficient gas

10    for our needs.

11            Subsequently, last week in fact, we met

12    with Virginia Natural Gas again because they

13    requested it, and at that meeting they informed us

14    that they had sufficient capacity for our needs.

15    And so I would view the GPC Green agreement as

16    being more imminent now than I would have told you

17    it was three weeks ago.

18        Q.    Okay.  And we'll come back to that.  But

19    have you analyzed whether you can switch from

20    Dominion to GPC Power under any of these

21    agreements?

22        A.    The agreements are silent on who the

23    energy provider is.

24        Q.    Okay.  And you are stating that because

Page 64

1    you have recently reviewed these contracts for that

2    specific purpose?

3        A.   Yeah.   Recently defined as in February,

4    but yeah.   We looked at it when we started to talk

5    about GPC.

6        Q.   Okay.   Are you aware that BMG has asserted

7    a right of setoff against the hosting fees owed

8    BCause Mining?

9        A.   I think right of setoff is a legal term.

10   I understand that we have agreed to amortize

11   approximately half of the debt that they provided

12   to us, and we've been executing on that agreement

13   for about 12 months.   And whether that's a right of

14   setoff, whatever you just said, I don't know.

15       Q.   So, in other words, basically they can

16   offset that debt against the monthly hosting fees?

17       A.   We have been doing that to the tune of

18   about $70,000 a month.

19       Q.   But that's not in writing anywhere?

20       A.   Again, this goes back to the agreement we

21   discussed earlier.   I believe it is in writing.   I

22   was there when it was negotiated, but I don't have

23   thank writing in my possession.

24       MR. AGAY:   Scott, do you have it?

Page 65

1     MR. CLAR:  No.

2     MR. AGAY:  Okay.

3     THE WITNESS:  And both parties, frankly, have

4  been acting as if there was a writing.  I just

5  can't produce it.

6     MR. AGAY:  Do you guys have it?

7     MR. MS. SANFELIPPO:  I don't personally have

8  it.

9     MR. AGAY:  We'd obviously like to see it.

10    MR. CLAR:  If we get it.

11  BY MR. AGAY:

12    Q.   To your knowledge do either St. Bitts or

13  SBI have the right of setoff in their agreements?

14    A.   There's no loan from them.  So to my

15  knowledge, no.

16    Q.   Okay.  So they wouldn't have a right to

17  setoff against the monthly hosting fees?

18    A.   So again your question presupposes that I

19  understand what a right of setoff is.

20    Q.   Sure.

21    A.   And so we're amortizing the loan from

22  St. Bitts or from SB -- from BMG at $70,000 a

23  month, but there are no such equivalent loans from

24  either St. Bitts or SBI.  So there is no setoff for

Page 66

1    them.

2        Q.    So BCause does not owe any money as of

3    today to either SBI or St. Bitts, correct?

4        A.    That is correct.

5        Q.    Okay.  And there are no gross up

6    mechanisms or other mechanisms built into the

7    contracts where either SBI or St. Bitts can

8    unilaterally reduce the monthly hosting fees that

9    are paid to BCause, correct?

10       A.    That is correct.

11       Q.    Okay.

12       A.    And, frankly, I would argue that even BMG

13   can't do that other than subject to the $70,000

14   that we have amortized that loan at over the last

15   12 months.

16       Q.    Okay.  Have any customers threatened to

17   withhold payment?

18       A.    I'm not even sure I understand the

19   question.  Withhold payment for what cause?

20       Q.    For whatever cause?

21       A.    No.

22       Q.    So SBI has not threatened to withhold

23   payment?

24       A.    No.  They paid their bill -- in fact, they

Page 67

1    pay their bill early each month.

2        Q.   St. Bitts hasn't threatened to withhold

3    payment?

4        A.   No.

5        Q.   Other than the right to setoff, BMG hasn't

6    threatened to withhold payment?

7        A.   Even then they don't.  I mean, we have

8    voluntarily done that.  We've reached an agreement,

9    so they haven't had to threaten us for the 70 --

10   the way you ask the question sort of

11   mischaracterizes, in my opinion, the agreement

12   between us and BMG.

13       Q.   Has anybody either orally or in writing

14   stated that they are not going to pay you your

15   monthly hosting fees?

16       A.   No.  And, in fact, in April they paid us.

17   In May they paid us.  In June they paid us.  What I

18   would say is that a couple of our providers paid us

19   late, and so your question was indefinite with

20   regard to time frame.  They paid us late in

21   November and December when the exchange rates were

22   extremely low, but subsequently they've paid on

23   time.

