# EXHIBIT B

Page 101

1    don't know what the exact number is so far, and I

2    know that -- or at least I believe that BMG was

3    supposed to pay their bill this morning, so --

4        Q.    Was BMG late?

5        A.    No.  It's like within a few days of the

6    things, and we just had a weekend.  So, no, we

7    wouldn't consider them to be late.

8        Q.    Did you receive payment from SBI?

9        A.    We did.

10        Q.    St. Bitts?

11        A.    We did.

12        Q.    Okay.  So on the third bullet, it says,

13    interest in hosting it, BCause has increased due to

14    increase in BTC pricing.  What do you mean by that?

15        A.    So -- and I think I testified to this a

16    couple three weeks ago.  We have seen an increase

17    in the amount of inquiries coming through our

18    website, and we attribute that to the fact that

19    it's become more profitable to mine Bitcoin now

20    than it was, say, six months ago.

21        Q.    But I think you also testified that none

22    of that is concrete at this point?

23        A.    I did.  And, in fact, that's what that

24    says.  Interest, interest has increased.

Page 102

1     Q.   Okay.  Other than SBI, do you have --
2  well, SBI is not -- strike that.
3         Do you have any potential new customers in
4  the pipeline right now?
5     A.   Yes.
6     Q.   Who?
7     A.   I'd have to look.  I don't remember their
8  names, but they're folks that we're currently back
9  and forth on in negotiating price and terms.
10    Q.   Do they know you're in bankruptcy?
11    A.   They do.
12    Q.   Okay.  And do you have anything in writing
13 from those potential customers?
14    A.   Emails to that effect, yes.
15    Q.   Okay.  How many?
16    A.   Six or seven, I think.
17    Q.   Okay.  And any timeline?
18    A.   No.
19    Q.   Do they have other options in terms of --
20    A.   I don't know.
21    Q.   -- potential hosters?
22    A.   I suppose.
23    Q.   Okay.  Are there other companies that do
24 what Mining does?

Page 103

1      A.    Yes.

2      Q.    How many?

3      A.    Well, I don't know.

4      Q.    Ten?

5      A.    I don't know.

6      Q.    Five?

7      A.    Certainly more than five.  I don't know

8   how many there are.

9      Q.    Okay.  Does Mining have competition?

10     A.    We do.

11     Q.    And do you expect that those potential new

12  customers are also talking to the potential

13  competition?

14     A.    I would expect that they are.

15     Q.    Okay.  So why would they sign a contract

16  with BCause at this point?

17     A.    Well, we compete, I would say, in two

18  areas.  We compete on a global basis or

19  international basis, and we compete on a national

20  basis.  And the drivers for those decisions are

21  different.  When we compete on a global basis, we

22  typically compete on the idea that the United

23  States has rule of law and property rights that are

24  more rigorous than some other places that people

Page 104

1    like Turkmenistan or Russia.  President Trump, for

2    all his faults, isn't likely to show up at our

3    datacenter and say thank you for the gift of all of

4    your mining equipment.  Yet that's happened to some

5    of our clients in Russia and Turkmenistan.

6    Further, in China, the Chinese central government

7    seems to be cracking down on mining, and so we've

8    had some interest of people moving their miners out

9    of China to our facility.

10              So on a global basis we compete on rule of

11   law and property rights.  On a national basis we

12   compete largely on price, and that would be with

13   miners largely in upstate New York and in

14   Washington State.  Typically we're competing in

15   terms of value proposition and our ability to

16   provide transparency to our clients and our ability

17   as a Bitmain -- having Bitmain certified personnel

18   on staff to actually service people's computers.

19   So we compete on a different axis when competing in

20   the United States versus abroad.

21      Q.   Okay.  Why would a new customer sign an

22   agreement with you if they didn't have clarity on

23   whether you're going to emerge from bankruptcy?

24      A.   I couldn't speak to why a customer might

1  sur -- why they would or wouldn't make that

2  decision, but my surmise would be that they believe

3  that we're going to be successful in the

4  reorganization.

5      Q.   So you believe that a customer --

6      A.   But, frankly, I don't think that's part of

7  their analysis.

8      Q.   You don't think they're considering

9  whether you're going to continue to exist in the

10 near future as part of their analysis?

11     A.   Certainly that, but quite a few mining

12 operations that were in business washed out in

13 October, November, December time frame.  In one

14 particularly well-publicized case, a competitor of

15 ours in Washington State declared bankruptcy with

16 about $65 million.  Many of our clients' gear is

17 tied up in that bankruptcy still today.  The fact

18 that we survived, I think people view that as

19 something beneficial to us.  In other words, they

20 view that favorably.

21     Q.   So they wouldn't have the same fear that

22 their gear would be tied up in your bankruptcy?

23     A.   No, I don't think so.

24     Q.   But they have that fear as to another

Page 106

1   bankruptcy?

2       A.   Not a fear, that's an actuality.

3       Q.   I see.  And because you're in bankruptcy,

4   do you have to compete on price?

5       A.   Everybody in our industry to some extent

6   competes on price or at least on value.  We try and

7   avoid competing on price as much as we can because

8   we don't want to be K-mart.  We want to be

9   Nordstrom.  The way we do that is we provide extra

10  value.  I'll just give you an example.  So I was

11  talking to BMG about two weeks ago about the idea

12  of increasing the number of machines that they host

13  with us.  And specifically they told us, we don't

14  have a complaint with your pricing, and we think

15  Sean's team, Sean's the group -- he's the guy who

16  manages the technicians that manage the computers,

17  we think they do a great job.

18          And so from that perspective I left it

19  with Lawrence and their team as to whether they'd

20  consider hosting additional machines with us.  We

21  have capacity right now for about an additional

22  2,000 machines, and that would -- any increase in

23  the number of machines would be beneficial to

24  everybody because then our fixed costs would be

Page 107

1   spread across more machines.

2       Q.   So you haven't had to reduce your hosting

3   fees to attract new customers?

4       A.   Other than what we talked about earlier

5   where you saw a decrease in the fees with

6   St. Bitts, we have not decreased our pricing with

7   anybody.

8       Q.   So do you view your bankruptcy as a

9   complete nonevent from your customers' perspective?

10      A.   Other than the one phone call we had with

11  St. Bitts, I think for everybody else it's been a

12  complete nonevent.  I can tell you for a fact BMG

13  and SBI personnel repeatedly have voiced their

14  support for our company.

15      Q.   But they have complete confidence that

16  you're going to exist next year?

17      A.   I don't know what they have confidence in

18  or not.

