# EXHIBIT B

Page 155

1   BY MR. AGAY:

2       Q.    Okay.  We're still on the proposed budget

3   Spot.  I think we established that during this time

4   period, Spot -- you believe Spot will make about

5   $4300, correct?  During this time period?

6       A.    It will create about $4300 in revenue.

7       Q.    Right.  And if we extend this through the

8   end of the year, your view is it will create how

9   much in revenue?

10      A.    I don't know that number off the top of my

11  head.

12      Q.    Okay.  What did you base your revenue

13  projections on?

14      A.    It's what's called a bottom up model.  So

15  it starts with individual traders and assumes a

16  certain number of trades per month that's

17  consistent with industry normals.  It assumes a

18  certain cost to acquire a customer, and it builds

19  up based upon sort of those number of customers

20  making an assumed number of trades which yield a

21  certain amount of revenue.

22      Q.    So how are you making money?

23      A.    The spot exchange charges those customers

24  for each trade.

Page 156

1       Q.    And so is there an assumed volume built

2    into that model?

3       A.    There is.

4       Q.    Okay.  What's that based on?

5       A.    I believe it's a dollar 35 a trade, but

6    I'm not certain.

7       Q.    No, an assumed volume of trades built into

8    that model.

9       A.    Well, yes, there is.  It's based upon

10   number of trades per client per month, and I

11   believe that's 2.3 trades per month.  But I'm not

12   certain of that number.  And then when you assume a

13   certain number of clients at 2.3 trades at a

14   dollar 35 a trade, it builds up the revenue from

15   that.

16      Q.    Okay.  So how many clients do you expect

17   the spot market will have within the first year?

18      A.    I don't know off the top of my head.

19      Q.    Okay.

20      A.    I know the model encompasses that

21   information, but I don't know what the number is.

22      Q.    Why is it you believe that customers,

23   clients will choose your spot market versus others?

24      A.    Because of the transparency and the

1   perception of the brand associated with Nasdaq and

2   associated -- and the relationships that certain

3   number of members of our staff have with people in

4   the financial community.

5       Q.   Okay.  What do you mean by transparency?

6       A.   Well, there are competitors of ours that

7   have been accused and with some substantial data to

8   back those accusations up that they're artificially

9   inflating market volumes and other key metrics.

10  The way in which we'll operate the market

11  consistent with U.S. regulations, make them more

12  transparent than, say, exchanges operated overseas.

13      Q.   Well, what about in the U.S.?

14      A.   Similarly, we think that there's reason to

15  suspect that regulators, some regulators,

16  particularly the New York attorney general, in a

17  report they released last September is taking it in

18  view of the operation of some of our competitors.

19      Q.   Is it fair to say at this point this is an

20  untested business model?

21      A.   In its specificity, yes.

22      Q.   Okay.  Do you plan to use any money from

23  either Holdings or Minings -- or Mining to fund

24  Spot?

Page 158

1      A.    No.   In fact, we're looking to fund Spot

2   separately to free up cash flow for benefit of the

3   creditors.

4      Q.    All right.   And I see you have a biweekly

5   payroll expense of $36,990?

6      A.    You've lost me.   Which sheet are you on

7   now?

8      Q.    Spot?

9      A.    Okay.   So, yes, there is a payroll of

10   36,990.

11      Q.    Are these individuals currently on the

12   Spot payroll?

13      A.    There is no Spot payroll today.

14      Q.    So you'd have to hire all these people?

15      A.    They're currently working in Holding along

16   with all the other employees.

17      Q.    I see.   I see.   That's $36,990 that would

18   be taken off of the Holding payroll?

19      A.    Yes.

20      Q.    Flip over to the next slide, the

21   justification.   Could you explain this slide?

22      A.    Sure.   So if you start with Mining

23   revenue, a hundred percent of that revenue whether

24   it's a million and change or let's just say a

Page 159

1   hundred or a dollar, of every dollar we spend about

2   65 cents on electricity costs.

3        Q.   Okay.

4        A.    In addition to that 65 cents on

5   electricity costs, there's roughly 15 cents in

6   facilities and personnel.  So there is this EBITDA

7   at the mining level that we've been talking about,

8   Holding and Spot cost expenses are here today.   In

9   other words, those combined expenses within Holding

10  currently consume about another 17 percent leaving

11  3 percent in EBITDA margin.

12        If we allow the creditor or this new group

13  of investors to invest in Spot and move those

14  expenses out, then what we're able to do is free up

15  another 4 cents on the dollar for a total of 70 to

16  a hundred thousand dollars.  This is very

17  conservative that would then, again, be available

18  for creditors.

19        Q.   And when you say available for creditors,

20  are you referring to that monthly payment on the

21  note?

22        A.   Yeah.  Free cash flow net of operating

23  expenses.

24        Q.   Okay.

Page 160

1      A.   Yeah.

2      Q.   So that's basically you're proposing to

3  take those savings and pay them out to creditors

4  under the note, effectively?

5      A.   Yes.  Yeah, effectively.

6      Q.   Okay.  So you see the first bullet, it

7  says, currently all business lines have been

8  treated as one?

9      A.   Yes.

10     Q.   What do you mean by that?

11     A.   Well, for instance, you know, Lakeside

12  Bank, we've only got one bank account for the

13  entire company.  We probably, not probably, we

14  would definitely open a separate banking account

15  for Mining and a separate banking account for Spot.

16  All personnel had been under payroll at the Holding

17  level.  We would split those three ways, share

18  resources like human resources and accounting.

19  Those types of functions that are split would stay

20  in Holding, but those functions that are solely

21  attributable to Mining would go to Mining.  And

22  those functions solely attributable to Spot would

23  go to Spot.

24     Q.   Okay.  So are you saying that up until now

Page 161

1  creditors and other stakeholders have viewed the

2  different BCause entities as one consolidated

3  enterprise?

4      A.   I couldn't speak to what creditors view?

5      Q.   Have you held yourself out as one

6  consolidated enterprise?

