# EXHIBIT B

Page 205

1   interest?

2       A.   In the first year.

3       Q.   In the first year, okay?

4       A.   Sort of, right.  But that gets reduced to

5   every month.

6       Q.   You're assuming that as you amortize the

7   loan, the interest goes down?

8       A.   Of course.

9       Q.   Okay.  I wish my mortgage worked like

10  that.

11          Do you have the Excel sheet that you used

12  to calculate the payout of the loan?

13      A.   Yes.

14      Q.   So just to be clear, this is a compounding

15  rate loan that pays interest on whatever the

16  principal outstanding is on the note?

17      A.   Monthly.

18      Q.   Monthly?

19      A.   Yes.

20      Q.   Netting out the amortization to date?

21      A.   Yes.

22      Q.   Okay.  And have you prepared any

23  projections that demonstrate how the company will

24  carry this cost?

Page 206

1      A.    Not that we've provided to the court, no.

2      Q.    Okay.

3      A.    And, frankly, the reasoning for that is

4  just the timing.

5      Q.    Okay.  Have you ever heard the term,

6  feasibility analysis?

7      A.    Yes.

8      Q.    Okay.  What do you think that means?

9      A.    An assessment of how feasible a plan would

10  be.

11      Q.    Okay.  And have you performed that

12  analysis here?

13      A.    We have not, not formally.

14      Q.    Okay.  Could we turn to the next slide,

15  Slide 20, key elements?

16      A.    Yes.

17      Q.    The first bullet point is substantial cost

18  reductions are still available?

19      A.    Yes.

20      Q.    What substantial cost reductions that are

21  not contained in these slides?

22      A.    They are contained in the slide, but

23  they're not yet executed.  For instance, the GPC

24  Green agreement or the Dominion renegotiation or

Page 207

1   subleasing the Hoffland Properties, these all have

2   the potential to improve monthly free cash flow.

3       Q.   Okay.  So when you say are still

4   available, you're not saying that outside of this

5   business plan?

6       A.   No.  I believe we've encapsulated

7   everything we think is reasonable.

8       Q.   Okay.  If my client WESCO and CSC were

9   secured creditors and you had to pay us a hundred

10  cents on the dollar, would you still be able to

11  execute on this plan?

12      A.   It would depend upon the terms of that

13  repayment, but if we had to do it lump sum up

14  front, no.  If we had to do it over five years sort

15  of concurrent with the terms in here, maybe.

16      Q.   But you don't -- you haven't modeled that

17  out?

18      A.   I have not.

19      Q.   So your contention is under this plan

20  other than the three creditors we discussed, all

21  other creditors get an 80 percent recovery?

22      A.   It depends on their individual tax rates,

23  but yes.

24      Q.   Okay.

Page 208

1      A.    With some plus or minus depending on their
2  tax rates.
3      Q.    Okay.
4      A.    Frankly, if I'm right about the launch of
5  the spot market and the attributable increase in
6  equity value, they get more than that.
7      Q.    Let's go to assumptions.
8      A.    Okay.
9      Q.    So this lays out four critical assumptions
10 to executing on this business plan?
11     A.    Yes.
12     Q.    None of which have occurred to date,
13 correct?
14     A.    That's correct.
15     Q.    Okay.  What if any one of these things
16 does not occur?
17     A.    Then our results will vary.
18     Q.    Okay.  Have you modeled those scenarios?
19     A.    There's too many of them.
20     Q.    Okay.  If any one of these things doesn't
21 occur, do you think you can execute on this
22 business plan?
23     A.    It would depend among the extent of which
24 it didn't occur.

1      Q.   But you can't say for sure that you could

2    execute on the business plan if any one of these

3    four things --

4      A.   That's correct.

5      Q.   What if you had to pay WESCO a million

6    dollars today in cash, could the company continue?

7      A.   No.

8      Q.   What if you had to pay WESCO 750,000,

9    could the company continue?

10     A.   No.

11     Q.   What if you had to pay WESCO 500,000,

12   could the company continue?

13     A.   I don't think so.

14     Q.   Okay.  Flip over to the next slide,

15   please, risk and dependencies, what is meant on

16   your first bullet, mining, margin is slim and needs

17   to scale to improve margins?

