# EXHIBIT C

Page 1

1       IN THE UNITED STATES BANKRUPTCY COURT

2          NORTHERN DISTRICT OF ILLINOIS

3                EASTERN DIVISION

4

5   In re:                    ) Chapter 11

6                             )

7   BCause Mining LLC, et al., ) Case No. 19-10562

8                             )

9              Debtors.       )

10  ---------------------------)

11

12          The deposition of FRED GREDE, called

13  for examination, taken pursuant to the Federal

14  Rules of Civil Procedure of the United States

15  Bankruptcy Courts pertaining to the taking of

16  depositions, taken before ANDREA L. KIM, CSR No.

17  84-3722, a Certified Shorthand Reporter of said

18  state, at Suite 1400, 300 North LaSalle Street,

19  Chicago, Illinois, on the 17th day of June, A.D.

20  2019, at 9:12 a.m.

21

22

23

24

Page 2

1    PRESENT:

2

3         CRANE, SIMON, CLAR & DAN,

4         (135 South LaSalle Street, Suite 3705

5         Chicago, Illinois 60603

6         312-641-7114), by:

7         MR. SCOTT R. CLAR,

8         sclar@craneheyman.com,

9              appeared on behalf of BCause Mining

10             LLC;

11

12        FREEBORN & PETERS LLP,

13        (311 South Wacker Drive, Suite 3000,

14        Chicago, Illinois 60606-6677,

15        312-360-6000), by:

16        MS. ELIZABETH L. JANCZAK,

17             appeared on behalf of Official

18             Committee of Unsecured Creditors of

19             BCause Mining LLC and BCause LLC;

20

21

22

23

24

1   PRESENT:   (Continued)

2

3       McDONALD HOPKINS LLC,

4       (300 North LaSalle Street, Suite 1400

5       Chicago, Illinois , 60654,

6       312-280-0111), by:

7       MR. DAVID A. AGAY,

8       dagay@mcdonaldhopkins.com,

9            appeared on behalf of WESCO

10           Distributions, Inc.

11

12

13

14   ALSO PRESENT:

15       MR. THOMAS FLAKE.

16

17   REPORTED BY:   ANDREA L. KIM, C.S.R.

18            CERTIFICATE NO. 84-3722.

19

20

21

22

23

24

Page 4

1                    I N D E X

2

3  WITNESS:                                    PAGE:

4    FRED GREDE

5         EXAM by MR. AGAY...................     5

6         EXAM by MR. CLAR...................   122

7         EXAM by MS. JANCZAK................   138

8         EXAM by MR. CLAR...................   148

9         EXAM by MR. AGAY...................   152

10

11                    * * * * *

12                    I N D E X

13  EXHIBIT NUMBER                    MARKED

14    Exhibit No. 1.............................. 97

15

16

17

18

19

20

21

22

23

24

Page 5

1       MR. AGAY:  Mr. Grede, good morning.

2       THE WITNESS:  It's Grede.

3       MR. AGAY:  Good morning.  My name is David

4   Agay from McDonald Hopkins.  I represent WESCO in

5   this case.  Thank you for making the time to come

6   in this morning.  I am going to start out with a

7   few introductory items before we jump into the

8   meat of things.

9                   (WHEREUPON, the witness was duly

10                  sworn.)

11                  FRED GREDE,

12  called as a witness herein, having been first

13  duly sworn, was examined and testified as

14  follows:

15                  EXAMINATION

16  BY MR. AGAY:

17      Q.    Mr. Grede, have you ever been deposed?

18      A.    Yes, I have.

19      Q.    How many times?

20      A.    I'd say between 10 and 15 times.

21      Q.    When is the last time you have been

22  deposed?

23      A.    Probably a year ago.

24      Q.    I am going to ask you a number of

Page 6

1   questions.  If you do not understand a question,

2   please say so.  If you answer, I am going to

3   understand -- I am going to assume that you

4   understand the question.

5           Is that fair?

6       A.    Fair.

7       Q.    When answering, please make audible

8   responses for the court reporter.  No head

9   shakes.

10      A.    I will.

11      Q.    You will notice the court reporter

12  recording everything that we say.  For a clear

13  record, it's important that we do not talk over

14  each other.  Accordingly, if you would please

15  wait until I finish my questions before speaking,

16  I'll do my best to provide the same courtesy when

17  you are responding.  Okay.

18          Lastly, this is a marathon, not a

19  sprint.  So please let me know when you need a

20  break.  Hopefully, it won't take more than this

21  morning.  That said, we will not take breaks

22  while a question is pending.  Okay.

23          Did you meet with counsel to prepare

24  for today's deposition?

Page 7

1          A.     No.

2          Q.     Did you meet with debtor's counsel at

3     all to prepare?

4          A.     When?

5          Q.     To prepare for the deposition?

6          A.     No.

7          Q.     Did you meet with anybody at the

8     debtor to prepare for this deposition?

9          A.     No.

10         Q.     Did you talk to anybody at the debtor

11    between last week and the deposition?

12         A.     No.

13         Q.     Have you met with anybody from the

14    committee in connection with this deposition?

15         A.     No.

16         Q.     Have you met with any customers of

17    BCause?

18         A.     No.

19         Q.     Any vendors?

20         A.     No.

21         Q.     I am going to get into a little bit

22    about your personal background and history.

23                Could you give me a summary of your

24    education?

Page 8

1      A.    Sure.  Bachelor of Science, University

2   of Illinois, law degree DePaul University.

3   Master's in Business from the University of

4   Chicago.

5      Q.    Any follow-on continuing education?

6      A.    Not that I recall.

7      Q.    Any certifications or special courses

8   like CPA?

9      A.    I am not a CPA.  Law degree, bar exam.

10     Q.    Just law?

11     A.    Yes.

12     Q.    Can you give me a run down of your

13   employment history after college and law school?

14     A.    Sure.  Went to work for the Chicago

15   Board of Trade, worked there for 25 years or so

16   executive vice president in charge of operations

17   for the Chicago Board of Trade.  Went to Hong

18   Kong, I was chief executive of the exchange in

19   Hong Kong from 2000 to 2005.  Had a consulting

20   business where we set up a number of exchanges

21   primarily in the Asia region.  Did that for three

22   or four years.

23            Then I was appointed in 2007 as the

24   U.S. Bankruptcy Trustee for the Sentinel Group

Page 9

1   that was a brokerage firm that went bankrupt and

2   lost about $700 million of its customers' money.

3   I have been doing that -- I am still doing that.

4   Then I was with BCause from 2017 to just

5   recently.

6         Q.    Okay.  Have you ever practiced as a

7   lawyer?

8         A.    Practiced not in a court of law, no.

9         Q.    So you went right from law school to

10  the Board of Trade?

11        A.    I did.

12        Q.    We talked about Sentinel.  We will

13  come back to that.

14              Other than Sentinel and BCause, have

15  you been involved with other distressed

16  companies?

17        A.    Only from my career at the Chicago

18  Board of Trade where we were in charge of

19  financial surveillance, monitoring the financial

20  health of the member firms, and of course we

21  would see a number of distressed companies in

22  conjunction with that.

23        Q.    But you have never owned a distressed

24  company?

Page 10

1      A.      I have not.

2      Q.      Do you understand what I mean by

3   distressed?

4      A.      There's a wide variety of

5   definitions --

6      Q.      What do you think I mean by it?

7      A.      Let's just say the financially

8   challenged.

9      Q.      In terms of financially challenged

10  companies, you have never been employed by one

11  other than that BCause --

12     A.      Correct.

13     Q.      -- and Sentinel, correct?

14             You have never been a director of one

15  other than BCause and --

16     A.      No.

17     Q.      You have never owned one --

18     A.      Have not.

19     Q.      Okay.  Other than BCause and Sentinel,

20  have you been involved in companies that have

21  filed for Chapter 7, Chapter 11 bankruptcy

22  protection?

23     A.      If your question is have I been

24  involved?  Well, again, from my career at the

Page 11

1    Chicago Board of Trade, we would have experienced

2    or overseen from a regulatory perspective

3    companies that went into Chapter 7 or Chapter 11,

4    brokerage companies.

5         Q.    Let me put it to you this way.

6               Prior to the Sentinel appointment,

7    describe to me your familiarity, experience slash

8    involvement in Chapter 7 or Chapter 11 bankruptcy

9    cases?

10        A.    Well, not directly, but again member

11   firms of the exchanges would have gone into

12   Chapter 7 or Chapter 11.

13        Q.    Well, and what was your involvement?

14   Did you hire outside counsel to assist you in

15   those situations, or did you monitor the

16   situation yourself?

17        A.    We would have monitored the situation.

18   These would have been firms that couldn't meet

19   the financial requirements of the exchange or the

20   CFTC.

21        Q.    Did you ever advocate for the Board of

22   Trade or your other employers in bankruptcy court

23   prior to Sentinel?

24        A.    No.

Page 12

1      Q.      Okay.   Tell me how your appointment as

2   the bankruptcy trustee in Sentinel came about.

3      A.      There were -- most of the creditors

4   were involved in the futures business in some

5   way, shape, form or another, and a number of the

6   creditors recommended me to the U.S. Trustee's

7   Office, went into the U.S. Trustee's Office, and

8   they were looking for someone who had the

9   knowledge and experience in the business but was

10  non-conflicted, and I was one of the only

11  choices --

12     Q.      What do you mean by non-conflicted?

13     A.      Wasn't employed by one of the

14  creditors.  Didn't have a relationship with the

15  creditors.  Didn't have a relationship with the

16  firm.

17     Q.      Tell me -- you have already alluded to

18  this, but tell me little bit more about the

19  business of Sentinel when it was operating.

20     A.      Sentinel was a money manager.  They

21  would accept deposits from customers.  They

22  were -- the intention was to invest those cash

23  deposits in U.S. treasuries, high-grade

24  corporates, so on and so forth.  That was the

Page 13

1    basic business to give firms and individuals a

2    better return on their fixed income investments.

3              Essentially, what happened is that the

4    principals of Sentinel allowed those customers'

5    deposits to be pledged to the bank and obtained

6    up to -- I should say up to about $700 million in

7    bank loans.  So they went out and bought a number

8    of securities.  I will call them exotic

9    securities, used a great deal of leverage.  The

10   market turned, and they lost a lot of money.

11             In effect at the end of the day the

12   customers' funds were double pledged, pledged to

13   the customers and pledged to the bank as

14   collateral for the loans.

15        Q.    Generally speaking, do you see any

16   overlap between Sentinel's business and BCause's

17   business model?

18        A.    No.

19        Q.    Can you describe your duties as the

20   bankruptcy in the Sentinel case?

21        A.    I was the trustee.  So we

22   investigated.

23        Q.    You were --

24        A.    I still am.  The case is still ongoing

Page 14

1   although it's close to the end.  We investigated

2   what happened, brought in an accounting team.

