# EXHIBIT C

Page 100

1      A.     Yeah, I do.  I mean, my first reaction
2   is I am sad that things have kind of gotten to
3   this point, disappointed that things have gotten
4   to this point, but I suppose that's my first
5   reaction.
6      Q.     What do you mean by that?
7      A.     Well, I mean ultimately the question
8   becomes what's the way forward, and I am not sure
9   that that's clear from this document.
10     Q.     Okay.
11     A.     My second response to you would be
12  that it continues to be from what I see 90
13  percent focused on mining, a little bit on the
14  exchange business, and it's kind of like we are
15  going to throw away the exchange business.
16  That's I think the impression that I would come
17  away with and I am sure the employees would come
18  away with as well.
19     Q.     So you don't view this as a serious
20  way forward for the exchange part of the
21  business?
22     A.     I do not.
23     Q.     You think the focus is on mining?
24     A.     Absolutely.

Page 101

1          Q.     Do you think this presents a feasible
2     business plan?
3          A.     Difficult.
4          Q.     Why?
5          A.     Let me use the word pie in the sky.
6          Q.     Okay.
7          A.     And, again, everything I think we hear
8     from Mr. Flake is pie in the sky.  Step number
9     one the third, a third, a third plan that says to
10    the creditors you are going to waive two-thirds
11    of the debt we owe you.  We want you to waive a
12    third.  We are going to give you a third equity.
13    The equity isn't worth very much, if anything,
14    and so we will repay you a third.
15               I can't see the creditors buying that.
16    I just can't see it.  So I think that's the
17    initial standpoint, and then with respect to the
18    exchange, they are basically saying we really
19    can't afford the exchange.  We are going to shut
20    it down.  I don't think it's realistic that they
21    are going to get money into the company, and as
22    we have had the discussion previously, I just
23    can't see the exchange piece going forward while
24    it's in Chapter 11.

Page 102

1      Q.     If the company can't get the creditors

2   support for this plan, then they will have to

3   fight with the creditors to confirm this plan,

4   correct?

5      A.     They will have to work with the

6   creditors to get a plan.

7      Q.     Okay.

8      A.     You know hopefully fights can be

9   avoided, but you need to put something out in

10   front of the creditors.

11      Q.     And you don't think the creditors will

12   go along with this?

13      A.     I am a creditor.  I wouldn't go along

14   with it.

15      Q.     If this were the only feasible plan,

16   do you think the company has a future in Chapter

17   11?

18      A.     It's going to be difficult.  As I said

19   earlier, the creditors and the judge are in

20   charge.  The creditors and the judge are the only

21   people that matter right now, and how are we

22   going to convince them.  That's the challenge

23   that I see.

24      Q.     Did you review the budgets in this

Page 103

1   plan?

2       A.    I did and I did previously.

3       Q.    Okay.  In your view is the time and

4   cost of litigating with WESCO over its claim

5   incorporated in this plan?

6       A.    I would -- I would have to go back and

7   look at it in detail.

8       Q.    Why don't we do that.  Let's turn to

9   slide number -- slides 10 and 11.  So there's a

10  slide 11 where you can see the number.  Keep

11  going.  There you go.  That's slide 11, and the

12  one before that I am calling slide 10.  Okay?

13      A.    Yeah.

14      Q.    These are their budgets -- proposed

15  go-forward budgets.  Could you please take a

16  minute to review both of these.

17      A.    Okay.

18      Q.    Then could you take a minute to review

19  slide 11.

20            Are you finished?

21      A.    Go ahead.  Ask me your questions.

22      Q.    So do you understand the first budget

23  on slide 10 to be a proposed budget for mining?

24      A.    Yes.

Page 104

1      Q.    Do you understand the second budget on

2  slide 11 to be a proposed budget for holding?

3      A.    I do.

4      Q.    Do you see how both of these budgets

5  go through the week of September 6th?

6      A.    I do.

7      Q.    Okay.  Do you think that the company

8  will be able to confirm a plan by September 6th?

9      A.    Zero possibility.

10      Q.    Do you think that the company will be

11  able to initiate and conclude litigation with

12  WESCO by September 6th?

13      A.    No.

14      Q.    Okay.  And do you see anywhere in

15  either of these budgets the legal cost of having

16  to litigate with WESCO or confirm a Chapter 11

17  plan contested or otherwise?

18      A.    Well, I mean, the only thing I see in

19  there is the $40,000 attorney fees due in August.

20      Q.    Is that going to suffice?

21      A.    I would be amazed if Mr. Clar's first

22  request for fees is under $40,000.

23      Q.    Okay.  And that's based on the work

24  they have done to date?

Page 105

1      A.     Correct.

2      Q.     So if in addition Mr. Clar's firm had

3   to engage in a plan confirmation process and if

4   in addition Mr. Clar's firm had to litigate

5   WESCO's liens and claims, is $40,000 going to be

6   enough?

7      A.     Look, Mr. Clar's fees are very

8   reasonable, very competent, but I think the board

9   is going to have a heart attack when they see the

10  bankruptcy fees when they actually come in.

11     Q.     Do you see the fees in there for the

12  creditors committee?

13     A.     I do.

14     Q.     If the creditors committee was

15  responsible for confirming a plan or litigating

16  with WESCO's claims and liens, do you think

17  30,000 is going to be sufficient?

18     A.     Well, I don't recall the exact

19  agreement with counsel for the creditors

20  committee.  I think that was the retainer, but,

21  look, any time you go into litigation, any time

22  you are filing briefs and replies and you go to a

23  trial, which eventually this is going to go to a

24  trial, the fees are going to be very high.  I

Page 106

1    don't have an exact number for you, but they are

2    going to be high.  They are going to go much

3    higher than what's represented here.

4         Q.    Was there an agreement with the

5    creditors committee's counsel with regard to

6    their fees?

7         A.    I thought there was.

8         Q.    And what did you think that agreement

9    was?

10        MS. JANCZAK:  Objection, calls for

11   speculation.  He has already testified he doesn't

12   recall.

13   BY THE WITNESS:

14        A.    I believe it was this $10,000

15   retainer.

16   BY MR. AGAY:

17        Q.    Per month?

18        A.    Correct.

19        Q.    Okay.  Now I believe you said that

20   it's highly unlikely that creditors are going to

21   accept this plan; is that correct?

22        A.    That's my opinion.

23        Q.    That's all I am asking.  That's your

24   opinion.

