# EXHIBIT D

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BCause Mining LLC, et al., | ) | Case No. 19-10562 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Janet S. Baer |

<u>**DECLARATION OF CARL S. LANE**</u>

I, Carl S. Lane, under penalty of perjury and in accordance with the requirements of 28

U.S.C. § 1746, hereby declare and state as follows:

1.       I offer this Declaration in support of WESCO Distribution Inc.'s Motion (i) to

Dismiss the Debtors' Bankruptcy Cases, or, in the alternative, (ii) for Relief from the Automatic

Stay.

**A.       <u>My Educational, Professional Background, and Compensation</u>**

2.       I have over 25 years of experience in financial advisory consulting and as an interim

officer leading corporate renewal and business transaction projects for middle-market and large

corporate companies across a range of industries.

3.       I hold Certified Turnaround Professional ("CTP"), Chartered Financial Analyst

("CFA"), Certified Insolvency and Restructuring Advisor ("CIRA"), and Certification in

Distressed Business Valuation ("CDBV") designations.

4.       I have advised distressed companies, lenders, unsecured creditors and equity

holders, and their lawyers, regarding liquidity management, financial restructuring, operational

improvement, financial projections, and valuation issues in connection with out-of-court and

Chapter 11 reorganizations across a wide range of industries. As part of some of these assignments,

I have also been asked to provide expert testimony.  I have also advised attorneys and their clients

in connection with litigation matters on a broad range of financial and accounting issues.

5.     I am a Managing Director at Willow Tree Consulting Group, LLC ("Willow Tree"), a financial consulting firm I founded eight years ago.  Prior to founding Willow Tree, I was a Managing Director at AlixPartners, LLP ("AlixPartners") in the Turnaround and Restructuring Services practice.  Prior to AlixPartners, I was a Principal at Deloitte Financial Advisory Services, LLP ("Deloitte FAS") in the Reorganization Services Practice.  Through Willow Tree, I provide financial advisory, interim management, and independent board director services to middle-market companies that are often financial distressed.  I provided similar services at AlixPartners and Deloitte FAS to both middle-market and large corporate companies.  AlixPartners is a global consulting firm that provides turnaround and restructuring, performance improvement, mergers and acquisitions, and other financial advisory services.  Deloitte FAS provides turnaround and restructuring, investment banking, forensic investigation, and other financial advisory services and is part of Deloitte, one of the largest accounting and consulting firms in the world.

6.     I have held various interim officer positions for restructuring companies and other transactional situations, including Chief Restructuring Officer ("CRO"), President, and Chief Financial Officer ("CFO"), among other titles.  I have also been an independent board director for multiple distressed companies.

7.     I received an MBA with a concentration in Finance and a Bachelor of Science in Accounting, both from the University of Florida.

8.     I am a member of the Turnaround Management Association ("TMA"), the Association of Insolvency and Restructuring Advisors ("AIRA"), the CFA Institute, and the Private Directors Association ("PDA").  I was the President and a Director of the Chicago/Midwest Chapter of the TMA and held various officer and board positions for the global TMA organization.

In 2009, I was named in Turnarounds & Workouts "People to Watch." I frequently speak and publish as an expert on finance, accounting and business transformation topics. I have been an instructor for the Certification in Distressed Business Valuation training course for the AIRA and was a co-author and technical editor for the *Valuations in Restructuring: De-mystifying the Valuation Process* course for the TMA. A copy of my current CV is attached hereto as ***Exhibit 1***.

9.       In connection with the preparation of this Declaration and testimony I may provide in this case, I am being compensated based on the actual hours incurred at an hourly billing rate of $500. As of the time of this Declaration, I have incurred approximately 30.5 hours.

**B.**       **Background of the Dispute and Materials Reviewed**

10.       I have been asked to present my opinions regarding issues associated with WESCO Distribution Inc.'s Motion (i) to Dismiss the Debtors' Bankruptcy Cases, or, in the alternative, (ii) for Relief from the Automatic Stay. Specifically, I have been asked to present my opinion on the Debtors' business plan ("Business Plan") and the Debtors' current enterprise value.

