Ankney Revisions 11.01.17

## SECURITIES LAW REPRESENTATIONS

EACH MEMBER, BY EXECUTING THIS AGREEMENT, HEREBY REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE MEMBERS THAT SUCH MEMBER (A) IS AWARE THAT THE ACQUISITION OF ITS INTEREST IN THE COMPANY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE, (B) IS ACQUIRING ITS INTEREST IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH INTEREST, (C) UNDERSTANDS THAT RESALE, PLEDGE, ASSIGNMENT, OR OTHER TRANSFER OF ITS INTEREST IN THE COMPANY IS LIMITED BY THIS AGREEMENT AND IN ANY EVENT MAY NOT BE EFFECTED UNLESS (i) THE TRANSFER IS REGISTERED AND QUALIFIED UNDER APPLICABLE SECURITIES LAWS, OR IS EFFECTED AS A NON-PUBLIC OFFERING THAT IS EXEMPT FROM REGISTRATION AND QUALIFICATION REQUIREMENTS OF APPLICABLE SECURITIES LAWS, AND (ii) THE PERSON ACQUIRING SUCH INTEREST REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE MEMBERS THAT SUCH PERSON IS ACQUIRING ITS INTEREST IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH INTEREST, (D) HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT IT IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF ACQUIRING ITS INTEREST IN THE COMPANY, (E) ACKNOWLEDGES THAT THERE IS NO GUARANTEE THAT THE COMPANY WILL BE A FINANCIAL SUCCESS, AND IS ABLE TO BEAR THE ECONOMIC RISK OF THE LOSS OF ITS ENTIRE INVESTMENT IN THE COMPANY, AND (F) ACKNOWLEDGES THAT THE COMPANY AND THE MEMBERS ARE RELYING ON THE FOREGOING REPRESENTATIONS.

## OPERATING AGREEMENT
## OF
## BCAUSE MINING LLC

THIS OPERATING AGREEMENT is made and entered into as of September 15, 2017, by and among the undersigned.

WHEREAS, the Company was formed by the filing of the Articles of Organization with the State Corporation Commission of the Commonwealth of Virginia on September 15, 2017;

WHEREAS, the Members desire to enter into this Operating Agreement.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## SECTION 1
## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

1.1    "Act" means the Virginia Limited Liability Company Act, as amended from time to time.



1.2   "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year or other period after giving effect to the following adjustments:

(i)   Credit to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the next to the last sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)   Debit to such Capital Account the items described in regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.3   "Affiliate" of a Person means: (i) a Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the first Person; (ii) any spouse or child of the first Person or a Person described in (i); and (iii) any trust or other entity established for the benefit of any of the Persons described in (i) or (ii). "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of voting securities, by contract, as trustee, executor, or otherwise.

1.4   "Agreement" means this Operating Agreement, as amended, modified or supplemented from time to time.

1.5   "Articles of Organization" means the Articles of Organization of the Company, as amended in accordance with the Act.

1.6   "Board of Managers" has the meaning set forth in Section 4.1.

1.7   "Capital Account," as further described in Section 9, means an account maintained for each Member which is equal to such Member's original Capital Contribution increased by additional Capital Contributions and, in accordance with Sections 10 and 11, such Member's share of Company profits, income, and gains and decreased by distributions and such Member's share of Company losses, expenses, and deductions.

1.8   "Capital Contribution" means the amount of cash or property contributed to the Company by a Member from time to time.

1.9   "Class A Member" means the Persons so identified on **Schedule A** and any Person that becomes a substitute Class A Member under this Agreement.

1.10   "Class A Unit" means any Membership Interest designated as a Class A Unit, including any and all benefits to which the holder of such Class A Unit may be entitled as provided in this Agreement. Initially, the Class A Units of each Member shall be the Class A Units set forth on **Schedule A**. **Schedule A** shall be updated by the Company's officers to reflect any changes in the Class A Units of the Members.

1.11    "Class B Member" means the Persons so identified on **Schedule A** and any Person that becomes a substitute Class B Member under this Agreement.

1.12    "Class B Unit" means any Membership Interest designated as a Class B Unit, including any and all benefits to which the holder of such Class B Unit may be entitled as provided in this Agreement. Initially, the Class B Units of each Member shall be the Class B Units set forth on **Schedule A**. **Schedule A** shall be updated by the Company's officers to reflect any changes in the Class B Units of the Members.

1.13    "Code" means the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue laws.

1.14    "Company" means BCause Mining LLC, a Virginia limited liability company.

1.15    "Company Minimum Gain" shall have the meaning set forth in Regulations Section 1.704-2(b)(2) and 1.704-2(d) with respect to partnership minimum gain.

1.16    "Conversion" has the meaning set forth in Section 17.1.

1.17    "Guaranteed Payment" shall have the same meaning as is given to the term under Code Section 707(c).

1.18    "IPO" shall mean an initial public offering of the Company's securities in accordance with the provisions of the Securities Act.

1.19    "Majority" means a Member or Members holding more than 50% of the Class A Units and the Class B Units, considered together as a single class, issued and outstanding at any particular time.

1.20    "Member" means each of the undersigned listed as a Class A Member, Class B Member, or Profits Units Member and any other Person who hereafter becomes an additional or substitute Member of the Company, for as long as each such Person continues to be a Member of the Company, and "Members" means the Persons who are at any one time Members of the Company.

1.21    "Member Nonrecourse Debt" shall have the meaning set forth in Regulations Section 1.704-2(b)(4) with respect to partner nonrecourse debt.

1.22    "Member Nonrecourse Debt Minimum Gain" shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

1.23    "Member Nonrecourse Deductions" has the meaning set forth in Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2) with respect to partner nonrecourse deductions.

1.24    "Membership Interest" or "Interest" means the ownership interest of a Member in the Company at any particular time, expressed as a percentage of outstanding Units, including the right of such Member to any and all of the benefits to which such Member may be entitled as

provided in this Agreement and in the Act, together with the obligations of such Member to comply with all the provisions of this Agreement and of the Act. Initially, the Membership Interest of each Member shall be the Membership Interest set forth on **Schedule A**. **Schedule A** shall be updated by the Company's officers to reflect any changes in the Membership Interests of the Members.

1.25   "Nonrecourse Deductions" shall have the meaning set forth in Sections 1.704-2(b)(1) and 1.704-2(c) of the Regulations.

1.26   "Nonrecourse Liability" shall have the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

1.27   "Person" means an individual, a general partnership, a limited partnership, a limited liability partnership, a trust, an estate, an association, a corporation, a limited liability company, or any other legal or commercial entity.

1.28   "Prime Rate" with respect to any period shall mean the interest rate stated as being the "Prime Rate" applicable in the United States during such period as published in *The Wall Street Journal* or reported by any internet-based service (or such reasonably comparable interest rate as may be readily available if such published or reported rate designated as the "Prime Rate" is not readily available in *The Wall Street Journal* or on any such internet-based service), as such published or reported interest rate may change from time to time during such period.

1.29   "Profits" and "Losses" means, for any period, an amount equal to the Company's taxable income or loss, for such period, taking into account any separately stated tax items and increased by any tax-exempt income of the Company during such period and decreased by the amount of any expenditures of the Company during such period and decreased by the amount of any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*); provided, however, that Profits and Losses of the Company shall be computed without regard to items of gross income, gain, loss or deduction that are specially allocated pursuant to Sections 10.3(a) and (b). If the Capital Accounts are adjusted pursuant to the second paragraph of Section 9, the Profits and Losses of the Company (and the constituent items of income, gain, loss and deductions) realized thereafter shall be computed in accordance with the principles of Regulations Section 1.704-1(b)(2)(iv)(*g*).

1.30   "Profits Units" means any Membership Interest designated as a Profits Unit, including any and all benefits to which the holder of such Profits Unit may be entitled as provided in this Agreement, and that, on its issuance, will cause no Capital Account credit to be reflected on the books of the Company. The recipient of a Profits Unit shall not be required to make any Capital Contributions with respect to the Profits Unit issued. Initially, the Profits Units of each Member shall be the Profits Units set forth on **Schedule A**. **Schedule A** shall be updated by the Company's officers to reflect any changes in the Profits Units of the Members. Profits Units shall be non-voting.

1.31   "Profits Units Member" means the Persons so identified on **Schedule A**, and any Person that becomes a substitute Profits Units Member under this Agreement.

1.32    "Regulations" means the federal income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

1.33    "Securities Act" means the U.S. Securities Act of 1933, as amended (and any successor thereto) and the rules and regulations promulgated thereunder.

1.34    "Supermajority" means a Member or Members holding more than two-thirds of the Class A Units and the Class B Units, considered together as a single class, issued and outstanding at any particular time.

1.35    "Units" are the measuring device in which Membership Interests are issued and are designated as Class A Units, Class B Units, or Profits Units.

1.36    "Unreturned Capital" of any Member means an amount equal to the excess, if any, of (a) the aggregate amount of Capital Contributions made in exchange for or on account of his Units, over (b) the aggregate amount of prior distributions made by the Company that constitute a return of the Capital Contributions therefor pursuant to Section 11.2(b)(i).

1.37    "Voting Membership Interest" means the Membership Interest of a Member taking into consideration only those Units of such Member having the right to vote hereunder, expressed as a percentage of all outstanding Units that have the right to vote hereunder.

## SECTION 2
## FORMATION OF LIMITED LIABILITY COMPANY

2.1    <u>Formation</u>.  On September 15, 2017, Articles of Organization creating the Company as a Virginia limited liability company were filed with the State Corporation Commission of the Commonwealth of Virginia in accordance with and pursuant to the Act.  Except as otherwise expressly provided herein or in the Company's Articles of Organization, the rights and liabilities of the Members shall be as provided in the Act.  In the event of any inconsistency between any terms and conditions contained in this Agreement and any non-mandatory provisions of the Act, the terms and conditions contained in this Agreement shall govern, and in the event of any inconsistency between any items and conditions contained in this Agreement and any mandatory provisions of the Act, the terms and conditions of the Act shall govern.

2.2    <u>Name</u>.  The business of the Company shall be conducted under the name "BCause Mining LLC", or such other name as the Board of Managers shall hereafter designate with the consent of a Supermajority.  Fictitious business name statements may be filed and published as deemed necessary by the Board of Managers.

2.3    <u>Principal Office</u>.  The principal office and principal place of business of the Company shall be 277 Bendix Road, Suite 420, Virginia Beach, Virginia 23452, or at such other place as the Board of Managers may designate.  The Company may have other offices at any place or places as may be determined by the Board of Managers.

2.4     Foreign Qualification. The Board of Managers shall comply with the requirements to qualify the Company as a foreign limited liability company in any jurisdiction where such qualification is necessary because of the conduct of its business.

2.5     Registered Agent and Office. The Company shall at all times maintain a registered office and a registered agent as required under the Act which shall be the office and agent as stated in the Articles of Organization or as otherwise may be determined from time to time by the Board of Managers. The initial registered agent of the Company, who is a resident of Virginia and a member of the Virginia State Bar, is:

> Joel Ankney, Esq.
> Law Office of Joel Ankney PC
> 4669 South Blvd., Suite 107
> Virginia Beach, Virginia 23452

2.6     Purpose. The purpose of the Company shall be to engage in any lawful business for which limited liability companies may be registered under the Act.

2.7     Term. The Company shall continue indefinitely unless terminated in accordance with this Agreement.

2.8     Bitcoin. The Members and the Company agree that any payments to be made to a Member for whatever reason in accordance with the terms and conditions of this Agreement (including, but not limited to, distributions) may, in the sole discretion of the Company, be made in Bitcoin or cash or a combination thereof. Each Member agrees to establish a Bitcoin wallet as soon as reasonably possible for the receipt of such payments.

## SECTION 3
## MEMBERS

3.1     Powers and Duties of Members. The Members in their capacity as Members shall not participate in the business and affairs of the Company, transact any business on behalf of the Company, or have any power or authority to bind or obligate the Company. The Profits Units Members shall have no voting rights whatsoever. The Class A Members and the Class B Members shall, however, be entitled to vote on those specific matters requiring Member approval expressly set forth in this Agreement, and, except as otherwise provided in this Agreement, all such votes shall require the approval of a Majority. The voting requirements for action by the Members set forth in this Section 3.1 and other Sections of this Agreement are intended to override, to the greatest extent permitted under applicable law, the default provisions regarding voting and approval by the Members contained in the Act. The following matters shall require the approval of a Supermajority:

(a)     A sale, exchange or other disposition of all, or substantially all, of the Company's assets which is to occur as part of a single transaction or plan;

(b)     A merger with any other business;

(c)     The dissolution or liquidation of the Company;

- 6 -

(d)     The amendment of this Agreement or the Articles of Organization;

(e)     A Conversion; or

(f)     An IPO.

3.2     Member Meetings.

(a)     Meetings of the Members may be called at any time by the Chairman, the President or the Board of Managers. A meeting of the Members shall be called by the Company on written request of the holders of at least 50% of the outstanding Units entitled to vote at such meeting. The President, or his designee, shall preside at all meetings of the Members. Written notice of meetings of the Members, specifying the time and place of the meeting and the purpose or purposes for which it is called, shall be given not less than 10 nor more than 60 days before the date set for the meeting. The Company shall serve notice of meetings of the Members on each Member entitled to vote at such meeting in accordance with Section 18. No business other than that specified in the notice shall be transacted at any such meeting. Meetings may be held at any time without notice if all of the Members entitled to vote at such meeting are present. Notice of any meeting need not be given to any Member who shall, either before or after the meeting, submit a waiver of notice or who shall attend such meeting, except when the Member attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any Member so waiving notice of the meeting shall be bound by the proceedings of the meeting in all respects as if due notice thereof had been given. The holders of more than 50% of the outstanding Units entitled to vote at such meeting shall constitute a quorum for the transaction of business. A Member shall be deemed to be present in person at a meeting of the Members if he is present by means of telephone, video-conferencing or any comparable arrangement.

(b)     A Member may vote his Units at a meeting in person or by proxy. A Member may appoint a proxy to vote or otherwise act for him by signing an appointment form, either personally or by the Member's attorney-in-fact. An appointment of a proxy is effective when received by the meeting secretary or other officer or agent authorized to tabulate votes. An appointment of a proxy is revocable by the Member unless the appointment form conspicuously states that it is irrevocable and the appointment is coupled with an interest. The death or incapacity of a Member appointing a proxy does not affect the right of the Company to accept the proxy's authority unless notice of the death or incapacity is received by the meeting secretary or other officer or agent authorized to tabulate votes before the proxy exercises his authority under the appointment. An irrevocable appointment is revoked when the interest with which it is coupled is extinguished. A transferee for value of Units subject to an irrevocable appointment may revoke the appointment if the transferee did not know of its existence when he acquired the Units and the existence of the irrevocable appointment was not noted conspicuously on the writing representing the Units, if any. Subject to any legal limitations on the right of the Company to accept the vote or other action of a proxy and to any express limitation on the proxy's authority appearing on the face of the appointment form, the Company is entitled to accept the proxy's vote or other action as that of the Member making the appointment.

(c)     Any action to be taken by the Members at a meeting may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by the Members holding the requisite number of Units for such an action.

(d)     The Board of Managers shall cause to be kept a book of minutes in which all of the Members' proceedings will be recorded. The minutes shall record the time and place of the meeting, by whom the meeting was called, the notice given thereof, the names of those present and the proceedings thereof.

3.3     <u>Liability of Members</u>. The Members shall have no individual liability whatsoever, whether to the Company, to any of the other Members or to the creditors of the Company, for the debts of the Company or any of its losses or liabilities.

