1

1    IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

4   BCause Mining, LLC,        )    No. 19 B 10562
                               )    Chicago, Illinois
5                              )    10:00 a.m.
                     Debtor.)       June 21, 2019
6

7              VOLUME I (Pages 1-321)

8           TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE JANET S. BAER

9

10  APPEARANCES:

11  For the Debtor:              Mr. Scott Clar,
                                 Mr. Jeffrey Dan;
12
    For WESCO Distribution:      Mr. David A. Agay,
13                               Ms. Maria G. Carr;

14
    For Hoffland Properties:     Mr. J. Mark Fisher,
15                               Mr. Dennis T. Lewandowski
                                 (Telephonic);
16
    For Virginia Electric:       Mr. Jason M. Torf,
17                               Mr. John M. Craig;

18  For the Committee:           Ms. Elizabeth L. Janczak;

19  For BMG Operations:          Mr. Brian L. Shaw,
                                 Ms. Jennifer M. McLemore
20                               (Telephonic);

21

22

23  Court Reporter:              Jerri Estelle, CSR, RPR
                                 U.S. Courthouse
24                               219 South Dearborn
                                 Room 661
25                               Chicago, IL  60604.

2

1                          I N D E X

2

3   WITNESS:                                    PAGE:

4        THOMAS FLAKE

5    Direct Examination By Mr. Agay              23

6        FREDERICK DON GREDE

7    Direct Examination By Mr. Agay             210
     Cross-Examination By Mr. Clar              275
8    Cross-Examination By Ms. Janczak           299
     Redirect Examination By Mr. Agay           309
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          THE CLERK:  Taking up this

2  Court's 10:00 o'clock set matters, Bcause Mining,

3  LLC.  And we have telephonic appearances.

4          MR. AGAY:  Good morning, Your Honor.

5  David Agay appearing on behalf of WESCO.

6          MR. CLAR:  Good morning, Your Honor.

7  Scott Clar and Jeffrey Dan on behalf the debtor.

8          MR. FISHER:  Good morning, Your Honor.

9  Mark Fisher on behalf of Hoffland Properties, the

10 landlord.

11          THE COURT:  Let's start over here now.

12          MR. TORF:  Good morning, Your Honor

13 Jason Torf on behalf of Virgina Electric.  Did I say

14 the name of the client right?

15          MR. CRAIG:  You did.  Good morning,

16 Your Honor.  John Craig on behalf of Virginia

17 Electric and Power Company, doing business as

18 Dominion Energy, Virgina.

19          MS. CARR:  Good morning, Your Honor.

20 Maria Carr on behalf of WESCO.

21          MR. AGAY:  Your Honor, I should have

22 introduced Ms. Carr.  She's with McDonald Hopkins.

23          THE COURT:  Good morning.

24          What was your name again, please?

25          MR. AGAY:  David Agay.

1           MR. FISHER:  Mark Fisher, Schiff

2   Hardin on behalf of Hoffland Properties, the

3   landlord.

4           MR. CLAR:  Scott Clar and Jeffrey Dan

5   on behalf of the debtor.

6           MS. JANCZAK:  Elizabeth Janczak on

7   behalf of the committee.

8           MR. SHAW:  Good morning, Your Honor.

9   Brian Shaw on behalf of BMG.

10           THE COURT:  Good morning.  And we have

11   two appearances on the phone:  Jennifer McLemore on

12   behalf of BMG, and Denise Lewandowski on behalf of

13   Hoffland Properties.

14           MR. TORF:  I think it's Dennis.

15           MR. FISHER:  Dennis.

16           THE COURT:  Oh, I'm sorry.  Dennis,

17   yes.  Couple housekeeping matters before we begin.

18   First of all, I want to apologize for having to delay

19   the start.

20           My son is doing a trip to Japan with

21   school.  Last night, they canceled his flight.  So

22   his new flight is at noon today.  So first time he's

23   ever gone abroad all by himself, I had to take him to

24   the airport.

25           Fortunately, traffic wasn't terrible,

1   so...

2                   MR. SHAW:  I was going to thank you

3   for making it an hour late.

4                   MR. FISHER:  Yes, that hour was great

5   timing.

6                   THE COURT:  Good.  I hope so too.  And

7   I have my phone here in case I got sort of last

8   minute, "Mom, I forgot whatever."

9                   MR. FISHER:  13 hours.

10                  THE COURT:  Yeah.  Okay.  Where are we

11  at?  Do we have housekeeping matters here?

12                  MR. CLAR:  Well, I don't know how we

13  want to handle the other motions, I mean, because it

14  occurs to me, and I'll try to stop using that word,

15  but it's hard, but I suppose some of them depend on

16  the outcome of today.

17                  THE COURT:  Most of them do, yeah.

18                  In fact, let me look at my list here.

19                  MR. SHAW:  I have one that doesn't,

20  that we are willing to withdraw.

21                  The motion for the 2004 exam, in light

22  of my understanding that the complaint has been or

23  will be filed --

24                  THE COURT:  It has been.  I received

25  it this morning.

1                MR. SHAW:  -- should be withdrawn at

2    this point without prejudice.

3                THE COURT:  Okay.

4                MR. SHAW:  I can either submit

5    something Monday --

6                THE COURT:  I think we can just show

7    on the docket that it's been withdrawn.

8                MR. SHAW:  That works too.  Thank you.

9                MR. CLAR:  There are two motions that

10   as I look at our call can be dealt with without

11   regard to the result today, and those are the motions

12   to reject.

13               THE COURT:  Yes, if there are no

14   objections.

15               I've got the motion to object to the

16   contract bandwidth agreement and the motion to reject

17   the executory contract office lease in Chicago.

18               On the bandwidth agreement have you

19   heard anything?  I would normally give somebody time

20   to object, unless it's by agreement.

21               MR. CLAR:  No, I haven't heard

22   anything.

23               THE COURT:  Then I'm going to set a

24   time to respond.

25               MR. CLAR:  That's fine.  We've asked

1    to reject both of these as of August 1st anyway.

2                    THE COURT:  Okay.  Have you heard

3    anything on the Chicago office lease?

4                    MR. CLAR:  I spoke with Mr. Fenton

5    several times just with respect to what their

6    intentions are with respect to the security deposit

7    and rejection damages and all that, but not that they

8    object, no.  They do not object.

9                    THE COURT:  All right.  Let's give

10   them time to respond, and you can work out agreed

11   orders and the like, hopefully.

12                   So today is the 21st.  Why don't we

13   give them 14 days to respond.  That will take them to

14   July 5.  And that takes care of those two.

15                   The motion to exceed the page

16   limitation I granted in chambers, so I think

17   everything else is dependent upon where we go next.

18                   MR. CLAR:  Well, there's only the bar

19   date motion.

20                   THE COURT:  Right.  There's the bar

21   date motion; the use of cash collateral; the adequate

22   assurance to the utilities, which I received the

23   stipulations.  You're going out to October.  We'll

24   see where we are.  So that has to wait until we see

25   what the outcome of this hearing is.

1                And then, of course, the motion to

2    dismiss and relief from stay, which is really why

3    we're here today.

4                MR. CLAR:  That's correct.

5                THE COURT:  All right.  Then if nobody

6    has anything else to say, I think we're ready to

7    proceed.

8                And I'll hear opening statements first

9    from Mr. Agay.

10               MR. AGAY:  Thank you.

11               Your Honor, David Agay on behalf of

12   WESCO.

13               Again, maybe it makes sense for me to

14   outline how we would conceive of proceeding.

15               THE COURT:  That will fine.

16               MR. AGAY:  I would propose to give a

17   very, very short opening statement.  We're presuming

18   that the Court has read all of the papers.

19               THE COURT:  I have.

20               MR. AGAY:  So you're familiar with our

21   positions.

22               Then I would jump into the direct

23   examination of Mr. Flake, who is the current CEO for

24   the debtors, and I would ask that he be treated as an

25   adverse witness so I'd be allowed to ask him leading

1  questions.

2          Thereafter, we contemplate presenting

3  Fred Grede as a witness, the debtor's ex-CEO; and

4  thereafter, Mr. Carl Lane, who will be our expert

5  witness.

6          And as of right now, while we're

7  reserving, that's who we're contemplating calling on

8  direct.

9          THE COURT:  Okay.

10          MR. CLAR:  And depending upon what

11  comes out, whether we would use the opportunity to

12  cross-direct or -- it really is a fluid situation.

13          THE COURT:  It is.  And it's a bench

14  trial, and we can all be fluid.  So whatever makes

15  sense.  I'm not going to hold somebody to the, oh,

16  you didn't ask this there, you have to ask it there

17  kind of thing.

18          MR. CLAR:  There are scope issues,

19  obviously, at some point.  But I haven't decided,

20  because I don't really know what's going to come out

21  on Mr. Agay's direct adverse solicitation of

22  Mr. Flake, so I really don't know.

23          THE COURT:  I understand.  Just so you

24  know, I've read all the materials, but I have not

25  examined the exhibits, but for I did read the

1   affidavit of your expert; did not look at the backup

2   documentation at all.

3             The way I proceed is a document will

4   be reviewed by me if you present it at trial.  I'm

5   not going to review a pile of documents back in my

6   chambers and make up my own mind.

7             So whatever you want to get into

8   evidence and you want me to review in detail, use it

9   here today.

10            MR. AGAY:  Right.

11            MR. CLAR:  Well, I was just wondering

12  if we can dispense with that and just move to admit

13  all of our exhibits at this point.

14            THE COURT:  No.  Not at all.  I'll

15  admit your exhibit when you use it and I see that

16  it's relevant.

17            MR. AGAY:  The last thing is, while we

18  would love to get done today, Your Honor, it's quite

19  possible, depending on who Mr. Clar presents in his

20  direct, etcetera, that this spills over.

21            And our hope would be that we can

22  continue to pick this up on Monday if the Court has

23  time.

24            THE COURT:  I have the day available.

25            MR. CLAR:  Your Honor, my colleague

1  reminds me that we should move to exclude witnesses

2  while the testimony's going on.

3            THE COURT:  That's absolutely fine.

4  Obviously, WESCO is entitled to have a representative

5  here.  But beyond that, their other witnesses can be

6  excluded.

7            MR. CLAR:  Right.  And I think that

8  only would be Mr. Grede and Mr. Lane.

9            MR. AGAY:  And I'm not -- he's going

10  to move to exclude our witnesses?

11            THE COURT:  Yes.

12            MR. CLAR:  Well, no, not permanently.

13  Just while the testimony is being --

14            MR. AGAY:  Oh, I see.

15            MR. CLAR:  I'd love to do that.

16            THE COURT:  One of your witnesses is

17  leaving now, Mr. Lane.

18            MR. AGAY:  But, actually, Your Honor,

19  what would be the reason for excluding witness?

20            MR. CLAR:  Well, I don't want them to

21  hear other people's testimony.  I mean, I think it's

22  fairly obvious.

23            MR. AGAY:  Well, part of the reason

24  that we're presenting Mr. Grede and Mr. Lane is to

25  impeach and rebut Mr. Flake's testimony.

1           MR. CLAR:  And that should already

2  have been done through the depositions, through --

3           THE COURT:  Mr. Agay, I think there's

4  a pretty clear federal rule that says if witnesses

5  are asked to be excluded for the very reason that you

6  don't want them learning things for the first time,

7  they can be excluded.

8           I'm not aware of how much discretion I

9  have, but I think I have a whole lot of it.  I think

10 it's pretty straightforward.

11          MR. AGAY:  Okay.

12          THE COURT:  So those two witnesses

13 will be excluded.

14          MR. AGAY:  Looks like they've excluded

15 themselves.

16          THE COURT:  I don't think they were

17 terribly upset about it.

18          MR. CLAR:  I think that's Mr. Lane.

19          THE COURT:  Yes.  There is a

20 conference room out there that says Judge Baer's

21 conference room.  You're welcome to use it, make all

22 the phone calls and do all the work you'd like to do.

23          And then anything else?

24          MR. CLAR:  I can't think of anything.

25          THE COURT:  Oh, I do have one thing.

1 I have to break at noon for an ABI call.  I think

2 Mr. Shaw is also involved in that same matter.

3                    So we will go from now until noon.

4 We'll take a break for lunch and so we can do our

5 call, and then after that.

6                    MR. CLAR:  How late can Your Honor go?

7                    THE COURT:  As long as we can all

8 stand it.  As long as my court reporter's with me.

9 Do you have a time problem?

10                    THE COURT REPORTER:  I'm good.

11                    THE COURT:  No, she's good.  Now, my

12 son's cat is waiting for me.  I'm babysitting for

13 five weeks, so...

14                    MR. AGAY:  I guess the last thing I

15 would ask, Your Honor, is if our witnesses are going

16 to be excluded, could his witnesses be excluded

17 during our witnesses' direct?

18                    THE COURT:  Yes.

19                    MR. CLAR:  Well, I only have one, and

20 he's a representative of the debtor.

21                    THE COURT:  And he's entitled --

22 they're entitled to have one representative here, so

23 I think that probably is it.

24                    MR. AGAY:  Fine.  Thank you.

25                    THE COURT:  All right.

1              MR. AGAY:  Very quick opening

2    statement, Your Honor, if I may proceed.

3              THE COURT:  Yes.

4              MR. AGAY:  Your Honor's obviously read

5    our papers.

6              Our position is very simple.  Up until

7    last night, nobody had objected to our claims.

8    They've now objected to our claims.

9              THE COURT:  And I have not read the

10   adversary.  I suspect I know what it says, but --

11             MR. AGAY:  Well, it actually says

12   things that are a lot different than what was in the

13   committee's objection.  In fact, it presents far

14   fewer arguments, so we'll be dealing with what

15   separately.

16             And I would venture to say they filed

17   a claim because they felt they had to at that point,

18   to take a position.  Whether or not it's actually a

19   bona fide objection to our claim remains to be seen.

20             I think the testimony Your Honor will

21   hear is that they don't have a viable business plan.

22   They don't have a viable Chapter 11 plan or scheme

23   for paying creditors in this case, and, hence, they

24   don't have a path to exit from Chapter 11.

25             And in sum, what is occurring today

1  and -- what has occurred up until now and what's

2  occurring today is a bridge to nowhere in these

3  cases.

4              I would also say, Your Honor, that by

5  the time we get done, I believe Your Honor will see

6  that what has been represented to the Court and other

7  creditors to date in these cases is not actually the

8  state of affairs at the debtors or with these cases.

9              And I think the testimony is going to

10  speak for itself in that regard.

11              THE COURT:  Thank you.

12              Mr. Clar.

13              MR. CLAR:  My opening statement's a

14  little bit longer than that.  And now that I've heard

15  Mr. Agay's opening statement, I think I'm correct in

16  going a little longer.

17              The first thing is that we're a little

18  more than two months into this case.  I'll try to be

19  brief, Your Honor, but when you sift through all the

20  pages of the exhibits, all the documents filed, all

21  the testimony you're about to hear, there's just a

22  few simple principles, core principles that stand

23  out.

24              First, this is a motion to dismiss or,

25  in the alternative, a motion for relief from stay.

1            For a motion to dismiss to be granted

2   there has to be cause.  Nowhere in the pleadings have

3   they proven cause.  The only cause seems to be,

4   "Well, we don't like their business plan.  We don't

5   think that their plan is feasible."

6            I want to also remind everyone -- I

7   don't have to remind the Court -- that this is not a

8   confirmation hearing.  This is a hearing with respect

9   to a motion for relief from stay or dismissal.

10            Best interests of the creditor, that's

11   another standard that has to be looked at.

12            The only creditor who supports

13   dismissal is WESCO, whether they're secured or

14   unsecured.

15            And they are doing it because it's

16   simply a rush to judgment on their part to serve

17   their own best interests, to the detriment of all

18   other creditors, and based on liens that are being

19   challenged.  And like Mr. Agay, I make no comment as

20   to whether or not that would be successful.

21            Cause simply does not exist here.  And

22   if we talk about best interest of the creditors, BMG,

23   Mr. Shaw's client, does not support dismissal.  The

24   creditor's committee, represented by Ms. Janczak,

25   does not support dismissal.  The landlord, our

1    largest landlord, Mr. Fisher's client, Hoffland, does

2    not support dismissal.

3              So no other creditor has come forward

4    to support dismissal.  The only creditor that

5    supports dismissal is WESCO for their own selfish

6    reasons, and I get it.

7              Are there problems in this case that

8    the Court's identified?  Of course there are.  But if

9    there weren't problems, we wouldn't be here; I

10   wouldn't have a case.  All Chapter 11 debtors have

11   problems.

12             The motion for relief from stay.

13             They have -- "they" being WESCO --

14   have to prove, one, that there is no equity in the

15   property.  Nowhere in their pleadings have they

16   alleged or could they allege that there's no equity,

17   and I've made this point several times at two or

18   three different hearings now.

19             The assets are cash, the receivables,

20   machinery and equipment.  Their expert cannot testify

21   as to valuation of the machinery and equipment for

22   several reasons.  One, he's not qualified, and he

23   said he's not qualified to do that.

24             Two, even if he was qualified, he

25   never went out to Virginia to inspect it.  He has no

1  idea what it's worth.

2              So we've got cash, receivables, and

3  the machinery and equipment, which when you add them

4  up add up to more than the amount of their claim,

5  more than the amount of WESCO's claim.

6              One other point.  WESCO's proof of

7  claim in this case admits that they're fully secured;

8  not only that, but the Court's already found, for a

9  lot of reasons, that they're adequately protected;

10 they're getting adequate protection payments.

11             Their proof of claim says that -- and

12 it's inconsistent, because -- and it's signed by

13 Mr. Agay, but the inconsistency is that the value of

14 the collateral is shown at about $840-something

15 thousand dollars.  But the box where you check, where

16 you say if you're secured, or if there's an unsecured

17 portion, they checked "no."  No unsecured portion.

18             So they seem to admit that they're

19 fully secured.  That's the first thing.

20             We could address the value of the

21 collateral.  I mean, it stays relatively the same,

22 the cash at about $900- to a million dollars; the

23 receivables, contract rights; about a million

24 dollars, steadily.

25             There was a power outage recently that

1  you'll hear about that affected revenue but also

2  brought Mr. Torf's client's debt down to, the next

3  payment to Dominion from 660- to 630-.

4              As of today, according to the budget

5  that we submitted and had approved in connection with

6  cash collateral usage, we have approximately

7  $560,000.  We were supposed to have four ninety-four

8  nine ninety-eight.  When you factor in the expenses

9  that have to be paid, we'll have about four

10 ninety-four five, which is within $400 of where we

11 said we would be.

12             Cash is increasing.  The accounts

13 receivable are consistent.  The machinery and

14 equipment, the depreciation argument is a complete

15 red herring.  All machinery and equipment

16 depreciates, but it's the value, the liquidation

17 value that matters.  Their claims -- their claim is

18 simply not increasing.  Their collateral is not

19 deteriorating.

20             I've said this before, but I think it

21 bears repeating:  This is not a confirmation hearing.

22 They have to prove that the property is not necessary

23 for an effective reorganization.

24             That doesn't mean that -- what it does

25 mean is that there's no plan that could be confirmed.

1   Debtors were tasked with providing a business plan.

2   We did that.  The business plan has to be fleshed out

3   and needs to be filed in August.

4                The basis for the plan and what's in

5   the business plan would be significantly reduced

6   expenses, which we are doing; possibly the launch of

7   the Spot exchange.  And the point needs to be made,

8   and it will be made that a plan could be confirmed

9   without launching Spot.

10                And if it is so speculative that Spot

11   could never launch, that's fine.  There's about

12   $72,000 of additional expenses per month that could

13   be cut without -- if we decided not to launch the

14   Spot exchange.

15                Expiring contracts:  You'll hear

16   Mr. Agay pound and pound about expiring contracts.

17   There are negotiations underway to ensure that each

18   of our current customers remain.

19                In fact, one of the customers, there's

20   a negotiation where there would be an arrangement

21   that would increase revenue.

22                No other customers notified the debtor

23   of its intent to terminate at the end of its

24   contract.  In fact, the one that Mr. Grede has

25   testified that will terminate is not.

1           You will hear about significant

2    expenditures that the -- that WESCO thinks and

3    Mr. Grede thinks need to be made without any basis

4    whatsoever in fact or law.

5               There's capital expenditures which

6    have to do with just capital expenditures for

7    improvements or repair.

8               There's absolutely no factual basis,

9    no quantifiable basis for the capital expenditures of

10   $3 million that Mr. Grede's going to testify to.

11              You'll hear about Nasdaq and how much

12   has to be -- the $800,000 payment to Nasdaq.  That's

13   an executory contract.  And I think those of us in

14   the room who practice bankruptcy know what we can do

15   with executory contracts.  It will have to provide

16   for prompt cure if we assume it.  If we reject it,

17   it's just an unsecured claim.  If we don't launch the

18   Spot exchange, we don't need it.

19              You'll hear about fire suppression

20   equipment, very important for the -- I don't know,

21   14,000 miners, I believe.  Very important.

22              Yes, and there are expenditures that

23   have to be made, and there are members of the debtor

24   who are willing, and Mr. Flake will testify, willing

25   to put in the money to pay for the fire suppression

1   system.

2                 We're not treating certain creditors

3   differently under a plan because there is no plan

4   yet.

5                 And, again, I just want to make the

6   point, we have to be careful not to mistake the

7   ability to propose a plan for issues that are more

8   appropriate at confirmation of a plan.

9                 The final thing I'll say is that

10  Bitcoin prices continue to increase, and this morning

11  they're 9500.

12                Thank you.

13                THE COURT:  Okay, Mr. Agay, call your

14  first witness.

15                MR. AGAY:  I would call Mr. Flake to

16  the stand.

17                THE COURT:  Mr. Flake.  You've been

18  here before.

19  (Witness sworn.)

20                THE CLERK:  State your name and spell

21  it for the record.

22                THE WITNESS:  Thomas Flake.

23  T-h-o-m-a-s, F-l-a-k-e.

24                THE COURT:  Thank you, Mr. Flake.

25                THOMAS FLAKE, WITNESS, SWORN

23

```
 1                  DIRECT EXAMINATION

 2  BY MR. AGAY:

 3       Q    Good morning, Mr. Flake.

 4             Could you please state your name for

 5  the record -- oh, you already did.

 6             Mr. Flake, did I take your deposition

 7  on June 3rd, 2019, in my office?

 8       A    You did.

 9       Q    And you were truthful during that

10  deposition?

11       A    I was.

12       Q    I want to cover some background for the

13  Court's benefit.

14             Are you aware of the identity of the

15  debtors in these Chapter 11 cases?

16       A    Did you say the "identity" of the debtors?

17             Yes.

18       Q    Okay.  What are the names of those debtors?

19       A    Bcause LLC and Bcause Mining, LLC.

20       Q    Am I correct that Bcause LLC is the holding

21  company and Bcause Mining is its direct subsidiary?

22       A    Yes.

23       Q    What is your current position with Bcause

24  Holding and Bcause Mining?

25       A    I'm the treasurer of the board of managers,
```

1    the chief marketing officer, and I'm the acting CEO.

2         Q    Of both companies?

3         A    Yes.

4         Q    So you hold each of those positions with

5    both companies?

6         A    Yes.

7         Q    Does Bcause LLC have any other subsidiaries

8    besides Bcause Mining?

9         A    It does.

10        Q    Did any of these other subsidiaries file

11   for bankruptcy?

12        A    They did not.

13        Q    I'd like to talk about the business

14   function of each subsidiary, if I may.  What's the

15   business function of Bcause Mining?

16        A    Bcause Mining operates data centers and

17   computers that are considered mining -- miners for

18   the purposes of generating cryptocurrency and profit

19   through the generation of cryptocurrency.

20        Q    Does Bcause Mining do mining for its own

21   benefit?

22        A    Not currently.

23        Q    What's the business function of Bcause

24   Spot?

25        A    The intention of that company is to operate

1  Spot exchange, which would be very akin to when you

2  travel abroad, you convert your dollars into euros.

3            But in this case, it would be online

4  and for the conversion of fiat currency and

5  cryptocurrency and back to fiat, or for the

6  conversion of crypto to crypto.

7       Q    And Bcause Spot is not currently operating;

8  is that correct?

9       A    It is not currently open for business to

10  the public.

11      Q    Okay.  In what capacity is Bcause Spot

12  currently operating in?

13      A    We have an operating agreement.  We have a

14  certificate with the State of Virginia.

15            So it has a legal presence, maybe, I

16  guess, is the answer to your question.

17      Q    Does it currently have any expenses?

18      A    No.

19      Q    And it has no revenue stream; is that

20  correct?

21      A    Correct.

22      Q    What is the business function of Bcause

23  Clear?

24      A    Both Bcause Clear and Bcause Derivatives

25  are tightly related.  One is intended to be the

1  clearing house for the purposes of clearing

2  derivatives trades.

3           And Bcause Derivatives is intended to

4  be what's known as a DCM, a derivatives clearing

5  market.

6      Q    Is Bcause Clear currently operating?

7      A    It is not.

8      Q    What is the business function of Bcause

9  Secure?

10     A    It's more tightly related to Bcause Spot in

11 the fact that in order to move money between and

12 amongst the states, you need a money transmitter

13 license for some of those states.

14          And when customers put their funds on

15 deposit for the purposes of trading, those funds need

16 to be held someplace, and Bcause Secure is the entity

17 that was created to do those functions.

18     Q    Is Bcause Secure currently operating?

19     A    It is not.

20     Q    In order for Bcause Spot to commence

21 operations, will Bcause Clear and Bcause Secure have

22 to commence operations?

23     A    Could you repeat the question?

24     Q    In order for Bcause Spot to commence

25 operations, will Bcause Clear and Bcause Secure also

1    have to commence operations?

2         A    Bcause Secure would; Bcause Clear would

3    not.

4         Q    Are you going to have to raise any money to

5    commence operations at Bcause Secure?

6         A    We are not.

7         Q    So you will not have to raise any money?

8         A    No.

9         Q    What is the business function of Bcause

10   Derivatives?

11        A    It's intended to be a designated contracts

12   market for the purposes of trading derivatives that

13   are largely based on the value of various

14   cryptocurrencies.

15        Q    Is Bcause Derivatives currently operating?

16        A    It is not.

17        Q    What's the business function of Bcause

18   Trust?

19        A    Bcause Trust was intended to be a trust

20   company authorized in the State of Virginia to

21   essentially have the functions of Bcause Secure that

22   I've just described to you.

23             We found there was some regulatory

24   issues with Bcause Trust in operating a trust in the

25   state of Virginia.

1              In fact, they -- the regulators there

2    suggested to us that we seek trust status in the

3    state of New York, so that effort was largely

4    abandoned.

5        Q    Do any subsidiaries other than Bcause

6    Mining have business operations currently?

7        A    If I understand your question correctly,

8    yes, Bcause Holding and Bcause Mining.

9        Q    So the only Bcause entities with operations

10   currently are Bcause Holdings and Bcause Mining?

11       A    Yes.

12       Q    What's the business function of Bcause LLC?

13       A    To act as a holding company for the

14   subsidiaries we discussed.

15       Q    Is it also a cost center --

16       A    It is.

17       Q    -- effectively?

18       A    Yeah.  It houses all of the expenses that

19   are appropriately shared between those entities

20   rather than for each dedicated entity.

21       Q    Is it also a holder of a bank account at

22   Lakeside Bank?

23       A    It is.

24       Q    And where does the cash that is currently

25   residing at Lakeside Bank come from?

1    A    Receipts from customers, the mining

2  operation.

3    Q    Okay.  So Bcause Holding does not have any

4  of its own receipts?

5    A    It does not.

6    Q    And those receipts flow directly from

7  Mining into the bank account?

8    A    They flow directly to the holding company

9  without going through any bank account associated

10  with the mining company.

11    Q    What do you mean they flow to the holding

12  company?

13    A    When our customers make payment, we don't

14  first put the receipts in a bank account owned by

15  Mining and then make a transfer.  They go directly to

16  a bank account owned by Holding.

17    Q    On your balance sheet are there any

18  intercompany balances currently which reflect the

19  movement of that cash to Bcause Holdings and Lakeside

20  Bank account?

21    A    There are none.

22    Q    Mr. Flake, were there one or more events

23  that precipitated the bankruptcy filings of Bcause

24  LLC and Bcause Mining?

25    A    There was.

1      Q      What were those events?

2      A      WESCO sought and received a garnishment on

3   our bank account.  That garnishment precluded us from

4   making payroll payments and from making payment to

5   our largest vendor, which is Dominion Power.

6             Because we were unable, particularly

7   in the timing of things, unable to make a payment to

8   Dominion Power and were under a cutoff notice because

9   of that, we sought bankruptcy protection to work our

10  way through this process.

11     Q      Any other events?

12     A      Not proximal events, no.

13     Q      But for WESCO's action to garnish the bank

14  account, would the debtors have filed Chapter 11

15  petitions?

16     A      No.

17     Q      Why didn't any of the other subsidiaries

18  file for bankruptcy?

19     A      They don't have any operations or

20  liabilities.  There was no sense in that.

21     Q      I'd like to go into a little bit about your

22  history, your personal history, along with the

23  history of the debtors.

24             I believe you said you are the founder

25  of Bcause at some point in these cases; is that

1    correct?

2         A    I am.

3         Q    What do you mean by that?

4         A    I had the original idea for the business.

5    I organized the original participants, and we

6    organized, jointly, the original investment.

7         Q    Were there any other founders?

8         A    So the first group of, roughly, five people

9    that I called together would probably consider

10   themselves to be founders as well.

11        Q    Did you invest any money in debtors at that

12   time?

13        A    I did.

14        Q    How much?

15        A    I think initially, we all invested about

16   $200 to buy a first mining computer.

17             Subsequently, we invested a subsequent

18   round to buy another mining computer.  And then,

19   subsequently, we bought a rack of about 12 mining

20   computers.

21             At each stage, all of us invested -- I

22   think all told, I probably have about $15,000 of cash

23   and about $5,000 of in-kind contributions from

24   another company.

25             So about 20,000 total.

32

1    Q     In personal investment?

2    A     Yes.

3    Q     And over the life of the Bcause entities,

4  how much in the aggregate has been invested from all

5  investors?

6    A     From investors, I think we're approaching

7  $7 million.

8    Q     What did you do before the founding of

9  Bcause?

10    A     I ran an incubator, which is an

11  organization that helps other people start

12  businesses.

13         It was called Peninsula Technology

14  Incubator.  It was run by the National Institute of

15  Aerospace on a contract with the City of Hampton.

16    Q     Why did you stop working there?

17    A     Bcause somebody came into my office and

18  asked me if I knew anything about Bitcoin, and I did

19  some research on it, and I became convinced that

20  cryptocurrency, not necessarily Bitcoin, was going to

21  be a significant addition to the economy in much the

22  same way the internet was a significant addition to

23  the economy.

24    Q     So you quit your job there?

25    A     I did.

1      Q     Does that entity still exist, that

2  incubator?

3      A     It does.

4      Q     What did you do before that?

5      A     I worked as a contractor for Jacobs

6  Engineering on a contract, first at Langley -- NASA

7  Langly Research Center and later at Johnson Space

8  Center.

9      Q     And to the extent you can disclose it, what

10  were your duties in connection with that?

11     A     I ran IT projects and IT security, both at

12  Nasa Langley and later at Johnson Space Center.

13     Q     What did you do before that?

14     A     I had a company called Synergy Consultants.

15     Q     Okay.  And --

16     A     It was a consulting business where we

17  provided a number of services to folks.

18     Q     And what happened that business?

19     A     It's sort of on hiatus today.  I mean, the

20  Synergy Consultants, the consulting piece of which

21  was for the creation of CDs for internet service

22  providers and for the operation of a call center,

23  that portion was merged into a company that became

24  known as Picus.

25     Q     And what happened to Picus?

1    A    It operated for about three years, and then

2  it entered bankruptcy.

3    Q    Was that Chapter 11 or Chapter 7

4  bankruptcy?

5    A    I don't recall, but I think it was a

6  Chapter 11, that it became a liquidating 11.

7    Q    What was your position with Picus when it

8  filed for bankruptcy?

9    A    I was the chief operating officer.

10   Q    And did you continue to hold that position

11  during the bankruptcy case?

12   A    I did not.

13   Q    What happened to your position during the

14  bankruptcy case?

15   A    All positions except the controller and the

16  CFO were eliminated in preference to maximize cash

17  flow to the debtor -- or the creditors.

18   Q    Have you ever filed for personal

19  bankruptcy?

20   A    I have.

21   Q    When was that?

22   A    A long time ago.  25 years ago, maybe.

23   Q    So before the Picus case?

24   A    Yes.

25   Q    Did the bankruptcy court decline to

35

1    discharge any of your debts in that personal

2    bankruptcy case?

3         A    I don't recall.

4         Q    Have you ever been accused of any type of

5    fraud?

6         A    No.

7         Q    Going back to the founding of Bcause.

8              What was the price of Bitcoin when you

9    started Bcause?

10        A    I can get you in the right ballpark.

11             It was about $200.

12        Q    Did it go up subsequently?

13        A    Considerably.

14        Q    What did it go up to?

15        A    At its highest point, it was about $19,000.

16        Q    So when you say the price of Bitcoin was

17   $200 when you started Bcause, what -- approximately

18   what date was that?

19        A    About seven years ago.

20        Q    So 2012?

21        A    Yes.

22        Q    Okay.  And from that point forward, did the

23   price of Bitcoin steadily increase?

24        A    From end to end it went up, but in the

25   middle there were peaks and valleys.

1          So, for instance, it went up to about

2   3,000 at one point and then pulled back to about a

3   thousand.

4       Q    So at what point did it reach 19,000?

5       A    December of '17.

6       Q    Okay.  So between 2012 and December '17,

7   there were some, I'll call them, speed bumps.

8               But generally speaking, the price of

9   Bitcoin was going up?

10      A    Yes.

11      Q    And what happened to the price of Bitcoin

12  after 2017?

13      A    We have an exhibit, I think, that talks

14  about the price of Bitcoin.

15              And I don't remember off the top of my

16  head, if you're asking me for exact dates.

17      Q    I'm not.  Just generally speaking.

18      A    So generally, it pulled back to about 3200.

19  And subsequent to that, it's now recovered to about

20  9800 as of this morning.

21      Q    So from that point in time in 2012, when

22  you founded Bcause, up until today, has Bcause ever

23  had positive net income or positive EBIDTA on an

24  annual basis?

25      A    On an annual basis, no.

1      Q      I believe you testified in your deposition

2  that there were months where Bcause had positive net

3  income or positive EBIDTA; is that correct?

4      A      Not just months.

5                  On an aggregate basis, Bcause has been

6  positive EBIDTA-wise since August of last year.

7                  For the last ten months we've been

8  positive EBIDTA.

9      Q      For every month?

10     A      No, but in the aggregate.

11     Q      Okay.  Out of the last ten months, for how

12  many months has Bcause had positive net income or

13  positive EBIDTA?

14     A      Nine out of ten.

15     Q      Nine out of ten.

16                  And before that point in time, just

17  estimate how many months in a year would Bcause

18  generally have --

19     A      Before August of last year?

20     Q      (Nodding.)

21     A      We only started operation in February, so

22  that's not a very long period of time.

23                  But six out of six months it was

24  negative up to that point because we were building

25  the data center, and that had a significant negative

1    effect on EBIDTA.

2        Q     So your testimony is that Bcause only

3    commenced operations at the beginning of 2018?

4        A     Yes.

5        Q     Okay.  What did Bcause do between 2012 and

6    2018?

7        A     We did some amount of mining, which in

8    about the third year we stopped because mining had

9    become unprofitable.

10             We did research on starting a

11   derivatives exchange.  We did software development

12   for the launch of that exchange, and we sought

13   regulatory approval.

14             All of those things didn't require

15   operations and did require a significant amount of

16   effort, because starting an exchange is not trivial.

17       Q     How have you funded the losses at Bcause?

18       A     Primarily through raising equity with

19   investors and a loan from BMG.

20       Q     How much was the loan from BMG?

21       A     I don't remember the exact amount, but it

22   was just around $8 million, I believe.

23       Q     So BMG loaned Bcause $8 million in cash

24   that Bcause subsequently used in its operations?

25       A     Primarily for the continued construction of

1  the data center.

2              And I guess I'd amend the last answer

3  as well.  I mean, the positive EBIDTA since August of

4  last year has also funded operations.

5    Q    So you're saying that since last August,

6  for nine out of ten months, Bcause has experienced

7  positive EBIDTA?

8    A    From August to March, I don't -- because

9  the accounting under bankruptcy is difficult, I don't

10 know what our performance was like in April or May.

11             But I assume our EBIDTA would have

12 been positive and if not, then but for the

13 bankruptcy-associated expenses.

14   Q    So if Bcause was generating positive EBIDTA

15 since last August, why did Bcause have to file for

16 bankruptcy?

17   A    During the period from January to June, we

18 had difficulty in getting an accurate bill from

19 Dominion.

20             And while that was being resolved,

21 once it was finally resolved, we found that we had

22 under-accrued for the amount of power that the bill

23 would eventually be.

