1

        IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS

2

             EASTERN DIVISION

3

BCause Mining, LLC,        ) No. 19 B 10562

4

                   ) Chicago, Illinois
                   ) 9:30 a.m.

5

         Debtor.     ) June 24, 2019

6

         VOLUME II (Pages 322-584)

7

        TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE JANET S. BAER

8

9

 APPEARANCES:

10

For the Debtors:      Mr. Scott Clar;

11

For WESCO          Mr. David A. Agay;

12

Distribution:       Ms. Maria G. Carr
                 (telephonic);

13

For Hoffland       Ms. Sarah K. Angelino:

14

Properties:        Mr. Dennis T. Lewandowski
                 (telephonic);

15

For Virginia      Ms. Heather L. Maly;

16

Electric:         Mr. John M. Craig;

17

For the Committee:   Ms. Elizabeth L. Janczak;

18

For BMG Operations:  Ms. Christina M. Sanfelippo;
                 Ms. Jennifer M. McLemore

19

                 (telephonic).

20

21

22

23

 Court Reporter:     MARY C. KELLY, CSR
                United States Courthouse

24

                219 South Dearborn Street
                Room 661

25

                Chicago, Illinois  60604

1                     I N D E X

2

3

4    WITNESS:                DX      CX       RDX    RCX

5

6    CARL LANE               328   377,405   411

7

8    THOMAS FLAKE            417   478,490

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.

2          Appearances from the left.

3          MR. AGAY:  Good morning.  David Agay

4   from McDonald Hopkins on behalf of WESCO.

5          MR. CLAR:  Good morning, Your Honor.

6   Scott Clar from Crane Simon on behalf of the

7   debtors.

8          MS. JANCZAK:  Good morning, Your Honor.

9   Elizabeth Janczak on behalf of the committee.

10          MS. SANFELIPPO:  Good morning, Your

11   Honor.  Christina Sanfelippo on behalf of BMG

12   Operations, Ltd., and our lead counsel Jennifer

13   McLemore is on the phone.

14          MS. ANGELINO:  Good morning, Your Honor.

15   Sarah Angelino of Schiff Hardin on behalf of

16   Hoffland Properties.

17          MR. CRAIG:  Good morning, Your Honor.

18   John Craig on behalf of Virginia Electric and Power

19   Company doing business as Dominion Virginia Power.

20          MS. MALY:  Good morning.  Heather Maly

21   also on behalf of Dominion.

22          THE COURT:  Good morning.

23          MR. AGAY:  Your Honor, I should have

24   mentioned I believe Maria Carr is participating on

25   the phone.

1        THE COURT:  I was just going to go

2   through that.

3        I show as listen only, Maria Carr from

4   McDonald Hopkins, Dennis Lewandowski from Kaufman

5   and Canoles representing Hoffland also, and then

6   Jennifer McLemore on behalf of BMG.

7        Okay.  Any housekeeping matters before

8   we proceed?

9        MR. CLAR:  I don't think so.

10        THE COURT:  All right.

11        Just so you know, in terms of

12   scheduling, I have a 3:00 o'clock conference call I

13   have to break for.  Other than that, we can be

14   pretty flexible, but we'll see what our court

15   reporter needs in terms of lunch and that sort of

16   thing and how long we can go.

17        MR. CLAR:  Okay.

18        THE COURT:  All right.

19        I think that we were going to proceed

20   with mister -- was it Mr. Flake's direct?

21        MR. CLAR:  No.  I think we're going to

22   proceed with Mr. Lane.

23        THE COURT:  Oh, Mr. Lane, right.

24        MR. AGAY:  Yes, Mr. Lane.

25        MR. CLAR:  That's what I thought.

1          MR. AGAY:  Yes, that's fine.

2          THE COURT:  Oh, all right.

3          MR. AGAY:  So just to sketch out the

4     schedule, I think the schedule is Mr. Lane, direct,

5     cross, and I think we'll be done with our witnesses

6     at that point, and then Scott will present Mr.

7     Flake.

8          MR. CLAR:  That's true.

9          MR. AGAY:  Direct, cross, redirect, et

10    cetera.

11          I don't know if you have any other

12    witnesses?

13          MR. CLAR:  I won't, and I don't -- I am

14    hesitant to predict, but I don't know that we're

15    going to need much more than what we have until

16    3:00 o'clock today.

17          THE COURT:  Great.

18          MR. AGAY:  Yes, and then we'll just do a

19    closing.

20          THE COURT:  Okay.  All right.

21          Everybody have a seat, and I'll let you

22    proceed with Mr. Lane.

23          MR. AGAY:  Thank you.

24          Your Honor, I would call Carl Lane to

25    the witness box.

1      THE COURT:  Okay.  Mr. Lane, right here

2  (indicating), and just remaining standing so we can

3  swear you in.

4      THE CLERK:  Would you raise your right

5  hand.

6          (Witness sworn.)

7      THE CLERK:  Thank you.

8      Please state your name and spell it for

9  the record.

10      THE WITNESS:  Carl Lane, C-A-R-L,

11  L-A-N-E.

12      THE COURT:  Good morning, Mr. Lane.

13      THE WITNESS:  Good morning, Your Honor.

14      THE COURT:  You'll notice we have an odd

15  setup here.  The court reporter has her back to

16  you, so if you'd please always answer verbally when

17  you answer questions.  If you nod, it won't show

18  anything on the transcript.

19      THE WITNESS:  Of course.  Thank you.

20      THE COURT:  Thank you.

21      MR. AGAY:  Your Honor, just very

22  briefly, we had submitted Mr. Lane's declaration as

23  Exhibit 18.  At the conclusion of his testimony, I

24  would ask that that exhibit be admitted into

25  evidence as nothing more than an opinion.

1          MR. CLAR:  No objection.

2          THE COURT:  All right.  That's fine.  I

3     believe I do have it here.

4          There it is.  I do have it here.

5          MR. AGAY:  Okay, good.  Great.  Thank

6     you.

7          We do have extra copies.

8          THE COURT:  Thank you.

9          CARL LANE, WITNESS, DULY SWORN,

10              DIRECT EXAMINATION

11    BY MR. AGAY:

12        Q.   Okay.  I believe you already stated your

13    name for the record.  Thank you very much,

14    Mr. Lane.

15        Could you please describe your

16    educational background, including any specialized

17    degrees and training?

18        A.   So I have an undergraduate degree, a

19    Bachelor of Science in accounting, from the

20    University of Florida, and I also have a Master's

21    in Business Administration with a concentration in

22    finance, also from the University of Florida.

23        Q.   Okay.  Any certifications or special

24    designations?

25        A.   Yes.  So I have a handful of

1    certifications.

2          I have a Chartered Financial Analyst

3    designation, often called a CFA.

4          I have a Certified Insolvency and

5    Restructuring Advisor certification also, often

6    called a CIRA.

7          I have a Certificate in Distressed

8    Business Valuation certification, often called a

9    CDBV.

10         And I have, finally, a Certified

11   Turnaround Professional designation, often called a

12   CTP.

13     Q.    Okay.  Are you a member of any

14   professional organizations?

15     A.    I'm also -- I'm a member of the

16   Turnaround Management Association, the Association

17   of Insolvency and Restructuring Advisors, and also

18   the Private Directors Association.

19     Q.    Okay.  Did you hold any officer

20   positions at the TMA?

21     A.    So, currently, I'm a director of the

22   Chicago chapter of the TMA.  I'm a past president

23   of the Chicago chapter.  I was also on the Board at

24   the national level and held both Board positions

25   and officer positions there.

1    Q.    So what would you characterize as your

2    professional area of expertise and specialty?

3    A.    So turnaround and restructuring both on

4    a financial and operational side, with expertise in

5    finance, accounting, valuation sort of economic

6    analysis.

7    Q.    Okay.  How many years have you been

8    working in this field?

9    A.    Over 25 years.

10   Q.    Okay.  Could you please provide a

11   background of your work experience after your

12   education?

13   A.    Yes.  I'll just summarize my most recent

14   three work experiences.

15        So I was a partner at Deloitte in

16   Deloitte Financial Advisory Services in what is

17   called their Reorganization Services Group, RSG.  I

18   was there for 13 years.

19        And then I was subsequent to Deloitte, I

20   was a managing director at AlixPartners in their

21   turnaround and restructuring services practice.

22        And then subsequent to AlixPartners, I

23   started Willow Tree Consulting Group about 8 years

24   ago where I'm managing director running products on

25   a day-to-day basis.

1      Q.    Okay.  What type of companies did you

2   advise at Deloitte?

3      A.    So at Deloitte, the focus was sort of

4   middle market and large corporate companies, most

5   of them distressed, in and out of court

6   restructuring situations.

7      Q.    Okay.  Were you involved in any

8   bankruptcy cases?

9      A.    Yes.  So, you know, primarily -- so I

10  was involved in advising debtors, creditors

11  committees and equity committees across a number of

12  industries, cases that included Jacobson Stores,

13  Coram Healthcare, Bally Total Fitness, Federal

14  Mogul.  You know, the list is fairly long.

15     Q.    What about at AlixPartners?

16     A.    Yes, AlixPartners.

17           So at AlixPartners, in addition to

18  advising companies as a financial advisor, we also

19  took on interim management roles, and then the

20  practice was really more focused on a debtor

21  advisory there.

22           So similar sized companies again, so

23  when I joined, I was focusing on middle market and

24  large corporate companies providing both financial

25  and advisory and interim officer roles like chief

1    restructuring officer for companies in and out of

2    bankruptcy.

3         Q.    And you were involved in bankruptcies at

4    AlixPartners?

5         A.    I was.

6         Q.    I believe you said you're currently with

7    Willow Tree?

8         A.    Yes.

9         Q.    Did you start Willow Tree?

10        A.    Yes.  So I founded Willow Tree about

11   8 years ago, really provide the same thing, the

12   same type of services I was providing at Deloitte

13   and AlixPartners but with a focus more on what I

14   call the lower middle market space, so companies

15   with revenues in the 50 to 250 million revenue

16   size, but there are situations where I worked with

17   companies at lower revenues than that.

18        Q.    Okay.  Have you ever worked as an

19   independent director?

20        A.    I have.  So more recently, I've been an

21   independent director, all for distressed companies,

22   five times, broad range of company types.  So one

23   was a craft brewer.  One was a mining and safety

24   products company.  Another one was a security

25   construction company, and then a medical device

1    manufacturer and, also, most recently, a restaurant

2    chain based out of the south.

3        Q.    Okay.  During your tenure at Willow

4    Tree, have you worked as an independent director or

5    an interim officer?

6        A.    Yes.  So I've acted both as a chief

7    restructuring officer, and I've also held CFO

8    titles, president titles for companies going

9    through restructuring.  And then, as I said, five

10   times I've been independent director.

11       Q.    Any bankruptcies?

12       A.    Yes.  So a couple of bankruptcies while

13   I was at Willow Tree.  One was The Budd Company,

14   which was here in Chicago, where I was the chief

15   restructuring officer, and two of those independent

16   director situations were bankruptcies.  One was

17   Cardiac Science, which was up in Wisconsin out of

18   Madison, and the other is the one that's the

19   restaurant chain was called Fatz Cafe which was in

20   South Carolina.

21            I would say, you know, certainly I do

22   some bankruptcy work at Willow Tree, but a good

23   portion of it is out-of-court restructuring-type

24   activity.

25       Q.    Okay.  Any published articles anywhere?

1    A.    I have.  So a fair amount of publishing

2  in sort of professional journals.  Probably the

3  biggest three that I would -- or that I've done is

4  some publishing in the Daily Bankruptcy Review,

5  also the ABI Journal, and then I have a chapter in

6  a book on restructuring alternatives, and it's

7  published by West Publishing.

8          So the topic range really focused on

9  sort of the financial sort of side of things.  So

10  restructuring, bankruptcy law changes from a

11  financial perspective, again, restructuring

12  alternatives in the West Publishing book.  So on a

13  range of topics.

14    Q.    Okay.  Have you taught any courses?

15    A.    I have.  So, I mean, I've had a large

16  number of speaking situations, but when I talk just

17  teaching courses, I'll focus on just a handful.

18          So I was the -- I taught a course for

19  the AIRA associated with their CDBV certification.

20  So after having my own certification, I was

21  actually teaching that course for them.

22          I, also, with the Turnaround Management

23  Association, created a course called CRO101 and

24  CRO201, so Chief Restructuring Officer 101 and 201

25  for sort of managing a turnaround restructuring

1    process which was ultimately a webinar that they

2    continue to utilize.  And then TMA also created a

3    valuation -- distressed company valuation course

4    that they do, you know, via webinar.  Although I

5    wasn't a speaker, I was the technical editor and

6    coauthor of sort of the overall presentation sort

7    of coordinating everyone else's components.

8         Q.    All right.  Given your experience as an

9    officer, consultant and director, do you ever have

10   to deal with valuation issues?

11        A.    Oh, pretty much in every single matter I

12   get involved with you have to deal with valuation.

13   At the end of the day, restructuring is about

14   distribution of value, right?  So you have to know

15   the value to know what your alternatives are and

16   how you're going to sort of distribute that value.

17        Q.    So can you give me a couple of examples

18   of engagements where valuation has played a

19   significant role?

20        A.    Yes.  So, you know, certainly in

21   situations where I did contested, you know,

22   bankruptcy, you have -- you typically will have to

23   put together a valuation so you know what the value

24   is to distribute, so I put -- you know, assisted or

25   helped put together valuations in contested

1    bankruptcy proceedings.  I've also put them

2    together for insolvency analyses.

3            But then just on a day-to-day basis, you

4    know, managing a restructuring, working with

5    investment bankers, I have to sort of, you know,

6    work with them to understand the value.  And, you

7    know, like I say, for a 363 sale.  So knowing what

8    the value is so when you are going down the path of

9    doing a 363 sale, you know approximately what

10   you're going to be getting.

11       Q.    Have you ever served as an expert

12   witness before?

13       A.    I have.  Approximately, five -- five

14   times.

15       Q.    What cases?

16       A.    Yeah, so sort of to do it from first to

17   last.

18            So Coram Healthcare, C-O-R-A-M

19   healthcare.  That was in Delaware.

20            Then Jacobson Stores, which was a

21   department store chain based in the midwest and

22   Florida, and that case was in Detroit, Michigan.

23            Then Motor Coach Industries, which was a

24   bus manufacturer essentially, whose case was in

25   Delaware.

1              Then ASARCO, A-S-A-R-C-O, which was a

2     coal mining company, and that case was in Texas.

3              And then, finally, The Budd Company,

4     which was here in Chicago.

5         Q.    Okay.  Any of those in bankruptcy court?

6         A.    Yes.  So those -- yeah, those were all

7     -- those were all in bankruptcy court.

8         Q.    Okay.  As part of your preparation for

9     this case, did you prepare a declaration regarding

10    your background and conclusions?

11        A.    I did.

12        Q.    Okay.  This declaration include a copy

13    of your CV?

14        A.    It does.

15        Q.    All right.  Does the CV list all of your

16    education and experience we've discussed today?

17        A.    It does, plus additional background on,

18    you know, other publishing and speaking situations,

19    a little bit more detail about the things I do on a

20    day-to-day basis in a restructuring situation.

21             MR. AGAY:  All right.  And, Your Honor,

22    I think I would reference I think it's Exhibit 18

23    that has Mr. Lane's CV attached and also some

24    statements regarding his qualifications in

25    addition.

1    BY MR. AGAY:

2        Q.    All right.  We'll walk through your

3    conclusions from your declaration in a moment.

4              On what were you asked to testify today?

5        A.    I had to provide my opinions regarding

6    the debtor's business plan and their cash flow

7    projections.

8        Q.    Okay.

9        A.    And their enterprise value ultimately.

10       Q.    Okay.

11             Who hired you?

12       A.    McDonald Hopkins did.

13       Q.    Okay.  What did you do to prepare for

14   your testimony today?

15       A.    So to prepare for my testimony today, I

16   reviewed my declaration, and I reviewed some of the

17   documents that I had reviewed in preparing my

18   declaration.

19       Q.    All right.  Are those documents listed

20   in your declaration?

21       A.    Yeah, so all the documents I reviewed

22   and relied upon are included in my declaration.

23   They included a fair -- some court filings,

24   transcripts of depositions of Flake and Grede.

25   They included the debtors' business plans.  I

1    actually reviewed a couple different versions of

2    their business plan.  The cash flow projections

3    that were included with those business plans as

4    well as other sort of miscellaneous business

5    documents, including the hosting agreements that

6    BCause Mining has.

7         Q.     Okay.  Who provided you these materials?

8         A.     Attorneys of McDonald Hopkins.

9         Q.     Did you do any research beyond these

10   materials?

11        A.     I did a little bit of research regarding

12   the price trends of bitcoin and also sort of other

13   companies that operate within the cryptocurrency

14   mining hosting business.

15        Q.     Okay.  How did you do this research?

16        A.     Just did it via the Internet.  So I

17   looked at a couple of different sites that tracked

18   the bitcoin prices and other cryptocurrency prices,

19   and then I looked at company websites that provide

20   similar services to BCause Mining, along with one

21   company that is sort of I'll call it a consolidator

22   of quotes, and so it sort of searches for quotes

23   and then provides a summary at the end.

24        Q.     Okay.  You being paid for your time

25   today?

1        A.      I am.

2        Q.      All right.  How are you being paid?

3        A.      So my compensation is simply a time

4    incurred at an hourly rate of $500 per hour.

5        Q.      Okay.  How much time have you spent on

6    this matter so far?

7        A.      Approximately 48 hours.

8        Q.      Are you being paid at all based on the

9    outcome of the matter?

10       A.      No, I'm not.

11       Q.      Okay.

12               MR. AGAY:  Your Honor, based on

13   Mr. Lane's testimony, based on his declaration and

14   CV, I would move to tender Mr. Lane as an expert in

15   distressed business analysis and business

16   valuation.

17               MR. CLAR:  Okay.  But not as to the

18   value of the assets, though.  I don't think he's

19   been qualified as to -- as an expert for that

20   purpose, which is why we're here.

21               THE COURT:  It depends on how you define

22   assets.  He clearly says he's going to testify and

23   is competent to testify as to the value of the

24   business in whole, the enterprise value and the

25   like.  I don't think he's going to testify about

1   the liquidation value of the racks in the

2   warehouse.

3           MR. CLAR:  And that's my problem.

4   Because we're here on a motion for relief from stay

5   which requires the creditor to prove two things.

6   One, that there is no equity in the property; and,

7   two, which I don't doubt that he's qualified to

8   offer, an opinion as to whether there's a plan of

9   reorganization that can be proposed.  I'll concede

10  that, but not as to the value of the assets which

11  is the basis of why we're here.

12          THE COURT:  Mr. Agay?

13          MR. AGAY:  I'm not offering Mr. Lane to

14  testify as to liquidation value.  And to the extent

15  we're deficient with respect to proving up some

16  element of 362(d), that's my problem, and we'll

17  make a closing statement which summarizes and I

18  believe will set forth why, in fact, there is no

19  equity in the property.

20          Mr. Lane is here to talk about the going

21  concern value of the business, and that's very much

22  at issue, and also the viability of the business

23  plan, and I think we've tendered enough to

24  demonstrate that he's an expert in this area.

25          MR. CLAR:  I don't dispute that there's

1    some value to a valuation of the going concern

2    value, but -- and, again, we'll get into this in

3    argument, Mr. Agay is right.  But to the extent

4    this is not a Section 362 sale, it's a motion for

5    relief from stay, I think that the focus is quite

6    narrow.

7              THE COURT:  I'm going to overrule your

8    objection.  Mr. Lane will be accepted as an expert

9    witness.

10             If you have objections to certain

11   testimony of Mr. Lane, please do so.  If Mr. Agay

12   is deficient in what he is presenting, that is, in

13   fact, Mr. Agay's problem.

14             MR. CLAR:  I agree.

15   BY MR. AGAY:

16        Q.   All right.

17             Mr. Lane, what is your understanding of

18   the debtors and their business?

19        A.   So the debtors are in the business of

20   we'll call it the cryptocurrency space,

21   cryptocurrency industry, focused primarily, if not

22   solely, on cryptocurrency mining and hosting.

23             They have a couple of subsidiaries that

24   are in bankruptcy court or entities that are in

25   bankruptcy court, BCause and BCause Mining.  They

1    have a handful of other subsidiaries that aren't in

2    Chapter 11.  And they have approximately a million

3    dollars in collections or a million dollars of

4    revenues a month.

5         Q.    Okay.  Do you have an understanding of

6    the BCause Mining customer base?

7         A.    Yes.

8              So BCause Mining has approximately nine

9    -- has nine customers.  As I said, they generate

10   about approximately a million dollars in

11   collections a month.

12             The vast majority of those collections

13   come from three customers that were acquired in

14   late 2017.  They are SBI Crypto, BMG Operations and

15   St. Bitts, LLC, I believe, are their names.  Again,

16   I believe they represent about 95 percent of the

17   revenues, and the contracts are for two years.

18             They have a handful of additional

19   customers that they acquired in, say, mid 2018, the

20   June to July timeframe that represent about

21   4.5 percent of their collections.

22             And they have one additional customer

23   they acquired in January of 2019 that represents, I

24   think, like, .2 percent of their collections.

25        Q.    I believe you said, but I just want to

1    make sure that we're clear.  When did Mining obtain

2    it's three biggest customers?

3        A.    So it was late 2017, so I believe it was

4    November and December of 2017 based on the

5    contracts that I reviewed.

6        Q.    Okay.  Based on your experience and

7    understanding of the debtors' track record and

8    these cases, what do you think the prospect is of

9    the debtors winning any new customers?

10        A.    Given sort of that they're in Chapter 11

11    and financially distressed and it's a fairly

12    competitive market for this type of service and

13    that they've had two customers basically tell them

14    that they either are not going to renew or even try

15    to terminate their contract in Chapter 11, I think

16    it's unlikely they're going to get any new

17    significant customers.

18            If you think about it, if you've got

19    expensive computer equipment that you need to put

20    with someone to do your mining, you're not going to

21    deal with a company that you are concerned about

22    their continued operation or security of that

23    equipment.

24        Q.    Okay.

25            Now, you've been tracking the price of

1    bitcoin, correct?

2         A.    I have.

3         Q.    And the price of bitcoin is way up,

4    right?

5         A.    The bitcoin is -- you know, it was

6    almost at 20,000 at one point in time, you know,

7    essentially when they acquired those three

8    customers.

9              It went down dramatically, and then it

10   has come back up in the near term, so it -- you

11   know, certainly it's part of the equation, but if

12   you -- just because it's up doesn't mean that a

13   customer would go with BCause Mining.  Because they

14   still have alternatives.

15        Q.    So the increase in the price of bitcoin

16   doesn't change your view.

17        A.    It does not.

18        Q.    Okay.

19              Are you familiar with BCause Spot?

20        A.    I am.

21        Q.    Does BCause Spot currently have any

22   operations?

23        A.    It does not have any operations.  They

24   are incurring some costs associated with Spot is my

25   understanding, but it does not -- they don't have

1    any real operation at this point in time.

2         Q.    Okay.  Do any of the other subsidiaries

3    have operations to your knowledge?

4         A.    They do not.

5         Q.    Okay.

6               You mentioned -- well, actually, did you

7    review the bankruptcy schedules in this case?

8         A.    I did.

9         Q.    Did you review the debtors' business

10   plans in this case?

11        A.    I did.

12        Q.    And did you review the consolidated

13   balance sheet in this case?

14        A.    I did.

15        Q.    And that was dated March 31, 2019?

16        A.    That's right.

17        Q.    Okay.  What's your understanding of the

18   debtors' liabilities based on that review?

19        A.    So there are different numbers on each

20   one of them.

21              I believe if you look at the business

22   plan, the total liabilities are approximately

23   $12 million.  If you look at the debtors'

24   statements and schedules, it was approximately

25   $12.5 million.  And then if you look at their

1    balance sheet as of March 31, 2019, I believe the

2    total was $16.7 million, and that includes

3    $3.2 million of deferred revenues within their

4    liabilities.

5         Q.    And you haven't reviewed the proofs of

6    claim filed in this case, have you?

7         A.    I have not.

8         Q.    So that doesn't take into account

9    whatever proofs of claim have been filed since the

10   beginning of the case, correct?

11        A.    It does not.

12        Q.    You reviewed a copy of the debtors' most

13   current business plan, correct?

14        A.    I did.

15        Q.    Do you have --

16             MR. AGAY:  And, Your Honor, I'm

17   reviewing -- I'm referring to Exhibit 1 that's been

18   introduced.

19   BY MR. AGAY:

20        Q.    Do you have an opinion regarding the

21   business plan?

22        A.    Yes.  I believe their business plan is

23   substantially speculative and not feasible.

24        Q.    Okay.  And we're going to -- rather than

25   just asking you why, I'm going to sort of go

1    through why you think that in separate pieces.

2              So you've already alluded to this.  But

3    based on your understanding of the debtors'

4    business, do you think it's likely that the debtors

5    are going to replace the revenue that they may lose

6    from their three biggest customers?

7         A.    I do not.  I mean, I think there is

8    substantial risk they'll lose at least two of those

9    large three companies, and I think it would be --

10   in the market, you know, given the risk to a

11   customer of putting their equipment with BCause

12   Mining, I think it would be very difficult for them

13   to replace those customers.

14        Q.    Okay.  If they just lose one of their

15   major customers, in your view, under their business

16   plan, have they demonstrated they'll be able to

17   continue to operate without that revenue?

18        A.    No, they have not provided any

19   projections to show that.

20        Q.    What about two major customers?

21        A.    No, no projection showing the loss of

22   two customers.

23        Q.    I would ask about three, but I think

24   it's self evident from your testimony.

25        A.    Right.

1      Q.     Do the debtors have any other revenue

2  source other than these hosting agreements?

3      A.     They do not.

4      Q.     Okay.  Have you reviewed the expenses

5  and cost reductions that the debtors have set forth

6  in their business plan?

7      A.     I have.

8      Q.     Do you have a view on those cost

9  reductions?

10     A.     Yeah.  So there's really two primary

11  cost reductions that the debtors put forth.  One is

12  that they're going to go to a natural gas for their

13  energy and to have lower costs, you know, of the

14  power, which was, you know, a significant cost in

15  this business.  However, that is a long-term

16  project.  It requires both approval and funding on

17  the provider side and possibly costs by the debtor,

18  and it's a long-term project that is unproven at

19  this point in time.

20     Q.     And are those additional costs reflected

21  in the budget?

22     A.     They are not.

23     Q.     Are there other expenses in your view

24  the debtor -- for which the debtors have not

25  accounted?

1   　　　A.　　Yes.  So the second one is really what

2   I'll refer to as the shifting of costs to Spot.  So

3   it's not really a reduction of costs.  It's really

4   moving costs from one business entity to the other.

5   And what they really need in that situation is to

6   obtain a funding for the Spot business.  So absent

7   that funding, which I think will be difficult to

8   obtain, they're not really reducing those costs.

9   They're just moving them to a different business

10  entity.

11  　　　Q.　　Did you review the debtors' payroll

12  expenses?

13  　　　A.　　I reviewed the, you know, amount in the

14  budget.

15  　　　Q.　　Okay.  And do you think the budget

16  adequately reflects their actual payroll expenses?

17  　　　A.　　Yeah, so it reflects payroll expenses

18  generally.  There are some deficiencies there.

19  　　　　　　There is no compensation for a CEO.

20  There is a compensation level consistent with their

21  general counsel included, and then there is

22  compensation for a CFO, but the item included was

23  for an acting CFO, and it's not consistent with

24  what a CFO would require.  It's literally 15,000

25  above what they're paying their controller and not

1    consistent with what you would have to pay a CFO.

2         And then you also have to take in

3    consideration the company is in bankruptcy or

4    distress, and so to be able to hire those people in

5    a distress situation, you usually have to pay more

6    because of the risk of going to a company that is

7    in bankruptcy.

8         Q.    Okay.  Are you aware of any properties

9    owned by the debtors?

10        A.    I'm not.

11        Q.    Okay.  So do the debtors lease their

12   current space?

13        A.    Yes, they do.

14        Q.    Are you aware of whether they sought to

15   reject leases in this case?

16        A.    Yes, they have.  So they've sought to

17   reject the leases, and in that situation, there

18   would be lease rejection damages that would be --

19   need to be dealt with in the restructuring in the

20   plan.

21        But in addition, if they're going to

22   obtain new office leases, there likely would be

23   deposits.  You know, typically in a normal lease,

24   it's one to two months, but those amounts could be

25   larger if you're in a situation where they don't

1  have confidence that you'll be able to pay your

2  rent.

3       Q.    Okay.  Did you see anywhere in the

4  business plan where the debtor set forth a cost for

5  completing a fire suppression system?

6       A.    I did not.  So they have amounts

7  presented that need to be paid under the plan, but

8  the cash flow projections did not include the

9  amount for the fire suppression system.

10       Q.    Okay.  What's your understanding of how

11  much that is going to cost?

12       A.    So I've reviewed sort of an addendum to

13  the contract.  The total contract was $475,000.  I

14  believe based -- that there essentially would be

15  approximately $213,750 associated with, like,

16  monthly payments and then a final sort of holdback

17  payment that would also be required.  At the end of

18  the day, I think the total that needs to be paid

19  would be half of the 475, so what is that?

20  237,500.

21       Q.    Okay.  Did you see any of this amount

22  included in the debtors' budgets?

23       A.    I did not.

24       Q.    Do you think the debtors can obtain

25  financing for this project?

1      A.     I do not.  It would be -- most lenders

2    -- I don't think any lender would lend against what

3    would be considered leasehold improvements because

4    at the end of the day, they can't get at their

5    collateral, right?  It's attached to the building.

6    So they're not going to lend against it because

7    they can't repossess it.

8      Q.     Okay.  Based on your review of the

9    business plan and the debtors' statements in the

10   business plan, what's your understanding what

11   happens if the debtors do not complete this

12   project?

13     A.     So based on, you know, testimony --

14   review of testimony and just sort of general

15   understanding of what would happen if you -- if you

16   are required to have fire suppression system and

17   you can't get it installed, you're likely to lose

18   your occupancy certificate, and if you lose your

19   occupancy certificate, you have to shut the

20   business down.

21     Q.     Okay.  You said that you reviewed a

22   whole lot of documentation in this case including

23   the deposition transcripts.

24            Based on that review, does it make sense

25   that there would be additional amounts necessary

1    for capital expenditures?

2         A.    Yes, so the deposition by Fred Grede

3    suggested that there was 3 to $4 million in

4    additional capital expenditures for items including

5    the fire suppression system, roof repairs and also

6    a heating and -- I'm sorry -- a cooling and

7    humidity system.  And, you know, I also in sort of

8    looking at that $3.4 million, I also looked at the

9    company's top 10 creditors and noted that of the

10   top 10, I think $1.6 million of it was for

11   construction companies or two construction

12   companies, and so, you know, this company clearly

13   has substantial capital expenditures.

14        Q.    Okay.  So irrespective of whether the

15   costs that Mr. Grede cited are correct, does it

16   make sense to you that those types of expenditures

17   would be necessary for a business like this?

18        A.    Yes.  So usually you're going to have

19   both -- in this situation, you're going to have

20   repairs and maintenance, so daily sort of activity

21   of, you know, keeping your systems up to date, but

22   you're also going to have capital expenditures

23   because it's a capital intensive business.

24        Q.    You mentioned shifting costs to Spot.

25   By shifting costs to Spot, do you actually reduce

1      any costs?

2           A.     No.  As I think I said, they really --

3      it's not -- you know, it's shifting, right?  It's

4      moving it to a different business entity.  But

5      absent funding of the Spot business, those costs

6      aren't really being reduced.

