to that Mortgagee's Unit which has not been cured within sixty (60) days. Each Mortgagee shall also be promptly notified of any taking in condemnation or by eminent domain and actions of the Association with respect thereto, any lapse, cancellation or material modification of any insurance policy or fidelity bond maintained by the Association and any proposed action that requires the consent of a specified percentage of Mortgagees.

6.2.    Notice of Amendment of Declaration or Bylaws. The Board of Directors shall give to all Mortgagees requesting same notice seven (7) days prior to the date for any meeting at which the Unit Owners, in accordance with the provisions of these Bylaws, may amend the Condominium Instruments.

6.3.    Mortgagees' Approvals. Except for the permitted subdivision of Unit B and except as provided in Section 55-79.44 of the Condominium Act, unless all of the Mortgagees holding first liens on Units (voting on the basis on one vote for each Mortgage owned except as provided below), or Unit Owners (other than Declarant), have given their prior written approval, the Association shall not be entitled to:

(A)    By act or omission, seek to abandon or terminate the Condominium; or

(B)    Change the Percentage Interest of a Unit; or

(C)    By act or omission, seek to abandon, partition, subdivide, encumber, sell or transfer the Common Elements (except that the granting of easements for public or private utilities or for other public purposes consistent with the intended use of the Common Elements by the Condominium shall not be deemed a transfer within the meaning of this clause).

6.4.    Other Rights of Mortgagees. Upon request, any Mortgagee shall be entitled to receive written notice of meetings of the Association and all Mortgagees or their designees shall be entitled to attend meetings of the Association and shall have the right to speak thereat. All Mortgagees shall have the right to examine the books and records of the Association.

ARTICLE VII.

Compliance and Default

7.1.    Relief. Each Unit Owner shall be governed by, and shall comply with, all of the terms of the ECR, the Condominium Instruments and the Condominium Act as any of the same may be amended from time to time. In addition to the remedies provided in Section 55-79.53 of the Condominium Act, a default by a Unit Owner shall entitle the Association, acting through its Board of Directors or through the Managing Agent, to the following relief:

(A)    Additional Liability. Each Unit Owner shall be liable for the expense of all maintenance, repair or replacement rendered necessary by its act, neglect or carelessness or the act, neglect or carelessness of any of its employees, agents, licensees, tenants and guests.

(B)    Costs and Attorney's Fees. In any proceedings arising out of any alleged default by a Unit Owner, the Association, if it prevails, shall be entitled to recover the costs of such proceeding and such reasonable attorney's fees as may be determined by the court.

37

(C)    <u>No Waiver of Rights</u>. The failure of the Association, the Board of Directors or a Unit Owner to enforce any right, provision, covenant or condition which may be granted by the Condominium Instruments or the Condominium Act shall not constitute a waiver of the right of the Association, the Board of Directors or the Unit Owner to enforce such right, provision, covenant or condition in the future. All rights, remedies and privileges granted to the Association, the Board of Directors or any Unit Owner pursuant to any term, provision, covenant or condition of the Condominium Instruments or the Condominium Act shall be deemed to be cumulative and the exercise of any one or more thereof shall not be deemed to constitute an election of remedies; nor shall it preclude the party exercising the same from exercising such other privileges as may be granted to such party by the Condominium Instruments or the Condominium Act or at law or in equity.

(D)    <u>Interest</u>. In the event of a default by any Unit Owner in paying any sum assessed against his Condominium Unit (other than for Common Expenses) which continues for a period in excess of ten (10) days, then the amount unpaid shall, at the option of the Association, bear interest from its due date at the lesser of the highest rate permitted by law or at the prime rate at the Bank of America, N.A., or its successor, as it may vary from time to time, plus 4% from the date due until paid.

(E)    <u>Abating and Enjoining Violations by Unit Owners</u>. The violation of any of the Rules adopted by the Board of Directors, the breach of any Bylaw contained herein or the breach of any provision of the Declaration or the Condominium Act shall give the Board of Directors the right, in addition to any other rights set forth in these Bylaws: (a) to enter the portion of the Condominium in which, or as to which, such violation or breach exists and summarily to abate and remove, at the expense of the defaulting Unit Owner, any condition that may exist therein contrary to the intent and meaning of the provisions hereof or of the Declaration (however, judicial proceedings shall be instituted before any items of construction are altered or demolished), and the Board of Directors shall not thereby be deemed guilty in any manner of trespass; or (b) to enjoin, abate or remedy by appropriate legal proceedings, either at law or in equity the continuance of any such breach.

(F)    <u>Legal Proceedings</u>. Failure to comply with any of the terms of the ECR, the Condominium Instruments and the Rules shall be grounds for relief, including without limitation, an action to recover any sums due for money damages, injunctive relief, foreclosure of the lien for payment of all assessments, any other relief provided for in these Bylaws or any combination thereof and any other relief afforded by a court of competent jurisdiction, all of which relief may be sought by the Association, the Board of Directors, the Managing Agent or by any Unit Owner (who shall also have a right of action with respect to decisions of the Association made pursuant to authority granted it by such documents) and shall not constitute an election of remedies. In any action brought for the enforcement of the ECR, the Condominium Instruments, Rules, or the Condominium Act, the prevailing party shall be entitled to recover its reasonable attorneys' fees and other enforcement costs from the other party.

7.2.    <u>Lien for Assessments</u>.

(A)    The total annual assessment of each Unit Owner for Common Expenses or any special assessment made pursuant to these Bylaws, together with any interest or late charge

applicable to such assessment and together with any costs of collection (including attorneys' fees), is hereby declared to be a lien against the Condominium Unit of such Unit Owner as provided in Section 55-79.84 of the Condominium Act, which lien shall, with respect to annual assessments, be effective on the first day of each fiscal year of the Condominium and, as to special assessments, on the first day of the next month which begins more than ten (10) days after delivery to the Unit Owner of notice of such special assessment. The Board of Directors or the Managing Agent may file or record such other or further notice or memorandum of any such lien, or such other or further document, as may be required by the aforesaid Section of the Condominium Act or by the laws of the Commonwealth of Virginia to confirm the establishment and priority of such lien.

(B)     The lien for assessments may be enforced and foreclosed in the manner provided by the laws of the Commonwealth of Virginia by action in the name of the Board of Directors, or the Managing Agent, acting on behalf of the Association. The plaintiff in such proceeding shall have the right to the appointment of a receiver under the laws of the Commonwealth of Virginia.

(C)     A suit to recover a money judgment for unpaid contributions may be maintained without foreclosure or waiving the lien securing the same, and a foreclosure may be maintained notwithstanding the pendency of any suit to recover a money judgment.

7.3.    Supplemental Enforcement of the Lien. In addition to the proceedings at law or in equity for the enforcement of the lien established by the Declaration, these Bylaws or the Condominium Act, any Unit Owner may be required by the Board of Directors to execute a bond conditioned upon the faithful performance and payment of the installments of the lien established thereby and may likewise be required to secure the payment of such obligations by a deed of trust upon its Condominium Unit recorded among the appropriate land records, granting unto a trustee or trustees appropriate powers to the end that, upon default in the performance of such bond, such deed of trust may be foreclosed by such trustee or trustees acting at the direction of the Board of Directors. In the event any such bond has been executed or such deed of trust is recorded, then any subsequent purchaser of a Unit shall take title subject to the obligations therein provided for.

7.4.    Subordination and Mortgage Protection. Notwithstanding any other provisions hereof to the contrary, the lien of any assessment levied pursuant to these Bylaws upon any Unit (and any penalties, interest on assessments, late charges and the like) shall be subordinate to, and shall in no way affect the rights of a Mortgagee who is an institutional lender secured by a first deed of trust recorded before perfection of the Association's lien for assessments; provided however, that such subordination shall apply only to assessments which have become due and payable before a conveyance of such Unit pursuant to a foreclosure or deed in lieu of foreclosure. Such conveyance shall not relieve the purchaser of the Unit at such sale from liability for any assessments thereafter becoming due, nor from the lien of any such subsequent assessment, which lien shall have the same effect and be enforced in the same manner as provided herein.

## ARTICLE VIII.

### Amendments to Bylaws

8.1.    Amendments.    These Bylaws may not be modified or amended except as follows: (a) the Declarant may make amendments and modifications subject to the approval of the Unit Owners which approval shall not be unreasonably withheld or unduly delayed and (b) the Bylaws may also be amended as provided in Sections 55-79.71 and 55-79.72:1 of the Condominium Act; provided, further that the approval or consent of the Owners of 80% of the aggregate Percentage Interests shall be required for any such amendment or modification. All amendments to the Bylaws shall be prepared and recorded by the Secretary/Treasurer.

## ARTICLE IX.

### Miscellaneous

9.1.    Notices.    All notices, demands, bills, statements or other communications under these Bylaws may be given by a party or its legal counsel and shall be in writing and shall be deemed to have been duly given if delivered personally (pursuant to Section 55-79.75 of the Condominium Act) or if sent by registered or certified mail, return receipt requested, postage prepaid (or otherwise as the Condominium Act may permit), (i) if to a Unit Owner, at the address which the Unit Owner shall designate in writing and file with the Secretary/Treasurer or, if no such address is designated, at the address of the Unit of such Unit Owner, or (ii) if to the Association, the Board of Directors or to the Managing Agent, at the principal office of the Managing Agent or at such other address as shall be designated by notice in writing to the Unit Owners pursuant to this Section, or (iii) if to a Mortgagee, to the address provided by the Unit Owner or to such other address as the Mortgagee may specify by written notice to the Association.

9.2.    Captions.    The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of these Bylaws or the intent of any provision thereof.

9.3.    Gender.    The use of the masculine gender in these Bylaws shall be deemed to include the feminine and neuter genders and the use of the singular shall be deemed to include the plural, and vice versa, whenever the context so requires.

9.4.    Construction.    These Bylaws are intended to comply with all of the applicable provisions of the Condominium Act and shall be so interpreted and applied.

15835492v13

**EXHIBIT C-2**
**TO**
**TRIPLE NET LEASE**

*Prepared by and return to:*
Kaufman & Canoles, P.C.
Robert C. Goodman, Jr., Esq. (VSB No. 04447)
150 West Main Street
Norfolk VA 23510

GPIN Parcel No.: 14673472780000

### DECLARATION OF EASEMENTS, COVENANTS, AND RESTRICTIONS

THIS DECLARATION OF EASEMENTS, COVENANTS, AND RESTRICTIONS ("ECR") is made effective as of November ____, 2017 (the "Effective Date") by Hoffland Properties, Inc., a Virginia corporation, ("Hoffland" or "Declarant") (to be indexed as a Grantor and Grantee).

### RECITALS:

A.   Hoffland owns fee simple title to Units A and B in the condominium known as "5465 Greenwich Road, a Condominium" (the "Condominium") created by the recordation immediately prior hereto of the Declaration of Condominium and related exhibits (the "Declaration"). Unless otherwise defined in this ECR, any capitalized terms used herein shall have the definitions ascribed to such terms in the Declaration.

B.   Unit B may, from time to time, be subdivided into one or more separate Units.

C.   Unit A and Unit B (including any subdivided Units thereof) are hereinafter sometimes referred to individually as a Unit and collectively as "Units."

D.   Upon conveyance of a Unit in the Condominium, the Units will be subject to the covenants and restrictions, and be entitled to the benefits of, this ECR.

E.   Hoffland, and any and all successors or assigns or subsequent holders of title to any Unit are referred to herein, from time to time, collectively as the "Owners" and individually, as "Owner." "Permittees" shall mean, with respect to any Owner, its authorized tenants, employees, guests, invitees, licensees, agents and contractors.

### AGREEMENT:

In consideration of the above recitals and of the covenants herein contained, the Declarant hereby declares that the Units and the improvements thereon (the "Improvements") and the easements and appurtenances thereunto belonging (collectively, the "Appurtenances" and together with the Units and the Improvements, the "Property") are subject to this ECR and that the Property shall be held, transferred, sold, leased and occupied subject to the easements, covenants and restrictions set forth herein. This ECR shall run with title to the Property and shall be binding upon, and inure to the benefit of the Owners, their successors and assigns, their respective lessees, licensee and occupants and for all persons acquiring any interests of any nature in the Units, or any portion thereof, as provided herein:

Page 1 of 57

1.  Party Wall. Along a portion of the boundary between Unit A and Unit B exists a masonry partition (the "Party Wall") which includes a steel drop down door in one location, a steel pedestrian door adjacent thereto, and another pedestrian door which is to be removed and replaced with a block wall. This Party Wall functions as a partial shared interior wall of the buildings located on the respective Units and is more particularly shown and designated as "LINE FROM 'A' TO 'B' IS A PARTY WALL" on that certain plat (the "Plat") entitled "PLAT SHOWING PARTY WALL LOCATED ON PARCEL DESIGNATED AS '7.37 ACRES' (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017" and attached hereto as **Exhibit 1**. Either Owner, at its own expense and acting in accordance with the procedures set forth below, shall have the right to replace the drop down steel door and the adjacent pedestrian door and the other door at the west end of the Party Wall with a block wall comparable to, or better quality than, the existing block wall (collectively, the "Party Wall Alterations").

1.1     Establishment of the Party Wall. The Owners agree that the Party Wall, and any modifications, replacements, or extensions hereafter constructed, shall be deemed a party wall in all respects, shall be subject to the restrictions and covenants set forth in this ECR, and except to the extent modified herein, the general rules of law regarding party walls and liability for property damage due to negligence or willful acts or omissions shall apply thereto.

1.2     Damage and Repairs to the Party Wall.

1.2.1   In the event the Party Wall is damaged or destroyed, in whole or in part, from any cause except a cause attributable to only one of the two Units or the negligent, reckless, or willful act or omission of an Owner, the Owners and their successors and assigns, sharing equally the cost of repair or reconstruction, shall repair or rebuild the Party Wall in the same location and to the same degree, using materials of like, or better, kind and quality as existed as of the date of the damage or destruction; provided that the Owners may mutually agree to a modification of the materials and design to be used in connection with any replacement. Each Owner shall have the right to the use of the Party Wall so repaired or rebuilt to the extent such Owner had the right to the use of the Party Wall before such damage or destruction.

1.2.2   The repairs and/or reconstruction of the Party Wall shall be undertaken wherever a condition exists which may result in (i) damage or injury to person or property or (ii) loss of security or privacy, or (iii) an adverse effect on the use of either Unit if repair or construction work is not undertaken. Either Owner, upon discovering the possibility of deterioration, damage or destruction, shall give written notice (the "Party Wall Notice") to the other Owner in writing of the nature of the damage, the work required to remedy the situation and the estimated cost of the repair or reconstruction. The Owner receiving the Party Wall Notice shall then have twenty (20) days from the date the Party Wall Notice is given to such Owner to object to the repairs or reconstruction. If the Owner receiving the Party Wall Notice does not object to the repairs or reconstruction within the twenty (20) day period, such Owner shall be deemed to have agreed to pay such Owner's share of the cost of the work. However, in the event of an emergency (i.e., a condition that is immediately threatening to the safety or security of persons or property) either Owner upon discovering the emergency shall have a right to make reasonable repairs as dictated by the emergency, including temporary solutions for security. The Owners shall share equally in the reasonable costs associated with repairing and/or reconstructing the Party Wall

(i) as a result of the emergency provided the emergency is not the fault of only one Owner, (ii) in each case in which a Party Wall Notice has been given by an Owner and not objected to by the other Owner within the period specified above, and (iii) in any other case not covered by this Section or Sections 1.2.1, 1.2.3 or 1.2.5.

        1.2.3    If an Owner's negligent, reckless, or willful act or omission shall cause damage to or destruction of the Party Wall, the negligent, reckless, or willful Owner shall bear the entire cost of repair or reconstruction.

        1.2.4    For all provisions of this ECR where there is a reference to Owner for the purpose of determining responsibility or fault, the act or omission of Permittee of the Owner shall be deemed to be the act or omission of the Owner.

        1.2.5    If the Party Wall is destroyed or damaged by fire, casualty or accident, the cause of which is attributable to conditions existing on one of the Units (e.g. fire originating in only one Unit or pipes bursting in only one Unit), but which is not attributable to the negligent or willful act or omission of either of the Owners, then, to the extent that the damage is not covered by the insurance carried by the Association, the Owner of the Unit upon which such conditions existed shall bear the cost of repair and restoration of the Party Wall.

