# EXHIBIT B

---

**Fill in this information to identify the case:**

Debtor 1 _____

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: _____ District of _____

Case number _____

---

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

---

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Name of the current creditor (the person or entity to be paid for this claim) _____

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☐ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| --- | --- |
| Name _____ | Name _____ |
| Number       Street | Number       Street |
| City                State          ZIP Code | City                State          ZIP Code |
| Contact phone _____ | Contact phone _____ |
| Contact email _____ | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☐ No
☐ Yes.  Claim number on court claims registry (if known) _____     Filed on _____
                                                                                    MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☐ No
☐ Yes.  Who made the earlier filing? _____

---

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_____

**9. Is all or part of the claim secured?**

☐ No

☐ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☐ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.   $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  _____
MM / DD / YYYY

Signature _____

**Print the name of the person who is completing and signing this claim:**

Name _____
First name   Middle name   Last name

Title _____

Company _____
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address _____
Number   Street

_____
City   State   ZIP Code

Contact phone _____   Email _____

# ADDENDUM

**Proof of Claim of BMG Operations LTD.**
**In re: BCause Mining LLC, *et al*.**
**Bankruptcy Case No. 19-10562**

A. <u>Background</u>.  BMG Operations LTD. ("**BMG**") and BCause Mining LLC (the "**Debtor**") entered into a Hosting Service Agreement dated November 30, 2017, pursuant to which the Debtor agreed to provide services and to host BMG's crypto currency mining computer equipment units at its datacenter in Virginia Beach, Virginia (the "**Agreement**").  *See* Agreement, <u>Exhibit A</u>. Under the terms of the Agreement, BMG was to pay the Debtor a monthly hosting fee, in advance, in exchange for the Debtor's hosting services. *Id.*, Art. 2(1), App. D. In February and March 2018, BMG agreed to advance to the Debtor certain funds in addition to the monthly hosting fee advance.  BMG and the Debtor agreed that these advances could be repaid by providing BMG with $70,000.00 credits on its monthly hosting fee advances (the "**Lending Arrangement**").  *See* Hosting Invoice Summary, <u>Exhibit B</u>.

B. <u>Description and Amount of Pre-Petition Claim</u>.

| Description | Amount |
|---|---|
| Outstanding balance from advances under the Lending Arrangement through April 2019. *See* Hosting Invoice Summary, <u>Exhibit B</u>. | $6,954,750.81 |
| Post-petition credits applied toward advances under the Lending Arrangement.[1] *See id.* | ($142,699.17) |
| **Total Amount:** | **$6,812,051.64**[2] |

C. <u>Reservation of Rights</u>.  Submission of this Proof of Claim (the "**Claim**") is filed under compulsion of a bar date set in this case and is filed to protect BMG from forfeiture of certain of its claims by reason of said bar date. Filing of this Claim is not and should not be construed to be:  (a) a waiver or release of BMG's rights against any other entity or person liable for all or part of any claim described herein; (b) a consent by BMG to the jurisdiction of this Court with respect to any proceeding commenced in this case against or otherwise involving BMG; (c) a consent by BMG to the treatment of any non-core claim against it as a core claim; (d) a waiver of the right to withdraw the reference with respect to the subject matter of this Claim, any objection or other proceedings commenced with respect thereto, or any other proceedings commenced in this case against or otherwise involving BMG; or (e) an election of remedy that waives or otherwise affects any other remedy of BMG.

BMG expressly reserves the right to amend or supplement this Claim in any respect, and to file additional proofs of claim for any additional claim or claims, and to assert any administrative claim or claims that BMG may have against the Debtor, including, but not limited to, those pursuant to section 503(b) of the Bankruptcy Code.

---

[1] If, for any reason, BMG must return these credits, then this pre-petition claim shall increase proportionally.

[2] BMG also extended $746,531.94 to the Debtor to pay for fees imposed by U.S. Customs and Border Protection ("**US Customs**") related to the importation of BMG's equipment.  *See* US Customs Fee Invoices, <u>Exhibit C</u>.  It is unclear whether these funds were, in fact, paid to US Customs.  If the Debtor failed to pay US Customs with the funds from BMG, then BMG's claim shall increase proportionally.

Additional and supplementary documentation for the Claim may be obtained by submitting a written request to:

Jennifer M. McLemore, Esquire
Williams Mullen
200 South 10th Street, Suite 1600
Richmond, Virginia 23219
Email:  jmclemore@williamsmullen.com

# Hosting Service Agreement

This Hosting Service Agreement ("Agreement") is made and entered into on 30th November 2017 ("Effective Date") by and between:

(1) BCause Mining LLC with its address at 277 Bendix Road, Suite 420, Virginia Beach, Virginia 23452 ("Bcause"); and

(2) BMG OPERATIONS LIMITED with its address at 44 Church Street, St. John's, Antigua ("BMG").

