IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Case No. 19-10562 |
| | ) | |
| BCause Mining, LLC, | ) | Judge Janet S. Baer |
| | ) | Chapter 11 |
| debtor/debtor-in-possession. | ) | (Jointly Administered) |

**DEBTORS' COMBINED PLAN OF REORGANIZATION
AND DISCLOSURE STATEMENT**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Case No. 19-10562 |
| | ) | |
| BCause Mining, LLC, | ) | Judge Janet S. Baer |
| | ) | Chapter 11 |
| debtor/debtor-in-possession. | ) | (Jointly Administered) |

### DEBTORS' COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT[1]

BCause Mining, LLC and BCause LLC, Virginia limited liability companies, debtors/debtors-in-possession herein ("Debtors"), by and through their attorneys, propose the following Combined Plan of Reorganization and Disclosure Statement in accordance with Section 1121(a) and 1125(f)(1) of the Bankruptcy Code and Rules 3016 and 3017.1 of the Federal Rules of Bankruptcy Procedure.[2]

### Plan Summary and Introductory Narrative

The Plan proposed by the Debtors contemplates payment of 100% to unsecured creditors, and to pay purported secured creditor WESCO Distribution, Inc. ("WESCO"), the indubitable equivalent of its claim[3]. Classes of both unsecured and secured creditors are impaired. Payments to unsecured creditors will either be over a twenty-five (25) month period in the event of a launch of the Spot Exchange, which will be explained further below, or over a forty-eight (48) month period in the event the Spot Exchange does not launch. Funding for distributions will be from the Debtors' continued revenue stream

---

[1] Simultaneous with the filing of this Combined Plan of Reorganization and Disclosure Statement, the Debtors have requested authority from the Court to file a combined plan of reorganization and disclosure statement. Rule 3017.1 of the Federal Rules of Bankruptcy Procedure provides the mechanism for Debtors to file a combined plan of reorganization and disclosure statement.
[2] By order of this Court dated May 8, 2019, the Debtors' cases are jointly administered.
[3] WESCO will receive payment of its secured claim within five (5) months of the Effective Date, as that term is defined herein, assuming that WESCO's secured claim is allowed by the Court. The Debtors have filed an adversary proceeding challenging the validity of WESCO's liens and security interests.

from its Hosting Agreements and, significantly, from self-mining revenues, which will also be explained further below. With respect to unsecured creditors, the Debtors' Plan clearly represents an opportunity to receive far more than would be realized in a Chapter 7 liquidation. Plan payments will be realized from BCause Mining's revenue as noted above, and reduced expenses, and in the case of a successful launch of the Spot Exchange, 25% of EBITPA until the debts are extrapolated. The Debtors anticipate reduction of expense liabilities through an amendment to BCause LLC's IT Services Agreement with NASDAQ Technology AB, whereby the IT Services Agreement with NASDAQ will be rejected by BCause LLC. BCause Secure, a 100% owned affiliate of BCause LLC will enter into a new IT Services Agreement with NASDAQ, and will assume approximately $845,000 of debt owed to NASDAQ. Attached hereto as **Exhibit A** is a "slide deck" showing the outline of the Plan, along with financial information necessary for creditors to assess the Plan (the "Slide Deck"). Where possible, references to specific slides will be noted in this Plan. Attached hereto as **Group Exhibit B** are the financial projections which are the underpinnings of the Plan.

Copies of written commitments for funding for launch of the Spot Exchange are attached hereto as **Group Exhibit C**.

Purported secured creditor WESCO will be paid all of its secured claim, approximately $626,305.84 (the "CSC Portion") within one (1) year of the Effective Date. It is anticipated that the Effective Date will be thirty (30) days after Confirmation of the Plan.

**Preamble and History and Background**

On April 11, 2019, BCause Mining, LLC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Mining Petition Date"). On April 12, 2019, BCause filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Holding Petition Date"). Both Debtors have been operating their businesses and managing their financial affairs as debtors-in-possession since the Holding and Mining Petition Dates. No trustee or examiner has been appointed, and an Official Committee of Unsecured Creditors has been appointed in the Debtors' Chapter 11 cases, and has been active.

