# EXHIBIT A

 Nasdaq

# IT Services Agreement

between bcause LCC and Nasdaq



Effective Date: 23 Mar 2018

**Confidential**

# Table of Contents

| A. | **General** | **5** |
|---|---|---|
| 1 | Definitions and Interpretation | 5 |
| B. | **Delivery Project and Acceptance** | **6** |
| 2 | Master Time Schedule | 6 |
| 3 | Joint Obligations During the Project | 6 |
| 4 | Nasdaq's Obligations during the Project | 7 |
| 5 | Customer's Obligations during the Project | 9 |
| 6 | Routine Guide | 11 |
| 7 | Acceptance | 11 |
| 8 | Delayed Acceptance | 12 |
| C. | **Services** | **14** |
| 9 | Nasdaq's Obligations during the Support Term | 14 |
| 10 | Customer Obligations during the Support Term | 15 |
| D. | **Change Management** | **16** |
| 11 | Change Procedure | 16 |
| E. | **Intellectual Property Rights and Confidentiality** | **17** |
| 12 | Software Product License | 17 |
| 13 | Intellectual Property Rights | 18 |
| 14 | Confidentiality | 19 |
| F. | **Charges** | **21** |
| 15 | Consideration | 21 |
| G. | **Term, Termination and Consequences of Termination** | **23** |
| 16 | Term and Termination | 23 |
| H. | **Warranties and Limitation of Liability** | **26** |
| 17 | Warranties | 26 |
| 18 | Damages | 28 |
| I. | **General** | **30** |
| 19 | Miscellaneous | 30 |
| Schedule 1 | **Definitions** | **37** |
| Schedule 2 | **Consideration and Payment Terms** | **45** |
| Schedule 3 | **Master Time Schedule** | **49** |
| Schedule 4 | **Regulations for Acceptance Test** | **52** |

| Schedule 5 | Training Specification | 66 |
| Schedule 6 | Project Governance | 71 |
| Schedule 7 | Software Functional Specification | 76 |
| Schedule 8 | License Scope | 78 |
| Schedule 9 | Documentation Specification | 80 |
| Schedule 10 | System Description | 83 |
| Schedule 11 | Services | 93 |
| Schedule 12 | Service Level Agreement | 106 |
| Schedule 13 | Change Procedure | 114 |

This **IT (Information Technology) Services Agreement** is entered into on the Effective Date by and between:

**Nasdaq Technology AB,** a company with its principal place of business at Tullvaktsvägen 15, SE-105 78 Stockholm, Sweden ("**Nasdaq**");

and

**bcause LLC,** a company registered in United States of America with its registered office at 277 Bendix Road, Suite 420, Virginia Beach, Virginia 23452 (the "**Customer**").

**WHEREAS:**

A)      The Customer has requested and Nasdaq has agreed to provide the Software Product and services related to the Software Product to the Customer.

B)      This Agreement sets out the Parties' rights and obligations during the Project (as defined herein) and Nasdaq's subsequent provision of Services to the Customer.

**THEREFORE**, the Parties agree as follows:

# A.      General

# 1       Definitions and Interpretation

## 1.1     Definitions

In this Agreement, and in the recitals, the definitions set forth in **Schedule 1** (Definitions) shall apply.

## 1.2     Interpretation

1.2.1    The schedules to this Agreement form an integral part of this Agreement. In case of any inconsistency between this document and the schedules, this document shall take precedence.

1.2.2    The headings in this Agreement are for convenience only and do not affect the construction or interpretation of any provision to which they refer.

1.2.3    Unless the context otherwise requires, the singular includes the plural and vice-versa.

1.2.4    The words "includes" and "including" shall be construed without limitation.

1.2.5    A reference to a clause number shall also be deemed to include its sub-clauses.

## B.   Delivery Project and Acceptance

Prior to the commercial operation of the Customer Market and the provision of the Services, it is necessary for Nasdaq to develop certain Adaptations to the Uncustomized Software Product. Furthermore, it is necessary to acquire, install and configure certain computer hardware, software and network facilities and to undertake related activities with respect to installation of the Software Product and training in the use thereof. Clause 2 through Clause 8 below sets out the Parties' respective obligations relating thereto.

## 2   Master Time Schedule

The Parties' obligations during the Project as set forth herein shall be performed in accordance with **Schedule 3** (Master Time Schedule).

## 3   Joint Obligations During the Project

### 3.1   Timely Performance of Obligations

Each Party acknowledges that complete and timely performance of its obligations pursuant to this Agreement may be necessary to enable the other Party to fulfil its obligations under the Agreement.

### 3.2   Project Organization

3.2.1   Commencing as of the Effective Date, each Party shall establish, and throughout the Project maintain, a Project Organization, substantially in accordance with **Schedule 6** (Project Governance).

3.2.2   Each Party shall appoint personnel to its Project Organization that are suitably qualified, experienced, skilled and trained to perform the tasks assigned to them during the Project and who shall be dedicated to the Project at all material times.

3.2.3   Each Party's Project Manager shall be responsible for managing the performance of that Party's obligations during the Project and be authorized to make binding decisions with respect to the day-to-day performance of its obligations under this Agreement, but not to amend the terms of this Agreement.

### 3.3   Project Planning and Management

3.3.1   Each Party shall in accordance with **Schedule 3** (Master Time Schedule) prepare an additional detailed project time schedule that will be for such Party's internal use and that will enable such Party to meet the milestones set forth in Schedule 3 (Master Time Schedule).

3.3.2   Any of the activities of either Party which interact with the other Party's activities, or upon which the other Party's activities are dependent, shall be planned by the first Party in sufficient detail to enable all interactions and dependencies to be efficiently established and performed.

3.3.3   If a Party becomes aware of any circumstance that may potentially lead to either of the Parties failing to meet any of their obligations under this agreement or that would impact upon any of the dates set out in **Schedule 3** (Master Time Schedule) that Party shall immediately notify the other Party's Project Manager and shall also prepare a report to be presented to the next Joint Steering Committee meeting.

3.3.4    Where a failure by one Party to meet its obligations affects the other Party's ability to fulfil its obligations under this Agreement, the latter Party shall be relieved of its obligations only to the extent that the performance of such obligations is affected by such failure and such latter Party:

(a)    notified the former Party of the adverse impact of such failure,

(b)    uses reasonable efforts to mitigate the adverse impact of such failure, and

(c)    uses reasonable efforts to continue to perform despite such failure.

3.3.5    The latter Party shall only continue to be relieved from its obligations whilst the failure continues to affect the performance of its obligations.

3.3.6    Each Party shall advise the other Party of the consequences of any failure that pursuant to **Clause 3.1** (Timely Performance of Obligations) may impact upon the other Party's ability to meets its obligations.

## 3.4    Project Meetings

Each Party shall attend Project Management and Joint Steering Committee meetings as set forth in **Schedule 6** (Project Governance).

## 3.5    Information

Each Party shall supply such information, which it may be reasonably expected to provide to the other Party, in writing and as such other Party reasonably requires in order to be able to meet its obligations under this Agreement and which the first Party can be reasonably expected to provide.

# 4    Nasdaq's Obligations during the Project

## 4.1    The Software Product

Nasdaq shall develop the Adaptations on the Uncustomized Software Product as specified in **Schedule 7** (Software Functional Specification).

## 4.2    Assistance

Nasdaq shall provide a reasonable level of Software Product advice and assistance to the Customer during the Project, including assisting with email and telephone queries, subject to availability of Nasdaq personnel, pertaining to:

(a)    Resolution of technical questions about the Customer Interfaces and Customer Applications;

(b)    The functionality of the Software Product;

(c)    Installation of the Software Product on the Customer Hardware Configuration subsequent to the initial installation performed by Nasdaq pursuant to **Clause 4.3** (Initial Installation and Installation Test); and

(d)    Configuration of the Software Product.

## 4.3    Initial Installation and Installation Test

4.3.1    After the completion of the development and Nasdaq internal testing of the Adaptations, the Software Product will be delivered to the Customer and Nasdaq shall be responsible for

the initial installation of the Software Product at the Customer Central Site on the Acceptance Test Environment.

4.3.2   Nasdaq shall conduct the Installation Test to validate interoperability between the Software Product, the Customer External Systems and the Customer Hardware Configuration.

4.3.3   Following the successful completion of the Installation Test, Nasdaq shall issue a Development Completion Notice indicating the Software Product is ready for the commencement of the Acceptance Test.

## 4.4   Documentation

Nasdaq shall provide the Customer with one (1) copy of the documents listed in **Schedule 9** (Documentation Specification) in electronic format. The language of the Documentation shall be English.

## 4.5   Training

Nasdaq shall provide training to the Customer's personnel as specified in **Schedule 5** (Training Specification). Training shall be conducted in the English language.

## 4.6   Acceptance Test

Nasdaq shall:

(a)   provide example Acceptance Test Procedure, Acceptance Test Plan and Acceptance Test Specification documentation to be used by the Customer as a reference in their development of their test documentation for Acceptance Test pursuant to **Clause 5.8.1(a)**;

(b)   have the right to review the Customer's Nasdaq ME Acceptance Test Plan, Acceptance Test Procedures and Acceptance Test Specification; and

(c)   prepare the Nasdaq MS Acceptance Test Procedure, the Acceptance Test Plan and the Acceptance Test Specification; and

(d)   provide support to the Customer during the Acceptance Test in accordance with **Schedule 4** (Regulations for Acceptance Test) pursuant to **Schedule 3** (Master Time Schedule).

## 4.7   Reference Data and Migration Guide

4.7.1   During the project, Nasdaq shall prepare a Migration Guide for the Customer defining the migration process to the Software Product. This guide shall include;

(a)   The data migration process to be executed to convert the Original Reference Data to the New Reference Data as is required for the operation of the Software Product;

(b)   A list of the required Original Reference Data and, if relevant, where this data should be sourced from in the existing system; and

(c)   Operating instructions for the Customer to execute the data migration.

4.7.2   Subject to Customer performing its obligations under **Clause 5.6** (Reference Data and Data Migration), Nasdaq shall perform the setup of the New Reference Data in the Software Product prior to the Installation Testing and Production Start.

# 5      Customer's Obligations during the Project

## 5.1      Design Study & Completeness of Schedules

5.1.1   The Parties acknowledge that prior to the commencement of the Project the Parties
conducted a detailed system analysis and design process ("Design Study"). Furthermore
the Parties acknowledge that one of the principle purposes of the Design Study was to
document, to a sufficient level of detail to allow the Project to be scoped and planned, the
business and technical requirements to be satisfied by the Software Product and the
services to be delivered.

5.1.2   The Customer acknowledges that, having reviewed the documented outcome of the Design
Study as at the Effective Date, **Schedule 7** (Software Functional Specification),
**Schedule 10** (System Description) and **Schedule 12** (Service Level Agreement) are
complete and meet the Customer's requirements with respect to functional, technical and
other aspects of the Software Product.

5.1.3   Alterations to agreed Schedules shall be dealt with by the Parties through the Change
Request procedure in accordance with **Clause 11** (Change Procedure).

## 5.2      Customer Hardware Configuration

The Customer shall:

(a)     procure, install and configure the Customer Hardware Configuration, as specified in
**Schedule 10** (System Description), at the Customer Central Site; and

(b)     install the Software Product on the Customer Hardware Configuration (except for the
initial installation as specified in **Clause 4.3** (Initial Installation and Installation
Test)).

## 5.3      Training and Knowledge Transfer

The Customer shall:

(a)     participate in training and knowledge transfer activities to be provided by Nasdaq as
specified in **Schedule 5** (Training Specification); and

(b)     provide training to Participants regarding the Software Product and the Customer
Market.

## 5.4      Integration of Customer External Systems

5.4.1   The Customer shall supply or develop and test the Customer External Systems and shall
ensure the integration of the Customer External Systems with the Software Product.

5.4.2   The Customer shall ensure that the Customer External Systems are developed in
accordance with the specifications of the Customer Interfaces as set out in **Schedule 10**
(System Description) to ensure that data fed or entered in to the Software Product does
not produce or result in any errors or malfunctions in the Software Product.

## 5.5      Third Party Developer Testing Prior to Acceptance

5.5.1   The Customer may use the Participant Interfaces for testing by Third Party Developers and
Participants prior to Acceptance. However, the Customer acknowledges that prior to
Acceptance, the stability of the Participant Interfaces may fluctuate and the Participant
Interfaces may be subject to changes before Acceptance.

5.5.2   The provision of:

(a)   test systems; and

(b)   any support requested by Third Party Developers performing tests against the Participant Interfaces,

shall be the sole responsibility of the Customer.

## 5.6   Reference Data and Data Migration

5.6.1   The Customer shall prepare and provide Nasdaq with the Original Reference Data identified in the Migration Guide.

5.6.2   The Customer shall assist Nasdaq in the initial setting-up of the New Reference Data for the Software Product.

5.6.3   The Customer shall at all times be responsible for the accuracy of its Original Reference Data and shall inform Nasdaq of any changes to any Original Reference Data prior to Production Start.

5.6.4   The New Reference Data shall be used during any internal testing to be carried out by Nasdaq, the Installation Test and the Acceptance Test.

## 5.7   Access and Resources

The Customer shall as reasonably required by Nasdaq to fulfil its obligations under this Agreement:

(a)   grant Nasdaq personnel access to and assistance with the Customer Hardware Configuration for the installation of the Software Product and to conduct the Installation Test;

(b)   grant Nasdaq personnel access to and assistance with the Customer Premises and the Customer Central Site; and

(c)   provide Nasdaq personnel with separate lockable office and working space, and standard office equipment including Internet access.

## 5.8   Acceptance Test

5.8.1   The Customer shall:

(a)   prepare the Nasdaq ME Acceptance Test Procedure, the Acceptance Test Plan and the Acceptance Test Specification; and

(b)   review and approve the Nasdaq MS Acceptance Test Strategy, Acceptance Test Coverage and Acceptance Test Procedures; and

(c)   plan, arrange and perform the Acceptance Test.

5.8.2   The Customer shall, no later than five (5) Customer Working Days after Acceptance pursuant to **Clause 7.2** (Acceptance), issue a written confirmation to Nasdaq that Acceptance has occurred. In the event the Customer fails to issue such confirmation no later than five (5) Customer Working Days following Acceptance, Nasdaq shall be entitled to issue a confirmation of Acceptance to the Customer.

# 6 Routine Guide

## 6.1 Project Activity

During the Project the Parties shall jointly produce the Routine Guide based on a template to be provided by Nasdaq.

## 6.2 Content

The Routine Guide shall describe:

(a)   the Parties' respective support organizations;

(b)   the Service support process; and

(c)   the Parties' respective contact details.

## 6.3 Changes to the Routine Guide

Once the Routine Guide has been agreed by the Parties in accordance with **Clause 6.1**, changes to the Routine Guide shall be dealt with in accordance with **Clause 11** (Change Procedure).

# 7 Acceptance

## 7.1 Acceptance Test

The Acceptance Test shall be performed in accordance with the provisions of **Schedule 4** (Regulations for Acceptance Test).

