IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Case No. 19-10562 |
| | ) | |
| BCause Mining, LLC, *et al.*,[1] | ) | Judge Janet S. Baer |
| | ) | Chapter 11 |
| debtor/debtor-in-possession. | ) | (Jointly Administered) |

### DEBTORS' FIRST AMENDED COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT[2]

BCause Mining, LLC ("<u>Mining</u>") and BCause LLC ("<u>Holdings</u>", together with Mining, the "<u>Debtors</u>"), Virginia limited liability companies, debtors/debtors-in-possession herein, by and through their attorneys, propose the following Combined Plan of Reorganization and Disclosure Statement in accordance with Section 1121(a) and 1125(f)(1) of the Bankruptcy Code and Rules 3016 and 3017.1 of the Federal Rules of Bankruptcy Procedure.[3]

### Plan Summary and Introductory Narrative

The Plan proposed by the Debtors contemplates payment of 100% to unsecured creditors, and to pay purported secured creditor WESCO Distribution, Inc. ("<u>WESCO</u>"), in full with interest on the allowed amount of its secured claim, with any deficiency to be treated *pari passu* with general unsecured creditors.  Classes of both unsecured and secured creditors are impaired.  Payments to unsecured creditors will be over a period of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are BCause Mining, LLC (0783) and BCause LLC (8579).

[2] Simultaneously with the filing of this Combined Plan of Reorganization and Disclosure Statement, the Debtors have requested authority from the Court to file a combined plan of reorganization and disclosure statement.  Rule 3017.1 of the Federal Rules of Bankruptcy Procedure provides the mechanism for Debtors to file a combined plan of reorganization and disclosure statement.

[3] By order of this Court dated May 13, 2019, the Debtors' cases are jointly administered.  (ECF No. 73.)

between twenty-five (25) and forty-eight (48) months, depending on whether Holdings'

subsidiary, BCause Secure LLC successfully launches the Spot Exchange, explained

further below.  Funding for distributions to creditors will be from the Debtors' continued

revenue stream from its Hosting Agreements[4] and, significantly, from self-mining

revenues.  The Debtors may also fund distributions realized from a successful launch of

the Spot Exchange.  The launch of the Spot Exchange is contingent upon an amendment

to BCause LLC's IT Services Agreement with NASDAQ Technology AB and assumption

and assignment of that agreement to BCause Secure LLC.

Attached hereto as **Exhibit A** is a "slide deck" showing the outline of the Plan,

along with financial information necessary for creditors to assess the Plan (the "Slide

Deck").  Where possible, references to specific slides will be noted in this Plan.  Attached

hereto as **Group Exhibit B** are the financial projections which are the underpinnings of

the Plan.

Copies of written commitments for initial funding for launch of the Spot Exchange

are attached hereto as **Group Exhibit C**.

### Preamble, History, and Background

On April 11, 2019, Mining filed a voluntary petition for relief under Chapter 11 of

the Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Illinois (the

"Bankruptcy Court").  On April 12, 2019, Holdings filed its voluntary petition for relief under

Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Debtors have been

operating their businesses and managing their financial affairs as debtors-in-possession

since the Petition Dates.  No trustee or examiner has been appointed, and an Official

---

[4] Capitalized terms in this Plan shall have the meaning ascribed to them in Article I of the Plan.

Committee of Unsecured Creditors has been appointed in the Debtors' Chapter 11 cases, and has been active in the cases.

Mining, a wholly-owned subsidiary of Holdings, operates a state-of-the-art facility in Virginia Beach, Virginia as a hosting venue for cryptocurrency mining, which is the process of producing digital currency using cryptography and high powered computers known as mining rigs or miners.  Mining historically has not mined cryptocurrency itself, but has recently begun efforts to mine on its own account to take advantage of current Bitcoin prices and increase revenues for the benefit of creditors and effectuate a critical part of the Debtors' proposed Plan. Specifically, Mining has recently entered into an agreement with SBI, a customer and member of Holdings, to "rent-to-own" certain miners and allow Mining to commence mining on its own.

Holdings is the 100% owner of Mining, BCause Spot LLC, BCause Secure LLC, BCause Trust LLC, BCause Derivatives LLC and BCause Clear LLC.

The Debtors' Chapter 11 filings were triggered by a judgment entered in favor of WESCO on March 1, 2019 in the approximate amount of $1.9 million, and a garnishment of Holdings' bank account, from which both of the Debtors' operating expenses are paid, including utilities such as Dominion Energy, Mining's energy provider, which had threatened to shut off utilities for non-payment, as of April 12, 2019.

