**TRIPLE NET LEASE**
**(WITH RIDER)**

**THIS LEASE** (the "Lease") is made as of November 1, 2017, by and between Hoffland Properties Inc., a Virginia corporation, Lessor, and Bcause Mining LLC, a Virginia limited liability company, Lessee.

**RECITALS:**

A. Lessor owns the parcel and improvements thereon commonly known as 5465 Greenwich Road, Virginia Beach, Virginia 23462, with the GPIN 14673472780000, and more exactly described in Exhibit A and generally shown on Exhibit A-1 ("Lessor's Property").

B. Lessee desires to lease, with an option to buy, on an "AS-IS", WHERE-IS" basis, the portion of Lessor's Property designated on Exhibit B as "Unit B" ("Unit B").

C. In connection with the transaction, Lessor will record a Declaration of Condominium and related exhibits ( the "Declaration") to create a condominium to be known as "5465 Greenwich Road, a Condominium" (the "Condominium"). Unit B will be part of the Premises (hereinafter defined) Leased to Lessee. Unit A and the improvements thereon will be the remainder of Lessor's Property, which will be sold by Lessor. Unit A and Unit B are hereinafter sometimes referred to collectively as "Units." Capitalized terms used in the Declaration shall have the same meaning herein unless otherwise defined herein or unless the context clearly requires otherwise.

D. A draft of the proposed Declaration is attached hereto as Exhibit C-1. While Exhibit C-1 may be revised by Lessor, in its sole discretion, it is expected that the final document will be substantially in the form of Exhibit C-1.

E. In addition, a draft of the proposed  a Declaration of Easements, Covenants, Conditions and Restrictions ("ECR") with respect to the Units and related improvements is attached hereto as Exhibit C-2. While Exhibit C-2 may be revised by Lessor, in its sole discretion, it is expected that the final document will be substantially in the form of Exhibit C-2 and that it will be recorded simultaneously with, or following, recordation of the Declaration.

1.  **DESCRIPTION OF PREMISES.** Lessor, in consideration of the rents to be paid by Lessee and other covenants of Lessee contained herein, does hereby lease to Lessee the premises described below (collectively, the "Premises"):

1.1.  Unit B, together with the buildings (consisting of approximately 105,861 square feet of space), structures, fixtures and other improvements (collectively, the "Improvements") located thereon and the Common Elements appurtenant thereto together with, and subject to, the rights, obligations, terms and conditions of the ECR;

1.2.  all of Lessor's right, title and interest in and to all tangible personal property within Unit B (the "Personal Property");



1.3.    to the extent severable, all of Lessor's right, title and interest in and to (i) all assignable existing permits, licenses, approvals and authorizations issued by any governmental authority for the Premises only; and (ii) all assignable existing warranties and guaranties issued to Lessor in connection with the Improvements or the Personal Property (the property described in this Subparagraph 1.3 being referred to in this Lease collectively as the "Intangibles").

1.4.    Property Defined.

Unit B, the Improvements, the Personal Property and the Intangibles may also be referred to in this Lease collectively as the "Property."

2.    **TERM**.  The term of this Lease shall be for a period of approximately one hundred twenty (120) months, commencing upon full execution of this Lease and receipt of certificate of insurance from Lessee (the "Commencement Date"), and ending at midnight on the 31st day of October, 2027 (the "Expiration Date").

3.    **RENT**.  Lessee agrees to pay Lessor, without demand, deduction or offset, monthly rent as outlined below, payable in advance on the first business day of each and every month.

| Term | Monthly Rent |
|---|---|
| Commencement Date – 04/30/18 | $38,729.00 |
| 05/01/18 – 10/31/18 | $50,000.00 |
| 11/01/18 – 10/31/19 | $51,751.00 |
| 11/01/19 – 10/31/20 | $53,561.25 |
| 11/01/20 – 10/31/21 | $55,435.89 |
| 11/01/21 – 10/31/22 | $57,376.15 |
| 11/01/22 – 10/31/23 | $59,384.32 |
| 11/01/23 – 10/31/24 | $61,462.77 |
| 11/01/24 – 10/31/25 | $63,613.97 |
| 11/01/25 – 10/31/26 | $65,840.46 |
| 11/01/26 – 10/31/27 | $68,144.88 |

The first installment of rent shall be due upon the execution of this Lease, but rent shall begin to accrue not later than November 1, 2017.  If the term of this Lease shall expire on a day other than the first day of a calendar month, the rent for any partial month shall be pro-rated.  All rent payments shall be paid to Lessor at its address specified in paragraph 32 below, or such other place as Lessor designates in writing.

4.    **ACCEPTANCE OF PREMISES**.  Occupancy of the Premises by Lessee shall constitute its acceptance of same, "AS-IS WHERE-IS".  Lessee acknowledges that Lessor has not made any warranties or representations, oral or written, whatsoever with respect to the Premises including, without limitation, LESSOR HAS NOT MADE ANY WARRANTY OF HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, physical condition, environmental condition, utility capacity, compliance with laws, governmental approvals, or operating history.  Lessee acknowledges and agrees that it has not relied on, and will not rely on, any express or implied warranties, representations, guaranties or statements pertaining to the Premises made or furnished by Lessor or any agent of Lessor. Lessor has furnished to Lessee, without warranty as to accuracy, completeness thereof or right to rely thereon, and subject to confidentiality, a copy of the report on Lessor's Property as prepared by

MAS, P.C. Lessor shall not be responsible for obtaining any governmental approvals or permits necessary to enable Lessee to occupy or use the Premises, same being the sole responsibility of Lessee. Lessor shall not be responsible for obtaining any certificates of occupancy or other approvals required in connection with construction work done by Lessee or contractors engaged by Lessee.

5.    **INTENTIONALLY DELETED.**

6.    **EARLY POSSESSION.**    If Lessee occupies the Premises prior to the Commencement Date, the Commencement Date shall be considered the date such occupancy begins and shall not advance the termination date; however, Lessee shall pay rent for such period.

7.    **USE AND COMPLIANCE WITH LAW.** The Premises shall be used only for data center purposes, and for no other purpose without Lessor's prior written consent. Lessee represents and warrants to Lessor that it will take all necessary measures so that the data center usage will not (A) prevent completely safe occupancy of Unit A or (B) interfere with, or prevent the owners or occupants of Unit A from use of, all equipment and apparatus now or hereafter located on Unit A, including, without limitation, computers, telecommunication equipment and similar devices. Lessee shall not use, or permit the use of, or its occupants the Premises for any unlawful purpose or so as to constitute a nuisance or a danger to Unit A or others. Lessee covenants and agrees to comply strictly with all requirements in the Declaration and ECR and with all ordinances, rules and regulations of governmental authorities applicable to the Premises.

8.    **SIGNS.**    Lessee shall not, without the prior written consent of Lessor and the architectural review committee having jurisdiction over the Improvements, place any signs or advertising matter or material on the exterior or interior of the Improvements. If Lessor approves any signage or advertising matter or material, Lessee shall remove same at its expense at the termination or expiration of this Lease, and shall repair at its expense any damage associated with such removal. Any signs must comply with all applicable sign ordinances.

9.    **QUIET ENJOYMENT AND COVENANT OF TITLE.** Lessor covenants that it has full right and power to execute this Lease and to grant the estate demised herein, and the Lessee, upon payment of the rents herein reserved and performing the terms, conditions, and covenants herein contained, shall peacefully and quietly have, hold, and enjoy the Premises during the full term of this Lease, and any extension hereof, from all persons claiming through Lessor.

10.    **OPERATING EXPENSES.**

10.1.    This Lease is triple net. Accordingly, Lessee shall pay to Lessor (unless paid directly to a third-party as herein required) during the term hereof, in addition to the rent payable under Paragraph 3, 100% of all expenses of any nature related to the Premises, including, without limitation, real and personal property taxes, insurance premiums, utility expenses, storm water fees, condominium fees and association charges, all assessments or other expenses in connection with the ECR, all repair, maintenance and replacement in connection with the Premises, trash collection charges, snow removal expenses, and the like (collectively, "Additional Rent").

10.2.    Lessee shall make arrangements for all utilities to be titled in its name and billed directly to it,

10.3.   Lessee's Additional Rent with respect to condominium fees, real estate taxes and insurance premiums shall not exceed Six Thousand Eight Hundred Nineteen and No/100 Dollars ($6,819.00) per month for the first Lease Year. No other components of Additional Rent are capped and the condominium fees, real estate taxes, and insurance premiums shall not be subject to the cap after the first Lease Year.

11.   **LESSOR'S OBLIGATIONS.** Lessor shall have no obligations to make any repairs of any sort to the Premises or to the balance of Lessor's Property.

12.   **LESSEE'S OBLIGATIONS.** Lessee, at Lessee's expense, shall keep in good order, condition and repair, making all replacements when necessary, the Premises and every part thereof including, without limiting the generality of the foregoing, all plumbing, electrical, HVAC, security and lighting facilities and equipment within the Premises, all fixtures, the roof, foundation, interior and exterior walls and ramps, parking and other paved areas, all fences and interior surfaces of exterior walls, ceilings, windows, and doors located within the Premises and all improvements or replacements and modifications made by Lessee.

13.   **ALTERATIONS BY LESSEE.** Lessee shall not make any alterations to the Premises without obtaining Lessor's prior written consent, which consent shall not be unreasonably withheld as to non-structural alterations. Any and all alterations, additions, or other improvements made by Lessee, with or without the consent of Lessor, regardless of how attached (except movable trade fixtures), shall become immediately upon installation and thereafter remain the property of Lessor, without compensation therefor to Lessee, unless otherwise agreed in writing by Lessor; provided, however, Lessor shall have the right to require that Lessee, upon the termination or at the expiration of this Lease, remove any or all such alterations, additions and improvements and restore the Premises to their original condition, normal wear and tear excepted, unless such right has been waived in writing by Lessor. See also Rider No. 1 which is a material part of this provision.

14.   **VEHICLE PARKING.**

14.1.   Lessee shall be entitled to use any portion of Unit B which is not restricted by the ECR or by ordinance, rule or regulation, for parking vehicles.

14.2.   Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, or invitees to be loaded, unloaded, or parked in areas other than within Unit B.

14.3.   If Lessee permits or allows any of the prohibited activities described above, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor or the Association.

15.   **SUBLEASING AND ASSIGNMENT.**

15.1.   Lessee and any approved assignee or approved subtenant may not assign their rights under this Lease or the applicable sublease, or sublet the whole or any part of the Premises, without the prior written consent of Lessor. Even if Lessor's consent is given, no subletting or assignment shall release Lessee from any obligation pursuant to this Lease or alter the primary liability and obligation of Lessee to pay the rent and to perform all other obligations to be performed by Lessee hereunder. Acceptance of rent by Lessor from an assignee or subtenant

who has not been approved by Lessor shall not waive the default created by failure to obtain Lessor's consent. As a condition of approving any proposed assignee or subtenant, Lessor may require such financial and other information concerning the proposed assignee or subtenant that Lessor deems appropriate. Approval of a proposed sublease or assignment in any one instance shall not affect Lessor's right to approve all subsequent assignments and subleases. Lessor shall be furnished with a duplicate executed original of all subleases and assignments. If Lessee requests Lessor's consent of an assignment of Lessee's interest in this Lease, Lessor may, at its option, elect to terminate this Lease as of the effective date of the proposed assignment. If Lessee requests Lessor's consent to a sublease, Lessor may, at its option, elect to terminate this Lease as of the effective date of the proposed sublease as to the portion of the Premises which Lessee desires to sublease, and if such option to terminate is elected by Lessor, rent under this Lease shall be adjusted as of the effective date of the partial termination and Lessee shall pay as Additional Rent, on demand, the cost of any demising walls required to separate the space as to which this Lease has been terminated from the remainder of the Premises.

15.2.    Notwithstanding anything in this Lease to the contrary, Lessee further agrees that any assignment or sublease shall be subject to the following additional limitations: Lessee shall not publicly advertise the rate for which Lessee is willing to sublet the Premises (excluding customary broker proposals or requests for proposals); and all public advertisements of the assignment of the Lease or sublet of the Premises, or any portion thereof, shall be subject to prior written approval by Lessor, such approval not to be unreasonably withheld or delayed. Said public advertisement shall include, but not be limited to, the placement or display of any signs or lettering on the exterior of the Premises or on the glass or any window or door of the Premises or in the interior of the Premises if it is visible from the exterior.

16.    **DAMAGE TO PREMISES.** If the Premises shall be damaged by fire, the elements, unavoidable accident or other casualty, but are not thereby rendered untenantable in whole or in part, Lessor shall, to the extent of its insurance proceeds, promptly at its expense cause such damage to be repaired, and rent shall not be abated. If by reason of such occurrence the Premises shall be rendered partially untenantable, Lessor shall, to the extent of its insurance proceeds, promptly at its own expense cause the damage to be repaired, and rent meanwhile shall be abated for the period of untenantability in proportion to the portion of the Premises rendered untenantable. If by reason of such occurrence all of the Premises are rendered untenantable, Lessor shall within fifteen (15) business days after agreed adjustment of the insurance proceeds with respect to such damage notify Lessee of its intent to repair, reconstruct or restore the Improvements and/or the Premises. If Lessor elects not to so repair, reconstruct or restore the Improvements and/or the Premises this Lease shall terminate as of the date of such total destruction. If Lessor elects to repair, reconstruct or restore the Improvements and/or the Premises, Lessor shall promptly at its expense cause the damage to be repaired, and rent shall abate until the Premises are again tenantable, unless within thirty (30) days after said occurrence Lessor shall give Lessee written notice that the estimated time necessary to reconstruct the destroyed Premises is in excess of one hundred eighty (180) days after commencement of reconstruction and Lessee elects to terminate this Lease by written notice to Lessor given within fifteen (15) days after receipt of Lessor's notice. If so terminated, this Lease and the tenancy hereby created shall cease as of the date of casualty and all rent shall be abated as of such date. Lessor shall not be obligated to reconstruct or repair the Improvements or Premises except to the extent insurance proceeds have been received with respect to the event causing the damage. Lessor shall not be required to repair, replace or insure any property which the Lessee may be entitled to remove from the Premises. No damages, compensation or claims shall be payable by Lessor for inconvenience, loss of business or other consequential damages arising from any casualty, maintenance, repair or restoration of the Premises or Improvements. All rent paid in

advance shall be apportioned in accordance with the foregoing provisions as of the date of damage (if rent abates); however, if the damage results wholly or in part from the fault of Lessee, its agents, contractors, employees or invitees, Lessee shall not be entitled to termination or any abatement or reduction in rent. Notwithstanding the foregoing to the contrary, Lessor shall not be obligated to repair damage or restore the Improvements or the Premises if Lessor does receive sufficient insurance proceeds available for such purpose.

17.   **INSURANCE.**

17.1.   **Liability Insurance--Lessee.**  Lessee shall, at Lessee's expense, obtain and keep in force during the term of this Lease a policy of Combined Single Limit Bodily Injury and Property Damage insurance insuring Lessee as a named insured and naming Lessor as an additional insured against any liability arising out of the use, occupancy or maintenance of the Premises (including, without limitation, the Improvements and Common Areas).  Such insurance shall be in an amount not less than $3,000,000 per occurrence.  The policy shall insure performance by Lessee of the indemnity provisions of paragraph 20.  The limits of said insurance shall not, however, limit the liability of Lessee hereunder.

17.2.   **Property Insurance by Lessor.**  Subject to Lessee paying rent and Additional Rent, Lessor shall obtain and keep in force during the term of this Lease a policy or policies of insurance covering loss or damage to the Improvements and Common Area improvements, but not Lessee's personal property, fixtures, equipment or tenant improvements or power and data processing equipment and installations, in an amount of the full replacement value thereof, as the same may exist from time to time, providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, flood (in the event same is required by a lender having a lien on the Premises) special extended perils ("all risk", as such term is used in the insurance industry), and such other insurance as Lessor deems advisable.

17.3.   **Property Insurance by Lessee.**  Lessee shall obtain and keep in force during the term of this Lease a policy or policies of insurance covering loss or damage to the Lessee's personal property, fixtures, equipment or tenant improvements and power and data processing equipment and installations, in an amount of the full replacement value thereof, as the same may exist from time to time, providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, flood (in the event same is required by a lender having a lien on the Premises) special extended perils ("all risk", as such term is used in the insurance industry), and such other insurance as Lessee deems advisable.

18.   **INSPECTION OF PREMISES.**  Lessor and Lessor's agents shall have free access during normal business hours to the Premises for the purposes of inspection, maintenance and repair. Lessor shall have the right to show the Premises to prospective tenants during the last one hundred eighty (180) days of the term of this Lease.

19.   **HAZARDOUS MATERIALS.**

19.1.   Without Lessor's prior written consent, Lessee shall not cause or permit any Hazardous Material to be brought upon, kept or used in or about the Premises by Lessee, its agents, employees, contractors or invitees, except for small quantities of such Hazardous Material incidental to Lessee's business.

6

19.2.    Any Hazardous Material permitted on the Premises as provided in Section 19.2 and all containers therefor, shall be used, kept, stored and disposed of in a manner that complies with all federal, state and local laws and regulations applicable to this Hazardous Material.

