**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>BCAUSE MINING LLC, et al.,<br><br>Debtors/Debtors-in-possession. | Chapter 7<br><br>Case No. 19-10562<br>(Jointly Administered)<br><br>Honorable Janet S. Baer<br><br>Hearing Date: January 8, 2020 at 10:00 a.m. |

**REPLY IN SUPPORT OF FEE APPLICATIONS OF FREEBORN & PETERS LLP**
**AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Freeborn & Peters LLP ("*Freeborn*"), counsel to the Official Committee of Unsecured Creditors (the "*Committee*") appointed in the above-captioned cases of BCause Mining LLC ("*Mining*") and BCause LLC ("*BCause*" together with Mining, the "*Debtors*"), hereby submits this reply in support of its first interim fee application (the "*First Interim Application*") (ECF No. 304) and second and final fee application (the "*Final Fee Application*," together with the First Interim Application, the "*Fee Applications*") (ECF No. 369). In support hereof, Freeborn states as follows:

**Preliminary Statement**

WESCO Distribution, Inc. ("*WESCO*"), the Debtors' purported secured creditor, filed an objection to Freeborn's First Interim Application (the "*Preliminary Objection*") (ECF No. 336) and a supplemental objection to the Final Fee Application (the "*Supplemental Objection*," together with the Preliminary Objection, the "*Objections*"). WESCO's Objections are entirely without merit and fail to identify and apply the correct standard applicable to review of professional fees under section 330 of the Bankruptcy Code.[1] Among other things, WESCO

---

[1] Capitalized terms not defined in this reply shall have the meaning ascribed to them in the Final Fee Application.

complains of Freeborn's efforts toward a chapter 11 plan of reorganization, the Spot Exchange sale process, and the complaint filed against WESCO as not progressing sufficiently or providing a benefit to the Debtors' estates. WESCO is not only incorrect on all counts, but ignores its own role in these cases to further its revisionist history. The Court should overrule WESCO's objections.

Significantly, WESCO does not lodge a single objection to a specific time entry as unreasonable or unnecessary. For these reasons and those that follow, WESCO's Objections should be overruled and the Fee Applications should be granted.

**I. Freeborn's Fees and Expenses Were Reasonably Likely to Benefit the Debtors' Estates at the Time They were Incurred and Have Yielded Such Benefits.**

In considering the reasonableness of a professional's fees and expenses under the factors of section 330 of the Bankruptcy Code, courts look at whether the fees were reasonable at the time the services were rendered. In re Colberg, 2019 WL 1451280, at *3 n.6 (Bankr. N.D. Ill. Feb. 27, 2019) ("Litigation can involve risk, and reasonableness should not be determined based on results after the fact.") (citing *In re Woerner*, 783 F.3d 266, 276 (5th Cir. 2015)). Thus, courts reject the "hindsight" analysis seemingly proposed by WESCO. *See In re Hospital Partners of America Inc.*, 597 B.R. 763, 766-67 (Bankr D. Del. 2019) ("Instead, for services to be compensable under § 330(a)(4)(A), they must only have been reasonably likely to benefit the debtor's estate *at the time they were rendered*, not in 'hindsight.'") (internal quotation omitted, emphasis in original).

    A. The Committee Worked With the Debtors to Reduce Costs and Increase Cash Flow

Throughout the Debtors' chapter 11 cases, the Committee worked in tandem with the Debtors to reduce operating costs and find new and additional sources of revenue in order to fund the cases and a chapter 11 plan of reorganization. In particular, the Debtors reduced payroll

- 2 -

by laying off employees, rejected certain unnecessary executory contracts, and reduced energy costs through efficient energy management and agreements with its provider, Dominion. Moreover, the Debtors explored new avenues of revenue creation and entered into an agreement with one of its customers to mine cryptocurrency on its own behalf, which resulted in a new income stream for the Debtors.

      B. <u>The Committee Worked With the Debtors to Prepare the Complaint Objecting to WESCO's Liens</u>

The Committee and the Debtors worked hand-in-hand to draft the initial adversary complaint objecting to the validity, priority, and extent of WESCO's liens. In particular, the Committee took the laboring oar on the initial draft at the request of the Debtors, which was ultimately finalized and filed by the Debtors. While WESCO contends that the Debtors and the Committee failed to make sufficient progress on that front, WESCO fails to acknowledge that litigation was delayed in party at WESCO's own request to extend the answer deadline by more than 30 days to just a month prior to conversion to chapter 7. That action is still pending and Freeborn understands that the chapter 7 trustee believes the complaint has merit and intends to continue pursuing the litigation. If ultimately successful, the litigation against WESCO will yield a substantial benefit to the Debtors' estates and create value for other creditors.

      C. <u>The Committee Worked With the Debtors to Formulate a Plan of Reorganization</u>

The Committee and the Debtors also worked together to formulate a plan of reorganization, in part, to address WESCO's criticisms that the Debtors had not proposed a path forward in chapter 11. WESCO now contends that the Committee and the Debtors did not make sufficient progress on that front by soliciting the plan.

