# TRIPLE NET LEASE
## (WITH RIDER)

**THIS LEASE** (the "Lease") is made as of November 1, 2017, by and between Hoffland Properties Inc., a Virginia corporation, Lessor, and Bcause Mining LLC, a Virginia limited liability company, Lessee.

**RECITALS:**

A. Lessor owns the parcel and improvements thereon commonly known as 5465 Greenwich Road, Virginia Beach, Virginia 23462, with the GPIN 14673472780000, and more exactly described in <u>Exhibit A</u> and generally shown on <u>Exhibit A-1</u> ("Lessor's Property").

B. Lessee desires to lease, with an option to buy, on an "AS-IS", WHERE-IS" basis, the portion of Lessor's Property designated on <u>Exhibit B</u> as ("Unit B").

C. In connection with the transaction, Lessor will record a Declaration of Condominium and related exhibits ( the "Declaration") to create a condominium to be known as "5465 Greenwich Road, a Condominium" (the "Condominium"). Unit B will be part of the Premises (hereinafter defined) Leased to Lessee. Unit A and the improvements thereon will be the remainder of Lessor's Property, which will be sold by Lessor. Unit A and Unit B are hereinafter sometimes referred to collectively as "Units." Capitalized terms used in the Declaration shall have the same meaning herein unless otherwise defined herein or unless the context clearly requires otherwise.

D. A draft of the proposed Declaration is attached hereto as <u>Exhibit C-1</u>. While Exhibit C-1 may be revised by Lessor, in its sole discretion, it is expected that the final document will be substantially in the form of Exhibit C-1.

E. In addition, a draft of the proposed  a Declaration of Easements, Covenants, Conditions and Restrictions ("ECR") with respect to the Units and related improvements is attached hereto as <u>Exhibit C-2</u>. While Exhibit C-2 may be revised by Lessor, in its sole discretion, it is expected that the final document will be substantially in the form of Exhibit C-2 and that it will be recorded simultaneously with, or following, recordation of the Declaration.

1.    **DESCRIPTION OF PREMISES**. Lessor, in consideration of the rents to be paid by Lessee and other covenants of Lessee contained herein, does hereby lease to Lessee the premises described below (collectively, the "Premises"):

1.1.    Unit B, together with the buildings (consisting of approximately 105,861 square feet of space), structures, fixtures and other improvements (collectively, the "Improvements") located thereon and the Common Elements appurtenant thereto together with, and subject to, the rights, obligations, terms and conditions of the ECR;

1.2.    all of Lessor's right, title and interest in and to all tangible personal property within Unit B (the "Personal Property");

**EXHIBIT 1**

1.3.    to the extent severable, all of Lessor's right, title and interest in and to (i) all assignable existing permits, licenses, approvals and authorizations issued by any governmental authority for the Premises only; and (ii) all assignable existing warranties and guaranties issued to Lessor in connection with the Improvements or the Personal Property (the property described in this Subparagraph 1.3 being referred to in this Lease collectively as the "Intangibles").

1.4.    <u>Property Defined</u>.

Unit B, the Improvements, the Personal Property and the Intangibles may also be referred to in this Lease collectively as the "Property."

2.    **TERM**.  The term of this Lease shall be for a period of approximately one hundred twenty (120) months, commencing upon full execution of this Lease and receipt of certificate of insurance from Lessee (the "Commencement Date"), and ending at midnight on the 31st day of October, 2027 (the "Expiration Date").

3.    **RENT**.  Lessee agrees to pay Lessor, without demand, deduction or offset, monthly rent as outlined below, payable in advance on the first business day of each and every month.

| Term | Monthly Rent |
|---|---|
| Commencement Date – 04/30/18 | $38,729.00 |
| 05/01/18 – 10/31/18 | $50,000.00 |
| 11/01/18 – 10/31/19 | $51,751.00 |
| 11/01/19 – 10/31/20 | $53,561.25 |
| 11/01/20 – 10/31/21 | $55,435.89 |
| 11/01/21 – 10/31/22 | $57,376.15 |
| 11/01/22 – 10/31/23 | $59,384.32 |
| 11/01/23 – 10/31/24 | $61,462.77 |
| 11/01/24 – 10/31/25 | $63,613.97 |
| 11/01/25 – 10/31/26 | $65,840.46 |
| 11/01/26 – 10/31/27 | $68,144.88 |

The first installment of rent shall be due upon the execution of this Lease, but rent shall begin to accrue not later than November 1, 2017.  If the term of this Lease shall expire on a day other than the first day of a calendar month, the rent for any partial month shall be pro-rated.  All rent payments shall be paid to Lessor at its address specified in paragraph 32 below, or such other place as Lessor designates in writing.

4.    **ACCEPTANCE OF PREMISES**.  Occupancy of the Premises by Lessee shall constitute its acceptance of same, "AS-IS WHERE-IS".  Lessee acknowledges that Lessor has not made any warranties or representations, oral or written, whatsoever with respect to the Premises including, without limitation, LESSOR HAS NOT MADE ANY WARRANTY OF HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, physical condition, environmental condition, utility capacity, compliance with laws, governmental approvals, or operating history.  Lessee acknowledges and agrees that it has not relied on, and will not rely on, any express or implied warranties, representations, guaranties or statements pertaining to the Premises made or furnished by Lessor or any agent of Lessor. Lessor has furnished to Lessee, without warranty as to accuracy, completeness thereof or right to rely thereon, and subject to confidentiality, a copy of the report on Lessor's Property as prepared by

2

MAS, P.C. Lessor shall not be responsible for obtaining any governmental approvals or permits necessary to enable Lessee to occupy or use the Premises, same being the sole responsibility of Lessee. Lessor shall not be responsible for obtaining any certificates of occupancy or other approvals required in connection with construction work done by Lessee or contractors engaged by Lessee.

5.   **INTENTIONALLY DELETED**.

6.   **EARLY POSSESSION**.  If Lessee occupies the Premises prior to the Commencement Date, the Commencement Date shall be considered the date such occupancy begins and shall not advance the termination date; however, Lessee shall pay rent for such period.

7.   **USE AND COMPLIANCE WITH LAW**.  The Premises shall be used only for data center purposes, and for no other purpose without Lessor's prior written consent. Lessee represents and warrants to Lessor that it will take all necessary measures so that the data center usage will not (A) prevent completely safe occupancy of Unit A or (B) interfere with, or prevent the owners or occupants of Unit A from use of, all equipment and apparatus now or hereafter located on Unit A, including, without limitation, computers, telecommunication equipment and similar devices. Lessee shall not use, or permit the use of, or its occupants the Premises for any unlawful purpose or so as to constitute a nuisance or a danger to Unit A or others. Lessee covenants and agrees to comply strictly with all requirements in the Declaration and ECR and with all ordinances, rules and regulations of governmental authorities applicable to the Premises.

8.   **SIGNS**.  Lessee shall not, without the prior written consent of Lessor and the architectural review committee having jurisdiction over the Improvements, place any signs or advertising matter or material on the exterior or interior of the Improvements. If Lessor approves any signage or advertising matter or material, Lessee shall remove same at its expense at the termination or expiration of this Lease, and shall repair at its expense any damage associated with such removal. Any signs must comply with all applicable sign ordinances.

9.   **QUIET ENJOYMENT AND COVENANT OF TITLE**.  Lessor covenants that it has full right and power to execute this Lease and to grant the estate demised herein, and the Lessee, upon payment of the rents herein reserved and performing the terms, conditions, and covenants herein contained, shall peacefully and quietly have, hold, and enjoy the Premises during the full term of this Lease, and any extension hereof, from all persons claiming through Lessor.

10.   **OPERATING EXPENSES**.

10.1.   This Lease is triple net. Accordingly, Lessee shall pay to Lessor (unless paid directly to a third-party as herein required) during the term hereof, in addition to the rent payable under Paragraph 3, 100% of all expenses of any nature related to the Premises, including, without limitation, real and personal property taxes, insurance premiums, utility expenses, storm water fees, condominium fees and association charges, all assessments or other expenses in connection with the ECR, all repair, maintenance and replacement in connection with the Premises, trash collection charges, snow removal expenses, and the like (collectively, "Additional Rent").

10.2.   Lessee shall make arrangements for all utilities to be titled in its name and billed directly to it,

10.3.   Lessee's Additional Rent with respect to condominium fees, real estate taxes and insurance premiums shall not exceed Six Thousand Eight Hundred Nineteen and No/100 Dollars ($6,819.00) per month for the first Lease Year.  No other components of Additional Rent are capped and the condominium fees, real estate taxes, and insurance premiums shall not be subject to the cap after the first Lease Year.

11.   **LESSOR'S OBLIGATIONS**.  Lessor shall have no obligations to make any repairs of any sort to the Premises or to the balance of Lessor's Property.

