**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 7** |
| | ) | |
| **BCause Mining LLC,** *et al.* | ) | **Case No. 19-10562** |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |
| | ) | Hon. Janet S. Baer |
| | ) | |

## NOTICE OF MOTION

**TO:     PERSONS LISTED ON THE ATTACHED SERVICE LIST**

    **PLEASE TAKE NOTICE THAT** on **Wednesday, June 24, 2020,** at the hour of **1:00 p.m.**, I will appear before the Honorable Janet S. Baer, or any judge sitting in that judge's place, and present the **First Interim Application for Allowance of Compensation and Reimbursement of Expenses to Mason Pollick & Schmahl LLC as Counsel to the Trustee and Request to Shorten Notice (the "Application")**, a copy of which is attached.

    **This Application will be presented and heard telephonically**.  No personal appearance in court is necessary or permitted.  To appear and be heard telephonically on the motion, you must set up and use an account with Court Solutions, LLC.  You can set up an account at www.Court-Solutions.com or by calling Court Solutions at (917) 746-7476.

    **If you object to this Application** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date.  If a Notice of Objection is timely filed, the motion will be called on the presentment date.  If no Notice of Objection is timely filed, the court may grant the motion in advance without a hearing.

Dated:  June 4, 2020

Alex Moglia, Chapter 7 Trustee of the
Bankruptcy Estates of BCause Mining LLC
and BCause LLC

By: /s/ Michael M. Schmahl
       Michael M. Schmahl

Michael M. Schmahl
POLLICK & SCHMAHL, LLC
200 E. Randolph, Suite 5100
Chicago, Illinois  60601
(312) 235-3296
mschmahl@pollickschmahl.com
*Counsel to the Trustee*

## CERTIFICATE OF SERVICE

The undersigned states under penalty of perjury that on June 4, 2020, he caused the above Notice of Motion and the Application to be served on the individuals listed on the below service list via the court's ECF system for those who are registered except for the individuals or entities that are identified to have been served by email who the undersigned caused to be served by email as indicated on the attached service list.  Additionally, the undersigned states under penalty of perjury that on June 4, 2020, he caused a copy of the Notice (in the form attached as Exhibit B to the Application) to be served by regular mail, postage pre-paid on all creditors and other parties in interest and that he will file a supplemental certificate of service related thereto.


By: /s/ Michael M. Schmahl_____
        Michael M. Schmahl

**SERVICE LIST**

Patrick S. Layng
Ha M. Nguyen
Office of the U.S. Trustee
219 S. Dearborn Street
Room 873
Chicago, IL 60604
Ha.nguyen@usdoj.gov
*United States Trustee*

John M Craig
Law Firm of Russell R Johnson
III, PLC
14890 Washington Street
Haymarket, VA 20169
russell@russelljohnsonlawfirm.com
*Counsel for Dominion Energy Virginia*
*Via e-mail*

David A Agay
Maria G Carr
Shara C Cornell
McDonald Hopkins LLC
300 N. LaSalle
Chicago, IL 60654
312-280-0111
dagay@mcdonaldhopkins.com
mcarr@mcdonaldhopkins.com
scornell@mcdonaldhopkins.com
*Counsel for WESCO Distribution, Inc.*

Shelly A. DeRousse
Devon J Eggert
Elizabeth L Janczak
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
312-360-6315
312-360-6520 (fax)
sderousse@freeborn.com
deggert@freeborn.com
ejanczak@freeborn.com
*Counsel for Creditors' Committee*

J Mark Fisher
Sarah K Angelino
Schiff Hardin LLP
233 South Wacker Drive
Suite 7100
Chicago, IL 60606
(312) 258-5861
mfisher@schiffhardin.com
sangelino@schiffhardin.com
Dennis Lewandowski, via email sent to:
dtlewand@kaufcan.com
*Counsel for Hoffland Properties, Inc.*

Russell R. Johnson, III
John M. Craig
Law Firm of Russell R Johnson
III, PLC
2258 Wheatlands Drive
Manakin Sabot, VA 23103
804-749-8861
russell@russelljohnsonlawfirm.com
john@russelljohnsonlawfirm.com
*Counsel for Dominion Energy Virginia*
*Via e-mail*

Marc Ira Fenton
Jamie L Burns
Levenfeld Pearlstein LLC
2 N Lasalle St Ste 1300
Chicago, IL 60602
312-346-8380
mfenton@lplegal.com
jburns@lplegal.com

