```
 1              IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
    BCause Mining, LLC,           )  No. 19 B 10562
 4                                )  Chicago, Illinois
                                  )  10:00 a.m./2:00 p.m.
 5                    Debtor.     )  September 4, 2019

 6

 7                  TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JANET S. BAER
 8
      APPEARANCES:
 9
    For the Debtors:       Mr. Scott Clar;
10
    For WESCO              Mr. David A. Agay;
11  Distribution:          Mr. Micah E. Marcus;

12  For Hoffland           Mr. Dennis T. Lewandowski;
    Properties:            Ms. Sarah K. Angelino:
13
    For Virginia
14  Electric:              Mr. Jason M. Torf;

15  For Dominion Power:    Mr. John M. Craig;

16  For the Committee:     Ms. Shelly DeRousse;

17  For BMG Operations:    Ms. Christina M. Sanfelippo;
                           Ms. Jennifer M. McLemore
18                         (telephonic);

19  For the U.S. Trustee:  Mr. Ha Nguyen.

20

21

22

23   Court Reporter:       MARY C. KELLY, CSR
                           United States Courthouse
24                         219 South Dearborn Street
                           Room 661
25                         Chicago, Illinois  60604
```

1              THE CLERK:  BCause Mining, LLC.

2              And we have a telephonic appearance.

3              THE COURT:  All right.

4              MR. TORF:  Good morning, Your Honor.

5    Jason Torf on behalf of Virginia Electric.

6              MR. CRAIG:  Good morning, Your Honor.

7    John Craig on behalf of Dominion Energy Virginia.

8              MR. AGAY:  Good morning, Your Honor.

9    Micah Marcus and David Agay on behalf of WESCO

10   Distribution.

11             MS. ANGELINO:  Good morning, Your Honor.

12   Sarah Angelino on behalf of Hoffland Properties.

13             MR. LEWANDOWSKI:  Good morning, Your

14   Honor.  Dennis Lewandowski on behalf of Hoffland

15   Properties.

16             MR. CLAR:  Good morning, Your Honor.

17   Scott Clar on behalf of both debtors.

18             MS. DeROUSSE:  Good morning, Your Honor.

19   Shelly DeRousse on behalf of the creditors

20   committee.

21             MR. NGUYEN:  Good morning, Your Honor.

22   Ha Nguyen for the U.S. Trustee.

23             MS. SANFELIPPO:  Good morning, Your

24   Honor.  Christina Sanfelippo on behalf of BMG

25   Operations, LLC.

1        THE COURT:  Good morning.

2        Here we are again.

3        MR. CLAR:  Here we are again.

4        THE COURT:  We have a lot of things

5   before us, so what is going on?

6        MR. CLAR:  Well, we're back again on

7   several matters, as I count, I think 12, but most

8   notably cash collateral and WESCO's motion for

9   relief from stay and/or to dismiss.  We're back

10  because of concerns about the debtors' cash

11  position and amended plan.

12        Debtors' cash position currently is

13  approximately $820,000, plus $30,000 of bitcoin,

14  and as the court will recall, the level that the

15  debtor is supposed to achieve from the beginning of

16  the case is $814,000, and the debtor is -- BCause

17  LLC is above the level, and WESCO is adequately

18  protected in that fashion.

19        Plus, with respect to the motion for

20  relief from stay, there has never been any

21  indication that there is a lack of equity here.

22  Reason?  Because there isn't.

23        We're here because we were supposed to

24  file an amended plan to take care of some issues in

25  the first plan.  We did.  Whether that plan is

1    going to be confirmed, obviously I can't say today,

2    but it is a plan that was forged with the help of

3    the Official Unsecured Creditors Committee.  It is

4    a plan that takes care of the concern -- one of the

5    concerns that WESCO had, which is that they, in Mr.

6    Agay's own words, wanted a cash down payment.

7    They're getting it under the plan.

8              So to the extent there are questions

9    about feasibility of the plan, I hate to keep

10   repeating myself, but those are confirmation

11   issues.

12             The issues for today with respect to

13   cash collateral and the motion for relief from stay

14   we believe have been answered.

15             I've received a deluge of e-mails from

16   Mr. Agay over the last five days asking for the

17   cash balance.  We've reported what the cash balance

18   was.  We've reported what the variance was between

19   the projections and the actual.  We've respond to

20   everything that we were supposed to respond to.

21             I should also point out that -- as the

22   court did in the hearing before in the previous

23   one, that WESCO's secured claim is at issue.  Now

24   WESCO has filed a motion to dismiss.  I've read it.

25   I have two issues with it, but, you know, we would

1    like time to respond to that, obviously.

2            One of the objections that WESCO raises

3    in its objection to the motion to sell -- there's a

4    lot of things that are tied together here.

5            THE COURT:  I know, and we'll get to

6    that.

7            MR. CLAR:  Well, yeah, I want to.  But

8    there are some things that are tied in.  Is that we

9    haven't filed a motion to have a hearing on the

10   combined plan and disclosure statement.  And we

11   need to deal with Mr. Nguyen's motion first as

12   well.

13           THE COURT:  Yes, we do.

14           MR. CLAR:  But I will do that.  If we're

15   moving forward today, I will do that in short

16   order.

17           So I didn't want to be presumptuous and

18   file that motion.  And I kind of don't appreciate

19   having that thrown in my face.  But we will file

20   that motion.

21           The backdrop of all of this is WESCO's

22   secured claim.  We have -- just as a preview, we

23   have two issues with their claim.

24           There is a 21-day notice of the

25   confession.  See, they had a UCC against Mining,

1    but not against LLC.  That's where the cash is.

2    There's a 21-day notice of confession.  We don't

3    believe they did serve notice of that.  We don't

4    believe they have a valid lien on the bank account.

5    Something to be argued for another day.  So if they

6    never had a lien on the bank account before, and

7    they got it by virtue of the garnishment, that is a

8    preference because it was within the 90-day period.

9    Just two of the issues that we'll raise in our

10   response.

11          So in summation, the cash is exactly

12   where it's supposed to be.

13          Oh, BMG.  Where is, oh, Ms. Sanfelippo.

14   Mr. Shaw and I are in the process of pounding

15   out -- well, actually, his client, her client,

16   pounding out a settlement agreement with BMG.

17   Under that settlement agreement as previewed the

18   last time, there will be three payments of

19   $250,000, which is approximately what the monthly

20   payment for BMG should be, paid before

21   November 1st.  They'll be able to get their

22   machines out.  But that will put an extra $400,000

23   of cash into the bank account because we have to

24   net out the mining proceeds that we have -- we're

25   holding for them.

1          So there's going to be more cash.  We

2    have a plan on file.  The cash is where it's

3    supposed to be.  They have never alleged -- WESCO

4    has never alleged there is no equity, and we

5    believe we should move forward yet again being able

6    to use cash collateral and move forward with

7    confirmation of the plan and adequacy of disclosure

8    statement.

9          THE COURT:  Mr. Agay.  Let's focus on

10    the cash collateral issue.

11          MR. AGAY:  Sure.  No problem.

12          So he just said the cash is right where

13    it's supposed to be.  He said they have $830,000 of

14    cash.  I'm not sure they have 830,000, but let's

15    just assume for the purpose of argument they did.

16    Then, cash is not where it's supposed to be, okay?

17          If you look at the budget that they

18    submitted for the week of September 6th, it says

19    their beginning cash balance is $1,175,125.  The

20    ending cash balance is $990,347, okay?  Which given

21    that their cash is currently at $830,000, pretty

22    much renders this fiction -- this budget a complete

23    fiction.  That's for starters.

24          And I'm happy to take Your Honor through

25    this budget compared to the last time they

1    presented you with a budget like this, and now you

2    see that their cash is magically double.  So we

3    know that this is wrong based on the current cash

4    balances, and it's further called into question by

5    the last budget that they presented you back in

6    August that took you through the end of December.

7    So that just deals with their proposed cash

8    collateral.

9              THE COURT:  And I want to stop you right

10    there and ask, Mr. Clar, because I didn't

11    understand the $830,000 being exactly where you are

12    either, so explain to me why that is the case.

13              MR. CLAR:  The issue was adequate

14    protection, and adequate protection issue is is

15    there more than the $914,000 that was there at the

16    beginning of the case.  Less the more than $100,000

17    now of payments that have been made for adequate

18    protection, for them to not be adequately

19    protected, we would have to have less than

20    $814,000.

21              THE COURT:  That's a different story.

22    That's not what you had originally said.  You left

23    me with the impression that you were right where

24    you were supposed to be on the budget.

25              MR. CLAR:  No, I'm sorry, Your Honor.

1    What I meant was for use of cash collateral.

2              MR. AGAY:  Okay.  But we also know Your

3    Honor cannot enter this order that they have

4    submitted to the court because the budget is not

5    correct by definition, okay?

6              In terms of the $830,000, mister --

7    well, I had requested, Mr. Clar is right, on

8    several occasions documentation of their cash

9    balance with the bank, okay, and I'm happy to

10   submit this into evidence for whatever it's worth.

11             Finally, yesterday, as of 9-3-2019, Mr.

12   Clar sends me a letter from Lakeside Bank saying

13   the balance as of this date is $698,305.62.  That's

14   yesterday.  Okay?  So the way that he gets to

15   830,000 is he'll present you with an exhibit which

16   shows, purportedly, that between yesterday and

17   today, they got a wire transfer from St. Bitts, one

18   of their customers, for $170,646.97, okay?  Well,

19   that takes you up to 870, not 830.

20             And the problem is, Your Honor, that

21   this is an actual bank statement which I'm sure Mr.

22   Clar will submit into evidence, that somehow they

23   couldn't produce prior to today but now they can

24   produce, and it is redacted.  So I don't know what

25   is underneath those redactions.  It could be the

1    actual bank balance.  It could be disbursements

2    that were made over the last couple of days that

3    takes the balance down to something less than 830,

4    870, whatever it is.  The bottom line is that we do

5    not have independent verification as of today that

6    their bank balance is above $814,000 where it's

7    supposed to be.

8         Secondly, the proposed budgets which

9    they have submitted to Your Honor as part of the

10   proposed order, which are part and parcel of the

11   adequate protection if not a key component of it,

12   are wrong.  They're wildly overstated.  So you

13   can't approve cash collateral today based on what

14   they've presented to you.

15        And I'm happy to take a witness through

16   whatever, but, Your Honor, we keep coming back to

17   this same issue.  And Your Honor is going -- we're

18   going to talk about the plan.  We're going to talk

19   about the sale motion that they have put up.

20   Honestly, we've lost faith in the debtors who are

21   in possession.  We think a trustee should be

22   appointed.  I don't care if it's a Chapter 11

23   trustee or a Chapter 7 trustee.  These guys are

24   playing hide the ball, and they're looking out for

25   their own interests and not the interests of their

1    creditors.

2          THE COURT:  Well, in that respect, I

3    would like to hear from the unsecured creditors

4    committee.

5          MS. DeROUSSE:  I think that's too

6    drastic.  I think we're talking about a very small

7    margin here for distribution of unsecured creditors

8    based on what the debtors have today, and so I

9    think putting a trustee in -- I mean, there has

10   been no evidence or indication that money is being

11   funneled out of these companies.  If it's a proof

12   issue, bank accounts, those are things that we can

13   get.  Those are things that Mr. Flake can testify

14   to under penalty of perjury.  So I think that would

15   be too drastic.

16          I think conversion is also too drastic

17   considering -- at this point considering that the

18   debtor does have a plan on file.  We did work with

19   the debtors in coming up with that plan, and there

20   might be one or two tweaks that still need to be

21   had.

22          And I also reached out to Mr. Agay.

23   Because, honestly, from the perspective of the

24   committee, we need to get the debtor and WESCO

25   together.  We need to bridge that gap.  And I

1   reached out to Mr. Agay, and I thought we had a

2   really nice conversation.  Obviously, considering

3   that we're all here today, it wasn't enough, but I

4   want to continue that conversation and see if we

5   can get WESCO on board with any type of plan.  And

6   then, that brings us to in order to do that, we're

7   going to have to first figure out what WESCO's

8   claim is.

9           And I think those are sort of the path

10  that needs to happen here.  Maybe we set a hearing

11  on WESCO's claim so then we can get to a plan.  But

12  I think appointing a trustee and converting is

13  premature at this point.  I think that it would --

14  it would -- even a Chapter 7 would result in a

15  smaller payout for unsecured creditors because we

16  wouldn't have the ability for the debtors to try to

17  reorganize and pay out of future earnings, and then

18  you're also paying a trustee fee.  So that's where

19  the committee is on this.

20          MR. AGAY:  Your Honor, I had a great

21  conversation with Ms. DeRousse and more than happy

22  to sit down with the committee.  In fact, I put a

23  couple proposals in front of them.  And we're not

24  negotiating right now in front of you.  And I'm

25  confident that if we sit down, us and the committee

1    can probably cut a deal on something.

2         I don't know why she says they're

3    looking at a thin recovery.  They just submitted a

4    plan that says they're going to get a hundred

5    percent recovery.

6         MS. DeROUSSE:  That's what not what I

7    meant.

8         MR. AGAY:  So I don't see --

9         MS. DeROUSEE:  I'm sorry.

10        MR. AGAY:  So I don't see why she thinks

11   it's such a thin margin at this point.

12        But in any event, the fundamental issue

13   is you have a debtor in possession who is trying to

14   preserve their equity interest in this property and

15   not pursuing and trying to salvage value for their

16   creditors.  That's the issue.  And that's what is

17   getting in the way of anything constructive getting

18   done in this case, and that's why I said there

19   needs to be a trustee.  Because to allow this case

20   to continue is just on our nickel.

21        THE COURT:  Yeah, the problem is the

22   trustee is not only going to be on your nickel, but

23   it's going to be on a dime or a quarter, and the

24   costs just --

25        MR. AGAY:  Yeah, you're right.  We have

1    to do something here.

