## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 7** |
| | ) | |
| **BCause Mining LLC,** *et al.* | ) | **Case No. 19-10562** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |
| | ) | **Hon. Janet S. Baer** |
| | ) | |

### NOTICE OF MOTION

**TO:**   **See attached list**

PLEASE TAKE NOTICE that on **July 13, 2022**, at the hour of **10:00 a.m.**, I will appear before the Honorable Janet S. Baer, United States Bankruptcy Judge or any judge sitting in that judge's place, and present the **MOTION OF TRUSTEE FOR SUBSTANTIVE CONSOLIDATION OF DEBTORS' ESTATES AND FOR RELATED RELIEF** (the "Motion"), a copy of which is attached.

**This motion will be presented and heard electronically using Zoom for Government**. No personal appearance in court is necessary or permitted.  To appear and be heard on the Motion you must do the following:

**To appear by video**, use this link: https://www.zoomgov.com/.  Then enter the meeting ID and password.

**To appear by telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666.  Then enter the meeting ID and password.

**Meeting ID and password**.  The meeting ID for this hearing is 160 731 2971 and the password is 587656.  The meeting ID and password can also be found on the judge's page on the court's web site.

**If you object to this motion** and want it called on the presentation date above, you must file a Notice of Objection no later than two (2) business days before that date.  If a Notice of Objection is timely filed, the motion will be called on the presentation date.  If no Notice of Objection is timely filed, the court may grant the motion in advance without a hearing.

Dated:  June 20, 2022

Alex Moglia, Chapter 7 Trustee of the
Bankruptcy Estates of BCause Mining LLC
and BCause LLC

By: /s/ Michael M. Schmahl
     Michael M. Schmahl

1

Michael M. Schmahl
MASON POLLICK & SCHMAHL LLC
70 W. Hubbard, Suite 304
Chicago, Illinois  60654
(312) 312-5531
mschmahl@mps-law.com
*Counsel to the Trustee*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned states under penalty of perjury that on June 20, 2022, he caused the above Notice of Motion and the Motion to be served on the individuals listed on the below service list via the court's ECF system for those who are registered except for the individuals or entities that are identified to have been served by email whom the undersigned caused to be served by email as indicated on the attached service list.

By: /s/ Michael M. Schmahl
Michael M. Schmahl

**SERVICE LIST**

Patrick S. Layng
Ha M. Nguyen
Office of the U.S. Trustee
219 S. Dearborn Street
Room 873
Chicago, IL 60604
Ha.nguyen@usdoj.gov
*United States Trustee*

David A Agay
Maria G Carr
Shara C Cornell
McDonald Hopkins LLC
300 N. LaSalle
Chicago, IL 60654
312-280-0111
dagay@mcdonaldhopkins.com
mcarr@mcdonaldhopkins.com
scornell@mcdonaldhopkins.com
*Counsel for WESCO Distribution, Inc.*

J Mark Fisher
Sarah K Angelino
Schiff Hardin LLP
233 South Wacker Drive
Suite 7100
Chicago, IL 60606
(312) 258-5861
mfisher@schiffhardin.com
sangelino@schiffhardin.com
Dennis Lewandowski, via email sent to:
dtlewand@kaufcan.com
*Counsel for Hoffland Properties, Inc.*

Marc Ira Fenton
Jamie L Burns
Levenfeld Pearlstein LLC
2 N Lasalle St Ste 1300
Chicago, IL 60602
312-346-8380
mfenton@lplegal.com
jburns@lplegal.com
*Counsel for W-R2 Jefferson Owner VIII, LLC*

John M Craig
Law Firm of Russell R Johnson
III, PLC
14890 Washington Street
Haymarket, VA 20169
russell@russelljohnsonlawfirm.com
*Counsel for Dominion Energy Virginia*

Shelly A. DeRousse
Devon J Eggert
Elizabeth L Janczak
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
312-360-6315
312-360-6520 (fax)
sderousse@freeborn.com
deggert@freeborn.com
ejanczak@freeborn.com
*Counsel for Creditors' Committee*

Russell R. Johnson, III
John M. Craig
Law Firm of Russell R Johnson
III, PLC
2258 Wheatlands Drive
Manakin Sabot, VA 23103
804-749-8861
russell@russelljohnsonlawfirm.com
john@russelljohnsonlawfirm.com
*Counsel for Dominion Energy Virginia*