24       Q.   All right.  So if you cannot replace the

Page 68

1    $950,000 revenue stream from SBI St. Bitts and BMG,

2    what happens to your revenues?

3         A.   Well, they'd be reduced by $950,000.

4         Q.   They go to almost zero?

5         A.   Yes.

6         Q.   Okay.  What happens to EBITDA?

7         A.   We commensurately go to almost zero.

8         Q.   What about net income?

9         A.   There is no net income.  It would become

10   less than it is now.

11        Q.   So what's the company worth on a going

12   concern basis in that scenario?

13        A.   In that scenario it would be worth a lot

14   less than it is today.

15        Q.   Would it be worth nothing?

16        A.   No.  You'd still have the book value of

17   the assets which would be $900,000.

18        Q.   You mean the liquidation value of the

19   assets?

20        A.   Yes.

21        Q.   Okay.  Plus the cash that's in the bank?

22        A.   Plus whatever cash is in the bank.

23        Q.   Plus your receivables at that point,

24   correct?

Page 69

1      A.    Yes.

2      Q.    Okay.   What happens if you cannot replace

3   or renew the $500,000 revenue stream from SBI?

4      A.    It's a similar scenario.   Our revenue

5   would go down by about $500,000.   EBITDA would go

6   down some proportionate amount.   And net income

7   would go down some amount.

8      Q.    Okay.   Would it render the company

9   nonfeasible as a going concern?

10     A.    We haven't modeled that, but I don't

11  believe so.

12     Q.    You believe you can still continue to

13  operate even if you lose SBI?

14     A.    Yes.

15     Q.    How?

16     A.    Well, understand that currently we have

17  January, February, March, about $150,000 of EBITDA.

18  That number is proportional, and so my estimate --

19  there's some fixed costs, but most of it is

20  variable cost.   The variable cost being primarily

21  electricity which is $660,000 a month roughly.   The

22  fixed cost is something more like $58,000 a month.

23  So the variable cost component of that is

24  predominant and by a lot.

1       And so if we were to lose roughly

2   50 percent of our revenue, we'd also lose 50

3   percent of our associated costs.  And so EBITDA

4   would be less, and significantly less, probably

5   60 percent less in my off-the-top-of-my-head guess.

6   But I haven't modeled it, but that would be

7   reasonable to assume.

8       Q.   And how would your existing creditors get

9   paid under that scenario?

10      A.   We haven't reached an agreement with them

11  as to how they would get paid.  But in our business

12  plan the proposal is about $75,000 a month in

13  amortized repayment.  If that were agreeable to all

14  the creditors, I'd have to do the modeling, but

15  it's possible that we'd still be able to make that

16  happen.

17          As I mentioned earlier, we've got ongoing

18  discussions with SBI for one that would add $40,000

19  a month in that single transaction to our -- to our

20  bottom line, and that covers a great fraction of

21  that agreed-to amortization or that hypothetical

22  agreed-to amortization.

23      Q.   You think even if you lose SBI you'll be

24  able to continue to make $75,000 a month in monthly

1    amortization payments?

2        A.   I believe that I've answered the fact that

3    I don't know off the top of my head, but my sense

4    is yes.

5        Q.   And what if you lose the $240,000 in

6    revenue stream from BMG?

7        A.   I think at that point it would be -- the

8    company would still be able to operate, but I think

9    our ability to repay our creditors would be greatly

10   impeded.

11       Q.   Okay.  And what if you lose the $200,000

12   revenue stream from St. Bitts?

13       A.   Again you're talking more about a

14   liquidation situation.

15       Q.   Okay.  So you think you can survive losing

16   SBI and BMG, but you can't survive losing

17   St. Bitts?

18       A.   I think I wouldn't name them, but we could

19   survive losing any two of those three customers.

20   We couldn't probably meet our obligations to our

21   creditors having lost more than one of those three

22   customers without replacing that income.

23       Q.   Have you modeled out any of those

24   scenarios that we've just been discussing?

Page 72

1      A.    Not explicitly the ones you've discussed.

2      Q.    They're not in your business plan,

3   correct?

4      A.    They're not.

5      Q.    Even those agreements terminate at the end

6   of this year?

7      A.    I didn't agree to that earlier when you

8   asked that question.  Hypothetically if they ended

9   at the end of this year, we probably should do

10   that.

11      Q.    We talked briefly before about the

12   company's plans of raising new capital.  Has the

13   company hired an investment banker or another

14   advisor to assist with that process?

15      A.    We have not.  The scale and scope of the

16   raise that we're talking about right now is within

17   the size of what you would consider to be an angels

18   or a friends and family round.  And so we're

19   primarily talking to existing stakeholders and

20   creditors.