19      Q.   Have you realized to date any new revenues

20  on account of the increase in Bitcoin prices?

21      A.   No.  We don't have direct exposure to

22  Bitcoin.

23      Q.   But you did mention that as Bitcoin prices

24  have gone up, interest has increased, correct?

Page 108

1   A.   Yes.

2   Q.   Okay.  So I'll ask the question again.

3   Have you realized any new revenues on

4   account of that increase in Bitcoin revenues?

5   A.   You've seen from our model that we haven't

6   seen any increased revenue, and any increased

7   revenue that we would have realized, we -- it would

8   be in dollars.  So I'm not sure I understand the

9   question.

10   Q.   Can you directly or indirectly trace any

11   new revenues to the increase in Bitcoin prices?

12   A.   There haven't been any new revenue, if

13   that's what you're asking.

14   Q.   That is what I'm asking.

15   A.   Okay.

16   Q.   And do you have any new revenues currently

17   in the pipeline?

18   A.   Yes.

19   Q.   Okay.  What are those?

20   A.   We've already talked about this idea that

21   SBI would host machines on a shared revenue basis

22   with us.  I already talked about the idea that I've

23   talked to BMG about hosting more machines with us.

24   And I've talked about inquiries that come through

Page 109

1    the website.

2        Q.    And taking those in reverse, we just

3    talked about the inquiries to the website are not

4    concrete right now and they're not in writing?

5        A.    None of those are in writing yet.

6        Q.    None of those are in writing?

7        A.    No.

8        Q.    What happens if Bitcoin prices go down?

9        A.    I would assume that some of that interest

10   will evaporate.

11       Q.    Does that significantly damage your

12   prospects if Bitcoin prices go down?

13       A.    It would if it happened.

14       Q.    Can you predict what's gonna happen with

15   the price of Bitcoin?

16       A.    No.

17       Q.    Do any of your projections contained in

18   this business plan reflect a decrease in Bitcoin

19   pricing?

20       A.    No, but neither do they reflect a

21   increase.

22       Q.    So they reflect the status quo?

23       A.    They reflect the status quo from three

24   weeks ago when it was $5800, and today it's $8600.

Page 110

1   So, if anything, our prospects have improved.

2       Q.   Okay.   Take a look at the net revenue

3   line?

4       A.   Yes.

5       Q.   It says the net revenues as of May 3 are a

6   million 18,577?

7       A.   Yes.

8       Q.   As of May 31, they're a million 14,535,

9   correct?

10      A.   I'm sorry.   I lost you on that one.

11      Q.   As of May 31 they're a million 14,535,

12  correct?

13      A.   I don't see that.   I see a million 18,577.

14      Q.   As of May 31?

15      A.   Yeah.

16      Q.   Net revenues?

17      A.   Unless you're looking at a --

18      Q.   No, no.   Net.

19      A.   Oh, I'm sorry, net.

20      Q.   Yeah, net revenues, a million 14,535?

21      A.   Yeah.   Got it, sorry.

22      Q.   Okay.   So that's correct?

23      A.   I believe so.

24      Q.   Okay.   And as of July 5, net revenues are

Page 111

1    940,376, correct?

2        A.    Yes.

3        Q.    And as of August 2, net revenues are

4    $896,741, correct?

5        A.    Yes.

6        Q.    Why are your net revenues declining on a

7    month-over-month basis?

8        A.    Give me a second.  They're not.  What

9    you're seeing there is the fact that the 31 May,

10   essentially May was a five-week month.  And so what

11   you're seeing there is the revenue were recognized

12   the week before, June 7.  And so what you'd have to

13   do is add in the week in which, for instance,

14   Hoffland Properties rent was realized and subtract

15   that $75,000 from the subsequent week.

16            You can see, for instance, in the week

17   of -- the two-week period of 28 June and 5 July,

18   that that effect was far less.  In fact, $9,000

19   instead of $75,000.  And what you don't see in

20   the -- or what you see in the week of 2 August is

21   that the customer curtailment credits, these are

22   credits paid for A days, occur in the week of

23   2 August, but they don't they don't appear there

24   because of the way in which the Schedule 10 works.

Page 112

1     Q.   So you're telling me that net revenues are

2  not going down under this budget?

3     A.   I'm telling you that you're reading them

4  incorrectly.

5     Q.   Okay.  So how -- how should I be reading

6  them?

7     A.   So it would be more appropriate to add

8  both the 31 May and the 7 July -- 7 June weeks

9  which look to me like they would net you about

10  $950,000, to look at the 5 July week which is about

11  $950,000, and to understand what's going on with

12  the A day customer curtailment credits as a anomaly

13  associated with the Schedule 10; and if you add

14  that back in, you get about $950,000.

15     Q.   So you're saying the net revenues are

16  staying constant on this schedule?

17     A.   As are the total revenue.

18     Q.   Well, the total is, but --

19     A.   I'm telling you that so is the net

20  revenue.

21     Q.   But that's not what this says?

22     A.   I'm telling you you're reading it wrong.

23     Q.   Okay.  So let's go back to the example you

24  just gave me.  You're saying May 31 where it says a

Page 113

1  million 14,535 I should deduct from that the 75,414

2  on June 7, correct?

3      A.   That seems appropriate because in this

4  particular case the revenue fell in the previous

5  month rather than in the month in which it's

6  accrued.  In other words, it fell on the 31st of

7  May rather than the 7th of June.  And that's an

8  anomaly associated with how the monthly billing

9  worked.  It just happened to be when the weekend

10  fell.

11     Q.   All right.  So that if I deduct that, I

12  get to 940,000?

13     A.   Roughly.

14     Q.   Roughly?

15     A.   Yes.

16     Q.   Okay.  So then if I look at July 5, you're

17  saying that is an accurate measurement of net

18  revenue?

19     A.   Yes.

20     Q.   Okay.  But there's -- we don't have the

21  same billing anomalies there?

22     A.   Of course you don't.  You're not seeing

23  that 5 July, million 14,000 fall on the 28th of

24  June week as it did in the previous month.  It fell

Page 114

1   in the month in which it occurred, so it's paired

2   up with the associated rent.  Whereas in the

3   previous frame it's not paired up with the

4   affiliated rent.

5       Q.   Okay.  Really we can go through this

6   exercise and pick out any numbers --

7       A.   Yeah, we can.

8       Q.   -- and say they should be included in the

9   prior month?

10      A.   No.  What you can do is you can say, look,

11  revenue in our case generally occurs once a month.