7      A.   No.  You can see that in, say, for

8  instance, our mining agreements, they're specific

9  to BCause Mining, LLC.  And, similarly, you can see

10 in a variety of different agreements that we've

11 signed, they're either very specifically BCause

12 Mining, LLC, or BCause, LLC.

13     Q.   So then what do you mean by the business

14 lines have been treated as one then?

15     A.   Internally we only had one bank account,

16 and we only had one lump sum of payroll, and so on.

17 And, frankly, it's a practice we hope to improve

18 on.

19     Q.   So operationally you have run as one

20 company?

21     A.   Yes.

22     Q.   Okay.  And I -- strike that.

23          So on the second bullet where you say, if

24 spot business is allowed to operate independently,

Page 162

1   dot, dot, dot, and associated increase in

2   enterprise value?

3       A.   Uh-huh.

4       Q.   When you say increase in enterprise value,

5   are you really referring to that more cash

6   available for creditors?

7       A.   No.  What we're referring to there is the

8   idea that a set of software personnel and licenses

9   is not nearly as valuable to the stakeholders as an

10  operating exchange.  So if you separate out the

11  Spot business, fund it through launch, the launch

12  by itself gives it greater enterprise value.

13      Q.   How?

14      A.   Because in an investors mind, they're

15  investing not to get something -- not to get an

16  idea formulated.  They're investing to ramp a going

17  concern to a higher level of revenue.  And that's a

18  different type of investor -- investment.  And it's

19  viewed as less risky.

20      Q.   So from the investor's perspective, it

21  increases enterprise value?

22      A.   Yes.  But under the terms of this proposed

23  plan, our creditors would be investors.

24      Q.   So just to stick with this page for a

Page 163

1  second, it says, repaying credit -- you see where

2  it says repaying creditors from here, the EBITDA

3  margin?

4      A.   Yes.

5      Q.   Okay.  And then it seems as though as

6  you've discussed, by shifting expenses you're

7  saying we can add another 4 percent for a total of

8  7 percent; and what you're saying is you're going

9  to repay creditors from that aggregate EBITDA

10  margin created?

11     A.   Yes.  And that's before $70,000 a month on

12  a million in revenue, and that's where those

13  numbers tie together.

14     Q.   Okay.  So can we flip over to the next

15  slide, please, 13, Areas of Improvement.  So the

16  sublease, Wild Things Apparel, has that happened?

17     A.   We have a written letter of expression of

18  interest from the potential sublessor, but we have

19  not yet obtained approval or, you know, agreement

20  from Hoffland Properties.

21     Q.   Okay.  And renegotiate a portion of the

22  Dominion Power to save 5800 or enter into the GPC

23  agreement, have either of those things occurred?

24     A.   I've sent an email to Dominion Power

Page 164

1   asking for consideration in the agreement.  Their

2   response -- their initial response was, no, why

3   should we.  But they don't know that GPC is sort of

4   pending.  My suspicion is, but I don't have any

5   substantiation for that, they'll be more amiable to

6   negotiation when they realize we have an

7   alternative.

8       Q.   Okay.  Why do you think that they'll be

9   more willing to negotiate when they know that you

10  have an alternative?

11      A.   Because we're one of their largest

12  customers in the state.

13      Q.   Even though you're currently in

14  bankruptcy?

15      A.   We paid them $3 million essentially in the

16  last 60 days even though we're in bankruptcy.

17  We're one of the biggest customers in the state.

18      Q.   And then you say move the facility to

19  North Carolina in conjunction with Cube Hydro?

20      A.   Uh-huh.

21      Q.   Explain to me the Cube Hydro concept.

22      A.   So there is a hydroelectric damn in Badin,

23  North Carolina, that was constructed or bought by

24  Cube Hydro or they own it.  I don't know exactly

Page 165

1    how that happened.  But they own a hydroelectric

2    facility in Badin, North Carolina, a dedicated

3    facility for an Alcoa Plant.  Alcoa closed down

4    that plant and now they have a hydroelectric damn

5    that doesn't have a customer.  We -- it is

6    coincidental, but nice for both parties that our

7    need for electricity is within the capabilities of

8    that hydroelectric plan which is about 50

9    megawatts.

10        Q.   Okay.  So what's the cost to move?

11        A.   We expect that the costs would be about

12   $600 per miner on an all-in basis, but the cost is

13   the cost which was your question.  But the cash

14   cost to us should be nothing.  We've talked to them

15   about bearing that in the amount they charge us for

16   the electricity.  Meaning --

17        Q.   But --

18        A.   -- that they offered to charge us $40 per

19   megawatt.  And I said, well, if you built out the

20   facility on our behalf and then charge us, say, $47

21   or $48 per megawatt, would you guys find that to be

22   an acceptable deal.  And they said they had to take

23   it to their management, and that's where things

24   stand.

Page 166

1        Q.    Who's going to pay for the costs to move

2    the facility to North Carolina?

3        A.    They would.

4        Q.    They're going to come up with the cash to

5    pay you to move everything to North Carolina?

6        A.    Yes.

7        Q.    They've said they would?

8        A.    Well, I just told you what they said which

9    is I told them what the deal would be, and they

10   said they'd take it to their management.

11       Q.    So they actually haven't committed to

12   doing that?

13       A.    They have not.

14       Q.    And if you move the facility to North

15   Carolina, aren't you going to interrupt the hosting

16   with your customers?

17       A.    If I were to stage it, I think we'd

18   interrupt it but in a manner that the customers

19   would find acceptable.  Because the tradeoff would

20   be that there would be no more A days and

21   interruption for their power.

22       Q.    And, again, you haven't analyzed those

23   agreements to see if you can move the hosting site,

24   have you?

Page 167

1    A.   No.

2    MR. AGAY:  Do you need to take a break?

3    MR. CLAR:  Not really.

4    MR. AGAY:  We're in the middle of a deposition,

5  Scott.

6    MR. CLAR:  It's important.

7  BY MR. AGAY:

8    Q.   Okay.  Can we flip sides to liabilities?

9  I'll call these Slides 14 and 15?

10    A.   Okay.

11    Q.   Are there any differences between these

12  slides and the slides you filed with the court?