18     A.   So this centers around a discussion we had

19   with BMG.  At 15,000 miners we have about $58,000 a

20   month in rent, and so we're paying 2.70-ish cents,

21   I'm rounding, but about 2.7 0 per machine in rent.

22   If we were to double the amount of miners that we

23   host, that would drop about a dollar 30 and improve

24   margin substantially about $30,000 a month.  So the

Page 210

1    discussion that I had with BMG centered around

2    whether we could host more machines for them and

3    improve our margins.

4        Q.    Okay.

5        A.    Because they had already expressed the

6    fact that they felt our pricing was fair.

7        Q.    So if you can get more business from

8    BMG --

9        A.    We can get more business from anybody, but

10    BMG is one of the largest participants in our

11    market.

12        Q.    Okay.  Have you discussed this concept

13    with anybody other than BMG?

14        A.    SBI.

15        Q.    But neither of them have committed to

16    date?

17        A.    Not yet.

18        Q.    Turn to opportunities, I think it's

19    Slide 23?

20        A.    Yes.

21        Q.    What do you mean by regulatory

22    developments?

23        A.    So there -- our industry is very young

24    from a regulatory standpoint, and we believe that

Page 211

1   there are opportunities to help shape that

2   regulation.  Both with the CFTC and with the

3   various state regulators.  We're in ongoing contact

4   with every one of the states in which we registered

5   as money transmitter and ongoing discussions with

6   the CFTC and SEC.  I personally testified in front

7   of the federal reserve and in front of the CFTC,

8   and they have shown an openness to sort of some of

9   our input on things.

10       Q.   Okay.  From your deposition testimony

11   today, it seems as though there's much more

12   potential upside from the spot exchange than

13   there is from the hosting and mining business.  Do

14   you agree with that?

15       A.   Define for me potential upside.

16       Q.   Dollar value?

17       A.   Over maybe a three-year time horizon, I

18   think that's possibly true.  Over a six-month time

19   horizon, the spot market is a cash sink, and the

20   mining operation throws off the free cash flow.  So

21   it depends upon your time frame.

22       Q.   What about a 12-month time frame?

23       A.   They're probably about equal, but there's

24   a lot of sort of uncertainty in that question with

Page 212

1    respect to, say, the exchange value.

2        Q.   So if you can't --

3        A.   I don't mean the spot exchange.  I mean

4    the exchange value of Bitcoin at that point in time

5    which nobody knows right now.

6        Q.   And your business plan presumes that

7    you're just going to continue hosting, correct?

8    That you're not also going to be mining?

9        A.   We wrote the proposal to the creditors and

10   the court in the most conservative manner possible.

11   But, no, as I've already testified, our intention

12   is to go out and raise $3 million and to mine for

13   ourselves.

14       Q.   Oh, I'm sorry.  I didn't hear that.  When

15   did you testify that you're going to raise

16   3 million and mine for yourself?

17       A.   Three ours ago.

18       Q.   Okay.  Remind me of that.

19       A.   That's what we said.

20       Q.   So you are raising additional money for

21   the mining --

22       A.   We are not currently, no.  But it is our

23   plan once we have clarity through this process to

24   raise additional money to mine for ourselves.

Page 213

1    Q.    And you think you'll need to raise

2  $3 million?

3    A.    Need, no.  That seems to be the

4  appropriate amount of money for the scale of mining

5  we would envision doing for ourselves.  $3 million

6  should allow us to procure about 1500 machines.

7    Q.    Okay.  But you're not planning on giving

8  your creditors any upside in that?

9    A.    They'll have equity in the company, and

10  the company would be more valuable.  And it would

11  generate free cash flow which would serve for our

12  ability to better service the amortization, so

13  absolutely they get upside to that.

14    Q.    Is one of your goals in this Chapter 11

15  case to preserve value for shareholders?

16    A.    Our goal is to preserve value for all the

17  stakeholders.

18    Q.    Including shareholders?

19    A.    Yes.

20    Q.    So can we turn to Slide 24, summary of

21  benefits to stakeholders?

22    A.    Yes.

23    Q.    In your view if shareholders cannot retain

24  any current or future interest in BCause, is it

Page 214

1    worthwhile to continue in Chapter 11 cases?

2         A.    Well, I think our primary consideration is

3    the stakeholders, albeit the creditors.  So if we

4    couldn't do that, I think we'd still need to

5    maintain value for the creditors.  But it's our

6    hope to do that for all parties.

7         Q.    And for creditors, do you think value is

8    best achieved in a Chapter 11 or in a Chapter 7?

9         A.    Well, we think that the enterprise value

10   today is about $12 million versus a $900,000

11   liquidation value.