3   Obviously hired a legal team.  They had a large

4   portfolio of securities about $3 billion worth of

5   securities.  So we liquidated that portfolio,

6   made distributions to the customers, and then

7   there were probably 70 different lawsuits that

8   were initiated and obviously went through a

9   number of trials, number of settlements, and a

10  few cases are still outstanding.

11        Q.    Initiated by whom?

12        A.    Well, I initiated the litigation.

13        Q.    So when you say 70 lawsuits, you

14  mean --

15        A.    Against customers who were paid out

16  ahead of the bankruptcy:  The accountants, the

17  insiders.  There were brokerage firms that were

18  involved, and the biggest suit was against the

19  Bank of New York who was the custodian of the

20  customers' funds.

21        Q.    So you were the plaintiff in those

22  lawsuits?

23        A.    I was plaintiff in all of those suits,

24  that's correct.

1       Q.      You mentioned a legal team.

2               You had counsel representing you?

3       A.      Jenner & Block represented me.

4       Q.      And they represented you in the

5   litigation?

6       A.      They did.

7       Q.      Okay.  And they represented you

8   generally as your duties -- in conducting your

9   duties as the trustee?

10      A.      Correct.

11      Q.      And you alluded to this, but how long

12  have you held that position?

13      A.      Well, 2007 and the case is still

14  ongoing.

15      Q.      So 12 years?

16      A.      Correct.

17      Q.      Let's talk about the lawsuits in which

18  you were involved and unpackage that a little

19  bit.

20              Do you have to object to creditors' --

21      A.      Yes.

22      Q.      -- claims in the bankruptcy case?

23      A.      Yes.

24      Q.      How many claims approximately?

Page 16

1       A.      Approximately 200 claims, and out of

2   those, there was just a handful that we would

3   have objected to.

4       Q.      Were any of those allegedly secured?

5       A.      Yes, the Bank of New York was secured,

6   allegedly secured.

7       Q.      Okay.  Did you object to that claim?

8       A.      We did.

9       Q.      Okay.  Did you have to bring avoidance

10  actions or other actions against creditors in the

11  case?

12      A.      We did.

13      Q.      Okay.  Did you bring any avoidance or

14  other actions against secured creditors other

15  than the Bank of New York?

16      A.      Bank of New York was the only secured

17  creditor.

18      Q.      So do you believe you are aware of the

19  time and the cost involved in objecting to

20  creditors' claims in bankruptcy cases?

21      A.      I do.

22      Q.      Secured creditors' claims?

23      A.      I do.

24      Q.      Okay.  You are aware -- you believe

Page 17

1    you are aware of the time and cost involved in

2    bringing avoidance or other litigation claims --

3         A.    I do.

4         Q.    -- against creditors?

5         A.    I do.

6         Q.    Secured creditors?

7         A.    I do.

8         Q.    How long has the Bank of New York case

9    gone on?

10        A.    The Bank of New York's case rough

11   estimate five years.

12        Q.    What was the nature of the claim

13   against the Bank of New York?

14        A.    Well, the Bank of New York was the

15   custodian of the customers' funds.  They had

16   signed documents that said they would segregate

17   those funds, and as I described earlier, they

18   allowed the customers' money to be taken out of

19   custody and held those customers' funds and

20   collateral securities as security for loans that

21   they made to the proprietary trading account of

22   Sentinel.

23        Q.    I assume Bank of New York was

24   represented by counsel?

Page 18

1        A.      They were.

2        Q.      Is the lawsuit still going?

3        A.      No.

4        Q.      Was it settled or --

5        A.      It was eventually settled.

6        Q.      Who was the counsel for the Bank of

7    New York in that --

8        A.      Mayer Brown.

9        Q.      Okay.  In the Sentinel -- strike that.

10            Did you share your experience

11   litigating as the trustee and objecting to

12   creditors' claims with Mr. Flake and the other

13   employees at BCause?

14       A.      Not in detail but in a broad general

15   sense.

16       Q.      Tell me about that.

17       A.      Just from the standpoint that once you

18   are -- here is the example that I gave.  When I

19   was first appointed as trustee in the Sentinel

20   case, I thought it was going to be a six- to

21   nine-month engagement.  It's now 12 years.

22            Bankruptcy is a long, complicated,

23   expensive process, and unfortunately it's out of

24   the control of the board, the management.  The

Page 19

1   court controls the timeframe, and it doesn't move

2   as quickly as anyone would like.

3       Q.    So let's rewind that discussion a

4   little bit.

5           Was there a point in time when one or

6   more persons specifically solicited your

7   experience in the Sentinel case in connection

8   with BCause?

9       A.    You need to help me with that

10  question.  I think the answer is, no, but you

11  need to maybe break that down a little bit for

12  me.

13      Q.    Prior to the filing of the BCause

14  bankruptcy cases, did you ever have a discussion

15  with the board or other employees or investors

16  regarding your experience in the Sentinel case?

17      A.    I mean, in a general sense.

18      Q.    Okay.  Why did you have those

19  discussions?

20      A.    Just because I did not think this was

21  going to be a quick process.  In other words, we

22  were not going to be in and out of bankruptcy in

23  60 days.  I think it's a much longer, much

24  riskier, much more extensive process.

Page 20

1      Q.    When was the first time that type of

2   discussion occurred?

3      A.    I am going to say a board meeting six

4   or eight weeks ago right when --

5      Q.    So after the filing of the cases?

6      A.    Right at that time because we had to

7   get the board's approval to file.

8      Q.    So it would have been before?

9      A.    Yes, yes.  Just --

10      Q.    A day?

11      A.    I can't remember whether it was a day

12   or couple days before, but we needed the board's

13   authorization.

14      Q.    Within a week of the filing of the

15   bankruptcy case?

16      A.    Certainly within a week.

17      Q.    Okay.  And during that board meeting,

18   did you make a presentation to the board?

19      A.    No.  There was a presentation that was

20   made that Mr. Flake I think I recall had

21   prepared.

22      Q.    So Mr. Flake led the board discussion

23   that day?

24      A.    Well, he had created a PowerPoint if I

Page 21

1  remember.

2      Q.    And he led the board through the

3  PowerPoint?

4      A.    It was kind of back and forth.  I let

5  him lead it, but then we offered comments along

6  the way.

7      Q.    And what was the subject matter of the

8  PowerPoint?

9      A.    Where we -- basically where we were in

10  the process.

11      Q.    Which was where?

12      A.    Well, I mean, it was fact -- bringing

13  the board up to speed from a factual perspective.

14  WESCO had filed a lien against the bank account.

15  Therefore, we couldn't get money out of the bank

16  account, and, therefore, we couldn't pay Dominion

17  and so on and so on.

18      Q.    Was there a recommendation in that

19  PowerPoint?

20      A.    You know, I don't recall specifically,

21  but obviously the subject of -- the purpose of

22  the meeting was to get the board's authorization

23  to file for the mining subsidiary and then for

24  the holding company to free up the bank account.

Page 22

1        Q.     Why only the mining subsidiary and the

2   holding entity?

3        A.     Because we couldn't pay Dominion if we

4   didn't free up the bank account, and the bank

5   account was in the name of the holding company.

6        Q.     Why didn't you file any other

7   subsidiaries for bankruptcy?

8        A.     Because there really weren't any

9   assets or liabilities in there.   The liabilities

10  were the holding company.

11       Q.     Okay.   What was your role in that

12  board discussion?

13       A.     I had made comments throughout the

14  discussion.

15       Q.     Were those comments in response to

16  questions from directors?

17       A.     Yes, combination.   I mean, questions

18  from directors and comments that I would offer.

19       Q.     Was it just Mr. Flake giving that

20  presentation or did you also --

21       A.     I was there, our general counsel, and

22  our chief financial officer all participated.

23       Q.     Did you lead the discussion at any

24  point with respect to specific slides in that

Page 23

1  PowerPoint?

2       A.    I can't recall the specific slides in

3  that PowerPoint.

4       Q.    Okay.  So then at a point in time did

5  one or more directors ask your opinion of

6  appropriate next steps?

7       A.    Yes -- well, yes.

8       Q.    And what was your response to those

9  questions?

10       A.    I said that we should file.  I saw no

11  alternative but to file in the mining facility

12  and the holding company.

13       Q.    And did you recommended at that point

14  that the company file for Chapter 11 or Chapter 7

15  bankruptcy?

16       A.    Chapter 11.

17       Q.    Why?

18       A.    Well, I remember the question that I

19  was specifically asked and I was specifically

20  asked what do I think the probabilities are that

21  we would go into a Chapter 7, and I told the

22  board 50/50, and they didn't want to hear that.

23       Q.    So let's back up a little bit.

24            What was the specific question that

Page 24

1    was posed to you?

2         A.    What do I think the probabilities are

3    that we can avoid a Chapter 7.

4         Q.    But didn't you say that you made a

5    recommendation to file for a Chapter 11?

6         A.    Yes.

7         Q.    And that was in response to what

8    question?

9         A.    Just the purpose of the board meeting.

10   We needed the board's approval to file.

11        Q.    So one or more directors asked you

12   should the company file for Chapter 11?

13        A.    I don't remember a specific

14   question --

15        Q.    Okay.

16        A.    -- in that regard.

17        Q.    But you remember stating the company

18   should file for Chapter 11?

19        A.    I do.

20        Q.    And then one or more directors

21   thereafter asked you what was the prospect of it

22   converting to Chapter 7?

23        A.    Correct.

24        Q.    And what was your specific answer to

Page 25

1   that?

2        A.     50/50.

3        Q.     Then you said they didn't like that

4   answer?

5        A.     Correct.

6        Q.     How did you know they didn't like that

7   answer?

8        A.     Because I think there was a general

9   sense that we could be in and out of bankruptcy

10  in 60 or 90 days, and that this was business as

11  usual and things should continue with business as

12  usual.

13       Q.     Why was there that general sense?

14       A.     I had a much different sense.

15       Q.     I understand, but why did the board

16  have that sense?

17       A.     Because I think Mr. Flake gave them

18  that sense, and they believed Mr. Flake.

19       Q.     Okay.  So Mr. Flake told the board

20  that the company would be in and out of

21  bankruptcy within 60 to 90 days?

22       A.     In effect, that's correct.

23       Q.     And you disagreed with Mr. Flake?

24       A.     I did.

Page 26

1    Q.    Okay.

2    A.    I hoped he was correct, but given my

3    previous experience in bankruptcies, I knew that

4    this is -- that the board is no longer in control

5    of the company.

6    Q.    And you told the board that?

7    A.    The creditors and the court,

8    everything is up to the creditors and the judge

9    from here on out.

10   Q.    That's what you said to the board?

11   A.    I did.

12   Q.    And it's your testimony that you told

13   the board with Mr. Flake in attendance there was

14   a 50/50 chance it would convert to Chapter 7?