Page 107

1          And if creditors don't accept this

2     plan, then either they are going to have come up

3     with another plan or they are going to have to

4     confirm this plan over creditors' objection.  Is

5     that true?

6          A.    I believe so.

7          Q.    Okay.  And as of today, we haven't

8     seen an alternative plan, correct?

9          A.    I have not.

10         Q.    Okay.  And is it your opinion that the

11    time and cost of confirming this plan over

12    creditors' objection is not reflected in these

13    budgets?

14         A.    It is my opinion it's not in this.

15         Q.    Okay.  So as a result, do you think

16    that this plan is feasible?

17         MR. CLAR:  Objection, that calls for a legal

18    conclusion.

19    BY MR. AGAY:

20         Q.    You can answer.

21         A.    Look, ultimately that's up to the

22    judge, and my opinion from a couple of sessions

23    so far is the judge is having a very difficult

24    time.

Page 108

1      Q.    Is it your opinion that the company is

2   going to be able to get Spot up and running?

3      A.    It is my opinion they will not be able

4   to get Spot up and running.

5      Q.    Are you aware of any new customers in

6   the pipeline at mining?

7      A.    I am not.

8      Q.    Would it surprise you if there were?

9      A.    Yes.  It would surprise me if there

10  were any significant new customers.

11     Q.    Before you left, are you aware of any

12  interest from new customers?

13     A.    No.

14     Q.    Are you familiar with the company's

15  competition?

16     A.    I am.

17     Q.    Let's focus on mining first.

18           How many competitors are there

19  domestically?

20     A.    I don't know the exact number because

21  it varies in size.  There are many small-sized

22  mining operations.  There are some on the West

23  Coast.  Many are located outside the United

24  States.

Page 109

1          Q.     So do the company's existing customers

2    have alternatives if they don't renew their

3    contracts when the company shuts down?

4          A.     They do.

5          Q.     Within the United States?

6          A.     Some within.   More outside.

7          Q.     Okay.   And do you believe that the

8    company's customers are exploring those options

9    today?

10         A.     I do.

11         Q.     Do you know that for a fact?

12         A.     I do.

13         Q.     How do you know that for a fact?

14         A.     I have talked to them.

15         Q.     Who specifically?

16         A.     SBI specifically.

17         Q.     And SBI has told you that they are

18   exploring other alternatives?

19         A.     More than exploring.   They are moving

20   to other alternatives.

21         Q.     Okay.   Within the United States?

22         A.     I don't think within the United

23   States.   I know they are looking at Canada, and

24   they are building their own facility.

Page 110

1      Q.      And is there a plan to execute that

2    after their current hosting agreement expires?

3      A.      Well, executing it as we speak, but

4    with respect to the machines that are located in

5    Virginia Beach, when it expires.

6      Q.      Do you believe that any point between

7    now and expiration of their hosting agreement,

8    SBI is going to discontinue paying fees to

9    BCause?

10     A.      I believe SBI will live up to their

11   contract.

12     Q.      Do you believe that St. Bitts will

13   live up to its contract?

14     A.      I do.

15     Q.      And what about BMG?

16     A.      I believe that all the customers will

17   live up to their contracts.

18     Q.      Do you believe that the company's

19   existing customers are concerned that BCause will

20   not exist by the end of this year?

21     A.      Yes.

22     Q.      Have any of them said that to you?

23     A.      Not in those words exactly.

24     Q.      But that's the sense you get?

Page 111

1      A.    Well, but I mean I think they are all

2  preparing to take whatever actions they believe

3  are necessary.

4      Q.    I apologize for continuing to jump

5  around.

6            Now going back to the budgets that you

7  just reviewed, are there any -- strike that.

8            Do you believe that the revenues are

9  accurate as are reflected in these budgets for

10 mining?

11     A.    I do.  Well, yes, for this period of

12 time.

13     Q.    Are you aware that the revenues have

14 gone down since the beginning of the case?

15     A.    I am aware that the per machine fee

16 has gone down.

17     Q.    Why is that?

18     A.    In the contracts -- in certain of the

19 contracts if we generated some savings from the

20 energy costs, we would pass those on to the

21 customers.

22     Q.    Okay.  From your review of these

23 budgets are there any expenses that are not

24 reflected in these budgets?

Page 112

1      A.      That's hard for me to say.  I mean, I

2   would have to go back and look at what's been cut

3   out --

4      Q.      Okay.

5      A.      -- but again my general assumption is

6   this is an ongoing operating budget.

7      Q.      Okay.  If you turn over to the

8   proposed budget for Spot, it's slide 12.

9      A.      Yep.

10     Q.      Take a second to review that.

11             Do you see where it says:  "Spot

12  Exchange is almost ready to launch on NASDAQ

13  platform.  503k funding required to go live by

14  August 12th"?

15     A.      I see where it says that.

16     Q.      Do you think they will go live by

17  August 12th?

18     A.      No chance.

19     Q.      Do you think they will ever go live?

20     A.      If they emerge from bankruptcy.

21     Q.      In terms of the 503k funding, I think

22  you testified that you don't believe they will be

23  able to raise that money; is that correct?

24     A.      Well, I mean, look, I know the money

Page 113

1   is coming from directors and friends and family

2   from Virginia Beach.  I don't know how they are

3   going to be able to put money into the company

4   without that money going directly to the

5   creditors.  If I am a creditor, I am going to say

6   pay me first.

7        Q.    And if that occurs, do you think those

8   investors will put that money into the company?

9        A.    I'm sorry.  If what occurs?

10       Q.    If that money has to go to creditors,

11  do you think those investors will put that money

12  into the company?

13       A.    Not a chance.

14       Q.    Okay.  On this budget do you see any

15  line items for payment of NASDAQ's existing

16  claim?

17       A.    Well, I see the two numbers in here,

18  but I don't know what generated those numbers

19  because that's nowhere near NASDAQ's claims.

20       Q.    When you say you see, what two

21  numbers?

22       A.    Isn't there a $17,000 number and a

23  $27,000 number?

24       Q.    Yes.

Page 114

1          A.      I am not sure what those are for --

2          Q.      Okay.

3          A.      -- but that's not going to satisfy

4    NASDAQ.

5          Q.      So those payments are not going to

6    suffice to secure's NASDAQ support for the Spot

7    platform?

8          A.      I don't see that that is even close.

9    I also said that I don't think NASDAQ will allow

10   their name to be used for a launch of an entity

11   that's in Chapter 11.

12       MR. AGAY:  Well, the good news is we are

13   moving to a conclusion at least for my questions.