11.       The Debtors, BCause LLC ("BCause") and BCause Mining LLC ("Mining"), are in the cryptocurrency mining business. Mining provides computer hosting services and technical support to its customers at its sole facility in Virginia Beach, VA. The services provided by Mining to its customers are governed by hosting agreements, master license and services agreements and/or order forms. The Debtors also have an office in Chicago, Illinois. Mining filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 11, 2019 and BCause filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 12, 2019. BCause is the member owner of Mining. BCause is the member owner of other LLCs, including BCause Spot LLC ("Spot"), none of which appear to have any ongoing operations. It appears that Spot was created with the intention of developing a cryptocurrency exchange.

12.     Mining has nine current customers which generate approximately $1 million in cash receipts per month. The vast majority of the cash receipts, approximately 95%, is concentrated with three customers that were attained in late-2017, when the Bitcoin price spiked to over $19,000. The agreements with these three customers denote a 24-month term. Five additional customers, which represent approximately 4.5% of cash receipts, where attained in mid-2018. The last customer, which represents approximately 0.2% of cash receipts, was attained in January 2019.[1] See Customer Receipts by Start Month attached hereto as ***Exhibit 2***. SBI Crypto Co., Ltd.. Mining's largest customer has verbally indicated that they do not intend to continue service.[2] St. Bitts, Mining's thirds largest customer, has also indicated that they want to terminate service.[3]

13.     The Debtors have presented an EBITDA for the trailing-twelve-month ("TTM") period ending March 2019 of negative $172,539.[4] The Debtors reported approximately $12.5 million of liabilities ($2,429,684 by BCause and $10,047239 by Mining) on its statements and schedules. Summaries in the Business Plan present approximately $12.0 million in liabilities.[5] The BCause balance sheet as of March 31, 2019 shows approximately $16.7 million in liabilities, including approximately $3.2 million in "Deferred revenues."

14.     In preparing this Declaration, I have reviewed the following materials, all of which were provided to me by counsel to WESCO:

- BCause LLC Chapter 11 Petition;

- BCause Mining LLC Chapter 11 Petition;

- BCause LLC Statements and Schedules;

---

[1] Per Summary of Cash Collections with payment dates from April 11 to May 1, 2019 and customer agreements.
[2] Per Flake deposition, page 45, lines 2-24.
[3] Per Flake deposition, page 56, lines 7-16.
[4] Per Business Plan, slide 37.
[5] Per Business Plan, slides 14-17.

4

- BCause Mining LLC Statements and Schedules;

- Order Authorizing Interim Use of Cash Collateral and Granting Related Relief;

- Second Interim Order Authorizing Use of Cash Collateral and Granting Related Relief;

- Third Interim Order Authorizing Use of Cash Collateral and Granting Related Relief;

- Fourth Interim Order Authorizing Use of Cash Collateral and Granting Related Relief;

- BCause LLC Chapter 11 Monthly Operating Report for the period ending April 30, 2019;

- BCause Mining LLC Chapter 11 Monthly Operating Report for the period ending April 30, 2019;

- WESCO Distributions, Inc. Proof of Claim and Addendum;

- WESCO Distributions Motion (I) to Dismiss the Debtors' Bankruptcy Cases, or, In the Alternative, (II) for Relief from the Automatic Stay (the "Motion to Dismiss");

- Deposition Transcript of Thomas Flake dated June 3, 2019 (the "Flake Deposition");

- BCause Creditor and Court Presentation dated June 5, 2019 (Exhibit 1 from the Flake Deposition, the "Business Plan");

- BCause Balance Sheet as of March 31, 2019 (Exhibit 2 from the Flake Deposition);

- Customer Hosting Agreements, Master License and Services Agreements and Order Forms, including Exhibits 3 through 6 from the Flake Deposition;

- Summary of Cash Collections with payment dates from April 11 to May 1, 2019;

- Memorandum of Debtors in Response to the Motion to Dismiss;

- The Official Committee of Unsecured Creditors' Preliminary Objection to the Motion to Dismiss;

- The Official Committee of Unsecured Creditors' Supplemental Objection to the Motion to Dismiss;

- BMG's Objection to the Motion to Dismiss;

- Proposed Order Approving Stipulation between the Debtor and Dominion Energy Virginia (the Debtors' version);

- Proposed Order Approving Stipulation between the Debtor and Dominion Energy Virginia (Dominion Energy's version);

- Letter from the State of Wisconsin Department of Financial Institutions with BCause Secure LLC Business Plan attachment;

- Revised BCause Creditor and Court Presentation dated June 5, 2019 (v14 received June 14, 2019);

- BCause Spot Exchange Financial Projections (Excel file version 28);

- Holding and Mining 13-week Budget through September 9, 2016 (Excel file version 10);

- Addendum to Purchase Order from BCause Issued to BFPE International, Inc.; and

- Deposition Transcript of Fred Grede dated June 17, 2019 (the "Grede Deposition").