3.4     <u>Company's Proprietary Rights</u>.   All ideas, strategies, concepts, information, and written material disclosed to any Member by the Company or developed by any Member in connection with such Member's work or dealings with the Company, or acquired from a franchiser, licenser, customer, vendor, consultant, partner or supplier of the Company, are and shall remain the sole and exclusive property and proprietary information of the Company or such franchiser, licenser, customer, vendor, consultant, partner or supplier, and are disclosed or made known to such Member or permitted to be acquired from such franchiser, licenser, customer, vendor, consultant, partner or supplier in reliance on each Member's agreement to maintain them in confidence and not to use or disclose them to any other person except in furtherance of the Company's business. Any and all property which any Member has assigned to the Company in exchange for Units shall be the sole and exclusive property of the Company.

## SECTION 4
## POWERS AND DUTIES OF THE BOARD OF MANAGERS

4.1     <u>Management of Company</u>.

(a)     The business and affairs of the Company shall be managed by its "Board of Managers", the members of which shall be elected as provided in Section 4.2.  The Board of Managers shall direct, manage, and control the business of the Company to the best of its ability and shall have full and complete authority, power, and discretion, subject to Section 3.1, to make any and all decisions, and to do any and all things which the Board of Managers deems necessary or desirable for that purpose.  Each member of the Board of Managers shall devote such of his time to the Company's business as he may, in his sole discretion, deem to be necessary to conduct said business.

(b)     Unless otherwise required herein, any decision, action, approval or consent required or permitted to be taken by the Board of Managers, may be taken by the Board of Managers only as follows: (1) at a duly noticed meeting of the Board of Managers in which a quorum is present, by the affirmative vote of a majority of the members of the Board of Managers then serving, or (2) without such meeting, without prior notice and without a vote, by written consent, setting forth the action so taken, signed by all of the members of the Board of Managers then serving.

(c)     Meetings of the Board of Managers may be fixed by resolution of the Board of Managers or called by the Chairman or a majority of the members of the Board of Managers then serving. The Company shall serve notice of meetings of the Board of Managers on each member of the Board of Managers in person, by confirmed electronic mail, by overnight courier or by telephone, at least 24 hours before the time of such meeting, specifying the time and place of the meeting but such notice need not state the purpose of the meeting; provided, however, notice need not be given of regular meetings held at times and places fixed by resolution of the Board of Managers. Meetings may be held at any time without notice if all of the members of the Board of Managers are present. Notice of any meeting need not be given to any member who shall, either before or after the meeting, submit a waiver of notice or who shall attend such meeting, except when the member attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any member of the Board of Managers so waiving notice of the meeting shall be bound by the proceedings of the meeting in all respects as if due notice thereof had been given.

(d)     A majority of the members of the Board of Managers then serving shall constitute a quorum for the transaction of business. A member of the Board of Managers may vote or be present at a meeting either in person or by proxy; provided, however, that a proxy may only be granted to another member of the Board of Managers and not to a third party. A member of the Board of Managers shall be deemed to be present in person at a meeting of the Board of Managers if he is present by means of telephone, video-conferencing or any comparable arrangement.

(e)     The Board of Managers shall cause to be kept a book of minutes in which all of the Board of Managers' proceedings will be recorded. The minutes shall record the time and place of the meeting, by whom the meeting was called, the notice given thereof, the names of those present and the proceedings thereof.

4.2    <u>Number, Election and Tenure</u>.

(a)     The Board of Managers shall consist of at least five and not more than 11 members, the number thereof to be determined from time to time by a Majority. The Class A Members and the Class B Members, voting together as a single class, shall be entitled to elect the members of the Board of Managers by plurality vote as provided in this Section.

(b)     Initially, the Board of Managers shall be set at five members and shall be divided into two groups of two and one group of one for purposes of their terms of service. The terms of service of each of such members of the Board of Managers shall be staggered as follows:

(i)     <u>Class I</u>. The terms of the first group of two members shall expire at the first annual Members' meeting after their designation in this Agreement as members of the Board of Managers ("Class I").

(ii)     <u>Class II</u>. The terms of the second group of two members shall expire at the second annual Members' meeting after their designation in this Agreement as members of the Board of Managers ("Class II").

(iii)    Class III. The terms of the third group of one member shall expire at the third annual Members' meeting after their designation in this Agreement as members of the Board of Managers ("Class III").

At each annual Members meeting thereafter, members of the Board of Managers shall be chosen for a term of three years to succeed those whose terms expire. The initial members of the Board of Managers and their respective classes are set forth on attached Exhibit A. In case of any increase or decrease, from time to time, in the number of members of the Board of Managers, the number of members in each class shall be apportioned as nearly equal as possible. No decrease in the number of members shall shorten the term of any incumbent member of the Board of Managers.

(c)    Each member of the Board of Managers shall serve until his death, resignation or mental incompetency or until his removal by a Majority. Any member of the Board of Managers may resign at any time by giving written notice of his intention to do so to the Chairman or the Secretary of the Company. On a member's death, resignation or mental incompetency or the removal of a member, a successor member to the Board of Managers (who shall replace such departing member for the remainder of the vacated term) shall be elected by a plurality of the Class A Members and the Class B Members, voting together as a single class, unless a Majority elects to reduce the size of the Board of Managers as provided above.

4.3    Liability of Board of Managers; Duties of Board of Managers.

(a)    No member of the Board of Managers shall have any individual liability whatsoever, whether to the Company, to any of its Members or to the creditors of the Company, for the debts of the Company or any of its losses or liabilities, except to the extent specifically set forth in the Act.

(b)    Each member of the Board of Managers, in his capacity as such, shall be subject to the same duties and standards of conduct as a member of the board of directors of a Virginia corporation shall be subject under the Virginia Stock Corporation Act.

4.4    Compensation and Reimbursement of the Board of Managers.

(a)    Each member of the Board of Managers shall be entitled to receive reasonable compensation for services rendered to the Company in his capacity as a member of the Board of Managers.

(b)    Each member of the Board of Managers shall be entitled to request and receive reimbursement from the Company for all properly documented reasonable expenses incurred by him in connection with Company business.

4.5    Officers. The Company may have such agents and other representatives as the Board of Managers may determine. The officers of the Company may include a Chairman of the Board of Managers, Chief Executive Officer, President, Secretary, Treasurer, Chief Financial Officer, and such Vice Presidents and other officers as the Board of Managers may deem necessary. The selection, removal, compensation, duties, terms and all other matters relating to such officers shall be within the sole power and authority of the Board of Managers. Unless the

authority of the agent designated as the officer in question is limited by the Board of Managers, any officer so appointed shall have the same authority to act for the Company as a corresponding officer of a Virginia corporation would have to act for a Virginia corporation in the absence of a specific delegation of authority.

4.6     Committees.

(a)     The Board of Managers, as it deems necessary, may create any one or more committees by appointing any three or more members of the Board of Managers to serve as members of any such committee and may delegate any power or responsibility not specifically reserved to the Board of Managers or the Members in this Agreement to such committee.

(b)     The Board of Managers may elect an Executive Committee that shall consist of no fewer than three members of the Board of Managers including the Chairman. When the Board of Managers is not in session, the Executive Committee shall have all power vested in the Board of Managers by law or this Agreement, provided that the Executive Committee shall not have the authority to approve the issuance of Units or take any action prohibited by express resolution of the Board of Managers.

(c)     Meetings of any committee established pursuant to this Section 4.6 may be called by the chairman of such committee or any two members of such committee and held subject to the same requirements with respect to time, place and notice as are specified in this Agreement for meetings of the Board of Managers.

(d)     The members of the committee shall be elected as above provided and shall hold office until their successors are elected by the Board of Managers or until such committee is dissolved by the Board of Managers. Any member of a committee may resign at any time by giving written notice of his intention to do so to the Chairman or the Secretary of the Company or may be removed, with or without cause, at any time by the Board of Managers. Any vacancy occurring in a committee resulting from any cause whatsoever may be filled by the Board of Managers.

(e)     A majority of the members of any committee then serving shall constitute a quorum for the transaction of business. Any decision, action, approval or consent required or permitted to be taken by any such committee, may be taken by such committee only as follows: (1) at a duly noticed meeting of such committee in which a quorum is present, by the affirmative vote of a majority of the members of such committee then serving, or (2) without such meeting, without prior notice and without a vote, by written consent, setting forth the action so taken, signed by all of the members of the committee then serving. A member of a committee shall be deemed to be present in person at a meeting of such committee if he is present by means of telephone, video-conferencing or any comparable arrangement.

## SECTION 5
## ACTIVITIES OF MEMBERS AND MANAGERS

5.1     Business Ventures. Except as set forth in Section 4.3(b) and Section 5.2 and subject to the terms of any other agreement between the Company and any of the Members or members of

the Board of Managers, any of the Members and the members of the Board of Managers may engage in or possess an interest in other business ventures of every nature and description, whether or not in competition with the Company's business, independently or with others; and neither the Company nor the Members shall have any right by virtue of this Agreement in and to such independent ventures or to the income or profits derived therefrom.

5.2    Restrictive Covenants.

(a)    Non-Solicitation. Each Member agrees that while he is a Member of the Company and for a period of 24 months following the date on which he ceases to be a Member of the Company, or 24 months from the date a court of competent jurisdiction enters a final order enforcing the terms of this provision, whichever is later, the Member shall not, for himself or on behalf of any third party, at any time or in any manner, solicit or induce, or attempt to solicit or induce, any employee or independent contractor of the Company to terminate their relationship with the Company for any reason whatsoever, or hire any person then employed or engaged by the Company or employed or engaged by the Company within a 12-month period preceding the date on which such Member ceased to be a Member of the Company, provided that such Member, on behalf of the Company, had interaction with, or gained confidential information about, such employee or independent contractor while such Member was a Member of the Company.

(b)    Confidential Information. Each Member will have access to and become acquainted with various trade secrets and other proprietary and confidential information which are owned by the Company and/or which are used in the operation of the Company's business. "Trade secrets and other proprietary and confidential information" consist of, without limitation, information concerning any matters relating to the business of the Company, any of its franchisers, licensers, customers, vendors, consultants, partners, suppliers, employees, customer contracts, licenses, technology, sales, marketing, pricing, costs, profits, strategies, finances, client or customer lists, or any other information concerning the business of the Company; provided, however, "trade secrets and other proprietary and confidential information" do not include any of the foregoing items that have become publicly known or made generally available through no wrongful act of any Member, employee, officer or member of the Board of Managers of the Company or of others who were under confidentiality obligations as to the item or items involved. No Member shall disclose or use in any manner, directly or indirectly, any such trade secrets and other proprietary and confidential information, during the term of the Company or at any time thereafter and while the Member is a Member of the Company or after the Member ceases to be a Member of the Company, except (i) that a Member may disclose such information to its Affiliates, provided that (and only if) such Affiliate, in advance of any disclosure, is informed by the Member of the confidential nature of the such information and either agrees to hold such information in confidence in accordance with the terms of this Agreement or is subject to confidentiality duties or obligations to the Member that are no less restrictive than the terms and conditions contained herein; (ii) as required to conduct, or in furtherance of, the Company's business; or (iii) with the unanimous written consent of the Board of Managers. Each Member agrees that, at any time on request of the Board of Managers, he shall turn over to the Company all documents, disks or other computer media or other materials in his possession or under his control that are connected with or derived from the Company's business and activities.

(c)     Severability.   If any term or provision of this Section 5.2 shall be determined by a court of competent jurisdiction to be unenforceable because of the scope or duration thereof or the geographic area included therein, the parties hereto expressly agree that the court making such determination shall have the power to reduce the scope and duration and restrict the geographic area of such term or provision in such manner as the court shall deem necessary to permit enforcement of such term or provision.

(d)     Restrictive Covenants of the Essence.   Each Member understands that the restrictive covenants set forth in this Section 5.2 are of the essence of this Agreement; they shall be construed as independent of any other provision in this Agreement, and the existence of any claim or cause of action that such Member may have against the Company or any other Member, whether predicated on this Agreement or not, shall not constitute a defense to the enforcement by the Company or the other Members of the restrictive covenants contained herein.

(e)     Opportunity for Review.   Each Member understands the nature of the burdens imposed by the restrictive covenants contained in this Section 5.2.   Each Member acknowledges that he is entering into this Agreement on his own volition and that he has been given the opportunity to have this Agreement reviewed by the person(s) of his choosing.   The Company and the Members have examined in detail the restrictive covenants set forth herein and agree that the restraints imposed on the Members are reasonable in light of the legitimate interests of the Company, and they are not unduly harsh on the Members' ability to earn a livelihood.   Each Member represents that on careful review, such Member knows of no reason why any restrictive covenant contained in this Agreement is not reasonable and enforceable.

(f)     Company.   For the purposes of this Section 5.2, the term "Company" shall include all Affiliates of the Company in existence from time to time.

(g)     Entity Members.   Each Member that is an entity hereby agrees to enter into a written agreement with each of its owners and Affiliates under which such owners and Affiliates agree to be bound by the terms and conditions set forth in this Section 5.2.   Each such Member shall be responsible for each breach of this Section 5.2 by any of its owners or Affiliates.

5.3     Guaranteed Payments.   To the extent determined without regard to the income of the Company, payments to a Member for services shall be considered to be Guaranteed Payments within the meaning of Code Section 707(c).

## SECTION 6
## INDEMNIFICATION

6.1     Limitation of Liability.   To the fullest extent permitted by the Code of Virginia of 1950, as it now exists or may be later amended, in any proceeding brought by or in the right of the Company or brought by or on behalf of its Members, no member of the Board of Managers, officer or Member of the Company shall be liable for any amount of monetary damages to the Company or its Board of Managers or Members arising out of a single transaction, occurrence or course of conduct.   The liability of a member of the Board of Managers, officer or Member shall not be

limited as provided in this Section, if the member of the Board of Managers, officer or Member engaged in willful misconduct or a knowing violation of the criminal law.

6.2    Indemnification.

(a)    The Company shall indemnify any Person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member, member of the Board of Managers, officer, employee or agent of the Company, or who is or was serving at the request of the Company as a manager, director, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person in connection with such action, suit or proceeding, if such Person acted in good faith and in a manner he reasonably believed to be in, or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or on a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which such Person reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal action or proceeding, that the person had reasonable cause to believe that such Person's conduct was unlawful.

(b)    The Company shall indemnify any Person who was or is a party, or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that such Person is or was a Member, member of the Board of Managers, officer, employee or agent of the Company, or is or was serving at the request of the Company as a manager, director, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by such Person in connection with the defense or settlement of such action or suit, if such Person acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Company, provided that no indemnification shall be made with respect to any claim, issue, or matter as to which such Person has been adjudged to have been liable to the Company, unless, and only to the extent that the court in which such action or suit was brought shall determine on application that, despite the adjudication of liability, but in view of all the circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses as the court shall deem proper.

(c)    Any indemnification under Sections 6.2(a) and (b) (unless ordered by a court) shall be made by the Company only as authorized in the specific case, on a determination that indemnification of the Person is proper in the circumstances because he has met the applicable standard of conduct set forth in such Sections. Such determination shall be made by a majority of the disinterested members of the Board of Managers, unless each member was a party to such action, suit or proceeding; in which case by independent legal counsel selected by the Board of Managers.

(d)    Expenses incurred in defending a civil or criminal action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding on receipt of an undertaking by or on behalf of the Person seeking indemnification to repay such amount

- 14 -

if it shall ultimately be determined that he is not entitled to be indemnified by the Company as authorized in this Section.

(e)    The indemnification and advancement of expenses provided by or granted under this Section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any other agreement, vote of disinterested members of the Board of Managers, or otherwise.

(f)    The Company shall have power to purchase and maintain insurance on behalf of any Person who is or was a Member, member of the Board of Managers, officer, employee or agent of the Company, or who is or was serving at the request of the Company as a manager, director, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of his status as such, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Section.