24             So in June, I believe, of that year,

25 we found that we were in arrears with Dominion to a

1   total of $4 million.

2                   So from the period of June until

3   January -- June of 2018 until January of 2019, we

4   were under, essentially, a constant threat of cutoff

5   from Dominion Power, and so we were working our way

6   out of that.

7                   So I'm actually happy to report that

8   as of this moment, I think we're not only mostly

9   caught up, but I think we may actually be ahead with

10  Dominion at this point, because I think our deposit

11  was used to cure that past arrearage.

12                  And if there is -- I think there might

13  be still a $366,000 piece that's outstanding.

14      Q    So the only reason -- I thought you

15  testified that the reason you filed for bankruptcy

16  was because WESCO garnished your bank account, not

17  because you fell behind on Dominion.

18      A    That's correct, because by the time we

19  caught up -- we filed, we were within half a month of

20  being current with Dominion, and we were no longer

21  under threat of being cut off.

22      Q    Okay.  So what debts were your accruing in

23  the meantime?

24      A    We accrued no additional debts.

25                  I think if you look at our balance

1   sheet over time, we paid off about a net of

2   $1.7 million in liabilities during that period.

3       Q    So where did your liabilities start and

4   where'd they end after the 1.7?

5       A    I believe they began at 17 1/2 million, and

6   as of March, they were at about 15 million.

7       Q    Is that where they currently are today?

8       A    I would assume they're actually somewhat

9   less than that, because we'd been making adequate

10  protection payments to your client, and Dominion's

11  been satisfied with regard to the application of the

12  deposit.

13          So, actually, I think they're probably

14  significantly less than that.

15      Q    What do you think they are as of today?

16      A    About 14 1/2 to 14 million.

17      Q    Okay.  So they've gone from about

18  15 million to 14 to 14 1/2 a half million; is that

19  your testimony?

20      A    I believe so.

21      Q    Are you planning on investing any money in

22  the debtors going forward?

23      A    I may.

24      Q    Okay.  How much?

25      A    I don't know.

1    Q    Have you made any written commitments to

2  invest?

3    A    I have not.

4    Q    Have you made any written commitments to

5  invest in Bcause Spot?

6    A    I have not.

7    Q    What about Bcause Mining?

8    A    I have not, if you're asking about written

9  commitments.

10   Q    I am.

11   A    Yeah.

12   Q    Have you ever --

13   A    Can I rephrase that?

14   Q    No.

15   A    Okay.  Or can I add to it?

16   Q    No.  Your counsel can ask you questions.

17   A    Okay.

18   Q    Have you ever tried to obtain a loan for or

19  on behalf of the debtors?

20   A    I think we have spoken to lending

21  organizations.  I don't think we've ever formally

22  filled out an application.

23   Q    So you've never obtained a loan for any of

24  the debtors or the debtors' subsidiaries?

25   A    We have not.

1    Q    Is it fair to say that you also --

2    A    Well, BMG actually loaned us the money, so,

3  yes, in that case, we did.

4            But if you meant like a loaning

5  organization, no.

6    Q    Actually, that brings up a good point.

7  Thanks for reminding me.

8            Is there a written agreement with BMG

9  evidencing those loans?

10   A    We thought there was, but Mr. Grede in his

11  deposition indicated that he never prepared one.

12   Q    Okay.  So I'll ask the question again.

13            Is there a written agreement

14  evidencing the loan from BMG?

15   A    I don't believe there is.

16   Q    Did you ask BMG for a copy of a written

17  agreement?

18   A    We did.

19   Q    And what did they say?

20   A    They had had a turnover of personnel as

21  well, so that person that negotiated that agreement

22  with Fred is no longer with BMG either, and they

23  weren't able to produce one either.

24   Q    So what evidence do you have as of today of

25  $8 million loaned by BMG to the company?

1      A     Well, we would have a bank statement where

2   we received the funds, and we would have our

3   performance on that loan since its inception, which

4   was approximately, I would think, October of last

5   year.

6      Q     When you say performance on the loan, what

7   do you mean?

8      A     We've credited their bill $70,000 a month

9   since that time.

10      Q     You've credited their bill $70,000 a month

11   since when?

12      A     I believe it was October of last year.

13      Q     Okay.  But you have no evidence that they

14   actually loaned you the money?

15      A     We don't currently have a written agreement

16   to that effect.

17      Q     Did the loan occur in October of last year?

18      A     I believe it did.

19      Q     And what did you spend that money on?

20      A     So, actually, the loan occurred more early,

21   because we were working on construction in March.

22   But I think we formalized the terms of that loan

23   later in the year.

24      Q     So when did the loan occur?

25      A     March, I think, of '18.

1    Q    At the time the loan occurred, was there

2  any written agreement?

3    A    No.

4    Q    But then you say you formalized it

5  thereafter.

6              What do you mean by that?

7    A    Fred and the representative from BMG and I

8  met in New York, and we discussed the terms of that

9  loan.

10   Q    Okay.  And what was the outcome of those

11  discussions?

12   A    We split the loan into two pieces.  One

13  half of the loan was amortized, I don't remember the

14  period of time, I think four years, at, I believe,

15  4 percent interest, which resulted in about a $70,000

16  a month payment.

17              The second half of the loan was

18  intended to be converted to equity.

19   Q    Okay.  So when you say the amortized part

20  of the loan, is that what you mean when you say

21  you're giving them a credit against their revenues?

22   A    Yeah, against their expenses associated

23  with mining, yes.

24   Q    Okay.  And for the second part of the loan,

25  is there any written evidence of the equity aspect of

1    that?

2        A    There's not.

3        Q    Are they recorded on your operating

4    agreement or otherwise in your books and records as

5    having an equity interest in the debtors?

6        A    They aren't.  I believe the terms of that

7    agreement is that it would convert at whatever our

8    next round was found to be, and we never closed a

9    subsequent round.

10       Q    Fast-forwarding to April 11th and 12th,

11   when you filed for bankruptcy, prior to filing for

12   bankruptcy, did you consider any other restructuring

13   options?

14       A    You have to tell me what you mean by "other

15   restructuring options."

16       Q    Any options for addressing the situation

17   with WESCO other than filing for Chapter 11.

18       A    Well, to the extent we could, we minimized

19   costs and maximized revenue.

20                   And so the results of that, I think

21   you are aware that our cost of electricity dropped

22   significantly in January.  We implemented new

23   software in December that made the miners more

24   efficient.  And in several other minor ways, we

25   improved EBIDTA performance.

1    Q    Outside of operational improvements, any

2  other restructuring options?

3    A    We were seeking investments from outside

4  parties.

5    Q    Uh-uhm.

6    A    Both, I think, in equity but also in debt.

7          But I believe Mr. Grede was handling

8  that, and I think you'll talk to him later.

9    Q    Anything else?

10    A    I don't think so.

11    Q    So what was the benefit of filing Chapter

12  11?

13    A    The primary benefit was that it would free

14  up the money that was garnished with the Lakeside

15  account and make it available to pay Dominion and our

16  employees.

17          Being unable to make either of those

18  payments would put the company out of business.

19    Q    Is it true to say that the primary benefit

20  from the bankruptcy would have been enjoining

21  garnishment?

22    A    Can you translate that for me?

23    Q    Is it -- sure.

24          Is it fair to say that the primary

25  benefit of the filing of the bankruptcy case was the

1   moratorium that was put on the garnishment?

2       A    I would say that that was the primary

3   short-term benefit.  The longer term benefit has been

4   that we've been allowed to reject certain agreements

5   that we had in place and further improve EBIDTA for

6   the benefit of creditors.

7       Q    When you say reject certain agreements,

8   what do you mean?  Which agreements?

9       A    So we had an agreement with CenturyLink,

10  which is a provider of bandwidth.  We rejected that

11  agreement.

12              We had administrative offices in

13  Virginia Beach we rejected or were about to reject,

14  I'm not sure where the paperwork stands with that

15  agreement.  We have an agreement with a landlord here

16  in Chicago that was about $10,000 a month.  We have

17  rejected that agreement.

18              So all told, we think we've saved

19  approaching $20,000 a month in additional capital.

20      Q    So are you planning -- strike that.

21              You said you were rejecting your lease

22  in Virginia Beach.  Is that a headquarters lease?

23      A    It's an administrative offices.  I would

24  classify our headquarters as being here.

25      Q    Are you looking now for alternative space?

1    A    We are.  We think that we can take that

2 expense from about $3400 a month to about $1300 a

3 month.

4    Q    Have you identified an alternative space

5 yet?

6    A    We have not.  But in the rejections, those

7 rejections are effective August 1st, and so our

8 employees know we have to be out and moved into new

9 offices by July 31st, or they can work from their

10 home until additional office space is found.

11    Q    Have you talked to any landlords?

12    A    We have.

13    Q    What's the feedback from those landlords?

14    A    In -- here in Chicago, we've identified --

15    Q    No, no, no.  Virginia Beach.

16    A    We've talked to people trying to identify

17 space.  We haven't yet identified space, so we

18 haven't entered -- if your question is have we

19 entered into lease negotiations, we haven't yet.

20    Q    Do the landlords with whom you've talked in

21 Virginia Beach know that you're currently in

22 bankruptcy?

23    A    I couldn't speak to what they know or don't

24 know, but I can tell you that the bankruptcy's been

25 widely publicized in Virginia Beach.

1      Q      Have you had any discussions with the

2   landlords in Virginia Beach?

3      A      I have not.

4      Q      Who has?

5      A      Ms. Vaassen and Ms. Chapman.

6      Q      So they have not indicated you to whether

7   the issue of the bankruptcy has come up?

8      A      They have not.

9      Q      All right.  Let's talk about the Chicago

10   lease.

11              Are you looking for alternative space

12   in Chicago?

13      A      We are.

14      Q      Do you feel that you need to have a

15   presence here in Chicago?

16      A      We do.

17      Q      Why?

18      A      Bcause if the Spot market is going to

19   launch successfully, Chicago and New York are two of

20   the biggest financial centers in the world, and

21   having a presence in those cities is vital, both to

22   be in the city as well as to find the appropriate

23   talent.

24      Q      Have you found an alternative lease in

25   Chicago yet?

51

1    A    We have.

2    Q    And have you signed a lease yet?

3    A    We have not.

4    Q    Have you entered into negotiations around a

5  written lease?

6    A    We have.  We have a written offer from the

7  landlord.

8    Q    Does that landlord know you're in

9  bankruptcy?

10    A    I don't know.

11    Q    Have you had any discussions with that

12  landlord?

13    A    I've had a discussion with an agent for the

14  landlord, but I have not directly spoken to the

15  landlord.  Mr. Pollack has been dealing with that.

16    Q    In your discussions with the agent for the

17  landlord, has the issue of your bankruptcy come up?

18    A    It has not.

19    Q    And you haven't disclosed it to them?

20    A    I have not.

21    Q    How many employees do you currently have in

22  Chicago?

23    A    Four.

24    Q    Okay.  How many employees did you have at

25  the beginning of the case?

52

1    A    11, I think.

2    Q    How many did you have at the beginning of

3  the year?

4    A    In Chicago?

5    Q    Yes.

6    A    In the beginning of 2019, I think the same

7  amount.

8    Q    Okay.

9    A    I don't think we made any new hires or

10  expanded.  There was one woman that left, so it's 11

11  plus or minus one.

12    Q    So you've lost seven employees since the

13  beginning of the case?

14    A    We laid off seven employees in an effort to

15  reduce costs.

16    Q    Okay.  And would Mr. Grede be among those

17  employees that you laid off?

18    A    He would be.

19    Q    What about your CFO, George Sladoje?  Did

20  you lay him off?

21    A    We did not.  He left of his own volition.

22    Q    Okay.  And you're not counting him among

23  the 11?

24    A    I'm not.

25    Q    What about Ann Cresce, your general

1  counsel?  Did she get laid off or did she voluntarily

2  leave?

3      A    She did not.  She left of her own volition.

4      Q    Are you counting her among the 11

5  employees?

6      A    I am.

7      Q    Okay.

8      A    The reason why the distinction between Mr.

9  Mr. Sladoje and Ms. Cresce is I believe Mr. Sladoje

10  was not an employee but a consultant.

11      Q    But you didn't terminate -- we've already

12  established that you didn't terminate seven

13  employees, because Ms. Cresce left of her own

14  volition, right?

15      A    That's correct, yeah.

16      Q    All right.  So I'll ask again:  How many

17  employees did you terminate versus how many quit

18  voluntarily?

19      A    Ms. Hyalmi (phonetic) was terminated,

20  Mr. Childress, Mr. Fallon, Mr. Boyk, Fred.

21          I think there's one other person, so I

22  think it may have been six.

23      Q    And your testimony is they did not leave

24  voluntarily?

25      A    They did not leave voluntarily.

1    Q    Do you feel that you can get Spot up and

2  running with the four employees currently in the

3  office?

4    A    I do.

5    Q    So you don't need to add any further

6  employees to get Spot up and running?

7    A    I don't believe so.

8    Q    Do you have to add any further employees to

9  get Spot up and running and profitable?

10   A    Yes.

11   Q    How many employees?

12   A    I'd have to look at our model, and the

13  timing of the answer to that question -- or the

14  answer to that question would depend on the time.

15             Because within that business plan,

16  there is an employee hiring sort of triggering, or

17  schedule, and I don't know when your question sort

18  of -- if you're talking about maybe January or

19  February of next year, when we anticipate that it

20  would break into -- beyond break even into

21  profitability, I believe it's 14 or 15.

22   Q    Are you currently soliciting for job

23  openings in Chicago?

24   A    We are not soliciting publicly, but we are

25  networking.

1    Q    Okay.  Have you had any interviews?

2    A    Yes.

3    Q    Okay.  And have you made any job offers?

4    A    We hired one woman to replace somebody who

5    had left.  Kristen was replaced with a woman, Eve, I

6    believe her name is.

7             And so that one hire was made on a

8    replacement basis.

9    Q    When did that occur?

10    A    About ten days ago.

11    Q    So in other words, you lost eight

12    employees, then you added back one.  It's not that

13    you lost seven employees, correct?

14    A    Well, if we're going to be precise about

15    the language, I would say that we laid off five

16    employees and lost two -- lost three maybe and then

17    rehired one.

18    Q    Okay.  So I believe you said you're the

19    acting CEO currently, right?

20    A    Yes.

21    Q    Who was the CEO when you filed the case?

22    A    Fred Grede.

23    Q    And we've already talked about that

24    Mr. Grede was terminated, right?

25    A    Yes.

1    Q    Why was he terminated?

2    A    The proximal cause of his termination was

3 the fact that he refused to lay off the people that

4 we had agreed to lay off in the court when we

5 proposed our budget.

6    Q    Okay.  Any other reasons?

7    A    That was the proximal cause.

8    Q    So your testimony is Mr. Grede was

9 terminated because he refused to lay off employees?

10    A    Yes.  Or more broadly, to take the actions

11 necessary to reduce costs consistent with the budget

12 that we had submitted and the Court had approved.

13    Q    Okay.  So it wasn't that he just refused to

14 lay off employees; there were other reasons?

15    A    Those were the primary reasons.  All the

16 other changes were made by us in Virginia as far as

17 reducing costs.

18    Q    What do you mean by that, when you say "all

19 the other changes were made"?

20    A    Well, we had already talked about this idea

21 of changing the electric rates.  We had already

22 talked about this idea of implementing new software

23 to reduce costs.

24         So those changes were made in

25 Virginia.

1    Q    Okay.  Who informed Mr. Grede that he was

2  terminated?

3    A    Mr. Adolphi, the chairman of the board.

4    Q    Going back to the four -- strike that.

5         And Mr. Grede was in Chicago?

6    A    Most of his time was spent in Florida, I

7  believe.

8    Q    Okay.  But was his office in Chicago?

9    A    It was.

10    Q    Okay.  And where was Mr. Sladoje's office?

11    A    Here in Chicago.

12    Q    Where was Ms. Cresce's office?

13    A    Here in Chicago.

14    Q    Okay.  Are you out looking for a new CEO

15  right now, or are you going to continue in those

16  duties?

17    A    Currently, I'm going to continue in those

18  duties.  The board hasn't informed me that they've

19  embarked on a search.

20    Q    Are you out looking for a new CFO?

21    A    We are.

22    Q    And have you interviewed any candidates?

23    A    I have.

24    Q    Have you made any offers?

25    A    No.

1      Q      What about a new general counsel?

2      A      We're not currently seeking a new internal

3   counsel.

4      Q      Okay.  Have any of the four remaining

5   employees in Chicago indicated to you or others at

6   the company that they're thinking about leaving?

7      A      No.

8      Q      Okay.

9             Why did George Sladoje leave?

10     A      You'd have to ask Mr. Sladoje.

11     Q      He didn't discuss it with you?

12     A      He did not.

13     Q      Did he discuss it with anybody else at the

14  company?

15     A      I couldn't tell you.

16     Q      So you would -- you never learned the

17  reason why Mr. Sladoje left?

18     A      No.  In fact, the last time I was in town,

19  I had breakfast with Mr. Sladoje, and he's

20  considering coming back to the company, depending on

21  the outcome of today's hearing.

22     Q      As part of that discussion, did you talk

23  about why he left?

24     A      I did not.

25     Q      So you never asked him during that

1  discussion, "George, why did you leave?"  But then

2  the outcome of that discussion was he's coming back

3  to the company?

4      A    I didn't say either of those two things.  I

5  never had a discussion with him about why he left.

6  It's true that I never asked him that question.

7              But he has not yet decided to come

8  back to the company, so you can't make that leap.

9      Q    Did you ever discuss the reasons for his

10  departure?

11      A    No.

12      Q    But, yet, you discussed him coming back to

13  the company?

14      A    Yes.

15      Q    And to your knowledge, George never

16  discussed it with anybody else at the company?

17      A    To my knowledge, he did not.

18      Q    And you never asked anybody in the company

19  "Why did George leave?"

20      A    I did not.

21      Q    So your CFO just left one day, and you

22  never asked anybody why; you just went on doing your

23  thing?

24      A    My assessment of why he left was he

25  testified in connection with these hearings about a

1  month ago -- about month and a half ago, and I think

2  he felt ill-used during those hearings.

3      Q    So you surmised it, but you never had any

4  fact gathering around it?

5      A    That's correct.

6      Q    Why did Ann leave?

7      A    I don't know.

8      Q    Did you ever ask?

9      A    I did not.

10     Q    You never asked Ann or anybody at the

11  company?

12     A    That's correct.  And I'm fairly certain in

13  this particular case that Ann didn't disclose that to

14  anyone.

15           In fact, we intended that she stay,

16  and she just told us one day that she was going to be

17  leaving at the end of the week.

18     Q    Did Ann and George leave before or after

19  Fred was terminated?

20     A    They left after he was terminated -- well,

21  I think George was largely out the door before Fred

22  left.  Ann definitely left after Fred left.

23     Q    And you don't think there's any connection

24  between Fred being terminated and George and Ann

25  leaving?

1          MR. CLAR:  Your Honor, I'm going to

2     have to object to the relevance of that.

3          THE COURT:  Overruled.  It's as

4     relevant as everything else.

5          THE WITNESS:  So my own suspicion is

6     that Fred encouraged Ann to leave, and I believe that

7     George left due to his frustration with the

8     situation.

9     BY MR. AGAY:

10         Q     How many directors do you currently have at

11    Bcause Holdings?

12         A     Six, I believe.

13         Q     Did you always have six directors?

14         A     No.  That number's fluctuated over time.

15         Q     How many did you used to have?

16         A     Give me a time frame.

17         Q     In the last five years.

18         A     When we formally constituted the board, I

19    believe it began with seven.

20               And then because we were seeking CFTC

21    approval and there were requirements to have external

22    board members.  If you're going to be a designated

23    contracts market or designated clearing organization,

24    you have to have a certain percentage of your board

25    represented externally.  We increased that number to

62

1    11.

2              I don't believe we ever filled the 11

3    seats, so I think the maximum number that we had was

4    ten.

5       Q    So you had ten filled seats?

6       A    I believe so.

7       Q    Of those ten filled seats, how many were

8    independent directors and how many were insiders?

9       A    I believe three were independent directors,

10   and we were seeking a fourth because the requirement

11   is, I think, for, like, 40 percent of external

12   directors.

13      Q    Okay.

14      A    Does that answer your question?

15      Q    It does.

16      A    Okay.

17      Q    Did those three independent directors

18   subsequently leave?

19      A    They did.

20      Q    Voluntarily or were they --

21      A    No, they resigned.

22      Q    Why did they resign?

23      A    The stated reason was that the company

24   hadn't secured directors and officers insurance that

25   they thought was prudent if they were going to serve

63

1   on the board.

2        Q    So, currently, you don't have any

3   independent directors; is that correct?

4        A    We do not.

5        Q    Are you a director?

6        A    I am.

7        Q    What is your percentage ownership of the

8   company?

9        A    Approximately 2 percent.

10       Q    Are all the directors equity holders?

11       A    They are.

12       Q    Where is the Bcause Mining operation

13  currently located?

14       A    5465 Greenwich Road, Virginia Beach,

15  Virginia.

16       Q    How many employees do you currently have in

17  Virginia Beach?

18       A    Approximately 14.

19       Q    How many did you have at the beginning of

20  the case?

21       A    Approximately 14.

22       Q    Okay.  How many did you have at the

23  beginning of the year?

24       A    Approximately 14.

25       Q    Okay.  So you haven't terminated any

1  employees in Virginia Beach and none have left?

2      A    We have not terminated any employees.  One

3  or two have left; they've been replaced.

4                  MR. AGAY:  Your Honor, I'm handing the

5  witness what's been marked as WESCO Exhibit 1.

6                  THE COURT:  Okay.

7  BY MR. AGAY:

8      Q    Mr. Flake, do you recognize this document?

9      A    I believe it's an outline of a business

10  plan that was submitted.

11      Q    Okay.  Is this the company's current

12  business plan?

13      A    I believe it is.

14      Q    Did you prepare it?

15      A    I was the primary organizer of it, yes, but

16  I had input from other people.

17      Q    Who else?

18      A    Christie Vaassen, Bruce Pollack, and

19  initially the person who put together the formats for

20  this, and a great number of the numbers was from

21  George Slodoje.

22      Q    But you're generally versed in everything

23  that's in this business plan?

24      A    I am very well versed.

25      Q    And you signed off on it?

1        A    I did.

2        Q    When did you prepare it?

3        A    This most recent version was prepared

4    approximately ten days ago.

5        Q    Okay.

6        A    Or was completed approximately ten days

7    ago.

8              But it's a derivative of previous

9    versions that preexisted our filing in early May.

10       Q    Is it the same business plan that we

11    discussed at your June 3rd deposition?

12       A    I believe it is.

13       Q    It hasn't changed at all since your

14    June 3rd deposition?

15       A    No, sir.

16       Q    You're sure?

17       A    To my knowledge.

18       Q    Okay.

19              MR. AGAY:  I'm handing the witness

20    what's been marked as WESCO Exhibit 2, Your Honor.

21              THE COURT:  Okay.

22              MR. AGAY:  If you would please review

23    that, Mr. Flake.

24              (Pause.)

25    BY MR. AGAY:

1      Q      Do you recognize that?

2      A      Give me a moment.

3             So the second one you handed me

4      appears to be a predecessor of the first one you

5      handed me.

6      Q      Uhm-hmm.

7             Do you recall if this was the business

8      plan we covered at your June 3rd deposition?

9      A      I don't remember which one was in effect at

10     that time.

11     Q      Could it be?

12     A      It could be.  The major change had to do

13     with some reduction in revenue due to damage and

14     associated reduction in cost due to the reduction in

15     operations.

16     Q      So it's possible that Exhibit 1 is an

17     updated version of Exhibit 2, correct?

18     A      It is, in fact, an updated version.

19     Q      It is an updated version?

20     A      Yes, that's correct.

21     Q      And do you believe this is the version that

22     you updated subsequent to your deposition?

23     A      This is the one that's in effect.  I don't

24     remember the exact timing of it.

25     Q      Okay.

1        A    And when I said "this," I was indicating

2    Exhibit 1.

3        Q    Okay.  Why did you -- and let's stick with

4    Exhibit 1.

5        A    All right.

6        Q    Why did you update and amend your business

7    plan after your June 3rd deposition?

8        A    Several weeks ago, there was a significant

9    storm and a series of electrical transients that

10   caused damage to some of the mining equipment.

11              We recognized that we were going to

12   realize less revenue, and in an attempt to be

13   transparent with the Court and all the creditors, we

14   updated the business plan to reflect what we believe

15   is the current state of affairs.

16       Q    Any other changes besides revenues?

17       A    I believe that we did find some additional

18   expenses that we think we can eliminate.

19       Q    Okay.  Did you prepare these business plans

20   before or after we filed our motion to dismiss on

21   April 26th?

22       A    So that's an interesting question.

23              So Mr. Sladoje and Ms. Vaassen were

24   primarily responsible for producing the financial

25   models that you see in slides seven and eight.

1     Q     I'm sorry?  Who?

2     A     Mr. Sladoje and Ms. Vaassen at that time.

3   I was -- I became engaged in this process, I think

4   subsequent to that, though I had some input into

5   that.

6                   And we and I put together what is

7   largely the rest of this outline.

8     Q     Did your counsel review this business plan

9   prior to that?

10     A     My counsel, Ann Cresce, yes; my counsel,

11   Mr. Clar, yes.

12     Q     Did you get feedback from either Ms. Cresce

13   or Mr. Clar on this business plan?

14     A     I don't remember receiving any feedback

15   from Ms. Cresce, and I don't recall any input from

16   Mr. Clar other than his review of it.

17     Q     Have you gotten any input or feedback from

18   the creditors committee or its counsel regarding your

19   business plan?

20     A     I think I had a conversation with creditors

21   committee counsel wherein she indicated that a

22   33 percent recovery would be considered good by most

23   standards.

24     Q     Okay.  Did she say anything else?

25     A     I don't remember anything specific.

1     Q    So all you talked about with creditors

2  committee counsel was their view that a 33 percent

3  recovery would be viewed as good here?

4     A    That's the only thing that I recall.

5     Q    Okay.  When did that conversation occur?

6     A    Yesterday, I think.

7     Q    Was it as part of a telephonic conference

8  call, or was it a live --

9     A    I believe it was telephonic.

10     Q    Who was on that call?

11     A    Mr. Clar and I were on our end, and at

12  least creditors committee counsel was on the other

13  end.

14     Q    What was the purpose of that discussion?

15     A    I don't remember that there was a stated

16  purpose, other than Mr. Clar told me that we had to

17  have a discussion with Liz.

18     Q    So what was discussed other than 33 percent

19  would be a good recovery?

20     A    I believe the discussion centered around

21  the motion that we were about to bring contesting

22  your position in security.

23           And I believe the discussion also had

24  some reference to BMG.

25     Q    Okay.  What was the reference to BMG?

1       A     I'm not sure if that's privileged or not.

2       Q     It's not for you to decide.

3             What was the decision about BMG?

4       A     Whether or not the ongoing payment of

5  $70,000 was sustainable, and I think we concluded

6  that it wasn't.

7             And I think the discussion was to be

8  had with Brian Shaw about the fact that it wasn't.

9       Q     Okay.  Why would the ongoing payment of

10 $70,000 not be sustainable?

11      A     I think there's a basis in law to not allow

12 it, but I couldn't tell you the exact sort of

13 nuance --

14      Q     Who instigated that discussion?

15      A     I believe Liz did, creditors committee

16 counsel.

17      Q     Okay.  And has that discussion been with

18 BMG yet or Mr. Shaw?

19      A     I believe it's ongoing.  I believe we began

20 a conversation.  I don't think a conclusion was

21 reached.

22      Q     Who had that conversation?

23      A     Well, I can only attest to my part of it,

24 and I can tell that you Mr. Clar and I and Mr. Shaw

25 had a brief phone conversation.

1      Q    When?

2      A    I believe it was also yesterday.

3      Q    And what was that conversation?

4                MR. SHAW:  Your Honor, I'm going to

5      speak up only because I need to.

6                Setting aside the fact that these

7      conversations did take place -- Brian Shaw.

8                At some point I feel awkward not

9      speaking up to the fact that these are hearsay

10     conversations.

11               This is hearsay testimony, and my

12     silence should not be construed as any statement that

13     the hearsay recounting of those conversations is

14     entirely accurate, and I'll just leave it at that.

15               MR. AGAY:  I didn't hear an objection.

16               THE COURT:  I didn't hear an objection

17     either.

18               MR. SHAW:  Well, I'm objecting -- in

19     fact, I'm noting that it's hearsay.  I think it's

20     somebody else's issue if they want to object to it,

21     but I do not want my silence to be construed as me

22     saying that -- and I'm not implying that there's any

23     intentional inaccuracy, I'm just not -- don't take my

24     silence to mean that I'm sitting here listening to an

25     accounting of what I said and believing it's

1   accurate.

2                    MR. AGAY:  No objection, Your Honor.

3                    THE COURT:  I still don't hear an

4   objection.

5                    MR. SHAW:  It's more of a statement

6   for the record.

7                    MR. AGAY:  I've never heard one

8   counsel lead another counsel in the courtroom before,

9   but anyway...

10                   THE COURT:  So noted.

11  BY MR. AGAY:

12      Q    So what was the discussion with Mr. Shaw

13  yesterday?

14      A    It centered around this idea that the

15  offset, the $70,000 offset couldn't continue.

16      Q    Okay.  And what exactly was said to

17  Mr. Shaw?

18      A    That we were going to not be able to make

19  those offsets moving forward and that there might be

20  some discussion around disgorgement of the

21  postpetition $70,000 payments that were made in May

22  and June.

23      Q    Okay.  And how    did Mr. Shaw react to

24  that?

25      A    I think he said he'd have to speak to his

1  clients.

2       Q     That was his only reaction?

3       A     I think he voiced some concern that that

4  was bad.

5       Q     What exactly did he say?

6       A     I can't tell you what he exactly said.

7       Q     You don't recall?

8       A     I don't.  My memory is just, you know, for

9  certain things.

10      Q     Yeah, I'm discovering that.

11            So having told BMG that you're no

12 longer going to give them $70,000 in credits a month

13 and you may have to disgorge other amounts, what's

14 your view of whether BMG will want to continue to do

15 business with the debtors?

16      A     I think we have a --

17            MR. CLAR:  Your Honor, I object.

18            That calls for speculation on his

19 part.

20            There's no testimony that that was

21 part of the discussion.

22            THE COURT:  I'll sustain the

23 objection.

24 BY MR. AGAY:

25      Q     Do you think BMG will want to continue to

1    do business with the debtors?

2       A     I do.

3            MR. CLAR:  Same objection, Your Honor.

4            THE COURT:  Sustained.

5            If you want to ask these kind of

6    questions, I think you need just a little background,

7    a little.

8            MR. AGAY:  We'll come back to that.

9    BY MR. AGAY:

10     Q    Prior to yesterday, had you had any

11    discussions with creditors committee or its counsel?

12           MR. CLAR:  I'm going to object just to

13    the extent that if he's asking if he had any

14    discussions, yes; if he's asking if he's aware of any

15    discussion that I had, that, I would object to.

16           THE COURT:  His question is clear.  He

17    said "Have you had any discussions?"

18           So I'll overrule the objection.

19           You may answer that question.

20           MR. CLAR:  Thank you, Your Honor.

21           THE WITNESS:  I don't know who all the

22    members of the committee are, but I don't believe

23    I've had any discussion with members of the creditors

24    committee, but I have had discussions with counsel.

25    BY MR. AGAY:

1      Q      Prior to yesterday?

2      A      Yes, on an ongoing basis.

3      Q      Okay.  How many discussions, do you think?

4      A      Half a dozen, maybe.

5      Q      So -- and I believe your testimony was the

6  discussion yesterday was around the filing of the

7  complaint against my client; is that correct?

8      A      Yes.

9      Q      And also the BMG issue, correct?

10     A      Yes.

11     Q      Okay.  Prior to yesterday, what did you

12  discuss with creditors committee counsel?

13     A      I can't recall with any specificity.  I

14  mean, we spoke -- for instance, I was here at the

15  last hearing, and we spoke in the hall.  I think

16  we've had some discussion relative to Dominion, but I

17  can't remember specifically.

18             So I don't recall with any specificity

19  things that we discussed.

20     Q      What did you discuss generally?

21     A      The course of the case, the -- well, I

22  guess the course of the case, generally.

23     Q      Nothing else?

24     A      Well, we talked about whitewater rafting.

25     Q      Okay.

1    A    And, frankly, we had a lot of time to

2  discuss during the deposition in your offices, both

3  the first one and the second one.  And so I don't

4  remember specifically all the things we discussed.  I

5  just do remember we discussed whitewater rafting.

6    Q    Did the creditors committee counsel offer

7  an opinion on your business plan during those

8  discussions?

9    A    I think we've agreed that this isn't the

10  business plan, this is a -- what was -- not the --

11  anyway -- the plan that needs to be submitted by

12  August 11th, but the outline.

13          So I think there was a concern that

14  it's tough, that the finances are -- they work, but

15  they're thin.

16    Q    So I'm speaking specifically as to Exhibit

17  1.

18    A    Uhm-hmm.

19    Q    Or Exhibit 2.

20    A    Uhm-hmm.

21    Q    Is your testimony that the feedback you got

22  from creditors committee counsel was that this

23  business plan is tough?

24    A    That was my takeaway from it, yes.

25    Q    Did they say anything other than that?

1       A     I'm sure they said other things than that.
2  I don't remember with specificity what it is.

3       Q     Why did they think it was tough?

4       A     Because the cash budget shows only marginal
5  increase between the May date and the September date.

6       Q     Your testimony is the cash budget shows a
7  marginal increase between the May date and the
8  September date?

9       A     Yes.

10      Q     Okay.  Any other reasons why it's tough?

11      A     I think that was primarily it.

12      Q     Okay.  Did creditors committee counsel
13 offer you an opinion on your repayment plan for
14 creditors?

15      A     Well, the repayment plan is -- includes an
16 amortized amount over time and a conversion to
17 equity.

18            And I think the summation of what was
19 spoken of was that if we could execute on that, the
20 recovery would be better than most unsecured
21 creditors realize in most other cases.

22      Q     Okay.  So what exactly did the creditors
23 committee say as it relates to that plan?

24      A     I don't remember, not with any specificity
25 anyway.

1            Like I said, the takeaway was, it's

2   tough, it works, and the recovery would be better

3   than is typical in these cases.

4        Q    Okay.

5            MR. AGAY:  Your Honor, at this point,

6   I would move to admit Exhibit 1 -- I'm sorry.  Strike

7   that.

8            I would move to admit Exhibit 1 and

9   Exhibit 2 into evidence.

10           THE COURT:  Any objection?

11           MR. CLAR:  No objection.

12           THE COURT:  Okay.  They'll be

13  admitted.

14           MR. CLAR:  Well, except to the extent

15  that I don't think there's been any -- I don't really

16  care, but there's been no foundation for Exhibit 2

17  laid.

18           THE COURT:  It's their business plan.

19           Do you have an objection?

20           MR. CLAR:  No, I don't -- well, except

21  Exhibit 2 is the previous one -- that's fine.  No

22  objection.

23           MR. AGAY:  We will stipulate that

24  Exhibit 2 is a previous version of Exhibit 1.

25           MR. CLAR:  That's fine.  As long as we

1   do that --

2                   THE COURT:  That's fine.  I believe

3   the witness was clear on that.

4                   MR. AGAY:  I'm not trying to sandbag

5   you here.

6                   THE COURT:  Okay.

7   BY MR. AGAY:

8       Q    Could you flip to slide number seven of

9   Exhibit 1, please.

10      A    Yes.

11                  THE COURT:  Are they numbered?

12                  THE WITNESS:  Not all of them are,

13  Your Honor.

14                  MR. CLAR:  Some are, Your Honor.

15                  MR. AGAY:  This one is.  It says

16  "Court-Proposed Budget, Mining."  And there's a

17  little seven on the right side of the page.

18                  THE COURT:  Well, I've got a page that

19  says "Court-Proposed Budget, Mining."  I don't see a

20  seven anywhere, but if that's what you're looking at,

21  I've got it.

22                  MR. CLAR:  Your Honor, if I might --

23                  THE COURT:  Oh, actually, it says ten.

24  All right.  Here it is.  I've now found the

25  very-hard-to-find numbers.

BY MR. AGAY:

1    Q    I want to talk about the revenue line item,
Mr. Flake.

What does this line item represent?

A    It's the aggregate of the receipts that
were received and are anticipated to be received from
clients.

Q    When you say "clients," we also refer to
those as customers?

A    Sure.

Q    How many customers do you currently have?

A    Approximately half a dozen.

Q    Approximately half a dozen.  So
approximately six?

A    Yes.

Q    Have you lost any since the beginning of
the case?

A    No.

Q    You don't have more than six customers?

A    Well, if it's seven, it may -- seven is
approximately six, but I don't remember.

I could try and reference them by
memory.  We all know BMG, St. Bitts and SBI are the
three largest.  But I believe there are three or four
others.