7           Q.     Okay.  So while we're on the topic of

8      Spot, what is your understanding of the debtors'

9      plans to raise money or other new capital for

10     BCause Spot?

11          A.     Yeah, so it's my understanding they need

12     approximately $750,000 in funding to operate for

13     approximately 14 weeks.  The budget has changed

14     slightly, but, you know, I believe it's generally

15     that they would need $750,000 to fund for 14 weeks,

16     which includes a period of time when they say they

17     could launch, and then subsequent to that 750, they

18     would need an additional $2 million to operate

19     until break even.

20          Q.     Okay.  What's your understanding of

21     where this money is coming from?

22          A.     So they would need to get it from new

23     investors or existing investors putting more

24     capital in.

25          Q.     When you say they "need to," that's

1    because the business plan contemplates getting it?

2         A.    That's right.

3         Q.    Okay.

4               What's your understanding of the

5    timeframe by which they need to raise this money?

6         A.    So, I mean, if you're -- the

7    projections -- again, if you're just shifting

8    costs, you need to get it as soon as you expend the

9    money, right?  So you need to acquire it within the

10   period of time that -- you know, the next couple of

11   months or less to operate the business.

12              And, you know, just getting 750 isn't

13   really all you need.  You need to get the

14   additional 2.75 million or it's just 750 to get to,

15   you know, 14 weeks from now.

16        Q.    Have you reviewed anything to indicate

17   that the debtors had received either oral or

18   written commitments for this money?

19        A.    So they have not, in my understanding,

20   received any written commitments for funding at

21   this point in time.

22              It's my understanding they have received

23   oral commitments for $350,000.  I'm not sure what

24   the verbal terms of that are.  But it's my

25   understanding based on the review of the Flake

1    testimony, that they received some verbal

2    commitments.

3         Q.    Okay.  Based on your experience, do you

4    think it's feasible for the debtors to raise this

5    money while they're still in bankruptcy?

6         A.    I think it would be very difficult.

7    Because the investor would be concerned that the

8    funds they would provide would go to some other

9    party, and so, essentially, it could go to the

10   creditors.  So if you have -- if you are putting

11   investment into a business that is leveraged, you

12   would be concerned that your cash would be used for

13   some other purpose other than for launching the

14   business.  So I think it would be very difficult

15   for them to obtain that funding.

16        Q.    Okay.  Did you review the slides in the

17   business plan relating to the debtors proposed

18   distribution to creditors in this case?

19        A.    I did.

20        Q.    Okay.  What's your understanding of that

21   plan for distribution?

22        A.    Yeah, so the general concept is the

23   creditors would receive a note for a third; they

24   would forgive a third; and they would get a third

25   of -- they would get equity for a third, and that

1    third they were going to get, I believe it was

2    20 percent, 21 percent of the equity of the

3    business.

4        Q.    And who is going to retain the rest?

5        A.    The current equity holders would retain

6    the rest.

7        Q.    Based on your experience in bankruptcy

8    cases, do you think it's likely that secured or

9    unsecured creditors will agree to this treatment?

10       A.    I do not.

11             Secured creditors would typically expect

12   to get treated differently than unsecured

13   creditors.

14             Unsecured creditors would expect to

15   receive the full value of their claim before equity

16   holders retained any interest.

17       Q.    Do you have experience with how secured

18   creditors are typically treated in bankruptcy

19   cases?

20       A.    So usually secured creditors will

21   receive the value of their collateral either in

22   cash or in a security for the equivalent of what's

23   the value of the collateral.

24       Q.    Okay.  Is this what the business plan

25   proposes as to the debtor's current secured

1    creditors?

2         A.     No.   The current plan just has secured

3    creditors included or lumped in with unsecured

4    creditors and treated the same as unsecured

5    creditors.

6         Q.     Okay.   Do unsecured creditors typically

7    receive more favorable treatment than equity in

8    bankruptcy cases?

9         A.     Yes.   As I noted, they -- usually

10   they're going to receive, you know, full value of

11   their claim before equity receives any interest.

12        Q.     And is this what is proposed under the

13   debtors' business plan?

14        A.     No.   In this situation, you know, the

15   unsecured creditors or all creditors are taking a

16   33 percent haircut and only getting 20 percent of

17   the equity.

18        Q.     Okay.   Does the BCause business plan

19   account for these rejection claims?

20        A.     It does not appear so.

21        Q.     So you mentioned that the debtors' plan

22   involved a note for a third of their debt, is that

23   correct?

24        A.     That's correct.

25        Q.     And what's the interest rate on this

1    note?

2         A.    I believe it was proposed to be

3    12 percent.

4         Q.    Okay.  And the testimony from Friday

5    indicated that this translates into a recovery of

6    33 percent for creditors in this case.  Do you

7    agree with that?

8         A.    I think, you know, falling back on my

9    views on the feasibility of the plan, right, so you

10   only get that 12 percent -- you only get those

11   payments if the plan is feasible and the company is

12   able to cash flow, and so if they're unable -- if

13   the plan is not feasible and they're unable to cash

14   flow, you're not going to get paid on that note, so

15   the note is not worth the value of the note.

16        Q.    Okay.  Do you think they're going to be

17   able to service the cash flows under that note?

18        A.    I do not.

19        Q.    Okay.  I would like to talk -- I would

20   like to turn to enterprise value and EBITDA under

21   the business plan.

22             We talked earlier about the plan to

23   raise money for BCause Spot.  And if old equity

24   contributes that money for BCause Spot and retains

25   80 percent of the company, how much do you think

1    the company is worth?

2        A.    Yeah, so if -- I mean, I think the

3    easier way to think about that is that if

4    there's -- if the old equity is receiving

5    80 percent and putting in whatever, 500 to

6    $750,000, the piece giving -- you're providing the

7    unsecured creditors at 20 percent is worth much

8    less than 500 and $750,000, so the value being

9    provided to the unsecured creditors is much less

10   than the third they're claiming that I believe it

11   was $3.8 million that they say the value was.

12       Q.    Okay.  So under that scenario, that

13   assumes that they're getting the 80 percent on

14   account of their contribution rather than on

15   account of their old equity, correct?

16       A.    That's right.

17       Q.    Okay.  What's your general opinion of

18   the debtors' EBITDA statements in their business

19   plan?

20       A.    I believe they're -- they're overstated

21   because they don't include certain costs and the

22   timeframe doesn't match the revenues or the

23   collections and the expenses.

24       Q.    Okay.  What is the EBITDA that they're

25   setting forth in their business plan?

1        A.    So the debtors used an EBITDA -- it's

2    really -- in their situation, to back up a little

3    bit, they're using a cash flow as sort of a proxy

4    for EBITDA.  So they're -- which if you -- if

5    you're not including, you know, depreciation and

6    interest and taxes, it's probably a reasonable

7    approach.  And so their EBITDA that they are

8    utilizing is $17,220 per week.

9        Q.    Okay.  And you think that's overstated?

10       A.    I do.

11       Q.    Okay.  By how much, and what's the

12   disconnect?

13       A.    So the disconnect is primarily just a

14   mismatch of collections and disbursements.  And so

15   they've included a period of time that includes

16   five months of collections, so that's, you know,

17   approximately $5 million of collections.  But they

18   haven't included the expenses for that same period

19   because it's only an 18-week period.

20            And so this company usually has, you

21   know, 80 to $90,000 of disbursements sort of

22   excluding the energy costs, and so if you need

23   additional four weeks of expenses so that you get

24   your expenses to that same five-month period,

25   that's approximately $340,000.

1    Q.    Okay.  So you're saying they've included

2    revenues through the week of September 6th?

3    A.    So they've -- they've included

4    revenues -- they say it's through the week of

5    September 6th.  They've actually -- the period of

6    time actually is the week prior because they're

7    using cash at the beginning of the week.  But, yes,

8    that is the last week they had collections of

9    approximately $1 million.

10   Q.    Right.  And you're saying the flaw is

11   they didn't exclude -- they excluded expenses for

12   that same month.

13   A.    That's right.

14   Q.    Okay.

15          Based on your review of the business

16   plan and your review of the deposition transcripts,

17   how much of the debtors' value is BCause Mining?

18   A.    They valued that at I believe it was

19   $10.2 million.

20   Q.    Okay.  And what was the basis for that

21   valuation?

22   A.    So they used a number of months of

23   revenue, which is not really sort of how you

24   typically look at it, but what I sort of applied is

25   it's a number -- it's a revenue multiple of .9

1    times.

2         Q.    Okay.  Well, do you think that's

3    reasonable in this situation?

4         A.    I do not.  I don't think a revenue

5    multiple is really an appropriate basis or an

6    appropriate methodology in this situation.

7              You usually use revenue multiples for

8    companies that have sort of consistent

9    profitability, consistent growth components, and

10   usually when you do an analysis, you will see that

11   there's a tight sort of connection between your

12   subject company and your comparable companies.

13             But, generally, revenue multiples are

14   underweighted or just not used in valuations.

15        Q.    Okay.

16             As part of their deposition testimony,

17   the debtors compared the use of a revenue multiple

18   to certain metrics that are used to measure the

19   public stock market performance or companies like

20   Uber or Lyft.

21             Is that an apples-to-apples comparison

22   in your view?

23        A.    It is not.  I mean, Uber and Lyft are

24   obviously much larger companies, and I don't think

25   that's the adjective you'd use in this situation of

1    comparing the companies, and they are -- have

2    substantial growth and profitability expectations.

3            At the end of the day, while people may

4    talk about those companies in sort of a revenue --

5    multiple times revenue, the reality is those

6    companies are being followed by, you know, many,

7    many analysts for investment companies.  And

8    they're doing cash flow projections over a

9    long-term period valuing that business.  At the end

10   of the day, the revenue multiple, they're not

11   valuing it via revenue, they're just using that to

12   sort of talk about it.  It's more of just an end

13   number to provide the reference.

14       Q.    So in terms of actually valuing the

15   company, they're more focused on cash flow and

16   other --

17       A.    Right.

18       Q.    -- business operations.

19       A.    Yeah, so they have to view the

20   projections after a period of time where these, you

21   know, companies are growing.  They may not have a

22   lot of profitability currently, but the expectation

23   is they'll have profitability in the future.  So

24   the key is they do those forecasts to determine

25   what their cash flow is in the long run.

1        Q.      Okay.  I think you said this, but there

2    are situations where revenue multiple valuations

3    might be appropriate, right?

4        A.      Certainly.

5        Q.      Okay.  And what situations are those?

6        A.      Yeah, so, I mean, again, usually it is a

7    multiple or a methodology that is utilized in

8    valuation.  I'd say it's often underweighted.  So

9    they'll do multiple methodologies and come up with

10   valuations under all of them, and they will sort of

11   look at it and take it into consideration, but they

12   will do other valuations or methodologies.

13          Typically where you find it to be

14   utilized is where your subject company, in this

15   case, BCause Mining, and your comparable companies

16   or comparable transactions, all the companies you

17   looked at to get your data, are very similar,

18   right, so they have similar growth potential,

19   similar profitability, and so what you'll see is a

20   very tight sort of band around the multiples you

21   come up with for all your comparable companies and

22   comparable transactions.

23       Q.      Okay.  What other valuation

24   methodologies are available for this situation?

25       A.      So typically, the most common valuation

1    methodologies to come up with enterprise value are

2    other multiples, so market multiple, and that would

3    typically be, say, an EBITDA multiple or an EBITDA

4    minus Capex multiple, and then they will also do a

5    cash flow calculation of a discounted cash flow

6    valuation methodology.

7         Q.    Okay.  Do you think any of those

8    methodologies would be more appropriate here?

9         A.    Yes.  So they would -- EBITDA would be

10   much more appropriate because it takes into

11   consideration the profitability of the subject

12   company, and a DCF would also be useful because it

13   could take into consideration the cash flow

14   expectations of the business and the risk of those

15   cash flows.

16        Q.    Okay.  Did the debtors provide a

17   rationale to your knowledge, for excluding these

18   other valuation methodologies?

19        A.    They did not.

20        Q.    Okay.  Are there any other adjustments

21   or methodologies that might be appropriate to use

22   for valuation of distressed companies?

23        A.    Yeah, so in addition to doing the base

24   calculation of enterprise value, you have to take

25   into consideration -- especially with distressed

1    companies, that often there are -- their financial

2    results fluctuate because of their distress, may

3    not incorporate costs or incorporate additional

4    costs that should be included.

5              They also typically will incorporate a

6    distressed company discount to take in the fact

7    that, you know, the subject companies you are

8    looking at are not distressed, so you're coming up

9    with multiples -- your expectations based on

10   companies that aren't distressed, but your company

11   is distressed.  You have to take that risk into

12   consideration, so often people will apply a

13   distressed company discount.

14        Q.    And is there a typical discount that

15   might be applied?

16        A.    Yeah, so the typical range is probably

17   in the 10 to 30 percent range, but it can vary

18   widely because, obviously, the distress of the

19   company can vary widely.

20        Q.    Okay.  In light of everything you

21   reviewed, what do you think an appropriate

22   valuation for the debtors' current going concern

23   value would be?

24        A.    It's my view that their value is between

25   zero and $1.7 million.

1    Q.    Okay.  So what methodology did you use

2    to come to that conclusion?

3    A.    So I relied on the EBITDA multiple

4    approach, and so I did several scenarios using the

5    EBITDA multiple.

6    Q.    Okay.  What were those scenarios?

7    A.    So the three scenarios that I did.

8    One is I did a calculation using their

9    trailing 12 months of EBITDA, so their historic

10   EBITDA, and their trailing 12 months through I

11   believe it was March of 2019 or as of March of 2019

12   was negative $173,000.  And so negative 173 times

13   any multiple is essentially a negative number, and

14   so you would indicate the value of zero.

15   I also did a calculation where I took

16   their EBITDA and adjusted for those -- the costs

17   that were incorporated of $340,000.  Again, taking

18   their -- the debtors' EBITDA and adjusting for

19   those costs, you end up with a negative EBITDA.

20   Again, any negative number times any multiple is a

21   negative number, and so it would indicate a zero

22   valuation.

23   And then third, I did a pro forma, a

24   normalized EBITDA number relying on the debtors'

25   EBITDA, and I came up with and then adjusted also

1    for deferred capital expenditures and came up with

2    a value of $1.7 million.

3          Q.    Okay.  Walk us through that calculation.

4          A.    Yeah, so focusing on the $1.7 million.

5    So what I did is I took the debtors' EBITDA of

6    17,222, multiplied it times 52 weeks to get an

7    annual EBITDA number.

8                I then adjusted that number and

9    normalized it for executive comp.  So while

10   executive comp is included in their EBITDA numbers,

11   it's not at the level that would be consistent with

12   comparable companies.  Comparable companies would

13   have a level of executive comp.  Subject company

14   does not, so you need to normalize it.  So I

15   adjusted their EBITDA for $290,000 to reflect the

16   additional cost of a CFO and a CEO at full

17   compensation and benefits.

18               I then took that number, so that's my

19   normalized EBITDA, I multiplied it times a 6 times

20   multiple and then applied a distressed company

21   discount of 40 percent, obtained a value prior to

22   deferred capital expenditures, and then I --

23   because any of those deferred capital expenditures

24   would have to be paid for the operation to

25   continue, and your -- again, your subject companies

1    don't have that, you would then need to reduce the

2    value for those capital expenditures.  In this

3    situation, I used what I believe is a conservative

4    number of $500,000 to come up with $1.7 million.

5         Q.    And this calculation is set forth in

6    your declaration, correct?

7         A.    It is.

8         Q.    Okay.  What was your basis for the 6

9    times multiple?

10        A.    Yes, the basis for the 6 times multiple

11   is just being involved in valuation situations as I

12   mentioned in pretty much all my cases, and so it is

13   the common multiple for companies that you would

14   see across industries.

15             And what it really takes into account is

16   sort of the leverage you can put on a business,

17   right?  So if you can go borrow at 4 times,

18   essentially the values is above that if you're

19   putting sort of a typical leverage in place, so you

20   get -- you borrow at 4, values tend to be above

21   that, and 6 is a common multiple.

22        Q.    Okay.  I think you said in your

23   testimony that a typical distressed company

24   discount is between 10 and 30 percent.  Did I hear

25   that right?

1      A.     That's right.

2      Q.     All right.

3             What discount did you use here?

4      A.     So I used 40 percent, and the reason I

5      used 40 is because of the additional risk here.

6      You have got a number of large companies who stated

7      they're not going to renew.  The difficulty in

8      replacing those and that revenue, you really can

9      think of it as kind of a probability, all right?

10     So there is a probability the company will have the

11     cash flow that they projected, and there's a

12     probability that they will have almost no cash

13     flow.  And so in this situation, you think about it

14     60 percent probability potentially that they would

15     have their cash flow, 40 percent they won't, so

16     it's a 40 percent discount.

17     Q.     Okay.  I think you also mentioned a half

18     million dollar adjustment for executive comp and

19     Capex?

20     A.     Yes.

21     Q.     Or maybe it was Capex.

22     A.     Yes, so their executive comp normalized

23     number.  Essentially, I looked at the level of CEO

24     comp and the level of CFO comp, and then the line

25     item I think they had for their prior person, who

1    was an acting CFO and was, according to testimony,

2    not really an employee was inadequate, so I

3    essentially took what would be normal, backed out

4    what they had included in their EBITDA number, and

5    then I adjusted it for benefits to come up with I

6    believe the number was $290,000.

7         Q.    Okay.  And then what about the rest to

8    get up to a half million?

9         A.    So that was the executive comp.

10             So the capital expenditure adjustment at

11   the end has two components.  So those components --

12   so, essentially, if you have the fire suppression

13   system that we already talked about, which is

14   237,500 according to the documentation I have, and

15   then you have this additional capital expenditure

16   range of 3 to $4 million according to Fred Grede,

17   and also looking at the experience of just the

18   creditors that they have of $1.6 million, I

19   thought, you know, it could be much larger, but in

20   this situation, I thought 500,000 was a

21   conservative number.  So that 500,000 includes the

22   fire suppression system and the additional amount

23   to cover the roof repair and the cooling and

24   humidity system.

25        Q.    Okay.  Turning to BCause Spot, what's

1    your understanding of the debtors' valuation of

2    BCause Spot?

3         A.    They ascribed a $2 million value to it.

4         Q.    Okay.  What methodology did they use for

5    that?

6         A.    They used replacement value.

7         Q.    Okay.  What's replacement value?

8         A.    So replacement value, which I don't

9    think is an appropriate basis or methodology here,

10   is typically used for valuing things like inventory

11   and equipment that you are using sort of in an

12   economic basis and is creating profitable

13   operations.  And so you think about inventory is

14   the easier one to think about.  What's that value?

15   You have to replace it to sell more of it.  So what

16   does it cost to replace it?  And so it's a

17   reasonable value because it's sort of what you're

18   replacing it at on a continuous basis to operate

19   your business.

20        In a situation where it's money spent on

21   computer systems and things like that and licenses,

22   it's not the same because you don't know that the

23   business is going to be profitable.

24        Q.    So this is not a business that is

25   dependent on inventory and equipment.

1        A.      It is not.

2        Q.      The value is the intellectual property.

3        A.      That's right.

4        Q.      Or at least in concept.

5                What is an appropriate valuation for

6    BCause Spot?

7        A.      So I would say the equity value

8    available to the creditors is zero.

9        Q.      Why?

10       A.      So if the business requires $750,000 of

11   investment, plus another 2 million beyond that, so

12   $2.75 million to operate, investors putting that

13   amount of money in are going to demand the vast

14   majority, if not all, of the equity in the

15   business.  So that equity value will go to those

16   investors, not to the creditors.

17       Q.      Based on your review of the

18   documentation, do you think Spot is ever going to

19   launch?

20       A.      I do not.

21       Q.      Did you review a business plan for

22   BCause Spot?

23       A.      I reviewed some financial projections

24   for BCause Spot, not really a business plan.

25       Q.      Okay.  And those projections were

1    provided by me, correct?

2         A.    That's right.

3         Q.    But they were provided to me by the

4    debtors, right?

5         A.    I believe so, yeah.

6         Q.    Okay.  Do you have a view on those

7    projections?

8         A.    Yeah.  They are extraordinarily

9    aggressive.

10        Q.    What do you mean by that?

11        A.    So, I mean, it's like any business

12   model, right?  You can put financial projections

13   with any assumptions in it, but the results may not

14   be reasonable.  They're just assumptions driving

15   some calculations.

16             And the projections included EBITDA

17   margins.  So EBITDA, basically cash flow, divided

18   by revenue of 70 to 80 percent, and 70 to

19   80 percent is just extraordinarily high.

20        Q.    Have you ever seen a business with 70 to

21   80 percent EBITDA margins?

22        A.    I have not.

23        Q.    Ever seen a business in bankruptcy with

24   those type of margins?

25        A.    Certainly not.

1              MR. AGAY:  I have no further questions.

2              THE COURT:  All right.

3              Cross?

4              MR. CLAR:  Yes, Your Honor.  Just give

5     me a minute.

6              THE COURT:  Why don't we take a 5-minute

7     break.

8              THE CLERK:  All rise.

9              Court is in recess until 10:35.

10                  (A recess was had.)

11             THE CLERK:  All rise.

12             THE COURT:  All right.  Mr. Clar.

13             MR. CLAR:  Thank you, Your Honor.

14                  CROSS EXAMINATION

15    BY MR. CLAR:

16         Q.   Good morning, Mr. Lane.

17         A.   Good morning.

18         Q.   Just a few questions about your

19    background.

20              You are not a CPA, correct?

21         A.   I am not.

22         Q.   And you said that you worked first at

23    Deloitte?

24         A.   I did.

25         Q.   And why did you leave Deloitte?

1          A.      To go to AlixPartners.

2          Q.      And why did you leave AlixPartners?

3          A.      To start Willow Tree Consulting Group.

4          Q.      Did you leave voluntarily from

5     AlixPartners?

6          A.      I did.

7          Q.      Okay.  During the course of your

8     experience, have you ever had occasion to value the

9     assets of a company per se?  Physical assets?

10         A.      I have.

11         Q.      Okay.  But not this time, correct?

12         A.      I did not value the assets in this

13    situation.

14         Q.      Have you ever testified in connection

15    with a motion to lift stay on behalf of a secured

16    creditor?

17         A.      I have not.

18         Q.      Have you ever testified on behalf of a

19    creditor, secured or otherwise, in connection with

20    a motion to dismiss?

21         A.      I have not.

22         Q.      Do you know the standard for a motion

23    for relief from stay?

24         A.      I do not.

25         Q.      So you didn't discuss that at any time

1    with anyone, correct, the standards for a motion

2    for relief from stay?

3         A.    I did not.

4         Q.    Do you have experience in the bitcoin

5    industry in terms of your consulting services?

6         A.    I have experience in financial services,

7    but not specifically within bitcoin.

8         Q.    So is the answer to my question no?

9         A.    As I specifically said, within bitcoin.

10   I have not worked with any companies in the bitcoin

11   industry.

12        Q.    So you have not consulted with any

13   bitcoin-related companies?

14        A.    I have not.

15        Q.    You have not provided any services to

16   any creditor in connection with a bitcoin-related

17   company, correct?

18        A.    I have not.

19        Q.    You testified that -- Strike that.

20             Did you -- during the course of your

21   engagement in this case, did you speak to anyone at

22   the debtor in Virginia or Chicago?

23        A.    I did not.  I had access to

24   transcripts -- deposition transcripts, but I did

25   not speak to anybody at the debtors.

1     Q.    Right.  But you didn't actually speak to

2     anyone at the debtor either in Chicago or Virginia,

3     did you?

4     A.    I did not.

5     Q.    And did you speak to any of the

6     creditors of BCause Mining or LLC?

7     A.    I did not.

8     Q.    Did you speak to any representatives of

9     the creditors of BCause Mining or LLC?

10    A.    I did not.

11    Q.    Did you speak to anyone else -- Strike

12    that.

13          Did you speak to anyone in this case,

14    other than counsel for WESCO, about your

15    engagement?  I'm sorry.

16    A.    I did not.  I reviewed transcripts,

17    primarily, to gain that understanding.

18    Q.    We'll get to that.  We'll get to that.

19          You reviewed transcripts.

20          Did you speak to Mr. Grede?

21    A.    I did not.

22    Q.    Did you speak to Mr. Flake?

23    A.    I did not.

24    Q.    Now -- so the only knowledge that you

25    have of BCause Mining and LLC is based upon

1    documents you were given and transcripts, correct?

2        A.    It's documents that I was provided,

3    transcripts that I reviewed, my review of the

4    Internet information that I did.

5        Q.    Well, Internet information regarding

6    what, Mr. Lane?

7        A.    So, I mean, I looked at the BCause

8    Mining's website.  But as I said in my testimony

9    before, looking at the price trends about bitcoin

10   and also about other companies that are in the

11   hosting mining business.

12       Q.    And you spent how much time doing

13   Internet research on bitcoin?

14       A.    Not more than two hours.

15       Q.    What's the price of bitcoin right now?

16       A.    It's in the $9,000 range.  I don't look

17   at it every day.

18       Q.    So you didn't look at it today?

19       A.    I did not.

20       Q.    Did you look at it yesterday?

21       A.    I did not.

22       Q.    How about the day before?

23       A.    I may have looked at it the day before.

24       Q.    Does it change daily?

25       A.    It changes every minute.

1      Q.    Okay.  So in your Internet review, did

2    you see an increase in bitcoin price over the past,

3    say, week?

4      A.    Uhm, I don't remember specifically what

5    has happened in the last week.  I believe it has

6    trended up.

7      Q.    You don't know.  Correct?

8      A.    I just said I believe it was trending

9    up, but I did not -- I don't have -- I don't look

10   at it on a daily basis.  A daily basis doesn't

11   impact my testimony.

12     Q.    Fair.  But when you last looked, was it

13   trending up or down?

14     A.    I believe it was trending up.

15     Q.    And for what period of time?

16     A.    For the last -- I mean, it sort of

17   depends on what period of time you're talking

18   about, right?  It's been trending up for the last

19   couple months.

20     Q.    Okay.

21           Now, when you did your analysis --

22   Strike that.

23           I believe it's your declaration.  Is

24   that Exhibit 18?  Is that your exhibit?

25           When you did your analysis, what

1   historical model were you using for bitcoin price

2   when you -- Strike that.

3              You've rendered an opinion as to the

4   expiring contracts, have you not?

5        A.    Yes.

6        Q.    And you've rendered an opinion that the

7   expiring contracts are not likely to be renewed,

8   correct?

9        A.    That's right.

10       Q.    Isn't that speculative?

11       A.    It's an evaluation based on the facts

12   and circumstances of the case.

13       Q.    Right.  But did you speak to -- let's go

14   through them.

15              How many major customers are there in

16   your analysis?

17       A.    I would say there's three primary

18   customers represent 95 percent of the revenues.

19       Q.    And can you identify those customers,

20   please?

21       A.    So SBI Crypto, BMG Operations and St.

22   Bitts, LLC.

23       Q.    And do you know what the relationship is

24   between SBI and the debtor, the debtor being BCause

25   Mining or BCause LLC?

1      A.      I believe there is a related entity

2   that's also a shareholder.

3      Q.      Any other -- any other relationship

4   you're aware of?

5      A.      That's the primary one I'm aware of.

6      Q.      Do you know if SBI -- one of SBI's

7   principals is a director of the debtor as well?

8      A.      Not specifically aware of that.

9      Q.      You don't know.  You don't know.

10   Correct?

11      A.      I'm not specifically aware of that.

12      Q.      Okay.  I think we're saying the same

13   thing.

14              So -- and did you speak to anyone at

15   BMG?

16      A.      I did not.

17      Q.      And do you know the nature of the

18   relationship between the debtor and BMG?

19      A.      I believe BMG also has some liabilities,

20   some loans to the company, and I believe some

21   revenues may also be associated with BMG.

22      Q.      Does the fact that BMG has a loan to the

23   debtor impact your opinion as to whether or not

24   they would renew their contract with the debtor,

25   if, in fact, they have one?

1      A.    It is -- it is a factor that you would

2   consider.  Certainly someone who has a loan with

3   the company may have a different view than someone

4   who doesn't have a loan with the company.

5      Q.    What kind of a different view might they

6   have?  Would they perhaps be more inclined to keep

7   the debtor in business?

8      A.    So I would sort of equate it kind of

9   like a private equity firm.  A private equity firm

10  has an interest, an equity interest in the

11  business.  At some point in time, they don't want

12  to put any more money into a business because it's

13  just more money they're going to lose.  So, yes,

14  it's something they would consider, but at some

15  point in time, an investor or a lender makes a

16  decision that if there is no future potential of

17  this business, they put no more money in.

18     Q.    At some point in time, but you don't

19  know if this is the time because you haven't spoken

20  to them, correct?

21     A.    I have not spoken to BMG.

22     Q.    What about St. Bitts?  Do you know

23  anything about St. Bitts and its relationship to

24  the debtor?

25     A.    I don't know other than knowing that

1    they are the third -- one of the top three

2    customers.

3         Q.    And a cute name, right?

4         A.    (Indicating).

5         Q.    If I told you the price of bitcoin today

6    was $11,000, would you be surprised?

7         A.    As I said, I didn't look at it this

8    morning, so...

9         Q.    And -- Strike that.

10        You said there is -- in response to Mr.

11   Agay's questioning, you said there's a substantial

12   risk to lose two of the three customers.

13        Who are those two customers, and why is

14   it a substantial risk?

15        A.    They are SBI and St. Bitts, and it's

16   because based on my review of the testimony, SBI

17   has indicated they do not plan to renew, and St.

18   Bitts actually tried to terminate their contract

19   during the bankruptcy proceeding.

20        Q.    Were they successful?

21        A.    They were not.  But if you're trying to

22   terminate it during bankruptcy, do it earlier, and

23   now you have to ride it out for another two months

24   or three months, they're likely not going to renew.

25        Q.    Even if the price of bitcoins increase?

1          A.     I don't -- I think if bitcoin is

2     increasing, and you are a hosting company, you are

3     going to make -- and you have an alternative versus

4     going with a distressed company, you're going to go

5     with the alternative.

6          Q.     Aren't you speculating, though?

7          A.     It's not speculating.  It's a business

8     valuation.

9          Q.     As long as we're both speculating, would

10    there be a cost associated in these large customers

11    leaving the debtor's hosting facility?

12         A.     There would be.

13         Q.     Do you know what it would be?

14         A.     I do not.

15         Q.     Okay.  You talked about the shifting of

16    costs from the debtors to Spot.

17                Can you explain your understanding of

18    the shifting of expenses, please?

19         A.     So I mean, essentially, moving expenses

20    that are associated with the Spot business into a

21    separate spreadsheet essentially, and saying those

22    are now costs of Spot.  So shifting them from

23    one -- you know, from one spreadsheet to the other

24    and one business entity to the other.

25         Q.     Thank you.

1          And is Spot a debtor in bankruptcy?

2     A.    It is not.

3     Q.    And, specifically, what costs do you

4  understand would be shifted?

5     A.    So payroll costs, costs associated with

6  the licensing with Nasdaq, other types of costs.

7     Q.    And do you have a quantification of

8  those expenses in your analysis?

9     A.    They are listed in the business plan, so

10  I didn't quantify them because they were already in

11  the business plan.

12     Q.    You didn't quantify them separately?

13     A.    They were already calculated.

14     Q.    So how much were they?

15     A.    I can't say off the top of my head right

16  now without the spreadsheet in front of me.

17     Q.    You talked about payroll expenses.  Do

18  you recall?  In response to Mr. Agay's questioning?