        1.2.6    If either Owner shall neglect or refuse to pay that Owner's share of any cost of repair or reconstruction as required herein, the other Owner may repair or replace the Party Wall, and the defaulting Owner shall reimburse the other Owner for (a) all of such Owner's share of costs and expenses incurred in undertaking the repairs or replacements; (b) such Owner's costs and expenses of collection, including reasonable attorneys' fees, expert fees, court costs and expenses; and (c) interest on the unpaid sum at the per annum rate (the "Applicable Rate") which is the greater of (i) fifteen percent (15%) and (ii) the rate which is equal to the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein or any similar release by the Federal Reserve Board plus, in each case, four percent (4%), from the date incurred to the date paid.

        1.3    Creation of Mutual Party Wall Easements. Subject to the terms and conditions of this ECR, the Units shall be subject to the following easements (collectively, the "Party Wall Easements"):

        1.3.1    Each Owner shall have an easement in that part of the Unit of the other Owner on which the Party Wall is located, as may be necessary or desirable to carry out the terms of this ECR.

        1.3.2    Each Owner shall have an easement in that part of the Unit of the other Owner necessary or desirable to repair and/or restore the Party Wall and/or perform the Party Wall Alterations.

        1.3.3    Each Owner shall permit the other Owner, or its agents, employees or contractors, to enter its Unit and the Improvements thereon for the purpose of inspecting,

repairing and/or restoring the Party Wall and/or performing the Party Wall Alterations and shall coordinate with the tenants, if any, occupying the Unit regarding such entrance; provided that the right of access shall be reasonably exercised (i) so as to minimize disruption of the use of such Unit and the Improvements thereon, (ii) with due regard for the security and safety of persons and property in such Unit and the Improvements thereon and (iii) with evidence of liability insurance coverage reasonably acceptable to the Owner of such Unit.

      1.3.4   No Owner shall file any mechanic's, laborer's or materialman's lien, or suffer or permit any such lien to be filed against a Unit of another Owner or any Improvements thereon, or any part thereof by reason of work, labor, services, or materials requested and/or supplies claimed to have been requested by or on behalf of such Owner; and if such lien shall at any time be so filed, within forty-five (45) days after notice of the filing thereof, the Owner requesting or directing such work shall cause it to be canceled and discharged of record.

      1.4   Use of Party Wall. Each Owner shall have the right to use the side of the Party Wall facing such Owner's Unit in any lawful manner, including attaching nonstructural or finishing materials to it; provided, however, an Owner shall not create windows or doors in the Party Wall or place on, under, through or above the Party Wall any air conditioning equipment or any other fixture that could reasonably be expected to affect the structural integrity or strength of the Party Wall without the advance written consent of the other Owner. Unless otherwise agreed in such written consent, any consent given to one of the Owners to make openings in the Party Wall shall be subject to the right of the other Owner to close such openings at such time as that Owner desires to use that part of the Party Wall.

      1.5   Insurance. To the extent not covered by the insurance carried by the Association, each Owner shall obtain, and maintain, "causes of loss-special form" property insurance for the Improvements located on its Unit in a minimum amount equal to the full replacement value of such Improvements (exclusive of the cost of excavation and foundations), without deduction for depreciation. The policies of property insurance shall, if the same are available without any increase in premium, contain waivers of subrogation and waivers of any defense based on coinsurance or of pro rata reduction of liability or of invalidity arising from any acts of the insured. Certificates of each Owner's policies of insurance and of all renewals of such insurance, together with proof of payment of premiums, shall be delivered to any Owner upon written request by such Owner. The Owners shall not do or permit any act or thing to be done in or to the Party Wall which is contrary to law or which invalidates the Association's or any Owner's policy of property insurance. An Owner who fails to comply with the provisions of this Section shall pay all costs, expenses, liens, penalties, and damages which may be imposed upon, or suffered by, the other Owner by reason thereof.

      1.6   Termination of Party Wall Provisions. The provisions of this Section shall continue in full force and effect until the earlier of: (a) the permanent removal of the Party Wall; or (b) the date mutually agreed to in writing by the Owners and all Mortgagees.

      1.7   Subdivision of Unit B. The provisions of this Section 1 shall apply, *mutatis mutandis*, to any party wall created in connection with any subdivision of Unit B unless otherwise provided in the amendment to the Condominium Instruments creating any such subdivision.

    2.    Ingress/Egress, Cross Access, and Encroachment Easements and Parking Restrictions.

    2.1    Grant and Reservation of Ingress/Egress and Cross Access Easements. Subject to any express conditions, limitations and reservations contained herein:

    2.1.1    Unit A Dock Access Easement. Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to grant and convey unto the Owner of Unit A and its successors in title to Unit A and their respective Permittees, for the benefit of Unit A, a nonexclusive, perpetual easement (the "Unit A Dock Access Easement") in, on, across and over those portions of Unit B lying within the area (the "Unit A Dock Access Easement Area," and together with the Unit B Dock Access Easement Area as defined in Section 2.1.4 the "Dock Cross Access Easement Area") designated as "DENOTES UNIT A DOCK ACCESS EASEMENT AREA = 531 SF or 0.012 AC" on Exhibit 2.1.1. captioned "PLAT SHOWING UNIT A DOCK ACCESS EASEMENT HEREBY ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017", for pedestrian and vehicular (including delivery trucks and commercial tractor-trailers) access, ingress and egress (but subject to the "No-Parking Restriction" as provided in Section 2.1.2) to allow access by the Owner of Unit A and its Permittees to the loading docks and facilities located on Unit A. The Dock Cross Access Easement Area will be utilized from time to time by both Unit A (pursuant to the Unit A Dock Access Easement) and Unit B (pursuant to the Unit B Dock Access Easement as defined in Section 2.1.4) and both Unit A and Unit B will need access to loading docks where a reasonable degree of cooperation from time to time will be required to facilitate mutual effective access. By acceptance and/or reservation of their respective easements and use of the Dock Cross Access Easement Area both parties agree to act reasonably to cooperate and to comply with any Rules or Regulations of the Association relating to use of the Dock Cross Access Easement Area.

    2.1.2    No-Parking Restriction. In view of the need for access (including potentially turnaround space for large vehicles) to the same area by both Units, Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to impose a restriction on the Owners of both Unit A and Unit B and their respective successors in title and their respective Permittees, for the benefit of the Units a no parking restriction within the Dock Cross Access Easement Area. Within the Dock Cross Access Easement Area there shall be no parking and there shall be no overhanging items or other encroachments into any other portion of the Dock Cross Access Easement Area and any failure to comply may result in revocation by the Association (after a due process hearing) of the parking right; provided, however, if the Owner of Unit B is not otherwise using this area, then the restriction shall be deemed suspended for Unit A until ten (10) days after the Owner of Unit B, in good faith, has given the Owner of Unit A written notice (a "Use Notification") that it is resuming use of the Dock Cross Access Easement Area. If the Owner of Unit B has not resumed use of the area within twenty (20) days after giving a Use Notification to the Owner of Unit A, the restriction on parking within the Dock Cross Access Easement Area shall again be suspended for Unit A until a new Use Notification shall have been given in good faith to the Owner of Unit A. If the Owner of Unit B gives the Owner of Unit A three (3) Use Notifications without having resumed the use within the required twenty (20) day period, the Owner of Unit B may not give another Use Notification (and

any such Use Notification shall have no effect) for a period of twelve (12) months after the date of the third (3rd) Use Notification.

2.1.3    Unit B Access Easement. Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to reserve from such conveyance for the Owner of Unit B and its successors in title to Unit B and their respective Permittees, for the benefit of Unit B, and by acceptance of a deed to Unit A, the Owner of Unit A and its successors in title to Unit A and their respective Permitees shall be subject to, a nonexclusive, perpetual easement (the "Unit B Access Easement") in, on, across and over those portions of Unit A lying within the areas (collectively, the "Unit B Access Easement Areas") (i) designated as "DENOTES 29.5' PRIVATE INGRESS/EGRESS EASEMENT AREA = 6,614 SF OR 0.152 AC" on Exhibit 2.1.3(A) captioned "PLAT SHOWING 29.5' PRIVATE INGRESS/EGRESS EASEMENT HEREBY ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017", and (ii) "DENOTES UNIT B ACCESS EASEMENT AND RESTRICTED AREA EASEMENT AREA = 7,364 SF or 0.169 AC" on Exhibit 2.1.3(B) captioned "PLAT SHOWING UNIT B ACCESS EASEMENT AND RESTRICTED AREA EASEMENT HEREBY ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017", for pedestrian and vehicular (including delivery trucks and commercial tractor-trailers) access, ingress and egress over, upon, and across the Unit B Access Easement Areas, which shall allow vehicular and pedestrian access, ingress and egress across Unit A to and from Greenwich Road and portions of Unit B as shown on Exhibits 2.1.3(A) and 2.1.3(B); provided that access through "Unit B Access Easement and Restricted Area Easement" on Exhibit 2.1.3(B) in front of the office building is restricted to motorcycles, cars and trucks with two axles.

2.1.4    Unit B Dock Access Easement. Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to reserve from such conveyance for the Owner of Unit B and its successors in title to Unit B and their respective Permittees, for the benefit of Unit B, and by acceptance of a deed to Unit A, the Owner of Unit A and its successors in title to Unit A and their respective Permitees shall be subject to, a nonexclusive, perpetual easement (the "Unit B Dock Access Easement") in, on, across and over those portions of Unit A lying within the area (the "Unit B Dock Access Easement Area") designated as "DENOTES UNIT B DOCK ACCESS EASEMENT AREA = 3,947 SF or 0.091 AC" on Exhibit 2.1.4 captioned "PLAT SHOWING UNIT B DOCK ACCESS EASEMENT HEREBY ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017" for pedestrian and vehicular (including delivery trucks and commercial tractor-trailers) access, ingress and egress (but subject to the "No-Parking Restriction" as provided in Section 2.1.2) in order to allow access by the Owner of Unit B and its Permittees to the loading docks and facilities located on Unit B.

2.1.5    Unit B Encroachment Easement. Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to reserve from such conveyance for the Owner of Unit B and its successors in title to Unit B and their respective Permittees, for the benefit of Unit B, and by acceptance of a deed to Unit A, the

Owner of Unit A and its successors in title to Unit A and their respective Permitees shall be subject to, a perpetual easement (the "Unit B Encroachment Easement") in, on, across and over those portions of Unit A lying within the area (the "Unit B Encroachment Easement Area") designated as "17' X 60' PRIVATE MAINTENANCE & ENCROACHMENT EASEMENT AREA = 1,020 SF OR 0.023 AC" on Exhibit 2.1.5 captioned "PLAT SHOWING 17' X 60' PRIVATE MAINTENANCE AND ENCROACHMENT EASEMENT HEREBY ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017", for the Improvements located on Unit B, and the attachments thereto including, without limitation, the wall mounted bumper blocks and any replacements of the forgoing, to overhang and encroach upon Unit A to the same extent such overhang and encroachment exists on the date of this ECR.

2.2    Open Access.

2.2.1    Except as provided herein or as otherwise required by applicable law, no buildings, walls, fences, structures or other barriers of any sort or kind shall be constructed or maintained in the Unit B Access Easement Areas or the Dock Cross Easement Area (collectively, the "Access Easement Areas"), or any portion thereof, that prevents or impairs the use of any portion thereof; provided, however, reasonable traffic controls, including but not limited to speed bumps and gates, as may be necessary to guide and control the orderly flow of traffic or restrict access of unauthorized persons, may be installed by either Owner in and on the Access Easement Areas located on the such Owner's Unit as long as, subject to Sections 2.2.3, 2.2.4 and 2.2.5, such easement areas are not closed or blocked so as to impair, in any material respect, the proper access and use by an Owner of its Unit and its successors in title to such Unit and their respective Permitees as provided in this ECR.

2.2.2    Subject to the provisions of Sections 2.2.3, 2.2.4 and 2.2.5 hereof, all Access Easement Areas shall be open and passable by vehicular traffic at all times, and shall not be temporarily or permanently altered, modified, relocated, blocked and/or removed without the express written consent of the Owners of Units.

2.2.3    There shall be maintained between the Units a smooth and level grade transition to allow for the use of the Access Easement Areas for pedestrian and vehicular ingress and egress as set forth in Section 2.1 hereof.

2.2.4    The parties shall have the right to install and maintain, at their own expense, a security fence on all portions of their respective Units which are not subject to access; provided that to the extent that any such fence would interfere with public safety, authorized access to a Unit, or otherwise prevent servicing of utilities or the like, in each case as provide in this ECR, appropriate gates must be installed and keys or codes made available to the Owners of other Units for use on an emergency basis, and, where there is no emergency, as otherwise provided herein.

2.2.5    Notwithstanding the foregoing,

2.2.5.1    The Owners each reserve the right to close off the Access Easement Areas located on its Unit for such reasonable period of time as may be legally necessary,

Page 7 of 57

in the opinion of such Owner's counsel, to prevent the acquisition of prescriptive rights by anyone; provided, however, that prior to closing off any portion of the Access Easement Areas, as herein provided, such Owner shall give written notice to each other Owner of its intention to do so, and shall attempt to coordinate such closing with each other Owner so that no unreasonable interference in the passage of pedestrians or vehicles or with the business conducted on any other Owner's Unit shall occur;

        2.2.5.2    Except as provided in Section 2.2.5.1 above, the Access Easement Areas shall be available for use on a "24 hours a day," "365 days a year" basis (subject to governmental regulations or restrictions, the other provision of this Section 2.2 and temporary interruptions that are attributable to ordinary maintenance of such areas by the Owners, provided that each Owner shall at all times proceed diligently to minimize any such interruption);

        2.2.5.3    Each Owner agrees to take all reasonable actions, with respect to its Unit, to prevent use of the Access Easement Areas located on its Unit by persons who are not an Owner or an Owner's Permittee; and

        2.2.5.4    Each Owner agrees to take all reasonable actions to require that its Permittees park only on the Unit owned by such Owner and with respect to which such Permittee has occupancy rights.

        2.3    Maintenance of Access Easement Areas.  Subject to the provisions of Section 11, each Owner shall be solely responsible to maintain any and all Access Easement Areas located on such Owner's Unit. Such maintenance obligations shall include, without limitation, (i) maintaining all pavement in good repair and safe condition at all times (to include resurfacing, repaving, and repairing paved surfaces as needed, and painting, maintaining, and repairing any striping); (ii) cleaning, sweeping, and removing debris and other refuse from the Access Easement Areas; (iii) removing, and sanding and salting of ice and snow; (iv) maintaining lane markings and directional signs; (v) complying with all applicable statutes, laws, ordinances, governmental rules, regulations and orders which may be applicable to such Unit; and (vi) performing any and all other duties as are reasonably necessary to maintain such Access Easement Areas in good condition and repair (collectively, the "Access Easement Maintenance").

        2.4    Damage. Notwithstanding the provisions of this Section 2.3, if any portion of the Access Easement Areas is destroyed or damaged (i) by a casualty, accident or otherwise, the cause of which is directly attributable to the fault, willful misconduct, negligence, act, or omission of an Owner or any of its Permittees; or (ii) by vehicles employed or contracted for by said Owner or any of its Permittees, then such Owner shall, at its sole cost and expense, and with due diligence, repair, restore and rebuild such damaged or destroyed portion of the Access Easement Areas to its condition existing immediately prior to such damage or destruction. In the event the Owner of any Unit, or any of its Permitees are responsible for a disproportionate amount of wear and tear on the Access Easement Area (e.g. a materially larger number of heavy commercial trucks cause, over time, damage to the paved areas) then the Maintenance Share (hereinafter defined in Section 11) of the Owners of the Units shall be equitably adjusted.

3.    Sanitary Sewer.

3.1    Sanitary Sewer Facilities. As of the date hereof, the Units and the Improvements thereon are served by sanitary sewer facilities consisting of lines, conduits, pipes, and other apparatus and equipment for the transmission of sanitary sewer (collectively, "Sanitary Sewer Facilities") which may be located within, through, over, and/or under both Units and the Improvements thereon.