(Singly a "Party", collectively the "Parties")

WHEREAS

(A) Bcause desires to provide services and to host BMG's crypto currency mining computer equipment units ("Units "or "Equipment") at its datacenter under the terms and conditions contained in this Agreement; and

(B) BMG desires to utilize BCause's services and intends to co-locate certain Units at BCause's datacenter in Fairless Hill, Pennsylvania beginning in February 2018. BMG desires to utilize BCause's services and intends to co-locate certain Units at BCause's datacenters in Fairless Hill, Pennsylvania and/or Virginia Beach Virginia beginning in February 2018.

NOW THEREFORE in consideration of the promises, mutual covenants and agreements herein and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

## Article 1 Co-location of Computer Equipment Units

(1) BMG agrees to co-locate certain Units at the BCause's datacenter in accordance with Appendix A.

(2) BCause's datacenter is located at 1 Ben Fairless, Fairless Hills, PA.

(3) Bcause shall enter into such electrical power contracts sufficient to meet the cumulative energy demand for the specified cumulative quantity of Units under Appendix A.

(4) During the normal course of business, it is expected that Bcause will pursue opportunities to increase the amount of electricity available at the datacenter described in (2) above.  If and when Bcause identifies a source or sources of additional electricity, concurrent with entering into negotiations for power purchase agreements, Bcause will notify BMG of the forecast quantity, and dates of availability. BMG shall have five (5) business days and a right of first refusal to commit to a take or pay contract for some, or all, of the additional capacity for additional hosted Units above and beyond Schedule A. After said five (5) business days, Bcause shall have the right to offer the uncommitted power quantity to other clients.

(5) Notwithstanding the above, changes to Appendix A may be made upon mutual agreement by both Parties based upon actual timing of capacity changes and availability of electrical power that can be contracted by Bcause with various power suppliers.

(6) BMG shall arrange the delivery of the Units to BCause's datacenter with shipment costs and any custom duties to be borne by BMG. BMG shall notify Bcause of estimated delivery dates.

(7) Unless otherwise arranged, Bcause shall securely store the Units at its datacenter upon delivery.

(8) Unless otherwise arranged, Bcause shall be responsible for inspection and installation of the Units.

## Article 2 Price

(1) Hosting Fee

   a. In consideration of the services provided by BCause to BMG, BMG agrees to pay the hosting fees set forth in Appendix D.

   b. Redacted

   c. Payment of the amount in Article 2(1) shall be made in advance of the month in which the service is to be rendered. Bcause shall present invoices to BMG two months in advance, payable 30 days net.

   d. Any adjustment made during a monthly period shall be accounted for as appropriate in the subsequent invoice.

   e. If BMG removes Units from commercial service in less than one year in breach of the terms of this Agreement, BMG agrees to pay the amount owed for the current month and for one additional month for the removed Unit(s) (the "Termination Fee").

   f. Redacted

(2) Expenses and Taxes

   a. Unless expressly provided otherwise, all amounts and other consideration payable under or in connection with this Agreement (including Hosting Fees) are exclusive of taxes and duties.

   b. Except as otherwise expressly agreed by the parties, each Party shall bear its own expenses and taxes incurred in connection with this Agreement.

## Article 3 Other Services/Responsibilities to be provided

(1) BCause agrees to provide services at BCause's datacenter in accordance with Appendix B ("Services").

(2) <u>Physical Security</u>. Prior to the time the Units have arrived at the datacenter, the facility shall be surrounded by a chain link fence at least six feet tall and surmounted by concertina wire. The parking lot and surrounds will be lit during night time hours. The external areas of the building will be monitored with IP-enabled security cameras. Recordings of the video made by these cameras shall be stored for not less than 72 hours of the video produced by these cameras. All external doors will have access controlled by card key. Such access will be logged electronically and stored for not less than three months. Physical security functions shall be provided by the personnel described in Article 3(6), unless other staffing measures are provided.

(3) <u>Electrical Service</u>. Electrical service will be provided by the local utility or other third party on their terms and conditions. It is agreed that the magnitude of consumption

envisioned by this Agreement will render backup generation and/or power storage economically infeasible. As such, no representation or warranty is made by BCause, and power will be delivered on a reasonable best effort basis.

(4) <u>Network Service</u>. Prior to the time the Units have arrived at the datacenter, BCause will provide two different Internet connections, each with sufficient capacity for the entire operation, as well as the capability to failover, one to the other. These Internet connections shall be provided from different suppliers and to the maximum extent practical, shall have power backup and diverse path/diverse route to ensure maximum availability.