Mining is in the business of crypto-currency mining, which is the process of producing digital currency using cryptography and high powered computers known as mining rigs or miners. The Debtor historically has not mined itself, but as noted above, self-mining is a critical part of this Plan. The Debtor has filed a motion with the Bankruptcy Court for authority to enter into an agreement with SBI, a customer and equity holder of Holdings to enable Mining to "rent to own" miners.[4] The agreement with SBI will be discussed in more detail below.

Mining provides a state of the art mining facility in Virginia Beach, Virginia and Holdings formerly maintained offices located at 130 S. Jefferson St., Suite 101, Chicago, Illinois. Holdings also maintained an office in Virginia Beach, but has rejected that lease in favor of a new lease for a reduced rent which is being finalized. Mining is wholly owned by Holdings, and both are limited liability holding companies formed in Virginia.

---

[4] Currently the price of Bitcoin is $11,600.

-3-

Holdings is also 100% owner of BCause Spot, BCause Secure, BCause Trust, BCause Derivatives and BCause Clear.

The Debtors' Chapter 11 filings were triggered by a judgment entered in favor of WESCO in the approximate amount of $1,300,000, and a garnishment of Holdings' bank account, from which both of the Debtors' bills are paid, including bills for utilities such as Dominion Energy, the Debtors' energy provider, which had threatened to shut off the Debtors' utilities for non-payment, as of April 12, 2019.

## **HIGHLIGHTS OF PLAN TO INCREASE/REPLACE REVENUE**

### **Status of Mining's Hosting Agreements**

At present, Mining is a party to Hosting Agreements with the following parties:

|  | Termination Date | % of Revenue | Status of Extension |
|---|---|---|---|
| St. Bitts, LLC | 12/13/19 | 20% ($200,000) | Extension not yet negotiated |
| FRMO Corp., Horizon and HK Cryptocurrency Mining LLC | 6/30/19 | 3% ($30,000) | Unknown |
| BMG Operations Limited | 12/31/19 | 27% ($250,000) | BMG has asked to Terminate |
| Fidelity Labs LLC | 12/31/20 | 19% ($3,000) | Unknown |
| SBI Crypto Co. Ltd. | 12/31/19 | 49% ($500,000) | Leasing debtors miners, still considering extension |
| Solutrix, LLC | Various dates, all more than 1 year | 1% ($11,000) | Unknown |
| Inate One LLC | Sept. 2020 | 1% ($10,000) | Unknown |

The Debtors recognize that Mining's revenue stream is at risk if extensions are not obtained. BMG, for example, will not extend the term of its Hosting Agreement. Therefore, in order to replace potential lost revenue, the Debtors have provided for

alternative means of producing revenue, namely the launch of the Spot Exchange (*slides 18-36*), assumption of NASDAQ debt (*slides 6, 10 and 11*), and the aforementioned SBI Rent to Own Agreement (*slide 14*).

### Launch of Spot Exchange

A Spot Exchange is akin to a money conversion facility in an airport. In the case of BCause Secured, it's an online facility where people can convey national currencies to crypto currency and cryptocurrency of one form to another, and from cryptocurrency back to national currency. The successful launch of the Spot Exchange would entail having buyers and sellers performing transactions on the BCause Secure Exchange with the expectation that the value of these transactions would increase over time.

Throughout the case, the Debtors have highlighted their desire to launch the so called "Spot Exchange." In order to launch the Spot Exchange, the Debtor has needed to raise capital, which is further magnified by the assumption of the NASDAQ debt. To that end, the Debtors have raised approximately $400,000 from investors to this point. Further investments will soon follow. Launch of the Spot Exchange or abandonment of the Spot Exchange launch will result in an additional monthly cost reduction of approximately $80,000, consisting of labor and other expenses.

Current funding is sufficient through launch (September 18, 2019) and then until October 31, 2019. An additional $500,000 will have to be raised through breakeven, estimated to be March 2020. At launch, Secure estimates that it will have licenses in 20 states as money transmitter status, and independent of money transmitter status, Secure will be able to launch in 48 states for cryptocurrency to cryptocurrency conversion.