## 7.2 Acceptance

7.2.1   The Customer shall commence the Acceptance Test within five (5) Customer Working Days of the later of:

(a)   the start of the Acceptance Test Period in accordance with **Schedule 3** (Master Time Schedule); and

(b)   the date that Nasdaq has issued a Development Completion Notice.

7.2.2   Acceptance of the Software Product ("Acceptance") shall occur when:

(a)   no test results have been classified as "Rejected" and remain uncorrected, as defined in **Schedule 4** (Regulations for Acceptance Test), upon completion of the Acceptance Test Period;

(b)   the Customer fails to commence the Acceptance Test within five (5) Customer Working Days of the later of:

(i)   the start of the Acceptance Test Period in accordance with **Schedule 3** (Master Time Schedule); and

(ii)   the date that Nasdaq has issued a Development Completion Notice,

provided that such failure is not a result of an action of default of Nasdaq;

(c)   the Customer fails to commence an Acceptance Test Cycle within five (5) Customer Working Days of Nasdaq issuing a written notice to the Customer stating that a correction has been released and the Software Product is ready for Acceptance Test provided that such failure is not a result of an action of default of Nasdaq; or

(d)   Production Start takes place with respect to the Software Product, or part thereof.

# 8   Delayed Acceptance

## 8.1   Project Delays

In the event of delays during the course of the Project due to non-performance by a Party or its agents ("Defaulting Party") of its obligations under this Agreement:

(a)   the Master Time Schedule shall be extended as agreed in writing between the Parties, but in any event by a period not less than the period by which the Project is delayed;

(b)   the other Party's ("Non-defaulting Party") time for performance shall be equitably adjusted; and

(c)   subject to the other Non-defaulting Party's compliance with the provisions of **Clause 3.3** (Project Planning and Management) where such delays impact upon Acceptance, the Non-defaulting Party shall be entitled to the remedies specified in **Clause 8.2** (Remedies for Delay of Acceptance).

## 8.2   Remedies for Delay of Acceptance

8.2.1   If Acceptance is delayed past the date specified in **Schedule 3** (Master Time Schedule), subject to **Clause 8.3** (Calculation of Delays), to the extent the delay is due to reasons attributable to or within Nasdaq's control, the Customer shall as a sole remedy be entitled to recover a credit in an amount of 1/120 of the Maximum Late Payment per day of delay, up to and including the 120th day of delay.

8.2.2   If Acceptance is delayed past the date specified in **Schedule 3** (Master Time Schedule), subject to **Clause 8.3** (Calculation of Delays), to the extent the delay is due to reasons attributable to or within the Customer's control, Nasdaq shall be entitled to compensation on a time and materials basis for any additional work, materials or resources required directly or indirectly as a result of the delay.

8.2.3   If Acceptance is delayed by more than one hundred and twenty (120) days from the date specified in the **Schedule 3** (Master Time Schedule), subject to **Clause 8.3** (Calculation of Delays), to the extent the delay is due to reasons attributable to or within the Defaulting Party's control, the Non-defaulting Party shall be entitled to terminate this Agreement as set forth in **Clause 16.4** (Termination due to Delayed Acceptance).

## 8.3   Calculation of Delays

The Parties acknowledge that a Party's entitlement to the remedies specified in **Clause 8.2** (Remedies for Delay of Acceptance) as a result of delays to Acceptance for which the other Party is responsible, shall:

(a)   be calculated with reference to **Schedule 3** (Master Time Schedule) prior to any adjustment thereto as agreed between the Parties pursuant to **Clause 8.1(a)**; and

(b)   only include delays for which the Defaulting Party is responsible.

## 8.4   Continuation Notwithstanding Delay

In the event a delay occurs which entitles a Party to termination as set forth in **Clause 16.4** (Termination due to Delayed Acceptance), but it is decided by the Parties that this Agreement shall not be terminated as set out in those clauses and the Parties thus decide

to continue the Project, such continuation shall take place under the terms set forth in this Agreement, save that the Parties shall renegotiate **Schedule 3** (Master Time Schedule) and compensation for costs due to further delay, in accordance with **Schedule 13** (Change Procedure).

## C.   Services

**Clause 9** below specifies the Services to be provided by Nasdaq to the Customer following Acceptance and defines the Parties' respective obligations in relation thereto.

## 9   Nasdaq's Obligations during the Support Term

### 9.1   Support Organization

9.1.1   Nasdaq shall, as of Acceptance, appoint individuals to the positions specified in the Routine Guide.

9.1.2   The individuals identified in **Clause 9.1.1** shall be entitled to represent Nasdaq with respect to day-to-day business issues arising under this Agreement, but shall not be authorized to modify, alter, add to or change the terms of this Agreement, unless otherwise agreed between the parties.

9.1.3   Nasdaq shall ensure that its representatives are individuals with suitable training, experience and skills to perform the tasks assigned to or required of them pursuant to this Agreement.

### 9.2   Services

Subject to the terms and conditions set forth in this Agreement, Nasdaq shall provide the Services set forth in **Schedule 11** (Services).

### 9.3   Commencement of Services

Nasdaq's provision of the Services shall commence upon Acceptance pursuant to **Clause 7.2.2**.

### 9.4   Production Start and Service Levels

9.4.1   Nasdaq shall, from Production Start, provide the Service in accordance with the Service Levels set forth in **Schedule 12** (Service Level Agreement).

9.4.2   Notwithstanding anything to the contrary herein, in the event of Production Start pursuant to **Clause B.7.2.2(d)** the Parties agree that the Service Levels set forth in this Agreement shall not apply until the Software Product have been tested in accordance with **Schedule 4** (Regulations for Acceptance Test), and all test results classified as "Rejected" have been rectified.

### 9.5   Root Cause Analysis

In the event of any failure by Nasdaq to maintain the Service Levels due to a Very High or Critical Incident, Nasdaq shall undertake a root cause analysis in order to ascertain the reason for such failure and shall implement such changes in its routines, the Software Product or the Services as are necessary to avoid a repetition of the failure.

### 9.6   Assistance to Third Party Developers

Unless otherwise agreed in accordance with **Schedule 11** (Services), Nasdaq shall not be responsible for providing support to Third Party Developers.

# 10      Customer Obligations during the Support Term

## 10.1      Support Organization

10.1.1      The Customer shall, as of Acceptance, appoint individuals to the positions specified in the Routine Guide.

10.1.2      The individuals identified in **Clause 10.1.1** shall be entitled to represent the Customer with respect to day-to-day business issues arising under this Agreement, but shall not be authorized to modify, alter, add to or change the terms of this Agreement, unless otherwise agreed between the parties..

10.1.3      The Customer shall ensure that its representatives are individuals with suitable training, experience and skills to perform the tasks assigned to or required of them pursuant to this Agreement.

## 10.2      General Obligations

The Customer shall:

(a)      perform its obligations as set forth in this Agreement with due skill, care and dispatch;

(b)      provide Nasdaq in a timely fashion with all information reasonably required by Nasdaq in order to comply with its obligations under this Agreement;

(c)      participate in meetings agreed between the Parties or otherwise reasonably required by Nasdaq and cause the tasks agreed in joint meetings as the duties of the Customer to be performed in accordance with the agreed time table;

(d)      contribute to the performance of the Services with respect to factors that are under the command or control of the Customer;

(e)      for its own part make decisions necessary for the performance of the Services within a reasonable time; and

(f)      provide Nasdaq with access to the Customer's Premises, the Customer Site and the Customer Hardware Configuration, as may be reasonably required by Nasdaq in order for Nasdaq to fulfil its obligations under this Agreement in accordance with Customer's policies and procedures as provided by the Customer to Nasdaq.

## 10.3      Operation of Customer Hardware Configuration

The Customer shall be responsible for the operation and maintenance of the Customer Hardware Configuration in accordance with **Schedule 10** (System Description).

## D.      Change Management

Where either Party wishes to make a change relating to this Agreement, the procedure set forth in **Clause 11** (Change Procedure) shall apply.

## 11      Change Procedure

### 11.1      Process

11.1.1    The Parties acknowledge that Change Requests may be raised by either Party during the Term due to changes in business and/or technical circumstances or as result of error, omission or oversight.

11.1.2    The Parties further acknowledge that Changes Requests may impact upon the project schedule and cost and should be avoided where possible.

11.1.3    Neither Party shall unreasonably refuse to address Change Requests that are requested by the other Party.

11.1.4    Change Requests shall be subject to the procedure set forth in **Schedule 13** (Change Procedure).

### 11.2      Authority for Approving Change Requests

11.2.1    Change Requests which do not affect the contract price or other contractual terms may be agreed upon by the Parties' Project Managers or Operation Managers/Account Managers (as applicable).

11.2.2    Change Requests which affect the contract price or other contractual terms may only be agreed upon by duly authorized representatives of the Parties.

# E.    Intellectual Property Rights and Confidentiality

## 12    Software Product License

### 12.1    Software Product License

Subject to payment by the Customer of the License Fee and the Annual Services Fee, Nasdaq grants to the Customer a non-exclusive, non-transferable and non-assignable license to Use the Software Product, in the Territory during the Term, for the purpose of operating the Customer Market as set forth in this Agreement (the "Software Product License"). The Software Product License shall entitle the Customer to Use the Software Product within the scope set forth in this Agreement and in **Schedule 8** (License Scope).

### 12.2    Scope of Software Product License

The Software Product License shall be subject to the following additional terms and conditions:

(a)    The Software Product shall not include a license to the Source Code of the Software Product;

(b)    Save as permitted by mandatory law, the Customer shall not decompile or reverse engineer the Software Product;

(c)    The Customer may make such back-up copies of the Software Product as are necessary for the purposes of the Customer's lawful use of the Software Product and for the purposes of back up and security;

(d)    The Customer may only operate the number System Instances of the Production System and Non-Production System specified in **Schedule 10** (System Description);

(e)    The Customer shall include original markings or notices identifying Nasdaq, or such third party as may be designated by Nasdaq, as the proprietor of the intellectual property rights (including trademarks, product names, copyright notices and the like) on any copies of the Software Product or in any communications referencing the Software Product;

(f)    The Customer shall not assign, transfer, sublicense (subject to **Clause 12.3** (Sublicensing to Participants and Third Party Developers) or otherwise dispose of any of its rights or obligations relating to the licenses granted pursuant to **Clause 12.1** (Software Product License) without the written consent of Nasdaq; and

(g)    Save as expressly set out in this Agreement the Customer shall have no right to use the Software Product for the benefit of, or disclose the Software Product to, any third party.

### 12.3    Sublicensing to Participants and Third Party Developers

12.3.1    The Customer shall be permitted to sublicense:

(a)    the Participant Interfaces to Participants and Third Party Developers, for the development and testing of back-office applications or other third-party applications and to other third parties who may acquire such an application, to permit such applications to be connected to the Participant Interfaces to access the Software Product or parts thereof operated by the Customer and for no other purpose; and

---

(b)   the Participant Applications to Participants for the sole purpose of accessing the Customer Market.

12.3.2   Sub-licensing pursuant to **Clause 12.3.1** shall be made on the license terms set forth in herein, save the sub-licensee shall not have the right to grant sublicenses. Nasdaq shall be named as a third party beneficiary in the relevant sublicensing agreement. Further, the sublicense agreement shall stipulate that Nasdaq shall not be liable for any damage whatsoever incurred by the sub-licensee as a result of the sublicensed software.

12.3.3   Upon request, the Customer shall provide Nasdaq with written information regarding the names and addresses of Third Party Developers and Participants to whom sublicenses are granted as set out above and shall provide Nasdaq with copies of such sublicenses within two (2) weeks from receipt of a request from Nasdaq.

12.3.4   Upon executing any sublicense agreement, the Customer shall apply sufficient security measures and care in relation to the software being sublicensed as to provide adequate protection of such software from unauthorized disclosure, copying or use and the Customer hereby undertakes to enforce the license terms of each sublicense agreement.

12.3.5   The sublicense entitles the sub-licensee to receive a copy of the parts of the Documentation that are associated with the sublicensed components.

# 13   Intellectual Property Rights

## 13.1   Nasdaq Work

Ownership of any intellectual property rights in:

(a)   the Software Product;

(b)   documents provided or prepared by Nasdaq for the Customer for the purpose of Nasdaq's performance of its obligations hereunder;

(c)   any works derived by Nasdaq from **Clauses 13.1 (a)** and **(b)**; and

(d)   any other literary works or other works of authorship created by Nasdaq, its personnel, employees, subcontractors or consultants including manuals, training materials and documentation,

shall vest or remain vested in Nasdaq or any other entity as Nasdaq may in its sole discretion elect. The Customer shall ensure that any of the Customer's employees or consultants execute any documents and perform any acts such as are necessary in order to effect the transfer of any interest such individuals may have, pursuant to any law, in any Nasdaq work, in accordance with this **Clause 13.1**.

## 13.2   Customer Work

Ownership of any intellectual property rights in:

(a)   Documents provided or prepared by the Customer;

(b)   any works derived by the Customer from **Clauses 13.2 (a)**; and

(c)   any other literary works or other works of authorship created by Customer, its personnel, employees, subcontractors or consultants including manuals, training materials and documentation,

shall vest or remain vested in the Customer or any other entity as the Customer may in its sole discretion elect. Nasdaq shall ensure that any of Nasdaq's employees or consultants

execute any documents and perform any acts such as are necessary in order to effect the transfer of any interest such individuals may have, pursuant to any law, in any Customer work, in accordance with this **Clause 13.2**.

### 13.3    Trade Marks

Each Party's Trade Marks are trademarks of that Party or a member of that Party's Group. Each Party undertakes not to use any of the other Party's Trade Marks or any part thereof, either alone or in combination with any other mark or device or any marks confusingly similar thereto, except with the express authority of the other Party and, where applicable, the member of the other Party's Group being the registered holder of such Trade Mark.

## 14    Confidentiality

### 14.1    Obligation to Keep Confidential

The Parties:

(a)    shall keep all Confidential Information received or emanating from the other Party confidential;

(b)    undertake to use the same only in connection with the purpose set forth in this Agreement and not to make any other commercial use thereof or use the same for the benefit of itself or any third party; and

(c)    shall not disclose any such Confidential Information, or part thereof, to any third party except:

(i)    to professional advisers, employees or subcontractors as necessary to perform any obligations within the scope of this Agreement (**"Permitted Third Person"**);

(ii)    where such Party is legally obliged to disclose the Confidential Information;

(iii)    if the receiving Party can demonstrate that the Confidential information was rightfully known to it prior to the disclosure thereof by the disclosing Party; or

(iv)    if such Confidential Information is public knowledge or becomes public knowledge other than by breach of this Agreement or by an agreement previously entered into by the Parties.

### 14.2    Obligation to Disclose

In the event a Party is obliged under law, statute or court order to disclose Confidential Information, such Party shall:

(a)    only disclose such portion of the Confidential Information that is so required;

(b)    inform the recipient of the Confidential Information that the information released is confidential and use its reasonable endeavours to ensure that the information is kept confidential by such recipient; and

(c)    promptly notify the other Party of its release of the Confidential Information specifying the information disclosed, the recipient of the information, and the circumstances giving rise to the duty to disclose it.