## HIGHLIGHTS OF PLAN TO INCREASE/REPLACE REVENUE

### Status of Mining's Hosting Agreements

At present, Mining is a party to Hosting Agreements with the following parties:

| Customer | Termination Date | Monthly Revenue |
|---|---|---|
| St. Bitts, LLC | December 19, 2019 | $200,000 |

| Customer | Termination Date | Monthly Revenue |
|---|---|---|
| FRMO Corp., Horizon and HK Cryptocurrency Mining LLC | June 20, 2019 | $30,000 |
| BMG Operations Limited | December 19, 2019 | $250,000 |
| Fidelity Labs LLC | December 20, 2020 | $3,000 |
| SBI Crypto Co. Ltd. | December 19, 2019 | $500,000 |
| Solutrix, LLC | Various dates, all more than 1 year | $11,000 |
| Inate One LLC | September 2020 | $10,000[5] |
| | | $    1,104,000 |

| Customer | Termination Date | Monthly Revenue |
|---|---|---|
| St. Bitts, LLC | December 19, 2019 | $200,000 |
| FRMO Corp., Horizon and HK Cryptocurrency Mining LLC | June 20, 2019 | $30,000 |
| Fidelity Labs LLC | December 20, 2020 | $3,000 |
| SBI Crypto Co. Ltd. | December 19, 2019 | $500,000 |
| Solutrix, LLC | Various dates, all more than 1 year | $11,000 |
| Inate One LLC | September 2020 | $10,000 |
| | | $    754,000 |

Mining has not received extensions of any of the Hosting Agreements as of the date of this Plan, but continues in discussions with its customers regarding the terms of potential extensions.  There are several factors which may impact Mining's willingness and ability to enter into extensions with its customers such as the price of Bitcoin and the status of the Debtors' bankruptcy cases.

---

[5] The first chart above contemplates continued BMG revenue, which the Debtor does not believe will occur. BMG and the Debtor have agreed to resolve existing differences between BMG and the Debtor pertaining to BMG's purported damages suffered post-petition as a result of a power surge, BMG's refusal to pay hosting fees of approximately $250,000 per month thereafter, and the Debtor's purported counterclaim against BMG for purported pre and post-petition breaches of contract.  Among the relevant  terms of the Agreement are that BMG will be allowed to remove its mining machines, and terminate its hosting contract with Mining, effective November 1, 2019; BMG will pay the Debtor for three (3) months of hosting, estimated to be approximately $750,000, and Mining and BMG agree to release each other from any and all other claims, except that BMG will retain its general unsecured claims in the amount of $6,808,599.64

The Debtors recognize that Mining's revenue stream will be reduced if extensions are not obtained.  In order to replace potential lost revenue, the Debtors have provided for alternative means of producing revenue, namely the launch of the Spot Exchange (See generally *slides 32*) and the aforementioned efforts to begin self-mining (*slides 14-26*).

## Launch of Spot Exchange

A spot exchange is akin to a money conversion facility in an airport.  In the case of BCause Secure, it is an online facility where people can convert national currencies to cryptocurrency, cryptocurrency from one form to another, and cryptocurrency back to national currency.  Buyers and sellers of cryptocurrency would perform transactions on the BCause Secure Spot Exchange for which BCause Secure would charge a small fee per transaction. The Debtors expect that the volume and value of these transactions would increase over time; the higher the volume of transactions, the more BCause Secure will earn and the more money will be made available to the Debtors' creditors.

There are several necessary components to a successful launch of the Spot Exchange.  First, Holdings must assume and assign the Amended Nasdaq Agreement to BCause Secure. The Amended Nasdaq Agreement is the lynchpin to launching the Spot Exchange because it grants an exclusive license for certain software necessary to operate the Spot Exchange platform.  Holdings currently has a motion pending before the Bankruptcy Court for authority to do so; under the terms of the proposed assumption and assignment to BCause Secure, BCause Secure would be responsible for all cure costs and debt due and owing to Nasdaq and would make quarterly payments to Nasdaq on account of such debt.  The first such payment is anticipated to be due in September 2019.

Second, in order to begin operations and service the debt to Nasdaq, Holdings, through its subsidiary BCause Secure must raise additional capital. Holdings has filed a motion with the Bankruptcy Court proposing to sell 75% of its membership interests in BCause Secure to certain investors in exchange for: (i) $390,000 cash which will be paid to BCause Secure to fund its operations through November 2019, in three separate tranches upon BCause Secure meeting certain milestones, and (ii) the right of Holding's to receive the first $1,000,000 (the "Initial Secure Distributions") in distributions from the operations of BCause Secure. BCause Secure intends to raise an additional round of capital (the "Additional Capital Investment") estimated to be $500,000, from its investors which will be sufficient to fund operations through April 2020, at which point the Debtors anticipate that BCause Secure's revenues will be sufficient to fully fund its operations. The amount of this Additional Capital Investment shall be deducted from the Initial Secure Distributions amount due to Holdings. A copy of the proposed Term Sheet memorializing the agreement between Holdings and the investors of Secure is attached hereto as **Exhibit D**.

Launch of the Spot Exchange (or abandonment of the launch) will result in an additional monthly cost reduction of approximately $80,000, consisting of labor and other expenses. At launch, the Debtors estimate that Secure will be able to operate in twenty (20) states, which includes fourteen (14) states in which it will have money transmitter licenses and six (6) states in which money transmitter licenses are not required. Ultimately, the Debtors believe that Secure's Spot Exchange will be able to operate in all fifty (50) states.