19.3.    Lessee shall not discharge, leak or emit, or permit to be discharged, leaked or emitted, any material into the atmosphere, ground, sewer system or any body of water, if that material (as is reasonably determined by the Lessor or any governmental authority) does or may pollute or contaminate the same or may adversely affect (aa) the health, welfare or safety of persons, whether located on the Premises or elsewhere, or (bb) the condition, use or enjoyment of the Improvements or any other real or personal property and which would result in a violation of applicable environmental laws.

19.4.    At the commencement of each Lease Year, Lessee shall disclose to Lessor the names and approximate amounts of all Hazardous Material that Lessee intends to store, use or dispose of on the Premises in the coming Lease Year. In addition, at the commencement of each Lease Year (beginning with the second Lease Year), Lessee shall disclose to Lessor the names and amounts of all Hazardous Material that to Lessee's knowledge were actually used, stored or disposed of on the Premises, if those materials were not previously identified to Lessor at the commencement of the previous Lease Years.

19.5.    As used herein, the term "Hazardous Material" means (aa) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976, as amended from time to time, and regulations promulgated thereunder; (bb) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and regulations promulgated thereunder; (cc) any oil, petroleum products and their by-products, other than those used in automotive or recreational activity, boats or motorcycles which are stored on the Premises in accordance with all applicable laws and minor leakage and spills which are, upon written request of Lessor, promptly cleaned up; and (dd) any substance that is or becomes regulated by any federal, state, or local governmental authority.

19.6.    Lessee hereby agrees that it shall be fully liable for all costs and expenses related to the use, storage and disposal of Hazardous Material kept on the Premises by the Lessee, and the Lessee shall give immediate notice to the Lessor of any violation or potential violation of the provisions of this Paragraph 19. Lessee shall defend, indemnify and hold harmless Lessor and its agents from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses (including without limitation, attorneys' and consultants' fees, court costs and litigation expenses) of whatever kind or nature, known or unknown, contingent or otherwise, arising out of or in any way related to (aa) the presence, disposal, release or threatened release of any such Hazardous Material that is on, from or affecting the soil, water, vegetation, buildings, personal property, persons, animals or otherwise; (bb) any violation of any laws applicable thereto. The provisions of this Section 19.6 shall be in addition to any other obligations and liabilities Lessee may have to Lessor at law or in equity and shall survive the transactions contemplated herein and shall survive the termination of this Lease.

20.    **INDEMNIFICATION.** Lessee hereby agrees to indemnify and hold Lessor and Lessor's agents and employees harmless from any and all claims, damages, liabilities or expenses arising out of (aa) Lessee's use of the Premises, (bb) any and all claims arising from any breach or default in the performance of any obligation of Lessee and/or (cc) any act, omission or negligence of Lessee, its agents or employees. Lessee agrees to procure and keep in force during the term hereof a contractual liability endorsement to its public liability policy, specifically

endorsed to cover the indemnity provision of this Paragraph. Lessee further releases Lessor and Lessor's agents and employees from liability for any damages sustained by Lessee or any other person claiming by, through or under Lessee due to the Premises, or any part thereof or any appurtenances thereto becoming out of repair, or due to the happening of any accident including, but not limited to, any damage caused by water, snow, windstorm, tornado, gas, steam, electrical wiring, sprinkler system plumbing, heating and air conditioning apparatus and from any acts or omissions of co-tenants, owners or lessees of the adjacent Unit or other occupants of the Lessor's Property. Lessor and Lessor's agents and employees shall not be liable for any damage to or loss of Lessee's personal property, inventory, fixtures or improvements, from any cause whatsoever except the affirmative acts of proven gross negligence of Lessor.

21.    **COMPLIANCE WITH LAW.** Lessee shall, during the term of this Lease, at its sole cost and expense, comply with all valid laws, ordinances, codes, rules, regulations, orders and requirements of any governmental authority which may be applicable to the Premises or to the use, manner of use or occupancy thereof, whether or not the same shall interfere with the use or occupancy of the Premises. Lessee shall give prompt notice to Lessor of any notice it receives of the violation of any law or requirement of any public authority with respect to the Premises or use or occupation thereof. Lessee shall also comply with all rules and regulations which may properly be promulgated by the Association.

22.    **CONDEMNATION.** If all or a part of the Premises sufficient to render same unusable for Lessee's purposes (in Lessor's reasonable judgment) or all means of access to the Premises shall be condemned for a period in excess of one hundred eighty (180) days or sold under threat of condemnation, this Lease shall terminate and Lessee shall have no claim against Lessor or to any portion of the award in condemnation for the value of any unexpired term of this Lease. Lessee may seek to recover independently compensation from the condemning authority for moving expenses, the value of any of Lessee's property taken (other than Lessee's leasehold interest in the Premises) or other compensable loss or damage. In the event of a temporary taking of one hundred eighty (180) days or less, this Lease shall not terminate, but the term hereof shall be extended by the period of the taking and the rent shall abate in proportion to the area taken for the period of such taking.

23.    **DEFAULT.**

23.1.    If Lessee does not pay any rent, Additional Rent, or any other sum payable by Lessee pursuant to this Lease and such default continues for a period of ten (10) days after written notice is given to Lessee (provided, however, that no written notice shall be required if Lessor has previously given written notice of failure to pay rent or Additional Rent during the preceding twenty-four (24) month period), or if Lessee shall fail to perform any other covenant, agreement, or obligation of Lessee pursuant to this Lease and such default continues for thirty (30) days after written notice thereof is given to Lessee, or if Lessee should become bankrupt or insolvent or any debtor proceedings are taken by or against Lessee, or if Lessee vacates or attempts to vacate the Premises, then Lessor, in addition to the remedies provided for in Section 23.2, shall have the following rights and remedies:

23.1.1. Lessor may terminate this Lease by written notice to Lessee, in which event this Lease, all rights of Lessee, and all duties of Lessor shall immediately cease and terminate, and Lessor may re-enter and take possession of the Premises, remove all persons and property from the Premises and store such property in a public warehouse or elsewhere at the cost of, and for the account of, Lessee and enjoy the Premises free of Lessee's estate pursuant to this Lease, without prejudice, however, to any and all rights of action against Lessee that Lessor

may have for rent, damages, or breach of this Lease, in respect of which Lessee shall remain and continue liable notwithstanding such termination;

23.1.2. Lessor shall have the right to re-enter the Premises and remove all persons and property from the Premises and store such property in a public warehouse or elsewhere at the cost of, and for the account of Lessee, without terminating this Lease. Lessor shall have the right to take such action without service of notice except as may be expressly required herein or by applicable law and without resort to legal process (unless required by law) and without being deemed guilty of trespass or becoming liable for any loss or damage which may be occasioned thereby. If Lessor elects to re-enter the Premises as aforesaid, Lessor may, at any time thereafter, elect to terminate this Lease by giving written notice to Lessee of such election. Whether or not Lessor elects to re-enter the Premises or takes possession of the Premises pursuant to legal proceedings or pursuant to any notice required by law, Lessor may, at its option (Lessor having no obligation to mitigate damages), re-let the Premises or any portion thereof for the benefit of Lessee for such term or terms (whether shorter or longer than the term of this Lease) and at such rental and upon such other terms and conditions as Lessor, in its sole discretion, deems advisable, and, at the expense of Lessee. Lessor shall have the right to make such repairs or alterations to the Premises as Lessor deems necessary in order to re-let same. Provided this Lease has not been terminated by Lessor, upon each such re-letting all rentals actually received by Lessor from such re-letting applicable to the unexpired term of this Lease shall be applied as follows: First, to the payment of any costs and expenses of such re-letting, including costs incurred by Lessor for brokerage fees, legal fees and alterations and repairs to the Premises; Second, to the payment of any indebtedness other than rent due hereunder from Lessee; Third, to payment of any unpaid portion of rent and Additional Rent then due. No such re-entry or taking of possession of the Premises by Lessor shall be construed or shall operate as an election by Lessor to terminate this Lease unless written notice of termination is given by Lessor to Lessee, or this Lease is terminated by an order or decree of a court of competent jurisdiction.

23.1.3. Lessee understands and agrees that the value of this Lease to Lessor is in the receipt of Rent and Additional rent for the full term and accordingly, as agreed and liquidated damages for any uncured default by Lessee, at the option of Lessor, all rent (annual rent and all Additional Rent at the prior Lease Year's billed rate) for the remainder of the then current term shall become immediately due and payable. At the option of Lessor, in addition, Lessor may draw down to the full extent of any outstanding balance on any Letter of Credit securing Lessee's obligations as well as fully applying any Security Deposit to the full extent of the rent and Additional Rent due for the remainder of the Term; or,

23.1.4. Lessor may lock up the Premises and preclude Lessee's access thereto. Lessee grants to Lessor a security interest in all of Lessee's property located in the Premises, and agrees to execute and deliver such financing statements and other instruments as may be necessary to perfect such security interest;

23.2.   In addition to all remedies specified in this Lease, Lessor shall have all remedies available at law or in equity.

23.3.   No re-entry, taking possession of, or repair of the Premises by Lessor, termination of this Lease or any other action taken by Lessor as a result of any default of Lessee shall relieve Lessee of any of its liabilities or obligations hereunder which arose prior to or by reason of such termination, whether or not the Premises are re-let.

23.4.    All remedies of Lessor shall be cumulative. Election by Lessor to exercise any remedy shall not prevent or be deemed a waiver of Lessor's right to thereafter exercise any other remedy.

23.5.    Lessee agrees to pay upon demand all costs, fees and expenses (including, without limitation, court costs and reasonable expert and attorneys' fees) incurred by Lessor in enforcing this Lease.

24.    **HOLDING OVER.**  If Lessee remains in possession of the Premises after the expiration or termination of the term of this Lease without Lessor's written consent, such possession shall, at Lessor's option, (a) be a tenancy at sufferance only, during which tenancy at sufferance annual rent shall be due and payable at 200% of the annual rent due for the last term, or (b) result in an extension of this Lease on a month-to-month basis, upon the terms and conditions applicable to the last year of the preceding term, except annual rent, which shall be at 200% of the rent due during the last month of the term. All other provisions of this Lease shall remain in force during the period of any such tenancy at sufferance or month-to-month renewal. Acceptance of rent by Lessor during any holdover tenancy at sufferance shall not waive the default created by Lessee's holdover or Lessor's option to select the tenancy created by the holdover.

25.    **SURRENDER OF PREMISES.**  Lessee shall surrender the Premises at the expiration or sooner termination of the Lease term, broom-cleaned, with all rubbish removed, free of subtenancies, and in good condition and repair, reasonable wear and tear excepted. Lessee shall deliver all keys to Lessor or Lessor's agent.

26.    **INFORMATION CONCERNING LESSEE.**  Lessee shall furnish within fifteen (15) days after request from Lessor such current information concerning the financial condition of Lessee as Lessor may reasonably require. Such financial information shall include (but is not necessarily limited to) a financial statement dated not more than twelve (12) months prior to Lessor's request. Such financial statement shall be prepared in accordance with generally accepted accounting principles and certified by a certified public accountant. A general partner or officer of Lessee shall furnish a certification to Lessor to the effect that there either has or has not been any material adverse change in the financial condition of Lessee since the date of the financial statement submitted, and if such certification states that there has been a material adverse change, furnishing such details concerning same as Lessor may request.

27.    **AUTHORITY OF LESSEE.**  Lessee shall furnish to Lessor within fifteen (15) days after request from Lessor such corporate resolutions, certificates of incumbency, partnership resolutions, partnership agreements, legal opinions or other information as Lessor may reasonably request in order to confirm that the execution and delivery of this Lease has been duly authorized by Lessee and that the person(s) executing this Lease on behalf of Lessee were duly authorized to do so. All such corporate or partnership resolutions, certificates or agreements shall be certified as being duly adopted and/or in full force and effect, without amendment, by an appropriate officer or partner of Lessee.

28.    **SECURITY DEPOSIT.**  Lessee shall deposit with Lessor upon Lessee's execution of the Lease and thereafter maintain with Lessor the sum of $50,000.00 which shall be held by Lessor, without interest to Lessee, as security for the full and faithful performance by Lessee of Lessee's obligations pursuant to this Lease. An additional security deposit may be required by Lessor in the event Lessee makes modifications to the Premises which, in the reasonable opinion of Lessor, would be required to be restored at the termination of the Lease. If Lessee fails to pay

any amount which Lessee is obligated to pay pursuant to this Lease, Lessor may, at its option (but Lessor shall not be obligated to), apply any portion of such security fund to the amount owed by Lessee. Any such application by Lessor shall not waive the default created by Lessee's failure to pay. If any portion of the security deposit is so applied by Lessor, Lessee shall, within ten (10) days after demand from Lessor, restore the security deposit held by Lessor to its original amount. The security deposit, less amounts properly charged against same, shall be refunded to Lessee within thirty (30) days after Lessee has paid all amounts owed and performed all of its obligations pursuant to this Lease or upon closing in event Lessee exercises its purchase option.

29.    **RULES AND REGULATIONS.**    Lessee, its employees, customers and guests shall perform and abide by such reasonable rules and regulations, and any amendments or additions to such rules and regulations as may be made from time to time by the Association.

30.    **SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT.**    Lessor is hereby vested with full power and authority to subordinate Lessee's interest hereunder to the lien of any mortgage or deed of trust which may now or hereafter be placed on the Premises or underlying leasehold estate and to all renewals, modifications, consolidations and replacement of such mortgage or deed of trust. Upon the request of Lessee or Lessor, Lessor shall obtain and deliver to Lessee from any present or future mortgagee, trustee, fee owner, prime lessor or any person having an interest in the Premises superior to this Lease a written subordination, non-disturbance and attornment agreement in recordable form providing that so long as Lessee performs all of the terms, covenants and conditions of this Lease and agrees to attorn to the mortgagee, beneficiary of the deed of trust, purchaser at a foreclosure sale, prime lessor or fee owner, Lessee's rights under this Lease shall not be disturbed and shall remain in full force and effect for the term of this Lease, and Lessee agrees to execute such agreement to acknowledge such subordination and attornment within ten (10) days of receipt thereof. If Lessee does not execute and return such agreement as required above, Lessee hereby irrevocably appoints Lessor as its attorney in fact to execute such agreement on behalf of Lessee.

31.    **ESTOPPEL STATEMENT.** Within ten (10) days after request therefor by Lessor, Lessee agrees to deliver in recordable form a certificate prepared by Lessor to any proposed mortgagee or purchaser of the Premises or to Lessor certifying (if such is the case) that this Lease is in full force and effect, that there are no defense or offsets thereto, or stating those claimed by Lessee, and such other facts related to this Lease, the Premises or Lessee as Lessor may request. If Lessee does not execute and return such agreement as required above, Lessee hereby irrevocably appoints Lessor as its attorney in fact to execute such certificate on behalf of Lessee.

32.    **NOTICES.** Any notices required pursuant to this Lease shall be in writing. Addresses to which notices shall be sent are as follows:

TO LESSOR:                    Hoffland Properties Inc.
                              c/o Atlantic Dominion Distributors/Hoffman Beverage
                              5400 Virginia Beach Boulevard
                              Virginia Beach, VA 23462
                              Attn: Robin Ray

                              With a required copy to:

                              Robert C. Goodman Jr.
                              Kaufman & Canoles, P.C.

150 E. Main Street, Suite 2100
Norfolk, VA 23410
rcgoodman@kaufcan.com

TO LESSEE:

Bcause Mining LLC
233 Bendix Road, Suite 420
Virginia Beach, VA 23452
Attn: Fredrick J. Grede  CEO
757.286.4927

With a required copy to:

_____
_____
_____
_____

Either party may at any time designate by written notice to the other a change of address for notices. All notices, demands and requests which are addressed as provided above and are (i) deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, or (ii) accepted for overnight delivery by Federal Express, Airborne Express, UPS or such other overnight delivery service, delivery charges prepaid or with delivery not conditioned upon payment of charges, shall be deemed to have been given for all purposes hereunder three (3) days following the time such notice, demand or request shall be deposited in the United States mail or one (1) day following acceptance for delivery by the applicable overnight delivery service.

33.    **PAST DUE RENTS.**  Lessee recognizes and acknowledges that if rent payments are not received when due, Lessor will suffer damages and additional expense thereby and Lessee therefore agrees that a late charge equal to ten percent (10%) of the late rent may be assessed by Lessor as Additional Rent if Lessor has not received any monthly installment of annual rent or other rent or Additional Rent due pursuant to this Lease within five (5) days after its due date. If any check given in payment of rent or Additional Rent is not honored when due, Lessor may require that subsequent rent payments be made by certified or cashier's check. All rent and other sums of whatever nature owed by Lessee to Lessor under this Lease that remain unpaid for more than five (5) days after its due date shall bear interest at the rate of eighteen percent (18%) per annum (or, if lower, the highest lawful rate) from the date due until paid.

34.    **BUILDING NAME.**  Lessor reserves the right to change at any time the name, address or designation of the Improvements without any liability to Lessee.