The Debtors did not seek solicitation of the chapter 11 plan for several reasons. For one, the Debtors and the Committee sought the input of WESCO in an effort to propose a consensual

chapter 11 plan, but were never able to gain much traction largely because WESCO was only interested in one outcome – dismissal of the bankruptcy cases. For another, the Debtors and the Committee were litigating WESCO's motion to dismiss at multiple evidentiary hearings. At the hearing on August 8, 2019, the Court indicated that in order to satisfy the Court's and WESCO's concerns raised in the motion to dismiss, the Debtors need not actually seek solicitation of a specific chapter 11 plan but rather demonstrate that the Debtors had a reasonable likelihood of reorganizing. In sum, WESCO ignores its own role in contributing to the delay in permitting the Debtors to seek solicitation of the proposed chapter 11 plan.

At the time the Debtors and the Committee worked to propose the plan, the Debtors had reasonable prospects for confirming a chapter 11 plan. They had reached a settlement with BMG that would have yielded a substantial benefit to the Debtors' estates and that the parties believed would have allowed the Debtors to continue to finance their operations through the confirmation of a chapter 11 plan. Moreover, the Debtors were in negotiations with one of its current customers to rent-to-own additional mining computers so that the Debtors could mine on their own account and add further revenue to finance a chapter 11 plan. Indeed, the Debtors and the Committee had negotiated extensively over chapter 11 plan provisions that would have resulted in a significant recovery for unsecured creditors. It was only the last-minute failure of the settlement with BMG that created a domino effect causing the Debtors' conversion to chapter 7. The Committee made every effort to maximize the value of the estates for unsecured creditors and those efforts were reasonable at the times they were undertaken.

### D. The Committee Facilitated the Marketing and Sale of the Spot Exchange

WESCO also contends that the Committee's efforts toward the sale of the Spot Exchange were insufficient and did not yield a benefit to the estates. On the contrary, the Committee's efforts yielded multiple interested buyers for the Spot Exchange.

The Debtors initially sought approval of an agreement with certain insiders of the Debtors which proposed to pay Holdings the first $1 million earned by the Spot Exchange after profitability was reached, plus retention of a percentage of Holdings' equity interest in the BCaus Spot. WESCO objected to that proposal and demanded a marketing process. The Debtors obliged and the Committee's counsel agreed to facilitate the sale process – *at WESCO's request* – by coordinating communications between potential purchasers and providing due diligence materials. Those efforts resulted in two interested buyers – the insider group and a group led by a former officer of the Debtors. Sale discussions were ongoing between those parties at the time of the Debtors' conversion to chapter 7 and were taken over by the chapter 7 trustee. At all times during the marketing and sale process, it appeared to the Committee that there was substantial potential value to be realized from the sale of the Spot Exchange.

**II.    The "Unauthorized Payments" Were Disclosed to All Parties and Have Been Transferred to the Chapter 7 Trustee**

WESCO also contends that Freeborn's entire Fee Applications should be denied because it received alleged "unauthorized payments." Freeborn disagrees because the payments were disclosed, authorized in cash collateral budgets, and, in any event, were transferred to the chapter 7 trustee at the Court's direction. Each of the payments to Freeborn were budgeted in the Debtors' various cash collateral orders, were disclosed in each version of the Debtors' chapter 11 plans filed with the Court, and were held in Freeborn's client trust account at all times until Freeborn transferred the funds to the chapter 7 trustee at the Court's direction. WESCO was aware of such budgeted payments at least as of early August 2019, but did not raise the issue with the Court until after negotiations between the Debtors, the Committee, and WESCO broke down and the case was converted to chapter 7. WESCO's objection is entirely unfounded in fact and law.

**III.    The Debtors Did Budget for Professional Fees**

WESCO also contends that the Fee Applications should be reduced or denied because the Debtors failed to properly budget for fees and WESCO has a lien on the Debtors' assets. WESCO, again, is mistaken.  For one, the Debtors did budget for professional fees. There were amounts budgeted for payments to Committee counsel and the Debtors' counsel in the Debtors' cash collateral budgets.  *See e.g.* ECF No. 79, 120, 166, 242, and 277.  While the amounts budgeted do not directly correlate with the amounts actually incurred, that is not uncommon.  It is incredibly difficult to budget for professional fees and expenses, especially when faced with uncertain litigation and evidentiary hearings from month to month.

WESCO's contention that it has liens on the Debtors' assets is clearly disputed by the adversary complaint and, further, is irrelevant.  Freeborn is not proposing to be paid out of WESCO's collateral as will ultimately be determined by the Court.

**IV.    Freeborn Satisfied Local Rule 5082-1(B)(2)**

Finally, WESCO complains that Freeborn failed to comply with Local Rule 5082-1(B)(2) by omitting the source of requested payment from its narrative summary.  WESCO is incorrect. Freeborn's Final Fee Application specifically requests payment of requested amounts "from available funds in the Debtors' estates."  (Final Fee Application ¶¶ 6 and 34.)

## Conclusion

Based on the foregoing, Freeborn submits that its fees and expenses were reasonably likely to benefit the Debtors' estates at the time they were incurred and did, in fact, benefit the Debtors estates.  The Court should overrule WESCO's objections and grant the Fee Applications.

Dated: December 11, 2019 **FREEBORN & PETERS LLP**

By: /s/ Elizabeth L. Janczak
      One of Its Attorneys

Shelly A. DeRousse
Elizabeth L. Janczak
311 South Wacker Drive, Suite 3000
Chicago, IL 60606
Tel:    312.360.6000
Fax:   312.360.6520
Email:  sderousse@freeborn.com
          ejanczak@freeborn.com