12.   **LESSEE'S OBLIGATIONS**.  Lessee, at Lessee's expense, shall keep in good order, condition and repair, making all replacements when necessary, the Premises and every part thereof including, without limiting the generality of the foregoing, all plumbing, electrical, HVAC, security and lighting facilities and equipment within the Premises, all fixtures, the roof, foundation, interior and exterior walls and ramps, parking and other paved areas, all fences and interior surfaces of exterior walls, ceilings, windows, and doors  located within the Premises and all improvements or replacements and modifications made by Lessee.

13.   **ALTERATIONS BY LESSEE**.  Lessee shall not make any alterations to the Premises without obtaining Lessor's prior written consent, which consent shall not be unreasonably withheld as to non-structural alterations.  Any and all alterations, additions, or other improvements made by Lessee, with or without the consent of Lessor, regardless of how attached (except movable trade fixtures), shall become immediately upon installation and thereafter remain the property of Lessor, without compensation therefor to Lessee, unless otherwise agreed in writing by Lessor; provided, however, Lessor shall have the right to require that Lessee, upon the termination or at the expiration of this Lease, remove any or all such alterations, additions and improvements and restore the Premises to their original condition, normal wear and tear excepted, unless such right has been waived in writing by Lessor. See also Rider No. 1 which is a material part of this provision.

14.   **VEHICLE PARKING**.

14.1.   Lessee shall be entitled to use any portion of Unit B which is not restricted by the ECR or by ordinance, rule or regulation, for parking vehicles.

14.2.   Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, or invitees to be loaded, unloaded, or parked in areas other than within Unit B.

14.3.   If Lessee permits or allows any of the prohibited activities described above, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor or the Association.

15.   **SUBLEASING AND ASSIGNMENT**.

15.1.   Lessee and any approved assignee or approved subtenant may not assign their rights under this Lease or the applicable sublease, or sublet the whole or any part of the Premises, without the prior written consent of Lessor.  Even if Lessor's consent is given, no subletting or assignment shall release Lessee from any obligation pursuant to this Lease or alter the primary liability and obligation of Lessee to pay the rent and to perform all other obligations to be performed by Lessee hereunder.  Acceptance of rent by Lessor from an assignee or subtenant

4

who has not been approved by Lessor shall not waive the default created by failure to obtain Lessor's consent.  As a condition of approving any proposed assignee or subtenant, Lessor may require such financial and other information concerning the proposed assignee or subtenant that Lessor deems appropriate.  Approval of a proposed sublease or assignment in any one instance shall not affect Lessor's right to approve all subsequent assignments and subleases.  Lessor shall be furnished with a duplicate executed original of all subleases and assignments.  If Lessee requests Lessor's consent of an assignment of Lessee's interest in this Lease, Lessor may, at its option, elect to terminate this Lease as of the effective date of the proposed assignment.  If Lessee requests Lessor's consent to a sublease, Lessor may, at its option, elect to terminate this Lease as of the effective date of the proposed sublease as to the portion of the Premises which Lessee desires to sublease, and if such option to terminate is elected by Lessor, rent under this Lease shall be adjusted as of the effective date of the partial termination and Lessee shall pay as Additional Rent, on demand, the cost of any demising walls required to separate the space as to which this Lease has been terminated from the remainder of the Premises.

15.2.   Notwithstanding anything in this Lease to the contrary, Lessee further agrees that any assignment or sublease shall be subject to the following additional limitations: Lessee shall not publicly advertise the rate for which Lessee is willing to sublet the Premises (excluding customary broker proposals or requests for proposals); and all public advertisements of the assignment of the Lease or sublet of the Premises, or any portion thereof, shall be subject to prior written approval by Lessor, such approval not to be unreasonably withheld or delayed. Said public advertisement shall include, but not be limited to, the placement or display of any signs or lettering on the exterior of the Premises or on the glass or any window or door of the Premises or in the interior of the Premises if it is visible from the exterior.

16.   **DAMAGE TO PREMISES**.  If the Premises shall be damaged by fire, the elements, unavoidable accident or other casualty, but are not thereby rendered untenantable in whole or in part, Lessor shall, to the extent of its insurance proceeds, promptly at its expense cause such damage to be repaired, and rent shall not be abated.  If by reason of such occurrence the Premises shall be rendered partially untenantable, Lessor shall, to the extent of its insurance proceeds, promptly at its own expense cause the damage to be repaired, and rent meanwhile shall be abated for the period of untenantability in proportion to the portion of the Premises rendered untenantable.  If by reason of such occurrence all of the Premises are rendered untenantable, Lessor shall within fifteen (15) business days after agreed adjustment of the insurance proceeds with respect to such damage notify Lessee of its intent to repair, reconstruct or restore the Improvements and/or the Premises.  If Lessor elects to not so repair, reconstruct or restore the Improvements and/or the Premises this Lease shall terminate as of the date of such total destruction.  If Lessor elects to repair, reconstruct or restore the Improvements and/or the Premises, Lessor shall promptly at its expense cause the damage to be repaired, and rent shall abate until the Premises are again tenantable, unless within thirty (30) days after said occurrence Lessor shall give Lessee written notice that the estimated time necessary to reconstruct the destroyed Premises is in excess of one hundred eighty (180) days after commencement of reconstruction and Lessee elects to terminate this Lease by written notice to Lessor given within fifteen (15) days after receipt of Lessor's notice.  If so terminated, this Lease and the tenancy hereby created shall cease as of the date of casualty and all rent shall be abated as of such date. Lessor shall not be obligated to reconstruct or repair the Improvements or Premises except to the extent insurance proceeds have been received with respect to the event causing the damage. Lessor shall not be required to repair, replace or insure any property which the Lessee may be entitled to remove from the Premises.  No damages, compensation or claims shall be payable by Lessor for inconvenience, loss of business or other consequential damages arising from any casualty, maintenance, repair or restoration of the Premises or Improvements.  All rent paid in

advance shall be apportioned in accordance with the foregoing provisions as of the date of damage (if rent abates); however, if the damage results wholly or in part from the fault of Lessee, its agents, contractors, employees or invitees, Lessee shall not be entitled to termination or any abatement or reduction in rent. Notwithstanding the foregoing to the contrary, Lessor shall not be obligated to repair damage or restore the Improvements or the Premises if Lessor does receive sufficient insurance proceeds available for such purpose.

17.    **INSURANCE**.

17.1.    **Liability Insurance--Lessee**.  Lessee shall, at Lessee's expense, obtain and keep in force during the term of this Lease a policy of Combined Single Limit Bodily Injury and Property Damage insurance insuring Lessee as a named insured and naming Lessor as an additional insured against any liability arising out of the use, occupancy or maintenance of the Premises (including, without limitation, the Improvements and Common Areas).  Such insurance shall be in an amount not less than $3,000,000 per occurrence.  The policy shall insure performance by Lessee of the indemnity provisions of paragraph 20.  The limits of said insurance shall not, however, limit the liability of Lessee hereunder.

17.2.    **Property Insurance by Lessor**.  Subject to Lessee paying rent and Additional Rent, Lessor shall obtain and keep in force during the term of this Lease a policy or policies of insurance covering loss or damage to the Improvements and Common Area improvements, but not Lessee's personal property, fixtures, equipment or tenant improvements or power and data processing equipment and installations, in an amount of the full replacement value thereof, as the same may exist from time to time, providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, flood (in the event same is required by a lender having a lien on the Premises) special extended perils ("all risk", as such term is used in the insurance industry), and such other insurance as Lessor deems advisable.

17.3.    **Property Insurance by Lessee**.  Lessee shall obtain and keep in force during the term of this Lease a policy or policies of insurance covering loss or damage to the Lessee's personal property, fixtures, equipment or tenant improvements and power and data processing equipment and installations, in an amount of the full replacement value thereof, as the same may exist from time to time, providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, flood (in the event same is required by a lender having a lien on the Premises) special extended perils ("all risk", as such term is used in the insurance industry), and such other insurance as Lessee deems advisable.

18.    **INSPECTION OF PREMISES**.  Lessor and Lessor's agents shall have free access during normal business hours to the Premises for the purposes of inspection, maintenance and repair. Lessor shall have the right to show the Premises to prospective tenants during the last one hundred eighty (180) days of the term of this Lease.

19.    **HAZARDOUS MATERIALS**.

19.1.    Without Lessor's prior written consent, Lessee shall not cause or permit any Hazardous Material to be brought upon, kept or used in or about the Premises by Lessee, its agents, employees, contractors or invitees, except for small quantities of such Hazardous Material incidental to Lessee's business.

19.2.    Any Hazardous Material permitted on the Premises as provided in Section 19.2 and all containers therefor, shall be used, kept, stored and disposed of in a manner that complies with all federal, state and local laws and regulations applicable to this Hazardous Material.