Brian L Shaw
Christina Sanfelippo
Fox Rothschild LLP
321 N Clark Street
Suite 1600
Chicago, IL 60654
312-517-9200
312-517-9201 (fax)

*Counsel for W-R2 Jefferson Owner VIII, LLC*

bshaw@foxrothschild.com
csanfelippo@foxrothschild.com
*Counsel for BMG Operations Ltd.*

Jennifer M McLemore
Williams Mullen
200 South 10th Street
Richmond, VA 23219
(804)420-6330
jmclemore@williamsmullen.com
*Counsel for BMG Operations Ltd.*
*Via e-mail*

Jason M Torf
Ice Miller LLP
200 W. Madison St.
Suite 3500
Chicago, IL 60606
312-726-6244
312-726-6214 (fax)
jason.torf@icemiller.com
*Counsel for Dominion Energy Virginia*

Jason M Torf
Ice Miller LLP
200 W. Madison St.
Suite 3500
Chicago, IL 60606
312-726-6244
312-726-6214 (fax)
jason.torf@icemiller.com
*Counsel for Dominion Energy Virginia*

Scott R Clar
Arthur G Simon
Jeffrey C Dan
Crane, Simon, Clar & Dan
135 S Lasalle Suite 3705
Chicago, IL 60603
312 641-6777
312 641-7114 (fax)
sclar@cranesimon.com
asimon@cranesimon.com
jdan@cranesimon.com
*Counsel for the Debtors*

Debra Devassy Babu
Askounis & Darcy, PC
444 N. Michigan Avenue
Suite 3270
Chicago, IL 60611
312-784-2400
312-784-2410 (fax)
ddevassy@askounisdarcy.com
*Counsel for CCA Financial, LLC*

Lindsey Conley
Hinshaw & Culbertson LLP
151 N. Franklin Street, Suite 2500
Chicago, IL 60606

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) ) ) ) ) ) ) ) ) | **Chapter 7**<br><br>**Case No. 19-10562**<br>**(Jointly Administered)**<br><br>**Hon. Janet S. Baer** |
| **BCause Mining LLC**, *et al.* | | |
| Debtors. | | |

**COVER SHEET FOR FIRST INTERIM APPLICATION FOR ALLOWANCE OF
COMPENSATION AND REIMBURSEMENT OF EXPENSES TO
MASON POLLICK & SCHMAHL LLC
<u>AS COUNSEL TO THE TRUSTEE</u>**

| | |
|---|---|
| Name of Applicant: | Mason Pollick & Schmahl LLC f/k/a Pollick & Schmahl, LLC |
| Authorized to Provide Professional Services to: | Alex Moglia, not personally, but solely as the chapter 7 trustee of the bankruptcy estates of BCause LLC and BCause Mining LLC |
| Date of Order Authorizing Employment: | October 16, 2019 (nunc pro tunc to October 8, 2019) **[Docket No. 350]** |
| Period for which Compensation is Sought: | |
| From: | October 8, 2019 |
| Through: | May 20, 2020 |
| Amount of Fees Sought: | $148,610.00 |
| Amount of Expense Reimbursement: | $1,191.38 |
| This is an: | |
| Interim Application:  YES | Final Application:  NO |
| | |

If this is not the first application filed herein by this professional, disclose as to all prior fee applications:

| <u>Date Filed</u> | <u>Period Covered</u> | <u>Total Requested</u><br><u>(Fees & Expenses)</u> | <u>Total Allowed</u><br><u>(Fees & Expenses)</u> | <u>Fees & Expenses</u><br><u>Previously Paid</u> |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |
| | | | | |

State the aggregate amount of fees and reimbursement of expenses paid to Applicant as of the
date of this Application: $0.00.

MASON POLLICK & SCHMAHL LLC

Dated: June 4, 2020

/s/ Michael M. Schmahl
Michael M. Schmahl
Mason Pollick & Schmahl LLC
70 W. Hubbard, Suite 304
Chicago, IL 60654
(312) 312-5531
mschmahl@mps-law.com
ARDC #6275860
*Counsel for the Trustee*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| | ) | **Chapter 7** |
| **In re:** | ) | |
| | ) | **Case No. 19-10562** |
| **BCause Mining LLC, *et al.*** | ) | **(Jointly Administered)** |
| | ) | |
| **Debtors.** | ) | **Hon. Janet S. Baer** |
| | ) | |

**FIRST INTERIM APPLICATION FOR ALLOWANCE OF COMPENSATION
AND REIMBURSEMENT OF EXPENSES TO MASON POLLICK & SCHMAHL LLC
AS COUNSEL TO THE TRUSTEE AND REQUEST TO SHORTEN NOTICE**