2          MS. DeROUSSE:  And, Your Honor, just to

3    clarify.  What I meant by "thin margin," I meant

4    today.  If you were going to stop this company or

5    liquidate or you were going to try to sell it at

6    fire sale, I think that's a thin margin as opposed

7    to allowing the debtor to try to reorganize.  The

8    two options.

9          THE COURT:  Well, what do we do with the

10   fact that we have a budget that says our starting

11   balance is way more than it is?  I mean, things are

12   off.  I don't know what the real numbers are then.

13         MR. CLAR:  Well, I mean, that's the

14   budget that was submitted in the slide deck.  If

15   Your Honor approves cash collateral, the draft

16   order to follow and a new budget we can certainly

17   take care of that.

18         THE COURT:  Well, I'm not going to

19   approve --

20         MR. CLAR:  The actual -- well --

21         THE COURT:  -- the use of cash

22   collateral until we have a new budget and we know

23   it's a budget that makes sense.

24         MR. CLAR:  I understand.  I understand.

25   That's really what I just said.  I understand that

1   completely.

2           So that's not -- that doesn't have

3   anything to do with whether or not they're

4   adequately protected, which is the issue for use of

5   cash collateral.

6           THE COURT:  Well, it's part of the issue

7   for cash collateral.  But I'm not going to approve

8   cash collateral with a budget that we know is dead

9   wrong.

10          MR. CLAR:  You don't have to approve

11  this budget.  You can approve use of cash

12  collateral subject to a draft order and a revised

13  budget.

14          THE COURT:  No.  When does the current

15  budget and the current --

16          MR. CLAR:  The 6th.

17          THE COURT:  Which is when?  Friday?

18          MR. CLAR:  Yes, Friday.

19          THE COURT:  So we have one day.

20          MR. AGAY:  Okay.  And I'm not asking you

21  to reconsider your prior orders, Your Honor.

22          But in the meantime, we do not have

23  verification that they actually have this money in

24  the account.  They submitted a redacted bank

25  statement which does not show the balance.

1          THE COURT:  Yes.  Why is it redacted,

2     Mr. Clar?

3          MR. CLAR:  I have to talk to Ms.

4     Vaassen.  I believe it had personal information in

5     there.

6          THE COURT:  On a business bank account?

7          MR. CLAR:  I'm not sure.  I'm not sure.

8          But, Your Honor, that is disingenuous

9     what Mr. Agay is saying, and here is why.

10         That's enough.  He's gotten evidence

11    yesterday of what the balance was and then got

12    evidence as to what -- as to the wire.  The e-mails

13    that I sent him all said that it was subject -- in

14    response to, well, tell us why the cash is lower

15    and tell us what you're going to do to preserve

16    cash.  No.  The cash is where it's supposed to be

17    for adequate protection purposes.

18         Mr. Flake can testify as to why there is

19    redactions.  Mr. Flake can testify as to exactly

20    what the bank balance is, what came in today, the

21    St. Bitts money of $170,000 to add on to the 630

22    that was already there.

23         Completely disingenuous.

24         THE COURT:  All right.  So where do we

25    go from here?  What else is -- let's talk about the

1    rest of this mess.

2              MR. CLAR:  Yes.  Well, I --

3              THE COURT:  I got your motion.  I got

4    Mr. Agay's response.  My reaction is, yeah, clearly

5    you've got a valuable asset that you're trying to

6    sell, and we don't know what it's worth, and the

7    insiders don't want to put money into it.  They

8    don't -- the insiders don't want to put money into

9    this new entity for the benefit of the old entity.

10   They essentially want to start this new entity on

11   its own, but clearly this new entity has value or

12   they wouldn't want to do this.

13             MR. CLAR:  Okay.  Well, let me respond

14   to that.  It's interesting that you said that

15   because Mr. Agay -- I mean, I agree with about a

16   third of what you said.  They are putting money

17   into the entity, and what is coming out of that

18   entity is going into the plan.

19             THE COURT:  Well, 25 percent of it is.

20             MR. CLAR:  A million dollars.

21             THE COURT:  Theoretically.

22             MR. CLAR:  Theoretically.  Well, it's

23   all theoretical.

24             THE COURT:  The fact of the matter is

25   75 percent of what apparently is a valuable

1    business entity that to the best of my knowledge

2    hasn't been marketed to anybody except the insiders

3    is now being sold.

4            First it was going to be given away for

5    zero.  Now it's being sold for whatever the number

6    is, and 25 percent of the profits will now go to

7    the debtor entity here.

8            I need to know what this business is

9    worth and what people in the marketplace would pay

10   for it.

11           MR. CLAR:  Well, sure.  And Mr. Lane

12   testified that it's worth nothing.  But whether I

13   agree with that or not, as it happens, last night

14   we got -- the three of us, Ms. DeRousse, Mr. Agay

15   and I got an e-mail from Jonathan Friedland who may

16   be known to the court.  Sugar Felsenthal.  Yes.

17   Me, too.  Saying that essentially he had a client

18   that may be interested, and I tried to reach out to

19   Mr. Friedland.

20           Mr. Flake can testify today as to

21   efforts made to market this.  And part of the

22   reason that they were unsuccessful is the short

23   leash that this debtor has been on throughout the

24   case.  No one is willing to put money in.  He can

25   testify to that.

1           What I can suggest because there is -- I

2    wouldn't say a deadline.  But there is a shelf life

3    to this issue, and the shelf life is governed by

4    the Nasdaq agreement.  Because that is the backbone

5    of this and the we'll call it promises made to the

6    investors that the Spot Exchange would launch by I

7    think it's the 18th or 19th.  Whether or not that's

8    an artificial deadline or realistic or not, I'm not

9    sure.  But we could put this motion over.  We could

10   hear testimony today as well, and we could -- we

11   will.  Ms. DeRousse and I will talk to Mr.

12   Friedland to see what he's got to say.

13           THE COURT:  Well, I don't want to have a

14   premature hearing if the facts are going to change.

15   I mean --

16           MR. CLAR:  Right.

17           THE COURT:  -- if there is marketing

18   going on and there is marketing out there, then Mr.

19   Agay should get the time he wants to respond, and

20   then we'll see what it all comes to.  Because it's

21   vital to know what it's really worth.

22           MR. CLAR:  As long as it's a short

23   period of time.

24           THE COURT:  So we do what we can.

25           MR. CLAR:  Right.

1          MR. AGAY:  They have to market these

2    assets.  I mean, this is basic.

3          THE COURT:  Right.  Right.

4          MR. CLAR:  He doesn't know that we

5    haven't, so let's hear the testimony.

6          MR. AGAY:  Well, we got -- he's right.

7    We got an e-mail from a potentially interested

8    party.  I don't know how interested.

9          THE COURT:  Sure.

10         MR. AGAY:  Yeah.  And at the end of the

11   day, Mr. Flake has been up on the witness stand

12   saying he thinks this exchange platform is worth

13   tens of millions of dollars.  We did have a witness

14   that said not worth anything.  He said tens of

15   millions of dollars.

16         Well, if it's worth tens of millions of

17   dollars, he's getting a nice deal on this asset

18   where we're getting only 25 percent for an asset

19   that has never been marketed.  None of the proceeds

20   are going into the estate.  But, aha, they say we

21   get the first $1 million of free cash flow goes to

22   the debtors.

23         But if you look at their plan on Page 6,

24   the most recent one that they submitted, it says:

25   BCause Secure intends to raise an additional round

1    of capital, defined term, of additional capital

2    investment estimated to be a half million dollars

3    from its investors which will be sufficient to fund

4    through April 2020, at which point the debtors

5    anticipate BCause Secure's revenues will be

6    sufficient to fully fund its operations.  The

7    amount of this additional capital investment shall

8    be deducted from the initial Secure distributions

9    due to Holdings.  The defined term initial Secure

10   distributions, that's the million dollars we've

11   been promised.

12          So in their plan, they're saying they're

13   going to take half million dollars of funding out

14   of that million dollars.  They never disclose that

15   in their sale motion.  It's kind of a joke.

16          THE COURT:  Well, it's unfortunate.

17          What else do we have?  We have got the

18   lease, too.

19          I have not reviewed the new plan.  I

20   don't know, somehow in everything that came in over

21   the weekend, I didn't see the new plan.

22          Oh, there it is.

23          MR. CLAR:  Can we go one by one through

24   the motions and see what we can dispose of if

25   there's anything?

1          THE COURT:  All right.  If anything.

2          MR. CLAR:  The motion to file a combined

3    plan and disclosure statement.

4          THE COURT:  Now, that's a real

5    interesting one.  I have many, many times allowed

6    combined hearings, but I actually haven't ever

7    allowed a combined plan and disclosure statement.

8    I have to agree.  It's kind of weird.  I was

9    thinking I've done this all the time, and I

10   thought, no, wait a minute.  I've actually never

11   had anybody ask me to do a combined plan and

12   disclosure statement in a non-small business case.

13         MR. NGUYEN:  There's some authority for

14   the combined hearing under 105(d), but there's no

15   statutory authority to do a combined plan and

16   disclosure statement.

17         MR. CLAR:  Did you read our reply?

18         THE COURT:  Yes, I read your reply.

19         MR. CLAR:  Okay.  Judge Thorne I can

20   tell you in the Erie Street case did the very same

21   thing last year.

22         THE COURT:  Did you mention that in your

23   reply?  Then I didn't see your reply.

24         MR. CLAR:  I don't know if we did or

25   not.  Mr. Simon drafted it, but --

1          THE COURT:  I didn't see any authority

2     except for some bankruptcy case somewhere --

3          MR. CLAR:  Yes.

4          THE COURT:  -- in a jurisdiction not

5     close by.  I forget where it was.

6          MR. NGUYEN:  From 1987.

7          MR. CLAR:  Here is the key.  It doesn't

8     say that you can't.  It doesn't say that you can't.

9          THE COURT:  It kind of says you have to

10    file a plan and a disclosure statement.

11         MR. CLAR:  Well, then what Judge Thorne

12    said was --

13         THE COURT:  If that's our only problem,

14    we can get over that one.

15         MR. CLAR:  Okay.  Well --

16         THE COURT:  Let's see what else we have.

17         MR. AGAY:  Your Honor, may I say

18    something on that?

19         THE COURT:  Sure.

20         MR. AGAY:  I know they have a local rule

21    in Delaware that allows for combined plans and

22    disclosure statements.

23         THE COURT:  They actually allow the

24    combined document?

25         MR. AGAY:  Yes.  And we recently

1   confirmed a case out there where they did a

2   combined document for what it's worth.  But the

3   local rule had to specifically provide for it.  I

4   don't think that's in a local rule.

5            Candidly --

6            THE COURT:  I don't think I can get away

7   with that here.

8            MR. AGAY:  Yes.

9            THE COURT:  If I tried to push a local

10  rule like that.

11           MR. AGAY:  We don't candidly care, as

12  long as there's sufficient disclosure, which there

13  is not right now.  And we believe there has to be a

14  separate disclosure statement hearing in advance of

15  confirmation hearing where you approve solicitation

16  and the disclosure statement, and all we care about

17  is that they don't try to conflate the two and jam

18  something through the court.  That's all we care

19  about.

20           MR. NGUYEN:  And that's the concern,

21  Your Honor.

22           I get that Mr. Agay is very

23  sophisticated, and he can distinguish the

24  difference between a disclosure statement and a

25  plan, but he's a sophisticated bankruptcy lawyer.

1    I think there's about $9 million of unsecured

2    creditors who are not as sophisticated as Mr. Agay.

3              And if you combine the two, I mean, they

4    are two separate documents with two different

5    standards for approval.  If -- and you being the

6    judge, Your Honor, you're not just judging for this

7    case.  You're also judging for all the other cases

8    that are going to come before you.

9              THE COURT:  That's really your point.

10             MR. NGUYEN:  Yes.

11             THE COURT:  The U.S. Trustee does not

12   want me to rule that it's permissible because I

13   will set precedent that they really don't like.

14             So, again, let's put that one aside for

15   a moment.  Let's talk about substance here.

16   Because I can actually say individual creditors are

17   probably more confused when there are two documents

18   since one documents always says everything and the

19   second document says and then some.  It's kind of a

20   paper mess.

21             MR. NGUYEN:  But Congress made the

22   decision to have two separate documents.

23             THE COURT:  And they're so bright all

24   the time.

25             MR. CLAR:  Second on your docket, Your

1    Honor, is the motion to extend time to assume or

2    reject the Hoffland lease.

3            We certainly can't assume the lease

4    right now, and we certainly don't want to reject

5    it.  There is still one issue that's outstanding

6    between the parties at least.

7            MR. LEWANDOWSKI:  Yes, Your Honor.

8    We're not unmindful of the importance of this lease

9    to the debtors' reorganization efforts.

10           We do have some serious concerns about

11    whether or not the defaults are going to be able to

12    be cured such that the debtors can assume the

13    lease.

14           We have the fire suppression issues.  We

15    have the $3.4 million letter of credit.  We have

16    some damages we have to address.

17           At a minimum, what we would ask is if

18    there is an extension, that it be short.  The

19    debtor filed this -- I think the deadline was

20    August 9th to file a motion to assume or reject.

21    We're now essentially a month later.  They asked

22    for October 9th.  So, you know, we would ask that

23    if there was an extension, it would be early

24    October some time, and that will give us whatever

25    opportunity might exist to see if we can --

1        THE COURT:  Yeah, we're not going to

2    have a lease assumed if the business isn't going to

3    exist past then.

4        So October 9th is fine, and I think

5    we'll just enter that order and put that one aside

6    for now.

7        MR. CLAR:  Okay.

8        THE COURT:  So I'll grant that.

9        MR. CLAR:  Thank you.

10        THE COURT:  Okay.

11        MR. CLAR:  Next.

12        THE COURT:  Next is the WESCO one.

13        Then after that, we have the power

14    company.  The power company is, again, dependent

15    upon where we go with cash collateral.