Brian L Shaw
Christina Sanfelippo
Fox Rothschild LLP
321 N Clark Street
Suite 1600
Chicago, IL 60654
312-517-9200
312-517-9201 (fax)
bshaw@foxrothschild.com
csanfelippo@foxrothschild.com
*Counsel for BMG Operations Ltd.*

Jennifer M McLemore
Williams Mullen
200 South 10th Street
Richmond, VA 23219
(804)420-6330
jmclemore@williamsmullen.com
*Counsel for BMG Operations Ltd.*

Jason M Torf
Ice Miller LLP
200 W. Madison St.
Suite 3500
Chicago, IL 60606
312-726-6244
312-726-6214 (fax)
jason.torf@icemiller.com
*Counsel for Dominion Energy Virginia*

Debra Devassy Babu
Askounis & Darcy, PC
444 N. Michigan Avenue
Suite 3270
Chicago, IL 60611
312-784-2400
312-784-2410 (fax)
ddevassy@askounisdarcy.com
*Counsel for CCA Financial, LLC*

Lindsey Conley
Hinshaw & Culbertson LLP
151 N. Franklin Street, Suite 2500
Chicago, IL 60606

Jason M Torf
Ice Miller LLP
200 W. Madison St.
Suite 3500
Chicago, IL 60606
312-726-6244
312-726-6214 (fax)
jason.torf@icemiller.com
*Counsel for Dominion Energy Virginia*

Scott R Clar
Arthur G Simon
Jeffrey C Dan
Crane, Simon, Clar & Dan
135 S Lasalle Suite 3705
Chicago, IL 60603
312 641-6777
312 641-7114 (fax)
sclar@cranesimon.com
asimon@cranesimon.com
jdan@cranesimon.com
*Counsel for the Debtors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| **BCause Mining LLC,** *et al.* | ) | Case No. 19-10562 |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |
| | ) | Hon. Janet S. Baer |
| | ) | |

**MOTION OF TRUSTEE FOR SUBSTANTIVE CONSOLIDATION
OF DEBTORS' BANKRUPTCY ESTATES AND FOR RELATED RELIEF**

Alex D. Moglia (the "Trustee"), not individually, but solely as trustee of the chapter 7

bankruptcy estates of BCause Mining LLC ("BC Mining") and BCause LLC[1] ("BC Holding"

and collectively with BC Mining, the "Debtors"), hereby moves this Court for entry of an order

substantively consolidating the assets, liabilities and bankruptcy estates of BC Mining and BC

Holding into a single, consolidated bankruptcy estate and granting related relief, and, in support

thereof, respectfully states as follows:

## INTRODUCTION

1.      Through this Motion, the Trustee seeks to substantively consolidate the Debtors'

estates.

2.      Prior to the commencement of these jointly administered bankruptcy cases, the

Debtors operated as a single, intertwined enterprise under the exclusive management of BC

Holding's board and officers and operated exclusively by employees of BC Holding.  BC Mining

did not have the ability to stand independently of BC Holding.

---

[1] BCause LLC is the debtor in bankruptcy case number 19-10731.

5

3.    The Debtors had two primary sources of funding: (a) operational revenues from a data center where customers paid monthly fees (as further defined below, the "Mining Business"); and (ii) the proceeds of equity, quasi equity, and/or debt investments in BC Holding. Various contracts related to the Mining Business were nominally entered in either the names of BC Mining or BC Holding without any apparent rational basis.  Irrespective, all contract were signed by officers of BC Holding, and all revenue and investment proceeds were paid directly to BC Holding, which held the Debtors' only bank account, and all expenses were paid in BC Holding's name, irrespective of name tied to or the purpose of the expense.

4.    The Debtors' maintained consolidated financials and did not track the source of deposits into the bank account or otherwise track intercompany transfers or transfer any assets between themselves.  They did not maintain separate balance sheets and filed joint tax returns.

5.    As a result, the assets and liabilities of the Debtors are commingled and confused. This confusion is reflected in the claims filed in these cases.