21      Q.    Okay.  What creditors?

22      A.    AlphaCraft has indicated that they would

23   be willing to participate in this round.

24      Q.    Okay.  But you haven't received anything

Page 73

1  in writing from anybody as of today?

2      A.   No.   Those discussions are still ongoing.

3                      (WHEREUPON, a short recess was

4                      taken.)

5  BY MR. AGAY:

6      Q.   All right.   Mr. Flake, we talked about

7  your efforts to raise new capital?

8      A.   Yes.

9      Q.   Do you have a deadline for raising new

10 capital?

11     A.   No.

12     Q.   So -- well, okay, no deadline.

13          We talked about needing to retain existing

14 customers?

15     A.   Yes.

16     Q.   Do you have a deadline for understanding

17 whether you are going to retain those new

18 customers?

19     A.   Well, in particular SBI's a priority for

20 us.   And whether it's retaining SBI or replacing

21 that revenue, December is a hard deadline for us.

22 And, frankly, we'd like to have made some progress

23 on that over the course of the summer and certainly

24 into the fall.

Page 74

1      Q.    Okay.  So your view is that the Chapter 11

2   case should be allowed to continue into December

3   even if you haven't received any commitments from

4   your existing customers?

5      A.    I believe that we can demonstrate that

6   between the value of the assets and the cash in the

7   bank that WESCO is not impaired in any way by us

8   continuing to operate even if it were until

9   December because the assets maintain their value

10  through that period of time.

11     Q.    And what if you can't raise any new

12  capital until December, do you still think the

13  bankruptcy case should still continue?

14     A.    If we weren't able to raise any amount of

15  the three-quarters of a million dollars between now

16  and the end of summer, it would call into question

17  the premise of the business plan.

18     Q.    And when you say raising the new capital,

19  do you mean a written commitment?

20     A.    No.  I mean the money in the bank.  I

21  would expect that we would be able to close at

22  three-quarters of a million dollars before the end

23  of summer.

24     Q.    By end of summer you mean August 31?

Page 75

1    A.   Yes.

2    Q.   Okay.

3    A.   I mean, off the record for a moment, just

4  between you and me --

5    MR. CLAR:  No, no, no.

6    THE WITNESS:  Sorry.

7    MR. CLAR:  No such thing.

8    THE WITNESS:  Okay.

9  BY MR. AGAY:

10    Q.   Can we turn to Slide 3 where it says

11  goals?

12    A.   Yes.

13    Q.   You see where it says under one, expand

14  revenue profit of BCause Mining?

15    A.   Yes.

16    Q.   How do you plan to expand revenue?

17    A.   So can you give me a question with a time

18  frame on it?  Because that question -- the answer

19  to that question is going to vary depending on the

20  time period.

21    Q.   The question is, how do you plan to expand

22  revenue.

23    A.   You would either mine -- BCause would

24  either mine for its own account or it would find

Page 76

1   new customers for the existing products.

2        Q.    Is that incorporated into your current

3   business plan?

4        A.    Our current business plan shows no

5   expansion of revenue.  It does show an expansion of

6   profit due to cost savings measures.

7        Q.    Okay.  At --

8        A.    I mean, just frankly, anything we put in

9   there is an expansion of revenue without an

10  associated written agreement would be called into

11  question by you, so it didn't seem prudent to put

12  some hypothetical revenue expansion in there.

13       Q.    Okay.  At what point do you think the

14  company can start growing its revenue?

15       A.    I mentioned earlier a discussion that

16  we're currently having with SBI regarding putting

17  into production mining gear that we currently store

18  for SBI and splitting the proceeds, and I mentioned

19  that.  If that were to become a fact, it would

20  expand our profit margin under current exchange

21  conditions by about $40,000 a month.  From the time

22  we got that agreement with SBI, it would take us

23  about seven days to put that into effect.

24            The premise of the three-quarters of a

1   million dollars and getting that new capital into

2   the company is to launch the spot exchange.  We

3   estimate it would take six weeks from the time the

4   money went in to launch the spot exchange.

5       Q.   Okay.  Just focusing on mining for now,

6   other than the potential with SBI, do you have

7   anything else in the pipeline by way of new revenue

8   streams?

9       A.   Yes.  We've received some inquiries

10  through the website, but I believe because the

11  miners from SBI are already on site and because we

12  have a good relationship with SBI, that that's the

13  most tangible and likely actionable sort of new

14  revenue.  And so we're focused on that.

15      Q.   So if terms of these inquiries through the

16  website, for now would you say that those are not

17  yet concrete?

18      A.   They're not concrete yet.

19      Q.   And you mention spot.  As of today spot

20  has no revenues, correct?