12  We bill SBI once a month.  We bill -- right?  And

13  to recognize revenue twice in one month, both on

14  the 3rd of May and the 31st of May is an aberration

15  associated with the billing.  It's not reality.

16          The basic premise of GAP is a philosophy

17  called matching from a management perspective, a

18  managerial accounting perspective.  You want to

19  match your expenses with your revenue, and the way

20  you're reading that doesn't do that.

21      Q.   Okay.  Then let's talk about cash.  So if

22  you'll slip over -- if you'll flip over to the next

23  slide?

24      A.   Okay.

Page 115

1    Q.   And could you tell me what this is?

2    A.   It's the court proposed budget for Holding

3    which is in this case a 13- week budget that begins

4    the third of -- the week of the 10th of May or

5    begins the week ending the 10th of May.

6    Q.   Okay.  And here you say -- well, let me

7    ask you this.

8         Are there any differences between this

9    slide and the slide that's been filed with the

10   court?

11   A.   I don't believe so.

12   Q.   Okay.  You say here that expenses have

13   been reduced by $40,000 a month?

14   A.   Yes.

15   Q.   Could you point out to me where those

16   expenses show up?  Those reductions show up?

17   A.   Sure.  If you look at the payroll line

18   where it says payroll, in parentheses, Paychex, and

19   if you start in the week ending 10 May, you can see

20   there it's $86,500 in the week of 10 May and

21   $86,500 in the week of 17 May.  But you can see two

22   weeks later it drops to $70,000.

23        So that accounts for $16,500 worth of

24   savings.  If you multiply that by 2, you end up --

Page 116

1    and it's not exactly by 2 because some months have

2    three payrolls, so it's actually like 4.3 weeks per

3    month.  But, nevertheless, that works out to about

4    $35,000 a month in savings.  That's the lion's

5    share of it.  But you can also see on the previous

6    page which carries over into the page you're asking

7    about, Silbar, is reduced from 2880 to 1440 which

8    is part of it.

9        Q.    Are you saying Mining?

10       A.    Yeah.  If you go to the mining page, that

11   carries over.

12       Q.    So when you say $40,000 a month, you're

13   including both Mining and Holding?

14       A.    Yeah, in total savings.

15       Q.    Okay.

16       A.    So that's part of it.  And then I think if

17   you look at the Century Link line under Holding, it

18   goes from 6850 to about 1664, and that's also part

19   of it.

20       Q.    Okay.  Now --

21       A.    I may be missing one, but I think I've

22   accounted for 39,000 at that point.  There might be

23   one other one in there.

24       Q.    Now, I see in here that you -- over the

Page 117

1    13-week period cash increases by about 72,000.  I

2    take it what you mean by that is you go from 844 at

3    the beginning to 916 at the end?

4        A.   Yes.

5        Q.   Is that what you're saying there?

6        A.   Yes.  That's correct.

7        Q.   Okay.  Now, am I also reading this right

8    that your cash balances really have peaks and

9    troughs during the month; is that correct?

10       A.   Absolutely.

11       Q.   Okay.  So the peaks of your cash position

12   are when your revenues come in --

13       A.   Yes.

14       Q.   -- is that correct?

15            And that's when the cash balance, you

16   know, shoots up over a million?  I'm generalizing.

17       A.   In general.

18       Q.   Okay.  But then during the month your cash

19   balance sometimes can get as low as a hundred

20   thousand or even as low as like 50,000

21   approximately?

22       A.   I think if you were to look at the very

23   lowest amount our cash is at, it's 54,138.

24       Q.   Now, what would happen if for whatever

Page 118

1    reason you had a customer that stopped paying you

2    during that week?

3         A.    Then our cash would be less.

4         Q.    Okay.  So what if SBI stopped paying you

5    during that week?

6         A.    Then our cash would be less by half a

7    million dollars.

8         Q.    What if BMG started stopped paying?

9         A.    Similarly.

10        Q.    And what if St. Bitts stopped paying you?

11        A.    Also similarly.

12        Q.    Okay.  In the aggregate it would be less

13   by about 950,000, correct?

14        A.    In the aggregate it would be.

15        Q.    And in that scenario, is it true that you

16   will have actually incurred costs during the

17   bankruptcy case that you could not pay?

18        A.    I think it's true of any business that if

19   you incur costs to serve a customer and then they

20   don't pay their associated bills, that you will

21   have incurred costs that you could not pay.

22        Q.    The answer is yes?

23        A.    The answer is as I've stated it.

24        Q.    All right.  Let's flip over to, I think

Page 119

1    it's Slide 9.  It's proposed budget Mining.

2        A.    All right.

3        Q.    So I'm looking at again the net revenue

4    line on this, and this says that under your

5    proposed budget -- well, let me back up.  Strike

6    that.

7              What does this slide show?

8        A.    So we've -- we have recast our existing

9    expenditures segregating expenses that we believe

10   are more appropriately part of the spot -- the

11   BCause Spot, LLC, subsidiary.  In doing so we've

12   attempted to free up as much cash flow for the

13   benefit of our creditors as we could.  In addition,

14   we've shown here some reduction in expenses over

15   the next couple months associated with rejecting

16   certain agreements.  And we have predicated this on

17   the idea that the court and creditors will agree

18   that outside group of investors can input some new

19   money to work in terms of equity infusion into Spot

20   to build value in the Spot subsidiary while at the

21   same time offloading those costs from Mining so

22   Mining can better benefit the creditors.

23       Q.    How does the new investment benefit

24   Mining?

Page 120

1      A.    Because it allows us to offload expenses

2    from Holding that are currently being paid by

3    Mining.

4      Q.    Assuming that those vendors continue to do

5    business with Spot?

6      A.    Yes.

7      Q.    Okay.  Now, am I reading this right?  In

8    terms of the net revenue line, this suggests that

9    net revenues are going up during this period?

10     A.    Yes.

11     Q.    Okay.  And so, you know, at the beginning

12   of the period -- well, I'm just taking July 5.

13   That says, 938,000 and change, August 2 says

14   895,000 and change, and then August 30 says 958,000

15   and change; is that correct?

16     A.    Yes.

17     Q.    Okay.  So that on its face says net

18   revenues are going up, correct?

19     A.    I'm not sure how you're drawing the line.

20   From 938 to have 895 it goes down.  From 895 to 958

21   it goes up.  And, again, that's ascribable to

22   vagaries between how costs occur.

23     Q.    So this doesn't --

24     A.    But in general, yes, if you just took 938

Page 121

1   and 958 as an end point, it would go up.