13    A.   I don't believe there's any difference

14  between these slides and the slides that may have

15  been filed with the court.  Again, I thought all we

16  did was file the spreadsheets, but you told me

17  earlier that there was more filed than that.  So

18  I'm unaware.  But what I would tell you is that I

19  believe since these slides were prepared on

20  Slide 15, Dominion Energy has reached an agreement

21  to apply our deposit against past due amounts.  And

22  so I don't believe that amount is any longer

23  $1.4 million.  I believe it's now 366,000.

24    Q.   Okay.

Page 168

```
 1        A.    But other than that, I think materially
 2    these haven't changed.
 3        Q.    All right.  Do these slides reflect all
 4    current liabilities of Holdings and Mining?
 5        A.    No.  They represent the liabilities prior
 6    to the filing date.
 7        Q.    Prior to the filing date, yes.  I mean
 8    current liabilities on a balance sheet basis.
 9        A.    So I'm not sure how to answer that given
10    sort of -- I'm unfamiliar with bankruptcy rules.
11        Q.    Strike that.
12              Could you please look at Exhibit 2?
13        A.    Yes.
14        Q.    The balance sheet as of 3-31-2019?
15        A.    Yes.
16        Q.    Do you see under there where it says --
17    under liabilities and equity?
18        A.    Yes.
19        Q.    It says, current liabilities?
20        A.    Yes.
21        Q.    Okay.  Do these slides reflect all current
22    liabilities as they would be set forth on your
23    balance sheet?
24        A.    No.  And I think the difference is -- I
```

Page 169

1    think the difference is -- oh, where you see

2    convertible notes payable $3.8 million, this would

3    be at the bottom of 1 of 2.  I believe that's the

4    amount owed to BMG at the time that this was

5    prepared, and I believe that's not included in the

6    numbers here.

7         Q.   Okay.

8         A.   Other than that, I think it is accurately

9    reflected.

10        Q.   That's a long-term liability?

11        A.   It is.  It is.

12        Q.   So I was just referring to current

13   liabilities.

14        A.   Well, the current liabilities are

15   $10.7 million --

16        Q.   Correct.

17        A.   -- reflected here.

18             And they are about $12 million represented

19   here.  I'm not sure how many of the long-term

20   liabilities were wrapped up in what was presented

21   to the court.  These numbers came from what was

22   filed with the court.

23        Q.   Okay.

24        A.   So I think the difference there is you

Page 170

1    have to add back in customer deposits payable and

2    perhaps future considerations to arrive at a

3    balance.

4         Q.    Okay.  Let's do it this way.  In terms of

5    the liabilities, do these two slides include

6    accounts payable?

7         A.    So they do include accounts payable, yes.

8         Q.    All accounts payable?

9         A.    I'm uncertain because we've already noted

10   there is a difference between what was presented

11   March 31 and what's here, and that could have to do

12   with sequencing of time.  But clearly there's a

13   difference in the numbers, but I'm not sure what

14   that's attributable to.

15        Q.    Okay.  Does this include -- do these

16   slides include all deferred revenue?

17        A.    They do not include deferred revenue.

18        Q.    Okay.  What about notes payable?

19        A.    I believe other than the note payable to

20   BMG, they do include any other notes payable.

21        Q.    Okay.  Payroll liabilities?

22        A.    There are some employees on here, but I'm

23   not certain whether that has to do with payroll

24   that's owed or whether -- in some cases I know for

Page 171

1    a fact it was money lent to the company by former

2    employees.  So I'm not sure what built up every

3    individual employees number.

4        Q.    Okay.  What about benefits payable?

5        A.    I don't believe there are any outstanding

6    benefits payable.  I believe all employees have

7    been paid current.

8        Q.    Okay.  And I believe you said that these

9    two slides do not include the long-term

10   liabilities?

11       A.    I said I don't think they include the BMG

12   portion of that long-term liability.

13       Q.    And that BMG portion is what?

14       A.    Here I think it falls under 22,550 which

15   is $3.8 million, I believe.

16       Q.    Okay.  So how much is owed to BMG today?

17       A.    I don't know what the status of the

18   amortization is.  It would be probably -- this was

19   prepared in March, April, May and now June have

20   passed, so it would be like $210,000 less than what

21   was represented.

22       Q.    But I see BMG is on here for $3.8 million,

23   so that's the long-term liable on here?

24       A.    Well, I don't know.  There's two halves to

Page 172

1    what we owe BMG.  One is the loan that we're

2    performing on, and the other one, I think, is the

3    deferred -- that may be the deferred revenue line.

4    I'd have to ask Christy why she labeled it that

5    way.  But I think it's the 3.8 plus the 3.2.

6        Q.   Okay.

7        A.   And the 3.8 is represented, but the 3.2 is

8    not represented.

9        Q.   So you think there could be another

10   $3.2 million of liabilities not reflected on these

11   sheets?

12       A.   Well, we know that.  We've been very open

13   about the fact that we continue to perform on the

14   loan to BMG for $70,000 a month.

15       Q.   Okay.  In terms of the amounts on these

16   slides that are owed to WESCO and CSC, are these

17   the just the amounts in your payable system?

18       A.   They are.

19       Q.   Okay.

20       A.   And I believe they're the amount that was

21   filed by us with the court, though I recognize that

22   WESCO and CSC have a different opinion.

23       Q.   So they don't reflect the entirety of the

24   amounts set forth on our promissory note?

Page 173

1    A.    I don't know.

2    Q.    Okay.  So there are additional liabilities

3  that are not reflected on these two slides,

4  correct?

5    A.    There are creditors that have a view that

6  they're owed moneys other than as represented here,

7  but this came from our system and what we filed

8  with the court.

9    Q.    Okay.  Setting aside my client, WESCO and

10  CSC, ballpark how much in additional potential

11  liabilities are there that are not on these slides?