12        Q.    Why do you say $900,000 liquidation value?

13        A.    Because that's the best estimate we've

14   gotten from AlphaCraft and a company related to

15   AlphaCraft.

16        Q.    But are you taking into account the cash?

17        A.    No.

18        Q.    Okay.  So there's liquidation value in the

19   cash obviously?

20        A.    There would be.

21        Q.    Okay.  And presumably there's also

22   liquidation value in the receivables, yes?

23        A.    There are no receivables.

24        Q.    What do you mean by that?

Page 215

1    A.    We invoice and they're paid.  So, I mean,

2    technically I guess there's 28, 29 days, but really

3    that money's not owed until a service is rendered.

4    Q.    I understand that, but if you're -- if you

5    render services and then commence a liquidation,

6    the customer's still going to have to pay for the

7    period in which you rendered services, correct?

8    A.    No.  Our customers pay sort of in advance

9    by 30 days.  So there's no liquidation value.

10    Q.    The customers pay in advance?

11    A.    Yes.

12    Q.    So they'll pay you, and then you're saying

13    you're going to owe them a refund?

14    A.    Yeah, if -- in a liquidation you would.

15    Q.    Okay.  So they would in addition to the

16    cash -- strike that.

17            Can we go back to -- I don't know what

18    slide it is.  Well, let's go back to the court

19    proposed budget Mining.  It's at the beginning of

20    the PowerPoint.

21    A.    Uh-huh.

22    Q.    So on that net revenue line, every time

23    you get a million dollars, May 3, May 31, July 5,

24    August 2, you're saying that's prepayment?

1      A.    Yes.

2      Q.    Okay.  So once that payment made is made,

3  is there a corresponding liability on your balance

4  sheet that's created?

5      A.    I don't know if Christy does that for the

6  28 days that that liability exists, but she might.

7  In fact, I think I read -- I'm not sure where she

8  accounts for that at.  It might be in future

9  considerations.  It might be in deferred revenue.

10  I'd have to ask her.

11      Q.    Okay.  So let me just pose a theoretical

12  to you.  Let's just look at May 10th, okay?

13      A.    Yes.

14      Q.    You have $750,000 in expenses?

15      A.    Yes.

16      Q.    Okay.  If you went out of business on

17  May 10 or something thereabouts where you had to

18  pay those expenses, but then had to repay the

19  million dollars, could you do that?

20      A.    If you look at the next slide, it seems

21  that there's $955,000 in available cash on the week

22  of May 10.  It seems like most of that would be

23  repayable.

24      Q.    Okay.  So you would have to use the cash

Page 217

1    in the Lakeside account to repay -- to pay those

2    expenses and also to repay your customers?

3         A.    That's the only cash there is.

4         Q.    Can we flip over to the slide that's

5    called, fall back plan?

6         A.    Option 1?

7         Q.    Yes.

8         A.    Yes.

9         Q.    All right.  So on this slide, the fifth

10   dash there you say, mining, business may not be

11   sustainable long term relative to scale, cost of

12   energy, business synergy, other value added

13   services.  I thought you said there was upside in

14   mining?

15        A.    We believe that there is, and that says

16   may not be sustainable.  There's uncertainty in

17   what we're talking about.

18        Q.    What are those uncertainties?

19        A.    All of the things we talked about.

20   Customers may not choose to continue service with

21   us, might not extend their contract.  If they

22   don't, we may not be able to replace the revenue.

23   All of those things are true.

24        Q.    What do you mean by cost of power?

Page 218

1      A.    So there are other areas of the country

2   where power is less expensive.  It gives some of

3   our competitors somewhat of an advantage.  So

4   moving to Badin, for instance, at 4 cents versus

5   where we're currently at -- or $40 versus where

6   we're at currently at $53, that $13 is a meaningful

7   difference.  Other areas of the country, upstate

8   New York and Washington State in particular have

9   some advantages.  They can be in the $30 range,

10  $38, call it something like that.  So $40 makes us

11  more competitive.  We compete on things other than

12  costs, but it's true that there's -- when only

13  looking strictly at cost, there are areas of the

14  country that are superior to where we're at

15  currently.

16      Q.    Okay.  I take it your competition knows

17  you guys are in bankruptcy, correct?

18      A.    I would assume so, but I can't speak to

19  what they do or don't know.

20      Q.    Do you know if they're calling your

21  customers?

22      A.    I don't know.

23      Q.    Okay.  What do you mean by business

24  synergy?