15   A.    I did.

16   Q.    Why did you believe that?

17   A.    I actually believed the probabilities

18   were greater, but I told them 50/50 because I

19   knew they would not like that answer.

20   Q.    What did you think the probabilities

21   would be?

22   A.    70 percent.

23   Q.    Why did you believe that?

24   A.    Just given the financials.

Page 27

1    Q.    What about the financials?

2    A.    The amount of debt that was

3    outstanding.  I am going to say 12 to 15 million,

4    and I didn't see a way to -- I couldn't conceive

5    of a plan to cover that obligation that the court

6    would be satisfied with.

7    Q.    When you say you couldn't conceive of

8    a plan, were you focussed on anything

9    specifically in the company's financials that was

10   deficient?

11   A.    Well, the amount of outstanding debt.

12   Q.    What about the amount of cash that the

13   company was generating?

14   A.    I didn't see a way that the free cash

15   flow would ever be sufficient to pay back the

16   creditors.

17   Q.    Okay.  So --

18   A.    I mean, my calculations were 20 years.

19   Q.    So by your analysis, you didn't think

20   that the company was generating sufficient cash

21   to reorganize and exit from Chapter 11; is that

22   correct?

23   A.    If your question is am I now in

24   conflict with my previous statement, I still

Page 28

1   believed that Chapter 11 was a correct first

2   step.

3          Q.     That's not my question.

4                 My question is when you told the board

5   that the chances were 50/50 that the case

6   converts to Chapter 7, were you stating that

7   opinion because you didn't believe that the

8   company was generating sufficient cash to

9   reorganize and exit from Chapter 11?

10         A.     That's correct.

11         Q.     And how long did you tell the board

12  the company would be in bankruptcy for?

13         A.     I don't remember a specific date.  If

14  I made the comment, it would have been I don't

15  see them BCause getting out of bankruptcy this

16  year.

17         Q.     Okay.  So you actively disagreed with

18  the assessment that it would be in and out of

19  bankruptcy within 60 to 90 days?

20         A.     I do.  I do and I did.

21         Q.     I am going to ask that again because I

22  am not sure --

23         A.     I am not sure I understand the

24  question but go ahead.

Page 29

1      Q.     So when Mr. Flake stated that the

2   bankruptcy would take 60 to 90 days, did you

3   express your disagreement with that statement?

4      A.     I can't recall the specific board

5   conversation, but given my experience, I know it

6   will take longer than that.

7      Q.     Did you say that to the board?

8      A.     I cannot recall the conversation at

9   the board meeting.

10     Q.     After the board meeting, do you think

11  the board believed that the bankruptcy would take

12  60 to 90 days?

13     A.     I do.

14     Q.     In terms of the length of the BCause

15  bankruptcy cases, in your view what are the

16  factors causing delay in the bankruptcy case?

17     A.     Well, let me start with claims.  We

18  haven't put out a claims bar notice to the best

19  of my knowledge.  There's no bar date set for

20  claims, and I think it's a minimum statutory

21  period of 60 days.  So even from today if we put

22  that notice out today, we are in the middle of

23  August.

24            Now we have to assess the claims,

Page 30

1   object to some, recognize others.  There's a

2   secured creditor in the case.  All of the

3   creditors in my view are going to try to knock

4   out the secured creditor or knock out their

5   secured status.  So now there's a discovery

6   process.  There's deposition process.  There's

7   submission.  There's a response to those

8   submissions.  There may be another reply to those

9   submissions, and then there's likely to be a

10   trial.

11          And I would estimate each one of those

12   periods to take 30 days.  So now we are in the

13   middle of the August before we know what the

14   claims are.  Probably takes another 30 days.  Now

15   there's a petition to knock out the secured

16   status, 30 days, 30 days, 30 days.  Then we have

17   got to prepare for trial.  So as I say just from

18   knowing how the legal process works in

19   bankruptcy.

20       Q.    So doing the math, how long do you

21   think it's going to take before you reach some

22   sort of resolution around all of those issues

23   that you just listed?

24       A.    Well, I would come back to the end of

Page 31

1   the year.

2        Q.    And do you believe that the company

3   can run a Chapter 11 plan process before it has

4   clarity around those issues?

5        A.    I don't know how you do that because

6   the secured creditor status I think is key to

7   everything.

8        Q.    So until you have resolution of

9   WESCO's secured claim, you can't confirm a

10  Chapter 11 plan.

11            Is that your view?

12       A.    Well, I haven't even gotten to a

13  confirmation of a Chapter 11 plan, but you need

14  to resolve that.  Then I don't think you can

15  create a confirmable Chapter 11 reorganization

16  plan overnight.  I mean, I am going back to the

17  Sentinel case.  It take us a year and a half.

18  Now there was more dollars at stake, perhaps more

19  complicated but...

20       Q.    So you view clarity and resolution

21  around WESCO's secured claim as a condition

22  precedent to confirming a Chapter 11 plan?

23       A.    I do.

24       Q.    How much do you think it's going to

Page 32

1   cost based on your experience litigating in

2   Chapter 7.

3        A.    First, let me start with the Sentinel

4   case.  We probably spent $20 million on the Bank

5   of New York litigation, and I think the Bank of

6   New York probably spent a similar amount.  Now

7   that was a five-year process.  It goes from the

8   bankruptcy court, Federal District Court, Seventh

9   Circuit Court of Appeals, back to the district

10  court, back to the Seventh Circuit Court of

11  Appeals, and then appeals are filed with the U.S.

12  Supreme Court.  Each one of those steps probably

13  took a year in terms of litigation.

14            This is not the same amount of money

15  at stake.  That was a $350 million claim.  You

16  know, I have -- I really don't know the answer to

17  your question.  Anything I would give you would

18  be a guess, but it's a very expensive process.

19       Q.    Were you involved in selling or

20  liquidating assets for Sentinel?

21       A.    I was.

22       Q.    What kind of assets?

23       A.    Securities primarily.

24       Q.    Do you view that experience as

Page 33

1   informative as it relates to the BCause assets?

2        A.      Yes, in the sense that it's a

3   difficult, challenging process.  I mean, in my

4   case -- I am going back to the Sentinel case now.

5   Some assets are relatively easy to sell:  U.S.

6   government securities, high-grade corporates, but

7   they had an exotic portfolio of collateralized

8   debt obligations, various equity strips of

9   collateralized debt obligations, and that was an

10  extremely illiquid market and very, very

11  difficult to sell.

12            In fact, there's probably four or five

13  securities that remain unsold simply because

14  there is no market value for them.  There is no

15  market for them.

16       Q.      In terms of the illiquid assets that

17  you were able to sell, what was the typical

18  discount to par value?

19       A.      Well, again, you have to remember that

20  the market dropped significantly 10 percent,

21  maybe 20 percent on the dollar.

22       Q.      That was the ultimate recovery on

23  those assets?

24       A.      Right, on some of them.

Page 34

1      Q.    Did you have to sell any computers, IT

2  equipment, or other machinery in the Sentinel

3  case?

4      A.    There was some but not much.  I don't

5  recall, and they weren't worth very much at all.

6      Q.    You say they weren't worth very much.

7  When you compare it to book value, what type of

8  recovery did you get on those assets?

9      A.    Not much, 10 percent maybe.

10     Q.    Did you sell those assets yourself or

11 did you hire --

12     A.    We hired somebody to do that.

13     Q.    A liquidator?

14     A.    Yeah.

15     Q.    We just talked about your experience

16 liquidating assets in Chapter 7.  Did you share

17 that experience --

18     A.    May I correct you?

19     Q.    Sure.

20     A.    Sentinel was never a Chapter 7.  It

21 was a Chapter 11, but it was a liquidating 11.

22 It never actually went to a seven.

23     Q.    So you were the Chapter 11 trustee in

24 Sentinel?

www.veritext.com                                      888-391-3376

Page 35

1        A.     Correct.

2        Q.     And they confirmed the Chapter 11

3    plan?

4        A.     They did.

5        Q.     Were you trustee in connection with

6    that plan process?

7        A.     I was.

8        Q.     So you were the proponent of that

9    Chapter 11 plan?

10       A.     I was.

11       Q.     From the filing of a disclosure

12   statement to confirmation of a plan, how long did

13   that take?

14       A.     Back up.  Help me with the disclosure

15   statement that -- when you talk about a

16   disclosure statement, you mean the beginnings of

17   the plan?

18       Q.     Yes.

19       A.     Again, I don't recall specifically,

20   but it was probably a year in the process.

21       Q.     And was that a contested plan?

22       A.     It was.

23       Q.     Okay.  And how long did the litigation

24   around confirmation take?

Page 36

1      A.      The litigation was in the bankruptcy

2  court.  So I am going to -- again, I can't recall

3  specifically but tell you three months.

4      Q.      I'm sorry?

5      A.      Three months approximately from the

6  plan to bankruptcy court confirmation.

7      Q.      So is it your testimony that the

8  entire plan process including the litigation in

9  the bankruptcy court took a year?

10     A.      Took more than a year.

11     Q.      More than a year.  Two years?

12     A.      A year and three months.

13     Q.      Okay.  And how much do you think was

14  spent on the plan process in that case?

15     A.      Again, rough estimate $10 million.

16     Q.      What type of a gap was there between

17  confirmation of the plan and the plan effective

18  date?

19     A.      I don't recall.  I am going to say six

20  months maybe.

21     Q.      So from the beginnings of the Chapter

22  11 plan process to the time that the plan went

23  effective, you are -- you believe that took

24  perhaps a year and nine months?

Page 37

1      A.    I do.

2      Q.    Okay.  Did you share that experience

3   around confirming a Chapter 11 plan with

4   Mr. Flake or other employees at BCause?

5      A.    Not in the specifics that you are

6   asking me.

7      Q.    So you never told them how long it

8   would take to confirm a plan?

9      A.    I don't recall getting that specific

10  with the board.

11     Q.    With any other employees at --

12     A.    I don't recall that.

13     Q.    What about the cost; did you ever

14  share that with them?

15     A.    The cost from my experience, I can't

16  recall ever sharing that with them.

17     Q.    Okay.  And then in terms of the

18  recovery on assets you liquidated, did you ever

19  share that experience with anybody at BCause?

20     A.    Not specifically, but I mean they had

21  a general sense as to if we were to liquidate

22  assets what the recovery might be.

23     Q.    What was their general sense?

24     A.    20, 30 percent on the dollar.

Page 38

1       Q.      When you say on the dollar, do you

2    mean book value?

3       A.      I mean original purchase price.

4       Q.      Okay.  So it was the board's view that

5    the recovery on assets in a liquidation of BCause

6    would be 20 to 30 percent on the purchase price?

7       A.      I would say that's close to accurate.

8       Q.      Was that Mr. Flake's view?

9       A.      I believe it was.

10      Q.      And how do you know that?

11      A.      Because I recall the conversations.

12      Q.      Was there ever a conversation around

13   the depreciation on those assets, the rate of

14   depreciation on those assets?