14       MR. CLAR:  What's the bad news?

15       MR. AGAY:  We are not done yet.

16   BY MR. AGAY:

17       Q.      Could you turn to the slide it's 18

18   here.  It's Priorities.  Would you review this,

19   please.

20               Could you explain to me what BFPE is

21   and the fire suppression system?

22       A.      Yeah, it's basically a fire

23   suppression system in a mining facility, and,

24   again, I can't vouch for the accuracy of these

Page 115

1   payments or what remains, but that's essentially

2   what it's for.

3        Q.    Is it your understanding that the

4   company has to complete a fire suppression system

5   to continue business?

6        A.    Yes.

7        Q.    And in terms of these payments to your

8   knowledge, does this reflect amounts owed as of

9   the petition date?

10        A.    I couldn't answer that question.  I

11   would have to go back and look at what the

12   original proposal was, what the payments were to

13   date, what the remaining expectation is.

14        Q.    Okay.  So you don't know how much it

15   was supposed to cost to complete this system?

16        A.    I don't recall.  I am going to say in

17   the neighborhood of 400,000.  I know we made a

18   $200,000 deposit before the project started.

19        Q.    So this suppression system has to be

20   completed for the company to continue business,

21   correct?

22        A.    Yes, but the date -- I am not aware

23   that there's a date certain.

24        Q.    I understand.  Now, when you had

Page 116

1  reviewed the budgets earlier for Mining and

2  Holding and Spot, did you see anywhere in there

3  where these payments were reflected?

4       A.    You mean these other pages?

5       Q.    Take your time and go back and look.

6       A.    Well, I mean, these are operating

7  budgets and, you know, as I go through these,

8  again I will reiterate my comment that these are

9  operating budgets.  I don't know.  I would have

10 to go back and look through this.  I don't know

11 that there's a budget for capital expenditures.

12      Q.    And you would view this fire

13 suppression system as a capital expenditure?

14      A.    I would.

15      Q.    Are there other capital expenditures

16 outside of the fire suppression system that the

17 company needs to make?

18      A.    Most likely, yes.

19      Q.    What are those?

20      A.    Well, first, let me -- whether you

21 classify it as capital, there are certain repairs

22 that will have to be made.  Ventilation systems

23 continue -- have to be improved.  There is no

24 cooling in that building.  So that's always been

Page 117

1    a problem in the hot summer months, heat and

2    humidity in Virginia Beach.  Again, as I say, I

3    may have missed it, but, you know, I fully expect

4    there will be capital improvements that will be

5    necessary.

6        Q.    So the amounts owed to BFPE in your

7    view are going to have to be paid for BFPE to

8    complete its work?

9        A.    Yes.

10        Q.    Okay.  Are you aware of how much those

11   additional Capex expenditures that you just

12   mentioned will cost?

13        A.    I am not specifically.  I couldn't

14   venture a guess, but there will continue to be

15   capital expenditures necessary in that facility.

16        Q.    And you don't see those reflected in

17   the operating budgets?

18        A.    No.

19        Q.    Did you see them reflected anywhere

20   else in this business plan?

21        A.    I don't recall.

22        Q.    Okay.  Fair enough.  Flip over to

23   slide 19.

24             So if you look on the left side of the

Page 118

1    page where it says Ownership.

2        A.    Yeah.

3        Q.    22.85 percent --

4        A.    Hang on.  Where are you?

5        Q.    Left side of the page.

6        A.    All right.  I have to look at this for

7    a minute.  The Class A and the Class B 12,347,000

8    are total shares outstanding.  I don't know where

9    the dollar four comes from.  I assume that comes

10   from the -- that one is pulled out of the air.

11   All right.  Debt conversion that means that a

12   third of the larger creditors convert to equity.

13   New shares issued 3,656,000.  That gives them the

14   22.85 percent ownership in the new company.

15   Okay.

16       Q.    So your understanding is creditors are

17   going to have 22 percent on account of --

18       A.    The conversion to equity.  That's

19   what I --

20       Q.    Who is going to own the rest of the

21   company?

22       A.    The existing shareholders.

23       Q.    And what if the existing shareholders

24   could not own the rest of the company?

Page 119

1       A.      I do not understand your question.

2       Q.      So under this plan, creditors are

3   going to take 22 percent of the company and 78

4   percent is going to be left with existing

5   shareholders.

6               Is that your understanding?

7       A.      That's my understanding of this

8   schedule.

9       Q.      And if the bankruptcy code did not

10  permit existing shareholders to retain 78 percent

11  of the company, would those existing shareholders

12  continue to support the company?

13      A.      Well, wait a minute.  That's kind of a

14  hypothetical question.  I am not aware that the

15  bankruptcy code would prohibit that.

16      Q.      But if it did?

17      A.      Well, yeah, but I don't think it does.

18  But I don't think the board would go forward with

19  this plan if this board did not retain a majority

20  ownership of the company.

21      Q.      Okay.  Are you aware of any

22  misrepresentation made by Mr. Flake or others at

23  the company since the beginning of the case?

24      A.      No.

Page 120

1      Q.    Are you aware of any

2   misrepresentations made by any creditors since

3   the beginning of the case?

4      A.    No.

5      Q.    Any customers?

6      A.    No.

7      Q.    So since the outset of these cases,

8   everybody has been truthful?

9      A.    I believe that they have been.

10     Q.    Are you aware of whether Mr. Flake has

11  ever been involved with a company that's filed

12  for bankruptcy prior to BCause?

13     A.    I am.

14     Q.    Could you please tell me what that

15  was.

16     A.    I don't recall specifically.  It was a

17  teleco company of some form or another.

18     Q.    Do you know what happened in that

19  bankruptcy case?

20     A.    I don't but generally speaking there

21  were more expenditures.

22     Q.    Did the company emerge from Chapter 11

23  or did it liquidate?

24     A.    I don't know.  I do not know.

Page 121

1      Q.    Has Mr. Flake to your knowledge ever

2   filed for personal bankruptcy?

3      A.    I don't know for a fact.

4      Q.    Okay.  Are you aware of whether

5   Mr. Flake or anybody else at the company has ever

6   been accused of fraud?

7      A.    I am not.

8      Q.    During your time at the company, was

9   the company ever involved in litigation with any

10  shareholders?

11     A.    Not to my knowledge.

12     Q.    Was it ever sued by any creditors?

13     A.    Other than WESCO?  If you want to call

14  it that, no, not to my knowledge -- oh, wait.