15.     In addition to the foregoing materials, and my general knowledge of business operations, valuation and leverage metrics, and chapter 11 restructurings, I considered the following additional facts and data:

- Bitcoin price trend from November 2017 to present; and

- Online search of cryptocurrency hosting companies.

**C.     The Debtors' Business Plan**

16.     In the Business Plan, and as further detailed during the deposition of Mr. Thomas Flake, the Debtors set forth their plan for emerging from chapter 11 bankruptcy. As part of that presentation, the Debtors' set forth a forward-looking plan. For a multitude of reasons set forth below, the Business Plan is substantially speculative and likely not feasible.

17.     The Debtors revenues are highly at risk and a loss of one or more of the key

customers would significantly impact cash receipts and cash flow. The Debtors three largest customers, which represent approximately 95% of cash receipts, have agreements that expire in late 2019 and none of the customers have committed to extending the agreements. In the current environment, particularly given that the Debtors have added only one new very small customer in January 2019, it is highly unlikely they will be able to replace the lost volume while in bankruptcy or soon after emerging. The Debtors have not presented projections demonstrating that they could continue to operate and pay their creditors if one or more of the key customers does not extend and cash receipts decline substantially.

18.    The Business Plan is substantially speculative and is predicated on substantial additional capital that has not been committed or secured. As noted above, the continuation of the cash receipts at the current level beyond 2019 is uncertain due to the expiring agreements. The cash disbursements presented in the Business Plan include certain cost reductions that have not been implemented and also do not include expenses that are likely necessary. My understanding is that the cash disbursements do not include sufficient payroll and benefits costs for key vacant positions. While it depends on who is hired, the incremental annual payroll and benefits costs for these positions would likely range from $100,000 to over $400,000. The cash disbursements do not include the deposits that would likely be required by new landlords and the current deposits would likely be retained by the old landlords to offset rejection damages. The cash disbursements do not include the cost to complete the fire suppression system at the data center. If the fire suppression system is not completed, the data center may not be able to remain open. The Debtors belief that they will be able to obtain separate funding to complete the project appears unlikely as there is no distinct value to an investor of paying for a fire suppression system and lenders typically do lend against leasehold improvements, and especially not for distressed companies. It also appears that

the cash disbursements do not include sufficient capital expenditures for other repairs and/or improvements of $3 to $4 million.[6]  Other potential cost savings presented in the Business Plan are also speculative and/or overstated.  The Business Plan indicates that the Debtors could save $37,000 per month by converting to natural gas.  However, no costs are included for the installation of the necessary equipment and the provider would need to obtain funding for the project.  Furthermore, if a portion of the power is converted to natural gas, Dominion Power may argue that its rates should increase given the lower volume.  It also appears that the cash disbursements are assumed to be lower at BCause and Mining by "shifting" costs to Spot.  As outlined further below, the ability to "shift" the costs is speculative as it requires funding to pursue the launch of Spot.

19.     The success of the Business Plan is also heavily dependent on the launching of the Spot exchange and such launch is highly uncertain.  The Debtors have indicated that Spot needs $750,000 in funding to go live and operate through August 31, 2019 (assuming there are no technical or regulatory delays) and then would need an additional $2 million to operate until Spot operates at breakeven.  As the Debtors have only obtained $350,000 in verbal commitments, it is highly uncertain if they will be able to obtain the necessary funding.  Furthermore, potential investors would likely be hesitant to provide capital if such capital would inure for the benefit of others.

20.     Based upon my experience in negotiating with secured and unsecured creditors in restructuring situations, it is unlikely that the secured and unsecured creditors of the Debtors would agree to the reorganization structure outlined in the Business Plan.  First, secured creditors would expect to receive the value of their collateral and to be treated differently than unsecured creditors.  Second, the unsecured creditors would expect to receive equity or debt for the full portion of their

---

[6] Per Grede deposition, pages 114-117, 149-152.