(g)    The indemnification and advancement of expenses provided by or granted under this Section shall continue as to a Person who has ceased to be a Member, member of the Board of Managers, director, officer, employee, or agent and shall inure to the benefit of the heirs, executors, administrators, successors and assigns of that Person.

## SECTION 7
## INSURANCE

The Company shall carry and maintain in force insurance in amounts and coverage as is customarily carried by enterprises with similar assets and business, as determined by the Board of Managers.

## SECTION 8
## MEMBER'S INTEREST AND CAPITAL

8.1    Membership Interests.  Each Member's Membership Interest in the Company and the number of Units owned by such Member is set forth opposite such Member's name on **Schedule A.**

8.2    Initial Capital.  Each of the Members has agreed to contribute to the Company the amount indicated on **Schedule A.**  Such contributions are hereby designated as initial Capital Contributions to the Company, and on receipt will be credited to the Capital Accounts of the Members.  No Member shall be entitled to interest on any Capital Contributions.  No Member shall be entitled to withdraw any portion of his Capital Account except through distribution or dissolution in each case as provided herein or in the Act.

8.3    Additional Capital.  Except as otherwise unanimously agreed to by the Members, no Member shall be obligated to make any additional Capital Contribution to the Company.

8.4     Guaranty of Company Indebtedness.   The Members shall not be obligated to guarantee Company indebtedness, but may mutually agree to do so on a joint and several basis.

8.5     Profits Units.  The Board of Managers shall be authorized to issue Profits Units to employees, members of the Board of Managers, consultants and strategic partners of the Company on terms and conditions determined in its sole discretion, subject to the terms of this Section 8.5. The Profits Units shall have no voting rights under this Agreement.  Any recipient of a Profits Unit shall execute the Company's standard form Profits Units Award Agreement unless the Board of Managers determines otherwise.  The Board of Managers may increase the number of Profits Units that may be issued (the "Profits Units Pool") from time to time in its sole discretion, provided that no such increase shall cause the Profits Units Pool to exceed twenty percent (20%) of the aggregate number of Class A Units and Class B Units then issued and outstanding (the "Profits Units Cap"). For avoidance of doubt, it shall not be a violation of this Section 8.5 if, as the result of redemptions or other reductions in the number of Class A Units or Class B Units then issued and outstanding, the Profits Units Pool exceeds the Profits Units Cap, but the Board of Managers may not seek to increase the Profits Units Pool during any such time.

(a)     No Capital Contribution or Capital Account.  The recipient of a Profits Unit shall not be required to make any Capital Contributions with respect to the Profits Unit issued and no Capital Account credit will be reflected on the books of the Company to reflect the issuance of the Profits Unit.

(b)     Revaluation of the Company Assets.  Upon each issuance of a Profits Unit, the Company shall revalue its assets and adjust the Capital Account of each Member as set forth in Treasury Regulation 1.704-1(b)(2)(iv)(f) and Section 9 of this Agreement.

(c)     Recipient of Profits Units.  The recipient of a Profits Unit must receive the Profits Unit for the provision of services to or for the benefit of the Company in a Member capacity or in anticipation of being a Member.  Although the Company does not assure, or guarantee any income tax result, all Profits Units are issued with the intention of complying with the definition of "Profits Unit" contained in this Agreement so as to be recognized as a profits interest, and not as interests in capital, for federal income tax purposes.  Each Profits Unit issued pursuant to this Agreement is intended to be a profits interest within the definition contained in Internal Revenue Service Revenue Procedure 93-27 and Revenue Procedure 2001-43 and is issued with the intention, but without assurance or guaranty, that under current interpretations of the Code, the recipient will not realize income on the issuance of the Profits Unit, nor the vesting of such Profits Unit, and neither the Company nor any Member is entitled to any deduction, either immediately or through depreciation or amortization, as a result of the issuance of the interest.  If the law changes, new Regulations are issued, or the Internal Revenue Service issues future authority with respect to the issuance of "Profits Units", the Members agree to amend this Agreement to comply with such provisions, provided that such amendment will not materially alter the economic arrangement between the Members.

(d)     Profits Units Subject to Conditions.  Profits Units held by recipients may be subject to vesting, forfeiture, redemption and such other terms and conditions to be set forth by the Board of Managers in its sole discretion at the time of issuance.

8.6     Pro Rata Right to Invest by Class A Members and Class B Members.

(a)     Certain Definitions. As used in this Section 8.6:

1.      The term "New Securities" shall mean any equity securities of the Company, whether now authorized or not, and rights, options or warrants to purchase equity securities, and securities of any type whatsoever that are, or may become, convertible into equity securities; provided, that the term "New Securities" does not include the following issuances: (A) the issuance of Profits Units pursuant to this Agreement to employees, consultants, or strategic partners of the Company; (B) the issuance of securities of the Company in a public offering pursuant to an effective registration statement under the Securities Act; (C) the issuance of equity securities, or securities exercisable for or convertible into equity securities, to banks or equipment lessors pursuant to equipment or other financing arrangements approved by the Board of Managers; (D) the issuance of equity securities, or securities exercisable for or convertible into equity securities, issued pursuant to the acquisition of another company by the Company pursuant to a plan, agreement or other arrangement approved by the Board of Managers; or (E) the issuance of equity securities issued in connection with any split, distribution or recapitalization by the Company or pursuant to a Conversion in accordance with Section 17.2 (the equity securities issued pursuant to the transactions described in subparts (A) through (E), collectively, the "Exempted Equity Securities").

2.      The term "Pro Rata Share" means the ratio, (i) the numerator of which is the number of Class A Units and Class B Units held by such Member on the date of the Company's written notice pursuant to Section 8.6(c) hereof, and (ii) the denominator of which is the number of Class A Units and Class B Units outstanding, assuming for this purpose conversion or exercise of all securities convertible into or exercisable for Class A Units or Class B Units.

(b)     Right of First Refusal. The Company hereby grants to each Class A Member and Class B Member, subject to the terms and conditions specified in this Section 8.6, the right of first refusal to purchase, on the terms and conditions set forth in the Company's notice pursuant to Section 8.6(c), up to its Pro Rata Share of all New Securities that the Company may, from time to time, propose to sell and issue.

(c)     Required Notices. If the Company proposes to undertake an issuance of New Securities, it shall give each Class A Member and Class B Member written notice of its intention, describing the type of New Securities, the price and the general terms on which the Company proposes to issue the same. Each Class A Member and Class B Member shall have 15 days from the date of any such notice to exercise its right of first refusal under Section 8.6(b) to purchase such New Securities for the price and on the general terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased. Notwithstanding the foregoing, the Company shall not be required to offer or sell such New Securities to any Class A Member or Class B Member who would cause the Company to be in violation of applicable federal securities laws by virtue of such offer of sale.

(d)     Company's Right to Sell. The Company shall have 120 days after the 15 day period described in Section 8.6(c) to sell all such New Securities respecting which the Class A Members' rights of first refusal or the Class B Member's rights of first refusal hereunder were

not exercised, at a price and on terms no more favorable in any material respect to the purchasers thereof than specified in the Company's notice. If the Company has not sold all such New Securities within such 120 day period, the Company shall not thereafter issue or sell any New Securities without first notifying the Class A Members and the Class B Members in the manner provided herein.

(e)     Expiration of Right. The rights of first refusal granted under this Section 8.6 shall not apply to, and shall expire on, the effective date of the closing of an IPO.

8.7     Issuance of Additional Class B Units Upon a Diluting Issuance.

(a)     Special Definitions. For purposes of this Section 8.7, the following definitions shall apply:

(i)     "Option" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Units or Convertible Securities.

(ii)     "Class B Antidilution Price" means the price per Class B Unit as set forth in the subscription agreement between the Class B Unit holder and the Company, subject to appropriate adjustment in the event of any Unit dividend, Unit split, combination or other similar recapitalization with respect to the Class B Units, or pursuant to the terms of this Section 8.7.

(iii)     "Class B Original Issue Date" shall mean the date on which the first Class B Unit was issued.

(iv)     "Convertible Securities" shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Units, but excluding Options.

(v)     "Additional Units" shall mean all Units issued (or, pursuant to Section 8.7(b) below, deemed to be issued) by the Company after the Class B Original Issue Date, other than Exempted Equity Securities.

(vi)     "Diluting Issuance" shall mean the issuance by the Company at any time after the Class B Original Issue Date (but prior to the effective date of the closing of an IPO) of Additional Units (including without limitation Additional Units deemed to be issued pursuant to Section 8.7(b)) without consideration or for a consideration per share less than the Class B Antidilution Price in effect immediately prior to such issuance.

(vii)     "Eligible Class B Member" means a Class B Member holding Class B Units, provided that the percentage Voting Membership Interest with respect to the Class B Units held by the Class B Member has not declined by more than 17.5% from the date of such original issuance until the time immediately prior to the applicable Diluting Issuance on account of (i) dilution resulting from any issuance by the Company of Units of any class that have the right to vote hereunder, and/or (ii) any dispositions of such Class B Units by the Class B Member. By way of example, if the percentage Voting Membership Interest represented by the Class B Units originally issued to a Class B Member was 10% as of the closing of the offering during which such Class B Units were purchased, and, due to the sale and issuance by the Company of a new class of

- 18 -

Units having voting rights or the disposition of certain Class B Units by such Class B Member, the percentage Voting Membership Interest represented by such Class B Member's Class B Units was 8% immediately prior to the applicable Diluting Issuance, such Class B Member would not be an Eligible Class B Member because the percentage Voting Membership Interest with respect to such Class B Units had declined by 20%. For avoidance of doubt, only the Class B Units originally issued to a Class B Member (plus any additional Class B Units issued to such Class B Member pursuant to Section 8.7(c) below as the result of an intervening Diluting Issuance, if applicable) shall be taken into consideration in determining the dilution described in this paragraph.

(b)     <u>Deemed Issuance of Additional Units.</u>

(i)     If the Company at any time or from time to time after the Class B Original Issue Date shall issue any Options or Convertible Securities (excluding Options or Convertible Securities which are themselves Exempted Equity Securities) or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of Units (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability, but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Units issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date.

(ii)     If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment to the number of Class B Units then-outstanding pursuant to the terms of Section 8.6(c), are revised as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (A) any increase or decrease in the number of Units issuable upon the exercise, conversion and/or exchange of any such Option or Convertible Security or (B) any increase or decrease in the consideration payable to the Company upon such exercise, conversion and/or exchange, then, effective upon such increase or decrease becoming effective, the number of Class B Units then-outstanding computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be recomputed to such number of Class B Units as would have been obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security. Notwithstanding the foregoing, no recomputation pursuant to this Section 8.7(b)(ii) shall have the effect of decreasing the number of Class B Units to an amount which is less than the number of Class B Units outstanding immediately prior to the original adjustment made as a result of the issuance of such Option or Convertible Security.

(iii)     If the terms of any Option or Convertible Security (excluding Options or Convertible Securities which are themselves Exempted Securities), the issuance of which did not result in an adjustment to the number of Class B Units then-outstanding pursuant to the terms of Section 8.7(c) (either because the consideration per Unit, determined pursuant to Section 8.7(d), of the Additional Units subject thereto was equal to or greater than the Class B Antidilution Price then in effect, or because such Option or Convertible Security was issued before

the Class B Original Issue Date), are revised after the Class B Original Issue Date as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (A) any increase in the number of Units issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (B) any decrease in the consideration payable to the Company upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended or adjusted, and the Additional Units subject thereto (determined in the manner provided in Section 8.7(b)(i)) shall be deemed to have been issued effective upon such increase or decrease becoming effective.

(iv)   Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security (or portion thereof) which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the number of Class B Units then-outstanding pursuant to the terms of Section 8.7(c), the number of Class B Units then outstanding shall be recomputed to such number of Class B Units as would have been obtained had such Option or Convertible Security (or portion thereof) never been issued.

(v)   If the number of Units issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Company upon such exercise, conversion and/or exchange, is calculable at the time such Option or Convertible Security is issued or amended but is subject to adjustment based upon subsequent events, any adjustment to the number of Class B Units provided for in this Section 8.7(b) shall be effected at the time of such issuance or amendment based on such number of Units or amount of consideration without regard to any provisions for subsequent adjustments (and any subsequent adjustments shall be treated as provided in clauses (ii) and (iii) of this Section 8.7(b)).   If the number of Units issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Company upon such exercise, conversion and/or exchange, cannot be calculated at all at the time such Option or Convertible Security is issued or amended, any adjustment to the number of Class B Units that would result under the terms of this Section 8.7(b) at the time of such issuance or amendment shall instead be effected at the time such number of Units and/or amount of consideration is first calculable (even if subject to subsequent adjustments), assuming for purposes of calculating such adjustment to the number of Class B Units that such issuance or amendment took place at the time such calculation can first be made.

(c)   <u>Adjustment of Class B Units Upon a Diluting Issuance.</u>  In the event of a Diluting Issuance, the Company shall issue to the Eligible Class B Member(s) for no consideration such number of additional Class B Units (rounded to the nearest whole Unit) determined pursuant to the following formula:

$$[(A * C) \div B] - A$$

Where,

A   =   The total number of Class B Units owned by the Eligible Class B Member(s) prior to such issuance;

B   =   The "Adjusted Class B Antidilution Price", calculating as follows (to the nearest one-hundredth of a cent):

$$C * [(D + E) \div (D + F)];$$

C   =   The Class B Antidilution Price in effect immediately prior to such issuance;

D   =   The number of Units outstanding immediately prior to such issue (treating for this purpose as outstanding all Units issuable upon exercise of Options outstanding immediately prior to such issue or upon conversion or exchange of Convertible Securities (assuming exercise of any outstanding Options therefor) immediately prior to such issuance);

E   =   The number of Units that would have been issued if such Additional Units had been issued at a price per unit equal to the Class B Antidilution Price in effect immediately prior to such issuance (determined by dividing the aggregate consideration received by the Company in respect of such issue by C); and

F   =   The number of such Additional Units issued in such transaction.

Further, contemporaneously with the adjustments contemplated by this Section 8.7(c), the Adjusted Class B Antidilution Price, as calculated above, shall thereafter become the Class B Antidilution Price and the percentage Membership Interests of the Members shall be adjusted to reflect such deemed issuance of additional Class B Units and the Capital Contribution of the Eligible Class B Members shall be allocated pro rata among the original Class B Units and the additional Class B Units; provided that such Class B Antidilution Price, percentage Membership Interests and Capital Contribution, each as adjusted, shall thereafter continue to be subject to adjustments as provided in this Section 8.7.

(d) <u>Determination of Consideration.</u> For purposes of this Section 8.7, the consideration received by the Company for the issue of any Additional Units shall be computed as follows:

    1.     <u>Cash and Property</u>: Such consideration shall:

        a.     Insofar as it consists of cash, be computed at the aggregate amount of cash received by the Company, excluding amounts paid or payable for accrued interest

        b.     Insofar as it consists of property other than cash, be computed at the Fair Market Value thereof at the time of such issuance; and

        c.     In the event Additional Units are issued together with other securities or other assets of the Company for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses 1 and 2 above, as determined in good faith by the Board.

2. <u>Options and Convertible Securities.</u> The consideration per Unit received by the Company for Additional Units deemed to have been issued pursuant to Section 8.7(b), relating to Options and Convertible Securities, shall be determined by dividing:

a. the total amount, if any, received or receivable by the Company as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Company upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by

b. the maximum number of Units (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

(e) <u>Distributions in Kind.</u> In the event that the Company shall make any other distribution upon any Units payable in Units, Options or Convertible Securities, then Units, Options or Convertible Securities, as the case may be, issuable in payment of such distribution shall be deemed to have been issued or sold without consideration.