1    Q    Sure.  Let's go there.

2              Why do we remember so vividly the

3    three top customers, BMG, St. Bitts and SBI?

4    A    Well, BMG is a significant stakeholder in

5    having loaned us the money, SBI is a significant

6    investor in that they own 40 percent of the company,

7    and St. Bitts is also a large customer.

8    Q    Okay.  Out of -- and I'm rounding down, I

9    will concede, but I'll call it approximately a

10   million dollars a month in monthly revenues.

11             How much is attributable to these top

12   three customers, SBI, St. Bitts and BMG?

13   A    I would estimate somewhere in excess of 90

14   percent.

15   Q    Would it surprise to you learn that it's 95

16   percent?

17   A    No.

18   Q    Would it surprise to you learn that out of

19   approximately a million dollars in revenues, those

20   three customers represent approximately $950,000?

21   A    No.

22   Q    Each of these top three customers have

23   hosting agreements with Bcause, correct?

24   A    They do.

25   Q    When do each of these hosting agreements

1  expire?

2      A    The end of this year or the beginning of

3  next, except in the case of St. Bitts, which is the

4  middle of next year, I believe it is.

5      Q    You believe that St. Bitts is the middle of

6  next year?

7      A    I believe it.

8      Q    But other than St. Bitts, you believe BMG

9  and SBI expire at the end of this year and the

10  beginning of next year?

11      A    Yes.

12      Q    Have any of these customers indicated they

13  would not renew their hosting agreements?

14      A    SBI did historically.  And in reference to

15  the written agreement that we didn't have with BMG,

16  the agreement was also not only will we amortize the

17  money over four years, but that their agreement would

18  extend to four years.

19      Q    Okay.  Is that in writing?

20      A    It is not.

21      Q    So you have nothing in writing with BMG

22  indicating that their contract would extend beyond

23  this year?

24      A    That's correct.

25      Q    So did I hear you testify that SBI has

1   indicated that they would not renew their agreement?

2       A    They did in the past, yes.

3       Q    What's their current position?

4       A    Currently, we're negotiating with them to

5   turn on 600 additional miners that are owned by them.

6              And so I believe that the increase in

7   the price of Bitcoin over the last -- well, since the

8   inception of the case, from about 4,000 when we

9   started to about $9800 today, is material to their

10  decision-making.

11      Q    Anything in writing from SBI extending

12  their agreement?

13      A    The agreement is in per draft.  So the

14  agreement is not done, but, yes, I have e-mail to

15  that effect.

16      Q    When you say "the agreement," you mean you

17  have a draft agreement?

18      A    That's the whole point.  The agreement has

19  gone -- is being generated by SBI, and I would expect

20  it in the next couple days.

21      Q    So you haven't actually seen it?

22      A    I have not.

23      Q    They just said they're drafting one?

24      A    And we've agreed to what those terms would

25  be in e-mail back and forth and phone mail

1   conversations.

2        Q    So you have an e-mail from SBI saying "We

3   agree to these terms"?

4        A    Yes.

5        Q    Do you have that e-mail with you today?

6        A    I don't know if we do or not.

7             MR. CLAR:  I'd be happy to introduce

8   when I --

9             MR. AGAY:  Great.

10            MR. CLAR:  It seems as if we're not

11  going to get much further than lunch, so I can

12  circulate copies at lunch.

13            THE COURT:  Good, thank you.

14  BY MR. AGAY:

15       Q    Yesterday, when you talked to Mr. Shaw,

16  what did Mr. Shaw say about the prospect of BMG

17  renewing at the end of the year?

18       A    I don't know that that was discussed with

19  Mr. Shaw.  I have had correspondence with other

20  representatives of BMG that have indicated that they

21  would consider that, depending on the outcome of this

22  case.

23       Q    Anything in writing?

24       A    Yes, e-mails to that effect.

25       Q    Okay.  Do you have those e-mails?

85

1      A     I don't believe we do.

2      Q     Okay.

3      A     But I might be able to get them.  I've got

4  them on my laptop.

5      Q     What about St. Bitts?  What's their

6  position?

7      A     We haven't had any correspondence with them

8  or discussion with them since the beginning of the

9  case.

10     Q     And at the beginning of the case, didn't

11  St. Bitts try to terminate their contract?

12     A     They did.

13     Q     And, specifically, they invoked the

14  bankruptcy clause in the contract to try to terminate

15  it, correct?

16     A     They did.

17     Q     SBI is an equity holder in the company,

18  correct?

19     A     They are.

20     Q     What percentage of the equity do they hold?

21     A     40 percent.

22     Q     Does that concern you that the 40 percent

23  equity holder has indicated that they're not going to

24  extend beyond the end of the year?

25     A     No.

86

1              And the reason for that is because

2   when they --

3        Q    You answered.  You answered the question.

4   Your counsel can ask you.

5              So as of today, have you received any

6   written commitments for renewals of your customer

7   agreements?

8        A    Of the existing customer agreements, no.

9        Q    Have you had any new customers since the

10  beginning of the case?

11       A    Not since the beginning of the case.

12       Q    When is the last time you had a new

13  customer?

14       A    It would have been January or February of

15  this year.

16       Q    Okay.  How much in monthly revenues did

17  that represent?

18       A    Several thousand dollars.

19       Q    When you say "several," was it less than

20  10-?

21       A    Yes.

22       Q    And before that, when is the last time you

23  had a new customer?

24       A    Maybe the fourth quarter of last year.

25       Q    Okay.  And how much in revenues does that

1    represent?

2         A    Again, probably less than $10,000 a month.

3         Q    When did SBI become a customer?

4         A    22nd of November 2017 is when they signed

5    the agreement.

6         Q    When did BMG become a customer?

7         A    The same date.

8         Q    What about St. Bitts?

9         A    Early 2018.  I don't remember the exact

10   time frame.

11        Q    Have you added any customers of the

12   magnitude of SBI, St. Bitts or BMG since early 2018?

13        A    We have not.

14        Q    Currently, do you have a source of revenue

15   other than your existing hosting agreements?

16        A    No.

17        Q    If we can focus on the expenses, can you --

18        A    Still on slide seven?

19        Q    Yes, I'm sorry.  Slide seven.

20        A    Okay.

21        Q    Can you identify the line items on the

22   slide where you have realized cost savings during

23   this case?

24        A    So we mentioned that -- well, what we

25   budgeted here was $660,000 and subsequently $700,000.

1  And then subsequently, if you combine the 14th of

2  June and the 28th of June, $660,000.  The last bill

3  we received from Dominion was less than $600,000, and

4  we anticipate the next bill from Dominion being less

5  than -- about $613,000.  This is based on numbers I

6  just received from Mr. Russell this morning.

7              So I believe that our -- we are

8  significantly outperforming our cost projections for

9  electricity.

10             In addition, we had budgeted in the

11 aggregate between 3 million, 21 June, $35,000 of

12 maintenance and repairs, and we have significantly

13 outperformed that number.

14     Q    Okay so would that be reflected in the

15 budgets hereafter?

16     A    Yes.

17     Q    Okay.  So we'll get to those.

18             Anything else?  Any other expenses?

19     A    On this page, no.

20     Q    And by the way, this is the budget that's

21 currently on file with the Court, correct?

22     A    It is.

23     Q    As part of the cash collateral?

24     A    It is.

25     Q    Flip to the next slide, slide eight.  It

1    says Court-Proposed Budget, Holding.

2                    Am I correct that Holdings is not

3    generating any revenues?

4        A    Holding does not have any revenue.

5        Q    So any cash on the Holding balance sheet is

6    attributable to Mining's revenue, correct?

7        A    Yes.

8        Q    Okay.

9        A    The reason I'm hedging there a little bit

10   is any cash in the Holding balance sheet that would

11   have come from equity contribution would be on the

12   Holding balance sheet not having anything to do with

13   revenue.

14       Q    Any recurring revenues on the Holding

15   balance sheet that's not attributable to Mining

16   revenues?

17       A    No.

18       Q    Could you please identify the line items on

19   this budget where you've realized cost savings during

20   the case?

21       A    And I'm assuming your question is past

22   tense, not where we anticipate future savings; is

23   that right?

24       Q    Yes, yes.

25       A    I believe we've performed in accordance

1  with this budget.  I don't believe there were any

2  additional savings that have been realized.

3      Q    So since the beginning of the case, you

4  haven't realized any savings for Holdings?

5      A    Well, my understanding of your question was

6  had we outperformed this budget in any way.

7      Q    No.  I'm asking since the beginning of the

8  case, for which line items --

9      A    Oh, in that case, then, with regard to

10  CenturyLink, we mentioned earlier that we rejected

11  that -- or a portion of that agreement, or we

12  rejected that agreement.  WR2, we're rejecting that

13  agreement.  And where it says Greenwich Center, we're

14  rejecting that agreement.

15      Q    Okay.  But that's going forward, correct?

16      A    Well -- so, again, your question -- no.

17  CenturyLink is historic, I believe.  I think we

18  rejected that contract as of June 1st.  So as of

19  today, no, we've saved money, and you asked from

20  April 11th.

21          So I'm trying to be really specific in

22  my answers --

23      Q    Sure.

24      A    And so, no, I don't think your question is

25  right.

1      Q    Okay.  Let's ask it this way:

2                  How much in aggregate cost savings to

3  date have you realized that can be attributable to

4  Holdings?

5      A    Total number or recurring?

6      Q    Aggregate, total -- on a monthly basis?

7      A    On the recurring, I believe about $40,000.

8      Q    Is that for Holdings and Mining or just

9  Holdings?

10     A    Primarily for Holding.

11     Q    I'm sorry?

12     A    Primarily for Holding.  We've already

13 discussed the savings that were in the aggregate for

14 Mining.

15                 But, again, I misunderstood your

16 question when you asked this.  I thought you meant

17 how would we outperform the budget.

18     Q    Let's do it this way.

19                 You see that bullet up there that says

20 expenses have been reduced by 40,000 a month in

21 accordance with the budget and submitted and

22 approved?

23     A    Yes.

24     Q    Is that just for Holdings or is that

25 Holdings and Mining together?

1    A    That's just for Holding.

2    Q    How much --

3    A    And that's primarily payroll, about a

4 $35,000 a month total reduction and about $5,000 from

5 CenturyLink.

6    Q    Okay.  How much for Mining in the

7 aggregate?

8    A    Per plan or realized?

9    Q    Per realized.

10   A    We now anticipate the electricity bill will

11 be about $30,000 per month less than what is

12 projected here.

13   Q    No.  I asked what you realized today.

14   A    Over two months, that would be about

15 $60,000.

16   Q    So $30,000 a month?

17   A    I believe so, yeah.

18   Q    So your testimony is that you've realized a

19 cost savings of 70,000 a month, 40,000 plus 30,000?

20   A    Yeah, I think that's right, compared to

21 this plan, right.

22   Q    What do you mean by that, "compared to this

23 plan"?

24   A    Well, when you say we've realized savings,

25 savings compared to what?  Savings compared to some

1   baseline prior to the filing, or savings compared to

2   the plan?

3                Because savings aren't in the absolute

4   something.  They're compared to --

5        Q    Why don't you explain what you think it

6   means, because you keep talking about all the

7   expenses that you saved since the beginning of the

8   case.

9                So you tell me what you think it

10  means.

11       A    Yeah.  So when we say expenses have been

12  reduced by approximately 40,000 per month, we are

13  comparing that -- in the plan where you see payroll

14  was $86,500 and it dropped to $70,000, and you

15  realize that payroll is every two weeks, if you take

16  that $16,500 and multiply by 2-ish, there's actually

17  4.3 weeks per month, then you come up with a number

18  close to $35,000 when you include salaries -- or when

19  you include benefits.

20       Q    Per month?

21       A    Yes, sir.

22       Q    Okay.

23       A    And so my understanding of the question was

24  compared to that baseline prior to the thing.  But

25  when you -- on this question -- and this is why I

1   said I misunderstood the question.  I didn't think

2   you meant prior to the baseline.  I thought you meant

3   compared to the plan.

4        Q    Okay.  Let's stick with the budget for

5   Holdings.

6        A    Okay.

7        Q    You said 30- -- you were realizing $35,000

8   a month in payroll --

9        A    Yes.

10       Q    -- savings, correct?

11       A    Yes.

12       Q    So is it your testimony that 35,000, not

13  $40,000, per month in savings have come from payroll?

14       A    Yes.

15       Q    Where did the rest come from, the $5,000?

16       A    The CenturyLink agreement.

17       Q    So that's from payroll and CenturyLink?

18       A    Yes.

19       Q    Now, let's go back to Mining.

20            I think you testified that you've

21  realized $30,000 a month in savings for Mining.

22            Could you please identify where that

23  has come from?

24       A    So we have bills in our possession from

25  last month and the numbers I just received from

1   Mr. Russell this morning that indicate that our bill

2   moving forward will be approximately $610- to

3   $630,000 per month.

4              That is less than what we budgeted

5   here significantly on average by about $30,000 a

6   month since we budgeted 660-.

7        Q    Okay.  So you're saying on a go-forward

8   basis, you're going to pay Dominion $30,000 less per

9   month?

10       A    That appears to be what the numbers

11  reflect.

12       Q    Okay.  But that's on a go-forward basis.

13             To date, have you realized any cost

14  savings from the Mining budget?

15       A    You'll notice here that Silbar dropped from

16  twenty-eight eighty to fourteen forty.  I think there

17  was some savings there.

18             But other than that, no, I don't

19  believe so.

20       Q    Okay.  So to date -- let's go back to your

21  testimony.  You testified that the debtors in the

22  aggregate have realized $70,000 in savings, correct?

23       A    Yes.

24       Q    Isn't that number really 40,000, and the

25  extra 30- comes from Dominion on a go-forward basis?

1     A     No, sir.  We budgeted six sixty on 10 May

2     and seven hundred on 24 May, and the bill we actually

3     received was under 600,000.  So that's not reflected

4     here.

5     Q     That's not reflected here?

6     A     That's what I just said.

7     Q     Okay, well, that's what I'm asking about,

8     what's reflected here.

9     A     What's reflected here was our best estimate

10    of what the electric bill would be at that point in

11    time.

12    Q     So other than Dominion, is it your

13    testimony that you've realized cost savings to date

14    from Silbar, payroll and CenturyLink?

15    A     Yes.  And we've also outperformed the

16    maintenance and repairs budget.  We've only spent

17    about $5,000 of what was approved to be $35,000.

18    Q     So the two -- setting aside Dominion, the

19    biggest item in there is from payroll, correct?

20    A     Yes.

21    Q     Okay.  Where did those payroll savings come

22    from?

23    A     The people that were laid off.

24    Q     In Chicago?

25    A     Yes.

1          THE COURT:  Mr. Agay, you're going to

2   have to wrap up for the lunch break in a couple

3   minutes.

4          So if you find a good point --

5          MR. AGAY:  Sure.  Unfortunately, we're

6   going to have to bring him back.

7          But, yeah, I got it.  No problem.

8   BY MR. AGAY:

9      Q    So let's flip over to the Holdings budget.

10         This is the budget currently on file

11  with the Court, correct?

12     A    It is.

13     Q    So under this budget, you projected cash to

14  go from eight forty-four zero fifty at the beginning

15  of the case to the nine sixteen nine four seven on

16  August 2nd, correct?

17     A    We did.

18         THE COURT REPORTER:  Excuse me, Mr.

19  Agay.  Could you please repeat your number with the

20  nine forty-seven?

21         MR. AGAY:  I'll just repeat the

22  question.

23  BY MR. AGAY:

24     Q    Under this budget you projected the

25  beginning cash balance of $844,050 on May 3rd and

1  the ending cash balance the week of August 2nd to

2  be $916,947, correct?

3      A    We did.

4      Q    So based on these current budgets, you

5  projected cash increasing by approximately $73,000

6  between May 3rd and August 2nd, correct?

7      A    We did.

8      Q    And that's entirely attributable to the

9  $40,000 a month in cost savings, correct?

10     A    I don't believe so.  I believe we were

11  already EBIDTA positive, and there's some

12  contribution there.

13              But the net of it, given sort of

14  court-associated expenses, I don't know if it's

15  entirely attributable or not.

16     Q    Well, cash -- your revenues are not going

17  up, correct?

18     A    They are not.

19     Q    And we're going to talk about it in a

20  moment.  They're actually going down, correct?

21     A    They have.

22     Q    Okay.  So if you're realizing additional

23  cash, that has to be because there's less cash going

24  out, correct?

25     A    It does.

1      Q     Is that coming from your expenses and --

2  your savings and expenses?

3      A     You asked earlier what it was entirely

4  attributable, and I said we were already EBIDTA

5  positive.

6      Q     Not my question.

7             Cash balances, a dollar is dollar,

8  correct?

9      A     Yes.

10     Q     And if your cash balance is going up and no

11 additional dollars are coming in, it has to mean

12 fewer dollars are going out, correct?

13     A     It does.

14     Q     So those fewer dollars going out are

15 attributable to lower expenses, correct?

16     A     Mostly.

17     Q     What would be the part of it that's not

18 "mostly"?

19     A     The part that was already EBIDTA positive

20 from the beginning, having nothing to do with savings

21 efforts that have been implemented since the

22 beginning of the case.

23     Q     I'll ask the question again.

24     A     Okay.

25     Q     You are going to have -- according to this

1   budget, you are going to have approximately $73,000

2   more cash in your pocket as of August 2nd, correct?

3        A    Yes.

4        Q    And if you're not bringing in any new cash

5   in terms of revenues, doesn't that increase in cash

6   have to come from additional savings in expenses?

7        A    Sure.

8        Q    Okay.

9             MR. AGAY:  This is a good stopping

10   point.

11             THE COURT:  It is.  Okay.  We'll

12   recommence at 1:00 o'clock.

13             (Lunch recess.)

14             THE CLERK:  Resuming with the Court's

15   10:00 o'clock set matter, Bcause Mining, LLC.

16             MR. CLAR:  Scot Clar on behalf of the

17   debtor.  Mr. Flake is down the hall.

18             THE COURT:  Nobody warned me of that.

19   They told me you were ready.

20             (Brief pause.)

21             THE COURT:  Mr. Flake, if you could

22   please resume the witness stand.

23             MR. AGAY:  Are we back on the record?

24             THE COURT:  Yes.

25             MR. AGAY:  Continuing with Mr. Flake's

1  direct, Mr. Flake is still under oath.

2  BY MR. AGAY:

3      Q    Mr. Flake, we just had a lunch break.

4              Did you talk to anybody during your

5  lunch break?

6      A    I did.

7      Q    Who did you talk to?

8      A    Mr. Clar and Mr. Dan, primarily, although

9  we had pleasantries in the hallway.

10     Q    What did you discuss?

11     A    The Civil Rights Movement, the difference

12  between seafood in Virginia versus steak in Illinois,

13  and the boxing career of an associate of Mr. Dan and

14  Mr. Clar.

15     Q    You didn't discuss anything about this

16  case?

17     A    We did not.

18     Q    Did you talk to anybody other than Mr. Dan

19  and Mr. Clar?

20     A    Certainly not about the case.  I might have

21  said hi to somebody in the hallway.

22              THE COURT:  By the way, I should just

23  note, I believe that Ms. McLemore and Mr. Lewandowski

24  are back on the phone.

25              MR. AGAY:  I am turning -- I'm handing

1    the witness Exhibit 8, WESCO Exhibit No. 8.

2                    THE COURT:  Okay.

3    BY MR. AGAY:

4        Q    Mr. Flake, did you have time to review this

5    generally?

6        A    I'm familiar with this.

7        Q    What is this?

8        A    It's a hosting agreement for SBI.

9        Q    Okay.  And is this the operative customer

10   agreement currently with SBI?

11       A    Yes.

12       Q    What is the effective date of this

13   agreement?

14       A    30 November 2017.

15       Q    Could you please turn to page six, Article

16   9(1).

17       A    Is this terms and termination?

18       Q    Yes.

19       A    Okay.

20       Q    What is the term of this agreement?

21       A    [AS READ:

22            **This agreement commences on the**

23       **effective date and continues thereafter for a**

24       **period of two years.**

25                **Thereafter, this agreement shall be**

1    **automatically renewed and continues on a**

2    **year-to-year basis, unless either party expresses**

3    **its intention not to renew or continue this**

4    **agreement by written notice to -- it's blurry --**

5    **other party two months before the expiration of the**

6    **original term in any such extended term of this**

7    **agreement.]**

8        Q    Okay.  So based on this, when does this

9    hosting agreement expire, if not renew?

10       A    Are you asking specifically and exclusively

11   in accordance with Article 9?

12       Q    Yes, I am.

13       A    It would be in two years.

14       Q    Two years from today?

15       A    Two years from the 22nd of November.

16       Q    Okay.  Do you mean November 30th?

17       A    Yes.

18       Q    So it expires November 30th, 2019?

19       A    In accordance with that paragraph, yes.

20       Q    Are you aware of any other paragraph that

21   extends the agreement beyond November 30th, 2019?

22       A    Yes.  If you look at Article 21(b), you'll

23   note that the monthly payments are simply a matter of

24   convenience, and you'll note that it's actually for

25   two annual payments of eight sixty-seven thirty-five,

1    and -- it's blurry on this copy -- I'm sorry -- nine

2    forty-six twenty.

3                    And those payments did not commence

4    until January of 2018, and so I believe it would be a

5    few months after November of this year.

6         Q    So your interpretation of the contract is

7    under Article 2(b) --

8         A    2(1)(a) and (b).

9         Q    2(1)(a) and (b) that says:

10                   [AS READ:

11              **Notwithstanding Article 9 on the term,**

12         **the effective date not commence until these things**

13         **occur.]**

14        A    Yeah, that would be my understanding.

15        Q    Okay.  Do you see anywhere in those

16   paragraphs where the definition of the effective date

17   is actually amended?

18        A    It is not.

19        Q    Other than those two paragraphs, do you

20   have anything else in writing which extends the date

21   of this agreement?

22        A    I do not.

23        Q    Now, the agreement renews automatically

24   unless two months' notice is given of nonrenewal,

25   right?

1      A      That's correct.

2      Q      Have you gotten that two-month notice yet?

3      A      Not in writing.

4      Q      Have you gotten it orally?

5      A      Several months ago they told us that, and I

6  don't know if that would hold or not or if they

7  intend to give us additional notice in October.

8      Q      So they have told you earlier that they

9  intend not to renew?

10     A      Yes, sir.

11     Q      Do you see Article 9(2), termination for

12  convenience?

13     A      Yes.

14     Q      Could you please explain to me your

15  understanding of this provision?

16     A      In summary, the customer has the right to

17  terminate service with us at their convenience and

18  are responsible for a payment penalty of any

19  unamortized portion of the buildout that we incurred

20  to host them.

21     Q      And your position is that would never

22  happen, because the penalties would be egregious.

23     A      The penalties are far more than just the

24  completion of the contract, so, yeah, I don't believe

25  the customer would exercise their rights under that

1  clause.

2      Q     Could you turn to page five under

3  Article 8, representations, warranties and

4  indemnifications?

5      A     Yes.

6      Q     And flip over to the next page, page six,

7  number four.  And I apologize.  It's not as clear as

8  it should be.

9                [AS READ:

10        **Bcause shall purchase and maintain**

11     **throughout the term of this agreement insurance or**

12     **indemnity protection for units.  The limit of**

13     **liability for the coverage by the insurance shall**

14     **be no less than the replacement value of the hosted**

15     **units per occurrence.]**

16                Do you see that?

17      A     I do.

18      Q     What's your understanding of that

19  provision?

20      A     That in the case of damage to the

21  customer's miners, that we are obligated to make them

22  whole with regard to that damage.

23      Q     But it's also that you have to have

24  insurance, right?

25      A     Insurance or indemnity protection, yes.

1       Q      Do you currently have that insurance?

2       A      We have fire, flood and other general

3  protection, yes.

4       Q      That's what the applicable coverage would

5  be?

6       A      There's -- we discussed earlier this idea

7  that we had damage to some machines due to an

8  electrical fault.  It's questionable right now

9  whether the electrical fault was covered under our

10  policy or Dominion's.  We're efforting that with

11  Dominion.

12       Q      No, I understand that, but my question was,

13  do you have the coverage that you just described?

14       A      I believe we do.

15       Q      Okay.  And is that what is known as

16  property insurance?

17       A      I believe so.

18       Q      Okay.  What is the current coverage limit

19  of your property insurance policy?

20       A      $3 million.

21       Q      Okay.

22              MR. AGAY:  Well, first, Your Honor, I

23  would move to enter Exhibit 3 in evidence -- I'm

24  sorry.  Exhibit 8 into evidence.

25              THE COURT:  Any objections?

1          MR. CLAR:  No, Your Honor.  In fact,

2     we've used that as one of our exhibits as well --

3          THE COURT:  It will be admitted.

4          MR. CLAR:  -- so we would be hard

5     pressed to do that.

6          MR. AGAY:  Your Honor, we didn't list

7     this as an exhibit, but this is coming up, and this

8     is something that was just tendered to us recently,

9     so I would like to potentially enter additional

10    documents into evidence and ask Mr. Flake about them.

11         THE COURT:  Do you have copies for

12    everyone?

13         MR. AGAY:  I do.

14         THE COURT:  All right.

15         MR. CLAR:  Might I --

16         THE COURT:  I'm not allowing it.  I'm

17    just hearing what he has to say.

18    BY MR. AGAY:

19    Q    Did you have time to review those

20    documents?

21    A    Yes.

22    Q    What's the first document I gave you?

23         THE COURT:  Let's mark them, Mr. Agay.

24         MR. AGAY:  Sure.

25         THE COURT:  Do you want to mark it as

1    one document, as three documents?  Whatever you --

2                    MR. AGAY:  Why don't we do them as one

3    document.  It will just be easy.

4                    THE COURT:  All right.  And we're on

5    Exhibit No. -- I'm on 17 in this binder, so I guess

6    that's 18.

7                    MR. AGAY:  Yeah, 18 -- Ms. Carr tells

8    me we're at 20.

9                    MR. CLAR:  Right.  That's correct.  We

10   have Exhibit 19.

11                   THE COURT:  Oh, this binder doesn't

12   have -- sorry.  Okay, so this is Exhibit 20.

13                   MR. AGAY:  Your Honor, these documents

14   were forwarded to us by debtor.

15                   The first document says evidence of

16   property insurance, the second document says

17   certificate of liability insurance.  The third

18   document says certificate of liability insurance.

19                   You'll see that these were prepared --

20   in the bottom, left-hand corner, you'll see that

21   these were prepared in connection with the bankruptcy

22   case.

23                   I guess I'm asking Mr. Clar, were

24   these filed in the bankruptcy case or sent to the

25   U.S. Trustee?

1          MR. CLAR:  Well, first of all, I've

2   never been aware of any requirement to file

3   certificates of insurance.  But, yes, they were sent

4   to the United States Trustee.

5          MR. AGAY:  I would move to enter these

6   into evidence.

7          THE COURT:  Well, Mr. Clar, do you

8   have, number one, any objection to Mr. Agay bringing

9   in additional documents; and, number two, do you have

10  any objection to the admission of these?

11         MR. CLAR:  I do have an objection to

12  bringing them in because he's had them -- he had them

13  before the date of their submission.  I do have a

14  problem with them.

15         MR. AGAY:  That's true, we did have

16  them before the date of submission.  However -- I'm

17  sorry.  When he says "submission," when we submitted

18  our exhibit list, that's true.

19         MR. CLAR:  Prior to the pretrial

20  order.

21         MR. AGAY:  That's true.  We did.  But

22  this topic just came up in the last couple days,

23  which is why the late filing, and we were just given

24  these documents in the last week.

25         THE COURT:  This topic meaning --

1              MR. AGAY:  The issue of whether they

2   have appropriate insurance coverage.

3              THE COURT:  Ah.  Mr. Clar.

4              MR. CLAR:  Well, I do object, because

5   we had a pretrial order, and these documents -- all

6   exhibits were supposed to be -- I mean, if we could

7   add exhibits on the day of trial, we would all do

8   that, and it would be a free for all.

9              MR. AGAY:  I'm offering these

10  exhibits, Your Honor, to impeach him on whether they

11  have the right level of insurance.

12             MR. CLAR:  And I'm objecting to their

13  admissibility.

14             THE COURT:  I'm not going to admit

15  them at this time, but I'll hear the question and

16  decide later about whether they're admissible.

17             MR. AGAY:  All right.

18  BY MR. AGAY:

19      Q    So, Mr. Flake, if you go down to the middle

20  of the page, where it says "coverage."

21             MR. CLAR:  Objection as to foundation,

22  Your Honor.  He's got to lay the foundation for these

23  documents first.

24             THE COURT:  Sustained.

25  BY MR. AGAY:

112

1    Q    Do you recognize the top document?

2    A    I've never seen it before, but I understand

3  what it is.

4    Q    What's your understanding of what it is?

5    A    Evidence of property insurance from our

6  insurer.

7    Q    And when we were just talking about fire

8  and other coverage, would that fall under this

9  category?

10   A    I believe it would.

11   Q    Now, when you go down to the bottom of the

12  page and you see 5469 Greenwich Road, Virginia Beach,

13  is that the hosting facility?

14   A    It is.

15   Q    And it says, "Amount of insurance 430,000."

16   A    Yes.

17   Q    With a deductible of 1,000.  Does that --

18  isn't that different from what you just said, that

19  you have $3 million of insurance?

20        MR. CLAR:  Objection, Your Honor.  He

21  said he's never seen the document before.

22        THE COURT:  Overruled.  That's not the

23  question.

24        THE WITNESS:  So if you go to

25  certificate of liability insurance, the third page of

1    which you provided to me, where it says "Each

2    occurrence, $3 million," I believe that's what I was

3    referencing.

4    BY MR. AGAY:

5         Q    Okay, but that's liability insurance.

6    That's different than property insurance.

7         A    I'm not an insurance expert.

8         Q    Okay.  But so you are saying that you have

9    $3 million under your liability insurance, and that

10   would cover the type of property damage that you just

11   described?

12        A    It may.  Again, I'm not an insurance

13   expert.

14        Q    You don't know that for sure?

15        A    I don't know that.

16        Q    Would it surprise you to learn that you

17   only have $430,000 of property insurance?

18        A    It's not consistent with what I understood

19   to be the case.

20        Q    And if you only had $430,000 of property

21   insurance, would that suffice to cover your hosting

22   facility?

23        A    I believe it might.  If you'll notice in

24   the clause that you cited, it's per occurrence.

25                   We just had such an occurrence, and we

1  estimate that the damages right now are about

2  $350,000.

3      Q    I'm sorry.  Where do you see that it says

4  "per occurrence"?

5      A    I understood that that's what you read to

6  me.

7              If you look at paragraph four, the

8  third line of the hosted units per occurrence.

9      Q    I'm sorry.  Where are you looking?

10     A    That would be Article 8, paragraph four,

11  third line.

12     Q    You're looking at the SBI agreement?

13     A    Yes, I am.

14     Q    But do you understand when it says 430,000,

15  the evidence of property insurance, that means per

16  occurrence?

17     A    I suppose it does.  That's my

18  understanding.

19     Q    So you think 430,000 is per occurrence?

20     A    I believe it is.

21              MR. AGAY:  I'll renew my motion to

22  move this into evidence.

23              THE COURT:  I'm going to sustain the

24  objection.

25              This witness apparently has never seen

1    these documents before.  These may or may not be the

2    debtor's correct certificates of insurance.

3              If Mr. Clar's not going to stipulate

4    that they are, then you're going to have to prove to

5    me that they are.

6              MR. AGAY:  Okay.  I would say, Your

7    Honor, as an aside, that I would hope that the debtor

8    has appropriate insurance here.

9              This is -- we want them to have the

10   appropriate levels of insurance, not the other way

11   around.

12             And if they only have 430 grand of

13   property insurance, that would be very concerning to

14   us.

15             THE COURT:  Understood.

16             MR. CLAR:  Just as an aside, I'd

17   really like to move this along and not have to do

18   this, but these were submitted to the U.S. Trustee.

19   Mr. Nguyen has no problem with them, and that's

20   something --

21             THE COURT:  I'm sorry?

22             MR. CLAR:  The --

23             THE COURT:  We're not having argument

24   here.  The only question is whether or not these are

25   authentic.  Sounds to me like you just said they are,

1  in fact, the debtor's insurance certificate.

2                    MR. CLAR:  They are.

3                    THE COURT:  Okay, fine.  Then I'm

4  going to admit them.

5                    MR. CLAR:  That's fine.  My objection

6  was to whether he could use them when we had a date

7  set for --

8                    THE COURT:  And I'm going overrule

9  that objection and admit these.

10                   MR. CLAR:  That's fine.

11                   But just to move it along, that's why

12 I did that.

13                   MR. AGAY:  I am handing the witness

14 WESCO Exhibit No. 9, Your Honor.

15                   THE COURT:  All right.

16 BY MR. AGAY:

17      Q    Do you recognize this document?

18      A    I do.

19      Q    What is it?

20      A    It's the hosting services agreement between

21 Bcause Mining, LLC, and St. Bitts, LLC.

22      Q    What's the effective date of this

23 agreement?

24      A    30 December, 2017.

25      Q    Okay.  Could you please turn to page seven,

1  Article 9(1).

2       A    Yes.

3       Q    Okay.  Do you see where it says, "This

4  agreement commences on the effective date and

5  continues thereafter for a period of two years"?

6       A    Yes.

7       Q    What's your understanding of that

8  provision?

9       A    That that provision would run until two

10  years from the date of whenever this was signed.  I'm

11  not seeing it.  Ah, 30 December 2017.

12      Q    So what's your understanding of when this

13  agreement expires?

14      A    This agreement's very similar to the SBI

15  agreement in that it's two annual amounts due for

16  nine forty-six twenty and eight sixty-seven

17  thirty-five.

18            We did not begin service with them

19  until May of 2018, I believe.  It might have been

20  actually a little bit later in the year, June

21  perhaps.

22            My interpretation of the whole

23  agreement, not just the article you cited, is that

24  even if we ended service at the end of this year,

25  they'd still owe us the amount due.

1      Q     My question was, what's your understanding

2  of when this agreement expires?

3      A     30 December 2017.

4      Q     No, that's the effective date.  When does

5  the --

6      A     30 December 2019.

7      Q     Do you have anything in writing from SBI

8  that indicates they're going to renew this agreement?

9      A     I think you mean St. Bitts.

10      Q     St. Bitts, yes.  Sorry.

11      A     We do not have anything in writing that

12  says that they will renew.  It renews automatically,

13  as does the SBI agreement.

14      Q     And do you have anything -- have you had

15  any oral communications with St. Bitts?

16      A     We have.

17      Q     What have those oral communications been?

18      A     Most recently, it was their desire to

19  exercise their rights under the bankruptcy clause.

20      Q     Oh, so that's when they tried to terminate

21  the agreement at the beginning of the case?

22      A     Yes.

23      Q     Okay.  So you haven't had anything in

24  writing or orally since then that indicates they're

25  going to extend it beyond the end of this year?

1      A      Not that they're going to extend it.

2      Q      Does this agreement under Article 9(2) have

3 a similar terminations for convenience clause?

4      A      It does.

5      Q      And could you please indicate your

6 understanding of that provision?

7      A      That upon receiving 60 days' written

8 notice, that the client has the right to terminate

9 their service under this agreement.

10               MR. AGAY:  Your Honor, I don't think

11 I've moved to admit this into evidence yet.

12               I'd like to move this into evidence.

13               MR. CLAR:  No objection.

14               THE COURT:  All right.  It will be

15 admitted.

16               MR. AGAY:  Your Honor, I'm going to

17 hand the witness what's been labeled WESCO Exhibit

18 10.

19               THE COURT:  Okay.

20 BY MR. AGAY:

21      Q      Mr. Flake, do you recognize this document?

22      A      I do.

23      Q      What is it?

24      A      It's an agreement for hosting services

25 between Bcause Mining, LLC, and BMG Operations,

1  Limited.

2      Q    What's the effective date of this

3  agreement?

4      A    30 November 2017.

5      Q    Could you please turn to Article 9(1), and

6  there's not a page number there.

7              Are you there?

8      A    I am.

9      Q    When does this agreement terminate?

10     A    Two years from the effective date.

11     Q    According to this agreement, when does it

12 terminate?

13     A    30 November 2019.

14     Q    Okay.  And BMG has not indicated that they

15 are going to renew this contract, have they?

16     A    They have not.

17     Q    Do you have anything in writing that

18 extends the date of this agreement beyond the end of

19 the year?

20     A    Not in writing.

21              MR. AGAY:  Your Honor, I'd move to

22 admit this into evidence, Exhibit 10.

23              MR. CLAR:  No objection.

24              THE COURT:  Okay.  That will be

25 admitted.

1    BY MR. AGAY:

2        Q    So, Mr. Flake, we just talked about the

3    SBI, St. Bitts and BMG agreements, and I believe you

4    testified that those three customers together account

5    for almost 95 percent of the debtor's revenues,

6    correct?

7        A    I think I testified to the fact that was it

8    somewhat over 90, and you suggested it was

9    95 percent.