19     A.    Yes.

20     Q.    And, oh, before I forget.  Do you

21  have -- do you have an understanding of the amount

22  of payroll expenses that could -- that could or

23  would be shifted from BCause LLC to Spot on a

24  monthly basis?

25     A.    Yeah.  I -- again, put it in front of

1    me.  I believe it was 25,000 every two weeks.  But

2    there was three different spreadsheets.  I might be

3    referring to the wrong payroll number.

4         Q.    Now, you testified that that wouldn't

5    make a difference.  Why?

6         A.    Because it's not really eliminating the

7    expense.  The expense is still being incurred.

8         Q.    By whom?

9         A.    By BCause Spot.  In the end, it's still

10   being incurred.  It's a subsidiary of BCause.

11        Q.    Okay.  Fair.  But let's walk through it.

12             How would the expenses be shifted?  What

13   would have to happen first?

14             I think you testified to this already.

15             So what would have to happen first

16   before the expenses shift?

17        A.    You'd have to have funding for that.

18        Q.    Exactly.  Okay.

19             So once you have funding for -- for the

20   launch?  Is that what you're saying?  For the

21   launch of the Spot exchange?

22        A.    Funding BCause Spot.

23        Q.    Fine.

24             So that funding, assuming that it

25   happens, wouldn't it be fair to say that that

1    funding supplies the funding for the shifted

2    expenses on its own?  Correct?

3        A.    Only if you have the funding.

4        Q.    Okay.  Fair.

5              But if you have the funding, it supplies

6    a basis for paying those expenses, correct?

7        A.    If you have that funding.

8        Q.    And then the expenses shift, do they

9    not?

10       A.    Assuming you have the funding.

11       Q.    Right.  And if you have the funding and

12   the expenses shift, then how is that not a cost

13   reduction to these debtors?

14       A.    Because you don't have the funding.

15       Q.    Okay.  But we're dealing with a

16   hypothetical now.

17       A.    Okay.

18       Q.    If you have the funding, Mr. Lane, and

19   the shift is -- expenses shift, you do not have the

20   expenses for these debtors, correct?

21       A.    If you hypothetically have $750,000

22   funding, then you have $750,000 to cover those

23   costs.

24       Q.    Now, what if Spot didn't launch?  Could

25   you eliminate those expenses anyway?

1    A.    It depends on if they're shared expenses

2    or not.

3        Q.    If they're I'm sorry?

4        A.    If they're shared expenses or not.

5        Q.    So, theoretically, if they're shared,

6    then you could, correct?

7        A.    No.  If they're shared expenses, if

8    they're people that work at both entities and you

9    need both of those entities and it's all payroll

10   that currently exists, it doesn't -- it doesn't

11   guarantee that you'd be able to eliminate them.

12   When a company downsizes, they can't always

13   eliminate every employee just because they're

14   getting smaller because those people may do

15   multiple tasks across the business.

16       Q.    Okay.  But if they only do tasks for

17   Spot, couldn't they be eliminated?

18       A.    Potentially.

19       Q.    You stated that the lease rejection

20   claims -- in response to Mr. Agay's direct

21   examination, that the lease rejection claims are

22   not provided for in the debtors' business plan.

23   Can you explain that?

24       A.    Yes.  So to the extent there were

25   damages claims within Chapter 11, those claims

1   would need to be dealt with under the plan.

2        Q.   Okay.  And how are -- how would you deal

3   with them under the plan?  Did you quantify them?

4        A.   They would -- they would be additional

5   claim that would need to get paid under the plan as

6   an unsecured creditor.

7        Q.   Do you understand -- I'm sorry.  I

8   didn't mean to interrupt you.

9        A.   Yes.  They would be treated as an

10  unsecured creditor primarily.

11       Q.   Okay.  And have you done an analysis of

12  what those unsecured claims would be?

13       A.   I did not.

14       Q.   Do you know which leases are being

15  rejected?

16       A.   An office lease and then another lease.

17       Q.   An office lease where?

18       A.   I believe it's the office lease here.

19       Q.   And another lease where?

20       A.   Yeah, I don't know the specifics.  I did

21  not review that document.

22       Q.   So you didn't prepare any analysis of

23  what the lease rejection claims would be, did you?

24       A.   I did not.

25       Q.   Moving to the cost of the fire

1    suppression system.

2              Do you know the status of -- excuse

3    me -- the status of the debtors' efforts -- Strike

4    that.

5              Do you know the status of the City of

6    Virginia Beach's requirement that the debtor have

7    the fire suppression system in order to operate?

8         A.    All I have understanding of is based on

9    my review of the transcripts, which the testimony

10   was that the fire suppression system was required

11   to -- for this building.

12        Q.    But you don't know -- Strike that.

13             You haven't spoken to anyone from the

14   City of Virginia Beach, have you?

15        A.    I have not.

16        Q.    And you haven't spoken to anyone at the

17   fire suppression system company -- system company

18   regarding the fire suppression system, have you?

19        A.    I have not.

20        Q.    And you haven't spoken to anyone at the

21   debtor in general, so you don't know if the debtor

22   is making provision for the fire suppression

23   system, do you?

24        A.    All I know is they incorporated in their

25   plan the necessity to pay 213 -- approximately

1    $213,000, and it wasn't reflected in their capital

2    projections.

3          So they presented it as a claim that

4    needed to be paid or an amount that needed to be

5    paid, but they didn't incorporate it into their

6    capital projections.

7          Q.    Now, we're speaking of Capex.  Is it

8    fair to say that your understanding of the debtors'

9    Capex expenditures is totally -- Capex expenditures

10   is totally based upon your review of Mr. Grede's

11   deposition transcript?

12         A.    No.

13         Q.    Grede, I'm sorry.  He's in the

14   courtroom.  I'm sorry.

15         It's not?

16         A.    No.

17         Q.    Then what else did you review to come up

18   with the Capex expenditures?

19         A.    So I also looked at the top 10 creditors

20   that were included in the business plan and looked

21   at what types of creditors those are.  And a number

22   of them are construction companies, so companies

23   who are going to be doing capital projects, and

24   they totaled, I believe, $1.6 million.  So you need

25   $1.6 million out of a total of 12,  so it is a

1    fairly substantial amount that reflects,

2    essentially, capital-expenditure type creditors.

3         Q.    But did you review when those

4    expenditures were made and for what?

5         A.    I did not.  I only had the list of

6    unsecured creditors.

7         Q.    So is it possible that those

8    expenditures have already been done for the build

9    out?  Is that possible?

10        A.    I would hope that if they're on your --

11   they're included as a liability, it's work that's

12   been done.  What it reflects is a level of types of

13   capital expenditures this company would have on an

14   ongoing basis.

15        Q.    I'm sorry.  You're going to -- I have to

16   back up to that.  It reflects what?

17        A.    The level of capital expenditures that a

18   company like BCause Mining and BCause would have.

19             So two ways you look at expenses.  You

20   look at the historical levels, and you look at

21   projected levels, and you try to compare those two

22   to determine if they're reasonable.

23        Q.    But you didn't actually ask anybody at

24   the company what those expenditures were for and

25   when, did you?

1       A.      I just looked at the type of vendors

2   that they were and the levels that they were.

3       Q.      So you don't know if those expenditures

4   are repeating, do you?

5       A.      Typically, capital expenditures are not

6   repeating.  They are individual capital projects.

7       Q.      Well, then if they're not repeating, how

8   did you do your Capex analysis?

9       A.      I don't understand your question.

10      Q.      Okay.  I'll try it again.

11              If they're not repeating, and you looked

12  at the debtors' schedules to determine what Capex

13  would be, how did you do your Capex analysis?

14      A.      Yeah, I think you're misunderstanding

15  what I'm saying.

16      Q.      Clearly.

17      A.      So in looking at capital expenditures

18  and trying to determine what a reasonable amount

19  is, and if you have testimony of someone who says

20  it's 3 to $4 million, and you have a number of

21  projects and you're trying to determine what a

22  reasonable level is or a conservative level is, you

23  have to look at historical information to evaluate

24  that reasonableness.  And so I looked at some

25  historical information that was available to me to

1    determine if that 3 or $4 million was reasonable.

2    And it is a fairly large number, and so, in

3    essence, when I did my analysis, I used a much

4    smaller number to be conservative.

5           But if I look back at historical levels

6    of capital expenditures, they are significant.  And

7    I believe there is also testimony that capital

8    expenditures are even larger than what I've looked

9    at for the historical experience.

10          So it's a way to evaluate the level that

11   has been presented is by looking at historical

12   information.  It's a common analytical approach.

13       Q.    What do you define as capital

14   expenditures?  What's your definition?

15       A.    So capital expenditures are usually

16   long-term projects that end up on your balance

17   sheet as a fixed asset.  So they are, you know,

18   building out stuff that would be attached to your

19   lease -- to your property, so leasehold

20   improvements.  They would be large equipment

21   purchases.

22          Most companies will have a level at

23   which they capitalize equipment and a level at

24   which they expense certain types of equipment, but,

25   typically, it's going to be something that is going

1  to end up on your balance sheet as a fixed asset or

2  as a leasehold improvement.

3      Q.     But since you didn't speak to anyone at

4  the company, you don't know exactly what those

5  expenditures will be or how much they'll cost, do

6  you?

7      A.     As I said, I relied upon the testimony

8  that said it was 3 to $4 million.  I have an

9  understanding of the types of projects that they're

10  talking about, and I looked at historical

11  information to determine the reasonableness of

12  those expectations.

13     Q.     And you relied on the testimony of whom?

14     A.     So both Tom Flake and Fred Grede.

15     Q.     What did Mr. Flake say about capital

16  expenditures, and where did he say that?

17     A.     I believe he referred to the fire

18  suppression system, and then Fred Grede talked

19  about -- more deeply about capital expenditures.

20     Q.     I first -- thank you.

21          I first asked about Mr. Flake, and you

22  answered that question.

23          Now, on to Mr. Grede.  You didn't talk

24  to Mr. Grede in person or on the phone, did you, or

25  by e-mail?

1    A.    No.

2    Q.    No communication with Mr. Grede.

3    A.    That's correct.

4    Q.    So do you have an understanding of when

5    Mr. Grede's -- what his understanding of the

6    capital expenditures -- what period we're talking

7    about?  When?

8    A.    So he said 3 to 4 million.  He did not

9    specifically say a time period.  And then he talked

10   about historical amounts, and, again, he didn't --

11   it was a substantial number, but, again, he didn't

12   talk about a time period.

13   Q.    Did he break it down into specific

14   categories of capital expenditures and numbers?

15   A.    He discussed the projects that would

16   need to be done, and he provided a range.

17   Q.    Okay.  What were those projects?

18         You keep mentioning the fire suppression

19   system.  What other projects?

20   A.    So the other projects he referred to is

21   fixing the roof, and then cooling and humidity is

22   the way he described the third project.

23   Q.    You didn't -- you didn't inspect the

24   roof, correct?

25   A.    I did not.

1   Q.   You didn't talk to a roofing contractor

2   about how much that would cost, correct?

3   A.   I did not.

4   Q.   So you don't even know what is wrong

5   with the roof, do you?

6   A.   Roof repair -- usually the issue with

7   roof repair is it leaks.

8   Q.   But you don't know that, do you?

9   A.   I do not.

10   Q.   And with respect to ventilation, do you

11   have any personal knowledge of what ventilation

12   capital expenditures need to be made and how much

13   they'll cost?

14   A.   Again, I just -- I relied upon the

15   general description of the projects, the broad

16   description of 3 to $4 million, historical

17   expenditures, and at the end of the day, I used a

18   much lower number than 3 to $4 million.

19   Q.   And how much, historically, has been

20   spent on ventilation, Mr. Lane?

21   A.   I don't have that specific.  As I said,

22   the information I have is the level of assets on

23   the balance sheet and the liabilities that were

24   included in the claims.

25   Q.   Well, how much of the liabilities that

1    were included in the court filing were spent on

2    ventilation?

3          A.    They are not broken down by the type of

4    service.  They're broken down by the vendor.

5          Q.    And since you didn't talk to anybody,

6    you really don't know.

7          A.    I did not talk to them.  I don't believe

8    I need to for the analysis I did.

9          Q.    Okay.  And with respect to the -- I

10   think you said heat and cooling issues?  Is that

11   the way you put it?

12         A.    I'm sorry.  Cooling and humidity issues.

13         Q.    Humidity issues.

14         A.    I said heating on accident earlier.

15         Q.    No, that could have been my mistake.

16   That's fine.

17               So heating and humidity.

18         A.    Cooling and humidity.

19         Q.    Cooling.  Sorry.

20               Do you have an idea as to how much those

21   repairs will cost?

22         A.    I do not.  Again, I think I've said it.

23   I have a range of 3 to $4 million.  I have an

24   understanding of the types of projects, and I have

25   looked at historical information.

1      Q.     But you don't know of that 3 to

2    $4 million that you've gotten out of a deposition

3    transcript is attributable to --

4            THE COURT:  Mr. Clar, you don't really

5    need to ask the question four different ways.

6    Again, really, think about what you're asking.

7            MR. CLAR:  I am.

8            THE COURT:  All right.

9            MR. CLAR:  I am.

10           Just give me a minute, Your Honor.

11   BY MR. CLAR:

12     Q.     With respect to the distribution to

13   creditors under the proposed business plan, have

14   you spoken to any of the creditors regarding their

15   reaction to the plan?

16     A.     I have not.

17     Q.     And with respect to your testimony that

18   -- Strike that.

19           Do you have an understanding of -- a

20   basic understanding of the absolute priority rule

21   in bankruptcy?

22     A.     I do.

23     Q.     And what is your basic understanding,

24   understanding that you're not an attorney?

25     A.     Yeah, that creditors and their order of

1    priority get paid before the creditor below them or

2    interest holder below them.

3         Q.    Is there an exception to that rule?

4         A.    Yes.  The new value exception is what it

5    is commonly called.

6         Q.    Did you have an opportunity to review

7    WESCO's loan documents or their lien documents?

8         A.    So I reviewed at a very high level, the

9    proof of claim that they filed but just to obtain a

10   general understanding.

11        Q.    Do you have an understanding of whether

12   their proof of claim stated that they were fully

13   secured?

14             MR. AGAY:  Objection, Your Honor, it's

15   outside the scope of his opinion and his testimony.

16             THE COURT:  Sustained.

17   BY MR. CLAR:

18        Q.    When you were looking at EBITDA, did you

19   look at comparable businesses in this industry?

20        A.    I did not.  I looked -- I used a

21   multiple based on sort of my general understanding

22   of valuation.

23        Q.    Did you review the 5-year financial

24   projections of BCause Spot?

25        A.    I did at a very high level.

1    Q.    What does that mean "at a very high

2    level"?

3    A.    I opened up -- opened up the

4    spreadsheet.  Looked at the financial results that

5    were presented in the projection.  I did not go and

6    look at every single assumption that was

7    incorporated or every formula.

8         It is a -- you know, it's a 5-year

9    model, so we were just looking at the summary of

10   the financial information at the end of the day.

11   Q.    When you did that, did you apply any

12   discounted cash flow or EBITDA analysis to that

13   model?

14   A.    I did neither.

15   Q.    So I guess asking you the results would

16   be -- Strike that.

17        Have you ever valued an exchange before,

18   Mr. Lane?

19   A.    Have I ever valued an exchange?

20   Q.    Yes.

21   A.    I've evaluated the valuation of

22   financial businesses, but I have not valued an

23   exchange.

24        MR. CLAR:  One minute, Your Honor.

25        No further questions.

1          THE COURT:  Thank you.

2          Any redirect, Mr. Agay?

3          MS. JANCZAK:  I have some questions,

4     Your Honor.

5          THE COURT:  Oh, I'm sorry.  I forget all

6     these other people.

7          MS. JANCZAK:  I should be quick.

8                    CROSS EXAMINATION

9     BY MS. JANCZAK:

10     Q.     Good morning, Mr. Lane.

11     A.     Good morning.

12     Q.     You testified earlier that BCause Mining

13     is in a competitive market.  Do you recall that?

14     A.     BCause Mining is in a space that's

15     competitive, yes.

16     Q.     What's your basis for that statement?

17     A.     That there is a large number of

18     companies in the U.S. and worldwide that market

19     based on pricing.  So if your market is based on

20     pricing, it's a competitive business because people

21     look at pricing as one of the key options.

22     Q.     Are you talking about cryptocurrency

23     mining hosting facilities?

24     A.     Yes.

25     Q.     How many in the United States?

1    A.    I don't know the exact number.  I did

2  general research to see the companies that were

3  based in the U.S.  I also saw some that were not

4  based in the U.S.

5    Q.    Do you have a ballpark figure?

6    A.    I do not.

7    Q.    So you can't say necessarily whether

8  it's competitive or not.

9    A.    Well, I can.

10    Q.    Because you can't testify how many

11  companies there are.

12    A.    I can look at that there are a number of

13  alternatives and see what -- how these companies

14  are presenting themselves.  And based on that

15  information, it's clear that it is a competitive

16  environment where people are marketing their

17  service based partially on price, and if you're

18  marketing your service based on price, it is

19  typically going to be a very competitive market.

20    Q.    Were there more than five companies in

21  the United States?

22    A.    Yes.

23    Q.    More than 10?

24    A.    Don't know if there are more than 10.

25    Q.    Were there any within 500 miles of the

1    Virginia Beach facility?

2        A.    I didn't specifically look at distance

3    from Virginia Beach in valuing the situation.

4        Q.    So you didn't look at location at all?

5    Geographic location at all?

6        A.    So geographic location is important

7    because it affects the price of electricity, and so

8    you have businesses in upstate New York and

9    Washington State, it's my understanding, because

10   that's where energy is less costly.  And since

11   these are just machines in a building, if you are

12   based in Virginia Beach, you don't really care if

13   your equipment is somewhere else.

14       Q.    You considered in your analysis the cost

15   reductions and, also, in the calculation of the

16   enterprise value, the payroll, is that correct?

17       A.    That's right.

18       Q.    Do you know if the payroll figure that

19   is in the debtors' budget and on which you based

20   your calculations included payroll expenditure for

21   general counsel?

22       A.    So it had an amount for general counsel

23   based on the level that was being paid to the

24   general counsel who left, but they do not currently

25   have a general counsel.

1      Q.     But you included -- you still included

2      that figure in your calculations, correct?

3      A.     I did not.

4      Q.     You did not include a general counsel

5      salary.

6      A.     No.  I adjusted for the CEO and the CFO.

7      Q.     And you adjusted upward, correct?

8      A.     What I did is I looked at what would be

9      normal compensation for a CEO and a CFO and backed

10     out the costs that were included in the forecast

11     and then added 20 percent for benefits and then

12     used that amount.

13     Q.     Normal for whom?  Normal for what kind

14     of company?

15     A.     For a company like BCause Mining.

16     Q.     What kind of companies are like BCause

17     Mining that you used to compare against?

18     A.     So I advised hundreds of companies

19     across all salary levels, and so it is, you know,

20     based on understanding the compensation for a CEO

21     and a CFO for a small to middle market company.

22     Q.     You said that you didn't separately

23     quantify the expenses for Spot, correct?

24     A.     Yeah.  So, I mean, I looked at the

25     financial projections they provided, but I didn't

1    add the amounts up.  They were already added up in

2    the spreadsheet.

3         Q.    And you didn't take that out of your

4    consideration in determining whether the debtors

5    could afford to fund the Chapter 11 plan, correct?

6         A.    I used the debtors' EBITDA number, and I

7    also used the debtors' EBITDA number and adjusted

8    it.

9         Q.    Okay.  So you didn't look at their cash

10   flows and deduct the Spot expenses, correct?

11        A.    Deduct it to make it lower or make it

12   higher?

13        Q.    To take out the Spot expenses.

14        A.    I used the debtors' number and adjusted

15   it for compensation.  I did not back out the costs

16   that they categorized BCause Spot, no.

17        Q.    Okay.  You testified earlier that the

18   debtors did not incorporate the fire suppression

19   expenses into their cash flow projections, correct?

20        A.    That's correct.

21        Q.    Which cash flow projections are you

22   talking about?

23        A.    The projections in the business plan.

24        Q.    Is that the budget that goes through

25   September 6th, I think?

1      A.    I believe so.

2      Q.    So it's your understanding the fire

3  suppression expenses would be paid as part of the

4  Chapter 11 plan?

5      A.    Yes.

6      Q.    Do you think it's likely that there's

7  going to be -- this budget is a proposed operating

8  Chapter 11 budget, correct?

9      A.    That's right.

10      Q.    So it wouldn't make sense to include

11  Chapter 11 plan expenses in an operating budget

12  while in Chapter 11, correct?

13      A.    It depends on the situation and if the

14  work needs to be done while they're in Chapter 11.

15  The fire suppression system, depending on the

16  timing requirement, may need to happen prior to

17  exiting Chapter 11.  So it could go both ways.

18      Q.    But you're not aware of whether there is

19  a timing requirement, correct?

20      A.    My understanding is that the debtors are

21  working with the authorities and have been

22  communicating with them, and it sounded based on

23  the testimony, you know, that they were, you know,

24  working toward a solution, but it wasn't imminent.

25      Q.    Okay.  Thank you.

1          THE COURT:  Anybody else who wants to

2    cross?

3          MS. SANFELIPPO:  No, Your Honor.  But I

4    just recently noticed that the audio is down.

5          THE COURT:  All right.  We'll keep

6    going, and, Matt, if you can look into that.

7          MR. AGAY:  Just a couple questions, Your

8    Honor.

9              REDIRECT EXAMINATION

10   BY MR. AGAY:

11        Q.    Mr. Lane, you testified in response to

12   one of Mr. Clar's questions, that you did not value

13   the assets in this situation.  Do you recall that?

14        A.    That's right.

15        Q.    Now, when you said that, did you mean

16   you did not value them for purposes of determining

17   a liquidation value?

18        A.    That's correct.

19        Q.    Okay.  But what you did do is you valued

20   the assets in terms of their ability to generate

21   cash for these businesses as a going concern, is

22   that correct?

23        A.    You essentially when you're valuing a

24   business and you're talking about the enterprise

25   value, you're valuing the assets' ability to make

1  cash flow.  At the end of the day, that's what a

2  valuation is.  I mean, if you think about it in the

3  sense of a discounted cash flow forecast, right?

4  It is the consolidation of assets and the use of

5  those assets in that unique way to create cash

6  flow.  So at the end of the day, the value is

7  driven by the assets you own.

8          Q.    Okay.

9               Mr. Clar asked you a lot of questions

10  about Capex.

11              Your actual adjustment in your valuation

12  for Capex was $500,000, correct?

13          A.    That's correct.

14          Q.    And of that 500,000, a little bit more

15  than 200,000 consisted of the fire suppression

16  system, correct?

17          A.    That's correct.

18          Q.    And those were numbers that were set out

19  by the debtor, correct?

20          A.    Yes.

21          Q.    So you really only included about

22  300,000 and change in Capex in addition to that 200

23  and change for the fire suppression system, right?

24          A.    Yeah, maybe 260 to 500 off the top of my

25  head unless my math is wrong.

1    Q.    No, my math is bad.  Sorry.

2          We talked about -- well, Ms. Janczak

3    talked about are there any facilities within

4    500 miles of Virginia Beach.  Did you say whether

5    you knew if that was true or not?  I can't

6    remember.

7    A.    I did not.  I didn't look at distance

8    because, again, we're talking about computer

9    equipment.

10   Q.    Yes.

11   A.    And it's done electronically.

12         So, you know, people are going to put

13   their equipment with -- in a place where the energy

14   is cheapest and they get the cheapest rate and

15   where they have confidence that their equipment is

16   secure.

17   Q.    In light of that and based on your

18   research and experience, is Virginia Beach a good

19   location for this business?

20   A.    I would think Virginia Beach would not

21   be a good location.  I wouldn't expect the energy

22   prices to be cheap because it's, you know, an urban

23   area near the ocean versus places where you have

24   access to, you know, hydroelectric electricity or

25   energy sources where, say, a facility was created

1   for a purpose and now it's not being fully

2   utilized.

3          Q.    Okay.  Are energy costs one of the

4   significant factors that are holding the debtors

5   back in this case?

6          A.    They claim that energy is the biggest

7   expense and looking to change that through a couple

8   of I'll call it potential projects to reduce that

9   energy cost.

10         Q.    Okay.

11         A.    And so clearly they believe that their

12  competitiveness needs to -- they need to change

13  their energy costs to be more competitive.

14         Q.    Okay.  And just one cleanup item.

15               Mr. Clar asked if you spoke to any

16  representatives of creditors.

17               WESCO is a creditor, correct?

18         A.    I did.

19         Q.    And you spoke to me, correct?

20         A.    I did.

21         Q.    Yes.

22         A.    And I thought I spoke to your client at

23  lunch.

24         Q.    Right.

25         A.    But not about the case.

1          Q.     Okay.

2                 MR. AGAY:  I don't have any other

3     questions, Your Honor.

4                 I can't remember if I did this formally,

5     but I would move to admit Exhibit 18 into evidence

6     just as --

7                 THE COURT:  Okay.  It will be admitted.

8     Thank you.

9                 All right.  Matt has not come back yet.

10                Mr. Clar?

11                MR. CLAR:  I need a break, Your Honor.

12                THE COURT:  Okay.  And that's fine.

13    Because I was going to say let's break.  I think

14    he's going to have to dial back up.

15                MS. SANFELIPPO:  It sounds like it's

16    working again.

17                THE COURT:  This is why when people say

18    phone appearances in Chicago, I'm all for it, but

19    we have an old and not particularly well-operating

20    courthouse.

21                Matt, we understand the phone may be

22    back up now?

23                THE CLERK:  I have to call and patch

24    them back in to the courtroom.

25                THE COURT:  All right.  Let's take a

```
 1    quick break.

 2              You were done with the witness, right?

 3              MR. AGAY:  Yes.

 4              THE COURT:  Okay.  You are excused,

 5    Mr. Lane.

 6              THE WITNESS:  Thank you.

 7              MS. JANCZAK:  Your Honor, does it make

 8    sense to break for lunch?

 9              THE COURT:  No.

10              MR. CLAR:  Because I don't know that I

11    have that much, so that's fine.

12              THE COURT:  Yes.  I mean, let's keep

13    going.

14              MR. CLAR:  It's going to go past noon,

15    but I --

16              THE COURT:  Right.

17              Are you okay?

18              THE COURT REPORTER:  Yes.  Thank you.

19              THE COURT:  All right.  Then let's keep

20    going.

21              We'll take a quick break to make sure

22    the audio is working.

23              THE CLERK:  All rise.

24              The court is in a brief recess.

25                   (A recess was had.)
```

```
 1              THE COURT:  Mr. Clar.

 2              MR. CLAR:  Thank you, Your Honor.

 3              I would like to call Thomas Flake to the

 4   stand.

 5              THE COURT:  All right.

 6              And, Mr. Flake, I believe you are

 7   already under oath, so I don't believe we need to

 8   reswear you.

 9              THE WITNESS:  Yes, ma'am.

10              THE COURT:  Thank you.

11       THOMAS FLAKE, WITNESS, PREVIOUSLY DULY SWORN,

12                    DIRECT EXAMINATION

13   BY MR. CLAR:

14       Q.    Mr. Flake, I know we talked about your

15   background.  We talked about your duties.  But I

16   want to get a little bit further into that.

17              What are your current duties with BCause

18   Mining and BCause LLC?

19       A.    I'm the treasurer of the Board, the

20   chief marketing officer of the company.  I act as

21   the head of the mining operation, and I'm

22   apparently the acting CEO.

23       Q.    And how long have you been the acting

24   CEO?

25       A.    Approximately six weeks.
```

1    Q.    And are you one of the Board of Members?

2    A.    I am.

3    Q.    And how long have you been on the Board?

4    A.    I believe we formed the Board about five

5    years ago.  So in five years, I've been re-elected

6    twice.

7    Q.    And what are your daily duties as acting

8    CEO?

9    A.    I interface with customers, vendors,

10   ensure operations are managed properly.

11   Q.    Now, you've been here throughout this

12   trial, correct?

13   A.    I have been.

14   Q.    And you've heard the testimony of, for

15   example, Mr. Grede, correct?

16   A.    I have.

17   Q.    And you've heard testimony -- Strike

18   that.

19         Have you heard testimony about your

20   relationships with customers?

21   A.    I have.

22   Q.    At the present time, are you involved in

23   day-to-day customer relations?

24   A.    I am via correspondence and e-mail, as

25   well as voice conversations on the phone.

1     Q.    And which customers are you currently

2   involved in daily correspondence with?

3     A.    Primarily, SBI and BMG, but Solutrix and

4   Inate One as well I've recently had conversations

5   with.

6     Q.    What are your other daily

7   responsibilities, Mr. Flake?

8     A.    Preparation of financial modeling and

9   slide decks, discussions with and training of

10   employees.

11          It's very -- it's -- in a small

12   business, you can be the head cook and bottle

13   washer all simultaneously.

14     Q.    And who was the previous CEO?

15   Immediately previous.

16     A.    Fred Grede.

17     Q.    And was Mr. Grede asked to resign or did

18   he leave voluntarily?

19     A.    Neither.  He was terminated with cause.

20     Q.    Okay.  And you are a member of the

21   Board, correct?

22     A.    I am.

23     Q.    Were there Board discussions as to why

24   Mr. Grede should be asked to leave his position?

25     A.    There were.

1      Q.     How many?

2      A.     I would say it was an ongoing dialogue

3    from February, but it came to a head in early

4    April.

5      Q.     How did it come to a head?

6      A.     I'm sorry, not in early April.  In early

7    May.

8      Q.     How did it come to a head?

9      A.     In May 8th, we had presented a plan to

10   the court that showed significant reduction in

11   payroll, and we had gotten that plan approved.

12           A week later, the required cuts in

13   payroll had not been made, and the fact that they

14   weren't made, which would have reduced our payroll

15   from $86,500 every two weeks to about $70,000 every

16   two weeks, threatened to cause us to overrun our

17   budget with the court.

18     Q.     Did you have any discussions with Mr.

19   Grede about the proposed cuts?

20     A.     I did not.  I believe our former chief

21   financial officer George Sladoje did, and he

22   related that to me.

23     Q.     If you can walk me through this.

24           Was Mr. Grede informed of the cuts that

25   were supposed to be made?

1      A.    He was.

2      Q.    And what happened next?

3      A.    He didn't make them.

4      Q.    Do you know why?

5      A.    I couldn't tell you, no.

6            I know that I talked to him.  I know

7      that George Sladoje talked to him, and I believe

8      Christie Vaassen, our control officer, spoke to him

9      about it.

10     Q.    Did you have a reason to question any

11     other of Mr. Grede's decisions while he was CEO?

12     A.    I did.

13     Q.    Did the Board have reason to question

14     any other of Mr. Grede's decisions while he was

15     CEO?

16     A.    They did.

17     Q.    Can you tell us what other decisions the

18     Board questioned?

19           MR. AGAY:  Objection, Your Honor,

20     there's lack of foundation.

21           MR. CLAR:  That's fair.

22           MR. AGAY:  I don't mind him exploring

23     the topics, but we just don't know in what context.

24           MR. CLAR:  That's fair.

25           THE COURT:  Sustained.

1    BY MR. CLAR:

2         Q.    Specifically, is the CEO involved in

3    contracts, hosting agreements and other contracts

4    of the debtors generally?

5         A.    Uhm, because this is organized somewhat,

6    I think, unusually from that perspective in that

7    our operating agreement explicitly says that the

8    Board is responsible for the day-to-day management

9    of the company, and I think in many companies it

10   would typically be the CEO or president or chief

11   operating officer, so while it's fair to say that

12   he was involved, it's not fair to say that he had

13   final authority.