3.1.1    Reservation of Unit B Easement. Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to reserve unto the Owner of Unit B and its successors in title to Unit B and their respective Permittees, for the benefit of Unit B, and by acceptance of a deed to Unit A, the Owner of Unit A and its successors in title to Unit A and their respective Permitees shall be subject to, (i) a permanent, nonexclusive easement (the "Unit B 20' Sanitary Sewer Easement") within, through, under, and/or across those portions of Unit A lying within the area (the "Unit B 20' Sanitary Sewer Easement Area") designated as "DENOTES UNIT B 20' PRIVATE SANITARY SEWER EASEMENT AREA = 4,020 SF or 0.092 AC" on Exhibit 3.1.1 captioned "PLAT SHOWING UNIT B 20' PRIVATE SANITARY SEWER EASEMENT HEREBY ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017" to maintain, inspect, operate, repair and replace Sanitary Sewer Facilities to serve Unit B and (ii) a permanent, nonexclusive easement (the "Blanket Unit B Sanitary Sewer Easement" and together with the Unit B 20' Sanitary Sewer Easement, the "Unit B Sanitary Sewer Easements") within, through, under and/or across the portions of Unit A and the improvements thereon (the "Blanket Unit B Sanitary Sewer Easement Area" and together with the Unit B 20' Sanitary Sewer Easement Area, the "Unit B Sanitary Sewer Easement Areas") to maintain, inspect, operate, repair and replace the Sanitary Sewer Facilities currently serving Unit B. The Unit B Sanitary Sewer Easements shall include the right of access over those portions of Unit A and the Improvements thereon to and from the Sanitary Sewer Facilities and over such areas of Unit A and the Improvements thereon as may be reasonably required to perform the Sanitary Sewer Maintenance (hereinafter defined).

3.1.2    Continuing Rights of Unit A. The Owner of Unit A shall continue to have the right to (a) use the Unit B Sanitary Sewer Easement Areas within Unit A and the Improvements thereon including, without limitation, the right to landscape and/or pave over (but not construct any buildings or other structures on) the Unit B 20' Sanitary Sewer Easement Area, (b) install utility facilities for its benefit in the Unit B 20' Sanitary Sewer Easement Area, (c) use the existing Sanitary Sewer Facilities, if any, located within the Unit B Sanitary Sewer Easement Areas (and any replacements thereof), and (d) grant other easements over, under and across the Unit B Sanitary Sewer Easement Areas, so long as the same does not materially interfere with the easement beneficiaries' rights hereunder.

3.2    Sanitary Sewer Maintenance.

3.2.1    Subject to the provisions of Section 11, each Owner shall inspect, maintain, repair and replace the Sanitary Sewer Facilities located on such Owner's Unit, including any pump stations included therein (the "Sanitary Sewer Maintenance"), excluding lateral

connections or other facilities that serve only Unit A or Unit B (which shall be inspected, maintained, repaired and replaced by the Owner of the Unit being served) as may be reasonably necessary to keep the same in good operating condition and repair.

      3.2.2   Each Owner shall, at its sole cost and expense, maintain in good operating condition and repair, any lateral connections (and facilities) serving only its Unit (the "Lateral Sewer Connections Maintenance") whether located on Unit A or Unit B.

      3.2.3   Each Owner shall have the right to enter on and upon the other Unit and the Improvements thereon provided it gives the Owner of such Unit ten (10) days prior written notice of such entry and the work to be performed, and such work is completed as quickly as possible, in a manner so as to not unreasonably interfere with the use of the affected Unit or the Improvements thereon and in compliance with all laws, rules, regulations, orders, permits, approvals and licenses of governmental authorities having jurisdiction.

      3.2.4   The Owner performing the Sanitary Sewer Maintenance or the Lateral Sewer Connections Maintenance, as applicable, shall defend, protect, indemnify and hold the other Owner, and its Permittees harmless from and against all claims and demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and costs of suit, arising out of or resulting from the performance of its maintenance rights and/or obligations hereunder. After performing any Sanitary Sewer Maintenance or any Lateral Sewer Connections Maintenance, the Owner performing such maintenance shall repair any damage resulting therefrom and shall restore any Property damaged to the same condition as existed prior to such maintenance.

      3.2.5   In the event that any Owner changes the use of its Unit and/or the Improvements thereon and such change requires any analysis of the pump station or any change thereto, including without limitation a change in cycling rates or capacity, such Owner shall pay all costs associated therewith, including any improvements required to increase capacity, and such Owner's share of the Sanitary Sewer Maintenance shall be adjusted proportionately to account for such increased usage.

      3.3   Separate Sewer Facility Option. Each Owner expressly reserves the right to construct and install a separate sewer system located on such Owner's Unit serving only such Owner's Unit and the Improvements thereon and terminate any connection to the Sanitary Sewer Facilities, so long as such disconnection does not impair the functioning of the Sanitary Sewer Facilities for any other Owner. In such case, said Owner, upon its disconnection to the Sanitary Sewer Facilities, shall have no further obligation or liability for Sanitary Sewer Maintenance related thereto.

      4.   Stormwater.

      4.1   Stormwater Facilities. As of the date hereof, the Units and the Improvements thereon are served by stormwater facilities consisting of lines, conduits, pipes, inlets, catchbasins, and other apparatus and equipment for the transmission of stormwater (collectively, "Stormwater Facilities"), which may be located within, through, over, and/or under both Units and the Improvements thereon.

4.1.1   <u>Reservation of Unit B Easement</u>.  Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to reserve unto the Owner of Unit B and its successors in title to Unit B and their respective Permitees, for the benefit of Unit B, and by acceptance of a deed to Unit A, the Owner of Unit A and its successors in title to Unit A and their respective Permitees shall be subject to, a permanent, nonexclusive easement (the "Unit B Stormwater Easement") within, through, under, and/or across those portions of Unit A lying within the area (the "Unit B Stormwater Easement Area") designated as "DENOTES UNIT B PRIVATE 30' STORM DRAIN EASEMENT HEREBY ESTABLISHED AREA = 6,896 SF or 0.158 AC" on Exhibit 4.1.1 captioned "PLAT SHOWING UNIT B 30' PRIVATE STORM DRAIN EASEMENT HEREBY ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017" to maintain, inspect, operate, repair and replace Stormwater Facilities. The Unit B Stormwater Easement shall include (i) the right to continue any existing drainage of surface water runoff from Unit B across Unit A, and (ii) the right of access over Unit A to and from the Stormwater Facilities and over such areas of Unit A as may be reasonably required to perform the Stormwater Maintenance (hereinafter defined).

4.1.2   <u>Continuing Right of Unit A</u>.  The Owner of Unit A shall continue to have the right to (a) use the Unit B Stormwater Easement Area including, without limitation, the right to landscape and/or pave over (but not construct any buildings or other structures on) the Unit B Stormwater Easement Area, (b) install utility facilities for its benefit in the Unit B Stormwater Easement Area, (c) use the existing Stormwater Facilities located within the Unit B Stormwater Easement Area (and any replacement facilities), and (d) grant other easements over, under and across the Unit B Stormwater Easement Area, so long as the same does not materially interfere with the easement beneficiaries' rights hereunder.

4.1.3   <u>Grant of Unit A Easement</u>.  Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to grant unto the Owner of Unit A and its successors in title to Unit A and their respective Permittees, for the benefit of Unit A, a permanent, nonexclusive easement (the "Unit A Stormwater Easement") within, through, under, and/or across those portions of Unit B lying within the area (the "Unit A Stormwater Easement Area") designated as "DENOTES UNIT A 30' PRIVATE STORM DRAIN EASEMENT AREA = 7,465 SF or 0.171 AC" on Exhibit 4.1.3 captioned "PLAT SHOWING UNIT A 30' PRIVATE STORM DRAIN EASEMENT HEREBY ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017" to maintain, inspect, operate, repair and replace Stormwater Facilities. The Unit A Stormwater Easement shall include (i) the right to continue any existing drainage of surface water runoff from Unit A across Unit B, and (ii) the right of access over Unit B to and from the Stormwater Facilities and over such areas of Unit B as may be reasonably required to perform the Stormwater Maintenance (hereinafter defined).

4.1.4   <u>Continuing Rights of Unit B</u>.  The Owner of Unit B shall continue to have the right to (a) use the Unit A Stormwater Easement Area in Unit B including, without limitation, the right to landscape and/or pave over (but not construct any buildings or other structures on) the Unit A Stormwater Easement Area, (b) install utility facilities for its benefit in

the Unit A Stormwater Easement Area, (c) use the existing Stormwater Facilities located within the Unit A Stormwater Easement Area (and any replacement facilities) and (d) grant other easements over, under and across the Unit A Stormwater Easement Area, so long as the same does not materially interfere with the easement beneficiaries' rights hereunder.

4.1.5   Grant of Reciprocal Stormwater Easement.   Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to grant unto the Owner of Unit A and its successors in title to Unit A and their respective Permittees, for the benefit of Unit A, and reserve unto the Owner of Unit B and its successors in title to Unit B and their respective Permitees, for the benefit of Unit B, a permanent, nonexclusive easement (the "Reciprocal Stormwater Easement") within, through, under, and/or across those portions of Unit A and the Common Element lying within the area (the "Reciprocal Stormwater Easement Area") designated as "DENOTES 20' PRIVATE STORM DRAIN EASEMENT AREA = 1,744 SF or 0.040 AC" on Exhibit 4.1.5 captioned "PLAT SHOWING 20' PRIVATE STORM DRAIN EASEMENT HEREBY ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017" to maintain, inspect, operate, repair and replace Stormwater Facilities. The Reciprocal Stormwater Easement shall include (i) the right to continue any existing drainage of surface water runoff from Unit A across the Common Element and any existing drainage of surface water runoff from Unit B across the Common Element and Unit A, and (ii) the right of access over Unit A and the Common Element to and from the Stormwater Facilities and over such areas of Unit A and the Common Element as may be reasonably required to perform the Stormwater Maintenance (hereinafter defined).

4.1.6   Continuing Rights of Unit A.   The Owner of Unit A shall continue to have the right to (a) use the portion of the Reciprocal Stormwater Easement Area located within Unit A including, without limitation, the right to landscape and/or pave over (but not construct any buildings or other structures on) the Reciprocal Stormwater Easement Area, (b) install underground stormwater drainage facilities for its benefit in the Reciprocal Stormwater Easement Area, and (c) grant other easements over, under and across the portion of the Reciprocal Stormwater Easement Area located within Unit A, so long as the same does not materially interfere with the easement beneficiaries' rights hereunder.

4.1.7   Continuing Rights of Declarant and the Association.   Declarant and the Association shall continue to have the right as provided in the Declaration to (a) use the portion of the Reciprocal Stormwater Easement Area located within the Common Element including, without limitation, the right to landscape and/or pave over (but not construct any buildings or other structures on) the Reciprocal Stormwater Easement Area, (b) install underground stormwater drainage facilities for the benefit of either or both Units in the Reciprocal Stormwater Easement Area, and (c) grant other easements over, under and across the portion of the Reciprocal Stormwater Easement Area located within the Common Element, so long as the same does not materially interfere with the easement beneficiaries' rights hereunder.

4.2   Stormwater Maintenance.

4.2.1   Subject to the provisions of Section 11, each Owner shall inspect, maintain, repair and replace the Stormwater Facilities located on such Owner's Unit (the

"Stormwater Maintenance"), excluding lateral connections or other facilities that serve only Unit A or Unit B (which shall be inspected, maintained, repaired and replaced by the Owner of the Unit being served) as may be reasonably necessary to keep the same in good operating condition and repair.

4.2.2    Each Owner shall, at its sole cost and expense, maintain in good operating condition and repair, any lateral connections (and facilities) serving only its Unit (the "Lateral Stormwater Connections Maintenance") whether located on Unit A or Unit B.

4.2.3    Each Owner shall have the right to enter on and upon the other Unit and the Improvements thereon, provided it gives the Owner of such Unit ten (10) days prior written notice of such entry and the work to be performed, and such work is completed as quickly as possible, in a manner so as to not unreasonably interfere with the use of the affected Unit or the Improvements thereon and in compliance with all laws, rules, regulations, orders, permits, approvals and licenses of governmental authorities having jurisdiction.

4.2.4    The Owner performing the Stormwater Maintenance or the Lateral Stormwater Connections Maintenance, as applicable, shall defend, protect, indemnify and hold the other Owner, and its Permittees harmless from and against all claims and demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and costs of suit, arising out of or resulting from the performance of its maintenance rights and/or obligations hereunder. After performing any Stormwater Maintenance or any Lateral Stormwater Connections Maintenance, the Owner performing such maintenance shall repair any damage resulting therefrom and shall restore any Property damaged to the same condition as existed prior to such maintenance.

4.3    Separate Stormwater Facility Option. Each Owner expressly reserves the right to construct and install a separate stormwater system located on such Owner's Unit serving only such Owner's Unit and terminate any connection to the Stormwater Facilities, so long as such disconnection does not impair the functioning of the Stormwater Facilities for any other Owner. In such case, said Owner, upon its disconnection to the Stormwater Facilities, shall have no further obligation or liability for Stormwater Maintenance related thereto.

5.    Waterline Easement and Water Usage.

5.1    Waterline Facilities. As of the date hereof, the Units and the Improvements thereon are served by water facilities consisting of lines, conduits, pipes, valves, meters, connections, and other apparatus and equipment for the transmission of water (collectively, the "Waterline Facilities") which may be located within, through, over, and/or under the Units and the Improvements thereon.

5.1.1    Reservation of Unit B Easement. Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to reserve unto the Owner of Unit B and its successors in title to Unit B and their respective Permittees, for the benefit of Unit B, and by acceptance of a deed to Unit A, the Owner of Unit A and its successors in title to Unit A and their respective Permitees shall be subject to (i) a permanent, nonexclusive easement (the "Unit B 20' Waterline Easement") within, through, under,

and/or across those portions of Unit A laying within the area (the "Unit B 20' Waterline Easement Area") designated as "DENOTES UNIT B 20' PRIVATE WATERLINE EASEMENT AREA = 3,905 SF or 0.090 AC" on Exhibit 5.1.1 captioned "PLAT SHOWING UNIT B 20' PRIVATE WATERLINE EASEMENT HEREBY ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017" to maintain, inspect, operate, repair and replace Waterline Facilities and (ii) a permanent, nonexclusive easement (the "Blanket Unit B Waterline Easement" and together with the Unit B 20' Waterline Easement, the "Unit B Waterline Easements") within, through, under and/or across the portions of Unit A and the Improvements thereon (the "Blanket Unit B Waterline Easement Area" and together with the Unit B 20' Waterline Easement Area, the "Unit B Waterline Easement Areas") to maintain, inspect, operate, repair and replace the existing Waterline Facilities currently serving Unit B. The Unit B Waterline Easements shall include the right of access over Unit A and over such areas of Unit A and the Improvements thereon as shall be reasonably necessary to gain access to the Waterline Facilities and to perform the Waterline Facilities Maintenance (hereinafter defined) and the Lateral Waterline Connections Maintenance (hereinafter defined).

      5.1.2   The Continuing Rights of Unit A.  The Owner of Unit A shall continue to have the right to (a) use the Unit B Waterline Easement Areas located on Unit A including, without limitation, the right to landscape and/or pave over (but not construct any buildings or other structures on) the Unit B 20' Waterline Easement Area, (b) install utility facilities for its benefit in the Unit B 20' Waterline Easement Area, (c) use the existing Waterline Facilities currently serving Unit A and located within Unit B and the Improvements thereon (and any replacements thereof) and (d) grant other easements over, under and across the Unit B Waterline Easement Areas, so long as the same does not materially interfere with the easement beneficiaries' rights hereunder.

      5.1.3   Grant of Unit A Easement.  Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to grant unto the Owner of Unit A and its successors in title to Unit A and their respective Permittees, for the benefit of Unit A, a permanent, nonexclusive easement (the "Unit A Waterline Easement") to maintain, inspect, operate, repair and replace the existing Waterline Facilities, if any, currently serving Unit A and located within, through, under, and/or across Unit B and the Improvements thereon. The Unit A Waterline Easement shall include the right of access over Unit B and the Improvements thereon to and from the Waterline Facilities and over such areas of Unit B and the Improvements thereon as shall be reasonably necessary to perform the Waterline Facilities Maintenance (hereinafter defined) and the Lateral Waterline Connections Maintenance (hereinafter defined).