(5) <u>Ambient Cooling and Ventilation</u>. Both parties agree that the magnitude of the envisioned heat load is such that 100% air conditioned cooling to dissipate the generated heat is economically infeasible. BCause shall provide sufficient ambient air flow, filtering, and limited dehumidification such that air supplied to the Units will be consistently maintained at a temperature within the operating temperature specifications of the Units.

(6) <u>Level 1 and Level 2 Technical Support.</u> BCause shall provide sufficient personnel 24/7 to commission Units after initial installation, remove Units from service upon request by BMG, provide minor repairs, install spare parts, and provide for shipment of Units and related equipment either to BMG or the manufacturer for repairs if such repairs are beyond the capability of BCause personnel. Cost of shipment shall be at the expense of BMG. In addition, responding to potential and actual security issues shall be included in the job description of all technical support staff. Installation and service level support shall be in accordance with Appendix A.1.

(7) <u>Parts and Inventory Management</u>. Unless otherwise arranged, BMG shall be responsible for the purchase and procurement of parts and related equipment for the Units and BCause shall be responsible for the safe storage and management of such Units and parts and equipment related to such Units. BCause and BMG shall make commercially reasonable efforts to maintain levels of inventory appropriate for expected demand of BMG. Bcause shall keep an updated inventory of spare parts and provide such inventory to BMG from time to time as reasonably necessary.

(8) <u>Hosting of Management Servers</u>. BCause shall provide hosting for separate servers of software that are necessary in order to provide BMG remote access/management of the Units and access to remote cameras to ensure physical security. Such hosting requests shall be reasonable and shall incur no additional costs.

(9) <u>Software Arrangements.</u> BMG will provide software necessary for inventory management and monitoring of its Units with capabilities particular to the states and times described in Appendix A.1. BCause will provide firewalls, and software for network security and be solely responsible for its operation. BCause will grant BMG unrestricted access to its IT Security Plan and to the machines BMG controls/owns that will be maintained on a separate sub-net from machines owned by other customers. Furthermore, BCause will grant BMG personnel remote access to BMG's machines and BMG's subnet through the BCause firewall.

(10) <u>Data and Network Security.</u> BCause shall take all practical and customary means to prevent unauthorized access to the Units and the network, which will consist of, but are not limited to, hardware and software such as firewalls.

(11) <u>Datacenter Access</u>. BMG shall be entitled to entrance and access to the datacenter in accordance with the IT Security Plan and which access shall not unreasonably be withheld.

## Article 4 White Labeling of Services

BMG shall have the right to white label the services and arrangements under this Agreement on a back-to-back basis to specifically named third parties upon thirty-day written notification to BCause, and BCause shall accept such execution of this right, provided there are no changes to the terms of this Agreement. Any requested changes to warranties, representations, obligations, or service levels to be provided by Bcause under an BMG white label shall be negotiated in good faith by the Parties. Unless prior arrangement is made, BMG shall be responsible for billing and collection associated with any white label offering.

## Article 5 Ownership and Intellectual Property

(1) The Parties acknowledge and agree that the Units mentioned in this Agreement are the sole property of BMG. In no event shall BCause claim the ownership of any such Units.

(2) As between the Parties, BMG is and shall remain the owner of all intellectual property in software applications provided by BMG ("Intellectual Property"). BMG shall grant Bcause a license to use such applications at each of its sites during the term of this Agreement. The license does not grant BCause any rights to the Intellectual Property beyond use; specifically, BCause may not sell or market any aspect of the Intellectual Property.

(3) The Parties acknowledge and agree that any outcomes or productivities, including but not limited to block chains, hash and digital currencies, generated from the operation of the Units are the sole property of BMG. In no event shall BCause claim the ownership of any of such outcomes or productivities.

(4) BCause shall not sell or create any mortgage, lien, or any kind of encumbrance on the Units, the Intellectual Property, or the outcomes or productivities owned by BMG, or seize, withhold, restrict access to or fail to return any Units, and for greater certainty, even in the case of material breach or any delay or failure in making any payment to Bcause hereunder.

## Article 6 Force Majeure

(1) <u>Definition of Force Majeure Event</u>—Force majeure means an event beyond the reasonable control of the affected party that occurs without the fault or negligence of the affected party. Force majeure events shall include but will not be limited to an act of God, fires, explosions, earthquakes, drought, tidal waves, floods, hurricanes, natural disaster, war, hostilities, invasion, embargo, rebellion, revolution, ionizing radiation or contamination by radio-activity from any nuclear fuel or waste, riot, commotion, strikes, act of terrorism.

(2) A party claiming a Force Majeure Event must use its best endeavors to remove, overcome or minimize the effects of that Force Majeure Event as quickly as possible.