## Rejection of NASDAQ IT Agreement, And Assumption Of Debt By BCause Secure

BCause LLC is currently a party to an IT Services Agreement with NASDAQ Technology AB dated March 23, 2018 (the "NASDAQ Agreement"). Under the Plan, the Debtor will reject the NASDAQ Agreement. All debts and fees of BCause LLC under the NASDAQ Agreement will be assumed and assigned to BCause Secure. A copy of the amendment to the IT Services Agreement, reflecting the above is attached hereto as **Exhibit D**.

Under the NASDAQ/BCause Secure transaction, the following will occur:

1. NASDAQ agrees to assign the current amount owed by Holdings of $804,070.14 to BCause Secure;

2. NASDAQ agrees to relicense all of the software currently licensed by Holdings to BCause Secure;

3. NASDAQ agrees to accept quarterly payments for the "payment due upon acceptance" from BCause Secure; and

4. NASDAQ agrees to accept quarterly payments for required support. *See slide 14.*

## SBI Rent to Own Agreement

SBI is a customer of and 40% investor in Holdings, and represents approximately 48% of the Debtor's revenue. Mining has requested authority from the Bankruptcy Court to enter into an Equipment Rent to Own Agreement with SBI (the "SBI Agreement"), whereby Mining will lease to own up to 3,500 Bitmain Antminer S9 cryptocurrency miners (the "Miners") with a reasonable expectation that the number of miners leased will grow to approximately 1,750, which are currently in storage located at Mining's datacenter at

5465 Greenwich Road, Virginia Beach, Virginia. A copy of the SBI Agreement is attached hereto as **Exhibit E**. The SBI Agreement will result in substantial revenue for Mining.

Under the terms of the SBI Agreement, Mining agrees to repair the Miners at its own cost in order for Mining to exclusively use and operate the Miners. In addition, Mining and SBI intend that ownership of all of the Miners and other related equipment will transfer to the Debtor upon full completion of this SBI Agreement, by way of rental payments made to SBI being applied to the purchase price during the rental period, which is six (6) months.

Article 3 of the SBI Agreement provides for the purchase price for each named Miner, as agreed upon by the parties. Approval of the SBI Agreement will provide approximately an immediate $40,000 per month in revenue for the Debtors, as bitcoin price is currently over $11,600. The SBI Agreement is immediately beneficial to the Debtors' "bottom line," as long as bitcoin exchange rates stay above $8,000. Once complete it is estimated that this transaction will add at least $100,000 in cash flow per month. *See slides 14 and 30*, which is a comparison of self-mining to revenue from BMG.

### The Debtors' Hosting Customers/BMG

As noted, Mining acknowledges that it will not obtain an extension of current Hosting Agreements with BMG Operations Ltd. BMG has filed a motion for relief from stay to allow for termination of its hosting agreement with Mining, and to issue a notice of its intention not to renew the current hosting agreement. BMG has also asked for authority to set off post-petition damages against Mining as a result of a power surge of, and BMG owes Mining its monthly hosting fee for August 2019 in the approximate amount of $170,000, as well as for improper setoffs both before and after Mining's Petition Date

in the monthly amount of $70,000. Mining also has claims against BMG for failure to provide proper support and parts under the terms of its hosting agreement.

Mining does not have written extensions from any of its other customers, but believes that some will continue to require Mining's hosting services. More importantly, as set forth above, Mining believes that it can replace any lost revenue through self-mining as described above, and the reduction of expenses (see *slide 30* for comparison of profitability, BMG v. self-mining.[5]

## ARTICLE I
## Definitions

The following terms, when used herein, shall have the meaning specified below, unless the context otherwise requires:

**1.1** **Administrative Expense**: A cost or expense of administration of this Chapter 11 case, including any actual, necessary expense of preserving or liquidating the estate, or of operating the business of the Debtors and all allowances approved by the Bankruptcy Court in accordance with Section 503 of the Bankruptcy Code.