Nasdaq

### 14.3    Disclosure to Permitted Third Person

Where a Party has disclosed Confidential Information to a Permitted Third Person, such Party shall:

(a)    ensure that, prior to disclosure to the Permitted Third Person, such Permitted Third Person has entered into a confidentiality agreement which contains terms no less stringent than those set forth in this Agreement with respect to the protection of Confidential Information;

(b)    use its reasonable endeavours to minimize the risk of disclosure of any Confidential Information by such Permitted Third Person; and

(c)    shall remain vicariously liable to the other Party for any acts or omissions of such Permitted Third Person which would constitute a breach of this Article if such acts or omissions had been those of the Disclosing Party.

### 14.4    Remedies for Breach of Confidentiality Undertaking

The Parties acknowledge that Confidential Information constitutes valuable property and that any breach of this **Clause 14** (Confidentiality) may result in irreparable harm to the innocent Party, the extent of which would be difficult and/or impracticable to assess, and that pecuniary damages would not be an adequate remedy for such breach. Accordingly, and by way of exception to **Clause 19.22** (Governing Law and Dispute Resolution), the Parties agree that in such circumstances the innocent Party shall be entitled to seek specific performance of this Agreement or an injunction as a remedy for such breach, in addition to all other remedies at law or in equity and without prejudice to any such remedy.

## F.    Charges

## 15    Consideration

### 15.1    Project Fee

In consideration of Nasdaq's performance of the services during the Project pursuant to this Agreement, the Customer shall pay Nasdaq the amounts specified in **Schedule 2** (Consideration and Payment Terms).

### 15.2    License Fee

In consideration of the Software Product License the Customer shall pay Nasdaq an Annual License Fee as specified in **Schedule 2** (Consideration and Payment Terms).

### 15.3    Annual Services Fee

In consideration of the provision of the Services the Customer shall pay Nasdaq an Annual Services Fee as specified in **Schedule 2** (Consideration and Payment Terms).

### 15.4    Work Performed Outside Working Hours

The Project Fee covers work by Nasdaq personnel to be performed during Nasdaq Working Hours. If the Customer requires work to be performed:

(a)    outside of Nasdaq Working Hours under circumstances where the performance of such work during such hours is not necessary to meet the milestones set forth in **Schedule 3** (Master Time Schedule); or

(b)    that is outside the scope of the Project,

such work shall be performed at an agreed fixed price or on a time and material basis, at the rates specified for Nasdaq Working Hours or non-working hours, as appropriate, in **Schedule 2** (Consideration and Payment Terms).

### 15.5    Increase in Fees

15.5.1    On each anniversary of the Effective Date the Annual Services Fee for the Support Term shall be subject to annual increases according to the Indexation Formula as specified in **Schedule 2** (Consideration and Payment Terms).

15.5.2    Nasdaq shall be entitled to increase the Annual Services Fee to cover;

(a)    the additional cost of providing Software Product Support for Change Requests if such Change Request increases the complexity of the functionality at the time that the Change Request is made. Such increase shall not exceed fifteen (15) percent of the development cost and additional license fees if applicable for the Change Request in question and shall be specified in the Change Request. Such increase shall be applied to the Annual Services Fee for the year in which the Change Request is made and each subsequent year during the term of this Agreement; and

(b)    the cost incurred by Nasdaq due to the non-compliance by the Customer with the time limits specified in **Schedule 11** (Services) for implementation of a Maintenance Release or a New Release.

## 15.6     Accommodation and Travel

15.6.1    The Customer shall reimburse Nasdaq for the all costs incurred for accommodation, travel and allowances during the Project.

15.6.2    All travel shall be scheduled in accordance with the Travel Plan specified in **Schedule 3** (Master Time Schedule) or as otherwise agreed by the Parties.

## 15.7     Work Performed on Time and Materials Basis

Any work on time and materials basis under this Agreement shall be charged at the rates specified in **Schedule 2** (Consideration and Payment Terms). Such rates shall be subject to annual increases according to the Indexation Formula as specified in **Schedule 2** (Consideration and Payment Terms).

## 15.8     Payment Terms

15.8.1    Invoices shall be due thirty (30) days from the date of the invoice ("Due Date"). An interest charge of One Month LIBOR plus four (4) percent per annum, shall be applied from the Due Date to any amounts which are not paid when due.

15.8.2    All amounts to be paid by the Customer pursuant to this Agreement shall be invoiced in United States Dollars.

15.8.3    Payments made by the Customer to Nasdaq hereunder shall be made by electronic transfer to the account designated by Nasdaq from time to time in writing.

## 15.9     Cessation of Services

Without prejudice to any other right or remedy of Nasdaq, where the Customer has failed to pay any amount due under this Agreement for a period exceeding thirty (30) days past the Due Date, Nasdaq shall be entitled to cease performance of any of the services to be provided under this Agreement with thirty (30) days written notice to the Customer, such notice which may be issued on the Due Date or any date thereafter, until such payment is made (together with accrued interest if any).

## 15.10    Taxes, Fees and Set-off

15.10.1    Any and all payments to Nasdaq under this Agreement do not include, and the Customer shall be responsible for, all applicable present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature imposed by the Territory or by any department, agency, state or other political subdivision or taxing authority in the Territory but excluding any taxes imposed by any Swedish taxing authority (collectively "Taxes").

15.10.2    Any payments due from the Customer to Nasdaq hereunder will be made without set-off or counterclaim, and free and clear and without deduction of or withholding for any Taxes or interest, penalties or similar liabilities. If any Taxes are so levied or imposed in respect of this Agreement, the Customer shall pay the full amount of such Taxes, and such additional amounts as may be necessary so that every net payment of all amounts due hereunder, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for in this Agreement.

# G.    Term, Termination and Consequences of Termination

## 16    Term and Termination

### 16.1    Term

The Term of this Agreement shall commence on the Effective Date and shall continue for a period of five (5) years following Acceptance unless terminated by either Party as set forth in this Agreement (the **"Term"**). This Agreement may only be terminated as expressly set out in this **Clause 16** (Term and Termination).

### 16.2    Termination for Cause

This Agreement may be terminated immediately by notice in writing:

(a)    By either Party where the other Party fails to pay any sums due under this Agreement within thirty (30) days of the Due Date and fails to cure such failure within thirty (30) days written notice of such breach (which notice must indicate the intention of the non-breaching party to terminate); or

(b)    By either Party if the other Party is in material breach of this Agreement and, where such breach is capable of being remedied, fails to remedy the breach within a period of thirty (30) days after written notice by the other Party and fails to cure such failure within thirty (30) days written notice of such breach (which notice must indicate the intention of the non-breaching party to terminate).

### 16.3    Termination for Insolvency

This Agreement may be terminated immediately by notice in writing by either Party if the other Party:

(a)    commits an act of bankruptcy, is adjudicated bankrupt or enters into liquidation, whether compulsory or voluntary, other than for the purposes of an amalgamation, reorganisation, merger, consolidation or reconstruction;

(b)    makes an arrangement with its creditors or petitions for an administration order;

(c)    has a receiver or manager appointed over all or any part of its assets; or

(d)    generally becomes unable to pay its debts as and when they fall due.

### 16.4    Termination due to Delayed Acceptance

16.4.1    Notwithstanding **Clause 16.2(b)**, pursuant to **Clause 8.2.3** a Non-defaulting Party shall be entitled to terminate this Agreement by giving the Defaulting Party four (4) weeks written notice.

16.4.2    The Non-defaulting Party's right to terminate this Agreement under this Clause shall lapse four (4) weeks after the right to terminate arose pursuant to **Clause 8.2.3**.

### 16.5    Termination due to Force Majeure

16.5.1    If a Force Majeure event pursuant to **Clause 19.10** (Force Majeure) prevails for a continuous period in excess of six (6) months after the date on which the Force Majeure

begins, the Non-Claiming Party shall be entitled to give notice to the Claiming Party to terminate this Agreement.

16.5.2    The notice to terminate must specify the termination date, which must be not less than thirty (30) clear days on which the notice to terminate is given. Once a notice to terminate has been validly given, the Agreement shall terminate on the termination date set out in the notice.

16.5.3    Neither Party shall have any liability to the other in respect of termination of this Agreement due to Force Majeure, but rights and liabilities which have accrued prior to termination shall subsist (including amounts accrued in favour of Nasdaq and all costs and expenses incurred by Nasdaq up to the date of termination).

## 16.6    Events upon Termination before Acceptance

16.6.1    In the event this Agreement is terminated by the Customer pursuant to **Clause 16.4** (Termination due to Delayed Acceptance), the Customer shall as a sole remedy be entitled to:

(a)    reimbursement of the Project Fee actually paid by the Customer to Nasdaq;

(b)    the Maximum Late Payment credit accrued pursuant to **Clause 8.2.1**;

(c)    indemnification pursuant to **Clause 17.4** (Indemnification); and

(d)    damages with respect to any breach of **Clause 14** (Confidentiality), if any, subject to the provisions of **Clause 18** (Damages).

16.6.2    In the event this Agreement is terminated by Nasdaq pursuant to **Clause 16.4** (Termination due to Delayed Acceptance), Nasdaq shall as a sole remedy be entitled to:

(a)    the balance of the remaining unpaid Project Fee   ;

(b)    the compensation accrued pursuant to Clause 8.2.2;

(c)    indemnification pursuant to **Clause 17.4** (Indemnification); and

(d)    damages with respect to any breach of **Clause 12** (Software Product License) and **Clause 14** (Confidentiality), if any, subject to the provisions of **Clause 18** (Damages).

## 16.7    Events upon Termination after Acceptance

16.7.1    In the event Nasdaq terminates this Agreement after Acceptance pursuant to **Clause 16.2** (Termination for Cause), Nasdaq shall as a sole remedy be entitled to:

(a)    the accrued fees pursuant to **Schedule 2** (Consideration and Payment Terms);

(b)    the balance remaining of the Annual Services Fee for the then current year of the Term;

(c)    any amounts accrued but unpaid for work performed, on a time and materials basis; and

(d)    indemnification pursuant to **Clause 17.4** (Indemnification) and damages with respect to any breach of **Clause 12** (Software Product License), **Clause 14** (Confidentiality), if any, subject to the provisions of **Clause 18** (Damages).

16.7.2    In the event the Customer terminates this Agreement after Acceptance pursuant to **Clause 16.2** (Termination for Cause), the Customer shall as a sole remedy and subject to the

payment of all outstanding amounts, costs and expenses incurred by Nasdaq up until the day of termination, be entitled to:

(a)    such portion of the Annual Services Fee which corresponds to the remaining Term paid for by the Customer; and

(b)    indemnification pursuant to **Clause 17.4** (Indemnification) and damages with respect to any breach of **Clause 14** (Confidentiality) if any.

## 16.8    Return of Confidential Information

In the event of termination of this Agreement for any reason whatsoever, the Parties shall promptly return all Confidential Information received from each other.

## 16.9    Survival

The terms of **Clause 14** (Confidentiality) and **19.22** (Governing Law and Dispute Resolution) shall survive the termination or expiry of this Agreement. Furthermore, any provision that by implication is intended to continue in force after termination shall not be affected by termination or expiry of this Agreement or any portion thereof.

## 16.10    Transition Services

16.10.1    If this Agreement is terminated or expires, Nasdaq shall upon the Customer's request, cooperate with the Customer in developing and implementing a transition plan for the orderly transition out of this Agreement.

16.10.2    Nasdaq shall use its reasonable endeavours to provide the resources set out in the transition plan and as are necessary for an effective transition out including, where requested and subject to their other obligations to the Customer, such Nasdaq personnel engaged in providing the Software Product Support prior to termination of this Agreement.

16.10.3    The transition services shall be provided by Nasdaq on commercially reasonable terms and subject to a separate agreement.

# H.    Warranties and Limitation of Liability

## 17    Warranties

### 17.1   Warranties by Nasdaq

Nasdaq warrants that:

(a)   it has the right to enter into this Agreement, to grant Customer the rights set forth in this Agreement and perform all of its obligations hereunder;

(b)   to the best of Nasdaq's knowledge the Software Product does not contain any viruses, worms or Trojan horses;

(c)   it shall perform its obligations under this Agreement with reasonable skill, care and dispatch; and

(d)   subject to the Customer Hardware Configuration meeting the requirements specified in **Schedule 10** (System Description) and the Customer fulfilling its obligations under this Agreement, the Software Product shall for the Support Term:

    (i)    be capable of performing the functionality specified in **Schedule 7** (Software Functional Specification); and

    (ii)   materially conform to the technical requirements of **Schedule 12** (Service Level Agreement).

### 17.2   Customer Remedies

The Customer, recognizing that software is not error or bug free, agrees that the sole remedy for breach by Nasdaq of its warranties under **Clause 17.1(d)** above shall be to require Nasdaq to perform its obligations as set forth herein.

### 17.3   Warranties by the Customer

The Customer warrants that:

(a)   it has the right to enter into this Agreement and perform all of its obligations hereunder; and

(b)   it possesses and will maintain all authorities, consents, registrations and licenses required under the laws of the Territory, in order for the Parties to be able to fulfil their obligations under this Agreement and for the Customer to operate the Customer Market;

### 17.4   Indemnification

17.4.1   Nasdaq shall defend, indemnify and hold the Customer, its affiliates and their respective employees and principals harmless from and against any claim, liability (including settlements and judgments) or expenses (including reasonable attorneys' fees, expenses and court costs) arising out of an infringement by the Software Product of any statutory or common law copyright, trademark or patent granted prior to the date hereof ("Infringement Claim").

17.4.2    In the event Nasdaq is notified of an Infringement Claim relating to the Software Product, Nasdaq shall be entitled, at its own cost, to do any of the following:

(a)    Obtain for the Customer the right to continue using the affected portion of the Software Product;

(b)    Modify the affected portion of the Software Product so that it is no longer infringing; or

(c)    Replace the affected portion of the Software Product with a non-infringing functional equivalent.

If Nasdaq selects option (b) or (c), the Customer shall immediately refrain from using the allegedly infringing portion of the Software Product.

17.4.3    In the event Nasdaq does not comply with **Clause 17.4.2**, Nasdaq shall have the right to remove the infringing portion of the Software Product. In case of such removal the Customer shall have the right to terminate this Agreement upon written notice to Nasdaq and Nasdaq shall repurchase that portion of the License Fee pertaining to the infringing portion of the Software Product for the remainder of the year for which the License Fee was paid in advance.

17.4.4    Notwithstanding the foregoing, Nasdaq shall have no liability for Infringement Claims:

(a)    where the Customer uses a version of the Software Product other than the most recent version issued to the Customer by Nasdaq from time to time; and

(b)    to the extent that the infringement arises out of:

(i)    the combination of the Software Product or any part thereof with equipment, products or data not supplied or approved by Nasdaq in writing;

(ii)    any modification to or configuration of the Software Product, made by or on behalf of the Customer; provided in each case that the Software Product as supplied by Nasdaq would not alone have given rise to such failure; or

(iii)    any requirements or specifications provided to Nasdaq by the Customer.