## SBI Rent-to-Own Agreement

SBI is a customer of and 40% equity owner in Holdings, and represents approximately 49% of Mining's monthly revenues from Hosting Agreements.  Mining has received Bankruptcy Court authority to enter into a Rent-to-Own Agreement with SBI (the "SBI Agreement"), whereby Mining will lease to own up to 3,500 Bitmain Antminer S9 cryptocurrency miners (the "SBI Miners") with a reasonable expectation that the number of miners leased will grow to approximately 1,750, which are currently in storage located at Mining's Virginia Beach Facility.  A copy of the SBI Agreement is attached hereto as **Exhibit E**.  The SBI Agreement will result in substantial revenue for Mining.

Under the terms of the SBI Agreement, Mining agrees to repair the SBI Miners at its own cost in order for Mining to exclusively use and operate the SBI Miners.  In addition, ownership of all of the SBI Miners and other related equipment will transfer to Mining upon completion of this SBI Agreement by way of rental payments made to SBI being applied to the purchase price during the six (6) month rental period.

The Debtors anticipate that the SBI Agreement will result in an immediate increase of $40,000 per month in revenue assuming a Bitcoin price of $10,000. Over the six month rental period, the SBI Agreement will yield positive revenues as long as Bitcoin exchange rates stay above $8,000.  Once Mining completes all payments to SBI, the Debtors anticipate that this transaction will add approximately $100,000 in net cash flow per month.  *See slide 14.*

## Power Surge/BMG Dispute and Resolution

Mining experienced a power surge on June 9, 2019, which impacted the operation of approximately all of its customers' miners, including those of BMG Operations Ltd.

Case 19-10562   Doc 251   Filed 08/30/19   Entered 08/30/19 16:39:28   Desc Main
Document     Page 8 of 25

("BMG").  In connection therewith, BMG did not remit its monthly hosting fee to Mining due in July 2019 and Mining terminated BMG's use of its miners at the Virginia Beach Facility on July 9, 2019.  However, those miners continued to operate and the proceeds were segregated pending resolution of the dispute between Mining and BMG.

In July 2019, BMG filed a motion seeking relief from stay in order to terminate its Hosting Agreement with Mining, retrieve its mining computers from the Virginia Beach Facility, and assert a setoff claim for post-petition damages relating to the power surge.  The Debtors responded to BMG's motion asserting, among other things, that BMG was indebted to Mining for monthly hosting fees, improper post-petition setoffs of approximately $70,000 per month, and breach of its Hosting Agreement for failure provide proper support and parts.

Mining and BMG reach an agreement to settle all of their disputes which provides, subject to Bankruptcy Court approval, summarized as follows:[6]

- Mining and BMG will terminate BMG's Hosting Agreement one month early (November 1, 2019);

- BMG shall be permitted to remove its miners from the Virginia Beach Facility on or after November 1, 2019;

- BMG will pay Mining the approximate sum of $750,000, representing three months of hosting fees through the period ending October 31, 2019;

- Mining shall provide BMG with an accounting of all Bitcoin mining proceeds generated since July 9, 2019 which proceeds shall be turned over to BMG;

- BMG will have an Allowed General Unsecured Claim of $6,808,599.64 million;

---

[6] All parties-in-interest should read the entire BMG Settlement Agreement to understand the entire scope of the parties' agreements.  In the event of any discrepancy, the terms of the BMG Settlement Agreement shall govern.

- With the exception of BMG's Allowed General Unsecured Claim, the Debtors and BMG shall mutually release all pre-petition and post-petition claims against one another; and

- BMG shall vote in favor of the Plan under the conditions set forth in the Settlement Agreement.

### Other Post-Petition Activities

Since the filing of their Chapter 11 cases, the Debtors have entered into several interim cash collateral orders with WESCO.   The Debtors have either performed at the level contemplated by each order, or in the case of expenses, outperformed their budgets. This, despite the fact that BMG setoff $70,000 per month during the first two months of the Debtors' Chapter 11 cases, and refused to pay hosting fees after July 2019 ($500,000).

The Debtors have also realized cost reduction through rejection of Mining's office lease in Virginia Beach and Holdings' office lease in Chicago, Illinois.  Holdings has also reduced its payroll significantly, and has rejected a bandwidth agreement and Comcast service agreement, further reducing expenses.  Launch of the Spot Exchange or not, Holdings will rid itself of approximately $80,000 per month of payroll related expenses and other expenses as of the Effective Date.

### ARTICLE I

### Definitions

The following terms, when used herein, shall have the meaning specified below, unless the context otherwise requires:

**1.1    Adequate Protection Payments**:  All payments made by Holdings to WESCO as adequate protection payments pursuant to the Cash Collateral Orders and the budgets approved thereby.

**1.2**     **Administrative Claim**:   A cost or expense of administration of these Chapter 11 cases, including any actual, necessary expense of preserving or liquidating the estate, or of operating the businesses of the Debtors and all allowances approved by the Bankruptcy Court in accordance with Section 503(b) of the Bankruptcy Code that is entitled to priority under section 507(a)(2) of the Bankruptcy Code.  For the avoidance of doubt, these Claims shall include any Professional Fee Claims approved by the Bankruptcy Court under section 330 of the Bankruptcy Code that are incurred on or before the Effective Date and all fees and charges properly assessed against the Debtors' estates under 28 U.S.C. § 1930.