35.    **INTENTIONALLY OMITTED.**

36.    **RENT TAXES.**  If applicable now or in the future, in the jurisdiction where the Premises are located, Lessee shall pay as Additional Rent to Lessor, concurrently with rent upon which such tax is based or within ten (10) days after written request therefor, as directed by Lessor, any state or local sales tax, gross receipts tax, business license tax or other tax, however denominated, imposed directly upon this Lease, the rent paid pursuant to this Lease or the

12

operation of the Premises as rental property. Lessee shall not be obligated to pay any federal, state or local income tax imposed on Lessor.

37. **REAL ESTATE TAXES.** Subject to reimbursement by Lessee pursuant to paragraph 9 hereof, Lessor shall pay all real estate taxes assessed against Unit B and the Improvements thereon applicable to the term of this Lease. If an increase in real estate taxes assessed on Unit B and the Improvements thereon is caused by Lessee's improvements or fixtures in Unit B or the Improvements thereon, Lessee shall pay as Additional Rent and within ten (10) days after demand therefor from Lessor all of such real estate taxes attributable to such improvements or fixtures.

38. **JANITORIAL SERVICES AND UTILITIES.** Lessee agrees to contract and pay directly for janitorial services and electricity, gas and any other utilities used on or charged against the Premises, or if said utilities are not separately metered, to reimburse Lessor for its proportionate share of said utilities.

39. **DEFINITION OF LEASE YEAR.** The first Lease Year is the period beginning on the Commencement Date and ending one (1) year after the last day of the month preceding the month in which the Commencement Date occurs. The second Lease year shall begin on the day after the end of the first Lease Year, and shall end one (1) year after the end of the first Lease year. The third and subsequent Lease Years shall begin and end on the appropriate anniversary dates of the beginning and ending dates of the second Lease Year.

40. **SUCCESSOR AND ASSIGNS.** This Lease shall bind and inure to the benefits of the successors, assigns, heirs, executors, administrators and legal representatives of the parties hereto. This provision shall not give Lessee by implication any right to assign its rights or interest pursuant to this Lease. The provisions of paragraph 15 above govern Lessee's right to assign and sublet.

41. **RELATIONSHIP OF LESSOR AND LESSEE.** It is expressly understood and agreed that Lessor shall not be construed as or held to be a partner, joint venturer or associate of Lessee, it being expressly understood and agreed that the relationship between the parties hereto is and shall at all times remain that of landlord and tenant.

42. **LIMITATION OF LESSOR'S OBLIGATION.** The obligations of Lessor hereunder shall be binding only upon its interest in the Premises, and not upon any other assets of Lessor or any partner of Lessor personally. Lessee agrees to look solely to the equity of Lessor in the Premises for the satisfaction of any remedies of Lessee or judgment obtained by Lessee as a result of a breach by Lessor of this Lease. Such exculpation of liability shall be absolute and without any exception whatsoever.

43. **PERFORMANCE BY LESSOR AND LESSEE.** If Lessee fails to perform any of its obligations hereunder, Lessor may, at its option (but shall be under no obligation to do so), perform the obligation of Lessee which Lessee has failed to perform. Any amounts advanced in so performing obligations of Lessee shall bear interest at the rate of eighteen (18%) percent per annum (or, if lower, the highest lawful rate) from the date expended until repaid, shall be due and payable on demand, and failure to pay on demand shall constitute an independent event of default

13

hereunder.  Payment or performance by Lessor of the obligations of Lessee shall not waive or cure any breach occasioned by Lessee's failure or refusal to pay or perform same.

44.   **WAIVER.**  Delay in asserting or prosecuting any right, claim or cause of action accruing hereunder is not and shall not be deemed to be a waiver of, and shall not prejudice the same, or any other right, claim or cause of action accruing hereunder at any time.  Waiver of any right, claim or cause of action at any time shall not prejudice any other right, claim or cause of action which Lessor may have or which shall thereafter accrue, and shall not waive Lessor's right to assert any other right, claim or course of action.  Acceptance by Lessor of rent from Lessee during the existence of any default shall not constitute a waiver of such default, or a waiver of the right of Lessor to insist upon Lessee's strict compliance with the terms of this Lease.

45.   **BROKER'S FEE.**  Upon execution of this Lease by both parties, Lessor shall pay to <u>CB Richard Ellis of Virginia, Inc.</u> ("Agent"), licensed real estate broker(s), a commission fee equal to four percent (4%) of the rent paid by Lessee hereunder for the leasing services payable monthly, as and when the rent is received, unless and until the property is sold to Lessee or any affiliated entity of Lessee.  Once the Lessor has sold the property Agent shall be paid a sales commission as set forth in a separate agreement between Lessor and said Agent.

46.   **AGENCY AND OWNERSHIP DISCLOSURE.**

46.1.   Lessor and Lessee each acknowledge that, in connection with this Lease:

<u>**Initial One**</u>

____      **the Agent is representing the Lessor exclusively**

**or**

__X__      **the Agent is representing the Lessor and Lessee, and Lessor and Lessee expressly consent to the Agent acting as a dual representative by their execution of this Lease and their review and execution of the attached Disclosure of Dual Representation).**

46.2.   <u>Initial one or both, if applicable</u>:

_____      One or more principals of Lessor are licensed Virginia real estate brokers or salespersons.

<u>and/or</u>

_____      Agent and/or one or more brokers or salespersons of Agent has an ownership interest in Lessor.

47.   **Removal of Electrical and Telecommunications Wires.**

47.1.   Lessor May Elect to Either Remove or Keep Wires:  Within ten (10) business days after the expiration or sooner termination of the Lease or at any time that any of the Wires (as defined below) are no longer in active use by Lessee, Lessor may elect ("Election Right") by written notice to Lessee to:

47.1.1. Retain any or all wires, cables, and similar installations appurtenant thereto ("Wires") installed by Lessee within the Premises including, without limitation, the plenums or risers of the Improvements;

47.1.2. Remove any or all of the Wires and restore the Premises to their condition existing prior to the installation of the Wires ("Wire Restoration Work"). Lessor, at its option, may perform such Wire Restoration Work at Lessee's sole cost and expense; or

47.1.3. Require Lessee to perform all or part of the Wire Restoration Work at Lessee's sole cost and expense.

47.2.   Compliance with Laws and Discontinuance of Wire Use:   Lessee shall comply with all applicable laws with respect to the Wires, subject to Lessor's right to elect to retain the Wires. In the event that Lessee discontinues the use of all or any part of the Wires or is no longer using all or any part of the Wires, Lessee shall ,within ten (10) days thereafter, notify Lessor of same in writing, accompanied by a plan or other reasonable description of the current type, quantity, points of commencement and termination, and routes of the Wires to allow Lessor to determine if Lessor desires to retain same.

47.3.   Condition of Wires:   In the event Lessor elects to retain any or all of the Wires (pursuant to paragraph 47.1 hereof), Lessee covenants that:

47.3.1. Lessee shall be the sole owner of such Wires, Lessee shall have the sole right to surrender the Wires, and the Wires shall be free of all liens and encumbrances; and

47.3.2. All Wires shall be left in good condition, working order, properly labeled and capped or sealed at each end and in each telecommunications/electrical closet and junction box, and in safe condition.

47.4.   Lessor Retains Security Deposit:   Notwithstanding anything to the contrary in Paragraph 28 of the Lease, Lessor may retain Lessee's Security Deposit after the expiration or sooner termination of the Lease until one of the following events has occurred with respect to all of the Wires:

47.4.1. Lessor elects to retain the Wires pursuant to paragraph 47.1;

47.4.2. Lessor elects to perform the Wire Restoration Work pursuant to paragraph 47.1.2 and the Wire Restoration Work is complete and Lessee has fully reimbursed Lessor for all costs related thereto; or

47.4.3. Lessor elects to require Lessee to perform the Wire Restoration Work pursuant to paragraph 47.1.3 and the Wire Restoration Work is complete and Lessee has paid for all costs related thereto;

47.5.   Lessor May Apply Security Deposit:   In the event that Lessee fails or refuses to pay all costs of the Wire Restoration Work within ten (10) days of Lessee's receipt of Lessor's notice requesting Lessee's reimbursement for or payment of such costs or otherwise fails to comply with the provisions of this Paragraph, Lessor may apply all or any portion of Lessee's Security Deposit toward the payment of any costs or expenses relative to the Wire Restoration Work or Lessee's obligations under this Paragraph.

47.6.   No Limit on Right to Sue:  The retention or application of such Security Deposit by Lessor pursuant to this Paragraph does not constitute a limitation on or waiver of Lessor's right to seek further remedy at law or in equity.

47.7.   Survival:  The provisions of this Paragraph shall survive the expiration or sooner termination of the Lease.

48.   **PARAGRAPH HEADINGS.**  The paragraph headings of this Lease are used for convenience only, and are in no way to be construed as a part of this Lease or as a limitation on the scope of the particular provision to which they refer.

49.   **INVALIDITY.**  If any provision of this Lease shall be held to be invalid, whether generally or as to specific facts or circumstances, the same shall not affect in any respect whatsoever the validity of the remainder of this Lease, which shall continue in full force and effect. Any provision held invalid as to any particular facts and circumstances shall remain in full force and effect as to all other facts and circumstances.

50.   **GOVERNING LAW.**  This Lease and the rights of the parties hereunder shall be interpreted in accordance with the laws of the state in which the Premises are located.

51.   **ENTIRE AGREEMENT.**  This Lease together with the attached Exhibits and Riders referred to herein and specified below, contains the entire agreement of the parties related to this transaction, supersedes all prior negotiations and agreements and represents their final and complete understanding.  This Lease may not be modified orally, through course of performance or in any manner other than by agreement in writing, signed by the parties hereto.

52.   **EXHIBITS AND ADDITIONAL PROVISIONS.**  The Exhibit(s) designated as A, B, C-1 and C-2 and Rider(s) designated as No. 1 which are attached hereto and are a part of this Lease, and are incorporated herein as if set forth in full.

IN WITNESS WHEREOF, this Lease has been duly executed by the parties hereto as of the date and year first above written.

LESSOR:

HOFFLAND PROPERTIES INC.,
a Virginia corporation

By: _Robin D. Ray_

Name: _Robin D. Ray_

Its: _Chairman / President_

Date: _11/6/17_

LESSEE:

**BCAUSE MINING LLC,**
a Virginia limited liability company

By: _____

Name: _Thomas Flake_____

Its: _HH Cha/Treasurer_____

Date: _11/6/17_____

RIDER NO. 1

DATED AS OF NOVEMBER 1, 2017

BY AND BETWEEN

HOFFLAND PROPERTIES INC. ("LESSOR")

AND

BCAUSE MINING LLC ("LESSEE")

The following paragraphs are made a part of this Lease, and in the event of any inconsistency between the following paragraphs and any other terms of this Lease, the following paragraphs shall control:

1.  Condominium Conversion: The Lessor's Property is being converted into a condominium. Unit A, as shown basically on the  shown on the attached Exhibit A as "1" in a circle and the building improvements thereon designated as "A-B" are being sold to another party. The precise boundaries of the Units are shown on an Exhibit to the Declaration. Unit B consists of the balance of Lessor's property except for a common element shared joint access area to be shown on the Condominium Plat as "Common Element". The respective Units, together with  the improvements, will be subject to a Declaration of Easements, Covenants and Restrictions ("ECR") spelling out, inter alia, access rights, parking rights, use of common walls and operational responsibilities. Closing on Unit A is anticipated by no later than mid-November, 2017.  Condominium documents and the ECR have been drafted and submitted by Lessor to Lessee for review.  By prior agreement with the purchaser of Unit A (which is smaller and less valuable than Unit B), Unit A will be responsible for 35%, and Unit B for 65%, of common expenses except where there are separate or sub-meters to measure usage, or the expenses ( or utility usage) are caused, or disproportionately used, by one party.

2.  Condominium Association – Declaration, ECR and Bylaws:  Lessee shall be bound by any conditions or restrictions required under the Bylaws of the Condominium Association, the Declaration and the ECR. Failure to comply with any of the governing documents shall constitute a default under the terms of this Lease.

3.  Tenant Improvements:  Lessee, at Lessee's sole cost and expense, shall be responsible for all improvements to the Premises including additional electrical power with separate metering, new fiber optic cable, chemical fire suppression system, security and improvements for office and other space.  All work shall be by  fully bonded licensed contractors pursuant to a contract which contains a waiver of the right to file any mechanics lien, with the language in Exhibit D, or with the full amount due under the contracts placed in escrow with an escrow agent for disbursement to the contractor(s) as billed. The contract(s) and all plans and specifications are subject to approval of Lessor, which such approval shall not be unreasonably withheld or unduly delayed.  Lessor understands that Lessee intends to use at least the portions of the Premises marked C, D and E for a data center.  Lessee represents to Lessor that (i) Lessee has already hired electrical engineers to start work on key planning for the Premises and (ii) the good faith estimated costs of Lessee expenditures on building improvements will exceed $1,600,000.00 (which amount is a material inducement to Lessor to enter into the Lease

and shall be confirmed with submission of plans and specifications). Subject to Lessee's execution of separate confidentiality agreement, Lessee has been furnished with copies of all inspection reports and Phase 1 Environmental reports. The existing fuel tanks on western side of the Premises are currently being cleaned and put into temporary closure in accordance with the requirements of the Virginia DEQ.

4.    <u>Purchase Option:</u>

A.    At the end of sixth (6th) full calendar month of the Lease term (April 30, 2018), provided Lessee is not then in default, Lessee shall have the option to purchase Unit B and the Improvements thereon in "AS IS WHERE IS" condition for $4,750,000 by both (i) giving not less than sixty (60) days prior written notice to Lessor which notice may be given at any time prior to the last business day of the first full six (6) calendar months of the Lease term (i.e. by March 1, 2018), and (ii) providing with such notice a $150,000 good faith deposit (payable to Lessor's qualified intermediary as permitted in C. below), which such good faith deposit shall be forfeited if there is no closing other than due to a default by Lessor. Lessor shall take all reasonable steps to close on the date specified in such notice provided Lessor has at least thirty (30) days from the date of such notice to close. The notice from Lessee shall specify a closing date on any business day from the last business day of the six (6) month period to the last business day of the twelfth (12th) full calendar month after the Lease Commencement Date.

B.    Lessee shall comply with all of its obligations under the Lease through the closing date and such compliance is a condition of closing. At closing there shall be the usual prorations for rent, Additional Rent and other expenses to the extent not already being paid by Lessee. Conveyance shall be by special warranty deed free and clear of all liens and encumbrances created by Lessor except for the Declaration, the ECR and other matters of record (other than liens of which there are currently none and which if arise due to any action or inaction of Lessor, it shall discharge). Lessee has been furnished with a title search from Fidelity Title and represents that it has reviewed the same and that title as shown, subject to the Declaration and ECR, is acceptable to Lessee.

C.    At either party's request (the "Requesting Party"), the other party will take all actions reasonably requested by the Requesting Party in order to effectuate all or any part of the transactions contemplated by this Lease as a forward or reverse like-kind exchange for the benefit of the Requesting Party in accordance with Section 1031 of the Internal Revenue Code and, in the case of a reverse exchange (Rev. Proc. 2000-37), including executing an instrument acknowledging and consenting to any assignment by the Requesting Party of its rights (but not its obligations) under this Lease to a qualified intermediary or an exchange accommodation titleholder. In furtherance of the foregoing and notwithstanding anything contained in this Lease to the contrary, the Requesting Party may assign its rights under this Lease to a "qualified intermediary" or an "exchange accommodation titleholder" in order to facilitate, at no cost or expense to the other party, a forward or reverse like-kind exchange under Section 1031 of the Internal Revenue Code; provided, however, that such assignment will not relieve the Requesting Party of any of its obligations under this Lease. If so requested, the other party will issue all closing documents to the applicable qualified intermediary

or exchange accommodation titleholder if so directed by the Requesting Party prior to the Closing.

5.      Letter of Credit:

If either (i) the purchase option is not exercised or (ii) or if the purchase option is exercised and timely closing does not occur due to no fault of Lessor by the last business day of the first Lease Year, then, as security for Lessee's obligations under this Lease, Lessee shall deliver to Lessor a clean irrevocable Letter of Credit (the "Letter") in the stated amount of $3,400,000.00 (which amount shall be reduced to $2,600,000.00 commencing on the commencement of the eighth (8th) Lease Year, to $1,700,000.00 on the commencement of the nineth (9th) Lease Year, and to $900,000.00 on the commencement of the tenth (10th) Lease Year), which Letter shall be issued by a major commercial bank (the "Bank") reasonably acceptable to Lessor, which Letter shall be transferable and shall specify that multiple draws are permitted, and upon which Lessor may draw by presentation of a sight draft accompanied by a certificate executed by Lessor stating: "We certify that (i) bcauseMining LLC is in default pursuant to the terms of its Lease with Hoffland Properties Inc., or its successor in interest and the amount drawn hereunder represents the amount required to cure such default or (ii) the Letter is expiring within thirty (30) days of this notice and we have not received an extension of the Letter or a replacement letter of credit meeting the requirements of the Lease, entitling us to draw against the Letter in the full stated amount."  The Letter shall either (x) expire on the expiration of the term of this Lease, or (y) be renewed periodically so that the original Letter or a replacement thereof shall be in full force and effect throughout the term of this Lease.  Lessee shall deliver to Lessor any replacement Letters not less than thirty (30) days prior to the expiration of the then current Letter.  If Lessee shall fail to so deliver any replacement Letter, then Lessor shall be entitled to draw upon the existing Letter to the full extent of its outstanding balance.  If Lessor shall draw upon any such Letter as a result of the failure of Lessee to perform any of its obligations under this Lease (including, without limitation, its obligations under this paragraph), Lessee shall immediately deliver to Lessor an additional Letter in the amount so drawn by Lessor, and otherwise on terms identical to the Letter.  If the Bank shall become or be declared insolvent or be liquidated or reorganized or shall be subject to any provision of any bankruptcy law or code as then in effect or if the Letter shall cease to be in full force or effect (all collectively, a "Failure") then the date on which any of the foregoing shall occur shall be deemed to be the expiration of the Letter, whereupon Lessee shall immediately deliver a replacement Letter from another Bank.  For purposes of Paragraph 5, if Lessee shall fail to deliver a replacement Letter as aforesaid within ten (10) days after notice from Lessor of the occurrence of a Failure, such event shall be deemed a default by Lessee in the payment of rent.  In addition to Lessor's other rights under this Lease, in the event of Lessee's default (including other termination rights), if Lessee fails to provide the Letter, in a timely manner as provided above, Lessor may, at any time thereafter, terminate this Lease with thirty (30) days prior written notice to Lessee.