19.3.    Lessee shall not discharge, leak or emit, or permit to be discharged, leaked or emitted, any material into the atmosphere, ground, sewer system or any body of water, if that material (as is reasonably determined by the Lessor or any governmental authority) does or may pollute or contaminate the same or may adversely affect (aa) the health, welfare or safety of persons, whether located on the Premises or elsewhere, or (bb) the condition, use or enjoyment of the Improvements or any other real or personal property and which would result in a violation of applicable environmental laws.

19.4.    At the commencement of each Lease Year, Lessee shall disclose to Lessor the names and approximate amounts of all Hazardous Material that Lessee intends to store, use or dispose of on the Premises in the coming Lease Year.  In addition, at the commencement of each Lease Year (beginning with the second Lease Year), Lessee shall disclose to Lessor the names and amounts of all Hazardous Material that to Lessee's knowledge were actually used, stored or disposed of on the Premises, if those materials were not previously identified to Lessor at the commencement of the previous Lease Years.

19.5.    As used herein, the term "Hazardous Material" means (aa) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976, as amended from time to time, and regulations promulgated thereunder; (bb) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and regulations promulgated thereunder; (cc) any oil, petroleum products and their by-products, other than those used in automotive or recreational activity, boats or motorcycles which are stored on the Premises in accordance with all applicable laws and minor leakage and spills which are, upon written request of Lessor, promptly cleaned up; and (dd) any substance that is or becomes regulated by any federal, state, or local governmental authority.

19.6.    Lessee hereby agrees that it shall be fully liable for all costs and expenses related to the use, storage and disposal of Hazardous Material kept on the Premises by the Lessee, and the Lessee shall give immediate notice to the Lessor of any violation or potential violation of the provisions of this Paragraph 19.  Lessee shall defend, indemnify and hold harmless Lessor and its agents from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses (including without limitation, attorneys' and consultants' fees, court costs and litigation expenses) of whatever kind or nature, known or unknown, contingent or otherwise, arising out of or in any way related to (aa) the presence, disposal, release or threatened release of any such Hazardous Material that is on, from or affecting the soil, water, vegetation, buildings, personal property, persons, animals or otherwise; (bb) any violation of any laws applicable thereto.  The provisions of this Section 19.6 shall be in addition to any other obligations and liabilities Lessee may have to Lessor at law or in equity and shall survive the transactions contemplated herein and shall survive the termination of this Lease.

20.    **INDEMNIFICATION**.  Lessee hereby agrees to indemnify and hold Lessor and Lessor's agents and employees harmless from any and all claims, damages, liabilities or expenses arising out of (aa) Lessee's use of the Premises, (bb) any and all claims arising from any breach or default in the performance of any obligation of Lessee and/or (cc) any act, omission or negligence of Lessee, its agents or employees.  Lessee agrees to procure and keep in force during the term hereof a contractual liability endorsement to its public liability policy, specifically

endorsed to cover the indemnity provision of this Paragraph. Lessee further releases Lessor and Lessor's agents and employees from liability for any damages sustained by Lessee or any other person claiming by, through or under Lessee due to the Premises, or any part thereof or any appurtenances thereto becoming out of repair, or due to the happening of any accident including, but not limited to, any damage caused by water, snow, windstorm, tornado, gas, steam, electrical wiring, sprinkler system plumbing, heating and air conditioning apparatus and from any acts or omissions of co-tenants, owners or lessees of the adjacent Unit or other occupants of the Lessor's Property. Lessor and Lessor's agents and employees shall not be liable for any damage to or loss of Lessee's personal property, inventory, fixtures or improvements, from any cause whatsoever except the affirmative acts of proven gross negligence of Lessor.

21.    **COMPLIANCE WITH LAW**. Lessee shall, during the term of this Lease, at its sole cost and expense, comply with all valid laws, ordinances, codes, rules, regulations, orders and requirements of any governmental authority which may be applicable to the Premises or to the use, manner of use or occupancy thereof, whether or not the same shall interfere with the use or occupancy of the Premises. Lessee shall give prompt notice to Lessor of any notice it receives of the violation of any law or requirement of any public authority with respect to the Premises or use or occupation thereof. Lessee shall also comply with all rules and regulations which may properly be promulgated by the Association.

22.    **CONDEMNATION**. If all or a part of the Premises sufficient to render same unusable for Lessee's purposes (in Lessor's reasonable judgment) or all means of access to the Premises shall be condemned for a period in excess of one hundred eighty (180) days or sold under threat of condemnation, this Lease shall terminate and Lessee shall have no claim against Lessor or to any portion of the award in condemnation for the value of any unexpired term of this Lease. Lessee may seek to recover independently compensation from the condemning authority for moving expenses, the value of any of Lessee's property taken (other than Lessee's leasehold interest in the Premises) or other compensable loss or damage. In the event of a temporary taking of one hundred eighty (180) days or less, this Lease shall not terminate, but the term hereof shall be extended by the period of the taking and the rent shall abate in proportion to the area taken for the period of such taking.

23.    **DEFAULT**.

23.1.    If Lessee does not pay any rent, Additional Rent, or any other sum payable by Lessee pursuant to this Lease and such default continues for a period of ten (10) days after written notice is given to Lessee (provided, however, that no written notice shall be required if Lessor has previously given written notice of failure to pay rent or Additional Rent during the preceding twenty-four (24) month period), or if Lessee shall fail to perform any other covenant, agreement, or obligation of Lessee pursuant to this Lease and such default continues for thirty (30) days after written notice thereof is given to Lessee, or if Lessee should become bankrupt or insolvent or any debtor proceedings are taken by or against Lessee, or if Lessee vacates or attempts to vacate the Premises, then Lessor, in addition to the remedies provided for in Section 23.2, shall have the following rights and remedies:

23.1.1. Lessor may terminate this Lease by written notice to Lessee, in which event this Lease, all rights of Lessee, and all duties of Lessor shall immediately cease and terminate, and Lessor may re-enter and take possession of the Premises, remove all persons and property from the Premises and store such property in a public warehouse or elsewhere at the cost of, and for the account of, Lessee and enjoy the Premises free of Lessee's estate pursuant to this Lease, without prejudice, however, to any and all rights of action against Lessee that Lessor

may have for rent, damages, or breach of this Lease, in respect of which Lessee shall remain and continue liable notwithstanding such termination;

23.1.2. Lessor shall have the right to re-enter the Premises and remove all persons and property from the Premises and store such property in a public warehouse or elsewhere at the cost of, and for the account of Lessee, without terminating this Lease. Lessor shall have the right to take such action without service of notice except as may be expressly required herein or by applicable law and without resort to legal process (unless required by law) and without being deemed guilty of trespass or becoming liable for any loss or damage which may be occasioned thereby. If Lessor elects to re-enter the Premises as aforesaid, Lessor may, at any time thereafter, elect to terminate this Lease by giving written notice to Lessee of such election. Whether or not Lessor elects to re-enter the Premises or takes possession of the Premises pursuant to legal proceedings or pursuant to any notice required by law, Lessor may, at its option (Lessor having no obligation to mitigate damages), re-let the Premises or any portion thereof for the benefit of Lessee for such term or terms (whether shorter or longer than the term of this Lease) and at such rental and upon such other terms and conditions as Lessor, in its sole discretion, deems advisable, and, at the expense of Lessee. Lessor shall have the right to make such repairs or alterations to the Premises as Lessor deems necessary in order to re-let same. Provided this Lease has not been terminated by Lessor, upon each such re-letting all rentals actually received by Lessor from such re-letting applicable to the unexpired term of this Lease shall be applied as follows: First, to the payment of any costs and expenses of such re-letting, including costs incurred by Lessor for brokerage fees, legal fees and alterations and repairs to the Premises; Second, to the payment of any indebtedness other than rent due hereunder from Lessee; Third, to payment of any unpaid portion of rent and Additional Rent then due. No such re-entry or taking of possession of the Premises by Lessor shall be construed or shall operate as an election by Lessor to terminate this Lease unless written notice of termination is given by Lessor to Lessee, or this Lease is terminated by an order or decree of a court of competent jurisdiction.

23.1.3. Lessee understands and agrees that the value of this Lease to Lessor is in the receipt of Rent and Additional rent for the full term and accordingly, as agreed and liquidated damages for any uncured default by Lessee, at the option of Lessor, all rent (annual rent and all Additional Rent at the prior Lease Year's billed rate) for the remainder of the then current term shall become immediately due and payable. At the option of Lessor, in addition, Lessor may draw down to the full extent of any outstanding balance on any Letter of Credit securing Lessee's obligations as well as fully applying any Security Deposit to the full extent of the rent and Additional Rent due for the remainder of the Term; or,

23.1.4. Lessor may lock up the Premises and preclude Lessee's access thereto. Lessee grants to Lessor a security interest in all of Lessee's property located in the Premises, and agrees to execute and deliver such financing statements and other instruments as may be necessary to perfect such security interest;

23.2.    In addition to all remedies specified in this Lease, Lessor shall have all remedies available at law or in equity.