Pursuant to 11 U.S.C. §§ 330 and 331 and Rule 2016 of the Federal Rules of Bankruptcy Procedure, Mason Pollick & Schmahl LLC f/k/a Pollick & Schmahl, LLC ("MPS")[1], counsel for Alex Moglia (the "Trustee"), not individually, but solely as trustee of the chapter 7 bankruptcy estates of BCause Mining LLC ("BC Mining") and BCause LLC[2] ("BC Holding" and collectively with Mining, the "Debtors"), submits this First Interim Application for Allowance of Fees and Reimbursement of Expenses (the "Application") as counsel to the Trustee for the period from October 8, 2019, through and including May 20, 2020, (the "Compensation Period") and requests the entry of an order allowing and authorizing the payment of interim compensation in the amount of $148,610.00 (the "Compensation") and reimbursement of expenses in the amount of $1,191.38 (the "Expense Reimbursement") for services provided and expenses incurred by MPS as counsel for the Trustee, and, in support thereof, respectfully states as follows:

---

[1] MPS recently changed its name from Pollick & Schmahl, LLC, to Mason Pollick & Schmahl LLC after Richard J. Mason joined the firm.
[2] BCause LLC is the debtor in bankruptcy case number 19-10731.

**Jurisdiction and Venue**

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334.

2.      This Motion is a core proceeding under 28 U.S.C. § 157(b)(2).

3.      Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

**Background**

4.      On or about April 11, 2019, BC Mining filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.      On or about April 12, 2019 (collectively with April 11, 2019, the "Petition Dates"), BC Holding filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.      On or about May 8, 2019, the Court entered an order [**Docket No. 72**] directing that the Debtors' bankruptcy cases be jointly administered under the above caption.

7.      On or about October 8, 2019 (the "Conversion Date"), the Court entered an order [**Docket No. 319**] converting the Debtors' bankruptcy cases to cases under chapter 7 of the Bankruptcy Code, and Richard J. Mason was appointed as the chapter 7 trustee of the Debtors' estates [**Docket No. 320**].

8.      On or about October 11, 2019, Mr. Mason was required to resign as chapter 7 trustee due to a potential conflict arising from connections with his prior firm that was not immediately apparent from reviewing the Debtors' creditor list.[3]  Later that day, Mr. Moglia was appointed as the Trustee [**Docket No. 334**].

9.      On or about October 16, 2019, the Court entered an order [Docket No. 350], authorizing the Trustee to retain MPS as his counsel *nunc pro tunc* to October 8, 2019.

---

[3] This is was specific to Mr. Mason's former firm, not to Mr. Mason and is not an issue for MPS.

10.     MPS has not previously requested nor been paid any compensation for its services to the Trustee.

### Relief Requested

11.     Through this Application, MPS seeks the entry of an order, pursuant to Sections 330 and 331 of the Bankruptcy Code, approving and authorizing immediate payment of Compensation in the amount of $148,610.00 and the Expense Reimbursement of $1,191.38 incurred during the Compensation Period.  A detailed abstract containing specific summaries of compensable services provided by MPS, including all fees charged and all expenses incurred, is attached hereto as Exhibit A.

12.     During the Compensation Period, the Trustee's primary strategy has been to enhance the cash on hand in the BC Holding estate, while trying to preserve that money by limiting and reducing the disputed secured claims of WESCO Distribution, Inc. ("WESCO").  All of the assets that the Trustee administered during the Compensation Period, except for the equipment (the "Equipment") in the Debtors' data center located in Virginia Beach, Virginia (the "Data Center"), which was clearly subject to WESCO's security interest, were property of the BC Holding's estate.

### Summary of Trustee Primary Activities and MPS' Related Services
### During the Compensation Period

13.     These cases have presented a number of complex challenges for the Trustee and required significant work from MPS often during compressed time frame, particularly during the initial period following the Conversion Date.

14.     BC Holding, as parent, owns all of the membership interests in BC Mining as well as several other non-debtor subsidiaries, including the non-debtor subsidiary known as BCause Secure LLC ("BC Secure" or "Secure").  On the Conversion Date, the primary asset of BC

Mining was the Equipment located in the leased Data Center, which was scheduled by the

Debtors as having a book value exceeding $7.5 million but whose actual value was unknown.

The primary assets in the BC Holding estate consisted of approximately $660,000 in cash,

Bitcoin and Bitcoin Cash (collectively, the "Bitcoin"), and certain software under development

and other assets intended, once complete, to operate a unique exchange (the "Spot Exchange")

where individuals could convert virtual currencies into U.S. dollars or other foreign currency

similar to a currency exchange.