16        MR. CLAR:  Well --

17        THE COURT:  I mean, everything -- you

18    have the small commercial lease in Virginia.

19        MR. CLAR:  Yeah.

20        THE COURT:  Is that for the new entity?

21    For the --

22        MR. CLAR:  Let me get the call.  Because

23    there's two.  There's an office service agreement

24    for Chicago that's been carried with the other

25    matters.

1            So a motion for relief from stay.

2            The office service agreement, Your

3   Honor, Number 7 on your call, is the Chicago

4   office.  We've already rejected the lease.  People

5   are working from their homes for now.

6            THE COURT:  Right.

7            MR. CLAR:  But it depends on --

8            THE COURT:  But if you're going to have

9   a business up and running, you're going to need

10  this.

11           MR. CLAR:  We have a business up -- -

12  well, we have a business.  You mean --

13           THE COURT:  I mean from their homes.  I

14  mean until they have something more substantial

15  than that and actually launch.

16           MR. CLAR:  Actually, that's true.

17  That's true.

18           THE COURT:  So, again, I think we need

19  to decide the bigger issue here.

20           MR. CLAR:  Okay.  Next is the motion for

21  relief from stay filed by BMG.

22           I think I previewed that we have an

23  agreement with BMG that is going to put cash into

24  the debtors' pockets.

25           THE COURT:  All right.

1          MR. CLAR:  And we're continuing to

2    negotiate with BMG over certain of their miners as

3    well to self mine.

4          THE COURT:  Okay.

5          MR. CLAR:  Then we have motion to assume

6    or -- oh, this is the -- Number 9 is the Nasdaq IT

7    agreement.

8          THE COURT:  Okay.

9          MR. CLAR:  Which is part and parcel with

10   the rest of this.

11         THE COURT:  Sale motion.

12         MR. CLAR:  Right.

13         Cash collateral.

14         General commercial lease.  That's the

15   new Virginia Beach lease.  We can hold off on that

16   because -- for several reasons, but we can hold off

17   on that.

18         I don't see Mr. Carver (phonetic) here

19   representing the current landlord.  The lease has

20   been rejected, but we're still negotiating their

21   rejection claim.

22         Motion to sell we talked about briefly.

23   Mr. Flake can testify as to that.

24         Motion to dismiss adversary proceeding.

25         THE COURT:  Right.  We should probably

1    set a briefing schedule on that one.

2              All right.

3              MR. CLAR:  Well, we would like time to

4    respond.

5              MR. MARCUS:  That's fine, Your Honor.

6              Your Honor, we think it's pretty

7    self-explanatory what *res judicata* means with

8    respect to the order.

9              THE COURT:  Yeah.  What is not

10   self-explanatory is I'm not an expert on Virginia

11   law and confessions of judgment, and that's really

12   the issue we all need to look at.  I'm very

13   well-versed in *res judicata* and love the law.

14             MR. MARCUS:  Sure.

15             So, Your Honor, I think at this point

16   we've briefed, and if they want to respond, that's

17   fine.

18             MR. CLAR:  21 days to respond.

19             THE COURT:  I think that's fine.

20             MR. MARCUS:  Your Honor, I mean, that's

21   fine.  I would only look to Mr. Agay as I don't

22   know how this relates to your issues if they're

23   trying to get a plan and a sale process pushed

24   forward within those same 21 days in a time when

25   you have to figure out whether or not we're

1  entitled to our secured debt, which I'm going to

2  tell you we are.  I'm not sure how that plays with

3  the rest of the case, but if that's what they want,

4  they put themselves in jeopardy of that, we can run

5  that process.

6          MR. CLAR:  I don't quite understand the

7  jeopardy.  If the case goes forward --

8          THE COURT:  Well, let me put it this

9  way, which is until I find they don't have a

10  secured claim, I am assuming they have one.

11          MR. CLAR:  Right.

12          THE COURT:  So the sooner I decide the

13  issue, the better off you are.

14          So given that, how much time do you want

15  to respond?

16          MR. CLAR:  Well, Your Honor, it's not as

17  if -- first of all, we're a small firm.  It's not

18  as if this is the only thing we're doing.

19          THE COURT:  Tell me about it.

20          MR. CLAR:  Right.

21          THE COURT:  You know how many things I

22  have under advisement right now?

23          MR. CLAR:  Right.

24          Well, I said 21 days, but --

25          THE COURT:  That's fine.

1          MR. MARCUS:  That's fine.  If we can

2     have 14.

3          THE COURT:  Okay.  Let me get the dates

4     here.

5          So 21 days from today is the 25th of

6     September.

7          And 14 days for reply?

8          MR. MARCUS:  Yes.

9          THE COURT:  That will take you until

10    October 9th.

11         MR. MARCUS:  Your Honor, can we have

12    until the 11th?  I just have during -- starting the

13    25th, I --

14         THE COURT:  Okay.  October 11th to

15    reply.

16         MR. MARCUS:  Thank you.

17         MR. CLAR:  What was the date for the

18    response?

19         THE COURT:  The 25th of September.

20         MR. CLAR:  Thank you.

21         THE COURT:  I'm not sure what's going to

22    happen next, but in terms of let's just -- to keep

23    it on track, we'll set it for a status after that.

24    I truly don't know if I'll be in a position to rule

25    or not.  It just depends how much we can get done.

1              Let's go to October 22nd on that one,

2    10-22 for status, potential ruling, I don't know.

3              MR. MARCUS:  10:00 o'clock, Your Honor?

4              THE COURT:  Yes.

5              MR. MARCUS:  Thank you.

6              THE COURT:  So that at least gets a date

7    for that one set.

8              Now, we really have to decide what we're

9    going to do on cash collateral given the current

10   situation.

11             Mr. Agay, do you disagree that -- well,

12   I guess if you don't even believe that they have

13   the 814 or so thousand dollars to adequately

14   protect you, then we have to have some testimony.

15             MR. AGAY:  Yeah.  I don't know.

16             THE COURT:  Do you -- do you need to do

17   it now or is there verifications you can get that

18   will solve the problem like the lack of redactions?

19             MR. AGAY:  Sure.

20             THE COURT:  Like an actual bank

21   statement?

22             MR. AGAY:  I would like an actual bank

23   statement.  They have until the 6th.  Send us the

24   bank statement.

25             MR. CLAR:  We can do that.

1          THE COURT:  I think that's appropriate.

2          And, again, it's like déjà vu all over

3    again.  I just don't want Mr. Flake on the stand to

4    hear the same stuff --

5          MR. CLAR:  Right.

6          THE COURT:  -- over and over again.

7          We need to know where the numbers are.

8    We need to have verification.  If they're not

9    adequately protected, I'm going to order more

10    adequate protection for us to keep going.  So

11    that's what we need to do.

12          So how long will this take to get the

13    verification?

14          MR. FLAKE:  We can have it by this

15    afternoon.

16          THE COURT:  Okay.  Do we want to come

17    back tomorrow?

18          MR. AGAY:  I'm out of town tomorrow.

19          MR. CLAR:  You have Mr. Marcus.

20          MR. AGAY:  So I was going to say they

21    have until the 6th.  Let's just come back on the

22    6th.

23          THE COURT:  That's Friday.  I am in

24    Geneva.

25          MR. CLAR:  I might be out of town.

1           MR. AGAY:  I'm sorry?  Oh, you're in

2     Geneva.

3           THE COURT:  I'm in Geneva.

4           MR. CLAR:  I'm not available.

5           MR. AGAY:  Well, they also need to come

6     back -- I'm fine coming back this afternoon if they

7     can get it.  But they also need to come back with a

8     budget that's correct.

9           MR. CLAR:  We can do that, too.

10          THE COURT:  All right.  Let's come back

11    this afternoon then.

12          MR. CLAR:  What time, Your Honor?

13          THE COURT:  What time will you have it?

14          MR. CLAR:  Can we come back at

15    2:00 o'clock?

16          THE COURT:  2:00 o'clock is fine.

17          MR. AGAY:  Your Honor, can I preview

18    this?

19          THE COURT:  Yes.  Let's talk about

20    everything we're going to do.

21          MR. AGAY:  Okay.

22          So, Your Honor, we need verification on

23    the actual balance in the bank account.

24          THE COURT:  Okay.

25          MR. AGAY:  We need the real budget.

1          Your Honor, when you compare the budget

2    that they submitted today versus the last time they

3    submitted a budget to Your Honor that takes them

4    through the end of the year, there's dramatic

5    differences in the cash balance.  Like their cash

6    balance literally doubled.  And when I did the

7    math, their expenses didn't really change.  Their

8    revenues actually went down.  So I don't understand

9    where the actual cash is coming from, so I would

10    like to understand for purposes of this

11    afternoon --

12          THE COURT:  Yep.

13          MR. AGAY:  -- how all of a sudden they

14    have this windfall of cash.

15          THE COURT:  All right.  Those are things

16    I'll expect to hear.

17          MR. CLAR:  That's fine.

18          THE COURT:  Yes.

19          MR. CRAIG:  Your Honor, John Craig on

20    behalf of Dominion.

21          Your Honor is correct that the advanced

22    payments are tied to cash collateral.  If there's a

23    date certain that cash collateral goes through,

24    that's what we have with regard to the advanced

25    payments.

1              I would say that the advanced payments

2     have -- we've agreed to reduce the estimated

3     advanced daily payments to 17,500 from

4     approximately 22,000.  They have had reduced usage.

5     They didn't have to make the $212,000 payment on

6     August 30th based on the credits.

7              What I would like to know, Your Honor,

8     is coming back at 2:00, what is going to happen?

9     I've got a 6:00 o'clock flight back to Virginia.

10    Is it going to last until 9:00 o'clock?  Is it

11    going to last to 5:00 o'clock?  Is it going to be a

12    half hour where I could catch my flight?

13              THE COURT:  If I could predict that, it

14    would be lovely, wouldn't it?

15              I have no idea.

16              MR. CRAIG:  Right.

17              THE COURT:  I mean, you've been through

18    these hearings before.

19              MR. CRAIG:  I understand.  There is no

20    way.

21              THE COURT:  I don't think you want me

22    here until 9:00 o'clock tonight.  It would not be

23    pleasant.  But we'll just have to see.  You know,

24    it usually takes a couple hours.

25              MR. CRAIG:  All right.

1           MR. AGAY:  Your Honor, we also have the

2     issue about our motion to dismiss.

3           I understand that adequate protection is

4     front and center.

5           But from our vantage point, they haven't

6     really advanced the ball in terms of the plan and

7     disclosure statement, and, you know, I would like

8     an opportunity to educate Your Honor on why we

9     believe that's the case.

10          THE COURT:  That's fine.

11          MR. CLAR:  That's fine, but that is,

12    again, the same testimony over and over again.

13          THE COURT:  And I don't want to hear the

14    same.

15          MR. AGAY:  No.  I'm just going to -- it

16    won't take more than a half hour.  I just have some

17    questions about the plan.

18          MR. CLAR:  I've heard that before.

19          THE COURT:  All right.

20          Well, I think we should budget 2:00 to

21    4:00 o'clock if that's helpful.  I would like to be

22    done by four.

23          MR. AGAY:  That's fine.

24          MR. CLAR:  That's fine.

25          THE COURT:  I think what we need to

1    address could be done in that timeframe.

2         I also would suggest you talk about what

3    you want to do in a sale.  We all know that there

4    has to be some kind of marketing efforts.

5         MR. CLAR:  Right.

6         THE COURT:  And there has to be some

7    sort of way to establish the value of this entity.

8    So perhaps between now and 2:00 o'clock, you can

9    talk about a way to proceed and the timeliness of

10   that and how long it will take.  Because that needs

11   to be done.

12        MR. CLAR:  Right.

13        Well, part of the testimony this

14   afternoon now that it's brought up would be what

15   efforts were used to market the property so far.

16        THE COURT:  That's fine.  That's a

17   start.

18        MR. CLAR:  Yes.

19        THE COURT:  All right.  So 2:00 o'clock.

20        THE CLERK:  All rise.

21        This court is in recess until

22   2:00 o'clock.

23              (A recess was had.)

24        THE CLERK:  All rise.

25        Court is reconvened.

1              Continuing with BCause Mining, LLC.

2              MR. AGAY:  Good afternoon, Your Honor.

3    David Agay on behalf of WESCO.

4              MR. CLAR:  Good afternoon, Your Honor.

5    Scott Clar on behalf of the debtors.

6              MS. DeROUSSE:  Good afternoon, Your

7    Honor.  Shelly DeRousse on behalf of the creditors

8    committee.

9              MR. NGUYEN:  Good afternoon, Your Honor.

10   Ha Nguyen for the United States Trustee.

11             MR. TORF:  Good afternoon, Your Honor.

12   Jason Torf on behalf of Dominion Energy.

13             MR. CRAIG:  Good afternoon, Your Honor.

14   John Craig on behalf of Dominion Energy Virginia.

15             MR. LEWANDOWSKI:  Good afternoon, Your

16   Honor.  Dennis Lewandowski on behalf of Hoffland

17   Properties.

18             MS. ANGELINO:  Sarah Angelino for

19   Hoffland Properties, Your Honor.

20             MS. SANFELIPPO:  Christina Sanfelippo on

21   behalf of BMG Operations.

22             THE COURT:  Good afternoon.

23             We think we may have on the phone,

24   Jennifer McLemore also on behalf of BMG.

25             Ms. McLemore, are you there?

1          MS. SANFELIPPO:  She had a hearing.

2          MS. McLEMORE:  Yes, Your Honor.

3          THE COURT:  We sort of forgot about you

4     this morning.