6.    Currently, there is approximately $121,452.69 in the estate of BC Holding and $0.00 in the estate of BC Mining.

7.    The Trustee recently filed a separate motion seeking the Court's approval of a settlement with Virginia Electric and Power Company d/b/a Dominion Energy Virginia ("Dominion") that would, among other things settle an adversary proceeding (the "Dominion Adversary") initiated by the Trustee against Dominion in which the Trustee seeks to recover five allegedly preferential pre-bankruptcy transfers to Dominion based on three alternative theories brought on behalf of each of the Debtors and a potential substantively consolidated estate.  Each theory seeks to recover the same transfers and result in Dominion paying $700,000 (the "Dominion Settlement Amount") to the Trustee.

6

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this motion (the "Motion") pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (O).

9.      Venue in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

10.      On or about April 11, 2019 (the "BC Mining Petition Date"), BC Mining filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

11.      On or about April 12, 2019 (the "BC Holding Petition Date" and, collectively with the BC Mining Petition Date, the "Petition Dates"), BC Holding filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

12.      On or about May 8, 2019, the Court entered an order [**Docket No. 72**] directing that the Debtors' bankruptcy cases be jointly administered under the above caption.

13.      On October 8, 2019 (the "Conversion Date"), the Court converted these cases to cases under Chapter 7 of the Bankruptcy Code (Docket No. 319).

14.      On October 11, 2019, the U.S. Trustee appointed Alex D. Moglia as trustee ("Trustee") (Doc No. 334).

## THE DEBTORS' INTERTWINED BUSINESS, CLAIMS AND THE ESTATES

### A.  The Debtors

15.      In or about December 4, 2013, BC Holding was formed as a Virginia limited liability company. On information and belief, BC Holding originally mined and/or invested in Bitcoin and/or other cryptocurrencies.

7

16. During the period from approximately 2015 through 2017, BC Holding formulated a plan to dramatically alter and expand its business operations by developing several new businesses, including, without limitation, a data center or cryptocurrency farm in which third parties would house and operate their computers (i.e. computers owned by third parties) to mine cryptocurrency in exchange for payment of monthly fees (the "Mining Business"), an online consumer-facing cryptocurrency exchange where consumers could exchange cryptocurrency for money (the "Spot Exchange"), and both a futures exchange for cryptocurrency and/or derivatives and a clearing house for all of the related transactions.

17. In short, BC Holding intended to shift from a Bitcoin investment business to owning and operating a complete universe of services and operating platforms where third-party cryptocurrency investors could mine, invest, trade and convert their cryptocurrency into cash.

18. To execute on this plan, BC Holding raised capital from equity investors through the sale of membership interests in BC Holding (at different times, BC Holding also raised capital through the sale of convertible notes and other quasi-equity or debt instruments). BC Holding intended to use this capital as well as the expected proceeds from the operation of the Mining Business fund the further development of the Mining Business as well as to develop the other business lines.

19. As a result, BC Holding is owned by a diverse group of equity holders comprised of investors.  BC Holding also issued membership units or profits interests in BC Holding as incentive compensation to various employees.

20. In connection with this plan, in 2017, BC Holding and its equity investors executed a restated operating agreement to provide for the election of a board of managers (the "Board"), the appointment of officers, the creation of different classes of equity interests or

membership units (i.e. common membership units and one or more layers of preferred membership units), and the creation and distribution of so-called "profits interests" or "profits units" akin to stock options that were distributed among employees as incentive compensation. Additionally, BC Holding's restated operating agreement contained provisions intended to accommodate the registration and trading of BC Holding's equity on the public equity markets. In short, although BC Holding is a limited liability company, it was designed to run similarly to a corporation, though it is taxed as a partnership.

21.     In 2017, BC Holding also formed several different limited liability companies that it owns as wholly-owned subsidiaries. Nominally, each appears to have been intended to become connected with BC Holding's various planned new business models.  BC Mining is one of these wholly owned subsidiaries.

22.     Nonetheless, at all relevant times prior to the Petition Dates, no steps were taken to provide BC Mining, or any other subsidiary[2], with capital, management, employees or anything else to render it capable of operating or owning or holding assets independently from BC Holding. At all relevant times:

  a.  BC Holding's Board directly oversaw, managed, planned and made decisions relating to the development and operation of the Mining Business and all of the other planned lines of business in meetings scheduled by BC Holding;

---

[2] Although not relevant to this Motion, the Trustee understands that one or more applications for certain state licenses required for the operation of the planned Spot Exchange may have been submitted to various states prior to the Petition Dates in the name of a non-debtor subsidiary.  Nonetheless, prior to the Petition Dates, that subsidiary never had any managers, employees, assets or bank accounts and did not enter into any contracts that are known to the Trustee.