21      A.   Spot has no revenue today.

22      Q.   And we're going to get to it, but in the

23  immediate future you don't project any revenues for

24  spot?

Page 78

1      A.    We do not because, again, that would be

2    called into question, but it's -- actually, I take

3    that back.   I think we do show about $4,000 of

4    revenue in spot.   Excuse me.   So I don't know what

5    slide number this is, but it's titled, proposed

6    budget spot.

7      Q.    Sure.

8      A.    I think what you'll see in there is

9    through 4 October there's about $4,000 in revenue.

10     Q.    Okay.   But that's not enough to crit --

11     A.    I'm not --

12     Q.    -- sustain -- I know you're not.

13     A.    I'm not positing that it is.   I'm just

14   being precise in my answer.

15     Q.    I appreciate that.

16           When does spot start generating revenue?

17     A.    February of 2020.   Well, revenue or

18   profit?

19     Q.    Revenue.

20     A.    Revenue, 30 August.   And that supposes

21   that the money goes in the second week of June.

22     Q.    Okay.   Let me ask it differently.

23           When does spot start producing a profit?

24     A.    February of 2020.

Page 79

1      Q.   And how does spot start producing profit?

2      A.   It makes its revenue on transaction

3  volume.  In other words, if you want to convert

4  dollars into Bitcoin or Bitcoin into dollars or

5  some other type of cryptocurrency, you're charged

6  several dollars on each transaction.

7      Q.   Okay.  But right now spot's not an

8  operating business, correct?

9      A.   That's correct.

10     Q.   So there are no guarantees that that's

11  gonna occur, correct?

12     A.   No.  But there's a plan.  The money would

13  go in.  It would start operation six weeks later.

14  Within 30 days it would generate some revenue, and

15  within about nine months it would be operating

16  profitably.

17     Q.   Okay.  Is the full spot business plan

18  reflected in the business plan in front of us?

19     A.   There's a three-year model associated with

20  it, but only the first roughly 14 weeks are shown

21  here.

22     Q.   Okay.

23     A.   I'm sorry, 22 weeks.

24     Q.   We'll come back to that a little bit

Page 80

1    later.  When you say Number 2, shift spot specific

2    expenses out of BCause into BCause Spot --

3        A.    Uh-huh.

4        Q.    -- what do you mean by shifting expenses

5    out?

6        A.    So as an example, we have a computer lease

7    that I think you'll find under -- this is in

8    Exhibit 1, the slide titled, Court Proposed Budget

9    Holding.  You'll see a lease, CCA Financial for

10   $18,000 a month.  We would propose to shift that

11   out of Holding and into Spot and fund that by money

12   received from external investors.  That's $18,000 a

13   month in cash flow that's currently being paid for

14   by Holding that would then be free for the benefit

15   of creditors.  That's one example.

16       Q.    Okay.  Isn't CCA Financial going to have

17   to agree to do business with Spot versus Holding?

18       A.    They wouldn't have to agree to who would

19   pay that bill.

20       Q.    Why not?

21       A.    I'm sure that if Spot sent them a check,

22   they'd cash it.

23       Q.    No, I understand, but they're now doing

24   business with a different company.

1      A.    They're doing business with a different

2   subsidiary of the same company.

3      Q.    Let me ask it differently.

4           How do you know that CCA Financial is

5   going to continue to do business with Spot?

6      A.    I don't.  But what I do know is if they

7   didn't, we would find a different -- we would

8   reject their contract under the bankruptcy and find

9   a different finance company for the miners or for

10  the computers.

11     Q.    Okay.  So you believe that CCA Financial

12  is going to view Spot as an acceptable credit risk

13  on a go-forward basis?

14     A.    I believe they would.

15     Q.    Any other creditors that you're going to

16  shift into Spot?

17     A.    Yeah.  So if you look at the proposed

18  budget holding, which is still in Exhibit 1, but --

19  and again that's the title.  I'm not sure of the

20  slide number.  What you'll find is there are a

21  number of entries with arrows to their right.

22  Every one of the ones with an arrow to its right

23  would shift into Spot with the exception of one,

24  and that would be payroll.  But you'll note that

Page 82

1   payroll under the court proposed budget was $75,000

2   every two weeks.  What we've done in the model is

3   we've separated payroll into three components, the

4   mining specific component, the spot specific

5   component and costs that are appropriately shared

6   between those components such as the controller and

7   human resources.

8          So what that, in fact, does is it reduces

9   payroll attributable to the combination of holding

10  and mining from $70,000 every two weeks to about

11  $41,000 every two weeks freeing up another 30,

12  roughly, thousand dollars per week for the benefit

13  of creditors and shifts approximately $30,000 of

14  that payroll into Spot which would be paid for by

15  new investors.