2       Q.   Okay.

3       A.   So, again, I'm not sure how you're drawing

4   the -- where -- what data points you're picking.

5       Q.   Fair.

6           So but we just spent some time where you

7   were criticizing me for not matching up

8   appropriately revenues with expenses, et cetera?

9       A.   Yes.

10      Q.   How do I know then that net revenues are

11  actually going up under this table?

12      A.   So you'll notice in this particular

13  example, this includes the frame of 7 June, but it

14  doesn't include the frame of 31 May.  Right?  So

15  this is offset by a week because of when the court

16  hearing was projected to happen.  Well, the reason

17  that that occurs then the way it does is because in

18  5 July, in 2 August and in 30 August, you don't

19  have that same effect.

20          But I will acknowledge to you that

21  probably the 10,014,000 from August has a similar

22  effect and probably could be recognized in the week

23  of 14 -- Week 14 of 6 September.  It is an effect

24  of sort of again when that weekend falls.

Page 122

1      Q.    Okay.  So by how much are net revenues

2  going up under this budget?

3      A.    If you turn to the next page, I can't tell

4  you exclusively to Mining how much they're going

5  up, but I can tell you that between Mining and

6  Holding total they go up about $131,000 over that

7  period.

8      Q.    In terms of your cash position?

9      A.    Yes.

10      Q.    Yeah.  We'll come back to that.

11      A.    Okay.

12      Q.    Are there any new revenues or receipts

13  reflected in this budget?

14      A.    There are no new customers or growth in

15  revenue projected in this budget.

16      Q.    Okay.  And this budget assumes that

17  customers don't exercise their rights to terminate

18  the contract or withhold payments, correct?

19      A.    It does assume that our customers pay

20  their bill on time.

21      Q.    And also that they don't terminate their

22  contracts, correct?

23      A.    It does assume that as well.

24      MR. CLAR:  Dave, I need to take a break.

Page 123

1   Sorry.

2        MR. AGAY:  Off the record.

3                   (WHEREUPON, a short recess was

4                   taken.)

5   BY MR. AGAY:

6        Q.   We're actually still on the proposed

7   budget for Mining.

8        A.   Got it.

9        Q.   If we extended the revenues through

10  October, would they be the same?

11       A.   We project that they would be materially

12  the same, yes.

13       Q.   What if you extend them through November?

14       A.   November, I think the answer is the same.

15  December if we did that, it would depend upon SBI

16  extending their contract or us finding replacement

17  revenue for them.

18       Q.   Or St. Bitts?

19       A.   Or St. Bitts or BMG.  I mean, we can argue

20  about sort of whether we think their mining ends in

21  December under the terms of the contractor or under

22  the terms of our agreement with them.  But the

23  notion of your discussion is that at some point if

24  those things -- if those revenues don't stop, what

Page 124

1   happens to your revenue.  Revenue goes down.

2        Q.   So if the revenues cease in December or

3   January between the filing of the bankruptcy case

4   and December or January, do you know how much the

5   assets will have depreciated?

6        A.   Between what dates?

7        Q.   Between the filing of the bankruptcy case

8   and December and January, do you know how much --

9   by how much the assets will have depreciated?

10       A.   So if you were to -- just for ease,

11  because you're asking me to do a mental

12  calculation, if you go from April 11 to January 11

13  which would be nine months, it would be

14  nine-twelfths of $1.4 million, whatever that works

15  out to.  Call it a million dollars in terms of

16  depreciation.

17       Q.   A million -- okay.

18       A.   Now, that said, I don't think the

19  marketable value of those assets would go down when

20  we talk about the $900,000 and three quarters.

21       Q.   How much do you think they will have gone

22  down by?

23       A.   You'll have to ask somebody from WESCO or

24  something like that.  I believe that their

Page 125

1    marketable value as used equipment will essentially

2    be static.

3        Q.    Okay.  Can we flip over to the next slide,

4    Slide 10, proposed budget Holding?

5        A.    Yes.

6        Q.    Any differences between this slide and the

7    slide currently filed with the bankruptcy court?

8        A.    None that I am aware of.

9        Q.    Now, your first bullet says, Holding plus

10   Mining create $131,543 and free cash flow over the

11   next 14 weeks.  What do you mean by that?

12       A.    So if you were to take the beginning cash

13   balance on the week ending 7 June at the beginning

14   of the model, that's a million and $48,000.  If you

15   were to take the beginning cash flow on 6 September

16   to be consistent in terms of comparing time frames,

17   you'd see that it's $10,000,180,000.  If you

18   subtract those numbers, I believe you come up with

19   $131,000.

20            But, similarly, if you take the ending

21   cash balance of $942,000 and subtract that from the

22   ending cash balance of 6 September of $1,059,000, I

23   believe you end up with a similar number.

24       Q.    Okay.  So by free cash flow you do not

Page 126

1    mean EBITDA?

2        A.   No.   It means from cash flow.   EBITDA

3    would include noncash events like depreciation.

4        Q.   So by free cash flow you're just saying

5    there's going to be a $131,000 more cash in the

6    bank at the end of the --

7        A.   Available to service our creditors, yes.

8        Q.   Okay.   And then you say almost twice the

9    cash increase in five additional weeks.   What do

10   you mean by that?

11       A.   So if you go back to the original budget

12   proposed to the court, I believe we showed about --

13   well, I don't even have to suppose.   Let's go back

14   to Exhibit 1, slide titled, the court proposed

15   budget for Holding, where we showed a beginning

16   cash of 844 and an ending cash of 916.   The

17   increase in cash is about $70,000.

18       Q.   I see.

19       A.   Okay.   Under this revised plan, the new

20   cash of $131,000 is about twice that number, and

21   it's twice that number with only four -- five

22   additional weeks.

23       Q.   All right.   So you're saying you're

24   generating an additional $60,000 in cash basically?

Page 127

1    A.   Yes.

2    Q.   Okay.  Now, I also see that for the week

3  of August 16 you have BCause bankruptcy attorney

4  fees of $40,000?

5    A.   Yes.

6    Q.   Okay.  Does that mean that by that point

7  your counsel will have burned through their

8  retainer?

9    A.   I have -- I have no way of knowing exactly

10 what the billable hours are at this point.  I have

11 no idea of how much of the retainer that will or

12 won't have consumed, but that's the first point in

13 time at which they're allowed to budget -- to bill

14 us.  And so we included a number there that we

15 thought was reasonable.

16    Q.   Was that based on input from your counsel?

17    A.   I don't recall.

18    Q.   You don't recall how you came up with that

19 number?