12    A.    I don't know for certain.  I do know that

13  we received notice of the IRS filing, a notice that

14  they were owed.  I read through the IRS filing, and

15  it's fiction.  And the reason I say it's fiction is

16  that we didn't have any payroll during the time

17  period they're implying that we owe them FUTA taxes

18  and other things and penalties associated with the

19  FUTA tax that we didn't owe them.  So I know that

20  there are creditors, IRS among them, claiming that

21  we owe a significant amount of additional money,

22  but we would contest in some cases.

23    Q.    Okay.  What about Nasdaq when they say

24  they're owed 800 grand?

Page 174

1        A.    I do know that they have filed, that

2    they're owed some additional money.  You mentioned

3    it earlier in our conversation.  But I don't -- I

4    have not taken the time to recollect -- reconcile

5    what they filed against the contract.

6        Q.    I guess where I'm struggling is your

7    balance sheet, Exhibit 2, reflects $15,665,864 --

8        A.    Yes.

9        Q.    -- in total liabilities.

10        These two slides set forth approximately

11   $12 million in liabilities?

12        A.    Yes.

13        Q.    Could you explain the difference to me?

14        A.    Yeah.  I believe the difference is that

15   additional liability owed to BMG.

16        Q.    Okay.  By the way, your -- Exhibit 2, the

17   balance sheet?

18        A.    Yes.

19        Q.    This is a consolidated balance sheet,

20   correct?

21        A.    It is.

22        Q.    This is for BCause, LLC, BCause Mining,

23   and the other BCause subsidiaries?

24        A.    All the subsidiaries, yeah.  Again,

Page 175

1    historically they were all considered one.

2        Q.    Okay.    Can we turn to Slide 17,

3    priorities?

4        A.    Yes.

5        Q.    Okay.    What is this slide intended to

6    show?

7        A.    At a very high level it's just going to

8    explain to interested parties what the priorities

9    would have to be and how those funds -- where they

10   would come from, and then ultimately in subsequent

11   slides how they'd be attributed.

12       Q.    Okay.    What is pay for BFP for completion

13   of fire suppression system?

14       A.    So up until April 11 we had a fire

15   suppression system at the datacenter that was under

16   construction.    As of April 11, BFP stopped

17   construction of that fire suppression system.

18       Q.    What's BFP?

19       A.    Baltimore Fire Protection Equipment.

20   It's --

21       Q.    Okay.

22       A.    But they go by BFP.

23       Q.    Okay.

24       A.    And we need to make a priority of getting

Page 176

1    that fire suppression system completed.  Otherwise,

2    we run the risk of running a foul with like a fire

3    marshall.

4        Q.   Okay.  And do I read this correctly in

5    that that could cost almost $215,000 in the

6    aggregate?

7        A.   Yes.

8        Q.   Okay.  Is that currently incorporated in

9    any of your budgets?

10       A.   It is not.  We look to raise that money

11   external to the company in either form of equity or

12   a loan to get that paid for.  There's a number of

13   other sources that we're looking at.

14       Q.   Okay.  So you're going to have to raise

15   external capital in order to pay for that?

16       A.   Yes.  It's not envisioned in the current

17   budget.

18       Q.   And if it was incorporated into the

19   current budget, what impact would that have?

20       A.   It would delay our payment to creditors

21   90 days, but it's roughly the same amount on a

22   monthly basis --

23       Q.   You're saying --

24       A.   -- on an amortized amount.

Page 177

1   Q.   I'm sorry.  I interrupted you.

2        You're saying it would delay payment for

3   90 days because you're just multiplying 70 times 3?

4   A.   Yes.

5   Q.   So I thought you said that you're not

6   currently seeking to raise capital for Holdings or

7   Mining?

8   A.   We're not, but I intend to.  I haven't

9   spoken to anybody other than our board about this

10  need.

11  Q.   Okay.  Is this currently in your cash

12  collateral budget that you submitted to the

13  bankruptcy court?  Do you know?

14  A.   If you're talking about the 13-week budget

15  that we submitted, it's not in it.

16  Q.   Okay.  Doesn't this slide say that you

17  have to pay this amount in order to stay in

18  business?

19  A.   It says that it's a necessity to complete

20  the fire suppression system.

21  Q.   And/or before start of business, correct?

22  A.   Yes.

23  Q.   So without $215,000 to pay to the fire

24  marshall --

Page 178

1    A.    Well, not to the fire marshall, but --

2    Q.    For the fire marshall?

3    A.    For BFP for the fire suppression --

4    Q.    The business has --

5    A.    -- fire marshall, yes.

6    Q.    Sorry I interrupted you.

7          The business has to close its doors,

8    correct?

9    A.    Yes.

10    Q.    Okay.

11    A.    That is a risk.

12    Q.    And that has to be done by September?

13    A.    There's no sort of date certain by which

14    it has to be done.  The city has shown a great

15    amount of tolerance for our situation, but we

16    recognize that it doesn't have an open-ended --

17    it's not an open-ended obligation.  It's something

18    that has to be addressed or at least we need to

19    demonstrate progress to the city.

20    Q.    Okay.  If you can't get a loan or raise

21    capital to pay for this, doesn't this more than

22    wipe out all your cost savings?

23    A.    For that 90-day period, yes.

24    Q.    Okay.

Page 179

1    A.    But not more than wipe it out, no, because

2    actually we're showing roughly a hundred thousand

3    dollars a month in cost savings.  So it would wipe

4    out about 70 percent of those cost savings.

5    Q.    So you haven't modeled out these

6    projections, what impact that would have on EBITDA

7    or cash, correct?

8    A.    No, because we intend to raise it from

9    separate sources.

10    Q.    That you'd have to repay?

11    A.    Unless it was equity.

12    Q.    Okay.

13    A.    Certainly if it was a loan, yes.

14    Q.    Okay.  Is this -- so let's move on to the

15    debt forgiveness piece of this?

16    A.    Yes.

17    Q.    Is this slide saying that in June you have

18    to convince your nine largest creditors to forgive,

19    convert or amortize their debt?

20    A.    I don't know about the nine largest.  I

21    think about the creditors in the aggregate.