Page 219

1      A.    It's not coming to me right now.

2      Q.    Okay.  What about other value added

3  services?

4      A.    There are -- there is this interplay

5  between mining and the spot exchange where our

6  mining customers have to turn their cryptocurrency

7  into fiat once they've mind it.  If we weren't

8  running the spot exchange, those sales wouldn't

9  necessarily accrue to the spot exchange.  And

10  there's anticipated to be some amount of revenue

11  associated with that.

12        And actually getting back to business

13  synergy, that's the answer to your question as

14  well.  If there's no spot exchange, that piece

15  doesn't exist.

16      Q.    Okay.  I think this is Slide 30, the

17  fallback option, close the doors?

18      A.    Yes.

19      Q.    What is this slide supposed to show?

20      A.    So the first slide was if we just shut

21  down Spot and ran Mining largely for the benefit of

22  the creditors, and this shows that if we just shut

23  down everything and sold all -- liquidated the

24  assets.

Page 220

1      Q.    And you think this is an inferior outcome?

2      A.    I think the judge actually said it would

3   be disastrous for all the other creditors.

4      Q.    What do you think?

5      A.    I think it would also be disastrous for

6   all the other creditors.

7      Q.    What would it mean for WESCO?

8      A.    That's not my concern.

9      Q.    I'm asking you in terms of a recovery, how

10  would WESCO do in this scenario versus your

11  proposed scenario?

12     A.    I believe they would do better with our

13  proposed scenario.

14     Q.    Okay.  So if WESCO -- strike that.

15         So I think you have some redundant --

16  there are these backup slides?

17     A.    Yes.

18     Q.    It seems as though some of these were

19  redundant?

20     A.    Certainly the first one is.  I'd agree

21  with you.

22     Q.    Okay.  What is Slide 30 showing me?

23     A.    So we made some modeling of our rates with

24  Dominion, and you may recall from three weeks ago

Page 221

1   they claim we should pay them $850,000 a month.

2   Our modeling showed that on average it would be

3   $637,000.  And, in fact, in our most recent bill,

4   we were correct.

5       Q.   Okay.

6       A.   Our bill came in at like $580,000.  But in

7   fairness to Dominion, that was 27 days, not

8   30 days.

9       Q.   Okay.  And this is that analysis?

10      A.   It is.

11      Q.   Okay.  What is Slide 31 supposed to show?

12      A.   So in July, August of last year, we were

13  $4 million in arrears with Dominion.  Since that

14  time and as of today's date, we not only are

15  current with Dominion, but even if you include

16  their $366,000 and offset that against the prepaids

17  that we've done, which is like $550,000, we

18  actually have a slight surplus with Dominion today.

19  The reason your client hasn't been paid is largely

20  because Dominion was being paid.

21      Q.   Oh, so you have prioritized Dominion over

22  my client?

23      A.   I have.

24      Q.   Even though Dominion's unsecured?

Page 222

1     A.    Even though Dominion can turn us off and

2   your client can't.  But all that said, we are

3   current with Dominion.

4     Q.    I'm sure you made Dominion very happy.

5          All right.  What's Slide 32 showing me?

6     A.    So it's important to understand that in

7   Dominion's billing cycle, it can vary from a load

8   of 30 days to maximum of 43 days.  And the fact

9   that we bill $22,000 a day means that that's a

10  $322,000 swing from their perspective.  From our

11  perspective and the way we present it to the court

12  is always based upon the bankruptcy date of the

13  11th of the month, and in that case our billings

14  are very stable.

15    Q.    Okay.  Slide 33, what is this showing me?

16    A.    This is just a graphical representation of

17  that trend with the debt to Dominion.

18    Q.    Slide 34, what is this showing me?

19    A.    So in August of '18, of last year, we were

20  $17 million in total liabilities.  End March of

21  this year, we were 15.6 in total liabilities.  We

22  had actually paid down $1.6 million in overall

23  liabilities through the course of that eight-month

24  period.

Page 223

1        Q.    Okay.

2        A.    And this slide just shows that graph

3   again.

4        Q.    Slide 35?

5        A.    Slide 35.

6        Q.    Okay.  Slide 36?

7        A.    Throughout our discussion today we've been

8   talking about free cash flow and associated EBITDA.

9   This just shows -- demonstrates what that EBITDA

10  was January, February, March of beginning of this

11  year.

12       Q.    Okay.  What does the interest line item on

13  this slide represent?