15      A.      Well, we depreciate the assets on the

16   financial statement, but that depreciation is

17   usually tied to lease on the building.  So it's a

18   ten-year depreciation schedule.

19      Q.      What about the fair market

20   depreciation?

21      A.      That's different.

22      Q.      And was there ever a conversation

23   around that?

24      A.      There was.

Page 39

1       Q.    What was that conversation?

2       A.    Well, that was the 20 to 30 percent

3    value, the question you asked me earlier.  Maybe

4    I don't understand your question.

5       Q.    I don't think I am being very clear.

6    So I apologize for that.

7             Was there ever a discussion around the

8    monthly rate of depreciation on the fair market

9    value of the company's assets?

10      A.    Not that I recall.

11      Q.    What about the weekly rate?

12      A.    Not that I recall.

13      Q.    Daily rate?

14      A.    Not that I recall.

15      Q.    So then share with me what the

16   discussion was around the rate of depreciation on

17   the assets?

18      A.    Well, I think I did.  The rate of

19   depreciation is tied to the lease of the

20   building.  That's what's reflected on the

21   financial statements, essentially a ten-year

22   depreciation on that equipment.

23            Your question now is something

24   different.  What do we really think the fair

Page 40

1   market value is of those assets, and I repeat the

2   conversation that we had previously 20 to 30

3   percent.

4        Q.    As of the date of the filing of the

5   case?

6        A.    At that time.

7        Q.    Do you believe the assets have further

8   depreciated since the beginning of the case?

9        A.    That would be difficult for me to say.

10  I mean, we are only talking about a six-week

11  period from the filing to today.

12       Q.    Okay.  So you don't know?

13       A.    I don't know but there's -- the assets

14  are worth what someone will pay for them.

15       Q.    Okay.  We also talked about your

16  experience in litigating claims and other actions

17  in bankruptcy.

18            Did you share that experience with

19  Mr. Flake and the board?

20       A.    In a general sense, not in a specific

21  sense.

22       Q.    What do you mean by that?

23       A.    Just that this is a long, complicated,

24  expensive process.

Page 41

1    Q.    And it is your testimony that they had

2   the benefit of that experience at the outset of

3   these cases?

4    A.    To the extent they wanted to hear it.

5   I don't think they wanted to listen to me.

6    Q.    But you said it?

7    A.    I said what I thought the

8   probabilities were and what I thought the length

9   of time would be.

10    Q.    Okay.  Do you remember any specific

11   reactions to your statements?

12    A.    They didn't want to hear what I had to

13   say.

14    Q.    What did they say specifically?

15    A.    That they thought that this was going

16   to be a 60- to 90-day process, and it would be

17   business as usual.

18    Q.    And what were they basing that opinion

19   on?

20    A.    Mr. Flake's opinion.

21    Q.    So they were saying because Mr. Flake

22   said it was going to be a 60- to 90-day process,

23   we believe it's going to be a 60- to 90-day

24   process?

Page 42

1      A.      Correct, absolutely.

2      Q.      And what was Mr. Flake basing his

3  opinion on?

4      A.      Mr. Flake's opinions come out of the

5  air.

6      Q.      When you say that, are you saying that

7  as it relates to the bankruptcy process or are

8  you making a more general statement?

9      A.      As the bankruptcy process and a more

10  general statement.

11      Q.      Okay.  So specifically as it relates

12  to the bankruptcy process, you don't believe

13  Mr. Flake had any basis for that opinion?

14      A.      That is correct.

15      Q.      Now, when you say in a more general

16  sense, what do you mean by that?

17      A.      Well, this board is now dominated by

18  people in Virginia Beach.  They are all long-time

19  associates of Mr. Flake.  Plain and simple they

20  have put their hands, their future in Mr. Flake's

21  hands.  They choose not to believe my

22  recommendations and follow Mr. Flake basically

23  blindly following whatever Mr. Flake tells them.

24      Q.      Okay.  Was that a source of friction

Page 43

1    before the bankruptcy case?

2         A.      Yes, it was.

3         Q.      Okay.  How did that friction manifest

4    itself?

5         A.      Well, I had been trying to get rid of

6    Mr. Flake for six to nine months.  The board

7    initially was ten people.  Three of them were

8    from Chicago.  Four of those board members

9    resigned.  So the remaining board is only six

10   people.  Mr. Flake is on the board, three other

11   people from Virginia Beach.  So they choose to

12   follow Mr. Flake no matter what.

13        Q.      So when you joined the company, there

14   were ten directors?

15        A.      Correct.

16        Q.      And how many directors are there

17   today?

18        A.      Six.

19        Q.      Okay.  Why specifically did four

20   directors resign?

21        A.      They had severe difficulties with the

22   ethics of the other members of the board and with

23   the general attitude toward shareholders, the

24   largest shareholders.

Page 44

1      Q.    Let's talk about first the attitude

2   towards shareholders.

3            What do you mean by that?

4      A.    Well, there were two specific cases.

5   SBI out of Japan was the largest shareholder.

6   They owned 40 percent of the company.  In

7   December of last year we all put in approximately

8   $500,000 to make a payment to Dominion Energy

9   because we couldn't make the payment, didn't have

10  enough cash, and the contributors were myself, a

11  number of people from Chicago, a couple of

12  directors.  And one of the provisions when SBI

13  invested was that if there's down round funding,

14  in other words a lower price, that they have

15  anti-dilution rights.  So, in essence, SBI bought

16  their shares at 78 cents a share.  The emergency

17  funding round in December was at 5 cents a share.

18            So SBI is entitled to more shares.  As

19  a result certain members of the board were

20  adamant that SBI should waive those anti-dilution

21  rights, and they would end up with a larger share

22  of the company, specifically Michael Adolphi and

23  Jonathan Ashby were trying to get a larger share

24  of the company.  We all knew that and none of us

Page 45

1  would waive our anti-dilution rights.

2         So back to the other directors.  They

3  saw that as basically certain directors who were

4  not experienced with publicly-held companies

5  trying to disenfranchise our largest

6  shareholders, and they had severe ethical

7  problems with that.

8         Then there was a second case Horizon

9  Kinetics October of 2018 bought shares at $2.39 a

10  share.  60 days later they were worth 5 cents a

11  share.  Now by mistake Horizon Kinetics had

12  signed a document that didn't give them the

13  anti-dilution rights.  I thought the right thing

14  to do was to award Horizon Kinetics the

15  anti-dilution rights, but those certain members

16  of the board went ballistic that somebody else

17  was again going to have a larger ownership

18  percentage in the company.

19         So those were two examples that I

20  think caused initially two directors to resign

21  and then a third one to resign as well.

22     Q.    Okay.  Are there any other examples?

23     A.    Those were I think, you know, the ones

24  that caused them a great deal of difficulty.

Page 46

1       Q.      Were those directors that resigned

2    shareholders in the company?

3       A.      No, they were not.

4       Q.      Were they employees?

5       A.      No.

6       Q.      So they were independent directors?

7       A.      Independent directors.

8       Q.      The directors remaining on the

9    company, are they all shareholders?

10      A.      Yes.

11      Q.      Are any of them insiders in the sense

12   that they are officers or employees of the

13   company?

14      A.      Yes.

15      Q.      How many?

16      A.      Two.

17      Q.      So the board doesn't currently have

18   any independent directors?

19      A.      It does not.

20      Q.      They are all either shareholders or

21   officers of the company?

22      A.      They are all shareholders and officers

23   of the company.

24      Q.      Okay.  Now, you said you tried to get

Page 47

1    rid of Mr. Flake for nine months prior to the

2    bankruptcy cases?

3        A.    Correct.

4        Q.    Why were you trying to get rid of

5    Mr. Flake?

6        A.    Just because I felt he wasn't

7    realistic about what the financial situation was,

8    wasn't realistic about the mining plan, and then,

9    you know, Mr. Flake is very disruptive.  He has a

10   tendency to blame everybody else in the

11   organization, and no one in the organization

12   could get along with Mr. Flake.

13            We had to intervene with all of -- all

14   of the customer relationships.  We had to

15   intervene with most of the vendor relationships.

16   So it was just one issue after another for the

17   last year and a half.  I probably spent 90

18   percent of my time trying to clean up issues that

19   arose in the mining area.

20       Q.    Give me an example of an issue that

21   came up with respect to a customer.

22       A.    SBI largest customer, largest

23   shareholder, largest customer of the mining

24   facility.  They would not talk with Mr. Flake.  I

Page 48

1   had to intervene in that relationship and handle

2   all of the customer relationships with Mr. Flake.

3            BMG second largest customer.  They

4   wanted nothing to do with Mr. Flake.  I had to

5   intervene and handle the entire BMG relationship,

6   and I can go on and on with other customers,

7   other vendors.

8       Q.    What about St. Bitts?

9       A.    St. Bitts we had someone else on the

10  staff handling that.  I didn't get involved

11  directly with that.  Dominion Energy is another

12  example.  They wouldn't talk to Mr. Flake.

13      Q.    Why won't any of these parties talk to

14  Mr. Flake?

15      A.    They don't believe him.  He would have

16  been confrontational in those relationships.  So

17  somebody else had to take over the relationship

18  to keep the customers.

19      Q.    So you think Mr. Flake has a

20  credibility issue with the customers?

21      A.    I do.

22      Q.    Do you think Mr. Flake has a

23  credibility issue with Dominion?

24      A.    I do.

Page 49

1      Q.    So they don't believe what Mr. Flake

2   tells them?

3      A.    I don't believe that they do, and they

4   tell us that.

5      Q.    Okay.  Give me an example of the

6   issues Mr. Flake had internally with other

7   employees.

8      A.    Mr. Flake has his own opinion of the

9   capabilities of other employees, and Mr. Flake

10  just looks for someone to blame.

11     Q.    Okay.  So you were unsuccessful in

12  getting rid of Mr. Flake in the nine months prior

13  to the case?

14     A.    Correct.

15     Q.    Why?

16     A.    Because the board is basically

17  long-time associates with Mr. Flake, and they

18  will listen to Mr. Flake and I think protect him

19  at all costs.

20     Q.    So at this point in time do you think

21  the company in the bankruptcy case are being run

22  for the benefit of Mr. Flake and the board?

23     A.    I do.

24     Q.    Do you think Mr. Flake and the board

Page 50

1   have the best interests of creditors and

2   customers in mind?

3       A.    Those are two different questions.

4   Customers, I think they would like to keep the

5   customers, but I don't think they are going to be

6   able to.  Creditors, you know, I do think most of

7   the creditors there's -- there had been a good

8   relationship there.  I don't think they are

9   trying to hurt the creditors, but I am not sure

10  there's a solution there that helps them.

11      Q.    Do you believe that Mr. Flake and the

12  board are elevating the interests of shareholders

13  over the interests of creditors at this point?