15  I'm sorry.  There was a small creditor that made

16  a filing.  I can't remember.  It was a creditor

17  that was $50,000 or something like that.

18     MR. AGAY:  Okay.  I don't have any further

19  questions.

20     MR. CLAR:  I have a few.

21     MR. AGAY:  But I reserve the right to ask

22  another one depending on what you ask.

23     MR. CLAR:  Of course.

24

Page 122

1                    EXAMINATION

2    BY MR. CLAR:

3         Q.    Mr. Grede, Fred.

4         A.    Mr. Clar, how are you?

5         Q.    Fine, how are you?  This is just as

6    awkward for me as it is for you I am sure.  I

7    have never been in this position before.

8         A.    I have been in this position.

9         Q.    Maybe you could help me through it.

10        A.    Fine, I will do my best.

11        Q.    I just have a few questions.

12              You were fired, were you not?

13        A.    Terminated.

14        Q.    Were you told why?

15        A.    No.  Services no longer necessary.

16        Q.    That's what you said.  Do you have an

17   idea of why?

18        A.    I gave that idea previously.

19        Q.    Okay.  What is your idea?

20        A.    Number 1, I told the board things they

21   didn't want to hear.  Number 2, I kept the board

22   from -- and the company from doing things I

23   didn't think were appropriate, and number 3 I

24   wanted to get rid of Mr. Flake for quite a long

Page 123

1  period of time.

2       Q.    Were you unhappy about being fired?

3       A.    No, not at all.

4       Q.    Why?

5       A.    I had been looking for a way to

6  separate myself from these people for some period

7  of time.

8       Q.    Perhaps you could have told me that.

9  I'm kidding.  Strike that.

10            I have a question though.  You've said

11  repeated you are unhappy in the direction the

12  company was going, correct?

13      A.    I don't know if I said that.

14      Q.    But you did say that you were in favor

15  of filing a Chapter 11, correct?

16      A.    I felt we had no other choice, that's

17  correct.

18      Q.    Right.  And yet you also testified

19  that you thought that -- that you told the board

20  that there was a 50/50 chance of reorganization

21  or a 50/50 chance of liquidation, correct?

22      A.    I did.

23      Q.    And yet you still recommended filing

24  of the Chapter 11, correct?

Page 124

1       A.      Yes.

2       Q.      Because you thought that there was a

3  chance of reorganization?

4       A.      I do.  I did and do.

5       Q.      You still do?

6       A.      I do.

7       Q.      Since you have left the company, you

8  said that you have had contact with people in

9  Chicago but not in Virginia Beach, correct?

10      A.      I think that's basically correct, yes.

11      Q.      Who in Chicago have you had contact

12 with?

13      A.      Every employee.

14      Q.      Can you name the employees?  There

15 aren't that many.  So can you name --

16      A.      George Sladoje, Ann Cresce --

17      Q.      Can I stop you a second?

18      A.      Yeah.

19      Q.      Is George still an employee?

20      A.      No, never was.

21      Q.      All right.  Keep going.

22      A.      Ann Cresce, George Sladoje, Pat

23 Childress, Kevin Fallon, Bill Boyk, Mike Love,

24 Bruce Pollack, Sean Ristau, Dan Schak, Kristen

Page 125

1    Werner.  Is there anyone else?  If there is

2    someone else -- Hyami Shirashi.

3         Q.    How many of those people are still

4    with the company?

5         A.    I believe three.

6         Q.    And those three are?

7         A.    Bruce Pollack, Dan Schak, and Sean

8    Ristau.

9         Q.    You have spoken to Bruce Pollack you

10   said?

11        A.    I have and I do.

12        Q.    Have you spoken to Bruce Pollack about

13   whether or not the company can reorganize?

14        A.    No.

15        Q.    What's Mr. Pollack's function in the

16   company?

17        A.    He runs the Spot market.

18        Q.    And you have testified today that

19   there are competitors, correct, to the BCause

20   Mining business?

21        A.    Yes.

22        Q.    How many are there in the United

23   States?

24        A.    Don't know.

Page 126

1      Q.    And you have testified that customers

2   to your knowledge are exploring other

3   alternatives.

4            When is the last time you spoke to one

5   of the BCause Mining's customers?

6      A.    Maybe three weeks ago.

7      Q.    Were you still employed by the

8   company?

9      A.    Yes.

10     Q.    And which customer was that, and what

11  did they say and what did you say?

12     A.    SBI.

13     Q.    Who did you speak to at SBI?

14     A.    Jonathan Tonamuri (phonetic).

15     Q.    What did Jonathan say, and what did

16  you say?

17     A.    Jonathan said that they were going to

18  move their machines.  He said that Mr. Flake is

19  out to ruin your reputation.  He said that there

20  was no way they were going to renew their lease.

21  He said that the facility in Virginia Beach is

22  very non-competitive.

23     Q.    How long have you known Mr. Flake?

24     A.    Well, since the spring of '17.

Page 127

1       Q.     Would it be fair to say that you and

2   he never got along?

3       A.     No, I don't think that's fair to say.

4       Q.     What would be fair to say?

5       A.     I think we started out fine, but then,

6   you know, from the very beginning of the

7   construction of the mining facility, things went

8   awry.  I remember a dinner that Mr. Flake and

9   myself and our chairman at that time Karan Rai

10  had in Chicago, and this was just before

11  Thanksgiving of '17, and I knew the budget was

12  already blown, and Mr. Flake and I had an

13  argument where I just was very clear that I

14  didn't trust his budgets.  I didn't trust the

15  finances.  That we were spending way too much

16  money, and, you know, he didn't want to hear

17  anything of it.

18      Q.     Jumping around just as much as

19  Mr. Agay did because that's what we do,

20  Mr. Grede, do you know what an executory contract

21  is?  Do you have an idea?

22      A.     I have an idea.

23      Q.     What's your idea?

24      A.     That -- well, you explain to me what

Page 128

1  you think it is.

2      Q.    No --

3      A.    Is this a test?

4      Q.    I will do that for you.

5      A.    I don't know the answer.

6      Q.    If you told you in simple terms it's a

7  contract for which performance is due on both

8  sides.

9      A.    Okay.

10     Q.    Does BCause Mining have any executory

11  contracts?

12     A.    I have no idea.

13     Q.    Does BCause LLC have any executory

14  contracts?

15     A.    I have no idea.

16     Q.    Let's talk about the NASDAQ licensing

17  agreement for a minute.