8

claim before shareholders retained any interest. Third, the Debtors did not incorporate any treatment for lease rejection claims. Additionally, many of the creditors would not be interested in owning equity merely for corporate governance reasons.

**D.    The Debtors' Assessment of Enterprise Value**

21.    As part of their plan for emerging from chapter 11 bankruptcy, and as further detailed during the deposition of Mr. Thomas Flake, the Debtors set forth a valuation of the Debtors' enterprise. For a multitude of reasons, summarized below, the Debtors' valuation conclusion is not well founded or supported.

22.    The Debtors' conclusion that the value of Mining is $10.8 million or 11 months of revenues is not well founded or supported. Putting aside that valuations are not commonly determined based on the number of months of revenue, the Debtors have essentially utilized a revenue multiple of 0.9 times annual revenues. The Debtors provided no reasonable basis for the revenue multiple utilized. They did not evaluate comparable M&A transactions or comparable public companies. The only substantiation provided by Flake during his deposition for the revenue multiple was that stocks trade at 3 to 5 times revenues and, therefore, 0.9 times would be conservative and that Uber and Lyft are valued at a multiple of revenues. The basis is not reasonable or even the same metric. Companies trading on the public market are dramatically larger than Mining, as are Uber and Lyft. The "trade" is the stock price, which is not the same as enterprise value, and such metrics are utilized to evaluate relative stock prices and stock price trends, not to value individual companies.

23.    The Debtors did not provide a reasonable basis for using a market multiples valuation methodology and, more specifically, a revenue multiple. While a revenue multiple may be considered when developing a valuation conclusion for Mining, it would be in conjunction with

9

other valuation methodologies and would likely be significantly under-weighted given its limitations. The revenue multiple use is limited as it basically presumes that the profitability and growth of the subject company and the comparable companies are substantially similar. Given the Debtors' historical negative profitability and expiring contracts, this presumption likely would not be supportable.

24.     The Debtors did not provide a rationale for excluding other market multiple valuation methodologies, such as an EBTDA multiple or an EBITDA minus capital expenditures ("EBITDA minus Capex") multiple. The EBITDA multiple is more appropriate for an operating company such as Mining as it takes into account the relative profitability of the subject company. The EBITDA minus Capex multiple would also be more appropriate as it takes into account the relative profitability, but also takes into account the relative infrastructure investment required by the subject company. The Debtors also did not provide a rationale for excluding the other commonly utilized valuation methodology, the discounted cash flow ("DCF") methodology. The DCF methodology should have been considered as it takes into account the projected future cash flows of the subject company, including capital expenditures and working capital, and also takes into account the riskiness of the cash flows, which is important for the Debtors given the customer concentration, the expiring contracts, and because Mining is financial distressed. It should also be noted that the DCF method can be applied to both mature companies and start-up companies through the use of differing discount rates that reflect the riskiness of the cash flows and/or scenario analyses.

25.     The Debtors' conclusion that the value of Spot is $2.0 million, based on replacement value, is not well founded or supported. The Debtors provided no basis for the use of replacement cost; and they did not provide any supporting cost information for the assets being replaced.

10

Replacement value is not a reasonable valuation methodology for the determining the value of a non-operating business. Replacement value is used primarily in valuing inventory and equipment of performing companies where the inventory and equipment is being utilized for profitable operations. Again, the Debtors did not provide a rational for excluding commonly utilized valuation methodologies like the DCF methodology. However, it is reasonable to conclude that the value of Spot is zero or close to zero as it currently is not operating and its prospects for success are highly uncertain. Furthermore, as Spot requires $2.75 million in capital to operate until it is expected to break even, the equity investors would demand the vast majority of the value.

E.      **The Debtors' Going-Concern Enterprise Value**

26.     Based on the information made available by the Debtors, the going-concern enterprise value is substantially lower than the $12.8 value put forth by the Debtors and would, therefore, also be below the level of secured and unsecured liabilities.