(f) <u>Multiple Closing Dates.</u> In the event that the Company shall issue on more than one date Additional Units that are a part of one transaction or a series of related transactions and that would result in an adjustment to the number of Class B Units then-outstanding pursuant to the terms of Section 8.7(c) then, upon the final such issuance, the number of Class B Units then-outstanding shall be recomputed to give effect to all such issuances as if they occurred on the date of the first such issuance (and without giving effect to any additional adjustments as a result of any such subsequent issuances within such period).

(g) <u>Record Date.</u> In the event that the Company shall take a record of the Members for the purpose of entitling them (i) to receive a distribution payable in Units, Options or Convertible Securities or (ii) to subscribe for or purchase Units, Options or Convertible Securities, then such record date shall be deemed to be the date of the issuance or sale of Units deemed to have been issued or sold upon the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

## SECTION 9
## CAPITAL ACCOUNTS

A Capital Account shall be established and maintained for each Member throughout the full term of the Company in accordance with the rules of Treas. Reg. §1.704-1(b)(2)(iv). Pursuant to Treas. Reg. §1.704-1(b)(2)(iv)(b), each Member's Capital Account (a) shall be increased by (i) the

amount of money contributed by that Member to the Company, (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Code Section 752), and (iii) allocations to that Member of Company income and gain (or items thereof) pursuant to Section 10, including income and gain exempt from tax and income and gain described in Treas. Reg. §1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treas. Reg. §1.704-1(b)(4)(i); (b) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Code Section 752), (iii) allocations to that Member pursuant to Section 10 of expenditures of the Company described in Code Section 705(a)(2)(B), and (iv) allocations to that Member of Company loss and deduction (or items thereof) pursuant to Section 10, including loss and deduction described in Treas. Reg. §1.704-1(b)(2)(iv)(g), but excluding items described in clause (b)(iii) above and loss or deduction described in Treas. Reg. §1.704-1(b)(4)(i) or §1.704-1(b)(4)(iii); and (c) shall be otherwise adjusted in accordance with the additional rules set forth in Treas. Reg. §1.704-1(b)(2)(iv).

The Members' Capital Accounts shall be adjusted to reflect revaluations of Company property to the extent permitted by and in accordance with Treas. Reg. §1.704-1(b)(2)(iv)(f); provided, however, that such adjustment shall be made only if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members, or on liquidation of the Company within the meaning of Treas. Reg. §1.704-1(b)(2)(ii)(g). As indicated herein, if under Treas. Reg. §§1.704-1(b)(2)(iv)(d) or (f) property is reflected on the Company's books and in the Members' Capital Accounts at a book value that differs from the adjusted tax basis of the property, then the Members' Capital Accounts shall be adjusted in accordance with Treas. Reg. §1.704-1(b)(2)(iv)(g) to reflect allocations to the Members of depreciation, depletion, amortization, other cost recovery, and gain or loss with respect to such property as computed for book purposes (rather than the allocations of the corresponding tax items). A Member that has more than one Interest shall have a single Capital Account that reflects all his Interests, regardless of the class of Interests owned by that Member and regardless of the time or manner in which those Interests were acquired.

On the transfer of all or part of an Interest, the Capital Account of the transferor that is attributable to the transferred Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(l).

The manner in which Capital Accounts are to be maintained pursuant to this Section is intended to comply with the requirements of Code Section 704(b) and (c) and the Regulations. If, in the opinion of the Board of Managers, the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section should be modified to comply with Code Section 704(b) and (c) and the Regulations, then, notwithstanding anything to the contrary contained in the preceding provisions of this Section, the Board of Managers may alter the method in which Capital Accounts are maintained, and the Board of Managers shall have the right to amend this Agreement without action by the Members to reflect any such change in the manner in which Capital Accounts are maintained; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between the Members.

## SECTION 10
## ALLOCATIONS OF PROFITS AND LOSSES

10.1    _Allocations Generally_.    After giving effect to the special allocations set forth in Section 10.3, Profit and Loss for any fiscal year shall be allocated in the following order and priority:

(a)    _Profits_.  Profits for each fiscal year (or shorter accounting period selected by the Board of Managers or as provided herein) shall be allocated to the respective Capital Accounts of the Members in the following order and priority:

(i)    _Restoration of Excess Losses_.  First, to each Member who was previously allocated amounts of Losses under Section 10.1(b)(iii), if any, in an amount equal to the excess of (A) all previous allocations of Losses to such Member under Section 10.1(b)(iii), over (B) all previous allocations of Profits to such Member under this Section 10.1(a)(i);

(ii)    _Restoration of Capital Account Balances_.  Second, to each Member who was previously allocated amounts of Losses under Section 10.1(b)(ii), if any, in an amount equal to the excess of (A) all previous allocations of Losses to such Member under Section 10.1(b)(ii), over (B) all previous allocations of Profits to such Member under this Section 10.1(a)(ii);

(iii)    _Restoration of Chargebacks_.  Third, to each Member who was previously allocated amounts of Losses under Section 10.1(b)(i), if any, in an amount equal to the excess of (A) all previous allocations of Losses to such Member under Section 10.1(b)(i), over (B) all previous allocations of Profits to such Member under this Section 10.1(a)(iii); and

(iv)    _Remaining Profits_.    The balance to the Members pro rata in accordance with their respective Membership Interests.

(b)    _Losses_.  Losses for each fiscal year (or shorter accounting period selected by the Board of Managers or as provided herein) shall be allocated to the respective Capital Accounts of the Members in the following order and priority:

(i)    _Chargeback of Profit Allocations_.  First, to each Member who was previously allocated amounts of Profits under Section 10.1(a)(iv), in an amount equal to the excess of (A) all previous allocations of Profits to such Member under Section 10.1(a)(iv), over (B) all previous allocations of Losses to such Member under this Section 10.1(b)(i);

(ii)    _Full Reduction of Capital Accounts_.  Then, to each Member to the extent of such Member's remaining positive Capital Account balance in accordance with the ratio that the amount of such Member's positive Capital Account balance (determined as of the date such allocation under, or with respect to, this Section 10.1(b)(ii) is to be made) bears to the aggregate amount of all Members' positive Capital Account balances combined, which shall also be determined as of the date such allocation under this Section 10.1(b)(ii) is to be made; and

(iii)    _Losses in Excess of Investment_.  The balance to the Members pro rata in accordance with their respective Membership Interests.

(c)     If the allocation of Losses pursuant to Section 10.1(b) above would result in a Member having an Adjusted Capital Account Deficit (as defined in Section 1.704-1(b)(2)(ii)(*d*) of the Regulations) at the end of any fiscal year and at such time there are other Members who will not, as a result of such allocation, have an Adjusted Capital Account Deficit, then all Losses in excess of the amount which can be allocated until the foregoing circumstance occurs shall be allocated among the Members who do not have Adjusted Capital Account Deficits on a proportionate basis according to their Membership Interests until each such Member would similarly be caused to have an Adjusted Capital Account Deficit.  At such time as a further allocation of Losses cannot be made without causing some Member to have an Adjusted Capital Account Deficit, then all remaining Losses for such fiscal year shall be allocated in accordance with the ratio described in Section 10.1(b)(iii).

(d)     Apportionment of Allocation.  Allocations made pursuant to, or in accordance with, Sections 10.1(a) and 10.1(b) unless otherwise specifically denoted in such Section shall be apportioned among the Members who are to receive allocations thereunder in the same ratios that (i) the amount each such Member is to have allocated to that Member (as of the time for which the allocation is to be made) pursuant to, or in accordance with, such Section, bears to (ii) the amount all Members who are to receive an allocation pursuant to, or in accordance with, such Section are to have allocated to them as of such time.

10.2    RESERVED.

10.3    Special Allocations.  The following special allocations shall be made in the following order:

(a)     Minimum Gain Chargeback.  Notwithstanding any other provision of this Section 10, if there is a net decrease in Company Minimum Gain during any fiscal year, then except as otherwise provided in Regulations Section 1.704-2(f), each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain during such fiscal year determined in accordance with Regulations Section 1.704-2(g)(2).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 10.3(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(b)     Member Nonrecourse Debt Minimum Gain Chargeback.  Except as otherwise provided in Regulations Sections 1.704-2(i)(4), notwithstanding any other provision of this Section 10, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Person's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Person pursuant thereto.  The items to be so allocated shall be

determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 10.3(b) is intended to comply with the minimum gain chargeback requirement Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*), or 1.704-1(b)(2)(ii)(*d*)(*6*), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 10.3(c) shall only be made if, and only to the extent that, such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 10 have been tentatively made as if this Section 10.3(c) were not in the Agreement.

(d)     Gross Income Allocation. In the event any Member has a deficit balance in his or her Capital Account at the end of any fiscal year of the Company that is in excess of the sum of (i) the amount such Member is obligated to restore (pursuant to the terms of this Agreement or otherwise) and (ii) the amount such Member is deemed to be obligated to restore pursuant to the next to last sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 10.3(d) shall be made if and only to the extent that such Person would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 10 have been tentatively made as if Section 10.3(c) hereof and this Section 10.3(d) were not in the Agreement.

(e)     Nonrecourse Deductions. Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Members in proportion to their Membership Interest.

(f)     Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable. Such allocations shall be made in accordance with, and in the manner set forth in, Regulations Section 1.704-2(i)(1).

(g)     Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Sections 1.704-1(b)(2)(iv)(*m*)(*2*) or 1.704-1(b)(2)(iv)(*m*)(*4*), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his or her interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their Membership Interests in the event Regulations Section 1.704-1(b)(2)(iv)(*m*)(*2*) applies, or to the Members to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*) applies.

(h)     Allocations Related to Taxable Issuance of Membership Interests. Any income, gain, loss or deduction realized as a direct or indirect issuance of an interest in the

Company to a Member (the "Issuance Items") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each Member if the Issuance Items had not been realized. To the extent gain or income is not recognized by the Company upon the issuance of such Membership Interests, the loss, expense or deduction associated with the issuance shall be allocated among the existing Members based on Membership Interests held prior to any issuance in accordance with Section 10.1(b).

10.4   Curative Allocations. The allocations set forth in Sections 10.1(c), 10.3(a), 10.3(b), 10.3(c), 10.3(d), 10.3(e), 10.3(f) and 10.3(g) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 10.4. Therefore, notwithstanding any other provision of this Section 10 (other than the Regulatory Allocations), the Company shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner determined by the Board of Managers to be appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to the Sections of this Agreement other than the Regulatory Allocations and this Section. In exercising its discretion under this Section, the Board of Managers shall take into account future Regulatory Allocations under Sections 10.3(a) and 10.3(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 10.3(e) and 10.3(f).

10.5   Tax Allocations: Code Section 704(c).

(a)   Contributed Property. In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of its contribution to the Company.

(b)   Revalued Property. Allocations of income, gain, loss and deduction with respect to any asset revalued in accordance with Regulations under Code Section 704 shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its fair market value in the same manner as under Code Section 704(c) and the Regulations thereunder and as required by Regulation Section 1.704-1(b)(2)(iv)(g).

(c)   Allocation Solely for Tax Purposes. Any elections or other decisions relating to allocations described in paragraphs (a) or (b) of this Section 10.5 shall be made by the Board of Managers in any manner that reasonably reflects the purposes and intention of this Agreement. Allocations pursuant to this Section 10.5 are solely for purposes of federal, state and local taxes and shall not affect, nor in any way be taken into account in computing, any Member's Capital Account or share of profits, losses or other items or distributions pursuant to any provision of this Agreement.

10.6    Other Allocation Rules.

(a)    For purposes of determining the income, losses, or any other items allocable to any period, income, losses, and any such other items shall be determined by the Board of Managers using any permissible method under Code Section 706 and the Regulations thereunder.

(b)    Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share profits or losses, as the case may be, for the year.

(c)    Except as otherwise provided in this Agreement, all items of income, gain, loss or deduction for federal income tax purposes shall be allocated to the Members in the same manner as the corresponding book allocations of such items as provided in this Section 10.

(d)    Solely for the purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3), the Members' interests in Company Profits are equal to the Members' Membership Interests.

10.7    Consistent Tax Reporting.  Each Member hereby agrees, for state and federal income tax purposes, to report his respective share of Company items of income, gain, loss, deduction or credit in a manner consistent with the tax treatment adopted by the Company.

10.8    Tax Warranties.  Each Member agrees that no other Member has made any representations or warranties as to the treatment or characterization, for federal income tax purposes, of the contributions, distributions, or allocations hereof, except as provided for herein. Each Member understands that Company taxation and the transactions contemplated by this Agreement involve complex issues of federal income taxation and each Member has been advised to and has had the opportunity to obtain competent independent tax counsel with respect to this Agreement and the transactions contemplated hereby.

10.9    Tax Elections.  All elections by the Company for federal income tax or other tax purposes shall be made by the Board of Managers.

10.10   Allocation of Recapture.  For purposes of determining the character (as ordinary income or capital gain) of any taxable income or gain of the Company allocated to the Members pursuant to this Section 10, such portion of the taxable income or gain of the Company allocated pursuant to this Section 10 which is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (a) the amount of depreciation previously allocated to each Member bears to (b) the total of such depreciation allocated to all Members. This Section shall not alter the amount of allocations among the Members pursuant to Section 10 but merely the character of the income so allocated.

## SECTION 11
## DISTRIBUTIONS

11.1   <u>Distributions to Pay Taxes</u>. The Company shall to the extent cash is available distribute an amount of cash at least quarterly to each Member equal to the product of the amount of the taxable income that the Company has allocated to such Member in the period relevant to such distribution times the Rate. For this purpose, the Rate shall be the sum of the highest federal income tax bracket applicable to individual taxpayers (or, if higher, corporate taxpayers) for the year of any such distributions plus an additional amount based on the highest Virginia rate for state income taxes. Distributions under this Section shall be offset against other distributions otherwise due to the distributee from the Company.

11.2   <u>Other Distributions</u>.

(a)   <u>Net Cash Flow</u>. The term "Net Cash Flow" for a fiscal year or other period of the Company shall mean (i) all cash receipts as shown on the books of the Company (excluding, however, Capital Contributions from Members and proceeds from the winding up of the Company, which shall be distributed in accordance with Section 15.2(b)), reduced by (A) cash disbursements for Company purposes, including interest and principal on loans (including loans from Members) and Guaranteed Payments made to Members, and (B) all cash reserves as reasonably determined by the Board of Managers; plus (ii) any other funds, including amounts previously set aside for reserves now reasonably deemed available as Net Cash Flow as determined by the Board of Managers.

(b)   <u>Priority of Distribution</u>. The Net Cash Flow of the Company, if any, for a fiscal year or other period shall be paid out to the Members on a yearly basis or at such intervals as the Board of Managers may determine from time to time to be appropriate in the following order of priority:

1.   first, to the Class A Members and the Class B Members pro rata in proportion to, and in the amount of, their Unreturned Capital; and

(ii)   thereafter, to the Members pro rata in accordance with their respective Membership Interests.

11.3   <u>Taxes Withheld</u>. Unless treated as a Tax Payment Loan (as hereinafter defined), any amount paid by the Company for or with respect to any Member on account of any withholding tax or other tax payable with respect to the income, profits or distributions of the Company pursuant to the Code, the Regulations, or any state, local or foreign status, regulation or ordinance requiring such payment (a "Withholding Tax Act") shall be treated as a distribution to such Member for all purposes of this Agreement, consistent with the character or source of the income, profits or cash which gave rise to the payment or withholding obligation. To the extent that the amount required to be remitted by the Company under the Withholding Tax Act exceeds the amount then otherwise distributable to such Member, the excess shall constitute a loan from the Company to such Member (a "Tax Payment Loan"), which shall be payable on demand and shall bear interest from the date that the Company makes the payment to the relevant taxing authority at the Prime Rate plus one percentage point compounded monthly. So long as any Tax Payment

Loan or the interest thereon remains unpaid, the Company shall make future distributions due to such Member under this Agreement by applying the amount of any such distribution first to the payment of any unpaid interest on all Tax Payment Loans of such Member and then to the repayment of the principal of all Tax Payment Loans of such Member.