10       Q    Do you agree with that, 95?

11       A    Probably.

12       Q    Okay.  So if these agreements terminate at

13   the end of the year, 95 percent of the debtor's

14   revenues go away, correct?

15       A    In each of those agreements as we talked

16   about Article 2 hosting fees seems to imply that if

17   they chose to go away at the end of this year, we

18   would receive lump-sum payments equal to the

19   outstanding months from when their service commenced.

20       Q    Okay.  So you think that there's going to

21   be a tail revenue stream post termination?

22       A    That would seem to be the way that the

23   agreement reads, and that's my interpretation of it.

24       Q    Have you modeled out that scenario as part

25   of your budgets?

1      A     We have not.

2      Q     So you can't tell me today what those

3  revenue issues would be after termination?

4      A     Not definitively at this moment, but

5  modeling that would be relatively easy.

6      Q     Have you modeled at all the scenarios where

7  the SBI, BMG and St. Bitts agreements terminate at

8  the end of this year?

9      A     If they all terminated at the end of this

10  year, it would be -- it would cause us to begin to

11  lose money.  We'd have to make adjustments.

12      Q     But you wouldn't go out of business?

13      A     I couldn't tell you because we haven't

14  modeled it yet.

15      Q     But it would be your position, then, in

16  that scenario, the Chapter 11 cases should still

17  continue, right?

18      A     There are a lot of events that have to

19  happen between now and the end of November, and I

20  wouldn't know what my position would be at that point

21  in time.

22            It would depend what had transpired

23  between now and then.

24      Q     And knowing what you know today, do you

25  think the debtor has to do any contingency planning

123

1   for those events?

2        A    At some point in time, yes.  I think it's

3   premature right now.

4        Q    Okay.  Under these agreements, are the

5   debtors paid in advance each month or in arrears?

6        A    We're paid in advance.

7        Q    So each month, these customers pay the

8   debtors at the beginning of the month for the

9   services they expect they will receive during that

10  month, correct?

11       A    Yes, I think so.

12       Q    So if the debtors went out of business

13  tomorrow, okay, which is -- would be the 22nd,

14  theoretically, do you think those customers would

15  make those payments on the beginning of next month?

16       A    I suppose you'd have to ask them for sure.

17            My assessment is I don't know the

18  rules under bankruptcy law whether they'd have to or

19  not, so I don't know.

20       Q    As a commercial matter, do you think they'd

21  want to make those payments?

22       A    I think they would not want to.

23            MR. AGAY:  Just bear with me for a

24  second.

25            (Brief pause.)

124

1   BY MR. AGAY:

2       Q    Now, you mentioned earlier that you're in a

3   discussion with SBI about continuing their agreement,

4   correct?

5       A    No, I didn't say it was about continuing

6   their agreement.  I said it was about turning on

7   additional miners.

8       Q    Okay.  So the discussion you're currently

9   having with SBI is not around extending the -- or

10  renewing their existing hosting agreement?

11      A    That's correct.

12      Q    So what exactly are you discussing with

13  SBI?

14      A    They currently have in storage with us a

15  total of about 3500 machines.  Those machines are not

16  operating, and some of them are not operational.

17           But we estimate that about 600 of them

18  are operational, and we're discussing the idea that

19  they would sell those machines to us, and we would

20  put them into service, mining on our own behalf.

21      Q    Where would you get the money to buy those

22  machines?

23      A    They would finance the purchase to us.

24      Q    So they would give them to you for free,

25  and then you would pay them back over time?

1      A     I don't think I said they would give them

2   to us for free.  I think I said they would finance

3   them to us.

4      Q     So how would that financing work?

5      A     It would be in six payments over six

6   months.

7      Q     And have you modeled out how the debtors

8   are going to make those payments?

9      A     This only came up yesterday as far as them

10   agreeing to that, so I haven't modeled it yet.

11            But I have a notion of how it would

12   work.

13      Q     Okay.  But, again, they haven't agreed to

14   renew those agreements beyond the end -- renew the

15   hosting agreement beyond the end of the year, have

16   they?

17      A     That's correct.

18      Q     Okay.  So the concept that you just

19   mentioned about SBI selling you machines and

20   financing your purchase of those machines, and,

21   furthermore, you repaying SBI for those machines, is

22   not currently reflected in your business plan?

23      A     It is not.

24            MR. AGAY:  Your Honor, if I may, I'd

25   like to turn back to the business plan.  I think it

1  was Exhibit 1.

2  BY MR. AGAY:

3       Q    I'd like to turn to slide eight, which I'm

4  not sure there's a slide number.

5       A    It is.  The Court-Proposed Budget, Holding.

6            THE COURT:  Yes, it's marked.

7            MR. AGAY:  So if Your Honor keeps

8  turning, I think it's slide ten, the Court-Proposed

9  Budget, Mining.

10           THE COURT:  Yeah, that's also sort of

11  marked page ten.

12  BY MR. AGAY:

13      Q    Are you on that page?

14      A    I am.

15      Q    Am I correct in understanding that this is

16  your proposed going-forward budget for Mining?

17      A    You are correct.

18      Q    In your view, would this budget, together

19  with your proposed go-forward budgets for Holdings

20  and Spot enable the debtors to restructure and exit

21  from Chapter 11?

22      A    Yes, I believe so.

23      Q    Through what date does this budget extend?

24      A    6 September.

25      Q    That's the week of September 6th, right?

1       A     It's the week ending September 6th, yes.

2       Q     And the current budget on file with the

3  bankruptcy court goes through August 2nd, correct?

4       A     That's correct.

5       Q     Now, in terms of revenues, I think we

6  talked about that these are actually prepayments for

7  each month, correct?

8       A     Yes.

9       Q     And do I understand that if I compare the

10  revenues on this slide versus the same slide in your

11  prior version, monthly revenues have gone down by

12  $46,619 per month?

13       A     Yes.

14       Q     Why?

15       A     We experienced an electrical fault at the

16  facility that caused damage to some of the miners.

17  They're not currently operating.

18       Q     So how long is this going to last?

19       A     We're currently working our way through the

20  insurance and sort of claims process with Dominion.

21              I don't really have a good feel for

22  how long that's going to last.

23       Q     So as of right now, you don't know?

24       A     I think I just said that.

25       Q     And do I understand that under this budget,

1  the Dominion costs have gone down by 30,000 per

2  month?

3       A    They have.

4       Q    So if your only revenues and your only

5  costs in this business were customer-hosting

6  agreements and Dominion, you would have had a net

7  loss of over $16,000 per month; is that correct?

8       A    Per this model, which was prepared

9  subsequent to me receiving the numbers from

10  Mr. Russell this morning, we believe this was

11  accurate.

12            It turns out that it looks like our

13  electric bill is actually going to be closer to about

14  $613,000, which means there would be essentially a

15  push from the question you just asked.

16       Q    Isn't Dominion also paid in advance?

17       A    They are because of the bankruptcy, yes.

18       Q    Right.  So for June do I understand that

19  you paid them -- well, you've already paid them

20  308,000; you contemplate another 352,000, correct?

21       A    Yes.

22       Q    Okay.  So that's 660,000 total, right?

23       A    Yes.

24       Q    And that's for usage in July, correct?

25       A    I believe it's for usage from -- for part

129

1  of June and part of the July.

2            Like June 15th to July 15th;

3  there's an overlap in their billing cycle.

4       Q    So if revenues have gone down because there

5  was a disruption in power or some other disruption,

6  why haven't these prepayments of Dominion also gone

7  down?

8       A    Because we're under a court-agreed-to

9  stipulation where we would make those payments.

10           I believe that in the month of July

11  we'll get a reimbursement in accordance with that

12  agreement from Dominion --

13      Q    Okay, so you're --

14      A    -- or a credit against future payments.

15      Q    I apologize.  I cut you off.

16           So you're going to have to claw back

17  30,000 somehow, some way?

18      A    It's in the stipulation already.

19      Q    Do I understand from this budget that the

20  debtors will realize 79,857,000 -- I'm sorry.  Strike

21  that.

22           Do I understand from this budget that

23  the debtors will realize almost $80,000 less in cash

24  from Mining versus your prior budget?  $79,857?

25      A    I'm not sure where you're looking.

1      Q     I just subtracted the revenues in your

2   prior budget from the revenues in the current budget.

3              So I see -- it seems as though there's

4   almost $80,000 in less cash coming in?

5      A     I believe the difference you're looking for

6   is the difference between 1,014,000 and 967,000.

7              And I'm not doing the math in my head,

8   but that appears to be about $40,000.

9      Q     Okay.  Times three is 120, correct?

10      A     If you're talking about July, August, and

11   September.

12      Q     Yes.

13      A     I would agree.

14      Q     But then your costs went down by $30,000 in

15   those months, so that's where I got the 80,000.

16      A     I believe this budget doesn't reflect where

17   they've actually gone down to.  It would have gone

18   from 660- to approximately 620-, which is 40-.

19              And if you do the same math over three

20   months, it would be a $120,000 reduction in

21   electrical costs.

22      Q     So we can't tell from here how much less

23   cash is coming into the company?

24      A     I don't think any less cash is coming into

25   the company.

1            In fact, I would say that we proposed

2    to the Court prior to May 3rd what it would be.

3    And right now, we're within $400 of that budget seven

4    weeks later.

5            I think our track record is that we

6    can adhere to the budgets that we project to the

7    Court.

8        Q    So let's talk about that.  Can you flip

9    over to the next page.

10       A    Next page being?

11       Q    Slide eleven, the proposed budget for

12   Holdings.

13       A    Yes.

14       Q    This is your projected budget for Holdings

15   going forward, correct?

16       A    The budget on top, and then the cash flows

17   on the bottom are consolidated.

18       Q    Yes, but this is your go-forward projection

19   for Holding, correct?

20       A    Yes.

21       Q    And you see at the beginning where

22   beginning cash balance on June 7th is a million

23   fifty-five dollars, approximately?

24       A    Yes.

25       Q    I'm sorry, approximately a million

1  fifty-six dollars?

2      A    Yes.

3      Q    Okay.  And the ending cash the week of

4  September 6 is $888,625, correct?

5      A    It is.

6      Q    That's less than in your prior budget,

7  correct?

8                MR. CLAR:  Your Honor, I don't know if

9  that's a general -- which budget he's referring to.

10  BY MR. AGAY:

11      Q    Do you understand what I'm saying?

12      A    I'm going to answer the way I understand

13  you to have asked the question, and we'll figure out

14  whether I understand it or not.

15                I believe what you're speaking to is

16  the 916,947 is the ending cash number on page eight.

17      Q    Yes.

18      A    So it seems to me that $916,000 is less

19  than $945,000, or, you know -- yeah, I think the 945-

20  is greater than the 916 if that's your question.

21      Q    Sure.  Let's look at slide eight.

22      A    Yes.

23      Q    For the week of August 2nd, you projected

24  cash to end at $916,947, correct?

25      A    Yes.

133

1     Q    Now, if you turn to slide 11.

2     A    Yes.

3     Q    And you look at the week of August 2nd.

4     A    Yes.

5     Q    You're now projecting cash to end at

6 $855,843, correct?

7     A    Yes.

8     Q    So you'll have less cash, correct?

9     A    At that point in time.

10     Q    Okay.  And that's less than the 914,000 you

11 had at the beginning of the case, correct?

12     A    The 855- is what your asking?

13     Q    Yes.

14     A    That is less than 914-.

15     Q    Now, in your prior budget you didn't

16 include the week -- it didn't go out to the week of

17 September 6th, correct?

18     A    It did not.

19     Q    But this shows your ending cash balance for

20 the week of September 6th at eight hundred and

21 eight-thousand dollars six hundred and twenty --

22 strike that.

23         So this budget shows for the week of

24 September 6th your ending cash balance is going to

25 be $888,625, correct?

1      A    Yes.

2      Q    Okay.  And that's less than the $914,000

3  you had at the beginning of the case, correct?

4      A    It is, but that's an unfair comparison.

5      Q    Okay.  Well, I'm sure your counsel can talk

6  to you about that.

7              Now, if you go to the week in June --

8  the week ending in June 21st, which is --

9      A    On which model, sir?

10      Q    I'm sorry.  Slide 11.

11      A    Okay.

12      Q    If you go to the week of June 21st, this

13  projects ending cash at $511,541, correct?

14      A    It does.

15      Q    How much cash do you currently have in the

16  bank?

17      A    I asked Ms. Vaassan that yesterday, and the

18  number was approximately $600,000.  I don't remember

19  the exact amount.

20              But she reported that there were still

21  some court-approved expenses that had not yet been

22  paid in the amount of about $60,000.  So she told me

23  that when they were paid, she estimated we'd have

24  about $540,000.

25      Q    And next week you're projecting cash to go

135

1   down to 70,000, right?

2        A    Yes.

3        Q    But then it jumps back up July 5th from

4   your customer prepayments, right?

5        A    Yes.

6        Q    But if you go out of business between today

7   and the week of July 5th, do you expect that you'll

8   be able to realize those receipts for the week of

9   July 5th?

10                  MR. CLAR:  Objection.  Calls for

11  speculation.

12                  THE COURT:  Overruled.  Simple math.

13                  THE WITNESS:  If we were to go out of

14  business, we would also not have the associated

15  expenses.

16  BY MR. AGAY:

17       Q    But you'd be out of business, right?

18       A    We would, but that was your question.

19       Q    Okay.  But -- no, my question was, do you

20  think you'd be able to collect the cash at that

21  point?

22       A    If we went out of business, right?

23       Q    Yes.

24       A    No.

25       Q    So let's go back to the week of September

1  6th.  You talked about whether it's an unfair

2  comparison.

3      A    Again on 11?

4      Q    Yes, I apologize.

5      A    Okay.

6      Q    The reason that your cash balances are

7  going back up to 945,300- -- I'm sorry.  I'm getting

8  these -- strike that.

9           The reason that your cash balances are

10  going back up to approximately 945,000 the week of

11  August 30th and then 888,000 the week of September

12  6th is because you've gotten customer receipts,

13  right?  That's the payment pattern?

14      A    Yeah.  So if you see on, actually, slide

15  ten, in the revenue line, there's projected receipts

16  the week ending August 30th.

17      Q    Okay.  Since this budget on slide 11 stops

18  at the week of September 6th, does this slide

19  reflect the expenses for the month of September?

20      A    It reflects the expenses realized through

21  the week ending 6 September.

22      Q    Okay.  But does it reflect all of your

23  expenses for the month of September?

24      A    It does not.

25      Q    Okay.  So when you factor in all of those

1  expenses for the month of September, do you have any

2  sense of what your cash balance will be at the end of

3  September?

4      A    Not with any precision.  But I believe that

5  you'll see -- if you look at slide eight, the week of

6  3 May, where we began with nine -- or eight

7  forty-four and fifty dollars, and if you compare

8  beginning cash to beginning cash, you'll see the cash

9  is increased by $101,000 over that period of time.

10              So I have no reason to believe that

11  cash would deteriorate through the month of September

12  any more than it did for the previous four months.

13     Q    So you're saying because you get paid at

14  the end of May, is that the comparison you're

15  drawing?

16     A    No.  We did not get paid on May 3rd at

17  the end of May.  That's how much cash we had on hand.

18     Q    I understand.  But is the comparison you're

19  drawing that because you get paid the week of

20  May 31st, your cash is increasing by a million one;

21  is that the comparison you're drawing?

22     A    I don't see any cash that you're talking

23  about that's a million -- could you point out to me

24  what you're looking at?

25     Q    You know, why don't I move on.

1    A    Okay.

2    Q    Am I to understand that on slides ten and

3  11, your proposed budget, there are no additional

4  revenues reflected?

5    A    There are no new additional revenues

6  reflected.

7    Q    Are there -- strike that.

8         If you flip to page -- slide eight,

9  please.

10    A    Yes.

11    Q    So -- strike that.

12         If you go to slide 11, and you have

13  several line items with arrows.

14    A    Yes.

15    Q    Could you explain what that means?

16    A    Those are expenses that we expect to be

17  able to shift out of Holding and into Spot

18  subsidiary.

19    Q    So those expenses are not going away,

20  correct?

21    A    If we continue and launch Spot, they're not

22  going away.

23         There is a scenario, slide 26 I think

24  it is, wherein we indicate that one scenario would be

25  that we would shut Spot down.

1    Q    Okay.  And if you shut Spot down, then

2  those expenses stay on this balance sheet, correct?

3    A    No.  If we shut Spot down, all of those

4  expenses would go away.

5    Q    What's the aggregate amount of those

6  expenses?

7    A    In slide 11 it appears to be about $40,000.

8  That's 18- plus 11-, which is 30, plus the 3- and 3-.

9  So maybe 35.

10         But in addition there are expenses on

11  slide 12, I think it is, which would also go away,

12  which include payroll, which is the largest portion

13  of that.

14    Q    You mean for Spot?

15    A    Yeah.  I thought your question was if you

16  didn't do Spot.

17    Q    Yeah, you answered.  Let's move to slide

18  ten -- I'm sorry.  I'm getting these slides mixed up

19  -- the next slide, slide 12.  The proposed budget for

20  Spot.

21    A    Got it.

22    Q    You may have already covered this, but for

23  the Court's benefit and my benefit, could you please

24  explain the Spot exchange.

25    A    The Spot exchange is a business wherein

1   people solicit the service of converting their

2   cryptocurrency to fiat and their fiat to

3   cryptocurrency and their cryptocurrency to --

4                    THE COURT:  Excuse me.  What's that

5   word "fiat"?

6                    THE WITNESS:  Fiat is the nomenclature

7   associated with a nationally issued currency.

8                    THE COURT:  What are the initials?

9                    THE WITNESS:  It's f-i-a-t.  It's an

10  Italian word.  It means "I will."

11                   THE COURT:  Oh, okay.

12                   THE WITNESS:  I will the dollar has

13  value; therefore, it does.

14                   THE COURT:  Okay.  I just wanted to

15  know if it was Fiat like the car or Fia or --

16                   THE WITNESS:  It is.  They're both

17  Italian.

18                   THE COURT:  Got it.  Okay.

19  BY MR. AGAY:

20      Q    Thank you.

21                   And this is your proposed budget for

22  Spot?

23      A    It is, yes.

24      Q    And this budget goes through September 6th,

25  right?

1       A    It does.

2       Q    Now, let's assume that Spot commences

3  operations or goes live on what date?

4       A    Roughly August 12th.

5       Q    Oh.  Are you certain of that?

6       A    All of the personnel indicate to me that

7  we've got everything in place necessary to make that

8  happen, with the exception of an agreement with

9  Nasdaq, and we're working with Nasdaq to make that

10  happen.

11      Q    And we'll come back to the prerequisites.

12           But on a prior budget, didn't you

13  project a go-live date of October -- of June 26th?

14      A    We did.

15      Q    You did?

16      A    Yes.

17      Q    Okay.  And why the delay?

18      A    Because WESCO asked for a continuance, and

19  we couldn't get concurrence from the creditors and

20  the Court in the hearing that was scheduled at the

21  beginning of the month.

22      Q    So you're saying the delay in going live

23  was because of my client's actions in the bankruptcy

24  case?

25      A    Your client -- yours -- we all agreed to

```
 1    have a continuance, and that continuance had an

 2    impact on our ability to put money into the business

 3    and to continue to launch Spot.

 4                     This budget reflects that slide.

 5         Q    Okay.  So was the impact of that

 6    continuance your ability to put money into the

 7    business?

 8         A    Yes.

 9         Q    Okay.  Was there any other impact?

10         A    Yes.  I think that clarity from the Court

11    is important in the discussions we're having with

12    Nasdaq.

13         Q    Okay.  We'll get to Nasdaq in a second.

14                     Do you require any funding to go live

15    by August 12?

16         A    We do.

17         Q    How much?

18         A    About $500,000 to go live; about 750- is

19    what we're trying to raise amongst certain people

20    that are interested in investing.

21                     And that would carry the company

22    through November.

23         Q    Have you raised that amount of money?

24         A    We have not.

25         Q    Do you have any written commitments for
```

1  that money?

2      A     We do not.

3      Q     Do you have oral commitments?

4      A     We do.

5      Q     When you say oral commitments, what type of

6  oral commitments?

7      A     The chairman of the board, Mike Adolphi;

8  and one of our other significant shareholders, Joe

9  LaMontagne, have verbally agreed that they would put

10  in about $350,000.

11          We're having ongoing discussions with

12  SBI about putting in another quarter of a million

13  dollars.

14     Q     Okay.  But, again, nobody has made any

15  written commitments?

16     A     That's true.

17     Q     I thought in a prior version of your

18  budget, you said that the 750- would take you through

19  August 31st, and that thereafter you would have to

20  raise $2 million to continue to operate.

21          Is that no longer the case?

22     A     It is no longer the case.  We found some

23  areas where we could structure payments with what we

24  think to be an agreement with Nasdaq, which saved

25  some money in cash up front.

1            And we provided a model of that to

2   your office, I think about a week ago.

3        Q    Are you referring to the model for the Spot

4   business?

5        A    Yes.

6        Q    Then after November, how much money are you

7   going to need to raise to continue to operate Spot?

8        A    The all-in money now stands at about $1.7

9   million, I believe.  This is from memory, so little

10  bit of latitude there.  But about $1.7 million rather

11  than $2-, but we still intend to raise $2 million.

12       Q    So you're going to raise 750- today to take

13  you through November, and thereafter, the plan is to

14  raise between $1.7 and $2 million?

15       A    Yes.

16       Q    And these investors are willing to put in a

17  half million to 750- today, without knowing where

18  that 2 million's going to come from; is that correct?

19       A    Yes.

20       Q    But you've received no written commitments

21  along those lines, right?

22       A    True.

23       Q    When does Spot become profitable?

24       A    It's early in next year, I believe.  Off

25  the top of my head, it's February or March of next

1    year.

2         Q    I think you testified -- I'm sorry.  Strike

3    that.

4                   And you're basing that on your

5    business modeling projections, correct?

6         A    I am, yes.

7         Q    And I think you testified that you think

8    Spot's going to be worth hundreds of millions of

9    dollars, is that correct, in your deposition?

10        A    I did, yes.

11        Q    Do you still believe that?

12        A    I do.

13        Q    But Spot will not generate any profits

14   until next year, correct?

15        A    That's correct.

16        Q    Under this budget, do you expect Spot to

17   generate any revenue during this time period?

18        A    I think you'll see $259 the week ending

19   August 30th.  And so, yes.  Through the fourth

20   quarter, there will be some additional revenue, but

21   it's minor in the third quarter.

22        Q    You mentioned Nasdaq.

23                   Do you view Nasdaq as critical to

24   launching Spot?

25        A    I view Nasdaq as critical to launching Spot

1    in the time frame that I cited, yes.

2        Q      Isn't your business model kind of built

3    around this collaboration with Nasdaq?

4        A      It's -- there are a number of software

5    providers that exist that you can build an exchange

6    around.

7                    Our business model for marketing

8    purposes is built around a relationship with Nasdaq.

9        Q      Do you believe Nasdaq is what

10   differentiates you from the competition?

11       A      I do.

12       Q      Are you aware of how much Nasdaq thinks

13   they're owed in this case?

14       A      I believe it's in the neighborhood of

15   $800,000.

16       Q      Could you pay that amount to Nasdaq today

17   and continue to operate?

18       A      We could not, no.

19       Q      Do you know if Nasdaq is willing to waive

20   that claim?

21       A      I have nothing in writing to that effect,

22   but we've had conversations to that effect.

23       Q      Have they said, "We'll waive the claim"?

24       A      They said that they -- the person I was

25   speaking to, Mark Driscoll, said he understands what

1    our plan to be to the extent -- I mean, recognizing

2    that we haven't submitted a plan, but the outline of

3    which he said, "We understand it -- I'll run that up

4    the flagpole internally."

5              I have not received word back yet.

6    Q    So they haven't said yes?

7    A    They have not.

8    Q    You're aware that you have a licensing

9    agreement with Nasdaq?

10   A    I am.

11   Q    And I'm aware that it's subject to

12   confidentiality.

13             If as part of assuming that

14   bankruptcy -- strike that.

15             If as part of assuming that contract

16   in the bankruptcy case you had to cure any

17   outstanding amounts owed to Nasdaq and those amounts

18   were $800,000, could you may that amount?

19   A    If they were $800,000 lump sum up front, we

20   could not.

21   Q    Could you pay 500,000?

22   A    I don't believe we could pay any

23   significant amount of money up front in a lump sum.

24   Q    Turning back to the budget for Spot, under

25   the Nasdaq line item, what do you contemplate

1  currently paying to Nasdaq --

2       A    Could you tell me what slide you're on?

3       Q    There's not a number.  It's the proposed

4  budget, Spot.

5       A    Got it.

6       Q    Under the Nasdaq line item, what are your

7  proposed payments to Nasdaq under this budget?

8       A    So the 17,885 represents a five-year

9  amortization, I believe of that $800,000, at

10 12 percent interest, from memory.

11           The twenty-seven thousand dollars nine

12 hundred and seventeen represents the required

13 payments under the agreement.

14      Q    And these are -- this is not anything that

15 Nasdaq has agreed to, correct?

16      A    True.

17      Q    In what states does Spot hope to operate?

18      A    At launch or eventually?

19      Q    Both.

20      A    Eventually, we hope to operate in at least

21 49 of the 50 states.  It's questionable whether any

22 exchange can operate in Hawaii because of the laws

23 they've got on the books.  But 49 out of 50

24 eventually.

25           At launch, we think we might be able

1 to launch in as many as 30, but more realistically,

2 it's probably in the low 20s.

3     Q     What type of regulatory approvals do you

4 need to launch the Spot exchange?

5     A     So there's a couple of answers to that

6 question in that it depends on which -- if we were to

7 launch a crypto-to-crypto product rather than a

8 fiat-to-crypto product, we could launch in

9 essentially all 50 states.  There's -- maybe New York

10 State would be an exception to that, so maybe 48

11 states, because they don't require a money

12 transmitter license, the states, for crypto-to-crypto

13 transactions.

14          It is because we intend to be a

15 fiat-to-crypto exchange that we're pursuing these

16 money transmitter licenses.  There are approximately

17 14 states that don't require a license for that

18 either, and we could launch in all 14 of those

19 states.

20          We've received approval in four

21 states, and one of those states, Washington State,

22 was part of a pilot product called -- a platform

23 called NMLS, which is the National Multiple something

24 system, and that would give us another 17 states.  So

25 it's the 14 plus 17 gets me to 31.

1          But I don't think the approvals will

2    be had in all of those 31 by then, so I would

3    anticipate it's more in the low 20s.

4          Q    So did I understand you correctly that

5    you've already received money transmitter licenses in

6    four states?

7          A    Yes.

8          Q    Do you have any written evidence that

9    you've received those approvals?

10          A    I don't know if we submitted exhibits to

11    that effect, but, yes, we do.

12          Q    Okay.  Have we seen that written evidence,

13    do you know?

14          A    I don't know.

15          Q    Okay.  So you've received money transmitter

16    licenses in four states.  When were those licenses

17    received?

18          A    I don't know off the top of my head.  I

19    know Washington State was most recent one, and that

20    was in approximately the last ten days.

21          Q    Okay.  Do you have written evidence of

22    that?

23          A    We do.

24          Q    And do you believe that the current status

25    of the debtors in bankruptcy is going to inhibit your

1    ability to get further licenses?

2         A     It may.

3         Q     Okay.  And do the states where you've

4    already received approvals know that you're in

5    bankruptcy?

6         A     I don't know that we've informed them

7    separately.  But, again, it's a matter of public

8    record, so I can't attest to what they do or don't

9    know.

10        Q     So you haven't updated your application?

11        A     For the applications that are still in

12   flight, we are in the process of updating them.

13        Q     Updating them in what way?

14        A     Our org charts, certain filings.  It varies

15   from state to state.

16        Q     But are you updating them to inform the

17   regulators that you're in bankruptcy?

18        A     To the degree that any of their

19   questionnaires ask that, we will answer truthfully.

20        Q     In what states have you completed business

21   registrations?

22        A     I don't have an answer for that.  I don't

23   know.  I think it's about 30.

24        Q     Okay.  Is that a prerequisite for Spot

25   going live?

152

1       A    For those states in which we would operate

2  as a fiat-to-cryptocurrency exchange, yes.

3       Q    But you don't know in how many of those

4  states you've completed the business registrations.

5       A    You are correct, yes.

6       Q    So what if you don't receive the money

7  transmitter licenses and complete all the business

8  registrations before August 12th?

9       A    Then I would anticipate that we would

10 launch a crypto-to-crypto-exclusively exchange,

11 because one of our largest competitor, a company

12 called Bit -- Binance has announced that they're

13 going to be leaving the United States, and that's

14 specifically the service that they provide.

15      Q    When did you originally receive the

16 approvals for those four states?

17      A    Again, Washington was sometime in the last

18 ten days to two weeks, and I can't tell you exactly

19 the other three states, but it was recent.

20      Q    Which three states?

21      A    I don't remember.

22      Q    Okay.

23           MR. AGAY:  I'm handing the witness

24 what's been marked as WESCO Exhibit 3.

25 BY MR. AGAY:

1    Q    Have you had a chance to review that,

2  Mr. Flake?

3    A    This is the first time I've seen it, so

4  give me a second.

5    Q    Sure.

6         (Pause.)

7         THE WITNESS:  Okay.

8  BY MR. AGAY:

9    Q    Were you a recipient of this e-mail?

10    A    It says that I was.

11    Q    Okay.  But you don't recall receiving it?

12    A    I do not.

13    Q    Okay.  Can you point to me on this document

14  where it says that the company has received any money

15  transmitter licenses or business registration

16  approvals?

17    A    I'm not sure that it does.

18    Q    So as of April 24th, in an e-mail from

19  Dawn Chapman summarizing where you stand in the

20  regulatory process, you don't see where it says you

21  received any approvals?

22    A    Yeah.  I think I've already testified that

23  they were received in the last two weeks or so.

24    Q    Okay.

25         MR. AGAY:  Your Honor, I'd move to

1    admit this into evidence, WESCO Exhibit 3.

2                    MR. CLAR:  No objection.

3                    THE COURT:  All right.  It will be

4    admitted.

5                    MR. AGAY:  I'm handing the witness

6    WESCO Exhibit 4.

7    BY MR. AGAY:

8        Q    Have you had chance to review it yet,

9    Mr. Flake?

10       A    Give me just a second.

11            (Pause.)

12            THE WITNESS:  Yes.

13   BY MR. AGAY:

14       Q    Okay.  Could you tell me what this is?

15       A    It's an e-mail from Dawn Chapman to Bruce

16   Pollack, Brian Saler, Daniel Shack (phonetic) and

17   myself.

18       Q    And it's the same Dawn Chapman that was on

19   the prior e-mail, right?

20       A    It is.

21       Q    And is Dawn Chapman leading your efforts to

22   obtain regulatory approval internally?

23       A    She is.

24       Q    Could you point me on this e-mail where it

25   says that you received any regulatory approvals?

1      A    It does not.  It does say that there are a

2    number of states where we don't need regulatory

3    approval, which is the crux of this e-mail.

4      Q    Okay.  So is your testimony that you're

5    going to launch in the states that you don't need

6    regulatory approvals or where you've already received

7    them?

8      A    My position would be that we would launch

9    in both, the states that don't require it and the

10   states where we're licensed.

11     Q    For the states that don't require it, have

12   you completed your business registrations?

13     A    I know we've got them in flight.  I don't

14   know specifically.

15            Business registration is a matter of a

16   couple of days, and we told you we're not going to

17   launch for six weeks.

18            I don't believe that is an obstacle.

19            MR. AGAY:  Your Honor, Mr. Flake just

20   testified that they've received approvals from the

21   state of Washington.

22            I'd like to introduce an exhibit

23   saying -- indicating that at least as of June 11th,

24   that's not true.

25            It was not on our exhibit list.

1                    THE COURT:  Mr. Clar.

2                    MR. CLAR:  I haven't seen it.

3                    Well, he can ask the questions.  I

4       don't -- once we get into it, then I can make a

5       decision.

6                    MR. AGAY:  Mark it as Exhibit 22.

7                    Your Honor, we didn't bring enough

8       copies for -- maybe Mr. Clar can have it while I'm

9       questioning the witness.

10                   MR. CLAR:  I don't want to hamstring

11      you.

12                   MR. AGAY:  No, no.

13                   MR. CLAR:  I can stand here too.  You

14      only have one copy.  I don't know how this is going

15      to work.

16                   MR. AGAY:  Well, that's --

17                   Mr. Flake, take a moment to review it.

18                   THE WITNESS:  All of this?  That will

19      take awhile.

20                   MR. AGAY:  Just the cover e-mail.

21                   (Pause.)

22                   THE WITNESS:  Got it.

23      BY MR. AGAY:

24          Q    Okay.  Can you point to me on that document

25      where it indicates you've received regulatory

```
 1   approvals in the state of Washington?

 2                   MR. CLAR:  Your Honor, to the extent

 3   that Mr. Flake is not on this e-mail, I'd object.

 4                   There's no foundation.

 5                   THE COURT:  Sustained.

 6   BY MR. AGAY:

 7       Q    When did you receive your regulatory

 8   approvals in the state of Washington?

 9                   MR. CLAR:  Are we still using this

10   exhibit?

11                   MR. AGAY:  No.

12   BY MR. AGAY:

13       Q    When did you receive your regulatory

14   approval?

15       A    Sometime in the last ten days to two weeks.

16       Q    How do you know that?

17       A    I was informed by e-mail from Dawn Chapman.

18       Q    Do you have that e-mail?

19       A    Hang on.  And I was -- we applied to

20   Washington State via the NMLS platform, and I was

21   apprised by an e-mail from Washington State to that

22   effect.

23       Q    Do you have those e-mails?

24       A    I do not.

25                   MR. AGAY:  I'll withdraw the exhibit.
```

1                    THE COURT:  Okay.

2                    By the way, before we go on, you never

3       moved for the admission of Exhibit 4.

4                    Did you want it in there?  That was

5       the Dawn Chapman --

6                    MR. AGAY:  Yes.  I move Exhibit 4.

7                    THE COURT:  Mr. Clar?

8                    MR. CLAR:  No objection.

9                    THE COURT:  That's admitted.

10      BY MR. AGAY:

11         Q    In all of these states where you're seeking

12      money transmitter licenses and business

13      registrations, are you seeking those for Bcause

14      Secure or Bcause Spot?

15         A    Bcause Secure.

16         Q    So not for Bcause Spot?

17         A    That's correct.

18         Q    Don't you need them for Bcause Spot?

19         A    No.

20         Q    So it's your position you don't need any

21      regulatory approvals for Spot?

22         A    Not for Spot to do the exchanges.  We do

23      need regulatory approval to move money around the

24      country, and that would be the function of Bcause

25      Secure.

1          MR. AGAY:  I'm handing the witness

2   WESCO Exhibit 5.

3   BY MR. AGAY:

4      Q    Did you have a chance to review it?

5      A    I recognize the document.  There's 20-some

6   pages here.

7      Q    Okay.  What is it?

8      A    It's Bcause Secure, LLC business plan.

9      Q    Did you --

10             MR. CLAR:  Which exhibit is this?

11             MR. AGAY:  I'm sorry.  Exhibit 5.

12             MR. CLAR:  Thank you.

13   BY MR. AGAY:

14     Q    Did you submit this as part of seeking your

15   money transmitter licenses or business registrations?

16     A    I believe Dawn Chapman would have submitted

17   it.

18     Q    Okay.

19     A    So if you meant "you" the company, yes; if

20   you meant me personally, no.

21     Q    Is this the business plan that's currently

22   on file with all the state regulators?

23     A    I can't speak to that.

24     Q    Do you know whether this has been updated

25   in any way if it has been submitted?

1      A    It appears not to be an updated version.

2  Ms. Cresce is still on, as is Mr. Boyk.

3      Q    Okay.  So let's talk about that.

4           Let's turn to page three.  It is the

5  fifth paragraph, starting, "The company will be

6  managed by two executives."

7           Do you see that?

8      A    Yes.

9           THE COURT:  Can I pause just for a

10  moment?  I know you're not raising a relevance

11  objection, but I'm just a little bit confused by now.

12           Why do I care about Bcause Secure if

13  it's a business that's not operating and not in the

14  current business plan?

15           I thought only Spot was in the

16  business plan.

17           MR. CLAR:  It is.  And I've tried to

18  not litter the record with objections.

19           THE COURT:  And I appreciate that, and

20  I truly -- I'm just trying to understand context

21  here, so, Mr. Agay, I'm kind of asking you for some

22  context.

23  BY MR. AGAY:

24      Q    Is Bcause Secure necessary to the operation

25  of Bcause Spot?

1        A      To the extent we wanted to launch a

2    fiat-to-cryptocurrency exchange, it would be.

3        Q      And isn't that, in fact, what you want to

4    do?