14        Q.    Mr. Flake, did you bring the debtor

15   exhibits with you to the --

16        A.    I believe they're in a binder on the

17   table, yes.

18        Q.    We'll get to that.

19             How many Board members are there

20   currently?

21        A.    Currently, six.

22        Q.    And who are those Board members?

23        A.    Mike Adolphi serves as the chairman.

24   John Ashby and Jonathan Tanemori serve on the Board

25   as representatives.  Chris Sikes, Karan Rai and

1    myself.

2         Q.    Let's go each one of them individually.

3               Mr. Adolphi.

4         A.    Yes.

5         Q.    What's his background if you know?

6         A.    I do.

7               Mike is the founder of the company

8    called ProSoft and a founder of several other

9    companies.  He's a very successful business person

10   in his own right.  He's got an electrical

11   engineering background by training.

12        Q.    And what about Mr. Ashby?

13              MR. AGAY:  Objection, Your Honor.  I let

14   the last one go, but, again, we don't know in what

15   context he knows these things.  We don't have these

16   witnesses testifying here as to their background.

17              Again, I don't have any objection to

18   this line of questioning, but I just don't have any

19   context for it.

20              THE COURT:  Overruled.  He started the

21   company with these folks.  If we get into people

22   beyond that, we'll see.

23              MR. CLAR:  Beyond the Board.

24              THE COURT:  Right.

25   BY THE WITNESS:

1          A.     Mr. Ashby is an orthodontist by

2    training, but he's also a local angel investor.  He

3    and I co-invested in maybe half a dozen other

4    companies.

5          Jonathan Tanemori formerly worked

6    actually at the same company that Mr. Lane did,

7    Axis Partners.

8    BY MR. CLAR:

9          Q.     You mean Alix?

10         A.     Or AlixPartners, I'm sorry.

11         He works currently for SBIC.  He was on

12   the due diligence team that made the original

13   investment from SBI and served on our -- and was

14   subsequently appointed to the Board by SBI as that

15   was one of the terms of their investment and, I

16   guess, for about three years at this point.

17         Q.     Mr. Rai?

18         A.     Karan Rai currently is the founder of

19   Asgard Capital Partners in New York.  Prior to

20   that, he served as the CFO of ADS, which is a

21   multi-billion dollar government contracting company

22   in Virginia Beach.

23         Chris Sikes serves as the head of IT

24   security for Facilities Management at NASA Langley

25   Research Center.

1       I think that's everybody.

2       Q.    Pardon me one second.

3             Where did you say your exhibits were?

4       A.    I believe they're in a binder on the

5   table.

6             MR. CLAR:  No, they're in a box.

7             Your Honor, I'm going to hand the

8   witness our exhibits.

9                  (Tendered.)

10            MR. CLAR:  Let the record reflect I

11  handed the witness the debtor's exhibits.

12            Before we start, as a housekeeping

13  matter, I want to introduce at some point Exhibit

14  Number 12, which is an e-mail from SBI.  I've

15  circulated copies.

16            One minute, Dave.

17            That I'm going to introduce later.  I'm

18  not asking it be admitted right now, but we will be

19  using it later.

20  BY MR. CLAR:

21      Q.    Okay.  Mr. Flake, you have the debtors

22  list of debtor's exhibits in front of you?

23      A.    Yes.

24      Q.    Specifically, Debtor's Exhibit 1, which

25  is the -- we'll call it the business plan slide

1     deck.  Do you see that?

2          A.    Yes.

3               MR. CLAR:  Your Honor, to the extent

4     it's necessary, I will ask this be admitted into

5     evidence.

6               THE COURT:  No, it's the same as WESCO

7     1, so I'm not going to admit two of the same.

8               MR. CLAR:  Okay.  That's what I thought

9     you'd say.

10              MR. AGAY:  I just have a question.  Is

11    this the same as our Exhibit 1?

12              MR. CLAR:  Yes.

13              MR. AGAY:  Okay.

14              THE COURT:  Okay.

15    BY MR. CLAR:

16         Q.    Directing your attention to Exhibit 2

17    and 3, which is the debtors' schedules and

18    statement of financial affairs for both debtors.

19    Okay?

20         A.    Yes.

21         Q.    Can you tell me from Exhibit 2 -- let's

22    go to --

23              MR. CLAR:  I'm sorry, Your Honor.  The

24    pages are not in order.

25              THE COURT:  Oh, no.  You don't have the

```
1    -- yes, you do.  You have the court signature on

2    the top.

3              MR. CLAR:  We do.

4    BY MR. CLAR:

5         Q.    Can you tell us from this document --

6    and I'm looking at page -- well, first of all,

7    we're looking at BCause LLC, Page 5 of 32 -- the

8    value of the debtor's office furniture and

9    equipment?

10        A.    Sorry.  I have it now.  I believe I do

11   anyway.

12              Office furniture, and this is Page 5 of

13   32, --

14        Q.    Correct.

15        A.    -- is listed at $16,880.

16        Q.    And what about office fixtures?

17        A.    13,853.

18        Q.    Okay.  Moving through, what about cash

19   at the time of filing?

20        A.    Is that on a different page?

21        Q.    It is a different page.  It is -- at

22   least it should be.

23              Well, let me back up a second.

24              Going back to page -- I guess on this

25   it's blocked out.  Schedule A/B, assets, real and
```

1    personal property.  It's -- I believe it's 2 of 32.

2         A.    Okay.

3         Q.    Accounts receivable.  What does the

4    debtor show as accounts receivable on the day of

5    filing?

6         A.    Slightly over $1 million.

7              THE COURT:  I don't see it, counsel.

8    Where is it?

9              THE WITNESS:  I think it's 2 of 32,

10   Number 10.

11             MR. CLAR:  If you look at --

12             THE COURT:  2 of 32 on my copy has a 3

13   and a 4 paragraph.  It doesn't have --  I think

14   it's 3.

15             MR. CLAR:  I'm sorry, it's blocked out

16   at the top.

17             THE COURT:  That would be 3.  Because 2

18   is there, and it's not this.

19             MR. CLAR:  Thank you.

20   BY THE WITNESS:

21        A.    I believe it's 1,022,000 and some

22   change.

23   BY MR. CLAR:

24        Q.    Do you know how much cash the debtor had

25   at the time of filing?

1          A.     I believe it's $911,000.

2          Q.     What's the debtor's cash position today,

3     do you know?

4          A.     I haven't checked since Wednesday.  But

5     on Wednesday, it was about $650,000.

6          Q.     And the receivables are how much each

7     month?

8          A.     Just under a million dollars.

9          Q.     How much in receivables are you

10    expecting to receive next and when?

11         A.     About $960,000, and it should be the end

12    of this week or the beginning of next.

13         Q.     Now, there's been testimony about a

14    power outage, is that correct?

15         A.     Not so much an outage but what Dominion

16    Power characterizes as a voltage spike.

17         Q.     When did that happen?

18         A.     About two weeks ago.

19         Q.     Do you know the date?

20         A.     It was Sunday about 4:00 o'clock in the

21    morning.  I don't remember the date, but I do

22    remember the phone call.

23         Q.     What happened?

24         A.     It was reported to us by our security

25    staff that the lights were blinking and that the

1    equipment in the facility was behaving unusually.

2            Shawn Dailey, who is the manager of the

3    mining operation, showed up and found the condition

4    of the equipment and essentially shut everything

5    down and rebooted everything.

6            So the outage lasted about 20 minutes,

7    but after the outage was over, approximately 1200

8    machines that had been previously working were no

9    longer working.

10           Q.    Whose machines were those?

11           A.    They belonged to a variety of clients.

12           Q.    Okay.  And has that had any affect on

13   revenue or will it?

14           A.    We anticipate that it will.  We had

15   presented to the court previously that our revenue

16   was somewhat over a million dollars a month, and in

17   our latest business model that's been presented to

18   the court, we're showing that revenue as somewhat

19   under a million dollars a month.

20           Q.    How much under?

21           A.    About $40,000.

22           Q.    Will there be corresponding reduction in

23   expenses?

24           A.    There will be.  About 66 cents on every

25   dollar that we take in is spent on electricity, so

1    as soon as a miner is no longer functional, that

2    electricity drops immediately.  The electricity

3    cost drops immediately.

4         Q.    Directing your attention to Exhibit 3,

5    which is the debtor's -- that's BCause Mining's

6    schedules and statement of financial affairs, Mr.

7    Flake, and specifically -- oh, this is a lot

8    clearer -- Page 4 of 43.

9         A.    Yes.

10        Q.    Can you tell us what the value of the

11   debtor's office furniture, fixtures, equipment is?

12        A.    44,957 and 36,725 respectively.

13        Q.    What's the office furniture, fixtures,

14   equipment and collectibles consist of?  I believe

15   there is a list behind it.

16        A.    So on Schedule 2, it gives a detailed

17   listing of what those assets are.

18        Q.    Did you participate in preparing the

19   schedules and statement of financial affairs?

20        A.    I reviewed them after they were

21   prepared, but Ms. Vaassen and her assistant were

22   the primary preparers.

23        Q.    And you agree with the numbers --

24        A.    Yep.

25        Q.    -- that are provided?

1          A.    I do.

2          Q.    Does the debtor have machinery and

3     equipment as well?

4                MR. CLAR:  And, Your Honor, I apologize.

5     Because it appears that Exhibit 3 is BCause Mining.

6     So let me back up again.  Exhibit 4 is BCause LLC.

7     BY MR. CLAR:

8          Q.    So directing your attention back to

9     Exhibit 3, Mr. Flake.

10         A.    Yes.

11         Q.    Is there a figure for -- I'm sorry.

12               Exhibit 2, BCause Mining's schedules and

13    statement of financial affairs.

14         A.    Yes.

15         Q.    Is there a figure for machinery and

16    equipment?

17         A.    I believe you'll find that on Page 8 of

18    32.

19         Q.    That's correct.

20         A.    And it's $7.5 million.

21         Q.    And how is that figure arrived at?

22         A.    The $7.5 million was the book value.

23         Q.    Is there another figure in there as

24    well?

25         A.    A million dollars.

1    Q.    For what?

2    A.    That's the estimated liquidation value

3    of that machinery.

4    Q.    Do you know how that was computed?

5    A.    Not specifically, but I know that we did

6    talk to Alpha Craft, which was one of the vendors,

7    and that was the high end of the valuation they

8    gave us.  They actually told us it would be between

9    900,000 and a million.

10         MR. CLAR:  Your Honor, at this time, I

11   would move to admit Exhibits 2 and 3 of the

12   debtors' exhibits.

13         THE COURT:  They're court records.

14   They'll be admitted.

15   BY MR. CLAR:

16   Q.    Moving to Mr. Grede again.  Sorry for

17   jumping around.  Was Mr. Grede involved in the

18   decision to grant WESCO its promissory note and

19   confession of judgment?

20   A.    He was.

21   Q.    Were you involved?

22   A.    In October, Mr. Grede and I and Mike

23   Adolphi and Ann Cresce exchanged -- had an e-mail

24   exchange where the proposed, at that time,

25   promissory note and confession of judgment were

1    described to us and given to us for our review.

2          And at that time, I voiced an opinion

3    that signing the confession of judgment was ill

4    advised.  In fact, I used the term show stopper and

5    deal killer in that particular e-mail

6    correspondence.

7          Subsequent to that e-mail

8    correspondence, I no longer had any visibility of

9    what was going on with the confession of judgment

10   or promissory note.

11        Q.    What happened next?

12        A.    Could you be more specific?

13        Q.    I could.

14              How did it get signed?

15        A.    Fred signed the promissory note and

16   confession of judgment near Thanksgiving.

17        Q.    Was there Board approval for signing

18   that note?

19        A.    There was not.

20        Q.    Was there Board approval for signing the

21   confession of judgment?

22        A.    There was not.

23        Q.    When did you first learn that it was

24   signed?

25        A.    In the April timeframe when we received

1   notice that WESCO had obtained a garnishment on our

2   bank account.

3           THE COURT REPORTER:  I'm sorry, I

4   couldn't hear you.

5   BY THE WITNESS:

6       A.    I said in April when we had obtained

7   notice that WESCO had obtained a garnishment on our

8   bank account.

9   BY MR. CLAR:

10      Q.    Do you ever recall the Board being asked

11  to approve the WESCO promissory note and/or

12  confession of judgment?

13      A.    So I heard Fred's testimony on Friday.

14  I went back and reviewed all of the Board minutes

15  subsequent to that.  There was no discussion of the

16  promissory note or confession of judgment in any of

17  the Board meetings between then and now other than

18  in April when it came up.

19      Q.    Have you reviewed the debtors' operating

20  agreement?

21      A.    Yes.

22      Q.    Do you believe that the action of

23  approving the promissory note and confession of

24  judgment is something that required Board approval?

25          MR. AGAY:  Objection, Your Honor.

1    They're litigating their adversary complaint right

2    now.

3              MR. CLAR:  Well, I knew that would be

4    the objection, and that's fair, but I'm not.  It

5    goes to Mr. Grede's credibility.

6              THE COURT:  Overruled.

7    BY THE WITNESS:

8         A.    Could you repeat the question, please?

9              MR. CLAR:  Can you read it back?

10             (The record was read as requested.)

11   BY THE WITNESS:

12        A.    No.  I believe the clause in the

13   operating agreement reserving the right to manage

14   the company to the members of the Board is very

15   clear, and I believe Mr. Grede's actions on other

16   occasions where he did seek Board approval supports

17   that stance, and I believe the fact that he had no

18   correspondence with the Board regarding this matter

19   between October and April further supports the idea

20   that he did it intentionally without Board

21   approval.

22   BY MR. CLAR:

23        Q.    I believe you said no, but I think you

24   meant -- didn't you mean, yes, that it did require

25   Board approval?

1          A.      It does require Board approval.

2          Q.      Mr. Flake, did you prepare or supervise

3    the preparation of Exhibit 1, the business plan?

4          A.      I did.

5          Q.      Could you summarize the -- according to

6    the business plan what are the three prongs of the

7    proposed plan that the debtor may propose as its

8    plan of reorganization?

9               I'm not asking you to look at it

10   specifically but tell me what -- and if there is a

11   slide you're looking at, let me know.

12         A.      You asked about three prongs.

13         Q.      Right.

14         A.      And I don't necessarily think about it

15   that way, so I want to make sure I'm thinking about

16   it in the way that's presented in the deck.

17              So on page -- on Page 4, there's a slide

18   titled "the goals," and it says that we intend to

19   better service the debt load by expanding revenue

20   and reducing costs, and that we intend to shift

21   Spot-related expenses into a dedicated subsidiary

22   and fund that separately.

23         Q.      Okay.  Let's talk about those

24   individually.

25              Number 2, shift Spot-specific expenses

1      out of BCause into BCause Spot.

2              What expenses are you referring to?

3          A.    So if you look at the court proposed

4      budget, Slide 11, you'll see that there are a

5      number of items that have arrows next to them that

6      would be costs associated with CCA Financial,

7      Century Link, Comcast, Commonwealth Edison, Cox

8      Communications and Fonality and W-R2.  You will

9      note that there is not an arrow next to payroll,

10     but you will note that payroll drops from $73,848

11     to $21,640.  So it's the combination of those items

12     with arrows next to them and the drop in payroll.

13             To be fair, though, it's not a $54,000

14     drop in payroll.  What we did was we -- Mr. Lane

15     alluded to this idea that there would be shared

16     expenses.  The $21,000 reflects the residual shared

17     expenses associated with payroll.  But if you look

18     at the Spot budget which shows -- which is on the

19     previous slide which shows budget of 36,711 and you

20     were to add those two, you would end up with about

21     $57,000.  The difference between the 73 and the 57

22     is the net payroll shift into Spot.  And that's

23     every two weeks.  And then you would have to also

24     include benefits.  We estimate that to be about

25     $50,000 in payroll shifted on a monthly basis, plus

1    the other expenses.  We believe that the savings to

2    the creditors would be about $70,000 additional.

3          Q.    But you heard Mr. Lane's testimony --

4          A.    I did.

5          Q.    -- earlier this morning.

6                And did you hear him specifically

7    testify about what has to happen for those expenses

8    to shift?

9          A.    He did.  Or, well, I heard him, and I

10   did hear what he said.

11         Q.    Did you hear him say that Spot would

12   have to be funded first, correct?

13         A.    He did.

14         Q.    So what --

15         A.    And I agree with him.

16         Q.    -- is the status of the Spot --

17               THE COURT:  Excuse me.  You said you

18   agree with him.

19               THE WITNESS:  I do agree with him.  That

20   in order for this to work, we would need to fund it

21   first.  That was the question.

22               THE COURT:  Okay.

23               THE WITNESS:  Yes, ma'am.

24   BY MR. CLAR:

25         Q.    What's the status of funding?

1    A.    We currently have verbal commitments

2    from Mr. Adolphi and Mr. Montaine (phonetic).  And

3    internal to SBI, they're currently discussing an

4    investment, and we expect to have word back from

5    them at some point.  It's a large organization.

6    I'm not sure how fast they can do it.

7         Q.    If you don't get the funding and you

8    don't launch Spot, can you still reduce expenses?

9         A.    Absolutely.  This is -- this is a

10   notional plan based upon the idea of launching

11   Spot.

12               If you look at Page 26.

13        Q.    Of exhibit --

14        A.    Of the same Exhibit 1.

15        Q.    Yes.  Yes, sir.  Is that marked fallback

16   plan?

17        A.    It is.  It's labeled Fallback Plan 1.

18   In that case, we believe there's approximately 10

19   additional jobs that can be reduced.  And while we

20   were talking about rejecting the W-R2 lease for

21   office space here in Chicago, we currently have

22   identified office space that we would like to move

23   into.  It's smaller and more appropriate to the

24   current head count.

25               If we raise the money and move into that

1    space, it would still save about $5,000 a month.

2    If we are not successful in the raising money and

3    have to rely on Fallback Plan Number 1, it would

4    save us about $10,000 because we wouldn't need any

5    office space.

6         Q.    Did you hear Mr. Lane testify or read in

7    his declaration the likelihood of you needing to

8    place security deposits for new space?

9         A.    I did hear him testify to that fact.

10        Q.    Now, you've asked the court to reject

11   certain agreements, have you not?

12        A.    We have.

13        Q.    Which agreements have you asked for

14   rejection?

15        A.    The W-R2 lease, the lease for the

16   Ballard property, and the agreement with Century

17   Link.

18        Q.    With respect to the W-R2 property,

19   that's in Chicago, correct?

20        A.    It is, yes.

21        Q.    And have you entered into negotiations

22   for new space for your Chicago people?

23        A.    We have.

24        Q.    Where?

25        A.    I believe it's on Jackson, but I'm not

1    necessarily familiar with Chicago's geography.  But

2    I've reviewed the proposed lease agreement with the

3    company.

4         Q.    Will there be a security deposit?

5         A.    There's not.  There's an $800 move-in

6    fee and an $800 move-out fee.  It's a 6-month

7    agreement.

8         Q.    What about the other lease that you're

9    rejecting?  Which is where?

10        A.    On Ballard Court in Virginia Beach.

11        Q.    And have you identified new space --

12   Strike that.

13             Has a decision been made as to whether

14   or not you need new space in Virginia Beach?

15        A.    A decision has not been made to that

16   effect.  We are looking at real estate, and we --

17   given our current head count of the people who we

18   need to move in there, we've sized it at about

19   $1,500 per month, which is about half what we're

20   currently paying, so we would save a net of $1500

21   if additional space was required.

22        Q.    What if -- what's the option for not

23   having new space?

24        A.    It's possible that those employees could

25   work from home.

1           MR. CLAR:  Your Honor, if this is a good

2    time to break?  I can keep going or --

3           THE COURT:  How much longer do you have?

4           MR. CLAR:  Probably about another

5    45 minutes.

6           THE COURT:  Well, I would like to get

7    all the testimony done by 3:00 with the idea that I

8    could break for my call and then have summations.

9           Why don't we go a little further here

10   and then break.

11          MR. CLAR:  Fine.  That's fine.

12   BY MR. CLAR:

13      Q.   Mr. Flake, did you hear the testimony --

14   Strike that.

15          Are you familiar with repairs and

16   maintenance for the Virginia Beach facility?

17      A.   As a line item in the budget.

18      Q.   Well, can you point us to the line item

19   in the budget?

20      A.   Yes.

21      Q.   What slide is it?

22      A.   I'm working on it.

23      Q.   It would be the BCause Mining proposed

24   budget, so probably Slide 7 perhaps?

25      A.   Well --

1        Q.     Or perhaps Slide 10, which is --

2        A.     Yes, sir.

3        Q.     Okay.

4        A.     Either 7 or 10, depending on which

5    version you're talking about, whether you're

6    talking about the version that's been approved by

7    the court or the one you would propose.

8        Q.     I'm talking about the one we are

9    proposing, not the one that has been approved.

10            So can you point --

11       A.     That would be Slide 10.

12       Q.     Yes.  Can you point to repair and

13   maintenance -- maintenance and repairs in that

14   budget?

15       A.     Give me a second.  I'm sorry.

16       Q.     That's all right.

17            Specifically, the first column about --

18            THE COURT:  Which one is it?  7 or 10?

19            MR. CLAR:  It's 10, Your Honor.

20   BY THE WITNESS:

21       A.     Got it.  Sorry.

22   BY MR. CLAR:

23       Q.     That's okay.

24            About three-quarters of the way down, do

25   you see the column marked or line item maintenance

1    and repairs?

2         A.    Yes.

3         Q.    And how much in the current budget is

4    delineated for maintenance and repairs?

5         A.    It's budgeted at $20,000 per month.

6         Q.    And what is that based on?

7         A.    Uhm, so I worked for Jacobs Engineering,

8    which is one of the largest engineering companies

9    in the world, for about 13 years.  And a good rule

10   of thumb throughout that industry is that about

11   2 percent of your Capex would be allocated on an

12   annual budget to maintenance of the money -- of the

13   equipment you invest the Capex in.  $20,000 a month

14   works out to $240,000 per year, which is

15   approximately 2 percent of the Capex that we've

16   invested in the facility.  So it's based on an

17   appropriate rule of thumb from the industry.

18        Q.    You were here when Mr. Grede testified

19   about capital expenditures, were you not?

20        A.    I was.

21        Q.    You were here when Mr. Lane testified as

22   to his understanding of what Mr. Grede said about

23   capital expenditures, correct?

24        A.    I was.

25        Q.    Did you hear the figure $3 million?

1          A.     I did.

2          Q.     What's your opinion of that?

3          A.     When Mr. Grede made that statement in

4     deposition, he referred to as pulling it out of the

5     air.  I agree with Mr. Grede.  He pulled it out of

6     the air.  It's complete fiction.

7          Q.     Well, but specifically with respect to

8     capital expenditures for the roof --

9          A.     Yes.

10         Q.     -- are you currently -- is there a need

11    to repair the roof at the present time in Virginia

12    Beach?

13         A.     There is not.

14         Q.     And you're there all the time, are you

15    not?

16         A.     Yes.

17         Q.     Are you aware of leaks in the roof?

18         A.     There are none.

19         Q.     And with respect to ventilation issues

20    that Mr. Grede and Mr. Lane testified to, what

21    repairs are immediately necessary or in the long

22    term for ventilation?

23         A.     There are currently some things in need

24    of repair, but they are well within the scope of

25    the maintenance and repair budget that's been

1    proposed.  There are no other heating, ventilation

2    or air conditioning needs and from a Capex

3    perspective at the facility.

4         Q.    What about for humidity?

5         A.    Humidity can be a problem.

6              I think Mr. Grede was working from old

7    information, and there are two things that have

8    changed materially in recent months.

9              First, we implemented ASIC boost

10   software, which makes the machines operate more

11   efficiently and generate less heat.

12             Second, we swapped from Schedule 4 with

13   Dominion Power to Schedule 10 with Dominion Power.

14   On Schedule 10, it is our plan -- and we talked

15   about it here in court, and we've negotiated it

16   with Dominion Power.  It is our intent to shut down

17   on peak hours with A days which tend to be the

18   hottest days of the year.  We didn't do any of

19   these things last year, and that's the basis of Mr.

20   Grede's experience.

21        Q.    Turning to the other capital expenditure

22   that was specified by both Mr. Lane and Mr. Grede,

23   the fire suppression system, are you familiar with

24   the fire suppression system?

25        A.    I am.

1      Q.     Are you familiar with the need for a

2  fire suppression system?

3      A.     I am.

4      Q.     Why is there a need for a fire

5  suppression system?

6      A.     It's required for BCause that the

7  facility become in compliance with that city's fire

8  suppression code.

9      Q.     City of Virginia Beach?

10      A.     Yes.

11      Q.     Have you been notified by the City of

12  Virginia Beach for a timeframe for installing the

13  fire suppression system?

14      A.     We have not.  There is no hard deadline,

15  but we understand the city views it as something

16  that must be done at some point.

17      Q.     And it's true that there is nothing in

18  the budget for the cost of the fire suppression

19  system, isn't it?

20      A.     That is true.

21      Q.     But have you made arrangements -- Strike

22  that.

23             Are you making arrangements to pay for

24  it?

25      A.     It's our intention not -- so the budget

1    that has been presented to the court is an

2    operating budget.  It's not a Capex budget.  But

3    it's our intention to raise that quarter of a

4    million dollars from our existing shareholders.

5          Q.    When you say it's your intention, what

6    have you done to move forward with that intention?

7          A.    So Mr. Adolphi is spearheading that

8    effort.  I've already mentioned that he and Mr.

9    Montaine have verbally agreed to make an investment

10   in the company.  I've also spoken to the fact that

11   SBI is currently considering making such an

12   investment.

13          In addition to that, we intend to do a

14   general solicitation to the other members, of which

15   there are about 31 in addition to Mr. Montaine and

16   Mr. Adolphi, to raise that money.

17         Q.    You anticipate that that will happen in

18   time to satisfy the City of Virginia Beach?

19         A.    I do.

20         Q.    Now, with respect to the Nasdaq

21   contract, are you familiar with the Nasdaq license

22   agreement entered into by Holdings?

23         A.    I am.

24         Q.    What can you tell me about that

25   agreement?

1       A.      It was negotiated jointly between Fred

2    and I with Nasdaq representatives at FIA in Boca

3    Raton, Florida, in March of '18.  It was an

4    agreement to use a full suite of software services

5    provided by Nasdaq that they use in their own

6    exchange and are considered as state of the art by

7    anybody else in the industry.

8       Q.      What would be the use of the Nasdaq

9    license agreement moving forward?

10      A.      We believe that one valid criticism of

11   our competitors is that the software that they use

12   is not as sophisticated as the financial industry

13   is used to, and because it lacks certain

14   capabilities, that people that act as fiduciaries

15   in the financial industry aren't able to do

16   business with some of our competitors.

17          It's our belief that from a marketing

18   standpoint if nothing else, that we would be a more

19   attractive alternative to those fiduciaries because

20   of the sophistication of the platform.

21      Q.      Who is "we"?

22      A.      Primarily, myself and Bruce Pollack and

23   Sean Ristau in the current company, but even before

24   that, I think other folks that are no longer with

25   the company shared that view.

1       Q.      Does mining need the Nasdaq license?

2       A.      Mining does not.

3       Q.      Does BCause LLC need the Nasdaq license?

4       A.      It does not.

5       Q.      Who needs the Nasdaq license?

6       A.      BCause Spot.

7       Q.      Okay.  And if BCause Spot doesn't

8  launch, will the Nasdaq license be needed?

9       A.      It would not be.

10       Q.      And what would happen?

11       A.      I believe they would be categorized with

12  the other unsecured creditors and treated in like

13  kind.

14       Q.      And if the -- what has to happen for

15  Spot to launch again?

16       A.      We have to raise about 300 -- I'm sorry,

17  $750,000.

18       Q.      And then what?

19       A.      We have to shift the expenses from

20  BCause and BCause Mining into Spot, and then we

21  have to finalize some software connections between

22  our AML, anti-money laundering, KYC, know your

23  customer, and our website and the Nasdaq software

24  to launch.

25       Q.      Would there be any state licensing

1    necessary?

2         A.    There is.

3               For the states that require it, we have

4    to be licensed as a money transmitter in order to

5    affect fiat-to-cryptocurrency or current

6    cryptocurrency-to-fiat exchanges.

7               There is no state that I'm aware of,

8    other than perhaps New York, that provides any kind

9    of licensure for crypto-to-crypto exchanges.

10        Q.    Have you currently obtained any licenses

11   in any states?

12        A.    We have.

13        Q.    Which states?

14        A.    If we were to -- we could actually

15   legally operate in six states today with both

16   licensure and business registration.  Virginia,

17   Utah, Washington State, and a couple of others.

18   Three others, in fact.

19        Q.    And if the investment money comes in --

20        A.    Yes.

21        Q.    -- and if the launch is successful, how

22   will you -- how do you propose to pay Nasdaq?

23        A.    I believe we'll negotiate that with

24   Nasdaq.  And certainly clearly we couldn't launch

25   until that negotiation was complete.  But I've had

1    conversations with my counterpart at Nasdaq, Mark

2    Driscoll.  We've frankly in trying to build a

3    consensus for this outline of a plan, I've floated

4    this idea of one-third, one-third, one-third to

5    him, and he's committed to running it up the

6    flagpole, his words, not mine, internal to Nasdaq.

7         Q.    Moving -- transitioning to the

8    one-third, one-third, one-third, can you explain

9    that?

10        A.    Uhm, I think it's been presented by

11   this point -- at this point by Mr. Agay.  At least

12   my read of it is it's the plan, but I would say

13   it's the starting point for negotiation with the

14   creditors.

15        Q.    One-third, one-third, one-third of what?

16        A.    The idea is of the total debt, which is

17   approximately $12 million, that the creditors would

18   forgive one-third, that we would convert one-third

19   to equity in the company, and that we would pay

20   back one-third of the company over time with

21   interest.

22        Q.    Have you spoken to any representatives

23   of your creditors about their reaction to this

24   plan?

25        A.    I have.

1      Q.    Who have you spoken to?

2      A.    Nasdaq, Alpha Craft, ProWindows.

3      Q.    Well, have you spoken to BMG?

4      A.    I have.

5      Q.    Have you spoken to SBI?

6      A.    I have not.  They're not a creditor.

7      Q.    Understand.

8            Who else have you spoken to?

9      A.    I think when you add BMG, I think that

10   may be all I've spoken to.

11     Q.    And when you spoke to BMG, who did you

12   speak to?

13     A.    I don't remember the gentleman's name,

14   but I believe he presented himself as working for

15   Ayer, A-Y-E-R, which is the financial group behind

16   BMG, and I believe he's their internal counsel.

17   And one other person.  I think Joe Chin if I'm not

18   mistaken.

19     Q.    You mentioned other creditors that

20   you've spoken to about the concept.

21     A.    Yes.

22     Q.    You said you spoke to Alpha Craft.

23     A.    Yes.

24     Q.    Who else did you speak to?

25     A.    Professional Heating and Cooling and

1    ProWindows.

2          Q.    Has anyone expressed their -- Strike

3    that.

4                What was the reaction of Alpha Craft?

5    Who did you speak to?

6          A.    I spoke to Joe -- I'm sorry, Chet Gagnon

7    and his brother Scott Gagnon.  They are the

8    principals in the business.

9          Q.    How much is Alpha Craft owed?

10         A.    I believe about $700,000.

11         Q.    What was their reaction?

12               MR. AGAY:  Objection, Your Honor.  This

13   is hearsay.

14               THE COURT:  Sustained.

15   BY MR. CLAR:

16         Q.    What did mister -- I'm sorry.  Who did

17   you speak to at Alpha Craft?