      5.1.4   Continuing Rights of Unit B.  The Owner of Unit B shall continue to have the right to (a) use the area (the "Unit A Waterline Easement Area") located on Unit B in which the existing Waterline Facilities are located including, without limitation, the right to landscape and/or pave over (but not construct any buildings or other structures on) the unimproved (other than with gravel, asphalt, concrete paving, curbs and gutters) portions thereof, (b) install utility facilities for its benefit in the Unit A Waterline Easement Area, (c) use the existing Waterline Facilities, if any, currently serving Unit B and located within Unit A and the Improvements thereon (and any replacements thereof), and (d) grant other easements over, under

and across the Unit A Waterline Easement Area, so long as the same does not materially interfere with the easement beneficiaries' rights hereunder.

5.2     Waterline Facilities Maintenance.

5.2.1   Subject to the provision of Section 11, each Owner shall inspect, maintain, repair and replace the Waterline Facilities (collectively, the "Waterline Facilities Maintenance") located on such Owner's Unit, excluding lateral connections or other facilities that serve only Unit A or Unit B (which shall be inspected, maintained, repaired and replaced by the Owner of the Unit being served) as may be reasonably necessary to keep them in good operating condition and repair.

5.2.2   Each Owner shall, at its sole cost and expense maintain in good operating condition and repair, any lateral connections (and facilities) serving only its Unit (the "Lateral Waterline Connections Maintenance") whether located on Unit A or Unit B.

5.2.3   Each Owner shall have the right to enter on and upon the other Unit and the Improvements thereon for the purpose of inspecting, maintaining, repairing, and replacing its lateral connections provided it gives the Owner of such Unit ten (10) days prior written notice of such entry and the work to be performed and such work is completed as quickly as possible and in a manner so as to not unreasonably interfere with the use of the affected Unit or the Improvements thereon and in compliance with all laws, rules, regulations, orders, permits, approvals and licenses of governmental authorities having jurisdiction.

5.2.4   The Owner performing the Waterline Facilities Maintenance or the Lateral Waterline Connections Maintenance, as applicable, shall defend, protect, indemnify and hold the Owner of the Unit on which such work is performed, and its successors in title to such Unit and their respective Permittees harmless from and against all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and costs of suit, arising out of or resulting from performance of its maintenance rights and/or obligations hereunder. After performing any Waterline Facilities Maintenance or any Lateral Waterline Connections Maintenance, the Owner performing such maintenance shall repair any damage resulting therefrom and shall restore any Property damaged to the same condition as it existed immediately prior to such maintenance.

5.3     Reimbursement for Water Usage. As of the date hereof, the water meter serving Units A and B is located on Unit A, and it is the intention of the parties to separately meter or sub-meter each Owner's Unit in accordance with Section 5.5 hereof. Until such time as the separate meter or submeter is in place and operating, as a condition precedent of the rights granted to Unit A under this Section, the Owner of Unit A and its successors in title to Unit A shall be obligated to reimburse the Owner of Unit B, on a monthly basis, or upon such lesser frequency as requested by the Owner of Unit B, for Unit A's share of any cost, billing, or charge associated with the usage of water which is billed to the Owner of Unit B. For purposes of this Section, to the extent such usage is not individually metered or sub-metered and each Owner's respective usage cannot be reasonably determined through the comparison with prior associated billings, all costs, billing, or charges associated with the usage of water among the Units shall be apportioned as follows:

Unit A   35%
Unit B   65%

After a sub-meter has been installed, the cost of reading and billing for water usage (but not the cost of the water usage itself) shall be an expense of the Association.

5.4     Each Owner expressly reserves the right to construct and install a separate water system located on such Owner's Unit serving only such Owner's Unit and the Improvements thereon and terminate any connection of the Waterline Facilities to such Owner's Unit and the Improvements thereon, so long as such disconnection does not impair the functioning of the Waterline Facilities for any other Owner. In such case, said Owner, upon its disconnection to the Waterline Facilities, shall have no further obligation or liability for Waterline Facilities Maintenance related thereto.

5.5     No later than sixty (60) days following recordation of this ECR, Unit A shall install, at its sole expense, all facilities necessary to meter or sub-meter the individual usage of water by Unit A, such that billing for water can be handled separately for Unit B and Unit A. Such facilities installed pursuant to this Section shall meet all requirements and regulations of the utility provider.

6.     <u>Fire Suppression System</u>.

6.1     <u>Fire Suppression Facilities</u>.  As of the date hereof, the fire suppression system serving the Units and the Improvements thereon originates at the fire hydrant house located on, or adjacent to, Unit B near the rail tracks and it provides for the transmission of water through lines, conduits, pipes, valves, connections  and other apparatus and equipment (collectively, the "Fire Suppression Facilities") located within, through, under and/or across both Units and the Improvements thereon.

6.1.1     <u>Grant of Unit A Easement</u>.  Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to grant and convey unto the Owner of Unit A and its successors in title to Unit A and their respective Permittees, for the benefit of Unit A, a permanent, nonexclusive easement (the "Fire Suppression Facilities Easement") to maintain, inspect, operate, repair and replace the Fire Suppression Facilities serving Unit A, within, through, under and/or across Unit B and the Improvements thereon. The Fire Suppression Facilities Easement shall include the right of access over Unit B and the Improvements thereon to and from the Fire Suppression Facilities and over such areas of Unit B and the Improvements thereon as may be reasonably required to perform the Fire Suppression Facilities Maintenance (hereinafter defined) and the Lateral Fire Suppression Connection Maintenance (hereinafter defined).

6.1.2     <u>Continuing Rights of Unit B</u>.  Unit B shall continue to have the right to (a) use the area (the "Fire Suppression Facilities Easement Area") in which the Fire Suppression Facilities are located, including, without limitation, the right to landscape and/or pave over (but not construct any buildings or other structures on) the unimproved (other than with gravel, asphalt, concrete paving, curbs and gutters) portions thereof, (b) install utility facilities for its benefit therein,  and (c) grant other easements over, under and across the Fire Suppression Facilities

Easement, so long as the same does not materially interfere with the easement beneficiaries' rights hereunder.

   6.1.3 <u>Alternative Fire Suppression System</u>.  In addition, as provided in, and subject to the conditions outlined in,  Section 6.2.5, the Owner of either Unit may, at its own expense, change from a water based fire suppression system to a chemical based fire suppression system.  In such case, the Owner shall maintain the chemical based fire suppression system at its own expense and will have no further obligation or liability for Fire Suppression Facilities Maintenance (hereinafter defined).

   6.2  <u>Fire Suppression Facilities Maintenance</u>.

   6.2.1 Subject to the provisions of Section 11, each Owner shall inspect, maintain, repair and replace the Fire Suppression Facilities (collectively, the "Fire Suppression Facilities Maintenance") located on such Owner's Unit, excluding lateral connections or other facilities that serve only Unit A or Unit B (which shall be inspected, maintained, repaired and replaced by the Owner of the Unit being served) as may be reasonably necessary to keep them in good operating condition and repair.

   6.2.2 Each Owner shall at its sole cost and expense maintain in good operating condition and repair the lateral connections (and facilities) serving only its Unit (the "Lateral Fire Suppression Connection Maintenance") whether located on Unit A or Unit B.

   6.2.3 Each Owner shall have the right to enter on and upon the other Unit and the Improvements thereon for the purpose of inspecting, maintaining, repairing, and replacing any lateral connections provided it gives the Owner of such Unit ten (10) days prior written notice of such entry and the work to be performed and such work is completed as quickly as possible and in a manner so as to not unreasonably interfere with the use of the affected Unit or the Improvements thereon and in compliance with all laws, rules, regulations, orders, permits, approvals and licenses of governmental authorities having jurisdiction.

   6.2.4 The Owner performing the Fire Suppression Facilities Maintenance or the Lateral Fire Suppression Connection Maintenance shall defend, protect, indemnify and hold the Owner of the Unit on which such work is performed, and its successors in title to such Unit and their respective Permittees harmless from and against all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and costs of suit, arising out of or resulting from the performance of its maintenance rights and/or obligations hereunder.  After performing any Fire Suppression Facilities Maintenance or any Lateral Fire Suppression Connection Maintenance on another Unit, the Owner performing such maintenance shall repair any damage resulting therefrom and shall restore any Property damaged to the same condition as existed prior to such maintenance.

   6.2.5 Each Owner expressly reserves the right to construct and install a separate fire suppression system on such Owner's Unit serving only such Owner's Unit and terminate any connection of the Fire Suppression Facilities to such Owner's Unit, so long as such disconnection does not impair the functioning of the Fire Suppression Facilities for any other

Owner. The Owner constructing and installing the separate fire suppression system shall, at its sole cost and expense, construct, install, and retrofit any and all components of the Fire Suppression Facilities serving other Owners and construct, install and connect all lines, pipes, conduits, valves, and other apparatus and equipment necessary to supply necessary water and maintain the requisite psi for proper operation of sprinklers and related components of the Fire Suppression Facilities. The Owner, upon its disconnection to the Fire Suppression Facilities, shall have no further obligation for Fire Suppression Facilities Maintenance related thereto.

      7.      <u>Electric Power and Telecom Facilities Easement</u>.

      7.1     <u>Electric Power and Telecom Facilities</u>. As of the date hereof, the Units and the Improvements thereon are served by an electric power system and a telecommunications system consisting of lines, wires, conduits, pipes, panel boards, junction boxes and other apparatus and equipment for the transmission of electricity and/or telephone, data and other telecommunications (collectively, the "Electric Power and Telecom Facilities"), which may be located within, through, over, and under both Units and the Improvements thereon.

      7.1.1   <u>Reservation of Unit B Easement</u>. Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, to reserve unto the Owner of Unit B and its successors in title to Unit B and their respective Permittees, for the benefit of Unit B, and by acceptance of a deed to Unit A, the Owner of Unit A and its successors in title to Unit A and their respective Permitees shall be subject to (i) a permanent, nonexclusive easement (the "Electric Power and Telecom Facilities Room Easement") within, through, under and/or across those portions of Unit A lying within the area (the "Electric Power and Telecom Room") designated as "DENOTES UNIT B ELECTRICAL POWER FACILITIES EASEMENT AREA = 3,947 SF or 0.091 AC" on Exhibit 7.1.1 captioned "PLAT SHOWING UNIT B ELECTRICAL POWER FACILITIES EASEMENT HEREBY ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017" to maintain, inspect, operate, repair and replace the Electric Power and Telecom Facilities serving Unit B, and (ii) a permanent, nonexclusive easement (the "Blanket Electric Power and Telecom Facilities Easement" and together with the Electric Power and Telecom Facilities Room Easement, the "Electric Power and Telecom Facilities Easement") within, through, under and/or across those portions of Unit A and the improvements thereon (the "Blanket Electric Power and Telecom Facilities Easement Area" and together with the Electric Power and Telecom Facilities Room, the "Electric Power and Telecom Facilities Easement Areas") to maintain, inspect, operate, repair and replace the Electric Power and Telecom Facilities currently serving Unit B. The Electric Power and Telecom Facilities Easement shall include the right of access over Unit A and the Improvements thereon to and from the Electric Power and Telecom Facilities and over such areas of Unit A and the Improvements thereon as may be reasonably required to perform the Electric Power and Telecom Facilities Maintenance (hereinafter defined) and the Lateral Electric Power and Telecom Connections Maintenance (hereinafter defined).

      7.1.2   <u>Contingency Rights of Unit A</u>. The Owner of Unit A shall continue to have the right to (a) use the Electric Power and Telecom Facilities Easement Areas including, without limitation, the right to landscape and/or pave over (but not construct any buildings or other

structures on) the unimproved (other than with gravel, asphalt, concrete paving, curbs or gutters) portions thereof, (b) install utility facilities for its benefit in the Electric Power and Telecom Facilities Easement Areas, (c) use the existing Electric Power and Telecom Facilities, if any, currently serving Unit A and located within Unit A and the Improvements thereon (and any replacements thereto) and (d) grant other easements over, under and across the Electric Power and Telecom Facilities Easement Areas, so long as the same does not materially interfere with the easement beneficiaries' rights hereunder.

    7.2    Electric Power and Telecom Facilities Maintenance.

        7.2.1   Subject to the provisions of Section 11, each Owner shall inspect, maintain, repair and replace the Electric Power and Telecom Facilities located on such Owner's Unit (the "Electric Power and Telecom Facilities Maintenance"), excluding lateral connections or other facilities that serve only Unit A or Unit B (which shall be inspected, maintained, repaired and replaced by the Owner of the Unit being served), as may be reasonably necessary to keep the same in good operating condition and repair.

        7.2.2   Each Owner shall, at its sole cost and expense, maintain in good operating condition and repair any lateral connections (and facilities) serving only its Unit (the "Lateral Electric Power and Telecom Connections Maintenance").

        7.2.3   Each Owner shall have the right to enter on and upon the other Unit and the Improvements thereon provided it gives the Owner of such Unit ten (10) days prior written notice of such entry and the work to be performed, and such work is completed as quickly as possible, in a manner so as to not unreasonably interfere with the use of the affected Unit or the Improvements thereon and in compliance with all laws, rules, regulations, orders, permits, approvals and licenses of governmental authorities having jurisdiction.

        7.2.4   The Owner performing the Electric Power and Telecom Facilities Maintenance or the Lateral Electric Power and Telecom Connections Maintenance, as applicable, shall defend, protect, indemnify and hold the other Owner, and its Permittees, harmless from and against all claims and demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and costs of suit, arising out of or resulting from the performance of its maintenance rights and/or obligation hereunder. After performing any Electric Power and Telecom Facilities Maintenance or any Lateral Electric Power and Telecom Connections Maintenance, the Owner performing such maintenance shall repair any damage resulting therefrom and shall restore any Property damaged to the same condition as existed immediately prior to such maintenance.

    7.3    Separate Electric Power and Telecom Facility Option. Each Owner expressly reserves the right to construct and install a separate electric power and/or telecom system located on such Owner's Unit serving only such Owner's Unit and the Improvements thereon and terminate any connection to the Electric Power and Telecom Facilities, so long as such disconnection does not impair the functioning of the Electric Power and Telecom Facilities for any other Owner. In such case, said Owner, upon its disconnection to the Electric Power and Telecom

Facilities, shall have no further obligation or liability for Electric Power and Telecom Facilities Maintenance related thereto.

7.4   Reimbursement for Electricity Usage. Until the Units are individually metered or sub-metered as stated in Section 7.5 hereof, as a condition precedent of the rights reserved to Unit B under this Section, the Owner of Unit B and its successors in title to Unit B shall reimburse Unit A on a monthly basis, or such lesser frequency as requested by Unit A, for Unit B's share of any cost, billing, or charge associated with the usage of electricity which is billed to the Owner of Unit B. For purposes of this Section, to the extent such usage is not individually metered or sub-metered, all costs, billing, and charges associated with the usage of electricity among the Units shall be apportioned as follows: the Owner of Unit A shall pay the difference between the total amount billed and the amount (the "Base Amount") last billed to the Property for the billing period ending prior to, but most nearly to, the date title to Unit A is transferred to a new Owner, and the Owner of Unit B shall pay the Base Amount.

Such obligation of Unit B for reimbursement under this Section shall continue until i) the Units are individually metered and/or sub-metered to track the individual usage of electricity by each Unit, or ii) the Owners have agreed in writing that such obligation shall be discontinued.

7.5   Separate Metering. No later than ninety (90) days following recordation hereof, unless either Unit has elected, pursuant Section 7.3, to install a separate electrical power facility, the Owner of Unit A shall install, at its sole cost and expense, all facilities necessary to meter or sub-meter the individual usage of electricity by Unit A and Unit B, such that billing for electricity can be handled separately for Unit A and Unit B. Such facilities installed pursuant to this Section shall meet all requirements and regulations of Dominion Virginia Power or the applicable utility provider.

8.   Gas Facilities Easement.

8.1   Gas Facilities. As of the date hereof, the Units and the Improvements thereon are served by natural gas facilities consisting of lines, conduits, pipes and other apparatus and equipment for the transmission of natural gas (collectively, "Gas Facilities") which may be located within, through, over, and under both Units and the Improvements thereon.