(3) If a Force Majeure Event continues for more than three months, either party may terminate this Agreement by giving at least 30 days' notice to the other party, without

prejudice and without the need to pay the Termination Fee if Units are removed from hosting service in less than one year.

## Article 7 Confidentiality

(1) The Parties acknowledge that, in the course of co-location services and performing its duties in connection with this Agreement, either party may obtain information about the other party that is of a confidential and proprietary nature ("Confidential Information"). Such Confidential Information includes, but is not limited to, this Agreement, trade secrets, know-how, inventions, development plans, techniques, designs, processes, programs, software, schematics, software source code/documents, data, customer lists, financial information, prices, costs, sales and marking plans, or any other information which either party knows or reasonable ought to know is confidential, proprietary or trade secret information of the other party. Each party owns and intends to maintain its ownership of its Confidential Information.

(2) Each party shall at all times, during the term of this Agreement and indefinitely upon termination or expiration of this Agreement, maintain in the strictest confidence and trust all such Confidential Information for ten (10) years , and shall not use such Confidential Information other than in the course of its duties and as expressly authorized by the other party under this Agreement, nor shall either party disclose any such Confidential Information to any party without the other party's prior written consent.

(3) Each party shall disclose such Confidential Information only to its employees and professional advisors who have a need to know such information in connection with the performance of such party's duties under this Agreement; provided, that each party shall appropriately bind each of its employees and professional advisors to whom such disclosure is made, to hold the Confidential Information in strict confidence and not to disclose such information to any person other than as is necessary in the course of its employment or engagement by such party. Each party will indemnify the other party for all damages suffered by such party in the event of wrongful disclosure of such confidential Information.

(4) The obligations of confidentiality set forth herein shall not apply to information which (i) was rightfully in possession of or known to such party without any obligation of confidentiality prior to receiving it from the other party; (ii) is, or subsequently becomes, legal and publicly available without breach of this Agreement and without being disclosed by the receiving party; (iii) is legally obtained by such party from a source other that the other party without any obligation of confidentiality; (iv) is developed by or for such party without use of the Confidential Information of the other party and such independent development can be shown by documentary evidence; and (v) becomes available to such party by wholly lawful inspection or analysis. Further, such party may only disclose Confidential Information pursuant to a valid order issued by a court or government agency, provided that such party provides the other party: (i) prior written notice of such obligation; (ii) the opportunity to oppose such disclosure or obtain a protective order; and (iii) the disclosing party only discloses such Confidential Information that is necessary to satisfy such valid order.

Article 8 Representation, Warranties, and Indemnifications

(1) Both parties represent and warrant that they have the right and capacity to enter into this Agreement and fully perform their respective obligations hereunder;

(2) BCause warrants that it shall use commercially reasonable efforts to perform the services as described in Article 3 and shall provide such services in a professional manner consistent with industry standards.

(3) BCause hereto agrees to indemnify and hold harmless BMG, and any of its respective successors, licensees and assigns, from any and all losses, costs, liabilities, damages and expenses (including reasonable lawyer fees) resulting from any breach of any representation, warranty and/or covenant under this Agreement. Notwithstanding or otherwise provided in this Agreement, BCause agrees to indemnify BMG of any losses (directly or indirectly) caused by gross negligence or intentional violation of BCause in its performance of corresponding obligations hereunder this Agreement, which include but are not limited to faulty operations, bad design, misuse of the facilities in the datacenter, etc. Moreover, should electrical supply be suspended for five (5) or more consecutive days other than due to Force Majeure, BMG shall have the right to immediately suspend or terminate this Agreement by giving written notice to BCause, without incurring the Termination Fee specified in Article 2(1)e.

(4) BCause shall purchase and maintain throughout the term of this Agreement customary insurance or indemnity protection for the Units. The limit of liability for the coverage by the insurance shall be no less than the replacement value of the hosted Units per occurrence, and BMG and BMG's directors, officers, and employees, to the extent of the owed indemnity obligations, shall be named as "additional insureds" under such policies. BCause shall also maintain workers' compensation insurance.

(5) BCause has and shall continue to have throughout the term of this Agreement, all permits, licences and other permissions required to provide the Services, and agrees to promptly provide evidence of same upon BMG's request;

(6) None of the Services shall infringe the rights, including intellectual property rights, of any third party.

(7) BCause has implemented and shall continue to implement industry standard anti-virus software at the datacenter; and

(8) BCause will provide all Services in a timely, diligent and professional manner consistent with the highest information technology industry standards for similar services at the time the services are provided, and in accordance with applicable law.

Article 9 Term and Termination

(1) Term. This Agreement commences on the Effective Date and continues thereafter for a period of two (2) years. Thereafter, this Agreement shall be automatically renewed and continued for additional one year terms unless either party expresses its intention not to renew or continue this Agreement by written notice to the other party at least two (2) months before the expiration of the original term or any such extended term of this Agreement.