**1.2** **Allowed Claim:** A "Claim" (as defined below) (i) proof of which has been filed with the Bankruptcy Court within the time fixed by the Bankruptcy Court or applicable rules or statutes, and with respect to which no objection has been timely filed by any party in interest, or (ii) that has been, or hereafter is, listed by the Debtors as liquidated in amount and not disputed or contingent in the Debtors' bankruptcy schedules filed in this

---

[5] During previous hearings, the Court has stressed that the Debtors either provide written extensions to current hosting agreements or provide for increased revenue to supplant hosting agreement revenue. The Debtors and, upon information and belief, the Committee, believe that the Debtors have provided evidence of replacement revenue in this Plan.

-8-

Chapter 11 case, or (iii) that has been allowed by a "Final Order" (as defined below) by the Bankruptcy Court, or (iv) that is allowed by the provisions of this Plan.

**1.3** **Allowed Interest**: An "Interest" (as defined below) (i) proof of which has been filed within the time fixed by the Bankruptcy Rules or within the time fixed by the Bankruptcy Court; or (ii) that has been scheduled in the list of equity security holders identified in the Debtor's bankruptcy schedules which have been filed with the Bankruptcy Court in this Chapter 11 case; and (iii) in the event of either (i) or (ii), as to which no objection to the allowance thereof has been filed within any applicable period of time fixed by an Order of the Bankruptcy Court, or as to which any such objection has been determined by a Final Order of the Bankruptcy Court.

**1.4** **Bankruptcy Code**:  Title 11 of the United States Code, Section 101 et seq., as amended.

**1.5** **Bankruptcy Court**:  The United States Bankruptcy Court for the Northern District of Illinois, Eastern Division.

**1.6** **Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

**1.7** **Bar Date:** The Court approved dates for filing proofs of claim in the Debtors' Chapter 11 cases, August 1, 2019 and October 11, 2019 for governmental claims.

**1.8** **BMG** – BMG Operations, Ltd.

**1.8** **Chapter 11**:  Chapter 11 of the Bankruptcy Code.

**1.9** **CSCD**: The law firm of Crane, Simon, Clar & Dan, Debtors' Counsel.

**1.10** **Claim**: The term "Claim" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

**1.11 Committee**: The Official Unsecured Creditors' Committee formed by the United States Trustee.

**1.12 Confirmation**: The entry by the Bankruptcy Court of a Final Order confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

**1.13 Debtors**: BCause Mining, LLC and BCause LLC.

**1.14 Debtors' Estates**: All of the Debtors' "property of the estate" as defined in Section 541 of the Bankruptcy Code.

**1.15 Effective Date**: Thirty (30) days following the date on which the Order confirming this Plan becomes a Final Order.

**1.16 Final Confirmation Order**: Final Order confirming the Plan and approving the adequacy of the information contained in the Combined Plan and Disclosure Statement under Section 1129 of the Bankruptcy Code.

**1.17 Final Order**: (i) An order or a judgment that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek reargument, reconsideration or rehearing has expired and has not been extended and as to which no appeal, petition for certiorari, reargument, reconsideration or rehearing is pending, or (ii) an order or a judgment for which an appeal, reargument, reconsideration, rehearing or certiorari has been sought, and as to which the order or judgment has been affirmed or the request for reargument, reconsideration, rehearing or certiorari has been denied, and the time to take any further appeal, reargument, reconsideration, rehearing or certiorari has expired, so that in the event of either (i) or (ii), such order or judgment shall have become final and non-appealable in accordance with applicable law.

**1.18  Freeborn and Peters**: Counsel for the Committee of Unsecured Creditors.

**1.19  Month**: A calendar month, including the month in which a date or event occurs.

**1.20  NASDAQ**: The entity with which BCause LLC maintains an IT Services Agreement.

**1.21  Plan**: This Combined Plan of Reorganization including any amendments or modifications thereto.

**1.22  SBI**: SBI Crypto Co., Ltd., customer and member of the Debtors, and the party to the SBI Rent to Own Agreement.

**1.23  Unclassified Claims**: The claims of Debtors' Administrative creditors and the Priority Tax Claims.

**1.24  WESCO**: The Debtors' purported secured creditor.

**1.25  WESCO Complaint**: The Complaint filed to avoid WESCO's lien.

Unless otherwise defined in this Plan, the words and phrases used herein shall have the meanings ascribed to them in the Bankruptcy Code and in the Bankruptcy Rules.