17.4.5    This **Clause 17.4** (Indemnification) sets out the Customer's sole remedies in relation to any Infringement Claims and termination of this Agreement as a result thereof.

17.4.6    The Customer shall defend, indemnify and hold Nasdaq, its affiliates and their respective employees and principals harmless from and against any claim, liability (including settlements and judgments) or expenses (including reasonable attorneys' fees, expenses and court costs) arising out of:

(a)    any suits or actions brought against Nasdaq in connection with this Agreement by:

(i)    Participants, including market participants or customers; and

(ii)    any regulatory authority having jurisdiction over the Customer or over the Customer Market; or

(b)    infringement claims pursuant to Clause **17.4.4(b)**.

## 17.5    Indemnification Procedure

17.5.1    If any third party claim is commenced against a Party entitled to indemnification under **Clause 17.4** (Indemnification) (the **"Indemnified Party"**), notice thereof shall promptly be given to the Party that is obliged to give the indemnification (the **"Indemnifying Party"**) specifying the nature of the claim in reasonable detail.

17.5.2    If, after such notice, the Indemnifying Party acknowledges that this Agreement applies with respect to such claim, the Indemnifying Party shall be entitled, if it so elects, in a notice promptly delivered to the Indemnified Party, but in no event less than ten (10) days prior to the date on which a response to such claim is due, to immediately take control of the defence and investigation of such claim.

17.5.3    The Indemnified Party shall cooperate, at the Indemnifying Party's cost, in all reasonable respects with the Indemnifying Party and its attorneys in the investigation, trial and defence of such claim and any appeal arising there from; provided, however, that the Indemnified Party may, at its own cost and expense, participate, through its attorneys or otherwise, in such investigation, trial and defence of such claim and any appeal arising there from.

17.5.4    The Indemnified Party shall take such measures as are reasonable in the circumstances to mitigate its loss, expenses and other detrimental effects resulting from the third party claim. If the Indemnified Party fails to take such measures, the Indemnified Party shall bear the corresponding portion of the loss.

17.5.5    No admission of liability shall be made nor shall any settlement of a claim be entered into without the consent of the Indemnified Party, such consent not to be unreasonably withheld.

17.5.6    If, after investigation of the facts known at the time, the Indemnifying Party disputes its obligation to indemnify the Indemnified Party:

(a)    the Parties shall cooperate to ensure that timely and adequate defence of the claim is provided; and

(b)    all costs shall initially be shared equally, provided that should the matter be resolved in favour of the Indemnifying Party, all costs shall be borne by the Indemnified Party and should the matter be resolved in favour of the Indemnified Party, all costs shall be borne by the Indemnifying Party.

## 17.6    Exclusion of Implied Warranties

The warranties set forth in **Clause 17** (Warranties) above are exclusive and in lieu of all other warranties whether express, implied or statutory, including without limitation the implied warranties or covenants as to quality of service.

# 18    Damages

## 18.1    Limitation of Liability

18.1.1    The liability of a Party pursuant to this Agreement shall be limited to liability for direct loss or damage arising out of each action or claim in contract, equity, negligence, tort or otherwise, upon which such liability is founded and shall be limited to a cumulative total, for all actions or claims pursuant to this Agreement, which shall not exceed, in the aggregate, an amount equal to the sum of the Annual Services Fee as specified in **Schedule 2** (Consideration and Payment Terms).

18.1.2    Neither the Customer nor Nasdaq shall be liable for, nor shall the measure of damages include, any indirect, incidental, special or consequential damages or amounts (whether direct or indirect) for loss of income, profits or savings arising out of or relating to its performance or failure to perform under this Agreement even if such loss or damage was

bcause                                                                          Nasdaq

reasonably foreseeable or either Party was aware of the possibility of such loss or damage arising.

18.1.3    The limitations or exclusions of liability set forth in this **Clause 18.1** (Limitation of Liability) shall not apply to:

(a)    a breach by either Party of its obligations to the other Party under **Clause 14** (Confidentiality);

(b)    the indemnification obligation set forth in **Clause 17.4** (Indemnification);

(c)    breaches by the Customer of the Software Product License;

(d)    damage caused by wilful default; or

(e)    fraud or fraudulent misrepresentation; or

(f)    death or personal injury resulting from negligence; or

(g)    any matter for which it would be unlawful for the Parties to exclude liability.

## 18.2    Exchange Information on the Customer Market

Nasdaq shall not be obliged to confirm the accuracy of any Exchange Information. Nasdaq shall under no circumstances be liable to the Customer for any inaccuracy, insufficiency or other defect relating to any Exchange Information.

## 18.3    Sole Remedies

No other right of termination or remedy, including damages, shall exist with respect to a breach of the terms of this Agreement other than those rights and remedies expressly set forth in this Agreement where such rights and remedies are described as the sole remedy in respect of such breach.

# I.    General

## 19    Miscellaneous

### 19.1    Audit Rights

19.1.1    Subject to thirty (30) days written notice, or such other notice as may be required by the Customer's regulators, Nasdaq shall permit the Customer's internal and external auditors, and the Customer's regulators access to such of Nasdaq's technical operations relevant to Nasdaq's performance of its obligations under this Agreement as may be necessary to enable the Customer to comply with applicable legal and regulatory requirements from time to time.

19.1.2    If any such audit results in Nasdaq being notified that Nasdaq is not in compliance with any law or audit requirement, Nasdaq shall use its reasonable endeavours to promptly take actions to comply with such audit.

19.1.3    The Customer shall bear all fees and expenses of the audit, including *inter alia*:

(a)    Nasdaq's costs related to the audit; and

(b)    any actions by Nasdaq to comply with the audit.

19.1.4    Notwithstanding the foregoing, if the non-compliance is a result of Nasdaq's breach of this Agreement, Nasdaq shall bear the expense for Nasdaq's costs related to the audit and its actions to comply with the audit.

### 19.2    Notice of Delay

Each Party shall without delay inform the other Party in writing of any actual or anticipated matters or circumstances which may influence or delay the other Party's performance of its obligations hereunder.

### 19.3    Mitigation

Each Party shall use all reasonable endeavours to mitigate and minimize the costs, expenses and losses such Party incurs due to any delays and Infringement Claims.

### 19.4    Security

Subject to prior written information from the Customer, Nasdaq shall ensure that its employees, consultants and subcontractors comply with the Customer's reasonable security, health and safety requirements while on the Customer Premises or at the Customer Central Site.

### 19.5    No Partnership

Nothing in this Agreement shall operate so as to constitute a partnership or any form of merger between the Customer and Nasdaq or alter the independence or sovereignty of the parties.

### 19.6    No Agency

Save as expressly provided herein, neither Party shall pledge the credit of the other nor represent itself as being (save to the extent expressly provided under this Agreement), an agent, partner, employee or representative of the other or (save as aforesaid) hold itself

out as such nor as having any power or authority to incur any obligation of any nature express or implied on behalf of the other.

## 19.7   Subcontractors and Consultants

The obligations of the Parties under this Agreement may be performed by subcontractors or consultants, provided that such Party obtains the prior consent of the other Party, such consent not to be unreasonably withheld, and such Party shall be responsible as principal to the other Party, for any work performed by the subcontractors or consultants. Notwithstanding the foregoing, the Customer shall not be entitled to subcontract its obligations to a direct competitor of Nasdaq.

## 19.8   Reasonableness of Remedies

Where in this Agreement a Party is required to pay a stipulated sum either as and by way of liquidated damages or as a consequence of a specified breach of an obligation under this Agreement, then the Parties acknowledge that such amount is a fair and reasonable estimate of the loss which the other Party will suffer as a result of the breach in respect of which such sum is payable.

## 19.9   Limitation of Right to Claim

19.9.1   Except as expressly set forth in this Agreement, where a Party intends to bring any action or claim pursuant to this Agreement, the claiming Party shall give the other Party written notice of its intention within three (3) months from the moment such Party became aware of the basis of the purported claim or right. In the absence of such notice, the claim or right shall be time barred effective from the expiry of such three (3) month period.

19.9.2   Any arbitration or legal proceedings shall be instituted within six (6) months after notice has been given, failing which the claiming Party shall be barred from commencing arbitration or court proceedings of any kind with respect to the claim or right.

## 19.10   Force Majeure

19.10.1   In this Agreement, "Force Majeure" shall mean, in relation to either Party, a circumstance beyond the reasonable control of that Party (the "Claiming Party") and lock-outs, strikes and other industrial disputes (in each case, whether or not relating to the Claiming Party's workforce and whether or not beyond the reasonable control of the Claiming Party).

19.10.2   The Claiming Party shall not be in breach of this Agreement or otherwise liable to the other Party (the "Non-Claiming Party") for any delay and shall not be liable for any delay compensation pursuant to **Clause 8.1** (Project Delays) in performance or any non-performance of any obligations under this Agreement (and the time for performance shall be extended accordingly) if and to the extent that the delay or non-performance is owing to Force Majeure and in such circumstances the Claiming Party shall be entitled to a reasonable extension of time for performing such obligations.

19.10.3   The Claiming Party shall promptly notify the Non-Claiming Party of the nature and extent of the circumstances giving rise to Force Majeure.

19.10.4   The Non-Claiming Party's right to terminate this Agreement due to a prevailing Force Majeure event is set forth in **Clause 16.4.2.**

bcause                                                                          Nasdaq

## 19.11   Factors Beyond Nasdaq's Control

19.11.1   The measurement of the Service Levels shall not include events, matters and circumstances which are not within the control of or attributable to Nasdaq.

19.11.2   Nasdaq shall not be liable to the Customer for any failure to meet the Service Levels due to new versions or releases of Third Party Software being part of the Customer Hardware Configuration, provided that Nasdaq shall use its reasonable endeavours to mitigate such Problems or Incidents caused by the Third Party Software.

19.11.3   Where a Problem, Incident or malfunction with the Software Product results from matters, events and circumstances which are not within the control of or attributable to Nasdaq, Nasdaq shall co-operate with the Customer and continue its efforts to restore Operating Capability of the Software Product. The Customer shall compensate Nasdaq for all work, except for first-level support and initial diagnosis and data collection work, on a time-and-materials basis. Problems outside Nasdaq's control shall include *inter alia*:

(a)   Problems with any Customer External Systems or the Customer Hardware Configuration or the Participant Application Hardware (including malfunctions due to changes in the Customer Hardware Configuration or the Participant Application Hardware not approved by Nasdaq);

(b)   Incidents or other issues with the Software Product that result from the Volumetrics or Maximum Load Profile being exceeded;

(c)   erroneous operation of the Software Product, the Customer Hardware Configuration, the Participant Application Hardware, any Participant External System or any Customer External Systems; and

(d)   environmental problems affecting the Customer Hardware Configuration or Participant Application Hardware.

19.11.4   Upon any failure by the Customer to implement any Maintenance or New Release of the Software Product within the time limits specified in **Schedule 11** (Services), Nasdaq shall be released from its obligations to maintain the Service Levels, to the extent the performance of such obligations is affected by the non-implementation of the Maintenance or New Release.

## 19.12   Independent Business

Neither Party has the right or power, express or implied, to make any commitments of any kind on behalf of the other Party without the prior written consent of the other Party. The Parties acknowledge that they are independent contractors and not partners, joint venturers or principal and agent.

## 19.13   Entire Agreement

19.13.1   Except as set out below, this Agreement supersedes and extinguishes all Pre-Contractual Statements relating to the subject matter hereof and constitutes the whole and only agreement between the Parties relating to the provision of the Software Product and related services.

19.13.2   Each Party acknowledges that in entering into this Agreement it is not relying upon any Pre-Contractual Statement which is not set out in this Agreement.

19.13.3   No Party shall have any right of action (except in the case of misrepresentation or fraud) against any other Party to this Agreement arising out of or in connection with any Pre-Contractual Statement.

## 19.14   Amendments

No modification, alteration, addition or change of the terms of this Agreement shall be binding on the Parties unless agreed by both Parties in writing.

## 19.15   Severability

If any provision of this Agreement should be held to be invalid, unlawful or unenforceable to any extent, such term shall be severed from the remaining terms which shall continue to be valid to the fullest extent permitted by law.

## 19.16   Waiver

Except where otherwise provided in this Agreement, any waiver or forbearance or failure of a Party in insisting in any one or more instances upon the performance of any provisions of this Agreement shall not be construed as a waiver or relinquishment of that Party's rights to future performance of such provision and the other Party's obligation in respect of such future performance shall continue in full force and effect. Any waiver or forbearance must be made in writing.

## 19.17   Consents, Approvals, Requests and Opinions

Except as specifically set forth in this Agreement, all consents and approvals to be given or opinions to be adopted by either Party under this Agreement shall not be unreasonably withheld or delayed and each Party shall make or adopt only reasonable requests and opinions under this Agreement.

## 19.18   Assignment

19.18.1   Save as expressly provided herein, neither Party may assign or transfer this Agreement or any of its rights or obligations under it without the consent of the other Party.

19.18.2   Notwithstanding **Clause 19.18.1**, Nasdaq shall be entitled to assign or transfer its rights or obligations hereunder to another company within the group to which it belongs for tax or regulatory purposes. In the event of such transfer, Nasdaq shall remain liable for the due performance of the assignee of the obligations set forth in this Agreement.

## 19.19   Public Information

Neither Party shall issue a press release nor any other public information relating to this Agreement, without the prior approval of the other Party, with the exception of information required to be released for regulatory purposes, in which case the Parties shall consult prior to the issuing of such information. The contact person for approval/consultation for each of the Parties shall be:

Nasdaq contact:

Name:   Lars Ottersgård
Tel:   +46 8 405 6000
Email:   lars.ottersgard@nasdaq.com

Customer contact:

| | Name: | Fred Grede |
| | Tel: | (630) 217-2712 |
| | Email: | fred@bcause.com |

19.19.1   Any notice, consent or other communication required or permitted to be given to either Party pursuant to this Agreement shall be in writing and shall be sufficiently served if delivered personally or sent by electronic mail. If sent by electronic mail, a confirmation of receipt is required.

Any notice shall be deemed to have been duly received if delivered personally, when left at the address referred to in this clause.

19.19.2   If such notice, consent or communication is being sent to Nasdaq, the address or electronic mail shall be the address given above.

19.19.3   General communications related to this Agreement shall be addressed to the Nasdaq Account Manager or the Customer Operations Manager respectively. Notices relating to alleged breaches of contract or the like shall be addressed to the President of Nasdaq or the CEO of the Customer as appropriate, with a copy to the Nasdaq Account Manager or the Customer Operations Manager.

19.19.4   The Parties, by like notice in writing, may designate, from time to time, another address or office to which notice may be given.

19.19.5   All notices shall be effective when received at the address specified in **Clause 19.20.1**.

## 19.20   Language

All communications between the Parties in relation to this Agreement shall be in English.