**1.3**     **Administrative Claim Bar Date**: The date set forth in Section 3.1.1(a).

**1.4**     **Allowed Claim**:   A Claim: (i) proof of which has been filed with the Bankruptcy Court within the time fixed by the Bankruptcy Court or applicable rules or statutes, and with respect to which no objection has been timely filed by any party-in-interest, or (ii) that has been, or hereafter is, listed by the Debtors as liquidated in amount and not disputed or contingent in the Debtors' bankruptcy schedules filed in these Chapter 11 cases and to which no objection to allowance has been raised within the applicable period fixed by the Bankruptcy Court or applicable rules or statutes, or (iii) that has been allowed by a Final Order by the Bankruptcy Court, or (iv) that is Allowed by the provisions of this Plan.

**1.5**     **Allowed Interest**:   An Interest: (i) proof of which has been filed within the time fixed by the Bankruptcy Rules or within the time fixed by the Bankruptcy Court; or (ii) that has been scheduled in the list of equity security holders identified in the Debtors' bankruptcy schedules which have been filed with the Bankruptcy Court in these Chapter 11 cases; and (iii) in the event of either (i) or (ii), as to which no objection to allowance has been raised within the applicable period fixed by the Bankruptcy Court or applicable rules or statutes.

**1.6**     **Amended NASDAQ Agreement**: The IT Services Agreement between Holdings and NASDAQ effective March 23, 2018, as amended by the Amendment to the IT Services Agreement assumed by Holdings and assigned to BCause Secure.

**1.7**     **Avoidance Actions**: Any actions commenced, or that may be commenced, before or after the Effective Date pursuant to Chapter 5 of the Bankruptcy Code.

**1.8**     **Bankruptcy Code:**   Title 11 of the United States Code, Section 101 *et seq.*, as amended.

**1.9**     **Bankruptcy Court:**   The United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, located in Chicago, Illinois, and any other court having jurisdiction over these cases or a proceeding arising in, or arising under or related to these cases.

**1.10**     **Bankruptcy Rules**:   The Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court.

**1.11   BCause Secure**: BCause Secure LLC.

**1.12   Business Day**: Any day, other than a Saturday, Sunday, or "legal holiday," as that term is defined in Bankruptcy Rule 9006(a).

**1.13   Bar Date:** The applicable bar date by which a proof of Claim must be filed in the Debtors' Chapter 11 cases, as established by the Bar Date Order.

**1.14   Bar Date Order**: That certain *Order and Notice Setting Bar Date for Filing Proofs of Claim* (ECF No. 161).

**1.15   BMG**: BMG Operations, Ltd.

**1.16   BMG Unsecured Claim**:

**1.17   BMG Settlement Agreement**: The Agreement between the Debtors and BMG to be approved by the Bankruptcy Court.

**1.18   Cash**: Legal tender of the United States of America.

**1.19   Cash Collateral Orders**: The orders entered by the Bankruptcy Court granting the Debtor's motions for authority to use cash collateral pursuant to section 363 of the Bankruptcy Code as ECF Nos. 20, 39, 79, 120, 166, 233 and 242, and as may be subsequently entered by the Bankruptcy Court.

**1.20   Causes of Action**: All claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross-claims of the Debtors and/or their Estates, whether asserted or could be asserted by the Debtors, the Committee, or any other Person on behalf of the Estates, including, but not limited to, Avoidance Actions and any and all claims against the Debtors' pre-Petition Dates managers, officers, directors, employees and/or agents of the Debtors.

**1.21   Chapter 11**:  Chapter 11 of the Bankruptcy Code.

**1.22   CSCD**: The law firm of Crane, Simon, Clar & Dan, Debtors' Counsel.

**1.23   Claim:**  A claim against the Debtors, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, as construed by Section 102(2) of the Bankruptcy Code.

**1.24   Class**: A category of holders of Claims or Interests defined in Article III of the Plan.

**1.25   Committee**: The Official Unsecured Creditors' Committee appointed by the United States Trustee in these Chapter 11 cases.

**1.26** **Confirmation Date**: The date on which the Bankruptcy Court enters the Confirmation Order.

**1.27** **Confirmation Hearing**: The hearing or hearings before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as may be continued or adjourned.

**1.28** **Confirmation Order**: The Order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**1.29** **Debtors**: BCause Mining, LLC and BCause LLC.

**1.30** **Debtors' Estates**: All of the Debtors' "property of the estate" as defined in Section 541 of the Bankruptcy Code.

**1.31** **Disallowed**: Any Claim or Interest, or portion thereof, that is not an Allowed Claim, an Allowed Interest, or a Disputed Claim or Disputed Interest.

**1.32** **Disbursing Agent**: The Debtors.

**1.33** **Disputed**: With respect to a Claim or Interest, any such Claim or Interest (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, or (b) with respect to which the Debtors or any Party-in-interest have interposed a timely objection (as a contested matter, adversary proceeding, or otherwise) or request for estimation prior to the Claim Objection Deadline in accordance with the Plan or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order as of the Effective Date.

**1.34** **Distribution**: Any initial or subsequent payment or transfer made on account of an Allowed Claim under the Plan.