EXHIBIT A
TO
TRIPLE NET LEASE

Legal Description of the Property

ALL THAT certain tract, piece or parcel of land, exclusive of the buildings and improvements thereon, situated in Bayside Borough in the City of Virginia Beach, Virginia and designated as 7.37 acres on a certain plat entitled "PLAT OF PART OF PROPERTY OF E .V. WILLIAMS CO., INC., BAYSIDE BOROUGH, VIRGINIA BEACH, VIRGINIA FOR HOFFLAND CORPORATION" which plat is dated June 8, 1966 and made by C. A. Bamforth, CLS, and duly of record in the Clerk's Office of the Circuit Court of the City of Virginia Beach, Virginia in Map Book 70 at page 22 to which reference is hereby made for a more particular description of the said property.

LESS, SAVE AND EXCEPT that portion of the property conveyed to VDOT recorded in the aforesaid Clerk's Office in Instrument No. 201609230000853880.

**EXHIBIT A-1**
**TO**
**TRIPLE NET LEASE**


**DESCRIPTION OF PREMISES**



## SITE PLAN

CONCEPTUAL PLAN FOR APPROXIMATELY 130 PARKING SPOTS ± (EXPANDABLE)

EXHIBIT B
TO
TRIPLE NET LEASE

## SURVEY NOTES:

1. THIS SURVEY WAS PREPARED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17091893/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 08:00AM.

2. THIS PROPERTY APPEARS TO FALL IN FLOOD ZONE "X" AS SHOWN ON PANEL 0083G OF THE FLOOD INSURANCE RATE MAPS FOR THE CITY OF VIRGINIA BEACH, COMMUNITY NO.: 515531, DATED: 1-16-15. FLOOD ZONE INFORMATION SHOWN HEREON IS NOT GUARANTEED AND WAS APPROXIMATELY SCALED FROM THE FLOOD INSURANCE RATE MAPS FOR THE CITY/COUNTY INDICATED. MSA, P.C. IS NOT A PARTY IN DETERMINING THE REQUIREMENTS FOR FLOOD INSURANCE ON THE PROPERTY SHOWN. FOR FURTHER INFORMATION AND TO CONFIRM THE FLOOD ZONE FOR THIS PROPERTY, CONTACT THE LOCAL COMMUNITY FLOOD OFFICIAL. FLOOD ZONE DETERMINATION IS BASED ON THE FLOOD INSURANCE RATE MAPS AND DOES NOT IMPLY THAT THIS PROPERTY WILL OR WILL NOT BE FREE FROM FLOODING OR DAMAGE.

3. NORTH MERIDIAN SHOWN HEREON IS BASED ON MAP BOOK 70, PAGE 22.

4. THIS SURVEY DOES NOT ADDRESS THE EXISTENCE OR NONEXISTENCE OF ENVIRONMENTAL HAZARDS, CEMETERIES OR ANY UNDERGROUND STRUCTURE NOT OBSERVED DURING THE COURSE OF THE SURVEY.

5. CURRENT OWNER: HOFFLAND PROPERTIES, INC., SOURCE OF TITLE: DEED BOOK 2473, PAGE 267.

6. UNABLE TO FIND DOCUMENT OF RECORD CREATING 10' WATER UTILITY EASEMENT. TAKEN FROM PLANS ENTITLED "SITE IMPROVEMENT PLAN OF HOFFMAN BEVERAGE COMPANY", DATED JANUARY 7, 1991, BY BENGTSON, DEBELL, ELKIN & TITUS, LTD.

7. CONDOMINIUM PLAT AND PLANS OF 5465 GREENWICH ROAD A CONDOMINIUM CONSISTS OF UNIT A, UNIT B AND A COMMON ELEMENT.



LOCATION MAP — SCALE: 1" = 2,000'



GRAPHIC SCALE
1" = 60'

I, JEFFREY J. VIERRETHER, A LAND SURVEYOR, DO HEREBY CERTIFY THAT THIS PLAT IS ACCURATE AND THAT IT COMPLIES WITH THE PROVISIONS OF SEC. 55-79.58.A OF THE CODE OF VIRGINIA, 1950 AS AMENDED. I FURTHER HEREBY CERTIFY THAT ALL UNITS OR PORTIONS THEREOF DEPICTED HEREON HAVE BEEN SUBSTANTIALLY COMPLETED.

SIGNED: 

EXHIBIT 'B'
CONDOMINIUM PLAT AND PLANS OF
## 5465 GREENWICH ROAD
A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA
## MSA, P.C.

Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc) www.msaonline.com



DWN BY: KCR
DATE: 10/24/2017

SHEET 1 OF 6
JOB# 17181
SCALE: 1" = 60'



SUBMITTED LAND
AREA = 320,332 SF
OR 7.354 AC

GREENWICH ROAD (VAR. R/W)
(SHPB 19, PG 33A)
(INSTR. NO. 20160923000853880)

N/F
VIRGINIA ELECTRIC
AND POWER COMPANY
(DB 712, PG 385)
PARCEL VP (MB 206, PG 8)
GPIN 1467-34-2238

N12°10'22"E
539.14' O/A

6.5' CHAIN
LINK FENCE

6' CHAIN
LINK FENCE 2.13'

PP METAL

6.5' CHAIN
LINK FENCE

SMALL PIN(F)
18" DEEP

RAILROAD
TRACKS

LARGE POWER POLE

571.94'
N82°16'39"W

N/F
NORFOLK & SOUTHERN
RAILROAD (66' R/W)

MATCHLINE — SEE SHEET 3 OF 6

PARCEL 24A
(MB 70, PG 22)
(SHPB 19, PG 33A)
(DB 2473, PG 267)
(INSTR. NO. 20160923000853880)
GPIN 1467-34-7278-6000
AREA=320,332 SF
OR 7.354 AC

SUBMITTED LAND

SCALE: 1" = 60'

NOTE: SEE SHEET 1 OF 6
FOR SURVEY NOTES,
GRAPHIC SCALE
AND CERTIFICATIONS
SEE SHEET 6 OF 6
FOR CURVE TABLE

EXHIBIT 'B'
CONDOMINIUM PLAT AND PLANS OF
5465 GREENWICH ROAD
A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA

LEGEND

SUBMITTED
LAND

MSA, P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)  www.msaonline.com

DWN BY:KCR
DATE: 10/24/2017

SHEET 2 OF 6
JOB# 17181
SCALE: 1" = 60'



GREENWICH ROAD (VAR. R/W)
(SHPB 19, PG 33A)
(INSTR. NO. 20160923000853880)

S86°49'07"E
25.40'

S82°16'39"E
510.06' O/A

(MP 70, PG 22)

6' CHAIN
LINK FENCE

S17°31'13"W
538.72' O/A

SUBMITTED LAND
AREA = 320,332 SF
OR 7.354 AC

PARCEL 24A
(MB 70, PG 22)
(SHPB 19, PG 33A)
(DB 2473, PG 287)
(INSTR. NO. 20160923000853880)
GPIN 1467-34-7276-0000
AREA=320,332 SF
OR 7.354 AC

N/F
COMMONWEALTH BUILDING COMPANY
(DB 1442, PG 339)
PARCEL 28A
(MB 73, PG 14)
GPIN 1467-44-2286

6' CHAIN
LINK FENCE

6' CHAIN
LINK FENCE

2.37'

LARGE POWER POLE

N/F
NORFOLK & SOUTHERN
RAILROAD (66' R/W)

RAILROAD
TRACKS

MATCHLINE – SEE SHEET 2 OF 6

EXHIBIT 'B'
CONDOMINIUM PLAT AND PLANS OF
**5465 GREENWICH ROAD**
A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA

**SUBMITTED LAND**
SCALE: 1" = 60'
NOTE: SEE SHEET 1 OF 6
FOR SURVEY NOTES,
GRAPHIC SCALE
AND CERTIFICATIONS
SEE SHEET 6 OF 6
FOR CURVE TABLE

DWN BY:KCR
DATE: 10/24/2017

**M S A,  P. C.**
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)  www.msaonline.com

LEGEND

SUBMITTED
LAND

SHEET 3 OF 6
JOB# 17181
SCALE: 1" = 60'



EXHIBIT 'B'
CONDOMINIUM PLAT AND PLANS OF
**5465 GREENWICH ROAD**
A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA

**M S A, P.C.**
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)  www.msaonline.com

**UNIT AREA**
SCALE: 1" = 60'

NOTE: SEE SHEET 1 OF 6
FOR SURVEY NOTES,
GRAPHIC SCALE
AND CERTIFICATIONS
SEE SHEET 6 OF 6
FOR CURVE TABLE

DWN BY:KCR
DATE: 10/24/2017

SHEET 4 OF 6
JOB# 17181
SCALE: 1" = 60'

LEGEND

UNIT AREA B

UNIT AREA A

COMMON ELEMENT



EXHIBIT 'B'
CONDOMINIUM PLAT AND PLANS OF
**5465 GREENWICH ROAD**
A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA

**M S A, P.C.**

Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)  www.msaonline.com

SHEET 5 OF 6
JOB# 17181
SCALE: 1" = 60'

DWN BY: KCR
DATE: 10/24/2017

**UNIT AREA**
SCALE: 1" = 60'

NOTE: SEE SHEET 1 OF 6
FOR SURVEY NOTES,
GRAPHIC SCALE
AND CERTIFICATIONS
SEE SHEET 6 OF 6
FOR CURVE TABLE

## EASEMENT LEGEND

| NO. | TYPE |
|---|---|
| 1 | PERMANENT DRAINAGE EASEMENT (SHPB 19, PG 33A) (INSTR. 2016092300085388O) |
| 2 | TEMPORARY CONSTRUCTION EASEMENT FOR ENTRANCE (SHPB 19, PG 33A) (INSTR. 2016092300085388O) |
| 3 | VAR. WDTH PERMANENT STANDARD VDOT UTILITY EASEMENT & VAR. WDTH PERMANENT STANDARD UTILITY EASEMENT FOR DOMINION VIRGINIA POWER (SHPB 19, PG 33A) (INSTR. 2016092300085388O) |
| 4 | TEMPORARY CONSTRUCTION EASEMENT FOR ENTRANCE (SHPB 19, PG 33A) (INSTR. 2016092300085388O) |
| 5 | PERMANENT DRAINAGE EASEMENT (SHPB 19, PG 33A) (INSTR. 2016092300085388O) |
| 6 | TEMPORARY CONSTRUCTION EASEMENT FOR SLOPES (SHPB 19, PG 33A) (INSTR. 2016092300085388O) |
| 7 | TEMPORARY CONSTRUCTION EASEMENT FOR ENTRANCE (SHPB 19, PG 33A) (INSTR. 2016092300085388O) |

## EASEMENT LEGEND

| NO. | TYPE |
|---|---|
| 8 | POSSIBLE 10' WATER UTILITY EASEMENT (SEE NOTE 6) |
| 9 | 30' RIGHT-OF-WAY RESERVATION FROM SOUTH LINE OF NORFOLK SOUTH RAILROAD AS SHOWN IN MB 2, PG 26 |
| 10 | 30' HRSD EASEMENT (DB 1013, PG 54) (DB 1046, PG 691) 30' CITY OF VIRGINIA BEACH UTILITY EASEMENT (MB 131, PG 38) (DB 1899, PG 143) AND 30' VEPCO EASEMENT (DB 3025, PG 446) (DB 2943, PG 971) (DB 2684, PG 126) (DB 1302, PG 484) (DB 998, PG 719) |
| 11 | 50' RESERVATION FOR INGRESS & EGRESS (DB 712, PG 385) |

## CURVE TABLE

| CURVE | RADIUS | LENGTH | TANGENT | CHORD | BEARING | DELTA |
|---|---|---|---|---|---|---|
| C1 | 243.50' | 87.29' | 44.12' | 86.83' | S76° 33' 01"E | 20°32'25" |
| C2 | 3.74' | 2.74' | 1.43' | 2.68' | S33° 25' 45"W | 41°57'38" |
| C3 | 117.51' | 46.49' | 23.55' | 46.19' | S71° 34' 41"W | 22°40'11" |
| C4 | 243.50' | 56.84' | 28.55' | 56.71' | S72° 58' 00"E | 13°22'24" |
| C5 | 243.50' | 30.04' | 15.04' | 30.02' | S83° 11' 16"E | 7°04'08" |
| C6 | 243.50' | 0.42' | 0.21' | 0.42' | S86° 46' 17"E | 0°05'53" |

## UNIT GPIN

| UNIT | GPIN |
|---|---|
| A | 1467-34-7278-XXXX |
| B | 1467-34-7278-XXXX |

EXHIBIT 'B'
CONDOMINIUM PLAT AND PLANS OF
**5465 GREENWICH ROAD**
A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA

# MSA, P.C.

Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)  www.msaonline.com



| DWN BY: KCR |
|---|
| DATE: 10/24/2017 |

SHEET 6 OF 6
JOB# 17181
SCALE: 1" = 60'

EXHIBIT C-1
TO
TRIPLE NET LEASE

## DECLARATION OF 5465 GREENWICH ROAD,
## A CONDOMINIUM

**THIS DECLARATION** (together with any supplements, modifications, amendments, and amendments and restatements thereof, from time to time, this "Declaration") is made this _____ day of November, 2017 by **HOFFLAND PROPERTIES, INC.,** a Virginia corporation, (hereinafter called "Hoffland" or the "Declarant") [to be Indexed as <u>Grantor</u> and <u>Grantee</u>], as the owner, to establish a condominium as provided in the Condominium Act of the Commonwealth of Virginia, as set forth in Chapter 4.2, Title 55, Code of Virginia of 1950, as amended (the "Condominium Act");

### RECITALS:

A.    Declarant owns fee simple title in certain land more particularly described in **Exhibit A** attached hereto and by reference made a part hereof (the "Land") and improvements (the "Improvements") with easements, rights of way and appurtenances thereto (such easements, rights of way and appurtenances are hereinafter called the "Appurtenances"), situate in the City of Virginia Beach, Virginia (the Land, Improvements and Appurtenances are hereinafter called the "Property");

B.    It is the desire and intention of Declarant to submit the Land but not the Improvements or Appurtenances to the provisions of the Condominium Act and thereby create a condominium.

**NOW, THEREFORE,** Declarant states as follows:

### ARTICLE 1

### SUBMISSION OF PROPERTY

Declarant hereby submits the Land (but not the Improvements or Appurtenances) to the provisions of the Condominium Act, and further declares that on and subject to the terms and conditions hereinafter set forth, the Land shall be held, conveyed, leased, rented and occupied, hypothecated and/or encumbered subject to the provisions of the Condominium Act and the covenants and restrictions hereinafter set forth, including the Bylaws of the Association (defined below), and Declarant further declares that the Land shall be a condominium known as "5465 Greenwich Road, a Condominium."

### ARTICLE 2

### DEFINITIONS

The following terms shall have the meanings ascribed thereto, and any capitalized terms defined in the Recitals or elsewhere in this Declaration shall have the meanings ascribed thereto

Prepared by: Kaufman & Canoles
   150 W. Main Street, Suite 2100
   Norfolk, VA 23510

GPIN. 14673472780000

1

in the Recitals or elsewhere in this Declaration, as the case may be. In addition, unless it is plainly evident from the context that a different meaning is intended, and except as hereinafter modified or extended, the terms used in the "Condominium Instruments" (defined below) shall have the meanings set forth in the Condominium Act as in effect as of the date of this Declaration.

2.1 **Association**. "Association" means 5465 Greenwich Road Condominium Owners' Association, a non-stock Virginia corporation, which is an association of the Unit Owners acting as a group in accordance with the Condominium Instruments and the Condominium Act.

2.2 **Bylaws**. "Bylaws" means the Bylaws of the Association, attached hereto as **Exhibit C** and made a part hereof by reference thereto, as the same may be supplemented, modified, amended or amended and restated from time to time.

2.3 **Clerk's Office**. "Clerk's Office" means the Clerk's Office of the Circuit Court of the City of Virginia Beach, Virginia.

2.4 **Condominium Act**. "Condominium Act" means Chap. 4.2 of Title 55 of the Code of Virginia 1950, as amended from time to time.