23.3.    No re-entry, taking possession of, or repair of the Premises by Lessor, termination of this Lease or any other action taken by Lessor as a result of any default of Lessee shall relieve Lessee of any of its liabilities or obligations hereunder which arose prior to or by reason of such termination, whether or not the Premises are re-let.

23.4.    All remedies of Lessor shall be cumulative.  Election by Lessor to exercise any remedy shall not prevent or be deemed a waiver of Lessor's right to thereafter exercise any other remedy.

23.5.    Lessee agrees to pay upon demand all costs, fees and expenses (including, without limitation, court costs and reasonable expert and attorneys' fees) incurred by Lessor in enforcing this Lease.

24.    **HOLDING OVER**.  If Lessee remains in possession of the Premises after the expiration or termination of the term of this Lease without Lessor's written consent, such possession shall, at Lessor's option, (a) be a tenancy at sufferance only, during which tenancy at sufferance annual rent shall be due and payable at 200% of the annual rent due for the last term, or (b) result in an extension of this Lease on a month-to-month basis, upon the terms and conditions applicable to the last year of the preceding term, except annual rent, which shall be at 200% of the rent due during the last month of the term.  All other provisions of this Lease shall remain in force during the period of any such tenancy at sufferance or month-to-month renewal. Acceptance of rent by Lessor during any holdover tenancy at sufferance shall not waive the default created by Lessee's holdover or Lessor's option to select the tenancy created by the holdover.

25.    **SURRENDER OF PREMISES**.    Lessee shall surrender the Premises at the expiration or sooner termination of the Lease term, broom-cleaned, with all rubbish removed, free of subtenancies, and in good condition and repair, reasonable wear and tear excepted.  Lessee shall deliver all keys to Lessor or Lessor's agent.

26.    **INFORMATION CONCERNING LESSEE**.  Lessee shall furnish within fifteen (15) days after request from Lessor such current information concerning the financial condition of Lessee as Lessor may reasonably require.  Such financial information shall include (but is not necessarily limited to) a financial statement dated not more than twelve (12) months prior to Lessor's request. Such financial statement shall be prepared in accordance with generally accepted accounting principles and certified by a certified public accountant.  A general partner or officer of Lessee shall furnish a certification to Lessor to the effect that there either has or has not been any material adverse change in the financial condition of Lessee since the date of the financial statement submitted, and if such certification states that there has been a material adverse change, furnishing such details concerning same as Lessor may request.

27.    **AUTHORITY OF LESSEE**.  Lessee shall furnish to Lessor within fifteen (15) days after request from Lessor such corporate resolutions, certificates of incumbency, partnership resolutions, partnership agreements, legal opinions or other information as Lessor may reasonably request in order to confirm that the execution and delivery of this Lease has been duly authorized by Lessee and that the person(s) executing this Lease on behalf of Lessee were duly authorized to do so.  All such corporate or partnership resolutions, certificates or agreements shall be certified as being duly adopted and/or in full force and effect, without amendment, by an appropriate officer or partner of Lessee.

28.    **SECURITY DEPOSIT**.  Lessee shall deposit with Lessor upon Lessee's execution of the Lease and thereafter maintain with Lessor the sum of $50,000.00 which shall be held by Lessor, without interest to Lessee, as security for the full and faithful performance by Lessee of Lessee's obligations pursuant to this Lease. An additional security deposit may be required by Lessor in the event Lessee makes modifications to the Premises which, in the reasonable opinion of Lessor, would be required to be restored at the termination of the Lease.  If Lessee fails to pay

any amount which Lessee is obligated to pay pursuant to this Lease, Lessor may, at its option (but Lessor shall not be obligated to), apply any portion of such security fund to the amount owed by Lessee. Any such application by Lessor shall not waive the default created by Lessee's failure to pay.  If any portion of the security deposit is so applied by Lessor, Lessee shall, within ten (10) days after demand from Lessor, restore the security deposit held by Lessor to its original amount. The security deposit, less amounts properly charged against same, shall be refunded to Lessee within thirty (30) days after Lessee has paid all amounts owed and performed all of its obligations pursuant to this Lease or upon closing in event Lessee exercises its purchase option.

29.   **RULES AND REGULATIONS**.   Lessee, its employees, customers and guests shall perform and abide by such reasonable rules and regulations, and any amendments or additions to such rules and regulations as may be made from time to time by the Association.

30.   **SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT**.   Lessor is hereby vested with full power and authority to subordinate Lessee's interest hereunder to the lien of any mortgage or deed of trust which may now or hereafter be placed on the Premises or underlying leasehold estate and to all renewals, modifications, consolidations and replacement of such mortgage or deed of trust.  Upon the request of Lessee or Lessor, Lessor shall obtain and deliver to Lessee from any present or future mortgagee, trustee, fee owner, prime lessor or any person having an interest in the Premises superior to this Lease a written subordination, non-disturbance and attornment agreement in recordable form providing that so long as Lessee performs all of the terms, covenants and conditions of this Lease and agrees to attorn to the mortgagee, beneficiary of the deed of trust, purchaser at a foreclosure sale, prime lessor or fee owner, Lessee's rights under this Lease shall not be disturbed and shall remain in full force and effect for the term of this Lease, and Lessee agrees to execute such agreement to acknowledge such subordination and attornment within ten (10) days of receipt thereof.  If Lessee does not execute and return such agreement as required above, Lessee hereby irrevocably appoints Lessor as its attorney in fact to execute such agreement on behalf of Lessee.

31.   **ESTOPPEL STATEMENT**.  Within ten (10) days after request therefor by Lessor, Lessee agrees to deliver in recordable form a certificate prepared by Lessor to any proposed mortgagee or purchaser of the Premises or to Lessor certifying (if such is the case) that this Lease is in full force and effect, that there are no defense or offsets thereto, or stating those claimed by Lessee, and such other facts related to this Lease, the Premises or Lessee as Lessor may request.  If Lessee does not execute and return such agreement as required above, Lessee hereby irrevocably appoints Lessor as its attorney in fact to execute such certificate on behalf of Lessee.

32.   **NOTICES**.  Any notices required pursuant to this Lease shall be in writing. Addresses to which notices shall be sent are as follows:

TO LESSOR:                         Hoffland Properties Inc.
                                   c/o Atlantic Dominion Distributors/Hoffman Beverage
                                   5400 Virginia Beach Boulevard
                                   Virginia Beach, VA 23462
                                   Attn: Robin Ray

                                   With a required copy to:

                                   Robert C. Goodman Jr.
                                   Kaufman & Canoles, P.C.

150 E. Main Street, Suite 2100
Norfolk, VA 23410
rcgoodman@kaufcan.com

TO LESSEE:

Bcause Mining LLC
233 Bendix Road, Suite 420
Virginia Beach, VA 23452
Attn: Fredrick J. Grede  CEO
757.286.4927

With a required copy to:

_____
_____
_____
_____

Either party may at any time designate by written notice to the other a change of address for notices. All notices, demands and requests which are addressed as provided above and are (i) deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, or (ii) accepted for overnight delivery by Federal Express, Airborne Express, UPS or such other overnight delivery service, delivery charges prepaid or with delivery not conditioned upon payment of charges, shall be deemed to have been given for all purposes hereunder three (3) days following the time such notice, demand or request shall be deposited in the United States mail or one (1) day following acceptance for delivery by the applicable overnight delivery service.

33.    **PAST DUE RENTS**. Lessee recognizes and acknowledges that if rent payments are not received when due, Lessor will suffer damages and additional expense thereby and Lessee therefore agrees that a late charge equal to ten percent (10%) of the late rent may be assessed by Lessor as Additional Rent if Lessor has not received any monthly installment of annual rent or other rent or Additional Rent due pursuant to this Lease within five (5) days after its due date. If any check given in payment of rent or Additional Rent is not honored when due, Lessor may require that subsequent rent payments be made by certified or cashier's check. All rent and other sums of whatever nature owed by Lessee to Lessor under this Lease that remain unpaid for more than five (5) days after its due date shall bear interest at the rate of eighteen percent (18%) per annum (or, if lower, the highest lawful rate) from the date due until paid.

34.    **BUILDING NAME**. Lessor reserves the right to change at any time the name, address or designation of the Improvements without any liability to Lessee.

35.    **INTENTIONALLY OMITTED**.