15.     The Spot Exchange assets had an unknown value but there were significant

indications that they may have significant value as the two most recent CEOs of the Debtors,

Tom Flake ("Flake") and Fred Grede ("Grede") were interested in acquiring them.  Additionally,

prior to the Conversion Date, the Debtors, with the apparent support of the former Creditors

Committee, intended to fund a chapter 11 plan largely with future profits from the Spot

Exchange following its sale to a group led by Flake.

16.     Further complicating virtually all of the Trustee's activities were the facts that the

Trustee had only approximately three to four weeks to investigate and make final determinations

related to both the Equipment and the Spot Exchange assets at the risk of incurring what would

have been substantial administrative expenses, including significant monthly rent expenses and

those required by the fire patrol mandated at the Data Center by local authorities in Virginia

Beach.

17.     Additionally, while disputed, WESCO asserted a security interest against nearly

all assets of the Debtors' estates, including the cash held by the Trustee.  As a result, the Trustee

had no access to unencumbered cash with which to operate.

18.    Therefore, the Trustee's overarching strategy was to seek to limit, reduce and ultimately resolve WESCO's asserted secured claims in order to preserve the cash on hand while diligently working to determine the value of the Equipment, the Spot Exchange assets and other assets.

19.    As summarized below, the overwhelming majority of MPS' services related to these activities.

20.    Additional services were provided in connection with meeting the Trustee's statutory obligations, including, retaining accountants to prepare tax returns (and the related retention of the Debtors' former controller to complete the financial books), responding to inquiries from creditors, equity holders and parties in interest, and seeking to close the 401(k) plan previously maintained by BC Holding, as well as addressing a circumstance where the Trustee became aware that certain of BC Holding's former employees continued to go to work after the Conversion Date, although not authorized by the Trustee, and an investigation into certain transfers from the BC Holding's bank account after October 3, 2019, that the Trustee understands were in contravention of the Court's directives on that date.

WESCO Disputes

21.    WESCO asserts secured claims against each of the Debtors in an amount in excess of $1.9 million that are purportedly secured by a security interest in and liens on, among other things, all of BC Mining's assets, including the Equipment, and the cash and Bitcoin in the BC Holding estate.

22.    WESCO's secured claim is ultimately based on unpaid debt originally owed by BC Mining to WESCO and its affiliate, CSC, related to the sale of certain of the Equipment.  BC mining, as debtor, and BC Holding, as guarantor, subsequently signed a promissory note in favor

of WESCO evidencing the purportedly combined debt owed to both WESCO and CSC, and

WESCO subsequently obtained a judgment by confession against both Debtors in state court in

Virginia.  WESCO asserts liens under Illinois and Virginia law based on its efforts to collect the

confessed judgment and a security interest (which WESCO asserts was also granted to CSC) in a

security agreement signed by BC Mining.

23.     WESCO's claims, liens and security interest are the subject of the adversary

proceeding captioned *Moglia v. WESCO Distribution, Inc.*, pending before the Court as

Adversary No. 19-769 (the "WESCO Adversary Proceeding") that was originally filed by the

Debtors.  Through the WESCO Adversary Proceeding, the Trustee generally seeks to avoid or

limit WESCO's liens and security interest, avoid the Debtors' obligations under the note, and

object to the amount of WESCO's asserted claims.

24.     The WESCO Adversary Proceeding is complex and involves multiple issues

under bankruptcy law, the Uniform Commercial Code, Virginia law, due process principles, and

the doctrines of *res judicata* and *Rooker-Feldman*.  Additionally, this litigation is complicated by

the multi-layered nature of WESCO's asserted secured claims.

25.     Subject to Court approval[4], the Trustee has reached a settlement with WESCO

that would resolve all disputes with WESCO and generally provides that the Trustee will pay

WESCO $625,000 from the money in the BC Holding estate and WESCO will withdraw its

claims.  As a result, subject to Court approval, this settlement will provide approximately

$359,000 of unencumbered cash for the benefit of unsecured creditors.

26.     MPS represented the Trustee with respect to all aspects of the WESCO Adversary

Proceeding, including investigating relevant facts, researching all legal issues, appearing at all

---

[4] A motion to approve the proposed settlement **[Docket No. 431]** has been filed by the Trustee and is scheduled to
be presented to the Court on June 10, 2020, at 1:00 P.M.

hearings, preparing all papers filed with the Court, including various motions, a draft amended

complaint, a response and a sur-reply in further response to WESCO's motion to dismiss, and

negotiated the settlement agreement and prepared the motion requesting the Court's approval

thereof.