5          MS. McLEMORE:  No problem.

6          THE COURT:  Are we ready to proceed?

7          MR. CLAR:  We are.

8          I sent over -- Mr. Agay had a few more

9     questions.  We believe we answered them.  At the

10    present time, there is 900 -- approximately

11    $912,600 in the account consisting of 480,000 in a

12    money market account and 396 in the debtors'

13    checking account, although I might have those

14    switched.

15         But one of the accounts is a money

16    market account, and the reason for that, in answer

17    to Mr. Agay's question, is because the U.S. Trustee

18    requires that there not be more than $250,000 in

19    any one account, so money gets moved.

20         The debtor does not write checks out of

21    the money market account, so, therefore, the

22    statements that have been provided to Mr. Agay are

23    current statements as of today, including one from

24    both accounts today showing this amount.

25              THE COURT:  All right.

1    MR. CLAR:  Then I also uploaded to Your

2    Honor's courtroom deputy or I had my assistant do

3    that, new budgets reflecting the updated figures.

4        THE COURT:  I have that.  And I assume

5    everybody here got them?

6        MR. CLAR:  Not everybody.  But I have

7    copies.

8        THE COURT:  Okay.  Did you get them, Mr.

9    Agay?

10       MR. AGAY:  I did.  I assume they're the

11   same.  I haven't seen them uploaded but assume

12   they're the same.

13       MR. CLAR:  Yes, they are.

14       THE COURT:  Okay.  So where do we go

15   from here?

16       MR. AGAY:  Can I speak, Your Honor?

17       THE COURT:  Yes.

18       MR. AGAY:  I think he got the dollar

19   amount wrong in terms of what is in the bank

20   accounts.

21       MR. CLAR:  It's within a few thousand

22   dollars.

23       MR. AGAY:  No.  So there is $480,148.70

24   in the money market account.  That's the

25   information we got.  And there's $396,135.52 in the

1    checking account, which is the information I got.

2              THE COURT:  Um-hum.

3              MR. AGAY:  That leaves you with

4    $876,284.22 according to the information we got.

5    I'm curious as to why it took that long to get the

6    information.  But be that as it may, Mr. Clar said

7    there's actually 912,000.  There's not because you

8    have to subtract from that $912,000 $36,357.81 that

9    they say they're holding in bitcoin.

10             So they appear to have provided

11   something -- I'm not quite sure what it is, it's

12   hard to tell -- which shows that they have some

13   bitcoin sitting somewhere, and that bitcoin would

14   have to be converted into dollars, I believe.  And

15   bitcoin is an asset of the estate.  It's not cash

16   as far as I'm concerned.

17             THE COURT:  Well, no, I think they have

18   customers that pay in bitcoin, and then they

19   convert it to cash.  So I was just going to ask is

20   that what this is or is this something else?

21             MR. CLAR:  No. It's self-mining

22   proceeds.

23             THE COURT:  Self-mining proceeds.  Okay.

24             MR. CLAR:  But it can be converted very

25   easily.  That's what they do.

1        MR. AGAY:  Okay.  But it hasn't been.

2    It's just sitting there.  So it's not -- I think

3    what you need to do, Your Honor, respectfully, is

4    look at the budgets that they've sent you.

5        THE COURT:  Yes.

6        MR. AGAY:  So I am looking at the

7    budget for -- I am just getting right to the bottom

8    line on the cash, okay?

9        THE COURT:  Sure.

10        MR. AGAY:  So it says they're starting

11   this week, September 6th, with 931,000 and change

12   in cash.  It says they're ending this week, meaning

13   Friday, with $765,000 in cash, okay, which is

14   clearly below where they need to be.  I'm sorry.

15   765,000 and change in cash.

16        Now, if you track that through, Your

17   Honor, they stay below where they need to be until

18   October 4th where when purportedly they go back up

19   to a million two, and you can track it through and

20   so on and so forth and you get it.

21        The only way that between now and

22   candidly as far as I can tell by the end of the

23   year that they get back up to where they need to be

24   is by this BMG -- net BMG settlement payment that

25   is reflected on the other one, Mining, on

1    September 20th, okay?  So that's for 425,000.  And

2    that is what provides their -- at least according

3    to these, their cash support and adequate

4    protection for the remainder of the cases.

5              Now, firstly, that's less than what was

6    advertised.  They advertised the settlement for

7    750, so I don't know where the 425 is coming from.

8              Secondly, Your Honor, there is no

9    settlement agreement before the court.  They

10   obviously are going to have to file a motion to

11   approve the settlement agreement.  I haven't seen

12   that.  I asked counsel for BMG where the settlement

13   agreement was.  She said she was still sharing it

14   with her clients.  I don't know and nobody knows

15   what that settlement says other than what counsel

16   has represented on the record, so I don't view some

17   future promise based on an abstract settlement or

18   an agreement in principle as adequate protection

19   under these circumstances, Your Honor.

20             So somehow or another, they have to fill

21   the gap in my opinion.  I don't even think we need

22   testimony for any of that.  It's just a straight

23   question.

24             MR. CLAR:  Well, I think, then, Mr. Agay

25   is admitting that if this is true, then he's

1    adequately protected. I think his client is

2    adequately protected regardless. And if we're

3    looking at the beginning of the week, they're

4    adequately protected. As the court notes and has

5    noted repeatedly, cash goes up and down as the

6    hosting revenue is received. Now we have mining

7    revenue as well.

8            The BMG payment wasn't different than

9    was advertised. It's the same as it was before.

10   Ms. Sanfelippo and I can certainly tell the court

11   about that. It's $750,000 less the mining proceeds

12   which is exactly what I said this morning, the

13   mining proceeds that we are holding representing

14   the proceeds that we have reaped from using their

15   mining.

16           THE COURT: Which you withheld after you

17   terminated them.

18           MR. CLAR: Correct. After we shut off

19   their machines, yes, whatever.

20           MS. SANFELIPPO: The terms outlined in

21   the disclosure statement are consistent with our

22   agreement.

23           MR. CLAR: Yes.

24           THE COURT: Yes, that's where I read it.

25           MR. CLAR: Right. And so I appreciate

1    Mr. Agay saying they are adequately protected if

2    that's true, and it is true.

3              MR. AGAY:  I didn't say that.

4              MR. CLAR:  I think you did.  And it's my

5    turn.

6              THE COURT:  You know, I've often said

7    this job my Number 1 qualification is being a

8    mother.

9              MR. CLAR:  I understand that.

10             THE COURT:  I need say no more.

11             MR. CLAR:  So we believe we've done

12   exactly what we said we were going to do before

13   this hearing and at this morning's hearing.  There

14   is enough cash, and we're going to make yet another

15   adequate protection payment as well under the

16   budget, so we believe we've shown enough to use

17   cash collateral.

18             The BMG settlement agreement is being

19   drafted by BMG counsel, I guess, in -- Jen is on

20   the phone.  I don't know if that is true.  Somebody

21   is drafting it in Virginia.  And it's going to say

22   exactly what was said in the disclosure

23   statement -- plan and disclosure statement.

24             THE COURT:  What is the anticipated

25   timing of the BMG settlement and receipt of

1    proceeds?

2              MR. CLAR:  All before November 1st.  If

3    not sooner.  I think it really depends on when the

4    motion is filed.  I'm ready to file a motion right

5    now.  I just need a settlement agreement.

6              MS. SANFELIPPO:  We expect turning

7    around the settlement agreement within a very short

8    period of time.  We're just about finished.

9              MR. CLAR:  And that's in place.

10             THE COURT:  All right.

11             MR. AGAY:  Well, it's not in place.

12   Basically, you would have to find that we're

13   adequately protected based on representations of

14   counsel on the record, not anything concrete in

15   front of Your Honor.

16             I actually looked for a case.  A

17   precedent for this.  I couldn't find it.

18             He just said we're not going to see that

19   until November 1st.  This says September 20th.

20             MR. CLAR:  No, I didn't say that.  I

21   said before November 1st.

22             MR. AGAY:  Okay.  My bad.

23             So they have to file that under a

24   certain amount of notice under the bankruptcy

25   rules, and everybody gets a chance to review it

1    because the devil is in the details as we found

2    out.  Between now and then, there's a shortfall,

3    and, actually, if Your Honor goes down to the week

4    of September 20th when they say they're getting

5    this 425 in, without that 425 which Mr. Clar is not

6    guaranteeing they're going to provide, they're

7    going to be down to less than 150 grand.  It's just

8    simple math.

9            That doesn't work, Your Honor, and that

10   assumes that everything goes swimmingly between now

11   and then.  It further assumes that they collect all

12   of the revenues that they're supposed to collect

13   between now and December keeping in mind that the

14   clock is ticking on these customer agreements, and

15   we also know, Your Honor, that they're over budget

16   this month in terms of their customer A days.  The

17   rebates.

18           Your Honor will recall, and I'm sure we

19   can get Mr. Flake up on the witness stand to

20   testify, that what's not shown here is that they're

21   going to have to make rebate payments under their

22   A-day customer curtailment credits.  It's under

23   Mining.  And Mr. Clar has already told me for

24   August they're over budget on that, and you can't

25   see that in here.

1           So we just don't know where the money is

2    going to come from to fill that gap.  And if the

3    money comes in by September 20th or October 4th or

4    November 1st, wonderful, great, then my client's

5    position is adequately protected.  But between now

6    and then, they got to provide us with security.

7           MR. CLAR:  I honestly don't know what

8    Mr. Agay is referring to, but we're actually under

9    budget.  In fact, we're getting another credit I

10   think from --

11          MR. AGAY:  I can show you the e-mail.

12          MR. CLAR:  -- Dominion.

13          MR. CRAIG:  That's already been --

14          MR. CLAR:  Right.  But there are only

15   five days in August.  I really honestly don't know

16   what Mr. Agay is talking about.

17          But the bottom line --

18          THE COURT:  Well, Mr. Agay, tell us

19   where you find that.

20          MR. AGAY:  Sure.

21          MR. CLAR:  I think what Mr. Agay is

22   doing is confusing July and August.  There were

23   14 days in July and 5 in August, so as far as I can

24   tell --

25          MR. AGAY:  Hold on.

1            THE COURT:  In the meantime, I want to

2    hear from BMG about the status of the settlement

3    and the expected timing and how real it is.

4            MS. SANFELIPPO:  How --

5            THE COURT:  How real it is.

6            MS. SANFELIPPO:  We have basically

7    finished drafting.  We are just going back and

8    forth with some comments with our clients, and I

9    expect -- and Ms. McLemore can correct me if I'm

10   wrong, but we expect to turn it around in a day or

11   so to the debtors.

12           THE COURT:  Okay.  And once it's filed,

13   is it immediate payment?

14           MS. SANFELIPPO:  No.

15           THE COURT:  I'm sorry.  Once it's

16   approved, is it an immediate payment?

17           MS. SANFELIPPO:  Jen?

18           MS. McLEMORE:  Your Honor, if I may,

19   this is Jen McLemore.

20           THE COURT:  Yes.

21           MS. McLEMORE:  What is contemplated

22   right now in the version that I have on my desktop

23   is within five days of the court's approval, which

24   would be the effective date of the settlement

25   agreement.

1      THE COURT:  Okay.  And it's the total is

2   the 750 minus whatever is owed that I think is held

3   in escrow?

4      MS. McLEMORE:  Correct.

5      MR. CLAR:  So to speak.

6      MS. McLEMORE:  Escrow under the current

7   version.

8      MR. CLAR:  And that comes to somewhere

9   over 400,000.

10      THE COURT:  And the total amount will be

11   owing?

12      MR. CLAR:  That we will net.

13      THE COURT:  That you will net.  Okay.

14      Mr. Agay, did you find it?

15      MR. AGAY:  Yes, I did.  And this is

16   unorthodox.  This isn't evidence, obviously, but I

17   thought I printed these out.  There are two

18   e-mails.

19      The first on is August 29, 2019, at 3:06

20   p.m.  A-day -- from Scott Clar.  Dave, A-day

21   customer curtailment credits budgeted for August

22   were 98,000.  Five A days at 14,000 per day equals

23   70,000.  August is not yet over, but the debtor is

24   under budget.  Nothing to report.  That's

25   August 29th.

1          MR. CLAR:  So I'm wondering how that

2    ties in.

3          THE COURT:  He's not done yet.

4          MR. AGAY:  There's a second e-mail.

5          MR. CLAR:  Okay.

6          MR. AGAY:  I'm not done yet.

7          THE COURT:  In consumer cases, I

8    actually have debtors hand me their phones.

9          MR. AGAY:  All right.  This is from

10   yesterday at 1:26 p.m.  Dave, the company will be

11   spending the expenditures that were already

12   approved in the last budget, including rent.  St.

13   Bitts will pay their $170,647 hosting fee today

14   leaving the balance well above the level at the

15   time of filing, and the company is also holding

16   30,000 in self-mining proceeds, period.

17         Next paragraph.  In addition, A-day

18   credits given to customers for August total

19   $117,631.  The debtors' bank balance and revenues

20   are at or near the levels projected.

21         That's what I'm referring to.

22         THE COURT:  Okay.

23         MR. CLAR:  Okay.

24         THE COURT:  So it's 117,000, not -- is

25   it budgeted at seven?

1          MR. CLAR:  Ninety-eight.

2          MR. AGAY:  So according to Mr. Clar's

3     e-mail, it's 117,000, which is over budget.

4          The point is there are rebates that

5     they're having to pay that aren't built in here.

6          There's just a lot of unknowns, Your

7     Honor, and I couldn't find any precedent for a

8     debtor providing adequate protection under these

9     circumstances given what they're asking.

10          THE COURT:  Well, there are a lot of

11     unknowns, and depending upon what hour of the day,

12     it's hard to figure out whether or not the adequate

13     protection is appropriate or not.

14          But I will say that the debtor has moved

15     along in several different directions.  I mean, we

16     have had a little bit of a moving target.  I'm not

17     sure that's ever going to change.  But, you know, I

18     haven't seen horrible footfalls, horrible

19     unpredicted things that have happened so far.