b.  BC Holding had no material business operations other than administrative functions and the development of the Mining Business and the other planned business lines;

c.  BC Mining (or any other subsidiary) never elected managers or had a board;

d.  BC Mining (or any other subsidiary) never held a management meeting;

e.  BC Mining (or any other subsidiary) had no officers, employees or anyone else to look out for its independent self-interest, handle its affairs or otherwise operate as an individual entity;

f.  BC Holding's officers managed the development and operation of the Mining Business and the development of the other planned business lines with employees of BC Holding;

g.  BC Holding's Board expressly authorized BC Holding's officers to sign documents and agreements on behalf of BC Holding and BC Mining;

h.  When documents were executed under BC Mining's name, BC Holding's officers signed them, generally using their titles at BC Holding;

i.  BC Holding maintained the sole payroll and employed all employees, irrespective as to whether an employee served an administrative or management function, worked on the Mining Business or on the development of any other the business line;

j.  All proceeds from debt and equity investments in BC Holding and all revenue from operations, whether from the Mining Business, including monthly fees paid under the hosting agreements, or anything else, were received and deposited into

bank accounts (the "Universal Account")[3] held exclusively in BC Holding's name;

k.  All expenses, including all costs related to the build out and operation of the Mining Facility, rent under Mining Facility lease, development of the Spot Exchange and other planned lines of business, payroll and other administrative and professional services, were paid in BC Holding's name out of the Universal Account irrespective as to the source of the funds or the reason the expense was incurred;

l.  BC Mining (or any other subsidiary) never set up a bank account in its own name;

m.  There were no service or other intercompany agreements between BC Holding and BC Mining (or any other subsidiaries);

n.  The Debtors maintained consolidated financial statements;

o.  The Debtors did not record or track or take any steps to documents any inter-company transactions, otherwise keep track of the source of the deposits into the Universal Account or whether payments from the Universal Account were intended to benefit BC Holding, the Mining Business or any other prospective line of business;

p.  The Debtors did not maintain separate balance sheets and did not differentiate ownership of assets between themselves; and

---

[3] Originally, the Universal Account consisted of two accounts at a bank in Virginia.  In December 2018, those two bank accounts were closed and replaced by a new, single account located at a bank in Chicago.  In all cases, the accounts were held solely in the name of BC Holding.  At no time were any of these accounts used specifically for the Mining Business.

q.  The Debtors filed consolidated tax returns as pass through entities that passed any resulting net income or loss on to BC Holding's members.

23.    BC Holding's Board conducted regular meetings at which the Board directly discussed and managed all of the Debtors' affairs, including the Mining Business, the development of the other planned business lines, prospective investment in BC Holding, and all other matters.

24.    The principal revenue driver of the Mining Business was a leased warehouse (the "Mining Facility") in Virginia Beach, Virginia, that the Debtors converted into a data center to host specialized mining computers owned by customers who would pay monthly fees pursuant to various hosting agreements. The lease for the Mining Facility, the hosting agreements, and some other agreements related to the Mining Business were nominally entered in BC Mining's name but were signed by BC Holding's officers.  However, other agreements related to the build out of the Mining Facility and operation of the Mining Business were also executed in BC Holding's name by BC Holding's officers, including, among others, the never completed build out of a fire suppression system in the Mining Facility, internet services for the Mining Facility, and other materials and services.  Further, BC Holding generally issued invoices for monthly fees to customers under BC Holding's name and all related services were provided by BC Holding's employees.

25.    The Debtors' did not maintain an arm's length relationship, and there does not appear to have been a rational justification for determining which Debtors' name was nominally used to acquire materials and services or enter into agreements related to the Mining Business.

26.    Irrespective, every customer under a hosting agreement nominally executed under BC Mining's name paid fees directly to and received invoices from BC Holding.  Similarly, the

12

lessor under the Mining Facility lease and every supplier, vendor and service provider with an agreement nominally under BC Mining's name was paid by BC Holding and directly interacted with employees of BC Holding.

27.     In early 2018, the Mining Facility became operational.  BC Holding issued a press release publicizing the launch of the Mining Business by BC Holding.  The press release failed to identify BC Mining.

28.     The Debtors operated at all times as a single, unified or intertwined enterprise.

**B.  Claims Against Debtors' Estates**

29.     These ambiguous circumstances are generally reflected in confusion among the proofs of claim filed against the Debtors' estates.