16      Q.   You said that you believe CCA Financial is

17  going to continue to do business with Spot.  Do you

18  believe that Century Link, Comcast, Com Ed,

19  Fonality, and -- well, do you believe that those

20  entities are going to continue to do business with

21  Spot?

22      A.   I have no reason to doubt that they -- I

23  have no reason to suspect that they --

24      Q.   Do they know that as of today that they're

Page 83

1   going to start doing business with Spot?

2       A.   All I can tell you for certain is that

3   Century Link knows we're in the bankruptcy because

4   we're rejecting a portion of an agreement we have

5   with them.  The other ones are trivial.  I mean,

6   you're talking about $325 to Comcast.  We'll get

7   cable from somebody else.  It's inconsequential to

8   the business whether Comcast does or doesn't.

9   Somebody needs to, and we'll find a provider,

10  similarly with Fonality which is a voiceover IP

11  service.

12       So the only ones that are really relevant

13  are the computers, and I'm very comfortable that we

14  can find another funding source for those computers

15  other than CCA, but I don't have any reason to

16  suspect that CCA wouldn't continue to do business

17  with us.

18       Q.   Okay.  What's the relationship between

19  Spot and Nasdaq?

20       A.   Nasdaq is a provider of software to run an

21  exchange, but I would say that currently the

22  relationship is between BCause, LLC, and Nasdaq,

23  not between Spot.  That said, the software is

24  necessary to run in exchange for surveillance of

Page 84

1  that exchange and for the other functions that are

2  necessary to operate an exchange in good order.

3      Q.   Okay.  So Nasdaq's a critical component of

4  Spot?

5      A.   Absolutely.

6      Q.   You cannot function without Nasdaq

7  support?

8      A.   We couldn't launch in the same time frame

9  that we presented here without Nasdaq support, but

10 there are other providers of software.

11     Q.   Okay.  Have you done business with those

12 other providers of software?

13     A.   We've talk -- yes, we have.  In fact, we

14 were in the process of going down the road with

15 other providers of software when the opportunity to

16 do business with Nasdaq came up, and we chose to do

17 business with Nasdaq because it was our view that

18 their brand added significant credibility to what

19 we were doing.

20     Q.   So is there a license agreement in place

21 between Nasdaq and Holding?

22     A.   There is.

23     Q.   Okay.  There's no license agreement

24 between Nasdaq and Spot, correct?

Page 85

1      A.    I don't know.  I'll have to -- I'd have to

2   get back to you on that, but to my knowledge the

3   agreement is with Holding.

4      Q.    There would have to be a license agreement

5   between Nasdaq and Spot, correct?

6      A.    Or we'd have to be able to somehow

7   transfer the existing licensing to Spot.

8      Q.    Okay.  Are you aware that Nasdaq filed an

9   $800,000 claim in your bankruptcy case?

10     A.    I didn't know the exact amount, but I am

11  aware that they filed a claim.

12     Q.    Okay.  And in your view that's not going

13  to impact on the relationship between Spot and

14  Nasdaq?

15     A.    No.  I had a conversation with very senior

16  people from Nasdaq as recently as last week, and

17  they're very much hoping for our success.

18     Q.    So they view the $800,000 as a mulligan?

19     A.    No.  I think that it's unclear to them how

20  they're going to get paid, but in their words they

21  view our success and their ability to communicate

22  to their auditors that they have a good faith

23  ability -- or belief in our performance on the

24  contract as a way to not have to write off that

Page 86

1    contract on their quarterly reports.

2        Q.    Okay.  So they're aware of your plans to

3    start the spot market?

4        A.    They are.

5        Q.    Okay.  And have you signed a license

6    agreement or entered into any negotiations between

7    Spot and Nasdaq?

8        A.    No.  And they didn't bring up the idea

9    that they thought it might be necessary.  Honestly,

10   I don't believe that that's going to be a hurdle.

11       Q.    Okay.  Number 3, under goals, it says,

12   reduce debt burden through combination of debt

13   forgiveness, conversion to equity and amortization

14   of remaining obligations on a reasonable timeline.

15            What do you view as a reasonable timeline?

16       A.    In this case we've shown a five-year

17   amortization at 12 percent interest.

18       Q.    No.  I mean -- oh, I sorry.  So when you

19   say reasonable timeline, you mean amortization of

20   remaining obligations on a five-year timeline?

21       A.    That would be what it says, yes.

22       Q.    I took that to mean something different.

23       A.    No, no.

24       Q.    Okay.  Going to my question, though, what

Page 87

1  would be a reasonable timeline to execute this

2  plan?