20    A.   I don't.

21    Q.   Okay.  And I see that you have committee

22 counsel fees budgeted in there for -- strike that.

23       Has your counsel agreed to cap their fees

24 for this case?

Page 128

1    A.   Our counsel I don't believe has.

2    Q.   Have they given you an estimate of what

3 their fees are going to be for this case?

4    A.   Not me personally.

5    Q.   Have they given anybody at your company an

6 estimate?

7    A.   I couldn't speak to that.

8    Q.   Who could speak to that?

9    A.   Fred --

10   MR. CLAR:  I could speak to that.  We haven't.

11   MR. AGAY:  I'm not deposing you.

12   THE WITNESS:  Fred and Ann.

13 BY MR. AGAY:

14   Q.   Who are no longer here?

15   A.   Who are no longer with us.

16   Q.   And I see that the Creditors Committee

17 fees are budgeted at $10,000 a month; is that

18 correct?

19   A.   They are.

20   Q.   Okay.  Is that based on an estimate that

21 the Creditors Committee has given you?

22   A.   I believe it's based on an agreement that

23 we have with the Creditors Committee.

24   Q.   So have they agreed to cap their fees at

Page 129

1    $10,000 a month?

2         A.    I believe so.

3         Q.    Okay.  And are you aware that the debtors

4    and the Creditors Committee counsel have challenged

5    the validity of WESCO's liens and claims?

6         A.    I am aware of that.

7         Q.    Okay.

8         A.    Or at least I'm aware that they filed a

9    motion to that effect.

10        Q.    Well, they haven't, but that's okay.

11        A.    Okay.

12        Q.    They have stated in court that they

13   believe that there are flaws in our liens and

14   claims.  You're aware of that, correct?

15        A.    I am.  Yes.

16        Q.    Okay.  Do you know if this budget takes

17   into account any litigation required to avoid

18   WESCO's liens and claims?

19        A.    This budget takes into account things as

20   we know them to exist when we prepared the budget,

21   and I am unaware of what that may cost either the

22   Creditors Committee or BMG.

23        Q.    So you're not aware of what it's going to

24   cost for either the Creditors Committee or BMG to

Page 130

1    pursue an action to avoid our liens and claims,

2    correct?

3         A.    That would be accurate.  Yes.

4         Q.    Okay.  And so because you're not aware of

5    that, that's not incorporated into this budget; is

6    that correct?

7         A.    That is also correct.

8         Q.    Are you assuming it would be the Creditors

9    Committee or BMG that would pursue those actions

10   and not your counsel?

11        A.    I don't know.

12        MR. CLAR:  That could happen.

13        MR. AGAY:  Okay.

14   BY MR. AGAY:

15        Q.    But you to date --

16        A.    To date our counsel has not taken any

17   action in that regard.

18        Q.    Okay.  So then this also does not include

19   costs for your counsel to pursue that action,

20   correct?

21        A.    It does not.

22        Q.    Okay.  And are you aware of how long

23   litigation around our liens and claims could take?

24        MR. CLAR:  Objection, that really calls for a

Page 131

1   legal conclusion and all sorts of other sorts of

2   speculation.  If you have any idea whatsoever, you

3   can answer.

4       THE WITNESS:  So I was involved in a bankruptcy

5   about 12 years ago under which my counsel unhooked

6   GE's lien, and it took about 30 days.

7   BY MR. AGAY:

8       Q.    How did he do that?

9       A.    It was found to be imperfected.

10      Q.    Okay.  And what did your counsel do to

11  achieve that?

12      A.    That's legal mumbo jumbo.

13      Q.    What's the name of the case?

14      A.    It was bankruptcy of Picus, P-i-c-u-s.

15      Q.    Where was that filed?

16      A.    Virginia.

17      Q.    And you're saying in 30 days they avoided

18  GE's lien?

19      A.    Yes.

20      Q.    Okay.

21      A.    That's the best of my recollection.  It

22  was about 15 years ago.

23      Q.    So --

24      A.    It was more like 20 years actually.

Page 132

1    Q.   So you believe that in this case it's

2    possible to avoid WESCO's lien in 30 days or less?

3    A.   I have no belief.  I just know that you

4    asked me if I was familiar with how long it could

5    take.  That's my one data point.

6    Q.   Has anybody advised you on how long it's

7    going to take?

8    A.   Fred Grede, who's our former CEO, told me

9    that as trustee in a case he was familiar with, it

10   took him six years to unhook the creditor.  So I

11   guess we've got a bid-ask spread there.

12   Q.   And have you had this discussion with your

13   counsel?

14   A.   Which discussion would that be?

15   Q.   About how long it would take to avoid our

16   liens?

17   A.   No, not specifically.

18   Q.   Okay.  Generally?

19   A.   Generally, yes.

20   Q.   Okay.  And have they told you how long

21   it's going to take?

22   A.   No.

23   MR. CLAR:  Objection, that violates the

24   attorney/client privilege.  So I know you're trying

Page 133

1   not to do that, but you did.  So objection.  You

2   don't have to answer that question.

3       THE WITNESS:  Okay.

4   BY MR. AGAY:

5       Q.   Do you know what a Chapter 11 plan is?

6       A.   Generally, yes.  Specifically, no.

7       Q.   As an example, I know that we're required

8   to file a business plan.  And I don't know if

9   there's a specific format for that or whether a

10  slide deck constitutes that or if it's formal like

11  20-page narrative?

12      MR. CLAR:  So you really don't know.

13      THE WITNESS:  I don't know specifically.

14  BY MR. AGAY:

15      Q.   Okay.  Do you know how long it takes to

16  confirm a Chapter 11 plan?

17      A.   I think the term is indeterminate

18  dependant on how prepared people are when they go

19  into the bankruptcy and sort of agreement from

20  parties.

21      Q.   Does this budget take into account the

22  time and cost of confirming a Chapter 11 plan?

23      A.   I don't know.

24      Q.   Does this budget take into account the

Page 134

1    time and cost of litigating WESCO's liens and

2    claims?

3        A.    It does not.    Except insofar I don't know

4    whether litigating WESCO's claims fall under the

5    $10,000 cap agreed to by Creditors Committee.

6        Q.    The third budget, I'm sorry, the third

7    bullet --

8        A.    Yes.

9        Q.    -- on this slide, an early exit from

10   bankruptcy implies $304,691 in free cash flow over

11   14 weeks.   What does this mean?