22    Q.    Okay.

23    A.    But, I mean, I think in a previous slide

24    we showed that the nine largest creditors are far

Page 180

1   and away the preponderance of what's owed, about

2   93.6 percent of what's owed.

3       Q.   So I guess I'll return to my question.

4            I mean, is this saying in June you have to

5   convince those creditors to forgive, convert and

6   amortize their debt?

7       A.   Yes.

8       Q.   And --

9       A.   And if not in June, then the whole plan

10  slides to right day for day essentially.

11      Q.   And if you can't accomplish that in June,

12  are you willing to keep operating the business?

13      A.   Absolutely.

14      Q.   Okay.  Indefinitely until that can occur?

15      A.   Absolutely.

16      Q.   Okay.  So at no point does it make sense

17  for you to throw in the towel?

18      A.   Not for the foreseeable future.

19      Q.   What is foreseeable future for you?

20      A.   Well, certainly through August or October,

21  October 4.

22      Q.   So what if it can't happen through

23  October 4?

24      A.   We'd have to reevaluate.

Page 181

1        Q.    So on 3B, it says, conversion of one-third

2    of the debt to equity and 11 months revenue, mining

3    and replace -- so what do you -- I think I know

4    what you mean, but what do you mean by equity at

5    11 months revenue?

6        A.    It's not equity at 11 months revenue.

7    It's debt to equity at 11 months revenue.  What

8    that means is that you convert 3.4 million.  This

9    is explained on the next slide actually.  You

10    convert $3.4 million.  It would work out to about a

11    dollar four a share, giving the creditors about

12    21 percent of the company.

13        Q.    Okay.  Let's turn to the next slide.

14    Could you just explain big picture what this slide

15    is intended to show?

16        A.    Sure.  We estimate 10 months revenue at

17    or, I'm sorry, 11 months revenue at about

18    $10.8 million, and that the replacement value of

19    the spot exchange would be about $2 million.  In

20    the aggregate that would give an enterprise value

21    of $12.8 million.  We currently have two classes of

22    ownership, A units and B units.  In the aggregate

23    they're $12.3 million or 12.3 million units which

24    is the equivalent of shares.

Page 182

1         If you were to divide the 12.3 million

2    shares outstanding by the 12.8 million imputed

3    value of the company, you'd arrive at a number of

4    about a dollar four a share.  If new money came in

5    or this isn't new money, but the debt conversion

6    were at that value, it would be $3.4 million in

7    essentially new money.  And we would issue

8    3.2 million new shares which would have dilutive

9    effect on existing shareholders of about

10   21 percent.  In the aggregate then we'd have

11   15.6 million outstanding shares and our post money

12   evaluation of the company would be $16.2 million.

13       Q.   Okay.  So let's start with WESCO and CSC.

14   Under this analysis, are you treating -- strike

15   that.

16            Do you know what the term pari passu

17   means?

18       A.   Yes.

19       Q.   Under this scenario are you treating WESCO

20   and CSC pari passu with your other creditors?

21       A.   Yes.

22       Q.   Meaning you're putting them together in

23   the same class of creditors?

24       A.   Yes.

Page 183

1      Q.   Okay.  And if WESCO and CSC do not agree

2   to that CSC, then the creditors are gonna have to

3   prevail in their litigation to avoid WESCO's liens,

4   correct?

5      A.   That's a legal question.  I don't know.

6      Q.   Okay.  So if WESCO and CSC do not agree to

7   that treatment, do you know what has to happen in

8   order for that treatment to occur?

9      A.   I do not.

10     Q.   And you don't know how long it would take

11   to accomplish that, do you?

12     A.   I don't.

13     Q.   You don't know how much it would cost,

14   right?

15     A.   I do not.

16     Q.   Otherwise, WESCO has to have consent to

17   that treatment, correct?

18     A.   I would assume WESCO and the other

19   creditors would have to agree to that treatment.

20   And, frankly, beyond that, I think the court, too.

21     Q.   And then let's go back to your methodology

22   of valuing --

23     A.   Yes.

24     Q.   -- the company based on revenue and

Page 184

1    replacement value.

2         Are you aware that you would have to

3    convince the creditors and the court that that's a

4    proper methodology for valuing the company?

5         A.    I believe that I am and that we can.

6         Q.    Okay.  And you haven't retained any

7    valuation or other experts to assist you in that

8    respect, have you?

9         A.    We have not.

10        Q.    And is your view based on a reading of the

11   bankruptcy code?

12        A.    No.  It's based upon familiarity with the

13   market.

14        Q.    What market?

15        A.    General the buy and sell of small

16   businesses.

17        Q.    Okay.  So it's also not based on any

18   reading of case law?

19        A.    It is not.

20        Q.    Okay.  So this says that creditors are

21   going to own 20 percent of the company?

22        A.    21, but yes.

23        Q.    Approximately 21 percent.  Who owns the

24   rest?

Page 185

1    A.    Existing shareholders would be diluted in

2    their existing ownership.

3    Q.    Who are the existing shareholders --

4    strike that.

5          How many existing shareholder are there?

6    A.    Approximately 35.

7    Q.    Okay.  Is there a concentration of

8    ownership among a few of those?

9    A.    The largest shareholder is SBI which is a

10   Japanese investment company, and they own about

11   40 percent of the company.

12   Q.    And who owns the next highest amount?

13   A.    I believe it's a gentleman by the name of

14   John Ashby.

15   Q.    Now, if, in fact, those individuals could

16   not retain any ownership stake in the company going

17   forward, what impact would that have on this plan?

18   A.    I suppose it depends on where the money to

19   execute the plan came from.

20   Q.    Okay.

21   A.    Because if they couldn't maintain any

22   ownership, my assumption is they wouldn't make the

23   investment the three-quarters of the million

24   dollars we've been discussing.

Page 186

1     Q.   Okay.  Do any existing employees have an

2  equity stake?

3     A.   I believe Bruce Pollack and myself are the

4  only two employees that have an equity stake.