14       A.    I don't know off the top of my head.

15       Q.    All right.  You see the right-hand side,

16  notes for controller?

17       A.    Yes.

18       Q.    What is this saying?

19       A.    There was an unusual expense in March that

20  artificially depressed EBITDA.  We were presented

21  with an invoice that was nine months old that we

22  didn't anticipate.  Had that invoice not been

23  received, EBITDA would have been $129,648 for the

24  month of March.  As it was, because the invoice was

Page 224

1    so large, it was 39460.

2        Q.    Okay.  So I'm looking -- this means that

3    without these additional invoices, the P&L would

4    have looked like this?

5        A.    Yeah, that operating -- EBITDA

6    would have been $126,000.  Instead of $115,000

7    loss, it would have been 126 largely attributable

8    to the depreciation expense.

9        Q.    Okay.  That's for March?

10       A.    Yes.

11       Q.    Okay.  What does Slide 37 show?

12       A.    This is an analysis of gross margins,

13   EBITDA and net margins, and just the trend over

14   time since the beginning of the company, since the

15   beginning of the company's operations anyway.

16       Q.    I think we've talked about this and it's

17   not to rub it in, but has BCause ever had positive

18   net income?

19       A.    No.

20       Q.    Okay.

21       A.    But we've had positive EBITDA since August

22   of last year.

23       Q.    Every month since August of last year?

24       A.    No.  You can see it graphically here,

Page 225

1   November it wasn't.  But other than that,

2   September, October, December, January, February and

3   March, it was positive.

4        Q.   Yeah, okay.

5             We've covered some of this, but I'm gonna

6   ask it again, nonetheless.

7        A.   All right.

8        Q.   Have you developed any projections in

9   connection with your business plan that incorporate

10  sensitivities to Bitcoin pricing?

11       A.   We have not.

12       Q.   Okay.  Have you developed any projections

13  in connection with your business plan that

14  incorporates sensitivity as to customer retention?

15       A.   We have not.

16       Q.   Have you developed any projections in

17  connection with your business plan that

18  incorporates sensitivities as to whether you are

19  successful in raising the money you need to raise?

20       A.   We have not.

21       Q.   Okay.  Isn't it true that on a liquidation

22  basis, purely on a liquidation basis, the company

23  today is as valuable as it will ever be?

24       A.   I don't believe that to be the case.

Page 226

1      Q.    Why?

2      A.    Because we believe on a going concern

3   basis, the value of the company is $12.8 million.

4      Q.    I understand.  I'm saying on a liquid --

5   just a theoretical liquidation basis, if your own

6   only option today or going forward was to liquidate

7   the company, and I understand you believe that's an

8   inferior option?

9      A.    Yes.

10     Q.    But if that were your only option --

11     A.    Yes.

12     Q.    -- isn't it true that today the company is

13  more valuable than it will ever be in the future?

14     A.    I have no way of knowing.

15     Q.    Why do you say that?

16     A.    We, you or I, don't know what the after

17  market value of transformers or switches is going

18  to be.  We, you and I, don't know what the after

19  market value of PDUs is going to be or any of the

20  associated equipment that's going to be liquidated.

21     Q.    So you think there's a possibility the

22  value goes up?

23     A.    Absolutely.

24     Q.    Okay.  And that it goes up in what

Page 227

1  scenario?

2      A.   Well, in December of 2018, there were many

3  companies that were building out datacenters to

4  accommodate mining accommodations, and it was very

5  challenging and expensive to get transformers and

6  switches and other associated equipment.  There's a

7  scenario in May of next year wherein the price of

8  Bitcoin goes up substantially, and people will be

9  building out mining datacenters with similar

10  urgency.  And the price of those assets would be

11  considerably higher under that scenario.

12      Q.   So in that scenario, would you have to

13  reevaluate whether a liquidation is a better

14  alternative than a going concern scenario?

15      A.   Yes.

16      Q.   Okay.  And if you can't retain one of the

17  three big customers or you can't raise money or any

18  of the other assumptions don't come to bear, would

19  you then have to reevaluate whether liquidation

20  makes more sense?

21      A.   We would.  But under that scenario with

22  the increasing prices of cryptocurrency, it's more

23  likely, not less, that our customers would retain

24  service with us or extend that service.

Page 228

1      MR. AGAY:  Can we take a break?  I'd just like

2  to go through and make sure I haven't missed

3  anything.