14      A.    I do.

15      Q.    Why do you think that?

16      A.    Because it's always been about the

17  local shareholders.  I just gave you two examples

18  of the largest -- the two largest outside

19  shareholders trying to be disenfranchised by the

20  board -- certain members of the board I should

21  say, and I really do think it's really all about

22  the local Virginia Beach community and what they

23  can do in that regard to keep that mining

24  facility alive.

Page 51

1      Q.    So do you believe that they are trying

2    to keep the mining facility alive at this point

3    so shareholders can keep some skin in the game?

4      A.    Yes.

5      Q.    Do you believe that that's in the best

6    interest of creditors at this point?

7      A.    You know, again, I think what hasn't

8    come to grips yet is that the creditors and the

9    judge in this case are in charge of the company

10   and not the board.

11     Q.    And you don't think they understand

12   that?

13     A.    I don't think they understand that.  I

14   don't think they have come to grips with that,

15   and as I said earlier in a conversation, it's

16   business as usual.

17     Q.    What's Mr. Flake's attitude toward my

18   client WESCO?

19     A.    I don't know.  You would have to ask

20   Mr. Flake that.  I don't think that Mr. Flake has

21   any ill will towards WESCO.  I don't think that

22   Mr. Flake or myself or other members of the

23   company like the actions that WESCO took to

24   freeze the bank account.  We all felt that there

Page 52

1    was a better way to address that, but I think we

2    all feel that that's what precipitated the

3    actions at the bankruptcy filings.

4         Q.    So the bankruptcy filings were a

5    direct result of the actions taken by my client

6    WESCO?

7         A.    Absolutely.

8         Q.    And but for WESCO taking those

9    actions, the company would not have filed for

10   bankruptcy?

11        A.    I believe that that is accurate.

12        Q.    I'd like to switch tracks for the

13   moment and rewind.  I would like to understand

14   how you became introduced to BCause.

15        A.    That probably goes back two years.

16   The principal founders of BCause, mostly

17   Mr. Adolphi and Mr. Flake, initially had a small

18   mining operation, and they recognized that that

19   business got more expensive, got more

20   challenging, and they made an application to form

21   a derivatives exchange.

22             They found a long-time associate of

23   mine Bill Boyk who had done CFTC applications for

24   a derivatives exchange.  They hired him.  We

Page 53

1   began some conversations.  They asked me if I

2   wanted to be on the board.  Then I went to a

3   number of meetings, and eventually they asked me

4   to become the CEO.

5        Q.    So when did you join BCause?

6        A.    I am going to say May of '17.

7        Q.    And what was your position when you

8   joined?

9        A.    I was the CEO.

10       Q.    Okay.  Were you ever an advisor before

11  becoming CEO of the company?

12       A.    Not formally, but I went to a number

13  of meetings and began to learn more about the

14  business and those types of things.

15       Q.    So is it fair to say that when you

16  joined, the company's main business was in

17  hosting mining facilities?

18       A.    No.

19       Q.    What was the main business?

20       A.    The main business was to become an

21  exchange.

22       Q.    From the beginning of the enterprise?

23       A.    Let me back up.  When they founded the

24  company four, five, six years ago, they were

Page 54

1    doing mining for themselves on a very small

2    basis.  They eventually abandoned that, filed for

3    the derivatives exchange.  So this period of time

4    when I joined, the sole focus was on becoming an

5    exchange.

6         Q.    So when did they start hosting mining?

7         A.    At that point in time I am going to

8    say the spring of '17 we were a startup.  We had

9    very little capital.  We went out and embarked on

10   a capital raising program.  In November of '17 we

11   raised $5 million, most of that coming from SBI

12   out of Japan, and there was another million

13   dollars from people like myself and other smaller

14   investors.

15        So we raised $5 million.  When we

16   closed the deal with SBI, SBI was pushing to get

17   into mining, and we at that point had a potential

18   facility and essentially told SBI that we could

19   create a mining facility to host -- I think the

20   original contract was to host 30,000 machines.

21   That was subsequently paired back to 10,500, but

22   that was really the regeneration of mining or the

23   beginning of it.

24        Q.    So it was never the business plan to

Page 55

1   host miners?

2       A.    Well, there's a period of time in

3   there from the spring of '17 until we secured

4   capital and part of the discussions with SBI were

5   to begin hosting mining and, you know, we thought

6   we could do that.

7       Q.    So subsequent to you joining as CEO,

8   what was the main focus of the company?

9           Was it developing the mining capacity?

10  Was it developing a derivatives exchange or both?

11      A.    The exchange.

12      Q.    So it was never the long-term business

13  plan for the company to become a host mine --

14      A.    That's a little bit too much of a

15  leap.  This all kind of developed in conjunction

16  with SBI.  Obviously, capital is the name of the

17  game.  They were going to supply capital, and

18  they really pushed you us in the direction of

19  setting up a mining facility.

20      Q.    I see.  Okay.  During those two years,

21  was the company successful in launching an

22  exchange?

23      A.    No.

24      Q.    Why not?

Page 56

1      A.      No money.

2      Q.      When you say "no money," was that

3  because you could not raise money to launch the

4  exchange?

5      A.      We could not -- we raised the $5

6  million, but we were generally unsuccessful in

7  raising any more money.

8      Q.      And where did the $5 million go?

9      A.      Primarily to build out the mining

10 facility.

11     Q.      And was the mining facility throwing

12 off enough cash to --

13     A.      No, not at that time.

14     Q.      What was the price of bitcoin when you

15 joined?

16     A.      Now you are going to back to the

17 spring of '17.  I am going to say it was seven,

18 $8,000.  It went to $18,000 in December of 2017.

19     Q.      And what happened after that to the

20 price --

21     A.      It fell to about $3500 over the course

22 of 2018.

23     Q.      What was it when the company filed, do

24 you know?

Page 57

1      A.    I am going to say 4,000, 4500.

2      Q.    What is it now, do you know?

3      A.    It hit 9,000 the other day.

4      Q.    Okay.  And during that entire period

5    that you just described, has the company ever

6    made money?

7      A.    You have to define what you mean by

8    making money.

9      Q.    Has the company ever had positive net

10   income on an annual basis?

11     A.    On an annual basis, no.

12     Q.    Are there months when the company had

13   positive net income?

14     A.    Yes.

15     Q.    How many months out of the year

16   typically?

17     A.    Well, I am going to say more recently

18   the company has been EBITDA positive.

19     Q.    So prior to the bankruptcy cases, the

20   company was never EBITDA positive?

21     A.    No, I didn't say that.  No, it was.

22     Q.    Okay.  On an annual basis?

23     A.    Not on an annual basis, but the last

24   few months it would have been.

Page 58

```
 1        Q.     Okay.  But you are saying more
 2   recently the company has generated positive
 3   EBITDA?
 4        A.     Correct.
 5        Q.     Okay.  To what do you attribute that
 6   to?
 7        A.     The income from the mining facility
 8   minus the expenses which is basically primarily
 9   power cost and payroll.
10        Q.     So is it the case that income --
11   that -- strike that.
12               Have revenues gone up?
13        A.     No.
14        Q.     Okay.  So is it the case that in order
15   to generate positive EBITDA, they have reduced
16   expenses?
17        A.     In part.  In part.  I think there's a
18   better handle on the energy costs, and it's
19   primarily revenue from mining machines,
20   expenses -- the major expenses, the energy costs.
21        Q.     But they haven't added any new mining
22   machines in the last year, have they?
23        A.     I am going to say 100 here, 100 there
24   but not any big contracts.
```

Page 59

1      Q.    Okay.  And have those additions
2  significantly impacted the revenues?
3      A.    No.
4      Q.    Okay.  So over the last two years, is
5  it fair to say that revenues have stayed
6  relatively flat?
7      A.    Yes.
8      Q.    Okay.  So I come back to my question
9  if revenues have stayed flat but EBITDA has gone
10 up more recently, then that has to be because
11 expenses have gone down; is that correct?
12     A.    In part that's correct.
13     Q.    And would you say those are expenses
14 that have been cut during the bankruptcy case?
15     A.    No -- well, the answer is some were
16 cut before, mostly the energy costs, and there's
17 been other cuts since then.
18     Q.    Would you say that the company is
19 performing as well today as it has ever
20 performed?
21     A.    I would say so.
22     Q.    And does that change your opinion on
23 whether the company is going to ultimately be
24 successful and exit Chapter 11?

Page 60

1    A.    No, it doesn't.

2    Q.    Why?

3    A.    Well, look, the problem that I have is

4    the basic business model of mining is that it's

5    fixed revenues, and I am concerned that we are

6    going to lose -- have been concerned that we are

7    going to lose those revenues, major customers.

8    The expenses will go down if we lose those

9    customers, but I mean the basic business model is

10   a fixed revenue, fixed expense.  So, therefore,

11   it's a relatively fixed margin.

12   Q.    Why are you concerned that you going

13   to lose your customers?

14   A.    Because I know they will.

15   Q.    What do you mean by that?

16   A.    Well, the largest customer is SBI now

17   down to 7,500 machines, and I think there's 100

18   percent probability that SBI does not renew their

19   contract.

20   Q.    Are you aware of when their contract

21   expires?

22   A.    I am going to say November of this

23   year.  I am not exactly sure, but it's right

24   around that time.

Page 61

1      Q.     Why do you believe that's there's 100

2    percent chance that SBI does not renew?

3      A.     Because they have basically told me

4    that.

5      Q.     Are you aware of when the I think it's

6    BMG contract expires?

7      A.     I think we redid the BMG contract.  So

8    that's a four-year contract.  So it's got another

9    two and a half years to run.

10     Q.     After 2019?

11     A.     Two years -- two years at the

12   beginning of 2019.

13     Q.     Do you have that in writing?

14     A.     I don't remember, but it was part of a

15   whole reorganization of the debt that we owed BMG

16   where we were basically paying them off $75,000 a

17   month, and we can check that.  I mean, I don't

18   recall specifically, but I believe we redid the

19   contract to go to another four years.

20     Q.     Do you have that --

21     A.     Do I?  I don't have it, no.

22     Q.     Do you know for certain that that's in

23   writing?

24     A.     I do not.  I don't recall for certain,

Page 62

1    but I think that was the essence of it.

2         Q.    Okay.  What about St. Bitts; are you

3    aware of when that contract expires?

4         A.    End of the year, early next year.

5         Q.    And do you think St. Bitts is going to

6    renew?

7         A.    I don't know.  I don't know.

8         Q.    Okay.  Are you aware that St. Bitts

9    tried to terminate the contract at the beginning

10   of the bankruptcy case?

11        A.    Yes, I am.

12        Q.    Okay.  If BMG's contract was expiring

13   this year, do you think BMG would renew its

14   contract?

15        A.    I do and I only say that because

16   there's no way for BMG to get paid back the

17   obligation that's owed them.

18        Q.    I see.  So they are interested in

19   getting repaid?