18     A.    Okay.

19     Q.    Based on the definition I just gave

20  you, would you say that that was an executory

21  contract?

22     A.    Where both parties have an obligation?

23     Q.    Sure.  Yes?

24     A.    I don't know.  I will take your word

Page 129

1    for it.  I don't know if this is a law school

2    test or what but go ahead.

3        Q.    No, it's not.  I just want to know if

4    you consider under my definition the NASDAQ

5    licensing agreement to be an executory contract?

6            It's not a trick question.

7        A.    I don't know the answer to that.

8        Q.    Okay.  During your tenure as trustee

9    and you are still trustee of Sentinel, did you

10   have cause to deal with executory contracts?

11       A.    I don't recall.

12       Q.    Give me a minute, Dave.

13           Do you know what the concept of new

14   value is in a Chapter 11 case?

15       A.    I do.

16       Q.    What is your understanding of new

17   value?

18       A.    That some party gives value for

19   services performed.

20       Q.    Well, do you have an understanding of

21   new value in connection with a plan of

22   reorganization?

23       A.    That you can provide new additional

24   value in return for payments.

Page 130

1      Q.    And do you have an understanding as to

2  what the relationship between new value and

3  confirmation of a plan with respect to existing

4  equity holding on to their interests?

5      A.    That sounds like a very compound

6  question.

7      Q.    So you have never dealt with that

8  before?

9      A.    I didn't say that.

10     Q.    Have you dealt with that before?

11     A.    I don't know.  Why don't you break

12  down your question and let's --

13     Q.    Well, I asked you what new value was.

14     A.    I just gave you an answer.

15     Q.    And what was your answer?

16     A.    I gave you an answer that it was

17  either new services or products in return for

18  payment.

19     Q.    Okay.  Did you deal with the concept

20  of new value at Sentinel?

21     A.    You know, I don't recall that we did

22  because it was a liquidation.

23     Q.    Do you have an understanding that if

24  new value is provided by existing shareholders,

Page 131

1   they can hold on to their equity?  You don't

2   know?

3        A.    I don't know.

4        Q.    Fair.  Oh, didn't you testify that you

5   weren't aware of regulatory approvals for Spot?

6        A.    I did.

7        Q.    So that was based on your knowledge at

8   the time you left the company, correct?

9        A.    It is.

10       Q.    So is it possible that there are

11  approvals that have been obtained since you left?

12       A.    It is possible.  I would be surprised.

13       Q.    Would you be surprised to learn that

14  there are approvals in at least three or four

15  states?

16       A.    I would be very surprised.

17       Q.    Consider yourself surprised.

18       A.    Okay.  I would like to see the

19  documentation because I don't believe it.

20       Q.    I would love to show it to you but not

21  in this context.

22       A.    Fair enough.

23       MR. AGAY:  I would like to see it.

24       MR. CLAR:  You have it.

Page 132

1      MR. AGAY:  So you are saying that's what you

2  have sent me?

3      MR. CLAR:  Yes.

4      MR. AGAY:  Okay.

5      MR. CLAR:  I think.  We can talk about that

6  later, but I am pretty sure I have.

7  BY MR. CLAR:

8      Q.    Jumping back to NASDAQ for a second,

9  you saw the payments in there in I think it was

10  slide -- I don't recall -- maybe slide 21.

11  Anyway, there was two payments in there, and you

12  made the statement that NASDAQ won't support Spot

13  if it's not paid, correct?

14      A.    I believe that to be the case that is

15  the statement I made.

16      Q.    How do you think NASDAQ wants to be

17  paid, and why do you think that?

18      A.    I think NASDAQ would be like to be

19  paid in cash.  Why do I think that?  Because

20  that's what they are owed.

21      Q.    Right, but how are they different than

22  any other creditor, and this gets back to my

23  question on executory contracts, but how are they

24  different than any other creditor in your

Page 133

1    experience?

2        A.    I am not sure that they are.

3        Q.    Fred, do you want to see BCause LLC

4    and BCause Mining LLC reorganized?

5        A.    I'm sorry.  Say that --

6        Q.    Do you want to see the debtors

7    reorganized?

8        A.    What do you mean by that?

9        Q.    Do you personally want to see them

10   reorganized?

11       A.    I don't want to see BCause Mining or

12   Spot go out of business.  I don't want to see

13   them be liquidated.

14       Q.    You don't?

15       A.    I do not.

16       Q.    Well, in your opinion how can that

17   happen?  How can they not be liquidated?

18       A.    It's difficult.  It's difficult.  It's

19   very difficult.

20       Q.    Give me a scenario in your opinion.

21       A.    You would need to get the creditors to

22   concur with something.

23       Q.    Fair.  So have you spoken to creditors

24   committee counsel or any members of the

Page 134

1    committees either before or after you left the

2    company?

3         A.    Since I have left the company or

4    before, I have not spoken to creditors' counsel.

5    The members of the committee I think there's

6    three some of whom I know, and I have obviously

7    spoken to them before but not since the filing.

8         Q.    So you don't know if they would

9    support the outline -- call it an outline of a

10   plan in the exhibit that Mr. Agay gave you?

11        A.    I do not.

12        Q.    And you don't know if creditors

13   outside of the committee would support this plan,

14   do you?

15        A.    I know some will; some won't.

16        Q.    Which ones will?

17        A.    I don't know.

18        Q.    Well, you said you know some will.  So

19   which ones will?

20        A.    I suspect some will.

21        Q.    Now it's a suspicion --

22        A.    I have been told by people in Virginia

23   Beach that there are a couple of the suppliers

24   would like to convert to equity.  Whether that's

Page 135

1    true or not I don't know.

2         Q.    Do you know which suppliers those are?

3         A.    One of them was -- I thought it was

4    Alphacraft and then the window supplier whoever

5    that was.  I can't remember the names exactly.

6         Q.    Okay.  Come back to my question

7    because you can all forgive me if I am asking a

8    question that's been answered, but what has to

9    happen specifically for a plan to be confirmed?

10        A.    I think you need to get a plan

11   prepared.

12        Q.    That's fairly obvious.  What else?

13        A.    I don't think this is that plan, but

14   you need to get the creditors to concur.  You

15   need to get the creditors to vote.  You kind of

16   have to work the plan with the creditors to see

17   what will work and won't work.  Then you

18   formalize it.  You finalize it.  You take it to

19   the court.  You put it before the creditors for a

20   vote, and ultimately the judge has to approved

21   it.