27.     Based on the information made available by the Debtors, the going-concern enterprise value of Mining is more likely between zero and approximately $1.7 million. The most appropriate valuation methodologies and metrics, and the most commonly used for distressed businesses, are a market multiple of EBITDA and the DCF methodology. As noted above, a multiple of EBITDA minus Capex would also be appropriate if sufficient and reliable capital expenditures information was available. The initial valuation estimates (or the factors utilized) would then typically be adjusted to reflect the additional risk associated with a distressed company. The discount is typically between 10 and 30 percent, but could be higher based on the distress and risk associated with the restructuring activities. The valuation estimate using an EBITDA multiple could be based on actual TTM EBITDA or projected EBITDA. As the actual TTM EBITDA is negative, a valuation estimate using that metric would indicate that there is no value to the

11

enterprise. The valuation estimate using the projected EBITDA prepared by the Debtors would be approximately $1.7 million. The $1.7 million is calculated as follows: $17,222 EBITDA per week times 52 weeks less a $290,000 pro-forma adjustment for additional executive compensation[7] times a 6 multiple with a 40% discount and then reduced by $500,000 for extraordinary capital expenditures[8] ($17,222 x 52 = $895,544, $895,544 - $290,000 = $605,544, $605,544 x 6 x 60% = $2,179,958, $2,179,958 - $500,000 = $1,679,958).  Given the risk of the loss of key customers, a 40% discount was deemed reasonable as it reflects the risk that EBITDA could be dramatically lower and possibly negative, along with other restructuring risks. The projected EBITDA was not adjusted for the potential additional cost reductions, given their speculative nature, or the costs being "shifted" to Spot, as they are not actually being reduced.  While the Debtors' projected EBITDA was utilized, it is likely overstated because the time period utilized includes an extra week of revenues/collections. The 18-week time period includes a $1,018,577 collection in the first week and a $967,752 collection in the second-to-last week.  While the extra collection is partially offset by an extra payment for electricity of $660,000, it does not appear to be offset by other weekly operating disbursements.  If the Debtors' projected EBITDA were adjusted for the net overstatement of approximately $340,000 (approximately $1,000,000 - $660,000), the projected EBITDA would be negative. If the Debtors are unable to "shift" costs to Spot and such costs cannot otherwise be eliminated, the estimated value would be lower.  The DCF methodology was not utilized as long-term cash flow projections were not prepared by the Debtors (or none have been provided by the Debtors).  However, a valuation estimate using the DCF methodology would need to incorporate the significant risk of losing key customers and cash flow going to zero.

---

[7] Estimated to include CEO at $300,000 and CFO at $200,000, plus benefits at 20%.
[8] Includes $237,500 for the fire suppression system and additional amount to reflect deferred capital expenditures.

28.     The equity value of Spot available for the Debtors' creditors is likely zero or close to zero.  As the exchange is not operational, requires at least $750,000 in capital to operate for the first 12 weeks, and requires at least an additional $2 million to operate until it breaks even, any value would inure to the new investors.  It should be expected that investors in the Spot business would receive equity interest in Spot and would demand the vast majority of the ownership, if not 100%, leaving little to no value available for the creditors of the Debtors.  The Debtors assertion that the value will increase by $2 million when the exchange launches is irrelevant.  The current value reflects the risks associated with the cash flows and such risk would reflect the probability of the exchange successfully launching or not.  Furthermore, again, any future increase in value would inure to the new investors.  Absent the $2.75 million in capital investment, Spot has little to no value as it would generate no cash flow and the costs incurred to date are merely sunk costs.

FURTHER DECLARANT SAYETH NOT

_____

Carl S. Lane
Willow Tree Consulting Group, LLC

Executed by Declarant on June 16, 2019

13

**Exhibit 1**

**Curriculum Vitae of Carl S. Lane**



Willow Tree Consulting Group, LLC
233 S. Wacker Drive
84th Floor
Chicago, IL 6060