The Board of Managers shall have the authority to take all actions necessary to enable the Company to comply with the provisions of any Withholding Tax Act applicable to the Company and to carry out the provisions of this Section 11.3. Nothing in this Section 11.3 shall create any obligation on the Board of Managers to advance funds to the Company or to borrow funds from third parties to make any payment on account of any liability of the Company under a Withholding Tax Act.

11.4   Restrictions on Distributions. Notwithstanding anything to the contrary in Sections 11.1, 11.2 and 11.3, no distribution shall be made if, after giving effect to the distribution:  (i) the Company would not be able to pay its debts as they become due in the ordinary course of business; or (ii) the fair market value of the Company's total assets would be less than the sum of its total liabilities.

## SECTION 12
## DETERMINATION OF CAPITAL ACCOUNTS AND TRANSFERS

Except as otherwise provided in this Agreement, whenever it is necessary to determine the balance in the Capital Account of any Member for purposes of this Agreement, such balance shall be determined after first giving effect to all allocations, for transactions effected before the time as of which such determination is made, of items of income and loss and other items allocated pursuant to Section 10, for the current year; and second, after giving effect to all distributions or deemed distributions for such year in respect of transactions effected before the date as of which such determination is to be made; and third, after giving effect to all allocations of the Company's items of income and loss for the transaction in question (that is, before giving effect to distributions or deemed distributions as a result of such transaction).

## SECTION 13
## ACCOUNTING AND BANK ACCOUNTS

13.1   Tax Returns. The Company shall cause to be prepared all tax returns and statements, if any, which must be filed on behalf of the Company with all federal, state and local taxing authorities, and shall submit such returns and statements to the Board of Managers for its approval before filing. On approval thereof, the Company shall make timely filing thereof.

13.2   Fiscal Year. The fiscal year of the Company shall be the calendar year.

13.3   Books and Records. The books of account of the Company and the other records required to be maintained under the Act shall be kept and maintained at all times at the Company's principal place of business.

13.4    Financial Statements. Within 75 days after the close of each fiscal year, the Company shall prepare and furnish to each Member a report showing the operations of the Company for such fiscal year including, without limitation, such information concerning the Company as may be required by any Member for state or federal tax returns. In addition, (i) within 10 days after the end of each month, the Company shall prepare and furnish to each Member the unaudited financial statements of the Company for such month, (ii) within 30 days after the end of each calendar quarter, the Company shall prepare and furnish to each Member the unaudited financial statements of the Company for such quarter, and (iii) within 60 days after the end of each calendar year, the Company shall prepare and furnish to each Member the unaudited financial statements of the Company for such year.

13.5    Access to Books of Account and Records. On reasonable notice to the Company, all Members shall have the right at all reasonable times during usual business hours to audit, examine, and make copies of or extracts from the books of account of the Company and the records required to be maintained under the Act. Such right may be exercised through any agent or employee of such Member designated by him or by an independent public accountant designated by such Member. Each Member shall bear all expenses incurred in any examination made for such Member's account.

13.6    Bank Account(s). All funds of the Company shall be deposited in the name of the Company in such bank or banks as may be deemed prudent by the Board of Managers and checks drawn on such account(s) shall require the signature of an authorized officer or member of the Board of Managers. All funds received from the operation and business of the Company shall be promptly deposited in the account(s) maintained in its name and all debts, expenses and charges shall be paid by checks drawn on such account(s). There shall be no commingling of the funds of the Company with the funds of any other entity.

13.7    Tax Matters Member. Thomas G. Flake is designated as the Tax Matters Member within the meaning of Section 6231(a)(7)(A) of the Code, and in such capacity may represent the Company and its Members in an IRS audit of its income tax return. Furthermore, the Tax Matters Member is authorized and entitled to negotiate, settle and make agreements and adjustments with respect to the Company's income tax return, binding on the Company and the Members with the advice of the legal counsel to the Company or the accountants servicing the books and records of the Company; however, the Tax Matters Member will not have the authority to determine the tax policy, taxable status or tax treatment of the Company's assets, income and expenses. All such matters shall be determined by the Board of Managers.

## SECTION 14
## RESTRICTIONS ON TRANSFER OF MEMBERSHIP INTEREST AND RESIGNATION

14.1    Restrictions on Transfer.

(a)    No Member shall sell, assign, transfer, pledge, give, donate, create a security interest in or otherwise dispose of or encumber any portion or all of his Units (collectively, "Transfer"), except in accordance with this Section 14. No Member shall otherwise resign, withdraw or dissociate from the Company without the prior written consent of the Board of

Managers. Any Transfer not in accordance with this Agreement shall be void *ab initio*, other than to give rise to an action for the purported transferor's breach of this Agreement.

(b)     No Member may Transfer any portion or all of his Units without the prior written consent of the Board of Managers.

(c)     A Member may Transfer all or a portion of his Units to such Member's Affiliate, spouse, ancestor or lineal descendant or a trust or an entity solely for the benefit of one or more of the foregoing Persons or such Member (a "Permitted Transfer"); *provided, however*, a Transfer pursuant to this Section 14.1(c) shall be subject to all other provisions of this Section 14, except Section 14.1(b), Section 14.2 and Section 14.5. Notwithstanding the foregoing, no party hereto shall avoid the provisions of this Agreement by making one or more Permitted Transfers and then disposing of all or any portion of such party's interest in any such transferee.

14.2     Right of First Refusal. Subject to Section 14.1(b), any Member (a "Selling Member") desiring to sell any portion or all of his Units to a third party (excluding an existing Member) in a bona fide arm's length sales or equivalent transaction (a "Third Party") shall first offer such Units (the "Offered Units") to the Company and the other Members (the "Other Members"), by giving notice of such intention to the Company and the Other Members specifying the Offered Units to be transferred, the intended transferee, the proposed selling price, and a complete description of the other terms and conditions of the intended sale ("Offer Notice").

(a)     Option to Purchase. The Company and thereafter the Other Members shall have an option for 40 days ("Option Period") after their receipt of the Offer Notice to purchase the Offered Units. The purchase shall be at the same price and under the same terms and conditions as those contained in the Offer Notice. If the forms of consideration (other than cash or cash-equivalents) requested by the Selling Member are such that the Company or the Other Members cannot, despite reasonable efforts, furnish the same form of consideration, then the Company or the Other Members may purchase the Offered Units for substitute consideration in a cash amount determined by an appraisal of the value of such noncash consideration by an appraiser, who is properly qualified to appraise the consideration in question, to be mutually agreed on. If the Company or the Other Members and the Selling Member are unable to agree on a qualified appraiser, then the Company or the Other Members and the Selling Member shall each choose a qualified appraiser and the value of the consideration to be paid by the Company or the Other Members shall be the arithmetic mean of the values determined by each appraiser. If the parties agree on an appraiser, the cost of appraisal shall be divided between them equally. If two appraisers are chosen, the Company or the Other Members and the Selling Member shall pay the costs of the appraiser each has chosen. The running of all time periods provided herein shall be suspended until such appraisal is completed and delivered to the Company and the Members.

(b)     Priority of Options. If the Company has not exercised its option as to all of the Offered Units within the first 20 days of the Option Period, then for the next 20 days the Other Members shall have an option to purchase all, but not less than all, of the Offered Units not purchased by the Company. Notwithstanding the foregoing, both the Company's and the Other Members' options shall be treated as not exercised unless they shall collectively be exercised as to all of the Offered Units.

(c)     Allocation of Other Members' Options. As between the Other Members who exercise their option, each shall have the right to purchase his pro rata portion of the Offered Units based on the Membership Interest held by such Other Member as compared to the total Membership Interest of the Company held by all Other Members exercising their options. If an Other Member does not exercise his option in full, then each fully exercising Other Member shall have the option to purchase his pro rata amount of the Offered Units subject to unexercised options. If any such options remain unexercised, then each fully exercising Other Member, in order of Membership Interest, shall have the right to purchase any remaining Offered Units as to which options have not been exercised.

(d)     Closing. If one or more options are exercised, the sale or sales shall be closed at the office of the Company at a time (during its ordinary business hours) fixed by the Selling Member, not less than 30 days after the exercise of the last option exercisable within the Option Period. If such options shall have been exercised in whole or in part by the Company or by one or more Members, the sales shall be closed simultaneously.

(e)     Non-Exercise of Option. If the option under this Section 14.2 is unexercised as to any of the Offered Units, on termination of the Option Period, the Selling Member may Transfer all of the Offered Units for the price and on the terms and conditions set forth in the Option Notice (but in no event for a lesser price or on better terms and conditions to the purchaser). Such Transfer must be carried out within 60 days after the Option Period has expired. However, the Third Party must comply with all of the conditions for admission of a substitute Member set forth in Section 14.3.

14.3    Transferees. Any Transfer of Units by a Person (the "Transferor"), other than to an existing Member or per Section 16.1, shall be effective only to give the transferee (the "Transferee") the right to receive the share of allocations and distributions to which the Transferor would otherwise be entitled. Thus, transferred Units shall have no voting rights unless and until the Transferee holder of such Units is admitted as a substitute Member as set forth below. Unless and until a Transferee is admitted as a substitute Member, the Transferee shall have no right to exercise any of the powers, rights or privileges of a Member hereunder or under the Act. A Member who has assigned all or a portion of his Units shall cease to be a Member on assignment of all of the Member's Units, and thereafter shall have no further powers, rights, or privileges as a Member hereunder, but shall, unless otherwise relieved of such obligations by the Board of Managers or by operation of law, remain liable for all obligations and duties as a Member. A Transferee shall be admitted as a substitute Member when and if such Transferee satisfies each of the following requirements:

(a)     The Board of Managers, in its sole discretion, shall expressly consent to such substitution in writing; provided, however, such consent shall not be required for a Transfer to an existing Member or a trust or entity solely for the benefit of an existing Member;

(b)     The Transferee shall expressly consent in writing to be subject to all the provisions of this Agreement in the manner set forth in Section 16.2;

(c)     The Transferor or Transferee shall have delivered to the Board of Managers a duly executed copy of the instrument making such Transfer, and such other documents or instruments as the Board of Managers may reasonably request, including without limitation the opinion of counsel required by Section 14.4; and

- 33 -

(d)    The Transferor or the Transferee shall have paid all reasonable legal fees and costs of the Company in connection with the Transferee's admission as a substitute Member.

14.4    <u>Securities Laws</u>. In addition to the other restrictions on Transfer of Units in this Agreement, all Transfers of Units must fully comply with all federal and state securities laws. In connection with the Transfer of Units of the Company, except in a public offering registered under the Securities Act, or Rule 144 promulgated thereunder (or any similar rule then in effect), the Company may require that the selling Member or substitute Member deliver to the Company an opinion of counsel which (to the Company's reasonable satisfaction) is knowledgeable in securities law matters to the effect that such Transfer may be effected without registration under the Securities Act and applicable state securities laws.

14.5    <u>Tag-Along Rights</u>.

(a)    <u>Tag-Along Right</u>. In addition to such other requirements as are contained in this Agreement, no Member or group of Members (individually or collectively, the "Transferring Member") shall transfer Units representing in excess of 25% of the then outstanding Units to a third party (excluding an existing Member) unless the other Members are given the opportunity ("Tag-Along Right") to transfer to the third party a portion of their Units (being of the same class of Units as the Units to be transferred by the Transferring Member) at a price and on terms and subject to conditions that are no less favorable to the other Members than those to the Transferring Member.

(b)    <u>Tag-Along Notice</u>. The Transferring Member shall deliver to the Company and each other Member a written notice (a "Tag-Along Notice") of the proposed sale subject to this Section no more than 10 days after the execution and delivery by all the parties thereto of the definitive agreement entered into with respect to the proposed sale and, in any event, no later than 20 days before the closing date of the proposed sale. The Tag-Along Notice shall make reference to the other Members' rights hereunder and shall describe in reasonable detail: (i) the number and type of Units to be sold by the Transferring Member; (ii) the name of the proposed transferee; (iii) the per Unit purchase price and the other material terms and conditions of the sale, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; (iv) the proposed date, time and location of the closing of the sale; and (v) a copy of any form of agreement proposed to be executed in connection therewith.

(c)    <u>Exercise of Tag-Along Right</u>. Unless the third party is willing to acquire a greater interest in the Company, all electing other Members and the Transferring Member shall be entitled to sell the same percentage of their Units to such third party. The other Members may exercise the Tag-Along Right by giving written notice of such exercise to the Transferring Member no later than 10 days after the Transferring Member has provided the Tag-Along Notice. If some or all of the other Members exercise the Tag-Along Right, then the Transferring Member shall not transfer any of the Transferring Member's Units to the third party unless the third party also acquires the Units of the other Member(s) in accordance with the provisions of this Section.

14.6    <u>Drag-Along Rights</u>.

(a)  Change in Control.  If a Supermajority (the "Requisite Parties") approves a sale of the Company or all or substantially all of the Company's assets whether by means of a merger, consolidation, sale of Units or assets, or otherwise (an "Approved Sale"), (i) if the Approved Sale is structured as a merger or consolidation of the Company, or a sale of all or substantially all of the Company's assets, each Member agrees to be present, in person or by proxy, at all meetings for the vote thereon, to vote all Units held by such Member for and raise no objections to such Approved Sale (or in lieu of a meeting, to execute a written consent in writing of the Members approving same), and waive and refrain from exercising any dissenters rights, appraisal rights or similar rights in connection with such merger, consolidation or asset sale, or (ii) if the Approved Sale is structured as a sale of the Units of the Company, each Member agrees to sell his Units on the terms and conditions approved by the Requisite Parties.  Each Member shall take all necessary and desirable actions approved by the Requisite Parties in connection with the consummation of the Approved Sale, including the execution of such agreements and such instruments and other actions reasonably necessary to (i) provide the representations, warranties, indemnities, covenants, conditions, non-compete agreements, escrow agreements and other provisions and agreements relating to such Approved Sale and (ii) effectuate the allocation and distribution of the aggregate consideration on the Approved Sale.

(b)  Irrevocable Proxy.  To secure each Member's obligations to vote the Units and execute all appropriate agreements and instruments in accordance with Section 14.6(a) of this Agreement, each Member hereby appoints one or more designees of the Requisite Parties as such Member's true and lawful proxy and attorney, with the power to act alone and with full power of substitution, to vote all of the Units in furtherance of the provisions of Section 14.6(a) and to execute all appropriate agreements and instruments consistent with Section 14.6(a) on behalf of such Member if, and only if, such Member fails to vote all of the Units in accordance with Section 14.6(a), or execute such agreements and instruments in furtherance of the provisions of Section 14.6(a), within five days of the Company's or any other party's written request for such Member's vote, written consent or signature.  The proxy and power granted by each Member pursuant to this Section 14.6 are coupled with an interest and are given to secure the performance of such Member's duties under Section 14.6.  Such proxy and power is irrevocable for the term of this Agreement.  The proxy and power, if the Member (and any successor to the Member) is an individual, will survive the death, incompetency and disability of such party or any other individual holder of the Units and, if the Member (and any successor to the Member) is an entity, will survive the dissolution, merger or reorganization of such party or any other entity holding the Units.

## SECTION 15
## DISSOLUTION AND WINDING UP

15.1  Events Causing Dissolution.  The Company will be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(a)  A Supermajority agrees to dissolve the Company; or

(b)  The entry of a decree of judicial dissolution or an administrative dissolution under the Act.

- 35 -

The death, resignation, retirement, expulsion, bankruptcy or dissolution of a Member or occurrence of any other event that terminates the continued membership of a Member in the Company shall not of itself dissolve the Company.