5        A      That's our current intention.

6        Q      Okay.

7               MR. AGAY:   That's the relevance, Your

8    Honor.

9               THE COURT:   Okay.  Understood.

10   BY MR. AGAY:

11       Q      If you turn to page three.

12       A      Yes.

13       Q      The paragraph starting, "The company will

14   be managed," and then it lists several executives:

15   Fred Grede, Brian Salor, Mike Adolphi, John Ashby,

16   Thomas Flake, etcetera?

17       A      Yes.

18       Q      Are there any individuals on this list that

19   are no longer with the company?

20       A      Fred Grede and Tom Hammond.

21       Q      Everybody else is still there?

22       A      Yes.

23       Q      Now, if you turn to page five, the third

24   full paragraph.  It say, "the company will initially

25   be capitalized between 500,000 and 1.5 million."

1          Do you see that?

2     A     Yes.

3     Q     Have you raised that money?

4     A     We used as our capital statement, with the

5 state of Washington at least, the amount of money

6 that we had spent developing the software and the

7 software that is then used.

8              And I don't mean the Nasdaq software.

9 I mean software that we've built for the website and

10 others.

11             That number was in excess of these

12 numbers and qualified for capitalization under those

13 terms.

14    Q     Okay.  So when you say "capitalized,"

15 that's not actual cash; you are saying that is

16 software development?

17    A     It's assets on the balance sheet in excess

18 of liabilities.

19    Q     Okay.  And the assets on the secured

20 balance sheet that you say are worth between 500,000

21 and a million five is software?

22    A     Software and the labor associated with it,

23 yes.

24    Q     And only Bcause Secure owns that software?

25    A     Holding technically does, I suppose, but

1    that's what we use as far as the -- because we don't

2    keep a separate set of books, and yet when we look at

3    them, that's what's attributable to that --

4         Q    So you took assets on Holding's balance

5    sheet and said those are secure assets for purposes

6    of this application?

7         A    It's Holding's intention to transfer those

8    assets, assets that you say are worth nothing.

9         Q    Has Holdings transferred those assets to

10   Secure?

11        A    I couldn't speak to that, but we're -- it's

12   in flight.

13        Q    Okay.

14             MR. AGAY:  Your Honor, I'm handing the

15   witness WESCO Exhibit 6.

16             MR. CLAR:  So we're clear, Your Honor,

17   counsel did not move in Exhibit 5, and I would object

18   because there was absolutely no foundation.  The

19   witness has never seen it before.

20             MR. AGAY:  Your Honor, it's a business

21   record.  It was submitted with their licenses to the

22   state of Wisconsin.  It was provided.

23             And he did say that he has seen this

24   before, and he did recognize it.

25             THE COURT:  I'll admit it because the

 1  witness testified that this was the document they

 2  submitted to the various states.

 3  BY MR. AGAY:

 4       Q    Have you had a chance to review that?

 5       A    Exhibit 6?

 6       Q    Yes.

 7       A    Yes.

 8       Q    Did you -- is this an article written for

 9  an online publication called CoinDesk?

10       A    Yes.

11       Q    Did you provide an interview for this

12  article?

13       A    I did.

14       Q    In the second paragraph it says "The

15  Chicago-based company has tentatively set May

16  23rd as the go-live date for Bitcoin, Bitcoin cash,

17  etcetera.

18            Did you in this interview say that May

19  23rd was going to be the go-live date?

20       A    I said that it was tentatively set.

21       Q    Does this article say "tentatively set"?

22       A    It does.

23       Q    Yeah, it does say tentatively set.

24            Did you go live on May 23rd?

25       A    We did not.

1    Q    Why not?

2    A    The plan at that time, when I gave this

3  interview, as communicated to the board by Mr. Grede,

4  was that we would launch on May 23rd.

5              Part of the reason for Mr. Grede's

6  termination was that he did not keep the board

7  apprised as plans changed.

8    Q    So you didn't go live because of Mr. Grede?

9    A    We didn't go live because of Mr. Grede.

10   Q    Okay.  In that same paragraph, the last

11  sentence says, "In anticipation of the launch, it has

12  obtained money transmitter licenses in eight states

13  with 20 mores application pending."

14             So did you in this interview, did you

15  say that you obtained money transmitter licenses in

16  eight states as of May 7th?

17   A    I don't think that's a direct quote, but I

18  think what I said was we had expected to have money

19  transmitter licenses in eight states.

20   Q    Isn't that different than the testimony you

21  gave today?

22   A    No.  What I testified today is what we

23  actually have, and what I gave in the interview was

24  our expectation on May 23rd, three weeks prior to

25  that.

1    Q    I thought it said that you obtained those

2  licenses.

3    A    It does say that.

4    Q    Oh, so that you were misquoted?

5    A    I believe I was.

6    Q    I believe during your deposition you

7  testified that Spot is an untested business model.

8             Do you still believe that?

9    A    By us, yes.

10   Q    If you lose Nasdaq support for Spot, what

11 impact does it have on the business?

12   A    It would delay our timeline.

13   Q    By how much?

14   A    I don't really have an idea.

15   Q    Okay.  But you think you can replace

16 Nasdaq?

17   A    Absolutely.  We'd already negotiated with

18 two other companies prior to signing the agreement

19 with Nasdaq.

20   Q    Would the company still be worth hundreds

21 of millions of dollars without Nasdaq?

22   A    Yeah, I believe it would.

23             That's based on a discounted cash flow

24 model.

25   Q    Do you need to install and complete a new

1  fire suppression system at the hosting facility in

2  Virginia Beach?

3       A    We do.

4       Q    Why?

5       A    It's required to be compliant with the fire

6  code.

7       Q    Do you have to complete these projects to

8  continue in business?

9       A    At some point, yes.

10      Q    How much do you currently owe to the

11 contractor performing this work?

12      A    I don't believe we currently owe them

13 anything, but I believe there is an amount necessary

14 to complete the contract.

15      Q    How much?

16      A    About $217,000.

17      Q    Is this amount currently incorporated in

18 your budget?

19      A    It's not.

20      Q    So when does this work have to be done?

21      A    It's indeterminate.  The city has given us

22 a great deal of latitude in terms of sort of

23 compliance.

24      Q    So you don't have to complete it to get out

25 of bankruptcy?

1    A    No, I don't believe so.

2    Q    Where are you going to get the cash to pay

3  for it?

4    A    I think that our existing shareholders will

5  supply the capital necessary to do it.

6    Q    Do you have any written commitments along

7  those lines?

8    A    No.

9    Q    What's the basis for your belief?

10    A    This is going to be me speaking about

11  something I understand it a little, but I'm not

12  certain I've got it right, is that in order to

13  maintain the ownership, they'd have to participate

14  materially in funding the company.

15    Q    And what if they no longer have an

16  ownership interest in the company?  Where's the money

17  going to come from?

18    A    I don't know.

19    Q    Can you make these payments and continue as

20  a going concern based on your cash today?

21    A    Which payments are those?

22    Q    The fire supression system?

23    A    Well, if we were to eliminate the Spot

24  exchange, and we've talked about sort of these two

25  parallel paths, either sort of continuing and

1 launching the Spot exchange, or in slide 26,

2 dispensing with the Spot exchange, in that

3 eventuality, it would free up about $75,000 a month

4 in capital.

5            And so, yeah, I think we could.

6     Q    I'm sorry.  So I thought that you said you

7 were raising money to launch Spot.

8     A    We are.

9     Q    Okay.

10     A    But if that's unsuccessful, we put a slide

11 in here that said we would shut it down.

12            And when you do the math, eliminating

13 the Spot-associated expenses should free up about

14 another $75,000 a month.

15     Q    The money to pay for the Spot expenses was

16 coming from the capital you were raising, right?

17     A    Yes.

18     Q    Okay.  So if Spot doesn't launch, you're

19 not going to raise the capital, correct?

20     A    We would -- we wouldn't raise the money for

21 the launch.  If we -- so let me unpack what you

22 asked.

23            If we are unsuccessful in raising the

24 capital necessary to launch Spot, we won't launch

25 Spot.  There are some of those expenses still in the

1   budgetary numbers, I believe, that would then go

2   away.

3        Q    And how much are those expenses?

4        A    Maybe I'm conflating the two.  It's been a

5   long day, but I think it's about $75,000 a month.

6        Q    Those are only expenses that you incur if

7   you launch Spot.

8                    THE COURT:  I'm sorry, Mr. Flake.  I'm

9   just going to cut to the chase here, because I'm

10  getting tired too.

11                   Are you telling me that right now, in

12  Bcause Mining budgets, there's about $75,000 a month

13  that actually is attributable to work on Spot?

14                   THE WITNESS:  No, ma'am.  I'm telling

15  you that the personnel associated with that are being

16  paid and they are doing some work on Spot.

17                   THE COURT:  Well, isn't that the same

18  thing?

19                   So what you're saying is --

20                   THE WITNESS:  Well, for instance, Dawn

21  Chapman is our head of HR.  And while she's working

22  on the money transmitter licensing, we still need a

23  person to work in HR.

24                   THE COURT:  I understand that.  But if

25  you don't launch Spot, are you going to fire Dawn

1    Chapman or cut her salary in half because she's doing

2    half her work for Spot?

3                    I don't see where the money's coming

4    from.

5                    THE WITNESS:  If we don't launch Spot,

6    then, yes, ma'am, we would lay off about another ten

7    people.  And if you look at slide 26, that's what it

8    speaks to.

9                    THE COURT:  All right.

10   BY MR. AGAY:

11       Q    Okay.  Let's look at slide 26.  Which slide

12   is slide 26?

13       A    It says "Fallback Plan, Option One, Mining

14   Only."

15                   MR. CLAR:  I'm sorry.  Which exhibit

16   are we on?

17                   MR. AGAY:  We're on Exhibit 1.

18   BY MR. AGAY:

19       Q    So where there does it say 75,000?

20       A    It doesn't.

21       Q    Oh.

22       A    But it does say ten jobs lost.  And if you

23   do the payroll associated with that ten jobs, it's

24   about 75,000.

25       Q    I'll move on.

1           Are there other exchanges in the

2   market that do what you want to do with Spot?

3        A    Not exactly, but similar, yes.

4        Q    Okay.  And what sets Spot apart?

5        A    The way in which we intend to go about the

6   business is more akin to a highly regulated exchange

7   that you might find in the securities industry than

8   what has been done previously in the market with,

9   say, some of our competitors.

10           There are fiduciaries in the market

11   that find that they can't do business with existing

12   exchanges because of their business model, and we

13   feel that we'd be able to track them.

14           And I think you made a point earlier

15   that Nasdaq is an important component of that.

16        Q    So the thing that sets Spot apart is

17   Nasdaq?

18        A    And practices associated with implementing

19   that software, yes.

20        Q    Okay.  So would you characterize that at

21   this point as an idea?

22        A    No.  It's -- actually, it's capabilities

23   such as market surveillance that are built into the

24   Nasdaq software that we feel that other competitors

25   don't have.

1    Q    So it's Nasdaq?

2    A    Yes.

3    Q    Does the Mining business have competition?

4    A    Yes.

5    Q    Okay.  So your existing and potential new

6  customers have other options for hosting facilities?

7    A    They do.

8    Q    Can your competitors afford to undercut you

9  on price?

10    A    Some.

11    Q    Okay.  Do you think your existing and

12  potential customers are questioning whether you're

13  going to continue to exist?

14    A    I suspect they are.

15    Q    So do you think they're looking at other

16  options?

17    A    I wouldn't know.

18    Q    Have you modeled any scenarios where the

19  price of Bitcoin goes down?

20    A    We haven't.

21    Q    Are there any sensitivities in your

22  business plan at all relating to the price of

23  Bitcoin?

24    A    There aren't.

25    Q    You can't predict what happens with the

174

1  price of Bitcoin, can you?

2      A    I cannot.

3      Q    If the price of Bitcoin goes down, does

4  that damage your business prospects?

5      A    I believe that customers that would

6  otherwise engage in the mining may choose not to.

7      Q    Turn to slide 15 and 16.

8              MR. AGAY:  I'm covering slides 15 and

9  16, Your Honor.

10 BY MR. AGAY:

11     Q    Do slides 15 and 16 reflect your current

12 prepetition liabilities for Bcause LLC and Bcause

13 Mining?

14     A    They cover them as we understand them.

15     Q    And these are unsecured liabilities in your

16 view, right?

17     A    In my view they were.

18     Q    So in these documents, you are treating

19 WESCO and CSC as unsecured, right?

20     A    These are -- these two slides reflect all

21 debt, secured and unsecured, and make no statement as

22 to whether CSC and WESCO are secured or not.

23     Q    Are you treating WESCO and CSC as unsecured

24 in this business plan?

25     A    We are.

1    Q    Are the costs and time of litigating WESCO

2   and CSC's claims incorporated in your budgets?

3    A    They are not.

4    Q    Do you have any sense of how much it's

5   going to cost and how long it's going to take?

6    A    I do not.

7    Q    Did you ask your lawyers?

8    A    I didn't ask our lawyers, but I heard

9   Mr. Grede speak to it in his deposition.

10    Q    So you never asked anybody how much it's

11   going to cost?

12    A    No.

13    Q    And nobody's ever told you?

14    A    No.

15    Q    And you're aware that WESCO and CSC have

16   filed secured claims in this case, right?

17    A    I am secured that they've made that claim.

18    Q    Are you assuming that WESCO and CSC will

19   voluntarily consent to relinquish their liens or

20   claims?

21    A    I'm aware that they plan not to.

22    Q    That we will object to that treatment,

23   correct?

24    A    Uhm-hmm.

25    Q    Has the IRS filed a claim in this case

1   that's not currently reflected in the budget or

2   business plan?

3        A    They have.

4        Q    For how much?

5        A    I believe it's $1.3 or -4 million.

6        Q    Is the cost of litigating this claim

7   included in the budget?

8        A    It is not.

9        Q    Have there been any claims filed that have

10  not been included in the business plan?

11       A    Not to my knowledge.

12       Q    Do you agree with the IRS' claim?

13       A    No.  It's fiction.  They claim back FICA

14  and FUTA taxes for periods of time in which we had no

15  employees.

16       Q    Do you have an understanding how this claim

17  is treated in bankruptcy?

18       A    I do not.

19       Q    Turning to slides 18 and 19 --

20            MR. AGAY:  And I'm trying to move this

21  along, Your Honor.  I apologize.

22  BY MR. AGAY:

23       Q    Slide 18 reflects your treatment of

24  liabilities and creditors in the case, correct?

25       A    Yes.

1     Q     I should say slides 18 and 19 reflect your

2     proposed treatment of creditors in the case, correct?

3     A     Yes.

4     Q     So do I understand your proposed treatment

5     of creditors as follows:  That creditors will forgive

6     one-third of their debt, correct?

7     A     Yes.

8     Q     Creditors will exchange one-third of the

9     debt for equity, correct?

10    A     Yes.

11    Q     Creditors will receive a note for the

12    remaining one-third of their debt, correct?

13    A     Yes.

14    Q     What consideration are you going to give

15    creditors for the one-third forgiveness?

16    A     I'm not sure that I understand the

17    question.  That's sort of the point of forgiveness, I

18    think.

19    Q     So they're just going to -- that's just

20    going to evaporate for no distributions; is that

21    your --

22    A     Yes.

23    Q     Now, in exchange for the other third of the

24    debt, will creditors own all the equity of Bcause

25    LLC?

1    A    No.  According to slide 19, they'd own

2  approximately 23 percent of the company.

3    Q    How did you arrive at this distribution?

4             MR. CLAR:  Your Honor, I've stayed

5  quiet, but I can't.

6             I don't understand the relevance of

7  this to a motion for relief from stay or a motion to

8  dismiss.

9             THE COURT:  Oh, I think it's highly

10  relevant.

11             The question is whether or not a

12  reasonable plan is conceivable within a reasonable

13  period of time.  This is your shot at it for now.

14             We're not here for confirmation; we're

15  here to determine whether or not you can ever get

16  there.

17             MR. CLAR:  As long as that's clear.

18             THE COURT:  It's always been clear.  I

19  actually do know --

20             MR. CLAR:  That's not what I meant.

21  But I'm just saying, it seems like we're heading down

22  the path of confirmation.  That's why I mentioned it.

23             MR. AGAY:  We're not.

24             THE COURT:  We're not.  We all know

25  why we're here; we all know when we're here in the

1  period of this case.

2  BY MR. AGAY:

3      Q    Did you -- I'll repeat the question.

4           Did you consult with your counsel to

5  understand if this treatment was permitted under the

6  Bankruptcy Code?

7      A    Not beforehand, but subsequent to that,

8  yes.

9      Q    Okay.  Do you understand whether this

10  treatment is permitted by the Bankruptcy Code?

11     A    From a legal standpoint -- I'm not an

12  expert -- but I believe it is.

13     Q    Okay.  Who's going to own the remaining

14  majority of the business?

15     A    If it were adopted as written here, without

16  changes, the existing shareholders.

17     Q    And they're receiving those interests on

18  account of their existing equity interest?

19     A    No, no.  I believe that they would be,

20  given that interest based upon their contribution to

21  Bcause Spot and because of their contribution for the

22  fire suppression system.

23     Q    Okay.  So you're saying that they're going

24  to contribute a million dollars in cash and in

25  exchange get 80 percent of the company?

1        A      Yes.

2        Q      Okay.  Can you show me on this slide where

3   you tie out that valuation?

4        A      I don't or I can't.  It's not on here.

5        Q      Oh.  Well, what does this slide reflect?

6        A      This slide reflects an existing enterprise

7   value estimated at $12.8 million, and that $12.8,

8   debt conversion of $3.8 million and both the

9   pre-money and post-money effect of that $3.8 million

10  conversion.

11       Q      I thought you just said that they're going

12  to get the 80 percent equity on own account of that

13  $1 million contribution.

14       A      I did.

15       Q      So how does that tie to an enterprise value

16  of $12.8 million?

17       A      It doesn't.

18       Q      Oh.  Okay.

19              So the enterprise value on this slide

20  is incorrect; is that correct?

21       A      No.

22       Q      Okay.  What's the enterprise value?

23       A      $12.8 million.

24       Q      So if somebody's getting a million dollars

25  in exchange for the equity, then everybody else is

1   going to get the rest of the equity for some amount

2   that's less than a million dollars in value.

3        A    Yes.

4        Q    So the enterprise value of the company is

5   not $12.8 million, correct?

6        A    The basis of your question is that all of

7   those transactions happen concurrently rather than

8   sequentially.

9             And the basis of your question is such

10  that when new money comes in, for instance, to launch

11  Spot, that there's no value accreted because of the

12  launch of Spot.

13            So, no, I reject the basis of your

14  question.

15       Q    Okay.  You're going to get a million

16  dollars --

17       A    Yes.

18       Q    -- right?

19            And on account of that million

20  dollars, your existing investors are going to get

21  80 percent of the company, right?

22       A    Yes.

23       Q    And existing creditors are going to get 20

24  percent?

25       A    At a point in time after that, yes.

1    Q    So based on those transactions, you're

2 telling the Court that the enterprise value of the

3 company is $12.8 million, correct?

4    A    At that point in time with a launched Spot

5 exchange, yes.

6    Q    With a launched Spot exchange?

7    A    Yeah, keep in mind, I said this is

8 sequential in time.  And so if people put in

9 three-quarters of a million dollars today and Spot

10 gets launched, the value of Spot goes up

11 substantially rather than just as a set of software.

12    Q    So what if your existing creditors could

13 not retain ownership of 80 percent of the company?

14 Would they still contribute the million dollars?

15                MR. CLAR:  I'm sorry.  Existing

16 creditors?

17                THE COURT:  Existing equity.

18                MR. AGAY:  I'm sorry if I misspoke.

19 BY MR. AGAY:

20    Q    If your existing equity holders could not

21 retain 80 percent of the company, would they

22 contribute the million dollars?

23    A    Everything's in negotiation, so I don't

24 know.

25                But my assumption was -- or I think

1  the basis of your question is would they be less

2  inclined to, and I think the answer to that is yes.

3      Q    Do you know when they're going to know

4  that?

5      A    Our intention is to have the investment

6  completely wrapped up before the end of July,

7  recognizing that if we don't have it wrapped up by

8  then, we'll shut down Spot, and that additional free

9  cash flow that's freed up will be accreted to the

10 creditors.

11     Q    And what if the only way that all of that's

12 going to come together under one roof is if you

13 confirm a plan by the end of July?

14     A    I don't think we're required to.

15     Q    Okay.  Are the costs of proposing and

16 confirming a Chapter 11 plan currently incorporated

17 in your budgets?

18     A    Not through the 6th of September.

19     Q    Okay.  When do you think it's going to

20 happen?

21     A    I believe we're supposed to submit the plan

22 by August 11th or thereabouts, 120 days from

23 April 11th filing date, and I suspect that there

24 would be hearings on that sometime after that.

25     Q    Okay.  But you don't know how long that

184

1  process is going to take?

2       A    I do not.

3       Q    And those costs are not incorporated in

4  here?

5       A    Because they're after September 6th, yes.

6       Q    Could you explain the terms of your

7  proposed note?  And here I'm on slide 20.

8                 MR. CLAR:  You said 20?

9                 MR. AGAY:  Yes.

10 BY MR. AGAY:

11      Q    Can you explain the terms of your proposed

12 note?

13      A    It's the $3.8 million and debt amortization

14 amortized at 12 percent interest over five years.

15      Q    Is this compounding interest?

16      A    It is.

17      Q    And compounding on what balance?

18      A    On the then monthly due balance.

19      Q    So the balance of the note is going down

20 over time, correct?

21      A    The principal is going down.

22      Q    Right, because you're amortizing the note?

23      A    Yeah.

24      Q    And then you're calculating the 12 percent

25 interest on that reduced balance of the note,

1    correct?

2        A    Yes.  So just like in a house payment or a

3    car payment, the amount applied to principal goes up

4    over time, and the amount applied to interest goes

5    down over time.

6        Q    Have you done a calculation to understand

7    whether under the terms of that note, you get to a

8    present value equal to the existing liabilities as of

9    today?

10            Strike that.  Let me ask this

11   question:  Have you done any present value analysis

12   as it relates to that note?

13       A    What discount rate would you have used?

14       Q    I'm asking you did use -- did you do any

15   present value analysis?

16       A    We did not.

17       Q    Do you recall in your prior business plan

18   the monthly payment on the note was $75,922, and

19   total payments were $4,555,358.22?

20       A    I do.

21       Q    Why has that changed?

22       A    Because the Nasdaq filing was incorporated.

23            Initially, we believed Nasdaq was owed

24   $125,000.  That's in round numbers.

25            But subsequent to that, we became

1  aware that NASDAQ's claim was significantly higher

2  than that, and this version incorporates that.

3      Q    Do you also recall in your deposition that

4  the company -- that you stated that the company could

5  not afford to pay more than the approximately $75,000

6  a month in debt service?

7      A    Yes.

8      Q    Why has that changed?

9      A    Because I don't -- on a percentage basis on

10  our revenue, I don't view the extra, I think $7,000,

11  if I heard your numbers right, as terribly material.

12     Q    Well, the monthly --

13     A    Certainly, we couldn't double the payment.

14     Q    Do you recall during your deposition I

15  asked you the following question:

16           [AS READ:

17           **Question:  Is there any cushion built**

18     **in there where you could pay some amount more than**

19     **the 75,000?**

20           **Answer --]**

21           MR. CLAR:  Are you referring to a

22  specific page in the deposition?

23           MR. AGAY:  I'm sorry.  Page 137 of

24  Mr. Flake's deposition, line three.

25           I'll start over.

1          [AS READ:

2                    Is there any cushion built in there

3     where you could pay some amount more than the

4     75,000?

5                    Answer:  Not a meaningful amount.

6     There's no hidden number here.  We're being as

7     honest as we can with all of our creditors.

8                    Question.  So the most you think you

9     can afford to pay and continue as a going concern

10    is 75,000 a month?

11                   Answer:  That's why we structured the

12    proposal the way we did.

13                   Question:  And if you had to pay more

14    than that amount, is it your view that the company

15    would not survive as a going concern?

16                   Answer:  It would make it difficult to

17    do things like maintenance, and, ultimately, that

18    would be deleterious to everyone who is depending

19    upon that stream of payments in the future.]

20                   Did I ask you those questions; did you

21    give those answers?

22        A     You did and I did.

23        Q     So how do you reconcile that with the

24    current loan?

25        A     You'll note in my answer I said not a

1   meaningful amount.

2          I don't view the $8,000, less than

3   10 percent, as a meaningful amount.

4       Q    Okay.  So you thought that there was

5   cushion in the 75,000?

6       A    Not a meaningful amount.

7       Q    Is there any cushion in the $84,595?

8       A    No.

9       Q    So you can't pay any more than that?

10      A    I don't believe so.

11      Q    In terms of cash distributions, you are

12  effectively just proposing to pay all your unsecured

13  creditors, including WESCO and CSC, $84,598.50 a

14  month, correct?

15      A    Yes.

16      Q    In addition to the equity.

17      A    In addition to the equity, and in addition

18  to the tax effects they'd have from writing off the

19  3.8 million.

20      Q    I'm glad you brought that up.

21      A    And this has come up since our deposition,

22  this whole idea of the $70,000 offset with BMG.

23      Q    Oh, so you're going to recover, now, more

24  from BMG?

25      A    I don't know.  That's still sort of an open

1   issue.

2       Q    All right.  So you think there's some tax

3   benefit to creditors from writing off their debt?

4       A    I think there can be.

5       Q    Do you know that for sure?

6       A    Yes, I mean in the federal --

7       Q    Are you tax a expert?

8       A    I'm an MBA.  I have experience with

9   preparing taxes.

10      Q    And so where in this model does it show the

11  benefit to creditors in writing off that debt?

12      A    It doesn't.

13      Q    Have you considered the impact on the

14  company for forgiveness of debt income?

15      A    Would you repeat the question?

16      Q    Do you know what CODI is, cancellation of

17  debt income?

18      A    Yes.

19      Q    Okay.  Have you considered that impact on

20  the company?

21      A    No, no.  But I recognize what you're

22  asking, which is forgiveness of debt would be

23  considered a profit to the company.  We'd have a tax

24  implication.

25      Q    Right.  Have you considered that impact?

1      A     It's not on our modeling, because from our

2   perspective, we have enough losses carried forward to

3   -- or at least losses in the current fiscal year to

4   offset that effect.

5      Q     Isn't your income and losses passed through

6   to your existing members?

7      A     It is.  So the tax impact would also pass

8   through to our members.

9      Q     All right.  And have you modeled that out

10  for your members at all?

11     A     We have not.

12     Q     What is the assumed effective date of your

13  Chapter 11 plan?

14     A     We intend to submit a plan for ratification

15  or approval, I'm not sure of the legal term, before

16  the deadline.

17     Q     The deadline being August 11th in your --

18     A     Being 120 days from April 11th.

19     Q     Are you aware that the debtors have filed a

20  motion in this case to set the claims bar date at

21  August 30th, 2019?

22     A     I believe I am aware of that.  I knew there

23  was a bar date.  I don't know that I knew it was

24  specifically that date in August.

25     Q     So you don't think you need to let that

1  claims bar date pass before you can propose a plan?

2      A    I think that we have the ability to ask for

3  an extension, but I haven't consulted with counsel on

4  whether that's a good idea at this point.

5      Q    Are you aware the same motion seeks to set

6  the governmental claims bar date on October 11, 2019?

7      A    No, I wasn't aware of that.

8      Q    Okay.  So you don't know whether you have

9  to let that pass before you propose a plan?

10     A    I do not.

11     Q    And you haven't considered how these bar

12 dates impact on timing for confirmation and

13 consummation of the Chapter 11 plan, correct?

14     A    That's correct.

15     Q    Are you assuming that all creditors consent

16 to the treatment you're proposing under your Chapter

17 11 plan?

18     A    I'm not aware -- what was that question

19 again?

20     Q    Are you assuming that all creditors consent

21 to the treatment you propose under your Chapter 11

22 plan?

23     A    I haven't spoken to all creditors about

24 whether they consent or not.

25     Q    I asked what you're assuming.

1      A      I'm assuming that a percentage and a number

2  sufficient to pass the plan will agree to the plan.

3      Q      Do you think WESCO has to agree to this

4  proposed treatment under the plan?

5      A      I believe if they're found to be secured,

6  they will.

7      Q      What if they're unsecured?

8      A      Then I think they're one vote among 90.

9      Q      Are you aware of the absolute priority

10  rule?

11              MR. CLAR:  Objection.

12              MR. AGAY:  I'm just asking if he's

13  aware.

14              MR. FISHER:  Your Honor, this is a

15  discussion of a lot of legal stuff here.

16              We've taken an enormous length of

17  time --

18              THE COURT:  Mr. Fisher, I think

19  Mr. Clar can handle this one, but thank you.

20              I'll let him answer one question, not

21  about legal advice --

22              MR. AGAY:  I'm just asking if he's

23  aware of it.

24              THE COURT:  -- just whether he's aware

25  of the rule.

1            MR. AGAY:  Fine.

2            THE COURT:  Which any interest holder

3    should know.

4            THE WITNESS:  I'm aware that it

5    exists.

6    BY MR. AGAY:

7        Q    Are you aware of what the best interest

8    test is?

9        A    I'm aware that it exists.  I don't think I

10   could give you a legal opinion.

11       Q    Okay.  Are you aware of the feasibility

12   test?

13       A    Again, I'm aware that it exists.  I'm

14   not -- I couldn't give you a legal opinion.

15           MR. AGAY:  We're getting there, Your

16   Honor.

17           THE COURT:  How much more?  I was

18   going to give you five more minutes.

19           MR. AGAY:  That might be all I need.

20           THE COURT:  Take it, and don't take

21   more.

22   BY MR. AGAY:

23       Q    We talked about this already.  What's the

24   going concern value of the business, in your view?

25       A    As a going concern, we believe it's about

1  $12.8 million.

2      Q    How did you arrive at this amount?

3      A    The -- I'm having trouble finding the page.

4  Give me a second.

5           We believe it's $10.8 million for the

6  mining operation, which is a multiple monthly

7  revenue, and we believe that it's a $2 million, which

8  is the replacement cost of the Spot exchange.

9           Both of those numbers we consider --

10  we considered other alternatives, and we think those

11  are more conservative than other alternatives.

12      Q    What's the current liquidation value of the

13  business?

14      A    I'm not a liquidation expert, but I believe

15  about a million dollars.

16           MR. CLAR:  If I might object,

17  liquidation value of the business -- I don't know if

18  the question is asking the liquidation value of the

19  assets; I don't know how -- I don't understand the

20  question.

21           THE COURT:  Sustained.

22  BY MR. AGAY:

23      Q    What's the liquidation value of the assets?

24      A    I believe the assets could be sold for

25  somewhat less than a million dollars.

1    Q    900,000 -- less than 900,000?

2    A    I think I testified on May 8th to the

3 fact that it was somewhere between 900- and a million

4 dollars.

5    Q    Okay.  Are the noncash assets in the

6 business depreciating?

7    A    Yes.

8    Q    At what rate?

9    A    It varies from asset to asset, but it's

10 fair to say that on average, we're using the

11 straight-line method over a ten-year period.

12              THE COURT:  Well, I'm going to ask for

13 a little clarification.

14              There's depreciation for purposes of

15 accounting, and there's depreciation because stuff

16 gets old.

17              THE WITNESS:  Yes, ma'am.

18              THE COURT:  I think we need

19 clarification of what you're asking.

20 BY MR. AGAY:

21    Q    What do you think the market value of the

22 depreciation during the case is?

23    A    Well, if it's a ten-year, straight-line

24 method, about 5 percent per year, or for a six-month

25 period.

1      Q      5 percent every six months?

2      A      If my math in my head without a calculator

3  is right, approximately that, yes.

4      Q      5 percent of what?

5      A      5 percent of the book value.

6      Q      So if the book value were 15 million, then

7  the assets would be depreciating at 75,000 every six

8  months in your view?

9      A      That's per tax code.  In terms of useful

10 life, we expect the transformers and racks and other

11 equipment that your client provided may have a useful

12 life longer than ten years.

13             MR. AGAY:  I'm showing the witness

14 Exhibit 11, Your Honor.

15 BY MR. AGAY:

16     Q      Have you seen this before?

17     A      Yes.

18     Q      What is that?

19     A      It's a Bcause balance sheet, unaudited,

20 dated March 31st, 2019.

21     Q      Is this the company's currently

22 consolidated balance sheet?

23     A      It was current as of March 31st.

24     Q      Do you have a new one?

25     A      We have not provided a new one.

1              I testified earlier, the accounting

2    under bankruptcy is outside of my or our controller's

3    expertise.

4        Q    Do you prepare separate balance sheets for

5    any of your subsidiaries?

6        A    We do not.

7        Q    Do you view the debtors in those

8    subsidiaries as a consolidated business and

9    operation?

10       A    We do.

11       Q    Are there any other company balances on

12   this balance sheet?

13       A    I don't believe there are, but let me

14   review it really quickly.

15       Q    Sure.

16              (Pause.)

17              THE WITNESS:  No, I'm not seeing any.

18   BY MR. AGAY:

19       Q    Under this balance sheet, what annual rate

20   of depreciation are you taking?

21       A    Again, I said it varies from asset to

22   asset, depending on the IRS code, but generally,

23   ten-year, straight-line method.

24       Q    There's a line item here that says

25   "accumulated depreciation."

1          What's your rate of depreciation under

2    that line item?

3         A     Can you give me the --

4               MR. CLAR:  I have to object, because I

5    don't know what kind of depreciation we're talking

6    about --

7               THE WITNESS:  -- line item number,

8    please.

9               MR. CLAR:  Excuse me.  I have to

10   object because I don't know what kind of depreciation

11   we're talking about.

12              THE COURT:  I think that was the

13   question.

14              MR. AGAY:  Yeah, what is --

15              THE COURT:  What is accumulated

16   depreciation as per this line item?

17              MR. CLAR:  Under what standard?

18              THE COURT:  It's an unaudited balance

19   sheet.

20              MR. AGAY:  You can cross him.

21              THE WITNESS:  So can you give me the

22   line item you're asking about?

23   BY MR. AGAY:

24        Q     1600 -- 16,000?

25        A     Accumulated depreciation, $1,460,000.

199

1      Q     So if you back out of that, an annual rate,

2   what would be the annual rate of depreciation of your

3   assets?

4      A     Ten-year per year is 10 percent per year.

5      Q     Okay.  So what dollar amount?

6      A     I don't remember what the original booked

7   value was of that, but you would assume that if this

8   covered about 15 months, about $1.1- or $1.2 million.

9      Q     Per year?

10     A     Yes.

11     Q     Okay.  In book value.

12     A     That's, by the way, why our EBIDTA is such

13  -- so much more important and relevant measure of our

14  profitability than net, because the depreciation is

15  so enormous, it offsets the -- it happens after --

16  depreciation happens after that.

17     Q     Right.  So the -- who gets the benefit of

18  that depreciation from a tax perspective?

19     A     The current shareholders.

20     Q     So today, the current shareholders are

21  getting the benefit of that depreciation, correct?

22     A     Yes.

23     Q     But that depreciation hurts your secured

24  creditors, correct?

25               MR. CLAR:  Your Honor, it calls for a

1    legal conclusion.

2             I didn't really understand the

3    question to begin with.

4             THE WITNESS:  I was actually trying to

5    unpack the question in my head.

6             MR. CLAR:  It asks for the witness to

7    give a legal conclusion and an accounting conclusion

8    at the same time.

9             THE COURT:  Sustained.

10            MR. AGAY:  I'll ask it again.

11   BY MR. AGAY:

12       Q    The value of the assets are going down on

13   account of appreciation, correct?

14       A    On account of depreciation, yes.

15       Q    On account of depreciation.

16       A    Yes.

17       Q    Have you hired any consultants or other

18   advisors to assist with the Chapter 11 or to help you

19   raise capital, other than your lawyers?

20       A    We have not.

21       Q    Have you hired an investment banker?

22       A    We have not.

23       Q    What about an appraiser?

24       A    We have not.

25       Q    An accountant or tax advisor?

1    A    No.

2    Q    Do you have the cost of potentially

3 litigating with BMG incorporated into these budgets?

4    A    I do not.

5    Q    If you had to pay WESCO's claim in full,

6 could you do it and continue in business?

7    A    Not if we had to do it lump sum, all up

8 front.

9              But I think we've demonstrated that we

10 believe there's a payment path that could work.

11   Q    What if you had to pay a million?

12   A    We could not.

13   Q    What about a half a million?

14   A    No, I don't believe so.

15   Q    The creditors committee's budget for 10,000

16 a month is in your budget, correct?

17   A    They are.

18   Q    Has the creditors committee agreed to a cap

19 on their fees in this case?

20   A    I don't believe they have.

21   Q    Isn't this different from your deposition

22 testimony?

23   A    My understanding has evolved.

24   Q    How has it evolved?

25   A    I think creditors committee counsel was

1  asked that same question during the May 8th

2  hearing, and she stood up and said they had not

3  agreed to a cap.

4      Q    So why are they still in the budget for

5  10,000?

6      A    Because I believe that that's an

7  appropriate number to this point.

8      Q    So you believe that 10,000 a month is going

9  to cover the cost of this trial for the creditors

10  committee?

11      A    I don't know that I knew today was going to

12  be quite so long.