18         A.    Scott Gagnon and Chet Gagnon.

19         Q.    What did they say?

20               MR. AGAY:  Objection.

21               THE COURT:  Sustained.

22   BY MR. CLAR:

23         Q.    How did you present it to them?

24         A.    We had a draft of the slide deck, and I

25   sat down with them in Baltimore, and we went

1    through it page by page.

2        Q.    Has anyone told you that they would not

3    agree to this?

4            MR. AGAY:  Objection, hearsay.

5            THE COURT:  Sustained.

6            MR. AGAY:  I'll testify that WESCO has

7    told them they won't agree to it.

8            MR. CLAR:  This would be a good breaking

9    point.

10           THE COURT:  Okay.

11           MR. CLAR:  I have probably a half hour

12   more.

13           THE COURT:  Okay.  Then let's come back

14   at 1:00 o'clock and keep going.

15           MR. CLAR:  That's fine.

16           THE CLERK:  All rise.

17           Court is in recess until 1:00 o'clock.

18               (A recess was had.)

19           THE CLERK:  All rise.

20           Court reconvened.

21           THE COURT:  You may proceed.

22           MR. CLAR:  Thank you.

23   BY MR. CLAR:

24       Q.    Mr. Flake, once you have a chance to be

25   seated, can you take a look at Debtor's Exhibit

1    Number 5, please?

2         A.    Yes.

3         Q.    Can you tell me what that exhibit is?

4         A.    It's titled BCause LLC Profit and Loss

5    by Class.  It's a listing, in particular, of the

6    expenses associated with Mining and the other

7    subsidiaries.

8              In particular, I think Mr. Lane called

9    into question how much money had been spent or the

10   justification for replacement cost of Spot.  This

11   helps substantiate that case of how much was spent

12   and, therefore, how much it would cost somebody

13   else to build something similar to what we built.

14        Q.    Can you take a look at Exhibit 4,

15   please.

16        A.    Yes.

17        Q.    Can you describe that exhibit, please?

18        A.    BCause Profit and Loss by Class again,

19   January to December.

20             In the previous version, it was January

21   to March of 2019.  In this case, it's January to

22   December of 2018.  So you would have to take the

23   two exhibits together to get a full picture of how

24   much has been spent on Spot to date.

25        Q.    And what is the total amount spent on

1    Spot to date?

2         A.    In the first exhibit, it was $352,000,

3    and in the second exhibit, it's an additional

4    $207,000.  So, minimally, somewhere around 600,000.

5              THE COURT:  You have to help me there.

6    Where are these numbers?  Where are you getting

7    these from?

8              THE WITNESS:  What I'm looking at,

9    ma'am, is -- I'm sorry, in fact.  I didn't go to

10   the fourth page.  If you go to the fourth page of

11   Exhibit 4 --

12             MR. AGAY:  Your Honor, I'm going to

13   object to this testimony.  There is no foundation

14   for these documents.  I don't know who prepared

15   these.

16             THE COURT:  I'm going to sustain this.

17   I don't know what this is or where they came from.

18   I'm with you.

19             MR. CLAR:  Fair.

20   BY MR. CLAR:

21        Q.    Did you prepare these Exhibits 4 and 5,

22   Mr. Flake?

23        A.    They were prepared by our comptroller

24   Christie Vaassen and reviewed by me.

25        Q.    And what do they purport to be?

1          THE COURT:  Whoa, you need a lot more

2     background than that.  When, where, why, how, what.

3     BY MR. CLAR:

4          Q.    When were these prepared?

5          A.    They were prepared subsequent to the

6     depositions last month is my recollect.

7          Q.    Why were they prepared?

8          A.    I think the point had been made in

9     deposition, that there was no -- Mr. Lane had made

10    in his deposition the -- he had laid as a

11    foundation for his argument that Spot had zero

12    value, that we had never justified the valuation as

13    replacement.  This was prepared in rebuttal to that

14    idea that he raised in deposition.

15         MR. AGAY:  Your Honor, I'm going to

16    object to these as hearsay.  These were prepared --

17    these weren't contemporaneously prepared.  They

18    were not ordinary course business records.

19         MR. CLAR:  We don't know that yet.

20         MR. AGAY:  They were prepared in

21    response to deposition testimony to rebut that

22    deposition testimony.

23         THE COURT:  I don't know what the heck

24    these are and what that means, frankly, and unless

25    he can go and explain what these are, what the

1   source was, and then point to the line items, right

2   now what you've said is completely useless to me,

3   which is not what you want a judge to say to you.

4            MR. CLAR:  I recognize that.

5   BY MR. CLAR:

6        Q.    What documents did -- were used to

7   prepare Exhibits 4 and 5?

8        A.    This is a data pull from our accounting

9   system.  It's a standard record built into Intuit.

10       Q.    Is this a document that you would

11   ordinarily prepare in the course of your business?

12       A.    Individual pieces of it.  Profit and

13   loss by subsidiary, yes.  This is a typical

14   document that just shows expenditures by

15   subsidiary.

16       Q.    Okay.  Where in Exhibits 4 and 5 can we

17   see what was spent on Spot?

18            THE COURT:  Hold on.  He is saying these

19   are documents that were prepared by subsidiaries or

20   something like that.  What's profit and loss by

21   class mean?  What is "by class"?

22            THE WITNESS:  That's how it's referred

23   to in the report by Intuit, Your Honor.

24            THE COURT:  That.  What's "that"?

25            THE WITNESS:  "That" being the division.

1    You can see in the column headings, Clearing,

2    Derivatives, Holding Corp, Mining and Spot.  That's

3    how they're allocated within our accounting system.

4              THE COURT:  Okay.

5    BY MR. CLAR:

6         Q.    I'm going to leave this exhibit for a

7    minute.

8              Directing your attention to Group

9    Exhibit 6, can you tell me what Group Exhibit 6

10   purports to be?

11        A.    It's the hosting services agreement

12   between BCause Mining, LLC, and BMG Operations,

13   Ltd.

14        Q.    And further on in this exhibit, are

15   there other hosting agreements?  If you look, there

16   is a blue sheet separating each of them.

17        A.    There are.

18        Q.    And do these represent all of the

19   hosting agreements that the debtor currently is a

20   party to?

21        A.    Maybe.  Give me a second.

22        Q.    Okay.

23        A.    Yes, it appears that they are.

24        Q.    Okay.  With respect to BMG, and you've

25   heard testimony both today and on Friday concerning

1   this contract, when in your opinion does the BMG

2   hosting agreement expire?

3          THE COURT:  That's not going to help.

4   We had a lot of testimony on that on Friday.  He

5   specifically pointed to the three big ones, the

6   dates when they were due, the clauses that talked

7   about the variation.  Unless you have got something

8   new, move on.

9          MR. CLAR:  Okay.  I wanted to lay the

10  foundation for it.

11         THE COURT:  Go ahead.

12  BY MR. CLAR:

13     Q.    But what I am going to ask you is have

14  you had any discussions with BMG about renewing

15  their contract?

16     A.    Not exclusively about renewing their

17  contract.  But at least in Mr. Grede's testimony

18  and in my recollection, we had renegotiated a

19  contract with BMG extending their hosting for

20  4 years, and I think there's a desire on their part

21  to do that.

22         We do not have that in writing at this

23  point, but I would expect that we would negotiate

24  something along those lines.

25     Q.    With respect to SBI, can you tell me if

1    there have been any negotiations with SBI about

2    renewing their contract?

3         A.    There have not been about renewing their

4    existing contract, but there have been about

5    transferring title to some portion of their

6    machines to us and for us to mine on our own

7    account.

8         Q.    I'm going to direct your attention to

9    Exhibit 12, which I've supplied to the court and to

10   Mr. Agay.

11        A.    It's not in this book.  Can I get a

12   copy?  This goes to 11.

13        Q.    Sure.

14              (Tendered.)

15   BY MR. CLAR:

16        Q.    Have you seen this document before, Mr.

17   Flake?

18        A.    I have.

19        Q.    What is it?

20        A.    It's a dialogue that I am engaged in

21   currently with Mr. Carson Smith of SBI.  He's the

22   manager for their crypto operations.  And we are

23   having SBI at this point, draft an agreement that

24   would allow us to lease approximately 600

25   operational machines from SBI and realize the

1   profits associated with the mining with utilizing

2   those machines.

3         Q.    Is there a cost associated with leasing

4   the machines?

5         A.    There is.  You'll see in the second

6   paragraph, it says BCause will pay a monthly lease

7   payment over, say, 4 to 6 months.

8               The cost of those machines on the market

9   right now is approximately $360, so our cost with

10  SBI would be about $60 per month.

11        Q.    How would you fund that cost?

12        A.    SBI has offered to be the lessor.

13        Q.    And as a result of this arrangement,

14  would there be any revenue realized by the debtors?

15        A.    There would be.  After accounting for

16  the cost of machines and the cost of electricity

17  and other operational considerations, at the

18  current exchange rate, which is about $11,000 per

19  bitcoin, each machine should realize about 75 to

20  $80 per month in profit.

21        Q.    What does that mean on a monthly basis?

22        A.    If you take, say, a conservative number

23  of 70, multiply it by 600 machines, it's about

24  42,000 in new profit.

25        Q.    You say "profit."  What are the costs

1   associated?  How much are the costs?

2        A.    It would be approximately 60 -- $65 per

3   machine, and it would be approximately $50 in

4   electricity, $53 in electricity.

5        Q.    How much more than what you're paying

6   now?

7        A.    Uhm, all in our costs would go up about

8   $120 per month, but net of all those costs, we

9   should still realize about $70 in profit per

10  machine.

11       Q.    You say $120 per month?

12       A.    In costs.

13       Q.    Per machine?

14       A.    Per machine.

15       Q.    How many machines are we talking about?

16       A.    600.

17       Q.    So how much money?

18       A.    Approximately $72,000.

19       Q.    And as a result of spending the $72,000,

20  how much would you realize?  In total revenue?

21       A.    Approximately -- oh, in revenue?

22  Approximately $170,000 a month in revenue.

23       Q.    And how did you calculate --

24       A.    I'm sorry.  $170 per machine times 600

25  machines.  And if you give me a calculator, I could

1    do that for you.  But it's about 170 times 600.

2         Q.    And the net profit?

3         A.    About $60 times 600 machines.  36,000 to

4    $48,000 ballpark.

5         Q.    And considering all costs associated?

6         A.    Yes.

7              MR. CLAR:  Your Honor, I move this --

8    BY THE WITNESS:

9         A.    You could see SBI's opinion in that last

10   paragraph.  It says I think -- or in the second to

11   last, I should say.  It says:  After a lease and

12   power payment, there should still be a good amount

13   left over for BCause, and if BTC price appreciates,

14   this margin will increase.

15             He wrote this on the 20th.  Today is the

16   24th.  At that time, the price of bitcoin was about

17   9,000.  So he's right.  BTC has appreciated by

18   almost 20 percent since then.

19   BY MR. CLAR:

20        Q.    Who is Carson Blake Smith?

21        A.    He manages the mining operation for SBI.

22        Q.    Who is Jonathan Tanemori?

23        A.    Jonathan is the Board representative

24   from SBI to BCause.  He works at SBI.  He was on

25   the due diligence team but he's actually been

1    promoted out of the cryptocurrency group.

2         Q.    Have you had any discussions with St.

3    Bitts about whether they're going to renew their

4    hosting agreement?

5         A.    We have not.

6         Q.    Do you know that -- do you have any

7    idea -- Strike that.

8              MR. CLAR:  Your Honor, I move to admit

9    Exhibit 12.

10             MR. AGAY:  Your Honor, I object.  They

11   didn't lay any foundation for this document.  I

12   don't know where it came from, what their process

13   was internally, if this was an internally generated

14   e-mail.  He laid absolutely no foundation for the

15   source of this document or the parties to it and

16   how they obtained it.

17             MR. CLAR:  Fine.

18             THE COURT:  Sustained.

19   BY MR. CLAR:

20        Q.    You told us who Carson Blake Smith is,

21   correct?

22        A.    I did.

23        Q.    And did you speak to Mr. Smith about --

24   prior to receiving this e-mail?

25        A.    I did.  I've had discussions with he and

1    Mr. Tanemori.  Mr. Tanemori by phone and Mr. Smith

2    via e-mail.

3         Q.    How did those discussions begin?

4         A.    SBI currently has stored with us

5    approximately 3500 miners, and they are not

6    currently mining.

7              It seemed that -- we have a number of

8    customers that are interested in procuring used

9    machines, and I opened a dialogue with SBI around

10   the idea of how could they best monetize those

11   machines that were in storage and how might that

12   benefit BCause.

13        Q.    Any of those discussions include renewal

14   of the SBI contract?

15        A.    They did not.

16        Q.    Do you have an opinion as to whether SBI

17   would be engaging in these negotiations if they

18   weren't going to renew?

19        A.    I couldn't speak to this negotiation and

20   the renewal intentions.

21             But if bitcoin continues to appreciate

22   in price, even if they didn't renew their contract,

23   I would agree to lease their 7,000 machines under

24   these terms.

25        Q.    Did you receive this e-mail?

1          A.     I did.

2          Q.     Do you have any reason to think Mr.

3     Smith didn't send it?

4          A.     No, I have reason to suspect he did in

5     conversation I had with Mr. Tanemori regarding

6     this.

7          Q.     After you received the e-mail?

8          A.     Contemporaneously with.  I don't

9     remember if it was just before or just after.

10         Q.     And do you know what Mr. Smith's

11    position is with SBI?

12         A.     He manages their cryptocurrency mining

13    group.

14                MR. CLAR:  I would ask this be admitted,

15    Your Honor.

16                MR. AGAY:  I object.  He talked about

17    all of the players supposedly involved in this

18    e-mail, but we still don't know where the e-mail

19    came from.

20                MR. CLAR:  I am sorry.  I don't

21    understand that.  It came from Carson Blake Smith.

22                MR. AGAY:  They could have created this

23    on a computer and printed it out.  I have no idea

24    from what system this came from.

25                MR. CLAR:  I don't see how anyone could

1    ever prove that.  I mean, what he's suggesting is

2    people are fabricating e-mails.  I don't know how

3    to deal with that.

4         MR. AGAY:  Well, the whole point of

5    establishing foundation and reliability of the

6    evidence is you understand where the e-mail came

7    from so the court has assurance somebody didn't sit

8    down and type this out.

9         THE COURT:  It's very simple.  Where was

10   he when this happened?

11        MR. CLAR:  I get it, but...

12   BY MR. CLAR:

13        Q.    When did you get this e-mail?

14        A.    On June 20th at 9:25 in the morning.

15        Q.    And where were you when you received the

16   e-mail?

17        A.    I believe I was in the office.

18        Q.    And have you responded to the e-mail?

19        A.    I have.

20        Q.    Do you have any reason to believe that

21   Mr. Smith didn't send this e-mail?

22        A.    No.  And concurrent with that, Mr.

23   Tanemori has encouraged Mr. Smith to speed things

24   along internal to SBI.

25        MR. CLAR:  I ask it be admitted, Your

1    Honor.

2         MR. AGAY:  Your Honor, if you look at

3    the bottom of the e-mail, it is clear that there

4    is -- I don't know what this is, and that didn't

5    establish the foundation.  Clearly there's more to

6    this e-mail.  There's just no context for what he's

7    presenting to the court.

8         THE COURT:  The problem, Mr. Clar, is

9    you have got an e-mail dated 6-20-19, and it says 1

10   of 6, and you've given us one page.  On the very

11   bottom suggests there's another e-mail.  I presume

12   this is a whole string.  And you picked out one

13   piece of paper from a string, and that's just not

14   sufficient.  So I'm not going to admit this

15   document.

16        MR. CLAR:  Thank you, Your Honor.

17   BY MR. CLAR:

18   Q.    Would you say that the price of bitcoin

19   today is -- Strike that.

20        When the debtor obtained the SBI, the

21   BMG and the St. Bitts contracts, what was the price

22   for bitcoin?

23   A.    Those contracts were signed at the end

24   of November of 2017, and at that time my

25   recollection is and I think we have got an exhibit

1    to this effect, that the price of bitcoin was

2    approximately $9,000.

3         Q.    What exhibit are you referring to?

4               Would that be Exhibit 7?

5         A.    It would be, yes.

6         Q.    What is Exhibit 7?

7         A.    Exhibit 7 is a tabular listing of the

8    price of bitcoin over time.

9         Q.    How was it compiled?

10        A.    It was extracted both from a common

11   cryptocurrency-related site and then I believe

12   another exhibit was also an extract of the Wall

13   Street Journal, so they corroborate each other.

14        Q.    Did you compile Exhibit 7?

15        A.    I did a data download from the website

16   I'm talking about.

17        Q.    What website?

18        A.    We didn't print or it wasn't printed the

19   first line of this, and so -- I believe it was

20   Coindesk, though.

21        Q.    Okay.

22              What was the price of bitcoin at the

23   time --

24        A.    Excuse me.  It was CoinMarketCap, and

25   it's the third page from the last.

1        Q.     What is CoinMarketCap?

2        A.     It's a well-known sort of exchange

3    listing of historical bitcoin prices.

4        Q.     Let me go back to my first question.

5               What was the price of bitcoin when you

6    entered into the BMG, SBI and St. Bitts contracts?

7               MR. AGAY:  Your Honor, I would object to

8    the extent that he's relying on this document to

9    answer that question.

10              Mr. Flake just testified that he

11   generated this document based on source data that

12   he found from other places, so it is data that is

13   distilled through Mr. Flake.  It's hearsay.  And I

14   don't know why they don't just have the direct

15   information from whatever he used to prepare this

16   because it's not reliable if it's going through the

17   witness.

18              MR. CLAR:  I'm not asking him to look at

19   this document.  I'm asking if he knows what the

20   price of bitcoin was when he entered into the

21   contracts.

22              THE COURT:  That's fine.  You can answer

23   that question.

24              MR. CLAR:  Fair enough.

25   BY THE WITNESS:

1        A.      It was approximately $9,000.

2   BY MR. CLAR:

3        Q.      And what is it now?

4        A.      About $11,000.

5        Q.      In your opinion, would it be more likely

6   that you would obtain new business when the price

7   of bitcoin is going up?

8        A.      Well, we've testified previously that we

9   don't have direct exposure to the exchange rate of

10  bitcoin, but, yes, our clients who do have direct

11  exposure to that exchange rate are more profitable

12  as the exchange rate goes up and are more likely to

13  engage in mining operations when it's more

14  profitable.

15       Q.      Would you look at Exhibit 9, please.

16       A.      Yes.

17       Q.      What is Exhibit 9?

18       A.      These are quotes from the Wall Street

19  Journal for the same time period.

20       Q.      Did you extract this document from the

21  Wall Street Journal?

22       A.      I believe our attorneys did.

23       Q.      Have you seen this document before?

24       A.      I have.

25       Q.      What does it purport to show?

1      A.      Historical price of bitcoin over time.

2      Q.      I'd ask you to look at Exhibit 11.

3              What is Exhibit 11, Mr. Flake?

4      A.      This is a chart of the historical price

5  of bitcoin over time showing in graphical form the

6  same data we presented tabularly.

7      Q.      What does it show?

8      A.      It shows that since middle of December

9  of last year, approximately six months ago, that

10  the price of bitcoin has continuously increased,

11  more or less.

12     Q.      Moving to the business plan.

13             If you do not launch Spot --

14     A.      Yes.

15     Q.      -- and if the expenses associated with

16  Spot are eliminated, will the debtors' cash flow be

17  positive?

18     A.      So I think when I was questioned from

19  Mr. Agay, we talked about the idea that at the

20  beginning of May, May 3rd I think, and I'm turning

21  right now to that slide, we had started with

22  approximately 800 and -- hold on for a second.

23             MR. AGAY:  What slide is he talking

24  about?

25             THE WITNESS:  I'll get there.

1   BY MR. CLAR:

2        Q.    Would it be 10?

3        A.    Well, it would be a combination of 8 and

4   11, I believe.

5              So you'll see in the week ending

6   May 3rd, we had starting cash of $844,000.  That

7   would be in the bottom left-hand corner circled.

8              THE COURT:  Page?

9              THE WITNESS:  Page 8, Your Honor.

10  BY THE WITNESS:

11       A.    And then we currently project beginning

12  cash for the week ending 6 September to be

13  $945,000.

14             So if you compare beginning cash to

15  beginning cash over that roughly 13, 14-week

16  period, we actually show a net increase of cash of

17  about $101,000.

18             If we were to eliminate an additional

19  $70,000 plus per month, it would positively impact

20  the direction of that cash increase.

21  BY MR. CLAR:

22       Q.    By how much?

23       A.    About $70,000 a month.

24             MR. CLAR:  If I could have one minute,

25  Your Honor.

1              THE COURT:  Okay.

2    BY MR. CLAR:

3        Q.    While the debtor has been in Chapter 11,

4    Mr. Flake, has the debtor paid all of its expenses?

5        A.    We have paid all the expenses that have

6    been approved by the court.

7        Q.    And has the debtor collected the revenue

8    -- other than due to the power outage, collected

9    all the revenue it's supposed to collect?

10       A.    We have.

11       Q.    Okay.

12       A.    And, in fact, I would go so far as to

13   say that if you look at the projected cash for 21

14   June, the five four ninety-four ending cash, that

15   we're actually in excess of that slide.

16       Q.    What slide?

17       A.    I'm sorry.  This is on Slide 8.  This is

18   a court proposed budget that was approved at, I

19   believe, the May 8th hearing.

20             We're actually within $400 of the target

21   amount.

22       Q.    Has the debtor made any adequate

23   protection payments to WESCO?

24       A.    We have.

25       Q.    How many?

1      A.    We made payments on 17 May and 21 of

2    June or at least that's when they're budgeted.  The

3    actual dates those payments were made may have

4    slipped a day or two.

5      Q.    How much?

6      A.    It's about 50 -- roughly, $50,000.

7      Q.    In total?  How much is each payment?

8      A.    $24,973.

9            MR. CLAR:  I have no further questions,

10   Your Honor.

11           THE COURT:  Okay.

12           Do any of the other parties want to ask

13   Mr. Flake questions on direct?

14           I can read your face.  She's thinking

15   about it.

16           MS. JANCZAK:  I don't know that I would

17   call it direct.

18           THE COURT:  Whatever.  He's kind of here

19   for everybody.

20           MS. JANCZAK:  You want me to go first?

21           MR. AGAY:  Yeah, sure.

22           MS. JANCZAK:  Why not.

23                  CROSS EXAMINATION

24   BY MS. JANCZAK:

25      Q.    Good afternoon, Mr. Flake.

1          A.     Good afternoon.

2          Q.     You testified regarding the adequate

3     protection payments to WESCO.  They're about 24,000

4     a month, is that correct?

5          A.     Almost 25,000, yes, ma'am.

6          Q.     How is that calculated?

7          A.     I couldn't speak to that directly.  It

8     was calculated when George Sladoje was still with

9     the company.  But I believe it's based upon the

10    interest imputed at 20 percent on the $1.8 million

11    that WESCO claims they're owed.

12         Q.     20 percent interest?

13         A.     I believe so.

14         Q.     And is that based on the confession of

15    judgment that WESCO obtained?

16         A.     I don't know if it's based on the

17    confession of judgment or the statutory rate limit

18    in Virginia, but I think it's one of those two

19    things.

20         Q.     Prior to the confession of judgment, are

21    you aware of whether WESCO was entitled to any

22    interest?

23         A.     Prior to what, ma'am?

24         Q.     The entry of the confession of judgment.

25         A.     I don't remember whether our agreement

1    with WESCO spelled out that in the case of a

2    default, if they were entitled to interest or not,

3    but I seem to recall 12 percent.

4         Q.    Okay.  And what about prior to that

5    promissory note?  Would WESCO have been entitled to

6    any interest?

7         A.    I don't believe so.

8         Q.    Okay.

9              If WESCO's liens were successfully

10   challenged or the amount of its debt were reduced,

11   would that reduce the adequate protection payment

12   as well?

13             MR. AGAY:  Objection.  That's asking for

14   a legal conclusion.

15             THE COURT:  Sustained.

16   BY MS. JANCZAK:

17        Q.    If the amount of WESCO's debt were

18   lower, would that change the amount of the adequate

19   protection payment?

20             MR. AGAY:  Same objection.

21             THE COURT:  Sustained.  I rule on

22   adequate protection.

23             If you're asking a simple math question,

24   you can ask that.

25             MS. JANCZAK:  Okay.

1   BY MS. JANCZAK:

2       Q.    You testified regarding the Spot

3   expenses.  Do you recall that?

4       A.    Yes, ma'am.

5       Q.    So could you look at Exhibit 1.  I think

6   we're going to look at Slide 11.

7       A.    Is that the Proposed Budget Spot?

8       Q.    Correct.  This is the Proposed Budget

9   Holdings, which I believe incorporates for a period

10  of time some of the Spot expenses.

11      A.    You're talking about Slide 8, ma'am?

12      Q.    I think it's Slide 11.

13      A.    The proposed budget on -- well -- got

14  it.

15      Q.    So if we look at Week 6, week ending

16  July 12th, there are several arrows that start that

17  week and a few more arrows that start the week

18  after in Week 7.  Do you see that?

19      A.    Yes, ma'am.

20      Q.    Just so I can clarify your prior

21  testimony, there are kind of two options with what

22  to do with these Spot expenses.

23            One option is to shift those expenses to

24  BCause Spot, a nondebtor subsidiary, is that

25  correct?

1        A.      Yes, ma'am.

2        Q.      And that only happens if BCause Spot

3   gets sufficient funding to operate, correct?

4        A.      Yes, that's correct.

5        Q.      And what's the other option?

6        A.      To eliminate those expenses entirely.

7        Q.      And to be clear, in total, if that were

8   to happen, how much would that take out of the

9   budget?

10       A.      It would retain for the benefit of the

11  creditors, approximately an additional $70,000 per

12  month.

13       Q.      So it's 70,000 per month.

14              Do I recall from your testimony on

15  Friday, that if Spot doesn't raise that additional

16  capital in the near future, that it will choose to

17  forego the launch?

18       A.      Yes, ma'am.

19              As part of the plan that we have to

20  submit to the court, we will have made a decision

21  prior to the submission of that plan.

22              We anticipate having made a go/no-go

23  decision on that by the end of July.  We feel that

24  the -- that will give the existing members of the

25  LLC time to consider and make a decision on whether

1    to make an investment or not.

2        Q.    So it's about one more month of Spot

3    expenses in the budget either way, correct?

4        A.    About six more weeks I would say.

5        Q.    Okay.

6            I don't remember if you testified about

7    this previously, but BMG is one of your customers,

8    and they're currently setting off about 70,000 a

9    month from their monthly fees, is that correct?

10       A.    When you say "currently," I would say

11   they have been historically, but we've been

12   instructed to no longer allow that offset.

13       Q.    Okay.  So prior to the bankruptcy

14   filing, in May and June, they set off about 70,000,

15   is that right?

16       A.    Yes, ma'am, that's right.

17       Q.    Did the monthly revenue projections in I

18   guess it would be Slide 10 or in any of your

19   revenue projections that you submitted to the

20   court, does that incorporate the additional $70,000

21   per month or does it contemplate that the setoff

22   was continuing to occur?

23       A.    It contemplates that the setoff would

24   continue, so our revenue and our EBITDA should be

25   $70,000 higher.

1          Q.     So all and all, with the reduction of

2     the Spot expenses, and if that BMG setoff were to

3     stop, that would be an additional 140,000 per

4     month, is that right?

5          A.     Yes, ma'am, that's correct.

6          Q.     You testified regarding a contract with

7     Nasdaq that relates to a Spot exchange.

8                 Is there a value to Nasdaq from the

9     relationship with BCause?

10         A.     Yes, ma'am.  In fact, Mark Driscoll, in

11    my conversation with him, was very clear that they

12    want to see us succeed and launch, and the reason

13    why is because they've already booked the revenue

14    associated with this contract, and if we were to

15    discount it in bankruptcy, they would have to take

16    that as a loss on their books, and that would

17    reflect negatively on Nasdaq's quarterly report.

18         Q.     Does Nasdaq have the same software

19    relationship with any other cryptocurrency

20    exchanges?

21         A.     No, ma'am, not with crypto, and,

22    frankly, not with any other exchange in the United

23    States.

24         Q.     Based on what you testified as to the

25    relationship with Nasdaq, do you have an

1    understanding of their willingness to continue

2    forward with the relationship with BCause Spot?

3        A.    As I related earlier, in my conversation

4    with Mr. Driscoll, we socialized this idea with

5    them, and they were open to it and have, in their

6    words, run it up the flagpole internal to Nasdaq.

7        Q.    Based on that, do you have any

8    understanding whether Nasdaq would be open to

9    negotiating some part of their claim or possibly

10   accepting payments over time?

11       A.    I believe that's certain.

12       Q.    All right.

13             SBI is one of BCause's largest

14   customers, is that right?

15       A.    They are.

16       Q.    Aren't they also the biggest investor?

17       A.    They are.

18       Q.    Is that about 40 percent?

19       A.    Yes, ma'am.

20       Q.    And BCause is looking to enter into an

21   arrangement with SBI to put about 600 more machines

22   in service, is that correct?

23       A.    Yes, ma'am.

24       Q.    That's, I think you testified, about a

25   net profit to BCause of 42,000 per month?

1     A.     Yes, ma'am, that's approximately right.

2  I mean, that's going to vary on a day-to-day basis

3  depending on the exchange rate, but at the current

4  exchange rate, yes, it would actually be slightly

5  higher than that.

6     Q.     Okay.  So net 42,000 per month, which if

7  you took out the Spot expenses and added in that

8  BMG setoff, we're talking about 182,000 per month

9  additional revenue -- or, I'm sorry, additional

10 bottom line revenue.

11    A.     I would say additional free cash flow or

12 EBITDA, yes, ma'am.

13    Q.     Okay.

14           Do you have an idea of the timeframe for

15 entering into this arrangement with SBI?

16    A.     Uhm, I think it's almost certain that it

17 would be in the same timeframe that we're

18 discussing going through sort of the beginning of

19 August.  I would suspect that SBI would get back to

20 us with a draft agreement in the next week, but we

21 may have some suggested changes that we will make

22 and send back to them.  But within two weeks, we

23 should have an agreed to agreement, contract, and

24 then it will take our staff approximately a week to

25 10 days to put those machines into production.

1        Q.      Given that SBI is your largest

2    shareholder and is looking to enter into this new

3    arrangement with the 600 machines, does this, from

4    your perspective, seem like the actions of a

5    customer looking to terminate their relationship?

6        A.      It's quite the opposite.  In fact, I

7    think both SBI and BMG have a vested interest in us

8    staying in business and being successful.

9        Q.      Do you believe your shareholders --

10   other shareholders besides SBI are also committed

11   to keeping the mining company business operating

12   going forward?

13       A.      Yes, ma'am.  In fact, you know, I

14   mentioned earlier Mr. Adolphi and Mr. Montaine, who

15   are two of our shareholders, are considering

16   investing to fund the fire suppression system or to

17   launch Spot, and there's no reason to suspect that

18   we've lost the faith and trust of any of the other

19   30 or 35 shareholders.

20       Q.      On Friday, some of the questions you

21   were asked were about the depreciation of the fixed

22   assets, and I think you testified that on a tax

23   basis, the fixed assets depreciated approximately

24   1.4 million per year, correct?

25       A.      I believe that to be the case, yes,

1   ma'am.

2        Q.    And that's based on a book value of 16

3   million or so, is that right?

4        A.    Roughly, yes.  It's a 10-year straight

5   line method.

6        Q.    Okay.  But if we're talking about

7   liquidation value, I think in prior hearings you

8   might have testified that somewhere between 900,000

9   and a million, is that right?