8.1.1   Reservation of Unit B Easement. Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A and the Improvements thereon, to reserve unto the Owner of Unit B and its successors in title to Unit B and their respective Permittees, for the benefit of Unit B, and by acceptance of a deed to Unit A, the Owner of Unit A and its successors in title to Unit A and their respective Permitees shall be subject to, (i) a permanent, nonexclusive easement (the "10' Private Gas Easement") within, through, under and across those portions of Unit A lying within the area (the "10' Private Gas Easement Area") designated as "DENOTES 10' PRIVATE GAS LINE EASEMENT AREA = 2,604 SF or 0.060 AC" on Exhibit 8.1.1 captioned "PLAT SHOWING 10' PRIVATE GAS LINE EASEMENT HEREBY ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22) (D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880) GPIN: 1467-34-7278-0000 VIRGINIA BEACH, VIRGINIA, OCTOBER 24, 2017" to maintain, inspect, operate, repair and replace Gas Facilities, and (ii) a permanent, nonexclusive easement (the "Blanket Gas Easement"

and together with the 10' Private Gas Easement, the "Gas Easement") within, through, under and/or across the portions of Unit A and the improvements thereon (the "Blanket Gas Easement Area" and together with the 10' Gas Easement Area, the "Gas Easement Areas") to maintain, inspect, operate, repair and replace the existing Gas Facilities currently serving Unit B and located within Unit A. The Gas Easement shall include the right of access over Unit A and the Improvements thereon to and from the Gas Facilities and over such areas as may be reasonably required to perform the Gas Facilities Maintenance (hereinafter defined) and the Lateral Gas Connections Maintenance (hereinafter defined).

    8.1.2   <u>Continuing Rights of Unit A</u>.   The Owner of Unit A shall continue to have the right to (a) use the Gas Easement Areas including, without limitation, the right to landscape and/or pave over (but not construct any buildings or other structures on) the 10' Private Gas Easement Area, (b) install utility facilities for its benefit in the Gas Easement Areas, (c) use the existing Gas Facilities serving Unit A and located within the Gas Easement Areas (and any replacement facilities), and (d) grant other easements over, under and across the Gas Easement Areas, so long as the same does not materially interfere with the easement beneficiaries' rights hereunder.

    8.2   <u>Gas Facilities Maintenance</u>.

    8.2.1   Subject to the provisions of Section 11, each Owner shall inspect, maintain, repair and replace the Gas Facilities located on such Owner's Unit (the "Gas Facilities Maintenance"), excluding lateral connections or other facilities that serve only Unit A or Unit B (which shall be inspected, maintained, repaired and replaced by the Owner of the Unit being served) as may be reasonably necessary to keep the same in good operating condition and repair.

    8.2.2   Each Owner shall, at its sole cost and expense, maintain in good operating condition and repair, any lateral connections (and facilities) serving only its Unit (the "Lateral Gas Connections Maintenance") whether located on Unit A or Unit B.

    8.2.3   Each Owner shall have the right to enter on and upon the other Unit and the Improvements thereon provided it gives the Owner of such Unit ten (10) days prior written notice of such entry and the work to be performed, and such work is completed as quickly as possible, in a manner so as to not unreasonably interfere with the use of the affected Unit and in compliance with all laws, rules, regulations, orders, permits, approvals and licenses of governmental authorities having jurisdiction.

    8.2.4   The Owner performing the Gas Facilities Maintenance or the Lateral Gas Connections Maintenance, as applicable, shall defend, protect, indemnify and hold the other Owner, and its Permittees, harmless from and against all claims and demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and costs of suit, arising out of or resulting from the performance of its maintenance rights and/or obligations hereunder. After performing any Gas Facilities Maintenance or any Lateral Gas Connections Maintenance, the Owner performing such maintenance shall repair any damage resulting therefrom and shall restore any Property damaged to the same condition as existed immediately prior to such maintenance.

8.3    Separate Facility Option. Each Owner expressly reserves the right to construct and install a separate natural gas system located on such Owner's Unit serving only such Owner's Unit and the Improvements thereon and terminate any connection to the Gas Facilities, so long as such disconnection does not impair the functioning of the Gas Facilities for any other Owner. In such case, said Owner, upon its disconnection to the Gas Facilities, shall have no further obligation or liability for Gas Facilities Maintenance related thereto.

8.4    Reimbursement for Gas Usage. Until the Units are individually metered or sub-metered as stated in Section 8.5 hereof, as a condition precedent of the rights reserved to Unit B under this Section, the Owner of Unit B and its successors in title to Unit B shall reimburse Unit A on a monthly basis, or such lesser frequency as requested by Unit A, for Unit B's share of any cost, billing, or charge associated with the usage of natural gas which is billed to the Owner of Unit B. For purposes of this Section, to the extent such usage is not individually metered or sub-metered, all costs, billing, and charges associated with the usage of natural gas among the Units shall be apportioned as follows: the Owner of Unit A shall pay the difference between the total amount billed and the amount (the "Base Amount") last billed to the Property for the billing period ending prior to, but most nearly to, the date title to Unit A is transferred to a new Owner, and the Owner of Unit B shall pay the Base Amount. Such obligation of Unit B for reimbursement under this Section shall continue until i) the Units are individually metered and/or sub-metered to track the individual usage of gas by each Unit, or ii) the Owners have agreed in writing that such obligation shall be discontinued.

8.5    Separate Metering. No later than ninety (90) days following recordation hereof, unless either Owner has elected, pursuant Section 8.3, to install a separate natural gas system, the Owners shall install, at joint cost and expense, all facilities necessary to meter or sub-meter the individual usage of natural gas by Unit A and Unit B, such that billing for natural gas can be handled separately for Unit A and Unit B. Such facilities installed pursuant to this Section shall meet all requirements and regulations of the applicable utility provider.

9.    Signage Easement.

9.1    Hoffland, upon conveyance of Unit A to a new Owner, shall be deemed at such time, effective with the transfer of Unit A, subject to the provisions below in this Section 9.1 below, to reserve unto the Owner of Unit B and its successors in title to Unit B and their respective Permittees, for the benefit of Unit B, and by acceptance of a deed to Unit A, the Owner of Unit A and its successors in title to Unit A and their respective Permitees shall be subject to, an exclusive, perpetual easement (the "Signage Easement") to install, maintain, repair and replace, sign(s) on the exterior front wall of the office building located on Unit A (and any replacements of such office building).

9.1.1    Under the assumptions in this Section 9.1.1., the Owner of Unit A may place on the western end of the northern facing facade of the current building on Unit A one wall sign with a maximum area of 150 sq. ft. and, in the discretion of Unit A, having individual illuminated channel letters, a box sign, or a combination of the two below and the provisions of Sections 9.1.2, 9.1.3 and 9.1.4 shall also apply. The assumptions are as follows:

9.1.1.1    The City of Virginia Beach sign ordinances will permit 1.5 sq. ft. of signage per linear foot of lot frontage.

9.1.1.2    The property has approximately 550' of frontage, which would mean 825 sq. ft. of signage.

9.1.1.3    The maximum any single wall sign can be is 150 sq. ft.

9.1.1.4    A freestanding ground sign may only be 12' tall and a maximum of 32 sq. ft. per side.

9.1.1.5    The Property will be allowed as many directional signs as are reasonably needed and that are a maximum of 4 sq. ft. each and no higher than 30" above ground.

9.1.1.6    Accordingly, based on the assumptions in Sections 91.1.1. through 9.1.1.5., the Property may legally have a maximum of (A) three non-directional signs which may consist of either three (3) wall signs of 150 sq. ft. each, or (B) 2 wall signs of up to 150 sq. ft. each plus 1 freestanding ground sign 12' tall and 32 sq. ft. per side.

9.1.2    If the sign permitted under Section 9.1.1 is in place and has not eliminated at least equal signage for Unit B then the remaining signage rights with respect to the Property shall be as allocated to Unit B except that if Unit B has one complete nondirectional sign and, in additional, if there is a ground sign or additional ground sign of sufficient size to permit Unit A and Unit B (including any subdivisions thereof) to have space, Unit B shall offer a place on such sign to Unit A.

9.1.3    In the event, and only in the event, the only location for directional signage for Unit B is on the current building on Unit A, then the Owner of Unit B may place on the eastern end of the northern facing facade of the current building on Unit A one wall sign with a maximum area of 150 sq. ft. and in the discretion of Unit A having individual illuminated channel letters, a box sign, or a combination of the two.

9.1.4    The Signage Facilities shall at all times comply with any applicable laws, codes, ordinances, rules and regulations. In the event of the destruction of any building or any change in law so that both Unit A and Unit B or either of them must forego or remove signage as described in Section 9.1.1 above, the parties shall equitably cooperate with the intent of each Unit having signage proportionate to its percentage ownership.

9.2    Each Owner shall inspect, maintain, repair and replace the Signage Facilities so that the Signage Facilities at all times are maintained in good condition and repair. The Signage Easement reserved on Unit B shall include the right to connect the Signage Facilities to electric power on Unit A (subject to the Owner of Unit B paying a reasonably charge for any electric consumption thereof) as well as the right of access over Unit A and the Improvements thereon as shall be reasonably necessary to access the Signage Facilities and to perform the installation, maintenance and repair of the Signage Facilities.

9.3    The Owner of a Unit performing any installation, maintenance, repair or replacement of the Signage Facilities (the "Signage Facilities Work") shall defend, protect, indemnify and hold the other Owner, and its Permittees, harmless from and against all claims and demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and costs of suit, arising out of or resulting from the performance of Signage Facilities Work. After performing any Signage Facilities Work, the Owner of Unit B shall repair any damage resulting therefrom and shall restore any Property damaged to the same condition as existed immediately prior to such work.

9.4    In the event the Owner of either Unit obtains from the City of Virginia Beach the right to install a monument sign on its Unit and only one monument sign is permitted for the Property, each Owner of a Unit shall have a right to a panel on such sign of a size in proportion to the relative square footage of such Unit to the square footage of all Units, with the Unit obtaining the right from the City of Virginia Beach having top billing; provided that in the event Unit B has no other directional signage, it shall be entitled to the first opportunity to select top billing.

10.    Relocation of Utility Facilities, Reconnection to Utility Facilities.

10.1    Relocation. The Owners shall have the right, from time to time, to relocate the Sanitary Sewer Facilities, the Stormwater Facilities, the Waterline Facilities, the Fire Suppression Facilities, the Electric Power Facilities and/or the Gas Facilities (collectively, the "Utility Facilities") on their respective Units, upon thirty (30) days' prior written notice to the other Owners, provided that such relocation:

10.1.1    shall not impair, in material respect, the function of the Utility Facilities; provided that there may be temporary reasonable shut down to switch over a Utility Facility;

10.1.2    shall not unreasonably impair the use and enjoyment of the other Owner's property or rights hereunder; and

10.1.3    shall be performed without cost to the other Owners.

10.2    Documentation of Relocation. If an Owner decides to relocate any of the Utility Facilities after such notice, the corresponding easement shall be deemed to be revised to reflect the relocated Utility Facilities, however, (i) the location of the relocated Utilities Facilities shall be specifically identified and the Owner shall provide such information to the other Owner and (ii) where the easement is specifically shown on the Plat, there shall be recordation by the Owner in the Clerk's Office of the Circuit Court of the City of Virginia Beach (the "Clerk's Office") of a revised plat, the former easement area or areas shall no longer be subject to the easement rights described in this ECR, but each Owner of a Unit or its successors or assigns shall remain responsible for its obligations under the terms of this ECR.

10.3    Reconnection to Utility Facilities. In the event any Owner (a "Disconnecting Owner") exercises a right hereunder to construct and install any separate Utility Facilities to serve only its Unit and the Improvements thereon, and thereafter disconnects from the comparable Utility Facilities formerly serving both Units and the Improvements thereon, such

Disconnecting Owner shall have the right, prior to December 31, 2020, to reconnect to such disconnected Utility Facilities. As a condition precedent to a Disconnecting Owner exercising its right of reconnection as provided in this Section, the Disconnecting Owner must (i) give the other Owner at least ninety (90) days prior written notice of its intention to reconnect to the specified Utility Facilities; (ii) pay all costs and expenses of such reconnection, (iii) perform, or cause to be performed, all work relative to such reconnection in compliance with the provisions of Section 13 of this ECR and (iv) reconnect to the Utility Facilities at such time (after business hours, if necessary) and in such manner so as not to interrupt the utilities supplied to such other Owner by the Utility Facilities being reconnected.

11.   Association Duties and Rights and Shared Maintenance Fees. The Owner of each Unit shall be obligated to reimburse the other Owner or the Association, as applicable, for its share ("Maintenance Share") of the actual costs and expenses incurred by an Owner (the "Maintenance Owner") or the Association, as applicable, in the performance of the Access Easement Maintenance, the Sanitary Sewer Maintenance, the Stormwater Facilities Maintenance, the Waterline Facilities Maintenance, the Fire Suppressions Facilities Maintenance, the Electric Power Facilities Maintenance and the Gas Facilities Maintenance (collectively, the "Annual Maintenance Costs"). The Owners shall pay their respective Maintenance Share of the Annual Maintenance Costs in full within thirty (30) days of receipt of a statement of such fees from the Maintenance Owner or the Association, as applicable. The obligations herein shall run with the land and be binding on any successors in title. The respective Maintenance Share for each Owner is as follows:

Unit A     35%
Unit B     65%

Until such time as the Association shall terminate its obligations and rights by written notice (the "Maintenance Termination Notice") given to each Owner at least one hundred and eighty (180) days prior to the date of termination as specified in the Maintenance Termination Notice, the Association shall be responsible for the Access Easement Maintenance, the Sanitary Sewer Maintenance, the Stormwater Facilities Maintenance, the Waterline Facilities Maintenance, and the Fire Suppression Facilities Maintenance, the Electrical Power Facilities Maintenance and the Gas Facilities Maintenance. The Association shall have the same rights and easements, including access, granted to, and shall be subject to such conditions and restrictions imposed on, the Owners in this ECR for the purpose of discharging the foregoing maintenance obligations. Whether performed by the Association or any Owner, the obligation to perform maintenance and repair work (other than emergency repairs) shall be contingent upon the Owners, or in the case of a Maintenance Owner, the other Owners, paying their Maintenance Share.

12.   Indemnification and Insurance. Each Owner shall indemnify, defend, and hold harmless each other Owner and its Permittees from and against all claims, actions, losses, damages, liabilities and expenses (including reasonable attorneys' fees) relating to accidents, injuries, loss, or damage of or to any person or property arising from the negligent, intentional or willful acts or omissions of such indemnifying Owner or others acting on behalf of such indemnifying Owner in connection with the terms of this ECR. Each Owner shall maintain, or cause to be maintained, commercial general liability insurance, including broad form endorsement, on an occurrence basis in combined policy limits of not less than $3,000,000 per occurrence and in the aggregate for bodily injury and for property damage with respect to its Unit. Such amount shall be increased

every five (5) years by the increase, if any, in the Consumer Price Index over such five (5) year period and (ii) coverage amounts generally maintained by others for similar operations with similar risks. Such insurance shall name the Owners of the other Units as additional insureds. Each Owner shall make available to the other Owners a certificate of insurance evidencing the general liability coverage required to be carried by said Owner under the provisions of this ECR upon demand. As used in this ECR, the term "Consumer Price Index" ("CPI") shall mean the index for "All Urban Consumers, U.S. City Average, All Items, 1982-1984 = 100", now published by the United States Department of Labor, Bureau of Labor Statistics, as part of the "Monthly Labor Review", calculated on the basis of 1982-1984 equals 100; provided however, that if said "Monthly Labor Review" or base is subsequently changed or revised, the Association shall make an appropriate conversion to such changed or revised labor review by the utilization of conversion factors, if any, published or otherwise made available by the Bureau of Labor Statistics. If such conversion factors are not published or otherwise made available, or if the "Monthly Labor Review" ceases to be published or otherwise becomes unavailable or unusable, the Association, in good faith, shall select a suitable substitute index.

13.   Conduct of Work. All construction, maintenance and/or repair required or permitted by this ECR shall be conducted in accordance with all laws, statutes, ordinances, codes, rules and governmental regulations and accepted engineering practices, and shall be completed in a good and workmanlike manner free and clear of any liens. With regard to any maintenance, repair, construction or other work required or permitted by this ECR, the Owner conducting such activity on the Unit of the other Owner agrees to indemnify, defend and hold harmless the other Owner and its Permitees with regard to all suits, claims, damages, costs, losses, expenses and liabilities suffered or incurred by the indemnified parties due to the actions or omissions of the indemnifying Owner or its agents, employees or independent contractors with respect to such work. The Owner and any Permittee undertaking any construction, maintenance and/or repair work shall take all reasonably necessary measures to minimize any disruption or inconvenience caused by such work and, except in the case of an emergency, shall give the other Owners affected by such work written notice at least forty-eight (48) hours (or such longer period as may be specified in this ECR) prior to commencing such work.