(2) Termination for Convenience. If the fees paid by BMG under the terms of this Agreement are greater than the value of the cryptocurrency mined as a result of the services provided by BCause for a period of two consecutive months, BMG may

terminate this Agreement without cause upon providing written notice of such termination to BCause thirty (30) days prior to the effective date of such termination. If BMG terminates this Agreement in accordance with this Article 9(2), BMG shall not be subject to a Termination Fee, provided the sub-clauses are satisfied:

    a. In the case that BCause shall terminate the service prior to the expiry of the Term, BCause shall be liable for all of BMG's direct damages arising thereof.

    b. In the case that BMG shall terminate the service, BMG shall be liable for all of BCause's direct and indirect damages arising thereof, specifically any remaining portions of contracted electrical service and remaining amortization on improvements made to the facility to provide services to BMG.

(3) <u>Termination with Cause</u>. If either party defaults in any material respect in the performance of any of its duties or obligations set forth in this Agreement, and such default is not substantially cured within thirty (30) days after written notice is given to the defaulting party specifying the nature of the default, then the party not in default may, by giving written notice thereof to the defaulting party, terminate this Agreement as of the date specified in such notice of termination. If BMG terminates this Agreement in accordance with this Article 9(3), BMG shall not be subject to a Termination Fee.

(4) <u>Termination for Insolvency or Bankruptcy</u>. Either party may immediately terminate this Agreement by giving written notice to the other party in the event of:

    a. Liquidation or insolvency of the other party;

    b. Appointment of a receiver or similar officer for the other party;

    c. Assignment by the other party for the benefit of all or substantially all of its creditors;

    d. Entry by the other party into an agreement for the composition, extension or readjustment of all or substantially all its obligations; or

    e. The filing of a meritorious petition in bankruptcy by or against the other party under any bankruptcy or debtors' law for its relief or reorganization.

(5) <u>Effect of Termination</u>. Unless otherwise provided in this Agreement, upon the termination or expiration of this Agreement,

    a. The Parties will immediately return to the other all the other's materials, documentation, data and Confidential Information including all related materials that were derived therefrom; and

    b. BCause shall return all the Units back to BMG with the shipment cost to be borne by the defaulting party. In the case neither party is in default, the Parties shall discuss amicably together regarding the shipment cost.

(6) <u>Survival</u>. The provisions of the following Articles of this Agreement shall respectively survive the termination or expiration of this Agreement:

    a. Article 5 (Ownership and Intellectual Property); Article 6 (Force Majeure); Article 7 (Confidentiality); Article 8 (Representation, Warranties, and Indemnifications).

## Article 10 General

(1) <u>Notices.</u> All notices under this Agreement shall be made in writing which include written, email, website, and other electronic messaging services. Notices shall be deemed received one business day after being sent by email.

Notices to BCause shall be addressed to:

tom@bcause.com

Notices to the BMG shall be addressed to:

notices@bmgpool.com

(2) <u>Severability.</u> If any part of this Agreement is found to be unenforceable, the remainder shall continue in full force and effect and the unenforceable provision shall be reformed so as to give maximum legal effect to the intentions of the Parties as expressed herein.

(3) <u>Entire Agreement.</u> This Agreement is the complete agreement between the Parties hereto concerning the subject matter herein and replaces any prior and contemporaneous quotations, proposals, understandings, representations or any other agreements, whether in oral or written form, between the Parties. There are no conditions, understandings, agreements, representations, or warranties, expressed or implied, which are not specified herein. This Agreement may only be modified by a written document executed by the Parties hereto.

(4) <u>Modifications.</u> Unless otherwise expressly permitted in this Agreement, neither party shall amend this Agreement unless by a formal written agreement signed by both Parties.

(5) <u>No Assignment.</u> This Agreement and all rights and obligations hereunder, in whole or in part, shall not be assigned, transferred by either party without the prior written consent of the other party except that BMG may assign the Agreement to a BMG Affiliate with sufficient financial standing to meet its obligations under this Agreement.

(6) <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the laws of Singapore, without reference to principles of conflicts of laws.

(7) <u>Dispute Resolution.</u> The exclusive jurisdiction and venue for any action arising out of or relating to the subject matter of this Agreement shall be the Singapore International Arbitration Centre ("SIAC") in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this clause. The seat of the arbitration shall be Singapore and the language of the arbitration shall be English.

(8) <u>Counterparties.</u> This Agreement shall be executed in two originals, each Party shall retain one original respectively.