## ARTICLE II

## SUMMARY CHART

Under the Plan, claimants, and the treatment of their claims is as follows:[6]

| Claimant | Treatment Under The Plan | Source of Funds |
|---|---|---|
| Administrative Claims, consisting of attorneys' fees of CSCD, Freeborn and Peters and quarterly fees owed to the Office of the United States Trustee | Will be paid in cash in full on the Effective Date unless otherwise agreed to by the parties | Mining hosting revenue and self-mining |

---

[6] Distributions under the Plan can be seen in more detail in *slides 33-39*.


| | | |
|---|---|---|
| Claim of IRS for $576,041.68 against Holdings for payroll taxes | Claim of approximately $17,000 will be paid over the five year statutory period, remainder is disputed because the debtor didn't have employees until 2018. | Mining hosting revenue and self-mining |
| Class 1: Secured Claim of WESCO. Class 1 Claim is impaired | To be paid the indubitable equivalent of its secured claim, if any, at the interest rate of 3-1/2% over prime within one (1) year of the Effective Date | Mining hosting revenue and self-mining |
| Class 2: General Unsecured Claims of both estates, totaling in excess of $10 million. Class 2 is impaired | 100% distribution, either: i) over 25 months in the event of the Spot Exchange launch; or ii) over 48 months if the Spot Exchange does not launch | Mining hosting revenue and self-mining |
| Class 3: Unsecured (or administrataive) Claim of BMG for loans and damages. Class 3 is impaired | 100% distribution, as allowed, subject to Mining's counterclaims | Mining hosting revenue and self-mining |
| Class 4: Unsecured deficiency claim of WESCO, if any. Class 4 is impaired | Will be paid 100%, either i) over 25 months in the event of the Spot Exchange launch; or ii) over 48 months if the Spot Exchange does not launch | Mining hosting revenue and self-mining |
| Class 5: Priority wage claimants | Will be paid 100% of their allowed claims on the Effective Date. The Debtors believe the majority of the allowed wage claims are invalid | Mining hosting revenue and self-mining |
| Class 6: Membership interests in both Debtors | Except as provided in the slide deck, with respect to dilution of BCause LLC members as a result of investment, members will retain their interests. All of the investors for launch of the Spot Exchange are current members of BCause LLC | N/A |

**Treatment of Claims and Interests Under the Plan**

The Plan has one (1) category of administrative claims, no tax claims, five (5) classes of creditors and one (1) class of membership interests. Classes 1, 2, 3 and 4 are impaired.

## ARTICLE III

## UNCLASSIFIED CLAIMS

### 3.1   Administrative Claims

Administrative Claims are unimpaired under the Plan. Administrative Claims consist of all fees and expenses of the law firm of Crane, Simon, Clar & Dan ("CSCD"), counsel for the Debtors, Freeborn & Peters, counsel for the Committee, and quarterly fees owed to the Office of the United States Trustee. The fees and expenses of CSCD are projected to be, as of the Effective Date, $150,000 in excess of the $50,000 pre-petition retainer paid to CSCD. Freeborn and Peters has been paid $30,000 to date and it is anticipated that Freeborn and Peters will be owed approximately $70,000 through the Effective Date.

### 3.2   Tax Claims

The Plan has a specific provision for the payment of taxes which are the type entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

### 3.3   Secured Claim of WESCO

Under the Plan, WESCO comprises the Class 1 secured claim. WESCO's secured claim has been challenged by the filing of an adversary complaint on several grounds. WESCO has asserted a claim in approximately the amount of $1.9 million. The Debtors believe WESCO's secured claim is considerably smaller than as represented by

WESCO's proof of claim, but in any event WESCO will be paid the indubitable equivalent of its secured claim over a period of one year (possibly as little as nine months, at the interest rate of 3-1/2 points over prime).