## 19.21   Governing Law and Dispute Resolution

19.21.1   This Agreement shall be governed by and construed in accordance with the laws of England and Wales.

19.21.2   Any dispute, controversy or claim between the Customer and Nasdaq arising out of or relating to this Agreement, or the breach termination or validity of this Agreement, which the Parties have failed to solve in the Joint Steering Committee or otherwise through negotiations or through an expert resolution as agreed upon between the Parties, shall be resolved by arbitration convened and conducted in accordance with the London International Court of Arbitration rules then in force, (the "Rules").

19.21.3   The Parties agree that the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

19.21.4   There shall be three (3) arbitrators who shall be appointed in accordance with the Rules. If any arbitrator has not been appointed within the time limits specified in the Rules, on the request of either Party, such appointment shall be made by the arbitration center, within thirty (30) days of such request. The arbitration shall be held in London, England and shall be conducted in the English language.

19.21.5   Except as otherwise provided in this Agreement and to the extent that it is reasonably possible, the performance of this Agreement shall continue during the referral of any dispute to arbitration.

19.21.6   The Parties hereby waive any rights of application or appeal to any court or tribunal of competent jurisdiction (including without limitation the courts of England) to the fullest extent permitted by law in connection with any question of law arising in the course of the arbitration or with respect to any award made except for actions relating to enforcement of the arbitration agreement or an arbitral award.

19.21.7   The award shall be final and binding upon the Parties, and shall be the sole and exclusive remedy between the Parties regarding any claims, counter-claims, issues, or accounting presented to the arbitral tribunal. Judgment upon any award may be entered in any court having jurisdiction thereof.

19.21.8   In disputes involving breach of the Customer's obligations regarding intellectual and other property rights in the Software Product or breach of a Party's obligations regarding Confidential Information, this Section shall not preclude a Party from obtaining interim injunctive relief on an immediate basis from a court of competent jurisdiction pending the outcome of arbitration.

19.21.9   The Parties undertake and agree that all arbitral proceedings conducted with reference to this Section shall be kept strictly confidential. This confidentiality undertaking shall cover all information disclosed in the course of such arbitral proceedings, as well as any decision or award that is made or declared during the proceedings. Information covered by this confidentiality undertaking may not, in any form, be disclosed to a third party without the written consent of the other Party. This notwithstanding, a Party shall not be prevented from disclosing such information in order to safeguard in the best possible way his rights vis-à-vis the other Party in connection with the dispute, or if the Party is obliged to so disclose pursuant to statute, regulation, a decision by an authority, a stock exchange contract or similar.

19.21.10   In case this Agreement or any part of it is assigned or transferred to a third party, such third party shall automatically be bound by the provisions of this **Clause 19.22** (Governing Law and Dispute Resolution).

## 19.22   Costs

Except as expressly provided in this Agreement, each Party shall pay its own costs incurred in connection with the negotiation, preparation and execution of this Agreement.

# Signing Page

_____                    _____
Place and date                                  Place and date


**Nasdaq Technology AB**                        **bcause, LLC**


_____                    _____
Signature:                                      Signature:


_____                    _____
Name:                                           Name:


_____                    _____
Title:                                          Title:

Nasdaq

# IT SERVICES AGREEMENT SCHEDULE

## Schedule 1        Definitions

The following terms when used in this Agreement shall have the meanings set forth below:

"**Acceptance**" shall have the meaning set forth in **Clause 7.2** (Acceptance) of the main agreement.

"**Acceptance Test**" shall mean the tests performed by the Customer in accordance with **Schedule 4** (Regulations for Acceptance Test) in order to verify that the Software Product comply with the specifications set forth in this Agreement.

"**Acceptance Test Cycle**" shall mean a test cycle within the Acceptance Test Period as set forth in **Schedule 4** (Regulations for Acceptance Test).

"**Acceptance Test Environment**" is the System Instance at the Customer Central Site that will be used to execute the Acceptance Test as set forth in **Schedule 4** (Regulations for Acceptance Test).

"**Acceptance Test Incident**" shall mean an incident that occurred during the Acceptance Test as set forth in **Schedule 4** (Regulations for Acceptance Test).

"**Acceptance Test Period**" shall mean the period between the planned dates of the completion of the Installation Testing and Acceptance as set forth in **Schedule 3** (Master Time Schedule).

"**Acceptance Test Plan**" shall have the meaning set forth in **Schedule 4** (Regulations for Acceptance Test).

"**Acceptance Test Procedures**" shall have the meaning set forth in **Schedule 4** (Regulations for Acceptance Test).

"**Acceptance Test Specification**" shall have the meaning set forth in **Schedule 4** (Regulations for Acceptance Test).

"**Accommodation & Travel Fee**" shall mean the fee covering costs for travel, accommodation, daily allowances and related expenses, set forth in **Schedule 2** (Consideration and Payment Terms).

"**Adaptations**" shall mean any adaptations to the Uncustomized Software Product and other software development specified in **Schedule 7** (Software Functional Specification).

"**Agreement**" shall mean this IT Services Agreement together with the Schedules, as amended by the Parties from time to time.

"**Annual Services Fee**" shall have the meanings set forth in **Clause 15.3** (License Fee) of the main Agreement.

"**Central Hardware**" shall mean the parts of the Customer Hardware Configuration upon which the Central Software is installed, as set forth in **Schedule 10** (System Description).

"**Central Software**" the components of the Software Product installed on the Central Hardware, as set forth in **Schedule 10** (System Description).

"**Change Procedure**" shall mean the procedure set forth in **Schedule 13** (Change Procedure).

"**Change Request**" shall mean requests for changes to this Agreement.

"**Claiming Party**" shall have the meaning set forth in **Clause 19.10.1** of the main Agreement.

"**Conditionally Accepted**" shall mean the conditional acceptance of the Product in accordance with **Schedule 4** (Regulations for Acceptance Test).

"**Confidential Information**" shall mean:

    (1)    the Software Product and all information related thereto;

    (2)    any other documentation which is proprietary to either Party;

(3)    market information, information concerning operation, personnel and business dealings of either Party as well as information regarding Participants and other third parties dealing with either Party, which by its very nature may neither be documented nor endorsed with a confidentiality notice; and

(4)    the contents of this Agreement.

"**Consumer Price Index**" shall mean the national consumer price index (CPI) published by the Australia Bureau of Statistics.

"**Correction**" shall mean releases of the Software Product of components of the Software Product made to the Customer during the Acceptance Test to correct faults reported in Acceptance Test Incidents.

"**Critical, Very High, High, Medium and Low priority Incidents**" shall have the meaning set forth in **Schedule 12** (Service Level Agreement).

"**Customer Application(s)**" shall mean:

(1)    such user interfaces parts of the Software Product as specified as Participant Applications in **Schedule 10** (System Description) and delivered to the Customer in accordance with this Agreement;

(2)    Maintenance Releases and New Releases of the software specified in "(1)" issued to the Customer during the Term;

(3)    any changes or adaptations to the software described in "(1)"; and

(4)    any parts of the Documentation related to the software described in "(1)", "(2)" or "(3)" as delivered to the Customer during the Term.

"**Customer Application Hardware**" shall mean the parts of the Customer Hardware Configuration on which the Customer Applications are installed.

"**Customer Central Site**" shall mean the site or sites where the Customer operates the Customer Hardware Configuration, at the address or addresses set forth in **Schedule 10** (System Description).

"**Customer External Systems**" shall mean external systems which shall interface with the Central Software using Customer Interfaces. The Customer External Systems, as identified by the Customer prior to the Effective Date and as amended from time to time, are set forth in **Schedule 10** (System Description).

"**Customer Interfaces**" shall mean:

(1)    such system interface parts of the Software Product as specified as Customer Interfaces in **Schedule 10** (System Description) and delivered to the Customer in accordance with this Agreement;

(2)    Maintenance Releases and New Releases of the software specified in "(1)" issued to the Customer during the Term;

(3)    any changes or adaptations to the software described in "(1)"; and

(4)    any parts of the Documentation related to the software described in "(1)", "(2)" or "(3)" as delivered to the Customer during the Term.

"**Customer Hardware Configuration**" shall mean the hardware and Third Party Software (including network hardware and software) to be acquired by the Customer pursuant to this Agreement and upon which the Software Product is installed and operated. The minimum requirements for the

Customer Hardware Configuration are specified in **Schedule 10** (System Description), such document to be updated from time to time in accordance with this Agreement.

"**Customer Market**" shall have the meaning set forth in **Schedule 8** (License Scope).

"**Customer Operations Manager**" shall mean the individual or, where more than one person is appointed, the individuals appointed by the Customer as responsible for supervising the day to day technical operation of the Customer Market.

"**Customer Premises**" shall mean the location where the Customer conducts its day-to-day business, at the following address:

> 130 S. Jefferson
>
> Suite 101
>
> Chicago, IL 60661

"**Customer Project Manager**" shall mean an individual appointed by the Customer who shall be responsible for managing the performance of the Customer's obligations during the Project.

"**Customer Working Day**" shall mean a standard business day, excluding local public holidays, in the jurisdiction of the Customer Premises.

"**Customer Working Hours**" shall mean the hours of 6:00am to 6:00pm Central Time, on Customer Working Days.

"**Development Completion Notice**" shall mean a statement that the Nasdaq development process has been completed and that the Installation Testing has been successfully completed.

"**Documentation**" shall mean:

    (1)    Documentation as defined in **Schedule 9** (Documentation Specification);

    (2)    documentation issued from time to time pursuant to a Change Request and any amendments to such documents; and

    (3)    Release Notes.

"**Due Date**" shall have the meaning set forth in **Clause 15.8** (Payment Terms) of the main Agreement.

"**Effective Date**" shall mean the date stated on the first page of this Agreement.

"**Exchange Information**" shall mean any data or information, including prices, volume, bids, offers and other trading and market data, entered or published on the Customer Market.

"**Force Majeure**" shall have the meaning set forth in **Clause 19.10.1** of the main Agreement.

"**Group**" shall mean all entities within a Party's group of companies which are existing now or in the future, owning or owned by or under common ownership of such Party and where the ownership structure is a controlling interest.

"**Incident**" shall mean an incident that has occurred with the Software Product and has been reported by the Customer to Nasdaq in accordance with the processes set forth in **Schedule 11** (Services).

"**Incident Management**" shall mean the process for managing Incidents as set forth in **Schedule 12** (Service Level Agreement).

"**Indemnified Party**" shall have the meaning set forth in **Clause 17.5** (Indemnification Procedure) of the main Agreement.

"**Indemnifying Party**" shall have the meaning set forth in **Clause 17.5** (Indemnification Procedure) of the main Agreement.

"**Indexation Formula**" shall have the meaning set forth in **Schedule 2** (Consideration and Payment Terms).

"**Infringement Claim**" shall have the meaning set forth in **Clause 17.4.1** of the main Agreement.

"**Installation Test**" shall mean the tests to validate interoperability between the Software Product, the Customer Hardware Configuration, and the Customer External Systems.

"**Joint Steering Committee**" shall have the meaning set forth in **Schedule 6** (Project Governance).

"**License Fee**" shall have the meanings set forth in **Clause 15.2** (License Fee) of the main Agreement.

"**Main Agreement**" shall mean the part of this Agreement that does not include the Schedules.

"**Maintenance Release**" shall mean a release provided to rectify a defect or defects in the Software Product while retaining the functionality of the Software Product as provided for (1) in this Agreement; and (2) in Release Notes issued pursuant to this Agreement.

"**Master Time Schedule**" shall mean **Schedule 3** (Master Time Schedule).

"**Maximum Late Payment**" shall mean five (5) percent of the Project Fee.

"**Maximum Load Profile**" shall mean the maximum load or capacity allowed for named parameters for the Production System and is set forth in the Nasdaq Non Functional Specification.

"**Migration Guide**" shall mean the document to be prepared by Nasdaq pursuant to **Clause 4.7.1**.

"**Nasdaq Account Manager**" shall mean the individual appointed by Nasdaq as being responsible for the business relationship between Nasdaq and the Customer under this Agreement.

"**Nasdaq Non Functional Specification**" shall mean the non-functional specification of the Software Product set out in **Schedule 7** (Software Functional Specification).

"**Nasdaq Project Manager**" shall mean an individual appointed by Nasdaq who shall be responsible for managing the performance of Nasdaq's obligations during the Project.

"**Nasdaq Project Organization**" shall mean the project organization established and maintained by Nasdaq throughout the Project, substantially in accordance with **Schedule 6** (Project Governance).

"**Nasdaq Technical Account Manager**" shall mean the individual or, where more than one person is appointed, the individuals appointed by Nasdaq as responsible for co-ordination of development and support regarding the Software Product, including the management of Change Requests and release planning.

"**Nasdaq Working Day**" shall mean any working day, excluding local public holidays and weekends at the location where the task is being performed during Nasdaq Working Hours.

"**Nasdaq Working Hours**" shall mean the hours of 09.00 - 17.00 local time where the task is being performed, on Nasdaq Working Days.

"**New Reference Data**" shall mean the Reference Data that has been converted from the Original Reference Data via the data migration process.

"**New Release**" shall mean a new release of the Software Product which may contain:

(1)     new versions of one or more existing modules of the Software Product containing structural and functional adaptations and improvements to maintain the structure and

quality of the Software Product and to maintain and improve, *inter alia*, design, functionality, security, availability, capacity, modularity and flexibility; or

(2)  Change Requests.

New Releases may also contain rectifications to defects such as are included in a Maintenance Release in which case the release shall be deemed to be a New Release.

"**Non-Claiming Party**" shall have the meaning set forth in **Clause 19.10.2** of the main Agreement.

"**Non-Production System**" shall mean a System Instance used by the Customer as a testing, development or training environment.

"**Operating Capability**" shall mean the capability of the Software Product to provide functionality for commercial operation substantially in conformance with **Schedule 7** (Software Functional Specification) and **Schedule 12** (Service Level Agreement) as amended from time to time during the Term.

"**Original Reference Data**" shall mean the original Reference Data provided by the Customer from its existing systems.

"**Participants**" shall mean users of the Customer Market, authorized by the Customer to access the Software Product primarily for the purpose of placing orders and viewing market data.

"**Participant Applications**" shall mean:

(1)  specific Customer Applications that may be sublicensed to Participants and Third Party Developers by the Customer, pursuant to **Clause 12.3.1 (b)**, as identified in **Schedule 10** (System Description); and

(2)  parts of the documentation related to the software described in "(1)".

"**Participant Application Hardware**" shall mean the parts of the hardware and Third Party Software (including network hardware and software) located at the Participant premises, where the Participant Applications are installed. The minimum requirements for the Participant Application Hardware are specified in **Schedule 10** (System Description), such document to be updated from time to time in accordance with this Agreement.

"**Participant External Systems**" shall mean external systems operated by Participants as are set forth in **Schedule 10** (System Description).

"**Participant Interfaces**" shall mean:

(1)  specific Customer Interfaces that may be sublicensed to Participants and Third Party Developers by the Customer, pursuant to **Clause 12.3.1 (a)**, as identified in **Schedule 10** (System Description); and

(2)  the Documentation related to the software described in "(1)"

"**Party**" or "**Parties**" shall mean Nasdaq or the Customer separately or together, as the context requires.