**1.35** **Dominion Energy**: Virginia Electric and Power Company d/b/a Dominion Energy Virginia.

**1.36** **Effective Date**: The date on which the Confirmation Order becomes the final order.

**1.37** **Estates**: The estates of the Debtors which were created by section 541 of the Bankruptcy Code upon the commencement of these Chapter 11 cases.

**1.38** **Executory Contract**: A contract to which any of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

**1.39** **Final Order**: An order or judgment as to which the time to appeal or seek direct review or rehearing has expired and as to which no appeal or petition for review or hearing is pending.

**1.40** **Financial Projections**: The Debtors' forty-eight (48) month projections of revenues and expenses attached to the Plan as Exhibit B.

**1.41** **Free Cash Flow**: Twenty-five percent (25%) of the Debtors' net revenues calculated monthly as gross revenues less operating expenses as reflected in the Debtors' Financial Projections.

**1.42** **Freeborn and Peters**: Freeborn & Peters LLP, counsel for the Committee.

**1.43** **General Unsecured Claim**: A Claim that is not an Administrative Claim, Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, the BMG Unsecured Claim, or an Interest.

**1.44** **Holder**: The owner of a Claim or Interest.

**1.45** **Holdings**: BCause LLC.

**1.46** **Holdings Petition Date**: April 12, 2019.

**1.47** **Initial Secure Distributions**:  The first $1,000,000 of BCause Secure's free cash flow which is payable to Holdings to make distributions to creditors under this Plan.

**1.48** **Intercompany Claim**: Any and all Claims of any one Debtor against the other Debtor.

**1.49** **LIBOR**: the rate per annum which appears in the Wall Street Journal as of such date for a three (3) month period in the London interbank market.

**1.50** **Lien**: The meaning set forth in section 101(37) of the Bankruptcy Code.

**1.51** **Mining**: BCause Mining LLC.

**1.52** **Mining Petition Date**: April 11, 2019.

**1.53** **Month**:  A calendar month, including the month in which a date or event occurs.

**1.54** **Nasdaq**:  Nasdaq Technology AB.

**1.55** **Person**: An individual, corporation, partners, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization or other entity.

**1.56** **Petition Dates**: The Holdings Petition Date and Mining Petition Date.

**1.57** **Plan**:  This Amended Combined Plan of Reorganization and Disclosure Statement including any amendments or modifications thereto.

**1.58   Priority Non-Tax Claim**: Any Claim, other than an Administrative Claim or Priority Tax Claim, to the extent entitled to priority under section 507(a) of the Bankruptcy Code.

**1.59   Priority Tax Claim**: A Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

**1.60   Pro Rata**: The proportion that the amount of an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of all Claims or Interests (but excluding Disallowed Claims and Interests) in such class.

**1.61   Professional Fee Claims**: Claims of Professional Persons for compensation for services rendered in these Chapter 11 cases pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

**1.62   Professional Person**: Any Person retained or to be compensated by the Debtors pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

**1.63   SBI**:  SBI Crypto Co., Ltd.

**1.64   SBI Agreement**: The Equipment Rent to Own Agreement between Mining and SBI approved by the Bankruptcy Court on August 8, 2019.  *See* ECF No. 226.

**1.65   Secured Claim**: A Claim that is secured by a valid, perfected and enforceable, and non-avoidable Lien upon property in which the Debtors have an interest, to the extent of the value, as of the Effective Date, of such interest or Lien as determined by a Final Order, or as otherwise agreed to in writing by the Debtors and the holder of such Claim.

**1.66   Schedules**: The schedules of assets and liabilities, list of equity security holders, and statements of financial affairs filed by the Debtors as required by section 521(a) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(1) and (3) and (b)(1).

**1.67   Spot Exchange**: The online platform developed by Holdings and BCause Secure and intended to be launched by BCause Secure for the purpose of converting cryptocurrency to national currencies, cryptocurrency to another form of cryptocurrence, and cryptocurrency back to national currency.

**1.68   Virginia Beach Facility**: The real property located at 5465 Greenwich Road, Virginia Beach, Virginia which is leased by Mining from Hoffland Properties, Inc.

**1.69   Voting Deadline**: The date set by the Bankruptcy Court by which ballots for accepting or rejecting the Plan must be received, which has yet to be determined.

**1.70   Unclassified Claims**: Administrative Claims, Priority Tax Claims, and Non-Priority Tax Claims.

**1.71   WESCO**:  WESCO Distribution, Inc.

-14-

**1.72**  **WESCO Complaint**:  The Complaint filed objecting to WESCO's proofs of claim and challenging the validity and extent of WESCO's liens and security interests in the Debtors' assets pending before the Bankruptcy Court as adversary proceeding number 19-00769.

**1.73**  **WESCO Deficiency Claim**: The Allowed amount of WESCO's Claim less the amount Allowed as a Secured Claim.

**1.74**  **WESCO Secured Claim**: The Secured Claim of WESCO.

Unless otherwise defined in this Plan, the words and phrases used herein shall have the meanings ascribed to them in the Bankruptcy Code and in the Bankruptcy Rules.