2.5 **Common Elements, Limited Common Elements, General Common Elements**. "Common Elements" means all portions of the Condominium other than the Units. "Limited Common Elements" means any areas so designated on the Plat and/or described in this Declaration and which are portions of the Common Elements intended for the exclusive use of one or more but less than all of the Units. "General Common Elements" means the Common Elements other than Limited Common Elements.

2.6 **Condominium**. "Condominium" means 5465 Greenwich Road, a Condominium, as submitted to the Condominium Act by the recordation of this Declaration.

2.7 **Condominium Instruments**. "Condominium Instruments" shall be a collective term referring to this Declaration, the Bylaws, any plats and plans, and any exhibit, schedule or certificate accompanying any of the foregoing and the deeds to the Units.

2.8 **ECR**. "ECR" means the Declaration of Easements, Covenants, Conditions and Restrictions, whether recorded in the Clerk's Office with this Declaration or at any time thereafter, which establishes and imposes certain easements, rights, duties, obligations, responsibilities, conditions, covenants, and restrictions upon the Unit Owners and/or the Association with respect to the operation, maintenance, repair and replacement of the Property or any components thereof, to assure the efficient, economical, and compatible use and operation of the Units and the Improvements thereon from time to time, as a warehouse distribution, vehicle servicing, office, data processing and other commercial development and to maintain a harmonious relationship among the Unit Owners, as the same may be supplemented, modified, amended, or amended and restated from time to time.

2.9 **Environmental Law**. "Environmental Law" means any applicable statute, code, enactment, ordinance, rule, regulation, permit, consent, approval, authorization, license, judgment, order, writ, common law rule (including without limitation the common law concerning nuisance

2

and other tort liability), decree, injunction, or other requirement having the force and effect of law, whether local, state, territorial or national, at any time in force or effect relating to:

2.9.1    Emissions, discharges, spills, releases or threatened releases of Hazardous Substances into ambient air, surface water, ground water, watercourses, publicly or privately owned treatment works, drains, sewer systems, wetlands, septic systems or onto land;

2.9.2    The use, treatment, storage, disposal, handling, manufacturing, transportation or shipment of Hazardous Substances;

2.9.3    The regulation of storage tanks; or

2.9.4    Otherwise relating to pollution or the protection of human health, safety, or the environment.

2.10    **Hazardous Activity.** " Hazardous Activity" means activity which generates EMF pollution at a level which would be materially more unsafe to the occupants of the other Unit or which would cause materially greater interference with communications than currently existing on the Property.

2.11    **Hazardous Substances.**    "Hazardous Substances" means at any time any substance, waste, pollutant, contaminant or material, in solid, liquid, or gaseous form, which:

2.11.1    Is a substance regulated, defined, or designated as hazardous, extremely or imminently hazardous, dangerous or toxic pursuant to any law; or

2.11.2    Is a substance with respect to which such authority may otherwise require environmental investigation, monitoring, reporting, or remediation; including but not limited to, all substances, wastes, pollutants, contaminants and materials regulated, or defined or designated as hazardous, extremely or imminently hazardous, dangerous or toxic, under the following federal statutes and their state counterparts, as well as these statutes' implementing regulations: the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11011 et seq., the Safe Drinking Water Act, 33 U.S.C. § 300f et seq., the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 et seq., the Atomic Energy Act, 42 U.S.C. § 2011 et seq., and the Hazardous Materials Transportation Act, 42 U.S.C. § 1801 et seq.;

2.12    **Mortgage and Mortgagee**.  "Mortgage" means any mortgage or deed of trust creating a lien on a Unit and all renewals, extensions and modifications thereto.  Mortgagee shall mean the Owner of the obligations secured by such mortgage or deed of trust; provided that such Mortgagee has given written notice of its status to the Association.

2.13    **Percentage Interest**.  "Percentage Interest" means the undivided percentage ownership interest of a Unit Owner in the Common Elements, as described in Section 4.3.  The Percentage Interest has been allocated based on par values.

3

2.14   **Person**. "Person" means individual, corporation, partnership, association, trustee or other legal entity.

2.15   **Plat**. "Plat" shall have the meaning ascribed to it in Section 3.2.

2.16   **Unit**. "Unit" means a portion of the Condominium designated and intended for individual ownership and use, together with the undivided interest in the Common Elements appertaining thereto. A Unit consists only of land and the appurtenances thereto. A Unit does not include any buildings or other improvements; provided, however, any conveyance of a Unit shall be deemed to include all improvements thereon, unless the deed of conveyance for such Unit provides to the contrary.

2.17   **Unit Owner**. "Unit Owner" means one or more persons who own a Unit.

2.18   **Unit Subdivision**. "Unit Subdivision" means a permitted subdivision of a Unit into two or more Units pursuant to Section 55-79.70 of the Condominium Act.

## ARTICLE 3

## DESCRIPTION OF THE CONDOMINIUM
## AND OTHER COMPONENTS OF THE PROPERTY

3.1   **The Land**. The Land consists of the real estate described in **Exhibit A**.

3.2   **Plat**. The Plat (the "Plat") for the Condominium is the drawing consisting of six (6) sheets attached hereto as EXHIBIT B, entitled "CONDOMINIUM PLAT AND PLANS OF 5465 GREENWICH ROAD A CONDOMINIUM (M.B. 70, PG. 22) VIRGINIA BEACH, VIRGINIA," dated 10/24/2017 and prepared by MSA, P.C.

3.3   **General Description of Improvements and Other Components of the Property**.

3.3.1   The Condominium consists of the Land only on which there are the following Improvements: (a) an office building, warehouse/office space and a garage/office; (b) parking and drive aisles and other access areas; (c) utilities and their related pipes, lines, conduits, wires and other apparatus, equipment, systems and facilities (together with the utilities, the "Utility Facilities"); and (d) storm water management and related facilities (the "SWM Facilities").

3.3.2   Delineation of the boundaries of the Units and any Common Elements and the location of certain easements are set forth on the Plat. The Utility Facilities, SWM Facilities, and various easements are to be created, described, and/or delineated in the ECR.

3.3.3   The Units are initially designated as Unit A and Unit B on the Plat. Unit B may, from time to time, be subdivided and thereafter resubdivided in which event Unit B will be redesignated to reflect such subdivided Units of Unit B.

3.4   **Unit Boundaries**. Each Unit consists of land area as delineated on the Plat. The horizontal (upper and lower) boundaries of the Units shall be those commonly appurtenant to

4

vacant land in Virginia, and shall extend *ab solo usque ad coelum*. The vertical (lateral or parametric) boundaries are delineated on the Plat.

## ARTICLE 4

## APPURTENANCES TO UNITS

4.1     **General Common Elements**. The General Common Elements will consist of only an access area that serves both Units and is identified as "COMMON ELEMENT AREA = 15,448 SF" on the Plat.

4.2     **Limited Common Elements**.

4.2.1     Limited Common Elements, if any, shall be shown on the Plat.

4.3     **Interest of Unit Owner in Common Elements**.

4.3.1     Interests in the Common Elements ("Percentage Interest") shall be allocated to the Units based on par values as follows:  Unit A - $3,500 and Unit B - $6,500.

4.3.2     Subject to any future subdivision of Unit B as permitted hereunder and by the Condominium Act,  each Unit shall have the Percentage Interest as follows:

| Units | Par Value | Percentage Interest |
|---|---|---|
| Unit A | $3,500 | 35% |
| Unit B | $6,500 | 65% |

4.3.3     No Percentage Interest of a Unit shall be altered (except by a Unit Subdivision) without the unanimous consent of each of the affected Unit Owners expressed in an amendment to this Declaration.  In the event of the subdivision of a Unit as otherwise permitted hereunder, the Percentage Interest for such Unit shall be allocated among the subdivided portions of such Unit in such manner as provided in the Condominium Act.

4.3.4     The Percentage Interest shall not be separated from the Unit to which it appertains, and shall be deemed conveyed or encumbered with the Unit even though such interest is not expressly mentioned or described in the conveyance or other instrument.  Subject to any conditions or restrictions imposed in the ECR, each Unit Owner may use any of the General Common Elements and the Limited Common Elements appurtenant to its Unit in accordance with the purposes for which they are intended, provided such use does not hinder or encroach upon the lawful rights of the other Unit Owners.

4.4     **Association Membership**. Each Unit shall include as an appurtenance thereto the membership of the Unit Owner in the Association, with Unit A having the right to appoint one member, and Unit B having the right to appoint two members, of the Board of Directors of the Association (the "Board").  In the event of deadlock, where a unanimous decision is required, the members of the Board may from time to time appoint, or either member may cause to be appointed, a neutral mediator or arbitrator, as more specifically provided in the Bylaws.

5

4.5     Easements. In order to achieve a greater simplicity in connection with the drafting of the Condominium Instruments, the Units of the Condominium consist only of the Land. However, it is recognized that there is a need for cooperation with respect to utilities, access and vehicular movement among other matters and, accordingly, the ECR will be recorded contemporaneously with, or subsequent to, this Declaration. In addition to such easements as may be provided by the Condominium Act, each Unit Owner shall have as appurtenances to its Unit perpetual nonexclusive easements for access and vehicular movement over the Common Element as shown on the Plat.

## ARTICLE 5

## RESTRICTIONS

5.1     Restrictions on Use. Use of the Property shall be in accordance with the following provisions:

5.1.1    Units A& B.

5.1.1.1    Subject to the restrictions imposed by (i) this Declaration, (ii) the ECR, and (iii) any easement in favor of any other party, Units A and B may be used for warehouse distribution, vehicular servicing, office space, data processing and other commercial uses as permitted by applicable zoning.

5.1.1.2    Pursuant to the ECR certain portions of a Unit will be subject to easements for access and vehicular movement, for Utility Facilities, SWM Facilities, and other matters.

5.1.1.3    No Unit Owner shall use or occupy its Unit in any manner or conduct any operations therein which will, or could reasonably be expected to, create an environmental, health or safety hazard to the occupants of any other Unit or cause any measurable interference (in accordance with then existing industry standards) to any equipment (computer, telecommunication or other equipment) being operated in any other Unit.

5.1.1.4    A Unit Owner shall not use, or permit the use of, the Premises for any unlawful purpose or so as to constitute a nuisance or a danger to the other Unit or its occupants or others.

5.1.1.5    Each Unit Owner shall comply with all restrictive covenants, and all applicable federal, state and local laws, statutes, ordinances, codes, rules, regulations and requirements (collectively, "Laws") applicable to it, its Unit and/or its operations within a Unit, including, without limitation, those Laws governing or relating to environmental or industrial hygiene.

5.1.2    Common Elements and Easement Areas.

5.1.2.1    The Common Elements and easement areas (collectively, the "Easement Areas") shall be used only for the purposes for which they are intended.  The use of

6

the Common Elements and Easement Areas shall be subject to the ECR and such other reasonable rules and regulations as may be promulgated by the Association from time to time.

5.1.2.2    From time to time if the use and/or development of the Land changes, the Common Elements and Easement Areas may be relocated in connection with such changed use and/or additional development; provided that the relocation shall not materially adversely affect any Unit or the improvements located thereon, or the use and operation thereof, and the Unit Owners agree to cooperate in executing any revised Plat and/or other instrument appropriate to document such relocation.

5.1.2.3    The Common Elements and, to the extent otherwise permitted, by the ECR, Easement Areas may also be used for the installation, operation, maintenance, repair, relocation, and replacement of Utility Facilities to serve the Units. Subject to the provision of the ECR, no Utility Facilities may be installed in a manner that will diminish the utility or functionality of any other Utility Facilities or adversely affect, in any material respect, the use or operation of the Common Elements or Easement Areas for their intended purposes.

5.1.2.4    Any party desiring to or perform any work (i) within a Common Element or (ii) which otherwise may affect or come into contact with a Common Element shall give written notice of its intention to each Unit Owner and the Association at least thirty (30) days prior to commencement of the work, provided that only such notice as shall be reasonable in the circumstances need be given in the event of an emergency. The required notice shall specify the need for the work, identify the proposed location the Utility Facilities, the nature of the service to be provided, the precautions taken to locate all Utility Facilities and structural elements that may be affected by the work, the anticipated commencement and completion dates for the work and including (i) copies of any approvals that are required from any governmental entity or authority, or public or private utility provider, and (ii) a certificate of insurance, with supporting declaration pages, and schedule of forms and endorsements, with copies of the endorsements evidencing the contractor and/or Unit Owner has obtained the minimum insurance coverage required by this Declaration and the ECR. The party which performs such work, and any Unit Owner on whose behalf such work is performed, shall indemnify, hold harmless and defend the Association and all other Unit Owners and occupants of the other Units from and against any loss, claim, liability, cost, expense, damage, suit, action, proceeding, obligation, judgment, fine, penalty or other amounts suffered or incurred by each of them as the result of, or arising out of or in connection with, the performance of any such work. The party which performs such work, and any Unit Owner on whose behalf such work is performed, shall promptly: (a) be obligated to restore any excavated or otherwise damaged areas or improvements to their pre-existing condition; (b) perform such work in a manner that minimizes, both in terms of the severity and duration, the interference (including interruption of access and/or utility services) with any business operations on the other Unit(s) and shall coordinate with any affected Unit Owners any interruptions of services to prevent any material adverse effects; (c) comply with any reasonable security measures imposed by any affected Unit Owner respecting access to such Unit Owner's Unit or the improvements located thereon; and (d) comply with any applicable conditions, restrictions or requirements of the ECR.

5.1.2.5    To the extent that any utility provider requires an easement for facilities requested to be installed by a Unit Owner be granted over the Common Elements, the

7

Association shall have the right to grant such easements over the Common Elements, which grant shall not be unreasonably withheld. The Association may impose such conditions on the grant of any such easement as may be reasonable in light of the circumstances. In all events there shall be no material adverse effect on a Unit or any improvements thereon.

5.1.2.6    No use of any Common Element shall be made by any owner, occupant or invitee of a Unit that will unreasonably interfere with its use by others for its intended purpose or unreasonably impede the free flow of vehicular or pedestrian traffic thereon.

5.1.2.7    Until conveyance of Unit A to a third party is complete, only the Declarant, without joinder of the Association, shall have the right and shall be the only necessary party, to grant easements over or impose any restrictions upon, the Common Elements. Accordingly, Declarant shall be the only party required for the ECR and the creation of easements in connection with the conveyance of title to Unit A.

5.2    **Nuisances and Hazards**.  No nuisances shall be allowed upon the Condominium, nor any use or practice which interferes with the peaceful possession and proper use of the Condominium by its owners and their designees.  All parts of the Condominium shall be kept in a reasonably clean and sanitary condition, and no rubbish, refuse or garbage allowed to accumulate or any fire hazard allowed to exist.  No Unit Owner shall make or permit any use of its Unit nor make or permit any use of the Common Elements or Easement Areas which will cause the premiums for insurance upon another Unit or the Condominium or the improvements thereof, as a whole, to be higher than the premiums applicable to similar uses, unless the additional expenses is assumed by such Unit Owner or its tenant.  Any Hazardous Substances brought onto the Condominium by a Unit Owner or its tenant, its agents, contractors, subcontractors, suppliers or invitees, and all containers therefor, shall be used, kept, stored, and disposed of in a manner that complies with all Environmental Laws applicable to Hazardous Substances. Any hazardous use shall be restricted or otherwise effectively managed so as to avoid adverse consequences to the other Unit and its occupants and shall be in strict compliance with all applicable laws, rules and regulations of all governmental authorities.

5.3    **Lawful Use**.  No unlawful use shall be made of the Condominium nor any part of it; and all valid laws, zoning ordinances and regulations of all governmental bodies having jurisdiction including, but not limited to federal, state and local laws regulating the use, generation, manufacture, processing, storage or disposition of hazardous materials or Hazardous Substances shall be observed.  The responsibility of meeting the requirements of government bodies relating to maintenance, modification or repair of portions of the Condominium shall be upon the same person who has the responsibility for maintenance and repair of the portion of the Condominium concerned unless a problem is caused by the actions of another party in which event the party causing the problem shall be responsible for the costs related thereto.

## ARTICLE 6

## MAINTENANCE, ALTERATION AND IMPROVEMENTS

6.1    **Units**.  So long as any improvements on a Unit are in existence and subject to the provisions of any easement requiring joint or different maintenance obligations, each Unit Owner

shall maintain, repair and replace all improvements on its Unit so that such improvements are maintained in a reasonably suitable condition so as not to materially denigrate the value or use of any other Unit.

6.2    **Right to Reconstruct and Replace**.

6.2.1    Each Unit Owner may from time to time modify, demolish, construct or reconstruct all or a portion of the improvements constructed on its Unit; provided that such modifications, demolition, construction or reconstruction do not materially adversely affect (a) the structural integrity or use of (i) any other Unit or (ii) the Common Elements or Easement Areas, (b) any other Unit's use of shared facilities, such as shared Utility Facilities, or (c) the vehicular movement rights of any other Unit under any easement, or (d) the access rights of any other Unit to Greenwich Road. All modifications, demolition, construction or reconstruction shall be in full compliance with applicable law and as provided in this Declaration and the ECR.