36.    **RENT TAXES**. If applicable now or in the future, in the jurisdiction where the Premises are located, Lessee shall pay as Additional Rent to Lessor, concurrently with rent upon which such tax is based or within ten (10) days after written request therefor, as directed by Lessor, any state or local sales tax, gross receipts tax, business license tax or other tax, however denominated, imposed directly upon this Lease, the rent paid pursuant to this Lease or the

operation of the Premises as rental property.  Lessee shall not be obligated to pay any federal, state or local income tax imposed on Lessor.

37.   **REAL ESTATE TAXES**.  Subject to reimbursement by Lessee pursuant to paragraph 9 hereof, Lessor shall pay all real estate taxes assessed against Unit B and the Improvements thereon applicable to the term of this Lease.  If an increase in real estate taxes assessed on Unit B and the Improvements thereon is caused by Lessee's improvements or fixtures in Unit B or the Improvements thereon, Lessee shall pay as Additional Rent and within ten (10) days after demand therefor from Lessor all of such real estate taxes attributable to such improvements or fixtures.

38.   **JANITORIAL SERVICES AND UTILITIES**.  Lessee agrees to contract and pay directly for janitorial services and electricity, gas and any other utilities used on or charged against the Premises, or if said utilities are not separately metered, to reimburse Lessor for its proportionate share of said utilities.

39.   **DEFINITION OF LEASE YEAR**.  The first Lease Year is the period beginning on the Commencement Date and ending one (1) year after the last day of the month preceding the month in which the Commencement Date occurs.  The second Lease year shall begin on the day after the end of the first Lease Year, and shall end one (1) year after the end of the first Lease year.  The third and subsequent Lease Years shall begin and end on the appropriate anniversary dates of the beginning and ending dates of the second Lease Year.

40.   **SUCCESSOR AND ASSIGNS**.  This Lease shall bind and inure to the benefits of the successors, assigns, heirs, executors, administrators and legal representatives of the parties hereto.  This provision shall not give Lessee by implication any right to assign its rights or interest pursuant to this Lease.  The provisions of paragraph 15 above govern Lessee's right to assign and sublet.

41.   **RELATIONSHIP OF LESSOR AND LESSEE**.  It is expressly understood and agreed that Lessor shall not be construed as or held to be a partner, joint venturer or associate of Lessee, it being expressly understood and agreed that the relationship between the parties hereto is and shall at all times remain that of landlord and tenant.

42.   **LIMITATION OF LESSOR'S OBLIGATION**.  The obligations of Lessor hereunder shall be binding only upon its interest in the Premises, and not upon any other assets of Lessor or any partner of Lessor personally.  Lessee agrees to look solely to the equity of Lessor in the Premises for the satisfaction of any remedies of Lessee or judgment obtained by Lessee as a result of a breach by Lessor of this Lease.  Such exculpation of liability shall be absolute and without any exception whatsoever.

43.   **PERFORMANCE BY LESSOR AND LESSEE**.  If Lessee fails to perform any of its obligations hereunder, Lessor may, at its option (but shall be under no obligation to do so), perform the obligation of Lessee which Lessee has failed to perform.  Any amounts advanced in so performing obligations of Lessee shall bear interest at the rate of eighteen (18%) percent per annum (or, if lower, the highest lawful rate) from the date expended until repaid, shall be due and payable on demand, and failure to pay on demand shall constitute an independent event of default

hereunder.  Payment or performance by Lessor of the obligations of Lessee shall not waive or cure any breach occasioned by Lessee's failure or refusal to pay or perform same.

44.    **WAIVER**.  Delay in asserting or prosecuting any right, claim or cause of action accruing hereunder is not and shall not be deemed to be a waiver of, and shall not prejudice the same, or any other right, claim or cause of action accruing hereunder at any time.  Waiver of any right, claim or cause of action at any time shall not prejudice any other right, claim or cause of action which Lessor may have or which shall thereafter accrue, and shall not waive Lessor's right to assert any other right, claim or course of action.  Acceptance by Lessor of rent from Lessee during the existence of any default shall not constitute a waiver of such default, or a waiver of the right of Lessor to insist upon Lessee's strict compliance with the terms of this Lease.

45.    **BROKER'S FEE**.  Upon execution of this Lease by both parties, Lessor shall pay to <u>CB Richard Ellis of Virginia, Inc.</u> ("Agent"), licensed real estate broker(s), a commission fee equal to four percent (4%) of the rent paid by Lessee hereunder for the leasing services payable monthly, as and when the rent is received, unless and until the property is sold to Lessee or any affiliated entity of Lessee.  Once the Lessor has sold the property Agent shall be paid a sales commission as set forth in a separate agreement between Lessor and said Agent.

46.    **AGENCY AND OWNERSHIP DISCLOSURE**.

46.1.    Lessor and Lessee each acknowledge that, in connection with this Lease:

<u>**Initial One**</u>

\_\_\_    <u>**the Agent is representing the Lessor exclusively**</u>

<u>**or**</u>

   X   \_\_\_    <u>**the Agent is representing the Lessor and Lessee, and Lessor and Lessee expressly consent to the Agent acting as a dual representative by their execution of this Lease and their review and execution of the attached Disclosure of Dual Representation).**</u>

46.2.    <u>Initial one or both, if applicable</u>:

\_\_\_\_\_    One or more principals of Lessor are licensed Virginia real estate brokers or salespersons.

<u>and/or</u>

\_\_\_\_\_    Agent and/or one or more brokers or salespersons of Agent has an ownership interest in Lessor.

47.    **Removal of Electrical and Telecommunications Wires**.

47.1.    Lessor May Elect to Either Remove or Keep Wires:  Within ten (10) business days after the expiration or sooner termination of the Lease or at any time that any of the Wires (as defined below) are no longer in active use by Lessee, Lessor may elect ("Election Right") by written notice to Lessee to:

47.1.1. Retain any or all wires, cables, and similar installations appurtenant thereto ("Wires") installed by Lessee within the Premises including, without limitation, the plenums or risers of the Improvements;

47.1.2. Remove any or all of the Wires and restore the Premises to their condition existing prior to the installation of the Wires ("Wire Restoration Work").  Lessor, at its option, may perform such Wire Restoration Work at Lessee's sole cost and expense; or

47.1.3. Require Lessee to perform all or part of the Wire Restoration Work at Lessee's sole cost and expense.

47.2.    Compliance with Laws and Discontinuance of Wire Use:  Lessee shall comply with all applicable laws with respect to the Wires, subject to Lessor's right to elect to retain the Wires.  In the event that Lessee discontinues the use of all or any part of the Wires or is no longer using all or any part of the Wires, Lessee shall ,within ten (10) days thereafter, notify Lessor of same in writing, accompanied by a plan or other reasonable description of the current type, quantity, points of commencement and termination, and routes of the Wires to allow Lessor to determine if Lessor desires to retain same.

47.3.    Condition of Wires:  In the event Lessor elects to retain any or all of the Wires (pursuant to paragraph 47.1 hereof), Lessee covenants that:

47.3.1. Lessee shall be the sole owner of such Wires, Lessee shall have the sole right to surrender the Wires, and the Wires shall be free of all liens and encumbrances; and

47.3.2. All Wires shall be left in good condition, working order, properly labeled and capped or sealed at each end and in each telecommunications/electrical closet and junction box, and in safe condition.

47.4.    Lessor Retains Security Deposit:  Notwithstanding anything to the contrary in Paragraph 28 of the Lease, Lessor may retain Lessee's Security Deposit after the expiration or sooner termination of the Lease until one of the following events has occurred with respect to all of the Wires:

47.4.1. Lessor elects to retain the Wires pursuant to paragraph 47.1;

47.4.2. Lessor elects to perform the Wire Restoration Work pursuant to paragraph 47.1.2 and the Wire Restoration Work is complete and Lessee has fully reimbursed Lessor for all costs related thereto; or

47.4.3. Lessor elects to require Lessee to perform the Wire Restoration Work pursuant to paragraph 47.1.3 and the Wire Restoration Work is complete and Lessee has paid for all costs related thereto;

47.5.    Lessor May Apply Security Deposit:  In the event that Lessee fails or refuses to pay all costs of the Wire Restoration Work within ten (10) days of Lessee's receipt of Lessor's notice requesting Lessee's reimbursement for or payment of such costs or otherwise fails to comply with the provisions of this Paragraph, Lessor may apply all or any portion of Lessee's Security Deposit toward the payment of any costs or expenses relative to the Wire Restoration Work or Lessee's obligations under this Paragraph.

47.6.   No Limit on Right to Sue:  The retention or application of such Security Deposit by Lessor pursuant to this Paragraph does not constitute a limitation on or waiver of Lessor's right to seek further remedy at law or in equity.

47.7.   Survival:  The provisions of this Paragraph shall survive the expiration or sooner termination of the Lease.

48.   **PARAGRAPH HEADINGS**.  The paragraph headings of this Lease are used for convenience only, and are in no way to be construed as a part of this Lease or as a limitation on the scope of the particular provision to which they refer.