The Equipment

27.    The Equipment was generally comprised, among other things, of transformers,

massive fans (installed directly into the roof of the Data Center), and other large pieces of

electrical equipment as well as a ventilation system (some of which comprised virtually an entire

external wall of the Data Center), extensive wiring and related electrical switches and related

equipment, and racking for computers with related support structures.  Although listed in the

Debtors' schedules with a book value exceeding $7.5 million, its actual value was not known.

28.    Complicating the Trustee's evaluation of the Equipment and any potential sale

was the fact that monthly rent of about $60,000 for the Data Center (and other potential monthly

expenses) would begin accruing on November 1, 2019, while removing the Equipment from the

Data Center was impractical and cost-prohibitive.  Further, the local fire marshall required that a

fire patrol (the "Fire Brigade") be present in the Data Center 24 hours a day due to the fact that

the Debtors had not completed a compliant fire suppression system in the Data Center.

29.    MPS represented the Trustee in multiple discussions with: (i) potential

auctioneers and liquidators related to potential sale structures, timelines, sale expenses, and

reasonable ranges for anticipated liquidation proceeds; (ii) Silbar, a third party service provider,

that provided Fire Brigade services during certain hours; (iii) certain of the Debtors' former

employees to staff the Fire Brigade at other times, including, without limitation, related staffing,

oversight and scheduling, and to obtain various information and details related to the Equipment,

the Data Center, and anticipated future expenses based on various potential sale structures; (iv)

the fire marshall, in an effort to end the required Fire Brigade; (v) and others to obtain additional

relevant information, including, without limitation, estimates of various expenses.  This

information was used to model the likely net results of the potential liquidation of the Equipment

based on various sale structures, including, without limitation, a single auction event, an auction

conducted over an extended period of time, a combined sale of the Data Center and the

Equipment, and various variations on these basic structures.[5]

30.     Discussions with various former employees were complicated by the fact that

certain of the former employees claimed entitlement to wages or salary that had not been paid

prior to the Conversion Date and discussions with Silbar were complicated by the fact that it had

not received payment in full for pre-petition services.

31.     In addition to WESCO's asserted secured claims against the Equipment, Hoffland

Properties ("Hoffland"), the landlord for the Data Center, asserted an ownership interest in the

Equipment pursuant to the terms of the lease.  Therefore, in an effort to avoid the costs of

unnecessary litigation, the Trustee also held discussions with WESCO and Hoffland in an

attempt to broker an agreement on an overall path forward with respect to the Equipment,

including discussions regarding potential sale structures, the value of the Equipment and

potential liquidation results, potential budgets to accommodate any sale, potential modifications

to the Data Center lease (or the terms of an alternative, cheaper agreement regarding possession

of the Data Center) and other related issues.

---

[5] As discussed below, the Trustee also conducted discussions with a party that expressed interest in acquiring substantially all of the Debtors' operating assets.  Although these discussions appeared promising at first, the potential buyer was unable or unwilling to provide evidence of ability to close and subsequently informed the Trustee that it was both not comfortable acquiring assets from a bankruptcy estate or pursuing the transaction.

32.     Through these efforts, the Trustee obtained an agreement with Hoffland pushing back in the due date for November rent; maintained the Fire Brigade until reaching an agreement with the fire marshall that it was no longer necessary; and an agreement with WESCO regarding use of cash through the end of October.

33.     Given the likely timeline to conduct a sale, the anticipated costs, and the disagreements between WESCO and Hoffland related to their competing claims related to the Equipment, the Trustee ultimately determined that the risks associated with selling the Equipment did not justify the potential value of a sale for unsecured creditors and abandoned the Equipment and rejected the lease for the Data Center without incurring any substantial costs other than those related to the Fire Brigade.

34.     MPS actively represented the Trustee throughout, including, but not limited to, in negotiations with the various parties in interest, preparing models to guide analysis and for use in certain of these discussions, preparing agreements with the individuals on the Fire Brigade, preparing a stipulation with Hoffland delaying November rent and attempting to negotiate other lease modifications, preparing and appearing in court on motions, including, without limitation, seeking to retain and pay those involved in the Fire Brigade, using cash collateral, and, ultimately, abandoning the Equipment and rejecting the Data Center lease.