20          What I am concerned about is going

21     forward there's a lot of questions about where

22     revenue is going to come from.  When you're talking

23     about a 100 percent plan and equity keeping

24     everything, and now equity is selling a piece of

25     another business off, and, frankly, if none of that

1   happens and you lost your customers and the mining

2   doesn't turn out to be what it is, there are just

3   so many things that have to happen right to make

4   this work.

5           MR. CLAR:  No question.

6           Can I just respond to one thing, though?

7           THE COURT:  Okay.

8           MR. CLAR:  Let's see what the self

9   mining generates when it's up and running.

10          THE COURT:  Well, what do we have to do

11  to see that?  I think it's a great idea that we see

12  how the self mining does, but we have to make sure,

13  Number 1, that WESCO is adequately protected in the

14  meantime; and, Number 2, that if self mining is

15  going to be up and running, that we don't give away

16  the store to get self mining up and running.

17          MR. CLAR:  Well, we're not -- we're not

18  really giving away anything.  That's already been

19  approved by the court.

20          THE COURT:  What I mean by that is now

21  you want to sell the asset, and that's a huge

22  question.

23          MR. CLAR:  Well, let's separate that

24  out.  Because that's an issue.  And by the way,

25  I'll say this again.  I've said it too many times

1   already.  All plans are speculative.  Some are more

2   speculative than others.

3              THE COURT:  Well, this has been a

4   speculative case from the day it was filed.

5              MR. AGAY:  Your Honor --

6              MR. CLAR:  And I don't dispute that.

7              MR. AGAY:  Can I make a suggestion in

8   terms of adequate protection?

9              MR. CLAR:  No.

10             THE COURT:  Yes, he can.  I get to

11  decide that.

12             MR. AGAY:  They say that this budget

13  means we're adequately protected.  I respectfully

14  disagree with that, and Your Honor will make her

15  decision.

16             This budget does not incorporate mining

17  revenues, okay?  So independent of mining revenues,

18  they say we're adequately protected.

19             Your Honor, to bridge the gap, I think

20  that they should have to pay us the mining revenues

21  that they're generating in some amount.  They say

22  they have $30,000 of bitcoin.  It's not in the

23  budget, so they don't need it to operate.  It's

24  disgorgeable if it turns out our claim is not

25  secured or if it turns out that we are adequately

1   protected.  I think that they should have to give

2   us additional payments to bridge this gap, and they

3   don't need the mining revenues right now.  They

4   have 30,000 of bitcoin that they're sitting on.

5   You heard Mr. Clar say they could easily convert it

6   into cash.  They should do that and pay that over

7   to us.

8             MR. CLAR:  But they have to be entitled

9   to the adequate protection first.  And the mining

10  revenue, as Mr. Agay well knows, comes in the

11  beginning of the month just like it has throughout

12  the case.

13            MR. AGAY:  No, self mining.

14            THE COURT:  No, the self mining.

15            MR. AGAY:  Self mining.

16            THE COURT:  He's talking the self

17  mining.

18            MR. CLAR:  He said that the mining

19  revenues.

20            THE COURT:  That's what he meant.  He

21  meant self mining revenues.  The 30,000 in bitcoin

22  you said were self mining revenues being held in

23  bitcoin.

24            MR. CLAR:  Okay.  Fair.

25            But I don't understand why we should

```
 1    have to give more adequate protection when, in
 2    fact, they are adequately protected.
 3              THE COURT:  That's the issue.
 4              MR. CLAR:  Right.
 5              THE COURT:  Are they adequately
 6    protected.  Look at these numbers.  Look at your
 7    beginning number.
 8              MR. CLAR:  I am.  And it's well over the
 9    814,000.
10              THE COURT:  No, it's not.
11              MR. CLAR:  Beginning cash balance is
12    931.
13              THE COURT:  Where is that?
14              MR. CLAR:  Right here (indicating).
15              THE COURT:  But that's not the beginning
16    balance.  Today is September 3rd, and you told us
17    what your beginning cash balance is.
18              MR. CLAR:  Right.
19              THE COURT:  Where do you get from today
20    to 931?
21              MR. CLAR:  We're already there with
22    the -- okay.  With the two bank accounts.
23              THE COURT:  You're at 876.
24              MR. CLAR:  I'm sorry.  We're at --
25              THE COURT:  You're at 876 with the two
```

1    bank accounts.

2            MR. CLAR:  You're right.  We're at 883

3    actually, okay?  But that's more than -- more than

4    814.  Either way, it's more than 814.  That's what

5    we started with.

6            THE COURT:  I thought we deducted some

7    things from there.

8            MR. CLAR:  Well, we started with 914,

9    Your Honor, and deducted --

10           THE COURT:  No, I know, I understand.  I

11   mean in terms of where we are today.

12           MR. CLAR:  No.  No.  Where we are today

13   is where we are today, and it's more than $814,000

14   which is the figure we started with at the

15   beginning of the case which in my experience is how

16   we determine adequate protection.

17           MR. AGAY:  This is why it's so

18   difficult.  They have $876,000 and change in fiat

19   money sitting in bank accounts.  They have another

20   30,000 and change in bitcoin.  That's where they

21   get the 912.

22           THE COURT:  Right.

23           MR. AGAY:  That's different than what

24   they say their beginning cash balance is at 931.

25   So, again, these budgets are wrong.  Not by much,

1    but they're still wrong.

2           And by the end of this week, they're

3    going to have 765.  So to say that they have 814 or

4    900 or whatever is just illusory because two days

5    from now they're going to have 765.  And that's

6    going to continue until October 4th, a month from

7    now, when supposedly they're going to get this cash

8    infusion, which we don't know what is going to

9    happen.

10          So all I'm saying, Your Honor, is we

11   don't believe we're adequately protected under any

12   circumstances.  But if Your Honor has some question

13   about that, the way to bridge the gap is to provide

14   us with additional adequate protection.  They

15   should convert the self mining revenues into cash,

16   and they should pay it over to us.  And to the

17   extent they can prove that we're not secured, they

18   can seek disgorgement.

19          MR. CLAR:  No.

20          MS. DeROUSSE:  Your Honor, may I say

21   something at this point?

22          THE COURT:  Yes.

23          MS. DeROUSSE:  I believe WESCO is

24   adequately protected because the money that is

25   coming in that's budgeted to come in on

1    October 4th -- unless I'm misunderstanding

2    something which is incredibly possible -- the

3    October 4th money, I believe, is being earned in

4    September.  So while we're looking at a cash

5    budget, this is not a statement of assets and

6    liabilities, and this debtor has some value there

7    that is being earned over the next three weeks

8    which will culminate into $835,000 on October 4th.

9    So to the extent, let's say, there was an

10   instantaneous liquidation which is I think what Mr.

11   Agay is getting at in terms of being adequately

12   protected on any given day or any given week, there

13   would be receivables that would be due to the

14   debtors which would provide that adequate

15   protection.

16        I don't -- maybe I am misunderstanding.

17        MR. AGAY:  Can I correct you?

18        MS. DeROUSSE:  Yes, please do.

19        MR. AGAY:  And I'm sorry.  Ms. DeRousse

20   and I have a very good relationship, and she wasn't

21   here for the testimony.  The testimony was that's

22   earned in advance.  They pay that monthly in

23   advance.  So those are advanced payments each

24   month, and that's why they have the rebates

25   afterwards for the A days where they don't have

1    power going on.

2            So those aren't -- they're receivables

3    only under the contract and to the extent that the

4    customers honor the contract, but they're not

5    actually earned during the month.

6            THE COURT:  And if I understand it

7    correctly, this assumes $425,000 from BMG.

8            MR. AGAY:  Yes.

9            MR. CLAR:  A couple things.

10           One, on October 11th, they get another

11   adequate protection payment.  That's Number 1.

12           Number 2, we still don't know if their

13   lien is valid.  So to give them adequate

14   protection -- more adequate protection when I don't

15   think it's necessary based on the numbers, we know

16   the numbers go up and down, would be wrong.

17           THE COURT:  Does anybody else wish to

18   speak on this issue?

19           MS. DeROUSSE:  I just have one more

20   comment.  I just would hate to see more money go

21   out the door until WESCO's lien is resolved.  I

22   don't know if the debtor needs that $36,000 to

23   operate.  To the extent it doesn't, maybe have the

24   debtors keep it segregated.  But I don't know if

25   that's an issue.

1    THE COURT:  It's not in the budget.

2  It's not in the budget.

3    MS. DeROUSSE:  Maybe that's a way to

4  kind of split the baby here where it's sitting

5  there, but --

6    MR. AGAY:  Your Honor, we're happy to

7  hold it in a separate account.

8    MS. DeROUSSE:  Well, mean I the debtors

9  can segregate it.

10    MR. AGAY:  I think that they should

11  convert it to cash, first of all, rather than

12  keeping it in bitcoin.  Who knows what is going to

13  happen with the price of bitcoin.  And I think they

14  should pay it over to us as adequate protection,

15  and we're happy to keep it in a segregated account.

16    MR. CLAR:  Apparently, the mining

17  proceeds are included in the revenue number.

18    MS. DeROUSSE:  In the 835,000?

19    MR. CLAR:  Yes.

20    THE COURT:  Well, again, what you said

21  is today you have $876,000 in the bank account,

22  plus $36,000 being held in bitcoin.  And Mr. Agay's

23  suggestion is given where these numbers are going

24  and how they're dipping up and down and we don't

25  have a definite BMG settlement with money on the

1    line yet, to the extent there is $36,000 there,

2    that could be an adequate protection payment.

3              So where -- where in the budget is this

4    $36,000?

5              MR. CLAR:  One moment, Your Honor.  I

6    believe it's in the 835 --

7              MR. FLAKE:  In the cash available as of

8    today.

9              THE COURT:  So the cash balance isn't

10   really a cash balance.  It includes 36,000 in

11   bitcoin.

12             MR. AGAY:  Well --

13             MR. CLAR:  Correct.

14             THE COURT:  Then why is this number so

15   off?  You've got -- I'm trying to read this -- 931

16   beginning cash balance?

17             MR. CLAR:  Yes.

18             THE COURT:  That's the 876 plus the 36?

19             MR. CLAR:  Correct.

20             THE COURT:  Okay.

21             And two days from now, you'll have 765

22   is what you're saying.

23             MR. CLAR:  That's correct, having made

24   an adequate protection payment on the 13th.

25             MR. AGAY:  Your Honor, they have --

1    according to their logic, they have cushion.  The

2    36,000 in bitcoin is not going to make a difference

3    to the million two they're going to have on

4    October 4th.  Between then and now, they're going

5    down to around 550, and we think that's

6    insufficient.  But if Your Honor thinks it's

7    sufficient, giving us $30,000 is not going to move

8    the dial on that issue.

9            THE COURT:  Well, one of the interesting

10   questions here is at what point in time do I decide

11   you're adequately protected?  Because you're

12   adequately protected one day a month.

13           MR. AGAY:  Well, great question.  I

14   never thought we were adequately protected to begin

15   with, Your Honor, for that reason.

16           THE COURT:  Right.

17           MR. AGAY:  They're living hand to mouth.

18   We have continued to participate and advocate in

19   these cases, and we keep raising this issue.  And

20   this episode has been the most tumultuous of all

21   the adequate protection things because we haven't

22   really gotten straight information, and they had to

23   get a payment from St. Bitts in at the last moment

24   today to even get to the number that they're at.

25           THE COURT:  Well, except the St. Bitts

1    payment was due.

2          MR. AGAY:  It was, yeah, I'm saying, but

3    if they're running into court with new budgets and

4    money moving around, and in the meantime --

5          MR. CLAR:  Money is not moving around,

6    Your Honor.  Money is not moving around.  This is

7    the same -- I'm sorry, Mr. Agay.

8          The numbers are the same as they've

9    been.  In fact, they're better than they were with

10   the last budget that not only the court approved,

11   but Mr. Agay approved.

12         MR. AGAY:  That's not true.

13         MR. CLAR:  It is true.

14         MR. AGAY:  These numbers are different

15   from the last budget.

16         MR. CLAR:  There were times when the

17   numbers were lower than this and the court found

18   they were adequately protected, so I don't agree

19   they're not adequately protected whether it's one

20   day a month, two days or 30 days a month.  They're

21   adequately protected during the period of time that

22   we're using cash collateral.  If, however, expenses

23   exceed what they're supposed to be or revenue is

24   significantly less, then we have a problem, or if

25   the BMG motion isn't filed next week, which it will

1    be, then we have a problem.  But if it is, we don't

2    have a problem.  That $400,000 is significant.

3         MR. AGAY:  Your Honor, they walked into

4    court this morning with a budget that showed a

5    million three across the bottom.  After we had the

6    dustup this morning, they came back -- compare this

7    budget, Your Honor, with the budget that they

8    submitted to you last night.  I mean, the numbers

9    are cut in half.  And it's only because we spoke up

10   and made them actually give you real numbers.  The

11   numbers keep moving around.

12        MR. CLAR:  But the real numbers show

13   more than was there at the time of filing.

14        THE COURT:  Well, again, at the time of

15   filing, the number was 814.

16        MR. AGAY:  Actually, 914.

17        THE COURT:  A hundred thousand has been

18   paid, so we all agree to that.

19        Every day things change here, and it's

20   getting a little bit tiring.  Every day, you know,

21   we have the same question and the same battle, and

22   every day I say, well, you know, the alternative is

23   I convert the case.  And if I convert the case

24   today, the number to everybody is one thing.  If I

25   convert the case a week from now or, frankly, if

1     the trustee shuts it down a week from now, the

2     number is very different because of the way this

3     revenue is coming in and off.