30.     The following summary of the claims asserted against the Debtors' estates is not intended to be complete and precise description of every claim asserted against the Debtors' estates.  Furthermore, the Trustee is still reviewing certain claims and nothing herein is intended nor should be construed as an admission regarding any claim or expense asserted against the Debtors' estates.  The Trustee expressly reserves all of his rights to object to and otherwise challenge any and all claims and expenses, of any type or asserted priority, asserted against either or both of the Debtors' estates.

Proofs of Claim Filed Against BC Mining

31.     A total of 35 proofs of claim have been filed against BC Mining totaling approximately $14,827,187.78.[4]

32.     Of these claims:

---

[4] These figures include all claims, including certain claims that have since been released pursuant to Court-approved settlement agreements with WESCO Distribution, Inc. [Claim No. 2-1 on the BC Mining Claims Register] and BMG Operations Ltd. [Claim No. 17-1 on the BC Mining Claims Register].

a.  Approximately 23 claims, totaling approximately $3,320,000, filed against BC Mining are based on agreements entered with BC Holding rather than BC Mining and were filed by: (i) trade vendors based on contracts with, invoices issued to and purchase orders and other documents issued by BC Holding; (ii) investors in BC Holding based on debt or quasi-debt instruments, such as convertible promissory notes (under which debt may be converted into equity or membership units in BC Holding), or other contracts with BC Holding; or (iii) employees of BC Holding, at least the majority of who did not principally work in the Mining Business, for purportedly unpaid salary, wages or benefits even though BC Mining had no employees or payroll and did not provide any benefits;

b.  Approximately, 10 claims totaling approximately $3,515,000, were filed against both BC Holding and BC Mining[5]; and

c.  The single largest claim asserted against BC Mining, a general unsecured claim of over $6.8 million is principally based on money advanced to BC Holding, not BC Mining, that was being slowly reimbursed through relatively small credits against monthly fees owed by the creditor under a hosting agreement nominally entered with BC Mining though signed by an officer of BC Holding.

33.     In total, over $12 million of the approximately $14.8 million in proofs of claim asserted against BC Mining are either based on agreements with BC Holding (based on the documents attached to the proofs of claim) or are asserted against both of the Debtors, including claims filed by some but not all employees and investors in BC Holding.

---

[5] This includes some but not all employee wage and benefits claims and some but not all of the debt and quasi-debt claims of investors.

34.     The remaining approximately $2.8 million are comprised of approximately 10 claims that appear to be asserted: (i) by parties to contracts nominally with BC Mining (though signed by officers of BC Holding), principally hosting agreements for space in the Mining Facility (approximately 5 claims), the lease for the Mining Facility (approximately 1 claim), and a utility contract for electricity to the Mining Facility (approximately 1 claim); (ii) third parties related to the importation of a customer's mining computers that were hosted in the Mining Facility under a hosting agreement (2 claims); and (iii) by the U.S. Trustee for unpaid fees during the Chapter 11 portion of these cases.

Proofs of Claim Filed Against BC Holding

35.     There are 43 proofs of claim filed against BC Holding asserting claims totaling approximately $6,267,114.18.[6]

36.     Of these claims, approximately 10 claims totaling approximately $3,515,000, were filed against both BC Holding and BC Mining.

37.     Approximately 29 claims appear to have been filed by either (i) investors in BC Holding based on debt or quasi-debt instruments, such as convertible promissory notes (under which debt may be converted into equity or membership units in BC Holding), or other contracts with BC Holding, or (ii) employees of BC Holding for purportedly unpaid salary, wages or benefits.

38.     Approximately 6 claims totaling approximately $1,278,000 appear to be related to goods and services acquired under BC Holding's name for the development and operation of its

---

[6] These figures include the proof of claim filed by WESCO Distribution, Inc. [Claim No. 1-1 on the BC Holding Claims Register] that has since been released pursuant to Court-approved settlement agreements with WESCO Distribution, Inc.

planned new business lines, principally including the Mining Business and portions of the buildout of the Mining Facility along with internet access for the Mining Facility.

39.     Approximately 4 claims, totaling approximately $200,000, appear to be related to administrative offices leased under BC Holding's name, including lease rejection damages claims, from which the BC Holding managed, planned and developed all of the new business lines, including the Mining Business.