3      A.   I can't speak to what's reason within the

4  context of a bankruptcy or the court, but from a

5  business perspective, assuming all the creditors

6  were agreeable, we could do this within 30 days.

7      Q.   Okay.  What if you couldn't do it within

8  30 days?

9      A.   Then it would be from the time we got

10 approval from the creditors and the court to

11 execute.

12     Q.   What if that couldn't happen until next

13 year?

14     A.   Well, some of the questions you asked

15 earlier would come into play which would be can you

16 exist beyond December successfully.  But to the

17 extent that you've seen our modeling through

18 October, there's no reason or deterioration in

19 WESCO's assets through that time, and so at least

20 October.  And we'll have nor clarity as time

21 passes.

22     Q.   Okay.  So if you can't get agreement from

23 your creditors by October, in your view does the

24 situation become less clear?

Page 88

1     A.   Well, no.  As you go down the road, you

2  gain clarity further -- I mean, the further you go,

3  the further you can see.  So I can't tell you in

4  October how far down the road we're going to see,

5  but right now we've got clarity for about five

6  months out.

7     Q.   And what if you can't get agreement from

8  your creditors?  Do you think that you can execute

9  on this plan without such an agreement?

10     A.   No, I don't think so.

11     MR. CLAR:  To the extent that that calls for a

12  legal conclusion because I can see several legal

13  points there.

14     MR. AGAY:  I'm not asking that.

15  BY MR. AGAY:

16     Q.   You can answer the question.

17     MR. CLAR:  Well, then what are you asking then?

18     MR. AGAY:  I'll ask the question.

19  BY MR. AGAY:

20     Q.   Did you understand the question?

21     A.   What I understood you to say was that

22  could we execute on the business plan without the

23  cooperation of our creditors.  And within the

24  context of the bankruptcy, I don't believe so.  I

Page 89

1   believe that we'd have to get concurrence from the

2   court and our creditors to execute on the business

3   plan.

4       Q.   So if WESCO doesn't agree to your business

5   plan and does not consent to this restructuring

6   scheme, do you believe you can execute on it?

7       MR. CLAR:  Objection, that does call for a

8   legal conclusion.

9   BY MR. AGAY:

10      Q.   You can answer it.

11      MR. CLAR:  Well, you can answer it, if you

12  understand it, sure.

13      THE WITNESS:  I don't believe that WESCO has

14  the sole decision rights in this situation.

15  By MR. AGAY:

16      Q.   If WESCO does not support your business

17  plan, do you think you can execute on it?

18      A.   I don't believe that WESCO has sole

19  decision rights in this decision.

20      Q.   If WESCO does not --

21      MR. CLAR:  How many times --

22

23  BY MR. AGAY:

24      Q.   If WESCO does not consent and does not

Page 90

1    support your business plan, do you think you can

2    execute on it?

3        MR. CLAR:  Same objection.

4        THE WITNESS:  I think there are --

5    BY MR. CLAR:

6        Q.    You can answer?

7        A.    I think there is a path forward wherein

8    WESCO's agreement or not is immaterial.

9        Q.    Okay.  So you don't believe you need

10   WESCO's support to execute on our business plan?

11       A.    I don't believe they have sole decision

12   rights in this situation, no.

13       Q.    Okay.  Who else is relevant in this

14   decision?

15       A.    I believe that the court, I believe that

16   our other creditors, and I believe that our members

17   of our LLC are all stakeholders, and all of them

18   need to sort of work together to make this happen.

19       Q.    So you believe your members of your LLC

20   are a key component of this restructuring?

21       A.    As I mentioned earlier, we're currently

22   speaking to members of our LLC to raise this

23   additional three-quarters of the million dollars,

24   so absolutely they're critical.

Page 91

1    Q.  And what if you can't retain any equity in

2  the business on a go-forward basis?

3    A.  Me personally?

4    Q.  Yes.

5    A.  Immaterial.  I only own about two percent

6  of the company right now.

7    Q.  What about your members?

8    A.  I think it would impact their motivation

9  as to whether to invest in the three-quarters of a

10  million dollars or not.

11    Q.  Okay.  We'll come back to that.  I think

12  it's Slide 5, actions taken over the last 30 days?

13    A.  Yes.

14    Q.  What do you mean by FTE reduction?

15    A.  FTE is a term that stands for full-time

16  equivalent.  It would be the amount of head count

17  that we reduced.  I mentioned earlier that we

18  reduced payroll from $86,500 every two weeks to

19  $70,000 every two weeks which is a savings of

20  almost $35,000 a month.