12       A.    So if you took the money associated with

13   moneys paid to WESCO for adequate protection, the

14   bankruptcy attorney fees, the Creditors Committee

15   and the trustee fees, and added them back into free

16   available cash flow as if we had an agreement from

17   all the creditors, then that would become free cash

18   flow available to service creditors.

19       Q.    Okay.   So what constitutes an early exit?

20       A.    Well, independent of early or not, I

21   couldn't speak to that.   But it would imply that in

22   any 14-week frame, there would be $304,000

23   available.

24       Q.    Oh, so you're saying if you're able to

Page 135

1    exit from bankruptcy by September 6?

2        A.    Uh-huh, implicit in that then would be the

3    following 14 weeks there would be an additional

4    $173,000 available for the benefit of creditors.

5        Q.    I thought you said 304,000?

6        A.    Well, the 131,000 is going to be there

7    regardless.

8        Q.    I see.  I see.

9        So you're saying it's an incremental 173

10    on top of that?

11        A.    Yes, which adds to 304,691.

12        Q.    All right.  If in addition to the adequate

13    protection payments and any other expenses under

14    this budget, if the debtors had to distribute any

15    cash in the Lakeside account to WESCO or any of its

16    other creditors, what impact would that have on

17    this budget?

18        MR. CLAR:  Objection, I don't even -- you can

19    answer.

20    BY MR. AGAY:

21        Q.    You can answer.

22        A.    Well, there's $131,000 in free cash flow

23    over that period of time.  I would anticipate that

24    we would, in fact, under any agreement and the

Page 136

1    agreement we've proposed would envision a 76 or

2    $77,000-a-month payment to creditors, that we would

3    disburse those funds to creditors for their

4    benefit.

5        Q.    Under the note you're saying there's a

6    $76,000 --

7        A.    Yes.

8        Q.    Okay.  So you're saying in addition to the

9    amortization -- the interest and amortization under

10   that note, that potentially there's another, call

11   it, 131,543 available plus 173,000 if we can emerge

12   early?

13       A.    Well, what I would say is that you have to

14   look at that on a month-by-month basis.  The 304

15   over 14 weeks works out to $22,000 per week on

16   average.  So if you were to say a typical week has

17   4.3 or a typical month has 4.3 weeks in it, that

18   works out to little bit less than a hundred

19   thousand dollars in free cash flow.  The

20   amortization that we're proposing is about 76,000

21   of that, about 75 percent of the available cash for

22   the benefit of creditors.

23       Q.    What if you had to pay more than that?

24   Strike that.

Page 137

1          Is there any cushion -- I'm sorry.  Strike

2     that.

3          Is there any cushion built in there where

4     you could pay some amount more than the $75,000?

5          A.    Not a meaningful amount.  There's no

6     hidden number here.  We're being as honest as we

7     can with all of our creditors.

8          Q.    So the most you think you can afford to

9     pay and continue as a going concern is $75,000 a

10    month?

11         A.    That's why we structured the proposal the

12    way we did.

13         Q.    And if you had to pay more than that

14    amount, is it your view that the company would not

15    survive as a going concern?

16         A.    It would make it difficult to do things

17    like maintenance, and ultimately that would be for

18    the -- deleterious to everyone who is depending

19    upon that stream of payments into the future.

20         Q.    Okay.  Can you turn to the ave next slide,

21    please, Slide 11?

22         A.    Uh-huh.

23         Q.    So could you explain to me what this slide

24    shows?

Page 138

1     A.    So our proposal to our creditors and the

2    court will center around the idea of external

3    funders coming in and funding the launch of the

4    spot market.  We think that's to everybody's

5    benefit for the following reason.  We believe that

6    it develops piece of software, some personnel and

7    some agreements.  It's not nearly as valuable in

8    the marketplace as a operating exchange.  We

9    project that at its current value, we talked about

10   this earlier, would be valued at its replacement

11   value.  But an operating exchange would be

12   typically valued on a multiple of revenue that

13   would be pretty lucrative.

14        We don't think it's unreasonable that the

15   difference between a hypothetical exchange for

16   which has been developed, but not launched, versus

17   a launched and operating exchange might be the

18   difference between $2 million of value and

19   $4 million of value.  So simply launching we think

20   increases the value of the concern significantly.

21   And because our plan includes equity for the

22   creditors, we think that's to their benefit.

23        Q.    So when you say exchange, what do you mean

24   by that?  What's Spot going to do?

Page 139

1    A.    So if you've ever been to an airport and

2    converted your dollars into euros or some other

3    foreign currency, a spot exchange does that very

4    same thing, but for cryptocurrency.  So it would be

5    clients who would have a desire to convert their

6    cryptocurrency to fiat or their fiat to

7    cryptocurrency.  The advantage that we have is that

8    our clients generate a significant amount of

9    cryptocurrency that they have to convert to fiat.

10   So we have sort of built-in clients, if you will.

11   Q.    Okay.  Are there other exchanges currently

12   out there?

13   A.    There are.

14   Q.    How many?

15   A.    Four or five that I'm aware of that

16   operate in the United States.  And dozens that

17   operate around the world.

18   Q.    So why would somebody use your exchange

19   versus another one of those exchanges?

20   A.    So this goes back to the agreement with

21   Nasdaq.  We believe that there is a hole in the

22   market right now with regard to exchanges that are

23   using proven software and have the ability to be a

24   money transmitter in all 50 states and have

Page 140

1    registered with FinCEN and are operating

2    transparently.  There are a number of exchanges

3    that have been criticized for wash sales,

4    artificially inflating volume reports, and reports

5    of exchanges with faulty software.

6            This is one of the reasons that we view

7    the relationship with Nasdaq is so strategic to

8    what we're doing and one of the things that adds

9    value to what we're doing and one of the reasons

10    that, frankly, fiduciaries and people that manage

11    money would choose our exchanges over other

12    exchanges.

13        Q.    Is your relationship with Nasdaq

14    exclusive?

15        A.    It is not, but it is -- nobody else is

16    using their software right now.  So they would be

17    free to license their software to somebody else,

18    but they haven't.  And it would take that somebody

19    else, in our estimate, 12 to 18 months to launch

20    with Nasdaq software.  So we have a significant

21    advantage in terms of lead time.

22        Q.    Why would it take that additional lead

23    time?

24        A.    Because their development cycle, their

Page 141

1   testing cycle and the availability of their project

2   people is such that people would have to get in cue

3   as we did 18 months ago, or not 18 months ago, but

4   17 months ago.

5       Q.   And did I understand you correctly that

6   Holdings currently has a license with Nasdaq?

7       A.   Yes.

8       Q.   Okay.  In order for Spot to operate, Spot

9   would have to enter into a license with --

10      A.   Or we just operate under Holdings' license

11  agreement with Nasdaq.