5     Q.   Okay.  And if you could not retain any

6  equity stake in the business going forward, would

7  that impact your decision-making around this

8  bankruptcy case?

9     A.   It's immaterial to me.

10     Q.   But it is material to the other equity

11  holder?

12     A.   I couldn't speak to him.

13     Q.   The members -- do the members of your

14  board own equity in the company?

15     A.   With the exception of Jonathan Tamnomore

16  who represents SBI, all of the other board members

17  own some portion of equity.

18     Q.   Are you aware of whether they believe

19  they'll retain an equity stake in the business

20  going forward?

21     A.   I couldn't speak to what they're aware of

22  or not.

23     Q.   Have they been advised that they'll retain

24  an equity stake in the business going forward?

Page 187

1     A.   Not by me.

2     Q.   Not by you?

3     A.   Yes.

4     Q.   To your knowledge by anybody else?

5     A.   Nope.

6     Q.   Have you ever heard of the absolute

7 priority rule?

8     A.   No.

9     Q.   Have you ever heard of the best interest

10 test?

11    A.   No.

12    Q.   Other than payment under the note, does

13 this contemplate any cash payment to WESCO or other

14 creditors?

15    A.   Well, as previously talked about, we are

16 making ongoing payments to BMG, and we're making

17 payments to WESCO as well, adequate protection

18 payments to have WESCO.

19    Q.   I'm asking a different question.  Let's

20 assume that there's an effective date --

21    A.   Yes.

22    Q.   -- for this restructuring?

23    A.   Yes.

24    Q.   Okay.  Post effective date -- well, either

Page 188

1   on or subsequent -- strike that.

2           Either on or subsequent to that effective

3   date, what cash payments does this contemplate

4   other than payments under the note to creditors?

5       A.   The only other payment would be the

6   ongoing payment to BMG -- portion that's not --

7   that's -- that deferred revenue we talked about

8   earlier.

9       Q.   Okay.  So if that ongoing payment to BMG

10   could not continue, do you think BMG would renew

11   their contract with the company?

12       A.   I don't know.

13       Q.   Do you have any sense of what impact it

14   may have on BMG's position if that payment stream

15   does not continue?

16       A.   I don't.

17       Q.   I know you have answered this, but I just

18   want to be clear.

19           This is not based on any discounted cash

20   flow analysis, correct?

21       A.   It is not.

22       Q.   And it's not obtained -- it's not based on

23   you obtaining any market comparables for this

24   business, correct?

Page 189

1    A.   It is not.

2    Q.   Okay.

3    A.   But I will say this, if I did a discounted

4  cash flow analysis, it would show the valuation is

5  higher.  So we showed the more conservative

6  valuation.

7    Q.   It would show the -- how would it show the

8  valuation's higher?

9    A.   Because the discounted cash flow of the

10  exchange would be in the hundreds of millions of

11  dollars over if I discount it back from three

12  years.  So instead of showing it at 2 million, I

13  would show it at significantly higher.  This is

14  much more conservative.

15    Q.   Okay.  So you're projecting hundreds of

16  millions of dollars in revenues for the spot

17  exchange?

18    A.   Yes.

19    Q.   Okay.  Where is that valuation?

20    A.   Meaning like do you want me to -- are you

21  asking if we have a three-year model that shows

22  that?  We do.

23    Q.   Okay.  What's the implied recovery for

24  WESCO under this scenario?

Page 190

1      A.    It would depend upon what you think the

2    terminal value of the equity is; but if you assume

3    the equity just stays at a dollar four a share,

4    it's about 80 percent recovery.

5      Q.    Okay.  So the --

6      A.    33 percent in repayment plus interest, but

7    excluding the interest or the time valued at money.

8    Just in the strict repayment of the note, it's

9    about 33 percent in equity.  And they'd be able to

10   write off $3.4 million in the debt forgiveness, and

11   depending on the state, they're gonna get about

12   40 percent return on that.  So all in, they'd get

13   about 80 cents on the dollar.

14     Q.    Assuming that's what the equity was worth?

15     A.    Assuming that's what the equity was worth.

16     Q.    And assuming that you could continue to

17   service the debt payments?

18     A.    Yes.

19     Q.    The hundreds of millions of dollars in

20   equity value in Spot, has that been confirmed by an

21   outside accounting firm?

22     A.    No.

23     Q.    Okay.  Has it been confirmed by any

24   outside consultants?

Page 191

1      A.    So we had retained Asgard Capital and

2   Castle Placement in previous years.  And as a

3   valuation for the spot market as a going concern,

4   we were talking about raising $20 million on a

5   $50 million premarket.

6      Q.    Okay.  So why can't you raise that same

7   $20 million today?

8      A.    Because it's not a functioning exchange.

9   The whole point is to get it launched, and then we

10  think it has much more value.

11     Q.    You think, but you don't know for sure.

12  You can't know for sure?

13     A.    You're answering your own question.

14     Q.    So the answer is, yes, you can't know for

15  sure?

16     A.    Nobody can know for sure.

17     Q.    Okay.  And is there any functioning

18  exchange in the market today that has that value?

19     A.    Absolutely.

20     Q.    Okay.  Which exchange is that?

21     A.    Coin Base, Bitfinex, Poloniex, these

22  exchangers are valued in the billions of dollars.

23     Q.    And your exchange is going to be valued at

24  the same amount?

Page 192

1       A.    Well, not initially.    That's not a

2   reasonable supposition.    But we believe that the

3   agreement with Nasdaq and our relationships in the

4   market combined with the market segment we've

5   chosen to address has significant value.

6       Q.    And at the hearing on the 21st, is there

7   anybody other than you that is going to testify to

8   that type of a valuation?    It's just going to be

9   you?

10      A.    I don't know.

11      MR. AGAY:  Do you know if you're going to have

12  other witnesses?

13      MR. CLAR:  I don't.

14      MR. AGAY:  Are you going to tell us in advance?

15      MR. CLAR:  I think I would do that.

16  BY MR. AGAY:

17      Q.    Other than your word and business plan, do

18  you have any independent confirmation of the

19  revenue stream and valuation for your spot market

20  on a going-forward basis?