4      MR. CLAR:  Sure.

5              (WHEREUPON, a short recess was

6              taken.)

7      MR. AGAY:  I don't have any further questions.

8      MS. JANCZAK:  I have a couple.

9              EXAMINATION

10  BY MS. JANCZAK:

11     Q.  Mr. Flake, my name is Elizabeth Janczak.

12  I represent the Official Committee of Unsecured

13  Creditors.  I just had a few short questions.

14          You testified earlier that the $10,000

15  that's in the cash collateral budget for the

16  committee's attorneys fees was a cap.  Do you

17  recall that?

18     A.  I think I said I understood it to be a

19  cap.

20     Q.  What is -- did you ever have any

21  conversations with anyone from Freeborn and Peters,

22  the Committee's counsel, regarding that?

23     A.  I did not.

24     Q.  Okay.  So what's the basis for your

Page 229

1   understanding?

2       A.   Information I received from Fred and Ann

3   prior to their departure, and I believe you or an

4   associate testified to that fact three weeks ago in

5   court.

6       Q.   I don't think anybody from Freeborn

7   testified --

8       A.   No, not testified, but spoke to the judge

9   about that effect.

10      Q.   Okay.  But you don't personally know --

11      A.   I do not.

12      Q.   -- whether there was or was not an

13  agreement for there to be a cap rather than a line

14  item in the budget?

15      A.   Agreed.

16  MS. JANCZAK:  I think that's all I have then.

17  MR. AGAY:  Do you have anything?

18  MS. SANFELIPPO:  No.

19  MR. AGAY:  Scott?

20  MR. CLAR:  No.

21      Are you going to order the transcript?

22  MR. AGAY:  So we're still on the record.  I

23  assume that you are going to file this business

24  plan with the court?

Page 230

1        MR. CLAR:  I don't know.

2        MR. AGAY:  Okay.  Well, here's the deal.  I

3    have to reserve the right to the extent that you

4    amend the business plan again --

5        MR. CLAR:  Right.

6        MR. AGAY:  -- to bring him back for another

7    deposition.

8        MR. CLAR:  Of course.

9        MR. AGAY:  Sorry to inconvenience you, but

10   that's sort of unfortunately the nature of the

11   beast.  So, you know, I don't know if we keep the

12   deposition open or reserve the right to bring him

13   back if there is an amendment of the business plan

14   or, further, if it turns out that you do not file

15   this business plan with the court, you just go with

16   your existing business plan.

17       MR. CLAR:  Right.

18       MR. AGAY:  Okay.

19       MR. CLAR:  Right.

20       MR. AGAY:  I think that's it.

21       MR. CLAR:  We will not waive signature.

22       MR. AGAY:  Thank you.

23            FURTHER DEPONENT SAITH NAUGHT.

24

Page 231

1          (WHEREUPON, deposition concluded

2     at the time of 6:00 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 232

1  STATE OF ILLINOIS  )

2                     )  SS:

3  COUNTY OF C O O K  )

4          I, RAELENE STAMM, Certified Shorthand

5  Reporter, licensed by the State of Illinois, do

6  hereby certify that heretofore, to-wit, on the

7  3rd day of June 2019, personally appeared before me

8  THOMAS FLAKE, a witness in a certain cause now

9  pending and undetermined in the United States

10 Bankruptcy Court, Northern District of Illinois,

11 Eastern Division, in re, BCause Mining, LLC, et al.

12         I further certify that the said THOMAS

13 FLAKE was by me first duly sworn to testify the

14 truth, the whole truth, and nothing but the truth

15 in the cause aforesaid; that the testimony then

16 given by said witness was reported stenographically

17 by me in the presence of said witness and

18 afterwards reduced to typewriting by Computer-Aided

19 Transcription, and the foregoing is a true and

20 correct transcript of the testimony so given by

21 said witness as aforesaid.

22         I further certify that the signature to

23 the foregoing deposition was not waived by counsel

24 for the respective parties.

Page 233

1          I further certify that the taking of this

2    deposition was pursuant to Notice and that there

3    were present at the deposition the attorneys

4    hereinbefore mentioned.

5          I further certify that I am not counsel

6    for nor in any way related to the parties to this

7    suit, nor am I in any way interested in the outcome

8    thereof.

9          IN TESTIMONY WHEREOF:  I have hereunto set

10   my hand this 5th day of June, 2019.

11

12

13

14

15   CERTIFIED SHORTHAND REPORTER

16

17

18

19

20

21

22

23

24