20        A.    Well, they are interested in getting

21   repaid.  They are also interested in mining

22   capacity.

23        Q.    Who did you report to at the company?

24        A.    The board.

Page 63

1      Q.    Who reported to you?

2      A.    All the employees in the organization.

3      Q.    Including Mr. Flake?

4      A.    Yes, with the exception of his role on

5  the board.

6      Q.    When you joined, was there a Chicago

7  office?

8      A.    No.

9      Q.    Okay.  Why was the Chicago office

10  created?

11      A.    Primary focus on the exchange

12  business, and as you know, the exchange community

13  in Chicago and many of the people that were

14  employed had exchange or markets experience.

15      Q.    Okay.  When you say the exchange, are

16  you talking about the BCause Spot business?

17      A.    Well, initially derivatives, but I

18  think we always knew that some of the larger

19  derivatives exchanges like the Chicago Mercantile

20  Exchange were going to trade bitcoin futures, and

21  it would be very difficult for us as a startup to

22  compete head to head.  So we had to create a

23  strategy that initially focused on Spot trading

24  because we felt that the market structure of

Page 64

1   cryptocurrency trading at least in the United

2   States left a lot to be desired.

3            So we contracted with NASDAQ so that

4   we had robust, world class technology.  We had a

5   number of people with regulatory experience.  So

6   we were going for full-fledged regulatory

7   approvals and obviously a lot of market

8   experience from the Chicago community.  So we

9   felt we could bring in world class technology,

10  world class regulation, world class operations

11  which would be more attractive to the

12  professional and institutional community in that

13  space.

14       Q.    So did you sign a lease for office

15  space here in Chicago?

16       A.    We did.

17       Q.    Okay.  And how many employees did you

18  ultimately have here in Chicago?

19       A.    I am going to say 10 to 12.

20       Q.    Okay.  Including you?

21       A.    Correct.

22       Q.    Does that include Ann?

23       A.    Yes.

24       Q.    Does that include George?

Page 65

1      A.    Yes.

2      Q.    How many employees currently are there

3   in Chicago?

4      A.    I think there's three.

5      Q.    Okay.  And are you aware that the

6   company rejected -- is seeking to reject its

7   office lease here in Chicago?

8      A.    I am not aware specifically, but it

9   doesn't surprise me.

10     Q.    Do you believe the company is going to

11  continue to have a presence here in Chicago?

12     A.    No.

13     Q.    Do you believe that the company can

14  launch its Spot Exchange without a presence here

15  in Chicago?

16     A.    No.

17     Q.    Is there anybody left at the company

18  in Virginia Beach that has the expertise to gain

19  the regulatory approvals to launch that business?

20     A.    No.

21     Q.    Is there anybody left in Virginia

22  Beach to actually execute on the business plan?

23     A.    No.

24     Q.    So you don't believe that they can

Page 66

1   actually move forward with the Spot Exchange

2   business model?

3        A.    I do not.

4        Q.    I know I am jumping around a little

5   bit, but I want to go back to talking about the

6   board and the existing investors.

7             Do you think that the current equity

8   owners and board of the company believe that they

9   are going to retain their equity interests in the

10  company going forward?

11       A.    Some do; some don't.

12       Q.    For those that do, do you think they

13  would continue to be supportive of the company if

14  they found out that they would not be able to

15  retain those equity interests?

16       A.    Let me make sure I understand your

17  question.  You are saying if the shareholders --

18  I am rephrasing your question.

19       Q.    How about this.  I will strike that

20  question.

21       A.    Please.

22       Q.    You said some of the equity holders

23  believe that they will continue to retain their

24  equity interests and some don't?

Page 67

1     A.    Correct.

2     Q.    Do you believe that all of the

3  directors on the current board believe that they

4  will retain their equity interests in the

5  company?

6     A.    I would say four of six do.

7     Q.    And are four of six continuing to be

8  supportive of the company's efforts in Chapter

9  11?

10    A.    Yes.

11    Q.    And for those four of six directors,

12 if they learned that they would not be able to

13 retain their equity interests, would they

14 continue to be supportive?

15    A.    That's hard for me to say.  I guess I

16 would answer your question I would think they

17 would be.

18    Q.    Why do you think they think they are

19 going to continue to retain their equity interest

20 in bankruptcy?

21    A.    I think they have a general impression

22 that it's business as usual, and we are going to

23 emerge from bankruptcy in the next 30, 60, 90

24 days.

Page 68

1    Q.    How much money have you personally

2    invested in BCause?

3    A.    Personally $600,000.

4    Q.    Okay.  Do you believe you are ever

5    going to see any of that?

6    A.    No.

7    Q.    Are you owed any money by BCause?

8    A.    Yes.

9    Q.    Okay.  How much?

10    A.    Let me rephrase the other statement.

11    I would say half a million dollars.

12    Q.    I'm sorry.  You have invested half a

13    million dollars?

14    A.    No, no, I have invested probably

15    200,000 approximately.

16    Q.    Okay.  And that 200,000 you don't

17    think you will ever see?

18    A.    No.

19    Q.    Okay.  How much are you owed as a

20    debt?

21    A.    Those are two different questions.  As

22    a debt, probably $50,000, maybe a little more.

23    Q.    What did you mean when you said those

24    are two different questions?

Page 69

1    A.    Because I am also owed past

2    compensation.

3    Q.    And how much for that?

4    A.    $400,000.

5    Q.    Do you believe you will ever get paid

6    that amount?

7    A.    No.

8    Q.    Okay.

9    A.    But let me just clarify that, I will

10   file a claim for that.

11   Q.    I wasn't asking you to waive your

12   claim.

13   A.    Okay.

14   Q.    All right.  So two years ago you said

15   you raised $5 million --

16   A.    Correct.

17   Q.    Did you raise any additional equity

18   between then and now for the company?

19   A.    Only through these emergency funding

20   rounds.  $500,000 in December and then to pay the

21   legal fees I think there was just another 50,000.

22   Q.    Oh, that was for the bankruptcy --

23   A.    Correct.

24   Q.    How much has Mr. Flake invested?

Page 70

1      A.     I am not aware that he has invested

2   anything.

3      Q.     Okay.

4      A.     Let me clarify.  There are shares and

5   there are profit units, but I believe the vast

6   majority of that was all sweat equity.

7      Q.     So Mr. Flake doesn't actually have any

8   financial interest in the company at this point

9   other than his current job?

10     A.     No, that's an overstatement.

11     Q.     Okay.

12     A.     He has shares in the company.

13     Q.     But he didn't actually invest any

14  capital?

15     A.     I am not aware that he ever did.

16     Q.     Okay.  Did he loan any money to the

17  company?

18     A.     No.

19     Q.     Okay.  Did you ever seek loans or

20  other debt capital for BCause during your time as

21  CEO?

22     A.     Sure, yes, absolutely.

23     Q.     Explain that to me.

24     A.     Well, raising capital is a constant

Page 71

1    process, never-ending process.  So we are always

2    out there either looking to raise equity capital,

3    and that led to discussions about debt and debt

4    capital, debt financing.  So we have had many,

5    many discussions, probably 100 different entities

6    that we have talked to about either investing or

7    raising debt.

8        Q.    And did you ever go down the path of

9    raising debt other than conversations?

10       A.    We got to the point where there were

11   proposals.

12       Q.    Why didn't you pursue --

13       A.    Because the proposals that I recall

14   were contingent on raising a certain amount of

15   equity.

16       Q.    Could you raise that amount of equity?

17       A.    No.

18       Q.    Are you aware that, as we sit here

19   today, the company is seeking to raise between

20   half a million and 750,000 for BCause Spot?

21       A.    I am.

22       Q.    Are you aware that they are attempting

23   to raise that as equity capital?

24       A.    I am.

Page 72

1      Q.    Okay.  Are you aware that Mr. Flake

2  has testified that the company has received oral

3  commitments for some amount of that equity

4  capital?

5      A.    I am not.

6      Q.    Okay.  Are you aware that the company

7  has received oral commitments for some --

8      A.    I am not.

9      Q.    So are you aware that the company has

10  received written commitments for any of that?

11      A.    I am not.

12      Q.    Do you think the company is going to

13  be successful in raising that money?

14      A.    No.

15      Q.    Why not?

16      A.    Why would any investor in their right

17  mind put money into a company that's in Chapter

18  11.

19      Q.    If an investor was willing to put

20  money into a Chapter 11, would it expect 100

21  percent of the equity in exchange?

22      A.    I don't know.

23      Q.    Okay.  Are you aware of whether the

24  company is currently seeking a loan?

Page 73

1      A.    I am not.

2      Q.    Do you think the company would be able

3  to obtain a loan if it was?

4      A.    I do not.

5      Q.    Why not?

6      A.    I think the financials speak for

7  itself.  Let me add to that we weren't successful

8  in raising equity or obtaining a loan when the

9  company was not in Chapter 11.

10      Q.    I thought you said that the company

11  was successful two years ago in raising 5

12  million?

13      A.    We were.  Yes, since that time since

14  we raised that.

15      Q.    So since December -- November or

16  December of 2017, you have been unsuccessful in

17  raising equity in --

18      A.    Other than for these emergency rounds.

19      Q.    Okay.  Bear with me for a second,

20  please.

21            At what point did you leave the

22  company?

23      A.    I would say a month ago.

24      Q.    So you served as CEO for a period of

Page 74

1    time after the company filed for bankruptcy?

2         A.    I did.

3         Q.    Okay.  Why did you leave the company?

4         A.    I think it was a mutual parting of the

5    ways.

6         Q.    Were you terminated?

7         A.    They did not want my services anymore.

8         Q.    Who didn't want your services?

9         A.    The board, Mr. Adolphi specifically.

10        Q.    How was that communicated to you?

11        A.    He sent me a note.

12        Q.    Was that an email?

13        A.    Yes.

14        Q.    And what did the email say?

15        A.    Your services are no longer needed.

16        Q.    Okay.  Did you have conversations

17   either before or after receiving that note where

18   you thought that you might be terminated?

19        A.    I knew I would be.

20        Q.    And why did you know you would be?

21        A.    Just because, as I said, the board did

22   not want to hear what I had to tell them.  The

23   board did not like the fact that I wouldn't let

24   them do what they wanted to do.  They are focused

Page 75

1    on protecting Mr. Flake at all costs, and they

2    knew I wanted to get rid of Mr. Flake for quite a

3    long period of time.  So it was either I was

4    going to leave or they were going to leave.

5          Q.    Are you aware that the company CFO

6    George -- I am going to butcher his last name.

7          A.    Sladoje.

8          Q.    Sladoje left?

9          A.    Yes, I am.

10         Q.    Do you know why he left?

11         A.    Yes, I do.

12         Q.    Why did he leave?

13         A.    Basically the same reasons that I did.

14         Q.    Which was what?

15         A.    Didn't agree with the direction of the

16   board and knew that Mr. Flake was a problem and

17   just didn't want to deal with it anymore.