22        Q.    With respect to secured creditors, do

23   you know -- based on your experience or your

24   knowledge, do you know what treatment has to be

Page 136

1   proposed for secured creditors?

2        A.    Assuming that their lien is upheld,

3   that they are secured.

4        Q.    We are assuming that.

5        A.    Okay.  Then based upon that assumption

6   if there are no objections to that secured status

7   either from the debtor or from other creditors,

8   then they are determined to be secured.  They get

9   paid first.

10       Q.    I understand that, but do you have any

11  further understanding of how they get paid?  If

12  the answer is I don't know, that's fine too.

13       A.    What do you mean how they get paid?

14  They get paid in cash.

15       Q.    What's the standard for them to get

16  paid?

17       A.    I don't know.

18       Q.    You didn't have to deal with that in

19  the Sentinel case?

20       A.    I did.

21       Q.    Do you know what indubitable

22  equivalent is?

23       A.    No.

24       Q.    Do you have an opinion as to whether

Page 137

1    WESCO's lien is valid in full or in part?  And I

2    am asking you.  I mean --

3         A.   No.  Again, you are asking for a legal

4    opinion --

5         Q.   Well, you are an attorney who has been

6    through a trustee of --

7         A.   I believe that WESCO's lien will be

8    challenged.  I believe that WESCO jumped the gun

9    in the actions that they took.  I believe that

10   you have other creditors that -- WESCO's lien is

11   simply a matter of timing.  They got there before

12   anybody else, and I believe that their lien will

13   be challenged.

14        Q.   Okay.  But moving on to the time it

15   takes to challenge a lien, you said that it

16   was -- was it the Bank of New York whose lien was

17   challenged in Sentinel?

18        A.   Yes.

19        Q.   How much was their debt?

20        A.   $320 million.

21        Q.   How much is WESCO's debt?

22        A.   I think it's around a million two.

23        Q.   It's not 300 million?

24        A.   No.

Page 138

1       Q.     It's nowhere near 300 million?

2       A.     Not even close.

3       Q.     So would that affect your opinion of

4    how long it might take to challenge their lien?

5       A.     Yes, I said that earlier.

6       Q.     So how long do you think it might take

7    to challenge the lien?

8              I know you testified as to the steps

9    and you were pretty accurate, but how long?

10      A.     I think it's six months minimum.

11      Q.     And do you think that -- strike that.

12      MR. CLAR:  I have nothing else.  Liz?

13   Although I will reserve -- just like Mr. Agay, I

14   will reserve my rights.

15                    EXAMINATION

16   BY MS. JANCZAK:

17      Q.     Mr. Grede, I represent the creditors

18   committee in this case.  I just have a few

19   questions.

20             You testified earlier about your

21   experience as Chapter 11 trustee in the Sentinel

22   management case.  Do you recall at what point in

23   the Chapter 11 process the plan was confirmed?

24      A.     It was -- they filed in August of

Page 139

1    2007, and it was right at the end of 2009. So

2    just about a year and a half.

3        Q.    At that point at plan confirmation at

4    the end of 2009, was the Bank of New York's

5    secured claim resolved at that point?

6        A.    No, no.

7        Q.    When was that resolved?

8        A.    That went through litigation that took

9    about five years to finally get it resolved.

10       Q.    But you testified earlier that you

11   thought in this case that WESCO claims had to be

12   resolved prior to a plan confirmation.

13            Why did you think that that would be

14   the case here but it wasn't in Sentinel?

15       A.    Good question. I suppose I

16   interpreted the question is to get out of

17   bankruptcy, you are going to have to resolve the

18   secured claim to ultimately get out of it.

19       Q.    Okay. So prior to dismissal of the

20   case?

21       A.    Yes.

22       Q.    Understood. Do you have an

23   understanding as to whether there's a difference

24   in the value of BCause's assets if they were

Page 140

1    liquidated versus the value to the company if it

2    continued to operate?

3        A.    I do.  I think if the company

4    continues to operate, there's more value there

5    then if it's just a straight out liquidation.

6        Q.    You testified earlier that four of the

7    ten original directors resigned from the company.

8            When did they resign?

9        A.    One resigned probably in March of '18.

10   Two of them resigned I am going to say February

11   of '19, and the other one resigned in April of

12   '19.

13       Q.    You testified earlier that during the

14   time you were CEO, you would try -- you had tried

15   to -- you had taken different steps to try to get

16   rid of Mr. Flake.

17           Can you explain what sort of steps you

18   took while you were CEO to get rid of Mr. Flake?

19       A.    Brought the issues to the board.

20       Q.    How so?

21       A.    Went to the board with the discussion

22   of what was going on.

23       Q.    What did you tell them was going on?

24       A.    That the spending was excessive, that,

Page 141

1    you know, the customers were unhappy.  Those

2    types of things.

3         Q.    Did you go to them with any sort of

4    documentation to show what you believed was

5    excessive spending?

6         A.    That was obvious.  I mean, the

7    financial statements were.

8         Q.    What was their response to your

9    concerns?

10        A.    They dismissed them.

11        Q.    When did you originally bring this to

12   the board?

13        A.    I'm going to say end of '18.

14        Q.    Did you raise the issue again between

15   the end of 2018 and the bankruptcy filing?

16        A.    I think it was apparent that there

17   were issues to the board, every meeting we had at

18   the board.

19        Q.    But at any of those meetings, did you

20   again voice your concern?

21        A.    I don't recall that specifically.

22        Q.    You said that there was excessive

23   spending, and at one point you testified that

24   that was one of your reasons for wanting to move

Page 142

1   the bank account to Chicago and having controls.

2           Are there specific expenditures that

3   you thought were unnecessary or excessive?

4       A.    Well, let me put it to you this way.

5   When the -- we began construction of the mining

6   facility, the original budget was three and a

7   half million dollars, and a million of that was

8   going to come from the city and State of

9   Virginia, two million of it was going to come

10  from a deposit from SBI.

11          That original budget came in at -- I

12  mean, the original spending was between 8 and 10

13  million.  So there was just -- you know, the

14  original proposals were just unrealistic, and

15  then there were further episodes along the way

16  where the same kind of things happened.

17      Q.    Did you have an opinion as to why

18  there were these cost overruns?

19      A.    I am going do say a couple of things.

20  Everything had to be done quickly, and just like

21  Mr. Flake says, we are going to get out of

22  bankruptcy in 60 days, he wants to do everything

23  quickly.  So we hired all kinds of people, all

24  kinds of consultants, all kinds of suppliers and,

Page 143

1    you know, paid more for machines than we needed

2    to, paid more for consultants.  All so that we

3    could get it done very, very quickly.