(312) 952-3880

**CURRICULUM VITAE OF
CARL S. LANE**

| | |
|---|---|
| **POSITION** | Managing Director, Willow Tree Consulting Group, LLC |
| **EDUCATION** | University of Florida, MBA with a concentration in Finance |
| | University of Florida, BS in Accounting |
| **PROFESSIONAL CERTIFICATIONS/ BUSINESS AFFILIATIONS** | Chartered Financial Analysts (CFA) Designation |
| | Certified Turnaround Professional (CTP) Designation |
| | Certified Insolvency and Restructuring Advisor (CIRA) Designation |
| | Certification in Distressed Business Valuation (CDBV) Designation |
| | CFA Institute |
| | Investment Analysts Society of Chicago of the Financial Analysts Federation |
| | Association of Insolvency and Restructuring Advisors |
| | Turnaround Management Association (International – 2010-2016 Board of Directors/Trustees, 2009 Spring Conference Co-chair; Chicago/Midwest Chapter – 2011 President, 2008-9, 2019 Board of Directors) |
| | 2009 People to Watch finalist by *Turnarounds & Workouts* |
| | Village of Winnetka (Zoning Board, 2008-2018) |
| **RANGE OF EXPERIENCE** | Carl has over 25 years of experience at tier-one professional services firms providing interim management and turnaround consulting to middle-market and large corporate companies, creditors, shareholders, and other interested parties. He has served both public and private companies across a broad spectrum of industries and business sectors. Representative matters include The Budd Company, Pacer International, Motor Coach Industries, MoneyGram International, Neff Corp., ASARCO, Bally Total Fitness, Federal Mogul, Florsheim Shoes, Jacobson Stores, an aerospace and defense manufacturing company, an aluminum casting company, a coal mining company, an oil derrick fabrication company, and a professional services company. His broad expertise also includes experience in litigation consulting, valuation, and mergers and acquisitions, as well as providing expert testimony on a range of financial matters. Carl is a frequent speaker and author on the subject of corporate restructurings, finance and accounting matters. |
| | Prior to founding Willow Tree, Carl was a managing director with AlixPartners LLP and a principal at Deloitte Financial Advisory Services LLP. |

**CARL S. LANE**
Page 2

**REORGANIZATION**
**SERVICES**

- Provided reorganization and restructuring consulting for major distressed companies, creditors, equity holders, and other interested parties

- Held position of Chief Restructuring Officer, Chief Financial Officer and President, among others

- Acted as an Independent Director for multiple companies

- Assisted management in developing restructuring initiatives and business plans to improve operations, profitability, and liquidity

- Performed analyses on restructuring of capital and assisted in the disposition of assets

- Prepared and assessed normalized and pro forma earnings, financial projections and business plans

- Performed stock and asset valuations in going-concern and liquidation scenarios

- Assisted companies in planning for filing for protection under Chapter 11

- Assisted with the sale of assets via Section 363 sales and the sale of businesses outside of Chapter 11

- Assisted with the development and evaluation of Plans of Reorganization and Disclosure Statements

- Advised clients regarding the terms and structure of Debtor-in-Possession (DIP) financings, key employee retention plans and management incentive plans

- Assisted in the development, implementation and management of critical vendor programs

- Assisted with the evaluation and analysis of pension and other post-retirement benefits in relation to the modification or termination of such benefits

- Assisted with the evaluation and analysis of mass tort claims in Chapter 11 matters, including claim estimation, insurance coverage and Section 524(g) trust issues

- Evaluated troubled loan portfolios and assisted in the sale of portfolio assets

- Performed due diligence to evaluate the quality of earnings and collateral and the reasonableness of financial projections associated with new and existing commercial loans

- Performed due diligence associated with the sale of consumer credit facilities

- Evaluated ability of companies to continue as a going concern for financial reporting purposes

**CARL S. LANE**
Page 3

- Assisted in the development of pro forma financial statements including adjustments resulting from the reorganization and "fresh-start" accounting

- Performed due diligence and analyses to evaluate potential adversarial actions including deepening insolvency, recharacterization and fraudulent transfer, among others

- Provided expert testimony on numerous occasions on bankruptcy court matters associated with valuation, market rates, feasibility, best interest of creditors, retiree benefits, avoidance actions and substantive consolidation

**DISPUTE CONSULTING SERVICES**

- Led and managed projects to provide assistance to counsel and management with respect to financial, accounting, and valuation issues, especially as they relate to damage calculations.  Litigation areas served include:

  - Alter ego/piercing the corporate veil
  - Breach of contract
  - Business interruption (lost profits and property claims)
  - Business and real estate valuation
  - Class actions (product liability and deceptive trade practices)
  - Construction contract cost overruns
  - Contribution claim
  - Environmental damages and insurance coverage
  - Fraudulent conveyance and preference actions
  - Patent infringement