15.2   Winding Up.

(a)   Winding Up Procedures.   If the Company is dissolved, then the Board of Managers shall proceed to wind up the affairs of the Company.   During the period beginning with dissolution of the Company and ending with the liquidation of the Company and the termination of this Agreement, the business and affairs of the Company shall be conducted by the Board of Managers. During such period, the business and affairs of the Company shall be conducted so as to preserve the assets of the Company and maintain the status thereof which existed immediately before such dissolution.   If any non-cash assets of the Company are sold by the Company, the purchaser may be a Member or member of the Board of Managers or a group in which any Member or member of the Board of Managers may have an interest.

(b)   Distributions in Liquidation.

(i)   On the dissolution and winding up of the affairs of the Company, the proceeds of liquidation shall be applied and distributed in the following order of priority:

1.   to the payment of all expenses of the dissolution, winding up and liquidation;

2.   to the payment of all debts and liabilities of the Company or to which the Company assets are subject in the order of priority as provided by law;

3.   to the creation of such cash reserves as the Board of Managers reasonably may deem necessary for any contingencies or any unforeseen liabilities of the Company; and

4.   to the Members, in proportion to and up to the positive balance in their respective Capital Accounts, after giving effect to all contributions, deductions and allocations for all periods; provided, however, that in the event that upon liquidation there would otherwise be any conflict between a distribution pursuant to the Members' respective Capital Account balances and the intent of the Members with respect to the distribution of proceeds as provided in Section 11.2(b), the Members, notwithstanding the provisions of Section 10, shall be allocated gains, profits and losses (including items thereof) in a manner that will, as nearly as possible, cause the distribution of liquidation proceeds to the Members to be in accordance both with the Members' economic expectations as set forth in Section 11.2(b) and their respective Capital Account balances.   If the Company's gains, profits and losses are insufficient to cause the Members' Capital Accounts to be in such amounts as will permit liquidation proceeds to be distributed both in accordance with the Members' respective Capital Account balances and Section 11.2(b), then the liquidation proceeds shall be distributed in accordance with the Members' respective Capital Account balances after the allocations described herein have been made.

Any cash reserves established pursuant to Section 15.2(b)(1)(iii) shall be deposited in an appropriate account for such purposes, and when the Board of Managers determines

that all contingent or unforeseen liabilities have been paid or otherwise satisfied the balance of such reserve shall be distributed in accordance with the provisions of Section 15.2(b)(1)(iv).

(ii)     If there is not a pro rata distribution of each asset, asset distributions in kind shall be appraised, if necessary, so that each Member receives his proportionate share of the value of the Company's net assets, based on the Members' respective Membership Interests. It shall not be a requirement that each Member receive his proportionate share of each asset available for distribution to the Members on dissolution. If valuation of the assets of the Company cannot be agreed on, such assets shall be valued at their fair market value as determined by an independent certified appraiser with experience in appraisals of enterprises with similar assets and business to the Company. The Board of Managers shall be required to retain such appraiser and other consultants as may be necessary and advisable, all at the expense of the Company, to advise it of their determinations of such fair market values, which determinations shall be binding on all parties to such winding-up. No Member shall have any right to demand or receive property other than cash on dissolution and termination of the Company.

(iii)     A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities as to creditors.

(iv)     Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and any return of his Capital Contributions thereto and share of profits or losses thereof, and shall have no recourse therefor (on dissolution or otherwise) against any other Member.

(c)     Final Reports. Within 90 days after the complete liquidation of the Company, the Board of Managers shall furnish to the Members a financial statement for the period from the first day of the then current fiscal year through the date of such complete liquidation prepared by the Company's accountants. Such statement shall include a Company statement of operations for such period and a Company balance sheet as to the date of such complete liquidation.

15.3     Waiver of Right to Court Decree of Dissolution. The Members agree that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve this Company except for an action to enforce this Section 15. Care has been taken in this Agreement to provide what the Members feel are fair and just payments to a Member withdrawing from the Company for any reason. Accordingly, each Member accepts the provisions of this Agreement as to his sole entitlement on termination of his Membership Interest in the Company. Each Member hereby waives and renounces his right to seek court decree of dissolution or to seek the appointment by a court of a liquidator for the Company except for an action to enforce this Section 15.

## SECTION 16
## ADDITIONAL AND SUBSTITUTE MEMBERS

16.1     Admission of New Members. Except as provided in Section 17.4 with respect to an IPO, the Board of Managers shall have the authority at any time to issue additional Units and to redeem Units held by the Members on terms and at valuations it deems acceptable and in the best

interests of the Company in its sole discretion. The creation of any new class or group shall be reflected in an amendment to this Agreement. Any such additional Member must agree in writing to be bound by the terms of this Agreement in the manner set forth in Section 16.2 before becoming a Member.

16.2    Consent. Any consent to be subject to this Agreement shall be made in writing, in substantially the following form:

> Consent to Operating Agreement. In consideration of the [issuance] [transfer] to the undersigned of _____ [Class A/Class B/Profits Units], the undersigned does hereby consent to become a party to and be governed by all the terms of an Operating Agreement between the Company and its Members, as amended from time to time (the "Agreement"). For purposes of the Agreement, I shall be considered a Member, as defined therein.

16.3    Allocations to New Members. No additional or substitute Member shall be entitled to any retroactive allocation of losses, income or expense deductions of the Company. The Board of Managers may, at its option, at the time an additional or substitute Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to an additional or substitute Member for that portion of the Company's tax year in which an additional or substitute Member was admitted, in accordance with the provisions of Section 706(d) of the Code and the Regulations promulgated thereunder.

## SECTION 17
## CONVERSION TO CORPORATION

17.1    Conversion. If the Board of Managers determines that conducting the business of the Company in a corporate, rather than a limited liability company, form is necessary for any purpose, including without limitation, for the purpose of an IPO, then the Board of Managers shall recommend to the Members that the Company become a corporation (the "Conversion"). Any Conversion shall be approved by a Supermajority.

17.2    Exchange. In the event of a Conversion, the formation of a newly-formed corporation ("Newco") shall be effected in the most tax efficient manner as determined by the Board of Managers in its sole discretion. On a Conversion, the Board of Managers shall order a revaluation of the Company's assets to serve as a basis for re-establishing the Capital Accounts of each Member. Empirical evidence as to the then-current value of the Company's assets from qualified independent advisors to the Company may exist and be relied on by the Board of Managers in making this determination. If no such evidence exists, the Board of Managers shall determine the then-current value of the Company in good faith. If, at the time of Conversion, the Unreturned Capital of the Class A Members or the Class B Members equals more than zero, each such Class A Member and Class B Member with Unreturned Capital in excess of zero shall receive shares of preferred stock in Newco which will have rights as identical as possible to the rights of the Class A Members or the Class B Members under this Agreement, as applicable, including a liquidation preference in relation to the holders of Newco common stock in an amount equal to

each such Class A Member's Unreturned Capital or such Class B Member's Unreturned Capital. In addition, each Member shall receive shares of common stock representing the resulting equity in Newco in an amount equal to the ratio of his positive (credit) balance in his Capital Account (for the avoidance of doubt, the Capital Account of Class A Members and Class B Members for this purpose will be calculated after deducting an amount equal to the liquidation preference associated with any Newco preferred stock issued to such Class A Member and Class B Member in the Conversion) over the balance of all Members' Capital Accounts. The registration rights set forth in Exhibit B shall survive the Conversion.

17.3   Further Assurances. At the time of such Conversion and subject to any legal, regulatory or similar requirements, the Members shall, and hereby agree to, take all actions reasonably required by the Board of Managers in connection with the Conversion and to cause the resulting corporation to be governed substantially as provided herein, including entering into a shareholders' agreement providing for an agreement to elect the board of directors of such resulting corporation in accordance with the substance of this Agreement; provided that such governance provisions and such shareholders' agreement shall terminate on the effective date of the closing of an IPO.

17.4   Initial Public Offering.   If the Board of Managers, with the approval of a Supermajority, elects to undertake an IPO, within 60 days after such approval, the Company shall engage one or more investment bankers and shall use commercially reasonable efforts to complete the IPO as soon as reasonably practicable; provided that the Company may defer the IPO if the Board of Managers determines that market conditions are sufficiently adverse to consummate the IPO within such period. At the time an IPO is consummated, each Member shall have registration rights with respect to its Newco stock pursuant to the terms attached as Exhibit B.

## SECTION 18
## NOTICES

All notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed given (i) when delivered in person, (ii) three days after having been sent by certified U.S. mail, return receipt requested, postage prepaid, (iii) when delivered by a nationally recognized overnight delivery service or (iv) when sent by facsimile or electronic mail, provided that a confirmation copy is sent via a nationally recognized overnight delivery service on the same business day, to the Members at their addresses as shown from time to time on the records of the Company or to the Company at the address of its principal office.

## SECTION 19
## MISCELLANEOUS

19.1   Authority of Members, Managers, Officers and Affiliates to Deal with the Company. The Company may employ or engage any Member, member of the Board of Managers, officer or any Affiliate of the foregoing for the performance of any and all services or purchase of goods or other property that may at any time be necessary, proper, convenient or advisable in carrying on the business of the Company or disposing of some or all of the Company's assets. However, the compensation or

price therefor shall not materially exceed that prevailing in an arm's length transaction by another Person rendering similar services on comparable transactions as an ongoing activity.

19.2   Amendment.  This Agreement shall be amended only with the written consent of a Supermajority.  Notwithstanding the foregoing, **Schedule A** may be updated by the Company's officers from time to time to reflect the then current status of the information contained thereon, and such update shall not be considered an amendment to this Agreement.

19.3   Inurement.  This Agreement shall be binding on, and inure to the benefit of, all parties hereto, their heirs, personal representatives, successors and assigns to the extent, but only to the extent, that assignment is made in accordance with, and permitted by, the provisions of this Agreement.

19.4   Entire Agreement.  This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof.  It supersedes any other prior agreement or understandings between any of them relating to the subject matter hereof.

19.5   Governing Law.  This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the Commonwealth of Virginia without regard to conflict of law principles.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the parties only in the courts of the Commonwealth of Virginia, City of Norfolk or, if it has or can acquire jurisdiction, in the United States District Court for the Eastern District of Virginia, Norfolk Division, and each of the parties consent to the exclusive jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and hereby irrevocably waives any objection to such jurisdiction and venue. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world. Unless stated otherwise, all remedies provided for in this Agreement shall be cumulative and in addition to and not in lieu of any other remedies available to either party at law, in equity, or otherwise.

19.6   Captions.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision thereof.

19.7   Severability.  If any provision of this Agreement, or the application of such provision to any person or circumstances shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected hereby.

19.8   Counterparts.  This Agreement may be executed in two or more counterparts (including by facsimile or electronic transmission), each of which shall be deemed an original but all of which shall constitute one and the same instrument.

19.9   Number; Gender.  Whenever the context so requires, the singular number will include the plural and the plural will include the singular, and the gender of any pronoun will include the other genders.

19.10   Waiver.  No waiver by any party of any condition or of the breach by the other of any term or covenant contained in this Agreement shall be effective unless in writing and signed

by the aggrieved party. A waiver by a party hereto in any one or more instances shall not be deemed or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of the breach of any other term or covenant set forth in this Agreement. Moreover, the failure of any party to exercise any right hereunder shall not bar the later exercise thereof.

19.11   <u>Company Losses Due to Member's Litigation</u>. If the Company is made a party to any litigation or otherwise incurs any losses or expenses as a result of or in connection with any Member's obligations or liabilities unconnected with the Company's business, then such Member shall reimburse the Company for all such expenses incurred, including attorneys' fees, and the interest of such Member in the Company may be charged therefor.

19.12   <u>Equitable Remedies</u>. The rights and remedies of the parties hereunder shall not be mutually exclusive, *i.e.*, the exercise of rights granted under any provisions hereof shall not preclude the exercise of any other provisions hereof. The parties confirm that damages at law may be an inadequate remedy for a breach or threatened breach of this Agreement and agree that, in the event of a breach or threatened breach of any provision hereof, the respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, without the necessity of posting a bond, but nothing herein contained is intended to, nor shall it, limit or affect any rights at law or by statute or otherwise of any party aggrieved as against the other for a breach or threatened breach of any provision hereof, it being the intention by this subsection to make clear the agreement of the parties that the respective rights and obligations of the parties hereunder shall be enforceable in equity as well as at law or otherwise.

19.13   <u>Creditors</u>. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company. The specific intent of the undersigned is that there shall be no third-party beneficiaries of this Agreement.

19.14   <u>Execution of Additional Instruments</u>. Each party agrees to perform any further acts and to execute and deliver any additional documents which may be reasonably necessary to carry out the provisions and intent of this Agreement.

19.15   <u>Attorney's Fees</u>. In any action at law or in equity to enforce any of the provisions or rights under this Agreement, the unsuccessful party to such litigation as determined by the court in a final judgment or decree shall pay the successful party or parties all costs, expenses and reasonable attorney's fees incurred therein by such party or parties (including, without limitation, such costs, expenses and fees on any appeals), and if such successful parties shall recover judgment in any action or proceeding, such costs, expenses and attorney's fees shall be included as part of such judgment.

19.16   <u>Legal Counsel</u>. This Agreement has been prepared by LeClairRyan, A Professional Corporation, and the Law Office of Joel Ankney PC (the "Firms"), as counsel to the Company, after full disclosure of its representation of the Company to the Members and with the consent and direction of each Member. Each Member has reviewed the contents of this Agreement and fully understands its terms. Each Member acknowledges that he is fully aware of his right to the advice of counsel independent from that of the Company, that the Firms have advised him of such right and disclosed to him the risks in not seeking such independent advice, and that he understands the

potentially adverse interests of the parties with respect to this Agreement. Each Member further acknowledges that no representations have been made with respect to the income or estate tax or other consequences of this Agreement to him and that he has been advised of the importance of seeking independent advice of counsel with respect to such consequences.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause Mining LLC as of the day and year first above written.

**MEMBERS:**

**BCAUSE LLC**

By: _____
(Signature)
Name: _____
Title: _____
Date: _____

## SCHEDULE A

MEMBERS,
INITIAL CAPITAL AND MEMBERSHIP INTERESTS

| Member | Initial Capital Contribution | Membership Interests |
|---|---|---|
| BCause LLC | $100.00 | 100 Class A Units |

Exhibit A

**Initial Board of Managers**

| Name of Manager | Class of Manager |
| --- | --- |
| Robert E. Lindberg Jr. | Class I |
| Robert T. Fitzgerald | Class I |
| Thomas G. Flake | Class II |
| John O. Ashby Jr. | Class II |
| W. Christopher Sikes, Sr. | Class III |

Exhibit B

**Registration Rights**

1.      <u>Registration Rights</u>.

1.1      <u>Definitions</u>. Any terms not otherwise defined in this <u>Exhibit B</u> shall have the meanings set forth in the Agreement. All references to Sections in this <u>Exhibit B</u> shall refer to Sections in this <u>Exhibit B</u>. For purposes of this <u>Exhibit B</u> only:

(a)      The term "<u>Affiliated Fund</u>" has the meaning set forth in Section 1.12.

(b)      The term "<u>Board</u>" has the meaning set forth in Section 1.2(c).

(c)      The term "<u>Common Stock</u>" means the Company's common stock.

(d)      The term "<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended (and any successor thereto) and the rules and regulations promulgated thereunder.

(e)      The term "<u>Form S-3</u>" means such form under the Securities Act as in effect on the date hereof or any successor form under the Securities Act that permits significant incorporation by reference of the Company's subsequent public filings under the Exchange Act.

(f)      The term "<u>Holder</u>" means any person owning or having the right to acquire Registrable Securities or any assignee thereof in accordance with Section 1.12 of this Agreement.