13      Q    Has your counsel agreed to a cap on their

14  fees?

15              THE COURT:  I mean, it's pretty bad,

16  but I'm looking at you saying why aren't you

17  objecting?

18              MS. JANCZAK:  I was going to object

19  generally.

20              I don't see that whether there's a cap

21  on my fees or Mr. Clar's fees is relative to what

22  we're doing.

23              MR. AGAY:  He's already answered.

24              THE COURT:  I'm actually going to

25  overrule that objection.  It was relevant to question

1 | one.  Now we're getting a little out of control here.

2 |        Move on.

3 | BY MR. AGAY:

4 |   Q   Has your counsel agreed to a cap --

5 |        THE WITNESS:  Actually, Your Honor, he

6 | said more than five minutes ago that we were going to

7 | end in five minutes.

8 |        Can I get a bio break?

9 |        THE COURT:  I'm in the same position.

10 |        I would like to take a break.  I was

11 | hoping you'd be finished with his direct before we

12 | did so.

13 |        MR. AGAY:  Okay.  Why don't we take a

14 | break, and I'll make sure I have no other questions.

15 |        THE COURT:  We're going to take a

16 | break, and when we come back, I will allow you five

17 | more minutes of questions if you desperately need

18 | five minutes of questions.

19 |        MR. AGAY:  Thank you.

20 |        MR. SHAW:  I'd also ask that we talk a

21 | little bit about scheduling, because I'm certain that

22 | no matter how late you're willing to stay, at this

23 | point, after it's taken this long to get through Mr.

24 | Flake's direct, we're not going to get this finished

25 | today.

```
 1                THE COURT:  Oh, of course not.

 2                MR. SHAW:  And I think some people

 3   probably need to figure some things out.

 4                THE COURT:  Why don't you talk, and

 5   let me know when you're ready.  But I'm taking a

 6   break, as is Mr. Flake, right now.

 7                (Brief recess.)

 8                THE COURT:  Continuing the Court's

 9   10:00 o'clock set matter, Bcause Mining, LLC.

10                MR. CLAR:  Thank you, Your Honor.

11                Before Mr. Agay's -- there's a couple

12   things that we need to clarify here.  How late we're

13   going to go today.  I don't know how late the court

14   reporter can go or wants to go, and she's important

15   too.  And my understanding is that Ms. Estelle has

16   some commitments or -- no?  Okay.  Good.

17                It's clear that we're going to have to

18   come back, and so the way that I think this is going

19   to be is Mr. Agay's going to finish.  I don't know if

20   Ms. Janczak will have any questions.  I would prefer

21   to leave my direct/cross until after the other

22   witnesses.

23                So what time should we -- are we

24   planning --

25                THE COURT:  Well, I was going to say
```

1  I'd like to finish Mr. Flake if that was at all

2  conceivable, although I suspected it was not.

3                    MR. CLAR:  It's not.

4                    THE COURT:  So it's -- you know, I

5  don't want to waste today.  I'm certainly willing to

6  go at least until 5:00.

7                    If you're finishing with your direct,

8  Mr. Agay, are you going to do any cross of Mr. Flake

9  or reserve all of it?

10                    MR. AGAY:  Here's what we were

11  thinking, because his direct and cross, either way

12  with Mr. Flake, is going to spill past today.

13                    THE COURT:  No question.

14                    MR. AGAY:  So what we were thinking

15  is, I just have one or two more questions for him.

16                    I would then put up Mr. Grede, do his

17  direct, hopefully finish that today.

18                    And then we can come back on Monday --

19                    MR. CLAR:  Yes.

20                    MR. AGAY:  -- and he can do a cross of

21  Mr. Grede and he can -- I can put up Mr. Lane --

22                    MR. CLAR:  On Monday.

23                    MR. AGAY:  -- on Monday, and he'll do

24  his direct and recross of Mr. Flake on Monday.

25                    THE COURT:  Right.

1              MR. CLAR:  That was our --

2              MR. AGAY:  If that works with the

3  Court.

4              THE COURT:  That's fine with me.  I

5  would hope that you can be more efficient with

6  Mr. Flake, Mr. Agay.  I'm not sure this was the model

7  of efficiency this afternoon.  We got going okay, but

8  it's gotten very long and a little bit repetitive.

9              So I'll just ask you to spend the

10  weekend to tighten things up a bit.

11             MR. AGAY:  I make no comment on my

12  opponent's day.  I will try.

13             THE COURT:  All right.  Okay.  Let's

14  do that, and we'll see how long it takes to get

15  through.

16             MR. AGAY:  Thank you.  All right.

17  Back on the record.

18  BY MR. AGAY:

19     Q    Mr. Flake, I understand you valued Bcause

20  Mining based on a multiple of revenues, and you

21  valued Bcause Spot based on replacement value.

22             Could you please explain your

23  methodology and why the difference?

24             MR. CLAR:  Objection as to relevance,

25  Your Honor.

1          In terms of the motion for relief from

2   stay -- I'm trying to move this along, because the

3   motion for relief from stay is the -- the equity in

4   the collateral, it's not -- doesn't go to that; or

5   whether it's necessary for an effective

6   reorganization, doesn't go to that; cause for

7   dismissal, doesn't go to that either.

8          THE COURT:  Mr. Agay.

9          MR. AGAY:  Part of the object here is

10  to understand if there's a confirmable plan, and it's

11  part of the understanding that I think there's an

12  assessment of the best interest test.

13         I know we're not here for

14  confirmation, but I think what he uses going concern

15  value versus liquidation value under his proposal is

16  relevant, very relevant to the Court's determination

17  and also in terms of what he's proposing -- what the

18  company's proposing to distribute out to creditors.

19         They're basing their plan on

20  distribution of equity to creditors.  What that

21  equity's worth is highly relevant.

22         MR. CLAR:  But --

23         THE COURT:  I'm going to sustain the

24  objection.  I think we're getting a little bit into

25  too much detail for purposes of what the Court has to

1  decide at this point in time, so I'd ask you to move

2  on.

3          MR. AGAY:  I don't have anything else

4  for Mr. Flake.

5          We're going to call Mr. Grede.  I have

6  to go out in the hall and get him.

7          But, before we do that, I don't have

8  any other motions --

9          THE COURT:  Okay.  Thank you,

10 Mr. Flake.

11         MR. CLAR:  I think Ms. Janczak had

12 some questions, so do we want to do that now?

13         MS. JANCZAK:  Or I can wait and save

14 it until you've done your direct.  Because I would

15 probably ask questions now and then also on Monday.

16         I'll just save it all for Monday.

17         THE COURT:  Why don't you save it.

18         Okay.  Thank you Mr. Flake.  You're

19 not going to be called anymore today, so you can go.

20         THE WITNESS:  I think I'll stay as a

21 representative of the company.

22         THE COURT:  Yes, that's fine.

23         THE WITNESS:  Thank you, ma'am.

24         MR. AGAY:  One issue, Your Honor.

25         So we are going to present the expert

1  witness testimony of Mr. Lane, and he's going to

2  testify as to his opinion, assuming the Court allows

3  it, regarding the company's business plan and the

4  company's valuation since they've set that out.

5              He is objecting to the relevance of me

6  asking these questions of Mr. Flake.  I think we

7  should vet this issue out right now to see if there's

8  going to be a relevance objection as it relates to

9  Mr. Lane.

10             MR. CLAR:  Well, there would be the

11  same objection as to relevance of the whole valuation

12  that he's giving, yes, but there also would be an

13  objection to Mr. Lane testifying as to the value of

14  the hard assets as well, so we get that out there

15  too.

16             THE COURT:  I'm not sure Mr. Lane's

17  going to talk about the value of the hard assets.

18             MR. CLAR:  If that's the case, then we

19  don't have to go there.

20             THE COURT:  But I do think that

21  Mr. Lane's testimony is going to be relevant here.  I

22  have to know whether or not a viable plan is

23  possible.

24             Now, we all understand this plan is

25  not on the table for confirmation.  This is an idea.

1  I have to at least know whether or not this idea has

2  any possible -- could in any possible way fly, and I

3  think that's what Mr. Lane's going to talk about.

4            MR. AGAY:  He will talk about it.

5  You'll also hear about that on direct from Mr. Flake

6  as well.

7            THE COURT:  All right.

8            MR. AGAY:  I'll go get Mr. Lane.

9  (Witness sworn.)

10           THE CLERK:  Please state your name,

11  and spell it for the record.

12           THE WITNESS:  Frederick Don Grede,

13  G-r-e-d-e.

14           THE COURT:  Thank you, Mr. Grede.

15           As you can see, the court reporter has

16  her back to you.  Please answer all questions with a

17  yes or no or something.  Don't nod or uhm-hmm because

18  she can't really see.

19           THE WITNESS:  I will.  Thank you.

20      FREDERICK DON GREDE, WITNESS, SWORN

21                DIRECT EXAMINATION

22  BY MR. AGAY:

23     Q    Mr. Grede, could you briefly summarize your

24  educational and employment background.

25     A    Sure.  Undergraduate degree in finance from

1   the University of Illinois, law degree from DePaul

2   University, master's in business from the University

3   of Chicago.

4                 Employment history, I originally

5   started working for the Chicago Board of Trade,

6   mostly in their regulatory department; advanced to

7   essentially run the operations for the Chicago Board

8   of Trade for the better part of 20 to 25 years.

9                 I was recruited to go to Hong Kong.  I

10  ran the Futures and Options exchange in Hong Kong.  I

11  was the chief operating officer of the Combined Stock

12  Options and Clearing organization.

13                Formed a consulting company, spent

14  four years in Thailand and other parts of Asia

15  setting up new markets.

16                In 2007 I was appointed as a U.S.

17  bankruptcy trustee for the Sentinel Management Group,

18  which was a brokerage firm here in Chicago, went

19  bankrupt, lost about $700 million of their customers'

20  funds.

21                And then I'm going to say

22  approximately two years ago, I got involved with

23  Bcause.

24      Q    Are you the former CEO of Bcause?

25      A    I am.

1    Q    Did you contact me about testifying?

2    A    I did not.

3    Q    Did I contact you?

4    A    You did.

5    Q    Did you meet me in advance of your

6    deposition?

7    A    I did.

8    Q    Do you recall what you told me at that time

9    about testifying?

10    A    I think I told you I was reluctant to

11    testify.

12    Q    Do you recall what I said to you?

13    A    You have to help me with that.  You said

14    many things to me.

15    Q    I can't help you, Mr. Grede.

16    A    With respect to what?  Would you give me a

17    subpoena?

18    Q    Yes.

19    A    Yes, I do recall that conversation.

20          I said I was reluctant to testify

21    absent a subpoena.

22    Q    You're aware that the debtors likely will

23    try to discount your testimony by saying you're a

24    disgruntled employee or you're to blame for all of

25    their problems.

213

1                 Do you have a response to that?

2       A     Typical.

3       Q     Can you tell me about your experience in

4  Sentinel?  Was that a Chapter 7 or Chapter 11 case?

5       A     It was a Chapter 11 case, but it was a

6  liquidating 11.

7       Q     So you confirmed the Chapter 11 liquidating

8  plan in that case?

9       A     We did.

10       Q     And how did your appointment as bankruptcy

11  trustee in that case come about?

12       A     Well, this was a bankruptcy case involving

13  many people in the futures industry, many of whom I

14  have had previous business dealings with.

15                 Actually, a number of the creditors

16  recommended me to the U.S. Trustee's office, division

17  of the Department of Justice; interviewed with the

18  U.S. Trustee's office, and they recommended me; and

19  then ultimately the bankruptcy courts approved me as

20  the trustee.

21       Q     How long have you been bankruptcy trustee?

22       A     Well, since 2007.  The case is almost over,

23  but it's now 12 years.

24       Q     Have you had to object to creditors' claims

25  in the case?

1     A     Yes.

2     Q     Are you aware of the time and cost involved

3 in objecting to creditors' claims?

4     A     I am.

5     Q     Did you have to bring avoidance or other

6 actions against creditors in the case?

7     A     Yes, we did.

8     Q     Are you aware of the time and cost involved

9 in these types of actions?

10     A     I am.

11     Q     What was your experience for bringing an

12 avoidance action in Sentinel?

13     A     Well, we had -- without getting too

14 complicated, there were a number of creditors who

15 received partial -- a partial amount of their funds

16 just prior to the bankruptcy.  We filed avoidance

17 actions against a number of those creditors.

18     Q     Did you file avoidance actions against any

19 secured creditors?

20     A     We did.  There was one secured creditor, it

21 was the Bank of New York, and we did file an action

22 to essentially avoid their lien.

23     Q     How long did that take?

24                MR. CLAR:  Your Honor, can I just ask

25 a question?

1          Are you seeking to qualify him as an

2    expert?

3          MR. AGAY:  I am not; just asking his

4    experience.

5    BY MR. AGAY:

6     Q    How long did it take to avoid -- strike

7    that.

8          How long did the litigation take

9    against the secured creditor in Sentinel?

10    A    I'm going to say approximately five years.

11    Q    How much did it cost?

12    A    I'm going to tell you -- I'll give you

13    approximate numbers.

14          We probably spent $15 million, and I

15    think the Bank of New York probably spent a similar

16    amount.

17    Q    Okay.  Did you share your experience in

18    Sentinel with Mr. Flake and the board of Bcause?

19    A    I did in a broad, general sense.

20    Q    Did you have a discussion with them about

21    how long it might take to confirm a Chapter 11 plan

22    and how much it might cost?

23    A    In broad, general senses, yes.

24    Q    Did you have a discussion with them about

25    how long it might take to litigate -- how long it

1  might take and how much it might cost to litigate

2  WESCO's claims?

3      A    Again, in a broad, general sense.

4      Q    And what did you tell them?

5      A    I told them -- I think they had an

6  expectation that bankruptcy is business as usual.  I

7  tried to disavow them of that notion.

8               I think they had a sense that they'd

9  be in and out of bankruptcy court in 60 to 90 days.

10 And I just told them that based upon my experience

11 and the fact that there's a secured creditor, that

12 this is going to be a longer, more complicated, more

13 difficult, more expensive process.

14     Q    Did you tell them -- did you give them an

15 opinion on how long it would take?

16     A    Again, in a broad sense, I told them I did

17 not expect this case to be out of bankruptcy this

18 year.  That was my expectation.

19     Q    Did you tell them how much it might cost to

20 run the bankruptcy case?

21     A    Only from the sense that it would be much

22 more than they anticipated, and I think much more

23 than was originally budgeted.

24     Q    What was Mr. Flake's reaction to -- when

25 you said that to him?

1     A     Well, I would just say, generally, I felt I

2   was telling them things they did not want to hear or

3   did not want to believe.

4     Q     When you say "they," you mean somebody

5   in --

6     A     Mr. Flake and the other members of the

7   board.

8     Q     So they reacted with disbelief?

9     A     Yes.

10     Q     Did they present a contrary view on how

11   long this would all take and how much it would cost?

12               MR. DAN:  Objection, Your Honor.  I

13   think we might be getting into some hearsay here.

14               And, also, everything that we've done

15   so far appears that he's been asking opinion

16   testimony of the witness, which he's not an expert.

17   He's not been tendered as an expert.  I don't know if

18   he's been asking lay opinion witness testimony.

19               But everything now we're getting into

20   appears that we're going right down the pathway of

21   hearsay.

22               MR. AGAY:  I'm not asking for an

23   opinion.  I'm asking what he said to them and what

24   they said to him.  And it's not hearsay, because I'm

25   not offering it up for the truth of the matter

1  asserted.  I'm just asking what the discussion was.

2              THE COURT:  I'm going to overrule the

3  objection with the understanding that the way I've

4  been listening to this is what he's telling them.

5              I'm not hearing this for the truth of

6  what they may have responded back.  I'm understanding

7  where Mr. Grede's head is at.

8  BY MR. AGAY:

9       Q    Do you want me to ask the question again?

10      A    Please.

11      Q    So what was the reaction of Mr. Flake and

12  the board when you shared your opinions with them?

13      A    They did not believe it.

14      Q    Okay.  Did they express to you how long

15  they thought it will all take and how much it would

16  all cost?

17      A    I think I said a few minutes ago, 60 to 90

18  days.

19      Q    And did they express an opinion on cost?

20      A    Not specifically.

21      Q    Okay.  Did you share with Mr. Flake and the

22  board, when you filed these cases, whether you

23  thought the debtors can successfully confirm a

24  Chapter 11 plan in these cases?

25              THE COURT:  I'm going to stop you

219

1   there.  I haven't heard any testimony that he filed

2   the cases, and I don't understand where this fits in

3   this process.

4                    MR. AGAY:  Sure, sure.  Fair enough.

5   I'm rushing along, Your Honor, but I'll lay some

6   foundation.

7   BY MR. AGAY:

8        Q    Mr. Grede, you said that you were the CEO

9   of Bcause?

10       A    I did.

11       Q    And in your capacity as a CEO, did you

12   consult with the board from time to time?

13       A    Yes, we did.

14       Q    Did you report to the board?

15       A    Yes.

16       Q    And did you have -- did you report to

17   anybody else?

18       A    No.

19       Q    Did you have anybody that reported to you?

20       A    Yes.

21       Q    Who was that?

22       A    Well, everyone -- every employee in the

23   organization.

24       Q    Including Mr. Flake?

25       A    Including Mr. Flake.

1    Q    Okay.  Were you involved in the -- strike

2  that.

3              You're aware that at a point in time,

4  WESCO garnished the Lakeside Bank account; is that

5  correct?

6    A    I am.

7    Q    And what happened thereafter at the

8  company?

9    A    Well, effectively, by garnishing the bank

10  account, we were unable to pay any of the obligations

11  of the company, and there was a payment coming due

12  very shortly to Dominion Energy, the power provider

13  in the facility in Virginia Beach.

14              And if we were unable to make that

15  payment to Dominion Power, they would basically turn

16  off the power and turn out the lights.

17    Q    And was there one or more board meetings

18  around this issue?

19    A    There were.

20    Q    How many?

21    A    Well, this had -- the challenge of making

22  payments to Dominion had happened on probably three

23  occasions in the past, so we had always consulted the

24  board and told them about the challenge to make those

25  payments.

1            This one specifically, yes, there was

2    a board meeting about the garnishment of the bank

3    account and the inability to make the payments to

4    Dominion.

5        Q    Were you at that board meeting?

6        A    Well, it was by telephone, so, yes, we were

7    on the phone.

8        Q    And at that board meeting, were you asked

9    your opinions as CEO on appropriate next steps for

10   the company?

11       A    Yes.

12       Q    What did you tell the board?

13       A    Well, we said we should file for Chapter 11

14   in the mining facility, obviously because we were

15   unable to meet those obligations to Dominion; and,

16   secondly, we should file for Chapter 11 in the

17   Holding company in an effort to address the

18   garnishment of the bank account and free up some cash

19   so that we can make ongoing obligations.

20       Q    But for WESCO's garnishment, would the

21   company have filed for Chapter 11?

22       A    I do not believe they would have.

23       Q    We talked about the opinions you had

24   regarding the time and the cost of litigating a

25   Chapter 11 and confirming a Chapter 11 plan.

222

1          Were those issues discussed at this

2    board meeting?

3          A    They were.

4          Q    And you were asked your opinions, and you

5    gave those opinions?

6          A    I did.

7          Q    Were you asked whether you believed the

8    company could exit from bankruptcy?

9          A    In a general sense.

10         Q    What were you asked?

11         A    Well, I was specifically asked what the

12   probabilities were of avoiding a Chapter 7.

13         Q    And what did you tell them?

14         A    I told them at that time I thought it was

15   50/50.

16         Q    Did you think it was 50/50 at that time?

17         A    I actually thought it was probably a bit

18   higher.

19         Q    Why did you tell them 50/50?

20         A    Just knowing the previous reactions of

21   their kind of disbelief to anything I had to tell

22   them.

23              And, again, I was trying to be as

24   realistic as possible.  As I said earlier, I don't

25   think they wanted to hear what I had to say.

1      Q      Has your opinion changed since the

2      beginning of the case?

3      A      From 50/50 to a different percentage?

4      Q      Sure.

5      A      Probably.

6      Q      Okay.  What do you think the likelihood is

7      today?

8      A      I think it's more challenging today.

9      Q      Have you reviewed the debtor's businesses

10     plan?

11     A      I have.

12     Q      And how did you come into possession of the

13     business plan?

14     A      I think you provided me a copy.

15     Q      Do you believe the debtors have

16     appropriately budgeted the time and cost in this

17     case, based on your review?

18     A      Time and cost of what?  Just the bankruptcy

19     proceedings?

20     Q      Yes.

21     A      I don't.  I think there is an estimated

22     payment in there of $40,000 for bankruptcy counsel.

23     The next payment --

24                     MR. DAN:  Objection, Your Honor.

25                     We're now back into opinion witness

224

1   testimony here.  I don't know if he -- again, he's

2   not been tendered as an expert.  He's giving lay

3   opinion witness testimony with no foundation for it

4   or any basis whatsoever.

5   BY MR. AGAY:

6       Q    Were you involved in preparing the budgets

7   on the case?

8       A    I was.

9               MR. DAN:  Your --

10              MR. AGAY:  I'm asking his experience.

11              THE COURT:  Sustained.

12              MR. AGAY:  It was -- Your Honor --

13              THE COURT:  Ask in more detail.

14  BY MR. AGAY:

15      Q    Were you involved in preparing the budgets

16  contained in the business plan that you reviewed for

17  these cases?

18              MR. CLAR:  When?

19              THE COURT:  Let's step back.

20              When did he leave the company?  I

21  haven't heard that date.

22              MR. AGAY:  Sure.

23  BY MR. AGAY:

24      Q    When you leave the company?

25      A    It was approximately one month ago.

225

1    Q    Why did you leave the company?

2    A    They said my services were no longer

3  needed.

4    Q    So you were terminated?

5    A    In their view, yes.

6    Q    How was that communicated to you?

7    A    By e-mail.

8    Q    So who sent you the e-mail?

9    A    Michael Adolphi.

10    Q    What did the e-mail say?

11    A    I think I just stated that.  "Your services

12  are no longer required."

13    Q    Okay.  Do you think that was a real reason

14  for your termination?

15    A    Oh, no.  Not at all.

16    Q    Why do you think you were terminated?

17    A    I think this has been coming for a long

18  time.

19         First, I was telling people what they

20  didn't want to hear.  Secondly, I was keeping them

21  from doing things that they wanted to do.  Number

22  three, I had been trying to terminate Mr. Flake for a

23  good six to nine months prior to this.

24         And I would also say that we had a

25  number of independent directors who I knew very well

1   who resigned from the board, and they were all

2   counseling me to separate myself from Bcause as soon

3   as I could.

4       Q    Why did those independent directors resign?

5       A    They were concerned about the ethics of the

6   other members of the board.

7       Q    Anything specific --

8            MR. FISHER:  Objection, Your Honor.

9   Hearsay, speculation.

10           THE COURT:  Sustained.

11  BY MR. AGAY:

12      Q    Do you have a view on why those directors

13  resigned?

14      A    I do.

15           MR. FISHER:  Objection.  Relevance.

16           MR. AGAY:  It's relevant to the

17  current state of mind of the board and Mr. Flake and

18  how their conduct in the past has translated into

19  things that have occurred to the company and how it

20  could impact on the company on a go-forward basis.

21           This is all about their character and

22  their way of doing business.

23           MR. CLAR:  How is that --

24           MR. FISHER:  Your Honor, this effort

25  at character assassination is not --

1          MR. AGAY:  What does he --

2          MR. FISHER:  Mr. Grede's own personal

3    views are not relevant to the Court's decision.

4          THE COURT:  Mr. Fisher, take it down a

5    notch.  This is not a big criminal trial.

6          I have to determine whether or not the

7    debtor's acting in good faith.  I believe that this

8    is relevant.  I don't want him to go too far.  We're

9    not looking for a character assassination.

10         But a man who's been in the job for a

11   period of time can have opinions about -- what,

12   Ms. Janczak?

13         MS. JANCZAK:  Never mind.

14         MR. SHAW:  Your Honor, I will say

15   something.

16         Setting it all aside, there is some

17   frustration you're seeing expressed by the people

18   that are sitting here, because this has taken a

19   really long time, and it does seem to be remarkably

20   inefficient, not Mr. Grede, but generally.  So I

21   understand Mr. Fisher's frustration.

22         Just so the Court's clear, I kind of

23   have the same frustration.

24         THE COURT:  I appreciate that, and you

25   don't have to defend him, and he knows he got a

1  little excited, so let's move on.

2  BY MR. AGAY:

3      Q    Why do you think those directors resigned?

4      A    I think they were concerned about the

5  ethics of the other members of the board.

6      Q    What specifically about those ethics?

7      A    Well, best example I can give you is

8  December of last year.

9            Again, there was an emergency funding

10 payment that had to be made to Dominion, and certain

11 members put in a half million dollars, and in return

12 for doing that, they wanted to take 50 percent

13 ownership interest in the company.

14            Well, our largest investor was SBI.

15 They invested about $4 million, approximately, a year

16 ago.  And when they invested that money, they

17 insisted on anti-dilution provisions.  In other

18 words, SBI bought their shares at 78 cents a share,

19 and this emergency funding round was at 5 cents a

20 share.  So they were entitled to additional shares to

21 make up for the down-round funding.

22            And there was a big objection from

23 certain members of the board who wanted SBI to waive

24 their anti-dilution provisions.  I was one of the

25 those investors, both in the November of '17 round as

1  well as in the emergency round.

2            To make a long story short, I think

3  many perceived it as certain of the insiders trying

4  to benefit themselves at the expense of the larger

5  shareholders.

6       Q    And as a result, those directors resigned?

7       A    They did.

8       Q    Okay.  And you testified that you had been

9  trying to get rid of Mr. Flake; is that correct?

10      A    It is.

11      Q    Could you explain why?

12            MR. CLAR:  Your Honor --

13            THE COURT:  Oh, come on, Mr. Clar.

14  This is about as relevant as it gets.

15            You put Mr. Flake up as your guy, with

16  your budget and your plan.  I think it's fair to ask

17  a witness, who was Mr. Flake's boss, as the CEO of

18  the company, why he wanted to terminate Mr. Flake.

19            MR. CLAR:  It's fair to ask one person

20  why they didn't like another person.  That's where

21  we're going with this.

22            THE COURT:  No, no.  We're not talking

23  about why he didn't like him.  We're talking about

24  why the CEO of the company wanted to terminate

25  Mr. Flake, who was the treasurer, and where it shakes

1   up.

2               MR. CLAR:  If we ever get to it, I'll

3   get to it on cross.

4   BY MR. AGAY:

5       Q     Why did you want to terminate Mr. Flake?

6       A     Well, this goes back to a number of events.

7               First of all, over the course of 2018,

8   we spent $33 million on Mining.  We spent maybe

9   2 million on the exchange business, which was most of

10  the people in Chicago.

11              It all started, really, back in late

12  November of '17, early '18.  The original budget for

13  the mining facility was $3 1/2 million.  2 million of

14  it was supposed to come from a deposit from SBI; a

15  million of it was supposed to come from the City of

16  Virginia Beach and the State of Virginia, so we were

17  going to be out about a half a million dollars -- or

18  we were going to have to fund about half a million

19  dollars, so everybody said okay.

20              Well, everything had to be done very

21  quickly, according to Mr. Flake.  The mining facility

22  was built with shifts 24 hours a day, seven days a

23  week.  The price tag came in at $8 million, and the

24  company was in trouble from there on out.

25              So this kind of -- well, the money's

1  going to come in.  It's going to fall from the sky,

2  those types of things continued.

3              And the challenge that I had is,

4  Mr. Flake is the founder of the company.  He's also

5  on the board, but yet he's an employee.  And it was

6  very difficult for me to be kind of in the middle of

7  that, trying to control Mr. Flake.

8              And at end of the day, he's just not

9  possible to control.

10    Q    Okay.  And on that topic, did you at a

11  point in time move the company's bank account from

12  Virginia to Chicago to try to gain better control

13  over expenditures?

14              MS. JANCZAK:  Objection.  Leading the

15  witness.

16              MR. AGAY:  She's right.

17              THE COURT:  Sustained.

18  BY MR. AGAY:

19    Q    Did the company always hold its bank

20  account in Chicago?

21    A    No.

22    Q    Where did it hold it previously?

23    A    It was originally with Town Bank in

24  Virginia Beach.

25    Q    Did you move it to Chicago at some time?

232

1     A    I did.

2     Q    Why?

3     A    To get better control of the spending.

4     Q    What do you mean by that?

5     A    Well, the controller was based in Virginia

6  Beach.  Not being critical, but she was relatively

7  junior, and Mr. Flake and Mr. Adolphi basically told

8  her who to pay, when to pay, who not to pay.

9              And as I said, I was trying to get

10  control of the finances, and I thought moving the

11  bank account out from under that control and also

12  bringing in a chief financial officer were very

13  important steps to get control of the finances.

14     Q    Who was the chief financial officer that

15  you brought in?

16     A    We brought in George Sladoje, CPA, CFO of

17  other exchanges, highly qualified.

18     Q    Did Mr. Sladoje leave the company right

19  around the time you left the company?

20     A    He did.

21     Q    Do you know why?

22     A    I do.

23     Q    Why?

24     A    Same reasons, that he just --

25              MR. CLAR:  Objection as to foundation.

233

1    I don't know how he knows this and --

2                    THE COURT:  Sustained.

3                    MR. CLAR:  -- whether it's hearsay or

4    not.

5    BY MR. AGAY:

6        Q    Are you aware that Mr. Sladoje left the

7    company?

8        A    I am.

9        Q    Did you have a discussion either before or

10   after he left the company with Mr. Sladoje?

11       A    Yes, both before and after, many

12   discussions.

13       Q    Did he tell you why he left the company?

14                   MR. FISHER:  Objection.  Hearsay.

15                   MR. CLAR:  Objection, hearsay.

16                   MR. DAN:  Objection.

17                   THE COURT:  You know that's the wrong

18   question.

19                   Sustained.

20   BY MR. AGAY:

21       Q    Did you also bring in Ann Cresce?

22       A    I did.

23       Q    And what was her role?

24       A    She was the general counsel.

25       Q    Did she leave the company around the same

1    time as you did?

2        A     She did.

3        Q     Did you have a discussion with her about

4    why she left the company?

5        A     I did.

6        Q     Okay.  And we'll come back to these

7    reasons.

8                    What was the company's business when

9    you joined?

10       A     There wasn't any business when I joined.

11   Five or six years ago, Mr. Flake and Mr. Adolphi were

12   the original founders of the company and were doing

13   mining, but on a relatively small scale.

14                   Then they decided to file an

15   application with the CFTC to become an exchange, to

16   become a derivatives exchange.

17                   And then they found a colleague of

18   mine who had done applications before that I worked

19   with at the Chicago Board of Trade, and eventually, I

20   was introduced to them.

21                   But at that point in time, there was

22   no active, ongoing business.

23       Q     Okay.  And how has the company's business

24   model evolved since then?

25                   MR. DAN:  Objection, Your Honor.

1           Can we actually have more specific

2   questions?  He keeps saying "the company."  There are

3   two companies here that -- obviously, one is a

4   holding company but has lots of different things

5   under it, and then there's Mining.

6           I think we need a little more

7   specificity so we know what we're talking about.

8           MR. AGAY:  All right, that's fine.

9           Your Honor, I'm trying to streamline

10  this for everybody's benefit, but then it's going to

11  take longer the more they make frivolous objections.

12  BY MR. AGAY:

13  Q    How has the Bcause -- how has the Bcause

14  enterprise business model evolved since you joined

15  them?

16  A    In October of '17, we raised about

17  $5 million.  Most of that came from SBI.  It used to

18  be SoftBank, which is a Japanese company.  As I said,

19  they invested -- basically bought 40 percent of the

20  company.

21          They were interested in two things.

22  They were interested in the exchange business and

23  they were also interested in getting into mining of

24  cryptocurrencies.

25          And I would say that SBI really helped

236

1   push us into the mining business.

2       Q    On an annual basis, was the company

3   profitable when you joined in terms of positive net

4   EBIDTA or positive net income?

5       A    No.  2018, I think it was about a $2 1/2

6   million loss on an operating basis.  I'd have to look

7   at the financial statements to be exact, but

8   approximately $2 1/2 million loss.

9       Q    Was the company making money when you left?

10      A    It would have been a positive EBIDTA when I

11  left.

12      Q    On a monthly basis?

13      A    On a monthly basis.

14      Q    Was it positive net income?

15      A    That would fluctuate from month to month,

16  and, again, I couldn't say on an annual basis what

17  2019 might look like.

18      Q    To your knowledge, has the company ever

19  been profitable on an annual basis?

20      A    No.

21      Q    Do you recall what the price of Bitcoin was

22  when you joined the company?

23      A    I do.

24      Q    And what was it?

25      A    Well, when I -- when I joined, that would

1  have been the spring of '17, and, again, I'm going to

2  give you rough estimates.  I'm going to say $8,000.

3  By December of '17, it ran up to about $18-,

4  $19,000.

5       Q    What's the price of Bitcoin today?

6       A    Well, today it's just around $9,000.

7       Q    Do you think the company's ever going to be

8  profitable?

9            MR. DAN:  Objection, Your Honor.  Now

10  we're back on to opinion testimony here.

11            MR. AGAY:  He's the ex-CEO of the

12  company.  He's very familiar with the business model,

13  he's very familiar with the financials.

14            I'm not asking for his opinion as an

15  expert.  I'm asking him for what his views are as the

16  ex-CEO of the company.

17            THE COURT:  Sustained.

18            We have no idea what the company's

19  going to be six months from now, so how can he

20  possible testify as to whether he thinks the

21  company's going to be profitable.

22            If you asked him what the current

23  company's projections are, that's a different story.

24  BY MR. AGAY:

25       Q    Have you reviewed the company's current

1  financial projections?

2      A    In the business plan?

3      Q    Yes.

4      A    I have.

5      Q    Okay.  And based on your review of those

6  projections, do you have a view on whether the

7  company's going to be able to execute on that

8  business plan?

9      A    I have to break that down into a couple of

10 components.

11          I think the mining business will

12 continue to operate basically as it is today, because

13 it's essentially a fixed revenue structure with fixed

14 operating expenses.  So it's basically a fixed

15 operating-for-profit margin.

16          The other side of the business is the

17 exchange business, but I think that's going to be

18 extremely difficult, if not impossible, to get up and

19 operating while the company's under Chapter 11.

20     Q    So in terms of the mining side of the

21 business, you said that the company's just going to

22 continue to operate as it is, correct?

23     A    That's what I said, yes.

24     Q    Okay.  Are the company's revenues going to

25 continue into the indefinite future?

239

1          MS. JANCZAK:  Objection.  There's no

2     foundation for that question.

3          THE COURT:  If anybody could predict

4     that, we'd all be brilliant.

5          Sustained.

6          MR. AGAY:  Again, I'm trying to take

7     Mr. Flake's testimony and incorp- -- that's fine.

8     I'll go through the foundation.

9     BY MR. AGAY:

10     Q    Are you familiar with the company's

11     customer agreements?

12     A    I am.

13     Q    Could you tell me, generally speaking, who

14     the company's main customers are?

15     A    Well, the three large --

16          THE COURT:  Mr. Agay, I don't know

17     where you're going here, but we had plenty of

18     testimony.  We all know the company's contracts are

19     expiring at the end of the year, and we all know that

20     nobody can predict whether or not at this point in

21     time they're going to renew.

22          So if you're going there again, don't

23     bother.

24          MR. AGAY:  Okay.

25     BY MR. AGAY:

240

1      Q    So based on that, do you think the

2  company -- do you think the mining business can

3  survive?

4             MR. FISHER:  Objection.

5             THE COURT:  Sustained.

6             MR. SHAW:  It's like whack-a-mole.

7             MR. AGAY:  Your Honor, he's the ex-CEO

8  of the company.  How is his opinion not relevant to

9  this?

10             THE COURT:  We don't need an opinion.

11  If you have all those contracts, and they're not

12  renewed, the contracts aren't there.

13  BY MR. AGAY:

14      Q    Do you think those contracts are going to

15  get renewed?

16             MR. CLAR:  Objection.

17             MR. FISHER:  Objection.

18             THE COURT:  Overruled.

19  BY MR. AGAY:

20      Q    Do you think those contracts are going to

21  get renewed?

22      A    Some will and some won't.

23      Q    Which ones will and which ones won't?

24             MS. JANCZAK:  Objection.  I guess the

25  specific objection should have been raised in the

1    prior question.

2              But we just don't have any foundation

3    for how he would be able to speculate to know what

4    the customers are likely to do.

5              THE COURT:  Sustained.

6    BY MR. AGAY:

7        Q    Okay.  You are you familiar with the SBI

8    relationship?

9        A    I am.

10       Q    Did you interact on a day-to-day basis with

11   SBI?

12       A    I did.

13       Q    And you're familiar with the SBI hosting

14   agreement?

15       A    I am.

16       Q    Are you familiar with BMG?

17       A    I am.

18       Q    Do you interact with BMG on a day-to-day

19   basis?