10       A.    Yes, ma'am.  We've been told that

11  20 percent is a reasonably good estimate of what

12  could be realized at a liquidation sale.

13       Q.    Is there any reason to think that the

14  liquidation value of the fixed assets would change

15  from now to the end of the year?

16       A.    No, ma'am.  These are long-lived assets.

17  They're racks.  They're transformers, electrical

18  switches, things that have a useful life that's

19  measured in multiples of years, if not decades.

20       Q.    And then you testified regarding an

21  issue with Dominion where there was -- I can't

22  remember if you said a power surge or something

23  along those lines?

24       A.    Power spike is what we were told, yes,

25  ma'am.

1      Q.     Power spike.

2             And that affected some of the equipment

3      at the BCause Mining facility, correct?

4      A.     Yes, ma'am, about 1200 miners is my

5      recollection.

6      Q.     Is there some equipment that was

7      designed to protect against that?

8      A.     They're connected to a series of two

9      sets of transformers that are separated by

10     electrical switches, and then each machine is

11     plugged into what is called a power distribution

12     unit.

13     Q.     Who provided the power distribution

14     units?

15     A.     WESCO did.

16     Q.     Okay.

17            MS. JANCZAK:  That's all I have.

18            THE COURT:  Thank you.

19            Anybody else besides Mr. Agay?

20            Okay.

21            THE WITNESS:  Could I have five minutes?

22            THE COURT:  Sure.  Five minutes.

23            THE CLERK:  All rise.

24                (A recess was had.)

25            THE CLERK:  All rise.

1      MR. AGAY:  May I proceed?

2      THE COURT:  Yes, you may cross.

3                  CROSS EXAMINATION

4  BY MR. AGAY:

5      Q.    Mr. Flake, you testified that you have

6  no reason to believe you've lost the confidence of

7  your shareholders.  Did I hear you testify

8  correctly?

9      A.    Yes.

10      Q.    Okay.  Who's your biggest shareholder?

11      A.    SBI.

12      Q.    Okay.  Aren't they also a director?

13      A.    Well, the corporation is not, but

14  Jonathan Tanemori represents them.

15      Q.    Okay.  So he's a representative of SBI

16  on your Board?

17      A.    He is, yes.

18      Q.    Okay.  And haven't they told you they're

19  not going to renew their hosting agreement?

20      A.    Yes.

21      Q.    Uhm, wasn't Mr. Adolphi on your witness

22  list?

23      A.    He was.

24      Q.    Okay.  Isn't he one of the individuals

25  who was going to help you fund Spot and other

1    things?

2         A.    Yes.

3         Q.    Okay.  Why isn't he here today?

4              MS. JANCZAK:  Objection.

5              THE COURT:  What's your basis?

6              MS. JANCZAK:  I think it goes to

7    judgmental impression and strategy and potentially

8    privileged.

9              THE COURT:  I think he's perfectly

10   capable of asking him that.

11             If we're asking for attorney-client

12   communications, you can tell us.

13   BY THE WITNESS:

14        A.    I don't think we are.

15             We actually believe we may have more

16   than verbal commitments by Friday for the amount of

17   money.  SBI wasn't able to process things

18   internally as fast as we thought.  And so Mr.

19   Adolphi was going to testify to the fact that it

20   was done, and now it seems like it will take an

21   extra week or two.

22   BY MR. AGAY:

23        Q.    Why aren't any of your shareholders here

24   in the courtroom supporting your testimony?

25             MR. CLAR:  Objection, Your Honor.  It

1    has absolutely no relevance.

2              THE COURT:  Overruled.  He can testify.

3    BY THE WITNESS:

4         A.    I couldn't speak to why our shareholders

5    aren't here other than it's at a distance for most

6    of them.  Many of them are in Virginia.  And I

7    don't suspect that there's any value to them being

8    in the courtroom.

9    BY MR. AGAY:

10        Q.    Because your word is golden?

11        A.    I couldn't speak to that.

12        Q.    Okay.

13              Can we -- oh.

14              You also testified that you paid all --

15   the company has paid all of its expenses while in

16   Chapter 11, is that correct?

17        A.    All of the court-approved expenses have

18   been paid, yes.

19        Q.    Okay.  Do you have any idea how much

20   your attorneys have billed to date?

21        A.    No, we don't have any invoices from them

22   at this point other than what we've incurred and

23   paid to the creditors committee attorney and what

24   we paid in terms of the initial retainer to Mr.

25   Clar's firm.

1    Q.    Okay.  I'm sorry, you just said two

2  different things.

3          You mean the initial retainer that you

4  paid to Mr. Clar's firm?

5    A.    Yes.

6    Q.    But you didn't pay a retainer to the

7  creditors committee's firm.

8    A.    I think we paid $10,000 per month, and I

9  think we paid that twice at this point.

10   Q.    Okay.  So do you have any idea how much

11  the creditors committee has accrued to date?

12   A.    I do not.

13   Q.    Have you asked?

14   A.    I have not.

15   Q.    Have you asked your attorney how much

16  they have accrued in fees to date?

17   A.    I have not.

18   Q.    So you don't know.

19   A.    I think I just said that.

20   Q.    Okay.  So you don't know what your legal

21  costs are for the case yet.

22   A.    I only know what we've paid to this

23  point.

24   Q.    Okay.  So those costs are not currently

25  incorporated into your budgets.  Correct?

1          MR. CLAR:  Objection as to foundation.

2    What costs?  Because they clearly are -- what

3    costs?  There's no foundation.

4          MR. AGAY:  Cost of the case.

5          THE COURT:  Sustained.  There's a

6    distinction between what is in a budget and what

7    may be accumulated.  I think that's where the

8    distinction comes in.

9    BY MR. AGAY:

10         Q.   Okay.  So what is already in the budget

11   in terms of your legal costs, those were just

12   estimates that you were provided at the beginning

13   of the case, correct?

14         A.   Yes.

15         Q.   Okay.  So what is currently not in the

16   budget is what has been actually billed by the

17   professionals involved in the case, correct?

18         A.   Only to the extent that what will

19   actually be billed has exceeded the retainer paid

20   to Mr. Clar's firm.

21         Q.   Explain that to me.

22         A.   In other words, the cash, beginning cash

23   and so on in the budget for the week ending May 3rd

24   reflects the expenses -- the -- that was real cash

25   on hand after the retainer was paid to Mr. Clar's

1    firm, so any additional cash due his firm would

2    have to be over and above the $100,000 that was

3    already paid to him.

4         Q.    Okay.  In your budget, you only have

5    $40,000 budgeted for Mr. Clar's firm, correct?

6         A.    I assume you're referring to Slide 11 --

7         Q.    Yes.

8         A.    -- of Exhibit 1.  Yes?

9         Q.    Yes.

10        A.    Yes, that would be $40,000.

11        Q.    And you have no idea if that matches up

12   with what they've actually billed, correct?

13        A.    I do not.  That's correct.

14        Q.    And the $10,000 per month that's in the

15   budget for the creditors committee, you have no

16   idea if that matches up to what they've actually

17   billed, correct?

18        A.    You're correct.

19        Q.    So there could be accrued expenses in

20   this case that haven't currently been budgeted for.

21        A.    There could be.

22        Q.    Okay.  Do you think there likely are?

23        A.    I don't have any way of knowing.

24        Q.    But you haven't asked anybody?

25        A.    I have not.

1    Q.    You mentioned that you're no longer

2    going to be allowed to offset this I think you said

3    it was $70,000 a month for BMG?

4    A.    That's correct.

5    Q.    And that means that BMG has to pay you

6    an extra $70,000 a month.

7    A.    Yes.

8    Q.    Okay.  Why would they pay that to you?

9    A.    I suppose you'd have to ask BMG that.

10    Q.    Well, no.  You testified that they're

11    going to pay you an extra 70 grand a month.

12    A.    I testified that I no longer would be

13    able to cap that as an offset.

14    Q.    Okay.  But why would they pay you that

15    $70,000?

16    A.    That's actually fair market value for

17    the service they receive.

18    Q.    And what happens if they don't pay you

19    the $70,000?

20    A.    I suspect we'll have a discussion with

21    BMG at that time.

22    Q.    Okay.  How are you going to be able to

23    enforce against them the ability to pay you an

24    extra $70,000?

25    A.    I suppose we'll cross that bridge when

1    we get to it.

2        Q.    Okay.  But Ms. Janczak asked you if

3    you're going to have an extra 70 grand a month in

4    your budget because there's an extra 70 grand

5    coming in for BMG, correct?

6            MS. JANCZAK:  Objection.

7    BY THE WITNESS:

8        A.    I don't believe that was her question.

9    BY MR. AGAY:

10       Q.    What was her question?

11       A.    You'd have to read it back.

12       Q.    Do you think you are going to have an

13   extra $70,000 a month from BMG in revenues coming

14   in going forward?

15       A.    I do believe we will.

16       Q.    Okay.  Why would they pay that to you?

17           MR. CLAR:  Asked and answered.

18           MR. AGAY:  He hasn't answered.

19   BY THE WITNESS:

20       A.    Because they've historically paid their

21   invoices.

22   BY MR. AGAY:

23       Q.    Okay.  And what are you going to do if

24   they don't pay that 70,000?

25       A.    We'll have a discussion with them at the

1    time.

2           Q.    Will you kick them out?

3           A.    That's one recourse.

4           Q.    Okay.  And what would happen if you kick

5    them out?

6           A.    I suppose our revenue and profits would

7    drop.

8           Q.    By how much a month?

9           A.    Revenue would drop by about $200,000.

10          Q.    Oh, okay.  It would be a big hit, right?

11          A.    It would be.

12          Q.    You talked about how valuable you are to

13   Nasdaq.  Did I understand your testimony correctly?

14          A.    I think that's right.

15          Q.    You're certain that they will negotiate

16   their claim?

17          A.    I have no reason at this point, based on

18   ongoing discussions I've had with Nasdaq

19   representatives, to believe anything else.

20          Q.    Okay.  Is Nasdaq here as a witness?

21          A.    They are not.

22          Q.    Okay.  Do you have anything in writing

23   from Nasdaq?

24          A.    E-mails, yes.

25          Q.    Okay.  Where are they?

1          A.      In my e-mail.

2          Q.      Okay.  Why aren't they here as evidence?

3                  MR. CLAR:  Objection, Your Honor.  There

4    could be any number of reasons for that having to

5    do with Attorney-Client Privilege.

6                  THE COURT:  Overruled to the extent that

7    it calls for a non-attorney-client-privileged

8    communication.

9                  THE WITNESS:  Well, it also calls for me

10   to conclude what is going on in Nasdaq's mind,

11   ma'am, and I don't know.

12                 THE COURT:  Fair enough.

13   BY MR. AGAY:

14         Q.      Okay.  Do you have any written evidence

15   here in court today, which is a pretty big day,

16   that Nasdaq is going to continue to support the

17   company other than your word?

18         A.      We do not.

19         Q.      So you have this nice exhibit,

20   Exhibit 11, that charted the price of bitcoin.  I

21   don't know if this is accurate, and I don't think

22   it was admitted into evidence, but for what it's

23   worth, it shows bitcoin peaking in 2018, bottoming

24   out at the end of 2018, then '19, and then

25   progressively trending upwards until today.  Am I

1    understanding this correctly?

2         A.    Yes.

3         Q.    I think I saw in the elevator today that

4    bitcoin is up over 170 percent this year.  Does

5    that sound right?

6         A.    It sounds like it's actually low.

7         Q.    You think it's up more?

8         A.    I think in January, we may have been

9    about 4,000, and we are currently at about 11,000.

10   That sounds like at least 170 percent.

11        Q.    Have you added any new customers during

12   that period of time?

13        A.    Are you counting or not counting the

14   agreement with SBI?

15        Q.    What agreement with SBI?

16        A.    The one that we presented earlier --

17        Q.    We'll get to that in a second.

18        A.    -- or we discussed earlier.

19        Q.    We'll get to that in a second.

20              I'm not counting that.

21        A.    You're not counting that?

22        Q.    No.  So other than that.

23        A.    Other than that, no.

24        Q.    Okay.  Have any of your existing

25   customers during that period of time informed you

1    that they were going to renew their hosting

2    agreements?

3         A.    They have not.

4         Q.    Have you received any additional funding

5    commitments during that period of time?

6         A.    Only verbal.

7         Q.    Okay.  And those are -- that's the 350

8    or 500 that you talked about --

9         A.    Yes, sir.

10        Q.    -- as relates to Spot.

11             Okay.  So we talked about this agreement

12   with SBI . And I put agreement in quotation marks.

13   This document wasn't admitted into evidence.  But

14   when did you first start discussing this agreement?

15        A.    Sometime in mid May.

16        Q.    Mid May?

17        A.    Yes, sir.

18        Q.    Okay.

19        A.    I would say approximately May 10, but it

20   may slide a day or two.

21        Q.    I'm sorry, what?

22        A.    Approximately May 10.

23        Q.    Why wasn't this in your business plan?

24        A.    We've tried to be very conservative in

25   our business plan, so we haven't shown any revenue

1    we don't think is guaranteed.

2        Q.    Oh.  And now you think $42,000 a month

3    is guaranteed?

4        A.    You'll see that it's not reflected in

5    the budget that we're suggesting that the court

6    approve for the next --

7        Q.    So I'm asking do you think $42,000 a

8    month is guaranteed?

9        A.    I believe it's likely.

10       Q.    Okay.

11             And where do you have in writing that

12   SBI has agreed to this arrangement?

13       A.    Well, the e-mail in your possession

14   shows the very high level detail or very high level

15   description of the detail, but I don't have a

16   formal contract with them yet.

17       Q.    Okay.  In your view, is this a contract?

18       A.    No.  My view it is not.

19       Q.    Okay.

20             And where in this document or any other

21   document that's in front of the court do you set

22   forth this new revenue stream from SBI in any level

23   of detail or not detail?

24       A.    We haven't.  As I've explained, we

25   didn't include any revenue in the budget that we're

1    proposing to the court other than what we thought

2    was very certain.

3         Q.    Okay.  So, again, we're just taking your

4    word for it.

5              That was a question.

6         A.    Oh, I heard a period at the end of that

7    statement.

8              Yes, I suppose you're taking my word for

9    it.

10        Q.    So you said that -- I'm skipping around

11   a little bit, so I apologize.

12             You said that you currently obtained

13   licenses in six states for a money transmitter --

14   I'm sorry.  Strike that.

15             I thought I heard you say that you

16   obtained money transmitter and business licensure

17   licenses in six states.  Did I hear you right?

18        A.    I believe I said if we open tomorrow, we

19   could legally operate in six states.

20        Q.    Okay.  And do you legally operate in

21   those states because you obtained licenses?

22        A.    Licenses and business registration.

23        Q.    What license have you obtained?

24        A.    FinCEN registration on a national level

25   and --

1     Q.     Isn't FinCEN registration -- it's just

2     this form that you submit?  There's no approval?

3     A.     I think that's your impression from Mr.

4     Grede.  It's a little bit more than that.

5     Q.     Okay.  So what is it?

6     A.     You have to demonstrate sort of who you

7     are and who the representatives of your company are

8     and the way in which you intend to do business and,

9     in particular, the way in which you will follow

10    American AML and KYC laws, American anti-money

11    laundering and know your customer laws.

12    Q.     Have you presented any evidence or

13    anything in writing or other evidence that that has

14    occurred?

15    A.     No.  Mr. Grede and I both testified to

16    it.

17    Q.     Okay.  Well, Mr. Grede just testified

18    that all you had to do was submit a piece of paper.

19    You disagree with him, but we don't have any

20    evidence other than what you're saying, correct?

21    A.     What I am saying is both Mr. Grede and I

22    testified that, in fact, BCause had received its

23    FinCEN registration.  Where we differ is on the

24    details of what is necessary to obtain that.

25    Q.     Okay.  What about the six states?

1     A.     Yes.

2     Q.     What have you received in those states?

3     A.     Either or both money transmitter where

4  it's required and registration as to do business in

5  those states.

6     Q.     Okay.  Do you have any written evidence

7  here today around that?

8     A.     No.

9     Q.     In terms of Nasdaq, who is the Nasdaq

10  license currently with?

11    A.     I believe it's with BCause LLC.

12    Q.     Oh, so it's not with BCause Spot.

13    A.     Correct.

14    Q.     So how is the license going to move from

15  BCause LLC to BCause Spot?

16    A.     I believe that would be a condition

17  precedent to us launching, and we would negotiate

18  that with Nasdaq.

19    Q.     Okay.  But that hasn't occurred?

20    A.     It has not.

21    Q.     Is there anything in writing from Nasdaq

22  about their commitment to the company?

23    A.     I mentioned an e-mail earlier that you

24  said was not in evidence.

25           So other than the e-mail exchange and

1     phone conversations that I had with Nasdaq and

2     Nasdaq representatives, no.

3          Q.     Is Nasdaq here in the courtroom?

4          A.     They are not.

5          Q.     So you testified earlier about Mr. Grede

6     signing the confession of judgment and something

7     you testified for which he didn't have authority,

8     correct?

9          A.     That's my opinion, yes.

10         Q.     Okay.  I think you testified that

11    signing the confession of a judgment by Mr. Grede

12    was a quote-unquote deal killer or a quote-unquote

13    show stopper.  Am I getting that correctly?

14         A.     You did.  That was in an e-mail in

15    October.

16         Q.     What did you mean by that, a deal killer

17    or show stopper?

18         A.     There were conditions in the --

19    particularly not the promissory note, but the

20    confession of judgment which I felt were

21    particularly onerous, meaning that originally WESCO

22    asked for personal guarantees from all of the

23    officers of the company, and WESCO asked for a

24    pledge of all the assets of all the subsidiaries,

25    and WESCO asked for several other terms and

1    conditions under the terms of the confession of

2    judgment which I felt were both overreaching,

3    unnecessary and would lead to the detriment of the

4    company.

5         Q.    Okay.  What do you mean by detriment to

6    the company?

7         A.    Meaning that one particular issue was

8    that if we defaulted with any -- with any other

9    creditor, WESCO would also receive, like, summary

10   judgment.  I don't know if that's the right legal

11   term or not.  But, essentially, there was terms in

12   that agreement that pertained to other folks, and

13   so I felt it would hamper our ability to negotiate

14   with all of our creditors.

15        Q.    Okay.  So how -- you mentioned hampering

16   the ability to negotiate with other creditors.

17             How else would it impede the company?

18        A.    It would -- it reduced our ability to

19   negotiate with WESCO as well.

20        Q.    So when you said show stopper/deal

21   killer, you're just saying it hampered your ability

22   to negotiate with WESCO and other creditors, is

23   that your testimony?

24        A.    Yes.

25        Q.    You didn't mean anything more than that?

1      A.    No.

2      Q.    Okay.

3            Oh, I think you said that SBI is also

4  discussing internally funding Spot?  Did I hear

5  that?

6      A.    Yes.

7      Q.    Is that anywhere in writing?  Any

8  evidence of that?

9      A.    No.  But I do have an e-mail where Mr.

10 Tanemori requested a term sheet.

11     Q.    Where is that e-mail?

12     A.    On my computer.

13     Q.    Okay.  Computer is not here, is it?

14     A.    It is not.

15           Well, no, actually my computer is here.

16     Q.    Okay.  Is it in evidence?

17     A.    It is not.

18     Q.    Okay.

19           So you pointed to this slide here.  And

20 I apologize.  I don't know what number slide it is.

21 It's Debtor's Exhibit 1.  It's Fallback Plan and

22 Option 1 Mining Only.

23     A.    Slide 26, I believe.

24     Q.    This is where you kill Spot?

25     A.    Yes.

1    Q.    And you said that there's a backup plan

2    if Spot doesn't go forward, right?

3    A.    Yes.

4    Q.    Now, on this slide, the fourth bullet or

5    hash, whatever you say, it's a hashmark, but I'll

6    call it a bullet, it says:  Mining.  Business may

7    not be sustainable long term relative to scale,

8    cost of power, business synergy, other value-added

9    services.

10         What does that mean?

11   A.    Which part?  The whole thing or one

12   particular clause?

13   Q.    Let's start with the whole thing.

14   A.    Excuse me for a second.

15         It is -- well, we have testified

16   throughout and I think both parties are agreed that

17   while we don't have direct access or direct

18   exposure to bitcoin, our customers do.  And

19   currently and for the last six months, bitcoin has

20   been going up, but it's equally true to say that

21   the bitcoin did drop to 3200 in December.  And so

22   were we to experience a pullback like that, there

23   is some risk.  And that's the long-term

24   sustainability.

25         As far as business synergy and other

1    value-added services, we anticipate that folks that

2    mine with us would also need to convert the

3    proceeds of that mining into fiat currency, and

4    that if we weren't running an exchange, those --

5    that added business would no longer be available to

6    us.

7         Q.    It mention the price of bitcoin in that

8    little bullet there?

9         A.    It does not.

10        Q.    And just remind me.  Bitcoin has been

11   going up since the beginning of the year, correct?

12        A.    Since December 13th.

13        Q.    Okay.  Over 170 percent, 200 percent,

14   whatever it is?

15        A.    Yes.

16        Q.    Have you added any new customers since

17   then?

18        A.    I think you asked that.

19        Q.    I did.  You can answer.

20        A.    We have not.

21        Q.    And have any of your existing customers

22   said they're going to renew?

23        A.    And again --

24             MR. CLAR:  Objection, Your Honor --

25   BY THE WITNESS:

```
1         A.      -- not including the SBI --

2              MR. CLAR:  -- asked and answered.

3              THE COURT REPORTER:  I'm sorry.  All

4    three of you were talking at the same time.

5              MR. CLAR:  I'm sorry.  But I wanted a

6    chance to object that both of these -- all of these

7    questions over the last two minutes have been asked

8    and answered.

9              MR. AGAY:  Not all of them.  Just the

10   last two.

11             THE COURT:  Sustained as to the last

12   two.

13             THE COURT REPORTER:  And can you just

14   repeat what your question was because I'm not sure

15   I got it all.

16             MR. AGAY:  Just strike that.

17   BY MR. AGAY:

18        Q.     Under this bullet "mining," you talked

19   about the cost of the power.  What's the issue

20   there?

21             MR. CLAR:  What slide are you on?

22             THE WITNESS:  26.

23             MR. AGAY:  The same.

24   BY MR. AGAY:

25        Q.     It talks about cost of power as being an
```

1    impediment to the business if I'm interpreting it

2    correctly.

3         A.    It doesn't specifically say that's an

4    impediment.  But to the degree that we can improve

5    our costs, that is one consideration that potential

6    customers take into consideration when deciding on

7    location to mine their -- or to host their

8    computers.

9              To the extent we can improve upon our

10   cost framework, we can pass that on to the

11   customers and become more competitive.

12        Q.    Okay.  So you are not as competitive

13   because of the cost of your power, is that correct?

14        A.    Well, we have attracted customers, and I

15   believe we will continue to attract customers at

16   our current cost framework.  We can become more

17   cost effective and, thus, more competitive.

18        Q.    My question was as to the cost of power.

19        A.    Um-hum.

20        Q.    Do you think you're at a competitive

21   disadvantage because of the cost of your power?

22        A.    It's one consideration that the

23   customers have when they select a mining site.

24   It's not the only consideration.

25        Q.    I'm asking you what you think.  Do you

1    think you're at a competitive disadvantage because

2    you --

3         A.    We don't compete on cost, generally.  We

4    compete on value.  And on a value consideration,

5    we're not at a disadvantage at all.

6         Q.    Okay.

7               Now, in this business plan, didn't you

8    propose to convert your power source?

9         A.    We did.

10        Q.    Okay.  Why?

11        A.    Well, at a minimum, that would improve

12   our margins.

13        Q.    Okay.  But you're losing money now.

14        A.    No, we're not.  We're EBITDA positive

15   and have been since August of last year.

16        Q.    Okay.  But -- so what's the plan to

17   convert your power source?

18        A.    So we signed an agreement in February

19   with GRC Green Hosting for them to install gas

20   turbine generators on-site, and in conjunction with

21   that agreement, that would lower our price to about

22   $50 per megawatt.  We're currently paying about $53

23   per megawatt.

24        Q.    Okay.  So it would reduce your cost of

25   power?

1         A.      It would.

2         Q.      Okay.  You said you have an agreement

3    with the power company?

4         A.      Not the power company.  GRC Green

5    Energy.

6         Q.      And are there any strings attached to

7    that?

8         A.      Could you define "strings"?

9         Q.      Are there any conditions to that

10   agreement?

11        A.      That we would buy power from them, I

12   believe, for five years at that $50 per megawatt,

13   and it would be --

14        Q.      And is it also conditioned that they go

15   out and raise money to fund the cost of converting

16   you?

17        A.      There is.

18        Q.      And have they raised that money?

19        A.      They have not.

20        Q.      Oh.  And when would that go online if

21   you were able to consummate it?

22        A.      Well, from the time that they raise the

23   money until the time it goes online, we've

24   estimated at six months.

25        Q.      We talked about or you talked about

1    Slide 11 on the business plan, and you talked about

2    if you kill Spot, excuse me, you eliminate $70,000

3    a month in -- per month in expenditures.  Did I get

4    that number right?

5         A.    Yes, sir.

6         Q.    Are we just counting the line items with

7    the arrows?

8         A.    The line items with the narrows plus the

9    net effect on payroll.

10        Q.    Okay.  So do that math for me.

11        A.    Okay.

12              So you'll notice that payroll drops from

13   73,848 to 21,640.  Do you see where I'm talking

14   about?

15        Q.    73,848.  Yes, I do.

16        A.    Okay.  So that's a net drop of $52,000

17   in round numbers, okay?  And that's every two

18   weeks.  But you have to add back in the payroll

19   that's now accounted for on the mining sheet.

20              So from that 52, you take the payroll

21   from mining, which is 18,000.  You're left with

22   34,000 every two weeks.  You multiply that 34,000

23   by 2, and you end up at 68.

24              And if you add in back benefits, because

25   that's just payroll, then you end up with a -- at a

1   number north of 70,000.

2        Q.    Okay.  Are you saying the $52,000 is

3   moving over to Spot?  Is that what you're saying?

4        A.    I'm saying if you look at the Spot roll,

5   that $36,711 moves to Spot, and that's on Slide 13,

6   I think.

7        Q.    Okay.  So what happens -- so I'm just

8   doing the math.

9        A.    Okay.

10        Q.    73,848 minus 21,640 is -- one second --

11   so just sticking with Holding right now, Slide 11.

12        A.    Yes.

13        Q.    This says that starting in August,

14   you're going to kill about $52,000 in expenses.

15   Correct?

16        A.    Well, we're going to reduce Holdings

17   payroll expenses by $52,000, but some of that moves

18   to Mining.

19        Q.    Oh, so --

20        A.    So you have to add back in the Mining

21   amount, and that is $18,016.

22        Q.    Okay.  So what are you actually shedding

23   from the debtors?

24        A.    The amount that you see on Spot, which

25   is approximately $36,000.

```
 1          Q.    Oh, okay.  So it's not 52,000.  It's
 2     36,000.
 3          A.    That's what I said.
 4          Q.    Okay.  So then -- so let's start with --
 5     so your plan is that if you eliminate Spot, you
 6     eliminate $36,000 in wages.  You're going to lay
 7     those people off, --
 8          A.    Yes, that's right.
 9          Q.    -- is that correct?
10          Okay.
11          And are you aware if you're going to
12     have any severance or other tail obligations to
13     those employees?
14          A.    We wouldn't.
15          Q.    Okay.  Why is that?
16          A.    Is it a requirement in the State of
17     Illinois that I have --
18          Q.    I'm just asking you.
19          A.    That's why I say it.  Because it's not a
20     requirement.
21          Q.    Okay.  So you are going to lay off --
22     those are employees you'd lay off in Illinois?
23          A.    Yes.
24          Q.    Okay.  So if it's 36,000, not 52, then
25     when you say you're going to eliminate expenditures
```

1    by killing Spot, it's less than 70,000 a month,

2    right?

3        A.    No.  You're only counting the payroll

4    expenditures.  If you look at the other arrows --

5        Q.    Um-hum?

6        A.    -- you have to add in the 18,000 for CCA

7    Financial, the $3300 for Century Link, and so on.

8    And once you've added those all together, and

9    realize the payroll is twice a month, not once a

10   month, then you end up with a number far in excess

11   of $70,000.

12       Q.    Got it.

13       A.    Just to make sure, I did answer your

14   question, right?

15       Q.    But your business -- you did.

16             But your business plan right now in

17   terms of the go forward is to continue with Spot.

18       A.    It is.

19       Q.    Okay.  And if -- even if you're able to

20   eliminate the $70,000 in expenditures by killing

21   Spot, what does that do to make up for lost

22   revenues?

23       A.    Which lost revenues are you referring

24   to?

25       Q.    When your customer hosting agreements

1    terminate at the end of the year.

2         A.    So that doesn't happen in the frame that

3    we were requested to provide, and when it does, I

4    believe we'll have an answer for that.

5         Q.    Okay.  I think -- could you turn to

6    Slide 10?

7         A.    Yes, sir.

8         Q.    We talked a little bit about the

9    maintenance and repairs line item of $20,000 a

10   month, and I think you said it's like a good rule

11   of thumb for industry, right, 2 percent?

12        A.    Yes.

13        Q.    Okay.  Could you show me on this budget

14   or any other budget where it reflects the expense

15   for the fire suppression system?

16        A.    It does not.  This is an operating

17   expenditure budget, not a Capex budget.

18        Q.    Oh, okay.  But we do know that you're

19   going to have to spend that money.

20        A.    At some point, yes.

21        Q.    Okay.  So where does it show that that's

22   going to be coming out of your bank account?

23        A.    It doesn't.  It's not envisioned that it

24   will come out of our bank account in this frame.

25        Q.    Okay.  When will it come out of your

1    bank account?

2        A.    Shortly after we've raised the money and

3    gotten approval from the court to make that

4    expenditure.

5        Q.    You're going to raise the money for the

6    fire suppression --

7        A.    Yes.

8        Q.    Where in this business plan does it say

9    you're going to raise the money for that fire

10   suppression system?

11       A.    If you look at Page 18.  It doesn't say

12   we're going to raise it.  It says BFP is

13   prioritized due to the necessity to complete the

14   fire suppression system or be forced out of

15   business by the fire marshal.

16             This slide deck has been shared with our

17   Board, and Mike Adolphi is efforting to raise the

18   associated money.

19       Q.    Okay.  But it doesn't say that here,

20   does it?

21       A.    It does not.

22       Q.    And Michael Adolphi is not in the

23   courtroom, is he?

24       A.    He is not.

25       Q.    Anybody else in the courtroom that can

1    provide evidence to this?

2        A.    No.

3        Q.    Do you have anything in writing which

4    talks about this money you're going to raise?

5        A.    No.

6        Q.    So we talked about the decrease in

7    revenues as a result of the storm damage, I

8    believe, correct?

9        A.    Yes.

10        Q.    All right.  By how much a month did your

11    revenues go down?

12        A.    About six and a half percent.

13        Q.    Dollar amount?

14        A.    Approximately $70,000.

15        Q.    All right.

16            And I think you said that there was a

17    corresponding decrease in -- by way of reduced

18    power usage, correct?

19        A.    There was, yes.

20        Q.    How much?

21        A.    Approximately, $45,000.

22        Q.    $45,000 a month?

23        A.    Yes.  Approximately.  I mean, we just

24    got the numbers from Mr. Russell on Friday.  And it

25    looks like where we had billed or we had projected

1    the electric bill would be about $660,000 on a

2    recurring basis, it looks like our current bill is

3    going to be about $613,000.