14.   No Rights in Public; No Implied Easements; Dedication of Utility Facilities. Nothing contained herein shall be construed as creating any rights in the general public or as dedicating for public use any portion of any of the Units or the Improvements thereon or any Utility Facilities. No easements, except those expressly set forth herein, shall be implied by this ECR. Notwithstanding the foregoing, in the event that all or any part of any of the Utility Facilities are dedicated to public use, then the rights and obligations created in this ECR shall not apply to the dedicated portions of the Utility Facilities for which any governmental authority has assumed maintenance obligations in connection with such dedication.

15.   Remedies and Enforcement.

15.1   Events of Default. Any breach or threatened breach by any Owner or its Permittees of any term, condition, obligation or covenant of this ECR shall constitute an "Event of Default" hereunder. Any Owner shall have the right, but not the obligation, to enforce this ECR and/or, subject to such conditions as provided herein, to cure any Event of Default hereunder.

15.2    Notice. Except as otherwise provided herein, upon the occurrence of an Event of Default hereunder, any Owner shall be entitled to give written notice of such Event of Default to the defaulting Owner, and such defaulting Owner shall have thirty (30) days following the date such written notice is given within which to cure such Event of Default, unless, with respect to an Event of Default the nature of which cannot reasonably be cured within such thirty (30) day period, the defaulting Owner promptly commences such cure and thereafter diligently prosecutes such cure to completion.

15.3    Remedies Upon Failure to Cure. If, after giving such written notice and the expiration of the cure period identified in Section 15.2 hereof, any Event of Default hereunder has not been satisfactorily cured, any Owner shall be entitled to full and adequate relief by injunction and/or all such other available legal and equitable remedies from the consequences of such Event of Default, including, without limitation, payment of any amounts due and/or specific performance. In addition to all other remedies available at law or in equity, any Owner shall have the right to perform peaceably such obligation contained in this ECR on behalf of such defaulting Owner and be reimbursed by such defaulting Owner upon demand for the reasonable costs thereof, together with an administrative fee of fifteen percent (15%), plus interest, as set forth in Section 15.7 hereof. All costs and expenses owed by a defaulting Owner shall constitute a lien against the defaulting Owner's Unit and the Improvements thereon. The lien shall attach and take effect only upon recordation of a claim of lien in the Clerk's Office by the Owner making the claim. The claim of lien shall include (i) the name of the lien claimant; (ii) a statement concerning the basis for the claim of lien and identifying the lien claimant as a curing party; (iii) an identification of the Owner or reputed Owner of the Unit and the Improvements thereon or interest therein against which the lien is claimed; (iv) a description of the Unit against which the lien is claimed; (v) a description of the work performed which has given rise to the claim of lien and a statement itemizing the amount thereof; and (vi) a statement that the lien is claimed pursuant to the provisions of this ECR, reciting the date, book and page (or instrument number) of recordation hereof. The notice shall be duly verified, acknowledged and contain a certificate that a copy thereof has been served upon the Owner against whom the lien is claimed, by personal service or by mailing. The lien so claimed shall attach from the date of recordation solely in the amount claimed thereby and may be enforced in any judicial proceedings allowed by law.

15.4    Immediate Self-Help. Notwithstanding anything contained herein to the contrary, in the event of (i) an emergency, (ii) the blockage or material impairment of the easement rights granted hereunder, and/or (iii) the unauthorized parking of vehicles on any Unit, any Owner may peaceably and immediately cure the same without the provision of any prior notice to the defaulting Owner and shall be reimbursed by the defaulting Owner upon demand for the reasonable cost thereof, together with interest, in the amount set forth in Section 15.7 hereof, from the date such costs are incurred until payment thereof is received. In the event of an actual or threatened Event of Default hereunder, each Owner agrees that such actual or threatened Event of Default shall cause the non-defaulting Owner to suffer irreparable harm and such non-defaulting Owner shall have no adequate remedy at law. As a result, in the event of an actual or threatened Event of Default hereunder, the non-defaulting Owner and its Permittees, in addition to all remedies available at law or otherwise hereunder, shall be entitled to injunctive or other equitable relief to enjoin an actual or threatened Event of Default hereunder.

15.5    Remedies Cumulative. The remedies specified herein shall be cumulative and in addition to all other remedies permitted at law or in equity.

15.6    No Termination for Breach. Notwithstanding anything contained herein to the contrary, the occurrence of any Event of Default hereunder shall not entitle any Owner to cancel, rescind, or otherwise terminate this ECR or the easements (other than the parking rights in the Parking Restricted Area) provided for herein. No Event of Default hereunder shall defeat or render invalid the lien of any deed of trust upon any Unit made in good faith for value, but the easements, covenants, conditions and restrictions hereof shall be binding upon and effective against any Owner of such Unit covered hereby whose title thereto is acquired by foreclosure, trustee's sale, or otherwise.

15.7    Late Fees and Interest. All costs and expenses which are to be reimbursed by any Owner to another Owner or the Association pursuant to this ECR and which are not reimbursed within the required time period shall be subject to a late charge equal to five percent (5%) of such costs and expenses, and interest shall accrue, at the Applicable Rate, on such costs and expenses from the date on which payment was due until paid. Each Owner shall be entitled to recover all reasonable costs of collection, including reasonable attorneys' fees actually incurred.

16.    Term. The easements, covenants, conditions and restrictions contained in this ECR shall be effective commencing on the date of recordation of this ECR in the Clerk's Office and shall remain in full force and effect thereafter in perpetuity unless otherwise stated herein, or unless this ECR is canceled or terminated by the written consent of all record Owners of the Units, and each holder or beneficiary of each and every mortgage or deed of trust encumbering all or any of the Units.

17.    Miscellaneous.

17.1    Attorneys' Fees. In the event any Owner institutes any legal action or proceeding for the enforcement of any right or obligation herein contained, the prevailing party after a final adjudication shall be entitled to recover its costs and reasonable attorneys' fees incurred in the preparation and prosecution of such action or proceeding.

17.2    Consents. Wherever in this ECR the consent or approval of any Owner is required, unless otherwise expressly provided herein, such consent or approval shall not be unreasonably conditioned, withheld or delayed. Any request for consent or approval shall: (a) be in writing; (b) specify the paragraph or Section hereof that requires such notice to be given or that such consent or approval be obtained; and (c) be accompanied by such background data as is reasonably necessary to allow the Owner to make an informed decision thereon. The consent of any Owner under this ECR, to be effective, must be in writing.

17.3    No Waiver. No waiver of any Event of Default by any Owner shall be implied from any omission of an Owner to take any action with respect to such Event of Default.

17.4    No Agency. Nothing in this ECR shall be deemed or construed by any Owner or by any third person to create the relationship of principal and agent or of limited or general partners or of joint venturers or of any other association between the Owners.

17.5   <u>Covenants to Run with Land</u>. It is intended that each of the easements, covenants, rights and obligations set forth herein shall run with the land and create equitable servitudes in favor of the Units benefited and burdened thereby, shall bind every person having any fee, leasehold or other interest therein and shall inure to the benefit of the respective parties and their successors, assigns, heirs, and personal representatives.

17.6   <u>Future Owner's Acceptance</u>. The future owner of any Unit or any portion thereof, by acceptance of a deed conveying title thereto or the execution of a contract for the purchase thereof, whether from the current Owners or any subsequent owners of such Units, shall accept such deed or contract upon and subject to each and all of the easements, covenants and obligations contained herein. By such acceptance, any such future owner shall for itself and its successors, assigns, heirs, and personal representatives, covenant, consent, and agree to and with the other owners, keep, observe, comply with, and perform the obligations and agreements set forth herein with respect to the Unit so acquired by such future owner.

17.7   <u>Severability</u>. Each provision of this ECR and the application thereof to the Units is hereby declared to be independent of and severable from the remainder of this ECR. If any provision contained herein shall be held to be invalid or to be unenforceable or not to run with the land, such holding shall not affect the validity or enforceability of the remainder of this ECR. In the event the validity or enforceability of any provision of this ECR is held to be dependent upon the existence of a specific legal description, the Owners agree promptly to cause such legal description to be prepared.

17.8   <u>Notices</u>. All notices, demands, or other communications that may be necessary or proper hereunder shall be in writing and shall be deemed to be delivered: (i) when received, if delivered by hand, (ii) on the next business day after deposit with a nationally recognized overnight courier service for next business day delivery (costs prepaid), (iii) when transmitted, if telecopied or sent via electronic mail with confirmation of receipt, provided notice is also sent by one of the other methods provided in this Section 17.8, or (iv) three (3) business days following deposit of same in a U.S. Postal Service receptacle, if sent by mail, postage prepaid, as registered or certified mail, return receipt requested, addressed as follows:

| | |
|---|---|
| Unit A: | at the premises<br>5465 Greenwich Road, Unit A<br>Virginia Beach, VA  23462 |
| with a copy to: | John Napier, Esq.<br>618 Village Drive, Suite J<br>Virginia Beach, VA 23454 |
| Unit B: | Hoffland Properties, Inc.<br>Attention: Robin D. Ray President<br>5400 Virginia Beach Boulevard<br>Virginia Beach VA 23462 |

with a copy to:      Robert C. Goodman Jr.
Kaufman & Canoles, P.C.
150 E. Main Street, Suite 2100
Norfolk, VA 23410
rcgoodman@kaufcan.com

Any party hereto may change its address for notice purposes hereunder by delivering written notice thereof to the other parties in accordance with the foregoing. Rejection or refusal to accept, or the inability to deliver because of a changed address of which no notice was given shall not affect the validity of notice given in accordance with this Section 17.8. Upon receipt of a written notice complying with the provisions of this Section 17.8 from a mortgagee having an interest in one of the Units, the Parties agree that from and after such date a copy of any notice given will be sent to such mortgagee. Such notice from a mortgagee must clearly state the Unit(s) in which such mortgagee has an interest.

     17.9   <u>Governing Law</u>. The laws of the Commonwealth of Virginia shall govern the interpretation, validity, performance, and enforcement of this ECR.

     17.10  <u>Estoppel Certificates</u>. Each Owner, within thirty (30) days of its receipt of a written request from any other Owner, shall from time to time (but not more than twice per year) provide the requesting Owner with a certificate binding upon such Owner stating that: (a) to the best of such Owner's knowledge, whether the other Owner is in default or violation of this ECR and if so identifying such default or violation; and (b) this ECR is in full force and effect and identifying any amendments to the ECR as of the date of such certificate.

     17.11  <u>Headings</u>. The headings of the sections and paragraphs of this ECR are for convenience only and do not in any way limit, amplify or otherwise affect the provisions contained herein.

     17.12  <u>Matters of Record</u>. The conveyances made and rights granted in this ECR are made subject to all applicable easements, restrictions, covenants and conditions of record in the chain of title to the Units.

     17.13  <u>Curative Items</u>.  Each Owner, and each successor in title to a Unit by acceptance of its deed thereto, shall be deemed to have agreed to enter into any reasonable amendments, supplements and/or modifications to this ECR and any exhibits and/or plats attached hereto or referenced herein to correct any errors and/or to satisfy any requirements of an institutional lender providing financing with respect to any Unit so long as such amendment, supplement and/or modification implements the purpose and intent of this ECR and does not materially increase the obligations, liabilities or expenses, or materially lessen the rights, benefits or protections of an Owner.

*[Signature Pages to Follow]*

WITNESS the following signature and seal:

DECLARANT:

Hoffland Properties, Inc.
a Virginia corporation

By:   _____
Name: Robin D. Ray
Title:  President

COMMONWEALTH OF Virginia
CITY/COUNTY OF _____

    The foregoing instrument was acknowledged before me this _____ day of November, 2017, by Robin D. Ray, President of Hoffland Properties, Inc., a Virginia corporation.

_____
                             Notary Public

My commission expires: _____
My registration number is: _____

15933230v18



EXHIBIT 1

EXHIBIT 1
PLAT SHOWING PARTY WALL LOCATED ON
PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

NOTE: SEE SHEET 2 OF 2 FOR
NOTES AND CURVE TABLE.

MSA, P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

DWN BY: KCR
DATE: 10/24/2017

SHEET 1 OF 2
JOB# 17181-10
SCALE: 1" = 60'

EXHIBIT 1

*SURVEY NOTES:*

1. *THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 1709189.3/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 8:00 A.M.*

2. *CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF TITLE IS DEED BOOK 2473 AT PAGE 267.*

3. *THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM RECORDED PLATS AND DEEDS.*

4. *THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT SHOWING THE PARTY WALL THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED.*

| CURVE TABLE | | | | | | |
|---|---|---|---|---|---|---|
| CURVE | RADIUS | LENGTH | TANGENT | CHORD | BEARING | DELTA |
| C1 | 243.50' | 87.29' | 44.12' | 86.83' | S76° 33' 01"E | 20°32'25" |
| C2 | 3.74' | 2.74' | 1.43' | 2.66' | S33° 25' 45"W | 41°57'38" |
| C3 | 117.51' | 46.49' | 23.55' | 46.19' | S71° 34' 41"W | 22°40'11" |



LOCATION MAP - SCALE: 1" = 2,000'






EXHIBIT 1
PLAT SHOWING PARTY WALL LOCATED ON
PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

M.S.A. P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

| | |
|---|---|
| DWN BY:KCR | SHEET 2 OF 2 |
| DATE: 10/24/2017 | JOB# 17181-10 |
| | SCALE: 1" = 60' |

EXHIBIT 2.1.1



TEMPORARY CONSTRUCTION
EASEMENT FOR ENTRANCE
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

PERMANENT DRAINAGE
EASEMENT
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

VAR. WIDTH PERMANENT STANDARD VDOT UTILITY EASEMENT
& VAR. WIDTH PERMANENT STANDARD UTILITY EASEMENT
FOR DOMINION VIRGINIA POWER
(SHP9 19, PG 33A) (INSTR. 20160923000853880)

TEMPORARY CONSTRUCTION
EASEMENT FOR ENTRANCE
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

PERMANENT DRAINAGE
EASEMENT
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

GREENWICH ROAD (VAR. R/W)
(SHPB 19, PG 33A)
(INSTR. NO. 20160923000853880)

+/−530' TO
BUSINESS
PARK DRIVE

35.00'

S82°16'39"E

510.08' O/A

262.76'

PIN(F)

PIN(F)

N/F
VIRGINIA ELECTRIC AND POWER COMPANY
(DB 712, PG 365)
PARCEL VP
(MB 206, PG 8)
GPIN 1467-34-2236

539.14'

N12°10'22"E

(MB 70, PG 22)

S7°43'21"W

195.25'

DENOTES UNIT A DOCK
ACCESS EASEMENT
AREA = 531 SF
OR 0.012 AC
(SEE NOTE 5)

S82°16'09"E
22.59'

N7°47'06"E
23.46'

N82°06'36"W
22.59'

S7°47'06"W
23.52'

PARCEL DESIGNATED AS "7.37 ACRES"
(MB 70, PG 22)
(DB 2473, PG 267)
(INSTR. NO. 20160923000853880)
GPIN 1467-34-7278-0000
AREA=320,332 SF
OR 7.354 AC

COMMONWEALTH OF VIRGINIA
JEFFREY J. WERRETHER
Lic. No. 2306
10/24/2017
LAND SURVEYOR

50'    0'    50'    100'

GRAPHIC SCALE
1" = 50'

EXHIBIT 2.1.1
PLAT SHOWING
UNIT A DOCK ACCESS EASEMENT HEREBY ESTABLSHED ON
PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

NOTE: SEE SHEET 2 OF 2 FOR
NOTES AND CURVE TABLE.

MSA, P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

DWN BY: KCR

SCALE: 1" = 50'

JOB# 17181-08
SHEET 1 OF 2

## EXHIBIT 2.1.1

### SURVEY NOTES:

1. THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17091893/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 8:00 A.M.

2. CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF TITLE IS DEED BOOK 2473 AT PAGE 267.

3. THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM RECORDED PLATS AND DEEDS.

4. THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT FOR THE UNIT A DOCK ACCESS EASEMENT (SEE NOTE 5) THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED, THAT WILL ESTABLISH THE UNIT A DOCK ACCESS EASEMENT.