(9) <u>Publicity.</u> Neither party will, without the other party's prior written consent, (a) use the name, trademark, logo or other identifying marks of the other party in any sales, marketing or publicity activities or materials, or (b) issue any press release, interviews or other public statement regarding this Agreement.

BCause Mining, LLC

_[signature]_

Name: Frederick J. Grede
Title:  CEO
Date:

BMG OPERATIONS LIMITED

_[signature]_

Name:  Stefan Matthews
Title:  CEO
Date: 16 Dec 2017

Appendix A

| Date | Quantity of Units | Energy Demand |
|------|-------------------|---------------|
| February 2018 | 20,000 units | 30.0 MW |
| August 2018 | 25,000 units | 34.5 MW |

Table 1 - Quantity of Units and Energy Demand Schedule

Appendix A.1 Definitions and Service Level Agreement

(1) Hash Rate. Is defined as the percentage of time, measured monthly, where the average monthly performance of all **On-Rack** units of Equipment meets the peak h/s (hashes/second) performance set out in the manufacturer's specifications [ref. (Table 2)].

(2) Start Time. Is defined as the time of the arrival of units of Equipment to the premises of the BCause's Datacenter.

(3) Service Levels. Is defined as the performance levels for the performance of the Service, as set out in Tables 2 and 3.

(4) Uptime. Is defined as the percentage of time to maintain uninterrupted performance of the total quantity of units of Equipment set out in the manufacturer's specifications, excluding failed Equipment, either warranty or non-warranty cases, that occurred due to no fault of BCause.

| Status | State | Description | Service Level Agreement / Action |
|--------|-------|-------------|----------------------------------|
| On-rack | Active | Normal hashing performance at 95% or better. | None required |
| On-rack | Degraded | Degraded hashing performance less than 95%. | One hour to respond to error detection. If error is persistent the state shall change from Degraded to Fault or Off-line. |
| On-rack | Fault | Minor repair (Fault light, Unit unreachable, Power or fan failure). | One hour to respond to error detection and four hours to repair. Spare replacement, performance optimization or repair carried out in the rack. |
| Off-rack | Off-line | Medium repair requiring removal from the rack. Repair in-house. | One hour to respond to error detection and 24 hours to return the Units to Active state. Obtain BMG approval if extra cost will be incurred for the repair. |
| Off-rack | Off-site | Major repair. Off-site repair is required. | Obtain BMG approval if extra cost will be incurred for the repair. Must be sent to off-site repairer within two (2) working days. |

Table 2 - Units Operating Status, States and Service Level Agreement

| Units | "Start Time" | 97.5% "Uptime" | 95% Hashing Performance |
|---|---|---|---|
| 20,000 | February 2018 | Within (60) calendar days from "Start Time" | Within thirty (65) calendar days from "Start Time" |
| 25,000 | August 2018 | Within (75) calendar days from "Start Time" | Within (80) calendar days from "Start Time" |

Table 3 – "Start Time", 97.5% "uptime" and 95.00% Hashing

(5) BMG will deliver Units by multiple shipments totaling 45,000 units, as the discretion of BMG, so long as the total amount of Units shipped meets the minimums set out above.

(6) BCause shall respond to under-performing Equipment within 1 hour from detection by monitoring system or reported by BMG, and shall restore full operation of Units within 4 hours from detection, unless repair by manufacture is required. All Equipment which is required to be repaired by manufacture or third-party repairer shall be shipped within two (2) working days. BCause shall obtain approval from BMG for all repair costs. All actions shall be logged in an inventory to be maintained by Bcause. BMG will have access to the inventory log via the web or other electronic method.

(7) Spares inventory shall be maintained and backfilled quarterly as required upon written agreement between BCause and BMG. The Spares inventory is the expense of BMG.

(8) BCause shall replace faulty components with spares from the Spares inventory, repair of any defective Equipment requiring a spare replacement, and will change state from 'On-rack' to 'Off-rack' if the required spare part is unavailable in BMG's inventory. Bcause shall obtain approval from BMG for cause of action in this matter.

(9) Bcause shall take commercially reasonable steps to optimize and tune the equipment to achieve 95% hashing performance.

Appendix B - BCause Undertakings

(1) Provide evidence of all services necessary for full Datacenter operations prior to Start Time including but not limited to power and internet to support the operation and otherwise provide the Service, and shall maintain same during the Term (as defined herein).

(2) Provide evidence to prove readiness to support and operate BMG's committed quantity of Equipment prior to Start Time.

(3) Accept delivery of BMG's Equipment.

(4) Install and connect the BMG Equipment on time in accordance with Appendix A.1.

(5) Ensure normal function and condition of engineering and technical infrastructure, security, CCTV camera system, fire prevention, Internet, and electrical network on the datacenter premises.

(6) Provide quality-of-switching and maintain operational capacity of the BMG's Equipment on the premises of the datacenter.