**3.4    Class 2: General Unsecured Claims of both estates, totaling in excess of $10 million.** 100% distribution, either: i) over 25 months in the event of the Spot Exchange launch; or ii) over 48 months if the Spot Exchange does not launch.

**3.5    Class 3: Claim of BMG for loans and damages.** 100% distribution, as with Class 2, as allowed, subject to Mining's counterclaims.

**3.6    Class 4: Unsecured deficiency claim of WESCO, if any.** Will be paid 100%, either i) over 25 months in the event of the Spot Exchange launch; or ii) over 48 months if the Spot Exchange does not launch.

**3.7    Class 5: Priority Wages**: Wages will be paid, if allowed, in cash on the Effective Date.

**3.8    Class 6: Membership interests in both Debtors.** Except as provided in the slide deck, subject to dilution of BCause LLC members as a result of investment, members will retain their interests. All of the investors for the launch of the Spot Exchange are current members of BCause LLC.

<u>Claims Objections</u>

Except as otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan, the Debtors shall file any and all objections to the allowance of Claims or Interests not already filed on or within one hundred and twenty (120) days of Confirmation of this Plan unless extended by Order of the Bankruptcy.

## PURPOSE OF DISCLOSURE STATEMENT

This Combined Plan and Disclosure Statement is provided to all of the known holders of Claims against and Interests in the Debtors, and is disseminated in connection with the solicitation of acceptances of the Plan filed by the Debtors. The purpose of this Disclosure Statement is to provide such information as would enable a hypothetical, reasonable investor, typical of the holder of Claims and Interests which are impaired under the Plan, to make an informed judgment about the Plan.

The information contained in this Combined Plan and Disclosure Statement has been submitted by the Debtors unless specifically stated to be from other sources. No representations concerning the Debtors or this Plan, other than those set forth in this Plan, have been authorized by the Debtors. The Debtors believe that all of the information contained in this Combined Plan and Disclosure Statement is accurate. However, the Debtors are unable to warrant that there are no inaccuracies.

**Under the Bankruptcy Code, a Class of Claims is considered to have accepted the Plan if both a majority in number and two-thirds (2/3) of the dollar amount of those actually voting vote to accept the Plan. The Claims of those who do not vote are not counted in determining whether the requisite statutory majority in number and dollar amount have voted for acceptance. Acceptance by the statutory majority will bind the minority who dissent and those who fail to vote.**

**Claimants in Classes 1, 2, 3, and 4 are impaired and may cast votes.**

## POST-PETITION ACTIVITIES

Since the filing of their Chapter 11 cases, the Debtors have entered into five (5) interim cash collateral orders with WESCO. The Debtors have either performed at the

level contemplated by each order, or in the case of expenses, outperformed their budgets. This, despite the fact that BMG setoff $70,000 per month during the first two months of the Debtors' Chapter 11 cases, and has refused to pay hosting fees after July 2019 ($500,000), pursuant to the pending disputes. Mining experienced a power surge on June 9, 2019, which further decreased its revenue, but the Debtor has entered into several stipulations and agreed orders with Dominion Energy for power usage and has successfully reduced its energy costs.

Cost reduction has also been seen in the form of rejection of Mining's office lease in Virginia Beach and Holdings' office lease in Chicago, Illinois. Holdings has also reduced its payroll significantly, and has rejected a bandwidth agreement and Comcast service agreement, further reducing expenses. Launch of the Spot Exchange or not, Holdings will rid itself of approximately $90,000 per month of payroll related expenses and other expenses as of the Effective Date. The SBI Agreement represents a significant post-petition development.

## OTHER ASPECTS OF THE PLAN

The Debtors will be the disbursing agent charged with making the payments required under the Plan to the holders of Allowed Claims and Interests.

Upon Confirmation of the Plan, the Debtors shall be revested with their assets, subject only to the terms and conditions of the Plan.