"**Pre-Contractual Statement**" means a draft, agreement, undertaking, representation, warranty, promise, assurance or arrangement of any nature whatsoever, whether or not in writing, relating to the subject matter of this Agreement made or given by any person at any time prior to the date of this Agreement.

"**Problem**" shall mean the root cause of one or more existing or potential Incidents.

"**Production Start**" shall mean the start of operation of the Software Product or part thereof for purposes of commercial operation of the Customer Market.

"**Production System**" shall mean a System Instance used by the Customer:

    (1)     as the primary configuration for day-to-day commercial operation of the Customer Market; and

    (2)     as the redundant configuration for back-up and recovery purposes, but only when and to the extent the primary configuration has failed and during such time as the redundant configuration is being used for day-to-day commercial operation of the Customer Market.

"**Project**" shall mean the period between the Effective Date and Acceptance and encompasses the activities to be performed and obligations to be met by both Parties, pursuant to this Agreement.

"**Project Fee**" shall have the meaning set forth in **Schedule 2** (Consideration and Payment Terms).

"**Project Management**" shall have the meaning set forth in **Schedule 6** (Project Governance).

"**Reference Data**" shall mean all the reference data, system configuration and set-up parameters necessary for the Software Product to be function as set forth in **Schedule 7** (Software Functional Specification).

"**Release Notes**" shall mean a written document describing:

    (1)     the procedure to be followed for installation of a Maintenance Release or New Release; and

    (2)     where the Release Notes relate to a New Release:

        (i)     the version of the Software Product which must be installed on the Customer Hardware Configuration prior to installation of the New Release to which the Release Notes relate;

        (ii)    any necessary changes to Third Party Software required to support the New Release;

        (iii)   any necessary changes to the Customer Hardware Configuration required to support the New Release; and

        (iv)   a specification of the functionality of the New Release.

"**Routine Guide**" shall mean a document describing the procedural relationship between the Customer and Nasdaq that will be developed during the Project. The Routine Guide is a working document and shall not form part of this Agreement.

"**Rules**" shall have the meaning set forth in **Clause 19.22.2** of the main Agreement.

"**Service Desk**" shall mean the point of contact for support to the Customer, as maintained by Nasdaq pursuant to **Schedule 11** (Services).

"**Service Initiation**" shall mean the Services to be provided prior to Production Start as set forth in **Schedule 11** (Services).

"**Service Levels**" shall have the meaning set forth in **Schedule 12** (Service Level Agreement).

"**Service Management**" shall mean the Services to be provided after Production Start as set forth in **Schedule 11** (Services).

"**Services**" shall mean the services set forth in **Schedule 11** (Services).

"**Software Product**" shall mean

    (1)     software operating materially in accordance with **Schedule 7** (Software Functional Specification),

bcause                                                                    Nasdaq

    (2)      Maintenance Releases, New Releases and Change Requests of the software specified in "(1)" issued to the Customer during the Term; and

    (3)      Documentation related to and materially in accordance with the software described in "(1)" and "(2)" listed in **Schedule 9** (Documentation Specification).

For the avoidance of doubt, Third Party Software shall not form part of the Software Product.

"**Software Product License**" shall have the meaning set forth in **Clause** 12.1 (Software Product License) of the main Agreement.

"**Software Product Support**" shall have the meaning set forth in **Schedule 11** (Services).

"**Source Code**" shall mean the set of instructions expressed in a non-machine language from which the machine executable object code software is derived.

"**Support Hours**" shall mean the hours when the Nasdaq service desk is open for telephone support as further defined in **Schedule 12** (Service Level Agreement).

"**Support Meeting**" shall have the meaning set forth in **Schedule 11** (Services).

"**Support Services**" shall mean the services to be performed by Nasdaq as specified in **Schedule 11** (Services).

"**Support Term**" shall mean the period commencing at Acceptance and ending on the date of termination of this Agreement.

"**System Instance**" shall mean a configured and operational installation of the Software Product running on a partition of the Customer Hardware Configuration.

"**Taxes**" shall have the meaning set forth in **Clause 15.10** of the main Agreement.

"**Term**" shall have the meaning set forth in **Clause 16.1** (Term) of the main Agreement.

"**Territory**" shall mean United States of America.

"**Third Party Developer**" shall mean any third party software developer engaged, *inter alia*, for the purpose of developing applications to be connected to the Participant Interfaces.

"**Third Party Software**" shall mean third party software, including operating system software.

"**Trading Days**" shall mean any day during which the Customer Market will be in commercial operation.

"**Travel Plan**" shall mean the scheduled travel for Nasdaq personnel during the project as specified in **Schedule 3** (Master Time Schedule).

"**Uncustomized Software Product**" shall mean the Uncustomised versions of the following Nasdaq proprietary software system products

    (1)      Nasdaq Matching Engine (Nasdaq ME)

    (2)      Nasdaq Market Surveillance (Nasdaq MS)

"**Use**" or "**Using**" shall mean to load, execute, operate, store, transmit, and display or access.

"**Working Day**" shall mean a day that is both a Nasdaq Working Day and a Customer Working Day.

23 Mar 2018          Copyright 2018 Nasdaq Technology AB

# IT SERVICES AGREEMENT SCHEDULE

Schedule 2        Consideration and Payment Terms

# 1    Fees

All fees stated are in US Dollars.

## 1.1    Project Fee

The Customer shall pay the Project Fee to Nasdaq, in the amount of:

| ACTIVITY/COMPONENT | AMOUNT |
|---|---|
| Project Fee | 975,000 |

The Project Fee shall be paid in the following installments:

| EVENT | % | AMOUNT |
|---|---|---|
| Signing of the Agreement | 40 | $250,000 |
| Deliver UAT Software Release (Spot) | 15 | $181,250 |
| Acceptance (Spot) | 15 | $181,250 |
| Deliver UAT Software Release (Futures) | 15 | $181,250 |
| Acceptance (Futures) | 15 | $181,250 |

## 1.2    Annual Fee

The following annual fees are payable:

1.2.1    Annual License and Annual Services Fee

The Customer shall pay Nasdaq the combined Annual License and Annual Services Fee for
the Nasdaq ME and Nasdaq MS for the Licensed Products detailed in Schedule 8, in
accordance with the following:

| PERIOD | ANNUAL AMOUNT |
|---|---|
| Year 1 | $335,000 |
| Year 2 | $410,000 |
| Year 3 | $485,000 |
| Year 4 | $560,000 |
| Year 5 | $585,000 |

## 1.3    Payment Terms

The Annual License Fee and Annual Services Fee shall be paid quarterly in advance upon
initial Acceptance of the Services under the agreement and on each anniversary of the
provision of the Services start.

## 2    Revenue Share

### 2.1    Nasdaq Attribution and Revenue Share

During the term of this Agreement and commencing at production go-live, Nasdaq shall grant Customer a limited right to use the Nasdaq attribution (i.e., "Powered by Nasdaq") in connection with Customer's public and private systems utilizing the Software provided under this Agreement.  Any such usage shall be subject to Nasdaq's prior written approval which shall not be unreasonably withheld, delayed or conditioned.

In addition to the Annual License and Annual Service Fee and in exchange for the attribution rights detailed above, Customer shall pay Nasdaq an annual revenue share equal to two percent (2%) of the Gross Revenue in excess of seven million dollars (USD7,000,000) in Gross Revenue during a given year.  "Gross Revenue" shall mean aggregate amounts collected and recognized as revenue under generally accepted accounting principles by Customer derived from any use of the Nasdaq licensed technology including, but not limited to trading, clearing, and surveillance.

### Reports and Payment

Within thirty (30) days after the end of each calendar year, Customer shall deliver to Nasdaq a written report setting forth Customer's Revenue including the Revenue Share amount that is payable to Nasdaq for the prior calendar year.  Within forty-five (45) days after such written report, Customer shall pay Nasdaq the full Revenue Share amount due for that prior calendar year.

### 2.2    Right to Audit Books and Records

Customer shall keep complete and accurate books and records containing all information and data which may be necessary to ascertain and verify Nasdaq's Revenue Share.  The Customer's books and records that solely relate to its calculation of Nasdaq's Revenue Share shall be open to examination at Nasdaq's prior written request (at least a week prior to examination) by Nasdaq or its designated auditor.  Nasdaq may exercise its right of audit no more frequently than once per any calendar year during the Term unless the prior audit revealed an underpayment. The records for any given calendar year shall be preserved for a period of three (3) years from the end of that calendar year or such longer period as may be required by law.  All information, documents, and records of Customer examined by the Auditor shall be treated as Confidential Information in accordance with the provisions of the underlying Agreement and, in the event Nasdaq uses a third party auditor, Customer shall have the right to require the Auditor to sign its standard non-disclosure agreement prior to receiving access to its records

## 3    Daily Rates

The price of work performed by Nasdaq in addition to the Project Fee and based upon agreed Change Requests will be on a time and materials basis and shall be calculated using the daily rates stated in this price list.

The daily rates are only valid for normal Nasdaq Working Days. If the Customer requests and Nasdaq agrees to perform work outside of Nasdaq Working Days, Nasdaq shall be

entitled an additional charge of fifty percent (50%) of the above daily rates. The price of work performed by Nasdaq on a time and materials basis shall be calculated using the daily rates stated in this price list.

*Table 1 – Daily Rates*

| RATE | USD |
|------|-----|
| Nasdaq Working Days | USD 2,300 |

# 4   Travel and Accommodation Expenses

Nasdaq shall be entitled to be reimbursed for reasonable travel, accommodation and daily allowance expenses incurred in the course of performing its obligations hereunder, as are reasonably evidenced by documentation. The expenses during the Project shall not exceed USD $200,000, unless approved in advance by the Customer. These expenses shall be invoiced monthly in arrears and are subject to an additional 5% administration fee.

Flights are to be business class if over four hours duration and accommodation is to be of four-star standard or above.  For the avoidance of doubt, the parties agree that travel between Sydney and London is greater than four hours duration and accordingly flights will be in business class.

# 5   Indexation Formula

All fees and rates set out in this Schedule 2 shall be subject to an increase based upon the following Indexation Formula which will be applied on an annual basis on each anniversary of the Effective Date.

The increase shall be the lesser of:

(a)     5%, or

(b)     The then current or most recently published Consumer Price Index,

except that under no circumstance shall the rates or fees be decreased.

# IT SERVICES AGREEMENT SCHEDULE

## Schedule 3        Master Time Schedule

bcause

▲ Nasdaq

# 1    Scope of Schedule

This document contains the Master Time Schedule which sets out the major tasks in the Project where there are dependencies between the Customer and Nasdaq and the responsibility (whether Customer or Nasdaq) to perform the tasks and the dates by which they must be done.

# 2    Major Project Milestones

The following project plan contains the contractual milestones.



# 3    Dependency

Each of the contractual milestones as stated herein depends on the completion of their respective preceding milestones. Therefore, in case of any delay in the completion of any milestone, Nasdaq and the Customer may need to agree on the revised schedule for project plan.

bcause

🔺 Nasdaq

# 4    Travel Plan

The following travel to the Customer's location is planned for Nasdaq personnel during the Project.

The Date represents the month in which travel will commence and dates are subject to change if Parties agree to change the Master Time Schedule.

| DATE | PRODUCT | ACTIVITY | NUMBER OF PERSONNEL | ONSITE DAYS |
|------|---------|----------|---------------------|-------------|
| May 2018 | Nasdaq ME | Demo Support & Training | 2 | 10 |
| July 2018 | Nasdaq ME | UAT 1 Support | 2 | 20 |
| July 2018 | Nasdaq ME | Mock Testing Support | 2 | 20 |
| August 2018 | Nasdaq ME | Go Live Support | 3 | 25 |
| June 2018 | Nasdaq Market Surveillance | Operational & Functional Training | 1 | 4 |
| June 2018 | Nasdaq Market Surveillance | Functional Training & Testing | 1 | 5 |
| July 2018 | Nasdaq Market Surveillance | UAT 1 Support | 1 | 5 |

CONFIDENTIAL

Copyright 2018 Nasdaq Technology AB

Schedule 3 - Master Time Schedule

23 Mar 2018

# IT SERVICES AGREEMENT SCHEDULE

## Schedule 4        Regulations for Acceptance Test

# 1      Introduction

This document defines the regulations for Acceptance Test of the Software Product released by Nasdaq to the Customer, including details of the respective obligations of both Parties. These regulations apply to Acceptance Test for project and Change Request deliverables unless otherwise decided.

Acceptance of the Software Product means that the released version meets the agreed functional and non-functional requirements as defined in the relevant specifications, listed in **Section 2**.

The Acceptance Test phase occurs after the initial Software Product installation and execution of the Installation Test, and before commercial use of the Software Product in the Production environment by real users. Upon successful completion of the Acceptance Test and acceptance by the Customer, the Customer assumes responsibility for preparation for use in the Production environment.

## 1.1     Scope

The regulations in this document cover:

- The objectives of Acceptance Test, including entry and exit criteria

- The general approach to Acceptance Test, including documents created

- Key responsibilities and qualifications of both Parties, and

- Details of the Acceptance Test Environment and Acceptance Test deliverables.

## 1.2     Audience

These regulations are to be followed by Customer and Nasdaq Project Managers and Test Managers during the Acceptance Test of the Software Product.

# 2      Testing Objectives

The Acceptance Test shall validate that the Software Product meets the specifications defined in the following schedules:

- **Schedule 7** (Software Functional Specification); and

- **Schedule 12** (Service Level Agreement);

During the Acceptance Test it shall be verified that the Software Product operates correctly on the Customer Hardware Configuration used in the Acceptance Test Environment. Specific tests of the Customer Hardware Configuration are not included in the Acceptance Test, but it must comply with the specification in **Schedule 10** (System Description).

The Acceptance Test shall be performed on the basis of tests specified in the Acceptance Test Specification reviewed by the Parties before the Acceptance Test starts. Tests of any of the contracted features of the Software Product, according to the above listed schedules, may be included in the Acceptance Test Specification.

## 2.1     Pre-conditions for Acceptance Test

The following conditions must be met before Acceptance Test can start:

- Acceptance Test Plan, Specification and Procedures are reviewed by the Parties. Nasdaq shall confirm, in writing, their review.

- Acceptance Test Environment is correctly prepared on site.

- Development of all Adaptations has been completed

- Nasdaq has delivered a Development Completion Notice.

- The Software Product has been released by Nasdaq to the Customer and installed at the Customer Central Site.

- The Installation Test has been successfully executed by Nasdaq

- Testers are trained and available to start Acceptance Test execution.

Prior to the start of the Acceptance Test, Nasdaq will issue a test report to the Customer summarizing the results of functional and non-functional testing conducted by Nasdaq during the Installation Test.