## ARTICLE II
### Summary Chart

Under the Plan, claimants, and the treatment of their claims is as follows:[7]

| Class | Impairment/Status | Treatment |
|---|---|---|
| Unclassified – Administrative Claims | Unimpaired Not entitled to vote | Will be paid in Cash in full on the Effective Date unless otherwise agreed to by the parties |
| Unclassified – Priority Tax Claims | Unimpaired Not entitled to vote | Will be paid in Cash in full on the Effective Date unless otherwise agreed to by the parties |
| Unclassified – Priority Non-Tax Claims | Unimpaired Not entitled to vote | Will be paid in Cash in full on the Effective Date unless otherwise agreed to by the parties |
| Class 1: Secured Claim of WESCO | Impaired Entitled to vote | Will be paid in full with interest on the allowed amount of its secured claim, with any deficiency to be treated *pari passu* with general unsecured creditors.  WESCO's secured claim is estimated to be between $600,000 and $800,000, depending on the outcome of the adversary complaint |
| Class 2:  General Unsecured Claims | Impaired Entitled to vote | Will be paid 100% of Allowed General Unsecured Claims Pro Rata with Holders of |

---

[7] Distributions under the Plan can be seen in more detail in *slides 33-39.*

| Class | Impairment/Status | Treatment |
|---|---|---|
| | | Class 3 and Class 4 Claims from Debtors' Free Cash Flow over 48 months |
| Class 3:  BMG Unsecured Claim. | Impaired Entitled to vote | Will be paid 100% of its Allowed BMG Unsecured Claim Pro Rata with Holders of Class 2 and Class 4 Claims from Debtors' Free Cash Flow over 48 months |
| Class 4: WESCO Deficiency Claim | Impaired Entitled to vote | Will be paid 100% of its Allowed WESCO Deficiency Claim Pro Rata with Holders of Class 2 and Class 3 Claims from Debtors' Free Cash Flow over 48 months |
| Class 5: Membership interests in both Debtors | Unimpaired Not entitled to vote | Members will retain their Interests in each Debtor |

## ARTICLE III
### Treatment of Claims and Interests Under the Plan

The Plan has one (1) category of administrative expenses, two (2) categories of priority Claims, four (4) classes of Claims and one (1) class of membership interests. Classes 1, 2, 3 and 4 are impaired.

### 3.1    Unclassified Claims.

### 3.1.1  Administrative Claims

(a)    Time for Filing.  All Holders of Administrative Claims, including Professional Fee Claims, shall file with the Bankruptcy Court a request for payment of such claims within thirty (30) days after the Effective Date (the "Administrative Claim Bar Date").  Any such request must be served on counsel for the Debtors and counsel for the Committee and must, at a minimum, set forth (i) the name of the Holder of the Administrative Claim; (ii) the amount of the Administrative Claim; and (iii) the basis for the Administrative Claim.  A failure to file any such request by the Administrative Claim Bar

Date will result in such claim being discharged and its Holder forever barred from asserting such Administrative Claim against the Debtor or their estates.

(b)     Payment.   Administrative Claims are unimpaired under the Plan.  Administrative Claims consist of Professional Fee Claims and quarterly fees owed to the Office of the United States Trustee.  The fees and expenses of CSCD, Debtors' counsel, are projected to be, as of the Effective Date, $150,000 in excess of the $50,000 pre-petition retainer paid to CSCD.  The fees and expenses of Freeborn and Peters, Committee counsel, is projected to be, as of the Effective Date, approximately $100,000 in excess of interim amounts received.[8]

### 3.1.2  Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim has agreed or agrees to a different treatment of such Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of such claim, payment in full in Cash on (or as soon as reasonably practicable after) the later of (a) the Effective Date or (B) fifteen (15) days after such Allowed Priority Tax Claim becomes Allowed.

To the extent interest is required to be paid on any Priority Tax Claim, the rate of such interest shall be the rate determined under applicable nonbankruptcy law, as set forth in section 511 of the Bankruptcy Code.  To the extent the Holder of an Allowed Priority Tax Claim has a Lien on the Debtors' property, such Lien shall remain in place until such Allowed Priority Tax Claim has been paid in full.

---

[8] Freeborn & Peters is holding such amounts in its client trust account pending approval by the Bankruptcy Court of its fees and expenses.

### 3.1.3   Priority Non-Tax Claims

Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment, each such Holder shall receive, in full satisfaction of such Claim, payment in full in Cash on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) fifteen (15) days after such Priority Non-Tax Claim becomes Allowed.

### 3.2   Classified Claims.

### 3.2.1   Class 1: WESCO Secured Claim

Except to the extent that the Holder of the Class 1 WESCO Secured Claim  agrees to a different treatment, the Holder of the Allowed Class 1 WESCO Secured Claim shall receive: (i) a lump sum Cash payment of $400,000 on the Effective Date, and thereafter (ii) monthly payments from the Debtors' Free Cash Flow sufficient to satisfy the remaining amount of such Allowed Class 1 Claim after deducting the amount of the Adequate Protection Payments.  The total payments to the Holder of the WESCO Secured Claim include interest of LIBOR plus 3.5%, which equal the Allowed amount of such Claim discounted to present value as of the Effective Date.