6.2.2    If there is any damage to the improvements located within a Unit which affects the exterior appearance thereof or otherwise adversely impacts another Unit, or the Common Elements, such as, but not limited to, presenting a shabby, run-down or otherwise unsightly appearance or unpleasant odor or unsafe condition, then it shall be the responsibility of the Unit Owner to proceed with reasonable diligence to repair and/or demolish and to remove all rubble and resulting debris, leaving the Unit in a clean, safe and sightly condition. In all cases, the Unit shall be maintained in compliance with the city code and the Association shall have the right to enforce prompt compliance with such requirements.

6.3    **Special Provision regarding Landscaped Areas**. Each Unit Owner shall be responsible for maintaining the landscaped areas within such Unit Owner's Unit in good condition at its own cost and expense.

6.4    **General Common Elements and Easement Areas**. To the extent that there is a need for subsequent rules and regulations in connection with the operation, maintenance or use of the Easement Areas, it is intended that the Association will be empowered to promulgate such rules and regulations and to undertake administrative efforts in the same manner and to the same extent that it would otherwise do so with respect to common elements in a condominium so long as such rules and regulations do not conflict with the ECR. To the extent not otherwise provided in this Declaration or the ECR, the Association shall, or shall delegate to the Unit Owners the responsibility to, maintain, repair and replace as necessary (to keep them in good, safe and passable condition) all roads, SWM Facilities and/or other improvements constructed within the General Common Elements and, to the extent applicable, Easement Areas, including, with respect to roads, routine surface maintenance, as well as repair and replacement, debris removal, and the installation, maintenance, repair, and replacement of safety improvements.

## ARTICLE 7

## ASSESSMENTS AND EXPENSES

The making and collection of assessments against Unit Owners for common expenses shall be prorated except where the ECR or a specific easement provides otherwise (based on factors

9

such as, but not limited to, different or excess use or responsibility for damage) and pursuant to the Bylaws and subject to the following provisions:

7.1    **Share of Common Expenses**.  Except as otherwise provided elsewhere in this Declaration or the Bylaws, each Unit Owner shall be liable for a proportionate share of the common expenses, in proportion to its Percentage Interest.  No Unit Owner may exempt itself from contributing toward such expense by waiver of the use or enjoyment of the Common Elements or by abandonment of its Unit.

7.2    **Collection of Common Expenses**.  The manner of collecting common expenses from Unit Owners shall be set forth in the Bylaws.

7.3    **Attorneys' Fees**.  In any action to collect common expenses and/or to enforce a lien for unpaid assessments as provided by the Condominium Act, the Association shall be entitled to recover, and said lien shall also secure, reasonable attorneys' fees incurred by the Association incident to the collection of such assessments or enforcement of such liens.

7.4    **Additional Rights of First Mortgagees**.  If a Mortgagee or other purchaser of a Unit obtains title as a result of foreclosure of a first lien Mortgage recorded prior to the perfection of a lien for assessments, such purchaser, its successor and assigns, shall not be liable for the share of the common expenses or assessments of the Association chargeable to such Unit which became due prior to the acquisition of title to such Unit by such purchaser.  Nothing herein shall be construed to relieve the prior Unit Owner-mortgagor of its personal obligation to pay such unpaid share of common expenses or assessments.

7.5    **Units Taxed Separately**.  Each Unit and its Percentage Interest shall be separately assessed and taxed for all types of taxes authorized by law including, but not limited to, special ad valorem levies and special assessments, and each Unit Owner shall be liable solely for the amount of taxes against its individual Unit and shall not be affected by the consequences resulting from the tax delinquency of another Unit Owner.  Any real estate taxes assessed after the creation of the Condominium but prior to the time that each of the Units is taxed separately shall be paid as follows:  (a) by the Owner of Unit A, an amount equal to the pro rata portion of the taxes for the entire Property based on the purchase price of Unit A as the numerator and the total assessment of the Property as the denominator, and (b) by the Owner of Unit B, the balance of the real estate taxes.

## ARTICLE 8

## INSURANCE

8.1    **Liability Insurance**.  The Association shall, or shall delegate to the Unit Owners the responsibility to, purchase through an agent from an insurance company authorized to do business in Virginia, a policy of commercial general liability insurance with cross liability endorsement to cover liabilities of the Association to a Unit Owner, as the Board may determine to be in the Association's best interests.  At the inception of the Condominium, such policy shall have a combined single limit of coverage in an amount not less than Three Million Dollars ($3,000,000) combined single limit.  Such amount shall be increased from time to time by the

Association to keep pace with both inflation as measured by the Consumer Price Index (CPI-U) and (ii) coverage amounts generally maintained by others for similar operations with similar risks. The named insured for such policy shall be the Association, individually and for the benefit of all of the Unit Owners without naming them, and shall also include as insureds the members of the Board and any managing agent retained by the Association. The coverage afforded by the policy carried by a tenant pursuant to any lease of the Units shall be primary and noncontributing vis-á-vis the liability policies that may be maintained by Association and if in excess of what is required to be carried hereunder may substitute for the requirement of the Association to carry coverage should the Board of the Association so determine.

8.2    **Other Insurance**. The Association shall purchase such other insurance as may be appropriate from time to time including, if appropriate, fidelity coverage to protect against dishonest acts by those who handle funds on behalf of the Association. All physical damage insurance necessary or desirable in connection with the Property or any Unit shall be obtained by the Unit Owners unless obtained by the Association or the tenants with the Unit Owners as additional loss payees.

8.3    **Premiums**. Premiums upon any insurance policy purchased by the Association shall be paid by the Association as a common expense. Not less than ten (10) days prior to the date when a premium is due, evidence of payment of such premium shall be furnished by the Association to any Unit Owner requesting such proof.

8.4    **Additional Conditions**. All policies shall, to the extent available in the market, provide that such policies may not be cancelled or substantially modified without at least thirty (30) days (ten (10) days in case of cancellation for nonpayment of premiums) prior written notice to any and all insureds named thereon, including any and all Mortgagees. All policies shall contain a waiver of subrogation by the insurer as to any and all claims against the Association, its members and Directors, the Unit Owners and/or their respective employees, tenants and invitees, and, if available, a waiver of any defenses based upon co-insurance or invalidity arising from the acts of any insured.

## ARTICLE 9

## RECONSTRUCTION OR REPAIR AFTER CASUALTY

If any part of the Property shall be damaged by casualty, whether or not it shall be reconstructed or repaired shall be determined in the following manner or as provided in the ECR:

9.1    **Damage to Common Elements**. If the damaged portion is within a Common Element, it shall be reconstructed or repaired by the Unit Owners or by the Association as the Board may deem necessary or desirable, and if the damage is not covered by insurance proceeds, the cost of the repair by the Association may be covered by a special assessment.

9.2    **Damage Within Units**. If any damage is within a Unit it shall be repaired by the Unit Owner or if demolished, the Unit Owner shall remove all of the resulting debris and rubble, and put the Unit in a clean and sightly condition.

9.3   **Insurance Proceeds**.  The Association shall make available, in a financially prudent manner, any casualty insurance proceeds or other payments it receives to be used for the repairs specified above.

## ARTICLE 10

## ASSOCIATION

The administration of the Condominium shall be by the Association which shall fulfill its functions pursuant to the following provisions:

10.1   **Articles of Incorporation**.  The Articles of Incorporation of the Association shall be filed with the State Corporation Commission.

10.2   **Bylaws**.  A copy of the Bylaws of the Association is attached as **Exhibit C**.

10.3   **Limitation of Liabilities of the Association**.  Notwithstanding the duty of the Association to maintain and repair parts of the Common Elements, except to the extent of insurance proceeds received therefor, the Association shall not be liable to Unit Owners for damage to any Unit, or any Improvements thereon, or any Common Element or Easement Areas, other than to pay the cost of maintenance and repair of the Common Elements and Easement Areas which are required by this Declaration to be maintained or repaired by the Association or by the elements or other owners or persons.

10.4   **Restraint Upon Assignment of Shares and Assets**.  The share of a Unit Owner in the funds and assets of the Association may not be assigned, hypothecated or transferred in any manner except as an appurtenance to its Unit.

10.5   **Approval or Disapproval of Matters**.  Whenever the decision of a Unit Owner is required or appropriate upon any matter, whether or not the subject of an Association meeting, such decision may be expressed by any person who would be entitled to cast the vote of such Unit Owner in an Association meeting, unless the joinder of record owners is specifically required by this Declaration.  Except and to the extent that any act of the Association is required hereunder or under the Bylaws or by law to be determined or approved by its members, actions by the Association shall be determined, and need be approved, only by its Board.

10.6   **ECR**.  The Association may be assigned additional rights, responsibilities and obligations by the ECR which shall be deemed accepted by the Association.

## ARTICLE 11

## COMPLIANCE AND DEFAULT

11.1   **Compliance with Bylaws; Regulations and Covenants; Damages; Injunctions**. Each Unit Owner its employees, agents, contractors, lessees, sublessees and invitees shall comply strictly with the Bylaws of the Association attached hereto as **Exhibit C**, and with the covenants, conditions and restrictions set forth in this Declaration.  Acquisition, rental or occupancy of a Unit shall constitute an acknowledgement that the Unit Owner, tenant or occupant agrees to be bound

by the provisions of this Declaration. Failure to comply with any of the same shall be grounds for an action to recover sums due or for damages or for injunctive or any other relief, or any combination thereof, maintainable by the Association on behalf of the other Unit Owners or, in a proper case, by a Unit Owner.

11.2 **Negligence**. Except to the extent covered and paid by insurance with waiver of subrogation, a Unit Owner shall be liable for the expense of any maintenance, repair or replacement rendered necessary by its willful or negligent act or omission or by that of any member or their employees, agents, contractors, lessees, sublessees and invitees.

11.3 **Costs and Attorneys' Fees**. In any proceeding arising because of an alleged failure of any Unit Owner or the Association to comply with the terms of this Declaration, the Articles of Incorporation or the Bylaws of the Association, as any of them may be amended from time to time, the prevailing party shall be entitled to recover the costs of the proceeding and such reasonable expert and attorneys' fees as may be awarded by the court.

11.4 **No Waiver of Rights**. The failure or delay of the Association or any Unit Owner to enforce any covenant, restriction or other provision of the Condominium Act, this Declaration, or the Articles of Incorporation or Bylaws of the Association, shall not constitute a waiver of the rights to do so thereafter.

## ARTICLE 12

## TERMINATION

The Condominium may be terminated in the following manner:

12.1 **Agreement**. The Unit Owners, by agreement of Unit Owners of Units to which one hundred percent (100%) of the votes in the Association appertain, may remove the Land from the provisions of the Condominium Act by an instrument to that effect executed in the same manner as required by the Condominium Act, provided that (a) there is full compliance with all applicable governmental law, including the subdivision ordinance after such termination and (b) any Mortgagees of the Units consent thereto or agree, in either case by instruments duly recorded, that their liens be transferred to the percentage of undivided interest in the Land as provided in Section 4.3 hereof.

12.2 **Shares of Ownership After Terminating**. Upon removal of the Land from the provisions of the Condominium Act, the Land shall be deemed to be owned as tenants in common by the Unit Owners, and any Mortgagees of such Unit Owners shall have Mortgages upon the respective shares of any Unit Owners whose Units were previously subject to a Mortgage. The undivided interest in the Land owned as tenants in common which shall appertain to each Unit Owner shall be the percentage of the undivided interest previously owned by such Unit Owner in the Common Elements.

13

## ARTICLE 13

## AMENDMENT

13.1    **Amendment by Agreement**.  If there is any Unit Owner other than the Declarant, then the Condominium Instruments may be amended as follows: (a) by the Declarant with the consent of the Unit Owners, which consent shall not be unreasonably withheld or unduly delayed and (b) otherwise only by the agreement of Unit Owners owning Units to which not less than eighty percent (80%) of the votes in the Association appertain.  Without the consent of the Unit Owner(s) of the affected Unit(s), (other than by subdivision or resubdivision as otherwise permitted herein) no amendment to the Condominium Instruments shall change the boundaries of any Unit, the undivided interest in the Common Elements, the number of votes in the Association, or the liability for payment of common expense by a Unit Owner.

13.2    **Protection of Mortgagees**.    Except as expressly permitted, no material amendment, including, but not limited to, any amendment which would change the Percentage Interests of the Unit Owners in the Common Elements, may be made to the Condominium Instruments without the prior written approval of each Mortgagee holding a first Mortgage on a Condominium Unit and who has requested, in writing, to be notified of such amendments.  A copy of any proposed amendment shall be furnished to all such Mortgagees holding bona fide first liens at the address shown in such recorded mortgage and unless the disapproval of any such amendment is received within thirty (30) days of the giving of such copy, the amendment shall be conclusively deemed approved by such Mortgagee.  A copy of each amendment shall be recorded in the Clerk's Office of the Circuit Court of the City of Virginia Beach, Virginia and shall become effective when recorded.

13.3    **Association Charter and Bylaws**.  The Articles of Incorporation and the Bylaws of the Association and the rules and regulations hereunder may be amended in the manner provided by such documents.

## ARTICLE 14

## COVENANTS RUNNING WITH THE LAND

All provisions of the Declaration and exhibits thereto constitute covenants running with the land and with every part thereof and interest therein, including but not limited to, every Unit and the appurtenances thereto; and every Unit Owner and claimant of the Land or of any part thereof or interest therein, and its heirs, executors, administrators, successors and assigns shall be bound by all of the provisions of the Declaration and exhibits thereto.

## ARTICLE 15

## PROVISIONS FOR BENEFIT OF MORTGAGEES

All provisions of the Declaration and exhibits thereto requiring the Association to maintain the Common Elements and to collect assessments and all restrictions in the Declaration and any

14

exhibits thereto are intended for the benefit of, and may be enforced by, either a Unit Owner or any Mortgagee of a Unit.

## ARTICLE 16

## SEVERABILITY

The invalidity of any covenant, restriction or provision in any Condominium Instrument shall not affect the validity of the remaining portions thereof.

## ARTICLE 17

## OBLIGATION TO ACT IN GOOD FAITH

17.1    Each Unit Owner and other occupant shall have the duty to act in good faith in dealing with the other Unit Owners and occupants of Units in matters related to the operation and administration of the Condominium and the operation of their respective businesses therein and any administrative revisions hereto.

17.2    In assessing good faith with respect to certain modifications that will be needed particularly at the outset of the Condominium, the follow shall provide guidance to the parties and for any dispute resolution:  since Declarant owned, operated and expanded its improvements on Declarant's property over many years in connection with a single business, there are currently buildings, utilities and other systems which were not designed or constructed or installed for the projected separate uses which the Condominium now contemplates.  Accordingly the parties shall work together in order not to have to reconfigure the buildings, utilities, systems and other improvements in a manner that would result in unnecessary expense to one or both parties.  At the same time it is the intent of the parties to provide all Unit Owners with safe, secure and reasonably separate Units within which to conduct their respective businesses

## ARTICLE 18

## MISCELLANEOUS

18.1    **Estoppel Certificate**.  Each Unit Owner and the Association agree that, upon written request of a Unit Owner (the "Subject Unit Owner") or the Association (which request shall not be more frequent than three (3) times during any calendar year), the party to whom the request is addressed will, within fifteen (15) days of receipt of such request, issue to such requesting party, or its prospective mortgagee or successor, an estoppel certificate stating to the best of the issuer's actual knowledge as of such date:

18.1.1  that copies of the Declaration and Bylaws of the Condominium delivered to the addressee of such estoppel certificate are the entire agreements which affect the subject matter contained therein and the organization and operation of the Association and stating whether the issuer knows of any other separate or additional agreements with respect to the Condominium that affects the Association's or the Subject Unit Owner's (as applicable) obligations with respect to the Condominium and/or Subject Unit;

15

18.1.2  whether the Condominium Instruments have been modified or amended in any way and if so, then stating the nature thereof;

18.1.3  whether this Declaration and the other Condominium Instruments are in full force and effect;

18.1.4  whether it knows of any default under the Condominium Instruments by the Subject Unit Owner or the Association (as applicable), and if there are known defaults, specifying the nature thereof;

18.1.5  if the estoppel certificate is issued by the Association, whether the Subject Unit Owner has paid any and all common expenses, assessments, maintenance fees, management fees and other charges due with respect to such Subject Unit Owner's Unit (the "Subject Unit") under the Condominium Instruments;

18.1.6  whether the Association or the Subject Unit Owner (as applicable) has given any notice pursuant to the Declaration or the other Condominium Instruments of any off-sets, claims, demands or set-offs against the issuer;

18.1.7  if the estoppel certificate is issued by the Association, if requested by the Subject Unit Owner, specifying the amount of the most recent annual assessments for the Subject Unit and providing any current and historical budgets adopted by the Board;

18.1.8  if the estoppel certificate is issued to the Association, whether the Association holds reserves for capital expenditures, and if so, the amount held by the Association;

18.1.9  whether the use of the Unit by the current occupants of a Subject Unit violates the Condominium Instruments; and

18.1.10    whether the issuer has received any notice of any present violation of any federal, state or municipal laws, regulations, ordinances, orders or directives relating to the use, operation or condition of the Condominium or a Subject Unit.