49.   **INVALIDITY**.  If any provision of this Lease shall be held to be invalid, whether generally or as to specific facts or circumstances, the same shall not affect in any respect whatsoever the validity of the remainder of this Lease, which shall continue in full force and effect. Any provision held invalid as to any particular facts and circumstances shall remain in full force and effect as to all other facts and circumstances.

50.   **GOVERNING LAW**.  This Lease and the rights of the parties hereunder shall be interpreted in accordance with the laws of the state in which the Premises are located.

51.   **ENTIRE AGREEMENT**.  This Lease together with the attached Exhibits and Riders referred to herein and specified below, contains the entire agreement of the parties related to this transaction, supersedes all prior negotiations and agreements and represents their final and complete understanding. This Lease may not be modified orally, through course of performance or in any manner other than by agreement in writing, signed by the parties hereto.

52.   **EXHIBITS AND ADDITIONAL PROVISIONS**.  The Exhibit(s) designated as A, B, C-1 and C-2 and Rider(s) designated as No. 1 which are attached hereto and are a part of this Lease, and are incorporated herein as if set forth in full.

**IN WITNESS WHEREOF**, this Lease has been duly executed by the parties hereto as of the date and year first above written.

LESSOR:

HOFFLAND PROPERTIES INC.,
a Virginia corporation

By: _Robin D Ray_

Name: _Robin D. Ray_

Its: _Chairman / President_

Date: _11/6/17_

**LESSEE:**                                         **BCAUSE MINING LLC,**
                                                    **a Virginia limited liability company**

By: _____

Name: _Thomas Flake_____

Its: _Cmo / Treasurer_____

Date: _11/6/17_____

**RIDER NO. 1**

**DATED AS OF NOVEMBER 1, 2017**

**BY AND BETWEEN**

**HOFFLAND PROPERTIES INC. ("LESSOR")**

**AND**

**BCAUSE MINING LLC ("LESSEE")**

The following paragraphs are made a part of this Lease, and in the event of any inconsistency between the following paragraphs and any other terms of this Lease, the following paragraphs shall control:

1.    Condominium Conversion:  The Lessor's Property is being converted into a condominium. Unit A, as shown basically on the  shown on the attached Exhibit A as "1" in a circle and the building improvements thereon designated as "A-B" are being sold to another party. The precise boundaries of the Units are shown on an Exhibit to the Declaration. Unit B consists of the balance of Lessor's property except for a common element shared joint access area to be shown on the Condominium Plat as "Common Element". The respective Units, together with  the improvements, will be subject to a Declaration of Easements, Covenants and Restrictions ("ECR") spelling out, inter alia, access rights, parking rights, use of common walls and operational responsibilities.  Closing on Unit A is anticipated by no later than mid-November, 2017.  Condominium documents and the ECR have been drafted and submitted by Lessor to Lessee for review.  By prior agreement with the purchaser of Unit A (which is smaller and less valuable than Unit B), Unit A will be responsible for 35%, and Unit B for 65%, of common expenses except where there are separate or sub-meters to measure usage, or the expenses ( or utility usage) are caused, or disproportionately used, by one party.

2.    Condominium Association – Declaration, ECR and Bylaws:  Lessee shall be bound by any conditions or restrictions required under the Bylaws of the Condominium Association, the Declaration and the ECR.  Failure to comply with any of the governing documents shall constitute a default under the terms of this Lease.

3.    Tenant Improvements:  Lessee, at Lessee's sole cost and expense, shall be responsible for all improvements to the Premises including additional electrical power with separate metering, new fiber optic cable, chemical fire suppression system, security and improvements for office and other space.  All work shall be by  fully bonded licensed contractors pursuant to a contract which contains a waiver of the right to file any mechanics lien, with the language in Exhibit D, or with the full amount due under the contracts placed in escrow with an escrow agent for disbursement to the contractor(s) as billed. The contract(s) and all plans and specifications are subject to approval of Lessor, which such approval shall not be unreasonably withheld or unduly delayed.  Lessor understands that Lessee intends to use at least the portions of the Premises marked C, D and E for a data center.  Lessee represents to Lessor that (i) Lessee has already hired electrical engineers to start work on key planning for the Premises and (ii) the good faith estimated costs of Lessee expenditures on building improvements will exceed $1,600,000.00 (which amount is a material inducement to Lessor to enter into the Lease

and shall be confirmed with submission of plans and specifications). Subject to Lessee's execution of separate confidentiality agreement, Lessee has been furnished with copies of all inspection reports and Phase 1 Environmental reports. The existing fuel tanks on western side of the Premises are currently being cleaned and put into temporary closure in accordance with the requirements of the Virginia DEQ.

4.    Purchase Option:

A.    At the end of sixth (6th) full calendar month of the Lease term (April 30, 2018), provided Lessee is not then in default, Lessee shall have the option to purchase Unit B and the Improvements thereon in "AS IS WHERE IS" condition for $4,750,000 by both (i) giving not less than sixty (60) days prior written notice to Lessor which notice may be given at any time prior to the last business day of the first full six (6) calendar months of the Lease term (i.e. by March 1, 2018), and (ii) providing with such notice a $150,000 good faith deposit (payable to Lessor's qualified intermediary as permitted in C. below), which such good faith deposit shall be forfeited if there is no closing other than due to a default by Lessor. Lessor shall take all reasonable steps to close on the date specified in such notice provided Lessor has at least thirty (30) days from the date of such notice to close. The notice from Lessee shall specify a closing date on any business day from the last business day of the six (6) month period to the last business day of the twelfth (12th) full calendar month after the Lease Commencement Date.

B.    Lessee shall comply with all of its obligations under the Lease through the closing date and such compliance is a condition of closing. At closing there shall be the usual prorations for rent, Additional Rent and other expenses to the extent not already being paid by Lessee. Conveyance shall be by special warranty deed free and clear of all liens and encumbrances created by Lessor except for the Declaration, the ECR and other matters of record (other than liens of which there are currently none and which if arise due to any action or inaction of Lessor, it shall discharge). Lessee has been furnished with a title search from Fidelity Title and represents that it has reviewed the same and that title as shown, subject to the Declaration and ECR, is acceptable to Lessee.

C.    At either party's request (the "Requesting Party"), the other party will take all actions reasonably requested by the Requesting Party in order to effectuate all or any part of the transactions contemplated by this Lease as a forward or reverse like-kind exchange for the benefit of the Requesting Party in accordance with Section 1031 of the Internal Revenue Code and, in the case of a reverse exchange (Rev. Proc. 2000-37), including executing an instrument acknowledging and consenting to any assignment by the Requesting Party of its rights (but not its obligations) under this Lease to a qualified intermediary or an exchange accommodation titleholder. In furtherance of the foregoing and notwithstanding anything contained in this Lease to the contrary, the Requesting Party may assign its rights under this Lease to a "qualified intermediary" or an "exchange accommodation titleholder" in order to facilitate, at no cost or expense to the other party, a forward or reverse like-kind exchange under Section 1031 of the Internal Revenue Code; provided, however, that such assignment will not relieve the Requesting Party of any of its obligations under this Lease. If so requested, the other party will issue all closing documents to the applicable qualified intermediary

or exchange accommodation titleholder if so directed by the Requesting Party prior to the Closing.