Spot Exchange and BC Secure

35.     Although it was never completed, BC Holding owned partially developed software, including an incomplete engine to process such transactions developed by NASDAQ (the "NASDAQ Engine"), a consumer facing website, and various other component parts intended to be used for the Spot Exchange.  Additionally, the non-debtor subsidiary BC Secure

apparently had applied for and appears to have obtained licenses from certain states needed to operate the Spot Exchange.

36.    The value of the Spot Exchange assets was not known and, the Trustee understands, the Spot Exchange's business model was the first of its kind.  However, a group led by Flake proposed to acquire these assets and the equity in BC Secure in exchange for the assumption of certain pre-petition unsecured claims and a commitment to share a portion of the anticipated profits from the Spot Exchange (the "Hope Note").  Additionally, a group led by Grede expressed interest in acquiring the Spot Exchange assets for cash.

37.    In addition to competitive interest in the Spot Exchange assets, their apparent value to creditors was enhanced by the fact that WESCO did not assert a lien on those assets.

38.    The NASDAQ Engine, which the Trustee understands was generally considered as the primary asset, required further work by and agreements with NASDAQ, which was already owed nearly $1 million.  Therefore, NASDAQ also insisted on approving any buyer before committing to any further agreements with such a buyer.

39.    The NASDAQ Engine software was housed on a large and cumbersome set of servers leased from CCH that were located in the Data Center.  Therefore, assuming an agreement with NASDAQ, it became increasingly likely that any sale would also require the assumption and cure of the CCH lease as well as either the payment of additional rent on the Data Center or moving the server to another data center (the "Server Costs").

40.    The Trustee conducted several discussions with both Flake and Grede to clarify and improve their respective proposals.  Additionally, the Trustee held discussions with CCH and NASDAQ and with other potential buyers, including significant discussions conducted over a relatively short period of time with a company that expressed interest in acquiring substantially

all of the Debtors' assets (the "Take All Party").  These discussions occurred in parallel into November.

41.    By early November, discussions with the Take All Party slowed and the Grede group had not made a firm cash offer as, the Trustee understands, Grede was raising capital. Therefore, the Trustee entered into contract negotiations with the Flake group intending any sale to be subject to competitive bidding.

42.    Shortly thereafter, it became apparent both that the Grede group would not make a firm offer until it had raised sufficient capital to fully fund its desired business (i.e. not simply acquire the Spot Exchange assets) and that its ability and continued desire to seek financing was uncertain.

43.    Similarly, the Take All Party, which had failed to participate in at least two or three scheduled discussions, was unable or unwilling to produce previously agreed upon evidence of funds or ability to close and informed the Trustee that it was not familiar with purchasing assets from a bankruptcy estate and would not be able to advance a transaction in the near term.

44.    Discussions with Flake also deteriorated.  Under the circumstances, the Trustee terminated contract discussions.

45.    MPS represented the Trustee in all discussions with Flake, Grede, the Take All Party, CCH, Hoffland (related to maintaining access to the server), NASDAQ and other parties in interest.  MPS also represented the Trustee in investigating the Spot Exchange and BC Secure and in responding to due diligence inquiries from interested potential buyers, including arranging and, when appropriate, participating in calls between potential buyers and certain former

employees.  MPS prepared a draft purchase agreement in connection with negotiations with

Flake, though the draft was never completed.

Sale of Bitcoin

46.    BC Holding's Bitcoin was spread unevenly across three virtual "wallets" or

accounts, including two that were located, respectively, at a trust company called PrimeTrust and

on a website that aggregated partial Bitcoin as it was mined by BC Holding (the "Slushpool").

47.    The Trustee initially experienced problems with the accounts at PrimeTrust and

Slushpool.  The Trustee understands that the PrimeTrust account was maintained on antiquated

software at PrimeTrust that could not process transactions and the responsible person on the

account was former employee of the Debtors.  The Trustee also understands that the Slushpool

account was technologically locked so that it could only transfer Bitcoin into the PrimeTrust

account.

48.    Additionally, the Trustee experienced difficulties locating a broker willing to

process a one-time liquidation of the Bitcoin for the Trustee.

49.    All of these problems were resolved pursuant to an agreement negotiated with

PrimeTrust.

50.    MPS represented the Trustee in investigating the Bitcoin and working with the

general counsel of PrimeTrust to resolve various legal issues raised by PrimeTrust and

negotiating the resolution of the problems related to the PrimeTrust account pursuant to an

agreement with PrimeTrust, including an approximate 50% reduction in its standard fee for

liquidating Bitcoin to 1%.  As a result, the Trustee realized then market value for the Bitcoin

although there is no centralized public market in which Bitcoin is traded.  MPS also prepared all

papers and appeared before the Court to obtain authority to sell the Bitcoin and obtained

WESCO's consent to the sale free and clear of WESCO's asserted security interest and liens, with liens to attach to proceeds.