4             I'm not going to lift the stay.  I'm not

5     going to dismiss the case.  The question is whether

6     I convert the case.  I don't think that's in

7     everybody's best interests right now, including

8     yours, Mr. Agay.  But I'm not going to under the

9     circumstances of what is going on here, dismiss the

10    case and let you take the whole thing.  I think

11    that would be the most irresponsible thing to do.

12            MR. AGAY:  I understand that, Your

13    Honor, and I'm not sitting -- you've made that

14    clear from the beginning of this case.  And I don't

15    think we've pressed that point.  We respectfully

16    disagree, but we're not pressing it.

17            Like I said before, we think conversion

18    is a better outcome here or as I said this morning,

19    appointment of some sort of trustee.

20            THE COURT:  That's not realistic in this

21    case.

22            MR. AGAY:  Okay.

23            THE COURT:  It's just simply not

24    realistic.

25            And, again, if I converted the case

1  today, I don't know when the trustee would go in

2  there, when things would shut down, when people

3  would stop paying, and as we all know, they've paid

4  in advance.  It could be way worse off for

5  everybody if we shut it down unless we did it in a

6  very meaningful way.

7       MR. AGAY:  The music is going to stop at

8  some point, Your Honor.

9       THE COURT:  It will, and, frankly, I

10 think the music is going to stop when these

11 contracts terminate, if not sooner.

12      And, you know, at the end of November,

13 it's all over unless significant progress has been

14 made on both self mining as well as potentially the

15 new Secure business.  So I want to figure out how

16 we can get from here to there without WESCO being

17 harmed or harmed any more than you think they've

18 already been harmed, so I don't think, frankly, the

19 thought of paying them an extra 35,000 to get us

20 there isn't a bad idea.

21      MR. CLAR:  You don't think it's a bad

22 idea?

23      THE COURT:  I think it is a good idea.

24 I don't think it's a bad suggestion is what I meant

25 to say to get us from here to there.  I don't want

1    to come back every 30 days if we don't have to.

2              MR. CLAR:  Can I just take a moment,

3    Your Honor?

4              THE COURT:  Yes.  You can take more

5    moments than that if you want to talk about it for

6    a while.

7              MR. CLAR:  No.  I just want -- I just

8    wanted to compose my thoughts to my client of what

9    you're saying.

10             If what you're saying is for 35,000,

11   Dave?

12             THE COURT:  35,000 is what I said.

13             MR. AGAY:  Yes.

14             MR. CLAR:  Yes.  Well, for 60 days?

15   Sure, we'll do that.

16             THE COURT:  But we have to talk about

17   now the other issue.

18             MR. CLAR:  Which is?

19             THE COURT:  Which is what happens with

20   the Secure business.

21             MR. CLAR:  Well, we're going to get to

22   that.

23             THE COURT:  Right.  They all go in the

24   same.

25             MR. CLAR:  All right.  So that's okay

1    with WESCO?

2         MR. AGAY:  I have to talk to my client,

3    Your Honor.

4         THE COURT:  I would suggest maybe we

5    take a moment, figure out where you want to go

6    next, but, again, I'm inclined -- I would like to

7    figure out how we can get to where something

8    significant is actually going to happen or not

9    happen rather than come back with the same argument

10   two weeks from now or three weeks from now.

11        MR. CLAR:  Sure.

12        With respect to the motion to sell

13   assets, Mr. Agay had a suggestion to me that a

14   third party be appointed.  It's not -- it's not a

15   feasible suggestion right now.

16        If we're not going to hear testimony

17   from Mr. Flake now as to what efforts he has made

18   to market and possibly have a motion approved now,

19   then I'm not sure where it goes from here.

20        We have this deadline that we have

21   imposed and no one else, I agree, of September 18th

22   or 19th.  But we do have Nasdaq, and I have a good

23   relationship with their counsel, but I don't know

24   how long that will last.

25        The other thing is we did speak to Mr.

1    Friedland, and Mr. Flake is meeting with Mr.

2    Friedland's client tomorrow to see what interest

3    there is there.

4          I would like a mechanism where I could

5    put Mr. Flake on the stand to testify as to what

6    efforts he's made already.  I recognize that the

7    motion is probably not going to be approved today.

8          THE COURT:  It's not.

9          MR. CLAR:  Okay.  Thank you for saying

10   that.  It didn't -- you don't have to hit me over

11   the head with a hammer to figure that one out.

12         But then I do need to get that done as

13   soon as possible.  So we can work with Mr. Agay and

14   the committee on suggestions.

15         And one of the suggestions I had to Mr.

16   Agay, and actually it's not so far-fetched because

17   our clients did discuss it in one meeting, is

18   whether or not they want to purchase the equity.

19   Because no one else here is objecting to the sale.

20   The committee is on board with the sale.  The

21   largest unsecured creditor is on board with the

22   sale.

23         THE COURT:  I have a funny feeling the

24   U.S. Trustee is not on board with the sale because

25   when I mentioned the fact that you're selling

1   something that was worth between zero and millions,

2   I got an interesting reaction from the trustee.

3            MR. NGUYEN:  Right, Your Honor.  I mean,

4   all the marketing that Mr. Flake is going to

5   testify, it should be in the motion already.  I

6   don't know why we're having a hearing when --

7            THE COURT:  Well, we certainly are going

8   to need that testimony at some point in time.

9            MR. CLAR:  Right.

10           THE COURT:  But, again, until you're

11  ready to actually sell it, if there are more

12  marketing efforts that can be made, it would make

13  some sense.

14           MR. CLAR:  Okay.  Well, then here is my

15  problem.  It's just mine.  It's nobody else's.

16  It's I need to get this done quickly.  So I can

17  file an amended motion and list the efforts that

18  have been made and have it heard at a date in the

19  near future.  I can do that.  We can get another

20  date pending the filing of that.  I can -- we can

21  talk to Mr. Friedland's client, but we do need to

22  get this done in a relatively expedient manner.

23           THE COURT:  Well, with respect to

24  Secure, you've picked sort of a date you want to

25  launch.

1          MR. CLAR:  Correct.

2          THE COURT:  What has to be done other

3     than Nasdaq to make that happen, and is it

4     happening?

5          MR. CLAR:  Other than Nasdaq, what would

6     have to be done is the approval of this motion.

7          THE COURT:  But what -- I mean, what's

8     the -- what's the magic to launch other than the

9     approval and Nasdaq?  Is there other work that has

10    to be done?  I mean --

11         MR. CLAR:  No, there's not.

12         MR. AGAY:  That's not true, Your Honor.

13    In their disclosure statement, they say as to

14    Secure -- bear with me.

15         MR. CLAR:  While we are bearing, I'll

16    point out that WESCO --

17         MR. AGAY:  Page 6.

18         MR. CLAR:  -- does not have a security

19    interest in the equity.

20         MR. AGAY:  Well, I'm not sure that's

21    true.

22         MR. CLAR:  I'm just saying.

23         MR. AGAY:  That may be true, but that

24    doesn't matter.

25         At the bottom of Page 6, it says launch

1    of -- this is the disclosure statement.  Launch of

2    the Spot exchange or abandonment of the launch will

3    result in an additional monthly cost reduction of

4    approximately 80,000 consisting of labor and other

5    expenses.  At launch, the debtors estimate that

6    Secure will be able to operate in 20 states, which

7    includes 14 states in which it will have money

8    transmitter licenses and 6 states in which money

9    transmitter licenses are not required.

10              Okay.  The debtors forwarded to us and

11   if they were going to put Mr. Flake on they would

12   present testimony that they have authority to do

13   business, foreign registrations, in 12 states, not

14   20, okay?  Those foreign registrations and business

15   registrations, they're not money transmitter

16   licenses.  They may have the money transmitter

17   licenses, but they haven't shown any evidence that

18   they do.  And you may recall that I've asked this

19   question to him a couple times.

20              THE COURT:  You have.

21              MR. AGAY:  Where is the money

22   transmitter licenses.  And all they have forwarded

23   to us were foreign registrations.  They were not

24   money transmitter licenses.  So we haven't actually

25   seen any evidence that they have those licenses.

1    That's why we don't understand what the rush is

2    here.

3              You may recall that Mr. Flake said in a

4    press release that Spot was going to launch back in

5    May or April or whatever it was, and then it was

6    going to be July, and now it's going to be

7    September.  Now, all of a sudden, we have to get it

8    done in September, and Mr. Flake is going to be in

9    charge of the marketing process, which is the

10   rooster guarding the henhouse.

11             Your Honor, we understand that this

12   estate probably cannot afford an investment banker,

13   right, and that's not this case.  I made a

14   suggestion to Mr. Clar that they should at least

15   investigate whether there is business brokers out

16   here -- out there that will work on commission.

17   They haven't even checked as far as I know.  That

18   may or may not be the case.  There may not be a

19   business broker who will take this.  We don't know

20   because they've never checked.  But we think there

21   needs to be an effort to have an independent,

22   untainted party leading this process.

23             To the extent that they can't find that

24   party, then -- and to the extent that there is no

25   other parties interested in bidding on these assets

1    and it has to be Mr. Flake or somebody else running

2    that process, we think that this transaction should

3    only be approved pursuant to a plan where creditors

4    get an opportunity to vote on it, not because of

5    the inherent interests of Mr. Flake and the other

6    insiders.  They're just tainted in everything they

7    do in relation to this.  And because there's such a

8    combination between this transaction and

9    distributions under the plan, that was part of our

10   objection, that creditors should have an

11   opportunity to vote on whether they approve this

12   transaction versus it being jammed through some

13   sort of a 363 shortcut sale.

14          Now, that should be able to get done

15   within 30 to 45 days.  They get their plan on file.

16   They file their disclosure statement.  Thirty days

17   notice.  And they plow forward, and they can do all

18   this stuff in parallel.

19          THE COURT:  Well, actually you ask an

20   interesting question which I think is something you

21   might want to hear from Mr. Flake about or talk to

22   Mr. Flake about, and that is I think we have a

23   little bit of a catch-22, which is investors don't

24   want to put money in unless they know there is

25   actually going to be a business that is going to

1    continue on.  Investors don't want to put money

2    into this new entity unless they know that it's

3    going to be approved and the Nasdaq license is

4    going to happen and they have the transmitter

5    license they need and they can launch and they're

6    actually going to make money.

7              And that's the whole issue.  If we put

8    it in a plan, then it becomes kind of part and

9    parcel of the whole deal, and it's going to rise or

10   fall on whether or not it works.

11             I don't know what's better from an

12   investor standpoint.  It may actually be in your

13   client's best interests, Mr. Clar, to do it that

14   way, and it's something you may want to give some

15   consideration to.

16             Because I realize from a business

17   standpoint you want to get -- you want to get it

18   going and you want to prove that you can do it, but

19   on the other hand nobody wants to put any money in

20   if it's going to be 30 days and then it's dead.

21             So I'm hot sure from a business

22   standpoint what they want to do.

23             MR. CLAR:  I guess the question that

24   occurred to me listening to both of you, actually,

25   is what is the downside to the estate in letting

1   this go forward?

2          THE COURT:  Well, the downside -- I

3   asked the same question when I was reading your

4   motion, and as I see it -- and I want to hear from

5   everybody on this -- it seems the downside to the

6   estate is you sell it too cheap.

7          MR. CLAR:  Right.  So we would have to

8   establish --

9          THE COURT:  So then you have to

10  determine what it's worth.

11         MR. CLAR:  Exactly.  We would have to

12  establish value, which Mr. Flake is prepared to do.

13         THE COURT:  Well, Mr. Flake can get on

14  the stand, but I have to tell you he's not going to

15  be able to establish value unless he's going to

16  talk about a very fulsome process to review the

17  marketplace.

18         MR. CLAR:  And I just want to remind the

19  court again that Mr. Agay -- that at another time

20  when it was more expedient, Mr. Agay's expert

21  testified that it had no value.

22         MR. AGAY:  And Mr. Flake testified it

23  had tens of millions of dollars of value.

24         MR. CLAR:  Okay.

25         MR. AGAY:  So, I mean, at the end of the

1    day, they have to establish the value of the

2    business, and to the extent it has tens of millions

3    of dollars, that's great.

4              THE COURT:  For everyone.

5              MR. AGAY:  For everybody.

6              And I would be very concerned that they

7    were giving away 75 percent of this business for

8    350 grand.  I mean, that's crazy.

9              MR. CLAR:  Well, it's not 350 grand

10   exactly.  It's -- that's what is being put in, but

11   there's an assumption of well over a million

12   dollars of the Nasdaq debt, and there's an

13   agreement to pay creditors back.  So if another

14   party is willing to do that, great.

15             THE COURT:  Well, we're going to have to

16   kind of take it one step at a time here.

17             With respect to where we go here, I

18   guess the question I would have is you've got a

19   plan and a disclosure statement.

20             MR. CLAR:  Right.

21             THE COURT:  You've got a process.  How

22   do you want -- you know, from a timing standpoint,

23   you have BMG, you've got the approval of the Nasdaq

24   deal, you have approval of the sale, and you have

25   plan and disclosure statement.  From a business

1    standpoint, what does your client think is the best

2    way to go?

3            MR. CLAR:  Let's take those in small

4    bites, okay?

5            THE COURT:  Oh, and by the way, I'm

6    going to make this comment.  The U.S. Trustee is

7    going to love this one.

8            I've read the plan and disclosure

9    statement.  While there may be some things that

10   have to be added to it, I actually think it's more

11   understandable than if it was a separate document.

12           And I've looked at the new small

13   business rules, and I was disappointed to see that

14   the number is 2.8 million.  It should probably be

15   more like 10 million.  I look at this as a small

16   business, I mean, really, when you think about it,

17   the employees and that sort of thing.

18           So in any case, I'm going to permit a

19   plan and disclosure statement in this case in these

20   circumstances to be filed as a joint document.

21           MR. NGUYEN:  Okay.

22           THE COURT:  So I will, I think, grant

23   their motion.