40.     The remaining approximately 5 claims totaling approximately $34,000 were filed by taxing authorities (mainly related to employment taxes) and the US Trustee, for unpaid Chapter 11 fees.

Chapter 11 Administrative Claims

41.     The Court previously approved, as Chapter 11 administrative claims, the following:

   a.  professional fees for Debtors' counsel totaling $225,386.97 [Docket No. 397] ("Debtor's Fees"), which were not allocated between the Debtors' estates;

   b.  professional fees for counsel to the Committee of Unsecured Creditors totaling $118,357.95 [Docket No. 395] (along with the Debtor's Fee, the "Ch. 11 Professional Fees"), which were not allocated between the Debtors' estates; and

   c.  $275,000 for BMG Operations Ltd. [Docket No. 487] for which the Debtors' estates are jointly and severally liable.

42.     Additionally, the U.S. Trustee filed proofs of claim asserting Chapter 11 administrative expenses against BC Holding's estate of $6,825 [Claim No. 38-1 on the Claims Register for BC Holding] and against BC Mining's estate of $25,230.68 [Claim No. 28-1 on the Claims Register for BC Mining].

43.    Finally, the Trustee understands that St. Bitts LLC d/b/a Bitcoin.com asserts a Chapter 11 administrative expense claim for approximately $370,595.50 against BC Mining.

44.    The Trustee disputes the Chapter 11 administrative expense claim asserted by St. Bitts LLC d/b/a Bitcoin.com and is hopeful of reaching an agreed resolution to such claim in the near future.

**C. Debtors' Estates**

45.    There is currently approximately $121,452.69 in BC Holding's estate and $0.00 in BC Mining's estate.

46.    Assuming that the Court approves the proposed settlement with Dominion, the Trustee will receive the Dominion Settlement Amount of $700,000.00.   The settlement with Dominion resolves alternative claims asserted on behalf of the two Debtors' estates.

47.    In the event that this Motion is not granted, the allowed Ch. 11 Professional Fees and the Dominion Settlement Amount will have to be allocated between the Debtors' estates.

**RELIEF REQUESTED**

48.     Through this Motion, the Trustee seeks to substantively consolidate the Debtors' estates into a unified pool of assets and claims.

**ARGUMENT**

49.    Substantive consolidation is intended to ensure the equitable treatment of creditors, *see Eastgroup Properties v. Southern Motel Assoc., Ltd.*, 935 F.2d 245, 248 (11th Cir. 1991); *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2nd Cir. 1988), and allows a court to disregard the separateness of two or more entities and treat their assets and liabilities as if they were held by a single entity. *See Reider v. Fed. Deposit Ins. Corp. (In re Reider)*, 31 F.3d 1102,

17

1107 (11th Cir. 1994). The doctrine is made applicable under Section 105 of the Bankruptcy Code. *See Fid. & Deposit Co. of Md. v. U.S. Bank N.A. (In re Kimball Hill, Inc.)*, 2014 U.S. Dist. LEXIS 155921, *6 (N.D. Ill. Nov. 4, 2014).

50.     The Court of Appeals for the Seventh Circuit has not directly addressed substantive consolidation, however, the doctrine has been acknowledged by the Supreme Court, *see Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941), and approved by numerous courts of appeal under the Bankruptcy Code. *See In re Gulfco Invest. Corp.*, 593 F2d 921 (10th Cir. 1979); *Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.)*, 810 F.2d 270 (D.C. Cir. 1987); *Augie/Restivo*, 860 F.2d 515; *Eastgroup Properties*, 935 F.2d 245; *In re Hemingway Transp., Inc.*, 954 F.2d 1 (1st Cir. 1992); *In re Giller*, 962 F.2d 796) (8th Cir. 1992); *Alexander v. Compton* (*In re Bonham*), 229 F.3d 750 (9th Cir. 2000); *In re Owens-Corning*, 419 F.3d 195 (3rd Cir. 2005). As a result, courts have applied varying tests or factors in evaluating substantive consolidation.

51.     The propriety of its application is evaluated on a case-by-case basis. *See FDIC v. Colonial Realty Co.*, 966 F.2d 57 (2nd Cir. 1992).