21    Q.  What is meant by conversations with

22  GPC Green Energy and ABE, or I'm sorry, Cube Hydro?

23    A.  Yeah.  So we spoke earlier about this idea

24  that we have a couple of alternatives to further

Page 92

1    reduce our cost of electricity.  The first one is

2    to generate on site.  That's an agreement with

3    GPC Green Energy.  Until recently we believed that

4    we didn't have enough pipeline capacity for natural

5    gas to be able to make that a reality; but as of a

6    meeting last week, we were informed by Virginia

7    Natural Gas that, in fact, we did have sufficient

8    pipeline.  And so currently GPC Green Energy is

9    seeking project financing.

10          Cube Hydro is a operator of hydroelectric

11    damns on the east coast of the United States.  They

12    have hydroelectric damn in Badin, North Carolina.

13    And we are having discussions with them about how

14    we could move our operations to Badin, and they

15    would pay for the buildout of the datacenter and

16    capitalize the costs, those costs associated with

17    the buildout into the cost of the electricity.

18                    (WHEREUPON, Flake Deposition

19                    Exhibit No. 7 was marked for

20                    identification.)

21    BY MR. AGAY:

22      Q.    I just put in front of you Exhibit 7.  Can

23    you tell me what this is?

24      A.    It's a letter I received from Skip Smith,

Page 93

1   it's signed James Smith, indicating GPC Green

2   Energy's agreement to move forward with our

3   agreement.

4        Q.   Does GPC know you're in bankruptcy?

5        A.   They do.

6        Q.   Okay.  And do you know whether entering

7   into this relationship will require court approval?

8        A.   I suspect that it will.

9        Q.   Okay.  And --

10       A.   Let me clarify my answer.  The agreement

11  with GPC dates to February of 2019, so there's an

12  agreement in place actually.  But we were -- we

13  were -- it was on the back burner until such time

14  as we received words from Virginia Natural Gas that

15  there was sufficient pipeline capacity available.

16       Q.   Okay.

17       A.   Nevertheless, I would still expect that

18  the court and creditors would have a voice in

19  whether we could move forward.

20       Q.   Okay.  If you go down to the third

21  paragraph?

22       A.   Yes.

23       Q.   Starting with the second sentence, do you

24  see where it says, as soon as the current status is

Page 94

1   concluded --

2       A.   Uh-huh.

3       Q.   -- and we have the authorization to

4   proceed, we will with all haste secure funding for

5   the first phase of the combined heat and power

6   facility, paren, CHP, install the hardware with the

7   required permits and begin the production of power

8   to the maximum limits of the fuel received?

9       A.   Yes.

10      Q.   What does this mean?

11      A.   I believe what they're referring to there

12  when they said the current status is concluded, I

13  believe they're referring to the bankruptcy, and

14  what they're looking for is some degree of clarity.

15  But subsequent to having received this letter, I

16  called Skip, and I told him that I thought that

17  obtaining funding was sort of concomitant with

18  getting some clarity.  So I think subsequent to

19  this letter they recognized that they should be

20  talking to some of their funding sources about the

21  project itself.

22          As far as first phase of combined heat and

23  power, it's anticipated ultimately that we could

24  put up to 50 megawatts of generating capacity on

Page 95

1   site, but that the first phase would only be

2   approximately 12.  Now, this is by memory.  So if

3   I'm off by a little bit, about 12 megawatts to

4   begin with because that's the capacity of the

5   pipeline that Virginia Natural Gas has identified.

6       Q.   Okay.  So GPC has to secure funding for

7   this?

8       A.   Yes.

9       Q.   How much?

10      A.   I don't know for certain.

11      Q.   Okay.  And when they go out to secure

12  funding for this, presumably they're going to

13  disclose it is for BCause, correct?

14      A.   Yes.

15      Q.   And they'll have to disclose that BCause

16  is currently in bankruptcy, correct?

17      A.   I assume so.

18      Q.   And then in terms of the required permits,

19  what are those?

20      A.   Well, what we're discussing is creating a

21  power generating capacity on our site.  So we would

22  need a building permit, as an example.

23      Q.   Any other permits?

24      A.   I'm unaware.  I'm not a general contractor

Page 96

1  in the commonwealth of Virginia, but the only one

2  I'm aware of would be sort of a general building

3  permit and then its subordinate tickets for

4  electrical and mechanical.

5      Q.    Okay.  And you have to get those from the

6  State of Virginia, correct?

7      A.    The City of Virginia Beach, not the state.

8      Q.    Okay.  And the City of Virginia Beach

9  knows you're in bankruptcy, correct?