12      MR. AGAY:  Scott, can you produce that license

13  agreement?

14      MR. CLAR:  I don't have it.

15      MR. AGAY:  Well, could you get it and produce

16  it?

17      THE WITNESS:  Probably.  Again, this gets tied

18  up in the whole why Ann and Fred are no longer with

19  us, particularly with Fred.  You notice, like for

20  instance, agreement between us and Roger wasn't

21  signed by Fred, so . . .

22      MR. AGAY:  Okay.

23      MR. CLAR:  Yes.  To the extent that I can get

24  it, I will give it to you.

Page 142

```
1   BY MR. AGAY:
2        Q.    What are the barriers to entry to start an
3   exchange like this?
4        A.    So you have to have three typically
5   disparate skill sets.  The first one is you have to
6   have the ability to run a sophisticated IT
7   platform.  The second one is you have to have the
8   ability to provide concomitant IT security.  And
9   the third one is you have to have skills in the
10  financial or fintech space and relationships with
11  the same.  I guess a fourth one would be you have
12  to go through the regulatory hurdles that are not
13  trivial.
14       Q.    Okay.  Let's start with the first three.
15       A.    Okay.
16       Q.    Do you view yourself as having an
17  advantage over others in the marketplace in that
18  regard?
19       A.    Absolutely.
20       Q.    How so?
21       A.    So a member of our board currently runs IT
22  for NASA Langley, and I formerly held that position
23  before him.  I think we're two of the most
24  knowledgeable in the country on IT security.  As
```

Page 143

1    far as running IT platforms, a sophisticated IT

2    platform, concomitant with that I did the same type

3    of work at NASA Langley in terms of running large

4    IT projects.  And Sean Daily who runs our mining

5    operation has historically run large IT

6    infrastructure for one of the largest credit unions

7    in the country and large financial based sort of

8    technology platforms.

9        Q.   And you don't believe there are others out

10   there that can do what you guys do?

11       A.   I'm not saying that individually.  What

12   I'm saying is it's a very rare skill set in all

13   three of those areas.  So there are other people

14   that do IT security planning.  There are other

15   people that do run large IT platforms.  But there

16   are -- if you add that third component, the

17   Venn diagram gets to be increasingly small, the

18   overlap areas.

19       Q.   But as we sit here today, there are five

20   others out there that do this, five other

21   exchanges?

22       A.   There are.  There are none other that run

23   it with a software platform as sophisticated as

24   Nasdaq's.

Page 144

1      Q.    Why don't they run it with Nasdaq's.

2      A.    I couldn't speak to that.  You'd have to

3  ask them.

4      Q.    Okay.

5      A.    But they don't.  In fact, I'll go a step

6  further.  I will tell you that last October when

7  the price of cryptocurrency was deteriorating

8  rapidly, the president and CEO of Coin Base, one of

9  our competitors, made a public comment about the

10  idea that the volume was such that their software

11  couldn't keep up.  Can you imagine any scenario

12  where the president of Nasdaq would make such a

13  statement?

14      Q.    Let's talk about the fourth piece of the

15  puzzle --

16      A.    Uh-huh.

17      Q.    -- in terms of getting the spot market

18  going, and that's the regulatory hurdles.

19            What are those regulatory hurdles?

20      A.    So you're required to register with FinCEN

21  which is a federal agency, and you're required to

22  register in the states that require it as a money

23  transmitter.  That's about 38 of the states.

24      Q.    Okay.  And have you guys cleared all those

Page 145

1  hurdles?

2      A.   We're in the process of clearing all of

3  them.  We have cleared it in about 8eight as of

4  this date, and we expect by the date we launch to

5  have cleared it in about 23.

6      Q.   Okay.  When did you clear the hurdles in

7  those eight states?

8      A.   I think the earliest one was maybe six

9  weeks ago.

10     Q.   So while you've been in bankruptcy, you've

11 actually got licensed in those states?

12     A.   Yeah.  In fact, we just -- we just did a

13 final submission in Washington State.  We're

14 continuing to work the process.

15     Q.   Okay.  Do they know you're in bankruptcy?

16     A.   If their questionnaires required it, we

17 answered truthfully.

18     Q.   And if they didn't require it?

19     A.   Then we didn't report it.

20     Q.   What about to FinCEN?

21     A.   Doesn't require.  That's more of a who are

22 you doing business with.  It has to do more with

23 your AML KYC policies.

24     Q.   So you haven't reported to FinCEN that

Page 146

1   you're in bankruptcy?

2       A.    We have not, to my knowledge anyway.    I'd

3   have to ask Dawn.    She runs that process.

4       Q.    I understand.    And what if Nasdaq refuses

5   to support Spot?

6       A.    We would have to find other software, and

7   it would delay us considerably.

8       Q.    And if you had to find other software, you

9   would lose the advantage of the NASDAQ software,

10  right?

11      A.    We would.

12      Q.    Yeah.

13      A.    I think I mentioned earlier, though, I had

14  an in depth conversation with their people last

15  week, and they're supportive.

16      Q.    Who did you talk to there?

17      A.    Off the top of my head, Mark Driscoll is

18  the one of them.    I could find out.

19      Q.    By the way, why do you need the bankruptcy

20  to launch the spot market?

21      A.    We don't need a bankruptcy to launch the

22  spot market.

23      Q.    You could do it today?

24      A.    Well, we need the investors to launch the

Page 147

1  spot market.

2      Q.    Right.  But why are you entangling it with

3  the bankruptcy?

4      A.    We're not.  It is entangled with the

5  bankruptcy.  I mean, it's a subsidiary of the

6  parent which is in the bankruptcy.

7      Q.    But Spot itself is not bankruptcy,

8  correct?

9      A.    To my knowledge, that's right.

10                        (WHEREUPON, Flake Deposition

11                         Exhibit No. 8 was marked for

12                         identification.)

13  BY MR. AGAY:

14      Q.    I'm handing you what I've marked as

15  Exhibit 8.  Okay.  So I have handed you an article

16  that was published on Coin Desk dated May 7, 2019.

17  Are you familiar with this Article?

18      A.    I am.

19      Q.    I'm just going to read the first two

20  paragraphs.  Cryptocurrency exchange and mining

21  startup, BCause, LLC, says it's a few weeks away

22  from launching its spot market despite operating

23  under bankruptcy protection.  The Chicago based

24  company has tentatively set May 23rd as the go live

Page 148

1    date for Bitcoin, Bitcoin cash and Lite Coin,

2    cofounder and chief marketing officer, Thomas

3    Flake, told Coin Desk.  In anticipation of the

4    launch it has obtained money transmitter licenses

5    in eight states with more than 20 applications

6    pending, Flake said.