21      A.    Those models were prepared by Bruce

22  Pollack who is running our Spot operation and has

23  extensive experience in the industry, and they were

24  corroborated by Fred Sladoji who was acting as our

Page 193

1    CEO and is a former senior executive with the

2    Chicago Board of Trade.  They'd both be considered

3    experts by anybody.

4        Q.    Do you plan on producing the models in

5    advance of the hearing on the 21st?

6        A.    I have no plans one way or the other.

7    Depends on --

8        Q.    Can you produce the models in advance of

9    the of 21st?

10       MR. CLAR:  Which models are you talking about

11   because I'm not sure this is really relevant?

12   Which models are we talking about?

13       MR. AGAY:  The three-year model for Spot.

14       THE WITNESS:  For the spot exchange.

15       MR. CLAR:  I'm just wondering why that -- just

16   talking through this -- why that's relevant when

17   all we're saying is it's going to reduce the amount

18   of expenses.  We're not relying on it for revenue,

19   so why is that --

20       MR. AGAY:  No.  He's saying it's worth hundreds

21   of millions of dollars, and that's going to

22   translate into equity value in recovery for my

23   client.  So I'd like to see the model.  It's highly

24   relevant.  I'm sure the judge will agree.  It's the

Page 194

1   entirety of this case.

2        MR. CLAR:  No, it's not.

3        THE WITNESS:  I think if you go to the last --

4        MR. CLAR:  There's no question pending, though.

5        THE WITNESS:  Yeah.

6   BY MR. AGAY:

7        Q.   Okay.  Let's move on.

8        A.   Maybe.

9        MR. CLAR:  I mean, if it will help resolve the

10  case, sure.  Otherwise, I'm not sure what the

11  relevance is.

12  BY MR. AGAY:

13       Q.   Oh, and just to be clear, this

14  contemplates that the BMG note is going to continue

15  through?

16       A.   Yes, it does.

17       Q.   And you'll continue to service it?

18       A.   It does.

19       Q.   So BMG gets better treatment than other

20  unsecured creditors under this plan?

21       A.   They get treatment consistent with the

22  rest of the creditors for the half that was

23  included in the bankruptcy.  They -- the other

24  piece -- again, this is on my unfamiliarity with

Page 195

1    bankruptcy, is that we've just continued to execute

2    on our agreement with BMG.

3        Q.    What's the right side of this page

4    showing?

5        A.    So essentially BCause Holding and BCause

6    Mining are the two debts carried from previous

7    slides, it's a recognition that BFP is going to be

8    required to be paid rather than handled in a

9    one-third, one-third, one-third.  It's also a

10    recognition that Dominion has already received,

11    frankly, an adjustment, and that number would

12    probably be converted to $366,000 and probably

13    included.

14            But the $1.4 million is no longer

15    operative because of the conversion of their

16    deposit.  The Nasdaq would need to be made whole in

17    some way to move forward.  So the numbers that

18    shows here in terms of the debt conversion and so

19    on would probably be somewhat different than what's

20    presented here because it was unclear to me when I

21    prepared this slide what the treatment for these

22    three entities would be.

23        Q.    So you think Nasdaq has to be made whole?

24        A.    No.  You told me that they believe they're

Page 196

1   worth -- they're owed $800,000.  I believe probably
2   123,000 of that would -- so --
3        Q.   But you think you're going to have to pay
4   them a hundred cents on the dollars on whatever the
5   amount is?
6        A.   No.  I think I'm going to have to pay them
7   123,000 out of the 800 you claim that they believe
8   they're owed which is 12 cents on 80.
9        Q.   I don't understand that.
10       A.   You told me earlier in the conversation
11  that you believe that Nasdaq had filed that they're
12  owed 800,000.  I believe I'm going to have to pay
13  them $123,000 to get them to support our software.
14       Q.   Where did you come up with that $123,000
15  number?
16       A.   It came from the earlier amount that we
17  think we owed them, but it was supported by the
18  conversation that I had with them earlier last
19  week.
20       Q.   Okay.  So based on what you think you owe
21  Nasdaq, you believe you're going to have to pay
22  them a hundred cents on the dollar?
23       A.   I think that's right.
24       Q.   Okay.  In order for them to support your

Page 197

1  license?

2      A.   When you frame it that way, but I would

3  say that if you take into consideration the

4  $800,000 from their perspective, they're not made

5  whole.

6      Q.   I understand.  But what if it was proven

7  that they were owed $800,000?

8      A.   I still don't think we'd have to pay them

9  the 800.  I think they would still do 125, roughly,

10  a thousand dollars.

11      Q.   You'd have to negotiate some separate

12  treatment for Nasdaq than other unsecured

13  creditors?

14      A.   Agreed.

15      Q.   So I'm still unclear on how the math is

16  playing out here because you have BCause Holding at

17  1 million 1 -- approximately $2 million in

18  liabilities and BCause Mining at approximately

19  $10 million of liabilities?

20      A.   Yes.

21      Q.   And then you have these adjustments, and

22  then you have a total number.  Could you please

23  just explain to me how these adjustments --

24      A.   For the purposes of the analysis, I simply

Page 198

1    subtracted out the BFP amount owed, the Dominion

2    amount owed, and the Nasdaq amount owed that you

3    can see on this previous slide.

4        Q.    I see.  So in addition, you think that

5    Dominion's going to have to be made whole on the

6    amount?

7        A.    They've already been made whole.  They had

8    a deposit and my understanding is that counsel's

9    allowed them to or the court allowed them to use

10   the deposit that was on deposit with them to

11   satisfy most of what they were owed.

12       Q.    Okay.  With respect to the amortization

13   piece, the five-year note at 12 percent, how did

14   you come up with 12 percent?

15       A.    It seemed like a market rate for what is

16   admittedly somewhat of a risky note.

17       Q.    Okay.  So you didn't come up with it based

18   on what the company could afford in terms of

19   monthly cash payments?