18         Q.    So was he terminated or did he

19   leave --

20         A.    He left on his own.

21         Q.    Okay.  Are you aware of whether the

22   company's general counsel Ann Cresce left?

23         A.    I am.

24         Q.    Okay.  Why did she leave?

Page 76

1      A.    Similar reasons.  She could no longer

2    tolerate the actions of the board and the

3    activities that were taking place.

4      Q.    Was she terminated or did she leave --

5      A.    She left voluntarily.

6      Q.    And this all occurred around the same

7    time that you left?

8      A.    Yes, probably within two weeks.

9      Q.    And did anybody else leave at around

10    the same time as you?

11      A.    Yes.

12      Q.    Who?

13      A.    One, two, three, four, probably five

14    other people.  Four were kept on.  Another one

15    has left, and I am very confident the other three

16    are leaving as well.

17      Q.    And these are all in Chicago?

18      A.    Yes.

19      Q.    So the three that you think that are

20    leaving are the remaining three employees in

21    Chicago?

22      A.    Correct.

23      Q.    And generally why do you think people

24    left?

Page 77

1        A.    Just, you know, no hope for the future

2    direction as well as unwillingness to tolerate

3    the actions that were taking place.

4        Q.    Mr. Grede, I assume you are aware that

5    the debtor and its counsel are going to try to

6    impeach you by saying you are a disgruntled

7    former employee, correct?

8        MR. CLAR:   To the extent that it matters,

9    that is an extremely objectionable question.   It

10   calls for speculation.

11   BY MR. AGAY:

12       Q.    You can answer.  Did you understand

13   the question?

14       A.    Sure.

15       Q.    Go ahead and answer.

16       A.    I think they will look for someone to

17   blame.

18       Q.    And do you think that someone is going

19   to be you?

20       A.    Of course.

21       Q.    Okay.  And do you recall that I

22   originally reached out to you in connection with

23   this deposition?

24       A.    I do.

Page 78

1      Q.     How did I reach out to you, do you

2  recall?

3      A.     I can't remember whether you contacted

4  me through LinkedIn or something, and then you

5  asked for a phone call or something.

6      Q.     And did we end up having a phone call

7  or did we end up meeting live?

8      A.     Both.

9      Q.     And what did we discuss during the

10  meeting?

11      A.     Same kind of things you are asking me

12  today.

13      Q.     Okay.  How long do you think that

14  meeting was?

15      A.     Half an hour.

16      Q.     Half hour.  I can't remember the exact

17  date, but do you recall when that meeting

18  occurred?

19      A.     I don't.

20      Q.     At that meeting did I ask you if you

21  would be willing to testify?

22      A.     You did.

23      Q.     Okay.  And do you recall what your

24  answer was?

Page 79

1        A.      I was very reluctant.

2        Q.      Okay.   And do you recall that I said

3    that I might have to subpoena your deposition and

4    testimony?

5        A.      I do.

6        Q.      And do you recall what your response

7    was to that?

8        A.      You would need to send me a subpoena.

9        Q.      I keep jumping around.   So I

10   apologize.

11       MR. CLAR:   Speaking of jumping around, can

12   we take a break?   Could we take a five-minute

13   break, please.

14                   (WHEREUPON, a recess was had at

15                   10:36 a.m. until 10:43 a.m.)

16       MR. AGAY:   Back on the record.

17   BY MR. AGAY:

18       Q.      Could you explain to me the function

19   of BCause Secure?

20       A.      Well, originally we created a

21   subsidiary called BCause Trust, and the objective

22   was to hold for the Spot Exchange -- the original

23   objective was to file in the State of Virginia

24   for trust company status because that would get

Page 80

1    us reciprocity in a number of states.

2         To trade Spot cryptocurrency, you need

3    to be registered.  There is no federal

4    regulation.  So it's state-by-state regulation.

5    You have to go to all 50 states to get a money

6    transmitter license.  The initial objective of

7    BCause Trust was to get a number of those

8    licenses as well as the trust status.

9         The State of Virginia was not going to

10   approve that.  So we went to try to get the

11   regulatory licenses, but then we couldn't operate

12   under the name of a trust if we weren't a trust.

13   So we basically created BCause Secured to do the

14   same thing, hold the state money transmitter

15   regulatory licenses.

16        Q.    Okay.  So as of today in terms of

17   seeking regulatory approvals, it's because Secure

18   that has sought the regulatory approvals the

19   company needs to operate the exchange, correct?

20        A.    Correct.

21        Q.    So BCause Spot has not sought any

22   regulatory approvals?

23        A.    No.

24        Q.    Okay.  And it's BCause Secure that

Page 81

1    will need to obtain those regulatory approvals?

2         A.    Correct.

3         Q.    Okay.  And those regulatory approvals

4    you said are money transmitter licenses?

5         A.    That's what they are called, correct.

6         Q.    Are there any other regulatory

7    approvals they need --

8         A.    There's a federal FinCEN registration,

9    but it's just a registration.

10        Q.    How many of those money transmitter

11   approvals did the company receive as of the

12   filing of the case?

13        A.    None.

14        Q.    Prior to you leaving as the CEO, had

15   the company received any other approvals?

16        A.    No.

17        Q.    To your knowledge, has the company

18   received any approvals after you left?

19        A.    No.

20        Q.    Okay.  Do you think the company is

21   going to obtain any of those approvals?

22        A.    No.

23        Q.    Why not?

24        A.    Because it's in Chapter 11, and I

Page 82

1    don't think any regulator is going to -- first, I

2    don't think they can meet the financial

3    requirements of the various states.  In those

4    states where you need a bond or some type of

5    security deposit, I don't think they are going to

6    be able to receive those bonds or security

7    deposits, and, again, I don't think any regulator

8    in their right mind is going to approve a company

9    while it's in Chapter 11.

10       Q.    So is there anybody left at the

11   company that can competently pursue that process?

12       A.    Well, there's a woman in Virginia

13   Beach, our head of HR who has been doing these

14   functions, but as I said, I don't think they are

15   going to be successful --

16       Q.    So irrespective of who is at the

17   company, it's not going to happen?

18       A.    I don't see any way that it can

19   happen.

20       Q.    Okay.  What about FinCEN?

21       A.    Well, that's just a registration.  It

22   is almost like a notification.

23       Q.    Okay.

24       A.    So that's already been obtained.

Page 83

1          Q.    And as part of that registration --
2    strike that.
3                Was that registration done before or
4    after the bankruptcy case?
5          A.    Before.
6          Q.    So it hasn't been updated since the
7    filing of the bankruptcy cases?
8          A.    I am not aware.
9          Q.    Should it be updated?
10         A.    I don't know.
11         Q.    Absent obtaining those money
12   transmitter licenses, can the company launch the
13   BCause Spot Exchange?
14         A.    I don't believe that they can.
15         Q.    Why not?
16         A.    Number 1, as I said earlier in the
17   deposition, I don't think any investor in their
18   right mind is going to put money into the company
19   while it's in Chapter 11.  Number 2, no customer
20   is going to put any deposits into the company
21   while it's in Chapter 11.  Number 3, you are not
22   going to get any regulatory approvals while it's
23   in Chapter 11, and number 4, the biggest
24   technology provider is NASDAQ.  There are other

Page 84

1   software vendors, but they are by far the

2   biggest.  They are owed a considerable amount of

3   money, but NASDAQ wants to protect their brand,

4   and they are not going to let this venture launch

5   while it's in Chapter 11 if at all.

6       Q.    So you don't think NASDAQ is going to

7   support the Spot Exchange on a go-forward basis?

8       A.    Let me clarify that.  While it's in

9   Chapter 11 --

10      Q.    Okay.  So --

11      A.    -- and if they don't get paid, they

12  are not going to support it.

13      Q.    Do you think NASDAQ is critical to the

14  success of the Spot enterprise assuming it could

15  get the regulatory approvals?

16      A.    I do.

17      Q.    In your view does the company need

18  internal or external counsel to obtain the

19  regulatory approvals even if it could?

20      A.    Well, it's helpful, but I don't know

21  that it's necessary.  These are just forms,

22  applications that are filed.

23      Q.    Since you left the company, have you

24  talked with any employees still at the company?

Page 85

1      A.     Every one of them.

2      Q.     Okay.

3      A.     Well, I should say everyone that's

4  from the Chicago team.

5      Q.     Okay.  And what are the people on the

6  Chicago team saying?

7      A.     They are frustrated.  They don't like

8  the situation.  I think they are all looking for

9  other jobs.

10     Q.     And have you talked to anybody in

11 Virginia Beach?

12     A.     I don't think so.

13     Q.     I continue to jump around.  So I

14 apologize for that.

15            But I think you testified that the

16 company decided to file for bankruptcy after

17 WESCO took action to garnish the bank account; is

18 that correct?

19     A.     That is correct.

20     Q.     When exactly did the company decide to

21 file for bankruptcy, do you recall?

22     A.     I would have to go back and look at a

23 calendar.  I don't recall the exact dates.

24     Q.     Was it a day or two before the

Page 86

1  bankruptcy filing?

2       A.    Yes.  I mean, if I remember -- and we

3  can get a calendar to look at the exact week, we

4  had a board meeting on a Monday night.  They gave

5  the authorization to hire counsel.  So that we

6  went and hired counsel.  That took a couple of

7  days.  Counsel required fees to take the case.

8  So we had to raise the fees, and if I remember,

9  it was a Thursday and Friday of that week that we

10 filed for the -- first for the mining facility

11 and then for the holding company.

12      Q.    Was there a board authorization?

13      A.    Yes.

14      Q.    Was it in writing?

15      A.    It would be in the minutes.

16      Q.    Okay.  Are the minutes documented?

17      A.    Documented?  There are minutes, yes.

18      Q.    So there are written minutes?

19      A.    Yes, yes.

20      Q.    Okay.  In your view did the company

21 sufficiently plan for the bankruptcy case?

22      A.    In advance?  I am not sure I

23 understand that question, but I mean I don't know

24 how you plan for a bankruptcy filing.  Everything

Page 87

1    was precipitated by the WESCO actions.

2         Q.    So the company did not actually plan

3    for the bankruptcy filing?

4         A.    Prior to WESCO's action, no.

5         Q.    When the company filed its bankruptcy

6    petition, was its primary goal to stop the WESCO

7    action?

8         A.    I think there were two primary goals.

9    First, we couldn't meet the payment to Dominion

10   Energy and, therefore, Dominion Energy would shut

11   off the power to the mining facility, and we

12   obviously did not want that to happen.  Secondly,

13   to address the action taken by WESCO.  There was

14   no way to free up any funds unless we addressed

15   that.

16        Q.    Did the company have a cash-flow

17   forecast or financial model for the bankruptcy

18   cases when it filed?