4         Q.    And whose decision was it to move that

5    quickly?

6         A.    Well, I put my faith and trust in

7    Mr. Flake and Mr. Adolphi who was the CFO at the

8    time.

9         Q.    Did you approve those expenditures?

10        A.    Ultimately we did, yes.

11        Q.    When you say "we," who is we?

12        A.    I would have.  And let me also say all

13   those went to the board as well.

14        Q.    Did the board have to approve --

15        A.    The budgets.

16        Q.    -- the budgets?

17        A.    Yeah.

18        Q.    Who prepared those budgets?

19        A.    Well, I mean ultimately it was our

20   controller at the time.

21        Q.    And that was who?

22        A.    Christi Vaassen, V-A-A-S-S-E-N.

23        Q.    You testified earlier that it was

24   your -- and you can correct me if I am misstating

Page 144

1    this -- that you believed that the current board

2    was elevating the interests of shareholders over

3    those of the creditors; is that correct?

4        A.    I don't know that I specifically said

5    it that way.

6        Q.    Okay.  Okay.  Do you have an

7    understanding of if this case were to be in

8    Chapter 7 or if you had filed Chapter 7

9    originally, what unsecured creditors might have

10   expected to get in a liquidation?

11       A.    Well, my general understanding is a

12   secured creditor is going to get most of their --

13   would come first, and then whatever is left over

14   would come to the unsecureds, and, you know, the

15   only assets to be sold are assets of the mining

16   facility.  And those are difficult to sell.

17   Those are racks.  Those are transformers.  Those

18   are power supply units.  These are things that

19   only have a special limited purpose.

20       Q.    So is it your opinion that it would be

21   difficult for unsecured creditors to receive a

22   recovery in a liquidation?

23       A.    It would be difficult.

24       Q.    What about your opinion as to

Page 145

1    unsecured creditors recovery in a Chapter 11

2    case?

3          A.    It would be difficult.

4          Q.    Do you believe they would be likely to

5    receive more money in a Chapter 11 than they

6    would in a Chapter 7?

7          A.    They may be.

8          Q.    You testified earlier that SBI had

9    told you that they did not intend to renew their

10   contract; is that right?

11         A.    That's correct.

12         Q.    Did they say why?

13         A.    They believed that the facility is

14   non-competitive.

15         Q.    That was based on your conversation a

16   few weeks ago; is that right?

17         A.    I think I said something like three

18   weeks ago, but they have told me that on more

19   than one occasion.

20         Q.    You said that you had originally been

21   reluctant to agree to testify; is that correct?

22         A.    Yes.

23         Q.    Why was that?

24         A.    I don't want to hurt BCause.  It's not

Page 146

1    my objective to hurt BCause, but as I say, I am

2    subpoenaed.  I answer the questions that are

3    posed to me as best I can.

4         Q.    I think you testified earlier that you

5    never had any conversations with any attorneys

6    representing the committee previously, correct?

7         A.    That is correct.

8         Q.    One thing that didn't come up was the

9    basis for -- strike that.

10             Are you aware of whether WESCO has a

11   promissory note and confession of judgment?

12        A.    I am.

13        Q.    Did you sign that document --

14        A.    I did.

15        Q.    -- on behalf of BCause?

16        A.    I did.

17        Q.    Why was that?

18        A.    When was it?

19        Q.    No, why.  Why did you sign that?

20        A.    I want to say because we didn't have

21   much of a choice.  That WESCO was pushing the

22   obligations.  Initially, they wanted personal

23   guarantees from all the directors, and that was a

24   non-starter as far as we were concerned.  So we

Page 147

1    went back and forth on the confession of

2    judgment, and basically what the confession of

3    judgment is is that we recognize that this is the

4    amount of money that we owe.

5        Q.    Who negotiated that on behalf of --

6        A.    Our general counsel.

7        Q.    Was that Ann Cresce?

8        A.    Yes, but in conjunction with Mr. Flake

9    and others.

10        Q.    Do you know what the ultimate

11    distribution to unsecured creditors is or was in

12    the Sentinel management case?

13        A.    Yes.

14        Q.    What was the percentage?

15        A.    Well, this is what also caused a great

16    deal of litigation, inter-creditor litigation.

17    There were some creditors that recovered

18    approximately 70 percent, and there were other

19    creditors who initially had zero recovery, and

20    they have ended up with approximately 60 percent.

21    So there was still a disparity between the

22    general unsecureds.

23        Q.    So is it fair to say that they

24    received somewhere between 60 to 70 percent --

Page 148

1      A.      Correct.

2      Q.      -- for their general unsecured claims?

3      A.      Yes.

4      MS. JANCZAK:  Those are all my questions.

5      MR. CLAR:  I have a couple more, but I think

6  it's your turn unless you want to wait.

7      MR. AGAY:  How much longer do you think you

8  have?

9      MR. CLAR:  Like two minutes.

10      MR. AGAY:  I don't have any other questions.

11                      FURTHER EXAMINATION

12  BY MR. CLAR:

13      Q.      All right.  Just a couple more.

14              Fred, if bitcoin price continued to

15  increase, would that change your opinion of the

16  ability of the debtors to reorganize?

17      A.      No.

18      Q.      Why not?

19      A.      Because the business model that we

20  currently have, the price isn't really relevant.

21  We don't make any more money if the price goes up

22  or if the price goes down.

23      Q.      Can you direct your attention back to

24  the slide deck, and I apologize because I don't

Page 149

1    know what slide this is.  There's no number on

2    it.  That's our fault, but it's the core proposed

3    budget for mining.

4         A.     Give me an idea of what page.

5         Q.     What is that?  Is that a seven?  Okay.

6    Slide 7.  Anyway, you testified I believe that

7    there was no Capex expenditures in the budget,

8    correct?

9         A.     Not that I was aware of.  That was in

10   relation to the BFPE numbers.

11        Q.     Isn't there a maintenance and repair

12   budget in this budget, a maintenance and repair

13   line?

14        A.     Right.

15        Q.     What else would be required?

16        A.     Capital expenditures.  You need a new

17   roof.  You need more racks.  You need more power.

18   You need a new fire protection system.

19        Q.     Does the facility need a new roof?

20        A.     Well, there's leaks in the roof.  It

21   needs to be repaired.  Whether that's in there,

22   I'm not sure.

23        Q.     Does it need a new roof?

24        A.     I don't -- you asked me does it --

Page 150

1    what's your question?