- Provided expert witness deposition testimony regarding various financial and accounting irregularities surrounding a liquidation proceeding

**OTHER EXPERIENCE AND INDUSTRIES SERVED**

- Served as Director of Corporate Planning and Development of an international publisher

  - Managed company efforts for reengineering and revision of financial management systems
  - Responsible for portions of the corporate finance and strategic planning functions of the company

- Consulting and industry experience serving both public and private institutions in various industries including:

  - Automotive
  - Construction
  - Financial Institutions
  - Food and Consumer Products
  - Healthcare
  - Insurance
  - Manufacturing
  - Oil and Gas
  - Publishing
  - Real Estate and Hospitality
  - Retail and Distribution
  - Transportation

CARL S. LANE
Page 4

**PUBLICATIONS/
PRESENTATIONS**

- "The Valuation of Distressed Businesses," Deloitte & Touche Presentation to Kirkland & Ellis, Chicago, Illinois, November 1, 2002

- "Bankruptcies and Restructurings: Lessons for the Performing Company," Deloitte & Touche and Jenner & Block Executive Breakfast Briefing, Chicago, Illinois, December 11, 2002

- "Crisis and Liquidity Management," Deloitte & Touche Presentation to Bank One Asset-Based Lending, Chicago, Illinois, February 19, 2004

- Moderator for Panel Discussion of the Chicago/Midwest Turnaround Management Association's 2004 Turnarounds of the Year, Chicago, Illinois, January 14, 2004

- Panelist for Discussion of Hypothetical Restructuring, Chicago/Midwest Turnaround Management Association and University of Chicago Graduate School of Business Career Forum, Chicago, Illinois, February 23, 2005

- "Determining the Feasibility of Plans," Joint Session of Association of Insolvency and Restructuring Advisors Conference on Recent Developments in Chapter 11 and Norton Bankruptcy Litigation Institute I, Park City, Utah, March 1, 2005

- Instructor for Asset Valuation Approach of Certified Distressed Business Valuation (CDBV) Course by the Association of Insolvency and Restructuring Advisors, Chicago, Illinois, March 16, 2005

- "The Mechanics of Automotive Industry Restructurings," Chicago/Midwest Turnaround Management Association Forum, Chicago, Illinois, May 13, 2005

- "Pension Obligations – Who owns the company anyhow?," Jefferies 2005 Global Automotive Conference, New York, New York, May 18, 2005

- "How to Win the Valuation Battle: An Overview of Critical Reorganization Valuation Issues," Turnaround Management Association Annual Conference, Chicago, Illinois, October 20, 2005

- "The New Bankruptcy Code – 7 Months Later," Chicago/Midwest Turnaround Management Association Forum, Chicago, Illinois, May 5, 2006

- "The Market Responds to Code Changes with Fewer Reorganizations," co-authored with Harold D. Israel, Daily Bankruptcy Review, June 28, 2006

- "A Utility Facing an Order Would Do Well to Respond," co-authored with Harold D. Israel, Daily Bankruptcy Review, July 28, 2006

- Quoted in October 31, 2006 CFO.com article "Burn Prevention for Creditors"

- Mentioned in October 17, 2006 Dow Jones Newswires article "Courting Trouble: Bankruptcy-Law Changes Cause Confusion"

- Quoted in Deloitte publication "Preparing for a Pandemic – Not your average business disruption"

**CARL S. LANE**
Page 5

**PUBLICATIONS/**
**PRESENTATIONS**
**(CONT.)**

- "Considerations in Buying or Selling an Underperforming/Distressed Business," The Nuts and Bolts of Buying and Selling Distressed Companies Workshop, Chicago/Midwest Turnaround Management Associations, Chicago, Illinois, April 20, 2007

- "Hardships in Homebuilding: Perspectives on an Increasingly Distressed Market," Deloitte & Touche and Foley & Lardner Seminar, Chicago, Illinois, June 5, 2007

- "Exchange Offers" chapter in "Strategic Alternatives for Distressed Businesses" co-authored with Josef Athanas and David Hoffman, West Publishing, all editions

- "Mastering a Distressed M&A Transaction," The Canadian Institute's 9th Annual Advanced Insolvency & Restructuring Law Conference, Toronto, January 23, 2009

- "Portfolio Company Turnarounds," McGuireWoods Private Equity Webinar, April 15, 2009