(g)      The term "<u>Immediate Family Member</u>" has the meaning set forth in Section 1.12.

(h)      The term "<u>Initiating Holders</u>" has the meaning set forth in Section 1.2(b).

(i)      The terms "<u>register</u>," "<u>registered</u>," and "<u>registration</u>" refer to a registration effected by preparing and filing a registration statement or similar document in compliance with the Securities Act, and the declaration or ordering of effectiveness of such registration statement or document.

(j)      The term "<u>Registrable Securities</u>" means (i) the shares of Common Stock issued on Conversion and (ii) any other shares of Common Stock of the Company issued as (or issuable on the conversion or exercise of any warrant, right or other security which is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, the shares listed in (i); provided, however, that the foregoing definition shall exclude in all cases any Registrable Securities sold by a Person in a transaction in which such Person's rights under this <u>Exhibit B</u> are not assigned. Notwithstanding the foregoing, Common Stock or other securities shall only be treated as Registrable Securities if and so long as (A) they have not been sold to or through a broker or dealer or underwriter in a public distribution or a public securities transaction,

(B) they have not been sold in a transaction exempt from the registration and prospectus delivery requirements of the Securities Act under Section 4(a)(1) thereof so that all transfer restrictions, and restrictive legends with respect thereto, if any, are removed on the consummation of such sale, or (C) the Holder thereof is entitled to exercise any right provided in this Exhibit B in accordance with Section 1.12 below.

(k)      The term "Registration Expenses" means all expenses (other than Selling Expenses) arising from or incident to the performance of, or compliance with, Sections 1.2, 1.3 and 1.4 including, without limitation, (i) SEC, stock exchange, Financial Industry Regulatory Authority and other registration, qualification and filing fees, (ii) all fees and expenses incurred in connection with complying with any securities or blue sky laws, (iii) all printing, messenger and delivery expenses, (iv) the fees, charges and disbursements of counsel to the Company and of its independent public accountants and any other accounting and legal fees, charges and expenses incurred by the Company (including, without limitation, any expenses arising from any special audits or "comfort letters" required in connection with or incident to any registration), (v) the fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange and (vi) Securities Act liability insurance (if the Company elects to obtain such insurance), regardless of whether any registration statement filed in connection with such registration is declared effective. "Registration Expenses" shall also include the fees, charges and disbursements of one counsel to all of the Holders participating in any underwritten public offering pursuant to Sections 1.2, 1.3 or 1.4 (which shall be selected by a majority, based on the number of Registrable Securities to be sold, of the participating Holders); provided, however, that such fees, charges and disbursements of counsel to the participating Holders shall not exceed $75,000.

(l)      The term "SEC" means the U.S. Securities and Exchange Commission.

(m)      The term "Securities Act" means the U.S. Securities Act of 1933, as amended (and any successor thereto) and the rules and regulations promulgated thereunder.

(n)      The term "Selling Expenses" means all underwriting discounts, selling commissions and stock transfer taxes applicable to the securities registered by the participating Holders and any expenses of counsel or other advisors to the participating Holders which are not covered under, or are in excess of the limits set forth in, the definition of Registration Expenses.

(o)      The term "selling security holder" has the meaning set forth in Section 1.8.

(p)      The term "Violation" has the meaning set forth in Section 1.10(a).

1.2     Demand Registration.

(a)     If the Company shall receive at any time after the date that is six months after the effective date of the first registration statement for a public offering of securities of the Company (other than a registration statement relating either to the sale of securities to employees of the Company pursuant to a stock option, stock purchase or similar plan or an SEC Rule 145 transaction), a written request from the Holders of at least 15% of the Registrable Securities then outstanding that the Company file a registration statement under the Securities Act covering the registration of at least such number of the Registrable Securities having an anticipated aggregate offering price, net of underwriting discounts and commissions, of at least $10,000,000, then the Company shall, within 10 days of the receipt thereof, give written notice of such request to all Holders and shall, subject to the limitations of subsection 1.2(b), use its best efforts to file as soon as practicable, and in any event within 90 days of the receipt of such request, a registration statement under the Securities Act covering all Registrable Securities which the Holders request to be registered within 20 days of the mailing of such notice by the Company.

(b)     If the Holders initiating the registration request hereunder ("Initiating Holders") intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to this Section 1.2 and the Company shall include such information in the written notice referred to in subsection 1.2(a).  The underwriter will be selected by a majority in interest of the Initiating Holders and shall be reasonably acceptable to the Company.  In such event, the right of any Holder to include its Registrable Securities in such registration shall be conditioned on such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise mutually agreed by a majority in interest of the Initiating Holders and such Holder) to the extent provided herein.  All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in subsection 1.5(e)) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting.  Notwithstanding any other provision of this Section 1.2, if the underwriter advises the Initiating Holders in writing that marketing factors require a limitation of the number of shares to be underwritten, then the Initiating Holders shall so advise all Holders of Registrable Securities that would otherwise be underwritten pursuant hereto, and the number of shares of Registrable Securities that may be included in the underwriting shall be allocated among all participating Holders thereof, including the Initiating Holders, in proportion (as nearly as practicable) to the amount of Registrable Securities of the Company owned by each participating Holder; provided, however, that the number of shares of Registrable Securities to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting.

(c)     Notwithstanding the foregoing, if the Company shall furnish to Holders requesting a registration statement pursuant to this Section 1.2, a certificate signed by the President of the Company stating that in the good faith judgment of the Board of Directors of the Company (the "Board"), it would be seriously detrimental to the Company and its holders of capital stock for such registration statement to be filed and it is therefore essential to defer the filing of such registration statement, the Company shall have the right to defer such filing.

(d)       In addition, the Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to this Section 1.2:

(i)       after the Company has effected two registrations pursuant to this Section 1.2 and such registrations have been declared or ordered effective;

(ii)       during the period starting with the date 90 days before the Company's good faith estimate of the date of filing of, and ending on a date 90 days after the effective date of, a registration subject to Section 1.3 unless such offering is the initial public offering of the Company's securities, in which case, ending on a date 180 days after the effective date of such registration subject to Section 1.3; provided that the Company is actively employing in good faith all reasonable efforts to cause such registration statement to become effective; or

(iii)       if the Initiating Holders propose to dispose of shares of Registrable Securities that may be immediately registered on Form S-3 pursuant to a request made pursuant to Section 1.4.

1.3       Piggyback Registration.  If (but without any obligation to do so) the Company proposes to register (including for this purpose a registration effected by the Company for holders of capital stock other than the Holders) any of its stock under the Securities Act in connection with the public offering of such securities solely for cash (other than the initial public offering of the Company's securities, a registration relating solely to the sale of securities to participants in a Company stock plan or a transaction covered by Rule 145 under the Securities Act, a registration in which the only stock being registered is Common Stock issuable on conversion of debt securities which are also being registered, or any registration on any form which does not include substantially the same information as would be required to be included in a registration statement covering the sale of the Registrable Securities), the Company shall, at such time, promptly give each Holder written notice of such registration.  On the written request of each Holder given within 20 days after mailing of such notice by the Company, the Company shall, subject to the cut back provisions of Section 1.8, cause to be registered under the Securities Act all of the Registrable Securities that each such Holder has requested to be registered.

1.4       Form S-3 Registration.  In case the Company shall receive from any Holder or Holders of at least 15% of the Registrable Securities then outstanding a written request or requests that the Company effect a registration on Form S-3 and any related qualification or compliance with respect to all or a part of the Registrable Securities owned by such Holder or Holders, the Company will:

(a)       promptly give written notice of the proposed registration, and any related qualification or compliance, to all other Holders; and

(b)       as soon as practicable, effect such registration and all such qualifications and compliances as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of such Holder's or Holders' Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any other Holder or Holders joining in such request as are specified in a written request given within 15 days after

iv

receipt of such written notice from the Company; provided, however, that the Company shall not be obligated to effect any such registration, qualification or compliance, pursuant to this Section 1.4: (i) if Form S-3 is not available for such offering by the Holders; (ii) if the Holders, together with the holders of any other securities of the Company entitled to inclusion in such registration, propose to sell Registrable Securities and such other securities (if any) at an aggregate price to the public (net of any underwriters' discounts or commissions) of less than $5,000,000; (iii) if the Company shall furnish to the Holders a certificate signed by the President of the Company stating that in the good faith judgment of the Board, it would be seriously detrimental to the Company and its holders of capital stock for such Form S-3 registration to be effected at such time, in which event the Company shall have the right to defer such filing; (iv) if the Company has, within the 12-month period preceding the date of such request, already effected two registrations on Form S-3 for the Holders pursuant to this Section 1.4; (v) in any particular jurisdiction in which the Company would be required to qualify to do business or to execute a general consent to service of process in effecting such registration, qualification or compliance; or (vi) during the period ending 180 days after the effective date of a registration statement subject to Section 1.3.

(c)        Subject to the foregoing, the Company shall file a registration statement covering the Registrable Securities and other securities so requested to be registered as soon as practicable after receipt of the request or requests of the Holders. Registrations effected pursuant to this Section 1.4 shall not be counted as demands for registration or piggyback registrations effected pursuant to Sections 1.2 or 1.3, respectively.

1.5        Obligations of the Company.  Whenever required under this Exhibit B to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)        Prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its reasonable best efforts to cause such registration statement to become effective, and, on the request of the Holders of a majority of the Registrable Securities registered thereunder, keep such registration statement effective for up to 120 days, or until the distribution described in such registration statement is completed, if earlier.

(b)        Prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement for up to 120 days, or until the distribution described in such registration statement is completed, if earlier.

(c)        Furnish to the Holders such number of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request to facilitate the disposition of Registrable Securities owned by them.

(d)        Use its reasonable best efforts to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such

jurisdictions as shall be reasonably requested by the Holders, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(e)    In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter of such offering. Each Holder participating in such underwriting shall also enter into and perform its obligations under such an agreement.

(f)    Notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing, such obligation to continue for 120 days.

(g)    Cause all such Registrable Securities registered pursuant hereunder to be listed on each securities exchange on which similar securities issued by the Company are then listed.

(h)    Provide a transfer agent and registrar for all Registrable Securities registered pursuant hereunder and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration.

(i)    Use its reasonable best efforts to furnish, at the request of any Holder requesting registration of Registrable Securities pursuant to this Exhibit B, on the date that such Registrable Securities are delivered to the underwriters for sale in connection with a registration pursuant to this Exhibit B, if such securities are being sold through underwriters, (i) an opinion, dated such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters and (ii) a letter dated such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters.

1.6    Furnish Information.    It shall be a condition precedent to the obligations of the Company to take any action pursuant to this Exhibit B with respect to the Registrable Securities of any selling Holder that such Holder shall furnish to the Company such information regarding itself, the Registrable Securities held by it, and the intended method of disposition of such securities as shall be required to effect the registration of such Holder's Registrable Securities. The Company shall have no obligation with respect to any registration requested pursuant to Section 1.2 or Section 1.4 of this Agreement if, as a result of the application of the preceding sentence, the number of shares or the anticipated aggregate offering price of the Registrable Securities to be included in the registration does not equal or exceed the number of shares or the anticipated aggregate offering price required to originally trigger the Company's obligation to initiate such registration as specified in subsection 1.2(a) or subsection 1.4(b), whichever is

applicable.

1.7     Expenses of Registration.

(a)     Demand Registration. All Registration Expenses incurred pursuant to Section 1.2 shall be borne by the Company; provided, however, that the Company shall not be required to pay for any Registration Expenses incurred pursuant to Section 1.2 if the registration request is subsequently withdrawn at the request of the Holders of a majority of the Registrable Securities to be registered (in which case all participating Holders shall bear such expenses), unless the Holders of a majority of the Registrable Securities agree to forfeit their right to one demand registration pursuant to Section 1.2; provided further, however, that if at the time of such withdrawal, the Holders (i) have learned of a material adverse change in the condition, business, or prospects of the Company that was not known to the Holders at the time of their request and (ii) have withdrawn the request with reasonable promptness following disclosure by the Company of such material adverse change, then the Holders shall not be required to pay any of such expenses and shall not forfeit their rights pursuant to Section 1.2.

(b)     Piggyback Registration. All Registration Expenses incurred pursuant to Section 1.3 for each Holder shall be borne by the Company.

(c)     Registration on Form S-3. All Registration Expenses incurred pursuant to Section 1.4 for each Holder shall be borne by the Company.

1.8     Underwriting Requirements. In connection with any offering involving an underwriting of shares of the Company's capital stock, the Company shall not be required under Section 1.3 to include any of the Holders' securities in such underwriting unless they accept the terms of the underwriting as agreed on between the Company and the underwriters selected by it (or by other persons entitled to select the underwriters), and then only in such quantity as the underwriters determine in their sole discretion will not jeopardize the success of the offering by the Company. If the total amount of securities, including Registrable Securities, requested by holders of capital stock to be included in such offering exceeds the amount of securities sold other than by the Company that the underwriters determine in their sole discretion is compatible with the success of the offering, then the Company shall be required to include in the offering only that number of such securities, including Registrable Securities, which the underwriters determine in their sole discretion will not jeopardize the success of the offering (the securities so included to be apportioned pro rata among the selling security holders according to the total amount of securities entitled to be included therein owned by each selling security holder or in such other proportions as shall mutually be agreed to by such selling security holders) but in no event shall the amount of securities of the selling Holders included in the offering be reduced below 20% of the total amount of securities included in such offering. For purposes of the preceding parenthetical concerning apportionment, for any selling security holder which is a holder of Registrable Securities and which is a partnership, limited liability company or corporation, the partners, members, retired partners, retired members and holders of capital stock of such holder, or the estates and Immediate Family Members of any such partners, members or holders and any trusts for the benefit of any of the foregoing persons shall be deemed to be a single "selling security holder," and any pro-rata reduction with respect to such "selling security holder" shall be based on the aggregate amount of

vii

shares carrying registration rights owned by all entities and individuals included in such "selling security holder," as defined in this sentence.

1.9    Delay of Registration. No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Exhibit B.

1.10    Indemnification. In the event any Registrable Securities are included in a registration statement under this Exhibit B:

(a)    To the extent permitted by law, the Company will indemnify and hold harmless each Holder, the partners, officers, directors and security holders of each Holder, legal counsel and accountants for each Holder, any underwriter (as defined in the Securities Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any losses, claims, damages, or liabilities (joint or several) to which they may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereof) arise out of or are based on any of the following statements, omissions or violations (collectively a "Violation"): (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law; and the Company will pay to each such Holder, underwriter or controlling person, as incurred, any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability, or action; provided, however, that the indemnity agreement contained in this subsection 1.10(a) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld), nor shall the Company be liable to any Holder, underwriter or controlling person for any such loss, claim, damage, liability, or action to the extent that it arises out of or is based on a Violation which occurs in reliance on and in conformity with written information furnished expressly for use in connection with such registration by any such Holder, underwriter or controlling person.

(b)    To the extent permitted by law, each selling Holder will indemnify and hold harmless the Company, each of its directors, each of its officers who has signed the registration statement, each person, if any, who controls the Company within the meaning of the Securities Act, any underwriter, any other Holder selling securities in such registration statement and any controlling person of any such underwriter or other Holder, against any losses, claims, damages, or liabilities (joint or several) to which any of the foregoing persons may become subject, under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereto) arise out of or are based on any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance on and in conformity with written information furnished by such Holder expressly for use in

connection with such registration; and each such Holder will pay, as incurred, any legal or other expenses reasonably incurred by any person intended to be indemnified pursuant to this subsection 1.10(b), in connection with investigating or defending any such loss, claim, damage, liability, or action; provided, however, that the indemnity agreement contained in this subsection 1.10(b) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Holder, which consent shall not be unreasonably withheld; provided that in no event shall any indemnity under this subsection 1.10(b) exceed the net proceeds from the offering received by such Holder, except in the case of willful fraud by such Holder.