20       A    I wouldn't say specifically day to day, but

21   on a frequent basis, yes.

22       Q    What about St. Bitts?

23       A    Not so much with St. Bitts.

24       Q    And based on your interaction with SBI and

25   your understanding of the SBI agreement, do you think

1  SBI's going to renew its customer agreement at the

2  end of this year?

3         MR. DAN:  Objection, Your Honor.  We

4  still have no foundation as to --

5         THE COURT:  Overruled.

6         You can answer.

7         THE WITNESS:  No.

8  BY MR. AGAY:

9    Q    And based on your relationship with BMG and

10 your understanding of the BMG contract, do you think

11 BMG's going to renew at the end of this year?

12   A    Well, I thought we extended the BMG

13 contract to a four-year contract.

14   Q    Right.  Are you aware of any written

15 documents around that?

16   A    I thought we redid the contract to

17 stipulate four years.

18   Q    Okay.  But are you aware of any written

19 agreements?

20   A    I don't recall.

21         There is a written agreement with BMG.

22 I thought it was amended to specify four years, but I

23 could be mistaken.

24   Q    Okay.

25         MR. AGAY:  For the record, Your Honor,

1  we've asked for that multiple times from the debtor

2  and from BMG.  We haven't seen it.

3  BY MR. AGAY:

4      Q    Based on your relationship with St. Bitts

5  and your understanding of the St. Bitts agreement, do

6  you think St. Bitts is going to renew at the end of

7  this year?

8            MS. JANCZAK:  Objection.  He

9  previously testified that he didn't have much

10  interaction with St. Bitts, so I think that not only

11  is there no foundation laid, but the foundation that

12  is laid isn't there.

13            THE COURT:  Sustained.

14  BY MR. AGAY:

15     Q    Are you familiar with the St. Bitts

16  contract?

17     A    I am.

18     Q    I'll ask it again.

19            Did you ever interact with St. Bitts?

20     A    Not as frequently as SBI or BMG, but I did

21  participate in phone calls and saw e-mails from St.

22  Bitts.

23     Q    So based on that experience, do you think

24  St. Bitts is going to renew at the end of this year?

25            MS. JANCZAK:  Same objection.

1          THE COURT:  Overruled.

2          THE WITNESS:  I think that one's

3   50/50.  They've made noises about -- or on a couple

4   of occasions threatened to terminate the contract.

5   BY MR. AGAY:

6      Q    Are you aware if they tried to terminate

7   the contract at the beginning of this case?

8      A    I'm sorry.  Did you say at the beginning of

9   the case?

10     Q    Yes.

11     A    Again, timing, I couldn't say for certain,

12  but I know that they threatened to terminate it on a

13  couple of occasions.

14     Q    Okay.  On or before the day that you

15  resigned from the company, had you expressed any

16  concerns --

17          MR. CLAR:  Objection, Your Honor.  He

18  didn't say he resigned.  He said he was fired.

19          MR. AGAY:  He's right.  I'm sorry.

20          THE COURT:  Sustained.

21          MR. AGAY:  He's right.

22  BY MR. AGAY:

23     Q    On or before the date --

24          MR. AGAY:  I apologize.  It was

25  accidental.

1   BY MR. AGAY:

2       Q    On or before the date you were terminated

3   from the company, did you express to the board or

4   Mr. Flake concerns about the company's financial

5   projections?

6       A    I mean, in a general sense, I mean, that

7   was an ongoing discussion and ongoing concern.

8       Q    Okay.  And what were those discussions?

9               THE COURT:  Mr. Agay --

10              MR. CLAR:  Objection.

11              THE COURT:  -- we need a time frame.

12  He's been with the company for two years.

13  BY MR. AGAY:

14      Q    Did you have discussions around the

15  company's projections from -- after the point in time

16  when the bankruptcy cases were filed but before you

17  were terminated?

18              MR. CLAR:  I don't really understand

19  the question.

20  BY MR. AGAY:

21      Q    Do you understand the question?

22      A    I think the general sense of the question

23  is did we have discussions about financial

24  projections.

25      Q    Correct.

1      A     And the answer is yes, every day.

2      Q     What were those discussions?

3      A     It was about the ongoing revenue --

4                  MR. CLAR:  Time frame -- excuse me.

5      Time frame, Your Honor.

6                  THE COURT:  Now he gave a time frame.

7      This time it was from the time of the filing of the

8      bankruptcy case to the date of termination.

9                  MR. CLAR:  Sorry.

10     BY MR. AGAY:

11     Q     What were those discussions?

12     A     It was about ongoing revenue projections

13     and ability to meet the financial obligations,

14     including the obligations to creditors.

15     Q     And did you express opinions regarding

16     those topics?

17     A     I did.

18     Q     What were those opinions?

19     A     Well, obviously, it was a challenge, that

20     we were going to need to change our strategy, our

21     business models, because this fixed operating

22     structure coming out of Mining was going to be a

23     challenge to pay back the creditors.

24     Q     And did you think the company's strategy at

25     the time was going to be adequate to accomplish those

1  goals?

2      A    With respect to Mining?

3      Q    Yes.

4      A    No.

5      Q    Why not?

6      A    Because, again, it's a fixed operating

7  margin, and there's no scalability to the business,

8  so the revenues are going to remain relatively fixed

9  for the foreseeable future.

10              And if you were to make the

11  calculations as to how long it takes to pay back 10-

12  or $12 million in debt, it was difficult to find a

13  solution.

14      Q    What about Spot?

15      A    Well, the challenge with Spot is, again, as

16  I mentioned earlier, we spent $33 million on Mining,

17  we spent somewhere around 2- on Spot, so we never

18  really had the resources for Spot.

19              Nasdaq, I think is -- as you know, is

20  the technology provider, but we owe Nasdaq a

21  considerable amount of money, and I don't think

22  they're going to let Spot launch until they're paid.

23      Q    Do you think Spot's going to be able to

24  launch?

25              MS. JANCZAK:  Objection.  Speculation,

1    there's no time frame indicated in the question.

2                    MR. AGAY:  Okay.

3                    THE COURT:  Overruled.

4    BY MR. AGAY:

5        Q    Do you think Spot's going to be able to

6    launch?

7        A    If I may qualify your question, do I think

8    Spot will be able to launch while the company is

9    under Chapter 11?

10       Q    Yes.

11       A    Is that the question?

12       Q    Sure.

13       A    No.

14       Q    Why not?

15       A    I can give you a myriad of reasons.

16                   Number one, Spot needs more money to

17   become operational.  I cannot imagine any investor

18   putting money into the company while it's in Chapter

19   11.

20                   Number two, you need a bank account to

21   accept customers' funds.  I don't think Spot has a

22   bank account to do that.

23                   Number three, no customer is going to

24   put money on deposit with a company that's in Chapter

25   11.

1          Number four, I don't think -- you need

2    certain state regulatory approvals.  I don't think

3    any regulator is going to approve the company while

4    it's in Chapter 11.

5          And then my last reason is Nasdaq -- I

6    think the obligations to Nasdaq are in the range of

7    $700,000.

8          Nasdaq's effectively stopped work, and

9    they're not going to let -- they're not going to let

10   the company launch until they get paid.  And I don't

11   believe Nasdaq will let the company launch while it's

12   in Chapter 11.  That would detrimentally impact the

13   Nasdaq brand.

14   Q    At the time you were terminated from the

15   company, had the company obtained any of the

16   regulatory approvals that it needed to launch Spot?

17   A    The only one -- it's a federal FinCEN

18   registration, which is just basically a registration

19   that was obtained, but you also need -- there is no

20   federal regulatory scheme over cryptocurrency

21   trading, spot cryptocurrency trading.  So you have to

22   go state by state to get a money transmitter license.

23        I know there were applications in

24   process.  None of those had been obtained.  There are

25   some states where you don't need a license at all,

1    you just need a business registration.

2        Q    Are you aware of whether those business

3    registrations have occurred?

4        A    I'm not.

5        Q    Explain to me the function between the

6    Chicago office versus Virginia Beach.

7        A    Generally speaking --

8                MR. CLAR:  Again, we have to have a

9    time frame.  He's not there anymore, so I really

10    don't know --

11    BY MR. AGAY:

12        Q    Prior to your termination, what was the

13    function of the Chicago office?

14        A    The people in Chicago were all the

15    exchange, the market-oriented people.  Many of them

16    had worked for the Chicago Mercantile Exchange, many

17    had worked for the Chicago Board of Trade, many were

18    involved in member firms.

19                So they were all exchange- or

20    markets-oriented people.

21        Q    So was the point of establishing a Chicago

22    presence to help launch the Spot business?

23        A    Yes, absolutely.

24        Q    How many employees worked in Chicago at its

25    peak?

1     A     I'm going to say ten to 12.

2     Q     And how many were there right before you

3 left?

4     A     I think about the same.

5     Q     Okay.  Do you know how many are there

6 today?

7     A     I think three.

8     Q     Do you think that based on having three

9 employees in Chicago, they're going to be able to

10 execute on the Spot business plan?

11          MR. CLAR:  Objection.  There's no

12 foundation whatsoever for that question.

13          THE COURT:  Sustained.

14 BY MR. AGAY:

15     Q     The Chicago office was established to

16 facilitate the Spot operations, correct?

17     A     Spot and derivatives trading, yes.

18     Q     So you're familiar with the Chicago

19 operation and the Chicago office, correct?

20     A     Yes.

21     Q     And you're familiar with the Spot business

22 plan, correct?

23     A     I am.

24     Q     So based on the current presence in

25 Chicago, do you think that will suffice to launch the

```
 1   Spot business?

 2        A    No.

 3             MR. CLAR:  Again, there's the

 4   foundational issue because he hasn't testified as to

 5   what exactly is necessary to launch the Spot exchange

 6   business.

 7             THE COURT:  Sustained.

 8             Furthermore, he's been gone for a

 9   month.  Spot's gone from certain employees to certain

10   others.  I don't know that he knows who's there.

11   BY MR. AGAY:

12        Q    Do you know who's still there?

13        A    I do.

14        Q    Okay.  How do you know?

15        A    I talk to people all the time.

16        Q    So who's still there?

17        A    Bruce Pollack, Sean Ristau, Dan Shack.  And

18   I understand they just hired a new employee the other

19   day.

20        Q    Do you think that's going to suffice to

21   launch Spot?

22        A    No.

23        Q    Before you left, were you involved in

24   trying to raise equity capital for Bcause Mining or

25   Bcause Spot?
```

1    A    Yes.

2    Q    What was that involvement?

3    A    Almost a constant involvement trying to

4  raise new capital; probably talked to a hundred

5  different potential investors.

6    Q    Okay.  And how much money did you raise

7  while you were there?

8    A    Well, let me back up.

9         When we first came on board, we raised

10 $5 million.  That was November of '17.  In October

11 of '18 someone invested about $250,000.  Then in

12 December of '18 we had the emergency funding round of

13 half a million dollars.

14   Q    Okay.  Have you raised any money since

15 then?

16   A    No.

17   Q    And did you -- were you involved in the

18 process of trying raise money prior to your

19 termination but subsequent to the filing of the

20 bankruptcy cases?

21   A    No.  Once we filed for bankruptcy, then it

22 was basically game over.  No one's going to invest

23 while the company's in bankruptcy.

24   Q    So while you were CEO of the company and

25 subsequent to the bankruptcy cases, you were not

254

1    involved in any fundraising discussions?

2         A    I'm sorry.  Say that to me one more time.

3         Q    Subsequent to the filing of the bankruptcy

4    cases but while you were still CEO of the company,

5    you were not involved in any fundraising discussions?

6         A    No.  I mean, we continued to search for

7    ways to deal with the bankruptcy and to try to get

8    the exchange operational, but that was extremely

9    difficult.

10        Q    So you're not aware of any commitments made

11   by any investors?

12        A    No, I'm not.

13        Q    Did you ever seek loans or other debt

14   capital on behalf of the company while you were CEO?

15        A    We did.

16        Q    Okay.  What was the outcome of those

17   efforts?

18        A    We had a number of different funding

19   proposals, lending proposals.  But any of the lending

20   proposals first were dependent upon raising equity,

21   and we weren't able to raise the equity.

22             We looked long and hard for companies

23   to finance equipment in the mining facility, but we

24   were never successfully able to do that.

25        Q    Were you involved in seeking any debt

1    financing as part the bankruptcy process?

2        A     Not really.   I mean, we had some phone

3    calls from people who would do, you know, distress

4    financing, that type of thing, but nothing ever

5    materialized that I was aware of.

6        Q     When you left the company, what was the

7    then-existing status of obtaining regulatory

8    approvals for Spot?

9        A     What was the then-existing status?

10                MR. CLAR:  Objection.  Foundation.

11                THE COURT:  No.  Actually, it's been

12   asked and answered.  You've already asked him that,

13   and he's already said they hadn't gotten any of the

14   approvals from the states.

15                MR. AGAY:  Okay.

16   BY MR. AGAY:

17       Q     When the company filed its bankruptcy

18   cases, at that time, did it have a plan for exiting

19   Chapter 11?

20       A     Not specifically at that time.  But, again,

21   in the subsequent days and weeks, we discussed, you

22   know, a general plan as to how we could exit

23   bankruptcy.

24       Q     Okay.  Does that plan that you discussed

25   look anything like the business plan that you

1    reviewed?

2        A    Well, I mean, it was basically the third, a

3    third, a third plan.

4        Q    And what's that plan?

5        A    Well, it was to go to the creditors and say

6    a third forgiveness, a third equity, and a third some

7    kind of a payment plan or payment structure.

8        Q    And did you express a view regarding that

9    plan?

10       A    Only from the sense that this is something

11   that we have to work with the creditors, discuss with

12   the creditors, get the creditors' buy-in and see what

13   we could come up with.

14       Q    And did you think creditors would buy in?

15       A    Again, I'm going to say some will, some

16   won't.  But there's only one way to find out, and

17   that's to start the process.

18       Q    To your knowledge, has the company started

19   the process?

20       A    I don't know that.

21       Q    Are you a creditor of the company?

22       A    I am.

23       Q    How much are you owed?

24       A    I would tell you approximately $600,000.

25       Q    And on account of what are you owed that

1  600- --

2       A     Past-due compensation.  I hadn't received

3  any in the last year; loans that I had made to the

4  company, expenses, business expenses probably in the

5  neighborhood of $60,000.

6       Q     Do you expect to ever see that money?

7       A     Again, I'm realistic.  Hopefully, some day.

8  But I'm -- again, I'm very realistic about that.

9               I know that we would likely end up as

10  a second priority as far as the creditors are

11  concerned.

12               But as I say, it will be a challenge.

13       Q     As a creditor of the company, would you

14  vote for the plan that's currently on the table?

15               MR. CLAR:  Objection, Your Honor.

16  There's no plan on the table.  There's no plan, and

17  -- all right, fine.  There's no foundation for that

18  question.

19               You know what I'm saying.

20               THE COURT:  Overruled.

21               But clarify what "the plan" is.

22  BY MR. AGAY:

23       Q     So you testified that you're familiar with

24  the scheme for the creditors to take a haircut of a

25  third, to get a note for the other third, and to get

1    equity for the other third, correct?

2                    MR. CLAR:  Objection to the

3    characterization as a scheme.  I don't know if that's

4    a proper objection, but I don't know where that came

5    from.

6                    THE COURT:  Overruled.

7                    THE WITNESS:  Probably not.

8    BY MR. AGAY:

9        Q    Huh?

10       A    I don't think I would.

11       Q    You wouldn't vote for it?

12       A    I don't think so.

13       Q    I was asking if you're familiar with it.

14       A    The third, a third, a third, yes.

15       Q    As a creditor, would you vote for that

16   plan?

17       A    No.

18       Q    Okay.  Why not?

19       A    At the end of the day, again, I'm also a

20   shareholder.  I think, ultimately -- again, I'm

21   realistic about the value of the shares.  So in

22   effect, you're asking the creditors to give up on

23   two-thirds.

24                    So, I mean, I know at end of the day,

25   you know, we can either liquidate the assets and what

1   recovery will come there versus a third recovery.

2           And that's the balance I think we're

3   ultimately trying to make.

4       Q   Okay.  I'm going to skip around a little

5   bit, and I apologize for that.

6           Did Bcause Mining ever have its own

7   bank account?

8       A   No, there was only ever one bank account.

9       Q   And receipts flowed directly into that bank

10  account?

11      A   Yes.

12      Q   Are there any intercompany balances between

13  the debtors, of which you're aware?

14      A   I don't remember any of those being

15  reflected on a balance sheet.

16      Q   Okay.  Does Bcause prepare one consolidated

17  balance sheet?

18      A   Yes.

19      Q   Operationally, did Bcause present itself to

20  the world as a single consolidated enterprise?

21      A   Again, that's a compound question.  I think

22  the answer to your question is yes, but I'm not sure

23  I completely understand the question.

24      Q   Okay.  Let's unpack it.

25          While you were the CEO of the company,

260

1    did Bcause present itself to its creditors and other

2    stakeholders as a consolidated business?

3         A    I want to say yes, but I'm still quizzical

4    about the question.  But we always represented

5    ourself as one company.

6         Q    Okay.  That's the answer to the question.

7         A    Okay.

8         Q    In the days prior to your termination, did

9    you have any discussions with Mr. Flake or others of

10   the company regarding the obstacles that the company

11   faced exiting Chapter 11?

12        A    Yes.  Those were constant conversations.

13        Q    Did you have those conversations with

14   Mr. Flake?

15        A    I believe I did, yes.

16        Q    And what was your viewpoint at that point?

17   What was your view at that point?

18             MR. CLAR:  I need to unpack that.

19   Your viewpoint about what?

20             THE COURT:  Sustained.

21   BY MR. AGAY:

22        Q    What was your view of -- at that point in

23   time on whether the company would be able to

24   successfully execute on its business plan?

25        A    Well, I think we've addressed part of that

1    in the past.  We'd have to come up with a so-called

2    confirmable plan, one that the creditors and the

3    Court would agree to and would approve.

4              And, again, as I understand the

5    standard, it has to be better than they would do in a

6    Chapter 7.

7              And so those were the kinds of

8    discussions:  What's the value of the inventory,

9    what's the current market value of the assets, those

10   types of discussions.

11   Q    And --

12             MR. SHAW:  Your Honor, may I interrupt

13   for a second?  I just got an e-mail from Jen McLemore

14   saying she has for the last few minutes gotten

15   complete silence on the line, and I'm wondering if

16   something happened with the connection.

17             THE COURT:  Oh.  Can we get a hold of

18   Court Call and find out what's going on?

19             THE CLERK:  Yes.

20             THE COURT:  We'll look into it.

21             MR. SHAW:  Thank you.

22             MR. AGAY:  Should I keep going?

23             THE COURT:  Yes, keep going.

24             MR. AGAY:  Could you read back the

25   last question and answer, please.

1                    (Record read.)

2    BY MR. AGAY:

3        Q    In those discussions you had before you

4    left the company, did you express a view on whether

5    the company would be better in a liquidation versus a

6    going concern?

7        A    I don't recall that I did, because we

8    really didn't have a feel for the market value of any

9    of the assets of the company.

10       Q    Mr. Flake has testified that he believes

11   the value of the assets of the company are between

12   900- and a million dollars.

13                    Do you agree with that?

14                    MR. DAN:  Objection.  Foundation.

15                    MR. AGAY:  I just asked him if he

16   agrees.

17                    MR. DAN:  He doesn't even know which

18   -- he just said, generally, the assets of the

19   company.

20                    There was a lot of discussion with Mr.

21   Flake about all this.  There's been no foundation,

22   just saying do you believe --

23                    THE COURT:  Sustained.  I think you're

24   missing one word.  You asked Mr. Flake, I believe,

25   about the fixed assets, or you had some term for it,

1   equipment or whatever.

2   BY MR. AGAY:

3       Q    Are you familiar with the assets currently

4   on the consolidated balance sheet?

5       A    I am.

6       Q    Do you have a view on the current value of

7   those assets?

8       A    My response to that is the value would be

9   what someone's willing to pay for them.

10              These are very specialized assets.

11  They're racks that hold the mining machines.  They're

12  power supply units.  It's networking equipment.

13  They're these large transformers.  So it's very, very

14  specialized.  It would be difficult to sell.

15              But, again, my -- I don't have a

16  particular view.  I think you would need, as I say,

17  some independent view.  But, ultimately, it's what

18  you can sell them for.

19      Q    Are you aware of representations that were

20  made prior to your termination regarding when Bcause

21  Spot would go live?

22      A    Well, again, this was a constant issue as

23  to when Spot could go live.

24      Q    Okay.

25      A    But you need the regulatory approvals.  We

1   didn't have those.  We didn't have any of those.

2                   You need bonds, you need security

3   deposits with the various states, and we didn't have

4   the finances to provide that.

5                   I've mentioned Nasdaq on a number of

6   occasions, and then Nasdaq isn't going to let the

7   company go live until they're paid.

8                   And then there was the software

9   development project that was going on as well, and

10  that was not completed yet.

11      Q    Are you aware of the expense necessary to

12  complete the fire suppression system?

13      A    I am.  Again, specific numbers, I'd have to

14  look at financial statements, but I'm generally aware

15  of what's required.

16      Q    And what's required?

17      A    I'm going to say another 2-, 250,000,

18  somewhere in that range.

19      Q    Okay.  Why -- as of the date of your

20  termination, do you know why that amount hasn't been

21  paid?

22      A    Couldn't afford it is the simple answer to

23  that.

24      Q    Okay.  While you were the CEO, did the

25  company make other types of capital expenditures?

1    A    Yes.

2    Q    What were those capital expenditures?

3    A    I'm sorry.  Again, at what time frame are

4  we talking about?

5    Q    While you were the CEO of the company, what

6  types of capital expenditures of the company --

7              MR. CLAR:  Objection as to foundation.

8  I don't know what capital expenses we're talking

9  about, when, why.

10              THE COURT:  Well, I think he said from

11  the beginning when he became CEO.  That is kind of

12  what the CEO should know.

13              I'm just not sure if it's relevant.  I

14  mean, they built a facility, so --

15              MR. AGAY:  It is going to be relevant.

16              THE COURT:  -- it seems like it's a

17  little broad.

18              MR. AGAY:  If I may have a little bit

19  of latitude here.

20              THE COURT:  Let's see where it goes.

21  BY MR. AGAY:

22    Q    Are you aware of capital expenditures?

23    A    I am.

24    Q    What types of capital expenditures were

25  made by the company when you were the CEO?

1    A    Well, again, primarily in the mining

2  facility, for infrastructure in the mining facility:

3  Racks, equipment, transformers, power supply,

4  networking, monitoring equipment, those types of

5  things.

6    Q    Okay.  Do you know how much the company

7  made annually in capital expenditures while you were

8  CEO?

9    A    Again, I think I previously stated that in

10  2018, we spent 33 million on Mining.  Part of that

11  was in payment to Dominion.  Let's call that $12

12  million, so -- and then there's payroll in there.

13          But I'm going to tell you probably

14  between 15- and 18 million in capital expenditures.

15    Q    Okay.  As of the time you left the company,

16  were those types of capital expenditures reflected in

17  the company's budgets?

18    A    In past --

19          MR. CLAR:  Objection, Your Honor.

20  Foundation.  What types of capital expenditure?

21          First of all, payroll and Dominion is

22  not capital expenses, so what are we talking about?

23          MR. AGAY:  No, I'm --

24          MR. CLAR:  Well, wait.  I'm --

25          THE COURT:  I have no idea what the

1  question is at this point.  Let's start over.

2  BY MR. AGAY:

3      Q    In addition to the capital expenditures

4  that you just described, are there general expenses

5  that the company incurs in maintaining the mining

6  facility?

7      A    Yes.

8      Q    What are those expenses?

9      A    Maintaining, obviously, repairs,

10  maintenance, payroll, security, those types of

11  things.

12     Q    Okay.  When you left the company, were

13  there repairs that the company had to make at that

14  point?

15                THE COURT:  The line got disconnected.

16  If we want to reconnect Ms. McLemore back, we have to

17  stop and call --

18                MR. SHAW:  You know what?  I think she

19  said that she got music back again.

20                THE COURT:  We understand that the

21  line is dead, as per the operator, as if somebody

22  hung up or somebody was disconnected.  So does she

23  need to be reconnected?

24                MR. SHAW:  I'm e-mailing her right

25  now.  I'm asking her.

1                    (Brief pause.)

2                    THE COURT:  The line has opened up.

3                    Ms. McLemore, we apologize.  It's been

4     a long day.

5                    MS McLEMORE:  Thanks, Your Honor.  I

6     appreciate it.  Thank you so much.

7                    MR. AGAY:  No problem.

8                    Mr. Agay, I don't remember where you

9     were.

10    BY MR. AGAY:

11       Q    As of the point that you were -- that you

12    left the company, were there certain expenditures

13    that the company had delayed making in connection

14    with the mining facility?

15                   THE COURT:  You mean capital

16    expenditures?

17    BY MR. AGAY:

18       Q    Yeah.

19       A    I think we just talked about the example of

20    the fire suppression system.  That was one.  I know

21    the roof leaked.  We can debate whether that's a

22    capital expenditure or repair and maintenance.  There

23    were ongoing issues with ventilation.

24                   And just as an example, Virginia

25    Beach, the summer is very hot and humid, and that has

1  an impact on machines and the performance of the

2  machines.

3            So we were always looking to improve

4  the ventilation and reduce the humidity in the

5  facility, those types of things.

6      Q    Prior to you leaving, had those types of

7  repairs been made?

8      A    Not to my knowledge.

9      Q    And prior to your leaving, were those

10  repairs and expenses incorporated in the company's

11  budgets?

12      A    The fire supression system --

13            MR. CLAR:  Objection as to what

14  budgets are we talking about?  He left, so --

15            THE COURT:  The question was prior to

16  his leaving, were the capital expenditures in the

17  company's budget.

18            MR. CLAR:  In what budget?

19            THE COURT:  Prior to him leaving.

20            Didn't the company have a budget then?

21  We're not talking about a projection.  We're talking

22  about a budget.

23            MR. CLAR:  I'll leave it alone.

24  BY MR. AGAY:

25      Q    Was it in the budget?

1      A    The fire suppression, yes.

2      Q    It was in the budget prior to you leaving?

3      A    Yes.

4      Q    Okay.  And were there other capital

5  expenditures in the budget prior to you leaving?

6      A    I don't recall there were capital

7  expenditures.

8              Again, there was a budget for repairs

9  and maintenance.

10     Q    And in the budget that you reviewed in the

11  business plan, was the fire suppression system

12  included?

13     A    I believe that it was, yes.

14     Q    In the business plan?

15     A    I believe that it was.

16     Q    Okay.  And what about other capital

17  expenditures?

18     A    I don't recall other capital expenditures

19  in there.

20     Q    Okay.

21              MR. AGAY:  I'm almost done, Your

22  Honor.

23  BY MR. AGAY:

24     Q    I want to go back to your interaction with

25  Mr. Flake before you left.

1          During your time as CEO, did you have

2   to intervene in situations where Mr. Flake was

3   causing problems with customers?

4          MS. JANCZAK:  Objection.  Leading.

5   There's no foundation for Mr. Flake having caused any

6   problems.

7   BY MR. AGAY:

8      Q    Did Mr. Flake cause problems with customers

9   before you left?

10     A    Yes.

11     Q    What were those problems?

12     A    It was almost every relationship with the

13  company.

14         Mr. Flake is quick with his e-mails

15  and is always the last one to respond in an e-mail,

16  and this, quite frankly, irritated almost every

17  customer.

18         So I had to intervene in the SBI

19  relationship.  They wouldn't talk to Mr. Flake.  Same

20  thing with BMG.  BMG would not deal with Mr. Flake.

21  St. Bitts, we had to get somebody else to deal with

22  them on a regular basis.

23     Q    Had that -- at the time that you left the

24  company, had those issues been resolved?

25     A    No.

1      Q     So are you aware when you left the company

2   whether an ongoing dialogue was going on between

3   Mr. Flake and those customers?

4      A     I'm not aware that there was any dialogue

5   between Mr. Flake and those customers.

6      Q     How was Mr. Flake's relationship with

7   employees at the company?

8      A     I can't speak so much for the employees at

9   Virginia Beach, but nobody in Chicago wanted to deal

10  with him.

11     Q     Why not?

12     A     Mr. Flake, everything was always pie in the

13  sky.  Everything -- always would set dates without

14  any rhyme or reasons behind them, and then Mr. Flake

15  would always be very critical and look to blame other

16  people for what most of us all perceived as his

17  failings.

18     Q     During your time at the -- I'm skipping

19  around a bit.  I'm almost done.

20            During your time at the company, did

21  the air conditioning ever fail at Virginia Beach?

22     A     There is no air conditioning in Virginia

23  Beach.

24     Q     The ventilation?

25     A     Well, the ventilation was a constant issue.

1              There is no air conditioning in that

2      facility, so we had to put fans in, and the fans were

3      inadequate.

4              So we had to put louvers in, which is

5      basically ventilation, on the sides of the buildings

6      to continue to improve the ventilation.

7              But the temperature inside the

8      building, plus where you have 10- or 15,000 machines

9      running constantly, gets very, very hot, and, you

10     know, the heat was an issue.

11     Q    Had that issue been addressed, to your

12     knowledge?

13     A    It continues to be addressed.  We redid the

14     fans, we improved the ventilation.  Whether or not

15     that's going to be adequate, you know, again, we're

16     heading for another hot, humid summer in Virginia

17     Beach.

18     Q    So the company may have to spend money to

19     address those issues?

20     A    Again, it's difficult for me to say

21     specifically, but I think it's going to be a constant

22     issue for that facility.

23              MR. AGAY:  I have nothing else.

24              THE COURT:  Thank you.

25              I don't know, is it possible for you

274

1  to finish your cross-examination in a reasonable

2  amount of time?

3          MR. CLAR:  Wow.

4          MR. FISHER:  That's a leading

5  question.

6          (Laughter.)

7          MR. CLAR:  Well, here.  I want to

8  answer the question.

9          THE COURT:  Let me ask you a different

10  way.

11          How much time do you think it will

12  take to cross-examine Mr. Grede?

13          MR. CLAR:  More than 20 minutes.

14          THE COURT:  More than 45 minutes?

15          MR. CLAR:  No.

16          THE COURT:  Then let's try to finish

17  Mr. Grede.

18          MS. JANCZAK:  I also will have

19  questions.  I don't know that it will take longer

20  than 20.  It will depend on what Mr. Clar asks.

21          THE COURT:  Do you think you'll have

22  20 in addition to his?

23          MS. JANCZAK:  I certainly hope not.

24  I'm hoping to have very few after Mr. Clar.

25          THE COURT:  All right.  Let's give it

1  a shot.  I'm not sure how much longer I'll be in a

2  good mood.

3                    MR. CLAR:  Okay, then let's stop.

4                    (Laughter.)

5                    MR. CLAR:  Your Honor, I may not even

6  have 45 minutes.

7                    THE COURT:  Then let's give it a shot.

8                    MR. CLAR:  Let's get this out there

9  first.  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11  BY MR. CLAR:

12     Q     This is awkward for me, Mr. Grede.  You and

13  I had an attorney/client relationship, and a good

14  one, for a long time --

15     A     We did.

16     Q     -- in this case, and so I'll try to avoid

17  anything with respect to that.

18                    But you were fired, were you not?

19     A     As I told you, the message was my services

20  are no longer needed.

21     Q     Did you take that to mean you were fired?

22     A     I took that to mean that we were separating

23  ourself from the company.

24     Q     How did you learn that your services were

25  no longer required?  Didn't you say that it was by

1   e-mail?

2        A    It was.

3        Q    And who was that e-mail from?

4        A    Michael Adolphi.

5        Q    And what else was in the e-mail?

6        A    I can't recall.

7        Q    Was there anything else in the e-mail?

8        A    Nothing material that I recall.

9        Q    So it just said, "Fred, your services are

10   no longer required"?

11       A    That was the effect of it, right.

12       Q    Well, was there anything else in there,

13   though, is what I'm --

14       A    I don't remember.  I don't have access to

15   the e-mails.  Ask Mr. Flake.  He has access to my

16   e-mails.

17       Q    Well, let's assume that people who are

18   fired generally remember what's in them.

19             So was there anything else in there?

20       A    I didn't really care what was in there.  I

21   was actually quite pleased to get that e-mail.

22       Q    And you testified as to your view of why

23   were you fired, have you not?

24       A    I did.

25       Q    And you think you were fired why?

1      A    I can go back through this again.

2            I believe that I was trying get rid of

3 Mr. Flake for the last six to nine months.  I believe

4 that I told the board things they didn't want to

5 hear, and I believe I kept the board and other

6 members of the board from doing what I believed were

7 inappropriate actions.

8      Q    I'm going to ask you about a couple of

9 actions that you took as CEO.

10            Do you believe that as CEO, during the

11 time you were CEO, your actions required -- all of

12 your actions required the approval of the board

13 members?

14      A    Not all of the actions --

15      Q    What actions --

16      A    -- but most of them.

17      Q    -- did require?

18      A    Most policy, strategy, budget, those types

19 of things.

20      Q    Contracts?

21      A    Not every contract, no.

22      Q    Some contracts?

23      A    Pardon?

24      Q    Some contracts?

25      A    Yeah, some.

278

1      Q      Which -- what kind of contracts would have

2    required board approval when you were CEO?

3      A      That's a very broad question.

4      Q      Well, if you could answer it.

5      A      I don't recall.  Most contracts we did.

6      Q      Most contracts you did what?

7      A      We would discuss with the board.

8      Q      You did?

9      A      Yeah.

10     Q      Okay.  So let me ask you specifically about

11   two situations.

12              Oh, and before I ask you that, did

13   anyone ever tell you you're being fired because of

14   certain decisions you made regarding contracts that

15   were entered into?

16     A      No.

17     Q      Never?

18     A      Never.

19     Q      Okay.  Was there ever a situation where you

20   did not go to the board with a contract that you

21   wanted entered into?

22     A      Not that I can recall.

23     Q      Are you familiar with the contract with an

24   entity called Keystone?

25     A      Very familiar.

1      Q      Who is or was Keystone?

2      A      Well, Keystone is another facility, another

3  data center, basically just north of Philadelphia.

4      Q      And was there a time when you entered into

5  -- "you" meaning the company -- entered into a

6  contract with Keystone?

7      A      We did.

8      Q      And for what?

9      A      Well, let me give you a little bit of the

10  background.

11      Q      Sure.

12      A      Again, Mr. Flake had entered into a

13  contract with BMG to place 45,000 mining machines in

14  our facility.

15              We were unable to deliver on that

16  contract.  First, the capital expenditures for 45,000

17  machines would be somewhere in the neighborhood of

18  $20 million.  We didn't have $20 million.

19              Secondly, we ran into difficulties

20  with Dominion Energy, so Dominion was unable to

21  supply sufficient power for us to meet that contract

22  for 45,000 machines.

23              So here we had an existing contract

24  with BMG that we were unable to deliver on, so we

25  began discussions with another facility, mining

1  facility, in Pennsylvania.  The name of the facility

2  was Keystone.  And what Keystone was willing to do

3  was to finance the purchases, the infrastructure so

4  that we could afford to meet the contract with BMG.

5            As a result, that was the Keystone

6  contract.  We went to the board of directors, and the

7  board approved the Keystone contract.

8       Q    So is your testimony that the board of

9  directors, board members, whatever they are, approved

10 Keystone?

11      A    My testimony is the board approved the

12 Keystone contract.

13      Q    Do you have e-mails to that effect?

14      A    We have minutes.  We can go back to the

15 minutes.

16      Q    And what happened next with respect to the

17 Keystone contract?

18      A    We had to make a deposit with Keystone.

19      Q    How much?

20      A    It was about $3- or $400,000.

21      Q    And did Keystone ever do anything for the

22 debtors?

23      A    No.

24      Q    So have you gotten back the deposit?

25      A    We have not.

1    Q    Did you try?

2    A    Absolutely.  Probably 15, 20, 30 times.

3  I'm happy to show you every e-mail, every phone call,

4  every effort.

5    Q    Did you get it back?

6    A    We did not.

7    Q    Why not?

8    A    Because now it's in bankruptcy court, and

9  one of the issues that you have is you should have a

10  security deposit receivable reflected on the

11  financial statement of a security deposit from

12  Keystone.

13          So now, Mr. Clar, I believe that's up

14  to you to get that money back.

15    Q    I'm sorry.  I want to break down what you

16  just said, because I didn't understand.

17          And I didn't ask you to ask me to get

18  it back.  I asked you if you tried to get it back,

19  and your response was what?

20    A    My response was every effort possible to

21  get it back.

22    Q    And I asked --

23    A    But Keystone now is in its own financial

24  difficulties and is unable to return that, or so they

25  say.

282

1    Q    Well, I wanted to clarify that, because I

2  thought you said now it's in bankruptcy.

3    A    I did not say that.  I said we're in

4  bankruptcy, and there should be a security deposit

5  receivable from Keystone in the bankruptcy filings.