4         Q.    Okay.  So they haven't offset the

5    reduced revenues.

6         A.    Who hasn't offset what reduced revenues?

7         Q.    The reduced power bills.

8         A.    Who is "they" in that context?

9         Q.    Your revenue loss has not been

10   completely offset by the reduced power bill.

11        A.    No, not completely.

12        Q.    And we don't know when those revenues

13   are going to recover, right?

14        A.    No.  We're currently working through the

15   claims process with Dominion Power.

16        Q.    What do you mean by the claims process

17   with Dominion Power?

18        A.    The equipment was clearly damaged by a

19   fault that happened on the grid, and they have a

20   claims process.

21              We've talked to Mr. Russell, who is our

22   representative at Dominion.  He referred us to a

23   particular woman.  We've entered a claim, and we're

24   waiting for the results of that claim.

25        Q.    So you're waiting for Dominion to pay

1    you back?

2         A.    Yes.

3         Q.    And you think that's going to happen

4    quickly?

5         A.    I have no way of knowing.  It's the

6    first time we've done -- worked through the

7    process.

8         Q.    I also think you testified that you've

9    had daily correspondence with SBI and BMG, correct?

10        A.    I don't think I said daily.

11        Q.    Okay.

12        A.    I think Mr. Grede said daily.

13        Q.    Okay.  How often?

14        A.    I would say probably two or three times

15    a week.

16        Q.    Okay.  What are you talking about with

17    them?

18        A.    It varies depending on the conversation.

19              Sometimes it's with Mr. Tanemori, and it

20    has to do with Board matters.  Sometimes it's with

21    Mr. Smith, and it has to do with the hosting

22    agreement that we are negotiating.

23        Q.    Okay.  During any of those

24    conversations, have either of those representatives

25    indicated that either SBI or BMG would renew their

1    hosting agreements?

2         A.    They haven't, but we haven't asked that

3    question.

4         Q.    Why not?

5         A.    Because the hosting agreement is not up

6    until November, and you've seen what the bitcoin

7    price has done since January, and it seems

8    premature to have that conversation.

9         Q.    So you're going to wait until November

10   to have that conversation?

11        A.    No, but it seems October is a more

12   appropriate time.

13        Q.    You're going to wait until October?

14        A.    Yes, that's our intention.

15        Q.    Okay.

16        A.    Because in the agreement itself, as you

17   know, we talked about this when I testified on

18   Friday, they have to provide a 60-day written

19   notice.  Today it would be more like 180-day

20   written notice.

21        Q.    Okay.  But 60 days is in September.

22        A.    Perhaps it is.

23        Q.    Okay.

24        A.    But I think it's the end of September,

25   right?

1      Q.    So you're going to wait until the end of

2   September.

3      A.    We're going to wait until the 60-day

4   window.

5      Q.    Okay.

6            Have you had any conversation with St.

7   Bitts?

8      A.    Not since our attorney and them

9   corresponded regarding their ability to turn off

10   service due to the bankruptcy.

11      Q.    How long ago was that?

12      A.    Three weeks perhaps.

13      Q.    That was three weeks ago?

14      A.    I believe so.

15      Q.    I thought you said it was at the

16   beginning of the case, which was April 11th.

17      A.    I don't remember exactly, but what I do

18   remember is they notified me that they would like

19   to secure hosting with us under the bankruptcy

20   clause.

21            I referred that to Mr. Clar.  He had

22   correspondence or a conversation with them, and I

23   have not spoken with them since.

24      Q.    All right.  So they tried to terminate

25   your agreement.  Mr. Clar got on the phone with

1    their attorney and talked them out of it, but you

2    haven't talked with them since.

3         A.    That's correct.

4         Q.    And when are you going to have a

5    conversation with them about renewing their hosting

6    agreements?

7         A.    Probably in October.

8         Q.    Okay.  You talked about the liquidation

9    value of the company at length with Mr. Clar.  Can

10   we just do the math real quick on what you think

11   that number is?

12        A.    Sure.

13        Q.    Starting with noncash assets, based on

14   your bankruptcy schedules and the other testimony

15   you've provided, what do you think the value of

16   your noncash assets are on a liquidation basis?

17        A.    Approximately $1 million if you're

18   talking liquidation of the physical assets.

19        Q.    Okay.  $1 million.

20              What if you include the cash assets as

21   of today?

22        A.    Approximately, one and a half million

23   dollars as of today.

24        Q.    I thought you said there's 650 in the

25   bank.

1          A.     Okay $1.65 million to be more precise.

2          Q.     Any other cash equivalents that would

3     have liquidation value?

4          A.     No, I don't think so.

5          Q.     Any receivables?

6          A.     Well, there's another -- if you're

7     considering those cash equivalent, there are

8     receivables that would be paid on or about July 1st

9     that are also valued at about 900,000 in addition.

10         Q.     Okay.

11         A.     Or almost a million dollars additional.

12         Q.     So you think it's like 2.4 million?

13         A.     That sounds about right.

14         Q.     Okay.

15         A.     Actually, if we said 1.65, it would

16    actually be about 2.6.

17         Q.     So the liquidation value today of the

18    company may be 2.6 million.

19         A.     That sounds about right.

20         Q.     Okay.  Any other assets we're missing?

21         A.     No, I don't think so.

22         Q.     Okay.

23                What about the intellectual property for

24    Spot?

25         A.     Yes.

1          Q.     Okay.  Does that have any value?

2          A.     I don't think that it does as a written

3     piece of software.  I think it does as an

4     operational concern.

5          Q.     Okay.

6          A.     That's actually one of the reasons we

7     want to launch Spot is because we think it has more

8     value to the creditors.

9          Q.     So if it doesn't have any value other

10    than as an operating entity, how does it have any

11    replacement value today?

12         A.     Well, that would be why somebody would

13    pay us that amount of money for those assets is

14    because if they wanted to get in the exchange

15    business, it would provide them with the assets

16    necessary, some of the licensing, some of the

17    registration, and some of the software necessary to

18    do that, and it would shortcut their time to market

19    by 18 months.

20         Q.     I just have one last question.

21                So given your optimism about the company

22    and the promises or pledges you received about -- I

23    shouldn't -- Strike that.

24                Given your optimism about the company

25    and the commitments -- the funding commitments you

1    received, why don't you just raise that money and

2    buy the company out of bankruptcy?

3         A.    I don't think that that's the way to

4    provide the creditors with the maximum return.

5              Part of our settlement with the

6    creditors is to offer them 33 percent of their debt

7    and equity, and if we simply bought the company

8    from the bankruptcy, if some group of investors

9    decided to buy the Spot exchange out of the

10   bankruptcy, I don't think that's the way to

11   maximize the return for the creditors who have

12   accepted equity.

13             MR. AGAY:  Okay.  I don't have any

14   further questions.

15             THE COURT:  Okay.  Any redirect?

16             MR. CLAR:  No, Your Honor.

17             THE COURT:  Okay.

18             Any other witnesses?

19             MR. CLAR:  I do not.

20             THE COURT:  Mr. Agay?

21             MR. AGAY:  No, I do not.

22             THE COURT:  Then we concluded all the

23   testimony.

24             It's 25 to 3:00.  Do you want to take a

25   recess until 4:00 and then do concluding statements

1    or can you get them done in 25 minutes?

2           MR. CLAR:  I think I can get mine done

3    in less than 25 minutes.

4           MR. AGAY:  Uhm --

5           THE COURT:  It's kind of like not a

6    choice because I have to be conducting a call at

7    3:00.

8           MR. AGAY:  No, I understand.  I think

9    it's best, Your Honor, I'm not going to take an

10   hour, but I might take a half hour, and just for

11   continuity purposes why don't we come back at 4:00

12   and knock it off there.

13          THE COURT:  Okay.

14          Yes?

15          MR. CRAIG:  Your Honor, I represent

16   Dominion.  I'm John Craig.  I am going to leave

17   after three.  I have a flight back.  I have local

18   counsel here.

19          THE COURT:  I understand.

20          MR. CRAIG:  I represent Virginia

21   Electric.

22          THE CLERK:  All rise.

23          Court is in recess until 4:00 o'clock.

24              (A recess was had.)

25          THE COURT:  Mr. Agay.

1          MR. AGAY:  Good afternoon again, Your

2     Honor.

3          May I proceed with wrap up?

4          THE COURT:  Yes, you may.

5          MR. AGAY:  Your Honor, we're here on our

6     motion to dismiss under 1112(b), or in the

7     alternative to lift the automatic stay under

8     362(d).

9          Cause for dismissal under 1112(b) is

10    substantial or continuing loss or diminution,

11    absence of reasonable likelihood of rehabilitation,

12    gross mismanagement, inability to consummate a

13    Chapter 11 plan, or, fifth, filing of the

14    bankruptcy solely to trigger the automatic stay or

15    filing on the eve of a foreclosure.  That is

16    resolution of essentially a two-party dispute.

17         Without a reasonable turnaround plan,

18    the court should not allow the debtors to accrue

19    additional administrative cost while other

20    prepetition creditors remain unpaid.

21         As against our motion, the debtors'

22    burden is to demonstrate unusual circumstances why

23    dismissal is not in the best interests of the

24    creditors in the estate.  I don't think they've

25    carried that burden of proof here.  And I'd also

1    say that to the extent that either the debtors or

2    the creditors committee would argue they would like

3    to try to avoid WESCO's liens, that does not count

4    as unusual circumstances to maintain these cases.

5         To lift the automatic stay for cause, we

6    had to show lack of adequate protection, lack of

7    equity in the property, or that the property is not

8    necessary for an effective reorganization.

9         I would submit to Your Honor that we've

10   shown not only cause to lift the automatic stay,

11   but cause for dismissal under 1112(b).

12        Your Honor, the uncontroverted facts are

13   as follows:

14        The only reason the debtors filed for

15   bankruptcy was to invoke the automatic stay and

16   block WESCO's garnishment.  That was Mr. Flake's

17   testimony.  That was Mr. Grede's testimony.  And

18   that's been consistent throughout these cases.  In

19   and of itself, that's cause to dismiss these cases.

20        Your Honor, the debtor is likely to be

21   out of business by the end of November of 2019, if

22   not sooner.  The SBI, St. Bitts and BMG hosting

23   agreements account for 970,000 or 95 percent of the

24   debtors' revenues.  Those are expiring,

25   evaporating, at the end of November.

1      SBI has told the debtor it will not

2  renew, and SBI is also the debtor's biggest equity

3  holder and a director on the Board.

4      St. Bitts already tried to terminate at

5  the beginning of the case and have been radio

6  silence since then.

7      We now know that the debtors will be

8  fighting with BMG over their claims and to recoup

9  unpaid hosting fees.  So as Mr. Shaw, I think, has

10  signaled to the court, there are issues on the

11  horizon with his client.

12      Even losing one of those customers would

13  be disastrous for this debtor, and they may lose

14  all three.  Those facts are uncontroverted, Your

15  Honor, and the debtors did not produce any evidence

16  written or otherwise that those agreements are

17  going to be extended past the end of November.

18      In fact, Mr. Flake said he's not even

19  going to start the conversation with those

20  customers until October or thereabouts, which, to

21  me, is completely insane in light of the debtors'

22  precarious position.

23      And that gets to some more themes that

24  will come out of some of the evidence and that have

25  come out in some of the evidence and which I'll

1    summarize as part of this.

2          Mr. Grede testified that the business is

3    fixed revenues and fixed costs; therefore, when the

4    revenues disappear, the business expires, period.

5    It's simple math.

6          Mr. Flake at various points has tried to

7    say, well, as revenues go down, the cost of our

8    power goes down, and we can move this line item

9    over here to Spot or reduce this cost, but the fact

10   is, as we've shown, as revenues have gone down,

11   costs have not gone down apace.

12         To the extent that they want to shift

13   these costs over to Spot, Spot is never going to

14   get off the ground.  They're never going to raise

15   the money.

16         They have not received and will not

17   receive regulatory approvals.  Nasdaq is not going

18   to get paid and will not support the business, and

19   the debtor is in the process of completely losing

20   their Chicago presence.

21         So you lose Spot, and the revenues of

22   Mining expire at the end of the year.  There is no

23   business here, unfortunately.  I mean, I don't

24   relish that.

25         In response, the debtors say not true.

1    We're working with SBI to renew.  Well, they're not

2    working with SBI to renew.  They have some sort of

3    new business arrangement with SBI where they're

4    going to lease their computers.  That just came up

5    today.

6              They received oral commitments for money

7    for Spot.  They will obtain necessary regulatory

8    approvals.  Nasdaq will support.  They're going to

9    rebuild their Chicago presence.  Well, the only

10   evidence that you have is Mr. Flake's

11   representations.  There's nothing in writing.  None

12   of the equity holders have shown up.  None of the

13   supposed investors who are funding these

14   commitments have shown up.  Nasdaq has not shown

15   up.

16             Effectively, the evidence Your Honor has

17   heard is that this business should continue because

18   Mr. Flake thinks it should continue, which runs in

19   the face of all of the other evidence that Your

20   Honor has seen.

21             So then the question is why not let the

22   cases continue to see if the debtors can conjure up

23   a miracle.  We have until November to see if these

24   agreements will renew or if the price of bitcoin

25   goes through the roof and all of a sudden the

1    debtors' services are in demand.

2              Well, the answer is, Your Honor, that in

3    the meantime, WESCO is not adequately protected,

4    and our collateral and the estates are quickly

5    deteriorating.  The uncontroverted written evidence

6    is that the debtors have only 4 to $500,000 worth

7    of property insurance coverage for assets with a

8    book value of over $10 million.  That's the

9    evidence in the record.  That is irresponsible.

10             You heard about the power outage at the

11   facility, and the revenues have already dropped

12   because of it.  Who knows?  There could be another

13   power surge or a storm or whatever and the place

14   burns down, and there's 4 to $500,000 of coverage

15   for that collateral.  Plainly deficient.

16             The debtors' cash position is

17   deteriorating.  For the weeks of August 2nd and

18   September 6th, cash will end at $855,843 and

19   $888,625 respectively for those weeks, which is

20   nearly $200,000 less than the balances predicted

21   two weeks ago and obviously less than the $914,000

22   where they started the case.  And that's only if

23   you believe those numbers.  Those are the debtors'

24   own numbers of where they think they're going to

25   end up.  And that does not incorporate at least

1    $213,750 for the fire suppression system which they

2    conveniently left out of their budget and likely

3    more for capital expenditures and other expenses,

4    meaning that the cash balances will drop by another

5    200,000 for the weeks of October 2nd and

6    September 6th.  But, aha, we're going to raise the

7    money while in bankruptcy to pay for that fire

8    suppression system.  Well, what evidence?  Whose

9    testimony?  Well, Mr. Flake says that they're going

10   to raise that money.

11              In addition, it's obvious the debtors

12   have not appropriately budgeted for the costs of

13   these cases.  Right now, there is $70,000 total in

14   the budget for the debtors and the committee

15   counsel.  I am highly certain that they have blown

16   well past that number, notwithstanding Mr. Flake's

17   willful ignorance of where things currently stand.

18   There is nothing in the budget for litigating with

19   us, WESCO.  There's nothing budgeted for litigating

20   with BMG.  There is nothing budgeted for a

21   Chapter 11 plan process, and, obviously, none of

22   these issues are going to be get resolved by the

23   end of the summer and likely not until the end of

24   the year.

25              In fact, the debtors' budget is largely

1    a fiction.  The debtors are not properly accruing

2    expenses.  They get paid in advance each month, so

3    that cash is largely committed to covering the

4    expenses necessary to generate that revenue.  Your

5    Honor has seen how during the month, their cash

6    balances go to almost zero, and then they have to

7    count on the prepayments again.  So as we sit here

8    today, we are not adequately protected.

9          They have according to Mr. Flake,

10   between 600 and $650,000 in the bank, and that's

11   only because WESCO has been speaking up throughout

12   these cases to prevent them from going out too far

13   on their budget and not spending that cash forward,

14   and that's almost $300,000 less than where they

15   started the case.

16         Those revenues are spoken for, Your

17   Honor, and the only reason the debtors could show a

18   positive cash balance for the week of September 6th

19   is by not accounting for the September expenses.

20   That means that today, either the court has to take

21   action to ensure that WESCO's position is

22   adequately protected and in doing so render the

23   estates administratively insolvent, or not protect

24   WESCO's position to ensure administrative solvency.

25         A Chapter 11 case is not a tradeoff

1   between these two alternatives.  They have to do

2   both.  And Chapter 11 does not allow them to

3   continue to spend while our position is not

4   adequately protected.

5         And while all of this is going on, the

6   debtors' noncash assets are exposed and

7   depreciating.  We talked about there not being

8   adequate insurance.  You heard Mr. Grede say the

9   roof is leaking.  We heard him talking about how

10  the facility is not adequately ventilated, and Mr.

11  Flake didn't entirely disagree with that.

12        The collateral is depreciating by a

13  significant amount on a book-value basis.  I think

14  it was one twenty-five a quarter, but albeit an

15  undetermined amount on a fair-market basis, but all

16  the while the equity holders are getting the

17  benefit of that depreciation by tax write-offs.

18  That is the uncontroverted evidence in this case

19  thus far, Your Honor.

20        Then we get to whether they can confirm

21  a Chapter 11 plan.  Their plan proposes existing

22  equity retain 80 percent of the company.  That

23  obviously violates the absolute priority rule,

24  meaning they cannot confirm without WESCO's

25  consent.  Even if we're unsecured.  And as I said,

1     WESCO is not consenting.

2             Well, now we've heard that they're

3     proposing a new value plan where old equity gets

4     80 percent on account of money contributed to Spot.

5     Well, then by that formulation, their enterprise

6     value is not 12 million or whatever Flake said it

7     was.  It's somewhere between 750 and 950 by simple

8     math.

9             So setting aside all of the problems

10    with this, not least of which is the debtors will

11    never raise the money that they say they're

12    bringing in as new value, that means that the

13    going-concern value likely is much less than the 12

14    million advertised by the debtor.  Probably much

15    less than 1 million.  And Your Honor heard the

16    uncontroverted expert opinion of Mr. Lane where he

17    said that the debtors' going-concern value is

18    between zero and 1.7 million.  I venture to say

19    that was conservative.  And where they wanted to

20    use a multiple of revenue, Mr. Lane used much more

21    traditional and accepted norms for Chapter 11 cases

22    which we can find plenty of case law to support.

23            Which then brings us to the best

24    interests and feasibility tests, neither of which

25    the debtors can clear for confirmation based on

1    simple math and the debtors lack of reliable

2    projections.

3              You heard Mr. Flake talk about, well,

4    there's two and a half million dollars of

5    liquidation value here.  Well, if that's true, then

6    that far exceeds the million dollars plus or minus

7    of enterprise value.

8              I'm guessing the liquidation value is

9    something less than that, but Mr. Clar is going to

10   say, well, they don't know what the liquidation

11   value is.  And he's write right.  We don't.  But we

12   do know what the cash is worth.  We do know that

13   the receivables are at risk if the debtor shuts

14   down tomorrow, and, you know, the assets are going

15   to be whatever they're worth on the market.

16             For all of these reasons and more, Mr.

17   Lane testified that the business plan is not

18   feasible, and the debtors' valuation makes no

19   sense.  When confronted with all of these

20   inconsistencies and other issues, Mr. Flake was

21   evasive, shifty and had a selective memory.

22             I don't believe that the debtors are

23   acting in good faith, unfortunately, at this point,

24   or working in the best interests of creditors.

25             I asked Mr. Flake why don't you just buy

1    the company?  Well, it's not good for creditors.

2    So this whole thing is good for creditors over

3    here?

4            At the end of the day, the company is

5    going to be worth what it's worth.  And if they

6    believe the company is worth what they say it's

7    worth, then they should be able to go out and raise

8    that money and execute a sale, particularly given

9    the commitments that he's been advertising to the

10    court.  And that would be a wonderful outcome for

11    creditors if they can actually execute it and get

12    close to the value that they're advertising.

13            There is no certain assessment of the

14    realities of the situation and certainly no

15    realistic balancing of whether the creditors do

16    better in a liquidation or in a going-concern

17    scenario.  The only reason for maintaining these

18    cases is so shareholders can hold out hope for a

19    miracle or so that the committee can improve its

20    position versus WESCO or other secured creditors.

21    These very clearly are not grounds for denying

22    WESCO the relief it seeks under 1112(b) or 362(d).

23            Your Honor, unfortunately -- and, again,

24    I don't relish this -- this company is going out of

25    business.  It's a question of whether it happens

1     sooner or later.  And for the court to allow this

2     to continue -- excuse me.  For the court to allow

3     this to continue will only destroy value, and the

4     court should put an end to this exercise.  The

5     facts of this case fit squarely under the test for

6     dismissal under 1112(b) or for lifting the stay

7     under 362(d), and the court should act to protect

8     value for creditors.

9               The debtors, through Mr. Flake and

10    through Mr. Grede and others, have advertised

11    creditors recovery.  At one point during his

12    deposition, he said it was going to be 80 percent.

13    Now they're saying 30 percent.  Both of those are

14    pulled out of thin air.

15              Anybody can propose a note or equity

16    that purports to pay at some value.  The real

17    question is whether creditors would ever see any

18    payments under that hypothetical note or whether a

19    viable business actually exists behind that equity.

20              The answer in this case, unfortunately,

21    is a definitive no, and no increase in the value of

22    bitcoin, unfortunately, is going to salvage these

23    debtors.  It's just a broken business model, and it

24    doesn't work.

25              THE COURT:  Thank you.

1           Mr. Clar.

2           MR. CLAR:  Thank you.

3           I want to read first -- thank you, Mr.

4      Agay.

5           I want to read first from Section

6      1112(b)(4).  For purposes of the subsection, the

7      term "cause" includes -- I'm only going to read a

8      little bit -- (A) substantial or continuing loss to

9      or diminution of the estate and the absence of a

10     reasonable likelihood of rehabilitation.  Not "or."

11     "And."

12          It's true that I wish I had more in

13     terms of what's happening with the expiring

14     contracts.  I wish I did.  However, what we have

15     shown here is or what hasn't been shown -- and the

16     same thing applies to Section 362 -- there has not

17     been shown a lack of equity under Section 362, and

18     there has not been shown a substantial or

19     continuing loss to or diminution of the estate.  In

20     fact, cash has remained the same or increased and

21     will continue to do so until the end of the budget.

22          So WESCO hasn't met its burden.  Not

23     only that, but WESCO's lien is currently being

24     challenged.  So they're -- whether they're even

25     entitled to lift the automatic stay.  I get what

1    Mr. Agay is saying about dismissal, but we'll get

2    to that in a minute.

3            The question is is there a plan that

4    could be proposed.  And if the customers stay, and

5    I don't think that there is any reason to think

6    that they won't with the price of bitcoin

7    increasing, which is what the testimony has been,

8    there's absolutely no evidence of lack of equity in

9    the collateral, and that applies to both sections

10   that WESCO has to rely on.

11           WESCO's expert did not testify and could

12   not and would not testify as to the value of the

13   assets.  The uncontroverted testimony is that cash

14   is approximately between 900,000 and a million

15   dollars throughout the length of the budget.  It

16   goes up and down as expenses are paid, yes.

17   Receivables are consistently somewhere around a

18   million dollars, and machinery and equipment

19   without any testimony from WESCO is liquidation

20   value is worth about a million dollars.

21           If the customers stay and if there is

22   funding for Spot, it's a big if, then there is

23   additional revenue.  There's additional value.  If

24   the funding does not occur, there's a backup plan.

25   Expenses are being reduced.

1    WESCO's counsel makes a big deal out of

2    the BMG.  BMG has an attorney here sitting here

3    throughout the proceedings.  They haven't said

4    anything.  We don't know that there is going to be

5    litigation with BMG.  In fact, I suspect because of

6    BMG's stake in the outcome, that there will be some

7    resolution of this.  I'm sure that my colleague

8    Mr. Shaw and Ms. Sanfelippo and I can work that

9    out.

10    In the meantime, expenses are being

11    reduced and will be further reduced.  The Capex

12    expenses that WESCO is relying on that haven't been

13    budgeted are the figment of Mr. Grede's -- I

14    shouldn't say figment of his imagination.  They're

15    the product of what he knew a year ago, not now.

16    They're also the product of a person who denies any

17    responsibility for the position the debtors are in,

18    despite the fact that he does bear some blame.

19    The plan is due on August 11th.  The

20    plan could be one-third debt reduction -- one-third

21    debt repayment, one-third debt excusal, and

22    one-third equity.  It could be.

23    Whether creditors will accept that or

24    not, whether WESCO accepts -- I don't want to get

25    into legal arguments with Mr. Agay about what WESCO

1    has to accept.  Suffice it to say that they do have

2    to first prove that they have a secured claim in

3    order for us to talk about cramdown.

4            But even beyond that, best interests of

5    creditors is one of the standards for dismissal.

6    The only creditor in this case who has even voiced

7    a little bit of opposition to the debtors remaining

8    in business is WESCO.  Why?  Because WESCO wants

9    the cash to the detriment of all the creditors.

10   BMG, SBI, Hoffland Properties, they are all here in

11   support of -- SBI is not here.  But the other

12   creditors are here in support of the debtors

13   continuing to operate.

14           I know that this case has problems.

15   It's been clear to me from the beginning.  If they

16   didn't have problems, they wouldn't be debtors.  I

17   know that.

18           In a perfect world, we would have come

19   to you and said we have got renewed contracts with

20   our three biggest customers.  No.  But what we have

21   is a continuing obligation to work towards that,

22   and I would hope before October.  I would hope.  I

23   would hope that those negotiations would take place

24   sooner than later and that by the time a plan is

25   due, that we have a definitive answer for that.

1         I also think that the fact that our

2   largest customer, SBI, is negotiating the

3   arrangement that was described is a good sign.  It

4   doesn't seem likely that they would want to leave

5   the facility if they were going to negotiate this

6   deal with us.  I'm not a bitcoin expert.  I'm

7   becoming somewhat versed, but it doesn't seem

8   likely.  And, again, the price of bitcoin continues

9   to rise meteorically.

10        Something I said at the beginning of

11  this hearing, and I think it bears repeating, and

12  if it doesn't, I'll do it anyway, but this is not a

13  confirmation hearing.  It is a hearing to determine

14  whether there is a plan that could be proposed.

15  It's a hearing to determine if the debtor has a

16  plan going forward.  It's a hearing to determine

17  whether there's cause to dismiss the case.

18        Is there substantial -- is there a

19  substantial or continuing loss to or diminution of

20  the estate?  No, not yet.  It could be argued that

21  it will occur, but not yet.

22        Is there absence of a reasonable

23  likelihood of rehabilitation?  That just means that

24  there's no plan that could be confirmed.  And

25  whereas I will agree that there are problems that

1    could cause that to be the case, it is simply not

2    the case two months into the Chapter 11 case.  We

3    don't even -- we haven't even passed the time by

4    which a plan is going to be -- is supposed to be

5    proposed.

6           As to the Capex expenses, the evidence

7    that was produced did not show any reason that the

8    roof has to be repaired, how much or the roof has

9    to be repaired now.  It didn't show what has to be

10   repaired for ventilation purposes.  And there was

11   testimony from Mr. Flake, and that's what we have,

12   that the fire suppression system not only will be

13   taken care of by the members, but also doesn't need

14   to be taken care of immediately.  They're not under

15   any sort of pressure from the City of Virginia

16   Beach right now.  If does have to be done.  It will

17   have to be provided for.

18          As to Mr. Agay's point that it was filed

19   to invoke the automatic stay, I'm trying to

20   remember a case in the years that I've been

21   practicing where it wasn't filed to invoke the

22   automatic stay.  This is simply not a two creditor

23   dispute.  There are other creditors involved.  And

24   it's not -- and there was no motion to dismiss for

25   bad faith filing, which I believe that that's what

 1   is being hinted there.  It's simply not that.  It's

 2   hardly a two creditor fight.

 3            One moment, Your Honor.

 4            As far as administrative fees are

 5   concerned, I'm thinking that this case probably

 6   should see a plan very soon, and that's based on my

 7   experience with Chapter 11 cases that have

 8   problems.  That's what I'm thinking should happen,

 9   and I'm thinking that that plan will have to

10   provide for payment of administrative expenses.

11   There currently is provision in the budget for an

12   additional $40,000 to be paid in August to our

13   firm.

14            Oh, I wanted to correct something that

15   my client said, though.  So the record is clear, we

16   did not receive $100,000.  We received 50.  I

17   wanted to make sure everybody knew that because

18   that would be bad.  Wouldn't care for that.  The

19   U.S. Trustee wouldn't like that.  The court

20   wouldn't like that.  We wouldn't like that.  We did

21   not get $100,000.  Maybe we should have, but we did

22   not get $100,000.

23            And Mr. Agay is correct when he says

24   that his client or his expert is guessing -- well,

25   actually, his expert didn't even guess about the

1    liquidation value of the assets.  They simply don't

2    know.

3              So to return to Section 1112(b)(4)(A)

4    and Section 362, we don't even get past the "and"

5    unless they -- in either case, unless WESCO can

6    show a lack of equity, and they simply have not

7    shown that.

8              Thank you, Your Honor.

9              THE COURT:  Ms. Janczak.

10             MS. JANCZAK:  Your Honor, something that

11   seems to have been a little bit overlooked so far

12   in the arguments and somewhat in the presentation

13   of testimony is the ability of the debtors to fund

14   a Chapter 11 plan, and, ultimately, I think that's

15   what we're here to find out.  I don't -- I don't

16   see some of these other arguments as determinative,

17   but I do see the ability to fund a Chapter 11 plan

18   and make some distribution to creditors as

19   determinative.

20             So looking at that, it's a function of

21   revenue and expenses.  The testimony is that the

22   price of bitcoin is going up.  The actions of SBI

23   to date suggest that it's a company that would be

24   interested in continuing the relationship.  It's a

25   40 percent stakeholder in the debtors.  It's

1   looking to expand the relationship with BCause

2   Mining by leasing some additional mining computers.

3           The time when they indicated -- the

4   testimony was the time when SBI indicated that it

5   wouldn't be interested in renewing its contract

6   was, I think, six months ago when the price of

7   bitcoin was substantially reduced, and there hasn't

8   been any recent indication that they still don't

9   intend to renew their contract.

10          As far as BMG, BMG is currently setting

11  off about $70,000 a month against its prepetition

12  debt.  That comes back into the budget.  That's

13  $70,000 above and beyond the monthly bottom line

14  that comes back into revenue, and the debtors so

15  far look to have been operating about even or just

16  over even, maybe 10 or $20,000 extra per month.  So

17  that's an additional $70,000 to fund things like

18  Mr. Agay is complaining about such as

19  administrative expenses or payments to unsecured

20  creditors or to WESCO under a plan.

21          Additionally, there's the potential for

22  the SBI and BCause Mining contract, which would add

23  $42,000 per month net to the bottom line revenue,

24  and that's in progress, and Mr. Flake testified

25  that he expects to receive a draft of that contract

1    this week.  So in total, that's $112,000 per month

2    added to the bottom line.

3              Then, if you look at the Spot expenses,

4    that's where some money can come out on the other

5    end.  We're looking at one of two options.  And I

6    think that the Spot and viability of Spot is a

7    little bit of a red herring.  One of two things is

8    going to happen in the next six weeks.  Either Spot

9    is going to launch and those expenses are going to

10   be shifted over to BCause Spot, or Spot won't

11   launch and they'll reduce those expenses

12   accordingly.  Mr. Flake testified that the amount

13   that would be reduced would be $70,000 per month in

14   total taken out of the debtors' budgets.