5. REFERENCE TO UNIT A IS TAKEN FROM CONDOMINIUM PLAT AND PLANS BY MSA, P.C. ENTITLED "EXHIBIT B CONDOMINIUM PLAT AND PLANS OF 5465 GREENWICH ROAD A CONDOMINIUM (M.B. 70, PG. 22) VIRGINIA BEACH, VIRGINIA", DATED OCTOBER 16, 2017.



LOCATION MAP - SCALE: 1" = 2,000'



EXHIBIT 2.1.1
PLAT SHOWING
UNIT A DOCK ACCESS EASEMENT HEREBY ESTABLSHED ON
PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017



**M S A, P.C.**
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

| DWN BY: KCR | JOB# 17181-08 |
| SCALE: 1" = 50' | SHEET 2 OF 2 |

EXHIBIT 2.1.3(A)



VAR. WIDTH PERMANENT STANDARD VDOT UTILITY EASEMENT
& VAR. WIDTH PERMANENT STANDARD UTILITY EASEMENT
FOR DOMINION VIRGINIA POWER
(SHPB 19, PG 33A) (INSTR. 20160923000853880)

S86°49'07"E
25.40'

GREENWICH ROAD (VAR. R/W)
(SHPB 19, PG 33A)
(INSTR. NO. 20160923000853880)

PIN(S)    C1    C4    PIN(S)
C2    C3    C4 NAIL(S)

S82°16'39"E 510.08'

TEMPORARY CONSTRUCTION
EASEMENT FOR SLOPES
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

TEMPORARY CONSTRUCTION
EASEMENT FOR ENTRANCE
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

PARCEL DESIGNATED AS "7.37 ACRES"
(MB 70, PG 22)
(DB 2473, PG 267)
(INSTR. NO. 20160923000853880)
GPIN 1467-34-7278-0000
AREA=320,332 SF
OR 7.354 AC

221.72'    S17°31'15"W    S17°31'13"W

(MB 70, PG 22)

DENOTES 29.5' PRIVATE
INGRESS/EGRESS EASEMENT
AREA = 6,614 SF OR 0.152 AC

N/F
COMMONWEALTH BUILDING
COMPANY
(DB 1442, PG 339)
PARCEL 2BA
(MB 73, PG 14)
GPIN 1467-44-2286

538.72' O/A

30' HRSD EASEMENT (DB 1013, PG 54) (DB 1046, PG 691)
30' CITY OF VIRGINIA BEACH UTILITY EASEMENT
(MB 131, PG 38) (DB 1899, PG 143) AND
30' VEPCO EASEMENT (DB 3025, PG 446) (DB 2943, PG 971)
(DB 2684, PG 126) (DB 1302, PG 484) (DB 998, PG 719)

S17°31'13"W

571.94'

N82°16'39"W    PIN(F)

N/F
NORFOLK & SOUTHERN RAILROAD (66' R/W)

50'    0'    50'    100'

GRAPHIC SCALE
1" = 50'

COMMONWEALTH OF VIRGINIA
JEFFREY J. MERRETHER
Lic. No. 2306
10/24/2017
LAND SURVEYOR

NOTE: SEE SHEET 2 OF 2 FOR
NOTES AND CURVE TABLE.

EXHIBIT 2.1.3(A)
PLAT SHOWING
29.5' PRIVATE INGRESS/EGRESS EASEMENT
HEREBY ESTABLISHED ON
PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

MSA, P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

DWN BY: KCR
SCALE: 1" = 50'

JOB# 17181-02
SHEET 1 OF 2

EXHIBIT 2.1.3(A)

SURVEY NOTES:

1.  THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL
    TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17091883/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT
    8:00 AM.

2.  CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF
    TITLE IS DEED BOOK 2473 AT PAGE 267.

3.  THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM
    RECORDED PLATS AND DEEDS.

4.  THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT FOR THE 29.5' PRIVATE INGRESS/EGRESS EASEMENT
    THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED, THAT WILL ESTABLISH THE 29.5' PRIVATE
    INGRESS/EGRESS EASEMENT.

### CURVE TABLE

| CURVE | RADIUS | LENGTH | TANGENT | CHORD | BEARING | DELTA |
|-------|--------|--------|---------|-------|---------|-------|
| C1 | 243.50' | 87.29' | 44.12' | 86.83' | S76° 33' 01"E | 20°32'25" |
| C2 | 243.50' | 56.84' | 28.55' | 56.71' | S72° 58' 00"E | 13°22'24" |
| C3 | 243.50' | 30.04' | 15.04' | 30.02' | S83° 11' 16"E | 7°04'08" |
| C4 | 243.50' | 0.42' | 0.21' | 0.42' | S86° 46' 17"E | 0°05'53" |



LOCATION MAP — SCALE: 1" = 2,000'



EXHIBIT 2.1.3(A)
PLAT SHOWING
29.5' PRIVATE INGRESS/EGRESS EASEMENT
HEREBY ESTABLSHED ON
PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017



**MSA, P.C.**
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture

5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

| DWN BY: KCR | JOB#: 17181-02 |
|-------------|----------------|
| SCALE: 1" = 50' | SHEET 2 OF 2 |

EXHIBIT 2.1.3(B)



EXHIBIT 2.1.3(B)
PLAT SHOWING
UNIT B ACCESS EASEMENT AND RESTRICTED AREA EASEMENT
HEREBY ESTABLISHED ON
PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

NOTE: SEE SHEET 2 OF 2 FOR
NOTES AND CURVE TABLE.

M.S.A., P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

DWN BY:KCR
SCALE: 1" = 50'

JOB# 17181-03
SHEET 1 OF 2

EXHIBIT 2.1.3(B)

### SURVEY NOTES:

1. THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17081893/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 8:00 A.M.

2. CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF TITLE IS DEED BOOK 2473 AT PAGE 267.

3. THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM RECORDED PLATS AND DEEDS.

4. THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT FOR THE UNIT B ACCESS EASEMENT AND RESTRICTED AREA EASEMENT (SEE NOTE 5) THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED, THAT WILL ESTABLISH THE UNIT B ACCESS EASEMENT AND RESTRICTED AREA EASEMENT.

5. REFERENCE TO UNIT B IS TAKEN FROM CONDOMINIUM PLAT AND PLANS BY MSA, P.C. ENTITLED "EXHIBIT B CONDOMINIUM PLAT AND PLANS OF 5465 GREENWICH ROAD A CONDOMINIUM (M.B. 70, PG. 22) VIRGINIA BEACH, VIRGINIA", DATED OCTOBER 16, 2017.

| CURVE TABLE | | | | | | |
|-------|--------|--------|---------|--------|-------------|---------|
| CURVE | RADIUS | LENGTH | TANGENT | CHORD | BEARING | DELTA |
| C1 | 243.50' | 87.29' | 44.12' | 86.83' | S76° 33' 01"E | 20°32'25" |
| C2 | 243.50' | 56.83' | 28.55' | 56.71' | S72° 58' 00"E | 13°22'24" |
| C3 | 243.50' | 30.46' | 15.25' | 30.44' | S83° 14' 13"E | 7°10'01" |



LOCATION MAP — SCALE: 1" = 2,000'






EXHIBIT 2.1.3(B)
PLAT SHOWING
UNIT B ACCESS EASEMENT AND RESTRICTED AREA EASEMENT
HEREBY ESTABLSHED ON
PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 2016923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

**M.S.A., P.C.**
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

| DWN BY:KCR | JOB# 17181-03 |
|------------|---------------|
| SCALE: 1" = 50' | SHEET 2 OF 2 |

EXHIBIT 2.1.4



TEMPORARY CONSTRUCTION
EASEMENT FOR ENTRANCE
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

PERMANENT DRAINAGE
EASEMENT
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

VAR. WIDTH PERMANENT STANDARD VDOT UTILITY EASEMENT
& VAR. WIDTH PERMANENT STANDARD UTILITY EASEMENT
FOR DOMINION VIRGINIA POWER
(SHPB 19, PG 33A) (INSTR. 20160923000853880)

TEMPORARY CONSTRUCTION
EASEMENT FOR ENTRANCE
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

PERMANENT DRAINAGE
EASEMENT
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

+/-530' TO
BUSINESS
PARK DRIVE

35.00'

GREENWICH ROAD (VAR. R/W)
(SHPB 19, PG 33A)
(INSTR. NO. 20160923000853880)

S82°16'39"E    510.08' O/A

250.47'

PIN(F)

VIRGINIA ELECTRIC AND POWER COMPANY
(DB 712, PG 365)
PARCEL VP
(MB 206, PG 8)
GPIN 1467-34-2238

539.14'

N12°10'22"E

(MB 70, PG 22)

149.40'
S74°06'W

DENOTES UNIT B DOCK
ACCESS EASEMENT
AREA = 3,947 SF
OR   0.091 AC
(SEE NOTE 5)

S82°19'09"E
68.69'

N7°47'06"E
45.85'

S7°40'51"W
69.52'

N82°16'09"W
35.10'

N7°47'06"E
23.52'

N82°06'36"W
33.72'

PARCEL DESIGNATED AS "7.37 ACRES"
(MB 70, PG 22)
(DB 2473, PG 267)
(INSTR. NO. 20160923000853880)
GPIN 1467-34-7278-0000
AREA=320,332 SF
OR 7.354 AC

COMMONWEALTH OF VIRGINIA
JEFFREY J. MERRETHER
Lic. No. 2306
10/24/2017
LAND SURVEYOR

50'          0'          50'          100'

GRAPHIC SCALE
1" = 50'

EXHIBIT 2.1.4
PLAT SHOWING
UNIT B DOCK ACCESS EASEMENT HEREBY ESTABLSHED ON
PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

NOTE: SEE SHEET 2 OF 2 FOR
NOTES AND CURVE TABLE.

MSA, P.C.
Environmental Sciences · Planning · Surveying
Civil & Environmental Engineering · Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

DWN BY:KCR

SCALE: 1" = 50'

JOB# 17181-13

SHEET 1 OF 2

EXHIBIT 2.1.4

SURVEY NOTES:

1.  THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17091893/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 8:00 A.M.

2.  CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF TITLE IS DEED BOOK 2473 AT PAGE 267.

3.  THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM RECORDED PLATS AND DEEDS.

4.  THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT FOR THE UNIT B DOCK ACCESS EASEMENT (SEE NOTE 5) THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED, THAT WILL ESTABLISH THE UNIT B DOCK ACCESS EASEMENT.

5.  REFERENCE TO UNIT B IS TAKEN FROM CONDOMINIUM PLAT AND PLANS BY MSA, P.C. ENTITLED "EXHIBIT B CONDOMINIUM PLAT AND PLANS OF 5465 GREENWICH ROAD A CONDOMINIUM (M.B. 70, PG. 22) VIRGINIA BEACH, VIRGINIA", DATED OCTOBER 16, 2017.



LOCATION MAP — SCALE: 1" = 2,000'



EXHIBIT 2.1.4
PLAT SHOWING
UNIT B DOCK ACCESS EASEMENT HEREBY ESTABLSHED ON
PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1487-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

 

MSA, P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

| DWN BY: KCR | | JOB# 17181-13 |
| SCALE: 1" = 50' | | SHEET 2 OF 2 |

EXHIBIT 2.1.5



VAR. WIDTH PERMANENT STANDARD VDOT UTILITY EASEMENT
& VAR. WIDTH PERMANENT STANDARD UTILITY EASEMENT
FOR DOMINION VIRGINIA POWER
(SHPB 19, PG 33A) (INSTR. 20160923000853880)

TEMPORARY CONSTRUCTION
EASEMENT FOR SLOPES
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

GREENWICH ROAD (VAR. R/W)
(SHPB 19, PG 33A)
(INSTR. NO. 20160923000853880)
S82°16'39"E 510.08' O/A

S86°49'07"E
25.40'

130.13'                                    C1

TEMPORARY CONSTRUCTION
EASEMENT FOR ENTRANCE
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

(MB 70, PG 22)

PARCEL DESIGNATED AS "7.37 ACRES"
(MB 70, PG 22)
(DB 2473, PG 267)
(INSTR. NO. 20160923000853880)
GPIN 1467-34-7278-0000
AREA=320,332 SF
OR 7.354 AC

N/F
COMMONWEALTH BUILDING
COMPANY
(DB 1442, PG 339)
PARCEL 2BA
(MB 73, PG 14)
GPIN 1467-44-2285

N7°53'24"E
17.00'
S82°06'36"E    60.00'
S7°53'24"W
17.00'
N82°06'36"W    60.00'
17' X 60' PRIVATE MAINTENANCE
& ENCROACHMENT EASEMENT
AREA = 1,020 SF OR 0.023 AC

30' HRSD EASEMENT (DB 1013, PG 54) (DB 1046, PG 691)
30' CITY OF VIRGINIA BEACH UTILITY EASEMENT
(MB 131, PG 36) (DB 1899, PG 143) AND
30' VEPCO EASEMENT (DB 3025, PG 446) (DB 2943, PG 971)
(DB 2684, PG 126) (DB 1302, PG 484) (DB 998, PG 719)

N/F
NORFOLK & SOUTHERN RAILROAD (66' R/W)

COMMONWEALTH OF VIRGINIA
JEFFREY J. MERRETHER
Lic. No. 2306
10/24/2017
LAND SURVEYOR

NOTE: SEE SHEET 2 OF 2 FOR
NOTES AND CURVE TABLE.

GRAPHIC SCALE
50'    0'    50'    100'
1" = 50'

EXHIBIT 2.1.5
PLAT SHOWING
17' X 60' PRIVATE MAINTENANCE AND
ENCROACHMENT EASEMENT HEREBY ESTABLISHED
ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

MSA, P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

DWN BY: KCR
SCALE: 1" = 50'

JOB# 17181-09
SHEET 1 OF 2

EXHIBIT 2.1.5

1. THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17091893/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 8:00 A.M..

2. CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF TITLE IS DEED BOOK 2473 AT PAGE 267.

3. THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM RECORDED PLATS AND DEEDS.

4. THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT FOR THE 17' X 60' PRIVATE MAINTENANCE AND ENCROACHMENT EASEMENT THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED, THAT WILL ESTABLISH THE 17' X 60' PRIVATE MAINTENANCE AND ENCROACHMENT EASEMENT.

### CURVE TABLE

| CURVE | RADIUS | LENGTH | TANGENT | CHORD | BEARING | DELTA |
|---|---|---|---|---|---|---|
| C1 | 243.50' | 87.29' | 44.12' | 86.83' | S76° 33' 01"E | 20°32'25" |



LOCATION MAP — SCALE: 1" = 2,000'





EXHIBIT 2.1.5
PLAT SHOWING
17' X 60' PRIVATE MAINTENANCE AND
ENCROACHMENT EASEMENT HEREBY ESTABLISHED
ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

M.S.A., P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

| DWN BY: KCR | JOB# 17181-09 |
|---|---|
| SCALE: 1" = 50' | SHEET 2 OF 2 |

EXHIBIT 3.1.1



GRAPHIC SCALE
1" = 50'

EXHIBIT 3.1.1
PLAT SHOWING
UNIT B 20' PRIVATE SANITARY SEWER EASEMENT HEREBY
ESTABLSHED ON PARCEL DESIGNATED AS "7.37 ACRES"
(M.B. 70, PG. 22) (D.B. 2473, PG. 267)
(INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

NOTE: SEE SHEET 2 OF 2 FOR
NOTES AND CURVE TABLE.