(7) Provide BMG secure 24x7 internet access to BCause operating management system to ensure the Equipment's operational status at individual and total mining levels.

(8) Provide BMG secure 24x7 internet access to the operating CCTV camera system viewing the BMG operations including Units and facilities. Notwithstanding this clause, cameras may or may not be installed to provide an uninterrupted view of each and every miner.

(9) Provide access to BCause's software such that BMG may review the status of Equipment, inventory reporting, defects repair life cycle (onsite, offsite), Hash Rate performance, uptime performance. BMG can assess whether the Service is being provided in accordance with the Service Levels, critical risks exposure and plans to recover and repair under-performing Equipment.

(10) Return the Equipment upon BMG's request and at BMG's expense, as soon as reasonably possible, but only after payment by BMG of all outstanding payment obligations which have accrued hereunder, to the extent not disputed by the BMG in good faith.

(11) Inform BMG immediately about emergencies that complicate or worsen the provision of Service; and ensure the prevention of accidents within the scope of Service, as well as mitigating their consequences.

(12) Take all reasonable measures for the preservation of BMG's Equipment, including but not limited to fire prevention, over-heating and flooding.

(13) Uninstall the Equipment and prepare it for transfer to BMG within fifteen (15) days after the Service Agreement termination or expiration and payment in full for accrued and outstanding fees have been paid by BMG in accordance with this Service Agreement other than to the extent that BMG in good faith disputes such payment, such disputes to be resolved as described in the Agreement. Such transfer shall be at BMG's expense.

Appendix C - Payment Amount and Payment Rules for Services

(1) The payment method will be made by BMG in Bitcoin or Bitcoin Cash and the conversion rate shall be based upon the prevailing exchange rate at 10.00am GMT on the last day of the calendar month for the Services invoiced, as such rate is available from CoinDesk Bitcoin Price Index (BPI) or another mutually agreeable price index if the BPI is unavailable. Such alternate Index shall be agreed to in writing.

(2) Payment for monthly services calculated on an all-inclusive basis (the "Monthly Fee"): "calculated amount" shall be in accordance with Appendix D.

(3) A penalty of two (2) % of the total amount of payment is charged if payment, other than to the extent disputed in good faith, is past the due date by more than ten (10) business days. No penalty shall be applied if instructions have not been provided to initiate the transfer in accordance with Service Agreement.

(4) Payments will be adjusted to reflect the actual numbers of computers in production, billed and collected in prior periods, and shall be pro-rated for computers in production for a portion of a billing period.

(5) Bcause is not liable for temporary interruptions to the operation of the Equipment for reasons beyond its control or Force Majeure as defined in the Agreement. Such interruptions include those caused by ancillary service providers not contracted by Bcause. For example, Bcause is not liable when the internet provider or the electrical provider drop service to the datacenter, when government agencies interfere with service connectivity, when natural disasters occur, etc. This type of downtime shall not be counted in calculating uptime, so long as Bcause takes commercially reasonable steps to remedy such downtime.

(6) The date-of-receipt of funds paid to BCause shall be recorded as the date-of-payment of the invoice.

Appendix D – Schedule of Fees:

Each type of mining equipment has its own characteristics (Power draw, outages, performance, etc.) and associated charges. Sections a. – e. and Table 4 below, apply to the Antminer S9 specifications. The parties will add an additional Appendix for each separate type of miner that BMG desires to host at BCause's datacenter. Each Appendix's associated costs and payments will be calculated using essentially the same the methodology as described in a.-e. below.

| Unit Type (Antminer) | Payment per Unit Daily Rate (US$) | Payment per Unit Monthly rate (US$) | Payment per Unit Yearly Rate (US$) |
|---|---|---|---|
| S9 14.0T | $2.16 | $65.75 | $788.94 |
| S9 13.5T | $2.08 | $63.40 | $760.76 |

Table 4 – Unit Charging Table

a. In consideration of the Services provided by Bcause to BMG, BMG agrees to pay the amounts as specified in Table 4 per Unit to Bcause.

b. BMGPayment of the amount in Article 2(1) shall be made in advance of the month in which the Service is to be rendered. Bcause shall present invoices to BMG two months in advance, payable 30 days net.

c. Any adjustment made during a monthly period due to BMG increasing the number of Units during a month shall be accounted for as appropriate in the subsequent invoice.