Upon Confirmation, an injunction under Section 524 of the Bankruptcy Code shall arise to prevent any party from foreclosing its lien or security interests or otherwise enforcing its claims against the Debtors and their assets in these bankruptcy cases except as authorized in the Plan. Such injunction shall not affect any secured creditor's right to

foreclose upon any security interest provided in the Plan in the event of any post-Confirmation default under the Plan. This injunction will remain in effect until all distributions under the Plan have been made.

The Plan is self-executing. The Debtors shall not be required to execute any newly created documents. Upon payment as required by the Plan, any liens supporting such Claims shall be deemed released and discharged.

All executory contracts and unexpired leases which exist between the Debtors and any other party, whether such executory contract be in writing or oral, which have not been previously assumed, assigned, rejected or otherwise terminated by the Debtors, shall be assumed upon Confirmation of the Plan pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code, except for the NASDAQ IT Agreement which is rejected as of the date of confirmation. Any and all Claims asserted by any party arising from the rejection of executory contracts and unexpired leases pursuant to the Plan must be filed on or within thirty (30) days following the rejection. Further, with respect to Claims for default relating to any unexpired lease or executory contract that is assumed pursuant to the Plan, any and all such Claims must also be filed on or within thirty (30) days following Confirmation. Allowed Claims emanating from the rejection of unexpired leases and executory contracts will be treated as Class 2 Claims. Any person failing to file such a Claim within the time provided in the Plan shall be forever barred from asserting such Claim and shall not receive any distribution under the Plan. The provisions for assumption, assignment and rejection shall be equally applicable to executory contracts and unexpired leases of real and personal property.

The Bankruptcy Court shall retain jurisdiction for certain specified purposes, as detailed in the Plan. In the event the Plan is not confirmed, the Trustee will conduct a sale of the Properties. Any distribution under the Plan that remains unclaimed sixty (60) days after the distribution is made will become property of the Debtors, and will not be recouped in subsequent distributions. The Debtors will have the right to make any distribution to creditors earlier than required by the Plan.

The provisions of the Plan shall bind all creditors, Interest holders and parties in interest. Except as expressly provided in the Plan or the Bankruptcy Code, no interest or penalties accruing on or after April 11 and April 12, 2019 (the Mining and Holdings Petition Dates), shall be paid on any Claim nor shall any creditor claiming any such interest or penalty be entitled to have its Claim for interest or penalty allowed for payment. To the extent necessary, pursuant to Section 1129(b) of the Bankruptcy Code, the Debtors reserve the right to confirm the Plan if all applicable requirements of Section 1129(a) of the Bankruptcy Code, other than Section 1129(a)(8), are met.

## LIQUIDATION ANALYSIS

The Debtors' combine assets and their liquidation value is a follows:

| Asset | Liquidation Value |
|---|---|
| BCause LLC Current Bank Account Balance at Lakeside Bank | $621,000 |
| Accounts receivable from Mining Hosting Agreements | $720,000 |
| Mining Machinery and equipment | $1 million |
| Total | $2.12 million |

Failure of the Debtors to obtain Confirmation of their Plan will result in liquidation of the Debtors' assets. Liquidation of the Debtors' assets will likely only result in a

-18-

distribution to WESCO, if in fact WESCO's secured claim is allowed, to the detriment of all unsecured creditors.

## FEASIBILITY AND FAIRNESS OF PLAN

Copies of the summary sheets from the monthly operating reports filed by the Debtors in these Chapter 11 cases, is attached hereto as **Exhibit F**. Copies of the last two years of the Debtors' consolidated tax returns and consolidated financial statements are attached hereto as **Exhibit G**. The Debtors believe that the plan represents opportunities for the holders of allowed claims to receive a much greater distribution than would be realized in a liquidation, and is feasible.

## RECOMMENDATION

The Debtors recommend that those persons entitled to vote, vote to accept the Plan.

BCAUSE MINING, LLC and BCause, LLC

By: /s/Scott R. Clar
One of their attorneys

**DEBTORS' COUNSEL:**
Scott R. Clar
(Atty. No. 06183741)
Crane, Simon, Clar & Dan
135 S. LaSalle Street, Suite 3705
Chicago, Illinois 60603
312-641-6777