❖ *Acceptance Test Plans, Specifications and Procedures are described later in this document.*

# 3    General Approach

The general approach to Acceptance Test for Nasdaq Software Product follows this pattern:

(a)       Prepare and confirm the Acceptance Test Plan, Specification and Procedures;

(b)       Prepare the Acceptance Test Environment at the Customer Central Site;

(c)       Release a tested Software Product version to the Customer;

(d)       Execute reviewed test cases and report results in a series of Acceptance Test Cycles;

(e)       Release corrections to the Software Product to resolve Acceptance Test failures;

(f)       Review final results and confirm acceptance by Customer;

These activities are explained in more detail below.

## 3.2    Acceptance Test Planning

To kick-off the Acceptance Test planning for the project, Nasdaq shall discuss with the Customer the detailed timing and scope of Acceptance Test and how the regulations in this document will be applied for this project.

The Nasdaq ME Acceptance Test Plan, Specification and Procedures described below shall be prepared by the Customer and reviewed jointly by the Parties to establish confirmation on the details before the Acceptance Test starts. Changes to these documents, once finalized and confirmed, shall be handled as project Change Requests.

The Nasdaq MS Acceptance Test Plan, Specification and Procedures described below shall be prepared by Nasdaq and reviewed jointly by the Parties to establish confirmation on the details before the Acceptance Test starts.

### 3.2.1    Acceptance Test Plan

The detailed timing of the Acceptance Test activities shall be documented in the Acceptance Test Plan. The Acceptance Test Plan shall enable timely and complete execution of the test cases within the timeframe set out in **Schedule 3** (Master Time Schedule). The Acceptance Test Plan shall also define details of the Acceptance Test Environment and the personnel from the Parties involved in Acceptance Test.

❖  *See section 6.1 for more details on what goes into the Acceptance Test Plan.*

3.2.2      Acceptance Test Specification

The scope of testing to be covered over the timeline defined in the Acceptance Test Plan
and agreed in the workshop shall be documented in the Acceptance Test Specification. This
must be agreed upon by the Parties before Nasdaq completes their testing of the Software
Product and before Customer Acceptance Test can start. The key dates for reaching
agreement on the Acceptance Test Specification are set out in **Schedule 3** (Master Time
Schedule).

❖  *See section 6.2 for more details on what goes into the Acceptance Test Specification.*

3.2.3      Acceptance Test Procedures

The detailed instructions for executing each of the test cases defined in the Acceptance
Test Specification shall be documented as an "**Acceptance Test Procedure**". These
procedures specify test data and expected results for each step.

❖  *See section 6.3 for more details on what goes into an Acceptance Test Procedure.*

## 3.3      Acceptance Test Preparation

The following activities shall be completed to ensure the Acceptance Test Environment is
suitable for Acceptance Test. The exact time periods for these activities are specified in
**Schedule 3** (Master Time Schedule).

❖  *See section 5 for more details on the Acceptance Test Environment.*

3.3.1      Software Product Installation

Nasdaq will perform the initial installation of the Software Product on the Acceptance Test
Environment in preparation for the Installation Test.

3.3.2      Installation Testing

The Installation Test is performed by Nasdaq directly after the initial installation of the
Software Product and the set-up of Third Party Software.

The purpose with the Installation Test is to verify interoperability between the Software
Product and the Customer Hardware Configuration and external systems, and to verify the
performance of the Software Product on the Customer Hardware Configuration.

The Acceptance Test Environment shall as far as possible be identical to the Production
System configuration as specified in **Schedule 10** (System Description) for the non-
functional segments of the Acceptance Test. The interfaces to these systems must comply
with relevant specifications provided to Nasdaq and defined in **Schedule 10** (System
Description). The Acceptance Test Environment for the functional segments of the
Acceptance Test shall not be required to be identical to the Production System
configuration.

The Installation Test includes tests of the performance, capacity and fail-over behaviour of
the Software Product on the Customer Hardware Configuration. Customer External Systems
or simulator tools, simulating the interaction with interfaces of the Customer External
Systems, must be capable of generating the required loads for this testing.

On completion of the Installation Test, Nasdaq shall issue a test report summarizing the
results and confirming the successful conduct of the Installation Test.

## 3.4 Acceptance Test Release

The decision to release the Software Product to the Customer for the Acceptance Test shall be made by Nasdaq based on the outcome of their internal testing.

## 3.5 Acceptance Test Execution

The test cases reviewed in the Acceptance Test Specification shall be executed by the Customer in Acceptance Test Cycles according to the Acceptance Test Plan. Test case failures shall be reported by the Customer as Acceptance Test Incidents using the Nasdaq Defect Tracking system(s), and test results summarized by the Customer in Acceptance Test Reports.

Acceptance Test shall be conducted on-site such that Nasdaq personnel are located at one physical location. Testing shall be confined to testing of the Software Product. Testing of features of individual components of hardware, standard system software, network hardware or network software shall not be conducted during Acceptance Test.

### 3.5.1 Acceptance Test Cycles

Acceptance Test shall be executed in one or more Acceptance Test Cycles where each shall be conducted on the same Software Product version. The initial number and duration of Acceptance Test Cycles shall be agreed in the **Schedule 3** (Master Time Schedule)**.**

Optimally an Acceptance Test Plan will include two Acceptance Test Cycles with a correction period in between. Additional Acceptance Test Cycles would only be necessary if test cases are reported as Rejected after the second one is complete.

An Acceptance Test Cycle may be terminated prematurely if a significant number of test cases are failed, blocked or invalidated due to defects in the Software Product, or due to malfunctions or changes in the Acceptance Test Environment. The decision to terminate an Acceptance Test Cycle shall be made jointly by the Customer and Nasdaq. If terminated, the date for subsequent Acceptance Test Cycles shall be agreed and the Acceptance Test Plan updated.

Execution of test cases shall be logged in an Acceptance Test Log, along with other events pertaining to the Acceptance Test such as restarts and upgrades.

The result of each test case shall be agreed by the Project Managers for both Parties and recorded as:

- Accepted

- Conditionally Accepted

- Rejected

The correct result is determined from the classification of any deviation from the expected test result. The classification shall not be logged until agreed by both Parties, and the result shall include references to related Acceptance Test Incidents.

❖ *See section 6.4 for more details on the Acceptance Test Log, including classification of deviations.*

### 3.5.2 Acceptance Test Incidents

Any deviation from the expected result for a test case shall be reported by the Customer to Nasdaq as an ("Acceptance Test Incident"). This report shall describe exactly what was observed by the tester and how this deviated from the expected result. Any additional information that may help to diagnose the cause of the failure shall also be included.

The classification for the severity of the deviation reported in an Incident shall be agreed between the Parties and recorded in the ("Acceptance Test Report"). This classification is a critical factor in the decision on acceptance and is intended to minimize the risk of users experiencing any significant failures in the Production System.

The outcome of analysis of the failure, including the identification of the fault, shall be recorded in the Incident. The plan for resolving each Incident shall be agreed between the Parties before Acceptance Test is completed. All Incidents that cause a test case to be Rejected shall be resolved before the final Acceptance Test Cycle, so that there are no Rejected test cases in that Acceptance Test Cycle.

❖ *See section 6.5 for more details on what is recorded in Acceptance Test Incidents.*

3.5.3      Acceptance Test Reports

An ("Acceptance Test Report") shall be provided to Nasdaq by the Customer at the end of each Acceptance Test Cycle.

The Acceptance Test Report shall list the test cases executed, the agreed result for each one, a summary of the results, and a list of Acceptance Test Incidents reported.

The Acceptance Test Report for an Acceptance Test Cycle shall provide the same information but cover all test cases over the whole Acceptance Test Cycle. This report shall be used by the Customer to make a decision on acceptance.

❖ *See section 6.6 for more details on what goes into Acceptance Test Reports.*

## 3.6   Acceptance Test Corrections

Any corrections or modifications called for due to Acceptance Test results shall be performed by Nasdaq once the Parties have evaluated the results of the Acceptance Test. A re-run of the Rejected tests shall then be performed by the Customer, assisted by Nasdaq, without delay. Any other tests that are reasonably deemed to be influenced by the corrections or modifications may be re-run by the Customer at the same time.

For Conditionally Accepted tests, Nasdaq shall specify when the deviation will be corrected or modified. The date of release of the corrections shall be agreed between the Project Managers and will be after Acceptance.

## 3.7   Acceptance Test Completion

The Software Product version tested in the last Acceptance Test Cycle shall be deemed as Accepted if the most recent test result for every test case in the Acceptance Test Specification is Accepted or Conditionally Accepted.

The Parties may mutually agree that the Software Product is Accepted even though one or more test case results have been classified as Rejected, such agreement which may be subject to stipulations from either Party. Such agreement shall be made in writing by the Project Managers.

The Customer shall confirm to Nasdaq in writing Acceptance, which shall include a listing of any Conditionally Accepted or Rejected test cases.

# 4   Key Responsibilities

It is essential for the successful completion of Acceptance Test that the responsibilities of each person involved in Acceptance Test are clearly defined.

The individual roles and responsibilities of personnel from both Parties are defined in more detail below.

## 4.1    Roles and Qualifications

Each Party shall supply the necessary personnel to ensure successful completion of the Acceptance Test. Both Parties shall provide a Test Manager, Project Manager, System Operator and Expert User. The Customer shall provide a number of Software Testers according to the Acceptance Test Plan. The individuals assigned these roles shall be recorded in the Acceptance Test Plan.

The essential qualifications for personnel in roles are as follows:

| ROLE | QUALIFICATIONS |
|---|---|
| Test Manager | • Comprehensive knowledge of **Schedule 3** (Master Time Schedule).<br>• Capable of managing execution of tests according to the Acceptance Test Plan, Specification and Procedures agreed upon by the Parties.<br>• Capable of resolving problems with the execution of tests, including possible conflict in the interpretation of a test result.<br>• Capable of qualifying a test result as passed or failed according to the Test Specification and in line with the provisions of the Agreement. |
| System Operator | • Comprehensive knowledge of the system description in **Schedule 10** (System Description).<br>• Working knowledge of the Software Product and how to operate and maintain it.<br>• Good knowledge of the Customer Hardware Configuration and its components and any other hardware, software and networking products and components engaged in the tests. |
| Expert User | • Comprehensive knowledge of customer requirements in **Schedule 7** (Software Functional Specification).<br>• Good knowledge of markets and instruments traded.<br>• Good knowledge of terminology used in the Software Product. |
| Software Tester | • Working knowledge of the Software Product, its user features and user interfaces to be tested.<br>• Successfully completed basic training on the Software Product.<br>• Competent use of the user workstation.<br>• Ability to interpret test results and capture diagnostic information. |

## 4.2    Customer Responsibilities

The Customer is primarily responsible for the preparation and execution of the Acceptance Test, reporting results, and making the decision on Acceptance.

| ROLE | RESPONSIBILITIES |
|---|---|
| Test Manager | • Preparation of the Acceptance Test Plan, Specification and Procedures<br>• Leads and manage the Acceptance Test process according to the Acceptance Test Plan.<br>• Conducts the weekly meetings to plan and evaluate the testing.<br>• Ensures that tests are performed according to the Acceptance Test Specification.<br>• Ensure that Acceptance Test Incidents are properly reported and recorded.<br>• Ensures that Acceptance Test case results are accurately recorded and produces the |

| ROLE | RESPONSIBILITIES |
|------|------------------|
|  | Acceptance Test Report for each Acceptance Test Cycle. <br><br> • Provides the Customer's classification of the deviations from expected test results in the Acceptance Test Report. <br><br> • Authority to demand a re-run of any individual test case, test sequence, or part thereof. <br><br> • Collaboration with Project Managers to evaluate test results and agree on classification. <br><br> • Reports to Customer Project Manager. |
| System Operator | • Reviews and approves Acceptance Test Specifications and Procedures where they relate to non-functional testing. <br><br> • Provides detailed description of the Acceptance Test Environment, including any deviations from **Schedule 10** (System Description). <br><br> • Follows documented procedures to operate the components of the Acceptance Test Environment. <br><br> • Ensures that any environment changes or events, such as unplanned restarts or upgrades, are recorded in the Acceptance Test Report. <br><br> • Analyses test results for non-functional testing to confirm that they show the agreed requirements have been met. |
| Expert User | • Reviews and approves Acceptance Test Specifications and Procedures where they relate to functional testing. <br><br> • Analyses test results for functional testing to confirm that they show the agreed requirements have been met. |
| Software Tester | • Executes test cases from the Acceptance Test Specification. <br><br> • Enters test data as specified in Acceptance Test Procedures. <br><br> • Records observed test results and compares with expected results. <br><br> • Assists in analysis and reporting of test results. |

## 4.3    Nasdaq Responsibilities

Nasdaq is primarily responsible for providing an example Acceptance Test Plan, Specification and Procedures, analysing test results and resolving Acceptance Test Incidents.

| ROLE | RESPONSIBILITIES |
|------|------------------|
| Test Manager | • Checks that the Customer follows Acceptance Test Plan. <br><br> • Participates in weekly meetings. <br><br> • Provides the Nasdaq classification of the deviations from expected test results in the Acceptance Test Report. <br><br> • Authority to allow a re-run of any individual test case, test sequence, or part thereof. <br><br> • Ensures that Incidents are analysed and resolution planned. <br><br> • Collaboration with Project Managers to evaluate test results and agree on classification. No decisions on this are made without both Project Managers present. <br><br> • Reports to Nasdaq Project Manager. |
| System Operator | • Supports Customer System Operator in executing operational procedures and operator test cases and diagnosing problems. <br><br> • Reviews and approves Acceptance Test Specifications and Procedures where they relate to non-functional testing. |

| ROLE | RESPONSIBILITIES |
|------|------------------|
| Expert User | • Supports Customer Expert User in executing test cases.<br>• Reviews and approves Acceptance Test Specifications and Procedures where they relate to functional testing. |

# 5  Test environment

The System Instance used for the Acceptance Test shall as far as possible be identical to the Production System, as specified in **Schedule 10** (System Description). A description of the Acceptance Test Environment, including versions of all installed software and hardware components, shall be provided by the Customer.

## 5.1  System Requirements

The hardware and software configuration of the Acceptance Test Environment, including physical location and access mechanisms, shall be defined in the Acceptance Test Plan.

To facilitate performance testing, Nasdaq shall provide a package of testing and simulator tools that include the capacity to simulate the required number of users and transactions.

No part of the Acceptance Test Environment may be located outside the Customer Central Site, unless otherwise explicitly stated in the specification of the Acceptance Test Environment.

To achieve stable test conditions, no other applications but the Software Product, or other software and simulator tools approved by Nasdaq, shall be installed or executed. No system activity, except the Acceptance Test, shall take place during the Acceptance Test.

Local area network and wide area network shall have no load from any other system than specified in the Agreement with the exception of the approved simulator tools.

## 5.2  System Access

Nasdaq shall be granted exclusive access to the Acceptance Test Environment for the duration of Acceptance Test, provided however that the Customer will have such access as is required in order to assist Nasdaq generally, and in particular to conduct the Acceptance Test.

For the duration of the Acceptance Test the customer shall not alter the configuration of any of the individual components of the Acceptance Test Environment without Nasdaq's written approval.

The Customer shall support Nasdaq in configuring the system, system management and any other system matter regarding the Acceptance Test Environment.