The Holder of the WESCO Secured Claim shall retain its security interests and Liens in the Debtors' assets with the same validity and priority as existed on the Petition Dates.  Immediately upon payment in full of the Allowed WESCO Secured Claim, all of WESCO's Liens and security interests in the Debtors' assets will be deemed satisfied, extinguished, released, and discharged in full.

### 3.2.2   Class 2:  General Unsecured Claims of the Estates.

Except to the extent that the Holders of the Class 2 General Unsecured Claims agree to a different treatment, the Holders of the Allowed General Unsecured Claims shall

receive 100% of their claims plus 1% interest, equaling the Allowed amount of such Claims discounted to present value as of the Effective Date, which shall be paid Pro Rata with the Holders of Class 3 and Class 4 Claims from the Debtors' Free Cash Flow over forty-eight (48) months.  Payments to Holders of Class 2 Claims shall not be entitled to any distribution from the Debtors' Free Cash Flow until after payment in full of the Class 1 Claim.

### 3.2.3   Class 3: BMG Unsecured Claim

Except to the extent that the Holder of the Class 3 BMG Unsecured Claim agrees to a different treatment, the Holder of the Allowed BMG Unsecured Claim shall receive 100% of its Claim plus 1% interest, equaling the Allowed amount of such Claim discounted to present value as of the Effective Date, which shall be paid Pro Rata with the Holders of Class 2 and Class 4 Claims from the Debtors' Free Cash Flow over forty-eight (48) months.  Payments to Holders of Class 3 Claims shall not be entitled to any distribution from the Debtors' Free Cash Flow until after payment in full of the Class 1 Claim.

### 3.2.4   Class 4: WESCO Deficiency Claim

Except to the extent that the Holder of the Class 4 WESCO Deficiency Claim agrees to a different treatment, the Holder of the Allowed WESCO Deficiency Claim shall receive 100% of its Claim plus 1% interest, equaling the Allowed amount of such Claim discounted to present value as of the Effective Date, which shall be paid Pro Rata with the Holders of Class 2 and Class 3 Claims from the Debtors' Free Cash Flow over forty-eight (48) months.  Payments to Holders of Class 4 Claims shall not be entitled to any distribution from the Debtors' Free Cash Flow until after payment I full of the Class 1 Claim.

### 3.2.5  Class 5: Membership interests in both Debtors.

Except as provided in the Slide Deck, subject to dilution of Holdings' members as a result of investment, members will retain their Interests in Holdings and Holdings shall retain 100% of its Interests in Mining.

## ARTICLE IV

## CLAIMS OBJECTIONS

Except as otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan, the Debtors shall file any and all objections to the allowance of Claims or Interests not already filed on or within one hundred and twenty (120) days of the Effective Date unless extended by order of the Bankruptcy Court.

## ARTICLE V

## PURPOSE OF DISCLOSURE STATEMENT

This Combined Plan and Disclosure Statement is provided to all of the known holders of Claims against and Interests in the Debtors, and is disseminated in connection with the solicitation of acceptances of the Plan filed by the Debtors.  The purpose of this Disclosure Statement is to provide such information as would enable a hypothetical, reasonable investor, typical of the holder of Claims and Interests which are impaired under the Plan, to make an informed judgment about the Plan.

The information contained in this Combined Plan and Disclosure Statement has been submitted by the Debtors unless specifically stated to be from other sources.  No representations concerning the Debtors or this Plan, other than those set forth in this Plan, have been authorized by the Debtors. The Debtors believe that all of the information

contained in this Combined Plan and Disclosure Statement is accurate.  However, the Debtors are unable to warrant that there are no inaccuracies.

**Under the Bankruptcy Code, a Class of Claims is considered to have accepted the Plan if both a majority in number and two-thirds (2/3) of the dollar amount of those actually voting vote to accept the Plan.  The Claims of those who do not vote are not counted in determining whether the requisite statutory majority in number and dollar amount have voted for acceptance.  Acceptance by the statutory majority will bind the minority who dissent and those who fail to vote.**

**Claimants in Classes 1, 2, 3, and 4 are impaired and may cast votes.**

## ARTICLE VI

## OTHER ASPECTS OF THE PLAN

6.1    <u>Disbursing Agent</u>.   The Debtors will be the disbursing agent charged with making the payments required under the Plan to the holders of Allowed Claims and Interests.

6.2    <u>Vesting of </u>Assets.   Upon Confirmation of the Plan, the Debtors shall be revested with their assets, subject only to the terms and conditions of the Plan.   Upon confirmation, pursuant to sections 1123(b)(2)(B) of the Bankruptcy Code, the Debtors shall retain and shall be vested with Causes of Action belonging to their respective estates.

6.3    <u>Substantive Consolidation of Debts</u>.  Upon the Effective Date, and except as otherwise provided in the Plan: i) any obligation of any Debtor and all guaranties thereof executed by another Debtor or Debtors will be treated as a single obligation and any obligation of two or more Debtors, and all multiple Claims against such entities on

account of such joint obligations, will be treated and allowed only as a single Claim against the consolidated Debtors and (ii) each Claim against any Debtor will be deemed a Claim against the consolidated Debtors and will be deemed a single Claim against a single obligation of the consolidated Debtors. Except as set forth in the Plan, such substantive consolidation will not (other than for purposes related to the Plan) cause any Debtor to be liable under the Plan for any Claim for which it otherwise is not liable, and the liability for any such Claim will not be affected by such substantive consolidation. On the Effective Date, any Intercompany Claims of Debtors against any other Debtors will be extinguished and cancelled.