18.1.11    The issuance of an estoppel certificate shall in no event subject the issuer to any liability for the failure of the issuer to disclose correct and/or relevant information (but it shall estop such issuer from making assertions contrary to those set forth in the certificate for the period covered by the certificate), nor shall such issuance be construed to waive any rights of the issuer to challenge acts committed by other parties for which approval by the Unit Owners was required but not sought or obtained.

18.2    **Notices**.  All notices, demands and requests (collectively, a "notice") required or permitted to be given under this Declaration may be given by a party or its legal counsel and must be in writing and shall be hand delivered or sent by registered or certified mail or by a nationally recognized overnight courier for next business day delivery, in each case to the address on file with the Association.  Such notices shall be deemed to have been received by the addressee upon the first to occur of (a) actual receipt thereof, (b) the date on which delivery thereof by a method described in this Section 18.2 is first attempted during customary business hours, (c) the next business day if sent by nationally recognized overnight courier, and (d) the fifth (5th) business day

16

after deposit in U.S. mail if sent by registered or certified mail.  Upon at least ten (10) days' prior written notice, each Unit Owner shall have the right to change its address to any other address within the United States of America by written notice to each Unit Owner and the Association. The initial mailing address of the Association is as follows: c/o Kaufman & Canoles, P.C., 150 W. Main Street, Suite 2100, Norfolk, VA 23510, Attn:  Robert C. Goodman, Jr., Esq.

*[Signature Page Follows]*

WITNESS the following signatures and seals:

**HOFFLAND PROPERTIES, INC.**
a Virginia corporation

By:_____[SEAL]
      Robin D. Ray, President

COMMONWEALTH OF VIRGINIA,
AT LARGE, to-wit:

     The foregoing instrument was acknowledged before me in City of Virginia Beach, Virginia, this _____ day of November, 2017, by Robin D. Ray, in her capacity as the President of HOFFLAND PROPERTIES, INC., a Virginia corporation, on its behalf.  She ☐ is personally known to me or ☐ has produced _____ as identification.

                    _____
                                     Notary Public

My Commission Expires: _____

My Registration Number is: _____        *(AFFIX SEAL)*

EXHIBIT A

to

**Declaration of 5465 Greenwich Road, a Condominium**

<u>Legal Description of the Property</u>

ALL THAT certain tract, piece or parcel of land, exclusive of the buildings and improvements thereon, situated in Bayside Borough in the City of Virginia Beach, Virginia and designated as 7.37 acres on a certain plat entitled "PLAT OF PART OF PROPERTY OF E .V. WILLIAMS CO., INC., BAYSIDE BOROUGH, VIRGINIA BEACH, VIRGINIA FOR HOFFLAND CORPORATION" which plat is dated June 8, 1966 and made by C. A. Bamforth, CLS, and duly of record in the Clerk's Office of the Circuit Court of the City of Virginia Beach, Virginia in Map Book 70 at page 22 to which reference is hereby made for a more particular description of the said property.

LESS, SAVE AND EXCEPT that portion of the property conveyed to VDOT recorded in the aforesaid Clerk's Office in Instrument No. 201609230000853880.

19

**EXHIBIT B**

to

**Declaration of 5465 Greenwich Road, a Condominium**

## SURVEY NOTES:

1. THIS SURVEY WAS PREPARED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17091893/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 08:00AM.

2. THIS PROPERTY APPEARS TO FALL IN FLOOD ZONE "X" AS SHOWN ON PANEL 0083G OF THE FLOOD INSURANCE RATE MAPS FOR THE CITY OF VIRGINIA BEACH, COMMUNITY NO.:515531, DATED: 1-16-15. FLOOD ZONE INFORMATION SHOWN HEREON IS NOT GUARANTEED AND WAS APPROXIMATELY SCALED FROM THE FLOOD INSURANCE RATE MAPS FOR THE CITY/COUNTY INDICATED. MSA, P.C. IS NOT A PARTY IN DETERMINING THE REQUIREMENTS FOR FLOOD INSURANCE ON THE PROPERTY SHOWN. FOR FURTHER INFORMATION AND TO CONFIRM THE FLOOD ZONE FOR THIS PROPERTY, CONTACT THE LOCAL COMMUNITY FLOOD OFFICIAL. FLOOD ZONE DETERMINATION IS BASED ON THE FLOOD INSURANCE RATE MAPS AND DOES NOT IMPLY THAT THIS PROPERTY WILL OR WILL NOT BE FREE FROM FLOODING OR DAMAGE.

3. NORTH MERIDIAN SHOWN HEREON IS BASED ON MAP BOOK 70, PAGE 22.

4. THIS SURVEY DOES NOT ADDRESS THE EXISTENCE OR NONEXISTENCE OF ENVIRONMENTAL HAZARDS, CEMETERIES OR ANY UNDERGROUND STRUCTURE NOT OBSERVED DURING THE COURSE OF THE SURVEY.

5. CURRENT OWNER: HOFLAND PROPERTIES, INC, SOURCE OF TITLE: DEED BOOK 2473, PAGE 267.

6. UNABLE TO FIND DOCUMENT OF RECORD CREATING 10' WATER UTILITY EASEMENT. TAKEN FROM PLANS ENTITLED "SITE IMPROVEMENT PLAN OF HOFFMAN BEVERAGE COMPANY", DATED JANUARY 7, 1991, BY BENGTSON, DEBELL, ELKIN & TITUS, LTD.

7. CONDOMINIUM PLAT AND PLANS OF 5465 GREENWICH ROAD A CONDOMINIUM CONSISTS OF UNIT A, UNIT B AND A COMMON ELEMENT.



LOCATION MAP — SCALE: 1" = 2,000'



GRAPHIC SCALE
1" = 60'

I, JEFFREY J. VERRETHER, A LAND SURVEYOR, DO HEREBY CERTIFY THAT THIS PLAT IS ACCURATE AND THAT IT COMPLIES WITH THE PROVISIONS OF SEC. 55-79.58.A OF THE CODE OF VIRGINIA, 1950 AS AMENDED. I FURTHER HEREBY CERTIFY THAT ALL UNITS OR PORTIONS THEREOF DEPICTED HEREON HAVE BEEN SUBSTANTIALLY COMPLETED.

SIGNED: 

EXHIBIT 'B'

CONDOMINIUM PLAT AND PLANS OF

## 5465 GREENWICH ROAD

A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA

### MSA, P.C.



Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)  www.msaonline.com

| | |
|---|---|
| DWN BY: KCR | SHEET 1 OF 6 |
| DATE: 10/24/2017 | JOB# 17181 |
| | SCALE: 1" = 60' |









| EASEMENT LEGEND | |
|---|---|
| NO. | TYPE |
| 1 | PERMANENT DRAINAGE EASEMENT (SHPB 19, PG 33A) (INSTR. 20160923000853880) |
| 2 | TEMPORARY CONSTRUCTION EASEMENT FOR ENTRANCE (SHPB 19, PG 33A) (INSTR. 20160923000853880) |
| 3 | VAR. WIDTH PERMANENT STANDARD VDOT UTILITY EASEMENT & VAR. WIDTH PERMANENT STANDARD UTILITY EASEMENT FOR DOMINION VIRGINIA POWER (SHPB 19, PG 33A) (INSTR. 20160923000853880) |
| 4 | TEMPORARY CONSTRUCTION EASEMENT FOR ENTRANCE (SHPB 19, PG 33A) (INSTR. 20160923000853880) |
| 5 | PERMANENT DRAINAGE EASEMENT (SHPB 19, PG 33A) (INSTR. 20160923000853880) |
| 6 | TEMPORARY CONSTRUCTION EASEMENT FOR SLOPES (SHPB 19, PG 33A) (INSTR. 20160923000853880) |
| 7 | TEMPORARY CONSTRUCTION EASEMENT FOR ENTRANCE (SHPB 19, PG 33A) (INSTR. 20160923000853880) |

| EASEMENT LEGEND | |
|---|---|
| NO. | TYPE |
| 8 | POSSIBLE 10' WATER UTILITY EASEMENT (SEE NOTE 6) |
| 9 | 30' RIGHT-OF-WAY RESERVATION FROM SOUTH LINE OF NORFOLK SOUTH RAILROAD AS SHOWN IN MB 2, PG 26 |
| 10 | 30' HRSD EASEMENT (DB 1013, PG 54) (DB 1046, PG 691) 30' CITY OF VIRGINIA BEACH UTILITY EASEMENT (MB 131, PG 38) (DB 1899, PG 143) AND 30' VEPCO EASEMENT (DB 3025, PG 446) (DB 2943, PG 971) (DB 2684, PG 126) (DB 1302, PG 484) (DB 998, PG 719) |
| 11 | 50' RESERVATION FOR INGRESS & EGRESS (DB 712, PG 385) |

| CURVE TABLE | | | | | | |
|---|---|---|---|---|---|---|
| CURVE | RADIUS | LENGTH | TANGENT | CHORD | BEARING | DELTA |
| C1 | 243.50' | 87.29' | 44.12' | 86.83' | S76° 33' 01"E | 20°32'25" |
| C2 | 3.74' | 2.74' | 1.43' | 2.68' | S33° 25' 45"W | 41°57'38" |
| C3 | 117.51' | 46.49' | 23.55' | 46.19' | S71° 34' 41"W | 22°40'11" |
| C4 | 243.50' | 56.84' | 28.55' | 56.71' | S72° 58' 00"E | 13°22'24" |
| C5 | 243.50' | 30.04' | 15.04' | 30.02' | S83° 11' 16"E | 7°04'08" |
| C6 | 243.50' | 0.42' | 0.21' | 0.42' | S86° 46' 17"E | 0°05'53" |

## UNIT GPIN

| UNIT | GPIN |
|---|---|
| A | 1467-34-7278-XXXX |
| B | 1467-34-7278-XXXX |

EXHIBIT 'B'
CONDOMINIUM PLAT AND PLANS OF
**5465 GREENWICH ROAD**
A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA

**MSA, P.C.**

Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)  www.msaonline.com



DWN BY: KCR
DATE: 10/24/2017

SHEET 6 OF 6
JOB# 17181
SCALE: 1" = 60'

EXHIBIT C

to

**Declaration of 5465 Greenwich Road, a Condominium**

BYLAWS

OF

5465 GREENWICH ROAD, A CONDOMINIUM

## ARTICLE I.

### Plan of Unit Ownership

1.1.    <u>Applicability</u>.  These Bylaws provide for the governance of the Condominium pursuant to the requirements of the Condominium Act.  The Condominium, located in the City of Virginia Beach, Virginia, and more particularly described in the Declaration, has been submitted to the provisions of the Condominium Act by recordation simultaneously herewith of the Declaration among the land records of the City of Virginia Beach, Virginia.

1.2.    <u>Compliance</u>.  Pursuant to the provisions of Section 55-79.53 of the Condominium Act, every Unit Owner and all those entitled to occupy a Unit shall comply with these Bylaws.

1.3.    <u>Office</u>.  The principal office of the Association shall be located at the Condominium or at such other place as may be designated from time to time by the Board of Directors.

1.4.    <u>Definitions</u>.  Capitalized or other terms used herein without definition shall have the meaning specified for such terms in the Declaration, or if not defined therein, the meanings specified for such terms in Section 55-79.41 of the Condominium Act.  These Bylaws are attached to the Declaration as Exhibit "C".  The following terms have the following meanings in the Condominium Instruments:

(A)    "Articles of Incorporation" means the Articles of Incorporation of Hoffman Greenwich Road Condominium Owners' Association.

(B)    "Board of Directors" or "Board" means the executive organ established pursuant to Article III of these Bylaws.

(C)    "Unit Owners Association" or "Association" means Hoffman Greenwich Road Condominium Owners' Association, a non-stock Virginia corporation.

## ARTICLE II.

### Composition; Meetings

2.1.    <u>Composition</u>.  The Association shall consist of all of the Unit Owners acting as a group in accordance with the Condominium Act pursuant to the Condominium Instruments.  The

Association shall have the responsibility of administering the Condominium, establishing the means and methods of collecting assessments and charges, arranging for the management of the Condominium and performing all of the other acts that may be required or permitted to be performed by the Association by the Condominium Act and the Condominium Instruments. The foregoing responsibilities shall be performed by the Board of Directors or Managing Agent, if any, as more particularly set forth in Article III of these Bylaws.

2.2.    Annual Meetings.  The annual meeting of the Association shall be held during the month of September of each year unless the same shall fall on a legal holiday, in which case the annual meeting shall be held on the next ensuing day which is not a legal holiday, or on such other date as the Board of Directors shall announce.  The meeting may be held by use of a consent signed by not less than 80% of the aggregate Percentage Interests; provided that a copy of the consent is furnished to all Unit Owners.

2.3.    Place of Meetings.  Meetings of the Association shall be held at the principal office of the Association or at such other suitable place convenient to the Unit Owners as may be designated by the Board of Directors.

2.4.    Special Meetings.  The President shall call a special meeting of the Association if so directed by resolution of the Board.  The President may call for a special meeting without request or petition from any other person.  The notice of any special meeting shall state the time, place and purpose thereof. No business shall be transacted at a special meeting except as stated in the notice.

2.5.    Notice of Meetings.  The Secretary/Treasurer shall mail to each Unit Owner a notice of each annual or regularly scheduled meeting of the Association at least twenty-one (21), but not more than sixty (60), days before such meeting, stating the time and place thereof.  Notice of any other meeting shall be sent at least ten (10), but not more than sixty (60), days before such meeting, stating the time, place and the purpose thereof.  Notwithstanding the foregoing, notice of any meeting at which there shall be voted upon any amendment to the Articles of Incorporation, a plan of merger, a proposed sale of assets pursuant to Va. Code Ann. Section 13.1-900 or the dissolution of the corporation shall be given as required by Va. Code Ann. Section 13.1-842. The mailing of a notice of meeting in the manner provided in this Section and Section 1 of Article IX of these Bylaws shall be considered service of notice.  Notices of meetings of the Association may be given by electronic transmission provided that the Unit Owner to whom such notice is sent consents and provided that the Secretary/Treasurer, or the Managing Agent, if any, certifies that notice was sent.

2.6.    Title to Units.  Title to a Condominium Unit may be taken in the name of one or more Persons in any manner permitted by law.

2.7.    Voting.  Except for specific actions described in Article 12 of the Declaration or elsewhere in these Bylaws, the only action of the Unit Owners shall be to elect directors with Unit A having the right to elect one director and Unit B having the right to elect two directors. Where the ownership of a Unit is in more than one Person, the Person who shall be entitled to cast the vote appurtenant to such Unit shall be the Person named in a certificate executed by all of the Unit Owners of such Unit and filed with the Secretary/Treasurer or, in the absence of such Person from

28

the meeting, the Person who shall be entitled to cast the vote appurtenant to such Unit shall be the Person owning such Unit who is present. If more than one Person owning such Unit is present, then such vote shall be cast only in accordance with their unanimous agreement pursuant to Section 55-79.77(c) of the Condominium Act. Such certificate shall be valid until revoked by a subsequent certificate similarly executed. Subject to the requirements of Section 55-79.77 of the Condominium Act, wherever the approval or disapproval of a Unit Owner is required by the Condominium Act or the Condominium Instruments, such approval or disapproval shall be made only by the Person who would be entitled to cast the vote of such Unit at any meeting of the Association.

2.8. <u>Proxies</u>. A vote may be cast in person or by proxy. Proxies shall be duly executed in writing by one with authority to execute deeds pursuant to the requirements of Section 55-79.77(d) of the Condominium Act (including without limitation the requirement that the proxy be dated) and must be filed with the Secretary/Treasurer before the appointed time of the meeting. Such proxy shall be deemed revoked only upon actual receipt of notice of revocation by the person presiding over the meeting from a Unit Owner. Except with respect to proxies in favor of a Mortgagee, no proxy shall in any event be valid for a period in excess of eleven (11) months after the execution thereof and, in any event, any proxy shall terminate automatically upon the adjournment of the first meeting held on or after the date of the proxy. The proxy shall include a brief explanation of the effect of leaving the proxy uninstructed.

2.9. <u>Quorum</u>. Except as otherwise provided in these Bylaws, the presence in person or by proxy of Unit Owners of at least seventy-five (75%) of the aggregate Percentage Interests shall constitute a quorum at all meetings of the Association. However should Unit A refuse to attend a meeting after reasonable notice and opportunity to do so, the presence of the remaining Unit Owners shall constitute a quorum.

2.10. <u>Conduct of Meetings</u>. The President may appoint a Person to serve as parliamentarian at any meeting of the Association. The then current edition of Robert's Rules of Order shall govern the conduct of all meetings of the Association when not in conflict with the Condominium Instruments or the Condominium Act.

ARTICLE III.

Board of Directors

3.1. <u>Number</u>. The affairs of the Association shall be managed under the direction of its Board of Directors. The number of persons comprising the Board of Directors shall be three (3) and may be changed by amendment to these Bylaws.