5.   Letter of Credit:

If either (i) the purchase option is not exercised or (ii) or if the purchase option is exercised and timely closing does not occur due to no fault of Lessor by the last business day of the first Lease Year, then, as security for Lessee's obligations under this Lease, Lessee shall deliver to Lessor a clean irrevocable Letter of Credit (the "Letter") in the stated amount of $3,400,000.00 (which amount shall be reduced to $2,600,000.00 commencing on the commencement of the eighth (8th) Lease Year, to $1,700,000.00 on the commencement of the nineth (9th) Lease Year, and to $900,000.00 on the commencement of the tenth (10th) Lease Year), which Letter shall be issued by a major commercial bank (the "Bank") reasonably acceptable to Lessor, which Letter shall be transferable and shall specify that multiple draws are permitted, and upon which Lessor may draw by presentation of a sight draft accompanied by a certificate executed by Lessor stating: "We certify that (i) bcauseMining LLC is in default pursuant to the terms of its Lease with Hoffland Properties Inc., or its successor in interest and the amount drawn hereunder represents the amount required to cure such default or (ii) the Letter is expiring within thirty (30) days of this notice and we have not received an extension of the Letter or a replacement letter of credit meeting the requirements of the Lease, entitling us to draw against the Letter in the full stated amount." The Letter shall either (x) expire on the expiration of the term of this Lease, or (y) be renewed periodically so that the original Letter or a replacement thereof shall be in full force and effect throughout the term of this Lease. Lessee shall deliver to Lessor any replacement Letters not less than thirty (30) days prior to the expiration of the then current Letter. If Lessee shall fail to so deliver any replacement Letter, then Lessor shall be entitled to draw upon the existing Letter to the full extent of its outstanding balance. If Lessor shall draw upon any such Letter as a result of the failure of Lessee to perform any of its obligations under this Lease (including, without limitation, its obligations under this paragraph), Lessee shall immediately deliver to Lessor an additional Letter in the amount so drawn by Lessor, and otherwise on terms identical to the Letter. If the Bank shall become or be declared insolvent or be liquidated or reorganized or shall be subject to any provision of any bankruptcy law or code as then in effect or if the Letter shall cease to be in full force or effect (all collectively, a "Failure") then the date on which any of the foregoing shall occur shall be deemed to be the expiration of the Letter, whereupon Lessee shall immediately deliver a replacement Letter from another Bank. For purposes of Paragraph 5, if Lessee shall fail to deliver a replacement Letter as aforesaid within ten (10) days after notice from Lessor of the occurrence of a Failure, such event shall be deemed a default by Lessee in the payment of rent. In addition to Lessor's other rights under this Lease, in the event of Lessee's default (including other termination rights), if Lessee fails to provide the Letter, in a timely manner as provided above, Lessor may, at any time thereafter, terminate this Lease with thirty (30) days prior written notice to Lessee.

**EXHIBIT A**
**TO**
**TRIPLE NET LEASE**

<u>Legal Description of the Property</u>

ALL THAT certain tract, piece or parcel of land, exclusive of the buildings and improvements thereon, situated in Bayside Borough in the City of Virginia Beach, Virginia and designated as 7.37 acres on a certain plat entitled "PLAT OF PART OF PROPERTY OF E .V. WILLIAMS CO., INC., BAYSIDE BOROUGH, VIRGINIA BEACH, VIRGINIA FOR HOFFLAND CORPORATION" which plat is dated June 8, 1966 and made by C. A. Bamforth, CLS, and duly of record in the Clerk's Office of the Circuit Court of the City of Virginia Beach, Virginia in Map Book 70 at page 22 to which reference is hereby made for a more particular description of the said property.

LESS, SAVE AND EXCEPT that portion of the property conveyed to VDOT recorded in the aforesaid Clerk's Office in Instrument No. 201609230000853880.

**EXHIBIT A-1**
**TO**
**TRIPLE NET LEASE**


**DESCRIPTION OF PREMISES**



## SITE PLAN

CONCEPTUAL PLAN FOR APPROXIMATELY 130 PARKING SPOTS ± (EXPANDABLE)

5465 GREENWICH ROAD
BUILDING AREA SUMMARY

OFFICE 1

| Area | Approx Clear Ht. | Use | | Approx Size SF | Dock Office |
|---|---|---|---|---|---|
| 1 | | | | | |
| A | | office | w Dover 2100 lb elev. | 21,640 | est. |
| B | 17' 10" | Whse & Loading | w/ cooling to 32 F | 9,400 | -1200 |
| | | | | 29,840 | +/-SF |

WHSE 2

| | | | | | |
|---|---|---|---|---|---|
| 2 | | | | | |
| C | 19'5" | Drive-Through Whse | clear span w/ floor drains | 27,230 | +1200 |
| D | 20' | Whse w/interior Loading | recessed covered van dock | 12,200 | est |
| E | 20' | Whse w/ Dock Loading | w/cooling to 45-50 F | 44,225 | est. |
| | | | | 84,855 | +/-SF |

SHOP - Building 3

| | | | | | |
|---|---|---|---|---|---|
| 3 | | | | | |
| | 14' | | | | |
| F | 19' at lift | Drive-Through Stg. Garage | 1437 LF of interior parking | 21,006 | est. |
| | | | | 21,006 | +/-SF |
| | | | Total Buildings 2 & 3 | 105,861±SF | |
| Sum | | | Total Bldgs. SF Per Plat | 135,701 | |
| | | | Total SF Estimate | 136,580 | |
| | | | Land AC | 7.37 | per CoStar |

Note: This information is for guideline purposes only. CBRE and preparer make no warranty as to accuracy and
cannot be held liable for errors and omissions.

Summary Greenwich Building Areas 092015

**CBRE** | Hampton Roads
Part of the CBRE affiliate network

**EXHIBIT B**
**TO**
**TRIPLE NET LEASE**

## SURVEY NOTES:

1. THIS SURVEY WAS PREPARED WITH THE BENEFIT OF A CURRENT TITLE REPORT PREPARED BY FIDELITY NATIONAL TITLE INSURANCE COMPANY, COMMITMENT NUMBER: 17091893/REV 1, EFFECTIVE DATE: AUGUST 23, 2017 AT 08:00AM.

2. THIS PROPERTY APPEARS TO FALL IN FLOOD ZONE "X" AS SHOWN ON PANEL 0083G OF THE FLOOD INSURANCE RATE MAPS FOR THE CITY OF VIRGINIA BEACH, COMMUNITY NO.:515531, DATED: 1-16-15. FLOOD ZONE INFORMATION SHOWN HEREON IS NOT GUARANTEED AND WAS APPROXIMATELY SCALED FROM THE FLOOD INSURANCE RATE MAPS FOR THE CITY/COUNTY INDICATED. MSA, P.C. IS NOT A PARTY IN DETERMINING THE REQUIREMENTS FOR FLOOD INSURANCE ON THE PROPERTY SHOWN. FOR FURTHER INFORMATION AND TO CONFIRM THE FLOOD ZONE FOR THIS PROPERTY, CONTACT THE LOCAL COMMUNITY FLOOD OFFICIAL. FLOOD ZONE DETERMINATION IS BASED ON THE FLOOD INSURANCE RATE MAPS AND DOES NOT IMPLY THAT THIS PROPERTY WILL OR WILL NOT BE FREE FROM FLOODING OR DAMAGE.

3. NORTH MERIDIAN SHOWN HEREON IS BASED ON MAP BOOK 70, PAGE 22.

4. THIS SURVEY DOES NOT ADDRESS THE EXISTENCE OR NONEXISTENCE OF ENVIRONMENTAL HAZARDS, CEMETERIES OR ANY UNDERGROUND STRUCTURE NOT OBSERVED DURING THE COURSE OF THE SURVEY.

5. CURRENT OWNER: HOFFLAND PROPERTIES, INC., SOURCE OF TITLE: DEED BOOK 2473, PAGE 267.

6. UNABLE TO FIND DOCUMENT OF RECORD CREATING 10' WATER UTILITY EASEMENT. TAKEN FROM PLANS ENTITLED "SITE IMPROVEMENT PLAN OF HOFFMAN BEVERAGE COMPANY", DATED JANUARY 7, 1991, BY BENGTSON, DEBELL, ELKIN & TITUS, LTD.

7. CONDOMINIUM PLAT AND PLANS OF 5465 GREENWICH ROAD A CONDOMINIUM CONSISTS OF UNIT A, UNIT B AND A COMMON ELEMENT.



LOCATION MAP – SCALE: 1" = 2,000'



GRAPHIC SCALE
1" = 60'

I, JEFFREY J. VIERRETHER, A LAND SURVEYOR, DO HEREBY CERTIFY THAT THIS PLAT IS ACCURATE AND THAT IT COMPLIES WITH THE PROVISIONS OF SEC. 55-79.58.A OF THE CODE OF VIRGINIA, 1950 AS AMENDED. I FURTHER HEREBY CERTIFY THAT ALL UNITS OR PORTIONS THEREOF DEPICTED HEREON HAVE BEEN SUBSTANTIALLY COMPLETED.