51.     The Trustee successfully liquidated the Bitcoin resulting in proceeds of approximately $240,479.44 for BC Holding's estate.

Additional Activities and Services

52.     In October, the Trustee became aware that certain of the BC Holding's former employees had returned or continued to perform work from disparate locations without the Trustee's knowledge or authorization.  MPS represented the Trustee in investigating the circumstances and directing all involved parties to cease any work.

53.     Additionally, in late October, the Trustee learned, as the Trustee understands it, that at a hearing on October 3 (prior to the Conversion Date), the Court directed the Debtors not to make any further payments from that date forward except to Silbar in connection with the Fire Brigade.  Nonetheless, several additional payments cleared between BC Holding's bank account after that date.  At the Court's direction, the Trustee investigated these transfers and reported to the Court.

54.     MPS also represented the Trustee in connection with obtaining and retaining the Debtors' former controller to complete their books and year end employee compensation filings as well as an accountant to prepare tax returns.

55.     Finally, MPS has assisted the Trustee in responding to inquiries from creditors, equity holders and other parties in interest, reviewing various fee applications related to services provided during the chapter 11 portion of these cases, obtaining a refund of a deposit from Dominion Energy, investigating and seeking to close a purportedly terminated 401(k) plan

previously maintained by BC Holding at Paychex, and initiating investigations into various other matters, including claims asserted by BMG.

56.    The Trustee is currently holding approximately $984,115.85 in the BC Holding estate.

57.    A summary of the normal hourly rates[6] charged by and the number of hours of services provided by the attorneys at MPS for the period covered by this application are as follows:

| Name | Title | Specialty | Total Hours | Rate ($/hour) |
|------|-------|-----------|-------------|---------------|
| Michael M. Schmahl | Partner | Bankruptcy and Litigation | 400.1 | $350 |
| John F. Pollick | Partner | Bankruptcy and Transactions | 24.5 | $350 |

58.    All services performed by MPS for which compensation is being sought were performed for and on behalf of the Trustee.

59.    This Application has been prepared with the intention of complying with the applicable standards set forth in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and Local Rule of Bankruptcy Procedure 5082-1.

60.    None of the payments received by MPS will be shared with any party, nor are these payments subject to a sharing arrangement between MPS and any third party.

61.    In accordance with Section 330 of the Bankruptcy Code, MPS asserts that the amount of fees and expenses is fair and reasonable given: (a) the complexities involved in these cases; (b) the time expended; (c) the nature and extent of the services rendered; (d) the value of such services; and € the costs of comparable services other than in a case under the Bankruptcy Code.

---

[6] MPS has periodically entered into fee arrangements providing for alternative fee structures, contingent fees, flat fee for certain services, or discounted rates under certain, limited circumstances.

62.     MPS has and continues to perform significant services to the Trustee, including, but not limited to investigating the Debtors' affairs, potential claims against third parties, and certain claims asserted against these estates.

63.     For the Compensation Period, MPS provided a wide variety of legal services to the Trustee. The services MPS performed are categorized and described in detail in the itemized statement attached hereto and made apart hereof as Exhibit A.  At the end of each category is a list of each attorney and the total number of hours (and the corresponding dollar value) spent on that matter.  The following chart is a brief overview of the services provided by MPS for which it seeks compensation.

| Nature of Services | Approximate Hours | Approximate Value |
|---|---|---|
| Administrative Matters | 47.9 | $16,765.00 |
| General Investigation | 36.8 | $12,880.00 |
| Potential Asset Sales | 126.3 | $44,205.00 |
| WESCO Disputes | 208.7 | $73,045.00 |
| Dominion Energy | 3.1 | $1,085.00 |
| BMG | 1.8 | $630.00 |

64.     A general summary of these services includes, but is not limited to:

a.     <u>Administrative Matters</u>: MPS has and will continue to: (i) review all pleadings; (ii) appearing at hearings; (iii) respond to inquiries from creditors, equity holders and other parties in interest; (iv) reviewing fee applications; (v) preparing papers required to retain professionals and fee applications for same; and (vi) assisting the Trustee in closing BC Holding's 401(k) plan and

performing his other statutory obligations. Additionally, during the Compensation Period, this category also included time spent addressing the removal of third party property from the Data Center.