24           MR. CLAR:  Thank you.

25           I'm sorry.  I'm going to have to go back

1    to your -- can you repeat -- well, the Nasdaq

2    agreement, I don't think there is any objection to

3    it being assumed and assigned.

4         THE COURT:  Well, I think the objection

5    is we have to make sure that at the end of the day

6    if things crater, there's no huge administrative

7    claim that's been created.  When you assume it and

8    assign it, that could happen, and that's the

9    concern about that one.

10        MR. CLAR:  Well, not with the order --

11   not with the language that Mr. Lewandowski and

12   Mr. Fisher and the committee put in there, which is

13   that under no circumstance will they have an

14   administrative claim.  So I think it's covered.

15        I mean, I don't know where any or all of

16   this is going yet, so I can't really envision --

17   maybe there's a date very soon that we can continue

18   things to where we will have filed the BMG

19   settlement motion, where we will have filed a

20   motion to have, I guess, a combined hearing on the

21   plan and disclosure statement.

22        THE COURT:  Well, I tell you, I am

23   inclined at this point in time instead of

24   continuing to do the same thing over and over

25   again --

1      MR. CLAR:  Right.

2          THE COURT:  -- to give you folks a very

3  short period of time to see if you can work out a

4  deal or I'm going to convert the case.

5          Because we can't keep going like this.

6  We can't keep going with both sides at each other's

7  throats all the time with the big question about

8  whether there's a secured claim or whether there's

9  not a secured claim, whether or not the business is

10  going to launch or not, whether they're adequately

11  protected or not.  It's just kind of getting a

12  little crazy here, especially when you're

13  considering the numbers here, the amount of counsel

14  that's involved and the time that's involved every

15  time we go through this every couple of weeks.  I

16  think it's now or never.

17          Again, we know that by the end of

18  November, the customer agreements are presumably

19  all gone, the big ones.

20      MR. CLAR:  Well -- okay.  Go ahead.

21      THE COURT:  So I really think it is now

22  the time to sit down and figure out what we want to

23  do.

24      MR. CLAR:  Well --

25      THE COURT:  Because if you don't figure

1   out a true plan going forward that's going to have

2   any hope of being confirmed here, there's just

3   really not any point in continuing to spend money.

4        MS. DeROUSSE:  Your Honor, I think

5   you're making a lot of valid points, that everybody

6   does need to get on the same page here if this is

7   going to happen, but I also would encourage you to

8   give more than a short -- a very short -- I don't

9   know what you define as a very short period of

10  time.

11        I think the first issue that needs to be

12  resolved is marketing the assets.  I think Mr. Agay

13  has made some points, I think Mr. Clar has made

14  some points here that are valid, and I think that

15  we need to sit down in light of this development

16  last night with Mr. Friedland and just find out,

17  you know, what we can do and how quickly we can do

18  it with respect to marketing the assets.  I think

19  that's the first hurdle we have to get over.

20        Once we get over that hurdle, we have

21  the plan to deal with or maybe simultaneously, but

22  I would hate to see the case converted when we have

23  a possibility of selling, you know, a going-concern

24  arm of this business or getting an investor into

25  that arm of the business because I think conversion

1   will be viewed as straight up liquidation.

2           So I would just encourage the court to

3   give enough time to at least have that

4   conversation.  And I'm happy to step into this

5   conversation and try to, you know, get both of

6   these parties at the table and see if we can figure

7   out something that works for everybody, a timeline

8   that works for the debtors, but yet a process that

9   works for WESCO, and if I can mediate, you know, we

10  can pull out a miracle here.

11          MR. CLAR:  I'm just wondering how we got

12  from adequate protection which we've agreed to to

13  the debtors made some good progress --

14          THE COURT:  There's been no agreement

15  here, Mr. Clar.

16          MR. CLAR:  No, no.  Wait.  Don't

17  misunderstand me.  I'm saying to you thought it was

18  a good idea to have additional adequate protection

19  to which we agreed to -- and I'm just repeating

20  what I heard -- to the debtors have some good ideas

21  but we have a problem, let's hear about the motion

22  to sell assets to, well, I think I'm going to

23  convert the case.

24          But I'm not sure what the court is

25  saying as to why you would convert the case or

1    when, so maybe I need to hear that, but it seemed

2    to me to be a bit of a disconnect frankly.

3              THE COURT:  I don't think there is any

4    disconnect at all.  You have got serious issues

5    here.

6              Okay.  If you settle the adequate

7    protection issue, we've solved one small issue.

8              MR. CLAR:  Okay.

9              THE COURT:  We've still got the sale

10   motion.  We've still got the Nasdaq.  We've still

11   got the utilities.  We've still got the landlord

12   thank you very much.  We've still got the motion to

13   dismiss the case.  We've still got the U.S. Trustee

14   who is not buying any of this.

15             MR. NGUYEN:  You might get an appeal on

16   the motion.

17             THE COURT:  Oh, on the plan and

18   disclosure statement?

19             MR. NGUYEN:  I think.

20             THE COURT:  Got to love you.

21             MR. NGUYEN:  I'm sorry, Your Honor.

22             THE COURT:  I haven't even -- all I said

23   was in this particular case.  I mean, you want to

24   take that one on appeal?

25             MR. CLAR:  Your Honor --

1           MR. AGAY:  Your Honor --

2           MR. CLAR:  Excuse me.

3           All I'm saying is perhaps I need to hear

4    what the dates are the court has in mind before I

5    spoke, but I just was expressing my frustration,

6    okay, at what I've heard.

7           So what did you have in mind?

8           THE COURT:  Mr. Agay, you want to say

9    something?

10          MR. AGAY:  Yes.  You're not here on

11   Friday, Your Honor?

12          THE COURT:  I'm in Geneva.

13          MR. AGAY:  You're in Geneva.

14          I was going to suggest we return on

15   Monday if you're available and see if we can get

16   something done in the meantime that kind of wraps

17   all this together.

18          MR. CLAR:  And if not, what?  We're not

19   going to convert the case on Monday.  It doesn't

20   give me enough time to file the motions I want to

21   do or resolve anything.

22          MS. DeROUSSE:  I agree with that.  I

23   mean, I think we need at least a few weeks --

24          MR. CLAR:  We need --

25          MS. DeROUSSE:  A few days --

1          THE COURT:  You're not going to get a

2     few days, and it's not going to be Monday.  I mean,

3     my thought process here is I'm talking about

4     something real here.

5          Mr. Agay, as much as you can argue, I

6     know that if you don't get it all, you don't want

7     to end up with nothing.  A conversion is really not

8     particularly great for your client unless you can

9     time it really well.

10         There's got to be a way to work this

11    situation out, and I want to give you the one -- I

12    mean, I've been giving you months and months to try

13    to work it out, and you haven't gotten anywhere.

14    It's kind of time to call it.

15         MR. AGAY:  All right.  Well, Your Honor,

16    from an adequate protection standpoint, in terms of

17    the 35 grand, honestly, I think you have to come

18    back on October 4th to make sure that the cash

19    receipts actually came in because that is the

20    adequate protection at the end of the day.  So Mr.

21    Clar said 60 days.  I think it has to be

22    October 4th to make sure that those receipts came

23    in.  I would accept Your Honor's suggestion of the

24    35 grand as additional adequate protection.  And in

25    addition, we want cash statements provided to us

1    from the bank on Monday, Wednesday, Friday so we

2    know what the debtors' cash position is.

3              THE COURT:  Isn't that what I already

4    ordered?

5              MR. CLAR:  No, but it's not a problem.

6    No, you didn't.

7              THE COURT:  All right.

8              MR. AGAY:  But you ordered them to tell

9    us.

10              MR. CLAR:  Which we did.

11              MR. AGAY:  But we've been asking for

12    statements.

13              MR. CLAR:  I have no problem with that.

14              THE COURT:  We need a sincere effort to

15    try to work out a business deal here before I have

16    to work out a legal deal.  Because I don't work out

17    legal deals.  I make legal decisions, and somebody

18    won't be happy.

19              MR. CLAR:  Well, I don't think anybody

20    is happy at this point.

21              THE COURT:  But that's not my fault.

22              MR. CLAR:  I'm not suggesting that.  I'm

23    not suggesting that at all.

24              What day is October 4th?

25              MS. DeROUSSE:  Well, it's a Friday, but

1    maybe Tuesday or Wednesday --

2              THE COURT:  I'm in Washington

3    October 4th.

4              MS. DeROUSSE:  Maybe Tuesday the 8th.

5              MR. CLAR:  Tuesday the 8th, Your Honor?

6              THE COURT:  How about Monday the 7th?

7              MS. DeROUSSE:  You have it x'd out.

8              THE COURT:  That's because I don't sit

9    on Mondays, but I can if I want to.

10             MS. DeROUSSE:  That would work for us,

11   the committee.

12             MR. CLAR:  What time?

13             MR. AGAY:  I cannot do Monday the 7th,

14   Your Honor.  I apologize.

15             Does the 8th work?

16             THE COURT:  Yes, the 8th works.  I was

17   trying to do it as soon as possible.

18             MR. AGAY:  No, I appreciate that.

19   Unfortunately, I cannot do the 7th.

20             I take it back.  I can do the 7th in the

21   morning.

22             THE COURT:  All right.  Let's do the

23   7th.

24             MR. CLAR:  What time, Your Honor?

25             THE COURT:  Let's start at 9:30.

1        MR. CLAR:  And that is for what?

2        THE COURT:  That is a status to see

3    where you are on working out a whole host of things

4    here, and if you haven't worked something out, then

5    I think we need to have a full-fledged hearing on

6    Mr. Agay's motion to dismiss or lift stay.

7        MR. LEWANDOWSKI:  Your Honor, I'll just

8    point out these extension motions expire on the

9    9th, so the 7th would be consistent with that.

10       THE COURT:  And by then, I mean, we have

11   to figure it out or I'm going to have to just on

12   the legal issues decide the legal issues on

13   elements and on the burden of proof.

14       MR. CLAR:  I'm happy to do that.  I

15   think we've done that already.

16       THE COURT:  I know you do.

17       MR. AGAY:  In terms of adequate

18   protection, Your Honor, is it through the 7th?

19       THE COURT:  Through the 7th.  I'll order

20   the extra $35,000 to be paid.  The understanding,

21   of course, is if it was not necessary because they

22   were adequately protected, if you're not secured --

23       MR. CLAR:  Provisionally.

24       THE COURT:  It's all provisional.

25       MR. AGAY:  Yes, of course, and they will

1    provide us bank statements.

2          THE COURT:  Bank statements Monday,

3    Wednesday and Friday.

4          MR. CLAR:  I think the only change that

5    needs to be made to the order is what Mr. Agay just

6    said, providing the bank statements, because

7    everything else is in there.

8          MR. AGAY:  And the budget.

9          MR. CLAR:  We have the budget.

10          THE COURT:  You attached the new budget.

11          MR. CLAR:  Right.  So we can submit that

12    this afternoon after circulating.

13          THE COURT:  Okay.  That's fine.  I'm

14    here all day tomorrow.

15          MR. CLAR:  So what do we do with all --

16          THE COURT:  Exactly.  Now what do we do

17    with everything else.

18          MR. CLAR:  Right.

19          THE COURT:  So we have cash collateral

20    through the 7th of October.

21          MR. AGAY:  I think you continue it, Your

22    Honor.

23          THE COURT:  I think with respect to all

24    -- let's make sure you can continue them all.

25          MR. CLAR:  Let's go through them.

```
 1                THE COURT:  Yes, I agree.

 2                MR. CLAR:  The --

 3                THE COURT:  On the combined joint plan

 4      and disclosure statement --

 5                MR. CLAR:  You've ruled on that one.

 6                THE COURT:  -- I have granted your

 7      motion given the circumstances of this particular

 8      case.

 9                MR. CLAR:  Motion to extend time to

10      assume or reject, I think you granted that, too.

11                THE COURT:  I granted that.

12                MR. CLAR:  WESCO motion for relief from

13      stay.

14                THE COURT:  Will be continued to

15      October 7th for hearing.

16                MR. CLAR:  The new office lease.

17                THE COURT:  The new office lease.  This

18      is the -- is this the -- this is the Chicago

19      office?

20                MR. CLAR:  Office service agreement is

21      Chicago.

22                THE COURT:  You don't need that until

23      afterwards, so October 7th should work for that.

24      If you launch Spot, great.

25                MR. CLAR:  True.  Well, how can we
```

1    launch Spot with -- we'll get to that.

2             THE COURT:  Yeah, true.

3             MR. CLAR:  BMG you're going to see a

4    motion shortly.

5             THE COURT:  BMG we'll just continue it

6    to the 7th with the hopes you'll have a motion and

7    by then you'll have the money.

8             MR. CLAR:  Right.  Well, we won't have

9    the money until the motion is approved I'm sure,

10   but --

11            THE COURT:  I know, but October 7th is,

12   you know, it's more than a week away -- I mean it's

13   30 days away.

14            MR. CLAR:  Right.  Well, what I was

15   thinking was to ask that the 21-day notice be

16   waived.  I'm not asking that now, but that's what

17   I'm going to ask for in the motion because it's

18   important.

19            THE COURT:  Again, marketing is going to

20   be key here.

21            MR. CLAR:  Marketing of the BMG

22   settlement?

23            THE COURT:  Oh, I'm sorry.

24            MR. CLAR:  Okay.  That's okay.  Believe

25   me, I understand if anyone does.

1        MR. AGAY:  Your Honor, they have a nasty

2   habit of filing things on the eve of hearings.  We

3   don't need 21 days to respond to it, but, you know,

4   we should have a reasonable period of time to

5   review this and respond.

6        THE COURT:  Let's set some deadlines.

7        MR. CLAR:  Sure.

8        THE COURT:  Can we set a deadline when

9   you can file the BMG motion?

10        MR. CLAR:  I guess.

11        THE COURT:  Realistically, when is it

12   going to be done?