52.     Generally, substantive consolidation results in "pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund." *Augie/Restivo*, 860 F.2d 515, 518. It is a flexible doctrine, however, and the Court has the power to modify substantive consolidation as may be appropriate for these Debtors' estates. *See In re Standard Brands Paint Co.*, 254 B.R. 563, 570 (Bankr. C.D. Ca. 1993); *see also In re Parkway Calabasas, Ltd.*, 89 B.R. 832, 837-838 (Bankr. C.D. Ca. 1988) (listing cases and examples of how substantive consolidation may be modified); *Owens-Corning*, 419 F.3d at 208, FN 13 (listing cases and example of the application of substantive consolidation in different contexts).

18

53.     The leading tests are either factor based, *see Augie/Restivo*, 860 F.2d at 518; *Bonham*, 229 F.3d at 766, or balancing approaches. *See Auto-Train*, 810 F.2d at 276; *Eastgroup*, 935 F.2d at 249; *In re Archdiocese of Milwaukee*, 483 B.R. 693, 699 (Bankr. E.D. Wis. 2012) (identifying the two tests).

54.     Under *Augie/Restivo*, substantive consolidation is appropriate if **either** (i) creditors dealt with the Debtors as a single unit without relying on their separate identity, **or** (ii) the Debtors' affairs are so entangled that substantive consolidation will benefit all creditors because untangling them is impossible or prohibitively costly.  *See* 860 F.2d at 518-519; *Bonham*, 229 F.3d at 766 (adopting the *Augie/Restivo* test); *In re World Access, Inc.*, 301 B.R. 217, 272-274 (Bankr. N.D. Ill. 2003) (applying *Augie/Restivo*); *see also Owens-Corning*, 419 F.3d at 211-212 (establishing nearly identical factors).

55.     *Auto-Train* incorporates the *Augie/Restivo* factors and then applies a burden-shifting balancing test under which the Trustee must first establish a *prima facie* case for substantive consolidation by demonstrating (i) a substantial identity between the Debtors and (ii) that consolidation will either avoid some harm or realize some benefit. *See Auto-Train*, 810 F.2d at 276; *Eastgroup*, 935 F.2d at 249. Upon this showing, it is presumed that creditors have not relied on the independent credit of the Debtors, and the burden shifts to any objecting creditor to demonstrate that both (a) it actually and reasonably relied on the separate credit of one of the Debtors and (b) would be prejudiced by substantive consolidation.  *See id.* If an objecting creditor carries this burden, the Court may then still order substantive consolidation if the Court determines that the benefits "heavily" outweigh the harm.  *See id.*

56.     Both the *Augie/Restivo* factors and the *Auto-Train prima facie* case are evaluated using the same or substantially similar considerations. *See Augie/Restivo*, 860 F.2d at 518-519

(collecting factors analyzed by numerous courts and consolidating or distilling those factors into the *Augie/Restivo* two-factor test); *Eastgroup*, 935 F.2d at 249 (adopting *Auto-Train* and applying similar factors to evaluate *prima facie* case). The most widely-cited criteria include:

    a.   Commingling of assets and business functions;

    b.   Degree of difficulty segregating and ascertaining individual assets and liabilities;

    c.   Existence of parent and intercorporate guarantees of loans;

    d.   Transfer of assets without observance of corporate formalities;

    e.   Use of consolidated financials;

    f.   Unity of interests and ownership between entities; and

    g.   Profitability of consolidation at a single physical location.

*See In re Vecco Construction Indus.*, 4 B.R. 407, 410 (Bankr. E.D. Va. 1980); *Bonham*, 229 F.3d at 765, FN 10 (citing *Vecco* and adopting *Augie/Restivo*); *Eastgroup*, 935 F.2d at 249 (*citing Vecco*).

57.    The *Vecco* factors are non-exclusive, and the *Eastgroup* court further considered: (i) whether the parent owned a majority position in a subsidiary; (ii) if the debtors shared common officers and directors; (iii) if the subsidiary was grossly undercapitalized; (iv) whether the subsidiary primarily did business with the parent; and (v) if both debtors disregarded the legal requirements of the subsidiary as a separate entity. *See Eastgroup*, 935 F.2d at 249. The presence or absence of any individual factor is not determinative. *See id.* at 249-250.