10     A.    They do.

11     Q.    Okay.

12     A.    In fact, I point out the City of Virginia

13 Beach gave us a $500,000 grant.  They're very

14 supportive of what we're doing.

15     Q.    In terms of implementing this, did I hear

16 you say correctly that you cannot start to

17 implement this until you exit from bankruptcy?

18     A.    No.  I don't think that that's the case.

19 I think it is the case that if we're in bankruptcy

20 when we want to implement this, that we'd need the

21 creditors' and the court's agreement.  But that the

22 idea that this would lower our cost of electricity

23 from $53 to $50 a megawatt which would save us

24 about $40,000 a month, would be in our creditors'

Page 97

1  best interest to allow us to do that.

2      Q.   How long do you think it's going to take

3  GPC to raise the money to implement this?

4      A.   I couldn't say, but I will note that in

5  the fourth paragraph it says that they expect six

6  to seven months from the time they raise the money

7  that we'd be operational.

8      Q.   Okay.  So best case scenario, you're

9  talking about well into 2020 before this goes live?

10     A.   Potentially.

11     Q.   After accounting for the transition,

12  installation and implementation costs, how long

13  until BCause starts realizing cost savings from

14  this?

15     A.   The very first day.

16     Q.   How long?

17     A.   Well, it would be about six to seven

18  months plus whatever time frame it took them to

19  raise the money.

20     Q.   Okay.  And are your customers aware of

21  this proposed switch?

22     A.   I believe they are, but I don't know.  I

23  mean, it wouldn't -- we have not notified them

24  formally in writing, but I have ongoing

Page 98

1  conversations with our customers all the time.  And

2  so I can't tell you exactly how formally or with

3  what specificity I've informed any of them.  What I

4  can tell you is that in the datacenter operations

5  business there are what are known as Tier 1, Tier

6  2, Tier 3 and Tier 4 datacenters.  One of the

7  hardest things about achieving Tier 1 status as a

8  datacenter is having multiple, diverse sources of

9  power.

10         It would make us one of the only Tier 1

11  datacenters in Virginia.  And in our testimony

12  three weeks ago, I mentioned this idea that we're

13  not just about hosting mining rigs.  We can host

14  any kind of servers.  Because of this, we would be

15  one more significant step closer to being a Tier 1

16  datacenter which would make us eligible to host a

17  whole host of other computers for other providers.

18      Q.   But to host computers for other providers,

19  that would effectively be a new line of business

20  for you, correct?

21      A.   We're currently in the business of hosting

22  computers for other people.  It just happens to be

23  a specialized kind of computer right now.

24      Q.   Okay.  And I believe you testified that

Page 99

1   you analyzed whether under your existing hosting

2   agreements you would need customer consents for

3   this switch over to GPC.  Am I getting that right?

4       A.    Yeah.

5       Q.    And you don't think you would?

6       A.    We don't think we would.  In fact, the

7   switchover is as follows.  We would begin to use

8   GPC's source of energy preferentially, but it

9   wouldn't disconnect us from the grid.  In fact,

10  this would make us not only less expensive than we

11  currently are, but it would make us more reliable

12  than we currently are.  In our earlier testimony I

13  think we talked at length about a schedule or

14  Schedule 10 and A days, B days and C days.

15          Essentially, we wouldn't have to shut down

16  on A days, as an example, because this source of

17  power would be available to us.  So in every way

18  this would make us a better solution for our

19  customers than we currently are.  So there's no

20  reason to suspect that our customers would be

21  resistant to that.

22      Q.    Okay.  Could we switch over to Slide 6?

23  Could you please explain to me what this slide is?

24      A.    You're going to have to tell me Slide 6.

1     Q.    I'm sorry.  It's the core proposed budget,

2   parens, mining.

3     A.    Yeah.  Got it.

4     Q.    Thanks.

5         Are there any differences between this

6   slide and the slide currently on file with the

7   bankruptcy court, do you know?

8     A.    I don't believe there are.

9     Q.    Okay.  Can you tell me what this slide is?

10    A.    This was the slide that we proposed to the

11  court three weeks ago which was 12 or 13-week

12  budget that was requested both by WESCO's counsel

13  and by the court.

14    Q.    And do you see where it says under total

15  revenue, May 3, $1,018,577, and you have that same

16  number under May 31 also?

17    A.    Yes.

18    Q.    Okay.  Did you fully realize those

19  revenues on each of those dates?

20    A.    I believe on May 3 we were within $300 of

21  that number.  On 31 May, I don't have the final

22  tally yet.

23    Q.    Okay.  Do you know what it is as of today?

24    A.    I know it's in excess of $900,000.  I