7        A.    Uh-huh.

8        Q.    Is that all accurate?

9        A.    It was accurate at the time.

10       Q.    Okay.

11       A.    Or at least I'll say it was what I

12   understood to be accurate at the time.

13       Q.    Okay.  So did you go live on May 23?

14       A.    We did not.

15       Q.    Why not?

16       A.    Because the project plan hadn't been

17   updated in a timely fashion, so it was not clear to

18   the board that we weren't going to launch on May 23

19   when we made these statements.

20       Q.    Okay.  This says in your business plan

21   that assuming you can get half a million dollars in

22   funding, you're going to go live July 26?

23       A.    Yes.

24       Q.    Okay.  So what if you cant get the half

Page 149

1    million dollars of funding, how --

2        A.    Can or cannot?

3        Q.    What if you, in fact, get the half million

4    of funding?

5        A.    Yes.

6        Q.    How certain are you that you're going to

7    go live July 26?

8        A.    We'll go live five to six weeks after the

9    money comes into the company.  I'm very certain of

10   that.

11       Q.    Okay.  And aren't you going to need the

12   licenses in these 12 remaining states in order to

13   do that?

14       A.    No.  We could go live in the eight states.

15   But, in fact, our Washington money transmitter

16   application was accepted by the State of Washington

17   last Tuesday, I want to say, because Monday was

18   Memorial Day.  And this is a long answer, but

19   Washington State was part of NMLS which was a pilot

20   program.  And in getting money transmitter approved

21   in Washington State, there are 17 other states that

22   follow behind Washington's approval.  So if we get

23   Washington and those 17 other states, it'll be more

24   like 25 other states.

Page 150

1    Q.   Okay.  And why again didn't you go live on

2    May 23?  Because you didn't have the money?

3    A.   No.  The project plan had slipped, and the

4    board was not informed.

5    Q.   What do you mean?  Oh, I'm sorry.  Explain

6    that to me.

7    A.   We had been told for several months prior

8    to the middle of May that we were going to go live

9    May 23.  It turned out that that was false

10   information.

11   Q.   Okay.  So this assumes a half million

12   dollars in funding, correct?

13   A.   It assumes about three-quarters of a

14   million dollars in funding.  And on your copy here,

15   the colors in the original slides didn't come

16   through.  But that three-quarters of a million

17   dollars funds the spot operation.  Through the

18   30th of August this assumes the money comes in the

19   week of 14 of June, but it funds the -- that

20   operation for about 13 weeks.

21   Q.   Okay.  So -- right.  So you need $750,000

22   effectively to fund the losses in the business,

23   correct?

24   A.   Actually until break even, it needs about

Page 151

1    $2 million.  You don't see that because it hasn't

2    carried it out to February, but, yes, for this

3    frame.

4        Q.   So let's just stick with August 30?

5        A.   Yeah.

6        Q.   You're saying you need $750,000 to fund

7    the losses in the business through August 30,

8    correct?

9        A.   Correct.

10       Q.   Okay.  And that assumes you go live

11   June 14?

12       A.   It assumes that the money goes in June 14,

13   and it goes live the 2nd of August.  You can see

14   the colored frame there that didn't copy very well.

15       Q.   Oh, I see.

16       A.   So there's a gap, and that gap of about

17   four weeks to five weeks is assumed based on -- or

18   we think is value added for the equity holders

19   because it gives the board time to raise money at a

20   higher valuation following the launch.

21       Q.   Okay.  And I believe you said you've

22   gotten oral commitments?

23       A.   Yes.

24       Q.   For how much?

Page 152

1      A.    About $350,000.

2      Q.    Okay.  And you haven't gotten any written

3  commitments?

4      A.    That is true.

5      Q.    And there have been no conditions tied to

6  those oral commitments you've received; is that

7  correct?

8      A.    None that I'm aware of other than the

9  purchases of equity.

10     Q.    Okay.  And then you say, need court and

11  creditor agreement to not encumber new money to

12  perceive.  What does that mean?

13     A.    So there's a fear that because Spot is

14  wholly owned by BCause, that any new money that

15  would come in would be held up in the bankruptcy or

16  that it would be used for the benefit of creditors.

17  So I guess there is one condition which is the

18  investors would want an agreement from the court

19  and from creditors that that money could be used

20  for this budget and not to cure past issues.

21     Q.    And what if they can't get that agreement?

22     A.    Then I would assume that the money won't

23  go in.

24     Q.    Okay.  Now, through October 4?

Page 153

1     A.    Yes.

2     Q.    This -- am I reading this right that this

3  shows $1,119,023 in losses?

4     A.    Yes.

5     Q.    Okay.  So how are you going to fund that

6  additional, call it, $400,000 in losses?

7     A.    Yeah.  The plan is that after the launch,

8  which would be either the week of 26 July or the

9  week of 2nd August, that the company would go out

10  and raise an additional $2 million.  And that funds

11  this operation through break even.

12     Q.    Okay.  And as we sit here today you don't

13  know where that $2 million is gonna come from?

14     A.    No.

15     Q.    So --

16                    (Short interruption.)

17     THE WITNESS:  Sorry.

18  BY MR. AGAY:

19     Q.    Your investors of 350,000 are willing to

20  put that money in even though they don't know where

21  the additional 2 million is going to come from?

22     A.    I would say that not just the 350, but

23  before this plan could be successfully launched

24  that we'd have commitments for three-quarters of a

Page 154

1   million, and all of them would have that same

2   understanding.

3        Q.   What understanding?

4        A.   That they don't know where the 2 million's

5   going to come from, but that it requires it.

6        Q.   Okay.  And I believe you stated that

7   because this business has no revenue, you cannot

8   value it based on a revenue stream, correct?

9        A.   It's not that you cannot.  You can base a

10  business's value on a business plan with regard to

11  a discounted cash flow, but that's not the most

12  conservative way to do it.  Replacement value in

13  this case seemed the most conservative way to value

14  the company.  In other words, how much would

15  somebody have to spend and how long would it take

16  them to replace what we've done and what's the

17  value of that time and what's the value of what

18  we've accomplished.  That number is about

19  2 million.

20       MR. CLAR:  I need to talk to my client about

21  something else.  I need a break.

22

23                    (WHEREUPON, a short recess was

24                     taken.)