20       A.    No.

21       Q.    Okay.  So then how do you know if the

22   company can afford that?

23       A.    Because the monthly payment squares back

24   at about 75 percent of the available cash flow that

Page 199

1  we expect the operation to spin off.

2      Q.    Okay.  Coincidentally?

3      A.    Well, it's 75 percent.  It's not a hundred

4  percent, so there's no coincidence about it.  It's

5  just the way the number worked out.

6      Q.    But you came up with 12 percent as a

7  market rate which just happens to go back to 75,000

8  which is the amount of cash that the company's

9  spinning out?

10     A.    The company spins out almost $150,000 in

11 EBITDA January, February, March.  But as you

12 pointed out with the court expenses, there's some

13 reduction in that free cash spinout which works out

14 to about a hundred thousand dollars a month.  The

15 75,000 is a portion of that, about 75 cents on the

16 dollar.

17     Q.    Okay.  So with the 12 percent, you said

18 that that seemed to be a market rate.  What was

19 that based on?  What analysis was that based on?

20     A.    So currently the risk free rate is about

21 two and a third percent.  A typical sort of car

22 loan or something of that nature is in the

23 6 percent range.  This represents some amount of

24 risk premium associated with the --

Page 200

1    Q.   And how did you come up with the risk

2  premium?

3    A.   Some things I just do second nature, and I

4  don't even think about how it's done.   But

5  typically if I were to go to a VC or something like

6  that, the rate would be between 12 and 14 percent.

7    Q.   When you said the risk free rate is -- I

8  thought you said was two and a half?

9    A.   Two and a third.

10    Q.   That's LIBOR?

11    A.   No.   That's not the risk free rate.   The

12  risk free rate is the American T-bill, 10-year

13  renewed rate.

14    Q.   All right.   Did you consult with your

15  counsel in preparing this?

16    A.   Our counsel was made aware of it and shown

17  previous drafts and this final draft.

18    Q.   Okay.   Did you get any feedback from your

19  counsel?

20    A.   Yeah.

21    Q.   Okay.   We probably know the answer to

22  this, but what happens to this scenario if you

23  can't retain SBI, BMG and/or St. Bitts as

24  customers?

Page 201

```
 1        A.    Well, we already spoke to the fact that if
 2   we lose one of those three, we can probably
 3   continue to execute on this plan; but if we lose
 4   two of those three, it would likely have to be
 5   modified in some way.
 6        Q.    But if you lose SBI, you're saying the
 7   plan doesn't need to be modified?
 8        A.    I'd have to model that.  But I think that,
 9   and you know this from previous slides, about
10   80 percent of our revenue is also costs.  So in
11   losing that revenue, we wouldn't necessarily lose
12   all of the margin.  Remember, there's this 75 cents
13   on the dollar.
14        Q.    But you haven't modeled it?
15        A.    We haven't modeled it.
16        Q.    Do any much these projections reflect any
17   sensitivities or other variables that might occur?
18        A.    We didn't perform sensitivity analysis.
19        Q.    Okay.  Could we turn over to Slide 19?  I
20   think we're moving along which is good.
21              Okay.  This is amortized -- it's cut off
22   at the top of the page, but amortized one-third of
23   debt over five years?
24        A.    Uh-huh.
```

Page 202

1    Q.    That's the slide I'm looking at, Slide 19?

2    A.    Yes.

3    Q.    So this assumes the start date of the loan

4    is September 1, 2019; is that correct?

5    A.    It does.

6    Q.    Okay.  Does that mean you assume you

7    confirm a Chapter 11 plan and go effective as of

8    September 1, 2019?

9    A.    I assumed actually that in a worst case

10   scenario, we paid BFP June, July and August, and

11   that this was just a continuation of that plan.

12   But as I said previously, we intend to raise that

13   money external to this, and September 1 is simply

14   for the model.  It could be any month, and sooner

15   would be better than later for everybody.

16   Q.    Okay.  I did the math.  And I calculate

17   12 percent interest on $3,413,105.59 as

18   $409,572.67 per year.  Does that make sense to you?

19   A.    It's 76,000 times 12, whatever that works

20   out to.

21   Q.    Well, so, again, let's do it this way.

22         So in order to figure out the interest on

23   the note --

24   A.    Oh.

Page 203

1    Q.    -- I calculated 12 percent -- the annual

2  interest.  I did 12 percent of approximately

3  3.4 million.  Would you agree that that's

4  appropriate?

5    A.    Not in a compounding loan.  You're doing

6  simple interest.

7    Q.    You're viewing this as a compounding loan?

8    A.    Absolutely it would be.

9    Q.    Okay.

10   A.    So what period of interest rate did you

11 use?  In other words, how fast were you

12 compounding?

13   Q.    I didn't compound.  I didn't realize you

14 were contemplating compounding this.

15   A.    Okay.

16   Q.    You are, just to be clear, contemplating

17 this as a compounding 12 percent loan?

18   A.    Yes.

19   Q.    Okay.  And how are you amortizing this

20 note?

21   A.    Over 60 months.

22   Q.    So equal payments --

23   A.    Yes.

24   Q.    -- of principal?

Page 204

1    A.   Yes, principal's interest.

2    Q.   So you see on the right-hand side of the

3  page where it says total interest equals

4  1.1 million --

5    A.   Yes.

6    Q.   -- approximately?

7         Are you certain that's the correct amount

8  of interest on this note?

9    A.   To the extent that Excel knows how to do

10  interest calculations, yes.

11    Q.   Would you agree that a compounding rate

12  loan pays more interest than a noncompounding rate

13  loan?

14    A.   Typically.

15    Q.   Okay.

16    A.   But you just said, I thought, that you had

17  done a calculation that was $400,000 of interest.

18    Q.   So bear with me for a second.  Let's just

19  pretend this is a noncompounding rate loan?

20    A.   Okay.

21    Q.   Okay.  Let's pretend the interest

22  10 percent rather than 12 percent?

23    A.   Okay.

24    Q.   That would infer $340,000 a year in