19        A.    Well, we always had cash-flow models

20   and financial statements.  You know, bankruptcy

21   filing changes some of that because we have got

22   other fees to take into account.  We have to make

23   some choices but -- as far as the operations are

24   concerned, and then I think you know all about

Page 88

1    the history of the cash collateral orders.

2        Q.    Did the company have a business plan

3    when it filed?

4        A.    Generally speaking, yes.

5        Q.    When you say "generally speaking,"

6    what do you mean?

7        A.    Well, business plan for the exchange

8    operations and business plan for the mining

9    operations.

10        Q.    Okay.  Let's put a pin in that for the

11    moment.

12              Did the company have a plan to exit

13    from bankruptcy when it filed?

14        A.    I would say in general terms general

15    discussions as to how we would approach it.

16        Q.    Okay.  What were those general

17    discussions?

18        A.    Well, obviously you have to continue

19    with the operations, but then the biggest issue

20    is how do we address the debt to the creditors.

21        Q.    And did you know how you would do that

22    when you filed?

23        A.    Well, Mr. Flake and I had had

24    discussions about that, and it was generally the

Page 89

1    one-third, one-third, one-third plan.

2         Q.    That was the plan all along?

3         A.    Yes.

4         Q.    Okay.  We will come back to that.

5              Do you know if the company is planning

6    to replace you as CEO with another individual?

7         A.    I don't.

8         Q.    Do you know if the company is planning

9    to replace its CFO?

10        A.    I don't.

11        Q.    Do you know if the company is planning

12   to replace its general counsel?

13        A.    I do not.

14        Q.    Do you know if the company is planning

15   to replace any of its employees it has lost since

16   the beginning of the case?

17        A.    I do not.

18        Q.    Is it your understanding that the

19   company only maintains one bank account, and that

20   bank account is at Lakeside Bank?

21        A.    Currently it is the Lakeside Bank,

22   that's correct.

23        Q.    So for BCause LLC and all of the

24   BCause LLC subsidiaries, there are no other bank

Page 90

1   accounts?

2       A.    Not to my knowledge.

3       Q.    When you say not to your knowledge, do

4   you think there's a possibility that there are

5   other bank accounts?

6       A.    No.  There was initially one in

7   Virginia Beach, but we closed that and

8   transferred it to Lakeside.

9       Q.    Why?

10      A.    Two reasons:  The bank didn't want to

11  handle our account.

12      Q.    Why?

13      A.    I think simply because it was in the

14  cryptocurrency business.

15      Q.    What was the second reason?

16      A.    I wanted to get control of the bank

17  account away from the people in Virginia Beach.

18      Q.    Why?

19      A.    Because there was no control on that

20  bank account.

21      Q.    When you say "there was no control on

22  that bank account," what specifically do you

23  mean?

24      A.    You can look at the past spending on

Page 91

1   the mining facility, and I think that speaks for

2   itself.

3       Q.    Okay.  So it's that there were

4   inappropriate expenditures on behalf of the

5   company?

6       A.    I think the word inappropriate is a

7   mischaracterization.

8       Q.    Okay.

9       A.    We spent $33 million on mining in

10  2018.  So I wanted to move the bank account

11  because I know that the controller that we had

12  just would pay whatever expenses Mr. Flake or

13  Mr. Adolphi told her to pay.

14      Q.    Okay.

15      A.    So I had to get control of the bank

16  account, and then I fought very hard to bring in

17  a CFO George Sladoje, and I got a great deal of

18  resistance from the board in doing that.

19      Q.    So when did Mr. Sladoje join the

20  company?

21      A.    I am going to say early January.

22      Q.    January of 2019?

23      A.    Correct.

24      Q.    And the company hadn't had a CFO prior

Page 92

1   to that?

2        A.    Correct.

3        Q.    Did the company have a controller?

4        A.    Yes.

5        Q.    Okay.  Who was the controller?

6        A.    A women named Christi Vaassen.

7        Q.    And you didn't trust her?

8        A.    She was fine, but I knew that she

9   would just pay whatever expenses Mr. Flake or

10  Mr. Adolphi told her to.

11       Q.    Got it.  So you viewed Mr. Sladoje as

12  a check on Mr. Flake?

13       A.    And Mr. Adolphi.

14       Q.    Okay.  And you viewed furthermore

15  moving money to the Lakeside account as a further

16  check on --

17       A.    Correct.

18       Q.    Are you aware of any money leaving the

19  company for anybody's personal benefit?

20       A.    No.

21       Q.    Okay.  Are you aware of any assets

22  leaving the company for anybody's personal

23  benefit?

24       A.    No.

Page 93

1       Q.      Prior to the bank in Virginia Beach,
2   did the company have any other bank accounts?
3       A.      Not to my knowledge.
4       Q.      Are you aware of which entity was the
5   holder of the prior bank account?
6       A.      It was always in the holding company.
7       Q.      It was always in the holding company?
8       A.      Yes.
9       Q.      And that didn't change when it moved
10   over to Lakeside?
11       A.      It did not.
12       Q.      Okay.  How did you pick Lakeside Bank?
13       A.      We had a number of banks in Chicago
14   that we talked to Harris, Burling Bank, Lakeside.
15   There were others, but it's difficult to find a
16   bank that would handle Spot customer deposits
17   mainly because of all of the anti-money
18   laundering, know your customer requirements.
19           So effectively our requirements would
20   have to be as good as the banks in that regard,
21   and Lakeside was one of those banks who would
22   take our operating account but also gave us an
23   indication, a commitment that they would handle
24   our Spot customer business as well.

Page 94

1  Q.  Okay. To your knowledge, do any

2 investors, directors, employees, or customers

3 have a relationship with Lakeside Bank?

4  A.  No.

5  Q.  Same question with respect to the

6 prior bank?

7  A.  Not to my knowledge.

8  Q.  Did BCause Mining ever have a bank

9 account?

10  A.  Not to my knowledge.

11  Q.  Okay. How is you money received by

12 the company moved from BCause Mining to the

13 Lakeside account?

14  A.  Some money comes in directly by wire

15 transfer right into the Lakeside account. Some

16 of our customers pay us in cryptocurrency in

17 bitcoin, and we use over-the-counter brokers to

18 immediately liquidate the coin into U.S. dollars

19 and then move it into the Lakeside account.

20  Q.  Okay. So effectively because mining

21 revenues are directly received into the bank

22 account?

23  A.  Yes.

24  Q.  Okay. Does to your knowledge --

Veritext Legal Solutions

www.veritext.com                888-391-3376

Page 95

1   strike that.

2          To your knowledge, does the company

3   record on its books the transfer of money from

4   BCause Mining to BCause LLC?

5          A.    No, it's all in LLC.

6          Q.    When you say it's all in LLC, you say

7   that because that's where the bank account is?

8          A.    Yes.

9          Q.    Are you aware of any intercompany

10  balances reflecting the movement of cash from

11  mining to LLC?

12         A.    Let me try to answer your question

13  this way.  I mean, there is a balance sheet and a

14  P&L for the holding company.  There's one for

15  mining, but if you are talking about intercompany

16  loans and payables, I don't recall that being on

17  the balance sheet.

18         Q.    So you think there's a balance sheet

19  for -- I'm sorry.  Strike that.

20         You think there's a balance sheet and

21  a P&L separately for mining?

22         A.    I do.

23  MR. AGAY:  Off the record.

24

Page 96

1              (WHEREUPON, discussion was had

2               off the record.)

3      MR. AGAY:  Back on the record.

4      MR. CLAR:  Specifically what you are asking

5  for?

6      MR. AGAY:  I am asking -- strike that.

7           Thus far we have received only a

8  consolidated balance sheet for the entire BCause

9  enterprise.  Mr. Grede just testified there is a

10  separate balance sheet and P&L for mining.  I

11  would like to see that.

12      MR. CLAR:  If it exists, we certainly will.

13  BY MR. AGAY:

14      Q.    So did I understand your testimony

15  that you are not aware of intercompany payables

16  or loans that are made between --

17      A.    I am not.

18      Q.    Let me ask it again.

19           You are not aware of any intercompany

20  balances or loans reflecting the movement of cash

21  from BCause Mining to BCause LLC?

22      A.    I am not.

23      Q.    Okay.  What was the balance on the

24  Lakeside account as of the date of the bankruptcy

Page 97

1   filing?

2        A.     I am going to say $900,000.

3        Q.     Exactly or --

4        A.     I don't know, approximately.

5        Q.     Are you aware of what the balance was

6   when you left the company?

7        A.     Not specifically.

8        Q.     To your knowledge, has the company

9   been truthful in its representations to the

10  courts and creditors in this case regarding the

11  company's cash receipts and cash balances?

12       A.     In the past?

13       Q.     Yes.

14       A.     To the best of my knowledge, it is.

15       MR. AGAY:  Let me mark this as Exhibit 1.

16              (WHEREUPON, a certain document

17              was marked Deposition Exhibit No.

18              1, for identification, as of

19              6/17/19.)

20  BY MR. AGAY:

21       Q.     Mr. Grede, I am handing you what's

22  been marked as Exhibit 1.

23              Do you know what this is?

24       A.     Not exactly but it looks to me like a

Page 98

1  business plan or the beginnings of a plan for

2  reorganization.

3      Q.    Okay.  Have you seen it before?

4      A.    I have but I don't know what version

5  this is.

6      Q.    Did I forward you a version most

7  recently?

8      A.    You did.

9      Q.    Okay.  And did I let you know that we

10  would be reviewing this at your deposition?

11      A.    You did.

12      Q.    Okay.  Do you recall when I forwarded

13  it to you?

14      A.    I am going to say middle of last week.

15      Q.    Were you involved in preparing this?

16      A.    No, but there may be slides in here

17  that I might -- from previous presentations to

18  the board that I might be aware of.

19      Q.    Who was the primary drafter of this?

20      A.    I don't know for a fact, but I am sure

21  it was Mr. Flake.

22      Q.    Do you know if this existed prior to

23  the bankruptcy filing?

24      MR. CLAR:  What is the "this" that you are

Page 99

1    referring to?

2         MR. AGAY:  Exhibit 1.

3         MR. CLAR:  Are you asking him if he knows --

4         MR. AGAY:  You can answer the question.  You

5    are not representing him.

6         MR. CLAR:  I can still --

7         MR. AGAY:  You can ask him when it's your

8    turn to ask questions.

9         MR. CLAR:  I do not understand the timeframe

10   of the question.

11        MR. AGAY:  You can ask him when it is your

12   turn.

13        MR. CLAR:  I think I just did.

14   BY MR. AGAY:

15        Q.    Did you understand the question?

16        A.    I did.

17              Not in its entirety; however, there

18   might be certain pages or schedules in here that

19   I have previously seen.

20        Q.    Okay.  Did you review this in detail

21   prior to your deposition?

22        A.    I reviewed it, yes.

23        Q.    Do you have any general thoughts

24   around it?