2         Q.    Well, you said it needs a new roof --

3    let me finish the question.

4              You testified that it needs a new

5    roof.

6         A.    Did I say that?

7         Q.    Is it a new roof or -- yes, you did.

8         A.    It leaks.  The roof leaks.  You need

9    to repair it.

10        Q.    Is that something that has to be done

11   in the next 60 to 90 days?

12        A.    Don't know.  That would be more for

13   Mr. Flake to describe.

14        Q.    Okay.  So what about the maintenance

15   and repair entry is insufficient?

16        A.    I think your -- I think the

17   expenditures in that facility will be much

18   greater than these.

19        Q.    Why do you think that?

20        A.    Past experience.

21        Q.    Tell me about your past experience.

22        A.    We spent $33 million on mining last

23   year.

24        Q.    What was that 33 million spent on?

Page 151

1      A.      Transformers, racks, power supply,

2   networking equipment, ventilation systems.  I can

3   go on and on and on.

4      Q.      How much of that would need to be

5   repeated now if you spent it last year?

6      A.      There will continue to be capital

7   expenditures required in that facility.  The

8   facility has -- ventilation is a problem,

9   humidity is a problem, the competitiveness of the

10  electricity price is a problem so.

11     Q.      But you really don't have a

12  quantification of the number --

13     A.      I have past experience that tells me

14  that there will continues to be additional

15  capital expenditures required, and I will tell

16  you I think they will continue to be significant.

17     Q.      But you don't know how much?

18     A.      I think they are going to be I am

19  going to tell right now you 3 or $4 million --

20     Q.      Over what period?

21     A.      Over the next year.  I have no doubt

22  that we will spend that much money.

23     Q.      Where did you pull that figure from?

24     A.      I pulled it from the air just like

Page 152

1    Mr. Flake does with all of his figures.

2         Q.    But you pulled it from the air?

3         A.    Based on past experience.  I have been

4    to that facility many times.  I have seen it.  I

5    have a pretty good idea what we have had to put

6    in there in the past.  You have got a fire

7    suppression system that has to be put in.  There

8    will be something else.  I can tell you that with

9    100 percent certainty that there will be more

10   capital expenditures required --

11        MR. CLAR:  I don't want to waste everybody's

12   time having you go down the $3 million to tell us

13   exactly what they consist of.  I have no further

14   questions.

15                FURTHER EXAMINATION

16   BY MR. AGAY:

17        Q.    Mr. Grede, you mentioned leaks in the

18   roof?

19        A.    Yes.

20        Q.    You mentioned humidity at the mining

21   facility?

22        A.    I did.

23        Q.    There also needs to be a fire

24   suppression system installed, correct?

Page 153

1          A.      Yes, yes.

2          Q.      Any other issues with the condition of

3     the mining facility or the atmospherics in the

4     mining facility?

5          A.      The heat.  The heat continues to be an

6     issue.

7          Q.      And how is that impacting on our

8     collateral?

9          A.      On your collateral it doesn't

10    directly --

11         Q.      Okay.

12         A.      -- because I mean your collateral is

13    all hardware, if you will --

14         Q.      So --

15         A.      -- what it does impact are the

16    machines that are there, the customers' machines.

17         Q.      Okay.  And what's it doing to those

18    machines?

19         A.      Puts them out of service.

20         Q.      Sooner than it would under ideal

21    conditions?

22         A.      Yes.

23         Q.      And in terms of the -- in terms of the

24    other equipment in the facility that are not

Page 154

1    machines, like the rest of the facility that's

2    not a machine, okay, are those -- is that

3    environment accelerating the deterioration of

4    that collateral?

5        A.    I don't know that I would say the

6    collateral that WESCO believes they have.  I

7    don't believe or I am not aware that that

8    collateral deteriorates as a result of the

9    condition.

10       Q.    What equipment in the facility would

11   be deteriorating as a result of that --

12       A.    Well, the customers' machines.

13       Q.    Okay.  Is that it?

14       A.    I think primarily, yeah.

15       Q.    And if there were a fire in that

16   facility tomorrow, does it currently have a fire

17   suppression system to put out the fire?

18       A.    I don't think it's adequate.

19       Q.    Okay.  Why not?

20       A.    Because that's why we are installing

21   the fire suppression system.

22       Q.    So the place would burn down?

23       A.    I don't know if it would burn down.

24       Q.    Okay.

Page 155

1      A.     You would have people running around

2   with fire extinguishers.

3      Q.     Does the company have insurance that's

4   current?

5      A.     You would have to go through what kind

6   of insurance.

7      Q.     Fire insurance.

8      A.     We would have to check.  I am not

9   aware.

10     Q.     You are not aware.

11            Was the company current on all its

12  insurance premiums as of the petition date?

13     A.     I am not aware.

14     MR. AGAY:  Okay.  That's it.  We will need

15  this tomorrow.

16     MR. CLAR:  We will need a copy too.

17     THE WITNESS:  I will reserve signature.

18                 (WHEREUPON, the deposition was

19                 concluded at 12:15 p.m.)

20

21

22

23

24

Page 156

1                        CERTIFICATE

2                            OF

3            CERTIFIED SHORTHAND REPORTER

4

5            I, ANDREA L. KIM, a State of Illinois

6   Licensed Certified Shorthand Reporter, License

7   number 84-3722, do hereby certify:

8            That previous to the commencement of

9   the examination of the aforesaid witness, the

10  witness was duly sworn or affirmed to testify the

11  whole truth concerning the matters herein;

12           That the foregoing deposition

13  transcript was reported stenographically by me,

14  was thereafter reduced to typewriting under my

15  personal direction and constitutes a true and

16  accurate record of the testimony given and the

17  proceedings had at the aforesaid deposition;

18           That the said deposition was taken

19  before me at the time and place specified;

20           That I am not a relative or employee

21  or attorney or counsel for any of the parties

22  herein, nor a relative or employee of such

23  attorney or counsel for any of the parties

24

Page 157

1    hereto, nor am I interested directly or

2    indirectly in the outcome of this action.

3

4            IN WITNESS WHEREOF, I do hereunto set

5    my hand and affix my seal of office at Chicago,

6    Illinois, this 17th day of June, 2019.

7

8

9

10

11

12

13

14

15            ANDREA L. KIM, CSR

16            License No. 84-3722.

17

18

19

20

21

22

23

24