- "Working It Out in the Age of Tight Credit," The Canadian Institute's Western Canada Advanced Insolvency Law & Practice Conference, Vancouver, September 16, 2009

- "Betting on a Recovery: When Will the Markets Fully Rebound?" Turnaround Management Association MidAmerica Conference, Detroit, September 14, 2010 (introductory comments and conference chair)

- "Chapter 11 Reorganization Process," The Nuts and Bolts of Dealing with a Troubled Business, Chicago/Midwest Turnaround Management Associations, Chicago, Illinois, October 14, 2010

- "Turnarounds and Restructurings: What a Difference a Year Makes," University of Florida, Hough Graduate School of Business – Finance Professional Speaker Series, Gainesville, Florida, February 18, 2011

- "CRO 101 – Using the Tools," Turnaround Management Association Webinar, April 21, 2011

- "Thirteen Week Cash Flow: What's In a Number?  The First 13 Weeks May Be Everything," Turnaround Management Association Webinar, June 9, 2011

- "CRO 201 – Executing the Operational Turnaround," Turnaround Management Association Webinar, September 27, 2011

- "Toolkit for a Workout – Thinking Beyond Bankruptcy," McGuire Woods 10th Annual Healthcare and Life Sciences Private Equity and Finance Conference, February 27, 2013

- "Interim Officers – Critical Skills for Critical Situations," co-authored with Duncan S. Bourne, ABI Journal, September 2013

- "Valuations in Restructuring: De-mystifying the Valuation Process," co-author and technical editor, Turnaround Management Association Course, July 2015

- "State of the Distressed Market," Ravinia Capital and Polsinelli 2017 Midwest Dealmakers Conference, August 4, 2017

**CARL S. LANE**
Page 6

| | |
|---|---|
| **PUBLICATIONS/ PRESENTATIONS (CONT.)** | • "2019 Restructuring & Economic Outlook," TMA NextGen Leadership Conference, November 30, 2018 |

**EXPERT TESTIMONY**

| | |
|---|---|
| Case Name: | In re: The Budd Company, Inc. (14-B-11873) |
| Date: | January 2016 |
| Type of Testimony: | Deposition and Hearing |
| Jurisdiction: | United States Bankruptcy Court, Northern District of Illinois, Eastern Division |
| Forum: | Court |
| Client: | Debtor |
| Nature of Dispute: | Modification of Retiree Benefits |

| | |
|---|---|
| Case Name: | In re: Motor Coach Industries International, Inc. (08-12136) (Jointly Administered) |
| Date: | January 2008 |
| Type of Testimony: | Deposition and Hearing |
| Jurisdiction: | United States Bankruptcy Court, District of Delaware |
| Forum: | Court |
| Client: | Debtors |
| Nature of Dispute: | Confirmation of Plan of Reorganization, DIP Facility Amendments |

| | |
|---|---|
| Case Name: | In re: ASARCO LLC, et al. (05-21207) (Jointly Administered) |
| Date: | July 2009 |
| Type of Testimony: | Declaration/Proffer |
| Jurisdiction: | United States Bankruptcy Court, District of Texas, Corpus Christi Division |
| Forum: | Court |
| Client: | Debtors |
| Nature of Dispute: | Confirmation of Plan of Reorganization |

| | |
|---|---|
| Case Name: | In re: Coram Healthcare Corp. and Coram, Inc. (00-3299) (Jointly Administered) |
| Date: | September 2003, April 2004 |
| Type of Testimony: | Deposition and Hearing |
| Jurisdiction: | United States Bankruptcy Court, District of Delaware |
| Forum: | Court |
| Client: | Official Committee of Equity Security Holders |
| Nature of Dispute: | Confirmation of Plan of Reorganization |

| | |
|---|---|
| Case Name: | In re: Jacobson Stores Inc., et al. (02-40957, 02-40958 and 02-40959) |
| Date: | July 2003 |
| Type of Testimony: | Deposition |
| Jurisdiction: | United States Bankruptcy Court, Eastern District of Michigan, Southern Division |
| Forum: | Court |
| Client: | Official Committee of Unsecured Creditors |
| Nature of Dispute: | Substantive Consolidation |

**Exhibit 2**

**Customer Receipts by Start Month**



BCause
Collections by Start Month