(c)      Promptly after receipt by an indemnified party under this Section 1.10 of notice of the commencement of any action (including any governmental action), such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 1.10, deliver to the indemnifying party a written notice of the commencement thereof and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnified party (together with all other indemnified parties which may be represented without conflict by one counsel) shall have the right to retain one separate counsel, with the reasonable fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action, if prejudicial to its ability to defend such action, shall relieve such indemnifying party of any liability to the indemnified party under this Section 1.10, but the omission so to deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 1.10.

(d)      If the indemnification provided for in this Section 1.10 is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any loss, liability, claim, damage or expense referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party hereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such loss, liability, claim, damage, or expense in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other in connection with the statements or omissions that resulted in such loss, liability, claim, damage or expense as well as any other relevant equitable considerations; provided that in no event shall any contribution by a Holder under this Subsection 1.10(d) exceed the net proceeds from the offering received by such Holder, except in the case of willful fraud by such Holder. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

(e)      Notwithstanding the foregoing, to the extent that the provisions on

ix

indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

(f)    The obligations of the Company and Holders under this Section 1.10 shall survive the completion of any offering of Registrable Securities in a registration statement under this Exhibit B, and otherwise.

1.11    Reports Under the Exchange Act. With a view to making available to the Holders the benefits of Rule 144 promulgated under the Securities Act and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company agrees to:

(a)    make and keep public information available, as those terms are understood and defined in SEC Rule 144, at all times after 90 days after the effective date of the first registration statement filed by the Company for the offering of its securities to the general public so long as the Company remains subject to the periodic reporting requirements under Sections 13 or 15(d) of the Exchange Act;

(b)    take such action, including the voluntary registration of its Common Stock under Section 12 of the Exchange Act, as is necessary to enable the Holders to utilize Form S-3 for the sale of their Registrable Securities, such action to be taken as soon as practicable after the end of the fiscal year in which the first registration statement filed by the Company for the offering of its securities to the general public is declared effective;

(c)    file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act; and

(d)    furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith on request (i) a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144 (at any time after 90 days after the effective date of the first registration statement filed by the Company), the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies), (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC which permits the selling of any such securities without registration or pursuant to such form.

1.12    Assignment of Registration Rights. The rights to cause the Company to register Registrable Securities pursuant to this Exhibit B may be assigned (but only with all related obligations) by a Holder to a transferee or assignee (a) that is a subsidiary, parent, partner, limited partner, retired partner, member, retired member or holder of capital stock of a Holder, (b) that is an affiliated fund or entity of the Holder, which means with respect to a limited liability company or a limited partnership, a fund or entity managed by the same manager or managing member or general partner or management company or by an entity controlling, controlled by, or under

common control with such manager or managing member or general partner or management company (such a fund or entity, an "Affiliated Fund"), (c) who is a Holder's child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law (such a relation, a Holder's "Immediate Family Member", which term shall include adoptive relationships), or (d) that is a trust for the benefit of an individual Holder or such Holder's Immediate Family Member, provided the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such transferee or assignee and the securities with respect to which such registration rights are being assigned; and provided, further, that such assignment shall be effective only if the transferee agrees to be bound by the terms and provisions of this Exhibit B and immediately following such transfer the further disposition of such securities by the transferee or assignee is restricted under the Securities Act. For the purposes of determining the number of shares of Registrable Securities held by a transferee or assignee, the holdings of transferees and assignees of (i) a partnership who are partners or retired partners of such partnership or (ii) a limited liability company who are members or retired members of such limited liability company (including Immediate Family Members of such partners or members who acquire Registrable Securities by gift, will or intestate succession) shall be aggregated together and with the partnership or limited liability company; provided that all assignees and transferees who would not qualify individually for assignment of registration rights shall have a single attorney-in-fact for the purpose of exercising any rights, receiving notices or taking any action under this Exhibit B.

1.13    Termination of Registration Rights. The rights contained in this Exhibit B shall terminate at the earlier of (a) five years from the effective date of the Company's first registration statement for a public offering of securities of the Company; or (b) with respect to a Holder, at such time that, in the opinion of the Company's counsel, all Registrable Securities held, or issuable on conversion of securities then held, by such Holder may be sold in a three month period without registration under the Securities Act pursuant to Rule 144 or another similar exemption under the Securities Act

1.14    "Market Stand-Off" Agreement. Each Holder hereby agrees that during a period, not to exceed 180 days, following the effective date of the initial, effective registration statement of the Company filed under the Securities Act, it shall not, to the extent requested by the Company and any underwriter, sell, pledge, transfer, make any short sale of, loan, grant any option for the purchase of, or otherwise transfer or dispose of (other than to donees who agree to be similarly bound) any Common Stock held by it at any time during such period except Common Stock included in such registration; provided, however, that all One Percent Stockholders (as defined below), if any, and all officers and directors of the Company enter into similar agreements. If the Company or any underwriter releases any One Percent Stockholder, officer or director of the Company from its obligations under such similar agreements, it shall similarly release each of the Holders from its obligations hereunder on a pro rata basis, as applicable. For purposes of this Section 1.14, the term "One Percent Stockholder" shall mean a stockholder of the Company who holds at least 1% of the outstanding Common Stock of the Company. To enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Registrable Securities of each Holder (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period.

Exhibit A

## COUNTERPART SIGNATURE PAGE TO
## OPERATING AGREEMENT
## OF
## BCAUSE LLC

The undersigned is hereby issued the number of Profits Units of BCause LLC (the "Company") set forth below and agrees to be bound by the terms and conditions of the Operating Agreement of the Company, dated as of January 1, 2014, as amended from time to time (the "Agreement").

Number of Profits Units Awarded:     **3,093.00**
Date:     1/1/2017

BCAUSE LLC

By: _____

Date: _____3.19.17_____

Robert E. Lindberg Jr., Chairman

In consideration of the issuance to the undersigned of the number of Profits Units of the Company set forth above, the undersigned does hereby consent to become a party to and be governed by all the terms of the Agreement. For purposes of the Agreement, the undersigned shall be considered a Member, as defined therein.

By: _____     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

Xueming Mike Shen     Social Security Number

IN WITNESS WHEREOF, the parties have executed this Profits Units Award Agreement as of the date first written above.

BCAUSE LLC

By:

Date: 3·19·17

Robert E. Lindberg Jr., Chairman

RECIPIENT:

By:

Date: 3 / 29 / 17

Xueming Mike Shen

List of Exhibits:

Exhibit A - Counterpart Signature Page
Exhibit B - Profits Units Recipient Investment Letter

7

Profits Units Award Agreement - BCause - PUQ V3 .docx

## Protective 83(b) Election

This statement is being made under Section 83(b) of the Internal Revenue Code, pursuant to Treasury Regulation Section 1.83-2.

(1)    The person who performed the services ("Recipient") is:

Name:                               Xueming Mike  Shen
Address:                            4340 Blackthorne CT

City, State Zip                    Virginia Beach, VA 23455
Social Security Number:    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

(2)    The property with respect to which the election is being made is 3,093.00 Profits Units of BCause LLC, a Virginia limited liability company ("Issuer"), issued to Recipient.

(3)    The property was transferred on 1/1/2017. The tax year of Recipient for which this election is made is calendar year 2017.

(4)    The property is subject to risks of forfeiture as follows. The Profits Units shall vest on the satisfaction of certain performance milestones described in the award agreement. If Recipient ceases to provide the services to Issuer for any reason, vesting of the Profits Units immediately stops, unvested Profits Units are forfeited and vested Profits Units are subject to redemption by Issuer.

(5)    The fair market value of the property at the time of transfer (determined without regard to any restriction other than a restriction which by its terms will never lapse) is $0.

(6)    The amount paid for such property is $0.

(7)    A copy of this statement was furnished to Issuer, for whom Recipient will render the service or payment underlying the transfer of property.

(8)    This statement is executed as of: _____.

RECIPIENT:

_____
Xueming Mike Shen

loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based on any false representation or warranty or breach or failure by me herein or in any other document furnished by me to any of the foregoing in connection with this transaction.

Sincerely,

Xueming Mike Shen

**COUNTERPART SIGNATURE PAGE TO**
**OPERATING AGREEMENT**
**OF**
**BCAUSE LLC**

The undersigned is hereby issued the number of Class B Units of BCause LLC (the "Company") set forth below and agrees to be bound by the terms and conditions of the Amended and Restated Operating Agreement of the Company, dated as of October 13, 2017, as amended from time to time (the "Agreement").

Number of Class B Units:        5,100,349.2

Date:        October 13, 2017

BCAUSE LLC

By: _____

Name: _____

Title: _____ CEO

In consideration of the issuance to the undersigned of the number of Class B Units in the Company set forth above, the undersigned does hereby consent to become a party to and be governed by all the terms of the Agreement. For purposes of the Agreement, the undersigned shall be considered a Member, as defined therein.

FOR INDIVIDUAL MEMBER

_____        _____
[Printed or Typed Name(s)]                Social Security Number

By: _____
        (Signature)

By: _____
        (Signature, if joint owner)

        *OR*

FOR ENTITY MEMBER

SBI Holdings, Inc.                        98-0635622
_____        _____
                                          Tax Identification Number

By: _____
        (Signature)
Name:  Yoshitaka Kitao
Title:  Representative Director, President & CEO

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Amended and Restated Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

_____
[Printed or Typed Name]

By: _____
      (Signature)

*if an entity:*

H.E. PEI, LLC
[Printed or Typed Entity Name]

By: _____
      (Signature)
Name: _Luke M. Hiller_
Title: _Manager_

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**                                *if an individual:*

GREG ACKERSON
_____
[Printed or Typed Name]

By: _____
       (Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
       (Signature)
Name: _____
Title: _____

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**                              *if an individual:*


TERRY FRANKLIN BYRUM
_____
[Printed or Typed Name]

By: _____
        (Signature)


*if an entity:*


_____
[Printed or Typed Entity Name]

By: _____
        (Signature)
Name: _____
Title: _____

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

_____
Jeremy  Alessi
_____

[Printed or Typed Name]

By: _____ *Jeremy Alessi* _____
_____    (Signature)

*if an entity:*

_____

[Printed or Typed Entity Name]

By: _____
_____ (Signature)

Name: _____

Title: _____

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

John Ashby

[Printed or Typed Name]

By: _____
 (Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
 (Signature)

Name: _____

Title: _____

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

_Robert E. Lindberg Jr._

[Printed or Typed Name]

By: _____
    (Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
    (Signature)

Name: _____

Title: _____

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**                              *if an individual:*

                                          William Christopher Sikes Sr
                                          [Printed or Typed Name]

                                          By: *William Christopher Sikes Sr*
                                              (Signature)

                                          *if an entity:*

                                          _____
                                          [Printed or Typed Entity Name]

                                          By: _____
                                              (Signature)
                                          Name: _____
                                          Title: _____

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

Richard Moormann
[Printed or Typed Name]

By: _____
(Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
(Signature)

Name: _____
Title: _____

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

RICHARD W. LALLY
_____
[Printed or Typed Name]

By: _____
       (Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
       (Signature)
Name: _____
Title: _____

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BC arts LLC as of the day and year first above written.

MEMBERS:

Betty Ackerson
Printed or Typed Entity Name

By: Betty Ackerson
    Signature

Printed or Typed Entity Name

By: _____
        Signature

Name: _____

Title: _____

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

JOSEPH A. KLETT
[Printed or Typed Name]

By: _____
      (Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
      (Signature)
Name: _____
Title: _____

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**                                      *if an individual:*


Marshall  Alan  Boyer
_____
[Printed or Typed Name]

By: _____
            (Signature)


*if an entity:*


_____
[Printed or Typed Entity Name]

By: _____
            (Signature)
Name: _____
Title: _____

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

Joseph A. Brimer
[Printed or Typed Name]

By: _____
(Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
(Signature)
Name: _____
Title: _____

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

MEMBERS:

*if an individual:*

_____

[Printed or Typed Name]

By: _____

(Signature)

*if an entity*:

John E. Greenhalgh Revocable Trust dtd 15 May 1992

[Printed or Typed Entity Name]

By: _____

(Signature)

Name: John S. Greenhalgh

Title: Trustee

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**                              *if an individual:*

_____

[Printed or Typed Name]

By: _____

       (Signature)

*if an entity:*

    Patten Investment Company, LLC

[Printed or Typed Entity Name]

By: _____

       (Signature)

Name:   Bradford Patten

Title:    Manager

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**                                    *if an individual:*

<u>   Robert T Fitzgerald   </u>
[Printed or Typed Name]

By: _____
        (Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
        (Signature)
Name: _____
Title: _____

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

MEMBERS:

*if an individual:*

John Travis
[Printed or Typed Name]

By: _____
(Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
(Signature)

Name: _____

Title: _____

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

Michael H. Carrothers Jr.
[Printed or Typed Name]

By: _____
(Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
(Signature)

Name: _____

Title: _____

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

_____
[Printed or Typed Name]

By: _____
    (Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
    (Signature)
Name: _____
Title: _____

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

MEMBERS:

*if an individual:*

_Michael Adolphi_
[Printed or Typed Name]

By: _____
     (Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
     (Signature)
Name: _____
Title: _____

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

*Thomas Flake*
[Printed or Typed Name]

By: _____
(Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
(Signature)

Name: _____

Title: _____

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

LARRY BOYER
_____
[Printed or Typed Name]

By: _____
(Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
(Signature)

Name: _____

Title: _____

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**                                    *if an individual:*

                                    William B. Travis
                                    [Printed or Typed Name]

                                    By:
                                    (Signature)


                                    *if an entity:*



                                    [Printed or Typed Entity Name]

                                    By:
                                    (Signature)
                                    Name:
                                    Title:

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**                                        *if an individual:*

                                        Taylor Boxer
                                        _____
                                        [Printed or Typed Name]

                                        By: _____
                                              (Signature)

                                        *if an entity:*


                                        _____
                                        [Printed or Typed Entity Name]

                                        By: _____
                                              (Signature)
                                        Name: _____
                                        Title: _____

- 38 -

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**

*if an individual:*

EARL J. COOK
_____
[Printed or Typed Name]

By: _____
(Signature)

*if an entity:*

_____
[Printed or Typed Entity Name]

By: _____
(Signature)

Name: _____

Title: _____

## COUNTERPART SIGNATURE PAGE TO
## OPERATING AGREEMENT
## OF
## BCAUSE LLC

The undersigned is hereby issued the number of Class B Units of BCause LLC (the "Company") set forth below and agrees to be bound by the terms and conditions of the Amended and Restated Operating Agreement of the Company, dated as of October 13, 2017, as amended from time to time (the "Agreement").

Number of Class B Units: _____

Date: _____

BCAUSE LLC

By: _____

Name: _____

Title: _____

In consideration of the issuance to the undersigned of the number of Class B Units in the Company set forth above, the undersigned does hereby consent to become a party to and be governed by all the terms of the Agreement. For purposes of the Agreement, the undersigned shall be considered a Member, as defined therein.

FOR INDIVIDUAL MEMBER

_Robert Fitzgerald_
[Printed or Typed Name(s)]

By: _____
    (Signature)

By: _____
    (Signature, if joint owner)

552 179986
Social Security Number

OR

FOR ENTITY MEMBER

_____

By: _____
    (Signature)

Name: _____

Title: _____

Tax Identification Number

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Amended and Restated Operating Agreement of BCause LLC as of the day and year first above written.

**MEMBERS:**                           *if an individual:*

 

Paul Wong                    10/24/2017
[Printed or Typed Name]

By: _____
     (Signature)

*if an entity:*

 

[Printed or Typed Entity Name]

By: _____
     (Signature)
Name: _____
Title: _____