6    Q    Let me ask you about another contract.

7         Did you negotiate the WESCO promissory

8  notes?

9    A    I did -- well, no, I didn't.  I signed the

10  WESCO promissory note.

11    Q    Okay.  Explain to me, how do you sign

12  something that you didn't negotiate?

13    A    Because our general counsel dealt with

14  WESCO's counsel and went through those negotiations.

15    Q    You're a lawyer, aren't you, Mr. Grede?

16    A    I am.

17    Q    So did you review the WESCO promissory

18  note?

19    A    I did.

20    Q    Did you review all the other documents

21  associated with that promissory note?

22    A    What other documents?

23    Q    Well, specifically, did you review the

24  confession of judgment?

25    A    I did.

1    Q    And do you have an understanding -- you're

2  a lawyer -- what a confession of judgment is?

3    A    I do.

4    Q    What is it?

5    A    It's an admission that we owe WESCO X

6  amount of dollars.

7    Q    And what does it mean, litigation, do you

8  know?

9    A    With respect to litigation, that we should

10  pay them what we owe them.

11    Q    Is it a heightened degree of -- strike

12  that.

13              So you signed a promissory note,

14  correct?

15    A    I did.

16    Q    And did you sign the confession of judgment

17  as well?

18    A    I believe I did.

19    Q    Did you have board approval to do either of

20  those things?

21    A    The board was aware of it.

22    Q    No, I asked you if you had board approval.

23    A    I don't recall.  I know the board was aware

24  of it.

25    Q    Again, if you can recall anything beyond

1  awareness.

2       A    We'd have to go back and look at the

3  minutes, Mr. Clar.

4       Q    So do you recall any conversations,

5  communications, e-mails, phone calls, texts that you

6  had with any board members about the execution of the

7  WESCO documents?

8            MR. AGAY:  Your Honor, I'm going to

9  object to relevance.  He's going to the adversary

10  that they filed and proving that up.

11            I honestly don't care if he continues

12  with this or not, but he's just continuing to waste

13  time on something that's not an issue today.

14            MR. CLAR:  No, I think it goes to

15  impeachability of Mr. Grede, actually, as to his

16  actions and why he was fired and -- no, I think it's

17  quite relevant.

18            THE COURT:  Overruled.

19            MR. CLAR:  Thank you.

20            THE WITNESS:  There were many --

21            MR. CLAR:  I'm sorry.  Could you

22  reread the question, Jerri?

23            (Record read.)

24  BY MR. CLAR:

25       Q    Any communications that you can recall,

1  whether by e-mail, phone call, text, anything else

2  with board members about the execution of the WESCO

3  promissory note and confession of judgment?

4      A     Many.  Many that I can recall.

5           It all started out, and I remember

6  Mr. Adolphi, and I think Mr. Flake specifically,

7  because the first offer we got from WESCO was that

8  all of the directors would have personal liability,

9  and, of course nobody wanted to agree to that, so the

10  conversations and the discussions evolved from there.

11          Now, again, Mr. Clar, I admit that our

12  general counsel was the primary negotiator, but those

13  -- Mr. Flake and Mr. Adolphi in particular were well

14  aware of the situation with WESCO.

15      Q    Well, it seems like it's gone from the

16  board was aware to Mr. Flake and Mr. Adolphi was

17  aware, so can we narrow that a little bit?

18          Was the entire board aware?  Was it

19  presented to the board for approval?

20      A    We'd have to go back and ask the board

21  members.  I don't recall.

22      Q    Fair.  And so is it possible that this --

23  that the WESCO promissory note and, in fact, the

24  confession of judgment as well were entered into

25  without board approval?

286

1      A     I don't recall.

2      Q     Is it possible?

3      A     I don't recall.

4      Q     Again, is it possible?

5      A     I don't know.

6      Q     You don't want to say yes, do you?

7                  THE COURT:  Mr. Clar.

8                  MR. CLAR:  I'm sorry.

9  BY MR. CLAR:

10     Q     Going back to the early days of the

11  bankruptcy case, Mr. Grede, do you recall a point in

12  time when, as a result of cash collateral hearings,

13  there was a promise made to the Court that expenses

14  would be reduced?

15     A     I'm sorry.  Is your question after the

16  filing?

17     Q     Yes.  As part -- I'll rephrase it.

18                 As part of the cash collateral

19  hearing, do you recall there being a mandate, in

20  fact, from the Court that we reduce expenses and

21  commitment on the part of the debtors to reduce

22  expenses?

23                 Do you recall that?

24     A     I do not recall that specifically, no, but

25  it doesn't surprise me that the Court would want to

1   see what the spending is going to be.

2       Q    The problem I have here is, I don't want to

3   get into discussions that you and I had, and I won't,

4   so let me ask it a little different way.

5            Were you aware of the commitment made

6   to reduce expenses in the bankruptcy case?

7       A    Did you provide that commitment?

8       Q    I'm just asking if you're aware, that's

9   all.  We'll get into that later.

10      A    I'm aware that the Court was concerned

11  about the ongoing spending.

12      Q    As part of the ongoing expenses and the

13  reduction, do you recall whether there was a movement

14  to -- I shouldn't say -- strike that -- do you recall

15  whether part of that was the letting go of employees?

16      A    I do.

17      Q    You do?

18      A    Yes, I do.

19      Q    So we're getting somewhere.

20           Were you given the directive to lay

21  off employees as a part of that program to reduce

22  expenses in the bankruptcy?

23      A    Well, I think if you recall, Mr. Clar, you

24  were dealing in the initial incidences with George

25  Slodoje, who was our chief financial officer, and we

1   were asked to prepare budgets, and you and he

2   prepared those budgets.  And whatever was in those

3   budgets, that's what we presented to the Court.

4            And it included a combination of

5   things from cutting expenses to cutting employees.

6       Q    Okay, well, what I -- you really didn't

7   answer my question.

8            As part of that directive that you now

9   recall, was there a part where you personally were

10   supposed to fire employees?

11      A    I do not recall that specifically, but

12   there were employees that we let go.

13      Q    Okay.  So do you recall at a point in time

14   when anyone at the company asked you to fire

15   employees, and you didn't?

16      A    No, I do not.

17      Q    So you don't recall ever being at odds with

18   anyone at the company over your inability or inaction

19   in firing employees that were supposed to be fired

20   pursuant to the budget that was submitted?

21      A    Not pursuant to the bankruptcy court

22   budget, no.  But I was constantly at odds with Mr.

23   Adolphi, and Mr. Flake in particular.

24            As I gave you the example, $33 million

25   spent on Mining, hardly anything spent on the

1  exchange business, and as I say, my takeaway is that

2  they did not -- were not providing adequate resources

3  for the exchange business.

4      Q    Yes, but I've asked you about the employees

5  specifically, and so I'm going to ask it a different

6  way, because I feel like I haven't gotten an answer.

7                  Were you asked to fire employees?

8      A    No.

9      Q    Never?

10      A    Not in those terms, no.

11      Q    In what terms were you asked?

12      A    That we were asked to reduce the expenses,

13  and part of that included employees, and we released

14  some employees.

15      Q    After you left or before you left?

16      A    Before.

17      Q    Who was released --

18      A    Bill Boyk is one example.

19      Q    Was that at your directive?

20      A    It was a combination of the budget and

21  everything else.

22      Q    Isn't it true that part of the reason you

23  were fired is because of your refusal to fire people?

24      A    I don't believe so.

25            I've stated my reasons previously.

1   You choose not to accept my reasons.

2      Q    Whether I accept them or not is really not

3   relevant.

4               Sorry, Your Honor.  Just give me a

5   minute here.

6               Were you ever informed by anyone that

7   a headcount reduction was necessary to reduce

8   expenditures?

9      A    Not specifically.

10     Q    Isn't it true you had a conversation with

11  Mr. Sladoje and Ms. Vaassen on subsequent occasions

12  that a headcount reduction was critically important

13  to save the company?

14     A    No.

15     Q    Not true?

16               THE COURT:  Mr. Clar, please don't

17  talk into your pen.

18               MR. CLAR:  I'm sorry.  That doesn't

19  work, does it?

20               THE COURT:  No.

21  BY MR. CLAR:

22     Q    That's not true?

23     A    No.  I worked very closely with Mr. Sladoje

24  on the budget.

25               MR. CLAR:  I'm going to skip around a

1    little bit.  I'm sorry.  I'm just trying to get it

2    done.

3    BY MR. CLAR:

4        Q    With respect to the capital expenditures

5    that you talked about, surely, you were not referring

6    to payroll and Dominion as capital expenditures, are

7    you?

8        A    No.  But I think you misinterpreted or

9    chose to interpret differently what I said.

10             I know the difference between capital

11   expenditures and operating expenditures.

12       Q    Okay.  You mentioned the fire

13   suppression -- strike that.

14             Was the context in which you were

15   testifying about capital expenditures, was that

16   context in terms of things that are not in the

17   budget?

18             Is that what you were testifying to?

19       A    I'm not sure I understand the question.

20             THE COURT:  Neither do I.

21             MR. CLAR:  Oh, that's fair.  With

22   respect -- I'll rephrase.

23             THE COURT:  It's getting late.

24             MR. CLAR:  It is late.

25   BY MR. CLAR:

1    Q    With respect to the fire suppression

2  system, didn't you testify that there is provision in

3  the budget for that?

4    A    I believe that there is, yes.

5    Q    And what other capital expenditures

6  immediately need to be made?

7    A    You know, I just described generally,

8  Mr. Clar.

9         All I'm saying is that last year there

10 were probably 15- to 20 million in capital

11 expenditures put into that mining facility.

12         I believe that over the course of the

13 next year, there will be additional capital

14 expenditures that will be required.

15    Q    What are those expenditures, and how much

16 will they cost, if you know?

17    A    I don't have access to the budgets, I don't

18 have access to my e-mails.  Mr. Flake is the one who

19 has access to all my e-mails, so he would be a better

20 person to ask about those capital expenditures.

21         I would give you an estimate that

22 you're going to need $3 million in capital

23 expenditures next year.

24    Q    That's what I was hoping you would say.

25         Why?

1      A      Just based upon past experience, knowing

2 that facility, knowing we've encountered in the past,

3 you are going to have to put more capital into that

4 facility, period, end of statement.

5      Q      For what?

6      A      Let's talk about ventilation, let's talk

7 about heat, let's talk about humidity, let's talk

8 about humidity, let's talk about the roof that leaks.

9 We can go on and.

10             On all I'm saying, if you want to make

11 a little wager, I'll say $3 million.  I'll take the

12 over, you can have the under.

13      Q      Well, how much was spent on those issues:

14 Ventilation, heat -- I'm not sure what that means,

15 but we'll ask you -- ventilation, heat, or the roof

16 leaking in 2018?

17      A      I don't have the budget in front of me.  I

18 don't have the financials in front of me.  I would

19 tell you probably $5 million last year.

20      Q      In 2018 that's what was spent on

21 ventilating, heat and the roof?

22      A      Mr. Clar --

23      Q      That's what I asked.

24      A      Yeah, I understand what you asked.

25             I don't have the numbers in front of

1  me.  I'm giving you my best estimate as to what was

2  spent on those issues.

3       Q    You really don't know, do you?

4       A    I have a relative idea, yes, I do.

5       Q    Have you had any discussions with anyone at

6  the company about capital expenditures for those

7  three items specifically since you left?

8       A    No, I have not.

9       Q    Was there ever a time when you made a

10  statement, and not in my office but in someone else's

11  office with other people involved, other people

12  around, where you said you really didn't care about

13  the mining business?

14      A    I don't recall ever saying that.  I do not

15  want to see the mining business fail.

16                As you know, Mr. Clar, my background

17  is in the exchange business, and this was a constant

18  fight for resources between Mining and the exchange

19  business.

20      Q    In response to Mr. Agay's questions, didn't

21  you at one point say that you thought that the mining

22  business could continue just now?

23                Didn't you say that?

24      A    I don't recall the --

25      Q    Well, we can get the transcript --

1      A    -- specific conversation, but the mining

2   business is, as I stated, a fixed revenue amount,

3   generally fixed operating expenses.

4      Q    So it is sustainable at the present time,

5   is it not?

6      A    Well, I mean, I think we've discussed the

7   challenge.  You're going to have more expenses.

8   Without getting specific, we're likely to lose some

9   customers.

10              Personally, I think Mining needs a

11   change in its strategy, because I don't believe that

12   the current strategy is sustainable.

13      Q    What if Mining were to obtain new

14   customers?  Would it be sustainable?

15      A    Well, again, that's pie in the sky.

16      Q    Why is that?

17      A    I'm not aware of any new customers wanting

18   to come in.

19      Q    Would the ability of Mining to attract new

20   customers have anything to do with the price of

21   Bitcoin?

22      A    Not really, because -- you know, maybe it

23   makes Mining more profitable, but, again, you know,

24   another challenge that you have in our mining

25   facility is its competitiveness.

1    Q    So if the price of Bitcoin continues to

2  rise, could that be a factor that could cause the

3  current customers to stay and attract new customers?

4    A    I don't believe so.  I think that there are

5  other facilities that most of these customers are

6  looking at moving to.

7    Q    But you don't really know, do you?

8    A    I do know for a fact SBI has a mining

9  facility that they're building and have another one

10 that they're using.

11           And they specifically are telling me

12 that they think that the facility in Virginia Beach

13 is not competitive.

14    Q    When are they telling you this, who told

15 you, and how was it told you?

16    A    I have had conversations with SBI.

17    Q    Why are you having conversations with SBI?

18    A    Bcause Mr. Flake couldn't have the

19 conversations with SBI.

20    Q    When's the last conversation you had with

21 SBI?

22    A    It would have been prior to when I was

23 terminated.

24    Q    Okay.  So since you've been terminated,

25 have there been any conversations?

1        A    No.

2        Q    So you really don't know what SBI's doing

3   right now, do you?

4        A    Not in the last couple weeks.

5        Q    When were you fired?

6        A    I don't remember.  A month ago.

7        Q    So have you had any discussions with SBI

8   since you were fired?

9        A    I don't believe so.

10       Q    So that would be almost a month, correct,

11   if not more?

12       A    Correct.

13       Q    Okay.  On that same line, if expenses were

14   reduced to a certain level, let's say expenses

15   concerning payroll, and expenses concerning leases,

16   is Mining sustainable at present, if you know?

17       A    When you use the word "sustainable," does

18   it generate enough revenue minus its operating

19   expenses that there's some positive cash flow in

20   there, the answer to that question is yes.

21       Q    And if -- strike that.

22            Who proposed the third, a third, a

23   third, and I'll amplify that, but who proposed that

24   plan?

25       A    Mr. Flake did.

1      Q      Who proposed it to counsel?

2      A      I'm sorry?

3      Q      Who proposed it to counsel?

4             THE COURT:  What counsel?

5  BY MR. CLAR:

6      Q      Bankruptcy counsel.

7      A      I don't recall.  I mean, it might have been

8  a joint discussion.

9      Q      It wasn't you, though, was it?

10     A      I don't remember.

11     Q      Uhm -- that's dangerous.

12            You said that the customers and --

13  customers specifically -- wouldn't deal with

14  Mr. Flake.

15            Who's been dealing with the customers

16  since you left?

17     A      I couldn't answer that question.  I don't

18  know.

19     Q      Have you actively encouraged current

20  Bcause, LLC, employees to leave since you left?

21     A      I have not.

22     Q      So if they were to say that you have,

23  they'd be lying?

24     A      I believe they would be, yes.

25            MR. CLAR:  Give me one minute, Your

1   Honor.

2                    (Pause.)

3                    MR. CLAR:  I'll defer to Ms. Janczak,

4   Your Honor.

5                    THE COURT:  All right.  Ms. Janczak.

6                    CROSS-EXAMINATION

7   BY MS. JANCZAK:

8        Q    Mr. Grede, one of the things that you

9   testified to earlier was that you thought that the

10  independent directors resigned over some concerns

11  regarding other board members' ethics; is that

12  correct?

13       A    I did.

14       Q    Is that related to the unwillingness of

15  some equity holders to waive anti-dilution provisions

16  in their agreements; is that right?

17       A    I believe it is in part, yes.

18       Q    Does that seem to you like an excessive

19  reaction of board members, to resign over an equity

20  holder's decision not to waive a contractual

21  provision they're entitled to?

22       A    No, but it was a little bit more than that.

23            To be very honest with you, the

24  independent directors were concerned that there was

25  no directors and officers liability insurance.

1    Q    Okay.

2    A    And the gentleman who recommended we not

3  get it they felt was the one who was causing the most

4  issues.

5    Q    Okay.  You testified earlier regarding the

6  move of the company's bank account to an account with

7  Lakeside in Chicago; is that correct?

8    A    I did.

9    Q    Prior to that point, where was the holding

10  company's bank account located?

11    A    Town Bank in Virginia Beach.

12    Q    At some point did Town Bank inform the

13  company that it didn't want to continue doing

14  business with Bcause?

15    A    They did.

16    Q    Why's that?

17    A    I'm sorry?

18    Q    Why was that?

19    A    I don't know specifically, but firms that

20  are in this cryptocurrency business, it's difficult

21  to find a bank that wants to handle that kind of

22  business.

23    Q    Okay.  So was the reason that they didn't

24  want to continue doing business with the

25  cryptocurrency company?

301

1      A      They did not.

2      Q      Was that the event that caused the company

3  to look for a new banking institution?

4      A      No.  We'd been looking for a new banking

5  institution for some time.

6      Q      Okay.

7      A      That helped to facilitate or precipitate

8  the move.

9      Q      Okay.  But the reason you chose Chicago was

10  because you wanted more control over the account; is

11  that right?

12      A      Over the finances, yes, absolutely.

13      Q      One of the things that you mentioned as

14  your concerns over Mr. Flake were these expenditures,

15  33 million spent on the mining company last year; is

16  that true?

17      A      It is.

18      Q      You were CEO at that time; is that right?

19      A      I was.

20      Q      Did you approve the budgets that had those

21  expenditures in them?

22      A      I wouldn't go that far to say that there

23  were budgets in there.  But the spending, as I say,

24  just continues.

25      Q      Did you approve the spending?

1      A     I don't recall specifically that it worked

2   that way.   I mean, the spending kind of occurred.

3                  Was I the CEO?   Yes is the answer to

4   your question.   But that's why I also felt the

5   necessity to bring in the CFO, over resistance from

6   the board.

7      Q     As the CEO, did you have the ability to

8   rein in that spending?

9      A     It was very difficult because, again,

10  Mr. Flake was the founder.   He was a member of the

11  board, and it was very, very difficult.   That was the

12  biggest challenge, obviously, that I faced.

13     Q     You testified that you had been trying to

14  get rid of Mr. Flake for six to eight months prior --

15  I think it -- was it to the bankruptcy filing or

16  prior to your departure?

17     A     Generally one and the same, just an

18  approximate time period.

19     Q     Did you raise this concern to the board at

20  some point?

21     A     I did.

22     Q     When was that?

23     A     Probably December, January time frame,

24  January '18.

25     Q     Did you raise that at a board meeting?

1     A     We did.  We had discussions with the board

2  members, yes.

3     Q     What happened at that board meeting?

4     A     You have to remember that the board is

5  dominated by Mr. Flake's colleagues in Virginia

6  Beach, so, you know, they were going to support

7  Mr. Flake no matter what.

8     Q     So subsequent to that board meeting in

9  December, did you raise any further concerns to the

10  board after that point?

11     A     Constantly with other members of the board.

12          But I knew that the Virginia Beach

13  contingent was all very close to Mr. Flake, so that

14  was a useless endeavor.

15     Q     So which board members did you raise this

16  concern to?

17     A     I would raise it with the then-independent

18  directors, I would then raise it with the SBI

19  directors.  I raised it with the former chairman of

20  the board as well.

21     Q     But you didn't raise it at another board

22  meeting after that point; is that right?

23     A     No.  I figured it was useless at that

24  point.

25     Q     You also testified that just prior to the

304

1  bankruptcy filing, you gave your opinion to the board

2  that you believed that there was a 50/50 chance of

3  the case staying in Chapter 11 versus being in

4  Chapter 7; is that right?

5      A    That is correct.

6      Q    But you also testified that you really

7  believed that it was a higher chance that it would be

8  in Chapter 7; is that correct?

9      A    In my own mind.

10      Q    But you told the board it was 50/50 because

11  you thought that that was the answer they wanted to

12  hear; is that right?

13      A    In part, that's correct.

14      Q    Can you think of another time you might

15  have given an opinion to the board based on what you

16  thought they wanted to hear?

17      A    I can't recall any specifics.

18      Q    Okay.  Were you a signatory on the Lakeside

19  Bank account?

20      A    I don't remember.

21      Q    What about the Town Bank bank account?

22      A    I think that might have been opened before

23  I came on board, but I don't recall, because that

24  would have gone all the way back to the middle

25  of '17.

1     Q    You testified earlier regarding the a

2  third, a third, a third proposal, I think we'll call

3  it, because we certainly won't call it a scheme.

4              But that's roughly 33 percent

5  distribution to creditors; is that right?

6     A    Yes.

7     Q    That proposal, that wasn't your idea, was

8  that your testimony?

9     A    I think that was Mr. Flake's proposal.

10     Q    Did you approve of that proposal?

11     A    Approve -- there isn't any kind of a formal

12  approval.

13              As I mentioned earlier, it was some

14  type of a plan to start working forward it was some

15  type of plan to start working with to see what the

16  creditors would concur with.

17     Q    At the time that you were CEO, did you

18  think that the third, a third, a third plan made

19  sense to propose?

20     A    As a starting point.

21     Q    Okay.  You also testified that you

22  yourself -- you believe yourself to be a creditor in

23  this case, too, correct?

24     A    I do.

25     Q    You testified that you were going to be

1 realistic about recovering or being repaid any

2 amount.

3              What does that mean to you, being

4 realistic?

5      A    Well, as I said earlier, the mining

6 business right now, fixed revenue, generally fixed

7 expenses, fixed operating margin, so that's what we

8 have to deal with.

9              And if that fixed operating margin is

10 a hundred or even $200,000 a month, how long does it

11 take to pay back the creditors?

12             That's really the calculation that

13 we've been trying to make.

14      Q    Okay.  But you said you wouldn't vote in

15 favor of a plan that paid you one-third of your

16 claim; is that correct?

17      A    I was asked my opinion as a creditor, and I

18 said probably not.  I think that's what I said.

19      Q    Do you think the company will be able to

20 pay more than a third?

21      A    More than a third?

22      Q    Correct.

23      A    I'm struggling with how they pay the third.

24             I mean, if a third of the total debt

25 is $15 million, you're talking about 5 million to pay

1  back the creditors.

2              So I'm kind of struggling with given

3  the current income stream, how that's going to

4  happen.

5     Q    So if there were a proposal to pay you a

6  third, and you didn't think that they could pay more

7  than a third, why wouldn't you accept 33 percent?

8     A    Very good question.  You're absolutely

9  right.  That's the math.

10             If the best you're going to give is a

11 third, that may be your only choice.

12    Q    But if you thought that that was what you

13 could get, then under those circumstances, would you

14 vote for it?

15    A    Well, look, again, I'm realistic.  I'm

16 likely to be subordinate to other creditors, simply

17 because of my past role and past position.  I

18 understand that.

19    Q    Fair enough.

20             You testified regarding the WESCO note

21 and confession of judgment.

22             Do you recall that?

23    A    I do.

24    Q    And you testified that you had some

25 discussions regarding WESCO's request for some

308

1   personal guarantees; is that right?

2       A     That's how the conversation originally

3   started.

4       Q     Conversation with the board members?

5       A     WESCO counsel to counsel and board members.

6       Q     What conversations did you have with board

7   members specifically about the WESCO note and

8   confession of judgment?

9       A     That they had originally asked for personal

10  guarantees, and that that was a non-starter for

11  everybody.

12      Q     Were there other discussions with board

13  members subsequent to that point?

14      A     I'm sure that there were.

15      Q     About what?

16      A     Same type of thing, what was happening with

17  WESCO.

18      Q     Any specific conversations that you can

19  recall with any board member about the terms of the

20  note and confession of judgment?

21      A     I cannot recall.

22      Q     Okay.

23              MS. JANCZAK:  That's all I have, Your

24  Honor.

25              THE COURT:  Thank you.

1          MR. AGAY:  I have two questions on

2   redirect.

3          THE COURT:  Okay.  Anything else over

4   here?

5          MR. CLAR:  No.

6          THE COURT:  All right, Mr. Agay.

7               REDIRECT EXAMINATION

8   BY MR. AGAY:

9       Q    Mr. Grede, as a creditor, do you believe

10  this plan proposes a 33 percent distribution to you?

11      A    To me personally?

12      Q    Yeah.

13      A    Again, I'm going to tell you that I'm

14  realistic, and I'm not sure I'm going to see that

15  33 percent distribution to me.

16      Q    Why do you say that?

17      A    Well, I mean, I have some experience in the

18  bankruptcy process.  I know I'm an insider, I know

19  I'm perceived to be an insider, even though I am a

20  creditor.

21               And, again, I don't want to

22  subordinate my position voluntarily, but I think I'm

23  realistic as to how this process is going to work

24  itself out.

25      Q    Do you think that there's a risk that that

1  payment -- you won't ever realize that payment

2  stream?

3      A    Do I think there's a risk or do I think

4  there's a probability?

5      Q    Probability.

6      A    I think there's a probability.

7      Q    Ms. Janczak indicated that, in fact, it's a

8  33 percent distribution.

9           Do you know if the math actually works

10 out to a 33 percent distribution?

11     A    I don't -- I'm not sure I understand the

12 question.

13          We can figure out the math, but,

14 again, as I say, I look at that as a general starting

15 point to begin discussions with the creditors.

16     Q    Okay.  But you can't testify today, based

17 on your knowledge, that you know that there's going

18 to be a 33 percent distribution to unsecured

19 creditors in this case, correct?

20     A    I'm not sure I understand your question.

21 If you're asking me will there be a 33 percent

22 distribution?

23     Q    Is what's proposed in here?

24     A    I believe that's what was proposed.

25     Q    Okay.  And you believe that because why?

1     A    Because I think that's what I saw in the

2   previous documents and business plans that you

3   supplied to me.

4     Q    And is that what you discussed with

5   Mr. Flake before you left, a 33 percent distribution

6   to creditors?

7     A    The general one-third, one-third, one-third

8   plan.

9     Q    And that is how you had pitched it

10   internally at the company, correct?

11     A    I don't know that "pitch" is the right

12   word.  I mean, again, I'm throwing that out as a

13   starting point.

14     Q    Okay.  Are you familiar with the company's

15   insurance coverage?

16     A    Generally.

17          MR. CLAR:  Your Honor, I'm going to

18   object as to -- I can see the relevance of the

19   question.  It's just who it's directed to.

20          He's not there anymore.

21          THE COURT:  Well, he only asked him if

22   was familiar.  We haven't gotten to the next

23   question.

24          MR. CLAR:  Okay, well, then as to

25   foundation, when were you familiar, I suppose.

1          And I don't mean to direct Mr. Agay,

2     but we --

3     BY MR. AGAY:

4          Q     As of your departure from the company, were

5     you familiar with the company's insurance coverage?

6          A     Again, generally speaking.  But, I mean, I

7     can't tell you what the specific policies were.

8          Q     Okay.  So you're not -- you don't know what

9     the specific property insurance coverage was?

10         A     I don't know specifically what the specific

11    property insurance coverage was.

12         Q     Do you know what the liability insurance

13    coverage was?

14         A     I don't know specifically.

15         Q     Do you know if the company, in fact, had

16    property insurance?

17                    MR. DAN:  Objection, Your Honor.

18    We're kind of well beyond the scope on redirect here,

19    and are we admitting those into evidence?

20                    THE COURT:  We are, and we already

21    have the documents.  I don't think we need to go

22    there.

23                    MR. AGAY:  Okay.

24    BY MR. AGAY:

25         Q     You mentioned D and O insurance in

313

1   connection with Ms. Janczak's redirect.

2                  Did the company have D and O

3   insurance?

4        A    They did not.

5        Q    As of the filing of the case, did they have

6   D and O insurance?

7        A    They did not.

8        Q    And as of your leaving the company, did the

9   company have D and O insurance?

10       A    They did not.

11                  MR. AGAY:  That's all I have.

12                  THE COURT:  Thank you.

13                  All right.  I think that's

14  concludes -- thank you very much.

15                  THE WITNESS:  Thank you.

16                  (Witness excused.)

17                  MR. AGAY:  Your Honor, one

18  housekeeping matter.

19                  So are we going to reconvene on

20  Monday?

21                  THE COURT:  We'll reconvene on Monday,

22  so the question is what time.

23                  MR. CLAR:  Right.  What time is best

24  for Your Honor?

25                  THE COURT:  I live a few blocks away.

1  You have people who are coming in on airplanes and

2  things.

3              MR. CLAR:  Well, I think just one

4  person.  And I think Mr. Flake is not going all the

5  way back to Virginia.

6              THE COURT:  So we can start whenever

7  it makes sense on Monday.

8              MR. CLAR:  The only -- and I hate to

9  even mention this.  The only thing is whether or not

10 I need to be in court with my daughter for her

11 divorce.  I don't think I do, so we can probably do

12 it in the morning.

13             It's a bad story, but yeah, we can

14 start in the morning.

15             THE COURT:  All right.  9:30 Monday.

16             MR. AGAY:  Last thing.  It won't take

17 long, but we have two additional witnesses.  We'd

18 like to call Ms. Janczak and Mr. Shaw as witnesses.

19             Mr. Flake testified as to discussions

20 that he had with them prior to today.  Those are not

21 privileged discussions.  He could not recall those

22 discussions he had with Ms. Janczak and Mr. Shaw.  I

23 think they're highly relevant.

24             They've been sitting here the entire

25 case chit-chatting with debtors' counsel and with

1  Mr. Flake.  None of those are privileged discussions,

2  and I think those would be highly relevant to this

3  case.

4           MR. SHAW:  Your Honor, I'm going to

5  make a suggestion.  I have a trial on Tuesday and

6  Wednesday in Dallas.  So if Mr. Agay wants to make

7  the mistake of putting me on the stand and asking me

8  what I was talking to Ms. Janczak about, he should do

9  so now, but it would be a mistake, because I was

10 making comments about the procedures in front of me.

11          If Mr. Agay wants to know what I

12 answered, or what I said to Mr. Flake when he asked

13 me about the $70,000, I can say it right now.

14          I said it's complicated.

15          MS. JANCZAK:  Your Honor --

16          THE COURT:  Let me just stop you right

17 there.

18          I'm not going to have an exploration

19 of what counsel was talking about with Mr. Flake.

20          But we have two significant issues,

21 and that is the WESCO debt and whether or not it's

22 secured or unsecured, and your client's debt and

23 whether or not there's a writing, whether it violates

24 the statute of frauds and whether or not there's any

25 obligation, and it's a big one.

316

1          Those are very key issues in terms of

2     whether or not this company is going to be able to

3     reorganize, and I'm not quite sure how that

4     information is going to be revealed.  I don't think

5     it should be revealed through counsel, however.

6          I mean, I think we've got an adversary

7     proceeding with respect to whether -- we know the

8     creditors committee's position, and we also have some

9     testimony by Mr. Flake, but there's a question about

10    Mr. Shaw's client's obligation.

11         Well, guess what?  Those guys really

12    care, because it makes a huge difference once again

13    to the unsecured creditors committee.  We all know

14    that.  That's not a mystery.

15         The real question is, how are you

16    going to get any more information about what is going

17    on with Mr. Shaw's client and whether or not we've

18    got a $3.8 million obligation or not, and I don't

19    think it's from Mr. Shaw.

20         MR. SHAW:  I can assure you that I'm

21    not -- well, like I think said this already.  I

22    cannot be here Monday.  Ms. Sanfelippo will be.

23         But having someone from my client come

24    and testify is not really an option on Monday.  It

25    would have to be pursuant to a proper subpoena.  We

1  have people that live out of the country.

2            MR. AGAY:  Your Honor, Mr. Flake had a

3  discussion with Ms. Janczak regarding the business

4  plan, several discussions, and regarding the

5  committee's views on that business plan.

6            He testified to that.  Now, if

7  Mr. Flake could have remembered what those

8  discussions were, that we could have foregone having

9  called Ms. Janczak to the witness stand, but he

10  couldn't.  And those are -- the committee's views on

11  that business plan are highly relevant.

12            THE COURT:  The committee's views on

13  the business plan is not really relevant all that

14  much right now.  And if it's relevant, it's going to

15  come out by them talking about it, by them putting on

16  cross-examination, not by their lawyers testifying.

17            At this point in time, Ms. Janczak and

18  Mr. Shaw are not going to be testifying.  I'm not

19  going to let you call them as witnesses.  I want to

20  hear the rest of the witnesses here, and then we'll

21  see where we're at, and then you can make your

22  argument again, but it's not going to happen on

23  Monday.

24            I do not want lawyers to be put on to

25  talk about their conversations about their opinions

1    on this sort of thing, and I'm really -- I think

2    there's a right way to get this information and a

3    wrong way, and right now, I'm looking at that as the

4    wrong way.

5              Now, you can convince me differently

6    later, perhaps, depending on what we hear.  We

7    haven't even had Mr. Flake on direct yet, and I don't

8    think we can decide anything until we get there.

9              MR. AGAY:  Well, look, if Mr. Flake

10   suddenly remembers what he talked about with

11   Ms. Janczak and Mr. Shaw, maybe we don't need to put

12   them on.

13             THE COURT:  We may.

14             MR. AGAY:  At the end of the day, if

15   they are saying something different to Mr. Flake than

16   what their portion is in court, I think that's highly

17   relevant.

18             And as Your Honor pointed out, the

19   nature of his client's claims in this case and the

20   fact that they might be clawing back payments, there

21   were credits that were made to them, that's very

22   troubling.

23             THE COURT:  Again, remember why we're

24   here.  I have to determine whether or not I'm going

25   to let the debtor go on for a little bit longer or

1    whether or not I'm going to cut it off now.  And what

2    they have to convince me is that they have enough

3    potential here that they should go on.

4              Well, we now know that there are two

5    huge debts out there that could impact whether they

6    have the financial wherewithal to go along.

7              I heard it for the first time here to

8    today.  I didn't know what the status of Mr. Shaw's

9    client's debt is.  It became a big question mark.

10             It factors into my thinking here.

11             MR. CLAR:  I just want to understand

12   what Your Honor's saying, two huge debts.

13             We were aware of BMG's debt.

14             THE COURT:  We weren't aware of what

15   the status is, and we weren't aware of what we've

16   heard so far, that it might not be in writing.

17             MR. CLAR:  Right.  And we weren't

18   aware that, at least I wasn't anyway, that there

19   might be a possibility of money coming back.

20             So these are not negative issues,

21   necessarily.  This could be positive.

22             But what's the other issue, the other

23   debt --

24             THE COURT:  His debt.

25             MR. CLAR:  Oh, the -- yes --

1          THE COURT:  And we're all aware of

2     that.  We don't need Ms. Janczak's testimony on that

3     one.

4          MR. SHAW:  Judge, I do find it

5     interesting that sitting here, the last time I was

6     before you I heard repeated criticism of everybody

7     that was raising questions about WESCO's lien, and

8     because no complaint was filed and no formal attack

9     was made.

10         And now I'm sitting here being told I

11    should go on the stand to defend my client's claim,

12    but there's no formal attack.

13         And I have said it before, and I will

14    say it again, and I will tell Mr. Agay like I told

15    Ms. Janczak.

16         My client's claim is complicated.

17    It's very complicated.  It's more complicated than

18    any of the issues that have kind of extracted itself

19    from the sausage and presented itself to the Court.

20         But my claim has not been made a

21    direct issue, and, you know, maybe someone should try

22    to ask him the questions first outside the courtroom.

23         THE COURT:  That's always a good

24    start.

25         MR. AGAY:  Well, we have.  We just

1  haven't gotten any answers, but that's neither here

2  nor there.

3            THE COURT:  It's not going to happen

4  on Monday.

5            Again, I want hear the rest of the

6  witnesses who are on the witness list.  I want hear

7  the full case that you prepared thus far, and then

8  we'll see where we go from there.  9:30 on Monday.

9            MR. SHAW:  And I apologize.  I will

10 not be able to be here on Monday, but we will have

11 coverage, and Ms. McLemore knows much more about this

12 than me.

13            MR. CLAR:  I just want to make sure

14 there's nothing else we need to deal with.  I think

15 we dealt with everything before the trial.

16            Cash collateral use expires on the

17 24th, so we'll have to deal with --

18            THE COURT:  Which is Monday.

19            MR. CLAR:  We'll have to deal with

20 that on Monday.

21            THE COURT:  Right.  Understood.

22            Thank you.

23            (Proceedings adjourned to June 22,
               2019, 9:30 a.m.)

24 I, JERRI ESTELLE, CSR, RPR, DO HEREBY
   CERTIFY THAT THE FOREGOING IS A TRUE

25 AND ACCURATE TRANSCRIPT OF PROCEEDINGS
   HAD IN THE ABOVE-ENTITLED CAUSE.  /s/