15             So when you add in the potential for

16   getting the BMG money into future revenues and the

17   $42,000 from the new relationship with SBI and the

18   70,000 in reduced expenses, you're looking at

19   $182,000 more per month that can fund Chapter 11

20   administrative expenses, can fund payments to WESCO

21   under a Chapter 11 plan and can fund payments to

22   creditors under a Chapter 11 plan.

23             As far as whether Spot launches or not,

24   again, I think it's a bit of a red herring.  If it

25   does launch, it sounds like that would be great for

1    everybody.  It would be a substantial source of

2    recovery.  It could only increase distributions to

3    creditors in this case.  I don't see it as -- I

4    don't see the downside if it does launch because

5    all these expenses will be caught up in that

6    entity.

7              One thing, also, that was not addressed

8    here and is part of WESCO's motion is WESCO's

9    liens.  It didn't introduce any testimony or any

10   documents to prove up its liens whatsoever, so

11   motion for relief from stay isn't really

12   appropriate.

13             They didn't introduce their proofs of

14   claim into evidence.  They didn't present any

15   testimony on it.  And, in fact, the underlying

16   basis of their claims, which is the judgment itself

17   and the garnishments, is potentially faulty because

18   the testimony was that Mr. Grede didn't have the

19   authority to sign that document.

20             What the committee is asking for here

21   and what the committee supports is some additional

22   time to allow the debtors to put together an actual

23   Chapter 11 plan which incorporates these revenue

24   increases and these expense decreases and put that

25   together so that everybody can look at it and

1    everybody can vote on it.

2              And it's true that some customers may or

3    may not renew their contracts in the future.

4    Nobody can tell what the future is going to be, but

5    that's not a reason to stop the case in its tracks

6    right now.

7              Finally, while the committee certainly

8    doesn't believe that there's been any cause for

9    dismissal or for relief from the automatic stay, to

10   the extent that the court does believe cause has

11   been demonstrated, the committee would ask that in

12   the best interests of creditors it would be

13   converted rather than dismissed.  Because of the

14   issues over WESCO's liens.  Because there needs to

15   be a single forum in dealing with the many and

16   obvious issues among all the creditors.  For

17   example, WESCO has a garnishment out there.  WESCO

18   has this judgment which may be subject to attack.

19   And the Bankruptcy Code has statutes that don't

20   exist under state law such as preference statutes.

21             Thank you.

22             THE COURT:  Thank you.

23             Did you want to say something?

24             MS. ANGELINO:  Yes, Your Honor.  Sarah

25   Angelino on behalf of Hoffland Properties.

1              I won't take too much time.  I would

2      just like to echo what we heard from the creditors

3      committee as well.

4              We don't believe that there has been

5      cause shown to dismiss this case or for relief from

6      stay.  And we would just ask that the court, you

7      know, again thinks backwards to what happens if

8      this were dismissed.  That wouldn't really work

9      here, again, because of the preference claim.  So

10     we would need to convert it, which would mean

11     incurrence of additional expenses and a Chapter 7

12     trustee.  We think that the debtor who has been in

13     this case from the beginning and obviously working

14     with the business is in a better position than any

15     trustee would be to continue sorting this out at

16     this juncture.

17             I will also, again, just echo that no

18     other creditors have been here today in support of

19     WESCO's motion, and the creditors are, in fact,

20     just working to dismiss a plan -- sorry -- just

21     starting to discuss the plan, and we would ask

22     again for additional time to be able to work out a

23     plan before it is due in August 11th.

24             Thank you, Your Honor.

25             THE COURT:  Thank you.

1          I'm going to start with 1112(b)(1).  It

2     says specifically:  The court shall convert or

3     dismiss a case, whichever is in the best interests

4     of creditors and the estate for cause.

5          And even before I get into cause, I want

6     to start with the "shall convert or dismiss,

7     whichever is in the best interests of creditors."

8          There is no question whatsoever that it

9     is not in the best interests of creditors to

10     dismiss this case.  There are too many questions

11     here with respect to WESCO, with respect to BMG,

12     and there are more creditors here than just WESCO,

13     significantly more creditors here than just WESCO.

14     So under no set of circumstances do I believe that

15     I can dismiss this case at this point in time.

16          The real question is do we convert it.

17     So now I look to cause.

18          Substantial or continuing loss or

19     diminution.  It depends on what day you look at the

20     case.  The way that this business works, the cash

21     goes up, and the cash goes down, but from the

22     beginning I think the fixed assets have been what

23     they've been worth.  And while, yes, from a balance

24     sheet point of view, a bookkeeping point of view,

25     assets deteriorate, but the couple of months that

1    the company has been in are not what I would

2    consider to be a situation where there is a

3    substantial or continuing loss or diminution.

4            Then, as Mr. Clar points out, the other

5    part of 1112(b)(4)(A) is "and the absence of

6    reasonable likelihood of rehabilitation."  And that

7    is really what most of the focus of today has been

8    about.  And I'll say right now the plan that's on

9    the table is not confirmable, and if we were in a

10   confirmation hearing today, I would not confirm the

11   plan.

12           The debtor has got to make up its mind,

13   and it has got to make up its mind now which way is

14   it going to go.  It has a lot of ideas.  And I

15   start with the fact that this is an entrepreneurial

16   business.  This is a business where a lot of people

17   came up with some cool ideas, and just like some of

18   the most tremendous businesses that are out there

19   now like Google, like Apple, you start off with an

20   idea, and you come up with a lot of money, and then

21   can you get people to continue to put money in and

22   continue to fund losses as you go forward.

23           And that's what we've really got here.

24   And if the equity here wants to continue to have a

25   business, the equity here is going to have to pay

1     for it.  And they have a choice, and they're at

2     that point in choosing now.  Do they put more money

3     in and fight to keep this business and this idea

4     going or do they cut their losses now and be done

5     with it?  Because I could very easily convert the

6     case today, and then they would have to move on.

7             But is that in the best interests of

8     creditors?  I don't know yet.  But I'm not

9     convinced that it's going to cause a great deal of

10    damage to anyone, including WESCO, to let them have

11    the chance to actually come up with a plan that

12    they want to move forward to confirm.

13            Just like equity put in a lot of money,

14    just like, frankly, SBI put in a lot of money and

15    committed equity and committed contracts, and just

16    like BMG lent a lot of money to have this company

17    exist, they, especially SBI, just have to come up

18    with more money if they want the company to

19    continue to exist.  Otherwise, people like BMG or

20    SBI are going to have to take all their machines

21    and move them somewhere else or just chalk it up as

22    a giant loss and move on.

23            We're not there yet.  We're also not

24    there yet on many aspects of confirming a plan.

25    And the debtor has to choose whether it launches

1  Spot or not.  And I agree, again, with what Mr.

2  Clar I believe it was who said it, which is that --

3  or maybe it was Ms. Janczak -- if Spot launches,

4  that means they come up with a whole bunch of

5  money, and it goes off, and the expenses come off

6  of one balance sheet in Mining, which is kind of

7  moving along, and it comes out where it comes out.

8  Or they cut their losses now.  They put Spot out of

9  its misery or they spin it off and let somebody

10  else do their thing with Spot and, again, the

11  expenses come off the balance sheet and what is

12  left of Mining can try to figure out what they do.

13         I will say, though, that the Mining

14  business on a day-to-day basis appears to be

15  sustainable, but the Mining business has too much

16  debt, and it is not going to be able to pay its

17  debt with its continuing operations, which means

18  that a plan where equity keeps 80 percent of the

19  company will never fly.  This is a situation where

20  maybe equity keeps -- and I'm not ruling on

21  anything -- I'm just saying a very small percentage

22  and the rest of it is given to the creditors.  That

23  might be in the best interests of creditors.  And

24  if this is a really good business, everybody could

25  ultimately be a winner, and if it's not, then it

1    will be a giant loss for everybody.

2              But, again, I believe that making that

3    decision today would be premature, but not by a

4    lot.  This business is not going to have until

5    October to find out whether or not its three main

6    customers will renew its contracts.  That is not

7    going to happen.  Right now, the plan is due on

8    August 11th, and I would expect to be well down the

9    road of having a confirmable plan with a definite

10   direction and definite commitments one way or the

11   other by the time that that rolls around.

12             I will say with respect to lifting the

13   automatic stay, once again, that is clearly not in

14   the best interests of all creditors here.  If I

15   lift the automatic stay today, WESCO is the only

16   winner, and everybody else is a giant loser.  If I

17   don't lift the automatic stay today, I don't

18   believe that WESCO is in that worse of a position.

19             Again, Mining is eking along.  It's not

20   losing a tremendous amount of money.  It's not

21   making a tremendous amount of money.  But every

22   month they're in business, the customers are still

23   paying, and they're still eking along, and in the

24   meantime, WESCO is getting adequate protection

25   payments at a 20 percent interest rate, which is

1    not terrible, to let it see where it goes for a

2    couple of months.

3         Do I believe there is equity?  I have no

4    idea.  Nobody testified about whether there is

5    equity, so I'm going to assume for purposes of this

6    hearing that there is no equity.  Therefore, the

7    burden is on the debtors to prove that a reasonable

8    plan is confirmable within a reasonable amount of

9    time.

10        The debtor hasn't proved it's not.  The

11   debtors proved that they have got a lot of ideas.

12   They've got people who were willing to commit money

13   before that are still there, and they're going to

14   now have to prove that those people are going to

15   stand up, put in the money and make this fly, or

16   they're going to have to talk to those people, talk

17   to the equity holders about chalking it up as a

18   giant great idea, but we just couldn't pull it off

19   and be done with it.  And I'm going to give the

20   debtor that little bit more time to try to do so.

21        So I will today deny without prejudice

22   WESCO's motion to dismiss and WESCO's motion to

23   lift the automatic stay, again, without prejudice,

24   meaning it can be raised at any point in time that

25   WESCO believes appropriate.

1        MR. AGAY:  Your Honor, can I ask the

2   motion be adjourned rather than denied?  Your Honor

3   has pointed out that they have a short window to

4   figure out what they're going to do here, and,

5   obviously, if they're not able to fulfill that, I

6   think it's in everybody's best interests that our

7   motion just continue rather than going through the

8   cost and exercise of having to refile it.

9        So I would just ask it be adjourned for

10  right now.

11       MR. CLAR:  Well -- I'm sorry.

12       MS. JANCZAK:  No, go ahead.

13       MR. CLAR:  I was thinking that actually

14  before Mr. Agay said it.

15       THE COURT:  And it's fine with me one

16  way or the other.

17       MR. CLAR:  Well, I'm thinking it

18  through.  With a motion for relief from stay, there

19  has to have been a hearing within 30 days, and

20  there was.

21       THE COURT:  And there was.

22       MR. CLAR:  So that's okay.

23       And when I was considering the various

24  outcomes that Your Honor might rule, I was

25  considering continuation.

1           I haven't spoken to my client about

2    this, but I guess I don't have a problem with that

3    because either the debtors are going to perform or

4    they're not, and so I guess I don't have a problem

5    with that.

6           MR. AGAY:  Okay.

7           MR. CLAR:  And depending upon what we

8    do --

9           THE COURT:  And I think that's fine.

10   Because here is what I'm not envisioning happening,

11   and I don't want you to have any illusions that it

12   will.

13          On August 11th, that's not going to be

14   the first day to file a plan.

15          MR. CLAR:  Oh, no.

16          THE COURT:  And we're not going to be

17   then setting it out for hearings in October.

18   That's way too late.

19          By August 11th, we should have a plan

20   ready to go and everybody should have commented on

21   that plan and we should be ready to see whether or

22   not we're going to move forward to confirmation

23   shortly thereafter.

24          So, again, it's time for the debtor to

25   make up its mind which direction it goes in.  And

1    the debtor has lots of alternatives including,

2    frankly, Mr. Agay's idea that somebody just come in

3    and buy the company which might ultimately save

4    equity a lot of money.

5                But there are all sorts of ideas out

6    there yet.  The question is where do we go.

7                MR. CLAR:  One -- thank you.

8                Ms. Janczak and I was thinking the same

9    thing actually.  Rather than having this sort of --

10   and the way she put it was sort of Damocles, I like

11   that, hanging over our head while we're trying to

12   solicit funding is probably not -- I mean, we have

13   to file a plan by August 11th.  I know Your Honor

14   wants us to be further down the road, and I want to

15   be further down the road.  It's just that I don't

16   know --

17               THE COURT:  Here is my problem, Mr.

18   Clar.  You file a plan on August 11th.  Then we

19   have to set a hearing to find out whether or not

20   you have the contracts renewed, whether or not you

21   have the financing.  No.  By August 11th, you have

22   the contract renewals or not, and you need to have

23   the funding in place or you need to let Spot go its

24   merry way.

25               MR. CLAR:  I don't disagree with that.

1    THE COURT:  That's what I'm saying.

2    MR. CLAR:  What I'm concerned about is

3  setting another date to file a plan.

4    THE COURT:  Well, what I can do is I can

5  set a hearing on August 11th on the motion to lift

6  stay or dismiss, and at that point in time, if you

7  don't have it, this case is probably converting.

8    MS. JANCZAK:  Your Honor, my only

9  thought in continuing -- in continuing it rather

10  than denying it is my understanding from the

11  depositions and from the testimony is that

12  potential investors in either Spot or in the

13  current equity who might fund to pay for the fire

14  suppression system were hoping for clarity to come

15  out of this hearing, and I feel if we continue

16  it --

17    THE COURT:  Then I can give you clarity

18  by continuing it and setting a date to file a plan

19  of July 15th.

20    MR. CLAR:  I don't want that either.

21  See, because that's even worse.

22    THE COURT:  I'm sure you don't.

23    MR. CLAR:  Well, no, from a --

24    THE COURT:  You have to figure out how

25  you're going to raise money in the circumstances

1    you are in.

2              MR. CLAR:  Or not raise money --

3              THE COURT:  Or not raise money.

4              MR. CLAR:  -- and figure out how the

5    contracts are going to continue.

6              THE COURT:  No, I didn't say that.  In

7    fact, I think I was very clear in saying that the

8    contracts renewing alone is not enough for you.

9    You've got $12 million in debt and no way to

10   amortize it.

11             Now, if the contracts are renewing and

12   you're willing to give equity to the creditors --

13             MR. CLAR:  Okay.

14             THE COURT:  -- of you name the

15   percentage, 90 percent, that's a different story.

16   Well, I've confirmed plans where I've given

17   95 percent away, and everybody came away a winner.

18   If it's a winner business, it's a winner

19   ultimately.

20             MR. CLAR:  The other factor is -- don't

21   take this wrong.  You will.  But the other factor

22   is how quickly we can determine whether WESCO has a

23   lien.  That's an important factor in connection

24   with their motion to lift stay.

25             THE COURT:  Been talking about it for

1    several months.  They finally got a case on file --

2                MR. CLAR:  We did.

3                THE COURT:  -- so you're moving along on

4    that.

5                MR. CLAR:  Right.

6                THE COURT:  And you have BMG, too, which

7    is a biggy.

8                MR. CLAR:  Well --

9                THE COURT:  I mean, come on.  BMG you're

10   going to stop paying them because they don't renew?

11   That's going to be a really interesting

12   conversation.

13               MR. CLAR:  Well, I -- we can debate

14   that.

15               THE COURT:  It's complicated.

16               MR. CLAR:  Right.  We can debate that,

17   but I don't want to do that now.  We have a ruling

18   that I like, so I don't want to debate that.

19               But there's a few other things.  If

20   that's what the court is going to do is to continue

21   the motion to August 11th, that's fine.  Then we

22   have other things we need to take care of as well.

23               THE COURT:  We do.  We do.

24               MR. CLAR:  So, for example, cash

25   collateral, and I would just ask that we be allowed

1   to use cash collateral according to the budget, the

2   same cash collateral order we've had in the past,

3   plus 10 percent to -- there's been -- to pay the

4   expenses that are in the budget, including Dominion

5   soon, I believe.

6           MR. CRAIG:   Tomorrow.

7           MR. CLAR:   Tomorrow.

8           MR. AGAY:   So I would say, Your Honor,

9   that we need more in terms of adequate protection.

10          The facts that have come out in this

11  hearing are that the debtor doesn't have adequate

12  property insurance.  In addition, they're about to

13  start in a fight with BMG.  They're paid in advance

14  each month by customers, and then those expenses

15  accrue throughout the month.

16          Honestly, I'm not trying to run up

17  additional costs, but I want to know in a formal

18  hearing how much cash they collect at the beginning

19  of July, meaning having another cash collateral

20  hearing the first or second week of July,

21  unfortunately, because I really think -- we are

22  very concerned about their cash position.

23          The other thing I would say, Your Honor,

24  is their own budget showed that for the weeks of

25  August 2nd and September 6th, the cash position is

1    falling way below the 914,000 that it was in the

2    beginning of the case.  That's the definition of

3    diminution.  And we don't know what it's going to

4    be for the week of July whatever.

5              THE COURT:  Well, that's the problem

6    with this business.  You pick a day.  I mean, you

7    picked a great day to garnish.  You could have

8    picked a really lousy day to garnish.  But you

9    picked a great day to garnish on purpose,

10    obviously.  That's the idea.  But this business

11    goes like this because of the way it's run and

12    because of where the cash goes.

13              MR. AGAY:  Right.  So we think that at

14    -- if, like, after the beginning of the month, we

15    want to see what the cash balance is.  Because if

16    it's falling below that 914, we're going to ask for

17    adequate protection by way of the difference, the

18    delta between where they started in the case and

19    the diminution in our collateral, and that's what

20    we're entitled to under the Bankruptcy Code.

21              MR. CLAR:  A couple -- are you finished?

22              MR. AGAY:  Yes.

23              MR. CLAR:  A couple things.

24              They're getting adequate protection

25    already, and there has been no showing that the

1   adequate protection they're getting in terms of a

2   replacement lien, if they're entitled to a lien at

3   all, and the actual cash they're getting is not

4   enough.  That's Number 1.

5          Number 2, we don't even know -- well, I

6   would also point to their proof of claim, which

7   wasn't entered into evidence, which says that

8   they're fully secured.  There is no evidence that

9   their collateral is deteriorating right now.

10          MR. AGAY:  Well, it's depreciating.  We

11   all know it's depreciating --

12          MR. CLAR:  Okay.  Okay.

13          MR. AGAY:  -- at some rate.

14          But more importantly, Your Honor, their

15   own budgets show what's happening to their cash

16   position.  Revenues are down because of some power

17   outage, and they are burning cash as we speak.  And

18   I wouldn't --

19          THE COURT:  Okay.  You're done

20   negotiating with me.

21          MR. CLAR:  Okay.

22          THE COURT:  Okay.  I'm going to continue

23   the motion to convert and motion to lift the

24   automatic stay until August 7th.

25          MR. CLAR:  Dismiss at this point.

1          MS. JANCZAK:  I'd be okay with calling

2     it a motion to convert.

3          MR. CLAR:  I would not.

4          THE COURT:  To August 7th at

5     10:00 o'clock.  I will set the entire day aside so

6     if we need a further hearing, be prepared to do so

7     on that day.

8          I'm going to continue the motion for

9     cash collateral to August 9th using the same

10    budget.

11         MR. CLAR:  Thank you, Your Honor.

12         THE COURT:  Let me see, we have other

13    things.  Let's just make sure we've covered

14    everything.

15         MR. CLAR:  We have a bar date motion.

16         MR. AGAY:  Your Honor, I brought up the

17    topic of the property insurance.

18         THE COURT:  The property insurance.  I'm

19    glad you mentioned that.

20         There was testimony about the property

21    insurance, but it was a certificate and a little

22    testimony, but it wasn't exactly clear to me what

23    it was and what it meant, and I don't think the

24    debtor knew either.

25         The debtor needs to look into that.

1    And, in fact, that's an important issue.  And I

2    think on that one, we need to set the hearing

3    sooner.  And let's see what else we have up here.

4    Because we need to make sure, in fact, as Mr. Agay

5    says, that to the extent that there is liquidation

6    value of the equipment of a million dollars, that

7    it's protected.

8              You know, for example, right now, if you

9    lost all these machines, maybe you'll collect from

10   Dominion, but alternatively you should be

11   collecting from property insurance.  So that's an

12   excellent question.

13             MR. CLAR:  I agree.  And I think it

14   might be miscommunication.  Not between me and Mr.

15   Agay, but between the client and the people in

16   Virginia as to what it means.

17             THE COURT:  Potentially, and I'll give

18   you an opportunity to look into that, but we'll set

19   further hearing on that.

20             MR. CLAR:  Thank you.

21             THE COURT:  The bar date motion.

22             MR. CLAR:  I don't have that with me.

23             THE COURT:  Yes, you're asking for

24   August 30th for nongovernment and October 11th for

25   government.  I didn't calculate out how much you

1    actually have to give to the government.

2              MR. CLAR:  Well, it's 60, generally, for

3    nongovernmental, and then 180 I think.

4              MS. JANCZAK:  Petition date.

5              THE COURT:  From the beginning of the

6    case.

7              MR. CLAR:  The petition date.

8              THE COURT:  So is that the date?

9              THE LAW CLERK:  Yes.

10             MR. CLAR:  Yes, I thought we computed

11   that.

12             THE COURT:  So we're good on that one

13   anyway.

14             With respect to the regular bar date,

15   can we get it in by August 1st?

16             MR. CLAR:  Yes.

17             THE COURT:  Yes, we can.  Get it out

18   right away.  Let's get it in by August 1st.

19             MR. CLAR:  Okay.

20             When do we have to get it out by,

21   though?

22             THE COURT:  Get it out -- today is

23   Monday.  You don't have that many creditors I don't

24   think.  Maybe you do.

25             Let's see, if you get it out -- if you

1    get it out by Friday the 30th.

2              MR. CLAR:  We can do that.

3              THE COURT:  Yeah, get it out by Friday

4    the 30th.

5              MR. CLAR:  As long as we're not still on

6    trial.  Yeah, we can do that.

7              MS. JANCZAK:  Isn't Friday the 28th?

8              THE COURT:  Oh, I'm looking at August

9    again.

10             Friday is the 28th.  Get it out by the

11   28th.  That's even better.

12             Okay.  Motion to use cash collateral, I

13   ruled on that.  Our next hearing on that is

14   August 7th at 10:00 o'clock.

15             Motion to provide adequate assurance

16   payments to utilities and utilities stipulation.

17   You need to adjust that because I'm only giving you

18   through August.

19             MR. CRAIG:  Your Honor, it's actually

20   timed very well to your ruling that there is going

21   to be a hearing on the 7th and use of cash

22   collateral through 8-9.

23             THE COURT:  Right.

24             MR. CRAIG:  Because we had -- and we'll

25   send a revised stipulation.  Through Paragraph 17,

1  there's a payment due August 7th, 308,000, plus

2  there's a true-up each month.  It should bill

3  today.

4          THE COURT:  Right.

5          MR. CRAIG:  So this week we'll know what

6  the true-up is, and if there is a credit, we'll

7  know what the credit is this week, which they can

8  use it however they want with regard to --

9          THE COURT:  I'm going to give you time

10 to talk about the stipulation, but I want to raise

11 something right here.

12          After the hearing last time, Dominion

13 filed on the record some sort of an order.  It had

14 provisions in it we never talked about.  And,

15 obviously, Mr. Agay is objecting to everything, and

16 I don't know how the creditors committee felt about

17 those provisions.  It included some drop deads, for

18 example.

19          MR. CLAR:  Should we perhaps circulate

20 the order?

21          THE COURT:  I think you better circulate

22 the order, and if there are objections, I need to

23 hear about them.  I'm not going to just enter.

24          MR. CRAIG:  Okay.  And to clarify this,

25 this would be a stipulation with an order approving

1    the stipulation?  Is that what the court would

2    like?

3              THE COURT:  Well, again, if you're

4    stipulating, what you're stipulating.

5              MR. CRAIG:  We're resolving it, yes.

6              THE COURT:  Drop dead and that sort of

7    thing.  No problem with respect to the -- I saw the

8    payment schedule.  But it was the language in an

9    order, a separate order that was submitted that I

10   did not enter.  And if you're asking for some sort

11   of order specifically with respect to Dominion,

12   then we need to talk about what the terms are.  If

13   you're only talking about the stipulation that says

14   when payments are made, then we're fine.

15             MR. CRAIG:  Okay.  When prepayments are

16   made and the true-up?

17             THE COURT:  Right.

18             MR. CRAIG:  All right.  We'll revise the

19   stipulation and have the payment go through --

20   prepaid through August 7th, which times perfectly

21   with the hearing on the 7th and use of cash

22   collateral through the 9th, and we'll submit it to

23   the court.

24             THE COURT:  Okay.  Well, are you

25   submitting an order, and, if so, what is the order

1      going to say?  That's where we got --

2              MR. CRAIG:  The order is going to --

3      it's going to be an order just like we just filed.

4      Not the order that you were speaking about.  It's

5      an order approving stipulation.  That's all it is.

6              THE COURT:  All right.  Negotiate the

7      stipulation.  Circulate it to all parties.  When

8      and if all the parties say okay, then submit it to

9      me for signature.  If the parties do not agree with

10     respect to the terms of the order and the

11     stipulation, then we're going to have to have a

12     further hearing on it.

13             MR. CLAR:  I'm a little confused, and I

14     have to confess Mr. Dan has been negotiating this

15     with Mr. Johnson.  So Mr. Craig just said there is

16     a payment due tomorrow.  That payment is allowed to

17     be made under a previous order, correct?

18             MR. CRAIG:  No.

19             MR. CLAR:  Then, yeah.

20             MR. CRAIG:  Yeah, that's an issue.

21     Because we have an objection on the 366 motion with

22     regard to adequate assurance.  We resolved it

23     tentative to the court's approval of a prepay,

24     which pursuant to 366(c)(1) is a form of adequate

25     assurance, cash deposit, surety bond, letter of

1   credit.  They can't do any of those.  So the prepay

2   is a form of adequate assurance of payment we've

3   agreed to.  They prepaid through today.

4               MR. CLAR:  Okay.  Well, a couple --

5               MR. CRAIG:  And adequate assurance --

6               MR. CLAR:  Sorry.  That's fine.

7               But a couple issues I discussed with Mr.

8   Johnson before, and that is, first of all, until a

9   cash collateral order is entered, we can't -- and a

10  budget approved, we can't pay, and so that cash

11  collateral order has to be circulated.  Now this

12  has to be circulated.  It's not our fault.  So I

13  really don't want to hear about adequate assurance

14  orders right now.  What I would like -- having just

15  had a two-day hearing, I don't want to hear about

16  that.

17              MR. CRAIG:  Well, we're not --

18              MR. CLAR:  What I would like to do is go

19  through the process.  Mr. Agay and I have been very

20  quick about getting cash collateral orders

21  approved.  The court has been quick as well.  Get

22  that approved with the budget.  Simultaneously,

23  Mr. Johnson and Mr. Craig and Mr. Dan can deal with

24  the stipulation, and Ms. Janczak and Mr. Agay can

25  deal with the stipulation and get that done.  But

1   what I don't want to be is whipsawed by Dominion at

2   this point.

3            MR. CRAIG:  Well, we --

4            THE COURT:  Let me -- it's ten after

5   five.  By the end of the day tomorrow, I want an

6   agreed cash collateral order and the Dominion

7   stipulation.

8            MR. CLAR:  That's fine.

9            THE COURT:  Dominion has to understand

10  that until that's submitted and I sign it, the

11  debtor can't pay.

12           MR. CRAIG:  I understand.

13           THE COURT:  So I would anticipate the

14  debtor would then pay on Wednesday.

15           MR. CLAR:  Yes.  That was my point.

16  Thank you.

17           THE COURT:  That's what has to happen.

18  That is just reality of the timing here.

19           MR. CRAIG:  That's a great

20  clarification.  I understand.

21           THE COURT:  All right.

22           With respect to the rejection of the

23  other contracts, I set hearing on those, the

24  bandwidth and the office lease, and that's

25  everything I have before me.

1    MR. CLAR:  You did set hearings.  Well,

2    I don't know if you set hearings or you set the

3    dates.

4        THE COURT:  No, I set dates for

5    response.

6        MR. CLAR:  Right.

7        THE COURT:  We need to set a hearing

8    with respect to the property insurance, and frankly

9    we can set a hearing for those at the same time

10   because I said the response to objections was due

11   on July 5th.

12       So let's come back here -- I'm gone the

13   following week.  We're going to have to come back

14   the week of July 15th.

15       MR. AGAY:  Your Honor, can we -- I'm

16   pressing on this because we're really concerned

17   about this property insurance.  I mean, can we come

18   back --

19       THE COURT:  It's been raining out a lot

20   again, too.

21       MR. AGAY:  Can we come back the week of

22   July 1st?

23       THE COURT:  Yes, we can on the property

24   insurance.  Why don't we come back on July 2nd,

25   July 2nd at 10 o'clock, and that will be -- we'll

1   just call it case status.  It's really a status on

2   the property insurance.

3           I would expect that the debtor will

4   immediately look into the insurance matter.  To the

5   extent that they do not have adequate coverage of

6   their equipment, they get adequate coverage

7   immediately.

8           MR. CLAR:  And we can put it in the

9   budget.

10          MR. AGAY:  Yeah, and I think the simple

11  answer to this is if we can -- I won't negotiate in

12  front of Your Honor.  But we would like to see the

13  policies in advance, obviously, and I would expect

14  that they would bring those to the hearing on the

15  2nd.

16          MR. CLAR:  I'll do better than that.

17          THE COURT:  And that will not be an

18  evidentiary hearing.  That's when I expect you

19  bring it in and show me it's all good.  I have a

20  trial that day, so it will not be an evidentiary

21  hearing.

22          MR. CLAR:  I will show Mr. Agay.

23          In fact, I did get an e-mail over the

24  weekend that I wanted to share with Mr. Agay, but I

25  wasn't able to do that.

1           THE COURT:  Ms. Janczak, you want to say

2    something?

3           MS. JANCZAK:  Was there a hearing on the

4    lease rejections?

5           THE COURT:  We better set one on the

6    lease rejections.  Let's set a hearing on the lease

7    rejections --

8           MR. CLAR:  I'm sorry, July 2nd at 10:00

9    was that?

10          THE COURT:  July 2nd at ten --

11          MR. CLAR:  For the insurance.

12          THE COURT:  -- for case status on the

13   property insurance.

14          And then we'll set the hearing on the

15   lease rejections for July 16th.

16          MR. CLAR:  At?

17          THE COURT:  Ten.

18          I suspect that's going to be nothing

19   but, okay, they don't disagree, and we're done with

20   it.

21          MS. JANCZAK:  I apologize, Your Honor.

22   What was the continued hearing date for the motion

23   to dismiss or lift stay?

24          THE COURT:  August 7 at 10:00 o'clock.

25          MR. AGAY:  Your Honor, I heard you say

1     that at that August 7th hearing, the debtor needed

2     to have something to indicate that those hosting

3     agreements are going to get extended or they have

4     whatever funding they need in hand.  Did I

5     understand that correctly?

6                  THE COURT:  That's what I said I would

7     expect by then.

8                  MR. CLAR:  Thank you for your

9     clarification.

10                 THE COURT:  Yes.

11                 And just remember, the alternative is

12    very likely, at this point, conversion.

13                 MR. CLAR:  Got it.

14                 THE COURT:  Thank you.

15                 MR. CLAR:  Thank you for your time.

16                 MS. JANCZAK:  Thank you.

17                 MR. AGAY:  Thank you.

18                 THE CLERK:  All rise.

19                 Court adjourned.

20                     (Which were all the proceedings had

21                      in the above-entitled cause,

22                      June 24, 2019, 9:30 a.m.)

23

24    I, MARY C. KELLY, CSR, DO HEREBY CERTIFY THAT THE
      FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF
      PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE.(f)

25