MSA, P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

DWN BY: KCR
SCALE: 1" = 50'
JOB# 17181-06
SHEET 1 OF 2

EXHIBIT 3.1.1

*SURVEY NOTES:*

1. *THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17081693/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 8:00 A.M..*

2. *CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF TITLE IS DEED BOOK 2473 AT PAGE 267.*

3. *THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM RECORDED PLATS AND DEEDS.*

4. *THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT FOR THE UNIT B 20' PRIVATE SANITARY SEWER EASEMENT (SEE NOTE 5) THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED, THAT WILL ESTABLISH THE UNIT B 20' PRIVATE WATERLINE EASEMENT.*

5. *REFERENCE TO UNIT B IS TAKEN FROM CONDOMINIUM PLAT AND PLANS BY MSA, P.C. ENTITLED "EXHIBIT B CONDOMINIUM PLAT AND PLANS OF 3465 GREENWICH ROAD A CONDOMINIUM (M.B. 70, PG. 22) VIRGINIA BEACH, VIRGINIA", DATED OCTOBER 16, 2017.*



LOCATION MAP — SCALE: 1" = 2,000'



EXHIBIT 3.1.1
PLAT SHOWING
UNIT B 20' PRIVATE SANITARY SEWER EASEMENT HEREBY
ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES"
(M.B. 70, PG. 22) (D.B. 2473, PG. 267)
(INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

 

**MSA, P.C.**
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture

5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

| DWN BY: KCR | | JOB# 17181-06 |
|---|---|---|
| SCALE: 1" = 50' | | SHEET 2 OF 2 |

EXHIBIT 4.1.1



VAR. WIDTH PERMANENT STANDARD VDOT UTILITY EASEMENT
& VAR. WIDTH PERMANENT STANDARD UTILITY EASEMENT
FOR DOMINION VIRGINIA POWER
(SHPB 19, PG 33A) (INSTR. 20160923000853880)

**GREENWICH ROAD** (VAR. R/W)
(SHPB 19, PG 33A)
(INSTR. NO. 20160923000853880)

S86°49'07"E
25.40'

S82°16'39"E 510.08'

PIN(S)    C2    C1    C3    NAIL(S)    PIN(S)

TEMPORARY CONSTRUCTION
EASEMENT FOR SLOPES
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

TEMPORARY CONSTRUCTION
EASEMENT FOR ENTRANCE
(SHPB 19, PG 33A)
(INSTR. 20160923000853880)

PARCEL DESIGNATED AS "7.37 ACRES"
(MB 70, PG 22)
(DB 2473, PG 267)
(INSTR. NO. 20160923000853880)
GPIN 1467-34-7278-0000
AREA=320,332 SF
OR 7.354 AC

(MB 70, PG 22)

226.09'    N7°31'13"E

233.69'

538.72' O/A

N/F
COMMONWEALTH BUILDING
COMPANY
(DB 1442, PG 339)
PARCEL 28A
(MB 73, PG 14)
GPIN 1467-44-2286

DENOTES UNIT B PRIVATE 30'
STORM DRAIN EASEMENT
HEREBY ESTABLISHED
AREA = 6,896 SF OR 0.158 AC

N72°28'47"W
30.00'

S7°31'13"W

305.03'

30' HRSD EASEMENT (DB 1013, PG 54) (DB 1046, PG 691)
30' CITY OF VIRGINIA BEACH UTILITY EASEMENT
(MB 131, PG 38) (DB 1899, PG 143) AND
30' VEPCO EASEMENT (DB 3025, PG 446) (DB 2943, PG 971)
(DB 2684, PG 126) (DB 1302, PG 484) (DB 998, PG 719)

571.94'    N82°16'39"W    PIN(F)

N/F
NORFOLK & SOUTHERN RAILROAD (56' R/W)

COMMONWEALTH OF VIRGINIA
JEFFREY J. MERRETHER
Lic. No. 2306
10/24/2017
LAND SURVEYOR

NOTE: SEE SHEET 2 OF 2 FOR
NOTES AND CURVE TABLE.

50'    0'    50'    100'

GRAPHIC SCALE
1" = 50'

EXHIBIT 4.1.1
PLAT SHOWING
UNIT B 30' PRIVATE STORM DRAIN EASEMENT HEREBY
ESTABLSHED ON PARCEL DESIGNATED AS "7.37 ACRES"
(M.B. 70, PG. 22) (D.B. 2473, PG. 267)
(INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

**MSA, P.C.**
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

DWN BY: KCR

SCALE: 1" = 50'

JOB# 17181-01

SHEET 1 OF 2

EXHIBIT 4.1.1

## SURVEY NOTES:

1. THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17091893/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 8:00 A.M.

2. CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF TITLE IS DEED BOOK 2473 AT PAGE 267.

3. THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM RECORDED PLATS AND DEEDS.

4. THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT FOR THE UNIT B 30' PRIVATE STORM DRAIN EASEMENT (SEE NOTE 5) THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED, THAT WILL ESTABLISH THE UNIT B 30' PRIVATE STORM DRAIN EASEMENT.

5. REFERENCE TO UNIT B IS TAKEN FROM CONDOMINIUM PLAT AND PLANS BY MSA, P.C. ENTITLED "EXHIBIT B CONDOMINIUM PLAT AND PLANS OF 5465 GREENWICH ROAD A CONDOMINIUM (M.B. 70, PG. 22) VIRGINIA BEACH, VIRGINIA", DATED OCTOBER 16, 2017.

### CURVE TABLE

| CURVE | RADIUS | LENGTH | TANGENT | CHORD | BEARING | DELTA |
|-------|--------|--------|---------|-------|---------|-------|
| C1 | 243.50' | 87.29' | 44.12' | 86.83' | S76° 33' 01"E | 20°32'25" |
| C2 | 243.50' | 81.73' | 41.25' | 81.35' | S75° 53' 45"E | 19°13'54" |
| C3 | 243.50' | 5.56' | 2.78' | 5.56' | S86° 09' 58"E | 1°18'32" |



LOCATION MAP — SCALE: 1" = 2,000'



COMMONWEALTH OF VIRGINIA
JEFFREY J. WERRETHER
Lic. No. 2306
10/24/2017
LAND SURVEYOR

EXHIBIT 4.1.1
PLAT SHOWING
UNIT B 30' PRIVATE STORM DRAIN EASEMENT HEREBY
ESTABLISHED ON PARCEL DESIGNATED AS "7.37 ACRES"
(M.B. 70, PG. 22) (D.B. 2473, PG. 267)
(INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017



## MSA, P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com



| | |
|---|---|
| DWN BY: KCR | JOB# 17181—01 |
| SCALE: 1" = 50' | SHEET 2 OF 2 |

EXHIBIT 4.1.3



EXHIBIT 4.1.3
PLAT SHOWING
UNIT A 30' PRIVATE STORM DRAIN EASEMENT HEREBY ESTABLISHED
ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

NOTE: SEE SHEET 2 OF 2 FOR
NOTES AND CURVE TABLE.

MSA, P.C.
Environmental Sciences · Planning · Surveying
Civil & Environmental Engineering · Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

DWN BY: KCR
SCALE: 1" = 50'

JOB# 17181-04
SHEET 1 OF 2

EXHIBIT 4.1.3

*SURVEY NOTES:*

1. THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17091893/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 8:00 A.M.

2. CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF TITLE IS DEED BOOK 2473 AT PAGE 267.

3. THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM RECORDED PLATS AND DEEDS.

4. THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT FOR THE UNIT A 30' PRIVATE STORM DRAIN EASEMENT (SEE NOTE 5) THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED, THAT WILL ESTABLISH THE UNIT A 30' PRIVATE STORM DRAIN EASEMENT.

5. REFERENCE TO UNIT A IS TAKEN FROM CONDOMINIUM PLAT AND PLANS BY MSA, P.C. ENTITLED "EXHIBIT B CONDOMINIUM PLAT AND PLANS OF 5465 GREENWICH ROAD A CONDOMINIUM (M.B. 70, PG. 22) VIRGINIA BEACH, VIRGINIA", DATED OCTOBER 16, 2017.



LOCATION MAP - SCALE: 1" = 2,000'



EXHIBIT 4.1.3
PLAT SHOWING
UNIT A 30' PRIVATE STORM DRAIN EASEMENT HEREBY ESTABLSHED
ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

  

MSA, P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

| DWN BY: KCR | JOB# 17181-04 |
| SCALE: 1" = 50' | SHEET 2 OF 2 |

EXHIBIT 4.1.5



PARCEL DESIGNATED AS "7.37 ACRES"
(MB 70, PG 22)
(DB 2473, PG 267)
(INSTR. NO. 20160923000853880)
GPIN 1467-34-7278-0000
AREA=320,332 SF
OR 7.354 AC

EXHIBIT 4.1.5
PLAT SHOWING
20' PRIVATE STORM DRAIN EASEMENT HEREBY ESTABLSHED ON
PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

NOTE: SEE SHEET 2 OF 2 FOR
NOTES AND CURVE TABLE.

MSA, P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

DWN BY:KCR
SCALE: 1" = 50'

JOB# 17181-07
SHEET 1 OF 2

EXHIBIT 4.1.5

*SURVEY NOTES:*

1. *THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17091893/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 8:00 A.M.*

2. *CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF TITLE IS DEED BOOK 2473 AT PAGE 267.*

3. *THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM RECORDED PLATS AND DEEDS.*

4. *THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT FOR THE 20' PRIVATE STORM DRAIN EASEMENT THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED, THAT WILL ESTABLISH THE 20' PRIVATE STORM DRAIN EASEMENT.*



LOCATION MAP — SCALE: 1" = 2,000'





EXHIBIT 4.1.5
PLAT SHOWING
20' PRIVATE STORM DRAIN EASEMENT HEREBY ESTABLISHED ON
PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017



M S A, P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

| DWN BY: KCR | | JOB# 17181-07 |
| SCALE: 1" = 50' | | SHEET 2 OF 2 |

EXHIBIT 5.1.1



GRAPHIC SCALE
1" = 50'

EXHIBIT 5.1.1
PLAT SHOWING
UNIT B 20' PRIVATE WATERLINE EASEMENT HEREBY ESTABLISHED
ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017

NOTE: SEE SHEET 2 OF 2 FOR
NOTES AND CURVE TABLE.

MSA, P.C.
Environmental Sciences · Planning · Surveying
Civil & Environmental Engineering · Landscape Architecture
5032 Rouse Drive, Suite 105
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

DWN BY: KCR
SCALE: 1" = 50'

JOB# 17161-05
SHEET 1 OF 2

EXHIBIT 5.1.1

**SURVEY NOTES:**

1. THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17081693/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 8:00 A.M..

2. CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF TITLE IS DEED BOOK 2473 AT PAGE 267.

3. THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM RECORDED PLATS AND DEEDS.

4. THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT FOR THE UNIT B 20' PRIVATE WATERLINE EASEMENT (SEE NOTE 5) THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED, THAT WILL ESTABLISH THE UNIT B 20' PRIVATE WATERLINE EASEMENT.

5. REFERENCE TO UNIT B IS TAKEN FROM CONDOMINIUM PLAT AND PLANS BY MSA, P.C. ENTITLED "EXHIBIT B CONDOMINIUM PLAT AND PLANS OF 5465 GREENWICH ROAD A CONDOMINIUM (M.B. 70, PG. 22) VIRGINIA BEACH, VIRGINIA", DATED OCTOBER 16, 2017.



LOCATION MAP — SCALE: 1" = 2,000'



EXHIBIT 5.1.1
PLAT SHOWING
UNIT B 20' PRIVATE WATERLINE EASEMENT HEREBY ESTABLISHED
ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017




MSA, P.C.
Environmental Sciences · Planning · Surveying
Civil & Environmental Engineering · Landscape Architecture

5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

| DWN BY: KCR | JOB# 17181-05 |
| SCALE: 1" = 50' | SHEET 2 OF 2 |

EXHIBIT 7.1.1



EXHIBIT 7.1.1

<u>SURVEY NOTES:</u>

1. THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17081833/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 8:00 A.M.

2. CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF TITLE IS DEED BOOK 2473 AT PAGE 267.

3. THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM RECORDED PLATS AND DEEDS.

4. THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT FOR THE UNIT B ELECTRICAL POWER FACILITIES EASEMENT (SEE NOTE 5) THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED, THAT WILL ESTABLISH THE UNIT B ELECTRICAL POWER FACILITIES EASEMENT.

5. REFERENCE TO UNIT B IS TAKEN FROM CONDOMINIUM PLAT AND PLANS BY MSA, P.C. ENTITLED "EXHIBIT B CONDOMINIUM PLAT AND PLANS OF 5465 GREENWICH ROAD A CONDOMINIUM (M.B. 70, PG. 22) VIRGINIA BEACH, VIRGINIA", DATED OCTOBER 16, 2017.

| CURVE TABLE | | | | | | |
|------|--------|--------|---------|--------|--------------|-----------|
| CURVE | RADIUS | LENGTH | TANGENT | CHORD | BEARING | DELTA |
| C1 | 243.50' | 87.29' | 44.12' | 86.83' | S76° 33' 01"E | 20°32'25" |



LOCATION MAP – SCALE: 1" = 2,000'





EXHIBIT 7.1.1
PLAT SHOWING
UNIT B ELECTRICAL POWER FACILITIES EASEMENT
HEREBY ESTABLISHED
ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017



M.S.A., P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

DWN BY: KCR

SCALE: 1" = 50'

JOB# 17181-12

SHEET 2 OF 2

EXHIBIT 8.1.1



EXHIBIT 8.1.1

*SURVEY NOTES:*

1. *THIS EXHIBIT WAS CREATED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17091893/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 8:00 A.M.*

2. *CURRENT OWNER PER CITY OF VIRGINIA BEACH TAX ASSESSOR IS HOFFLAND PROPERTIES, INC. THE SOURCE OF TITLE IS DEED BOOK 2473 AT PAGE 267.*

3. *THIS EXHIBIT DOES NOT CONSTITUTE A BOUNDARY SURVEY. PROPERTY LINES WERE ESTABLISHED FROM RECORDED PLATS AND DEEDS.*

4. *THE PURPOSE OF THIS EXHIBIT IS TO CREATE AN EXHIBIT FOR THE 10' PRIVATE GAS LINE EASEMENT THAT WILL BE RECORDED CONTEMPORANEOUSLY WITH THE DEED, THAT WILL ESTABLISH THE 10' PRIVATE GAS LINE EASEMENT.*

| CURVE TABLE | | | | | | |
|---|---|---|---|---|---|---|
| CURVE | RADIUS | LENGTH | TANGENT | CHORD | BEARING | DELTA |
| C1 | 243.50' | 87.29' | 44.12' | 86.83' | S76° 33' 01"E | 20°32'25" |



LOCATION MAP – SCALE: 1" = 2,000'





EXHIBIT 8.1.1
PLAT SHOWING
10' PRIVATE GAS LINE EASEMENT HEREBY ESTABLSHED
ON PARCEL DESIGNATED AS "7.37 ACRES" (M.B. 70, PG. 22)
(D.B. 2473, PG. 267) (INSTR. NO. 20160923000853880)
GPIN: 1467-34-7278-0000
VIRGINIA BEACH, VIRGINIA
OCTOBER 24, 2017



M.S.A., P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100
Virginia Beach, VA 23462-3764
757-490-9264 | www.msaonline.com

| DWN BY:KCR | JOB# 17161-14 |
|---|---|
| SCALE: 1" = 50' | SHEET 2 OF 2 |

**EXHIBIT D**
**TO**
**TRIPLE NET LEASE**

**WAIVER OF MECHANICS LIENS CLAUSE**

Contractor waives any right to filing a mechanic's lien, or claim of any sort or kind, against the premises of Owner or any part thereof.  Contractor shall not permit or suffer any mechanic's or similar lien filed by any subcontractor, supplier, laborer or materialman to remain upon the premises of Owner and shall satisfy and have discharged any lien so filed within fourteen (14) days of filing or such earlier period as may be necessary to avoid enforcement thereof.  Contractor shall bond off or provide other security satisfactory to Owner against any lien which Contractor has not satisfied and discharged.  Contractor agrees to indemnify and hold Owner free and harmless from and against any and all loss, liability, claim, damage, cost and expense, including reasonable attorneys' fees, from any lien on the Project which is placed on or remains on the Project in connection with the Work, or any stop notice or similar action on the part of any Subcontractor, supplier, laborer, materialman, and Contractor shall at its sole cost and expense save and defend Owner, from any and all cost and expense in connection therewith.  In the event Contractor should neglect or refuse to cause any such mechanic's or other similar lien promptly to be discharged or bonded off as required above, Owner, after giving Contractor seven (7) calendar days written notice of its intention so to do, shall have the right, but not the obligation, to bond off such lien, and such payment incurred by Owner shall be credited to the account of the Owner.  Owner shall be entitled to offset 100% of the amounts so bonded, plus amounts for reasonable attorneys' fees, against payments thereafter becoming due to Contractor hereunder.  Owner may exercise any other right or remedy granted by this Agreement (including termination hereof for cause) or granted by law. The bonding off of any lien by Owner pursuant to the foregoing shall not be deemed to cure or waive Contractor's default.

27

15982010v8