d. Redacted

e. BCause bears the responsibility for non-compliance with promised Hash Rate performance (95%) and uptime (97.5%). The performance shall be monitored and calculated on a monthly basis. It is in the interest of BCause and BMG not to pursue compensation actions due to non-performance, but to resolve through negotiations and optimization of operation. Bcause shall compensate BMG for persistent non-performance (any 3 months of non-compliance in any 12 months period) of either the promised Hash Rate performance or uptime for circumstances that are due to Bcause's failure to perform. In no case shall compensation be due BMG for circumstances due to design flaws or other issues inherent in the equipment provided by BMG. The compensation to Customer in cases of Bcause's failure to perform shall be calculated as the loss of BMG's earnings as if the minimum SLA had been met.

| Month | Details | Inv # | Payment/ (Consumption) |
|---|---|---|---|
| Feb-18 | Payment | | 1,291,500.00 |
| Mar-18 | Payment (2) | 1013, 1006 | 6,457,500.00 |
| May-18 | Consumption | | (311,296.00) |
| Jun-18 | Consumption | | (319,327.25) |
| Jul-18 | Consumption | | (311,202.10) |
| Aug-18 | Payment | 1059 | 241,202.10 |
| Aug-18 | Consumption | | (326,797.00) |
| Sep-18 | Payment | 1072, 1082 | 738,152.50 |
| Sep-18 | Consumption | | (308,621.95) |
| Oct-18 | Payment | 1086, 1083 | 481,698.35 |
| Oct-18 | Consumption | | (321,555.39) |
| Nov-18 | Consumption | | (314,463.20) |
| Dec-18 | Payment | 1102 | 249,683.89 |
| Dec-18 | Consumption | | (322,106.24) |
| Jan-19 | Payment | 1114 | 252,470.50 |
| Jan-19 | Consumption | | (315,603.13) |
| Feb-19 | Payment | 1126 | 246,229.91 |
| Feb-19 | Consumption | | (314,886.74) |
| Mar-19 | Payment | 1152, 1141 | 479,246.74 |
| Mar-19 | Consumption | | (317,074.18) |
| Apr-19 | Consumption | | (316,894.96) |
| May-19 | Payment | 1168 | 244,168.20 |
| May-19 | Consumption | | $264,730 |
| Jun-19 | Payment | 1172 | 194,757.59 |
| Jun-19 | Consumption | | (257,220.20) |
| Balance as at June 2019 | | | 6,554,831.44 |

Case 19-10562 Claim 47-1 Part 3 Filed 07/31/19 Desc Exhibit C Page 1 of 3

BCause
192 Ballard Court, Suite 303
VA  23462
accounting@bcause.com
www.bcause.com



# INVOICE

BILL TO

INVOICE # 091318
DATE DUE 09/13/2018
TERMS Due Upon Receipt

| ACTIVITY | QTY | RATE AMOUNT | TOTAL AMOUNT |
|---|---|---|---|
| US Customs Invoice Processing | 1 | $368,520.95 | $368,520.95 |
| 3rd Party Processing Fee | 1 | $3685.20 | $3685.20 |

BALANCE DUE          **$372,206.15**

BCH Wallet address: qz6lultnyxjnrnwvtynu5xmq3lz6a5k52y2la5s66m

Agreed BCH Rate: 456.00

BCH to be sent by BMG to Bcause: 816.3232 BCH

Case 19-10562  Claim 17-1 Part 3  Filed 07/31/19  Desc Exhibit C  Page 2 of 3

**BCause**
192 Ballard Court, Suite 303
VA  23462
accounting@bcause.com
www.bcause.com



# INVOICE

BILL TO

INVOICE # 091918
DATE DUE 09/20/2018
TERMS Due Upon Receipt

| ACTIVITY | QTY | RATE AMOUNT | TOTAL AMOUNT |
|---|---|---|---|
| US Customs Invoice Processing | 1 | $368,520.95 | $368,520.95 |
| 3rd Party Processing Fee | 1 | $3685.20 | $3685.20 |

BALANCE DUE          **$372,206.15**

BCH Wallet address: qz6lultnyxjnrnwvtynu5xmq3lz6a5k52y2la5s66m

Agreed BCH Rate: $428.00

BCH to be sent by BMG to Bcause: 869.666

**BCause**
192 Ballard Court, Suite 303
VA  23462
accounting@bcause.com
www.bcause.com



# INVOICE

BILL TO

INVOICE # 092018
DATE DUE 09/21/2018
TERMS Due Upon Receipt

| ACTIVITY | QTY | RATE AMOUNT | TOTAL AMOUNT |
|---|---|---|---|
| US Customs Interest | 1 | $2,098.66 | $2,098.66 |
| 3rd Party Processing Fee | 1 | $20.98 | $20.98 |

| | BALANCE DUE | **$2,119.64** |
|---|---|---|

BCH Wallet address: qz6lultnyxjnrnwvtynu5xmq3lz6a5k52y2la5s66m

Agreed BCH Rate: $486.50

BCH to be sent by to Bcause: 4.401 BCH