The Customer is responsible for all network components and network services as well as all other system components outside the Acceptance Test Environment.

The Customer will be invited to take part in and overlook all configuration work in the Acceptance Test Environment performed by Nasdaq.

## 5.3  Availability of Customer External Systems

The Customer External Systems or simulators, simulating the interaction with interfaces of the Customer External Systems, shall be available for testing during the Acceptance Test according to the agreed **Schedule 3** (Master Time Schedule) and according to the

Acceptance Test Plan as well as during the Installation Test, performed before the Acceptance Test. These systems or simulators shall also be prepared with sufficient test data.

# 6   Test Documentation

The documents described in earlier sections of these regulations shall contain the content defined below and shall be provided in Microsoft Word or Excel compatible formats.

All documents shall be written in English.

## 6.1   Acceptance Test Plan

The "**Acceptance Test Plan**" defines the following aspects of the Acceptance Test activities as agreed between the Parties in the planning workshop:

- **Timing** of preparation activities and planned Acceptance Test Cycles, including key milestone dates

- **Dependencies** on other Customer test activities, and

- **Resources** required for Acceptance Test, including the Acceptance Test Environment and the names and roles of personnel involved.

The Acceptance Test Plan shall be approved by the Parties before commencement of Acceptance Test. Deviations from the Acceptance Test Plan, including the execution of additional Acceptance Test Cycles, shall be agreed by the Parties before proceeding.

## 6.2   Acceptance Test Specification

The "**Acceptance Test Specification**" defines *what* to test as a set of test cases to be executed by the Customer for the Acceptance Test.

Test cases are identified by titles that describe in outline how the test is performed and are associated with relevant specification statements in **Schedule 7** (Software Functional Specification) and **Schedule 12** (Service Level Agreement).

The Acceptance Test Specification does not list the detailed steps required to perform each test case. That information is provided in Acceptance Test Procedures, defined below.

## 6.3   Acceptance Test Procedure

An "**Acceptance Test Procedure**" defines *how* to execute each test case as a sequence of steps. Each test case in the Acceptance Test Specification shall have a documented Acceptance Test Procedure.

Each Acceptance Test Procedure shall describe:

- **Purpose** of the test, with cross-reference to statement(s) in requirements specifications

- **Pre-conditions** for the test, including any dependencies on previous successful tests

- **Actions** for each test step with **test data** and **expected result** for each one, and

- **Post-conditions** if any, including the existence of specific data or processes inside the system that are to be included in the expected results.

## 6.4    Acceptance Test Log

All test cases executed shall be logged in chronological order in the **"Acceptance Test Log"**. The log shall specify for each test:

- A unique reference to the test case

- The person who executed the test case

- The date and time of execution

- References to any Acceptance Test Incidents reported relating to this test case

- The agreed classification of any deviation from expected results, and

- A status Accepted, Conditionally Accepted or Rejected.

All events that affect the Acceptance Test Environment shall also be logged with the date and time, plus any known impact on Acceptance Test results.

The Customer Project Manager shall sign-off each test and event recorded in the Acceptance Test Log.

The way deviations from expected test results are classified depends on whether the tests are against **Schedule 7** (Software Functional Specification) or **Schedule 12** (Service Level Agreement), as defined below.

### 6.4.1    Deviations from **Schedule 7** (Software Functional Specification)

For deviations from expected results for tests in the Acceptance Test Specification relating to **Schedule 7** (Software Functional Specification) are classified as follows:

| # | DESCRIPTION OF THE DEVIATION | CLASSIFICATION/TEST STATUS |
|---|---|---|
| 1 | The Software Product or parts thereof halts and the user cannot **with reasonable measures** circumvent the problem(s). | The test is **Rejected**. |
| 2 | A single function or multiple functions deviate from specified functionality and the user cannot **with reasonable measures** circumvent the problem(s). | The test is **Rejected**. |
| 3 | The deviation(s) as set forth in 1) or 2) above is (are) minor and does (do) not affect normal use of the Software Product. | The test is **Conditionally Accepted** if the customer's Project Manager requests correction of the deviation, otherwise the test is **Accepted**. |
| 4 | A single function or multiple functions deviate from specified functionality, but the deviation has no impact on the Customer's use of the Software Product. | The test is **Accepted**. |
| 5 | Functionality does not deviate from description in **Schedule 7** (Software Functional Specification). | The test is **Accepted**. |

### 6.4.2    Deviation classification examples – Nasdaq MS

To assist with assessing the classification of deviations during acceptance test reporting – the following are example deviations for each deviation classification level.

| SEVERITY | DEFINITION AND EXAMPLE OF DEVIATIONS |
|---|---|
| Critical (1) | Critical Incident shall mean an Incident which seriously affects the entire operation of |

| SEVERITY | DEFINITION AND EXAMPLE OF DEVIATIONS |
|---|---|
| | and totally prohibits all surveillance.<br>• Data is not available for the real-time day in the Nasdaq MS client applications (not applicable to T+1 solutions)<br>• Data is not viewable in Nasdaq MS at all for any trading days<br>• Nasdaq MS client applications cannot be started<br>• Nasdaq MS client applications crash or freeze for all users |
| Very High (2) | An Incident materially affecting at least a significant proportion of functionality.<br>• Data is not available in the Nasdaq MS Client applications for previous or historical trading days<br>• More than 50% of Alerts/Reports are not functioning correctly as per specification due to a single data source of failure (e.g. badly converted data)<br>• Daily export of data from Nasdaq MS is not generated (downstream dependency)<br>• The Nasdaq MS secondary server is not available/accessible – redundancy is compromised<br>• Operational batch processes do not complete autonomously, and require daily operator intervention<br>• Nasdaq MS client applications crash or freeze for multiple users, but not all users |
| High (3) | Incident materially affecting a limited number of individual end-users or issues that cause inconvenience but do not prevent surveillance.<br>• System performance is materially degraded - impacting a surveillance analyst's ability to perform everyday surveillance and alerting workflow management in an efficient manner<br>• The primary and secondary servers do not correctly synchronise data<br>• Up to 50% of Alerts/Reports are not functioning correctly as per specification due to a single data source of failure (e.g. badly converted data)<br>• Daily export of data from Nasdaq MS to downstream systems is not sent<br>• Some transactions are missing<br>• Some transactions are missing mandatory attributes according to the MPL specification<br>• Nasdaq MS client applications crash or freeze for a single user. |
| Medium (4) | Incidents regarding individual user login problem, or incidents with limited impact to ongoing market operations/trading.<br>• Some transactions are missing optional attributes according to the MPL specification<br>• A single alert/report is not functioning correctly as per specification<br>• A non-mandatory input file is not processed (i.e. a file that is not critical for the daily operation of the system)<br>A warning is not displayed when non-critical batch processes fail and/or do not run. Non-critical batch processes are those that are not required for the standard daily batch to operate and allow users to review data in real-time in the applications. |
| Low (5) | All general questions related to the package software and functionality or operations.<br>• Petty layout discrepancies, spelling/grammatical errors<br>Non-material degradation of the functionality not affecting the commercial use of the system |

6.4.3    Deviations from **Schedule 12** (Service Level Agreement)

For deviations from expected results for tests in the Acceptance Test Specification relating to each of the criteria in the Maximum Load Profile are classified as follows:

| # | DESCRIPTION OF THE DEVIATION | CLASSIFICATION/TEST STATUS |
|---|---|---|
| 1 | Measured criteria are less than 80% of specified criteria for Acceptance. | The test is **Rejected**. |
| 2 | Measured criteria are less than 100% but equal to or higher than 80% of specified criteria for Acceptance. | The test is Conditionally Accepted. |
| 3 | Measured criteria are equal to 100% of specified criteria for Acceptance. | The test is **Accepted**. |

## 6.5   Acceptance Test Incident

Each observed deviation from the expected result for a test case shall be reported as an **"Acceptance Test Incident"**.

The following shall be recorded in each reported Incident:

- Date and time of the test

- The unique test case identifier

- The title of the test case as a brief description

- Any unusual pre-conditions not defined in the Acceptance Test Procedure

- The observed result for each step in the Acceptance Test Procedure, with all deviations highlighted

- The expected result if not sufficiently well defined in the Acceptance Test Procedure, and

- Relevant evidence and diagnostic information, such as screenshots and log files.

After analysis the following additional information shall be included:

- Relevant comments from all personnel involved in Acceptance Test, including any disagreements on evaluation and analysis with associated comments from Project Managers, and

- Proposed resolution and planned version for release to resolve it.

The Acceptance Test Log shall provide a complete record of all Incidents reported, and the Acceptance Test Reports shall provide a summary per Acceptance Test Cycle.

## 6.6   Acceptance Test Report

All tests performed shall be summarized and signed off in the Acceptance Test Report compiled by the Customer from the "end-of-week" meeting between the Customer and Nasdaq Test Managers and Project Managers.

The overall result for an Acceptance Test Cycle shall be summarized and signed off in the Acceptance Test Report produced by the Customer at the end of the Acceptance Test Cycle.

An Acceptance Test Report shall include the following information:

- Project identification and report date.

- Acceptance Test Environment and version of Software Product under test.

- Acceptance Test Cycle number if a weekly report.

bcause                                                                    Nasdaq

- List of test cases executed, with agreed status and references to any Incidents for each one.

- List of Incidents with summary and status.

- Total number and percentage of test cases in each status: Accepted, Conditionally Accepted, Rejected, In Progress, Blocked, Pending.

- Signatures of both Test Managers and both Project Manager.

Nasdaq

# IT SERVICES AGREEMENT SCHEDULE

## Schedule 5        Training Specification

# 1   Introduction

This document specifies the courses that will be delivered to the Customer during the Project, as well as the conditions, prerequisites and materials needed for the course. The dates for each course are stated in **Schedule 3** (Master Time Schedule).

Each course is given once on a full time basis (that is, normally 9:00 a.m. - 4:30 p.m.). The classroom courses will be delivered at locations agreed between the Parties and where training resources will be readily available.

The training shall be conducted at the Customer's Premises.

# 2   Training Objectives

## 2.1   Training on the Software Product

This part of the training will be carried out on the Software Product. The objectives of this training are to give a thorough understanding of the functions of the system and how it can be used. This will enable the Customer's personnel to prepare for the Acceptance Test Period, to supervise the market and operate the system.

# 3   Required class room equipment and facilities

To ensure the quality of the courses, a classroom has to be dedicated for the training and the servers used for training should be isolated, that is, no other activities or development should occur on the system during preparation and training. For the courses held at the Customer's premises, it is the Customer's responsibility to provide adequate training equipment as follows:

- Training / workshop room in a quiet area with desks for up to the maximum size of the class

- One Microsoft Windows 7 or Windows 8 machine, enabled for English for each participant and trainer, with connection to the training system

- The user applications of the Software Product and other required software installed on each workstation

- PDF file reader, such as Adobe Acrobat Reader

- An Internet browser

- Appropriate broadband (or equivalent) connection to the internet

- High quality paper-copying facilities and assistance with copying are needed during all courses

- A projector that can be connected to a laptop or PC. The projector should have a minimum resolution of 1280 x 1024.

# 4   Course Documentation

The course documentation will be delivered at the time of training in paper format. The courses provided by Nasdaq may contain confidential information and may not under any circumstances be reproduced, in whole or in part, or transmitted in any form without the prior written permission from Nasdaq.

Audio and video recordings or other media reproductions of the courses are not permitted.

Nasdaq grants the Customer the right to use the course material from the Nasdaq ME Workstation course for the sole purpose of training its Participants under this Agreement.

All course participants will be awarded a Certificate of Completion when they have successfully completed each training course.

# 5    Course Constraints

The estimated course length is based on Nasdaq's prior experience under favourable conditions and upon the maximum number of participants listed.

Course content and course length may be subject to change at Nasdaq's discretion if the conditions so require.

In order to maintain the quality of the training sessions, a maximum of participants per course will be allowed if no other maximum number is stated under the respective course description.

# 6    Train the Trainer concept

Nasdaq will train the Customer's personnel involved in training and supporting the Participants in using the Nasdaq Matching Engine Workstation. The course will be delivered on a Train the Trainer basis, with the intention that the Customer's personnel (or the Customer's nominees) will then train Participants. The training material will be made available to the Customer for this purpose.

# 7    Summary of included training courses

The following tables list the training courses, each to be conducted once during the Project.

*Table 2 - Training on the Software Product*

| PRODUCT | COURSE | DAYS |
|---------|--------|------|
| Nasdaq Matching Engine | Nasdaq ME Admin Application | 1 |
| Nasdaq Matching Engine | Nasdaq ME Workstation (Train the Trainer and Market Controller) | 1 |
| Nasdaq Matching Engine | Nasdaq Web Trader (Train the Trainer) | 1 |
| Nasdaq Matching Engine | Nasdaq ME Operators | 2 |
| Nasdaq Market Surveillance | Nasdaq Market Surveillance Operational Deployment and Non Functional. | 4 |
| Nasdaq Market Surveillance | Functional Testing and Training | 5 |
| | Total | 14 days |

# 8      List of Included Courses

## 8.1      Nasdaq Matching Engine Admin

| | |
|---|---|
| DESCRIPTION | Impart the knowledge needed to work with the Nasdaq ME Admin application. |
| PREREQUISITES | None |
| TARGET GROUP | INTERNAL - The Market operation personnel responsible for maintaining and, when necessary, changing the product, user, accounts, and member related information in the Database. |
| DURATION | 1 day |
| ATTENDEES | Maximum 5 persons |

## 8.2      Nasdaq Matching Engine Workstation

| | |
|---|---|
| DESCRIPTION | Provides the market operator and trainer with a basic, generic understanding of the operation of the Nasdaq ME Workstation application. Specific details of how the application is used within the context of the customer environment are then explored. |
| PREREQUISITES | None |
| TARGET GROUP | INTERNAL - Personnel involved in training and supporting the Participants in using the ME Workstation. The course will be delivered on a Train the Trainer basis, with the intention being for Customer's personnel (or the Customer's nominees) to train Participants. The training material will be made available to the Customer for this purpose. |
| DURATION | 1 day |
| ATTENDEES | Maximum 5 persons |

## 8.3      Nasdaq Matching Engine Operators

| | |
|---|---|
| DESCRIPTION | This course will train the system operators to run and manage the Nasdaq Matching Engine implementation. |
| PREREQUISITES | Intermediate knowledge of the Linux operating system. |
| TARGET GROUP | INTERNAL - Technical personnel with little or no experience of the Nasdaq Matching Engine system |
| DURATION | 1 day |
| ATTENDEES | Maximum 5 persons |

**Nasdaq**

## 8.4    Nasdaq MS System Operations

| DESCRIPTION | This course gives both theoretical and hands-on training. The course shows how to view the information from the Nasdaq Market Surveillance application. The participants will get a sufficient level of knowledge to be able to use the Nasdaq Market Surveillance GUI. |
|---|---|
| PREREQUISITES | None |
| TARGET GROUP | System Operations personnel |
| DURATION | 4 days |
| ATTENDEES | 5 persons |