6.4   Injunction.   Upon confirmation, an injunction under Section 524 of the Bankruptcy Code shall arise to prevent any party from foreclosing its lien or security interests or otherwise enforcing its claims against the Debtors and their assets in these bankruptcy cases except as authorized in the Plan. Such injunction shall not affect any Secured creditor's right to foreclose upon any security interest provided in the Plan in the event of any post-confirmation default under the Plan. This injunction will remain in effect until all distributions under the Plan have been made.

6.5   Self-executing Plan.   The Plan is self-executing. The Debtors shall not be required to execute any newly created documents. Upon payment as required by the Plan, any liens supporting such Claims shall be deemed released and discharged.

6.6   Executory Contracts and Unexpired Leases.   All Executory Contracts and unexpired leases which exist between the Debtors and any other party, whether such Executory Contract be in writing or oral, which have not been previously assumed, assigned, rejected or otherwise terminated by the Debtors, shall be rejected upon entry

of the Confirmation Order pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code, except for the Amended Nasdaq Agreement which shall have been previously assumed and assigned to BCause Secure.  Any and all Claims asserted by any party arising from the rejection of Executory Contracts and unexpired leases pursuant to the Plan must be filed on or within thirty (30) days following the rejection.  Further, with respect to Claims for default relating to any unexpired lease or Executory Contract that is assumed pursuant to the Plan, any and all such Claims must also be filed on or within thirty (30) days following Confirmation.  Allowed Claims emanating from the rejection of unexpired leases and Executory Contracts will be treated as Class 2 Claims.  Any person failing to file such a Claim within the time provided in the Plan shall be forever barred from asserting such Claim and shall not receive any distribution under the Plan.  The provisions for assumption, assignment and rejection shall be equally applicable to Executory Contracts and unexpired leases of real and personal property.

6.7    <u>Retention of Jurisdiction</u>.  The Bankruptcy Court shall retain jurisdiction for certain specified purposes, as detailed in the Plan.  Any distribution under the Plan that remains unclaimed sixty (60) days after the distribution is made will become property of the Debtors and may be redistributed to other creditors under the Plan.  The Debtors will have the right to make any distribution to creditors earlier than required by the Plan.

6.8    <u>Binding Effect</u>.  The provisions of the Plan shall bind all holders of Claims, Interest holders, and parties-in-interest.   Except as expressly provided in the Plan or the Bankruptcy Code, no interest or penalties accruing on or after the Petition Dates, as applicable to each Debtor, shall be paid on any Claim nor shall any creditor claiming any such interest or penalty be entitled to have its Claim for interest or penalty allowed for

payment.  To the extent necessary, pursuant to Section 1129(b) of the Bankruptcy Code, the Debtors reserve the right to confirm the Plan if all applicable requirements of Section 1129(a) of the Bankruptcy Code, other than Section 1129(a)(8), are met.

## LIQUIDATION ANALYSIS

The Debtors' combined assets and their liquidation value is a follows:

| Asset | Liquidation Value |
|---|---|
| BCause LLC Current Bank Account Balance at Lakeside Bank | $621,000[9] |
| Accounts receivable from Mining Hosting Agreements | $720,000 |
| Mining Machinery and equipment | $1 million[10] |
| **Total** | **$2.12 million** |

Failure of the Debtors to obtain confirmation of their Plan will likely result in a conversion of these cases to chapter 7 of the Bankruptcy Code and liquidation of the Debtors' assets.  Liquidation of the Debtors' assets will likely only result in a distribution to WESCO to the extent that WESCO's Secured Claim is Allowed.

## FEASIBILITY AND FAIRNESS OF PLAN

Copies of the summary sheets from the monthly operating reports filed by the Debtors in these Chapter 11 cases, is attached hereto as **Exhibit F**.  Copies of the last two years of the Debtors' consolidated tax returns and consolidated financial statements are attached hereto as **Exhibit G**.  The Debtors believe that the Plan represents

---

[9] Holdings' cash varies, depending upon the time of the month, based upon when hosting revenues come in.  However, self mining should ease the fluctuation of Holdings' cash flow.  The cash figure above represents the amount in the bank account at the time of the filing of the initial combined plan and disclosure statement.  .

[10] The above figure represents Mining's best estimate of the value of its machinery and equipment at liquidation.

-24-

opportunities for the holders of allowed claims to receive a much greater distribution than

would be realized in a liquidation, and is feasible.

## **RECOMMENDATION**

The Debtors recommend that those persons entitled to vote, vote to accept the

Plan.

BCAUSE MINING, LLC and BCAUSE, LLC

By:  /s/Scott R. Clar
            One of their attorneys

**DEBTORS' COUNSEL:**
Scott R. Clar
(Atty. No. 06183741)
Crane, Simon, Clar & Dan
135 S. LaSalle Street, Suite 3705
Chicago, Illinois 60603
312-641-6777