3.2. <u>Powers and Duties</u>. The Board of Directors shall have all of the powers and duties necessary for the administration of the affairs of the Association and may do all such acts and things as are by the Condominium Act or the Condominium Instruments required to be exercised and done by the Association. The Board of Directors shall have the power to designate those officers authorized to provide statements and waivers to Unit Owners as may be desirable or required pursuant to the Condominium Act and, to establish the fees to be charged therefor so long as the same do not exceed the maximum amounts set forth in the Condominium Act, including

29

without limitation Sections 55-79.84, 55-79.85 and 55-79.97 thereof. The Board of Directors may delegate to one of its members, or to a Person employed for such purpose, the authority to act on behalf of the Board of Directors on such matters relating to the duties of the Managing Agent (as defined in Section 3 of this Article), if any, which may arise between meetings of the Board of Directors. In addition to the duties imposed by these Bylaws or by any resolution of the Association that may hereafter be adopted, the Board of Directors shall on behalf of the Association, but only to the extent that the following matters are not dealt with by the Owner of, or any tenant leasing, Unit A and Unit B:

(A)    Prepare and disseminate an annual budget in which there shall be established the assessments of each Unit Owner in respect of expenditures lawfully made or incurred by or on behalf of the Association or lawfully assessed by the Association for the creation and/or maintenance of reserves, in each case as authorized by the Declaration (the "Common Expenses").

(B)    Make assessments against Unit Owners to defray the costs and expenses of the Condominium and determine when the same shall commence as to all Units, establish the means and methods of collecting such assessments from the Unit Owners and establish the period of the installment payments of the annual assessment for Common Expenses. Unless otherwise determined by the Board of Directors, the annual assessment against each Unit Owner for his proportionate share of the Common Expenses shall be payable in equal quarterly installments, each such installment to be due and payable in advance on the first day of each calendar quarter for such quarter.

(C)    Provide for the operation, care, upkeep, maintenance and servicing of the Common Elements and Easement Areas, except to the extent that operation, care, upkeep, maintenance and service is the responsibility of the Unit Owner.

(D)    Designate, hire and dismiss the personnel necessary for the maintenance, operation, repair and replacement of the Common Elements and Easement Areas and provide services for the Common Elements and Easement Areas and, where appropriate, provide for the compensation of such personnel and for the purchase of equipment, supplies and material to be used by such personnel in the performance of their duties; provided that all services by a Unit Owner or any party related to a Unit Owner shall be charged at prices which are at or below competitive prices from unrelated third parties.

(E)    Collect the assessments from the Unit Owners, deposit the proceeds thereof in bank depositories designated by the Board of Directors and use the proceeds to carry out the purposes of the Association.

(F)    Upon approval of not less than seventy-five percent (75%) of the Percentage Interests, enact and amend rules from time to time for the use of the Units and the Common Elements and Easement Areas ("Rules") in accordance with the provisions of the Declaration and the ECR; provided however, that no such Rules so adopted shall be in conflict with the Condominium Act, the Condominium Instruments or the ECR; and provided further that no such Rules shall bind or be construed so as to impair in any manner the lien of any mortgage or deed of trust with respect to any Unit or the Common Elements.

(G)    Open bank accounts on behalf of the Association and designate the signatories thereon.

(H)    Make, or contract for the making of, repairs, additions and improvements to or alterations of the Common Elements and Easement Areas and repairs to and restoration of the Common Elements in accordance with the Declaration and the ECR after damage or destruction by fire or other casualty, or as a result of condemnation or eminent domain proceedings.

(I)    Enforce by legal means the provisions of the Condominium Instruments and the ECR and the Rules and act on behalf of the Unit Owners with respect to all matters arising out of any eminent domain proceedings.

(J)    Obtain and carry insurance as provided in the Declaration and the ECR, pay the premiums therefore and adjust and settle any claims thereunder in accordance with the Declaration and the ECR.

(K)    Pay the cost of all authorized services rendered to the Association and not billed to Unit Owners of individual Units or otherwise provided for in these Bylaws.

(L)    Keep books with detailed accounts in chronological order of the Association's receipts and expenditures affecting the Condominium and the administration of the Condominium, specifying the expenses of maintenance and repair of the Common Elements and Easement Areas and any other expenses incurred. All books and records shall be kept in accordance with generally accepted accounting principles consistently applied (but may be on the cash method of accounting) and shall be open for inspection by Unit Owners.

(M)    Disclose to the entire Board of Directors any conflict of interest which the director or the Unit Owner appointing such director may have in connection with any matter being acted on by the Board of Directors.

(N)    Do such other things and acts not inconsistent with the Condominium Act and the Condominium Instruments which the Board of Directors may be authorized to do under the Condominium Act or Condominium Instruments or by a resolution of the Association.

3.3.    Managing Agent. The Board of Directors may appoint for the Condominium a "Managing Agent", who shall serve without compensation unless compensation of such Managing Agent is approved by a vote of all of not less than ninety percent (90%) of the Percentage Interests. Any Managing Agent who handles funds for the Association shall be covered by its own fidelity bond providing for the coverage required by Article VI and naming the Association as an additional obligee.

(A)    Duties. The Managing Agent shall perform such duties and services as the Board of Directors shall unanimously authorize. The Board of Directors may delegate to the Managing Agent all of the powers granted to the Board of Directors by these Bylaws other than the powers set forth in paragraphs (B), (F), (G) and (M) of Section 3.2 of this Article III. The Managing Agent may perform the obligations, duties and services relating to management of the

31

Condominium, the rights of Mortgagees and make recommendations concerning the maintenance of reserve funds in compliance with the provisions of these Bylaws.

(B)   Standards.  The Board of Directors may impose appropriate standards of performance upon the Managing Agent.  Unless the Managing Agent is instructed otherwise by the Board of Directors:

(i)   no remuneration shall be accepted by the Managing Agent from vendors, contractors or others providing goods or services to the Association, whether in the form of commissions, finders' fees, service fees or otherwise, and any discounts received shall benefit the Association; and

(ii)   any financial or other interest which the Managing Agent may have in any firm providing goods or services to the Association shall be disclosed promptly to the Board of Directors.

(C)   Limitations.  Subject to the provisions of Section 55-79.74(b) of the Condominium Act, the Board of Directors may appoint a Managing Agent for a term not to exceed two (2) years.  Any contract with the Managing Agent must provide that it may be terminated (without payment of a termination fee) with cause on no more than thirty (30) days written notice and without cause on no more than ninety (90) days written notice.  The foregoing shall not be deemed to prohibit renewals of the contract in accordance with the Condominium Act and the provisions hereof.

(D)   Liaison.  The Board of Directors may designate one of its members as liaison officer who shall be authorized to instruct and deal with the Managing Agent on any matter relating to the Condominium.

3.4.   Number and Term of Office.  The Board of Directors shall initially consist of three (3) persons, each of whom shall be Unit Owners or members, partners, officers or employees of Unit Owners.  Except for resignation or removal, the directors shall hold office for terms of one (1) year or until their respective successors shall have been appointed by the Unit Owners' Association.

3.5.   Appointment of Directors.  The owner of Unit A shall have the right at all times to appoint one (1) director, the owner of Unit B shall have the right at all times to appoint two (2) director.  Any such director appointed pursuant to this Subsection shall serve at the pleasure of the Unit Owner who appointed him or her and may be removed at any time by such Unit Owner but may not be removed by the vote of any other Unit Owners.  If Unit B is subdivided, the right of appointment may be allocated pursuant to the instrument of subdivision.

3.6.   Resignation of Directors.  A director may resign at any time.

3.7.   Organization Meeting.  The first meeting of the Board of Directors following each annual meeting of the Association at which directors are elected shall be held within thirty (30) days thereafter at such time and place as shall be fixed by the Association at the meeting at which such Board of Directors shall have been elected, and no notice shall be necessary to the newly

elected members of the Board of Directors in order to legally constitute such meeting provided that a quorum of the Board of Directors shall be present.

3.8.    Regular Meetings. Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the directors, but such meetings shall be held at least once during each fiscal year unless there is a unanimous consent. Notice of regular meetings of the Board of Directors shall be given to each director, by mail, telegraph, telephone, telecopy or electronic transmission at least three (3) business days before the day named for such meeting.

3.9.    Special Meetings. Special meetings of the Board of Directors may be called by the President on three (3) business days' notice to each director, given by mail, telegraph, telephone, telecopy or electronic transmission which notice shall state the time, place and purpose of the meeting.    Special meetings of the Board of Directors shall be called by the President or Secretary/Treasurer in like manner and with like notice on the written request of at least one (1) director.

3.10.    Waiver of Notice. Any director may at any time, in writing signed by such director, waive notice of any meeting of the Board of Directors, and such waiver shall be deemed equivalent to the giving of such notice. Except in the circumstances described in Va. Code Ann. Section 13.1-867B, attendance by a director at any meeting of the Board of Directors shall constitute a waiver of notice by him of the time, place and purpose of such meeting.  If all directors are present at any meeting of the Board of Directors, no notice shall be required and any business may be transacted at such meeting.

3.11.    Quorum of Board of Directors.  At all meetings of the Board of Directors, two directors shall constitute a quorum for the transaction of business.

3.12.    Compensation. No director shall receive any compensation for acting as such or reimbursement for expenses from the Association.

3.13.    Unresolved Board Disputes.  In the event that the Board of Directors cannot unanimously agree, then any member of the Board of Directors may cause the dispute to be decided either by mediation or by binding arbitration in Norfolk, Virginia by a single Arbitrator in accordance with the rules of the American Arbitration Association, with cost of such mediation or arbitration borne in proportion to Percentage Interests.

3.14.    Action Without Meeting.  Any action by the Board of Directors required or permitted to be taken at any meeting may be taken without a meeting if all of the members of the Board of Directors shall individually or collectively consent in writing to such action. Any such written consent shall be filed with the minutes of the proceedings of the Board of Directors.

ARTICLE IV.

Officers

4.1.    Designation. The principal officers of the Association shall be the President, the Vice President, and the Secretary/Treasurer, all of whom shall be elected by the Board of Directors.

33

The President shall be a member of the Board of Directors. Any other officers may, but need not, be members of the Board of Directors. All officers shall be an employee, officer, or designee of a Unit Owner.

4.2.    Election of Officers. The officers of the Association shall be elected annually by a majority vote of the Board of Directors at the organizational meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

4.3.    Removal of Officers. Upon the unanimous vote of the Board of Directors, any officer may be removed, either with or without cause, and a successor may be elected at any regular meeting of the Board of Directors or at any special meeting of the Board of Directors called for such purpose.

4.4.    President. The President shall be the chief executive officer of the Association, preside at all meetings of the Association and of the Board of Directors and have all of the powers and duties which are incident to the office of president of a corporation organized under the Virginia Nonstock Corporation Act.

4.5.    Vice President. The Vice President shall take the place of the President and perform the duties of the President whenever the President shall be absent or unable to act. If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board of Directors to act in the place of the President on an interim basis. The Vice President shall also perform such other duties as shall from time to time be imposed upon him by the Board of Directors or by the President. The Vice President shall have primary responsibility for obtaining the insurance as provided in the Declaration and the ECR, authorizing payment of the premiums therefore and adjusting and settling any claims.

4.6.    Secretary/Treasurer. The Secretary/Treasurer shall keep the minutes of all meetings of the Association and of the Board of Directors, have charge of such books and papers as the Board of Directors may direct, maintain a register setting forth the place to which all notices to Unit Owners and Mortgagees hereunder shall be delivered and, in general, perform all the duties incident to the office of secretary of a corporation organized under the Virginia Nonstock Corporation Act. The Secretary/Treasurer shall also have the responsibility for Association funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data, and be responsible for the deposit of all monies and other valuables in the name of the Association in such depositories as may from time to time be designated by the Board of Directors and, in general, perform all the duties incident to the office of treasurer of a corporation organized under the Virginia Nonstock Corporation Act.

4.7.    Compensation of Officers. No officer shall receive any compensation for acting as such or any reimbursement for expenses from the Association.

ARTICLE V.

Operation of the Property

5.1.    Determination of Common Expenses and Assessments Against Unit Owners.

34

(A)   Fiscal Year.  The fiscal year of the Association shall be the calendar year unless otherwise determined by the Board of Directors.

(B)   Preparation and Approval of Budget.  At least forty-five days (45) before the beginning of the fiscal year, the Board of Directors shall, to the extent necessary taking into account the obligations of any tenants leasing Units, adopt by a unanimous vote a budget for the Association containing an estimate of the total amount considered necessary to pay the cost of maintenance, management, operation, repair and replacement which the Association is obligated to maintain.  Following its adoption, the budget shall be distributed to the Unit Owners.

(C)   Reserves.  Such budget may, to the extent necessary taking into account the obligations of any tenants leasing Units, also include such amounts as the Board of Directors considers necessary to provide working capital, a general operating reserve and reserve for contingencies and replacements.  At least thirty (30) days before the beginning of the fiscal year, the Board of Directors shall send to each Unit Owner a copy of the budget in a reasonably itemized form which sets forth the amount of the Common Expenses and any special assessment payable by each Unit Owner.  Such budget shall constitute the basis for determining each Unit Owner's assessment for the Common Expenses of the Association.

(D)   Assessment and Payment of Common Expenses.  Any expenses shall be assessed by the Board of Directors against each Unit Owner in as provided in the Declaration and the ECR and shall be a lien against each Unit Owner's Unit as provided in Article VII, Section 7.2, of these Bylaws.  Within ninety (90) days after the end of each fiscal year, the Board of Directors shall supply to all Unit Owners an itemized accounting of the Common Expenses for such fiscal year actually incurred and paid, together with a tabulation of the amounts collected pursuant to the budget unanimously adopted by the Board of Directors for such fiscal year, and showing the net amount over or short of the actual expenditures plus reserves.  Any amount accumulated in excess of the amount required for actual expenses and reserves shall, if the Board of Directors deems it advisable, be credited according to each Unit Owner's contribution to the next quarterly installment(s) due from Unit Owners under the current fiscal year's budget, until exhausted.  Any net shortage shall be assessed promptly against the Unit Owners in accordance with the contribution responsibilities as provided in the Declaration and shall be payable as the Board of Directors may determine.

(E)   Initial Budget.  Upon taking office, the first Board of Directors shall determine the budget and level of assessments to the date of expiration of the first fiscal year, as defined in this Section, and the date the assessments shall commence as to all Units.  Assessments shall be levied and become a lien against the Unit Owners during such period as provided in this Section and in Article VII, Section 7.2.

(F)   Effect of Failure to Prepare or Adopt Budget.  The failure or delay of the Board of Directors to prepare or adopt a budget for any fiscal year shall not constitute a waiver or release in any manner of a Unit Owner's obligation to pay his allocable share of the Common Expenses as herein provided whenever the same shall be determined and, in the absence of any annual budget or adjusted budget, each Unit Owner shall continue to pay each quarterly installment at the rate established for the previous fiscal year until notice of the quarterly payment which is due more than ten (10) days after such new annual or adjusted budget shall have been delivered.

35

5.2.   Payment of Common Expenses. Each Unit Owner shall pay the Common Expenses assessed by the Board of Directors pursuant to the provisions of Section 5.1 of this Article V. No Unit Owner may exempt itself from liability for its contribution toward Common Expenses by waiver of the use or enjoyment of any of the Common Elements or by abandonment of its Unit. No Unit Owner shall be liable for the payment of any part of the Common Expenses assessed against its Unit and due subsequent to the date of recordation of a conveyance by it in fee of such Unit to a successor Unit Owner (except a conveyance as security for the performance of an obligation). Each Unit Owner waives the benefit of the homestead exemption as to any assessments levied hereunder against either the Unit or the Unit Owner. Each such assessment, together with the interest, late charges and costs of collection (including attorney's fees) shall also be the personal obligation of the Unit Owner at the time the assessment fell due. The personal obligation for delinquent assessments shall not pass to successors in title or interest unless assumed by them.

5.3.   Collection of Assessments. The Board of Directors, or the Managing Agent at the request of the Board of Directors, may take action to collect any assessments due from any Unit Owner. Any assessment, or installment thereof, not paid within ten (10) days after due shall, at the option of the Association, accrue a late charge in the amount of $100 and shall accrue interest as provided in Article VII, Subsection 7.1(D). Each defaulting Unit Owner shall also pay all costs of collection, including without limitation attorney's fees, incurred in the collection of any unpaid assessment and shall also pay any expense incurred as a result of a check being returned to the Association without payment. The Board of Directors shall have the power to accelerate all remaining installments of any annual assessment in the event an assessment is not paid within thirty (30) days of its due date.

5.4.   Statement of Common Expenses and Access to Records. The Association shall promptly provide any Unit Owner, contract purchaser or Mortgagee so requesting the same in writing with a written statement of all unpaid assessments for Common Expenses due from such Unit Owner. The Board of Directors may impose a reasonable charge for the preparation of such statement to the extent permitted by the Condominium Act. The Association shall make available during normal business hours for inspection, upon request by Unit Owners, Mortgagees, and prospective purchasers, and their authorized agents current copies of the Condominium Instruments and any Rules governing the Condominium and other books, records and financial statements of the Association (including, if such is prepared, the most recent annual audited financial statement of the Association). If and so long as there is no audited statement available, any Mortgagee may have an audited statement prepared at its expense.

5.5.   Maintenance, Repair, Replacement and Other Common Expenses. The maintenance, repair and replacement of the Common Elements shall be as provided in the Declaration and the ECR.

ARTICLE VI.

Mortgages

6.1.   Notice of Default, Casualty or Condemnation. Upon request, the Association shall give notice to any Mortgagee of a default in paying an assessment or any other default with respect

36