SIGNED: 

COMMONWEALTH OF VIRGINIA
JEFFREY J. VIERRETHER
Lic. No. 2306
10/24/2017
LAND SURVEYOR

EXHIBIT 'B'

CONDOMINIUM PLAT AND PLANS OF
### 5465 GREENWICH ROAD
A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA

## MSA, P.C.

Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)  www.msaonline.com

DWN BY:KCR
DATE: 10/24/2017

SHEET 1 OF 6
JOB# 17181
SCALE: 1" = 60'



EXHIBIT 'B'
CONDOMINIUM PLAT AND PLANS OF
*5465 GREENWICH ROAD*
A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA

**M S A, P. C.**
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)   www.msaonline.com

**SUBMITTED LAND**
SCALE: 1" = 60'
NOTE: SEE SHEET 1 OF 6
FOR SURVEY NOTES,
GRAPHIC SCALE
AND CERTIFICATIONS
SEE SHEET 6 OF 6
FOR CURVE TABLE

DWN BY: KCR
DATE: 10/24/2017

LEGEND

SUBMITTED
LAND

SHEET 2 OF 6
JOB# 17181
SCALE: 1" = 60'

GREENWICH ROAD (VAR. R/W)
(SHPB 19, PG. 33A)
(INSTR. NO. 2016092300085380)

S86°49'07"E
25.40'

MATCHLINE – SEE SHEET 2 OF 6

S82°16'39"E
510.08' O/A

6' CHAIN
LINK FENCE

(MP 70 PG 22)

S17°31'13"W
538.72' O/A

SUBMITTED LAND
AREA = 320,332 SF
OR 7.354 AC

PARCEL 24A
(MB 70, PG 22)
(SHPB 19, PG 33A)
(DB 2473, PG 267)
(INSTR. NO. 2016092300085380)
GPIN 1467-34-7278-0000
AREA=320,332 SF
OR 7.354 AC

6' CHAIN
LINK FENCE

N/F
COMMONWEALTH BUILDING COMPANY
(DB 1442, PG 339)
PARCEL 28A
(MB 73, PG 14)
GPIN 1467-44-2286

6' CHAIN
LINK FENCE

2.37'

LARGE POWER POLE

RAILROAD
TRACKS

N/F
NORFOLK & SOUTHERN
RAILROAD (66' R/W)

EXHIBIT 'B'
CONDOMINIUM PLAT AND PLANS OF
**5465 GREENWICH ROAD**
A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA
**MSA, P.C.**
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)  www.msaonline.com

**SUBMITTED LAND**
SCALE: 1" = 60'
NOTE: SEE SHEET 1 OF 6
FOR SURVEY NOTES,
GRAPHIC SCALE
AND CERTIFICATIONS
SEE SHEET 6 OF 6
FOR CURVE TABLE

DWN BY: KCR
DATE: 10/24/2017

LEGEND

SUBMITTED
LAND

SHEET 3 OF 6
JOB# 17181
SCALE: 1" = 60'

EXHIBIT 'B'
CONDOMINIUM PLAT AND PLANS OF
5465 GREENWICH ROAD
A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA
MSA, P.C.
Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)  www.msaonline.com

UNIT AREA
SCALE: 1" = 60'

NOTE: SEE SHEET 1 OF 6
FOR SURVEY NOTES,
GRAPHIC SCALE
AND CERTIFICATIONS
SEE SHEET 6 OF 6
FOR CURVE TABLE

DWN BY: KCR
DATE: 10/24/2017

SHEET 4 OF 6
JOB# 17181
SCALE: 1" = 60'

LEGEND
UNIT AREA B
UNIT AREA A
COMMON ELEMENT

GREENWICH ROAD (VAR. R/W)
(SHPB 19, PG. 33A)
(INSTR. NO. 2016092300853880)

S86°49'07"E
25.40'

S82°16'39"E 259.61'
510.08' O/A

UNIT A
AREA = 80,096 SF
OR 1.839 AC

N7°47'06"E
23.52'
35.10'
117.69'
N82°06'38"W
N7°46'23"E
31.16'
82.25'
N82°13'37"W
N72°26'47"W
54.94'

UNIT B
AREA = 224,788 SF
OR 5.161 AC

PARCEL 24A
(MB 70, PG. 22)
(SHPB 19, PG. 33A)
(DB 2423, PG. 267)
(INSTR. NO. 2016092300853880)
GPIN 1467-34-7278-0000
AREA=320,332 SF
OR 7.354 AC

S17°31'13"W
538.72' O/A

233.69'

305.03'

2.37'

N/F
COMMONWEALTH BUILDING COMPANY
(DB 1442, PG 339)
PARCEL 28A
(MB 73, PG 14)
GPIN 1467-44-2286

(MP 70 PG 22)

6' CHAIN
LINK FENCE

6' CHAIN
LINK FENCE

6' CHAIN
LINK FENCE

LARGE POWER POLE

N/F
NORFOLK & SOUTHERN
RAILROAD (66' R/W)

RAILROAD
TRACKS

## LEGEND

| | |
|---|---|
| ▨ | UNIT AREA B |
| ▨ | UNIT AREA A |
| ▨ | COMMON ELEMENT |

MATCHLINE – SEE SHEET 4 OF 6

**UNIT AREA**
SCALE: 1" = 60'

NOTE: SEE SHEET 1 OF 6
FOR SURVEY NOTES,
GRAPHIC SCALE
AND CERTIFICATIONS
SEE SHEET 6 OF 6
FOR CURVE TABLE

DWN BY: KCR
DATE: 10/24/2017

EXHIBIT 'B'
CONDOMINIUM PLAT AND PLANS OF
**5465 GREENWICH ROAD**
A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA

## M S A, P. C.

Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)  www.msaonline.com

| | |
|---|---|
| SHEET 5 OF 6 | |
| JOB# 17181 | |
| SCALE: 1" = 60' | |

## EASEMENT LEGEND

| NO. | TYPE |
|---|---|
| 1 | PERMANENT DRAINAGE EASEMENT (SHPB 19, PG 33A) (INSTR. 20160923000853880) |
| 2 | TEMPORARY CONSTRUCTION EASEMENT FOR ENTRANCE (SHPB 19, PG 33A) (INSTR. 20160923000853880) |
| 3 | VAR. WIDTH PERMANENT STANDARD VDOT UTILITY EASEMENT & VAR. WIDTH PERMANENT STANDARD UTILITY EASEMENT FOR DOMINION VIRGINIA POWER (SHPB 19, PG 33A) (INSTR. 20160923000853880) |
| 4 | TEMPORARY CONSTRUCTION EASEMENT FOR ENTRANCE (SHPB 19, PG 33A) (INSTR. 20160923000853880) |
| 5 | PERMANENT DRAINAGE EASEMENT (SHPB 19, PG 33A) (INSTR. 20160923000853880) |
| 6 | TEMPORARY CONSTRUCTION EASEMENT FOR SLOPES (SHPB 19, PG 33A) (INSTR. 20160923000853880) |
| 7 | TEMPORARY CONSTRUCTION EASEMENT FOR ENTRANCE (SHPB 19, PG 33A) (INSTR. 20160923000853880) |

## EASEMENT LEGEND

| NO. | TYPE |
|---|---|
| 8 | POSSIBLE 10' WATER UTILITY EASEMENT (SEE NOTE 6) |
| 9 | 30' RIGHT-OF-WAY RESERVATION FROM SOUTH LINE OF NORFOLK SOUTH RAILROAD AS SHOWN IN MB 2, PG 26 |
| 10 | 30' HRSD EASEMENT (DB 1013, PG 54) (DB 1046, PG 691) 30' CITY OF VIRGINIA BEACH UTILITY EASEMENT (MB 131, PG 38) (DB 1899, PG 143) AND 30' VEPCO EASEMENT (DB 3025, PG 446) (DB 2943, PG 971) (DB 2684, PG 126) (DB 1302, PG 484) (DB 998, PG 719) |
| 11 | 50' RESERVATION FOR INGRESS & EGRESS (DB 712, PG 385) |

## CURVE TABLE

| CURVE | RADIUS | LENGTH | TANGENT | CHORD | BEARING | DELTA |
|---|---|---|---|---|---|---|
| C1 | 243.50' | 87.29' | 44.12' | 86.83' | S76° 33' 01"E | 20°32'25" |
| C2 | 3.74' | 2.74' | 1.43' | 2.68' | S33° 25' 45"W | 41°57'38" |
| C3 | 117.51' | 46.49' | 23.55' | 46.19' | S71° 34' 41"W | 22°40'11" |
| C4 | 243.50' | 56.84' | 28.55' | 56.71' | S72° 58' 00"E | 13°22'24" |
| C5 | 243.50' | 30.04' | 15.04' | 30.02' | S83° 11' 16"E | 7°04'08" |
| C6 | 243.50' | 0.42' | 0.21' | 0.42' | S86° 46' 17"E | 0°05'53" |

## UNIT GPIN

| UNIT | GPIN |
|---|---|
| A | 1467-34-7278-XXXX |
| B | 1467-34-7278-XXXX |

EXHIBIT 'B'

CONDOMINIUM PLAT AND PLANS OF

### 5465 GREENWICH ROAD

A CONDOMINIUM, (M.B. 70, PG. 22)
VIRGINIA BEACH, VIRGINIA

# MSA, P.C.

Environmental Sciences • Planning • Surveying
Civil & Environmental Engineering • Landscape Architecture
5032 Rouse Drive, Suite 100, Virginia Beach, VA 23462
757-490-9264 (Ofc)  www.msaonline.com



| DWN BY:KCR | SHEET 6 OF 6 |
| DATE: 10/24/2017 | JOB# 17181 |
| | SCALE: 1" = 60' |

**EXHIBIT C-1**
**TO**
**TRIPLE NET LEASE**