b.  <u>General Investigation</u>: MPS has and will continue to: (i) investigate the Debtors' financial affairs; (ii) represent the Trustee at meetings of creditors; and (iii) investigate the post-October 3 transfers and other unique circumstances that may arise.

c.  <u>Potential Asset Sales</u>:  MPS has and will continue to represent the Trustee in evaluating assets of these estates and in liquidating them, including the Equipment, the Spot Exchange assets, and the Bitcoin.  MPS estimates that it provided 56.7 hours ($19,845) working on the potential sale of the Equipment, approximately 18.9 hours ($6,615) working on a potential sale to the Take All Party, approximately 28.3 hours ($9,905) working on a potential sale of the Spot Exchange assets, and approximately 19.0 hours ($6,650) working on the sale of the Bitcoin.[7]

d.  <u>WESCO Disputes</u>:  MPS has represented the Trustee in all aspects of the WESCO Adversary Proceeding and negotiating and drafting, subject to the Court's approval, of the settlement agreement resolving the Trustee's disputes with WESCO resulting in approximately $359,000 of unencumbered cash for the benefit of unsecured creditors.

---

[7] Please note that these figures are good faith estimates of time tied specifically to these individual sub-matters. Certain entries related to other matters unrelated to these specific potential transactions and are not included in these estimates (e.g. evaluation and abandonment of certain furniture or later motions to lift stay tangentially related to assets). Additionally, some entries relate to discussions related to numerous matters rather than one specific potential transaction. Those entries have generally not been included in these figures.

    e.  <u>Dominion Energy</u>:  MPS has represented the Trustee in obtaining a refund from Dominion Energy of a deposit previously made by the Debtors and will continue investigating other issues related to Dominion Energy.

    f.  <u>BMG</u>:  MPS has and will continue to confer with BMG's counsel, investigating, and seeking to resolve claims, including chapter 11 administrative claims, asserted by BMG.

65.    For these services, MPS requests that the Court enter an order allowing Compensation in the amount of $148,610 and authorizing the Trustee to immediately pay MPS from the cash in the BC Holding estate.

## **Expenses**

66.    In addition, MPS incurred certain reasonable and necessary expenses during its representation of the Trustee and seeks reimbursement of the actual amount of such expenses totaling $1,191.38, comprised of the following:

    a.  Document retrieval and certified copy charges to obtain a certified copy of the case file from the Circuit Court of Arlington County, Virginia related to WESCO's confessed judgment: $136.00

    b.  Filing fee related to the Trustee's motion to sell the Bitcoin: $181.00

    c.  Court Solutions charges related to telephonic participation in hearings prior to the filing of this Application: $70.00

    d.  Postage related to various notices and papers mailed to creditors or other parties in interest and to comply with the Federal Rules of Bankruptcy Procedure: $804.38

**<u>Request to Approve and Shorten Notice</u>**

67.     Sections 330 and 331 of the Bankruptcy Code require notice and a hearing before any determination is made on this Application.  In compliance with these sections and Federal Rule of Bankruptcy Procedure 2002, MPS has mailed a copy of the notice (the "Notice") of this Application to all creditors and provided a full copy of this Application with all exhibits to all parties who have entered an appearance in these cases through the Court's ECF system.  A copy of the Notice is attached hereto as Exhibit B.  Additionally, MPS will make a copy of this Application with all supporting exhibits available to any party in interest that submits a written request to Michael M. Schmahl via mail to MPS at 70 W. Hubbard, Suite 304, Chicago, IL 60654, or via email sent to mschmahl@mps-law.com.  Finally, MPS requests that the Court shorten notice by approximately one day so that this Application may be heard on June 24, 2020.

WHEREFORE, MPS respectfully requests that this Court enter an order: (i) allowing MPS Compensation in the amount of $148,610.00; (ii) allowing the Expense Reimbursement in the amount of $1,191.38; (iii) authorizing the Trustee to immediately pay the Compensation and Expense Reimbursement to MPS from the funds in the BC Holding estate; (iv) authorizing and approving shortened notice and the form of the the Notice; and (v) granting such other and further relief as this Court deems just or appropriate.

Dated: June 4, 2020                              /s/ Michael M. Schmahl
                                                 Michael M. Schmahl
                                                 Mason Pollick & Schmahl LLC
                                                 70 W. Hubbard, Suite 304
                                                 Chicago, IL 60654
                                                 (312) 312-5531
                                                 mschmahl@mps-law.com
                                                 ARDC #6275860
                                                 *Counsel for the Trustee*