13        MR. CLAR:  I'm sorry.  One question.

14   Cash collateral is through?

15        THE COURT:  October 7th.

16        MR. CLAR:  October 7th.  Okay.

17        BMG motion realistically -- well,

18   there's things I can't control.

19        THE COURT:  Right.  That's why I'm

20   looking to Ms. Sanfelippo or Ms. McLemore.

21        MR. CLAR:  Well, I think we should look

22   to the phone, right?

23        MS. SANFELIPPO:  Ms. McLemore?

24        MS. McLEMORE:  Your Honor, this is

25   Jennifer McLemore for the record.

1      I just got client approval, so we should

2   be in a position very quickly.  I didn't see any

3   point to circulating it while Mr. Clar was at the

4   podium, but I should be able to get him something

5   this evening.

6          THE COURT:  All right.  So realistically

7   then, getting the motion on file, today is the 4th

8   of September.

9          MR. CLAR:  Right.

10          THE COURT:  Can you get it on file by

11   Monday or is that too aggressive?

12          MR. CLAR:  Well, I could, but what I

13   don't know is what it's going to say.  I'm not

14   expecting any surprises.  I think Mr. Shaw or Ms.

15   McLemore or Ms. Sanfelippo would have told me if

16   there is anything else that I should expect in

17   there.

18          Can I get it on file by Monday?  Yes.

19          THE COURT:  Okay.  Let's assume you get

20   it on file by September 9th.  Shorten the notice to

21   14 days.

22          MR. CLAR:  That works.

23          THE COURT:  That would give us until --

24   so you set it up for the 23rd for hearing?

25          No, I can't hear it on the 23rd.

1           The 25th for hearing?

2           MR. CLAR:  Uhm, I just don't know when

3      the holidays are.

4           THE COURT:  29th is the first day of --

5           MR. CLAR:  So that's fine.  25th is

6      fine.

7           THE COURT:  September 25th at

8      10:00 o'clock for the hearing.

9           So if filed by the 9th, Mr. Agay, that

10     should be plenty of time.

11          MR. AGAY:  Yes.  Thank you.

12          MR. CLAR:  I'm sorry, September 25th

13     at --

14          THE COURT:  September 25th at

15     10:00 o'clock.

16          MR. CLAR:  At 10:00 o'clock.

17          And when was the response?

18          THE COURT:  You want a response

19     deadline?

20          MR. AGAY:  Sure, if they want one.  We

21     can respond by the 18th.

22          THE COURT:  Yeah, the 18th is good.

23          MR. CLAR:  Okay.

24          THE COURT:  Okay.  And in your notice of

25     motion, put that in, that responses are due on the

1    18th.

2              MR. CLAR:  In the motion?

3              THE COURT:  In the notice of motion.

4              MR. CLAR:  How about in the order?

5              THE COURT:  What order?  You're going to

6    file a motion on September 9th.

7              MR. CLAR:  Right.

8              THE COURT:  You're going to set it up

9    for hearing on September 25th.

10             MR. CLAR:  Correct.

11             THE COURT:  When you set it up for

12   hearing on September 25th, in your notice of motion

13   motioning it up for September 25th, say any

14   responses to it are due on September 18th.

15             MR. CLAR:  I'm just unfamiliar with

16   putting it in a notice.

17             THE COURT:  That's because you're from

18   Chicago.

19             MR. AGAY:  We're fine with that, Your

20   Honor.

21             MR. CLAR:  Well, I'm fine with it.  I

22   just don't know what it is.

23             MR. AGAY:  I'll show you.

24             MR. CLAR:  Are we talking about putting

25   it in the top where there is a hearing date?

1          THE COURT:  Talk to the guys who file in

2     Delaware.  It's done every day.

3          MR. CLAR:  Okay.  We still talk believe

4     it or not.

5          THE COURT:  Okay.  That's BMG.  That's

6     BMG.

7          And by that, what that would mean is if

8     it flies, you should have the money by the 7th.  I

9     think it was --

10          MS. SANFELIPPO:  Five days.

11          MR. CLAR:  Five days.

12          Well, I don't know what the agreement

13     says.

14          Jen, five days?

15          MS. McLEMORE:  This is Ms. McLemore for

16     the record.  Five days.

17          THE COURT:  Okay.  Thank you.

18          MR. CLAR:  Motion to sell equity.

19          THE COURT:  All right.

20          MR. CLAR:  Well, my preference would

21     have been to put Mr. Flake on today to testify as

22     to what efforts he has made to sell.

23          THE COURT:  Then he's just going to go

24     on twice because presumably he's going to go on

25     when this comes up for hearing on what the evidence

```
 1    has been.
 2            MR. CLAR:  Okay.
 3            THE COURT:  Although I would like to see
 4    those in the motion, but hopefully by then there
 5    will be even more.
 6            MR. CLAR:  Right.  By that time.
 7            MR. AGAY:  May I make a suggestion, Your
 8    Honor?
 9            THE COURT:  Sure.
10            MR. AGAY:  I think you should continue
11    this to October 7th.  I know that they want to get
12    it done today, but if they're able to get real
13    value for this, that is just good for us.  So if
14    there is value, we don't want to crater it.
15            Between now and the 7th is 30 days or
16    thereabouts.  That's a reasonable time, albeit
17    quick, to do a process and to find out if there is
18    any interest out there in the market and to
19    actually do this in a disinterested arm's length
20    way.  And maybe in the meantime we're able to
21    improve value and maybe we're able on a quick basis
22    to retain a business broker.  But I think that
23    30 days is the right way to do this.
24            MR. CLAR:  A couple thoughts.  I don't
25    disagree with that usually.
```

1          My first thought was that perhaps if

2     discussions with Mr. Friedland's client or anyone

3     else lead to a better result, we can file an

4     amended motion and set up an auction procedure.

5          MR. AGAY:  Great.

6          MR. CLAR:  That's one thought.

7          THE COURT:  That's a thought, but you

8     don't need a public auction here.  This is going to

9     be a private sale, and it's fine to be a private

10    sale just as long as we know there's been fulsome

11    marketing.

12         I'm a fan of private sales.  Because the

13    auction procedure of the bankruptcy court is very

14    awkward.  It has lots of bells and whistles you

15    don't need.

16         MR. CLAR:  Well, that goes to my second

17    thought, which is that short of that, I can file an

18    amended motion setting forth all of the efforts

19    that have been made and file that to be heard on a

20    date -- I just don't know that we can wait until

21    October 7th.

22         MR. AGAY:  But then they assume they're

23    going to win on that.

24         Why not try to market this stuff?

25         MR. CLAR:  Well, we will.  We will in

1    the meantime try to market it.

2              I'll leave it up to Your Honor.  I

3    honestly don't --

4              THE COURT:  I'm thinking the alternative

5    is we can do that on the 25th when we're here.

6              MR. CLAR:  25th?

7              THE COURT:  September 25th when we're

8    here on BMG.

9              MR. CLAR:  To do the sale motion?

10             THE COURT:  We can do the sale motion at

11   that time.

12             MR. CLAR:  That would be great.

13             THE COURT:  It's a couple weeks worth of

14   marketing efforts.  I'm sure there's not a huge

15   market out there for this, but we need to know

16   efforts have been made and what they are.

17             MR. CLAR:  Okay.

18             THE COURT:  So why don't we set it up

19   for the 25th also at 10:00.

20             In the meantime, share information.  We

21   don't need Mr. Flake on the stand to tell me the

22   marketing efforts.  We need Mr. Flake to be telling

23   these folks who have an interest in this asset --

24             MR. CLAR:  Right.

25             THE COURT:  -- potentially the marketing

1    efforts.

2              MR. CLAR:  We have dealt with the motion

3    to dismiss the adversary complaint already.

4              MR. AGAY:  Yes.

5              MR. CLAR:  There's also -- Mr. Nguyen

6    and I are thinking the same way on this anyway.

7              Oh, the motion to exceed -- oh, motion

8    to enter into general commercial lease, I think

9    we've already continued that to the 7th, have we

10   not?

11             THE COURT:  If not, we will.

12             MR. CLAR:  Yeah, okay.

13             And then the Nasdaq motion.

14             THE COURT:  The Nasdaq motion.  You want

15   to carry it with the sale motion?

16             MR. CLAR:  Yes, absolutely.

17             THE COURT:  All right.  Then that is up

18   on the 25th also.

19             MR. CLAR:  Okay.

20             I think we better go through this again.

21             THE COURT:  On the motion to exceed the

22   page limit, I will grant that.

23             MR. CLAR:  Yes.

24             THE COURT:  Yes.

25             The lien.

1          MR. CLAR:  Yes.

2          THE COURT:  I know.  I received a

3    stipulation.  Now you know the next date.

4          MR. CRAIG:  And as Your Honor has done

5    several other times, what I would propose is that

6    they make advanced payments through the 7-day

7    period following October 7th would be October 14th.

8    And the same stipulation.  We have to submit a

9    revised stipulation with the true up.  True ups are

10   working.  They're cutting their power somehow.

11   Maybe it's because it's less machines.  I don't

12   know.

13         THE COURT:  Well, there are less

14   machines.

15         MR. CRAIG:  But identical to what has

16   happened the last several times is it's the

17   advanced payments for a week later, which is

18   October 14th, would be based on a reduced per diem

19   usage of 17,500, which is down from 22,500 at the

20   beginning of the case.

21         THE COURT:  All right.

22         MR. CLAR:  We've agreed to the

23   stipulation already.

24         THE COURT:  Yes, and I think that's

25   fine.  It just has to be revised with the revised

1    dates.

2                 MR. AGAY:  We just would like to see a

3    copy of it.

4                 MR. CRAIG:  We'll send a copy to you.

5                 THE COURT:  It looks like all the

6    others.

7                 MR. CRAIG:  Yes.

8                 MR. TORF:  And, Dave, you were copied on

9    the e-mail yesterday.

10               MR. CRAIG:  And local counsel has been

11   submitting it to your chambers.

12               Thank you, Your Honor.

13               THE COURT:  Okay.

14               MR. CLAR:  I think that's it, but do we

15   want to go back through this again one more time to

16   make sure we have everything?

17               THE LAW CLERK:  Yes.

18               THE COURT:  You want to go back through

19   it?  Okay.  Let's make sure you have it on line

20   items because they don't always say what they're

21   supposed to say.

22               MR. CLAR:  Okay.  Looking at the call

23   and from the beginning, the motion to authorize

24   debtors to file a combined joint plan, that's been

25   approved.

1        THE COURT:  Granted.

2        MR. CLAR:  The motion to extend time to

3   assume or reject lease for the Hoffland company,

4   that's been continued to August 7th.

5        MR. LEWANDOWSKI:  No, that's been

6   granted.

7        MR. CLAR:  Oh, that's been granted?  I'm

8   sorry.  That's why we're doing this again.

9        THE COURT:  That has been granted, and

10  you have got until August 9th.

11       MS. ANGELINO:  October.

12       THE COURT:  October.

13       MR. CLAR:  October 9th, right.  Okay.

14  Thank you, Dennis.

15       MS. ANGELINO:  You can have until

16  August 9th, that's okay.

17       MR. CLAR:  The motion for relief from

18  stay is continued to October 7th.

19       The motion to authorize debtor to enter

20  into office space, which I think office service

21  agreement --

22       THE COURT:  That's the Chicago office.

23       MR. CLAR:  That's Chicago.  It is

24  continued.

25       THE COURT:  It's continued, but would

1   you rather continue that to the 25th of September?

2              MR. CLAR:  I would.

3              THE COURT:  Because if we approve the

4   sale, that may make sense.

5              MR. CLAR:  I would.

6              THE COURT:  All right.

7              MR. CLAR:  Let me make sure I have that.

8              THE COURT:  That's Line Number 7.  So

9   that's September 25.

10             MR. CLAR:  Yeah.  All right.

11             Motion for relief from stay, BMG, we

12  have a -- we're supposed to file a motion by the

13  9th.

14             THE COURT:  That's September 25.

15             MR. CLAR:  And September 25 at

16  10:00 o'clock.

17             THE COURT:  And that has a response

18  deadline of the 18th of September.

19             MR. CLAR:  Right.

20             The motion to -- oh, this is Nasdaq.

21             THE COURT:  The Nasdaq agreement.

22             MR. CLAR:  Yes.  That goes over to --

23             THE COURT:  September 25.

24             MR. CLAR:  -- 25th, right.

25             Motion to use cash collateral to --

1          THE COURT:  October 7th.

2          MR. CLAR:  -- October 7th.

3          Motion to authorize debtor to enter into

4     general commercial lease.

5          THE COURT:  That's the Virginia Beach.

6          MR. CLAR:  That's Virginia Beach.

7          MR. AGAY:  I think that should be

8     continued, Your Honor.

9          MR. CLAR:  Oh, that should be continued,

10    no question.

11         THE COURT:  That's October 7th.

12         MR. CLAR:  October 7th is fine.

13         Motion to sell or lease property, that's

14    the 25th.

15         THE COURT:  Right.

16         MR. CLAR:  Motion to dismiss, we have

17    dates.

18         THE COURT:  And we have a briefing

19    schedule on that already.

20         MR. CLAR:  Right.

21         And then we've dealt with Dominion

22    already.

23         That's it.

24         THE COURT:  Okay.

25         MR. CLAR:  Thank you, Your Honor.

1          THE COURT:  Okay.

2          MR. AGAY:  Thank you.

3          THE CLERK:  All rise.

4          Court is adjourned.

5               (Which were all the proceedings had

6                in the above-entitled cause,

7                September 4, 2019, 10:00 a.m./2:00

8                p.m.)

9

10   I, MARY C. KELLY, CSR, DO HEREBY CERTIFY THAT THE
     FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF
11   PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE.(f)

12

13

14

15

16

17

18

19

20

21

22

23

24

25