58.    These cases should be consolidated under these tests.

59.    The Debtors are not merely intertwined but conjoined. BC Holding wholly owned and directly managed and operated BC Mining. BC Mining had no board, no officers, no employees, no bank account, and no ability to do anything. To the extent that a limited number

of agreements were nominally entered under BC Mining's name, they were all signed by BC Holding's officers and actually administered by BC Holding. BC Holding issued invoices under the hosting agreements, monthly fees were paid to BC Holding directly, and BC Holding's employees provided all services under those agreements. Similarly, BC Holding paid, in its own name, the rent under the lease for the Mining Facility and all other bills issued to BC Mining. The Debtors did not observe any corporate formalities with respect to BC Mining and, at the very least, commingled business functions.

60.    Other than the proceeds of periodic investments from investors, BC Holding had no material source of funding other than the fees under the hosting agreements. The Debtors maintained consolidated financial statements and filed joint tax returns but never tracked the source of deposits into the Universal Account, whether that money was spent on expenses related to the Mining Business, administrative or professional functions or any other developing business lines, or made any other attempt to record transactions between them. That materials and services for the Mining Facility and the Mining Business were acquired nominally under each of the Debtors' names further blurs any individual asset ownership and responsibility for individual liabilities between the Debtors. This confusion is reflected in the proofs of claim filed in these cases.

61.    Moreover, all creditors were either paid by or received services from and otherwise actually did business with BC Holding, irrespective of the Debtor name on an agreement. Further, BC Holding's activities, including relationships with all creditors, were largely funded by the monthly fees received under the Mining Business' hosting agreement. Therefore, it is difficult to comprehend how any creditor could have reasonably relied on the independence of either Debtor.

62.     Substantive consolidation will allow creditors to receive distributions under the provisions of the Bankruptcy Code, rather than based on the Debtors' whim in nominally entering into an obligation in the name of BC Mining or BC Holding without any rational basis, and avoid the need to allocate claims, the allowed Ch. 11 Professional Fees and the Dominion Settlement Amount.

63.     The Trustee believes that substantive consolidation is in the best interests of all creditors.  If, however, a creditor objects and can show both prejudice and that it actually and reasonably extended credit in reliance on the independence of one of the Debtors, the Court may still order substantive consolidation as the benefits heavily weigh in favor of substantive consolidation.  *See Auto-Train*, 810 F.2d at 276 ("[T]he court may order consolidation only if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm."); *Eastgroup*, 935 F.2d at 249 (consolidation appropriate if "consolidation yields benefits offsetting the harm it inflicts on objecting parties."); *In re Reider*, 31 F.3d at 1108 (same); *see also Owens-Corning*, 419 F.3d at 210 FN 16 and 212 FN 22 (questioning whether full substantive consolidation may be ordered over the prejudice of a creditor that actually and reasonably relied on independence of one debtor and expressly not addressing whether partial substantive consolidation would be appropriate).

## NOTICE AND REQUEST FOR APPROVAL OF FORM "NOTICE"

64.     The Federal Rule of Bankruptcy Procedure do not establish a specific procedure for considering substantive consolidation requests.  Courts have addressed such requests in a variety of different procedural contexts, including by motion.

65.     The Trustee has also provided a copy of this Motion to the U.S. Trustee and all parties who have entered appearances in these cases via the Court's ECF system.

66.     On June 17, 2022, the Trustee also caused a copy of the short-form Notice of this Motion, in the form attached as Exhibit 1 hereto (the "Notice"), to be mailed, via first-class U.S. Mail, postage prepaid, to all creditors and will provide a copy of this Motion with all attachments to any party who submits a request for a copy to the Trustee's undersigned counsel.  The Trustee will file a supplemental certificate of service related to the service of the Notice.

67.     The Trustee also requests that the Court approve the form of the Notice.

WHEREFORE, the Trustee respectfully requests the Court to enter orders:

A.     approving the form of the Notice;

B.     substantively consolidating the Debtors' estates, including all of their respective assets, claims and liabilities, into a single consolidated bankruptcy estate; and

C.     granting such other or further relief as the Court determines is just or appropriate.

Respectfully submitted,

Dated:  June 20, 2022

Alex Moglia, Chapter 7 Trustee of the
Bankruptcy Estates of BCause Mining LLC
and BCause LLC

By: /s/ Michael M. Schmahl
     Michael M. Schmahl

Michael M. Schmahl
MASON POLLICK & SCHMAHL LLC
ARDC # 6275860
70 W. Hubbard, Suite 304
Chicago, Illinois  60654
(312) 312-5531
mschmahl@mps-law.com
*Counsel to the Trustee*